CASE NO. 22-5

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

RICHARD TIPTON, II,

*Defendant - Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

---

## JOINT APPENDIX - VOLUME I OF III
### (Pages 1 - 496)

---

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
 FOR THE WESTERN DISTRICT
 OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720

Jeffrey L. Ertel
FEDERAL DEFENDER
PROGRAM, INC.
101 Marietta Street NW, Suite 1500
Atlanta, GA 30303
404-688-7530

*Counsel for Appellant*

Joseph Attias
Richard D. Cooke
OFFICE OF THE UNITED
STATES ATTORNEY
919 East Main Street, Suite 1900
Richmond, VA 23219
804-819-5400

*Counsel for Appellee*

---

# TABLE OF CONTENTS

## VOLUME I OF III

JA Page

District Court Docket Sheet [3:92-cr-00068-DJN-1]..............................................JA1

Judgment in a Criminal Case
Entered June 1, 1993 ...................................................................................JA10

Amended Motion to Vacate Conviction Under 28 U.S.C. § 2255
In Light of *United States V. Davis*, __U.S.__, 139 S. Ct. 2319 (2019)
Filed February 22, 2022 [ECF159] ............................................................. JA14

Ex. 1:    Superseding Indictment, April 24, 1992...................................... JA61

Ex. 2:    Verdict Form, February 3, 1993 ................................................... JA84

Government's Response in Opposition
Filed 2022.04.27 [ECF172].......................................................................... JA92

Reply In Support of Motion to Vacate Conviction
and Sentence Pursuant to 28 U.S.C. § 2255
Filed June 17, 2022 [ECF179]...................................................................... JA120

Memorandum Opinion
Entered October 6, 2022 [ECF186]............................................................... JA134

Order (Denying § 2255 Motion)
Entered October 6, 2022 [ECF187]............................................................... JA164

Notice of Appeal
Filed December 5, 2022 [ECF195] .............................................................. JA165

**Transcripts:**

**Excerpt of Trial Transcript, Volume IV (January 14, 1993)** ....................... JA315

**Trial Transcript, Volume V (January 15, 1993)** ............................................... JA379

    Testimony of Gregory Taylor
        Direct Examination ................................................................. JA382
        Cross Examination .................................................................. JA398
        Redirect Examination ............................................................. JA418
        Recross Examination .............................................................. JA423

    Testimony of Dennis Patrick Malone
        Direct Examination ................................................................. JA424
        Cross Examination .................................................................. JA428

    Testimony of Anthony Howlen
        Direct Examination ................................................................. JA429
        Cross Examination .................................................................. JA435

    Testimony of Richard E. Bice
        Direct Examination ................................................................. JA446
        Cross Examination .................................................................. JA448

    Testimony of James E. McMillian, Jr.
        Direct Examination ................................................................. JA453

    Testimony of William Thomas
        Direct Examination ................................................................. JA455
        Cross Examination .................................................................. JA457

    Testimony of Antoine Brooks
        Direct Examination ................................................................. JA458
        Cross Examination .................................................................. JA469
        Redirect Examination ............................................................. JA490

iii

Testimony of Ralph Fleming
    Direct Examination........................................................................JA492
    Cross Examination.........................................................................JA493

# VOLUME II OF III

**Trial Transcript- Volume VI (January 18, 1993)** ............................................ JA497

Testimony of Charles Townes
Direct Examination ........................................................................ JA501
Cross Examination ......................................................................... JA532
Redirect Examination ..................................................................... JA574

Testimony of Jeanne Keim
Direct Examination ........................................................................ JA577
Cross Examination ......................................................................... JA580

Testimony of Maurice Saunders
Direct Examination ........................................................................ JA581
Cross Examination ......................................................................... JA606
Redirect Examination ..................................................................... JA625

Testimony of Jeanette Pauley
Direct Examination ........................................................................ JA625
Cross Examination ......................................................................... JA630
Redirect Examination ..................................................................... JA636

**Trial Transcript- Volume VII (January 19, 1993)** ........................................ JA639

Testimony of A.D. Merz
Direct Examination ........................................................................ JA640

Testimony of Fred Bolling
Direct Examination ........................................................................ JA642

Testimony of Johnny Lee Byrd
Direct Examination ........................................................................ JA642
Cross Examination ......................................................................... JA650
Redirect Examination ..................................................................... JA671
Recross Examination ...................................................................... JA672

Testimony of Sherry L. Gay
    Direct Examination ........................................................................... JA673
    Cross Examination ........................................................................... JA675

Testimony of Wayne Hines
    Direct Examination ........................................................................... JA676
    Cross Examination ........................................................................... JA681

Testimony of Richard Farmer
    Direct Examination ........................................................................... JA686
    Cross Examination ........................................................................... JA687

Testimony of George Wynn
    Direct Examination ........................................................................... JA688
    Cross Examination ........................................................................... JA692
    Redirect Examination........................................................................ JA694

Testimony of Rebecca Talley
    Direct Examination ........................................................................... JA694

Testimony of Hussone Curtis Jones
    Direct Examination ........................................................................... JA696
    Cross Examination ........................................................................... JA719
    Redirect Examination........................................................................ JA748

**Trial Transcript- Volume VIII (January 20, 1993)** ....................................... JA754

Testimony of Denise Robin Berkely
    Direct Examination ........................................................................... JA757
    Cross Examination ........................................................................... JA786
    Redirect Examination........................................................................ JA812

Testimony of Rodney Rodriguez
    Direct Examination ........................................................................... JA815
    Cross Examination ........................................................................... JA819
    Redirect Examination ....................................................................... JA822

Testimony of Ralph Fleming
    Direct Examination ...................................................................... JA822
    Cross Examination ....................................................................... JA824
    Redirect Examination ................................................................. JA827

Testimony of John Dorman
    Direct Examination ...................................................................... JA827
    Cross Examination ....................................................................... JA829

Testimony of Ralph Fleming
    Cross Examination ....................................................................... JA831
    Redirect Examination.................................................................. JA832

Testimony of Paul Tuttle
    Direct Examination ...................................................................... JA833
    Cross Examination ....................................................................... JA839

Testimony of Pamela Denise Williams
    Direct Examination ...................................................................... JA840
    Cross Examination ....................................................................... JA849
    Redirect Examination.................................................................. JA856

**Trial Transcript- Volume IX (January 21, 1993)** ......................................... JA861

Testimony of Robert "Papoose" Davis
    Direct Examination ...................................................................... JA862
    Cross Examination ....................................................................... JA877
    Redirect Examination.................................................................. JA899
    Recross Examination ................................................................... JA901

Testimony of Ronita Hollman
    Direct Examination ...................................................................... JA902
    Cross Examination ....................................................................... JA909
    Redirect Examination.................................................................. JA919

Testimony of David Burt
    Direct Examination ...................................................................... JA921
    Cross Examination ....................................................................... JA922

Testimony of Thomas Searles
    Direct Examination ..................................................................... JA923
    Cross Examination ....................................................................... JA927

Testimony of Anne D. Jones
    Direct Examination ..................................................................... JA929
    Cross Examination ....................................................................... JA934
    Redirect Examination.................................................................. JA935

Testimony of Dennis Keith Moody
    Direct Examination ..................................................................... JA936
    Cross Examination ....................................................................... JA942
    Redirect Examination.................................................................. JA950

Testimony of Dr. Marcella Fierro
    Direct Examination ..................................................................... JA951
    Cross Examination ....................................................................... JA959
    Redirect Examination.................................................................. JA964

**Trial Transcript- Volume X (January 25, 1993)** ............................... JA967

Testimony of Stanley Smithers
    Direct Examination ..................................................................... JA971
    Cross Examination ....................................................................... JA981
    Redirect Examination ................................................................. JA989

Testimony of Mary Johnson
    Direct Examination ..................................................................... JA990

Testimony of William C Brereton
    Direct Examination ..................................................................... JA991

Testimony of Gary Brunelli
    Direct Examination ..................................................................... JA993

Testimony of Anne D. Jones
    Direct Examination ..................................................................... JA996
    Cross Examination ....................................................................... JA999

Testimony of Sterling R. Hardy
    Direct Examination ...................................................................... JA1001
    Cross Examination ....................................................................... JA1017
    Redirect Examination................................................................... JA1040

Testimony of Martha Jane McCoy
    Direct Examination....................................................................... JA1043
    Cross Examination........................................................................ JA1052

Testimony of Montez Zeron McCoy
    Direct Examination ...................................................................... JA1057
    Cross Examination ....................................................................... JA1059

Testimony of Gary Brunelli
    Direct Examination ...................................................................... JA1060
    Cross Examination ....................................................................... JA1065

Testimony of Anne D. Jones
    Direct Examination ...................................................................... JA1066
    Cross Examination ....................................................................... JA1070

## VOLUME III OF III

**Trial Transcript- Volume XI (January 26, 1993)** ........................................ JA1074

Testimony of Jerry Gaiters
    Direct Examination ..................................................................... JA1075
    Cross Examination ...................................................................... JA1095
    Redirect Examination ................................................................. JA1131

Testimony of C.T. Woody, Jr.
    Direct Examination ..................................................................... JA1133
    Cross Examination ...................................................................... JA1135
    Redirect Examination ................................................................. JA1139

Testimony of Dr. Marcella Fierro
    Direct Examination ..................................................................... JA1140

Testimony of James Feefer
    Direct Examination ..................................................................... JA1148

Testimony of Thomas Searles
    Direct Examination ..................................................................... JA1153
    Cross Examination ...................................................................... JA1159

Testimony of Anne Davis Jones
    Direct Examination ..................................................................... JA1160

Testimony of Charlotte Denise Moore
    Direct Examination ..................................................................... JA1162
    Cross Examination ...................................................................... JA1166

Testimony of Santo Gutierrez
    Direct Examination ..................................................................... JA1168
    Cross Examination ...................................................................... JA1170

Testimony of Anne Davis Jones
    Direct Examination ..................................................................... JA1171

Testimony of Cynthia Riley
    Direct Examination ...................................................................... JA1174
    Cross Examination ....................................................................... JA1176

Testimony of Ralph Fleming
    Direct Examination ...................................................................... JA1178

**Trial Transcript- Volume XII (January 27, 1993)**....................................... JA1181

Testimony of Walter Tuck
    Direct Examination ...................................................................... JA1182
    Cross Examination ....................................................................... JA1184

Testimony of Gwendolyn Greene
    Direct Examination ...................................................................... JA1186

Testimony of Prisilla "Pepsi" Greene
    Direct Examination ...................................................................... JA1189
    Cross Examination ....................................................................... JA1198
    Redirect Examination................................................................... JA1209

Testimony of Ralph Fleming
    Direct Examination ...................................................................... JA1210
    Cross Examination ....................................................................... JA1212
    Redirect Examination .................................................................. JA1213

Testimony of Nellie Pulley
    Direct Examination ...................................................................... JA1213

Testimony of Carolyn Chiles
    Direct Examination ...................................................................... JA1214

Testimony of C.T. Woody
    Direct Examination ...................................................................... JA1215
    Cross Examination ....................................................................... JA1216

Testimony of Wanda B. Brown
    Direct Examination ...................................................................... JA1216

x

Testimony of David S. Tweedie
    Direct Examination ...........................................................JA 1217

Testimony of Greg Noble
    Voir Dire ...........................................................JA1223
    Direct Examination ...........................................................JA1225
    Cross Examination ...........................................................JA1229

Testimony of Ralph Fleming
    Direct Examination ...........................................................JA1230

Testimony of Leroy Slater
    Direct Examination ...........................................................JA1231
    Cross Examination ...........................................................JA1236

Testimony Of Dr. Marcella Fierro
    Direct Examination ...........................................................JA1246

Testimony of Ralph Fleming
    Direct Examination ...........................................................JA1252
    Cross Examination ...........................................................JA1252

Testimony of Rodney Rodriguez
    Direct Examination ...........................................................JA153

Testimony of Anne D. Jones
    Direct Examination ...........................................................JA1254
    Cross Examination ...........................................................JA1258

Testimony of Valerie Lee Butler
    Direct Examination ...........................................................JA1259
    Cross Examination ...........................................................JA1282

**Trial Transcript- Volume XII (January 28, 1993)**.......................................JA1295

**Trial Transcript- Volume XIV (January 29, 1993)** ....................................JA1318

    Testimony of Thomas Leonard
        Direct Examination .......................................................................JA1329
        Cross Examination ........................................................................JA1331

    End of the Government's Case ................................................................JA1332

    Testimony of Gloria Anne Bridges
        Direct Examination .......................................................................JA1332
        Cross Examination ........................................................................JA1336

    Testimony of John J. Cox
        Direct Examination .......................................................................JA1338
        Cross Examination ........................................................................JA1341

    Testimony of C.T. Woody, Jr.
        Direct Examination .......................................................................JA1344
        Cross Examination ........................................................................JA1345
        Redirect Examination.....................................................................JA1345

    Testimony of Maurice D. Scott
        Direct Examination .......................................................................JA1346
        Cross & Redirect Examination ......................................................JA1347

    Testimony of Billy Baylock
        Direct Examination .......................................................................JA1348
        Cross Examination ........................................................................JA1350

    Testimony of C.T. Woody
        Direct Examination .......................................................................JA1351
        Cross Examination ........................................................................JA1353

    Testimony of Rodney Tucker
        Direct Examination .......................................................................JA1355
        Cross Examination ........................................................................JA1356

    Testimony of C.T. Woody
        Direct Examination .......................................................................JA1357

Testimony of Ralph Fleming
  Direct Examination ..................................................................JA1359
  Cross Examination ...................................................................JA1360
  Redirect Examination................................................................JA1360

Testimony of Robin Cooper
  Direct & Cross Examination......................................................JA1363

Testimony of Dr. Pamela Royal
  Direct Examination ..................................................................JA1364
  Cross Examination ...................................................................JA1366

Testimony of Gina Taylor
  Direct Examination ..................................................................JA1367
  Cross Examination ...................................................................JA1369
  Redirect Examination................................................................JA1372

**Trial Transcript- Volume XV (February 1, 1993)**......................JA1377

Testimony of Steve A. Dalton
  Direct Examination ..................................................................JA1378
  Cross Examination ...................................................................JA1384
  Redirect Examination................................................................JA1385

Government Guilt Phase Closing Argument ...........................................JA1395

Robert P. Geary, Esq.  Guilt Phase Closing Argument ...........................JA1427

Craig S. Cooley, Esq. Guilt Phase Closing Argument.............................JA1444

**Trial Transcript- Volume XVI (February 2, 1993)** ...................JA1468

David P. Baugh, Esq. Guilt Phase Closing Argument...........................JA1470

Robert J. Wagner, Esq. Guilt Phase Closing Argument........................JA1491

Government Guilt Phase Rebuttal .......................................................JA1502

Court Instructions to the Jury re: Guilt Phase.......................................JA1511

**Trial Transcript- Volume XVII (February 3, 1993)** ....................................JA1553

Jury Verdict .........................................................................JA1554

Query     Reports     Utilities     Help     Log Out

2255,CLOSED,DEATHP

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CRIMINAL DOCKET FOR CASE #: 3:92-cr-00068-DJN-1

Case title: USA v. Tipton, et al                Date Filed: 04/24/1992

Related Cases: 3:22-cv-00100-DJN         Date Terminated: 06/01/1993

                  3:22-cv-00099-DJN

Assigned to: District Judge David J. Novak

Appeals court case number: 20-16 USCA

**Defendant (1)**

**Richard Tipton**              represented by    **Frederick Robert Gerson**
*TERMINATED: 06/01/1993*                            Durrette Arkema Gerson & Gill PC
*also known as*                                  1111 East Main Street
"Whittey"                                        16th Floor
                                          Richmond, VA 23219
                                          804-775-6900
                                          Fax: 804-823-2611
                                          Email: fgerson@dagglaw.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Eric David White**
                                          Samuel I White PC (VA Beach)
                                          596 Lynnhaven Pkwy
                                          Suite 200
                                          Virginia Beach, VA 23452
                                          757-490-9284
                                          Fax: 757-497-2802
                                          *TERMINATED: 06/01/1993*
                                          *Designation: Retained*

                                          **Gerald Wesley King , Jr.**
                                          Federal Defender Program
                                          101 Marietta Street NW
                                          Suite 1500
                                          Atlanta, GA 30303
                                          NA
                                          678-539-4342
                                          Fax: 404-688-0768
                                          Email: Gerald_King@fd.org
                                          *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Jeffrey Lyn Ertel**
Federal Defender Program, Inc.
101 Marietta Street
Suite 1500
Atlanta, GA 30303
**NA**
678-539-4313
Fax: 404-688-0768
Email: jeff_ertel@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*

**Robert Patrick Geary**
PO Box 42
Sandston, VA 23150
(804) 643-8003
Email: rpg.esq11@yahoo.com
*TERMINATED: 06/01/1993*
*Designation: Retained*

**Stephen Atherton Northup**
Troutman Pepper Hamilton Sanders LLP
(Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219
(804) 697-1200
Email:
steve.northup@troutmansanders.com
*ATTORNEY TO BE NOTICED*

**Pending Counts**                    **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                  **Disposition**

None

**Highest Offense Level (Terminated)**

None

**JA2**

| Complaints | Disposition |
|---|---|
| None | |

## Interested Party

**Wakeel Sabur**
1003659
Red Onion State Prison
PO Box 970
Pound, VA 24279

## Intervenor

**Willie Lee Seward**

## Plaintiff

| | | |
|---|---|---|
| **USA**<br>*TERMINATED: 05/27/1992* | represented by | **S. David Schiller**<br>Office of the U.S. Attorney<br>SunTrust Building<br>919 East Main Street<br>Suite 1900<br>Richmond, VA 23219<br>(804) 819-5400<br>Email: david.schiller@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Joseph Attias**<br>United States Attorney Office (Richmond-NA)<br>SunTrust Building<br>919 East Main Street<br>Suite 1900<br>Richmond, VA 23219<br>**NA**<br>804-819-5400<br>Email: joseph.attias2@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard D. Cooke**<br>United States Attorney's Office (Richmond)<br>SunTrust Building<br>919 East Main Street<br>Suite 1900 |

Richmond, VA 23219
804-819-5449
Email: richard.cooke@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Thomas Arthur Garnett**
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5431
Email: Thomas.A.Garnett@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/1997 | | Supreme Court denied certiorari; order filed by USA as to Richard Tipton (Entered: 09/02/1997) |
| 03/23/2020 | | Case reassigned to District Judge David J. Novak. District Judge James R. Spencer no longer assigned to the case. (jsmi, ) (Entered: 03/23/2020) |
| 06/08/2020 | | 2255 Appeal Remark: USCA 2255 Case docketed. Case #20-10, Case Manager EBorneisen (lgar, ) (Entered: 06/08/2020) |
| 07/01/2020 | | Appeal Record Returned re: USCA Case #16-7, SEALED PSR. (lbre, ) (Entered: 03/23/2022) |
| 07/16/2020 | 13 | 2255 ORDER of USCA as to Richard Tipton : Upon consideration of submissions relative to the movants motion to hold in abeyance, the court grants the motion and places this case in abeyance pending a decision by this court in United States v. Taylor, No. 19-7616. Entered at the direction of Judge Motz with the concurrence of Judge Floyd. Judge Wilkinson voted to deny authorization to file a successive motion under 28 U.S.C. § 2255. (lbre, ) (Entered: 07/16/2020) |
| 07/31/2020 | 24 | MOTION for Imposition of a Reduced Sentence Under Section 404 of the First Step Act by Richard Tipton. (Attachments: # 1 Exhibit 1, Superseding Indictment, # 2 Exhibit 2, Jury Decision Forms, # 3 Exhibit 3, Court's Judgment, # 4 Exhibit 4, Verdict Form, # 5 Exhibit 5, Tipton Special Findings)(Gerson, Frederick) (Entered: 07/31/2020) |
| 08/04/2020 | 25 | Motion to appear Pro Hac Vice by Gerald Wesley King, Jr. and Certification of Local Counsel Frederick R. Gerson by Richard Tipton. (Attachments: # 1 Pro Hac) No fee required Federal Defender Services(khan, ) (Entered: 08/04/2020) |
| 08/04/2020 | 26 | Motion to appear Pro Hac Vice by Jeffrey L. Ertel and Certification of Local Counsel Frederick R. Gerson by Richard Tipton. (Attachments: # 1 pro hac) No fee required Federal Defender Services (khan, ) (Entered: 08/04/2020) |
| 08/07/2020 | 28 | NOTICE OF ATTORNEY APPEARANCE Richard D. Cooke appearing for USA. (Cooke, Richard) (Entered: 08/07/2020) |

**JA4**

| 08/07/2020 | 29 | VACATED PER 32 ORDER ENTERED ON 8/14/2020 - ORDER DENYING 26 Motion for Pro hac vice as to Richard Tipton (1). Signed by District Judge David J. Novak on 08/07/2020. (tjoh, ) Modified on 8/14/2020 (jsmi, ). (Entered: 08/07/2020) |
| --- | --- | --- |
| 08/07/2020 | 30 | ORDER granting 25 Gerald Wesley King, Jr. Motion for Pro hac vice as to Richard Tipton (1). Signed by District Judge David J. Novak on 08/07/2020. (tjoh, ) (Entered: 08/07/2020) |
| 08/13/2020 | 31 | MOTION for Reconsideration re 29 Order on Motion for Pro hac vice *to Jeffrey L. Ertel* by Richard Tipton. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Gerson, Frederick) (Entered: 08/13/2020) |
| 08/14/2020 | 32 | ORDER as to Richard Tipton that VACATES its previous 29 Order denying the admission pro hac vice of Mr. Ertel and hereby GRANTS 26 Motion to Appear Pro Hac Vice by Jeffrey L. Ertel. The Court hereby ORDERS Mr. Ertel to file an affidavit signed under the penalty of perjury attesting to the fact that he has thoroughly read the Local Rules for the United States District Court for the Eastern District of Virginia and that he agrees to comply with all of the local rules. Failure to file such an affidavit within seven days of the entry of this Order shall result in the revocation of his pro hac vice admission. Signed by District Judge David J. Novak on 8/14/2020. (jsmi, ) (Entered: 08/14/2020) |
| 08/21/2020 | 42 | NOTICE *of Filing* by Richard Tipton re 32 Order on Motion for Reconsideration,, (Attachments: # 1 Affidavit of Jeffrey L. Ertel)(Gerson, Frederick) (Entered: 08/21/2020) |
| 09/02/2020 | 45 | ORDER as to Richard Tipton that the Court hereby DIRECTS the United States Attorney's Office to respond within 15 days of this Order and to explain its position regarding Defendant's First Step Act Motion and requested relief. If Defendant disagrees with the Government's response, Defendant may reply to the Government's response within 15 days of the date that the Government's response is filed. The United States Probation Office is DIRECTED to prepare a First Step Act Worksheet within 14 days of the date of entry hereof. See Order for details. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/02/2020) |
| 09/04/2020 | 47 | ORDERS granting 34 , 35 , and 36 Motions for Pro hac vice as to Cory Johnson. Alexander C. Drylawski, Judith A. Flumenbaum, and Donald P. Salzman added. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/10/2020 | 48 | First Step Act Work Sheet (Sealed Document) as to Richard Tipton (Attachments: # 1 Supplement Presentence Report)(frere, laurie) (Entered: 09/10/2020) |
| 09/17/2020 | 49 | MOTION for Extension of Time to File Response/Reply as to 24 MOTION for Imposition of a Reduced Sentence Under Section 404 of the First Step Act , 45 Order to Respond - First Step Act,, by USA as to Richard Tipton. (Attachments: # 1 Proposed Order)(Cooke, Richard) (Entered: 09/17/2020) |
| 09/17/2020 | 50 | ORDER as to Richard Tipton that Government's 49 Unopposed Motion for a Four Day Extension for Filing the United States' Response to § 404 Motion is GRANTED. The Government shall have until September 21, 2020, by which to file its response to Defendant's First Step Act Motion. Signed by District Judge David J. Novak on 9/17/2020. (jsmi, ) (Entered: 09/17/2020) |

**JA5**

| | | |
|---|---|---|
| 09/21/2020 | 54 | RESPONSE in Opposition by USA as to Richard Tipton re 24 MOTION for Imposition of a Reduced Sentence Under Section 404 of the First Step Act (Attachments: # 1 Exhibit A)(Attias, Joseph) (Entered: 09/21/2020) |
| 10/02/2020 | 61 | MOTION for Extension *TIME TO FILE A REPLY TO THE GOVERNMENTS RESPONSE TO DEFENDANTS MOTION FOR A REDUCED SENTENCE UNDER SECTION 404 OF THE FIRST STEP ACT* by Richard Tipton. (Attachments: # 1 Proposed Order)(Gerson, Frederick) (Entered: 10/02/2020) |
| 10/07/2020 | 62 | ORDER granting 61 Motion for Extension of Time as to Richard Tipton (1). Defendantshall have until October 20, 2020, by which to file his reply in support of his First Step ActMotion. Signed by District Judge David J. Novak on 10/05/2020. (tjoh, ) (Entered: 10/07/2020) |
| 10/20/2020 | 65 | REPLY TO RESPONSE to by Richard Tipton re 24 MOTION for Imposition of a Reduced Sentence Under Section 404 of the First Step Act (Gerson, Frederick) (Entered: 10/20/2020) |
| 11/17/2020 | 71 | PAPER DOCKET SHEET as to Richard Tipton. (jsmi, ) (Entered: 11/17/2020) |
| 11/17/2020 | 74 | ORDER of USCA (#20-10) as to Richard Tipton : For reasons appearing to the court, this case is placed in abeyance pending a decision by this court in United States v. Ortiz-Orellana, No. 16-4844. (lbre, ) (Entered: 11/18/2020) |
| 11/19/2020 | 76 | ORDER as to Richard Tipton that the Court finds that Defendant's convictions on Counts Three, Seventeen, Eighteen, Nineteen, Twenty Four and Twenty-Five do not constitute covered offenses under the First Step Act. Although Defendant's convictions on Counts Thirty-Two and Thirty-Three do constitute covered offenses, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's 24 Motion for Imposition of a Reduced Sentence Under Section 404 of the First Step Act will be denied. Signed by District Judge David J. Novak on 11/19/2020. (jsmi, ) (Entered: 11/19/2020) |
| 11/24/2020 | 80 | NOTICE OF APPEAL by Richard Tipton re 76 Order on Motion for Reconsideration. (khan, ) (Entered: 11/24/2020) |
| 11/24/2020 | 81 | Transmission of Notice of Appeal to US Court of Appeals as to Richard Tipton re 80 Notice of Appeal. (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 11/24/2020) |
| 11/25/2020 | | USCA Case Number 20-16, Case Manager Emily Borneisen for 81 Notice of Appeal filed by Richard Tipton. (lgar, ) (Entered: 11/25/2020) |
| 12/08/2020 | 84 | MOTION TO INTERVENE by Willie Lee Seward. (jsmi, ) Modified on 2/5/2021 (tjoh, ). (Entered: 12/08/2020) |
| 12/09/2020 | 85 | ORDER (Denying Motion to Intervene) as to Richard Tipton - This matter comes before the Court on a Motion to Intervene (ECF No. 84) filed by Wakeel A. Sabur ("Sabur"), requesting placement in the witness protection program upon release from prison. However, the Court cannot grant Sa bur the relief that he seeks, as the Court has no role in the witness protection program. Rather, the Government controls the witness protection program. Accordingly, Sabur's Motion to Intervene (ECF No. 84) is hereby DENIED. Signed by District Judge David J. Novak on 12/9/2020. (Copy mailed to Wakeel A. Sabur) (smej, ) (Entered: 12/09/2020) |

**JA6**

| 01/06/2021 | 105 | MOTION for Reconsideration by Wakeel Sabur. (jsmi, ) (Entered: 01/06/2021) |
|---|---|---|
| 01/07/2021 | 106 | ORDER denying 105 Motion for Reconsideration as to Richard Tipton (1). Signed by District Judge David J. Novak on 1/7/2021. (cgar) (Entered: 01/07/2021) |
| 03/16/2021 | 134 | ORDER of USCA as to Richard Tipton. Upon consideration of submissions relative to appellants motion to hold case in abeyance, the court grants the court grants the motion and places this case in abeyance pending a decision by this court in United States v. Thomas, No. 20-6234.Judge Motz and Judge Floyd voted to grant the motion. Judge Wilkinson voted to deny the motion. (20-16) (tjoh, ) (Entered: 03/16/2021) |
| 01/24/2022 | 146 | ORDER of USCA, with attached NOTICE of AUTHORIZATION, and Motion as to Richard Tipton in USCA Case #20-10: Movant has filed a motion for an order authorizing the district court to consider a second or successive application for relief under 28 U.S.C. § 2255. The court grants the motion. Entered at the direction of Judge Motz with the concurrence of Judge Floyd. Judge Wilkinson voted to deny the motion. (lbre, ) (Entered: 01/25/2022) |
| 01/31/2022 | 149 | ORDER (Requiring Signed § 2255; Setting Briefing Schedule) The Court hereby DIRECTS Defendant to submit, within twenty (20)days of the date of entry hereof, a § 2255 motion complying with Rule 2. Once submitted, the Clerk shall then file the signed § 2255 motion as a separate document and assign it an appropriate civil action number. The Court will proceed on the signed § 2255 as the operative § 2255 motion. The Government shall then file a complete, fully briefed response to that motion within sixty (60) days of service. Any reply by Defendant shall be filed within thirty (30) days thereafter. SEE ORDER FOR DETAILS. Signed by District Judge David J. Novak on 1/31/2022. (asho, ) (Entered: 01/31/2022) |
| 02/19/2022 | 154 | MOTION to Vacate under 28 U.S.C. 2255 by Richard Tipton. (Attachments: # 1 Appendix Original Proposed Section 2255 Motion, # 2 Appendix Mr. Tipton's Verified Section 2255 Form)(Gerson, Frederick)<br>Civil case 3:22-cv-00099 opened. (Entered: 02/19/2022) |
| 02/19/2022 | 155 | MOTION to Amend/Correct 154 MOTION to Vacate under 28 U.S.C. 2255 filed by Richard Tipton by Richard Tipton. (Attachments: # 1 Appendix Amended Section 2255 Motion)(Gerson, Frederick) (Entered: 02/19/2022) |
| 02/19/2022 | 156 | Motion to appear Pro Hac Vice by Gerald Wesley King, Jr. and Certification of Local Counsel Frederick R. Gerson by Richard Tipton. (Attachments: # 1 Appendix Motion for Admission PHV of Jeffrey Ertel and Gerald King)(Gerson, Frederick) (Entered: 02/19/2022) |
| 02/19/2022 | 157 | Motion to appear Pro Hac Vice by Jeffrey Lyn Ertel and Certification of Local Counsel Frederick R. Gerson by Richard Tipton. (Attachments: # 1 Appendix Motion for Appointment PHV of Jeffrey Ertel and Gerald King)(Gerson, Frederick) (Entered: 02/19/2022) |
| 02/22/2022 | 158 | ORDER (Granting Motion to Amend) - Because the Court finds good cause, and the parties are in agreement, Defendant's Motion (ECF No. 155 ) is hereby GRANTED. The Clerk is hereby DIRECTED to docket Defendant's Amended§ 2255 Motion to Vacate (ECF No. 155-1) as a separate entry on the docket, at which point it will become Defendant's operative § 2255 Motion. Defendant's previous § 2255 Motion to Vacate (ECF No. 154 ) is hereby DENIED AS MOOT. The deadlines established by the Court's briefing schedule (ECF No. 149 ) shall begin to run with the filing of the |

**JA7**

| | | |
|---|---|---|
| | | Amended § 2255 Motion to Vacate as a separate entry on the docket. Signed by District Judge David J. Novak on 2/22/2022. (jpow, ) Civil Case 3:22-cv-00099 closed. (Entered: 02/22/2022) |
| 02/22/2022 | 159 | AMENDED MOTION to Vacate Conviction Under 28 U.S.C. § 2255 In Light Of *United States v. Davis*, __ U.S. __, 139 S. Ct. 2319 (2019) by Richard Tipton. (jpow, ) Civil case 3:22-cv-00100 opened. (Entered: 02/22/2022) |
| 02/22/2022 | 163 | ORDER granting 156 Motion for Pro hac vice at to Gerald Wesley King, Jr. as to Richard Tipton (1). Signed by District Judge David J. Novak on 2/22/2022. (jpow, ) (Entered: 02/22/2022) |
| 02/22/2022 | 164 | ORDER granting 157 Motion for Pro hac vice as to Jeffrey Lyn Ertel as to Richard Tipton (1). Signed by District Judge David J. Novak on 2/22/2022. (jpow, ) (Entered: 02/22/2022) |
| 04/25/2022 | 168 | MOTION for Extension of Time to File Response/Reply as to 159 MOTION to Vacate under 28 U.S.C. 2255 by USA as to Richard Tipton. (Attachments: # 1 Proposed Order)(Attias, Joseph) (Entered: 04/25/2022) |
| 04/26/2022 | 170 | ORDER (Granting Motions for Extension) This matter comes before the Court on the Government's Unopposed Motions to Extend Response Date (ECF Nos. 168, 169), moving for an extension of time by which to file its oppositions to Defendants' Motions to Vacate (ECF Nos. 159, 161). Because the parties are in agreement, and the Court finds good cause, the Government's Motions (ECF No. 168 , 169 ) are hereby GRANTED. The Government shall have until Wednesday, April 27, 2022, to file its oppositions to Defendants' Motions to Vacate. Signed by District Judge David J. Novak on 4/26/2022. (asho, ) (Entered: 04/26/2022) |
| 04/27/2022 | 172 | RESPONSE in Opposition by USA as to Richard Tipton re 159 MOTION to Vacate under 28 U.S.C. 2255 (Attias, Joseph) (Entered: 04/27/2022) |
| 05/24/2022 | 175 | MOTION for Extension of Time to File Response/Reply *in Support of His Motion to Vacate* by Richard Tipton. (Attachments: # 1 Proposed Order)(Gerson, Frederick) (Entered: 05/24/2022) |
| 05/25/2022 | 176 | ORDER Granting Motion for Extension) This matter comes before the Court on the Defendant Richard Tipton's Unopposed Motion for an Extension of Time to File His Reply in Support of His Motion to Vacate (ECF No. 175), moving for an extension of time by which to file his reply in support of his § 2255 Motion. Because the parties are in agreement, and the Court finds good cause, the Defendant's Motion (ECF No. 175 ) is hereby GRANTED. Defendant shall have until June 17, 2022, to file his reply in support of his § 2255 Motion. Signed by District Judge David J. Novak on 5/25/2022. (asho, ) (Entered: 05/25/2022) |
| 06/17/2022 | 179 | Reply by Richard Tipton re 159 MOTION to Vacate under 28 U.S.C. 2255 (Gerson, Frederick) (Entered: 06/17/2022) |
| 06/23/2022 | 180 | Letter received from Wakeel Abdul-Sebur, a/k/a Willie Lee Seward. (Attachments: # 1 Envelope)(jpow, ) (Entered: 06/23/2022) |
| 08/08/2022 | 183 | USCA ORDER re: Notice of Appeal 69 as to James H. Roane, Jr. (USCA #20-14), and Notice of Appeal 80 as to Richard Tipton (USCA #20-16): For reasons appearing to the court, appeal Nos. 20-14 and 20-16 are consolidated for the purpose of oral argument. Total argument time of 20 minutes per side is allotted for the consolidated argument of both cases. Amended oral argument acknowledgment forms sharing the |

**JA8**

| | | allocated time are required from counsel for appellants. (lbre, ) (Entered: 08/08/2022) |
|---|---|---|
| 10/06/2022 | 186 | MEMORANDUM OPINION as to Richard Tipton. Signed by District Judge David J. Novak on 10/6/2022. (jsmi, ) (Entered: 10/06/2022) |
| 10/06/2022 | 187 | ORDER (Denying § 2255 Motion) Defendant's Richard Tipton's 159 Amended Motion to Vacate Conviction Under 28 U.S.C. § 2255 is hereby DENIED. A certificate of appealability is hereby DENIED. See Order for details. Signed by District Judge David J. Novak on 10/6/2022. (jsmi, ) (Entered: 10/06/2022) |
| 10/18/2022 | 188 | Appeal Remark: USCA Opinion re 69 Notice of Appeal filed by James H. Roane (20-14) and 80 Notice of Appeal filed by Richard Tipton (20-16). AFFIRMED. (smej, ) (Entered: 10/18/2022) |
| 10/18/2022 | 189 | Appeal Remark: USCA Judgment re 69 Notice of Appeal filed by James H. Roane (20-14) and 80 Notice of Appeal filed by Richard Tipton (20-16). In accordance with the decision of this court, the judgments of the district court are affirmed. (Attachments: # 1 Notice) (smej, ) (Entered: 10/18/2022) |
| 11/04/2022 | 192 | Appeal Remark: USCA TEMPORARY STAY OF MANDATE re 69 Notice of Appeal filed by James H. Roane (20-14) and 80 Notice of Appeal filed by Richard Tipton (20-16). Under Fed. R. App. P. 41(b), the filing of a timely petition for rehearing or rehearing en banc stays the mandate until the court has ruled on the petition. In accordance with Rule 41(b), the mandate is stayed pending further order of this court. (smej, ) (Entered: 11/04/2022) |
| 11/15/2022 | 193 | Appeal Remark: USCA ORDER - re 69 Notice of Appeal filed by James H. Roane (20-14) and 80 Notice of Appeal filed by Richard Tipton (20-16). The court denies the petition for rehearing and rehearing en banc. No judge requested a poll under Fed. R. App. P. 35 on the petition for rehearing en banc. (smej, ) (Entered: 11/15/2022) |
| 11/23/2022 | 194 | Appeal Remark: USCA MANDATE re 69 Notice of Appeal filed by James H. Roane (20-14) and 80 Notice of Appeal filed by Richard Tipton (20-16). The judgment of this court, entered October 18, 2022, takes effect today. (smej, ) (Entered: 11/23/2022) |
| 12/05/2022 | 195 | NOTICE *of Appeal* by Richard Tipton re 187 Order, 186 Memorandum Opinion. No Fee Paid. (Gerson, Frederick) Modified on 12/5/2022 (asho, ). Modified on 12/5/2022 (Khan, ). (Entered: 12/05/2022) |
| 12/06/2022 | 196 | Transmission of Notice of Appeal to US Court of Appeals as to Richard Tipton re 195 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jsmi, ) (Entered: 12/06/2022) |
| 12/08/2022 | | USCA Case Number 22-5, Case Manager E. Borneisen, for 195 Notice of Appeal filed by Richard Tipton. (smej, ) (Entered: 12/08/2022) |
| 12/08/2022 | 197 | USCA ORDER re 195 Notice of Appeal filed by Richard Tipton. The court appoints Gerald Wesley King, Jr of the Federal Defenders of Western North Carolina as lead counsel and Jeffrey Lyn Ertel of the Federal Defender Program, Inc. as co-counsel for the appellant. SEE ORDER FOR DETAILS. (22-5) (smej, ) (Entered: 12/08/2022) |

**PACER Service Center**

**Transaction Receipt**

**JA9**

AO 245 S (Rev. a 90) Sheet 1 Judgment in a Cr. Case

# United States District Court

EASTERN —— District of —— VIRGINIA

CLERK U.S. DISTRICT
RICHMOND. VA

UNITED STATES OF AMERICA

V.

**RICHARD TIPTON**
**a/k/a Whittey**

(Name of Defendant)

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: **3:92CR68-0l**

**Eric D. White, Esquire**
**Robert P. Geary, Esquire**

Defendant's Attorney

THE DEFENDANT:

‾ pleaded guilty to count(s) _____
X was found guilty on count(s) **l,2,3,4,l7,l8,l9,20,2l,22,23,24,25,26,27,28,29,30,32,33** after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 2l U.S.C. 846 | Conspiracy | 03/16/92 | l |
| 2l U.S.C. 848 | Continuing Criminal Enterprise | 03/16/92 | 2 |
| 2l U.S.C. 848(e)(l)(A) and l8 U.S.C. 2 | Murder in furtherance of CCE; aid and abet | 02/19/92 | 3,l7,l8,l9,24,25 |
| l8 U.S.C. 1959 & 2 | Violent crimes in aid of racketeering; aid & abet | 02/19/92 | 4, 2l-23, 27-30 |
| l8 U.S.C. 924(c) & 2 | Use of firearm in crime of violence or drug trafficking crime; aid and abet | 02/19/92 | 20,26 |
| 2l U.S.C. 84l(a)(l) and l8 U.S.C. 2 | Possession with intent to distribute crack cocaine; aid and abet | 02/02/92 | 32, 33 |

The defendant is sentenced as provided in pages 2 through __8__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X The defendant has been found not guilty on count(s) **5, 6, 7, l4, l5, and l6** and is discharged as to such count(s).
X Count(s) **ll, l2, and l3** (is)(are) dismissed on the motion of the United States.
X It is ordered that the defendant shall pay a special assessment of $ **950.00** XXXXXXXXXXXXXXXXXXXXXXXXXXX . for count(s) **listed above, with the exception of Ct. l** which shall be due X immediately _ as follows.

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: **ll7-58-5004**

Defendant's Date of Birth: **05/13/70**

Defendant's Mailing Address:

**5l3 W. l79th Street**

**New York, New York l0033**

Defendant's Residence Address:
**Incarcerated**

**June l, 1993**

Date of Imposition of Sentence

Signature of Judicial Officer

**James R. Spencer, United States District Judge**

Name & Title of Judicial Officer

**June l, 1993**

Date

542

00287

**JA10**

AO 245 S (Rev. 4/90) Sheet 2 - Imprisonment

Defendant:    **RICHARD TIPTON**            Judgment — Page __2__ of __4__
Case Number:    **3:92CR68-01**

## IMPRISONMENT

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

The Court imposes a sentence of DEATH as to each of Counts 3, 24, and 25.
The Court imposes a sentence of LIFE as to each of Counts 17, 18, and 19.
In addition, the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE plus TWENTY-FIVE (25) YEARS, consisting of the following sentence:
Count 2 – LIFE
Counts 4, 21, 22, 23, 27, 28 – LIFE as to each count, to run concurrently with any other sentence imposed.
Counts 29 and 30 – THIRTY (30) YEARS on each count, to run concurrently with any other sentence impos[ed]
Count 33 – TWENTY (20) YEARS, to run concurrently with any other sentence imposed.
Count 32 – FORTY (40) YEARS, to run concurrently with any other sentence imposed.
Count 20 – FIVE (5) YEARS, to run consecutively to any other sentence imposed.
Count 26 – TWENTY (20) YEARS, to run consecutively to any other sentence imposed.

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States marshal.
☐ The defendant shall surrender to the United States marshal for this district.
     ☐ at _____ ☐ a.m. ☐ p.m. on _____.
     ☐ as notified by the United States marshal.
☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons.
     ☐ before 2 p.m. on _____.
     ☐ as notified by the United States marshal.
     ☐ as notified by the probation office.

### RETURN

I have executed this judgment as follows:

_____

_____     00288     —

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy Marshal

00288

**JA11**

AO 245 S (Rev. 4/90) Sheet 3 - Supervised Release

Defendant: **RICHARD TIPTON**            Judgment — Page **3** of **4**
Case Number: **3:92CR68-01**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____

**FIVE (5) YEARS on the Indictment.**

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

☐ The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

☐ The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

☐ The defendant shall not possess a firearm or destructive device.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

00289

**JA12**

AO 245 S  Rev 4 90  Sheet 7 - Statement of Reasons

Defendant:  **RICHARD TIPTON**                    Judgment—Page __4__ of  4
Case Number: **3:92CR68-01**

## STATEMENT OF REASONS

X The court adopts the factual findings and guideline application in the presentence report.

OR

☐ The court adopts the factual findings and guideline application in the presentence report except
(see attachment, if necessary):

**Guideline Range Determined by the Court:**

Total Offense Level: ____**43**____

Criminal History Category: ____**I**____

Imprisonment Range: _____ to **LIFE** months

Supervised Release Range: ____ to **5** years

Fine Range: $ **25,000** to $ **5,000,000**

☒ Fine is waived ~~or is below the guideline range~~ because of the defendant's inability to pay.

Restitution: $ **not recommended per 18 U.S.C. 3663(d)**

☐ Full restitution is not ordered for the following reason(s):

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no
reason to depart from the sentence called for by application of the guidelines.

OR

☒ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed
for the following reason(s):
**The Court imposed the sentence as recommended by the jury as to Counts 3,24,25 and Counts 17,18,19.
As to the additional counts on which a sentence of life imprisonment was imposed, deterrence is
guaranteed; punishment will be a by-product of the sentence imposed.**

OR

The sentence departs from the guideline range

☐ upon motion of the government, as a result of defendant's substantial assistance.

☐ for the following reason(s):

00290

*U S GPO 1990 12  142

**JA13**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| RICHARD TIPTON, III, | ) | |
| | ) | Criminal Case No. 92CR68 |
| Movant, | ) | Prior Civil Case No. 98CV361 |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**AMENDED MOTION TO VACATE CONVICTION
UNDER 28 U.S.C. § 2255 IN LIGHT OF
*UNITED STATES V. DAVIS*, __U.S.__, 139 S. Ct. 2319 (2019)**

Movant Richard Tipton, III, by and through undersigned counsel, respectfully moves this Court pursuant to 28 U.S.C. § 2255 to set aside his convictions and sentences for Counts 20 and 26 in the above-captioned case, which charged him with using a firearm during and in relation to a "crime of violence" or drug trafficking crime in violation of 18 U.S.C. § 924(c). As explained below, these counts must be vacated in light of the Supreme Court's decision in *United States v. Davis*, __U.S.__, 139 S. Ct. 2309 (2019), which held that § 924(c)(3)(b)'s "residual clause" is void for vagueness and violates the Due Process Clause. As Mr. Tipton's particular § 924(c) convictions cannot be otherwise sustained, this Court should grant review and relief.

**JA14**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

    A.     Mr. Tipton's Convictions and Sentencing. .............................................2

    B.     Mr. Tipton's Direct Appeal. ...................................................................5

    C.     Mr. Tipton's First Section 2255 Motion. ...............................................5

    D.     Mr. Tipton's Prior Applications for Authorization. ...............................6

ARGUMENT .......................................................................................................9

    I.     Mr. Tipton's is Entitled to Relief Under 28 U.S.C. § 2255
          Because His Claim under *Davis* is Cognizable, Timely, and
          Satisfies the Successive Petition Requirements of § 2255(h)..............11

        A.     Mr. Tipton's Claims under *Davis* are Cognizable under
            § 2255(a). .................................................................................11

        B.     Mr. Tipton's Motion Satisfies § 2255(h). ................................12

        C.     Mr. Tipton's Motion is Timely Under § 2255(f). .....................13

    II.    After *Davis*, Mr. Tipton's § 924(c) Convictions Can No Longer
          Be Sustained. ........................................................................................14

        A.     Under the Modified Categorical Approach, a § 924(c)
            Conviction Based on Multiple Offenses is Invalid if
            There is Ambiguity as to Which Offense Supported the
            § 924(c) Conviction and at Least One of the Possible
            Predicates is not Categorically a "Crime of Violence." ...........16

        B.     Section 1959(a) is Not Categorically a "Crime of
            Violence" and Thus Cannot Support a § 924(c)
            Conviction. ................................................................................24

          1.     The jury was empowered to base Mr. Tipton's §
             924(c) convictions on § 1959 conspiracy, which is

i

**JA15**

not a categorical "crime of violence," and it may have done so. ..................................................25

2.     After *Davis*, Mr. Tipton's § 924(c) convictions can no longer rest on § 1959 murder offenses. .....................27

3.     Maiming is not categorically a crime of violence and thus cannot support Mr. Tipton's 924(c) convictions. ...............................................................36

4.     Mr. Tipton's 924(c) convictions cannot rest on assault resulting in serious bodily injury, which is not categorically a crime of violence ............................37

C.     Mr. Tipton's § 848(e) Convictions Also Fail to Qualify Categorically as "Crimes of Violence" under § 924(c). ...........37

III.     Because Both of Mr. Tipton's § 924(c) Convictions are Invalid after *Davis*, Mr. Tipton is Entitled to be Resentenced. .......................40

CONCLUSION AND PRAYER FOR RELIEF ....................................................42

ATTACHED EXHIBITS

*United States v. Tipton*, EDVA, No. 3:92CR68,
Superseding Indictment .............................................................................Exhibit 1

*United States v. Tipton*, EDVA, No. 3:92CR68, Verdict Form ...................Exhibit 2

JA16

# INTRODUCTION

Before *Davis*, § 924(c) included two alternative clauses defining "crime of violence." The first, § 924(c)(3)(A), is commonly referred to as the "force" or "elements" clause and applies to any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." The second, § 924(c)(3)(B), was referred to as the "residual clause" and applied to any felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. *Davis*, however, held that § 924(c)(3)'s residual clause is void for vagueness, violates the Due Process Clause, and, accordingly, unconstitutionally imposed criminal punishment. 139 S. Ct. at 2336.

Absent § 924(c)'s residual clause, none of Mr. Tipton's purported predicate offenses can categorically qualify as a "crime of violence" because none has as a *required* element the intentional use, attempted use, or threatened use of violent physical force.[1] Moreover, as the record does not establish the specific offense used by the jury as the predicate offense for his § 924(c) convictions, reviewing

---

[1] See *Borden v. United States*, 141 S. Ct. 1817, 1834 (2021) (offenses with *mens rea* of recklessness do not qualify as violent felonies under the Armed Career Criminal Act (ACCA) because they cannot satisfy its elements clause).

1

**JA17**

courts cannot assume that the jury chose a predicate that authorized conviction for a drug trafficking crime as an alternative to a crime of violence.

As § 924(c)'s residual clause is void and its force clause is unsatisfied, Mr. Tipton's convictions and sentences: (1) violate due process; (2) violate the laws of the United States and result in a fundamental miscarriage of justice; and (3) were entered in excess of the district court's jurisdiction.  Mr. Tipton is accordingly innocent of the § 924(c) offenses, and his convictions and their associated sentences are void.

## STATEMENT OF RELEVANT FACTS

### A.    Mr. Tipton's Convictions and Sentencing.

On February 3, 1993, Mr. Tipton was convicted of the following offenses: conspiracy to possess cocaine base with intent to distribute in violation of 21 U.S.C. § 846[2]; engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(a) [3]; six counts of murder "while engaged in and working in furtherance of" a CCE in violation of 21 U.S.C. § 848(e)[4]; six counts of murder "to

---

[2]Count 1.

[3]Count 2.

[4]Counts 3, 17, 18, 19, 24, and 25.

maintain or increase position in racketeering enterprise" in violation of 18 U.S.C. § 1959[5]; two counts of maiming "to maintain or increase position in racketeering enterprise" in violation of 18 U.S.C. § 1959[6]; two counts of possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1)[7]; and, most relevant to this motion, two counts of using a firearm in relation to a crime of violence or a drug trafficking crime, 21 U.S.C. § 924(c).[8]

This Court instructed Mr. Tipton's jury that it could find him guilty of his charges under 18 U.S.C. § 1959 based upon any of the substantive crimes listed in the statute, including *conspiracy* to commit them. Tr. 3219-20.[9]  This Court further instructed the jury that it could find him guilty of his 21 U.S.C. § 848(e) charges if

_____

[5]Counts 4, 21, 22, 23, 27, and 28. As discussed below, the indictment did not identify any federal or state statute defining murder as to these counts, nor was the jury instructed as to a specific murder statute to consider.

[6]Counts 29 and 30.

[7]Counts 32 and 33.

[8]Counts 20 and 26.

[9]Citations to Mr. Tipton's transcript are "Tr. [page number]."  Citations to the docket in Mr. Tipton's underlying criminal case, *U.S. v. Tipton, et al*, Case No. 3:92-cr-00068-DJN-1  (EDVA), are "D.[docket number]:[page number]." Citations to Mr. Tipton's dockets in the Fourth Circuit are "Doc. [docket number]," followed by the case number.

3

**JA19**

it concluded that he had *counseled, commanded, induced, procured, or caused* the intentional killing of the named victim.  Tr. 3216-17.

As for Mr. Tipton's § 924(c) offenses, the Second Superseding Indictment offered multiple § 848(e) and § 1959 counts as the predicate offenses for each.  See Exhibit 1.  For the first, Count 20, the indictment cited: conspiracy, as charged in Count 1; the § 848(e) violations charged in Counts 17, 18, and 19; and the § 1959 violations charged in Counts 21, 22 and 23.  *Id.* at 15. For the second, Count 26, the indictment cited: conspiracy, again as charged in Count 1; § 848(e) violations as charged in Counts 24 and 25; § 1959 violations as charged in Counts 27 and 28; and the § 1959 maiming violations charged in Counts 29 and 30.  *Id.* at 15.

When instructing the jury as to the § 924(c) offenses, however, this Court made no reference to these predicates.  Tr. 3221-24.  Rather, it simply read the text of § 924(c)(1) to the jury, including a nearly verbatim recitation of its force and residual clauses.  *Id.*  Nor did this Court identify certain counts as drug trafficking crimes, merely stating generally that each of "[t]he offenses alleged . . . are crimes of violence *or* drug trafficking crimes."  Tr. 3223.  This Court repeatedly admonished the jury to refer to Mr. Tipton's verdict form to "assist" it in "giving individual consideration to each…count against him," T. 3219-22, but that form required no specific findings as to the predicate or § 924(c) offenses, directing the jury only to find Mr. Tipton "Guilty or Not Guilty."  *See* Exhibit 2.

4

**JA20**

At the conclusion of the penalty phase, the jury recommended death sentences for three killings in furtherance of a CCE (Counts 3, 24 and 25). The jury also recommended sentences of life for three murders in furtherance of a CCE for which the prosecution had sought the death penalty. This Court sentenced Mr. Tipton in accord with the jury's recommendation, also imposing terms of imprisonment for the non-capital counts of which Tipton was convicted, including the two § 924(c) counts.

### B.    Mr. Tipton's Direct Appeal.

Mr. Tipton timely appealed to the Fourth Circuit, raising issues relating to the guilt and penalty phases of his trial. That Court vacated Mr. Tipton's conviction under Count One, conspiracy in violation of 21 U.S.C. § 846, as violating the Constitution's double jeopardy clause, but it otherwise affirmed his convictions and death sentences. *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). The Supreme Court denied certiorari. *Tipton v. United States*, 520 U.S. 1253 (1997).

### C.    Mr. Tipton's First Section 2255 Motion.

In 1998, Mr. Tipton filed a timely motion for collateral relief under § 2255, raising in the motion (and amendments to it) claims of error in both the guilt and penalty phases of his trial. This Court denied relief. *Tipton v. United States*, No. 3:92CR68 (E.D. Va. Nov. 26, 2003). The Fourth Circuit affirmed the denial of

5

**JA21**

relief. *United States v. Roane*, et al., 378 F.3d 382 (4th Cir. 2004). The Supreme Court denied certiorari. *Tipton v. United States*, 546 U.S. 810 (2005).

### D.    Mr. Tipton's Prior Applications for Authorization.

In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague. The Court subsequently found *Johnson*'s rule substantive and retroactively applicable to cases on collateral review. *Welch v. United States*, 578 U.S. 120, 129-30 (2016).

On May 20, 2016, Mr. Tipton moved the Fourth Circuit for authorization to file a successive § 2255 motion challenging his § 924(c) convictions and sentences based upon *Johnson* and *Welch*. (Doc. 1, *In re: Tipton*, No. 16-7.) The Fourth Circuit denied that motion on June 6, 2016. (Doc. 13, No. 16-7.)

On April 17, 2018, the Supreme Court held in *Sessions v. Dimaya,* __ U.S. __,138 S. Ct. 1204, 1223 (2018), that the residual clause of the federal criminal code's definition of a "crime of violence," as codified in § 16(b) of Title 18, was void for vagueness and violated the Due Process Clause of the Fourteenth Amendment. On April 17, 2019, Mr. Tipton moved the Fourth Circuit for authorization to file a successive § 2255 motion challenging his § 924(c) convictions and sentences based upon *Dimaya* and the Fourth Circuit's en banc decision in *United States v. Simms,* 914 F.3d 229 (4th Cir. 2019) (*en banc*), *cert.*

6

**JA22**

*denied*, 140 S. Ct. 304 (2019), which held that Section 924(c)(3)(B)'s residual clause was *also* void for vagueness, as it was identical to Section 16(b) and imposed the same "categorical approach" and "ordinary case" inquiry that *Dimaya* rejected. (Doc. 1, *In re Tipton*, 19-2.) The Fourth Circuit summarily denied Mr. Tipton's application on May 14, 2019. (Doc .9, *In re Tipton*, 19-2.)

The Supreme Court issued its decision in *Davis* on June 24, 2019. On June 8, 2020, Mr. Tipton moved the Fourth Circuit for authorization to file a successive § 2255 motion challenging his § 924(c) convictions and sentences based upon *Davis*, which, unlike *Johnson and Dimaya*, directly addressed and invalidated § 924(c)'s residual clause. (Doc. 2-1, *In re Tipton*, 20-10.)

On July 31, 2020, Mr. Tipton filed a motion in this Court pursuant to Section 404 of the First Step Act, seeking sentencing relief "for the interrelated [Section 841(a)(1) and 848] offenses charged in Counts 3, 24, 25, 32, and 33" of his superseding indictment, "as the statutory penalty for each has been modified by the Fair Sentencing Act." ("Section 404 motion," D.24:1.) On November 19, 2020, this Court entered an order denying Mr. Tipton's Section 404 motion on the ground that his "convictions on Counts Three, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five'—his Subsection 848(e) convictions—"do not constitute covered offenses under the First Step Act." D.76:12. This Court expressly incorporated its earlier order addressing a Section 404 motion presented

7

**JA23**

by James Roane, Mr. Tipton's co-defendant. D.76:1, n.1; see also D.66. While concluding that Mr. Tipton's convictions on Counts Thirty-Two and Thirty-Three did constitute covered offenses, this Court declined to exercise its discretion to reduce his sentences for those offenses. D.76:12. This Court further disclaimed any authority to "revisit" the sentencing determination made by Mr. Tipton's 1993 jury, or to consider evidence not heard by that jury. *Id.* Mr. Tipton filed a notice of appeal on November 24, 2020. D.80. His appeal is currently held in abeyance. Doc. 31, *U.S. v. Tipton*, No. 20-16.

On January 24, 2022, the Fourth Circuit granted Mr. Tipton's authorization motion. Doc. 42-1, *In re Tipton*, 20-10. In its accompanying Notice of Authorization, the Fourth Circuit transferred "[t]he post-conviction application attached to the motion for authorization…to the district court with the order granting authorization." Doc. 42-2, *In re Tipton*, 20-10. The Notice further directed that "[a]ny proposed amendment to the post-conviction application should be filed in the district court rather than in the court of appeals." *Id.*

On January 31, 2022, this Court ordered Mr. Tipton "to submit within twenty (20) days of the date of entry hereof, a § 2255 motion complying with Rule 2" of the Rules Governing Section 2255 Proceedings. D.149:2. Mr. Tipton has timely filed the Section 2255 motion appended to his authorization motion in the Fourth Circuit and contemporaneously submits this amended Section 2255 motion.

8

**JA24**

## ARGUMENT

As noted *supra*, *Davis* held that the residual clause in § 924(c)'s definition of a "crime of violence" is void for vagueness and violates the Due Process Clause. 139 S. Ct. 2319. Accordingly, a § 924(c) conviction predicated upon a crime of violence cannot remain valid unless its predicate offense satisfies the elements-based, categorical approach required by § 924(c)(3)(a)'s "force" or "elements" clause. As discussed below, a reviewing court applying the categorical approach determines only "whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *Simms*, 914 F.3d at 233. The reviewing court must also determine whether that use, attempted use, or threatened use of physical force meets "a *mens rea* requirement…of purposeful or knowing conduct." *Borden v. United States*, 141 S. Ct. 1817, 1828, 210 L. Ed. 2d 63 (2021). Moreover, the requirements of § 924(c) cannot be satisfied unless the record established with "certainty" that the defendant was "necessarily" convicted of an offense that qualifies as a "crime of violence." *Shepard v. United States*, 544 U.S. 13, 21 (2005). Accordingly, in cases where the record does not establish which of multiple offenses the jury might have found as the predicate, the § 924(c)

conviction cannot be sustained if even *one* of the possible predicates is not categorically a crime of violence.[10]

As detailed *infra*, at least two types of offenses charged as predicates for Mr. Tipton's § 924(c) counts–those pursuant to § 1959(a) and § 848(e)–cannot categorically qualify as "crimes of violence" absent the residual clause voided by *Davis.* Moreover, the record does not conclusively establish which of the many possible predicates listed were relied upon by the jury when convicting him of § 924(c) violations. Finally, the record cannot establish with certainty whether § 848(e) was considered by the jury as a crime of violence or a drug trafficking charge, which prevents its use as an alternative predicate for the § 924(c) offenses. Accordingly, following *Davis*, Mr. Tipton's § 924(c) convictions are legal nullities that were entered in excess of this Court's jurisdiction, which warrants relief under § 2255.

---

[10] The Fourth Circuit has granted a certificate of appealability on the question of "whether an 18 U.S.C. § 924(c) conviction is subject to vacatur where the indictment charged multiple predicates, one of which is invalid," but was unable to reach the question. *United States v. Taylor*, 979 F.3d 203, 205 (4th Cir. 2020), cert. granted, 141 S. Ct. 2882, 210 L. Ed. 2d 990 (2021) ("given our holding that here neither predicate constitutes a 'crime of violence' under § 924(c), we cannot reach that question in this case.")

**I.**     **MR. TIPTON'S IS ENTITLED TO RELIEF UNDER 28 U.S.C. § 2255 BECAUSE HIS CLAIM UNDER *DAVIS* IS COGNIZABLE, TIMELY, AND SATISFIES THE SUCCESSIVE PETITION REQUIREMENTS OF § 2255(H)**

**A.     Mr. Tipton's Claims under *Davis* are Cognizable under § 2255(a).**

A federal prisoner may obtain relief under 28 U.S.C. § 2255(a) if his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence." Mr. Tipton's convictions violate the Due Process Clause of the Fifth Amendment, violate federal law, and exceed this Court's jurisdiction. This Court therefore should grant him relief.

As detailed below, Mr. Tipton's § 924(c) convictions violate the Due Process Clause, as their predicate offenses cannot categorically satisfy its force clause and, thus cannot be sustained as "crimes of violence" absent the residual clause vacated by *Davis*. As no predicates were clearly established as drug trafficking crimes, Mr. Tipton's indictment therefore failed to state an offense under § 924(c). Given this infirmity, his convictions violate the laws of the United States. This is precisely the type of error that is cognizable under § 2255(a). *See Davis v. United States,* 417 U.S. 333, 346-47 (1974) (holding that when an intervening decision establishes that a prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a

11
**JA27**

complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255").

Mr. Tipton's convictions exceed this Court's jurisdiction because his indictment not only failed to state a § 924(c) offense, but also alleged conduct that is outside the reach of that statute. These convictions are legal nullities entered in excess of this Court's jurisdiction, and they must be vacated. *See United States v. Brown,* 752 F.3d 1344, 1347 (11th Cir. 2014) (a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); see also *United States v. Barboa,* 777 F.2d 1420, 1423 n.3 (10th Cir. 1985) (even guilty plea "does not bar a claim that the defendant may not constitutionally be convicted in the first instance," as "this jurisdictional defect…goes 'to the very power of the State to bring the defendant into court to answer the charge brought against him.'" (quoting *Blackledge v. Perry*, 417 U.S. 21, 30 (1974)).

### B.    Mr. Tipton's Motion Satisfies § 2255(h).

Section 2255(h)(2) imposes a gatekeeping restriction on second or successive motions. Before filing such a motion, the petitioner must obtain permission to do so from the appropriate circuit court of appeals. *See* 28 U.S.C. § 2255(h)(2). The court of appeals must certify that the successive motion contains a claim based on "a new rule of constitutional law, made retroactive to cases on

collateral review by the Supreme Court, that was previously unavailable." *Id.; see also* 28 U.S.C. § 2244(b)(3)(C).  In granting Mr. Tipton's application for authorization and directing this Court to file his Section 2255 motion, the Fourth Circuit implicitly made that certification.  The Fourth Circuit has also explicitly "consider[ed] whether *Davis* (1) announced a new rule of constitutional law (2) made retroactive to cases on collateral review (3) by the Supreme Court (4) that was previously unavailable"[11] and concluded that "*Davis* satisfies these requirements."  *In re Thomas*, 988 F.3d 783, 788 (2021).

## C.    Mr. Tipton's Motion is Timely Under § 2255(f).

A 2255 motion must be filed within a one-year limitations period, which runs from the latest applicable triggering event.  28 U.S.C. § 2255(f).  Where, as here, the motion is pursuant to a "right [that] has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review," the one-year limitations period runs from "the date on which the right asserted was initially recognized by the Supreme Court."  28 U.S.C. § 2255(f)(3).  The Supreme

---

[11]*Davis*'s new constitutional rule was not previously available to Mr. Tipton during his direct review, which concluded in 1997, nor during his prior 2255 filings.  *Davis* marked the first occasion when the Supreme Court applied the constitutional vagueness analysis to the residual clause in 18 U.S.C. § 924(c) and found it wanting.

Court decided *Davis* on June 24, 2019. Because Mr. Tipton sought authorization

to file this successive motion within one year of that date (*i.e.*, before June 24,

2020), this motion is timely.

**II.    AFTER *DAVIS*, MR. TIPTON'S § 924(C) CONVICTIONS CAN NO LONGER BE SUSTAINED.**

Mr. Tipton's convictions for using or carrying a firearm during and in

relation to a "crime of violence" are void because their predicate offenses cannot as

a matter of law qualify as "crime[s] of violence" for purposes of § 924(c). To

constitute a crime of violence under § 924(c), the offense requires not only the use

of strong physical force[12], but also that the use of force is intentional. *Borden*, 141

S. Ct. at 1821-22 (crime capable of commission with "a less culpable mental state

than purpose or knowledge," such as "recklessness," cannot qualify as "violent

felony"). As none of these predicate offenses requires as an element the (1)

intentional (2) use of strong physical force, necessary to satisfy the force or

elements clause, and as the residual clause can no longer provide a catch-all for

such offenses, Mr. Tipton's § 924(c) convictions are no longer valid federal

crimes. Their vacatur, moreover, entitles Mr. Tipton to a resentencing free from

their impermissible influence upon his jury.

---

[12]The "physical force" required for a crime of violence is "*violent* force –
that is, force capable of causing physical pain or injury to another person." *Johnson
(Curtis) v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

Section 924(c) prohibits "us[ing]" a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). It is "a combination crime," in that it "punishes the temporal and relational conjunction of *two separate acts*." *Rosemond v. United States,* 572 U.S. 65, 69 (2014) (emphasis added). Accordingly, the jury must find *each* of those separate acts: "the commission of an underlying crime and the use of a firearm." *Simms*, 914 F.3d at 237 (quoting *Smith v. United States*, 508 U.S. 223, 227-28 (1993)).

After *Davis*, the first of these acts, the underlying "crime of violence," cannot be found in Mr. Tipton's case. At the time of Mr. Tipton's trial, § 924(c)(3) defined a "crime of violence" as a felony that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). *Davis,* however, has had the effect of striking the second of these definitions—§ 924(c)(3)(B), otherwise known as the residual clause—from the statute as unconstitutionally vague. *Davis*, 139 S. Ct. at 2336. As a result, the residual clause, which was cited by this Court in its instructions to the jury, can no longer support Mr. Tipton's § 924(c) convictions.

Nor can the surviving elements clause; indeed, it never could. To qualify as a "crime of violence" under the elements clause, the "use of...force" must satisfy

15
**JA31**

two requirements. First, the conduct, as described in the *statute* (and not as events actually played out), must involve *violent* force—that is, "strong physical force" that is "capable of causing physical pain or injury to another person." *Johnson v. United States,* 559 U.S. 133, 140 (2010). Second, the use of such force must be *intentional*—not merely reckless or negligent. *Borden*, 141 S. Ct. at 1834 ("[o]ffenses with a *mens rea* of recklessness do not qualify as violent felonies under ACCA"); *see also Garcia v. Gonzales,* 455 F.3d 465, 469 (4th Cir. 2006) ("recklessness, like negligence, is not enough to support a determination that a crime is a 'crime of violence'"). Because at least one—if not all—of Mr. Tipton's convictions fail to satisfy the requirements of the elements clause, his § 924(c) convictions are a legal nullity that were entered in excess of this Court's jurisdiction, and relief under § 2255 is warranted.

> **A.      Under the Modified Categorical Approach, a § 924(c) Conviction Based on Multiple Offenses is Invalid if There is Ambiguity as to Which Offense Supported the § 924(c) Conviction and at Least One of the Possible Predicates is not Categorically a "Crime of Violence."**

To determine whether a predicate offense constitutes a "crime of violence" under the "force" or "elements" clause of § 924(c), courts must apply the categorical approach. *See Borden*, 141 S. Ct. at 1822 ("[t]o decide whether an offense satisfies the elements clause, courts use the categorical approach"); *United States v. Evans,* 848 F.3d 242, 245–46 (4th Cir. 2017); *United States v. Fuertes*,

16

**JA32**

805 F.3d 485, 498 (4th Cir. 2015).  This approach is a purely legal analysis that requires the courts "to look to whether the statutory elements of the offense *necessarily require* the use, attempted use, or threatened use of physical force." *Simms*, 914 F.3d at 233.  And the courts must "look *only* to the statutory definitions—*i.e.*, the elements—of a defendant's [offense] and *not* to the particular facts underlying [the offense]." *Id.* (emphases added).

In other words, an offense can only qualify as a "crime of violence" under the categorical approach if *all* of the criminal conduct covered by the statute, including the least culpable conduct, matches or is narrower than the definition of a "crime of violence." *Borden*, 141 S. Ct. at 1832 ("[a]n offense does not qualify as a 'violent felony' unless the *least* serious conduct it covers falls within the elements clause" (emphasis in original)); *see also United States v. Torres-Miguel,* 701 F.3d 165, 167 (4th Cir. 2012) (abrogated on other grounds by *United States v. Allred*, 942 F.3d 641, 653 (4th Cir. 2019)); *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008) ("We look only to the statutory definition of the . . . crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a 'crime of violence'"); *see also United States v. Davis*, No. 4:18-cr-00011, 2019 WL 3307235, at *9 (W.D. Va. July 23, 2019) ("[T]he key consideration is whether the state statute 'sweeps more broadly than the generic crime.' If the state statute is broader, and is applied to

17

**JA33**

capture non-violent conduct, the conviction in question cannot serve as the predicate § 924(c) "crime of violence" regardless of whether the defendant's actual conduct violates the generic form of the offense" (quoting *Descamps v. United States*, 570 U.S. 254, 260–61 (2013)). "When a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not 'categorically' a crime of violence under the force clause." *Simms*, 914 F.3d at 233.

If necessary, the court may employ the modified categorical approach, and consult a select few documents to help "'determine what crime, with what elements,' formed the basis of a defendant's conviction." *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019) (quoting *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016)). These documents, known as *Shepard* documents, are generally limited to the indictment, jury instructions, and verdict form. *See Shepard v. United States*, 544 U.S. 13, 26 (2005). The modified categorical approach "acts not as an exception [to the categorical approach] but instead as a tool" to facilitate its inquiry, which remains confined to the *elements* of the crime and *not* the facts of the case. *Descamps*, 570 U.S. at 261-262.

Under the modified categorical approach, therefore, an offense cannot serve as the predicate for a § 924(c) conviction unless the *Shepard* documents establish with "certainty" that the defendant was "*necessarily*" convicted of an offense that

18

**JA34**

meets its surviving definition for a crime of violence. *Shepard*, 544 U.S .at 21.

The "plausibility or even likelihood," that the defendant was convicted of a

qualifying crime of violence is not enough. *United States v. Clay*, 627 F.3d 959,

967 (4th Cir. 2010). This bar is purposefully set high to protect against the kind of

"evidentiary inquiries into the factual basis for the conviction" that the categorical

approach eschews. *Shepard*, 544 U.S. at 21, 22; *Fuertes*, 805 F.3d at 498.

Accordingly, when it cannot be conclusively determined that the defendant

was convicted of an offense that categorically qualifies as a "crime of violence,"

courts should assume that he was convicted of the "least serious" conduct

criminalized by the underlying statute. *See United States v. Chapman*, 666 F.3d

220, 228 (4th Cir. 2012) (looking to the "the least serious of the statutory conduct"

only to determine which crime a defendant pleaded guilty to); *see also United

States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (*en banc*) ("[I]n trials by jury, it

has been established that a defendant convicted under a conjunctively charged

indictment cannot be sentenced–in the absence of a special verdict form identifying

the factual bases for conviction."); *Ortiz v. Lynch*, 796 F.3d 932, 935 (8th Cir.

2015) (alterations in original) ("[W]e must presume [Ortiz's] conviction rested

upon [nothing] more than the least of th[e] acts criminalized" (quoting *Moncrieffe

v. Holder*, 569 U.S. 184, 190-91 (2013)).

19

**JA35**

Moreover, in cases such as Mr. Tipton's, in which multiple potential predicates are put before the jury, a § 924(c) conviction cannot be sustained if even *one* of the possible predicates is not categorically a crime of violence under its force clause and the *Shepard* documents do not conclusively establish the basis of the conviction. The Second Circuit recognized this principle in *United States v. Capers*, vacating the appellant's conviction for a § 924 firearms offense "[b]ecause it is unclear whether the jury based its decision to convict [the defendant]" on one of the alternative predicates that *Davis* had rendered invalid, or on one that was still valid. 20 F.4th 105, 112 (2d Cir. 2021). The Fifth Circuit held similarly in *United States v. McClaren*, vacating § 924 convictions where it "cannot determine whether the jury relied on the RICO or drug-trafficking predicate," noting that "because a RICO conspiracy is not a crime of violence, the basis for conviction may have been improper." 13 F.4th 386, 414 (5th Cir. 2021).

Applying these principles in *United States v. McCall*, this Court vacated a § 924(c) conviction post-*Davis* because the jury *could* have based its § 924(c) verdict on the offense that did not constitute a crime of violence. 2019 WL 4675762, at *6-7 (E.D. Va. Sept. 25, 2019). Likewise, in *United States v. Berry*, the court vacated a § 924(c) conviction post-*Davis* because "there [wa]s no means of establishing whether the conviction was for attempt–which could qualify as a crime of violence–as opposed to conspiracy–which *does not* qualify as a crime of

20

**JA36**

violence." 2020 WL 591569, at *3 (W. D. Va. Feb. 6, 2020) (citation omitted). In

*United States v. Lettiere*, the District of Montana vacated a § 924(c) conviction

because the *Shepard* documents "arguably did not establish that he committed a

crime of violence as defined by § 924(c)(3)(A)." 2018 WL 3429927, at *4 (D.

Mont. July 16, 2018).

This authority also underscores the inapplicability to Mr. Tipton's case of

the Fourth Circuit's decision in *United States v. Ali*, 991 F.3d 561, 574 (4th Cir.

2021), which was the subject of extensive briefing in the Fourth Circuit during its

consideration of Mr. Tipton's authorization motion. See Docs. 35, 37, 40, 41, *In

re: Tipton*, No. 2010. In *Ali*, the Fourth Circuit denied the defendant's unpreserved

challenge to his § 924(c) conviction, which argued that it was unclear which of two

*closely intertwined* offenses was its predicate—aiding and abetting Hobbs Act

robbery, which constituted a crime of violence, or Hobbs Act conspiracy, which

did not. *Id.* at 574. The Fourth Circuit concluded that it could answer that factual

question itself, through "a case-specific and fact-intensive determination" that

yielded an "*overwhelming* weight" of uncontroverted evidence establishing that Ali

had committed the valid predicate offense while providing and carrying firearms.

*Id.* at 574-76 (emphasis added) (internal citations and quotations omitted).

But *Ali* is inapposite here. In the first place, there is neither the

"overwhelming" record evidence nor "strong proof" present in *Ali*, 991 F.3d at

21

**JA37**

575-76, that Mr. Tipton used a firearm in the commission of the still-valid predicate offenses.  Mr. Tipton's second superseding indictment offered multiple predicates for each of his § 924(c) offenses, alternatively offering his convictions for drug-trafficking, as charged under 21 U.S.C. §§ 846 and 848(a), *or* crime of violence killings, as charged under 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 1959, neither of which are valid predicates after *Davis*.[13]  And there was no clear evidence in the record that Mr. Tipton used a firearm *in the commission* of his drug-trafficking offenses—the only remaining, valid predicates. In light of this record evidence, it is simply impossible to assume that the jury's § 924(c) verdicts comport with the Constitution.

The case of *United States v. Said,* which is now pending on appeal in the Fourth Circuit, is instructive.[14]  There, after receiving briefing on *Ali,* the district court for the Eastern District of Virginia granted the petitioner's § 2255 motion and vacated his § 924(c) convictions based on its "grave doubt…based on the record[,]

---

[13] For the first, Count 20, the indictment cited: § 846 conspiracy, as charged in Count 1; the §§ 848(a) and 848(e) violations charged in Counts 17, 18, and 19; and the § 1959 violations charged in Counts 21, 22 and 23. Exhibit 1 at 15. For the second, Count 26, the indictment cited: § 846 conspiracy, again as charged in Count 1; §§ 848(a) and 848(e) violations as charged in Counts 24 and 25; § 1959 violations as charged in Counts 27 and 28; and the § 1959 maiming violations charged in Counts 29 and 30.  *Id.*

[14] *United States v. Said*, No. 21-7089 (4th Cir.).

22

**JA38**

which is unclear on whether the jury relied on the invalid predicate offenses…or valid offenses…or a combination thereof" when finding him guilty. See Order (Doc. No. 632) at 22, *Said v. U.S.*, Case No. 2:10-CR-00057-RAJ-DEM (E.D. Va. July 19, 2021). As with Mr. Tipton, *Said*'s § 924(c) offenses were (1) based on multiple predicates that, unlike *Ali*, (2) were not factually intertwined and (3) were imposed by a jury that was never instructed that it had to decide unanimously which predicate supported its finding of guilt.

Thus, in Mr. Tipton's case, the *Shepard* documents do not establish with "certainty" which potential predicates underlay the jury's ultimate § 924(c) determinations. The superseding indictment pointed to multiple possible predicate offenses under 18 U.S.C. § 1959(a), 21 U.S.C. §§ 846, and 848(e)(1)(A). *See* Exhibit 1 at 15, 18. The jury instructions, moreover, referred only to the general terms used in the statute itself, stating that "[i]t is charged in the indictment that . . . [the defendants] used a firearm during and in relationship – or in relation to the commission of a crime of violence or a drug-trafficking crime." Tr. 3221. In instructing the jury as to the burden of proof for Mr. Tipton's § 924(c) counts, this Court stated only that "the government must prove the following two essential elements beyond a reasonable doubt: one, the defendant committed *the crime as charged in the indictment*; and two, during and in relation to the commission of *that* crime, the defendant knowingly used or carried a firearm." Tr. 3222

23

**JA39**

(emphasis added).  Rather than identify any specific "crime charged in the indictment," however, this Court then merely listed "[t]he offenses alleged in Counts . . . Eight, Ten, Eleven, Thirteen, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty-one, Twenty-two, Twenty-three, Twenty-four, Twenty-five, Twenty-seven, Twenty-eight, Twenty-nine, Thirty" as "crimes of violence or drug trafficking crimes."  Tr. 3223.

For its part, the portion of special verdict form that addresses the § 924(c) counts refers only to "killing," which matches the language used to describe both the § 1959(a) and § 848(e) offenses on the verdict form.  As set forth below, however, neither § 1959(a) nor § 848(e) qualifies as a categorical "crime of violence" under *Davis*.

> **B.**  **Section 1959(a) is Not Categorically a "Crime of Violence" and Thus Cannot Support a § 924(c) Conviction.**

While § 1959 was identified as a possible underlying crime for each of Mr. Tipton's § 924(c) convictions, its statutory language sets forth multiple crimes that are punishable when done "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  These crimes include (1) murder, (2) kidnapping, (3) maiming, (4) assault with a dangerous weapon, (5) assault resulting in serious bodily injury, (6)

24

**JA40**

a threat to commit a crime of violence, (7) attempt to commit the foregoing, or (8) conspiracy to commit the foregoing. 18 U.S.C. § 1959(a). In Mr. Tipton's case, the jury instructions and other *Shepard* documents identify as many as *four* types of § 1959 conduct—each of which categorically fails to qualify as a § 924(c) "crime of violence" following *Davis*. As even one invalid predicate undermines Mr. Tipton's § 924(c) convictions under the modified categorical approach, the resulting uncertainty leaves those convictions untenable.

> 1. *The jury was empowered to base Mr. Tipton's § 924(c) convictions on § 1959 conspiracy, which is not a categorical "crime of violence," and it may have done so.*

As the en banc Fourth Circuit made clear in *Simms*, conspiracy does not categorically qualify as a "crime of violence" and cannot support a § 924(c) conviction. *Simms*, 914 F.3d at 233-34. "[T]o convict a defendant of [a conspiracy] offense, the Government must prove only that the defendant agreed with another to commit actions that, if realized, would violate the [statute at issue]. Such an agreement does not invariably require the actual, attempted, or threatened use of physical force." *Id.* The instructions given by Mr. Tipton's trial court underscore this point, as they informed his jury that the only two elements needed to convict a defendant of conspiracy were "that two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment…[and] that

25

**JA41**

the defendant knowingly and willfully became a member of such a conspiracy."

Tr. 3201.  Elements of such vagueness and breadth would allow a defendant to be

found guilty of conspiracy for an incredibly wide spectrum of conduct *and*

culpability.  It is accordingly impossible to discern precisely what degree of

responsibility the jury ultimately assigned to Mr. Tipton—an uncertainty that

undermines the reliability of his sentences to a degree that the Constitution cannot

abide.

 As noted above, 18 U.S.C. § 1959 includes conspiracy to commit any of the

multiple crimes listed in the statute.  In Mr. Tipton's case, this Court also

specifically instructed the jury that it could base its finding of guilt on the crime

charged *or* of "*conspir[acy]* to commit the crime charged in the particular count

under consideration."  Tr. 3220.  It is therefore impossible to tell whether the jury

found Mr. Tipton guilty of § 924(c) based upon a crime itself or the conspiracy to

commit it.  However, this Court must assume that the jury followed its instructions,

which unequivocally stated that the § 924(c) conviction could be predicated on

either.  *United States v. Runyon*, 707 F.3d 475, 497 (4th Cir. 2013) (quoting

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("Our analysis is governed, first

and foremost, by the 'almost invariable assumption of the law that jurors follow

their instructions'"); *see also United States v. Hager*, 721 F.3d 167, 189 (4th Cir.

2013) ("Without any evidence to the contrary, we must assume that the jury

26

**JA42**

followed the instructions given to it by the court."). Thus, in *McCall*, this Court vacated the defendant's § 924(c) conviction because conspiracy could not qualify as a § 924(c) predicate and the "liability in [the § 924(c) count] could have been based on committing assault with a dangerous weapon by either unlawful or malicious wounding or brandishing *or conspiring* to commit those offenses." 2019 WL 4675762, at \*7 (emphasis added). The same is true here. Because conspiracy cannot qualify as a "crime of violence," all of Mr. Tipton's § 924(c) convictions are invalid.

> 2.    *After* Davis, *Mr. Tipton's § 924(c) convictions can no longer rest on § 1959 murder offenses.*

Even if conspiracy had not been included as an underlying offense, Mr. Tipton's § 1959 counts would not stand up to the categorical, elements-based approach now required for § 924(c) convictions after *Davis*. Pursuant to *Borden*, the level of mens rea needed for a crime of violence is "a purposeful or knowing mental state," 141 S. Ct. at 1830, which "excludes conduct, like recklessness, that is not directed or targeted at another," *ibid* at 1833. *See also United States v. Townsend,* 886 F.3d 441, 444–45 (4th Cir. 2018) ("'Use' of force means to act with a *mens rea* more culpable than negligence or recklessness."); *United States v. McNeal*, 818 F.3d 141, 154-55 (4th Cir. 2016) ("Although *Leocal* reserved the question of whether a reckless application of force could qualify as a 'use' of force, we answered that question two years later by ruling that recklessness was not

27

**JA43**

enough."); *see also Allred*, 942 F.3d at 652 ("[A]n offense will not have as an element the 'use' of force sufficient to qualify as a violent felony if it does not have the requisite level of *mens rea*."); *United States v. Middleton*, 883 F.3d 485, 497 (4th Cir. 2018) ("The difference in mental states distinguishes the reckless causation of death…that cannot constitute a "use…of physical force," from the intentional causation of injury…that constituted "use of…physical force.") (Judge Floyd, writing for the plurality); *Popal v. Gonzales*, 416 F.3d 249, 254 (3d Cir. 2005) (holding that a court may not assume a *mens rea* greater than "the minimum culpability required for a conviction under" the predicate statute and finding that, because the predicate statute "requires a *mens rea* of recklessness, rather than intent, it is not a crime of violence under § 16(a)").  Accordingly, a crime that could be committed without intent sweeps more broadly than § 924(c) allows and cannot qualify as a "crime of violence" under the elements clause.  *Garcia*, 455 F.3d at 468 ("[The predicate state statute] does not contain an element that there be the intentional employment of physical force against a person or thing, and thus is beyond the scope of 18 U.S.C. § 16(a)").

In Mr. Tipton's case, § 1959(a) fails under this standard. The *Shepard* documents are devoid of any reference to a specific "murder" statute to which the categorical, elements-based approach required by *Davis* could be applied.  Indeed, no specific "murder" charge or statute is referenced in the indictment, the jury

instructions, or the jury's special verdict form. As an elements-based analysis of a murder statute can only occur where there is a statute to analyze, the lack of any reference to any specific murder statute makes it *impossible* to determine whether Mr. Tipton § 1959 convictions established the necessary *mens rea* to satisfy the intent and elements required for a conviction under § 924(c)'s remaining force clause. As a result, it cannot be shown that he was convicted of a crime that is categorically a "crime of violence."

But even if Mr. Tipton's § 1959 conviction *had* rested on the federal murder statute, 18 U.S.C. § 1111, it would not categorically qualify as a "crime of violence," because that statute does not require intent.

*First*, homicide under § 1111 encompasses *felony* murders—including those based on felonies resulting in death where neither the underlying felony, nor the resultant death requires the intentional use of violent physical force. Thus, the government has elsewhere conceded, in light of *Borden*, that kidnapping resulting in death does not constitute a crime of violence. Government's Unopposed Motion to Vacate, Entry ID: 5115866, *United States v. Ross*, Nos. 18-2800/18-2877 (8th Cir., Jan. 7, 2022) ( "After *Borden*…[defendants'] convictions under Count Three must be vacated because kidnapping resulting in death is no longer a crime of violence under the force clause of 18 U.S.C. § 924(c)(3)(A)."); *see also United States v. McDuffy*, 890 F.3d 796 (9th Cir. 2018) (holding that bank robbery

resulting in even accidental death satisfies the mens rea requirement).   Because intent is not required for its commission, § 1959(a)(1) sweeps more broadly than § 924(c)(3)(A) and cannot categorically qualify as a crime of violence.

Second, second degree murder does not require a *mens rea* necessary to satisfy the force clause. The elements of § 1111 are (1) "unlawful killing of a human being" and (2) "malice aforethought," which does not require the higher degree of *mens rea* demanded by § 924(c).  Instead, the "malice aforethought" element of § 1111 requires only evidence of conduct that is "reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm."  *United States v. Fleming*, 739 F.2d 945, 947–48 (4th Cir. 1984); *United States v. Begay*, 934 F.3d 1033, 1040 (9th Cir. 2019) ("[S]econd-degree murder may be committed recklessly—with a depraved heart mental state—and need not be committed willfully or intentionally") (en banc review is pending); *Simpkins v. State,* 596 A.2d 655, 657 (Md. Ct. Spec. App. 1991) (holding second-degree murder requires only "the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart)" or "the intent to commit a dangerous felony."); Dep't of Justice, Violent Crimes in Aid of Racketeering: A Manual for Federal Prosecutors § 9-110.000 (2006) ("The government need not show a subjective intent to kill" to establish malice

aforethought.).  Accordingly, because § 1111 encompasses second-degree murders, and "second-degree murder [as defined in § 1111] can be committed recklessly, rather than intentionally," § 1111 does not require the government to prove an intentional killing, and does not categorically constitute a "crime of violence." *Begay*, 934 F.3d at 1040.

While the Fourth Circuit has ruled that some second-degree murder statutes can categorically qualify as "crimes of violence," those rulings addressed specific statutes that were available for the required elements-based analysis and rested upon the conclusion that those statutes required intent.  In *In re Irby*, for example, the Fourth Circuit examined a defendant's convictions for retaliatory murder under 18 U.S.C. §§ 1513 and 1111.  858 F.3d 231, 234 (4th Cir. 2017).[15]  As a specific murder statute could be identified for analysis, the court was able to determine that each of the necessary elements to constitute a "crime of violence"—including the *mens rea* element—were present in § 1513.  *In re Irby*, 858 F.3d at 234 (Section 1513 "makes it an offense to intentionally kill another person in retaliation" (emphasis added)).  Similarly, in *United States v. Parrish*, the defendant's conviction for second-degree murder was pursuant to North Carolina law, which

---

[15]The defendant in *Irby* was also convicted of 18 U.S.C. § 1111, which the court described as *setting forth the punishment for a violation of § 1513*.  *In re Irby*, 858 F.3d 231, 234 (4th Cir. 2017).

31

**JA47**

"is proved by *intentional* conduct." 767 Fed. Appx. 440, 442 (4th Cir. 2019) (quotation omitted) (emphasis added). Here such an analysis is impossible because nothing in the record references a murder statute that categorically qualifies as a crime of violence. Accordingly, this Court has no way to identify and analyze the elements of the "murder" relied upon by the jury in reaching its verdict. For that reason, cases like *Irby* do not control—and, indeed, are irrelevant to—this court's analysis of Mr. Tipton's § 924(c) convictions.

Moreover, while *Borden* explicitly reserved the question of whether extreme recklessness or a "depraved heart" mental state would satisfy the force clause (a question not before the Court), *Borden*, 141 S. Ct. at 1825 n.4, the reasoning of both the plurality opinion and Justice Thomas's concurrence indicate that the level of intent required by the force clause could be satisfied only by purposeful acts, and not by *any* form of recklessness.

Despite its modifier, extreme recklessness is *still* recklessness, requiring a risk "far less than . . . substantial certainty." Wayne R. LaFave & Austin W. Scott, 2 Substantive Criminal Law § 14.4(a), Westlaw (3d ed. database updated Oct. 2020). And even tolerance of a large and dangerous risk is not the "deliberate choice of wreaking harm on another," that *Borden* rejected, but rather "mere indifference to risk." *Borden*, 141 S. Ct. at 1830 (plurality op.) (emphasis added).

32

**JA48**

Thus, even when the risk is "extreme," it remains just a possibility, and one that the defendant might have underestimated. Actors who disregard a risk that their conduct will create harmful force simply do not "use," "target," or "intend" that application of force in the way that an intentional violator does. See *Borden*, 141 S. Ct. at 1824-27 (plurality op.).[16] An interpretation of § 924(c)(3)(A) that

---

[16]The *Borden* plurality held up a number of cases as examples of extreme reckless conduct that do not fit the common understanding of violent felonies—most prominently reckless driving, but also jumping from a mall balcony and skiing at dangerously fast speeds. 141 S. Ct. at 1831.

Similar conduct has been found sufficient for conviction of crimes that require "extreme" recklessness. Carelessly throwing a piece of lumber into a street would be sufficient in Virginia courts to support a murder conviction. *See Mosby v. Commonwealth*, 190 S.E. 152, 154 (Va. 1937); *Whiteford v. Commonwealth*, 27 Va. 721, 724–25 (Va. Gen. Ct. 1828). Instructing an undocumented alien to hide in a truck compartment and failing to tell Border Patrol agents of his hiding place is sufficient to support a federal conviction for second degree murder. *United States v. Escobedo-Moreno*, 781 F. Appx. 312, 314, 318 (5th Cir. 2019). Failing to properly train and control aggressive dogs, so that the defendant "could have reasonably foreseen" that they could injure someone, is sufficient to support a murder conviction in Kansas. *State v. Davidson*, 987 P.2d 335 (Kan. 1999).

And reckless or drunk driving are the paradigmatic examples of reckless conduct that "do[es] not fit within the ordinary meaning of the term violent crime" and would not satisfy the force clause according to the *Borden* plurality. 141 S. Ct. at 1830-31 (plurality op.) (internal quotation marks omitted). It is well established that reckless and intoxicated driving can count as extremely reckless behavior. *See Knight v. Commonwealth*, 733 S.E.2d 701, 708-09 (Va. Ct. App. 2012) (driver who drove a car at a high speed into a turn lane); *United States v. Lemus-Gonzalez*, 563 F.3d 88, 93 (5th Cir. 2009) (intoxicated driver who transported aliens without seatbelts at a high rate of speed); *State v. Barstad*, 970 P.2d 324, 326 (Wash. Ct. App. 1999) (intoxicated driver who sped through red light at busy intersection), *review denied*, 137 Wash. 2d 1037, 980 P.2d 1284 (1999); *State v.*

33

**JA49**

would sweep in these "extremely reckless" violators would have results even harsher than those that the *Borden* plurality considered implausibly severe.

As noted *supra*, the Ninth Circuit reached that same conclusion in *Begay*, a pre-*Borden* case in which it concluded that second-degree murder does not categorically constitute a crime of violence because it can be committed recklessly, rather than intentionally.  *Begay*, 934 F.3d at 1040.  Even though the recklessness required for commission of second-degree murder was "extreme," the Ninth Circuit deemed the specific level of recklessness inconsequential to the result, as its precedent required intentional use of force, and "[r]eckless murder, no matter how extreme, is not intentional." *Id.*

In sum, and as the *Borden* plurality explained, reviewing courts "'cannot forget that we ultimately are determining the meaning of the term 'crime of violence.'" 141 S. Ct. at 1830 (quoting *Leocal*, 543 U.S. at 11) (emphasis added). And that term is meant to establish and police the boundaries between even

---

*Braden*, 867 S.W.2d 750, 753 (Tenn. Crim. App. 1993) (intoxicated driver who took a blind curve at over eighty miles per hour); *Allen v. State*, 611 So.2d 1188, 1189-90 (Ala. Crim. App. 1992) (intoxicated driver who swerved into oncoming traffic); *State v. Woodall*, 744 P.2d 732, 736 (Ariz. Ct. App. 1987) (intoxicated driver who crossed the center line while speeding); *Pears v. State,* 672 P.2d 903, 909 (Alaska App.1983) (intoxicated driver who ran stop signs, yield signs, and traffic lights), *remanded on other grounds*, 698 P.2d 1198 (Alaska 1985).

extreme, reckless conduct and the "narrow 'category of *violent*, *active* crimes'" that it defines. *Id.* (quoting *Johnson*, 559 U.S. at 140) (emphasis added).

*Third,* both §§ 1959(a)(1) and 1959(a)(2) categorically fail to qualify as "crime[s] of violence" because, like a wide range of other offenses under state and federal law, its plain language criminalizes acts of *omission* that require *no* physical force, much less the "violent force" required by § 924(c)'s force clause. And, under the categorical approach, that fact is disqualifying. *See, e.g., United States v. Gomez,* 690 F.3d 194, 201 (4th Cir. 2012) (holding that a statute categorically fails to qualify as a "crime of violence" under element clause because "a defendant may be found guilty" under the statute "by committing an affirmative act or by neglecting to act, neither of which necessarily requires the use of physical force); *see also Torres-Miguel,* 701 F.3d at 169-70 (citing examples); *United States v. Mayo,* 901 F.3d 218, 227 (3d Cir. 2018) (holding that offense did not categorically qualify as a "crime of violence" under elements clause because convictions "have been upheld not because a defendant used physical force against the victim, but because serious bodily injury occurred, as with the deliberate failure to provide food or medical care"). *But see United States v. Rumley*, 952 F.3d 538 (4th Cir. 2020) (explaining, though in dicta,—"that the intentional infliction of bodily harm requires a use of physical force, *even if* the means used are indirect").

35

**JA51**

>   3.   *Maiming is not categorically a crime of violence and thus cannot support Mr. Tipton's 924(c) convictions.*

An analysis of Mr. Tipton's "maiming" charges leads to the same conclusion. The indictment fails to identify a particular statute defining maiming, and the jury instructions say even less about maiming than they do about murder. In fact, they reference the counts by number only and do not even describe them. As a result, it is *impossible* to determine whether Mr. Tipton was convicted of maimings that would categorically qualify as "crimes of violence."

Additionally, maiming under § 1959(a)(2) suffers from the same defects discussed above as to murder: it criminalizes acts of omission that require no physical force whatsoever. Maiming is an assault, which itself does not require actual violent physical force. *See United States v. Royal,* 731 F.3d 333, 341 (4th Cir. 2013). Moreover, the intent element of maiming does not convert assault into a "violent felony" because it can be accomplished merely by *causing* injury rather than the use of strong physical force. *See Torres-Miguel,* 701 F.3d at 168 (holding that the threat of *any physical injury,* even "serious bodily injury or *death,"* does not necessarily require the use of physical force—let alone "violent force").

36

**JA52**

4.    *Mr. Tipton's 924(c) convictions cannot rest on assault resulting in serious bodily injury, which is not categorically a crime of violence.*

Count 26 charged Mr. Tipton with "assault resulting in serious bodily injury." Verdict, 22a. Because no intent is required for such a conviction, this is not categorically a crime of violence and thus does not support a conviction under § 924(c)(1)(A). *See United States v. Knif*e, 592 F.2d 472, 482 (8th Cir. 1979) ("Section 113(f) requires only that the assault shall have resulted in serious bodily harm; the assault need not have been committed with a dangerous weapon, or with intent to do bodily harm.").

**C.    Mr. Tipton's § 848(e) Convictions Also Fail to Qualify Categorically as "Crimes of Violence" under § 924(c).**

Section 848(e), which was identified as a possible underlying crime for both of Mr. Tipton's § 924(c) counts, but Mr. Tipton's convictions under § 848(e)(1)(A) likewise do not categorically qualify as crimes of violence under § 924(c)(3)(A) because they do not require 1) the intentional 2) use of any physical force by the defendant.

First, the *mens rea* required in the predicate crime § 848(e) includes an intent level of "extreme recklessness/grave risk of death," a level that falls short of the intent required for a crime of violence under *Borden, supra. See e.g., United States v. Alvarez*, 266 F.3d 587 (6th Cir. 2001) (permitting a jury instruction for § 848(e) that included a *mens rea* of recklessness creating grave

37
**JA53**

risk of death). Similarly, the Modern Federal Jury Instructions include language regarding a "grave risk of death."[17] The "risk" of death does not require the *intentional* use of physical force. *See also United States v. Winston*, 55 Fed. App'x 289, 300-01 (6th Cir. 2003) (upholding murder instruction that allowed for conviction based on *mens rea* of extreme recklessness, a question left open by *Borden*.) As noted *supra*, no degree of recklessness can satisfy the *mens rea* required by § 924(c).

Second, § 848(e)(1) authorizes a conviction for any person who, *inter* alia, "counsels, commands, induces, procures, or causes the intentional killing of an individual" in furtherance of a CCE. None of these actions – not counseling, commanding, inducing, procuring, or causing a killing – necessitates the use of force; like conspiracy, they require only interaction with others regarding the underlying actions. *Simms*, 914 F.3d at 233-34 (such third-party interactions do "not invariably require the actual, attempted, or threatened use of physical force"). Because the jury could have convicted Mr. Tipton under 848(e) for carrying a firearm while merely counseling his co-defendant, the court must assume that his

---

[17]Instruction 56-53 includes as the required intent that the defendant "intentionally engaged in conduct *that the defendant knew would create a grave risk of death to [the victim] and resulted in the death of [the victim]). (Emphasis added.) See* 3 Modern Federal Jury Instructions-Criminal P 56.07. While the jury is instructed that some conduct must be intentional, it does not require the intentional use of force.

38

**JA54**

§ 848(e) conviction rested on this "least serious of the disjunctive statutory conduct." *United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012). Therefore, a violation of § 848(e) would not categorically qualify as a "crime of violence" and cannot serve as the predicate for Mr. Tipton's § 924(c) convictions. As discussed *infra*, this variability in culpability further questions the soundness of his sentences of death, now that they are no longer buttressed by his unconstitutional Section 924(c) convictions.

The modified categorical approach does not support a different conclusion, as the available *Shepard* documents—the indictment, the jury instructions, and the verdict form—only underscore the ambiguity of the jury's finding. The indictment alleged that Mr. Tipton both "killed" *and* "counseled commanded, induced, procured, and caused" the killing. The jury instructions allow for a finding of guilt if Mr. Tipton "*either* intentionally killed, *or* counseled, commanded, induced, procured, *or* caused" the killing. Tr. 3217 (emphasis added). The jury was never directed to pick one or the other, and the Court "must assume that the jury followed the instructions given to it by the court." *Hager*, 721 F.3d at 189. The special verdict form offers no clarity, simply referring to the "killing" without

39

**JA55**

asking the jury to choose or identify the role it found Mr. Tipton had played.[18]

Accordingly, Mr. Tipton's § 848(e) convictions cannot categorically qualify as a crime of violence within § 924(c)'s force clause.

### III.   BECAUSE BOTH OF MR. TIPTON'S § 924(C) CONVICTIONS ARE INVALID AFTER *DAVIS*, MR. TIPTON IS ENTITLED TO BE RESENTENCED.

In light of the foregoing analysis, Mr. Tipton's five § 924(c) criminal charges and two convictions are and always have been unconstitutional; accordingly, they should never have been put to his jury.  As the Supreme Court recognized in *United States v. Tucker*, "the real question" for Mr. Tipton is "whether the sentence" for those of his convictions that remain in place "might have been different if the [jury] had known that at least two of [Mr. Tipton's] previous convictions had been unconstitutionally obtained."  404 U.S. 443, 448 (1972).  In keeping with *Tucker,* courts have held that a defendant must be resentenced on any valid convictions "unless it can be ascertained from the record that a [jury's] sentence on a valid conviction was not affected" by invalid convictions.  *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986); *see also Jerkins v. United States,* 530 F.2d 1203, 1204 (5th Cir. 1976) (same); *James v.*

---

[18]In order to be construed as consistent with the jury instructions, this reference must be considered shorthand for both clauses of § 848(e).  This Court must assume that the jury followed the jury instructions, which unequivocally instructed that the § 924(c) conviction could be predicated on any of the possible § 848(e) conduct listed.  *Hager*, 721 F.3d at 189.

*United States,* 476 F.2d 936 (8th Cir. 1973) (same). Because this is a capital case, ascertaining whether the jury's sentence was affected by the invalid convictions must be guided by "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to *a special need for reliability* in the determination that death is the appropriate punishment in any capital case." *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (citation omitted) (emphasis added). Indeed, because "[t]he decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make," the Supreme Court has made clear that "[t]he *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing." *Mills v. Maryland,* 486 U.S. 367, 383–84 (1988) (emphasis added).

There is more than a possibility here that the jury considered improper factors. The record shows that the government's penalty phase case relied almost exclusively on evidence from the guilt-innocence phase of the trial. The government "did not put on a great deal of evidence" during the penalty phase. T. 3883–3884, 3891, 3392–3893. Rather, it urged the jury to rely upon its findings "in your guilt phase verdict." T. 3893. Thus, the jury's decision to impose the death penalty was intertwined with the invalid § 924(c) convictions, making it not

41

**JA57**

merely possible, but likely, that Mr. Tipton's two unconstitutional § 924(c) convictions profoundly affected the jury's decision to impose a sentence of death.

In light of the Eighth Amendment's requirement of reliability in capital sentencing, the "possibility" that the jury improperly relied upon the unconstitutional § 924(c) convictions in sentencing him to death requires that Mr. Tipton be resentenced on the remaining counts.

## CONCLUSION AND PRAYER FOR RELIEF

For all the reasons set forth above, Mr. Tipton respectfully asks this Court to vacate his convictions and sentences on Counts 20 and 26, the invalid charges under 18 U.S.C. § 924(c).

Mr. Tipton further requests the following relief:

a) That this Court vacate Mr. Tipton's sentences on all of the remaining counts and order a new sentencing proceeding on those counts.

b) Any other relief that may be necessary to correct Mr. Tipton's invalid convictions and sentence and put him back in the position he would have been in were it not for having been convicted of non-existent crimes.

[Signatures on following page.]

Respectfully submitted on this, the 19th day of February, 2022.

/s/Frederick R. Gerson
Frederick R. Gerson
VSB #39968
Bank Of America Center
1111 East Main Street, 16th Floor
Richmond, VA 23219
fgerson@dagglaw.com

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

*Jeffrey Lyn Ertel
Ga. Bar No. 249966
Federal Defender Program, Inc.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Jeff_Ertel@fd.org

*Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas
Unit
Federal Public Defender
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Direct: (704) 688-6946
Gerald_King@fd.org

*Applications for admission *pro hac vice* pending.

Counsel for Richard Tipton, III.

43

**JA59**

## CERTIFICATE OF SERVICE

I certify that on this, the 19th day of February, 2022, the foregoing document

was served on all parties or their counsel of record though the CM/ECF system and

will be served electronically on the attorney listed below:

Richard Cooke, Esq.
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamison Avenue
Alexandria, Virginia 22314

This, the 19th day of February, 2022.

                                        _/s/Frederick R. Gerson_
                                        Frederick R. Gerson
                                        VSB #39968
                                        Durrette, Arkema, Gerson & Gill, PC
                                        Bank Of America Center
                                        1111 East Main Street, 16th Floor
                                        Richmond, VA 23219
                                        fgerson@dagglaw.com

44

**JA60**

**Exhibit 1**

*United States v. Tipton*, **EDVA, No. 3:92Cr68**

**Superseding Indictment.**



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JUL 2 0 1992

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:92CR68 |
| ) | |
| RICHARD TIPTON aka Whittey ) | 21 USC § 846 |
| (Counts 1-7, 11-30, 32-33) ) | Conspiracy |
| ) | (Count 1) |
| CORY JOHNSON aka "O" aka "CO" ) | |
| (Counts 1, 2, 8-32) ) | 21 USC § 848 |
| ) | Continuing Criminal Enterprise |
| JAMES H. ROANE, JR., aka "J.R." ) | (Count 2) |
| (Counts 1, 2, 5-16, 32) ) | |
| ) | 21 USC § 848(e)(1)(A) & 18 USC § 2 |
| VERNON LANCE THOMAS ) | Murder in Furtherance of CCE |
| aka Anthony Mack aka "V" ) | (Counts 3,5,8,11,17,18,19,24,25) |
| (Counts 1, 2, 11-16, 24-30, 32) ) | |
| ) | 18 USC § 924(c) |
| JERRY R. GAITERS ) | Use of Firearm in Relation to Crime of |
| (Counts 1, 17-23, 32) ) | Violence or Drug Trafficking Crime |
| ) | (Counts 6,9,12,15,20,26) |
| STERLING HARDY ) | |
| (Counts 1, 14-16, 32) ) | 18 USC §§ 1959 & 2 |
| ) | Violent Crimes in Aid of Racketeering |
| ) | (Counts 4,7,10,13,14,16,21-23,27-30) |
| SANDRA REAVIS ) | |
| (Count 1) ) | 21 USC § 841(a)(1) |
| ) | Distribution of Crack |
| ) | (Count 31) |
| ) | |
| ) | 21 USC § 841(a)(1) & 18 USC § 2 |
| ) | Possession w/Intent to Distribute Crack |
| ) | (Counts 32-33) |

115

00085

## SECOND SUPERSEDING INDICTMENT

JULY 1992 TERM - At Richmond

### COUNT ONE

THE GRAND JURY CHARGES that from on or about January, 1989, the exact date being unknown to the grand jury, and continuously thereafter up to and including the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", JERRY GAITERS, STERLING HARDY, and SANDRA REAVIS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury to commit the following offenses against the United States of America:

1.    To knowingly, intentionally, and unlawfully possess with the intent to distribute, and to distribute, a Schedule II narcotic controlled substance, that is, at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

### WAYS, MANNERS, AND MEANS OF THE CONSPIRACY

The ways, manners, and means by which the conspirators carried out the purpose of the conspiracy includes, but are not limited to, the following:

1.    It was part of the conspiracy that defendants and co-conspirators would cause cocaine to be purchased in New York City, and elsewhere, and transported to Richmond, Virginia, where the cocaine was to be distributed.

2

00086

**JA63**

2.      It was further part of the conspiracy that once the defendants and co-defendants would receive cocaine in Richmond, Virginia, they would cook the cocaine in such a way to make it cocaine base ("crack" or "cook-em-up"), which cocaine was intended to be distributed on the streets of Richmond, Virginia.

3.      It was further part of the conspiracy that the defendants and co-defendants would induce other individuals to work for them selling the crack cocaine on the streets of Richmond, Virginia.

4.      It was further part of the conspiracy to engage in a pattern of violent activity, including murder, assaults, and threats of violence to further the goals of the conspiracy. To that end, members of the conspiracy bought, possessed, and transferred firearms, which firearms were used in their violent activities.

## OVERT ACTS

In furtherance of this conspiracy, and to bring about the objects and goals of the conspiracy, the defendants, co-conspirators, and unindicted co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1.      In or about December, 1991, defendants RICHARD TIPTON, aka Whittey, and CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a cocaine debt.

2.      On or about January 5, 1992, RICHARD TIPTON, aka Whittey, murdered Douglas A. Talley.

3

00087

**JA64**

3. On or about January 13, 1992, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R." murdered Douglas Moody.

4. On or about January 13, 1992, an individual known to the grand jury, disposed of the knife used by JAMES ROANE, JR., aka "J.R.", to kill Doug Moody.

5. On or about January 14, 1992, members of the conspiracy caused an individual known to the grand jury to purchase one Glock handgun and two Tech 9mm handguns from Southern Gun World in Richmond, Virginia.

6. On or about January 14, 1992, JAMES ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", murdered Peyton Maurice Johnson.

7. On or about January 15, 1992, CORY JOHNSON, aka "O," aka "CO", distributed a certain amount of cocaine base ("crack" or "cook em up") in Richmond, Virginia.

8. On or about January 29, 1992, RICHARD TIPTON aka Whittey, JAMES ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Louis J. Johnson, Jr., in Richmond, Virginia.

9. On or about January 31, 1992, CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a drug debt, and solicited that individual to kill Dorothy Armstrong.

10. On or about February 1, 1992, JAMES ROANE, JR., aka "J.R.", RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON

4

00088

**JA65**

LANCE THOMAS, aka Anthony Mack, aka "V",and STERLING HARDY murdered Torrick Brown and shot Martha McCoy in Richmond, Virginia.

11.    On or about February 1, 1992, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong aka Mousey, in Richmond, Virginia.

12.    On or about February 2, 1992, defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", and JERRY GAITERS possessed with the intent to distribute crack cocaine.

13.    On or about February 13, 1992, STERLING HARDY solicited the murders of certain individuals.

14.    On or about February 19, 1992, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Curtis Thorne, Linwood Chiles, and shot, seriously wounding, Gwendolyn Green and Priscilla Green, in Richmond, Virginia.

15.    On or about April 10, 1992, RICHARD TIPTON, aka Whittey, possessed with the intent to distribute crack cocaine in Richmond, Virginia.

(In violation of Title 21, United States Code, Section 846).

## COUNT TWO

THE GRAND JURY FURTHER CHARGES that from at least January, 1991, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants RICHARD TIPTON,

5

00089

JA66

aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", unlawfully, intentionally, and knowingly, did engage in a Continuing Criminal Enterprise, that is, they did violate Title 21, United States Code, Section 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", in concert with at least five other persons with respect to whom they occupied positions of organizer, supervisor, and manager, and from which continuing series of violations the defendant, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848.)

## COUNT THREE

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant RICHARD TIPTON aka Whittey, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas A. Talley, and such killing resulted.

6

00090

JA67

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, RICHARD TIPTON aka Whittey, did knowingly, intentionally, and unlawfully cause the murder of Douglas Talley, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas Moody, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

7

00091

**JA68**

## COUNT SIX

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is, a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Five and Seven of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants; RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, intentionally, and unlawfully cause the murder of Douglas Moody, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

00092

**JA69**

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Peyton Maurice Johnson, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINE

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eight and Ten of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

9

00093

**JA70**

## COUNT TEN

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, JAMES H. ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Peyton Maurice Johnson, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Louis J. Johnson, Jr., and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

10

00094

**JA71**

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eleven and Thirteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, intentionally, and unlawfully cause the murder of Louis J. Johnson, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in

11

00095

**JA72**

narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

### COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992,
at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD
TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O,"
aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING
HARDY, did knowingly, intentionally, and unlawfully cause the murder of Torrick
Brown, Jr., as consideration for the receipt of, and as consideration for a promise and
agreement to pay, something of pecuniary value from an enterprise engaged in
racketeering activity, and for the purpose of gaining entrance to and maintaining and
increasing position in an enterprise engaged in racketeering activity, said racketeering
activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

### COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992,
at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD
TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O,"
aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING
HARDY, did knowingly, willfully, and unlawfully use a firearm, during and in relation to
a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court

12

00096

**JA73**

of the United States, that is a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1959, as set forth in Counts One, Fourteen and Sixteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21

13

00097

JA74

USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Long, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded,

14

00098

**JA75**

induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity,

15

00099

**JA76**

and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and

16

00100

**JA77**

agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly,

17

00101

**JA78**

intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Linwood Chiles, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as

18

00102

**JA79**

consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and

19

00103

**JA80**

unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the maiming of Gwendolyn Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about January 15, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, CORY

20

JA81

JOHNSON, aka "O," aka "CO", did knowingly and intentionally distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 2, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES ROANE, JR., aka "J.R.", and JERRY GAITERS, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about April 10, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD

21

00105

JA82

TIPTON aka Whittey, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

A TRUE BILL:

ISI *Christopher F. Snead*
**FOREPERSON**

RICHARD CULLEN
UNITED STATES ATTORNEY

By:

Howard C. Vick, Jr.
Assistant United States Attorney

William Parcell
Special Assistant U.S. Attorney

22

00106

**JA83**

**Exhibit 2**

*United States v. Tipton*, EDVA, No. **3:92Cr68**

**Verdict Form.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Criminal Case No. 3:92CR68-01 |
| RICHARD TIPTON<br>a.k.a. "Whittey" | ) |



**VERDICT**

WE, THE JURY, FIND as follows:

Count 1:        Conspiracy to Distribute Controlled Substance

Guilty
(Guilty or Not Guilty)

Count 2:        Continuing Criminal Enterprise

Question:  Do you find that the government has proven, beyond a reasonable doubt, that a Continuing Criminal Enterprise existed as charged in the indictment?

Yes: Yes                    No: _____

If you indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant, RICHARD TIPTON, Not Guilty as to Count 2.

If you indicated that a Continuing Criminal Enterprise did exist, you must now determine whether defendant RICHARD TIPTON is Guilty or Not Guilty of the crime of engaging in that continuing criminal enterprise as charged in Count 2, and enter your finding below:

Guilty
(Guilty or Not Guilty)

465

**JA85**

FEB - 3 1993

**Count 3:**       Killing of Douglas A. Talley while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

<u>Guilty</u>
(Guilty or Not Guilty)

**Count 4:**       Killing of Douglas A. Talley to Maintain or Increase Position in Racketeering Enterprise

<u>Guilty</u>
(Guilty or Not Guilty)

**Count 5:**       Killing of Douglas Moody while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

<u>Not Guilty</u>
(Guilty or Not Guilty)

**Count 6:**       Use of Firearm in Relation to Killing of Douglas Moody

<u>Not Guilty</u>
(Guilty or Not Guilty)

**Count 7:**       Killing of Douglas Moody to Maintain or Increase Position in Racketeering Enterprise

<u>Not Guilty</u>
(Guilty or Not Guilty)

Defendant RICHARD TIPTON is not charged in Counts 8-13 of the indictment.

JA87

Count 14:    Killing of Torrick Brown, Jr., to Maintain or Increase Position in Racketeering Enterprise

_____Not Guilty_____
(Guilty or Not Guilty)

Count 15:    Use of Firearm in Relation to Killing of Torrick Brown, Jr., and Maiming of Martha McCoy

_____Not Guilty_____
(Guilty or Not Guilty)

Count 16:    Maiming of Martha McCoy to Maintain or Increase Position in Racketeering Enterprise

_____Not Guilty_____
(Guilty or Not Guilty)

Count 17:    Killing of Bobby Long while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did **not** exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 18:    Killing of Anthony Carter while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did **not** exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

JA88

Count 19: Killing of Dorothy Mae Armstrong while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 20: Use of Firearm in Relation to Killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong

_____Guilty_____
(Guilty or Not Guilty)

Count 21: Killing of Bobby Long to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 22: Killing of Anthony Carter to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 23: Killing of Dorothy Mae Armstrong to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

JA89

Count 24:          Killing of Curtis Thorne while Engaged In or
                   Working in Furtherance of a Continuing Criminal
                   Enterprise

         (If you indicated, in response to the Question set forth under
         Count 2 above, that a Continuing Criminal Enterprise did not
         exist, you must find the defendant Not Guilty as to this
         Count).

                              Guilty
         _____
                   (Guilty or Not Guilty)


Count 25:          Killing of Linwood Chiles while Engaged In or
                   Working in Furtherance of a Continuing Criminal
                   Enterprise

         (If you indicated, in response to the Question set forth under
         Count 2 above, that a Continuing Criminal Enterprise did not
         exist, you must find the defendant Not Guilty as to this
         Count).

                              Guilty
         _____
                   (Guilty or Not Guilty)


Count 26:          Use of Firearm in Relation to Killing of Curtis
                   Thorne and Linwood Chiles and Maiming of Priscilla
                   Green and Gwendolyn Green

                              Guilty
         _____
                   (Guilty or Not Guilty)


Count 27:          Killing of Curtis Thorne to Maintain or Increase
                   Position in Racketeering Enterprise

                              Guilty
         _____
                   (Guilty or Not Guilty)


Count 28:          Killing of Linwood Chiles to Maintain or Increase
                   Position in Racketeering Enterprise

                              Guilty
         _____
                   (Guilty or Not Guilty)


**JA90**

**Count 29:**    Maiming of Priscilla Green to Maintain or Increase Position in Racketeering Enterprise

Guilty
_____
(Guilty or Not Guilty)

**Count 30:**    Maiming of Gwendolyn Green to Maintain or Increase Position in Racketeering Enterprise

Guilty
_____
(Guilty or Not Guilty)

Defendant RICHARD TIPTON is not charged in Count 31 of the indictment.

**Count 32:**    Possession of Controlled Substance with Intent to Distribute  (on or about 2/2/92)

Guilty
_____
(Guilty or Not Guilty)

**Count 33:**    Possession of Controlled Substance with Intent to Distribute  (on or about 4/10/92)

Guilty
_____
(Guilty or Not Guilty).

SO SAY WE ALL.

_____     ___2/3/93_____
FOREPERSON'S SIGNATURE                         DATE

**JA91**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| RICHARD TIPTON, III, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Response in Opposition
to Defendant's Motion to Vacate**

In 1993, a jury convicted the defendant, Richard Tipton, for his role in a drug organization that was responsible for at least ten murders and additional maimings between January and February 1992. The jury found Tipton responsible for six murders—the killings of Douglas Talley, Dorothy Mae Armstrong, Bobby Long, Anthony Carter, Curtis Thorne, and Linwood Chiles—and other violent crimes. Tipton's convictions and sentence have been upheld on direct appeal and multiple rounds of collateral review. Tipton now seeks to vacate two of his firearm convictions (Counts 20 and 26) under *United States v. Davis*, 139 S. Ct. 2319 (2019). But *Davis* had no effect on Tipton's convictions.

First, Tipton's challenge to his firearm convictions is procedurally defaulted. Defendants have been challenging statutes on vagueness grounds for decades and nothing prevented Tipton from lodging a vagueness challenge to 18 U.S.C. § 924(c). Moreover, neither "cause" nor "prejudice" exits to excuse this default.

Second, *Davis* did nothing to alter the meaning of a "drug-trafficking crime." *See* 18 U.S.C. § 924(c)(2). With or without *Davis*, Tipton's firearm convictions are supported by independent

1

**JA92**

and still-valid drug-trafficking predicates, namely, violations of 21 U.S.C. § 848(e) (capital murder in furtherance of a criminal enterprise). The debate in this case over what is or is not a "crime of violence" after *Davis* is academic. A conviction under § 924(c) can be sustained on only one valid predicate. Because both of Tipton's firearm convictions rely on still-valid drug-trafficking predicates, the Court can deny Tipton's motion.

But even if that were not the case, Tipton's firearm convictions are supported by still-valid crime-of-violence predicates, even after *Davis*. Capital murder in furtherance of a criminal enterprise and VICAR murder and maiming are crimes of violence under § 924(c)(3)(A).

Finally, even if the Court concludes that some of the predicate offenses underlying Tipton's convictions are no longer valid, Tipton's challenge would still fail. Under governing precedent, Tipton must show more than a reasonable possibility that the jury *only* found him guilty on Counts 20 and 26 in reliance on the invalid predicate. *See United States v. Said*, 26 F.4th 653 (4th Cir. 2022). Ambiguity and uncertainty are not enough on collateral review for Tipton to show a substantial and injurious effect on his verdict. Tipton does not even attempt to make this showing, thus providing a fourth basis for this Court to deny relief. And Tipton could not possibly make the requisite showing. For example, because each § 848(e) murder involved a victim who was shot with a firearm, and because § 848(e) itself requires a nexus between the murder and the drug trafficking, Tipton cannot meet his burden of showing that the jury would not have convicted him of the § 924(c) counts relying on a still valid drug-trafficking predicate.

## Factual Background

### A.    Tipton is indicted, convicted, and sentenced.

On July 20, 1992, Tipton, along with six others, was charged in a 33-count indictment with the following offenses:

2

**JA93**

| Count | Offense | Statutory Provision |
|---|---|---|
| Count 1 | Conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base | 21 U.S.C. § 846 |
| Count 2 | Engaging in a continuing criminal enterprise | 21 U.S.C. § 848(a) |
| Counts 3, 5, 11, 17-19, 24, 25 | Capital murder in furtherance of a criminal enterprise | 21 U.S.C. § 848(e) and 18 U.S.C. § 2 |
| Counts 4, 7, 13-14, 16, 21-23, 27, 28-30 | Commission of violent crimes in aid of racketeering activity | 18 U.S.C. § 1959 |
| Counts 12, 15, 20, 26 | Use of a firearm in relation to a crime of violence or a drug-trafficking offense | 18 U.S.C. § 924(c) |
| Counts 32-33 | Possession with intent to distribute cocaine base | 21 U.S.C. § 841(a)(1) |

Each firearm offense charged in Counts 20 and 26—the only convictions that Tipton challenges here—relied on multiple underlying predicates.

Count 20 charged Tipton with using, or aiding and abetting the use, of a firearm on or about February 1, 1992, during and in relation to the following crimes of violence or drug trafficking crimes:

| Count | Predicate Offense |
|---|---|
| Count 1 | 21 U.S.C. § 846 |
| Count 17 | 21 U.S.C. § 848(e)(1)(A) (CCE murder of Bobby Long) |
| Count 18 | 21 U.S.C. § 848(e)(1)(A) (CCE murder of Anthony Carter) |
| Count 19 | 21 U.S.C. § 848(e)(1)(A) (CCE murder of Dorothy Mae Armstrong) |
| Count 21 | 18 U.S.C. § 1959 (VICAR murder of Bobby Long) |
| Count 22 | 18 U.S.C. § 1959 (VICAR murder of Anthony Carter) |

3

**JA94**

| Count | Predicate Offense |
|---|---|
| Count 23 | 18 U.S.C. § 1959 (VICAR murder of Dorothy Mae Armstrong) |

Count 26 charged Tipton with using, or aiding and abetting the use, of a firearm on or about February 19, 1992, during and in relation to the following crimes of violence or drug trafficking crimes:

| Count | Predicate Offense |
|---|---|
| Count 1 | 21 U.S.C. § 846 |
| Count 24 | 21 U.S.C. § 848(e)(1)(A) (CCE murder of Curtis Thorne) |
| Count 25 | 21 U.S.C. § 848(e)(1)(A) (CCE murder of Linwood Chiles) |
| Count 27 | 18 U.S.C. § 1959 (VICAR murder of Curtis Thorne) |
| Count 28 | 18 U.S.C. § 1959 (VICAR murder of Linwood Chiles) |
| Count 29 | 18 U.S.C. § 1959 (VICAR maiming of Priscilla Green) |
| Count 30 | 18 U.S.C. § 1959 (VICAR maiming of Gwendolyn Green) |

These charges stemmed from Tipton's leadership role, along with Cory Johnson and James Roane, in a continuing criminal enterprise, the "New York Boyz," that trafficked large quantities of cocaine in the Richmond, Virginia area between 1990 and 1992.

In February 1993, a jury convicted Tipton of six capital murders under § 848(e) (Counts 3, 17, 18, 19, 24, 25); conspiracy to possess cocaine base with the intent to distribute under § 846 (Count 1); engaging in a continuing criminal enterprise under § 848(a) (Count 2); committing violent crimes in aid of racketeering activity under § 1959 (Counts 4, 21, 22, 23, 27, 28, 29, 30); using a firearm in relation to a crime of violence or a drug-trafficking offense under § 924(c) (Counts 20 and 26); and possession of cocaine base with the intent to distribute under § 841(a)(1) (Counts 32 and 33). Following a penalty hearing on the capital murder counts, the jury

4

**JA95**

recommended that Tipton be sentenced to death for three of the six murders for which he was convicted under § 848(e) (Counts 3, 24, 25). *See United States v. Tipton*, 90 F.3d 861, 870 (4th Cir. 1996)

In accordance with the jury's recommendation, the Honorable James R. Spencer sentenced Tipton to death. *Id*. The jury also sentenced Cory Johnson to death on all seven of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*. After sentencing, Judge Spencer refused to order the defendants' execution on the grounds that Congress neither authorized the means by which the death sentences were to be carried out nor authorized the Attorney General to implement regulations to that effect. *Id*.

All three defendants appealed their convictions and sentences and the government cross-appealed Judge Spencer's stay of execution of the death sentences. *Id*. The Fourth Circuit affirmed the defendants' convictions and sentences, with the exception of the Count One § 846 cocaine conspiracy, which it vacated as being a lesser included offense of the § 848 continuing criminal enterprise convictions. *Id*. at 891, 903. The Fourth Circuit also reversed Judge Spencer's refusal to execute the defendants' death sentences. *Id*. at 903.[1]

---

[1] The government recounts only the procedural history relevant to Tipton's motion to vacate. For the sake of completeness, following the Fourth Circuit's decision on direct appeal, *Tipton* sought relief from the district court under § 2255. The district court dismissed or denied all of Tipton's claims and he appealed. On appeal, Tipton raised about a dozen issues. The Fourth Circuit rejected them all. *See United States v. Roane*, 378 F.3d 382 396–407 (4th Cir. 2004). Tipton then made numerous unsuccessful attempts at receiving authorization to file successive habeas petitions. *See United States v. Tipton*, No. 13-8, ECF No. 14 (4th Cir. Oct. 29, 2013) (order granting Tipton's motion to dismiss appeal of district court's denial of successive habeas petition); *In re Richard Tipton*, No. 16-7, ECF No. 13 (4th Cir. June 6, 2016) (denying authorization to file successive petition); *In re Richard Tipton*, No. 19-2, ECF No. 9 (4th Cir. May 14, 2019) (same). In July 2020, Tipton filed a motion for a sentence modification under § 404(b) of the First Step Act. (ECF No. 24.) This Court denied the motion. (ECF No. 76.) Tipton's appeal is fully briefed and currently held in abeyance at the Fourth Circuit. *See United States v. Tipton*, No. 20-16, ECF No. 31 (4th Cir. Mar. 3, 2021).

5

**JA96**

**B.   Tipton's application for a successive petition under 28 U.S.C. § 2255**

On June 8, 2020, Tipton filed a motion for authorization to file a successive petition under § 2255 challenging his two § 924(c) convictions under *Davis*. The government opposed the motion, and after multiple rounds of briefing and two orders holding the case in abeyance, the Fourth Circuit granted the application by a 2-1 vote. *See in re Richard Tipton*, No. 20-10, ECF No. 42 (4th Cir. Jan. 24, 2022). On February 19, 2022, Tipton filed the present motion to vacate (ECF No. 155.) Through this motion, Tipton renews his post-*Davis* challenge to Counts 20 and 26. For the reasons that follow, Tipton's challenge fails for both procedural and substantive reasons.

## Argument

**I.    Tipton's challenge to his § 924(c) convictions is procedurally defaulted.**

*Davis* is retroactive on collateral review. *See In re Thomas*, 988 F.3d 783, 790 (4th Cir. 2021). Even so, by not raising his constitutional attack on his firearm convictions before they became final, Tipton procedurally defaulted such a challenge. *Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *United States v. Fugit*, 703 F.3d 248, 253–54 (4th Cir. 2012); *see also Marlowe v. Warden, FCI Hazelton*, 6 F.4th 562, 571 (4th Cir. 2021) ("Principles of procedural default sharply limit a prisoner's ability to raise on collateral review claims not raised in his initial criminal proceeding or on direct appeal."). That default "may be excused in two circumstances: where a person attacking his conviction can establish (1) that he is 'actually innocent' or (2) 'cause' for the default and 'prejudice resulting therefrom." *Fugit*, 703 F.3d at 253 (quoting *Bousley*, 523 U.S. at 621). Tipton cannot satisfy either standard. Nor has he even attempted to.

**JA97**

### A. Tipton cannot demonstrate actual innocence

Tipton is not actually innocent of violating § 924(c). "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotation marks omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623–24 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019) (same). Tipton cannot make this showing. Even assuming that several predicate offenses are no longer crimes of violence after *Davis*, the record clearly demonstrates that Tipton is factually guilty of Counts 20 and 26. In fact, Tipton did not even challenge the sufficiency of the evidence on those counts on appeal. Moreover, each count is predicated on an independent and still-valid drug trafficking offense.

To demonstrate actual innocence of the § 924(c) offenses, Tipton "would have to show that no reasonable juror would have concluded he [] possess[ed] a firearm in furtherance of any of the valid predicate offenses." *Granda v. United States*, 990 F.3d 1272, 1292 (11th Cir. 2021), *cert.denied*, 142 S. Ct. 1233 (2022). Tipton cannot make that showing. And again, he has not even attempted to do so. For these reasons, and as explained in greater detail *infra* Section II, Tipton is not actually innocent of Counts 20 and 26 so as to excuse his procedural default.

### B. Tipton cannot show cause for his default.

Nor can Tipton demonstrate cause for his default. A defendant may alternately overcome the procedural default of a claim if he shows "cause" and "actual prejudice" resulting from the default. *Bousley*, 523 U.S. at 622; *see also Murray v. Carrier*, 477 U.S. 478, 485–86 (1986). Tipton cannot establish either prong.

7

**JA98**

To establish "cause sufficient to excuse a procedural default" Tipton must make "a showing of some external impediment preventing counsel from constructing or raising the claim." *United States v. Herrera-Pagoada*, 14 F.4th 311, 319 (4th Cir. 2021) (quoting *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). The Supreme Court has explained that "cause" may exist where a claim "is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984). "The question is not whether subsequent legal developments have made counsel's task [in raising a particular claim] easier, but whether at the time of the default the claim was 'available' at all." *Smith v. Murray*, 477 U.S. 527, 537 (1986). To answer that question, the Supreme Court has considered whether, at the time of the default, other litigants were raising similar claims; if such claims were repeatedly raised, then "it simply is not open to argument that the legal basis of the claim petitioner now presses on federal habeas was unavailable to counsel at the time." *Id*.; *see Bousley*, 523 U.S. at 622–23 (rejecting a novelty-based "cause" argument in part because the "Federal Reporters were replete with cases" considering the purportedly "novel" claim "at the time" petitioner should have raised it).

This analysis is fatal to any "cause" argument Tipton might make. Tipton was convicted in 1993 and the Fourth Circuit decided his direct appeal in 1996. Both before and during that timeframe, defendants were challenging various aspects of § 924 on vagueness grounds.[2] During

---

[2] *See United States v. Meyer*, 803 F.2d 246, 248 (6th Cir. 1986) (vagueness challenge to § 924(c); unclear which clause); *United States v. Chaidez*, 916 F.2d 563, 564 (9th Cir. 1990) (vagueness challenge to § 924(c)(2)'s definition of "drug trafficking crime"); *United States v. Pettit*, 933 F.2d 1017, 1991 WL 83902, at *1 n.1 (9th Cir. 1991) (vagueness challenge to § 924(c)'s "during and in relation to" and "uses or carries a firearm" language); *United States v. Kuffel*, 1 F.3d 1247 (9th Cir. 1993) (vagueness challenge to § 924(c)'s "second or subsequent conviction" language); *United States v. Magee*, 21 F.3d 1108 (5th Cir. 1994) (vagueness challenge to § 924(c)(1)); *United States v. Maloy*, 37 F.3d 632 (5th Cir. 1994) (vagueness challenge to § 924(c)(1)); *United States v. Santos*, 64 F.3d 41, 47 (2d Cir. 1995) (vagueness challenge to § 924(c)'s "firearm silencer and firearm muffler" language); *United States v. Rodriguez*, 53 F.3d 545 (2d Cir. 1995) (vagueness challenge to § 924(c)'s phrase "equipped").

**JA99**

that same period, defendants were also lodging vagueness challenges to the Armed Career Criminal Act (ACCA).[3] Courts have required the categorical approach to § 924(c)(3)(B) for decades, *see United States v. Simms*, 914 F.3d 229, 249 (4th Cir. 2019) (en banc), including at the time of Tipton's trial and appeal. *See id*. n.13 (citing, in part, circuit-level decisions from 1994 and 1995); *see also United States v. Adkins*, 937 F.2d 947, 950 n.2 (4th Cir. 1991) (the question whether an offense is a crime of violence is a legal one); *United States v. Johnson*, 953 F.2d 110, 114 (4th Cir. 1991) (mandating categorical approach to U.S.S.G. § 4B1.2); *United States v. Aragon*, 983 F.2d 1306, 1313 (4th Cir. 1993) (same as to § 16(b)). In fact, courts have been applying the categorical approach even before *Taylor v. United States*, 495 U.S. 575 (1990), effectively settled the issue. *See United States v. Thompson*, 891 F.2d 507, 509 (4th Cir. 1989); *United States v. Springfield*, 829 F.2d 860, 862–63 (9th Cir. 1987) (using categorical, rather than circumstantial, test in determining whether involuntary manslaughter is a "crime of violence" under § 924(c)(3)); *United States v. Sherbondy*, 865 F.2d 996, 1009–10 (9th Cir.1988) (categorical approach required in deciding whether witness intimidation was "violent felony" under § 924(e)).

Had Tipton wanted to challenge Counts 20 and 26 on vagueness grounds, he could easily have done so. Again, the relevant inquiry is not "whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all." *Smith*, 477 U.S. 527 at 537. And a claim is not so novel to excuse a default where the tools clearly existed to raise such a claim. *Engle v. Isaac*, 456 U.S. 107, 133 (1982) ("In light of this activity, we cannot say that respondents lacked the tools to construct their constitutional claim."); *United*

---

[3] *See United States v. Sorenson*, 914 F.2d 173, 175 (9th Cir. 1990); *United States v. Argo*, 925 F.2d 1133, 1134–35 (9th Cir. 1991); *United States v. Vance*, 961 F.2d 217 (9th Cir. 1992); United States v. Powell, 967 F.2d 595, 1992 WL 127038, at *3 (9th Cir. 1992); *United States v. Castner*, 19 F.3d 1434 (6th Cir. 1994); *United States v. Presley*, 52 F.3d 64, 68 (4th Cir. 1995); *United States v. Veasey*, 73 F.3d 363, 1995 WL 758439, at *2 (6th Cir. 1995); *United States v. George*, 56 F.3d 1078, 1085 (9th Cir. 1995).

9

**JA100**

*States v. Bane*, 948 F.3d 1290, 1297 (11th Cir. 2020) (defendants' "claims are not novel in any sense of the word. As long as they had access to the United States Code and dictionaries—the tools the Supreme Court used in *Honeycutt*—they could have raised their claims on direct appeal."); *accord Dugger v. Adams*, 489 U.S. 401, 409–10 (1989) (concluding that a claim was not novel where "the legal basis for a challenge was plainly available"). Indeed, as Justice Gorsuch pointed out in *Dimaya*, the Supreme Court's prelude to *Davis*, courts have been striking down or refusing to apply criminal statutes on vagueness grounds since the early 1800s. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1225–27 (2018) (Gorsuch, J., concurring). And the vagueness cases *Davis* itself cited, other than *Johnson* and *Dimaya*, were Supreme Court decisions from 1812, 1876, 1914, 1921, 1926, and 1983. *See Davis*, 139 S. Ct. at 2325. Clearly then, based on the conduct of other litigants and the *Davis* decision itself, the tools existed for Tipton to challenge his § 924(c) convictions. He simply chose not to and pursued a variety of other claims instead.[4] As the Eleventh Circuit has held, "[t]he tools existed to challenge myriad other portions of § 924(c) as vague; they existed to support a similar challenge to its residual clause." *Granda*, 990 F.3d at 1288. Thus, "[Tipton] cannot show cause to excuse his procedural default." *Id.*; *see also Turner v. Jabe*, 58 F.3d 924, 927–30 (4th Cir. 1995) (rejecting "cause" argument based on novelty where other litigants where making similar arguments in the years prior to decision that overturned prior precedent and where the "Eighth Amendment principles underlying [the] claim had been around even longer.").

Some courts have excused *Davis*-type challenges on futility grounds. Any such argument, however, would fail in this case. The theory underlying excusing defendants from making

---

[4] For example, Tipton lodged a vagueness challenge to 21 U.S.C. § 848(n)(8)'s use of the word "substantial" on direct appeal. *See Tipton*, 90 F.3d at 895. Interestingly, the phrase "substantial risk" was one of the key problematic phrases in *Dimaya*, and *Davis*, as was the phrase "serious potential risk" in *Johnson*. Tipton could easily have extended his vagueness challenge to cover other statutes of conviction.

**JA101**

*Johnson*- or *Davis*-type arguments is that *James v. United States*, 550 U.S. 192, 210 n.6 (2007), which *Johnson* later overruled, rejected the argument that the ACCA's residual clause was unconstitutionally vague. And so, the argument goes, any challenge to the ACCA or § 924(c) would have been futile. The First Circuit, for example, found cause to excuse a defaulted *Johnson* claim where the defendant's direct appeal occurred in 2013, when *James* was "still good law." *Lassend v. United States*, 898 F.3d 115, 122 (1st Cir. 2018).

*Lassend*, however, is incompatible with Supreme Court and Fourth Circuit precedent. *See Bousley*, 523 U.S. at 623 ("[F]utility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" (quoting *Engle*, 456 U.S. at 130 n.35)); *Engle*, 456 U.S. at 130 ("If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid."); *United States v. Sanders*, 247 F.3d 139, 147 n.5 (4th Cir. 2001) ("As *Bousley*[]  and *Engle*[], indicate, in order to show cause, the defendant must raise any constitutional claims on direct review even if doing so may seem futile in light of existing precedent."); *see also Greer v. United States*, 141 S. Ct. 2090, 2099 (2021) (rejecting argument that "it would have been futile" to object prior to trial given the "uniform wall of [contrary] precedent").

Moreover, even if *Lassend* were compatible with binding precedent, it is unclear that *James* would have even precluded a challenge to § 924(c). As the Eleventh Circuit held in rejecting a similar argument, "*James* did not consider the § 924(c) residual clause at all. In fact, *James* indicated that at least three Justices were interested in entertaining vagueness challenges to the ACCA's residual clause, and perhaps to similar statutes." *Granda*, 990 F.3d at 1287. Moreover,

even after *James*, but before *Johnson*, defendants continued lodging vagueness challenges to the ACCA. *Id.* (collecting cases).

Finally, even if *Lassend*'s reasoning were both correct and applicable to § 924(c), it would still have no effect on this case. Tipton's trial and appeal both took place prior to the Supreme Court's 2007 *James* decision. Thus, Tipton cannot take refuge in a futility argument or *Reed*'s exception for instances when the Supreme Court overturns itself. 468 U.S. at 17. *See Gatewood v. United States*, 979 F.3d 391, 397 (6th Cir. 2020) ("[F]rom Gatewood's sentencing in 1997 to the conclusion of his direct appeal in 2002, the tools to construct his present vagueness claim existed, and no Supreme Court precedent foreclosed it. Gatewood therefore had a reasonable basis for raising a vagueness challenge to the residual clause of the three-strikes statute, § 3559(c)(2)(F)(ii). Because he did not raise such a challenge on direct appeal, procedural default bars him from doing so now on collateral review."), *cert. denied*, 141 S. Ct. 2798 (2021).

The Tenth Circuit has found cause for defendants whose convictions became final *before James* was decided, concluding that "no one . . . could reasonably have anticipated *Johnson*." *United States v. Snyder*, 871 F.3d 1122, 1127 (10th Cir. 2017). But, as the Sixth Circuit has observed, "*Snyder* did not offer a justification for this conclusion." *Gatewood*, 979 F.3d at 398. Still worse, *Snyder*'s unreasoned conclusion is historically inaccurate, as the three-Justice dissent in *James* demonstrates. Furthermore, *Snyder*'s application of *Reed* appears to take an overly granular approach to "cause" that is inconsistent with Fourth Circuit precedent, and in any event, inapplicable to the present case. *Snyder* relied on *Reed*'s exception for defaulted claims where the Supreme Court explicitly overrules prior precedent and articulates a previously unrecognized constitutional principle. *Snyder*, 871 F.3d at 1127 (citing *Reed*, 468 U.S. at 17). But *Reed*'s

exception was dicta, and even assuming its continued vitality after *Bousley*, *see United States v. Moss*, 252 F.3d 993, 1002–03 (8th Cir. 2001) (collecting cases), it still would not help Tipton.

First, *Reed*'s exception would not apply because the Supreme did *not* overrule itself *Davis*, like it did in *Johnson.* Nor did it articulate "a constitutional principle that had not been previously recognized." *Reed*, 468 U.S. at 17. As noted above, courts have been striking down statutes on vagueness grounds for centuries. *See Dimaya*, 138 S. Ct. at 1225–27 (Gorsuch, J., concurring). Finally, *Snyder*'s no-one-could-reasonably-have-anticipated-*Johnson* approach to procedural default is both overly myopic and in tension with Fourth Circuit precedent. The relevant inquiry is not whether a defendant's attorney could have foreseen some particular case *avant la lettre*, but whether he "lacked the tools to construct the[] constitutional claim." *Engle*, 456 U.S. at 133. And these "tools," the Fourth Circuit has explained, are the "case law[] necessary to conceive and argue the claim[.]" *Poyner v. Murray*, 964 F.2d 1404, 1424 (4th Cir. 1992). But, as already explained, the vagueness cases on which *Davis* relied spanned from 1812 to 1983. Clearly, then, they existed in the 1990s when Tipton was litigating his case. Moreover, in determining whether "cause" exists to excuse a defaulted claim, the Fourth Circuit has looked not only at the landmark case itself, but at the constitutional backdrop that would have allowed a defendant to assert the claim. *See Jabe*, 58 F.3d at 927–30; *Poyner*, 964 F.2d at 1424–25. So conceived, it is impossible to claim that the tools to construct a vagueness challenge to § 924(c)(3)(B) did not exist prior to *Johnson*. If the defendant in *Johnson* possessed the tools prior to *Johnson*, then so did any other litigant.

Consistent with the authority discussed above, Tipton's failure to challenge § 924(c) earlier is not excusable on novelty or futility grounds. Collateral review is not "an all-purposive receptable for claims which in hindsight appear more promising than they did at the time of trial." *Sanders*,

13

**JA104**

247 F.3d at 146. Tipton's claim is defaulted, and he cannot demonstrate cause to excuse that default.[5]

## II.     Tipton cannot demonstrate any prejudice from the inclusion of assumedly invalid predicates.

### A.     Counts 20 and 26 are unaffected by *Davis*.

Counts 20 and 26 rely entirely on valid crime-of-violence and drug-trafficking predicates.

First, *Davis* did not invalidate the definition of a "drug trafficking crime," which includes "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)[.]" 18 U.S.C. § 924(c)(2). *See United States v. Eldridge*, 2 F.4th 27, 36 n.9 (2d Cir. 2021) ("*Davis* interpreted only the definition of a crime of violence, and thus had no effect on the scope of drug offenses that may also serve as predicates for § 924(c) convictions, *see* 18 U.S.C. § 924(c)(2)."); *United States v. Cannon*, 987 F.3d 924, 946 (11th Cir. 2021) ("*Davis* did not, however, affect the definition of a drug trafficking crime, which includes 'any felony punishable under the Controlled Substances Act.'"); *see also United States v. Hare*, 820 F.3d 93, 106 (4th Cir. 2016). Indeed, in declaring § 924(c)(3)(B) unconstitutionally vague prior to *Davis*, the Fourth Circuit noted that it "le[ft] intact

---

[5] In a single undeveloped footnote, the Fourth Circuit recently rejected a post-*Davis* procedural default argument. *See United States v. Jackson*, — F.4th —, 2022 WL 1160391, at *2 n.3 (4th Cir. Apr. 20, 2022). But *Jackson*'s one-line rejection misses the point. Whether *Davis* established a "new rule" for purposes of 28 U.S.C. § 2255(h)(2) is not the same as whether a claim was "available" to a defendant. *See Murray*, 477 U.S. at 537. A new decision's outcome can be *both* not dictated by prior precedent—the relevant inquiry under *Teague v. Lane*, 489 U.S. 288 (1989)—but still "available" in the sense contemplated by *Murray*. *Jackson* could not overrule prior precedent, including Supreme Court precedent, on procedural default. Moreover, the government is making a much more developed, and distinct, argument than was before the Fourth Circuit in *Jackson*. *See United States v. Jackson*, No. 20-9, ECF No. 39 at 8-9 (4th Cir. Dec. 2, 2021) (government's response brief). *Jackson* could not be treated as deciding the issue here. *See, e.g., United States v. Norman*, 935 F.3d 232, 240–41 (4th Cir. 2019). Not "everything said in a panel opinion binds future panels." *United States v. Buster*, 26 F.4th 627, 633 (4th Cir. 2022) (citation omitted). In any event, the government makes a procedural default argument here to preserve its ability to vindicate that doctrine and avoid a waiver of procedural default. *See United States v. Harris*, 991 F.3d 552, 558 (4th Cir. 2021).

. . . the entirety of the definition of 'drug trafficking crime in § 924(c)." *United States v. Simms*, 914 F.3d 229, 252 (4th Cir. 2019) (en banc). Thus, the drug conspiracy predicate (Count 1) and the drug-related murder predicates (Counts 17-19, 24-25) remain unaffected by *Davis*.

*Second*, the drug-related murder convictions (Counts 17-19, 24-25) are also crimes of violence under § 924(c)(3)(A). Under § 848(e)(1)(A), the government must prove that the defendant intentionally killed a person. Although § 848(e)(1)(A) has three distinct ways in which a connection is drawn between the killing and the drug trafficking, *see United States v. Hager*, 721 F.3d 167, 179–80 (4th Cir. 2013), the government must still prove an intentional killing for every violation of § 848(e)(1)(A). Such proof satisfies § 924(c)(3)(A).

The Fourth Circuit has repeatedly held that an offense that requires proof of a murder satisfies § 924(c)(3)(A). *See, e.g.*, *United States v. Jackson*, — F.4th —, 2022 WL 1160391 (4th Cir. Apr. 20, 2022) (premeditated first-degree murder under 18 U.S.C. § 1111 satisfies § 924(c)(3)(A); *United States v. Roof*, 10 F.4th 314, 400–02 (4th Cir. 2021) (death-resulting offense under 18 U.S.C. § 249 (a)(1) satisfies § 924(c)(3)(A); *United States v. Mathis*, 932 F.3d 242, 264–65 (4th Cir. 2019) (VICAR murder satisfies § 924(c)(3)(A)); *In re Irby*, 858 F.3d 231, 236–38 (4th Cir. 2017) (second-degree retaliatory murder is a crime of violence under § 924(c)(3)(A)); *cf. United States v. Allred*, 942 F.3d 641 (4th Cir. 2019) (knowingly engaging in conduct that causes bodily injury in violation of witness retaliation statute satisfies ACCA's elements clause); *United States v. Battle*, 927 F.3d 160, 167 (4th Cir. 2019) (Maryland conviction for assault with intent to murder satisfies ACCA's elements clause "because the offense contemplates an intentional causation of bodily injury").

Insofar as Tipton argues that § 848(e)(1)(A) could be violated by a bare omission, the Fourth Circuit has rejected such arguments. *See United States v. Rumley*, 952 F.3d 538, 551 (4th

15

**JA106**

Cir. 2020). The Fourth Circuit and the Supreme Court have recognized that crimes of violence and violent felonies encompass crimes "characterized by extreme physical force, such as murder, forcible rape, and assault and battery with a dangerous weapon." *United States v. Bryant*, 949 F.3d 168, 181 (4th Cir. 2020) (quoting *In re Irby*, 858 F.3d at 236; *Johnson v. United States*, 559 U.S. 133, 140–41 (2010)). Indeed, given that "the force necessary to overcome a victim's physical resistance is inherently 'violent' in the sense contemplated by *Johnson*," *Stokeling v. United States*, 139 S. Ct. 544, 553 (2019), it follows that the force need to kill a person suffices.

Tipton makes a series of arguments about why his murder offenses are not crimes of violence. He contends that felony murder knocks out murder offenses. But the jury unanimously found before imposing the death sentence that the murders at issue here were "the result of substantial planning and premeditation." *United States v. Tipton*, 90 F.3d 861, 894 (4th Cir. 1996). This was not a felony-murder case, and as the Fourth Circuit's recent ruling in *Jackson* illustrates, as a matter of federal law, felony murder is divisible under § 1111. And in *Mathis*, the Fourth Circuit ruled that first-degree murder under Virginia law, as used in the VICAR statute, satisfies § 924(c)(3)(A). Moreover, Tipton fails to identify how § 848(e) creates liability on a felony-murder theory.

Defendant also contends that depraved-heart murder creates a version of recklessness that falls outside § 924(c)(3)(A) after *Borden v. United States*, 141 S. Ct. 1817 (2021). But the First Circuit has correctly rejected that argument, and the Supreme Court denied certiorari in that case after *Borden* was decided. *See United States v. Baez-Martinez*, 950 F.3d 119 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 2805 (2021). The Ninth Circuit reached the contrary result about extreme recklessness but has vacated that decision on rehearing en banc. *United States v. Begay*, 15 F.4th 1254 (9th Cir. 2021) (order granting rehearing en banc). The oral argument was held this past

16

**JA107**

January, and the court does not appear to have taken the case en banc to endorse the panel majority's reasoning that second-degree murder is not a crime of violence.[6] To the extent § 848(e) is read as reaching extreme recklessness, notwithstanding the plain language of § 848(e), because of the capital sentencing gateway factors, *see United States v. Alvarez*, 266 F.3d 587 (6th Cir. 2001), the gateway factors are elements that must be unanimously found by the jury, making them divisible, and again, the jury found that the murders here were "the result of substantial planning and premeditation." *Tipton*, 90 F.3d at 894.

*Third*, VICAR murders (Counts 21-23, 27-28) and maiming (Counts 29-30) are crimes of violence under § 924(c)(3)(A). As to the VICAR murders under § 1959(a)(1), the Fourth Circuit has already held that the murder offenses like those here satisfy § 924(c)(3)(A). *See Mathis*, 932 F.3d at 264–65. That conclusion is further reinforced by *United States v. Keene* 955 F.3d 391 (4th Cir. 2020). In *Keene* the Fourth Circuit described the relationship between a particular VICAR enumerated offense—there, assault with a dangerous weapon—and the state law referenced in the VICAR statute. As *Keene* explained, under the VICAR statute in § 1959, "the statutory language at issue requires only that the defendant's conduct, presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime." *Id*. at 393. Under this approach, a defendant's VICAR offense can be no broader than the enumerated federal offense, and every instance of Tipton's VICAR murder satisfies § 924(c)(3)(A), as *In re Irby* illustrates.

VICAR maiming also satisfies § 924(c)(3)(A), although, as explained below, this Court need not reach the question here. If contrary to *Keene*, the Court requires a state predicate crime satisfy § 924(c)(3)(A), then here that requirement is met. Virginia malicious wounding falls within

---

[6] And as an aside, at the en banc argument, the Assistant Federal Public Defender conceded that felony-murder under § 1111 is divisible.

17

**JA108**

the elements clause. *United States v. Hardy*, 999 F.3d 250, 257 n.4 (4th Cir. 2021) (citing *Rumley*, 952 F.3d at 550). And under any federal generic definition of maiming, the same precedent that establishes that Virginia malicious wounding qualifies would also suffice, as further illustrated by precedent like *Allred* and *Battle*.

And *Borden* does not affect the analysis of the VICAR offense for an additional reason. Under § 1959(a), the government must prove that the defendant's purpose in committing the predicate crime "was to maintain or increase his position in the enterprise." *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1997) (citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)); *Tipton*, 90 F.3d at 891 (same). Just as the specific intent required for attempted murder narrows the *mens rea* for murder, *see, e.g., Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill."), so too the purpose requirement for VICAR makes the commission of the predicate crime deliberate. True, the purpose required under § 1959(a) need not be the sole or even primary purpose, *United States v. Chavez*, 894 F.3d 593, 603–04 (4th Cir. 2018), but it must be a purpose that a defendant has in undertaking the crime.

Finally, Tipton's contrary citation to *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), is misplaced. (Def. Mot. 35) In at least five cases, the Fourth Circuit has recognized that *Torres-Miguel*'s indirect-force holding is no longer viable after *United States v. Castleman*, 572 U.S. 157 (2014). *See United States v. Allred*, 942 F.3d 641, 653 (4th Cir. 2019); *United States v. Covington*, 880 F.3d 129, 134 (4th Cir. 2018); *United States v. Reid*, 861 F.3d 523, 529 (4th Cir. 2017); *In re Irby*, 858 F.3d 231, 237–38 (4th Cir. 2017); *United States v. Burns–Johnson*, 864 F.3d 313, 318 (4th Cir. 2017). Moreover, *United States v. Rumley*, 952 F.3d 538, 549 (4th Cir. 2020), and *Moreno-Osorio v. Garland*, 2 F.4th 245, 253 (4th Cir. 2021), foreclose Tipton's proposition

18

**JA109**

that a statute cannot satisfy § 924(c)(3)(A) through an omission. *See also United States v. Scott*, 990 F.3d 94, 100-01 & n.5 (2d Cir. 2021) (en banc) (collecting cases)

Thus, *Davis* had no effect on Tipton's firearm convictions. The § 848(e)(1)(A) predicates underpinning Counts 20 and 26 are drug trafficking predicates that remain completely unaffected by *Davis*. This Court can deny Tipton's motion on that basis alone. Moreover, the VICAR murder and maiming predicates remain valid crimes of violence under § 924(c)(3)(A), even after *Davis*.

**B.      Even if *Davis* invalidated a predicate for Counts 20 and 26, Tipton still cannot demonstrate any prejudice.**

### 1.      General habeas principles

Once direct review is completed, "a presumption of finality and legality attaches to the conviction and sentence," *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (citation omitted), and courts are "entitled to presume" that the defendant's conviction and sentence are lawful, *United States v. Frady*, 456 U.S. 152, 164 (1982). That "presumption of regularity . . . makes it appropriate to assign a proof burden to the defendant" on collateral review. *Parke v. Raley*, 506 U.S. 20, 31 (1992); *see also Hawk v. Olson*, 326 U.S. 271, 279 (1945) (explaining that a prisoner necessarily "carries the burden in a collateral attack on a judgment"). Because, as the Fourth Circuit has put it, "[o]n collateral review . . . the calculus changes." *Bauberger v. Haynes*, 632 F.3d 100, 104 (4th Cir. 2011). Thus, on collateral review, the defendant carries the burden of showing a constitutional violation. *See, e.g.*, *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under governing precedent, however, the mere fact of an invalid predicate offense under § 924(c) does not result in the automatic vacatur of those convictions. There are many circumstances in which a conviction will rest on multiple theories of liability, only for it to subsequently become clear that one of them is invalid. In such circumstances, courts do not automatically vacate the problematic count. Instead, courts assess the error for harmlessness to

19

**JA110**

determine whether the count survives on any still-valid theories of conviction.  The Supreme Court mandates this approach. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60–61 (2008) (per curiam); *Skilling v. United States*, 561 U.S. 358, 414 n.46 (2010). And the Fourth Circuit has repeatedly applied it in a variety of contexts. *See United States v. Moriello*, 980 F.3d 924, 936–37 (4th Cir. 2020) (direct appeal); *Bereano v. United States*, 706 F.3d 568, 577 (4th Cir. 2013) (collateral review); *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012) (direct appeal). Under *Hedgpeth*, "[a]n instructional error arising in the context of multiple theories of guilt no more vitiates all the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted." 555 U.S. at 61.

In cases where a defendant forfeits an alternative-theory claim by failing to raise it below, as did Tipton, he "must show not only that he *could* have been convicted under the erroneous [theory], but also that he *was not* convicted under the properly-instructed" theory. *United States v. Robinson*, 627 F.3d 941, 955 (4th Cir. 2010); *see also United States v. Banks*, — F.4th — 2022 WL 815862, at *9 (4th Cir. Mar. 18, 2022). And on collateral review, the standard becomes stricter still.  In evaluating a habeas claim, the examination of whether an alternative-theory error is harmless is further evaluated through the lens of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, a habeas petitioner must show that a purported error resulted in "actual prejudice." *Id.* at 637. Thus, an error is harmless on collateral review unless it had a "substantial and injurious effect" on the defendant's conviction. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013); *accord Barnes v. Thomas*, 938 F.3d 526, 533 n.3 (4th Cir. 2019) (explaining that the *Brecht* standard is a "'less onerous harmless-error standard' than the requirement on direct appeal that an error be proven 'harmless beyond a reasonable doubt'" (quoting *Brecht*, 507 U.S. at 623)); *cf. Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015).

**JA111**

2.      **Fourth Circuit precedent governing multi-predicate § 924(c) convictions.**

The Fourth Circuit has repeatedly reiterated the principle that a § 924(c) conviction need only rest on one valid predicate to itself be valid. For example, after *Johnson v. United States*, 576 U.S. 591 (2015), the Fourth Circuit held that when a § 924(c) conviction has two predicate offenses—one crime of violence and one drug-trafficking crime—the validity of the drug-trafficking predicate is sufficient to sustain the conviction, even if the crime of violence is invalid. *United States v. Hare*, 820 F.3d 93, 105–06 (4th Cir. 2016). After *Davis*, the Fourth Circuit has repeatedly reaffirmed *Hare*'s principle, in both the trial and guilty plea context. *See United States v. Gillespie*, 27 F.4th 934 (4th Cir. 2022) ("In the context of a § 924(c) conviction, the verdict stands even if the jury was instructed on an invalid predicate, so long as the jury relied on a valid basis for conviction."); *United States v. Crawley*, 2 F.4th 257, 263 (4th Cir. 2021) ("We reaffirm our holding in *Hare* that a § 924(c) conviction based on one valid and one invalid predicate offense remains sound following *Johnson* and its progeny, and we extend that holding to cases in which the defendant pleads guilty to a § 924(c) offense expressly based on the valid and invalid predicate.").

In *United States v. Ali*, 991 F.3d 561 (4th Cir. 2021), the Fourth Circuit extended its decision in *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), to the context of a dual-predicate § 924(c) conviction, applying plain-error review to affirm a defendant's conviction after a trial involving a general jury verdict. *Ali* held that the inclusion of an invalid predicate (Hobbs Act conspiracy) was a plain error but that the valid, factually supported predicate (aiding or abetting Hobbs Act robbery) established that the error did not affect the defendant's substantial rights. *Ali* further held that "a showing of uncertainty as to 'whether the verdict returned by the jury rested solely on the mis-instruction' does not meet the defendant's burden of establishing

21

**JA112**

actual prejudice under the third *Olano* prong." *Id*. at 474–75 (citation omitted). And it was irrelevant that the Court "d[id] not know for certain which theory of guilt the jury accepted" because "that [type of] ambiguity is insufficient under plain error review." *Id*. at 575.

Recently, in *United States v. Said*, 26 F.4th 653 (4th Cir. 2022), the Fourth Circuit applied *Ali* and reversed a district court's grant of habeas relief to a defendant convicted of § 924(c) and § 924(o) offenses, each of which was premised on multiple predicates, some of which were invalid after *Davis*. Consistent with prior precedent, *Said* first confirmed, that "a § 924(c) conviction may stand even if the jury based its verdict on an invalid predicate, so long as the jury also relied on a valid predicate." *Id*. at 659.

*Said* then rejected the rationale offered by the district court for granting the defendant habeas relief. The district court in *Said* concluded that the defendant could show a substantial and injurious effect from the inclusion of now-invalid predicates because it could not tell on which predicate offense the jury relied, there was a more than reasonable probability that the jury would not have convicted the defendant absent the inclusion of now-invalid predicates, and "because there is no evidence in the record showing that the jury relied on either an invalid or valid predicate offense to convict[.]" *Id*. at 661.

But, the Fourth Circuit held, that sort of ambiguity "is not enough." *Id*. As *Said* explained, the Fourth Circuit has "repeatedly held, even under the plain-error standard, the defendant bears the burden of showing that the erroneous instruction given resulted in his conviction, *not merely that it was impossible to tell under which prong the jury convicted*." *Id*. (citing *Ali*, 991 F.3d at 575; *Robinson*, 627 F.3d at 954) (internal quotation marks omitted). In other words "'ambiguity is insufficient to 'establish[ ] actual prejudice' even under plain-error review." *Id*. (quoting *Ali*, 991 F.3d at 575). "Instead, the defendant 'must show not only that he *could* have been convicted under

22

**JA113**

the erroneous . . . instruction, but also that he *was not* convicted under the' proper instruction." *Id*. (quoting *Robinson*, 627 F.3d at 955). "[M]ere uncertainty as to which . . . predicate or predicates the jury relied on when it found the defendant guilty of the § 924(c) counts does not suffice to demonstrate plain error, let alone the sort of substantial and injurious error required for habeas relief." *Id*. (cleaned up). Thus, "to meet his burden, Said must show 'more than a reasonable possibility' that the jury *only* found him guilty on Counts 4 and 10 because it improperly considered" the now invalid predicates. *Id*. at 662.

And under that standard, the defendant could not succeed. As the Fourth Circuit explained, "common sense supports that a jury that found Said guilty of several substantive crimes of violence, the evidence for all of which showed to involve the use of firearms[.]" *Id*. Moreover, the jury convicted the defendant on all the underlying predicates thus removing a level of supposed ambiguity from the case. *Id*. at 663.[7]

### 3.     Tipton's § 2255 motion fails under Fourth Circuit precedent.

Governing Fourth Circuit precedent forecloses Tipton's challenge to Counts 20 and 26.

As a preliminary matter, Tipton's reliance on the modified categorical approach is both misplaced and contrary to Fourth Circuit precedent. Tipton repeatedly attempts to enlist the modified categorical approach as a lens through which to determine on which predicate offense the jury relied. (*See* Def. Mot. 16, 18, 25.) But Tipton's proposed approach to assessing the

---

[7] The Fourth Circuit granted Tipton authorization to file a successive petition before it decided *Said*. Since then, the Fourth Circuit has denied similar requests to defendants seeking permission to challenge multi-predicate § 924(c) convictions under *Davis*. *See In re Abdi Osman*, No. 21-263, ECF No. 12 (4th Cir. Mar. 16, 2022). The Fourth Circuit has also denied certificates of appealability (COA) to defendants who filed *authorized* successive petitions only to be denied relief in the district court. *See United States v. Ali*, No. 19-7352, 2022 WL 794959 (4th Cir. Mar. 15, 2022) (consolidated appeal denying COA to three defendants seeking to appeal Chief Judge Davis' § 2255 denial, one of whom received authorization to file successive petition); *United States v. Beyle*, No. 21-7511, 2022 WL 989350 (4th Cir. Apr. 1, 2022) (same for defendant seeking to appeal Judge Smith's § 2255 denial of authorized successive petition).

**JA114**

viability of multi-predicate § 924(c) offenses has already twice been rejected by the Fourth Circuit. In *Ali*, the defendant argued that, because the court could not definitively know on which predicate the jury relied (due to the general verdict), it should vacate the firearms convictions under the modified categorical approach. But the Fourth Circuit held that the defendant's suggestion "fundamentally misunderstands what the categorical approach accomplishes and the nature of our inquiry under plain error review. The purpose of the categorical (and modified categorical) approach is not to determine what the predicate was–a factual question-but rather whether a particular predicate meets the requirements of a "crime of violence"–a purely legal question." *Ali*, 991 F.3d at 574. Similarly, the district court in *Said* did exactly what Tipton proposes here. But the Fourth Circuit, relying on *Ali*, reversed. *See Said*, 26 F.4th at 661 n.13 (citing *Ali*, 991 F.3d at 574). Other courts of appeals are in accord. *See Granda*, 990 F.3d at 1295.

The correct framework through which to assess Tipton's challenge was recently articulated by the Fourth Circuit in *Said*. And under *Said*, Tipton's challenge easily fails.

*Said* instructs that a defendant seeking to challenge a multi-predicate § 924(c) conviction on collateral review must show more than a reasonable possibility that the jury *only* found him guilty on based on the invalid predicates. *Said*, 26 F.4th at 662. Ambiguity, *Said* repeatedly stressed, is simply not enough.  Tipton has never attempted such a showing, and the record in this case would make any attempt to do so futile.[8]

Tipton, like the *Said* defendant, was convicted of every count underlying his convictions on Counts 20 and 26. And even assuming the invalidity of one or more crime-of-violence

---

[8] Tipton repeatedly stressed before the Fourth Circuit that all he had to show to obtain authorization to file a successive petition was a "prima facie" case. But while that is technically true, here, Tipton has not advanced beyond that showing in any meaningful way. As was the case at the successive stage, Tipton does not contend with the facts of this case or make any attempt at showing prejudice beyond mere reliance on ambiguity.

24

**JA115**

predicates, it is impossible that the jury did not find that Tipton used a firearm in furtherance of the undisputedly valid drug-related murders charged under § 848(e) (Counts 17, 18, 19, 24, and 25). As noted above, § 848(e) is a valid drug-trafficking predicate and is enough—on its own—to support the § 924(c) convictions charged in Counts 20 and 26. The Fourth Circuit explained on direct appeal, that the murders that formed the basis of the § 924(c) convictions were "all in relation to [the defendants'] drug-trafficking operation," and occurred "because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Tipton*, 90 F.3d at 868. Both of Tipton's § 924(c) convictions had drug-trafficking and murder predicates that controlling precedent establish are valid; the jury separately convicted Tipton of each of those predicate offenses, removing any doubt that the jury unanimously found each predicate proven; and each of those predicates was furthered through a firearm given that the murders were all drug-related and accomplished with a gun.

Indeed, each murder for which Tipton was found guilty, including even the murder that was not a § 924(c) predicate, was committed to advance the organization's drug trafficking. As the Fourth Circuit explained, "[t]he Government's evidence expressly linked each of the nine § 848(e) murders of which the appellants were severally convicted to a furtherance of the CCE's purposes: either silencing potential informants or witnesses, eliminating supposed drug trafficking rivals, or punishing underlings for various drug-trafficking misfeasances." *Tipton*, 90 F.3d at 887.

In the first murder, which did not serve as a § 924(c) predicate, Tipton stabbed Douglas Talley 84 times in an attack that lasted three to five minutes because Talley mishandled a drug deal. *Tipton*, 90 F.3d at 868. Tipton committed this murder, the jury found, "in an especially heinous, cruel, or depraved manner involving serious physical abuse." *Id*. at 894.

**JA116**

The next murder, which did serve as a § 924(c) predicate, was likewise committed to advance the drug trafficking. Dorothy Mae Armstrong was shot to death on February 1, 1992, because she owed a drug debt and was thought to be a threat to the drug organization. *Id*. at 869. When Tipton, Cory Johnson, and Jerry Gaiters found Armstrong at her brother's house, Johnson killed not only her, but also Bobby Long and Anthony Carter to prevent them from being witnesses. PSR ¶ 88.

Linwood Chiles was murdered on February 19, 1992, because he was believed to be cooperating with police. *Id*. at 869. With Tipton standing by, Johnson ordered Chiles to put his head on a steering wheel and shot him to death. Curtis Thorne, who was shot to death with Chiles, owed a drug debt (PSR ¶ 93), and Priscilla and Gwendolyn Greene were shot and seriously and permanently injured because they happened to be present in the car with Chiles and Thorne.

For the murders of Armstrong, Carter, and Long, the Fourth Circuit explained that Tipton "was instrumental in planning the murders and directly aided their execution by driving Cory Johnson, the designated executioner, to the scene, awaiting accomplishment of the deed in a getaway car, then driving the executioner from the scene." *Tipton*, 90 F.3d at 890. As to the later murders of Chiles and Thorne, the Fourth Circuit noted that "Tipton and Johnson planned the executions of both victims for suspected treachery (Chiles) and thievery (Thorne) in relation to the drug-trafficking enterprise, and … Tipton was present at the scene as an active participant in seeing that the executions were carried out and that those responsible escaped detection." *Id*.[9]

No reasonable jury could have concluded that Tipton used a firearm in furtherance of the assumedly invalid predicate offenses, but not the valid drug-trafficking murder predicates charged in Counts 17, 18, 19, 24, and 25. *See Said*, 26 F.4th at 662–63. Under *Said*, it is irrelevant that the

---

[9] *Ali* and *Said* also establish that it is irrelevant for present purposes whether Tipton was held liable as an aider and abettor for a murder. *See Said*, 26 F.4th at 659 n.9; *Ali*, 991 F.3d at 573–74.

"record does not indicate which predicates the jury relied on[.]" *Id.* at 662. It is Tipton's burden to show that the jury relied *only* on the invalid predicates, and much like the *Said* defendant "[t]his he cannot do." *Id.* Tipton has offered no reason to think "that the jury reached the commonsense-defying conclusion of relying *only* on those [invalid] predicates[.]" *Id.* Put differently, Tipton has not "pointed to any reason why the jury would not have convicted him on Counts [20] and [26] based on at least one of the valid predicates—let alone any evidence that they did not do so." *Id.* Indeed, "the fact that [Tipton] can point to nothing more than ambiguity is enough to resolve this case[.]" *Id.* at 662 n.15.

As explained above, even after *Davis*, Tipton's § 924(c) convictions are still supported by, at the very least, valid drug-trafficking crimes and VICAR murder predicates. Given this reality— as well as Tipton's repeated failure to even attempt to demonstrate some form of prejudice from the assumedly no-longer valid predicate offenses—he cannot demonstrate that any error had a "substantial and injurious effect" on his convictions. *Smith*, 723 F.3d at 517.

Because Tipton has failed to demonstrate any prejudice, his challenge to Counts 20 and 26 must be rejected.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      /s/

Richard D. Cooke
Joseph Attias
Assistant United States Attorneys
U.S. Attorney's Office
Eastern District of Virginia
919 East Main Street, Suite 1900
SunTrust Building
Richmond, Virginia 23219
(804) 819-5471

27

**JA118**

**Certificate of Service**

I certify that on April 27, 2022, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

 

 

/s/
_____

Joseph Attias
Assistant United States Attorney

28

**JA119**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 3:98-CV-00361 |
| | ) | |
| vs. | ) | Crim. No. 3:92-CR-00068 (DJN) |
| | ) | |
| RICHARD TIPTON, III, | ) | **CAPITAL CASE** |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF MOTION TO VACATE CONVICTION**
**AND SENTENCE PURSUANT TO 28 U.S.C. § 2255**

Richard Tipton, III, by and through counsel, respectfully submits this reply in support of his amended motion to vacate his convictions pursuant to 18 U.S.C. § 924(c) as charged in Counts 20 and 26 of his superseding indictment and for resentencing in light of the Supreme Court's decisions in *United States v. Davis*, 139 S. Ct. 2319 (2019), and *United States v. Borden*, 141 S. Ct. 1817 (2021). The Government's response depends upon a misapplication of *Davis* and *Borden*. Mr. Tipton's 924(c) convictions must be vacated because all of the predicate crimes that the jury could have relied upon are void because they do not qualify categorically as crimes of violence after *Davis*. Moreover, even if some of the predicate crimes can be characterized as drug-trafficking offenses – which they cannot be, consistent with how they were prosecuted – there is no evidence in the record that Mr. Tipton used a gun during their commission.

**I.    Mr. Tipton Has Not Procedurally Defaulted His Challenge to His §**
**924(c) Convictions.**

The Government argues that Mr. Tipton's motion is procedurally defaulted because he did not "lodg[e] a vagueness challenge to 18 U.S.C. § 924(c)" before his convictions became final. D.172:1. This is unavailing.

1

**JA120**

### A. The Fourth Circuit has rejected the Government's defense.

28 U.S.C. § 2255(h) permits a successor motion when, *inter alia*, it is based on "a new rule of constitutional law...made retroactive to cases on collateral review...by the Supreme Court...that was previously unavailable." *In re Thomas*, 988 F.3d 783, 790 (4th Cir. 2021). The Fourth Circuit has held that: 1) *Davis* established such a rule; and 2) procedural default did not bar a successor motion based on *Davis* where the petitioner did not raise the issue on direct appeal. *See United States v. Jackson*, 32 F.4th 278, 283 n.3 (4th Cir. 2022). The Government concedes that "*Davis* is retroactive on collateral review," D.172:6, and admits that the Fourth Circuit "recently rejected a post-*Davis* procedural default argument" in *Jackson*, D.172.14, n.5. But the Government suggests that the question is unsettled because "[n]ot 'everything said in a panel opinion binds future panels.'" D.172.14, n.5 (quoting *United States v. Buster*, 26 F.4th 627, 633 (4th Cir. 2022)). This Court, however, is bound by *Jackson*. Respondent's argument must fail.

### B. Cause and prejudice exists to excuse any default.

If so required[1], Mr. Tipton also can establish cause and prejudice to excuse any default of his motion. Cause exists because, until *Davis*, this claim was not reasonably available to Mr. Tipton. The decision of the Fourth Circuit in *United States v. Bennerman*, 785 F. App'x 958 (4th Cir. 2019) (unpublished), is instructive. In *Bennerman*, the Fourth Circuit "reject[ed] the government's...argument" that the movant's challenge to his

---

[1] The Government faults Mr. Tipton for not "even attempt[ing] to" show cause and prejudice in his motion. D.172:6. Procedural default is an affirmative defense. Mr. Tipton is under no obligation to address it prophylactically, particularly as it is not applicable to his motion.

**JA121**

convictions under the Armed Career Criminal Act (ACCA) "is subject to procedural default because he failed to raise it on direct appeal," holding that the movant's challenge "wasn't reasonably available before the change in law wrought by" *Johnson v. U.S.*, 576 U.S. 591 (2015), which expressly held the residual clause of that statute unconstitutional. *Id.* at 963; *see also Reed v. Ross*, 468 U.S. 1, 14, 16 (1984). Noting that its "sister circuits have entertained procedurally defaulted Johnson claims due to their previous unavailability," the Circuit "conclude[d] that this approach is applicable here." *Id.* (citing *Lassend v. United States*, 898 F.3d 115, 122-23 (1st Cir. 2018); *Cross v. United States*, 892 F.3d 288, 294-96 (7th Cir. 2018); *United States v. Snyder*, 871 F.3d 1122, 1127 (10th Cir. 2017)).  By this reasoning, Mr. Tipton's challenge to his Section 924(c) convictions was not reasonably available until *Davis* struck down the statute's residual clause.

Mr. Tipton notes, moreover, that he sought authorization to file a successive motion making this challenge following both *Johnson*'s invalidation of the ACCA's residual clause[2] and the decision of the Supreme Court in *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018), voiding the residual clause of the federal criminal code's definition of "crime of violence."[3]  It is difficult to argue that he has sat on this challenge.

Prejudice exists because the jury would not have convicted Mr. Tipton of his Section 924(c) offenses but for the statute's unconstitutional residual clause. The government devotes a number of pages to arguing that Mr. Tipton was guilty of the predicate offenses themselves.  But that argument does not establish his guilt of the *§ 924(c) offenses*.  For the reasons detailed in Mr. Tipton's motion, and discussed further *infra*, the § 1959(a) and § 848(e) offenses designated as its predicates do not qualify as

---

[2] See Doc. 3, *In re Tipton*, No. 16-7.

[3] See Doc. 2, *In re Tipton*, No. 19-2.

3

**JA122**

crimes of violence under § 924(c)'s force or elements clause. The record at trial does not support that the jury considered his § 848(e) offenses as drug trafficking charges. For that matter, the record at trial does not establish that the jury found—or was even asked to consider—that he committed any remaining, valid drug-trafficking offense *using a firearm*. Accordingly, a conviction for those offenses cannot support a conviction under § 924(c). Simply put, the conduct for which Mr. Tipton was convicted no longer amounts to a violation of § 924(c).

### C.  Actual innocence would also excuse any default.

As Mr. Tipton has detailed in his motion, his conduct no longer supports his convictions for violations of § 924(c), such that he is actually innocent of those charges, which excuses any procedural default. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("actual innocence, if proved, serves as a gateway through which a [habeas] petitioner may pass" when the impediment is a procedural bar); *see also United States v. Adams*, 814 F.3d 178, 183 (4th Cir. 2016) (petitioner actually innocent of felon-in-possession conviction because intervening circuit precedent rendered him no longer a felon); *United States v. Bowen*, 936 F.3d 1091 (10th Cir. 2019); *United States v. Reece*, 938 F.3d 630 (5th Cir. 2019). The Government argues that Mr. Tipton must demonstrate his actual innocence by showing that "'it is more likely than not'"[4] that "'no reasonable juror would have concluded he possessed a firearm in furtherance of any of the valid predicate offenses.'"[5]  As detailed in Mr. Tipton's motion and below, he could no longer be convicted of his § 924(c) charges, and thus can show that it is more likely than not that

---

[4] D.172:7 (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

[5] D.172:7 (citing *Granda v. United States*, 990 F.3d 1272, 1292 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1233 (2022)).

4

**JA123**

he is actually innocent of those offenses.[6]

## II. The Government Cannot Rebut that *Davis* Invalidated Mr. Tipton's § 924(C) Convictions.

Mr. Tipton's motion details why his convictions under § 1959(a) and § 848(e) no longer constitute valid predicate crimes for his § 924(c) convictions following Davis and Borden. He will not reprint those arguments here. He instead focuses in the main on the Government's mistaken assertion that no harm has come to him from these unconstitutional convictions.

### A. Mr. Tipton's predicate convictions under § 1959(a) and § 848(e) are not crimes of violence following *Davis* and *Borden*.

#### 1. The § 1959(a) convictions are not crimes of violence.

As Mr. Tipton explains in his motion, his § 1959(a) convictions cannot serve as predicates for his § 924(c) offenses because his jurors were permitted by its statutory language—and instructed by the trial court—to convict him if they found that he had conspired to commit any of the multiple offenses listed in the statute, and conspiracy cannot qualify as a "crime of violence." D.159:25-27. The Government makes no attempt to rebut this argument; it does not mention conspiracy at all.

As further noted in his Motion, Mr. Tipton's § 1959(a) convictions cannot be valid predicate crimes for his § 924(c) convictions because, under the categorical approach, this Court may only consider the least culpable conduct criminalized by the statute when determining whether it qualifies a crime of violence. Here, § 1959 includes conspiracy,

---

[6]As with cause and prejudice, the Government's criticism of Mr. Tipton for supposedly "not even attempt[ing] to make" a showing of actual innocence falters in two respects. D.172:7. An assertion of procedural default is an affirmative defense that Mr. Tipton is not required to anticipate and address prophylactically. Second, because Mr. Tipton's motion details why he could no longer be convicted of his § 924(c) charges, he has indeed made that showing.

5

which is not a crime of violence. *See, e.g., United States v. Simmons*, 11 F.4th 239, 260 (4th Cir. 2021) (aggravated "RICO conspiracy is not categorically a crime of violence"); *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (conspiracy to commit Hobbs Act robbery is not a crime of violence).

Even if the Court applies the modified categorical approach, as the Government suggests, and instead considers whether murder or maiming under § 1959 constitutes a crime of violence, the result is the same. None of the documents that the Court may consult pursuant to that approach—his indictment, jury instructions, and special verdict form, collectively known as *Shepard* documents[7]—references a specific charge or statute for murder or maiming to which the categorical approach could be applied, making it impossible to determine whether the jury found the intent or elements necessary to satisfy § 924(c)'s surviving force clause. D.159:25-37.  The Government attempts to elide this point in several ways.

The Government first argues that "offenses like *those here* satisfy" the force clause, D.172:17. This flouts the categorical approach, which, again, requires this Court to determine whether "the most innocent conduct" criminalized by the statute, and not the facts of the particular case, "qualifies as a 'crime of violence.'" *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) (under the categorical approach, "we must presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized" (quoting *Johnson*, 559 U.S. at 137)).  The Government also cites authority for the proposition that "premeditated first-degree murder under 18 U.S.C. § 1111," the federal murder stature, "satisfies § 924(c)(3)(A)." D.172:15.  Again, this argument ignores that Mr. Tipton was not

---

[7] See *Shepard v. United States*, 544 U.S. 13, 26 (2005).

charged with a § 1111 offense; indeed, there is no mention of § 1111 in Mr. Tipton's indictment, jury instructions, and verdict form. Without knowing which murder statute or offense to examine through the lens of the categorical approach, it is impossible to know whether to compare the § 1959 conviction here to § 1111 premeditated murder, which the Fourth Circuit recently found constitutes a crime of violence, *see Jackson*, (petition for rehearing en banc pending), § 1111 felony murder, which is not a crime of violence, *see id.*, or any other federal murder offense. In rebuttal, the Government can only contravene the categorical approach once more, arguing that "[t]his was not a felony-murder case." D.172:16. What supporting authority it musters either predates *Borden* or addresses VICAR offenses based on specific state or federal statutes. D.172:17-18.

### 2. Mr. Tipton's § 848(e) convictions were prosecuted as crimes of violence, not drug-trafficking crimes.

The Government contends that the § 846 "drug conspiracy" charged in Count One of Mr. Tipton's indictment and his § 848(e) convictions—or "drug-related murder[s]"— remain valid predicate offenses because they are "drug-trafficking crimes." D.172:14-15. In the first place, Mr. Tipton's § 846 conviction was vacated on appeal and cannot serve as a valid predicate. Secondly, the Government ignores Fourth Circuit precedent that § 848(e) offenses are not crimes of violence.

### 3. The § 848(e) crimes do not require *Borden*'s *mens rea* of specific intent.

Like Mr. Tipton's § 1959(a) convictions, his § 848(e) convictions cannot satisfy *Borden*'s *mens rea* requirement because they allow for conviction when a killing is committed without specific intent and thus are not categorically crimes of violence. *See, e.g., United States v. Alvarez*, 266 F.3d 587, 594-95 (6th Cir. 2001) (permitting § 848(e) jury instruction that included *mens rea* of recklessness creating grave risk of death). The

7

**JA126**

Government offers a string cite for the proposition that "[t]he Fourth Circuit has repeatedly held that an offense that requires proof of a murder satisfies § 924(c)(3)." D.172:15 (citing *Jackson*, 32 F.4th 278; *United States v. Roof*, 10 F.4th 314 (4th Cir. 2021); *United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019); and *In re Irby*, 858 F.3d 231 (4th Cir. 2017)). It suggests that these cases are analogous because they feature a "murder," but it does not engage with the statutes at issue in this case. Such an analysis is necessary because not all murders qualify as a crime of violence. See, *e.g.*, *Jackson*, 32 F.4th at 285 (felony murder is not a crime of violence). Instead, the Court must look to the statute of conviction to assess the most innocent conduct it criminalizes before determining whether the conviction satisfies 924(c)(3)'s surviving force clause.

None of the cases in the Government's string cite – not *Jackson, Roof, Mathis,* or *Irby* –addresses a killing defined by § 848(e).   And none of the offenses at issue in those cases can be committed with anything less than a *mens rea* of specific intent.[8]  By contrast, killings under § 848(e) can be committed recklessly with "grave risk" of harm. D.159:37-38. As *Borden* made clear, offenses that can be committed with a *mens rea* of recklessness simply do not qualify as crimes of violence under the force clause. And, as Mr. Tipton details in his motion, a defendant can also be found guilty under 848(E)(1)(a) if he "counsels, commands, induces, procures, or causes the intentional killing"— all of which

---

[8] *Jackson* focused on whether 18 U.S.C. § 1111 is a divisible statute before finding that premeditated first-degree murder satisfies the force clause, further acknowledging that felony murder under § 1111 does not satisfy the force clause because it does not require a *mens rea* greater than recklessness.  32 F.4th at 285-87. *Roof* involved "willfully caus[ing] bodily injury" resulting in death, pursuant to 18 U.S.C. § 249(a)(1). 10 F.4th at 400-02. *Mathis* involved commission of VICAR by committing first-degree murder under Virginia law, which requires the "willful, deliberate, and premeditated" killing of another. 932 F.3d at 265. *Irby* involved second-degree retaliatory murder under 18 U.S.C. § 1513(a)(1)(B), which requires "kill[ing] or attempt[ing] to kill another person with intent to retaliate." 858 F.3d at 234. *Irby* and *Mathis* also pre-date *Borden*.

8

**JA127**

could be committed without a defendant even being present for the actual killing, which precludes their qualifying as crimes of violence.

### B. The record contains no real evidence that Mr. Tipton used a firearm in the charged offenses.

The Government relies upon the Fourth Circuit's decision in *United States v. Said* to argue that "a defendant seeking to challenge a multi-predicate § 924(c) conviction on collateral review must show more than a reasonable possibility that the jury only found him guilty based on the invalid predicates." D.172:24 (citing 26 F.4th 653, 662 (4th Cir. 2022)). The Government further asserts that "the record in this case would make any attempt to do so futile." D.172:24. Hardly. As Mr. Tipton has detailed in his Motion, no valid predicates remain, either because they are not categorically crimes of violence (as discussed supra) *or* because there is no evidence that he used a firearm in their commission.

The Government's insistence that the jury, when convicting Mr. Tipton of his § 848(e) offenses, was treating them as "drug trafficking offenses," and not as crimes of violence, finds no support in the record. When instructing Mr. Tipton's jury, the trial court stated that "[t]he term 'drug trafficking crime' means an offense that is a felony and involves the *distribution, manufacture, or importation* of any controlled substances, or the conspiracy to *distribute, import, or manufacture* controlled substances"— language that does not invoke murder. T.3223 (emphases added). Nor did the instructions state that Mr. Tipton's 848(e) offenses were "drug trafficking crimes"; they instead lumped those counts, by number only, within a laundry list of *25 charges* they described collectively as "crimes of violence *or* drug trafficking crimes." *Id.* (emphasis added). For its part, the Government used the phrase "drug trafficking" a single time in closing argument, and only while discussing the murder of Douglas Moody, which was not cited as a predicate offense for Mr.

9

**JA128**

Tipton's 924(c) convictions.[9]  By contrast, the Government's discussion of Mr. Tipton's 848(e) predicates focuses on their "violence" and lurid details. See, e.g., T.3008 (characterizing the 848(e) predicates for Count 20 as "[t]he *violence* continu[ing]").  The Fourth Circuit's precedent prior to *Davis* and *Borden* that "§ 848(e) clearly sets forth a *separate* substantive violent offense" undermines any suggestion that it is necessarily a drug trafficking offense. *United States v. NJB*, 104 F.3d 630, 635 (4th Cir. 1997) (emphasis added); *see also United States v. Turner*, 198 F.3d 425, 432 (4th Cir. 1999) (§ 848(e)(1)(A) is "a substantive crime of violence").  Nor does the Fourth Circuit's description, in its opinion, of the killings as "*in relation* to [the defendants'] drug trafficking operation" support the jury viewing these offenses as themselves "drug trafficking"; on the contrary, the use of "relation" recognizes that these offenses were, if connected, nonetheless separate. *United States v. Tipton*, 90 F.3d 861, 868 (4th Cir. 1996). The Fourth Circuit also found that murders were committed "because [the victims] had *personally* offended one of the partners", which would not, in fact, connect directly to the drug trafficking. *Tipton*, 90 F.3d at 868.

In sum, *Said* "d[id] not hold that a challenge such as Said's will *never* succeed," *id.* at 664 (emphasis added). In *Said*, the petitioner "pointed to nothing to eliminate the commonsense prospect that the jury relied on one or more of the valid predicates." *Id.* Here, by contrast, Mr. Tipton has pointed to many things.

The Government next asserts that "[n]o reasonable jury could have concluded that

---

[9]"Also charged, beginning with the Doug Moody murder which we will talk about next, is use of a firearm during a drug trafficking crime or a crime of violence. It couldn't be any more simply stated than that. If you find them guilty of murdering the people as the evidence and as the government has argued, through the use of a firearm, they are guilty of that." T.2994.

10

**JA129**

Tipton used a firearm in furtherance of the assumedly invalid predicate offenses, but not the valid drug-trafficking murder predicates charged in Counts 17, 18, 19, 24, and 25." D.172:26. But the evidence in the record does not demonstrate that Mr. Tipton himself used a firearm in the commission of *any* of the 848(e) offenses offered as predicates for his 924(c) convictions.

For the Section 924(c) offense charged in Count 20, the 848(e) predicates were that Mr. Tipton and defendants Cory Johnson and Jerry Gaiters "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of" Bobby Long, Anthony Carter, and Dorothy Mae Armstrong in furtherance of a continuing criminal enterprise. Counts 17-19, Indictment at 13-15.  As the Fourth Circuit summarized on appeal, however, the evidence at trial showed that Mr. Tipton "waited in the car" while Mr. Johnson, accompanied by Mr. Gaiters went to the front door" of Mr. Long's house and, when Mr. Long opened the door, "opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard." *United States v. Tipton*, 90 F.3d 861, 869 (4th Cir. 1996).  The Government emphasized in closing argument that "[t]here was one shooter in that house, according to ballistics. The Glock was used to kill all three of those people. Cory Johnson had the Glock that night." T.3010.

For the Section 924(c) offense charged in Count 26, the 848(e) predicates were that Mr. Tipton and defendants Mr. Johnson and Lance Thomas "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of" Curtis Thorne and Linwood Chiles. Counts 24-25, Indictment at 17-18. As the Fourth Circuit summarized on appeal, however, the offenses stemmed from Mr. Johnson shooting both men inside the station wagon in which they and he had been riding

**JA130**

together, while Mr. Tipton, who had arrived in another vehicle, was "alongside the station wagon....standing by." *Tipton*, 90 F.3d at 869. While the Government suggested that Mr. Tipton had also participated in the shooting, it acknowledged that Mr. Johnson's Glock was "the same Glock that ballistics have shown you unequivocally, unimpeachably, without a doubt, to be the gun that was used to kill Curt and Linwood[.]" T.3015.

The Government seems to recognize the lack of evidence, stating that both Counts 20 and 26 charged Mr. Tipton "with using, *or aiding and abetting the use*, of a firearm"—language that does not appear in the superseding indictment. D.172:3. And to the extent that Mr. Tipton's convictions under 848(a) could serve as predicates for his § 924(c) offenses, there is a similar paucity of evidence that he used firearms in the commission of the drug trafficking.

The Second and Fifth Circuits have vacated § 924(c) convictions that rested upon both valid and invalid predicates, holding that where there is a genuine question as to whether a firearm was used in the "valid" predicate in question, relief must issue. *See, e.g., United States v. Laurent*, ___F.4th___, 2022 WL 1217395, at *15 (2d Cir. 2022) (vacating § 924(c) conviction because "[w]e cannot be [] confident that a properly instructed jury would have convicted" the defendant where jury "may have based" its § 924(c) conviction on an invalid predicate); *United States v. Heyward*, 3 F.4th 75, 84 (2d Cir. 2021) (vacating § 924(c) convictions where valid and invalid predicates were not "inextricably intertwined"); *United States v. Capers*, 20 F.4th 105, 125 (2d Cir. 2021) (vacating § 924(c) conviction where invalid RICO conspiracy and valid narcotics conspiracy predicates were not "intertwined"); *United States v. McClaren*, 13 F.4th 386, 413-14 (5th Cir. 2021) (vacating § 924 convictions where invalid RICO conspiracy predicate "involved acts of violence going beyond the [valid] drug conspiracy"); *United States v. Jones*, 935 F.3d 266

12

**JA131**

(5th Cir. 2019) (vacating § 924(c) convictions where "the [invalid] RICO conspiracy offense encompassed conduct beyond the [valid] controlled-substance conspiracy"). That reasoning applies with equal force here.

## III.    CONCLUSION

For all the reasons set forth in his amended motion and above, Mr. Tipton respectfully asks this Court to vacate his convictions and sentences on Counts 20 and 26, the invalid charges under 18 U.S.C. § 924(c), and order a new sentencing proceeding.

Respectfully submitted on this, the 17th day of June, 2022.

/s/Frederick R. Gerson
Frederick R. Gerson
VSB #39968
Durrette, Arkema, Gerson & Gill PC
1111 East Main Street, 16th Floor
Richmond, VA 23219
Tel:  (804) 775-6900
Fax:  (804) 775-6900
fgerson@dagglaw.com

*Jeffrey Lyn Ertel
Ga. Bar No. 249966
Federal Defender Program, Inc.
101 Marietta Street, Suite 1500
Atlanta, Georgia 30303
404-688-7530
(fax) 404-688-0768
Jeff_Ertel@fd.org

Stephen Northup
VSB #16547
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240
(fax) (804) 698-5120
steve.northup@troutmansanders.com

Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas Unit
Federal Public Defender
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720
Direct: (704) 688-6946
Gerald_King@fd.org

*Admitted *pro hac vice.*

**Counsel for Richard Tipton, III**

13

**JA132**

## CERTIFICATE OF SERVICE

I certify that on this, the 17th day of June, 2022, the foregoing document was served on all parties or their counsel of record though the CM/ECF system and will be served electronically on the attorney listed below:

Richard Cooke, Esq.
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamison Avenue
Alexandria, Virginia 22314


This, the 17th day of June, 2022.

> */s/Frederick R. Gerson*
> Frederick R. Gerson
> VSB #39968
> Durrette, Arkema, Gerson & Gill PC
> 1111 East Main Street, 16th Floor
> Richmond, VA 23219
> Tel:  (804) 775-6900
> Fax:  (804) 775-6911
> fgerson@dagglaw.com

**JA133**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.

Criminal No. 3:92cr68 (DJN)
Civil No. 3:22cv99 (DJN)

RICHARD TIPTON,
    Defendant.

**MEMORANDUM OPINION**

A jury convicted Defendant of killing numerous individuals in furtherance of his substantial drug ring. Defendant now asks the Court to find that those convictions constitute neither crimes of violence nor drug trafficking crimes. This matter comes before the Court on Defendant Richard Tipton's Amended Motion to Vacate Conviction under 28 U.S.C. § 2255 in Light of *United States v. Davis* ("§2255 Motion" (ECF No. 159)). Defendant moves for the vacatur of his convictions under 18 U.S.C. § 924(c) in light of the Supreme Court's decisions in *United States v. Davis*, 139 S. Ct. 2319 (2019) and *Borden v. United States*, 141 S. Ct. 1817 (2021). Defendant argues that his § 924(c) convictions now rest on invalid predicate crimes in that the predicates no longer constitute crimes of violence. However, Defendant's § 924(c) convictions rest on multiple convictions that constitute both drug trafficking convictions and crimes of violence. Consequently, for the reasons explained below, the Court will DENY Defendant's § 2255 Motion.

**JA134**

## I.    BACKGROUND[1]

### A.    Factual Background

Defendant, along with Corey Johnson ("Johnson") and James Roane, Jr. ("Roane") (collectively, the "partners"), ran a substantial drug trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 4, 1992, Roane and Tipton drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. *Id.* Roane grabbed Talley and Tipton stabbed him repeatedly for three to five minutes. *Id.* Talley died from eighty-four stab wounds to his head, neck and upper body. *Id.*

On January 13, 1992, Roane and Tipton went to the apartment of Douglas Moody, a suspected rival in their drug trafficking area, and Tipton shot Moody twice in the back. *Id.*

---

[1]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004).

**JA135**

Tipton and Roane pursued the fleeing Moody before Roane caught him and stabbed him eighteen times, killing him. *Id.*

In late January 1992, after Johnson threatened Dorothy Armstrong for not paying for a supply of crack cocaine, Armstrong went to live with her brother, Bobby Long. *Id.* On February 1, 1992, Johnson, Tipton and Jerry Gaiters ("Gaiters") went to Long's house. *Id.* at 391. While Tipton waited in the car, Johnson and Gaiters approached the front door. *Id.* When Long opened the door, Johnson opened fire, killing Dorothy Armstrong and Anthony Carter. *Id.* As Bobby Long fled out the front door, Johnson shot him dead in the front yard. *Id.*

On February 19, 1992, Johnson arranged to meet with Linwood Chiles, who Johnson suspected of cooperating with the police. *Id.* That night, Chiles and Johnson drove off together in Chiles' station wagon, with Curtis Thorne and sisters Priscilla and Gwen Greene also in the car. *Id.* Chiles parked in an alley before Tipton parked behind the station wagon and walked up beside it. *Id.* With Tipton standing by, Johnson told Chiles to place his head on the steering wheel before shooting him twice at close range. *Id.* The partners fired additional shots, killing Thorne and critically wounding the Greene sisters in the station wagon. *Id.* The autopsy report indicated that bullets fired from two different directions had hit Thorne. *Id.*

## B.    Verdict and Sentencing

In January and February of 1993, United States District Judge James R. Spencer presided over the trial of Defendant and his co-conspirators. Defendant[2] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for eight of these killings — Talley (Count Three), Moody (Count Five), Louis Johnson (Count Eleven), Armstrong (Count Seventeen), Carter (Count Eighteen), Long (Count

_____

[2]    The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

**JA136**

Nineteen), Thorne (Count Twenty-Four) and Chiles (Count Twenty-Five) (collectively, the "CCE Murder Counts"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 6-18). On February 3, 1993, the jury convicted Defendant of six of the CCE Murder Counts — Counts Three, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five (the "CCE Murder Convictions"). One of the other two CCE Murder Counts was dismissed (Count Eleven) and the other resulted in an acquittal (Count Five). *Id.* The jury also convicted Defendant of one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One); one count of engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two); eight counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty) and two counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Twenty and Twenty-Six) (collectively, the "§ 924(c) Counts"). 378 F.3d at 391; (Dkt No. 592). Finally, the jury convicted Defendant of two counts of Possession with Intent to Distribute Crack Cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Thirty-Two and Thirty-Three (the "Drug Distribution Counts" or the "Drug Distribution Convictions")). 378 F.3d at 391; (Dkt Nos. 465, 592.) Defendant's § 2255 Motion pertains to Counts Twenty and Twenty-Six — the § 924(c) Counts.

On February 16, 1993, following a penalty hearing on the CCE Murder Counts, the jury recommended that Defendant be sentenced to death for the murders of Talley, Chiles and Thorne. 378 F.3d at 392. Consequently, on June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Defendant to death for Counts Three, Twenty-Four and Twenty-Five. *Id.* Relevant here, the Court also sentenced Defendant to life imprisonment for each of the CCE

4

**JA137**

Murder Convictions for which he did not receive a death sentence — Counts Seventeen, Eighteen and Nineteen. Defendant also received a life imprisonment sentence for the CCE conviction in Count Two, life sentences for Counts Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven and Twenty-Eight. (Dkt No. 592.) Additionally, Defendant received a sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twenty-Six and Thirty-Three and five years' imprisonment for Count Twenty. (Dkt. No. 592.)

C.    Post-Trial Proceedings

The defendants appealed their convictions and sentences and the Government cross-appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit analyzed and disposed of approximately sixty issues, including challenges by the defendants to aspects of the jury-selection process and both the guilt and penalty phases of the trial. *United States v. Tipton*, 90 F.3d 861, 861 (4th Cir. 1996). The Fourth Circuit rejected nearly all of the claims, affirming the convictions and sentences of all of the defendants, except that it vacated on Double Jeopardy grounds the drug conspiracy convictions under 21 U.S.C. § 846, finding that the CCE convictions in Count Two precluded sentences for the drug conspiracy offenses. *Id.* at 903.

Defendant continued to press his appeals. On June 1, 1998, Defendant filed a motion under 28 U.S.C. § 2255 to vacate and set aside his sentences. *Roane*, 378 F.3d at 392. The Court granted the Government's summary judgment motion, and Defendant appealed. *Id.* at 393. The Fourth Circuit affirmed, ruling against Defendant on all accounts. *Id.* at 398-407.

**JA138**

In 2016, Defendant filed an application with the Fourth Circuit to file a successive § 2255 petition to invalidate his § 924(c) convictions. The Fourth Circuit denied his requests. *In re Tipton*, No. 16-7 (4th Cir. 2016), ECF No. 13.

On July 31, 2020, Defendant filed a Motion for the Imposition of a Reduced Sentence Under Section 404 of the First Step Act (("First Step Act Motion") ECF No. 24), arguing for a reduced sentence on his CCE Murder Counts and Drug Distribution Counts. The First Step Act, in relevant part, allows defendants convicted of certain crack-cocaine drug trafficking offenses to move for a reduced sentence if the Fair Sentencing Act modified the statutory penalties for those drug trafficking offenses. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. Defendant argued that the First Step Act covered his CCE Murder Counts, because the CCE Murder Counts rely on drug trafficking predicates that the Fair Sentencing Act Modified. (First Step Act Motion at 4-5.)

With respect to the present § 2255 Motion, on June 8, 2020, Defendant filed yet another application with the Fourth Circuit for a successive § 2255 pursuant to the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). *In re Tipton*, No. 20-10 (4th Cir. 2020), ECF No. 2. On January 4, 2022, the Fourth Circuit granted authorization to Defendant to file a successive 28 U.S.C. § 2255 motion.[3] (ECF No. 159.) On February 22, 2022, Defendant filed his § 2255 Motion. On April 27, 2022, the Government filed its Response in Opposition to Defendant's Motion to Vacate (("Govt.'s Opp.") (ECF No. 172)). On June 17, 2022, Defendant filed his Reply (("Def.'s Reply") (ECF No. 179)), rendering this matter ripe for review.

---

[3]   The Court agrees with the Fourth Circuit that Defendant's § 2255 Motion relies upon "a new rule of constitutional law, made retroactive to cases on collateral review." 28 U.S.C. § 2255(h)(2).

**JA139**

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a movant may collaterally attack a conviction or sentence that the Court imposed in violation of the United States Constitution or its laws, where the Court lacked jurisdiction to impose the sentence, where the sentence exceeded the maximum sentence authorized by law, or "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A movant under § 2255 bears the burden of showing a constitutional violation. *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010). Generally, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice" to excuse his procedural default or his actual innocence." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

"[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This standard requires the habeas petitioner to show that "[t]here [is] more than a 'reasonable possibility' that the error was harmful." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022) (alterations in original) (quoting *Davis*, 576 U.S. at 268). "Thus, mere speculation that the defendant was prejudiced by trial error is not enough; the court must find that the defendant was actually prejudiced by the error." *Id.*

## III.    ANALYSIS

Resolution of Defendant's § 2255 Motion first requires the Court to determine whether his two § 924(c) Counts still rest on valid predicates. Because they do, the Court will then determine whether Defendant can show prejudice from the possibility that some of the predicate offenses may not constitute valid predicates while others do. He cannot. However, the Court

7

**JA140**

must first address whether Defendant may bring this claim at all in light of the fact that he did not raise this challenge at trial or on direct appeal.

### A.    Procedural Default

The Government argues that Defendant procedurally defaulted on his claim, because he did not raise it at trial or on direct appeal. (Govt.'s Opp. at 6-14.)  Generally, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice" to excuse his procedural default or his actual innocence. *Massaro*, 538 U.S. at 504.

Defendant claims that his actual innocence excuses any procedural default. (Def.'s Reply at 4.)  In the event of a procedural bar, "actual innocence, if proved, serves as a gateway through which a petitioner may pass." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  A gateway claim requires a petitioner to present "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence —that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Defendant has not presented any new reliable evidence of his innocence of his § 924(c) conviction.  That alone forecloses his assertion of actual innocence.

With respect to cause and prejudice, Defendant claims that the Fourth Circuit has excused procedural default for petitioner bringing a § 2255 claim under *Davis*. (Def.'s Reply at 2.)  In support, Defendant cites *United States v. Jackson*, where the court rejected a similar argument by the Government in a footnote: "For this reason, the Government's first argument, that procedural default bars Jackson's § 2255 motion because he did not raise the issue on direct appeal, fails." 32 F.4th 278, 283 n.3 (4th Cir. 2022).  The Government asks the Court not to view this "single undeveloped footnote" as binding on this Court, because it misconstrues precedent on procedural default and "not everything said in a panel opinion binds future panels."

8

**JA141**

(Govt.'s Opp. at 14, n.5.)  However, the Court need not wade into an analysis of whether it must follow *Jackson* or reject it as conflicting with prior precedent, because the Court can assume without deciding that *Jackson* renders Defendant able to show cause as to his procedural default. Even if Defendant can show cause, Defendant cannot demonstrate prejudice that would satisfy the requirements for procedural default or habeas review generally, as described below.

### B.    Section 924(c)

Section 924(c) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to an additional mandatory minimum sentence.  18 U.S.C. § 924(c)(1)(A).  The statute defines a "drug trafficking crime" as "any felony punishable under the Controlled Substances Act (21 U.S.C. § 801, *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951, *et seq.*), or chapter 705 of title 46."  § 924(c)(2).  Further, the statute defines "crime of violence" to mean "an offense that is a felony and has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  § 924(c)(3).[4]  As the statute plainly states, it "prohibits the possession of a firearm in furtherance of a crime of violence *or* a drug trafficking crime."  *United States v. Hare*, 820 F.3d 93, 105-06 (4th Cir. 2016).  Therefore, the Court must determine whether Defendant's convictions in Counts Twenty and Twenty Six rest on convictions that constitute valid crimes of violence or drug trafficking crimes.  This begins with an examination of the predicate convictions.

---

[4]    The Supreme Court has struck down the additional phrase in the "crime of violence" definition as discussed below.

9

**JA142**

**D.      Defendant's Predicate Convictions for Counts Twenty and Twenty-Six**

**1.      The Charges in the Indictment**

Count Twenty of the Second Superseding Indictment states:[5]

> THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, . . . RICHARD TIPTON aka Whittey . . . did knowingly, willfully and unlawfully use a firearm during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(Indictment at 15.)  Thus, the Indictment predicated Count Twenty on the following Counts:

**Count One** charged Tipton with participating in a conspiracy to possess with intent to distribute and to distribute fifty (50) grams or more of cocaine base.  (*Id.* at 2-5.)

**Count Seventeen** charged that, on February 1, 1992, Tipton, while engaged in and working in furtherance of a CCE, "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Lone, and such killing resulted.  (In violation of 21 United States Code, Section 848(e)(1)(A) and Title 18 United States Code, Section 2.)." (*Id.* at 13-14.)

**Count Eighteen** charged that, on February 1, 1992, while engaged in and working in furtherance of a CCE, Tipton "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.  (In violation of 21 United States Code, Section 848(e)(1)(A) and Title 18 United States Code, Section 2.)." (*Id.* at 14.)

**Count Nineteen** charged that, on February 1, 1992, while engaged in and working in furtherance of a CCE, Tipton "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.  (In violation of 21 United States Code, Section 848(e)(1)(A) and Title 18 United States Code, Section 2.)." (*Id.*)

**Count Twenty-One** charged that, on February 1, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged

---

[5]      The Court corrects the capitalization in any quotations referring to the counts of the Second Superseding Indictment.

10

**JA143**

in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 15-16.)

**Count Twenty-Two** charged that, on February 1, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 16.)

**Count Twenty-Three** charged that on February 1, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 16-17.)

## B.    Count Twenty-Six

Count Twenty-Six of Second Superseding Indictment states:

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, . . . RICHARD TIPTON, aka Whittey . . . did knowingly, intentionally, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(*Id.* at 18.) Thus, the Indictment predicated Count Twenty-Six on the following charges:

**Count One** charged Tipton with participating in a conspiracy to possess with intent to distribute and to distribute fifty (50) grams or more of cocaine base. (*Id.* at 2-5.)

**Count Twenty-Four** charged that, on February 19, 1992, Tipton, while engaged in and working in furtherance of a CCE, "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted. (In violation of 21 United States Code, Section 848(e)(1)(A) and Title 18 United States Code, Section 2.)." (*Id.* at 17.)

**Count Twenty-Five** charged that, on February 19, 1992, Tipton, while engaged in and working in furtherance of a CCE, "knowingly, intentionally, and unlawfully killed and

11

**JA144**

counseled, commanded, induced, procured, and caused the intentional killing of Anthony Mack, and such killing resulted. (In violation of 21 United States Code, Section 848(e)(1)(A) and Title 18 United States Code, Section 2.)." (*Id.* at 17-18.)

**Count Twenty-Seven** charged that, on February 19, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 18-19.)

**Count Twenty-Eight** charged that, on February 19, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 19.)

**Count Twenty-Nine** charged that, on February 19, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 19-20.)

**Count Thirty** charged that, on February 19, 1992, Tipton "did knowingly, intentionally, and unlawfully cause the maiming of Gwendoyln Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering being dealing in narcotic or other dangerous drugs. (In violation of Title 18, United States Code, Sections 1959 and 2.)" (*Id.* at 20.)

### 2. The Pertinent Jury Instructions and Verdict Form

The Court instructed the jury that:

> In order to sustain its burden of proof of the crime of using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime as charged in Counts . . . Twenty and Twenty-Six of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:

12

**JA145**

One, the defendant committed the crime as charged in the indictment; and two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

The term "crime of violence" means an offense that is a felony and has as one of its essential elements the use, the attempted use, or threatened use of physical force against the person or property of another, or an offense that by its very nature involves a substantial risk that such physical force may be used in committing the offense.

The term "drug trafficking crime" means an offense that is a felony and involves the distribution, manufacture, or importation of any controlled substances. The offenses alleged in Counts . . . Seventeen, Eighteen, Nineteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, Thirty-Two, and Thirty-Three are crimes of violence or drug trafficking crimes.

(Feb. 2, 1993 Tr. 3222–23.)

Defendant's Verdict Form further stated:

Count 20:    Use of Firearm in Relation to Killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong

_____
(Guilty or Not Guilty)

. . . .

Count 26:    Use of Firearm in Relation to Killing of Curtis Thorne and Linwood Chiles and Maiming of Priscilla Green and Gwendolyn Greene

_____
(Guilty or Not Guilty)

(Docket No. 465, at 5-6.) The jury found him guilty of both. (*Id.*)

### 3.    Defendant's Arguments for Relief

Defendant contends that in the wake of *Davis* and *Borden*, none of the designated offenses constitute a viable crime of violence predicate for the § 924(c) offenses in Counts Twenty and Twenty-Six. His arguments fail. As explained below, Counts Twenty and Twenty-Six are supported by multiple, valid drug trafficking and crime of violence predicates. Counts One, Seventeen through Nineteen, Twenty-Four and Twenty-Five constitute valid drug

13

**JA146**

trafficking crime predicates for his § 924(c) convictions. Counts Seventeen through Nineteen, Twenty-Four and Twenty-Five remain valid crime of violence predicates for his § 924(c) convictions. Defendant devotes most of his brief to arguing that his racketeering-related crimes no longer qualify as a crime of violence. Given the many unquestionably valid predicates for Defendant's § 924(c) convictions, no need exists to assess whether the racketeering crimes could serve as crime of violence predicates for the § 924(c) convictions. *Said*, 26 F.4th at 659 ("[A] § 924(c) conviction may stand even if the jury based its verdict on an invalid predicate, so long as the jury *also* relied on a valid predicate." (citing *United States v. Crawley*, 2 F.4th 257, 263 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 819 (2022); *Hare*, 820 F.3d at 106)).

> **E.      Counts One, Seventeen through Nineteen, Twenty-Four and Twenty-Five Remain Valid Drug Trafficking Predicates for § 924(c) Convictions.**

First, Defendant's § 924(c) convictions rest on valid drug trafficking predicates, a fact that Defendant barely addresses. [6] The statute defines a "drug trafficking crime" to mean "any felony punishable under the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46." 18 U.S.C. § 924(c). Several of Defendant's predicate convictions meet this definition.

Defendant's drug distribution conspiracy conviction in Count One remains a valid drug trafficking predicate for Counts Twenty and Twenty-Six. *Hare*, 820 F.3d at 97, 106 (finding that drug distribution conspiracy charge could properly support a § 924(c) conviction); *see United States v. Heyward*, 3 F.4th 75, 81 (2d Cir. 2021) ("[A] § 924(c) conviction may be premised on a

---

[6]      Defendant largely ignores the fact that his § 924(c) convictions could be predicated upon drug trafficking crimes. Instead of squarely addressing this facet of his § 924(c) convictions, he makes unsupported assertions such as, "the record does not establish that the jury found – or was even asked to consider – that he committed any remaining, valid drug-trafficking offense *using a firearm*." (ECF No. 179, at 4.) The jury instructions and the Second Superseding Indictment reflect that this is simply not true.

14

**JA147**

drug-trafficking crime, including conspiracies." (citing *United States v. Dussard*, 967 F.3d 149, 157-58 (2d Cir. 2020))); *United States v. Cannon*, 987 F.3d 924, 948 (11th Cir. 2021) (denying relief in the wake of *Davis* where 924(c) conviction was predicated on an invalid Hobbs Act conspiracy and "the still-valid cocaine conspiracy crime"), *cert. denied sub nom. Holton v. United States*, 142 S. Ct. 283 (2021). The vacatur on appeal of Count One on double jeopardy grounds does not impact this analysis. *United States v. Hopkins*, 310 F.3d 145, 153 (4th Cir. 2002) ("Moreover, a defendant's conviction under § 924(c) 'does not depend on his being convicted — either previously or contemporaneously — of the predicate offense, as long as all of the elements of that offense are proved and found beyond a reasonable doubt.'" (citing *United States v. Crump*, 120 F.3d 462, 466 (1997))). The jury found beyond a reasonable doubt that Defendant conspired to traffic at least 50 grams of crack cocaine. The Fourth Circuit vacated this conviction not based on any defect in the jury's finding or the evidence to support the conviction, but rather because the charge constituted a lesser included offense within the CCE conviction. *Tipton*, 90 F.3d at 891. Thus, Count One remains a valid drug trafficking predicate.

Even if the Court could not consider the vacated Count One conviction, Defendant's CCE Murder Convictions constitute valid drug trafficking crimes. The CCE Murder statute prohibits killing while trafficking in drugs or engaging in a continuing criminal enterprise, which it defines in terms of drug trafficking activities undertaken in concert with five or more persons. 21 U.S.C. § 848(e). This prohibition appears in Title 21 as part of the Controlled Substances Act, bringing it squarely within the ambit of the definition of a drug trafficking crime in § 924(c). Controlled Substances Act, Pub. L. No. 91-513, § 408, 84 Stat. 1236 (1970), *as amended by* the Anti-Drug Abuse Act, Pub. L. No. 100-690, § 7001, 102 Stat. 4181, 4387-88 (1988) (codified as amended at 21 U.S.C. § 848(e)(1)(a)).

15

**JA148**

Courts have recognized that convictions under § 848(e) qualify as drug trafficking predicates for the purpose of § 924(c). *United States v. Walker*, 142 F.3d 103, 111 (2d Cir. 1998) (observing that "21 U.S.C. § 841(a)(1) and § 848(e)(1)(A), like § 846, are part of the Controlled Substances Act."); *United States v. Gomez*, 2021 WL 2592965, at *3 (S.D.N.Y. June 24, 2021) (concluding that "murder while engaging in a major drug conspiracy" in violation of 21 U.S.C. 848(e)(1)(A), is a "felon[y] under the Controlled Substances Act" and remains a valid drug trafficking predicate for a § 924(c) conviction after *Davis*).

Despite Defendant's fleeting arguments to the contrary, his convictions under § 848(e)(1)(A) necessarily implicate drug trafficking offenses. "A CCE conviction requires proof that the defendant . . . committed felony violations of federal narcotics laws." *United States v. Roane*, 2020 WL 6370984, at *11 (E.D. Va. Oct. 29, 2020). As the Fourth Circuit noted on direct appeal, "a substantive connection [between the murder and the drug offense] must be implied as an essential element of § 848(e)." *Tipton*, 90 F.3d at 887, n.13.

In moving for relief under the First Step Act, Defendant argued that his CCE Murder convictions constituted "covered offenses," because they relied on drug trafficking crimes. (First Step Act Motion at 4-7.) Indeed, during oral argument before the Fourth Circuit on his appeal of this Court's denial of his First Step Act Motion, Defendant argued that §848(e) could not "be separated out from Title 21, where it is placed" and that "it's absolutely regulating drug dealing." (Oral Argument at 29:06; 1:00:40, *United States v. Tipton*, (No. 20-16, 4th Cir.), *available at* https://www.youtube.com/watch?v=GzoJ-X54ge4.) The Court agrees that § 848(e) necessarily implicates drug trafficking offenses and arises under the Controlled Substances Act. Given its

16

**JA149**

plain text and placement within the United States Code, the Court has little trouble determining that § 848(e)(1)(A) constitutes a "drug trafficking crime" as defined by § 924(c)(2).[7]

**F.      Counts Seventeen through Nineteen, Twenty-Four and Twenty-Five Remain Valid Crime of Violence Predicates for the § 924(c) Convictions.**

Defendant contends that the CCE Murder Counts charged in Counts Seventeen through Nineteen, Twenty-Four, and Twenty-Five fail to qualify as crimes of violence under the elements clause. First, Defendant contends that CCE Murder does not require the necessary *mens rea* specified in *Borden v. United States*, 141 S. Ct. 1817 (2021) for a crime of violence, because it encompasses merely reckless conduct. (ECF No. 159, at 37–38.) Second, Defendant contends that, because "848(e)(1) authorizes a conviction for any person who, *inter alia*, 'counsels, commands, induces, procures, or causes the intentional killing of an individual' in furtherance of CCE," it does not invariably require the use, attempted use, or threatened use of physical force against another person. (§ 2255 Motion at 38 (emphasis corrected).) Both of Defendant's arguments fail. His CCE murders constitute valid crime of violence predicates under the elements clause.

**1.      Crime of Violence Jurisprudence**

In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held "that imposing an increased sentence under the residual clause of the Armed Career Criminal Act [("ACCA")] violates the Constitution's guarantee of due process," *id.* at 606, because the Residual Clause of the ACCA, 18 U.S.C. § 924(e)(2)(B)(ii), defined "violent felony" in an unconstitutionally vague

---

[7]     In finding that the CCE Murder Convictions constitute drug trafficking offenses, the Court does not conflict with its earlier holding that the CCE Convictions do not constitute covered offenses under the First Step Act. The First Step Act implicates a narrow set of certain crack-cocaine related offenses for which the Fair Sentencing Act modified the statutory penalties, whereas § 924(c) predicates encompass all felonies under the Controlled Substances Act or the Controlled Substances Import and Export Act. 18 U.S.C. § 924(c)(2).

**JA150**

manner for the reason that the Residual Clause encompassed "conduct that presents a serious potential risk of physical injury to another." *Id.* at 597–98 (citation omitted).[8] Subsequently, in *Welch v. United States*, 578 U.S. 120 (2016), the Supreme Court held that "*Johnson* announced a substantive rule [of law] that has retroactive effect in cases on collateral review." *Id.* at 135.

Similarly, § 924(c) provides for consecutive periods of imprisonment when a defendant uses or carries a firearm in furtherance of violence or a drug trafficking crime. At the time of Defendant's convictions on Counts Twenty and Twenty-Six, the United States could demonstrate that an underlying offense constitutes a crime of violence if it established that the offense satisfies one of two requirements. Namely, the statute defined a crime of violence as any felony:

**(A)** [that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another [(the "force clause or the elements clause")], or

**(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense [(the "residual clause")].

18 U.S.C. § 924(c)(3). The Supreme Court recently invalidated the residual clause of § 924(c). *Davis*, 139 S. Ct. at 2336 (holding that "§ 924(c)(3)(B) is unconstitutionally vague"). Thus, for Defendant's § 924(c) convictions in Counts Twenty and Twenty-Six to pass constitutional

---

[8]    The ACCA provides that

[i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . .

18 U.S.C. § 924(e)(1). Under the Residual Clause of the ACCA, the term violent felony had been "defined to include any felony that 'involves conduct that presents a serious potential risk of physical injury to another.'" *Johnson*, 576 U.S. at 593 (quoting 18 U.S.C. § 924(e)(2)(B)).

18

**JA151**

muster as crimes of violence, they must be predicated on a crime of violence that satisfies the force/elements clause of § 924(c).

To determine whether a charged offense constitutes a crime of violence, courts apply the categorical approach, which requires them to "ask whether the most innocent conduct that the law criminalizes requires proof of the use, attempted use, or threatened use of force sufficient to satisfy the elements clause." *United States v. Roof*, 10 F.4th 314, 398 (4th Cir. 2021). If yes, "then the offense categorically qualifies as a crime of violence. But if the statute defines an offense in a way that allows for both violent and nonviolent means of commission, then that predicate offense is not 'categorically' a crime of violence under the elements clause." *Id.* (cleaned up). This approach requires courts to analyze the elements of the offense charged, rather than the specific way in which the defendant committed the crime. *Id.*

Therefore, the Court begins with the elements of a CCE conviction. To obtain a conviction for a CCE Murder, the Government must prove beyond a reasonable doubt three elements: (1) that while engaged in a continuing criminal enterprise or engaging in an offense punishable under § 841(b)(1)(A) or § 960(b)(1) that involved a certain quantity of drugs;[9] (2) the defendant intentionally killed the victim or commanded, induced, procured or caused the intentional killing of the victim; and (3) that the death of the victim resulted from such activity of the defendant. 21 U.S.C. § 848(e)(1)(A); *see United States v. Hager*, 721 F.3d 167, 185 (4th Cir. 2013) (reviewing district court's jury instructions for an § 848(e)(1)(A) charge). The Court will determine if these elements require the mens rea and force necessary to qualify as a crime of violence.

---

[9] The Court need not employ the modified categorical approach. Even if the first element is divisible, the force and mens rea requirements of the other three elements dictate that the categorical analysis would reach the same conclusion regardless of which alternative element of the first element forms the basis of the charge.

19

**JA152**

**2.    The CCE Murder Statute Satisfies the Mens Rea Requirement to Serve as a Crime of Violence.**

In *Borden v. United States*, 141 S. Ct. 1817 (2021), the Supreme Court held that the ACCA's Force Clause's "definition of 'violent felony' — an offense requiring the 'use of physical force against the person of another' — [does not] include[] offenses criminalizing reckless conduct." *Id.* at 1825. The Court reasoned that "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual. Reckless conduct is not aimed in that prescribed manner." *Id.* The Fourth Circuit has applied this reasoning to § 924(c)'s force clause and held that, "even if the statute governing the predicate offense requires that the proscribed conduct result in death, it must also indicate a higher degree of intent than reckless, negligent, or merely accidental conduct in order to satisfy the elements[/force] clause." *Roof*, 10 F.4th at 399–400 (citing *Borden*, 141 S. Ct. at 1824; *United States v. Runyon*, 994 F.3d 192, 200 (4th Cir. 2021)). Therefore, "to qualify as a crime of violence for purposes of § 924(c), a predicate offense such as CCE [murder] must involve a purposeful or knowing *mens rea*." *United States v. Smith*, No. __ F. Supp. 3d __, 2022 WL 1538706, at *13 (D.D.C. May 16, 2022).

Defendant argues that the intent level required for a CCE Murder conviction falls short of the purposeful or knowing *mens rea* required for a crime of violence. (§ 2255 Motion at 37-38.) However, the statute belies this argument. The statute provides that anyone engaging in a CCE "who *intentionally* kills or counsels, commands, induces, procures or causes the *intentional* killing of an individual and such killing results," is subject to conviction of CCE Murder. Thus, the statute explicitly requires an intentional killing created by the defendant's intentional behavior, satisfying the heightened *mens rea* requirement.

20

**JA153**

The recent district court decision in *Smith* supports this outcome, as the court there found that CCE Murder constitutes a crime of violence for purposes of § 924(c). A defendant, "who 'intentionally kills' the victim while working in furtherance of a continuing criminal enterprise has obviously displayed [the requisite] intent." *Smith*, 2022 WL 1538706, at *13. "[A]lternatively, a defendant commits CCE Murder by counseling, commanding, inducing, procuring, or causing the victim to be killed, the active, intentional nature of each of these verbs reflects the same degree of direct, knowing involvement and thus the same heightened culpability." *Id.* (citing Oxford English Dictionary (3d ed. 2007)). Therefore, "courts interpreting the CCE Murder statute have consistently found a heightened *mens rea* to apply, [that the defendant intended the killing to occur,] regardless of the form of defendant's contribution to the intentional killing." *Id.* at *14 (citing *United States v. Johnson*, 495 F.3d 951, 967 (8th Cir. 2007); *United States v. Chandler*, 996 F.2d 1073, 1099–1100 (11th Cir. 1993); *United States v. Villarreal*, 963 F.2d 725, 728 (5th Cir. 1992); *United States v. Tidwell*, No. 94-cr–353 (MOR), 1995 WL 764077, at *2 (E.D. Pa. Dec. 22, 1995); *United States v. Beckford*, 966 F. Supp. 1415, 1426 (E.D. Va. 1997)). The Court agrees with the reasoning in *Smith*.

Additionally, the jury instructions here for the CCE Murder predicates required "a higher degree of intent than reckless, negligent, or merely accidental conduct." *Roof*, 10 F.4th at 399–400 (citing *Borden*, 141 S. Ct. at 1824; *Runyon*, 994 F.3d at 200). Specifically, the Court instructed the jury that:

> Before you can find an individual defendant guilty of [a CCE Murder], you must be convinced beyond a reasonable doubt of each of the following elements: First, that the defendant was engaged in or working in furtherance of the continuing criminal enterprise charged in Count Two of the indictment; second, that while the defendant was so engaged, the defendant intentionally killed, or counseled, commanded, induced, procured, or caused the intentional killing of the individual victim named in a particular count; and three, that the killing of that victim actually resulted.

21

**JA154**

(Feb. 2, 1993 Tr. 3217.)  These instructions required the jury to find that Defendant intended to kill each of the victims of the CCE murders. Therefore, each of the CCE murders required the requisite intent to serve a crime of violence predicate for the § 924(c) charges.

### 3.    CCE Murder Categorically Requires the Use of Force Against a Person.

Defendant further argues that the statute's varying levels of culpability render it not a crime a violence, presumably because someone other than the one who carries out the killing can face liability under § 848(e)(1)(a).  (§ 2255 Motion at 38-40.)  As noted previously, § 924(c)(3)'s "force clause" defines a "crime of violence" as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  "To determine whether an offense is a crime of violence under [the force] clause, courts use an inquiry known as the 'categorical' approach.  They look to whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 7-10 (2004); *United States v. McNeal*, 818 F.3d 141, 151-52 (4th Cir. 2016)).  "When a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not 'categorically' a crime of violence under the force clause." *Id.*

Within the context of defining a violent felony, "the phrase 'physical force' means *violent force* — that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).  "[M]urder is a crime of violence under § 924(c)'s force clause because it '[h]as an element the use, attempted use, or threatened use of physical force against the person.'" *In re Irby*, 858 F.3d 231, 234–35 (4th Cir. 2017) (alteration in original) (citing *In re Hubbard*, 825 F.3d 225, 229 (4th Cir. 2016)).  "Murder 'requires the use of force

22

**JA155**

capable of causing physical pain or injury to another person' irrespective whether that force is exerted directly or indirectly by a defendant." *United States v. Mathis*, 932 F.3d 242, 265 (4th Cir. 2019) (citing *In re Irby*, 858 F.3d at 236, 238).

With respect to CCE Murder, the statute requires an intentional killing and that the killing actually results. 21 U.S.C. § 848(e)(1)(A). Thus, the elements of the offense require infliction of "the greatest physical injury imaginable — death." *Jackson*, 32 F.4th at 287. Because CCE Murder necessarily results in death, it satisfies the physical force element of a crime of violence. *See id.* (concluding that a death-results crime necessarily requires the use of violent force).

Defendant focuses on the statute's prohibition on counseling, commanding, inducing, procuring or causing an intentional killing, rather than providing liability only for the person who carries out the killing. However, this argument misconstrues the principles of aiding and abetting law. Federal law provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2. Thus, these actions "simply describe[] the way in which a defendant's conduct resulted in the violation of a particular law." *United States v. Ali*, 991 F.3d 561, 574 (4th Cir. 2021). In *Ali*, the Fourth Circuit determined that "aiding and abetting a crime of violence is also categorically a crime of violence." *Id.* It reached this decision on the grounds that "since the law generally treats aiders and abettors the same as principals, the categorical approach must as well." *Id.* at 573. The Fourth Circuit noted that the decisions brought it in line with its sister circuits who have considered the issue. *Id.* at 574 (collecting cases). The Court sees no reason to treat a defendant who "counsels, commands, induces, procures, or causes" differently for the categorical approach than one who "aids and abets," especially when Congress has instructed that all of those actions subject an offender to principal liability. 18 U.S.C. § 2.

23

**JA156**

Moreover, the Supreme Court has held that "physical force is simply force exerted by and through" human action and, therefore, a person need not "directly" touch his victim to exert "physical force." *United States v. Castleman*, 572 U.S. 157, 170-71 (2014). Consequently, "so long as an offender's use of physical force, whether direct or indirect, could cause a violent result, the force used categorically is violent." *Mathis*, 932 F.3d at 265; *see also In re Irby*, 858 F.3d at 236, 238 (noting that the distinction "between indirect and direct applications of force . . . no longer remains valid in light of *Castleman's* explicit rejection of such a distinction"). Here, the statute requires intentional action by the defendant to bring about the intentional killing of the victim. Whether the defendant directly touches the victim or not, it remains categorically a violent crime.

Defendant cites to the Fourth Circuit's decision in *United States v. Simms* as supporting his argument that none of "counsels, commands, induces, procures, or causes" necessitates the use of force. (§ 2255 Motion at 38.) In *Simms*, the Fourth Circuit determined that a conspiracy to commit Hobbs Act robbery did not constitute a crime of violence, because "the Government must prove only that defendant agreed with another to commit actions that, if realized, would violate the Hobbs Act." 914 F.3d at 233-34. Such agreement would not necessarily require the actual, attempted, or threatened use of physical force. *Id.* at 234. However, the comparison to a conspiracy charge does not help Defendant. As the Fourth Circuit noted, a conspiracy conviction does not require the commission of the substantive violent crime. The agreement itself exposes the defendant to criminal liability. In contrast, a CCE Murder requires the commission of the crime, as the statute requires that "such killing results" for criminal liability to attach. 21 U.S.C. § 848(e)(1)(A). This distinction finds support in *Ali*, where the Fourth Circuit held that the defendant's § 924(c) conviction could not rest on a conspiracy to commit Hobbs Act robbery, but

24

**JA157**

that it could rest on his conviction for aiding and abetting a Hobbs Act robbery. *Ali*, 991 F.3d at 574 ("And, under [the categorical approach], we already know that conspiracy does not count and aiding and abetting does."). Accordingly, Defendant's argument that his CCE Murder convictions do not constitute crimes of violence for purposes of his § 924(c) convictions fails.

### G.   Defendant Fails to Demonstrate Prejudice.[10]

Defendant contends that he suffered prejudice, because a § 924(c) conviction cannot stand "if even one of the possible predicates is not" a valid predicate. (§ 2255 Motion at 25.) However, Fourth Circuit caselaw forecloses Defendant's argument.

"[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Ayala*, 576 U.S. at 267 (quoting *Brecht*, 507 U.S. at 637). This standard requires the habeas petitioner to show that "[t]here [is] more than a 'reasonable possibility' that the error was harmful." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022) (alterations in original) (quoting *Davis*, 576 U.S. at 268). Under this standard, "it is proper to look at the record to determine whether the [alleged] invalid predicate actually prejudiced the petitioner — that is, actually led to his conviction — or whether the jury instead (or also) found the defendant guilty under a valid theory." *Granda v. United States*, 990 F.3d 1272, 1294 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1233 (2022).

Even assuming Defendant's VICAR convictions cannot establish valid predicates for his § 924(c) convictions,[11] Defendant's CCE Murder convictions constitute valid predicates. Therefore, "a § 924(c) conviction may stand even if the jury based its verdict on an invalid

---

[10]   The Court's finding that Defendant has suffered no prejudice applies equally to the analysis of whether he can show prejudice for his procedural default (assuming he can show cause) and whether he can demonstrate a harmful error for habeas review.

[11]   Again, the Court need not reach this question, as Defendant's 924(c) convictions rest on multiple other valid predicates.

25

**JA158**

predicate, so long as the jury *also* relied on a valid predicate." *Said*, 26 F.4th at 659 (citing

*Crawley*, 2 F.4th at 263; *Hare*, 820 F.3d at 106). Here, the Special Verdict Form did not require

the jury to identify which predicate crimes of violence or drug trafficking crimes that it relied

upon to find Defendant guilty of Counts Twenty and Twenty-Six. Defendant asserts that in cases

such as his, "in which multiple potential predicates are put before the jury, a § 924(c) conviction

cannot be sustained if even *one* of the possible predicates is not categorically a crime of violence

under the force clause and the [relevant] documents do not conclusively establish the basis for

the conviction." (§ 2255 Motion at 23.) This statement demonstrates that Defendant fails to

appreciate the burden that he bears in demonstrating actual prejudice at this stage.

"[M]ere 'uncertainty as to which . . . [predicate or predicates] the jury [relied on] when it

found [the defendant] guilty of the § 924(c) count[]' does not suffice to demonstrate plain error,

let alone the sort of substantial and injurious error required for habeas relief." *Said*, 26 F.4th at

661–62 (citing *Davis*, 576 U.S. at 268; *Ali*, 991 F.3d at 575). At this stage, to meet his burden,

Defendant "must show 'more than a reasonable possibility' that the jury *only* found him guilty"

of Counts Twenty and Twenty-Six, because it improperly considered one of the listed predicate

counts to be a crime of violence. *Id.* at 662 (citing *Davis*, 576 U.S. at 268). This he cannot do.

As pertinent here, the jury found Defendant guilty of the drug conspiracy in Count One,

and the murders in furtherance of a CCE in Counts Seventeen, Eighteen, Nineteen, Twenty-Four,

and Twenty-Five. As discussed above, these offenses constitute valid drug trafficking predicates

for Counts Twenty and Twenty-Six. Additionally, the CCE Murders constitute valid crime of

violence predicates for Counts Twenty and Twenty-Six. Common sense dictates that the jury

had at least one of these valid predicates in mind when it convicted Defendant on Count Twenty

and Twenty-Six. *See id.* at 664 (finding error harmless when the defendant "pointed to nothing

26

**JA159**

to eliminate the common sense prospect that the jury relied on one or more of the valid predicates when it convicted him of the § 924 charges").

Indeed, Defendant's Motion, filed before the Fourth Circuit's decision in *Said*, now undercuts his position. Defendant argues: "The case of *United States v. Said*, which is now pending on appeal in the Fourth Circuit, is instructive." (§ 2255 Motion at 25.) The Court agrees.

In *Said*, the Fourth Circuit overturned the district court's decision, which had vacated the defendant's § 924(c) conviction on the grounds that "there was a reasonable possibility that the jury relied solely on those invalid predicates" for his § 924(c) convictions. 26 F.4th at 658. The defendant had been convicted of three counts of § 924(c). Following the Supreme Court's decision in *Davis*, three of the predicate convictions for the § 924(c) convictions no longer remained valid, while four others remained valid convictions. *Id.* at 659.[12] The Fourth Circuit framed the question as follows: "So, we are left with the question of whether Said is entitled to habeas relief because the jury *may* have relied *solely* on one or more of the invalid predicates in rendering guilty verdicts on Counts 4 and 10." *Id.* In answering the question in the negative, the court rejected both of the defendant's arguments: (1) that he had shown prejudicial error because "it is impossible to know from the record which predicate" the jury had in mind in convicting him of the § 924(c) counts, and (2) that he could show prejudicial error, because the court could not determine "whether the jury was unanimous in its decision as to which predicate or predicates applied." *Id.* at 661.

In rejecting these arguments, the Fourth Circuit relied heavily on the fact that the defendant bore the burden of establishing that the jury did not convict him on a valid predicate.

---

[12]   The Government conceded to the vacatur of one of the § 924(c) counts, because it relied only on invalid predicates following *Davis*. *Id.* at 658.

27

*Id.* at 661-62. The record did not indicate which predicate the jury relied on, but "that sort of ambiguity is not enough." *Id.* at 662. Even though the Government pointed to the conspiracy predicates in its closing argument, "common sense" supported that when the jury found a defendant guilty of several substantive crimes of violence, and the evidence showed that he had used firearms in the attacks at issue, the jury "had at least one of those crimes in mind when they convicted him" of the § 924(c) counts. *Id.* at 662. The court concluded: "neither Said nor the district court has pointed to any reason why the jury would not have convicted him on Counts 4 and 10 based on at least one of the valid predicates — let alone any evidence that they did not do so." *Id.*

The Court agrees with Defendant that *Said* controls. Defendant attempts a similar argument as the defendant in *Said*, arguing that the record does "not establish with 'certainty' which potential predicates underlay the jury's ultimate § 924(c) determinations." (§ 2255 Mot. at 26.) But, this flips the burden on its head, as the Fourth Circuit has instructed that Defendant must show "more than a reasonable possibility" that the jury only found him guilty on invalid predicates. This, he cannot do.

In his Reply, filed after the Fourth Circuit's decision in *Said*, Defendant latches onto the Fourth Circuit's comment that it did "not hold that a challenge such as Said's will *never* succeed when the defendant has been convicted of both a § 924(c) charge and a valid crime-of-violence predicate." 26 F.4th at 664. It did not elaborate on what a successful challenge would entail. Defendant's claim that he fits into one of the unidentified exceptions largely flows from his argument that neither his CCE Murder Convictions nor VICAR Convictions constitute valid predicates. But, the Court has already rejected that argument. Consequently, Defendant has not offered a sufficient reason for the Court to stray from the Fourth Circuit's rule in *Said* that a

**JA161**

§ 924(c) conviction may properly rest on a valid predicate even if it also rests on an invalid predicate.

Defendant also claims that he can demonstrate prejudice, because the record does not demonstrate that Defendant himself used a firearm in the commission of any of the § 848(e) offenses. (Def.'s Reply at 11.) However, in finding Defendant guilty of the underlying CCE Murders as well as in the separate counts charging him with use of a firearm in relation to those murders, the jury necessarily found that he used a firearm in the commission of the predicate offenses. Accordingly, his argument that they could not have found that he used a firearm in the commission of any of the CCE Murders amounts to nothing more than a collateral attack on the sufficiency of the evidence. Although the record demonstrates ample evidence to support the jury's verdict, the Court need not review that evidence here. Given that Defendant has already exhausted his direct appeal process and the habeas review process once, the time to raise a sufficiency of the evidence challenge has long since expired. Accordingly, Defendant has not demonstrated prejudice with respect to his § 924(c) convictions.

**JA162**

## IV.    CONCLUSION

Defendant's CCE Murder Convictions, wherein the jury convicted him of killing individuals in furtherance of his substantial drug trafficking ring, plainly constitute both crimes of violence and drug trafficking crimes. Accordingly, his § 924(c) convictions predicated on those convictions must stand. Accordingly, the Court will DENY Defendant's § 2255 Motion. (ECF No. 159.) A certificate of appealability will be denied.

An appropriate Order shall issue.

Let the Clerk file a copy of the Memorandum Opinion electronically and send a copy to counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: October 6, 2022

30

**JA163**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.

                                                   Criminal No. 3:92cr68(DJN)
                                                   Civil No. 3:22cv99 (DJN)

RICHARD TIPTON,
    Defendant.

**ORDER**
**(Denying § 2255 Motion)**

    This matter comes before the Court on Defendant Richard Tipton's Amended Motion to

Vacate Conviction Under 28 U.S.C. § 2255 (ECF No. 159), moving to vacate his convictions in

Count Twenty and Twenty-Six in light of the Supreme Court's decision in *United States v.*

*Davisi,* __ U.S. __, 139 S.Ct. 2319 (2019). For the reasons stated in the accompanying

Memorandum Opinion, Defendant's Motion (ECF No. 159) is hereby DENIED. A certificate of

appealability is hereby DENIED.

    Let the Clerk file a copy of the Order electronically and send a copy to counsel of record.

    It is so ORDERED.

                                                       _____/s/_____

                                                 David J. Novak
                                               United States District Judge

Richmond, Virginia
Dated: October 6, 2022

**JA164**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 3:22-CV-00099 (DJN) |
| vs. | ) | Crim. No. 3:92-CR-00068 (DJN) |
| RICHARD TIPTON, III,<br>Defendant. | ) | **CAPITAL CASE** |

<u>**NOTICE OF APPEAL**</u>

Notice is hereby given that Richard Tipton, III, the petitioner in the above-captioned civil case and defendant in the above-captioned criminal case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from this Court's Order (ECF 187) based upon its Memorandum Opinion (ECF 186) denying his Amended Motion to Vacate Conviction Under 28 U.S.C. § 2255, entered in this case on the 6th day of October, 2022.

Respectfully submitted on this, the 5th day of December, 2022.

[SIGNATURES ON FOLLOWING PAGE.]

1

**JA165**

*/s/   Frederick R. Gerson*

Frederick R. Gerson (VSB #39968)
Durrette, Arkema, Gerson & Gill PC
1111 East Main Street, 16th Floor
Richmond, VA  23219
Tel:  (804) 775-6900
Fax:  (804) 775-6911
fgerson@dagglaw.com

Stephen Northup (VSB #16547)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA 23218-1122
Tel:  (804) 697-1240
Fax:  (804) 698-5120
steve.northup@troutmansanders.com

*Jeffrey Lyn Ertel (Ga. Bar #249966)
Federal Defender Program, Inc.
101 Marietta Street, Suite 1500
Atlanta, GA  30303
Tel:  (404) 688-7530
Fax:  (404) 688-0768
Jeff_Ertel@fd.org

*Gerald W. King, Jr.
Chief, Capital Habeas Unit for the
Fourth Circuit
Federal Public Defender for the
Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC  28202
Tel:  (704) 374-0720
Direct:  (704) 688-6946
Gerald_King@fd.org

*Admitted *pro hac vice*

**Counsel for Richard Tipton, III**

2

**JA166**

## CERTIFICATE OF SERVICE

I certify that on this, the 5th day of December, 2022, the foregoing document

was served on all parties or their counsel of record through the CM/ECF system and

will be served electronically via email on the attorney listed below:

> Richard Cooke, Esq.
> U.S. Attorney's Office
> Eastern District of Virginia
> 2100 Jamison Avenue
> Alexandria, Virginia 22314
> Richard.Cooke@usdoj.gov

This, the 5th day of December, 2022.

> /s/   Frederick R. Gerson
> Frederick R. Gerson (VSB #39968)
> Durrette, Arkema, Gerson & Gill PC
> 1111 East Main Street, 16th Floor
> Richmond, VA  23219
> Tel:  (804) 775-6900
> Fax:  (804) 775-6911
> fgerson@dagglaw.com

<u>PRINTERS NOTE</u>

PAGES 168 - 314

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

deliverance make, between the United States of America and Richard Tipton, Cory Johnson, James H. Roane, Jr. and Sandra Reavis, the defendants at the Bar, and a true verdict give according to the evidence, so help you God?

(The jury swore the oath.)

THE COURT: Ladies and gentlemen, now that you have been selected and sworn, I'm going to give you some brief preliminary instructions to guide you in your participation in the trial. And after I give you these instructions, I will release you for a time for lunch, and then when we come back we anticipate starting the case with the opening statements.

It will be your duty to find from the evidence what the facts are. And you and you alone are the judges of the facts. You will then have to apply to those facts the law as I shall give it to you. You must follow that law whether you agree with it or not. Nothing the court may say or do during the course of this trial is intended to indicate, nor should it be taken by you as indicating any view as to what the Court's view is as to what the verdict should be. That is a matter entirely up to you.

Now, the evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts the lawyers agree or stipulate to or that the Court may instruct you to find. Certain things are not evidence, and it is important that you understand what is not evidence. What is not evidence, of course, must not be considered by you. So let me go through a list of these things. First of all, statements, arguments, questions by lawyers are not evidence. Objections to questions are not evidence. The lawyers have an obligation to their clients to make an objection when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If the objection is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that has been excluded by the Court, that the Court has told you to disregard, is not evidence and must not be considered by you. Anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in open Court.

Now, there are two kinds of evidence: direct

**JA315**

and circumstantial.  Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  A person takes the stand and tells you what they saw; that would be direct evidence.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  I'll give you some further instructions on these as well as other matters at the end of the case.  But have in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness' testimony to accept or reject.  I will also give you some guidelines for determining the credibility of witnesses at the end of the case.  As you know, and as I've stated on several occasions

0761

since we got started with this process, this is a criminal case.  And there are three basic rules about a criminal case that you must keep in mind throughout this process.  First, the defendants are presumed innocent until proven guilty.  The indictment against the defendants brought by the government is only an accusation and nothing more.  It is not proof of guilt or anything else.  The defendants, therefore, start out with a clean slate.

Second, the burden is on the government until the very end of the case.  The defendants have no burden to prove their innocence or to present any evidence or to testify.  And since the defendants have the right to remain silent, the law prohibits you in arriving at your verdict from considering that any defendant or defendants may not have testified.  Third, the government must prove the defendants' guilt beyond a reasonable doubt.  I will give you some further instructions on this point later.  But bear in mind that in this respect, a criminal case is different from a civil case.

Now, a few brief words about your conduct as jurors.  First, I instruct you that during the trial, you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to

0762

the jury room at the end of the case to deliberate on your verdict, you are simply not to talk about this case.

Second, do not read or listen to anything touching on this case in any way:  any newspaper coverage, radio reports, or television reports.  And if anyone should try to talk to you about it, anyone, bring it to the Court's attention promptly and I will take care of the matter.

Third, do not try to do any research or make any investigation about the case on your own.  Obviously, whatever you learn about this case you will learn in

**JA316**

the confines of this courtroom.

Finally, do not form any opinion until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

Now, in this case we anticipate that it will be somewhat lengthy as trials go in this district. And if you wish, you will be allowed to take notes. We will provide you with pads and pens. Now these notes, if you decide to take them, are for you. They are not to be shared with other jurors. These are your notes for your purposes. Now, you may leave the notebooks, if you decide to take notes, in the jury room at night when you are gone. As I said, these notes should not be given to or read by anyone else but yourself.

Now as I said, this afternoon we will come back and the trial will begin. First the government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next, the defendants may, but they are not required to, make an opening statement, also. Opening statements are neither evidence nor argument. The government will then present its witnesses and the counsel for the defendants may cross-examine them. Following the government's case, the defendants may, if they wish, present witnesses whom the government may cross-examine. After all of the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you. And then the Court would instruct you on the law. After that, as I indicated to you all in the individual voir dire, if the jury were to find the defendants guilty beyond a reasonable doubt of certain of these offenses charged against them, we would then proceed to the second stage as I described it before, a penalty phase, where the government would have an opportunity to present evidence to try to convince you that the death penalty is appropriate in this case, and the defendants would have an opportunity to present evidence in mitigation to try to convince you that the death penalty is not appropriate in this case. I will then instruct you again on the law as it relates to the penalty phase and to sentencing, and you would go out and make a final determination.

Now, let me give you some idea about how we will be running the Court on a daily basis. We are doing it somewhat differently. Normally, in the normal trials that I run, we work from 9 o'clock until somewhere around 6:00, 5:30 to 6:00, like that, with an hour out for lunch. In this case, because of the anticipated length of the trial, we will do it differently. We will start in the morning at 10

o'clock and we will stop at a convenient place somewhere around 4:30.  And the reason for that is so that you, the lawyers, and myself can have time to do other things.  For instance, this morning I had a hearing at 9 o'clock.  The cases don't stop because I'm in here.  So I have to do other things in the morning, I'll have to do things in the afternoon, and the same applies to everybody else.  And hopefully, this will give you a chance to do things if you have things that need to be done as well.

We have already decided that January 20th will be a day off, so you can make your plans around that.  We will not be taking the Martin Luther King holiday.  We will be working on Monday.  January 20th will be a day off, and there will be others as we go along, again so that folk can do other work and you all can have some kind of break as we move along.  I thank you as I have before profusely for your patience, and I must now thank you in advance for the diligence and patience that will be required in this particular matter.

Now, let me do this.  I'm going to release you all to return at 2 o'clock.  We have got some legal matters that we might have to deal with, so let's say 2 o'clock, and we will get on with the opening statements.

Now, let me explain something else to you.  When I am getting ready to recess or adjourn Court, I will always say, "Everyone remain seated while the jury leaves the courtroom."  You all will leave first.  The Marshal will lead you out.  If it is just a recess, he will lead you out to the jury room and you can leave your notepads and whatever here.  If it is going to be an adjournment, you are going home, he will lead you out to the jury room and you can go home from there.  And my Clerk just gave me a note:

"The jury fees or payments to the jurors will be processed every seven to ten days so there won't be any waiting until the end for that to be worked out."

Now, as I said -- and this is very important, so I'm going to repeat it -- if anybody tries to talk to you, you are now a sworn jury.  You should be insulated from outside forces.  And what happens in this courtroom should be what it is that makes up the body of knowledge that will bring you to your conclusions and determinations.

All right, 2 o'clock.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, I've got a couple things on the table.  Roane had a motion in limine regarding the

**JA318**

Chiles videotape.  I'm going to need to see that.

MR. VICK:  We will bring it to you.  I can tell you for opening, we do not intend to discuss it in opening.

THE COURT:  That's exactly what I was going to suggest.  I need to see it before I can rule on it.  So don't talk about it.  And if counsel would like to say anything more on the other motion in limine, I will probably rule on that before we come

0767

back, just before opening.  But go ahead and say what you have to say.

MR. BAUGH:  Your Honor, just in the matter of proffer, we have reviewed the materials.  And based upon the materials that were tendered from New Jersey, it would appear that the violent act about which the United States plans to offer testimony occurred prior to the time this New York Boyz group was established.  And also, the New York Boyz activity was completed before this alleged conspiracy began.  And additionally, I don't believe the United States, unless they have a proffer, my client never adopted or ratified these activities or even knew of the activities, it is my understanding, of what occurred up in New Jersey.  And for those reasons, Your Honor, it would be highly prejudicial, particularly in a capital murder case.  For those reasons, we ask it be excluded.

MR. GEARY:  Judge, on behalf of Mr. Tipton, we have previously filed a motion in limine on the New Jersey evidence that's going to be offered in this case.  I would ask the Court to look at the indictments, the original indictment and the two superseding indictments.  The allegations contained in the charge from the Grand Jury, the information

0768

brought to it by the government, and the ways, manners, and means of the conspiracy on page two and three of the indictments, lists everything connected between Richmond and the only other place that is mentioned, New York City, where the drugs may have been bought and brought down here.  There is absolutely no mention of Trenton, New Jersey in the indictment.  The relationship which would appear from these documents between this case and Trenton, New Jersey is a totally different conspiracy case.

Now, I'm suggesting to the Court that unless the government proffers what this connection is, that we run a serious risk of somewhere down the road having a very serious mistrial motion filed by Mr. Tipton, Johnson, and especially Mr. Roane, who is not connected with New Jersey.  Because what they have here, Judge, it appears to be two different cases. They are not offering the evidence under 404(b) to

**JA319**

show it is some kind of inclination to be a drug dealer or to be violent in drug dealings. The evidence that they will offer in this case, we know what it is, is going to be that from late November until mid-February, and perhaps Mr. Tipton up until April, that there were a series of drug dealings and a series of violence. That is all totally in

0769

Richmond or Henrico County, Virginia. There is absolutely no relationship between the evidence to be offered by the government in regard to Trenton than there is in this indictment other than to prejudice the jury against these defendants because of other crimes evidence.

MR. McGARVEY: On behalf of defendant Johnson, we would likewise join in the argument. We also filed a motion in limine which was overruled by the Court. We would renew that motion and adopt the arguments of co-counsel.

MR. WAGNER: I would join in the motion in limine filed by Mr. Roane. Ms. Reavis had nothing to do with what went on in New Jersey, and it would be prejudicial to her.

THE COURT: All right.

MR. VICK: Your Honor, we have already litigated this, I believe, to a certain extent on a pretrial motion. But I will proffer for the Court and tell the Court that indeed --

THE COURT: You are right. I think Mr. Geary's complaint and Mr. Johnson's complaint has been dealt with fundamentally. Mr. Baugh raised another point.

MR. VICK: I will proffer for the Court

0770

exactly what the evidence is so the Court knows exactly what we are doing. If you look at the indictment, we have indicted this case from on or before January of 1989. We will not precede that date with any evidence. In other words, all the evidence will be post that date. Our first witness, Your Honor, will indeed testify -- Mr. Gregory Scott -- will testify that he, too, was a member of this New York Boyz group. He will testify that indeed he grew up at 155th and Amsterdam Avenue with Mr. Lance Thomas; that he lost his job in 1989; and indeed Mr. Lance Thomas and a number of the other people from that building at 155th and Amsterdam Avenue had set themselves up in Trenton, New Jersey selling drugs. Included amongst that group were Mr. Richard Tipton, Mr. Cory Johnson, Mr. Lance Thomas, and "E.B.," Edgar Black, Edgar Thomas, a juvenile about which there will be a great deal of testimony concerning his activities here in the City of Richmond, including the murder of Peyton Maurice

**JA320**

Johnson. He was present for that.

All four of those defendants who he will include in the New York Boyz is growing out of this place at 155th and Amsterdam Avenue. He will tell you that indeed Mr. Tipton had gone to school with Mr. Lance Thomas and that's how they knew each other. That Mr. Tipton, while they were in New Jersey selling drugs, came back and forth to Richmond and came back up and said, "You can really make a lot of money in Richmond, three times the amount of money in Richmond."

That led, obviously, to Mr. Lance Thomas, Mr. Cory Johnson, and "E.B." coming to Richmond to set up operations here in Richmond. Indeed, Mr. James Roane and Ms. Sandra Reavis joined that conspiracy, mr. James Roane upon his release from the penitentiary, and Ms. Reavis at about the same time in November of 1991. So indeed there is a continuity of parties, a continuity of activities. Indeed, the violent activities that are being objected to involve the testimony of a Mr. Anthony Howlen, an individual severely cut about his face and body by Mr. Tipton and Mr. Johnson in New Jersey in a drug turf war. They cut him over drug turf. Mr. Scott will testify that indeed, that was one of the functions of the New York Boyz, to protect each other concerning drug turf. So all of this clearly falls within the gambit of the indictment as charged, Your Honor, and it is a necessary predicate to the CCE proof.

THE COURT: All right.

MR. GEARY: If I may, I would just like to put on the record that I think what Mr. Vick has proffered to the Court based on what Mr. Scott and others from New Jersey will say shows there was a separate and different conspiracy in New Jersey. Judge, we are here to try this case in Richmond, not the New Jersey case.

THE COURT: I'll rule on it when we come back at 2 o'clock. We will be in recess.

MR. VICK: One other fact that the Court should know about that ruling that I think would be important, because the cases deal with continuity of parties and activity. Most of the New York Boyz were arrested in Trenton. There were very few left out. We unfortunately ended up with a number of those who were left out up there.

THE COURT: All right.

(Luncheon recess taken from 12:47 p.m. to 2:00 p.m.)

THE COURT: All right. For the record, after reviewing the arguments and the cases cited in the defendant's motions in limine, they are all

**JA321**

denied.

All right, let's bring in the jury.

(The jury entered the courtroom.)

0773

Alternates, just have a seat in front. Is the government ready to open?

MR. VICK: The government is ready, Your Honor. Good afternoon, ladies and gentlemen. As you know, my name is Toby Vick and I'm an Assistant United States Attorney here in the Eastern District of Virginia, charged with the very serious obligation of trying this case. As you have been previously introduced, I would like to introduce you again to Mr. Buddy Parcell, who is an Assistant Commonwealth's Attorney, who will be trying this case with me. This is Mr. Ralph Flemming, who is the chief investigator on the case, and seated next to him is Ms. Pam Bishop, who is a paralegal in our office.

First, I'd like to thank you for the patience that you have exhibited the first three-and-a-half days that it took to get you seated in this jury box. We appreciate that. The Court, I'm sure, appreciates that. Defense counsel and the defendants appreciate it. We appreciate your candor. We appreciate the fact that this is a great expenditure of time on your part. I can only assure you, as I'm sure you know, that this is a very, very important process. That indeed, as I'm sure you also know, we are going to ask you to make one of the most

0774

difficult decisions that a person can ever make, perhaps a decision none of you thought you would ever have to make. And that's the decision whether or not to take the life of another human being.

The jury selection process was slow because of that decision. We needed to get to know you to the extent we got to know you so we could make to a certain extent some informed decisions in your choice as panel members. The trial, too, will be slow. The trial, too, will be brutal and excruciating, and very, very trying upon you. The trial will be permeated with the fact that we will ultimately be asking you to place certain people to death. We are going to be asking you, as you know from the voir dire, to sentence to death Mr. Richard Tipton, "Whitey," as you will come to know him; Mr. Cory Johnson, "C.O.," or "O" as you will come to know him; and Mr. James Roane, "J.R.," as you will come to know him. We are not asking you to sentence to death Ms. Sandra Reavis. We are saying simply she was a member of the conspiracy.

It would be impossible to address you at this point and not address the death penalty aspects of this case. This case will outline for you a number

**JA322**

of murders that were committed by these people and

others operating with them in the furtherance of a drug enterprise, a Continuing Criminal Enterprise. These people, along with other people, Lance Thomas, also known as "V," who is not here today for trial for reasons that shouldn't concern you and are unimportant to you, an individual by the name of Edgar Black, "E.B.," who is also not here for trial for reasons that should not concern you and are unimportant to you, Sterling Hardy, and Jerry Gaiters, who you will hear from. They were defendants in this case and have pled guilty and were charged with murder, and will be testifying in this case. These people killed these people in furtherance of their drug enterprise.

Now, as the Court has touched upon, let me tell you what is evidence, what you shall be rendering your verdict based upon. Evidence is what you hear from that witness stand. Evidence is not what I say. It is not what Mr. Parcell says. It is not what any of these gentlemen say. It is not what the Court says. Evidence is what you will hear from the witness stand and what will be introduced through the witnesses in the form of tangible objects, such as pictures and charts and forms. And also, you might have some evidence that comes in by way of agreement;

that is, that it is not a contest, there is no real reason to put on a witness that can attest to this factual issue because it is not a contest. That's the only way you will receive evidence. That is the only thing that you are to consider when rendering your verdict in this case.

I'd like to outline for you briefly the charges in the indictment. There are 33 counts, as you know from the Court's instructions to you prior to your being picked. Those counts charge these murders. Those counts charge a Continuing Criminal Enterprise. Those counts charge a conspiracy. I'll tell you very briefly, we are going to spend a great deal of time on this at the end of the trial outlining for you what the law is concerning the specific charges. But just so you have some sort of idea as to what you are going to be asked to apply here, let me tell you first that a conspiracy is Count One of the indictment. It is a drug conspiracy. It is a very simple thing, legally. And it will be a very simple thing factually.

It simply is our allegation, which we will prove, that these defendants, along with the other individuals that I have outlined to you already, joined together in an agreement to sell drugs. We

**JA323**

have alleged in the indictment and we will prove through the evidence that they agreed to sell more than 50 grams of crack cocaine. That's simply a legal requirement that we have to put in there. And indeed the evidence will show that they sold a great deal more cocaine than 50 grams. Crack cocaine is a form of cocaine that can be smoked. It is taking powdered cocaine and reducing it through a process to a smokeable form, taking the water out of it so you can put it in a pipe and smoke it. That's what these people distributed. That's Count One of the indictment, that they all agreed to join each other in the distribution of crack cocaine.

Count Two of the indictment charges everyone except for Ms. Reavis with joining in a Continuing Criminal Enterprise. So Mr. Tipton, Mr. Johnson, and Mr. Roane are charged in Count Two of the indictment with operating a Continuing Criminal Enterprise. That is like a conspiracy, ladies and gentlemen, except it says in essence that they were the leaders of this conspiracy; that they were the people who directed and controlled this conspiracy. There is some technical, legal requirements that we must prove in order to prove that, such as we must prove a continuing series of transactions, at least three

0778

drug violations. And that won't be an issue in this trial. We will prove many more than three drug violations. We must prove that in operating that Continuing Criminal Enterprise, they managed or controlled five or more people. And that also will be shown clearly and convincingly by the evidence. That is, that they directed, managed, controlled five or more people.

There will be testimony from a number of people that they were directed, managed, and controlled, or put together in an organization by these people.

We must also show that in order to prove the CCE, the Continuing Criminal Enterprise charge that these people generated substantial amounts of income. And that's a fairly nebulous phrase that can be applied considering the facts that you will hear, and those facts will also be present and they will be just that ladies and gentlemen, these people made thousands of dollars a day selling their crack cocaine on the streets of New Jersey and on the streets of Richmond, Virginia.

Those are the first two counts in the indictment. Starting with Count Three through Count Thirty-two, we have alleged -- through Count Thirty-one, excuse me, we have alleged a number of

0779

the murder counts. There were 11 murders, ladies and gentlemen, committed by these people in a period of

**JA324**

45 days, the evidence will show.  11 murders beginning on January 5th, 1992, and ending on February 19th, 1992.  11 of these people pictured here lost their lives as a direct result of the cocaine distribution activities of Mr. Tipton, Mr. Johnson, and Mr. Roane.  A number of those people were killed directly by Mr. Tipton, Mr. Johnson, and Mr. Roane.  Starting with Count Three and continuing through Count Thirty-one, we outlined those murders.  And in greater detail I will outline the specific counts for you when I get to my recitation of the evidence in each one of those murders.  But the majority of the counts in this indictment are simply that, murder counts against these people based upon the murder of these people.

There are two separate murder counts charged in most of the murders in the indictment.  It is a federal crime to commit a murder in furtherance of a CCE, that is, to commit a murder in furtherance of the Continuing Criminal Enterprise.  It is a federal crime to kill somebody to further your drug business.  And indeed the allegations and the evidence will prove that most of these people were

0780

killed in an effort to further their drug business.  It is also a federal crime to kill someone to maintain or increase your position within a racketeering enterprise.  And I will tell you that the law says that a racketeering enterprise and a Continuing Criminal Enterprise are, for purposes of law, the same thing.  They have the same basic definition.  But it is also a crime to kill someone to further your position within that Continuing Criminal Enterprise.  And indeed, most of the murders in here also have that charge.  It is a 1959 count.  That is, that each one of the murders committed by this man and this man and this man maintained and increased their position within the conspiracy.  So there will be two counts in there of murder as to most of these people who were killed.

There will also be gun counts as to each one of the murders.  It is a federal crime, as I'm sure you can well imagine to use a gun, a firearm, in the furtherance of criminal activity.  Simply put, these men used guns in most of these murders.  Therefore, there will be those counts in there.

There are also two distribution counts in there; that is, that these men on specific dates possessed with the intent to distribute cocaine and actually

0781

distributed cocaine.  I think those charges are fairly self-explanatory and the evidence will be straightforward and self-explanatory in that regard, also.

**JA325**

The purpose for opening, as the Court has alluded to earlier, is to allow the government to give you an outline of sorts. Unfortunately, trials do not go like novels. We can't stand up here and simply tell you the story of what occurred, tell you the story of this conspiracy. We have got to do it, as I've indicated, through the testimony of witnesses. The testimony of these witnesses is to a certain extent disjointed. Some know things about certain aspects of the story, let's call it, that others don't. So the trial will come before you somewhat like putting a puzzle together. And the purpose of opening is hopefully to give you a road map of sorts, a preview, to allow you to know what the overall picture is so that you can fit these individual pieces of the puzzle into that overall picture, so that you know when you hear it what this particular piece of evidence has to do with the overall picture.

Now, the Court told you also that you will be allowed to take notes in this case. And I would even encourage you to take notes in this case. It is going to be fairly lengthy. You have my promise, as I'm sure you have the promise of everyone else involved in the trial of this matter, that we will move it along as quickly as possible. But there will be over 90 witnesses testifying as to this on the government's behalf, over 90 witnesses testifying to the story of this murderous conspiracy. It is going to be tough for you to remember the testimony of the first witness after you have heard the testimony of the 90th witness. So I encourage you to take those notes. And take them in any manner that would allow you to come back, look at those notes, and refresh your recollection as to what these witnesses say.

Let me tell you about the type of witnesses we are going to have. There are going to be four basic types of witnesses. As I've told you, this is the story of a criminal conspiracy. Criminal conspiracies by their very nature are private things. Criminals don't let anyone but criminals inside their conspiracy, for very obvious reasons. Criminals don't knowingly let police officers inside their conspiracy. Criminals only associate with the initiated. They do not associate with the uninitiated. So in order to tell this story, ladies and gentlemen, we have got to bring before you and receive testimony from that witness stand from a number of the participants in this conspiracy, some of them direct participants, some of them members in the conspiracy. I've already told you we will have two people testifying who have pled guilty to the

**JA326**

charges in this very indictment and are testifying in an effort to get the Court to take lenience on them in their sentencing. We will have those two participants in this particular indictment testifying.

But we will also have a number of witnesses who will testify who were to a greater or lesser extent members of this conspiracy or had some contact, sometimes not criminal, but some contact with this conspiracy. A number of them, ladies and gentlemen, will be testifying pursuant to agreements that they have reached with the government. That is, in most of the cases the agreements are "In return for your testimony, we will not, the government, will not use what you tell us against you. Very simply stated, we will not then take your words and prosecute you saying we know you are a member of this conspiracy because you have told us you are a member of this conspiracy." It does not mean that these people

0784

could not be prosecuted if indeed there was other evidence other than their own words which led to that prosecution.

So most of these people have received use immunity for the words that you will hear from that stand.

There are a great number of these witnesses that will be coming forward and testifying. That's the first group of witnesses, participants in the story itself, people who were actually there and witnessed what these people did.

The second group of witnesses, and by far the next largest group of witnesses, are going to be police witnesses, the police officers and technicians and investigators who are charged with the responsibility of investigating the crimes of the sort that you are going to have outlined in front of you. And their testimony is important for a number of reasons. But I would suggest to you, ladies and gentlemen, that their testimony is primarily important for this reason: Being reasonable, ladies and gentlemen, you will listen to the testimony from the first group of witnesses, from the participants in this story, so to speak, and you will ask yourself, "Should I indeed believe these people?

0785

Should I believe what they are telling me, these criminals, also?" I'll tell you, ladies and gentlemen, that indeed you should take your notes and pay close attention to the testimony you receive from the second group of witnesses, because indeed that testimony will corroborate what the first group of witnesses tell you.

The police testimony will indeed show you that

**JA327**

the testimony you have received from that first group of witnesses is true.  It is a very important process and I ask you to be alert to it.  When listening to each one of these participants' stories, listen to what they say and then listen to the other evidence we show from sources that are not so impeachable, from sources that will not make you question the veracity of what they are saying and ask "Does that mesh?"  It is a very simple process that you must go through.  You are brought here for a very simple reason.  There is a jury sitting in this courtroom for a very simple reason.  Because the Founders of this country and the writers of the Constitution decided that between the government and accused defendants, there should be a set of people, citizens, who will apply their common sense to the evidence and determine indeed whether the allegations

0786

of wrongdoing are correct.  And that's what your function here is, to apply your common sense to what you hear from that witness stand.  And I'm suggesting to you, ladies and gentlemen, that when you take the testimony of the first two groups together, the participant testimony, and listen to it in conjunction with the testimony from the second group of witnesses, the police officers and investigators, your common sense will tell you that the story that is being told from that witness stand is indeed the truth.

There is a third group of witnesses that are technical, of sorts, legally technical.  There will be very few of them.  They are custodian-of-record witnesses, people who simply run businesses and have had occasion to come in contact with members of this conspiracy, which contact generated business records.  They will be here to simply authenticate those business records as being true and accurate business records of their business.  For example, you will see custodians of records from rental agencies, car rental agencies.  You will see them from Western Union.  You will see them from gunshops here in the City of Richmond where guns were purchased by that conspiracy to commit these murders.  Those are just

0787

custodial witnesses.

There is a fourth and unique category of witnesses, and actually in this case it will be a witness.  No, there will be three witnesses, doctors' testimony.  As you can see and as you know, there were a number of murders committed here.  So there have been a number of medical examinations done by the Medical Examiner who did the autopsies on these people, and she will be here to testify, dr. Marcella Fierro.  There will also be doctors -- some

of these people were maimed, seriously wounded, but not killed. "Pepsi" Greene, and her sister, Gwen Greene, will be here to testify for you. They were shot, actually -- and I'll outline this in greater detail later -- they were shot by Mr. Johnson and Mr. Tipton on February 19th. Gwen Greene is paralyzed, can barely talk. "Pepsi," is paralyzed to a certain extent on her left side. You will see the ramifications of their actions when they walk in the courtroom. Their doctors will be here to testify to the extent of injuries they received. The third individual who survived the shooting spree is an individual by the name of Martha McCoy. She will also be here to testify. Her doctor will also be here to testify to the extent of the injuries she received when this man, Mr. Cory Johnson, put six bullets into her in the company of this man, Mr. James Roane.

That's the type of testimony you will receive. That's the type of witnesses that will be coming in front of you. I would now like to outline for you the specific witness testimony. I won't take too long, hopefully. It is going to be along trial and I need to touch on each one of the counts and tell you a little bit about the specific witnesses that will come forward and testify about these counts.

As you know, Count One charges the conspiracy to distribute more than 50 grams of crack cocaine. Count Two charges these three individuals and Mr. Lance Thomas, who is not here in the courtroom, with operating a Continuing Criminal Enterprise. That is, being the managers of this conspiracy. The trial is going to proceed in this way, ladies and gentlemen. We are going to put before you first that group of witnesses that will establish that conspiracy and that Continuing Criminal Enterprise. The first witness, for example, is an individual by the name of Gregory Scott. Gregory Scott is a very articulate man, frighteningly articulate, to think he got involved in this criminal activity. He is from 155th and Amsterdam Avenue in New York. He will tell you, ladies and gentlemen, that he knows Mr. Richard Tipton and he knows Mr. Cory Johnson and he knows Mr. Lance Thomas, "V," because he grew up with Mr. Lance Thomas at 155th and Amsterdam Avenue in New York City. And that in 1989 when he lost his job with a market in New York City, he went with Mr. Lance Thomas, a lifelong friend of his, to Trenton, New Jersey, where Mr. Lance Thomas had set up business with Mr. Richard Tipton, Mr. Cory Johnson, and 15 or 20 or 25 other individuals from New York City, most of them from 155th and Amsterdam Avenue.

**JA329**

He will tell you that they had a name for themselves, they have been given it by the police, but which they like: the New York Boyz. They were down there selling crack cocaine in Trenton, New Jersey. And they were a group organized to protect each other and to help each other distribute cocaine. And they liked the name the New York Boyz because it kept competitors away and it instilled a certain amount of fear in people who might want to cross their path.

He will testify that Mr. Richard Tipton, Mr. Lance Thomas, and Mr. Cory Johnson were members of the New York Boyz; that they actually sat around in New Jersey, in Trenton, and had meetings and discussed what physical acts of retaliation they should take against people who had wronged them and decided whether it would hurt business to hit this person or whether it would not hurt business.

He will tell you that they used to beat people regularly with baseball bats, aluminum bats that the New York Boyz used because they wouldn't break. He will tell you that Mr. Cory Johnson and Mr. Richard Tipton particularly liked razor blades and knives to carry with them. In fact, you will hear from a number of witnesses that Mr. Richard Tipton will carry a razor blade almost every day, every waking hour, inside his mouth so he can spit it out and grab it and cut you in a heartbeat with it. You will hear testimony from people who have been at the other end of that razor blade.

He will tell you that from 1989 through 1991, the New York Boyz stayed in Trenton and distributed crack cocaine on the streets of Trenton. Richard Tipton, a New York Boy, went back and forth from Richmond, Virginia to Trenton and would talk about how much money he would make in Richmond, Virginia, how much more you could sell the cocaine for in Richmond, Virginia. There were a series of events that led them to leave Trenton, a series of busts by the police that led them -- Greg Scott was busted at 491 Martin Luther King Boulevard in Trenton, and a number of the New York Boyz were arrested up there. And unfortunately for the inhabitants of the City of Richmond, several of the New York Boyz decided to make their way south because Mr. Richard Tipton, "Whitey," said there was so much money to be made down here.

Richard Tipton, you will hear from a number of witnesses, had been born in Richmond and spent some time in Richmond, grew up in New York, and had people here in Richmond that he knew. And he came back and forth with his cocaine.

**JA330**

In 1991, Cory Johnson came down with Richard Tipton and set up shop in Richmond selling cocaine. In December of 1991 or early 1992, Lance Thomas and Edgar Black, "E.B.," came down and set up shop with "Whitey" and "C.O." selling cocaine. The New York Boyz arrived.

Gregory Scott will tell you that they didn't kill anybody in New Jersey, not that he knows of. But for some reason, when they came to Richmond the violence escalated and these people were all killed or wounded because of the presence of the New York

0792

Boyz and their cocaine distribution operation here in the City of Richmond.

You will hear also from another Trenton witness, a guy named Anthony Howlen. He was a drug dealer in the city of Trenton who was told by Mr. Richard Tipton, "Whitey," and Cory Johnson, "C.O.," that he shouldn't be selling drugs in a certain area. And of course being an entrepreneur he disagreed with that. They chased him down on the evening of April 29th, 1989. One held and the other cut, left his face a bloody mess. They cut him with the razors that they carried. You will hear his testimony. And you will see that in 1989, the violence that finally surfaced at such a terrible pace in the City of Richmond began to exhibit itself in New Jersey.

When they came to Richmond, "Whitey" had known a number of people in the Central Gardens area out near Highland Springs. And he came and that's where he first set up shop. And he recruited a number of people from Central Gardens to sell crack cocaine with him. You will hear the testimony of those witnesses. You will hear from Antwoine Brooks, who was recruited by him in 1989 to sell crack cocaine. You will hear from Charles Townes. You will hear from Maurice Saunders. You will hear from "Studie"

0793

Green. You will hear from a number of people in the Central Gardens area who were recruited by these people to sell crack cocaine, and they will tell you the same story, particularly Mr. Maurice Saunders. He will tell you "Whitey" was awful proud of the fact he was a New York Boy and had wreaked havoc in Trenton and would take care of those same sorts of people that crossed him down here and would kill anybody who got in his way and would hurt anybody who crossed his path in a way that offended him.

They will testify further as to the conspiracy to distribute drugs and the distribution of a great amount of drugs in the City of Richmond. Remember that for Count One, we need to prove to you that they distributed more than 50 grams of crack cocaine. We are going to prove that they distributed far more

**JA331**

than that.  There are 28 grams in an ounce of cocaine.  They were distributing ounces and ounces of cocaine on a daily basis.  Indeed, Maurice Saunders will tell you that he took trips to New York for Mr. Tipton to go see the New York Boyz in New York, indeed to go see an individual by the name of "Light" to get cocaine.  And on one of those occasions he brought back three kilograms of cocaine.  So as I said, the 50-gram requirement is not even a great

0794

issue here.  All of that cocaine was crack cocaine, cook-'em-up, you might hear it called, brought to Richmond to be sold on the streets of the City of Richmond.

You will hear from Greg Scott, also, that "Light" was a member of the New York Boyz and that "Light" was the main source of cocaine for "Whitey," Richard Tipton.  Charles Townes is one of the Central Gardens people who was recruited by "Whitey" to sell for him.  And it is with Charles Townes and the next witness, Mr. Hussone Jones, that we begin to hear the frightening story of the murder rampage that was foisted upon the City of Richmond from January 5th of last year until February 19th of last year, a period of 45 days, ladies and gentlemen, when there were 11 people killed by this conspiracy, by these individuals.

Mr. Charles Townes distributed cocaine for them, went to New York with them to get cocaine.  He will tell you in his testimony that on a couple of occasions, particularly on February 1st, 1992, he was with Mr. Richard Tipton just prior to their killing a number of people.  And he knew that Mr. Richard Tipton was going on a murder expedition.  He will tell you that he knew Mr. Richard Tipton was going to

0795

go to Church Hill and kill Dorothy Armstrong, Bobby Long, and Tony Carter.  Why?  Because Dorothy Armstrong, "Mousey," who you will hear from a number of witnesses who sold cocaine for the New York Boyz, owed him $400, and because they were fearful she might be talking to the police.  So they went hunted her down and murdered her.  And they murdered Mr. Bobby Long and Mr. Tony Carter because they were present and they didn't want to leave any witnesses.

Mr. Townes will also tell you that he was with Mr. Tipton on February 19th, a particularly vicious day; that Mr. Tipton, "Whitey," was met by Cory Johnson and told that Mr. Cory Johnson had Linwood Chiles, Curt Thorne, Priscilla Greene, and Gwendolyn Greene.  And indeed, ladies and gentlemen, on February 19th, 1992, in a station wagon down here on Stony Run just over past Church Hill, four bodies were found, two of which were resuscitated by MCV and

**JA332**

lived, two of which could not be resuscitated.  Curt Thorne and Linwood Chiles were killed, and Priscilla Greene and Gwendolyn Greene were maimed by these two gentlemen in furtherance of their drug activities.  Why?  Because Mr. Linwood Chiles was believed by them to be "5-0."  You might hear that term through this trial.  "5-0" was means the police.  He was believed

0796

to be snitching to the police, providing information.  He had been arrested on February 1st along with a number of other people, but had been released.  They couldn't understand why he was released unless he was cooperating.  Mr. Curt Thorne owed them money.  He was scared they were going to kill him, and indeed, they killed him.  Priscilla and Gwen, again, were in the wrong place at the wrong time.  They were nearly killed because they did not want to leave witnesses.

You will hear next from Mr. Hussone Jones.  He is another part of the Central Gardens crew who was recruited by "Whitey" to sell cocaine in Central Gardens.  Mr. Hussone Jones will outline also the conspiracy testimony about the distribution of cocaine, and how Mr. Richard Tipton, Mr. Cory Johnson, Mr. James Roane, and Lance Thomas were partners in this business.  They were the leaders.  He was a worker.  Charles Townes was a worker.  You will hear from a number of the other workers.  But these were the partners.  You might here hear it explained in other ways, different terminology, but of that same fact by different witnesses.  But you will find through the testimony that they were the partners, the people who headed this business

0797

operation of the distribution of cocaine.

Mr. Hussone Jones will tell you a frightening story about the very first murder.  He was there.  He witnessed it.  He had gone from Central Gardens on the evening of January 4th into the early morning hours of January 5th to get cocaine from "Whitey."  He went to the Newtowne section.  And the testimony will show that sometime around November of 1991, the New York Boyz decided to go to the Newtowne section of Richmond, which is basically up here off Belvidere near the Carver School area, and set up shop selling cocaine.  They were going to recruit a new mob in Newtowne just like they had in Central Gardens and in Trenton.

Mr. Hussone Jones will tell you he went to Newtowne to a house owned by James Roane that these people stayed in, owned by Mr. Roane's father, to get cocaine.  Doug Talley came in.  And Mr. Jones will tell you that Richard Tipton and James Roane asked him to follow them while they rode with Doug Talley.

**JA333**

He will tell you he didn't know exactly what was going to happen. He probably had an idea. They went to South Richmond over in the Blackwell section. Doug Talley parked his car. James Roane and Richard Tipton got out of that automobile, went and talked awhile. Hussone Jones is parked a few feet behind. The automobile was sitting, in the middle of the night, sitting under a streetlight there in Blackwell and he will tell you that Richard Tipton and James Roane walked back to that automobile. James Roane got in the backseat and he slid over behind Mr. Doug Talley and put his arm around the neck of Mr. Doug Talley. And Mr. Richard Tipton got in the front seat of that automobile and began to violently slash Mr. Doug Talley with a knife. He stabbed him 84 times, ladies and gentlemen.

Hussone Jones will tell you that this man for a period of four or five minutes brutally stabbed and slashed Doug Talley. Why? They thought he, too, was a snitch on their cocaine operation. They thought he, too, was providing evidence to the government. So he had to die. He will tell you that the last stab he saw went into Mr. Talley's head like an axe hitting a piece of wood. Three of these wounds actually penetrated the skull. And that Mr. Tipton had to put his foot up on the car to pull that knife out of Mr. Talley's head. They got into the automobile and Mr. Hussone Jones drove away. Mr. Hussone Jones is typical of the type witnesses you are going to look at yourself and say, "Why should I believe this man?" And I ask you to think about that. You are going to. He will tell you that he was scared to death, not for himself at that point, but he was scared to death for his sister and other members of his family. He was scared that if he didn't go along with the New York Boyz and their murdering ways, that they also would be killed. So he drove them away.

Next you will hear from a group of witnesses in the Newtowne area, that place in Richmond where these New York Boyz went and set up shop to sell cocaine in November of 1991 and into the early months of 1992. You will hear from Swain Ball who will testify as to the CCE, the conspiracy, and the distribution of cocaine. You will hear from Jeanette Pauley. I won't belabor their testimony. You will hear from them. Their testimony is all integral to the conspiracy and the story that is going to be told. Let me tell you, too, just briefly, that as to the murder of Doug Talley on January 5th, 1992, that's Counts Three and Four of the indictment. So you begin to see how the indictment was drawn. The

**JA334**

murder counts, the murders lead to counts in the indictment.

Denise Berkley is one of the people who was recruited by these people to participate in their conspiracy in the Newtowne area of Richmond, Virginia. Indeed, she was recruited to be a maid of sorts to clean their house and do small errands for them, look out for the police when they were cutting cocaine. She was given crack cocaine in return for that. She will tell you a story of being part of a family, a story that will also recur throughout this trial. Members of the New York Boyz considered themselves to be family. They called each other cousin or brother when they weren't actually cousins or brothers. It was a sign of unity in the drug distribution activities. She will tell you that she became part of this family, or so she thought, and that she did indeed do the things that they asked her to do, did the chores they asked her to do, and got in return the cocaine that they were willing to give her.

There were other participants in this part of this story. You will hear from "Papoose" Davis, that he, too, was recruited to be a participant. And he sold some cocaine and let his house be used to cook up the cocaine.

Denise Berkley will tell you and be one of several witnesses who will tell you about the murder of Douglas Moody, which took place on January 13th, 1992. By the way, you see on this chart, this number, the CME number, that's the Medical Examiner's report. Those exhibits will be introduced into evidence and they tell you just simply what numbers the medical examiners gave to the bodies of the dead people that they examined. And you can tell from them that Martha McCoy, Priscilla Greene and Gwendolyn Greene were not killed because they did not generate a report number. She will tell you that Douglas Moody was killed on the evening of January 13th, 1992 in the Newtowne section of Richmond, shot twice, and stabbed a number of times. She will testify that she thinks from witnessing it he was stabbed 17 or 18 different times. Doug Moody had committed the crime of being thought by "Whitey" and James Roane and "O" and the other members of the conspiracy to have wanted some of their turf, to perhaps have made a tape.

You will hear testimony about a tape that they thought had been made where Doug Moody and Peyton Maurice Johnson made threats to "Whitey" and "O" in that tape over drug turf. He was killed for that, shot by "Whitey." He dove through the window of his

**JA335**

house, where he was caught outside by James Roane and

0802

stabbed a number of times until he died for the sin of being a rival in the drug business.

You will hear testimony from a Ms. Pam Williams, very crucial and important testimony, short testimony, but very crucial and important testimony, that on January 14th and 15th, 1992, she went with members of this conspiracy, with New York Boyz "C.O.," "O," James Roane, and "V," to purchase firearms. She purchased two semi-automatic 9mm Tec-9 type firearms and a 9mm handgun, a Glock. And she gave it to those people in return for some money and some cocaine. They wanted guns. And those guns, ladies and gentlemen, and her story play a very important role in this trial and are a very important point of evidence that you need to remember.

She gave those guns on the day she bought them to Cory Johnson, James Roane, and "V." They took those guns back to their housekeeper, Denise Berkley, and got -- and this testimony is important, too, from Denise Berkley, who will tell you -- a little black Salem Lights bag, dark blue or black you will hear it described by a number of different witnesses. And they put their guns in there with their bullets, and sometimes their cocaine. And that's where they stored it until they needed their guns. "Papoose"

0803

Davis, who by the way is Dorothy Armstrong's brother, will tell you that he stored those guns for them on occasion and would get a little crack cocaine in return for them.

His testimony will lead you to the next murder, which is the murder on January 14th, 1992 of Peyton Maurice Johnson. Peyton Maurice Johnson, like Doug Moody, committed the sin of being a rival in the drug business. And he needed to be killed by this conspiracy because of that. "Papoose" Davis and a number of the other witnesses will tell you that on that day, James Roane had been looking for Peyton Maurice Johnson. And he found Peyton Maurice Johnson and came and got the guns and came and got "E.B.," and came and got "O," and that they burst into a house in Newtowne where Peyton Maurice Johnson was sitting after James Roane had gone in to determine that indeed Peyton Maurice Johnson was there. A couple of minutes later, "C.O." or "O" burst in and blew him away, shot him 15 times, killed him as he sat on the sofa in furtherance of their drug distribution activities. A turf war, ladies and gentlemen.

That testimony will be underlined by the testimony of another participant in this story, Mr.

0804

**JA336**

Stanley Smithers. As I told you, some of these people like Denise Berkley, like Hussone Jones, were members of the conspiracy. Others simply had their lives touched by the conspiracy. Gwen Greene, for example, was not a member of the conspiracy. She simply had her life torn apart by that conspiracy by coming in contact with it. Stanley Smithers, too, came in contact with that conspiracy. He happened to be sitting in the house. It was his house that Peyton Maurice Johnson was sitting in on January 14th, 1992 when "J.R." and "C.O." decided it was time to kill Peyton Maurice Johnson. And he will give you vivid, eyewitness testimony of James Roane entering and determining that indeed Peyton Maurice Johnson was there, and "C.O." bursting in with a juvenile, "E.B.," shortly thereafter, and blowing him away, Peyton Maurice Johnson, all to further their drug goals.

You will hear testimony from Ronita Hollman in that same murder vein. She is the girlfriend, or was the girlfriend of Peyton Maurice Johnson. She will tell you that "Whitey" had tried to recruit her to sell cocaine for him in the Newtowne area and had been rebuffed by both her and Peyton Maurice Johnson prior to Peyton's murder, and that there had been threats made in the presence of "J.R." that indeed these people weren't taking them seriously. Well, on January 14th, 1992 when they brutally murdered Peyton Maurice Johnson, they did indeed show that those threats should have been taken seriously.

That, ladies and gentlemen, is Counts Eight, Nine, and Ten of the indictment, the counts outlining the murder of Peyton Maurice Johnson and the use of a firearm in that murder. Indeed, the use of the firearms that had been bought by Pam Williams. That was the first use of those firearms. It took them no time whatsoever to take those firearms and begin using them in their murderous ways.

Counts Eleven, Twelve, Thirteen deal with the murders of Louis Johnson on January 29th, 1992. As you can see, he was shot seven times in the middle of Kinney Street up in Newtowne. He was shot because "O" perceived him somehow to have made a threat against him, another turf battle, another cleaning out the Newtowne area so the New York Boyz could set up shop selling cocaine. He was brutally gunned down in the streets by "J.R.," "O," and Lance Thomas, "V." We will have eyewitness testimony to that murder by a number of people. You will hear eyewitness testimony from Dennis Moody, who happened to be a friend of Sterling Hardy. He, let me remind you, is one of the defendants in this case who pled guilty and is going

**JA337**

to testify.  He was with Sterling Hardy that night. He's not an angel of a man.  He was smoking crack cocaine.  But he was not a participant in this conspiracy, not a member of the New York Boyz.  And indeed he was smoking cocaine that evening with Louis Johnson.  James Roane wanted them to keep Louis Johnson near.  James Roane, "O," and "V" came driving up to Louis Johnson as they were walking down out of the alley on Kinney Street, parked the car, went over, and they brutally blew him away in the middle of the street.  You will hear testimony also from Sterling Hardy concerning that murder.  He, too, was there and witnessed it and will say that James Roane, "V," Lance Thomas, and "C.O." had murdered Mr. Louis Johnson.

Another defendant in this case, Jerry Gaiters, who has pled guilty and will testify, was also there for that murder and he will tell you the exact same story; that indeed, those people had gone up to Lewis Johnson and murdered Louis Johnson on the streets of Richmond because of a perceived threat by "O," a threat to his drug distribution activities. Again, that's Counts Eleven, Twelve, and Thirteen of

0807

the indictment.

Counts Fourteen, Fifteen, and Sixteen of the indictment deal with the murder of Torrick Brown and the severe wounding of Martha McCoy on February 1st, 1992.  And here, ladies and gentlemen, let me point out something to you about the difference between the 1959 counts and the CCE murder counts, which is how you will come to know them.  You will find when you look at the indictment, when this trial is over, that Mr. Torrick Brown's murder was not charged to be in furtherance of the CCE.  It is not a capital murder. These people that we are seeking to put to death can be put to death for their murders, the law says, in furtherance of the Continuing Criminal Enterprise, those murders they committed to further their drug trade.  They cannot be put to death for the murders they committed in violation of 18 U.S.C. Section 1959, the 1959 murders.  That indeed is the murder of Torrick Brown and the wounding of Martha McCoy.

Now, as I said, it is against the law to murder someone, to maintain your position or increase your position within a criminal conspiracy.  And that's indeed how Torrick Brown came to be murdered over the most petty of things.  James Roane was mad at him because while James Roane was away for some time, Mr.

0808

Torrick Brown had been friendly with his girlfriend, Robin Cooper.  So Sterling Hardy went on the evening of February 1st, 1992 to the house that the New York Boyz had set up over here on 1212 West Moore Street

**JA338**

in the City of Richmond, the Newtowne section, got the guns, got "C.O.," got "V," and drove to Lynhaven in South Richmond where they kicked in the door of Torrick Brown's apartment, blew away Torrick Brown and shot Martha McCoy, his sister, six times in front of her three small children simply because he had offended James Roane by talking to his girlfriend.

Now, why is that in this indictment? It is not in furtherance of the drug conspiracy. It is a squabble over Robin Cooper. It is in the indictment because it is a continuity of people, a continuity of co-conspirators. That conspiracy killed Torrick Brown. Those conspirators, "C.O.," who had no problem with Torrick Brown over Robin Cooper, and "V," got the guns that had been bought by Pam Williams and went to Torrick Brown's house and killed him. Why? To maintain their position within the conspiracy. It was necessary.

Can you imagine if at any one of these murders people had said, "I will not participate in this murder"? Their stature would have fallen. It was to maintain their position in the conspiracy. That's why that murder is in the indictment.

You will hear from Montez McCoy, seven years old, who stood there and watched James Roane, whom he knows, burst through the door of that apartment and blow away his uncle and shoot his mother, shoot his mother six times right there in front of him. You will find that there were other little children standing right beside Torrick Brown when these people decided to kill him. And they did not care. Indeed, you will hear from one of the later witnesses whose testimony I'll outline in greater detail later that after the arrest of a number of these individuals, they bemoaned the fact that they had not killed everybody there, including the children; that they had left witnesses, witnesses that could cause problems to this criminal conspiracy. Brutal, senseless murders, ladies and gentlemen. That is Counts Fourteen, Fifteen, and Sixteen of the indictment.

Counts Seventeen, Eighteen, and Nineteen, Twenty, Twenty-one, Twenty-two, and Twenty-three of the indictment deal with the triple homicide that I have touched upon briefly before of Dorothy Armstrong, Bobby Long, and Tony Carter that occurred up on Church Hill in the City of Richmond, also on the evening of February 1st, 1992. The New York Boyz really got rolling that day, ladies and gentlemen. They killed Torrick Brown and killed those three people.

Why did they kill those three people? They are

**JA339**

charged under the CCE count. They killed them in furtherance of the drug conspiracy. Dorothy Armstrong, you will have heard, sold cocaine in Newtowne, was a large seller of cocaine in Newtowne for the conspiracy. She incurred a debt of some $400, as I've stated before, and that made them mad. And they thought also she might be cooperating with the police about the conspiracy. So they got her cousin, Jerry Gaiters, to take them to where she was, to show them where she was in Church Hill, where once again, armed with the guns that Pam Williams had bought them on the 14th of January, "C.O." burst into that house, shot Dorothy Armstrong a number of times, shot Tony Carter as he sat in a chair, and shot Bobby Long as he attempted to get away. Witnesses. Bobby Long and Tony Carter had done nothing more than be living in that house with Dorothy Armstrong and they were killed so "C.O.," "Whitey," "J.R.," and the rest of the people in this conspiracy would go undetected

0811

by the police. Indeed, you will find from the testimony of Gaiters that "Whitey" drove the automobile that carried "C.O." and Gaiters there that evening, the automobile that carried them away from that murder. Over $400, ladies and gentlemen.

You will find that on February 2nd, 1992, in another very important piece of evidence, that the Richmond Police, who had been pursuing these people in this investigation, finally got enough evidence and executed a search warrant on the house at 1212 West Moore Street where these people had been staying and seized that black Salem Lights bag. It had those three guns in there, the two Tec-9 weapons and the 9mm Glock. And it had a large amount of crack cocaine in there. And you will hear that testimony, and that's important for a reason I'll outline later in greater specificity.

Counts Twenty-four, Twenty-five, Twenty-six, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty of the indictment again deal with senseless murders perpetrated by these people. They deal with the murders of Curt Thorne and Linwood Chiles on the evening of February 19th, 1992, and the wounding and maiming of Priscilla Greene and Gwen Greene that I have touched upon. On February 2nd, 1992, Linwood

0812

Chiles was arrested in the house at 1212 West Moore Street along with James Roane, "V," Sandra Reavis, "E.B.," the other New York Boy who had come down and set up shop, and Sterling Hardy, pursuant to the search warrant done by the police and the arrest warrants. "V" stayed in jail. Sterling Hardy stayed in jail. Linwood, unfortunately for him, was bonded out of jail. He got out of jail, a sure sign to the

New York Boyz that he was snitching to the police. He had therefore to be killed. Curt Thorne owed them a drug debt.

Well, "O" and "Whitey" were the only ones left on the street of this group of people at that time, the others having been arrested. And they went and found Curt and Linwood and "Pepsi," and Gwen. They had them together in an automobile on Stony Run. You will hear testimony from Priscilla Greene that "O" was seated in the middle of the backseat of that automobile that Linwood Chiles was driving, and that Linwood Chiles was told to place his head on the steering wheel, whereupon "O" shot him. You will hear that Priscilla Greene was shot, and you will hear from Gwen Greene that she, too, was shot by "Whitey." Curt Thorne was shot and died there at the scene, also. Again, in furtherance of the

0813

conspiracy, this drug distribution conspiracy, these four people were shot, two of whom died.

You will hear very important testimony that I forgot to mention just prior to that, and that comes from "Studie" Green and Charlotte Denise Moore. "Studie" Green is the brother of Hussone Jones and Maurice Saunders, believe it or not; different last names, but they are all brothers. "Studie" Green will tell you that he went to purchase those firearms and went to purchase two Glocks. Remember, on February 2nd, the guns that had been purchased by Pam Williams were seized by the police at 1212 West Moore Street, leaving "O" and "Whitey" unarmed on the streets of Richmond. So they got "Studie" Green and Charlotte Denise Moore and they went and purchased, on February 5th, 1992, two Glocks, 9mm Glock handguns. Those Glocks were used to shoot Curt Thorne, Linwood Chiles, Priscilla and Gwen Greene.

You will next hear testimony, after you hear from "Pepsi," and Gwen, from Valerie Butler. Valerie Butler met "C.O.," "O," on January 14th, 1992 when Pam Williams purchased the gun for them. She became his girlfriend. She will chronicle for you being present -- he was living at her house -- the night that he killed Curt Thorne and Linwood Chiles and

0814

wounded and Priscilla and Gwen. She didn't know that at the time. She was able later to put the facts together and determine that indeed had happened. In fact, recovered from her house was the coat Curt Thorne had been wearing on the evening he was killed. That had been brought to her house by "O."

She will tell you a frightening story, too, about the conspiracy. She will tell you about overhearing, after the arrest of "J.R." and "V" and Sandra Reavis, a number of three-way conversations

**JA341**

from the jail to "O" and "Whitey," who were in New York. They had left Richmond. And they had talked about the murders and they had talked about how they had made a mistake at Lynhaven by not killing all of the witnesses. And "V" wanted to get "O" to go back and find Martha McCoy and kill her, as she was the only witness against "J.R." And "J.R." was concerned about Martha McCoy still living because she was the only witness against him. So they wanted "O" to come back down from New York and kill Martha McCoy and her children. Frightening testimony, ladies and gentlemen.

You will also hear from Valerie Butler about the fact that she rented cars for "Whitey" and "C.O." so they could drive to New York to pick up more cocaine. And that on a certain occasion, which is very important testimony, also, that "C.O." had been arrested in New York by the New York Transit Police under the name of Kevin Hill. And you will hear the testimony from those officers. When he was arrested, he had in his possession a Glock 9mm. And they were concerned about that arrest because that Glock 9mm, she will tell you, they were concerned it could be matched ballistically to some of these murders. So she and Sandra Reavis took some of the drug money she got from Charles Townes and Hussone Jones and wired it, Sandra Reavis, through Western Union, wired that money to New York to get "O" out on bail, to get Kevin Hill out before they determined his true identity and made a ballistics match of that gun to the murders.

You will hear testimony from a number of other witnesses of that same sort. And that testimony is all crucial and important. I won't spend a great deal of time outlining it. I would like to outline for you one other murder and tell you about, as you see over here, we have on the board the murder on January 21st, 1992 of Katrina "Nat" Rozier. It is not charged in the indictment. We don't know which one of these individuals killed her. Valerie Butler's testimony is very important in that regard. Valerie Butler will tell you that after the rest of the people had been locked up and "C.O." was in New York, "Whitey" came back down and set up shop in another area of Richmond, over on 15th Street in Blackwell, and had cocaine with him but was unarmed. He needed a gun. He got Sandra Reavis to bring him a .38 revolver. And indeed, Sandra Reavis brought him that .38 revolver to his new drug distribution locale over in South Richmond. And that .38 revolver was in his possession, not on his body, but found at the house he had set up shop in on 15th Street in April

**JA342**

of 1992 when he was arrested.

A search of that residence, of the yard outside that residence, turned up that .38. We don't know who did it, ladies and gentlemen. But we can tell you that that .38 that Sandra Reavis gave to "Whitey" for protection of his new drug turf was used to kill Katrina Rozier. And that leads us, ladies and gentlemen, and I'd like to run back through it very briefly -- I know I've spoken a long time -- into the second group of witnesses, the police witnesses, and the corroboration that they will provide for the participant witnesses.

We will provide police testimony that will show

0817

indeed what these participants are saying is true. For example, we will provide you testimony from police officers in Trenton, Officer J.E. McMillian, for example, who arrested "Whitey" in Trenton on May 30th, 1990 in possession of crack cocaine, unimpeachable evidence of his distribution of crack in the city of Trenton. We will provide you testimony from Officer Denny Malone that on June 4th, 1991, they searched the residence of the New York Boyz in Trenton, 491 Martin Luther King Boulevard, and seized a large quantity of crack cocaine, crack cocaine seized in vials from the bedroom that Greg Scott will tell you belonged to "V" and "O.," unimpeachable testimony.

We will have testimony from a task force officer, Bill Thomas, who says that on November 18th, 1991 in Trenton, New Jersey, he purchased in an undercover capacity cocaine from "V," a hand-to-hand purchase from "V," proving that indeed the story told by Greg Scott about the distribution of cocaine on the streets of New Jersey by the New York Boyz is indeed true. That's corroboration for the story you will hear from these witnesses.

You will hear, and I think it is important, too, and I would ask you to pay attention, you will hear

0818

how a number of the participants' testimony overlaps each other. You will hear from Greg Scott, for example, about "Light." Then you will hear from Maurice Saunders, who doesn't know Greg Scott, about going to New York from Richmond and meeting "Light," who was one of the New York Boyz and their source of cocaine. Your common sense will tell you that that testimony meshes and shows that they are telling the truth. How could two people who don't know each other tell the same story unless they had seen it? You will hear from Officer Jay Keim from Trenton, who will tell you that on March 20th, 1992, he arrested "Whitey" in Valerie Butler's car in New Jersey with $3,000 cash. "Man Man," Charles Townes, will have

**JA343**

told you they were on their way to New York to get more cocaine from the New York Boyz and bring it back to Richmond to distribute.  More corroboration.

You will hear testimony from Ralph Flemming, the detective assigned to lead this investigation, that upon the arrest of "O" in New York, he was told by "O" that indeed he had distributed drugs on the streets of the City of Richmond, Virginia. Unimpeachable testimony proving what the participants in this story will tell you is true.

You will get then to the technical testimony,

0819

very damning and strong technical testimony.  As to the murder of Doug Talley that will be testified to by Charles Townes, "Man Man," and Hussone Jones, you will find that the Richmond Police, as they do at every murder scene, cordoned off the area, processed the scene to determine what evidence was there.  And you will see pictures of a bloody fingerprint smeared on the passenger car door of Doug Talley's vehicle. That fingerprint, ladies and gentlemen, has been positively identified by the FBI as being the fingerprint of Richard Tipton, the man that Hussone Jones will tell you spent four or five minutes stabbing Doug Talley in the head.  Proof positive that Hussone Jones is telling you the truth.

You will hear testimony from Denise Berkley, as I said, about the family and about the murder of Doug Moody.  You will hear that testimony also repeated by another witness, "Pepsi" Greene.  And I ask you to apply your common sense.  Here is "Pepsi" Greene, who will come in here partially paralyzed, missing part of her brain because of the bullets put in her by these people.  And ask yourselves what motive in the world does she have as to tell a mistruth?  She only wants the people who hurt her to be put in jail.  Why would she make up a story against someone other than

0820

the person who hurt her?  She wants those people who hurt her put in jail.  Ask yourself that about Gwen Greene's testimony, also.  You will hear from a number of police officers who will simply provide testimony as to the time of the murders and such, and that testimony will be consistent with the testimony that you hear from the participants in this story about those murders.  You will hear from the Medical Examiner that on the murder of Doug Moody -- remember I told you that Denise Berkley is going to say she thinks he was stabbed 17 or 18 times -- he was stabbed 18 times, corroboration for what Denise Berkley has told you.

Beginning with the testimony of Peyton Maurice Johnson, remember I told you it was very important to remember the purchase of the firearms by Pam Williams

**JA344**

on January 14th, 1992. Beginning with the murder of Peyton Maurice Johnson and continuing through the murders on February 1st, 1992, you will find that on each and every one of those murders, those firearms purchased by Pam Williams for "O," "J.R.," "Whitey," and "V," there has been a positive ballistics match linking those firearms seized from the Salem Lights bag gotten by Denise Berkley to those murders. As you can see, the Glock and the Intratec 9mm has been positively identified as being used to kill Torrick Brown. Lewis Johnson was shot by those same guns, positively identified by ballistics. You will hear the testimony of Anne Jones coming in and telling you that she has positively identified those firearms as being the firearms that were used in that murder.

Peyton Maurice Johnson has been positively identified as being shot by those firearms that were purchased by Pam Williams on that day, as well as the other individuals who were shot, Dorothy Armstrong, Bobby Long, and Tony Carter, on February 1st, 1992 up in Church Hill. Those same firearms were used and will be positively identified as being used by "O" to kill those people in Church Hill on February 1st, 1992.

You will hear testimony from officers from the New York Transit Police that on February 29th, after the murders of Linwood Chiles and Curt Thorne and the maiming and wounding of Priscilla and Gwen Greene, that they arrested this man, "C.O.," I've touched upon it already, in New York and that he had in his possession a Glock 9mm. Remember I told you about the testimony that you will have heard by "Studie" Green and Charlotte Denise Moore that they purchased Glocks for "C.O." and "Whitey." That will be proven true by the testimony of the police officers in New York, because indeed that gun was seized. The gun that we will prove to you through the custodian of records of the firearms business that was purchased by Charlotte Denise Moore was seized from that man by the New York City Transit Police. Anne Jones will tell you that she has positively identified that firearm as being the firearm that was used to kill Linwood Chiles, Curt Thorne, and to shoot "Pepsi" and Gwen Greene. Unimpeachable testimony that tells you that what the participants in this story are telling you is true.

You will see the Western Union receipts for $1,200 that are signed by Sandra Reavis showing that on March 5th, 1992, she transferred to New York $1,200 to be used, according to the story of Valerie Butler, to bond out Kevin Hill, "O," before they found that ballistic; proof positive that what

**JA345**

Valerie Butler is telling you is true, ladies and gentlemen.

You will hear from C.T. Woody, a detective in this case, that he told "V," Lance Thomas, that indeed Linwood Chiles had made some statements. And you will hear from Valerie Butler that Linwood Chiles was killed because he was snitching. You will hear

0823

her testimony that she overheard a conversation between "C.O.," or "O," and "V" in jail, where "C.O." said, "Didn't I take care of Linwood for you? I'll take care of Martha. Didn't I take care of Linwood and Curt for you?" Proof that what she is saying is believable, reasonable, commonsensical.

Again, I've touched upon and told you about the positive match of the .38 that was used to kill Katrina Rozier with the gun sent to "Whitey" by Sandra Reavis.

There will be other evidence proving that indeed that gun which killed "Nat" Rozier was used by some member of the conspiracy to kill "Nat" Rozier. You will hear she had a drug debt to these people. You will hear that from Denise Berkley. And in testimony that will tell you that she indeed had been killed by this conspiracy, you will hear from unimpeachable sources that the bullets which were used to kill her were of a unique sort of.38 ammunition, Anne Jones will tell you, a certain grain that is unique. In fact, she will tell you that is the first time she has seen that particular grain of .38. And that particular type of ammunition was seized from 1212 West Moore Street in the search of February 2nd, 1992. Proof that for whatever reason  --  excuse me,

0824

reason known, but by whomever decided to do it -- one of these members of this conspiracy killed Katrina Rozier.

Finally, you will hear from Dr. Fierro, the Medical Examiner. And her testimony is necessary, but it will also be informative in that it, too, corroborates the testimony you will hear from the participants. She will tell you, for example, as I've touched upon, that indeed "Little Doug" Moody had been stabbed 18 times, consistent with the testimony that you will hear from Denise Berkley. She will tell you and you will see an unbelievable picture depicting how Curt Thorne was shot in a crossfire, proving that there were two people there on the evening of February 19th, 1992 at those murders. These two people, ladies and gentlemen.

I've told you before and I will tell you again that this is going to be  --  I know the jury selection process has been agonizing and slow, and I can tell from each one of your faces when you were

**JA346**

chosen that you take this as a very serious responsibility.  And I can tell you that the testimony, my recitation of the testimony, will not begin to outline for you the sheer weight of such testimony of the brutality of the crimes that have

0825

been committed that you unfortunately are going to have to live with for at least the next six weeks, and possibly for the rest of your life.

Because ladies and gentlemen, I'll come back to what this is all about.  We are not only going to ask you to find these defendants guilty, because we will prove their guilt beyond a reasonable doubt.  We are going to ask you to put them to death.  We are going to ask you to put Richard Tipton to death.  We are going to ask you to put "C.O.," Cory Johnson, to death.  We are going to ask you to put James Roane to death, an incredibly hard choice to make.  And I'm going to ask you to pay close attention to this because you need to know this.  As you have gone through in voir dire, you know that there will be a second phase to this trial if indeed you find these people guilty.  And I submit you will find them guilty based upon the evidence.  There will be a second phase of this trial concerning the penalty that should be rendered if indeed you find them guilty.  You can't consider that in intimate detail now, because you do not even know what the law is that's applicable to that portion of the trial.  You don't know what aggravating circumstances the law is going to tell you to apply and the Judge will tell

0826

you to apply.

MR. BAUGH:  Objection.

THE COURT:  All right.  Mr. Vick, let's not get into that.

MR. VICK:  I just want to underline for the jury that it is necessary to know that what you will hear about all of these murders will be important in that second phase.  You need to remember that.  It will be the cornerstone of the second phase.  So please, take your notes.

I understand it is an incredibly hard burden that's being placed upon you.  It is an obligation that's being placed upon you as a citizen.  It is a strong obligation.  I know you all know that.  Thank you.

THE COURT:  All right.

MR. WHITE:  Could we take a very short personal break?  I will tell the Court that my remarks are not going to be anywhere as lengthy as Mr. Vick's, probably a third of that, if that much, Judge.

THE COURT:  All right.  We will take a ten

**JA347**

minute break.  I want everyone to remain in place while the jury leaves the courtroom.

(The jury left the courtroom.)

0827

All right, Mr. Marshal, do you want to remove the defendants?

(The defendants were removed from the courtroom.)

(Recess taken from 3:20 p.m. to 3:32 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT:  Counsel for Mr. Tipton?

MR. WHITE:  May it please the Court, ladies and gentlemen of the jury:  I am sure that we would all agree that the story that has just been told by the United States Attorney is a very sad, brutal, and a very, very gruesome one.  But I would suggest to you, ladies and gentlemen of the jury, that much of it is just that.  It is a story.  The one thing that you did not hear from the government is any comment about the nature of the government's burden in proving each and every one of those facts that he says he is going to prove.

The government's burden is to prove the story beyond a reasonable doubt.  And that is something that should be kept in your mind at all times during the course of this trial as you hear the evidence that we will all hear presented from that witness

0828

stand.  And remember, the statements are not evidence, ladies and gentlemen.  I, too, want to tell you that what comes from that witness stand is the evidence, not what we as lawyers tell you.  Remember, we are advocates for our client.  We are here to tell you our version of the story, what we hope the evidence is going to prove.

Now, Bob Geary and I have been appointed to represent Mr. Tipton.  The law provides in cases of capital punishment that each defendant be given two lawyers.  And I would hope that you would not draw any negative inferences from that.  It is the nature of the special precautions which are taken in cases of this magnitude.

As the Judge indicated, ladies and gentlemen, Mr. Tipton has pled not guilty to all of these charges.  You must bear with us; you must listen with us; and you must understand that we will all be hearing a great deal of this for the first time.  Not only you as jurors, but we as defense counsel.  Because we do not have the resources of the government.  We do not have access to the government's witnesses.  We have not had the opportunity to talk to the government's witnesses.

**JA348**

MR. VICK: That's improper.

THE COURT: Sustained. This is opening statement. Tell us what you are going to show.

MR. WHITE: I think the evidence will show we have not had access to the government's witnesses. Ladies and gentlemen, Mr. Tipton is no angel. He is a seller of crack cocaine. The evidence will most likely show you that he has been selling crack cocaine since he was about 15 years old. As Mr. Vick indicated he was born in Richmond, moved to New York at a very early age, but was not a resident of 155th and Amsterdam Avenue with others who you have heard named in his story. Mr. Tipton came to live in Central Gardens around the time he was 15 or 16 years old with his father and his step-mother at the corner of Catchpenny and Beck in Central Gardens. He sold crack, he didn't invent it. But he along with so many other people, including all the people that you have heard so far, have had involvement in this.

All these people are dead. There is nothing we can do to bring them back. Their deaths are attributable in part to their involvement with the problem that confronts us all. But remember one thing, ladies and gentlemen: Just because someone sells drugs doesn't mean he is a murderer. Just because someone sells drugs doesn't mean he is the head of a Continuing Criminal Enterprise. The evidence will not show a Continuing Criminal Enterprise. And remember, ladies and gentlemen, when it comes to roadmaps, that's the road you have got to take to get to the death penalty. The reason why there are two kinds of murders charged in this indictment is that if you don't take that bus, if you don't get on that bus, you have still got another one to take. The evidence will not prove a Continuing Criminal Enterprise, nor will it prove that these murders were done in furtherance of a Continuing Criminal Enterprise. Were they done in connection with drug-related activities? You may well find that. But you will not find a Continuing Criminal Enterprise.

With regard to the conspiracy that is charged against Mr. Tipton in Count One, the evidence will clearly show that Richard Tipton knew Cory Johnson, he knew Lance Thomas, he knew James Roane, he knew Jerry Gaiters, he knew Sterling Hardy. He knew all the people who you will hear from, along with a lot of other people that you will not hear from. He did associate with them. He had dealings with them. And those dealings related to the distribution of crack

**JA349**

cocaine.  The question for you will be whether those dealings and whether those associations rise to the level of activity proscribed by the laws of conspiracy.

With regard to the Continuing Criminal Enterprise, as is charged in Count Two, Mr. Tipton did not engage in a Continuing Criminal Enterprise And I hope that you will pay attention, ladies and gentlemen, to the terms of that indictment.  I hope you will take the time at the close of this guilt-phase case to read that indictment and read the second count in that indictment, which says that at some time around December of 1991, a Continuing Criminal Enterprise started.  It ended just a couple of months later.  Mr. Vick is correct, he has to prove substantial income.  He has got to prove a lot of things.  The evidence is simply not there.

With regard to the murders of Douglas Talley as charged in Counts Three and Four, Mr. Tipton did not stab Douglas Talley.  The evidence will show that Mr. Tipton -- excuse me, the evidence will not prove, certainly will not prove beyond a reasonable doubt that Mr. Tipton stabbed Douglas Talley.

With regard to the murder of Douglas Moody as charged in Counts Five, Six, and Seven, Mr. Tipton neither shot nor stabbed Douglas Moody.  You will hear some curious things about the murder of Doug Moody.  You will hear that about two hours before Doug Moody was killed that a couple of men with guns burst into the house of his mother looking for Douglas Moody, trying to find Douglas Moody because Douglas Moody had killed somebody in another part of town.  And Douglas Moody had been hiding from those people.  You will hear from another witness who will say she saw the person -- you may hear from a government witness who says she thinks somebody was stabbed 17 or 18 times.  What she thinks is what she heard.  You will hear from a witness who saw someone other than Richard Tipton, and for that matter, James Roane, stabbing Douglas Moody.

Now, with regard to the murder of Peyton Johnson in Counts Eight, Nine, and Ten, Mr. Tipton wasn't there.  Mr. Tipton didn't do it.  Mr. Tipton didn't shoot Peyton Johnson.  Peyton Johnson was, as the evidence will show, another drug dealer in Newtowne. The evidence is going to show that in each of the neighborhoods that are mentioned in the course of this case, there were lots of people who were out there selling crack cocaine.  And what the police will tell you -- as an aside at this point in my comments -- is that all of the amounts were consistent with what we call street-corner selling of

**JA350**

crack cocaine.  This was not a Continuing Criminal Enterprise.

Regarding the murder of Louis Johnson as charged in Counts Eleven, Twelve, and Thirteen, Mr. Tipton was originally charged with that murder.  Those charges against him have been dismissed.  He was not there.  He did not shoot him.  And as an aside at this point in my remarks, I will tell you that is something else you will hear, ladies and gentlemen, the continuing evolution of the government's theories of this case.  Things have changed.

MR. VICK:  Your Honor, this is improper argument.

THE COURT:  This is argument, Mr. White.

MR. WHITE:  Judge, I am going to show this.

THE COURT:  Mr. White, do not argue with me.  This is argument.  If you are going to tell them what the evidence would demonstrate, do that.  Otherwise, sit down.

MR. GEARY:  Can I talk to Mr. White, Your Honor?

THE COURT:  Yes.

(Counsel conferring.)

MR. GEARY:  May we approach the bench?

(At Bench.)

MR. GEARY:  On behalf of Mr. Tipton, I move for a mistrial.

THE COURT:  Denied.

MR. GEARY:  On the record, you have slammed on the bench in front of these 12 jurors.  Most of Mr. Vick's opening statement was argument.

THE COURT:  Did anybody get out of their seat?

MR. GEARY:  No, sir.  They have had 35 different theories of this case, they have changed it so many times.

THE COURT:  Denied.

(In Open Court.)

BY MR. WHITE:

Q   I apologize.  With regard to the murder of Torrick Brown, as is charged in Counts Fourteen, Fifteen, and Sixteen, Mr. Tipton is charged with that murder.  The evidence will show that he was not there; that he did not shoot.  I think the government's evidence is going to show that at some time after that shooting, Mr. Tipton talked to some people about that, but he did not shoot Martha McCoy or Torrick Brown, nor was he there.

With regard to the murders of Dorothy Armstrong, Bobby Long, Anthony Carter, Mr. Tipton did not shoot any of those three individuals.  Mr. Tipton was in

**JA351**

the car, but never got out.  Mr. Tipton didn't have a gun.  This is what the evidence will show.  This is what the government's witnesses will tell you.

What the government's witnesses will also tell you or what you will find from the government's witnesses is some very serious confusion as to what if anything was discussed on the way to the place where Dorothy Armstrong, Bobby Long, and Anthony Carter were.  What the evidence will clearly show is that there was no anticipation that Bobby Long and Anthony Carter weren't there.

With regard to the murders of Linwood Chiles and Curtis Thorne, and the shootings of "Pepsi" and Gwendolyn Greene, Mr. Tipton did not shoot those people.  Mr. Vick tells you that there are groups of witnesses.  I think there are basically three groups of witnesses in this case.  First are law enforcement, police officers, detectives, investigators, agents of the government.  The second group is what we would characterize as street people:  drug dealers, drug users, drug addicts, unindicted co-conspirators, snitches, and informants, people who commit crimes and stay out of trouble and stay out of jail by helping the police.  Ex-cons with a range of criminal records that go from murder, attempted murder, rape, robbery, bad checks, forgery, assault, the whole range.

The third group is much smaller.  They will be used to primarily identify records, the sad task of identifying the bodies of these people, describing some crime scenes.  But it is our belief that their evidence will not offer much insight for you as to exactly what happened on the streets of Newtowne.

With regard to the law enforcement people, ladies and gentlemen, they didn't see anything.  And as far as their personal knowledge is concerned, that which they know firsthand, what they heard, what they saw, they don't know anything, either.  All of what they know is derived from that other group, the street people.

Now, they do know some things.  They did recover some items; for example, the items which were recovered from 1212 West Moore Street.  But I would suggest to you, ladies and gentlemen, that with regard to Richard Tipton, their importance is minimal and they will tell you very little about what if anything Richard Tipton did in connection with the murders of all of these people.  What they know, that being the law enforcement people, is what they learned from the streets.

Now, ladies and gentlemen, when it comes to listening to the street people, I want you to keep in

**JA352**

mind four things, please. Four things. As you listen, as you attempt to understand, as you attempt to determine what actually did happen, there are four things that the evidence will show you: Number one, the street people have been spoonfed information.

MR. VICK: Objection, Your Honor.

THE COURT: It is argument, Mr. White. Sustained.

MR. WHITE: I ask the Court to note my objection.

Number two, they have been promised the moon and the stars. They have been promised immunity from prosecution. They have been promised jobs. They have been promised support.

MR. VICK: Objection, Your Honor.

THE COURT: No.

MR. VICK: It is improper.

THE COURT: I'll overrule that.

MR. WHITE: They have been promised new identities in new locations. The evidence will show you that people are told "Here is what we know, and here is what we can do to you. Now, if you don't join the team, this is what will happen to you. If you do join the team, you get the ticket. Forget about your criminal record and your background; we will take care of you."

Number three, they are criminals. Now, you are going to hear an interesting theory develop during the course of this case. There are good criminals and there are bad criminals. The good criminals are the ones that cooperate with the government. And while I mean no disrespect, with all sincerity, these people, these people are criminals.

(Counsel Pointing to the murder photographs.)

The bad criminals are the ones that don't cooperate, that don't help the government, that don't say what the government wants them to say. The government has said that common sense will tell you that the street people are telling the truth. You use your common sense. We will trust you.

Number four, they are druggies. You know, ladies and gentlemen, at the time, and the evidence is going to show this, is going to show you that at the time these people were observing the things that they are going to come in here and tell you about now, they were high, they were strung out, they were junked up. They were doped up on heroin, crack, cocaine, alcohol, marijuana, and whatever else they could get their hands on. And they are going to come in here and tell you, "Sure, I remember it, clear as a bell."

Ladies and gentlemen, the government is alleging

**JA353**

a Continuing Criminal Enterprise. As I indicated, the evidence is going to prove that this was a creature of a couple of months. New Jersey and what happened in New Jersey was dead and gone. What I think the evidence is going to show from New Jersey is that there was a bust on Martin Luther King Boulevard, and most of the people who were connected with the New York Boyz, whatever they were or however big a group it was, were all taken down, money seized, drugs seized. I guess we are going to hear about that. It was over and done with. They had to get out of town. They had nothing else to do. Did Cory Johnson wind up in Richmond? Well, he was here. Did Lance Thomas wind up in Richmond? He was here, too. But they didn't associate, didn't even get to know each other, particularly James Roane, until November of 1991 playing basketball around

Maggie Walker High School over near Newtowne. One thing leads to another. Guys hanging around the basketball court smoking pot, watching everybody in the neighborhood selling their little vials of crack cocaine. It comes naturally. That's what the evidence is going to show you; that on the streets, it comes naturally.

Mr. Tipton had his own friends in Central Gardens, and I don't use that phrase loosely. Maurice Saunders, Charles Townes, also known as "Man-Man" or "May-May," Hussone Jones, "Rah-Rah," "Studie," "Baldy," these are all guys who had known each other for years. They will come to Court. They are going to take that witness stand and they are going to tell you, "Hey, Central Gardens, not a bad place to be. We are from there. We hang out there. We know everybody out there. It is not a violent place." You are going to hear from police who can tell you, and you will see pictures of it, Central Gardens is a nice working-class neighborhood that unfortunately happens to be infected with a terrible crack problem. But these guys didn't start it. And there are lots of other people out there doing it. You will hear that from the Henrico County police who will come and testify. No violence, just small-time

street-corner selling of crack cocaine. Yes, they were friends. They went to fast food restaurants all the time. Yes, they went and bought beer. Yes, they smoked a lot of pot together. No, they weren't out shooting, stabbing, slicing people up with razor blades. You aren't going to hear any of that. That's a pattern of activity and association that existed over three years.

And then Newtowne, and all of a sudden, a Continuing Criminal Enterprise springs to life.

**JA354**

Ladies and gentlemen, what the evidence is going to show you is that there was no time for any such beast, no time for any such enterprise to occur. You are not going to hear any evidence of any fancy jewelry; no diamonds, no gold, no fancy watches. Clothes? Nothing fancy. You are going to hear stories that some of these guys went to the clothing store every week to buy some clean underwear and they didn't buy anything else.

Houses? You are going to see the pictures. North Harrison, Norton Street, Sandy Lane, Moore Street, junkie houses, crack houses. No fancy apartments, no fancy homes. Nothing. Cars? You know, we all see the BMW's and the Benzes with 15 and 16-year-old kids running around in them. You don't see any of those in the case. You will hear the police tell you about how other people in these neighborhoods, not Mr. Tipton, not Mr. Johnson, not Mr. Roane, either, no Benzes, no BMW's, no Jaguars. Buses. The guys from Central Gardens are going to tell you, "Yes, we got a ride on buses. Every once in awhile one of the junkies on the streets who had a driver's license would take us to go somewhere to buy pot or go to Pizza Hut." Friends, what might be commonly referred to out on the streets as cokeheads or crackheads. "Give somebody a vial of crack and it will take you anywhere you want to go." Meals and entertainment? As I said, pizza, fast food, McDonald's, lots of beer, lots of pot.

What you are going to see from this evidence, ladies and gentlemen, is that over a course of four years, four years, there was no accumulation of wealth, no progression of lifestyle, no enhancement of lifestyle, no such thing. No substantial income. And you are going to hear from the, quote/unquote lieutenants, about the extent of their dealings with Richard Tipton and others. Not the kind of amounts that are going to generate the thousands of dollars that the government speaks of.

Ladies and gentlemen, the evidence will very definitely show problems, people like Richard Tipton, but not just Richard Tipton. You will see the size of the problem. The evidence is going to show you the extent to which selling crack has become institutionalized in many of our neighborhoods and how so many people within those neighborhoods know and do. You will hear from people who stopped selling to look for a job, couldn't find a job, and start the selling again because they could make a couple of hundred dollars a week that they needed to survive. You are going to hear from people who failed in their search, got back into it. You are

**JA355**

going to hear from people who got a job and still couldn't get away from it because they liked that extra couple of hundred dollars a week or month.  And they also liked having the drug.

Your task, ladies and gentlemen, your job, is to determine within the framework of this institutionalization the extent of Mr. Tipton's activities and whether they rise to the level that is proscribed by the laws relating to conspiracy and, most importantly, Continuing Criminal Enterprise. You are going to hear that in these neighborhoods, everybody knew everybody.  Mr. Vick in his remarks says secret conspiracies.  They were loose associations.  One guy would come up to another guy and ask about a third guy.  "Yo, what's up, he okay?"  "Yeah, he is okay."  And that's all it takes.  "I'll sell to him.  Give him two or three vials.  Front it to him.  Don't even have to give me any money.  He will bring the money back."  Casual. That's the way it is.  That's the way it was.

You are more likely, ladies and gentlemen, to find, if you do decide that the laws of conspiracy apply to this particular case, multiple conspiracies.  You are going to have to ask yourself -- I'm sure Hussone Jones, Charles Townes are not going to come in here and tell you, "Oh, yes, I was working for people other than Richard Tipton." Richard Tipton wasn't setting prices.  Richard Tipton wasn't directing their activities.  They didn't have the organizational meetings.  They didn't have management meetings.

MR. VICK:  Argument again.

THE COURT:  Sustained.

MR. WHITE:  That's what the evidence is going to show, Judge.

THE COURT:  Sustained.

MR. WHITE:  No such thing.  Were they out there selling?  You bet.  But remember, the Continuing Criminal Enterprise, or as you may hear it referred to during the course of the case, CCE, requires so much more, a level of organization that is not contemplated by a conspiracy.

The associations that form around the selling of crack cocaine, you will hear, change on a daily and a weekly basis.  They can change for a variety of reasons, including arrest, including change of residence, for a number of reasons.  Some groups, some associations, conspiracies, if you will, that sell to people don't want to associate with others. Some do.  You may find one person and you will hear situations in which one person from one group, for example a Doug Moody, who dealt with people like

**JA356**

Peyton Johnson and Ronita Hollman, who was a drug dealer who hid drugs in her two-year-old kid's diapers, would make inroads, make contacts to other people that were selling in the neighborhood. Some did, some didn't. Turf wars developed sometimes, sometimes they didn't. Sometimes they were worked out, sometimes they weren't.

But the government says this is one grand conspiracy starting in New Jersey. The evidence is not going to support it. It is not there, a Continuing Criminal Enterprise. The activities in Newtowne were limited to November, 1991 to February of 1992. In February of 1992, Lance Thomas was arrested, Sandra Reavis was arrested, Jerry Gaiters, I believe, was arrested, others were arrested. There was no organization left. It was all gone.

The evidence will show you murders. And the evidence will show you that many of these murders were drug-related. But some were not. Some of the government witnesses will tell you that some of these murders were personal things. The evidence will not show you, ladies and gentlemen, that these murders were in furtherance of a Continuing Criminal Enterprise. That Continuing Criminal Enterprise is the vehicle to the death penalty. You know, ladies and gentlemen, what we are asking you to do, what Mr. Geary and I are asking you to do is to do your job. The one thing you didn't hear from the government was "beyond a reasonable doubt." The government has the burden of proving their story beyond a reasonable doubt. Those standards are there to protect us all. And you are sitting between the government and these people. That's where you are supposed to be. And you should not let the details of that story put you anywhere else. And remember one other thing, ladies and gentlemen: This story is a part of the war on drugs. The war on drugs. War is not fair. Justice must be. You told the Judge you could be fair to both sides. All we are asking you to do is to do your job.

THE COURT: All right. Counsel for Mr. Johnson, do you care to open?

MR. COOLEY: May it please the Court. Good afternoon to you, ladies and gentlemen, and gentleman and lady of the Commonwealth: About 30 years ago, in I suppose what would have been the waning years of black and white TV, some folks out in Hollywood decided and latched upon the idea of the TV western. And they began to glorify the Wild West and its characters. And they did that by creating television shows that many of us grew up with. We had Matt Dillon on Gunsmoke, the Cartrights, Bonanza, Rawhide,

**JA357**

shows like that. In the early part, we enjoyed all those shoot-'em-ups. They were entertaining to us. And at the beginning, it was very easy to tell the good guys because they always had on the white hats. And then the television producers began to glorify bad guys. Jesse James became a Robin Hood, and a little while later Billy the Kid became a handsome, articulate fellow on TV and we found him entertaining, even as he shot folks.

0848

Hollywood could glorify just about everything and just about anything. But at some point they stretched too far. And they created a series, while the rest of these things went on for decades, that lasted less than a year. And they called that series the Bounty Hunter. And that series failed because the American viewing public simply would not accept the glorification of people, of men, who would hunt down other men for their personal gain. Now, bounty hunters have been around in this country for a long time. Bounty hunters started back in the slave years chasing down slaves and returning runaway slaves so the rest of the folks could see that authority prevailed. And bounty hunters, you may think, passed away with the Wild West.

But ladies and gentlemen, they did not. Because in the next several weeks, the government is going to parade in front of you one bounty hunter after another. And those folks, back in the Wild West, they were prepared to hunt down folks for profit, for silver, for their own personal gain. And these folks that you are going to hear from in these next several weeks are prepared to do the same thing. And I'm going to simply ask you to compare them, and I'm going to try to rather rapidly, in the course of my

0849

opening statement, touch upon what those gains are, and who those bounty hunters might be.

The bounty hunters didn't care and don't care about true guilt, and they don't care about true innocence. They didn't even care if their prey had ever been brought to trial. Bring 'em back dead or alive. And if they did, the bounty hunter got paid. He got his pieces of silver, he got his reward. He got his personal gain, perhaps at the cost of his humanity, but he got his personal profit.

Now, by the government's count, there are 32 such folks that they will bring before you. And I suggest to you that they, in the course of this evidence, will admit to you that they have gotten, are getting, or anticipate getting silver, money, a reward, that profit, that personal gain, for their appearance before you as a witness. Now the government has built its case on the versions, the

**JA358**

information, the conformed versions, and yes, the spoonfed versions, and reconformed versions of these folks. And it will base its case, and has in the course of its description in its opening statement, upon the testimony of these bounty hunters.

Now, I suspect, as you have heard it laid out to you by the government in the opening statement, that you are going to see a presentation of the evidence in an effort to give the appearance of credibility, believability, and integrity to these 32 bounty hunters. Because their testimony is going to be sprinkled in with and surrounded by the testimony of police officers and decent citizens. And then the government, as it has in its opening statement, will argue to you that the testimony of their bounty hunters has been corroborated. I ask you not to be deceived by that. That method of presentation obscures the fact that there are going to be in these cases two issues, two real contradicted issues. The first of those is who committed the crime; the second of those is why was this offense committed? Those are the real issues in this case.

Now, the testimony of nearly every one of the police officers in this case and nearly every one of the decent citizens in this case is going to be not about who committed the offense or why they committed the offense, but simply that an act occurred. For example, the government calls its first witness. It is a police officer, a person who you will, and all of us will, readily accept as a person of integrity. That police officer will say to you, "I walked down the street on my regular beat and a citizen pointed out something suspicious over to me and I went over and discovered a body, a person who was dead." End of testimony. There is no dispute that that person was dead. Not a single counsel in this room would dispute that any of these folks are dead. That's what that witness testifies to.

The second witness the government will call is a bounty hunter witness. The bounty hunter gets up and he says, "I saw you, or you, or one of these folks, commit this offense. And they committed this offense, they shot this person, you shot them, they shot them, they did that because --"

MR. VICK: I hesitate to rise again, but this is all argument. It is not outlining what the evidence is going to be.

THE COURT: No, I think this is all right. Overruled.

MR. COOLEY: And that bounty hunter says he shot that person because of a domestic dispute, a robbery, drug activity, and the bounty hunter leaves

**JA359**

the stand.  The third witness the government calls is a police officer.  The police officer says, "I found a .32 caliber  --  excuse me, I found a bullet at the scene, I recovered it, here it is."  The fourth witness the government calls is a forensics expert.

The forensics expert says, "This is a .32 caliber bullet."  The fifth witness the government calls is the Medical Examiner.  The Medical Examiner says, "This person is dead.  This person is dead because he was shot; he was shot with a .32 caliber bullet."

Now ladies and gentlemen, five witnesses, and the government will say they have corroborated the other  --  the other four corroborated the bounty hunter.  And I say to you they have told you nothing but facts that are not in dispute.  The only person who will have told you that this person or that person committed the act, the only person who will tell you why the act was committed, is the bounty hunter witness.  And that testimony has not been corroborated.  In fact, all of us would agree those four other witnesses are fine folks, high credibility.  All you have to do is have the bounty hunter fill in the blank and we change the guilt of the person from him to me or to whoever's name is filled in.

What one has done and what one is accused of doing may be very, very different things.  But what a person has in fact done and what a bounty hunter witness testifies to that person having done may be very different things.

In this case, who are the bounty hunters?  And what is their personal profit?  What is it that they get for their appearances in this courtroom before you?  Well, gain in this case is measured in a variety of ways, a whole lot of ways.  And Mr. White in his opening statement to you for Mr. Tipton has outlined some of those and I'll try not to belabor some of them.  Some of these folks literally have already or will receive money, currency, for a variety of purposes, those pieces of silver.  Some have been given use immunity as to their offenses and things that they have done.  Some have been given homes, places to stay.  Some have been given job referrals.  One will tell you, Dennis Moody, that he was promised just about anything he wanted if he would come in and testify.  Some have had all or most of their charges against them in the state courts, including murder charges.  Dropped.

But the biggest gain of all, the biggest and best profit for these bounty hunters, is something called a 5K motion.  Now, in order for you to understand when we cross-examine these folks, the

**JA360**

government asks them about what they hope to gain by being here. When they respond, "I'm hoping for a 5K motion," for you to understand the impact of that and

0854

the profit motive to that bounty hunter witness, you have got to understand what a 5K is. And to do that, you have to understand at least a little bit about Federal Sentencing Guidelines. And ladies and gentlemen, what I think you will hear from these witnesses is that they understand the circumstances to work this way: If, for instance, one of the government's bounty hunter witnesses has been charged with a crime, being a member and supervisor or a manager within a Continuing Criminal Enterprise, if convicted he must be sentenced. He has to be, or she, has to be sentenced to a minimum sentence of 20 years. And it may be as much as life imprisonment. But it has to be no less than 20 years. No judge, no federal court can alter that range or the minimum sentence unless and until the government files a 5K motion with the Court. 5K is just a subsection of the Federal Sentencing Guidelines.

When that 5K motion is filed, it opens the door for the Court to give a lesser sentence than that 20-year mandatory minimum sentence, or whatever the lowest sentence in the range might be. It allows the Court to give Mr. or Ms. bounty hunter that lesser sentence. What triggers the 5K? First, it belongs solely and exclusively to the government. Defense

0855

attorneys cannot --

MR. VICK: Your Honor, that's a misstatement of the law. It does not belong solely to the government. It is in the discretion of the Court.

THE COURT: No, Mr. Cooley, I'll let you clarify it.

MR. COOLEY: The initiation of the 5K.1 motion is solely and exclusively the prerogative of the government. Once it files it, whether the Court reduces the sentence or not is up to the Court. But unless and until the government decides that a 5K.1 motion is appropriate, the minimum sentence must be imposed. How do you get one? You must satisfy the government that you have substantially assisted the government or law enforcement. And only in their sole discretion, when they are satisfied that you have done enough, will they present to the Court a 5K motion which allows your sentence, the bounty hunter's sentence, to be reduced.

Now, the government has had roughly a year from the time of these alleged offenses. And during that time, they have had an opportunity to interview, reinterview, videotape, bring before a Grand Jury,

**JA361**

reinterview again, talk with, polish perhaps, the

0856

witnesses that are to appear before you. And what you are going to hear is that the testimony of many of these bounty hunters has not a single thing in common with the first version that they told to the police. In fact, the bounty hunters' testimony in this case in many instances has nothing to do with the second version, the third version, the fourth version, and in some cases even the tenth version that was given by them to the police.

Now, the government does not have to tell the defense what their witnesses are going to testify to at trial. But if a witness has previously given a different version, a prior inconsistent statement we call that, then the government has to provide to the defense the gist of that prior inconsistent statement. And I'm going to ask you to watch as this unfolds in this courtroom through cross-examination of the bounty hunters and through other witnesses, how these modern-day bounty hunters, step by step, under interrogative techniques -- and I'll ask you to judge those; I might label them, but I'll ask you to judge them -- step by step these the bounty hunters' versions begin to conform to the government's theory of this case and the government's perception of what they must say to qualify their testimony as truthful,

0857

as defined by the government, and trigger the 5K motion.

Listen as government agents, detectives, over and over again during their interrogation of these bounty hunter witnesses who now are before you as Mr. White describes, the good criminals, listen to the detectives say, "Now, I can't put words in your mouth, but," and proceed to discuss with them what the detective believes in fact happened. It happens over and over again. Step by step, the bounty hunter's version has nothing to do with today's, tomorrow's, next week's testimony. But step by step, "While we can't put words in your mouth, we know what really happened up there because somebody else told us. We know you didn't do that. We think you have been truthful with us about this, because it is consistent with what we already believe; but we are sure you are lying about this." And that happens not only at a point in time where these folks are under accusation, but watch how it develops once the government determines that this person is going to be playing on their team. Once the detective determines we can use this person in our prosecution of other folks, suddenly the pace quickens. Suddenly, when the bounty hunter says, "No, it didn't happen that

0858

**JA362**

way, now I can't put words in your mouth, but we know it must have happened this way." And a few minutes later, it is like a lightbulb comes on. You can watch it happen on the video. The lightbulb comes on. "Yes, Detective, come to think of it, it happened this way." It just happens to be the way it was described before. And you will see that.

Now, who are these bounty hunters? Watch for them. You, ladies and gentlemen of the jury, gauge them and determine for yourselves individually and collectively their credibility. Watch for a fellow named Jerry Gaiters, who is on the government's list of witnesses. Watch for him, because he supplied to the government much of the information it now deems to be the truth. And that information from Mr. Gaiters forms the basis for the government's theory of the prosecution. Watch for Jerry Gaiters, the bounty hunter, who was charged in the state court with the first degree murder of Katrina Rozier, one of these young ladies here. Jerry Gaiters. Watch for Jerry Gaiters, charged in the state court with the capital murder of Anthony Carter, one of these folks. Watch for Jerry Gaiters, who was charged in the state court with the capital murder of Dorothy Mae Armstrong, known as "Mousey." Watch for Jerry

0859

Gaiters, who was charged with the fourth murder, third capital murder, of Bobby Long. Jerry Gaiters, the best of the bounty hunters. He committed four murders. He was charged with four murders.

Another government witness, Delores Calvin, will tell you about Jerry Gaiters. She was inside the house where these three folks, Mr. Long, Mr. Carter, and Ms. Armstrong were killed. She is the only survivor from inside the house. And she says the only person who had an announced entry to that residence just before the shooting was Gaiters, Jerry Gaiters. And the only voice she heard before these three folks were shot down was Jerry Gaiters'.

Now, this bounty hunter, Jerry Gaiters, he had all of his state murder charges dropped. He is in protective custody. Jerry Gaiters has systematically altered his versions, his stories, until they conformed to the government's theory of this case. And, and this is a big "and," ladies and gentlemen, Jerry Gaiters is counting something. He is counting on a 5K motion to reward him in this federal system.

Under his own versions, Jerry Gaiters would have been subject to the potential of capital punishment. But no more. No more. Because Jerry has joined the team.

0860

MR. VICK: That also is a misstatement. As Mr. Cooley knows, there was never any anticipation of

**JA363**

Mr. Gaiters being a capital defendant.

MR. COOLEY: That might be true of the government. His actions qualify him is what I said, Judge, and that's evidence.

THE COURT: I think that's fair.

MR. COOLEY: Sterling Hardy is another one of the government's bounty hunters. In his opening statement, Mr. Vick said, "not an angel of a man." That is truly a masterful understatement. The information is that Sterling Hardy participated in the events of these killings. The government's information is that Sterling Hardy personally directed the killing of Linwood Chiles. Sterling Hardy, by his actions, is subject to the potential of capital punishment. But no more. No more. Because he is a bounty hunter who has joined the team.

There are 30 other felons, convicted or admitted, also looking for their reward, their silver, their money, their immunity, their 5K. They will allege that these young folks, all of these young folks, are members of an ongoing Continuing Criminal Enterprise and that they reaped substantial income. But the evidence will belie that, ladies and gentlemen. Cory Johnson came to Richmond in October of 1991, October of 1991, for the first time. Cory knew Richard Tipton, but he never met James Roane until December or later, December of 1991 or later. Cory owned no car. You are not going to hear any witness testify Cory had a car. Cory had owned no truck. He had no BMW, no Mercedes. He didn't even have a 1979 Pontiac. He had no vehicle. Cory, I think you will hear, owned no house, couldn't rent an apartment, generally lived with four, five, sometimes seven and eight other folks in an apartment. Cory, the evidence will show, had no bank account, no substantial cash holdings. Cory had no flashy clothes, no jewelry. Cory had not even small assets, much less substantial assets, as the government alleges and must prove to establish the Continuing Criminal Enterprise.

MR. VICK: That's a misstatement, also. We need not prove substantial assets. We need only prove there was substantial income, money generated.

THE COURT: That is correct. The objection will be sustained.

BY MR. COOLEY:

Q  I apologize. That's correct. The evidence will show, ladies and gentlemen, that Cory Johnson was not a member of a Continuing Criminal Enterprise. The evidence from the bounty hunters will suggest that Cory was involved in some street-level sales. But a kingpin? Never. A manager? Never. Supervisor?

**JA364**

No.

"Street sales," what do I mean by that? What is the evidence going to show about that? Well, I think you will hear testimony about quantities and the manner in which things are handled. One would go to a wholesaler and buy, let's say -- and these are the quantities you will hear about -- a gram, two or three grams of this cocaine called crack. It would be broken into tenths. The street-level value of a gram broken into tenths is about $100. I think that's what you will hear. Each one of these little tenths or rocks would be sold for the humongous sum of $10. So if I or the person that's alleged gets it from a wholesaler, say pays 35, $40 for a gram, and he gives it to someone else to sell for him or for her, that person sells it on the street and the gross sales of that gram are $100. That's what that generates. Out of that $100, the person who is selling it keeps roughly a third, $33, $35, into their pocket. The balance, 65, $67, is handed back to the person who got it from the wholesaler. The profit for that person is the difference between the $65, $67 that came back and the price that was paid wholesale; $25, $30, a third over here, basically, a third over here, a third here. Those are the quantities you are going to hear about. Folks who were picking up $100 worth, $300 worth of cocaine from different people on the street. You are not going to hear truthfully from any witness of large quantities of distribution by Cory Johnson. While I do not this afternoon or any other time portray Cory Johnson to you as an angel, I do say to you that accusation does not equate to proof beyond a reasonable doubt. Accusation and reality are very different things.

And I ask you to guard against being overwhelmed by the sheer quantity of counts in this indictment. The burden is on the government, these folks, in their case to prove each accusation if they can, and to prove it with evidence which establishes not suspicion, not probability of guilt, but proof beyond a reasonable doubt. Particularly, I ask you to gauge the witnesses as they a appear. Gauge what is their underlying motivation for testifying. Is it truth? Is that their interest? Or is it 5K motions? Is that their interest?

And I'll remind you of this: Just like in the Wild West and in slave days, when the bounty hunter pointed his gun at his prey, he cared not a whit about the truthfulness, the guilt or the innocence of that person. And in this courtroom, in the weeks ahead, the government's bounty hunters are going to

**JA365**

point their fingers at these young folks and they are going to hope that by doing that, that they will produce for the government the result the government desires.  And they are going to do that not because they are good citizens.  They are going to do that because they want their own personal gain from their testimony.  Bring them back dead or alive, pretrial, untried, or at trial, guilty or innocent.  It is going to be up to you folks, you 12 folks, perhaps some of you 16 folks, to sift through this evidence, to sweep away the falsity and the tainted testimonies and to distinguish accusation from actuality; to distinguish allegation from fact; and to judge each of these young folks who are seated behind me and behind their counsel fairly and separately.

On behalf of Cory Johnson and on behalf of my co-counsel, John McGarvey, I would ask you all only to do what you have taken an oath to do.  And that is to be fair.  Be fair to both sides.  Be fair to the

0865

government, which will be ably, ably represented by these gentlemen here.  And also be fair to these young people who are seated behind me.  Thank you.

THE COURT:  Thank you, Mr. Cooley.  Counsel for Mr. Roane?

MR. BAUGH:  May it please the Court, Mr. Vick, counsel:  First, and I know you are getting tired, but first I want to thank the government for allowing me to participate in this case because this is the kind of case that lawyers should want.  The government is going to try during this case to show you that these young people are not worthy of their rights, the rights that they got when they were born, and they are.  All right?  This is the kind of case where these young men should be viewed by you as you would any other citizen charged with a crime.  It is merely an allegation.

Now, my client, Mr. James Roane, seated back here in the blue jacket, is charged with killing or aiding in the killing of Douglas Moody.  Douglas Moody, it will be alleged right here, was in a house and was shot twice, allegedly, according to the government's witnesses.  He jumped out of a window.  He fell into the alley.  According to other government witnesses, my client came over and said,

0866

"This man isn't dead," and stabbed him 17 or 18 times in the chest, killing him.  That's what the government witnesses will tell you.  And you have heard that you can believe them because I wrote her name down -- I didn't know this until the United States pointed it out -- a Ms. Denise Berkley is going to come into Court and you can believe her.  Because she is going to tell you, "I remember, it was

**JA366**

17 or 18 times." Her truth is going to be accurate. But you know what? She is lying through her teeth.

And you know how I'm going to prove it? Let me tell you about Mr. Moody, what they didn't tell you. When Mr. Moody jumped out of the window, he had been shot, and someone stabbed him. But he didn't die right away. He called out for help. And over there in Newtowne, and I'll tell you about Newtowne in a few minutes, a young woman came out. She is a nurse. And she tried to help him. She then ran back into her house and got a knife and cut his clothing off of him and did CPR and kept him alive until the ambulance got there. Her name is Gina Taylor. She is not a government snitch. She is not being promised anything. She is just some lady who lives over there who tried to help someone who she thought was dying.

0867

Way back when this happened in January of 1992, oh, yes, look at this Medical Examiner, ME 2-6-92. This young man, referred to by Mr. Vick as "Little Doug," was approximately five-foot-six and weighed 130 pounds -- 160 pounds. She told the police back in January, "I saw someone sitting on his chest and I thought they were hitting him. Later, I found out he was stabbing him. The person who stabbed him was smaller and darker than this man right here, Mr. Moody, who is five foot six." She says, "I don't know who he was but he was smaller and he was darker," and the police knew that in January of 1992. And you know what else she is going to testify to? She is their witness. She is going to come in here and say until last week, until we went and saw her, "No one ever asked me did that young man over there stab him to death." And the answer is, she is going to say from that stand, "No, he didn't. That is not the man who stabbed him to death." That's not the man they indicted for capital murder of that man.

I'll tell you something else. Ms. Wallington, W-A-L-L-I-N-G-T-O-N, is his mother. She will tell you a week before her son was murdered, somebody named Keith -- she came home from work and her door

0868

at 1310 Catherine Street over in that neighborhood had been kicked open. She was told that somebody named Keith was through with a machine-gun looking for her son. Later that day she will say her son came home covered with cobwebs. He had been hiding next-door under the house. All right.

She will also tell you that two hours before Mr. Moody was killed, a young man named Keith, who is 15 to 16 years old, approximately five-foot-three to five-foot-four, came to her house with a machine-gun

**JA367**

looking for her son. Now, she doesn't know who killed her son. But I will bet you that when she gives you the description of the man, the young boy who was looking for her son that night, it will match almost exactly the description given to you by Ms. Gina Taylor. And the United States is going to ask you to kill my client because he allegedly stabbed this man, and that is a lie. And they have known it since 1992. The question I ask you is this: Why wouldn't someone from the government ask, "Lady, could you see who did it?" She saw who did it. No one ever asked. And she will come into Court and testify to it. I know. I talked to her Sunday. And she is off of their witness list. You must find this young man not guilty of this capital murder.

0869

He is also charged with the death of Peyton Maurice Johnson. Let me tell you about Newtowne. Newtowne is a very small area, only about eight square blocks. On the corner of 1200 West Clay at what's called a nip joint, it is a place run by a gentleman named Stanley Smithers and his mother. People come in there all the time. Mr. Smithers will tell you that Mr. Roane was in there that night and that a few minutes later there were shots fired. Mr. Smithers is not going to tell you that there was a meeting. No. He is not going to tell you that at all. You must find him not guilty of this killing.

Now, another one, Louis Johnson. You have heard about Jerry Gaiters. Jerry Gaiters will come to Court and testify, assuming he does not -- well, we are going to have to work at it, but he has already testified to this under oath. Louis Johnson was not killed over drugs. Lewis Johnson was killed because he was a bully and he was always shooting at people. Mr. Smithers, "Stinker", the guy who ran the nip joint, he will testify this man pulled a shotgun on him. Now, let's talk about lying for a minute. Now, I don't know what all the government witnesses are going to say about the killing of Mr. Louis Johnson, January 29th. I don't know that because we are not

0870

privy to it. But I do know that Sterling Hardy, one of their witnesses is going to say he was there. And I know that Jerry Gaiters is going to say he was there. And I also know that Mr. Dennis Moody will say he was there, and I did find Mr. Dennis Moody. And Mr. Dennis Moody is going to come into Court, assuming he is not going to change his story again, and Mr. Moody is going to come to Court and say, "I was there when Louis Johnson was shot. And I saw Mr. Roane shoot him one time and he fell down and he was shot again with another gun and by another person." That's what he will say. He will also tell you

**JA368**

this: "The first time I was approached by the police, they walked up to me and said, 'Are you Dennis Moody?' and I said, 'Yes.'"

Before he told them anything, the evidence will show you, they said, "If you help us, we will relocate you to any place in the United States you want to go, set you up and start you fresh." He will tell you that. They said that Before they asked him anything else. He said, "Sounds good to me." He then said my client shot this man one time, he fell down, and then the man was shot by somebody else repeatedly with another gun. And who else are we going to call? Their witness, Ms. Anne Jones. Ms.

Anne Jones, believe it or not, is a firearms expert for the Commonwealth of Virginia, a female firearms expert. And she is going to come to Court and she is going to say, "This young man was shot repeatedly, and I got every bullet that was pulled out of him. Every bullet that was fired into him." Some of them went through, all right, so they didn't get all the bullets. They brought out like four of them. They will say those four bullets didn't come from the kind of gun that Mr. Moody said my client was carrying. In fact, she will say those four bullets came from one gun. Wait a minute, that doesn't prove anything, because other bullets went through. These guns are called automatics. When you pull the trigger the bullet goes out and the empty cartridge jumps out. Every cartridge found came from one gun. The Commonwealth's witness will tell you that on the night that this man was shot, only one gun was fired. Unless they were firing it, picked up their brass, picked it up and left. The Commonwealth's witness will tell you that. She will tell you it can't even be a mistake because the characteristics of the barrels between a Glock and an Intratec are completely different. You will be able to see with your naked eye that they are not the same. The

Commonwealth's witness will tell you that.

Now, why no one ever asked Ms. Jones how many different kinds of bullets came out of him, I don't know. But if anyone says that my client put shots into this man with an Intratec according to the Commonwealth, that will be a lie. Oh, now you say, how would Dennis Moody know that? One, he was there. Number two, Dennis Moody will also tell you that when he was approached by the police, the police had their notes with them and said, "Sterling Hardy told us this," blank, blank, blank, "What do you have to say?" That was the first interview he had. He will tell you that, assuming he doesn't change it again.

**JA369**

I believe you will find that Mr. Roane had nothing to do with the murder of Mr. Moody. Mr. Roane had nothing to do with the murder of Mr. Johnson. And Mr. Roane had nothing to do with the murder of Mr. Louis Johnson. He didn't fire any gun either, nada.

Now, they have also alleged, they haven't charged it in the indictment because the indictment came back last spring, but because these stories are changing, they now come in and say Mr. Roane held this man up here, Mr. Talley, while he was stabbed to death. Now, we have been advised that allegedly, my client held this man while he was stabbed to death and he got out, my client, got out of the car while the man was being stabbed to death, walked over to one of the witnesses, I don't know which one, and said, "My God, you wouldn't believe what's going on in there, I got stuck myself," and held up a wound. That's what they said.

MR. VICK: Misstatement.

MR. BAUGH: Was not a misstatement.

MR. VICK: Misstatement.

THE COURT: I don't want to take the time now to have Mr. Vick correct any alleged misstatements. Move on.

MR. BAUGH: Thank you. Now, maybe they have changed since then because I can tell you we will bring all the MCV records in and every cut on his hand we will be able to corroborate. So I bet you that witness won't be able to tell you where that cut was, because it didn't happen. Further, he didn't tell them about it before the indictment.

Now, we have him not involved in this murder, not involved in this one, not involved in this one, not involved in this one.

Now, my client is also charged with participating in a Continuing Criminal Enterprise, organizing, supervising, directing other people. No one will come in here and tell you that James Roane told him where to sell drugs, how much to sell drugs for, that "You have to sell drugs for me," none of that. There will be no evidence of direction, no evidence of management. None. Nada. You will find that Mr. Roane was not involved in any conspiracy with anyone. No one will tell you that.

Further, now there will be evidence that my client did shoot Torrick Brown. Yes, he did. Now, they are not seeking the death penalty on this charge, but my client is alleged to have shot Torrick Brown. Ms. Robin Cooper, who has been subpoenaed by the United States, will come to Court. And she will testify that she used to be Mr. Roane's paramour and

**JA370**

they have been together on and off for some period of time.  I should tell you all this stuff about Trenton, New Jersey, all of that.  Mr. Roane, our client, was in jail in the penitentiary until November 19th, 1991.  So anything that went on in New Jersey, he doesn't know about it.

He, Mr. Roane, was staying with Ms. Cooper for awhile.  And while he was there, the evidence will indicate from Ms. Robin Cooper, that while Mr. Roane

0875

was lying in the back bedroom, Mr. Torrick Brown came and kicked the door in and walked into the house.  James Roane allegedly, according to Ms. Cooper, jumped up and said, "Who are you, why are you here?"  There was a confrontation, a discussion about why he was there.  During that confrontation, Mr. Roane allegedly asked Ms. Cooper, "Were you having relations with this man while I was in jail?"  And before Ms. Cooper could answer, this man said yes, and said he would be coming back soon.  And that is why he was killed.  Not a good reason, but it had nothing to do with drugs.  Not a thing.  And that will be the evidence.  Ms. Robin Cooper will tell you that.

Ms. Robin Cooper will tell you that Ms. Martha McCoy was also there and she was shot because she was also involved in the discussion, the debate, the argument that went on that day.  She will tell you that.  Ms. McCoy, Mr. Brown were both drug dealers.  Both of them used drugs.  Both of them sold drugs out of that house where those children were.  And both of them, Ms. McCoy's boyfriend and the father of her children, Mr. Douglas Cunningham, continued to sell drugs out of that house after Mr. Torrick Brown was killed until his arrest in Henrico sometime later.

0876

Now, these occurred on February 1st, 1992.  My client was arrested in the early morning hours of February 2nd.  He was in jail when all the rest of this stuff happened.

So in summary, my client is charged with capital murder of this man, Mr. Moody; this man, down here, Mr. Johnson; and this man, Mr. Louis Johnson.  Peyton Johnson and Louis Johnson.  The government's witnesses will tell you my client did not shoot that man, my client did not stab that man.  My client may have been present in the nip joint, but the witness will tell you that my client came to that nip joint often.  In fact, their witness will tell you my client walked in and said, "Are you open yet?"  And Mr. Smithers said, "No, I'm not, come back later," and he said, "Oh, okay," and left.  Then sometime later, allegedly some people came in and did some shooting.  That's what he is going to testify to.

**JA371**

The evidence will indicate that my client did not sell drugs with anyone else.  He had his own reason for selling drugs.  He did not have substantial income.  He is not a drug kingpin.  The drug kingpin statute is what they prosecuted Noriega on.

MR. VICK:  Objection.

0877

THE COURT:  Sustained.

MR. BAUGH:  This man is not a drug kingpin and the evidence will indicate that.

Normally, in a case like this you don't want to get into too much detail.  But I can tell you this: The government's witnesses, namely, will tell you -- and this is more detail than you are supposed to give, but I will do it now.  Gina Taylor will say under oath, not promised a deal, "I swear to God James Roane did not kill this man."  Anne Jones will say, she will swear under oath, "Only one gun was used that night in the shooting of this man, Louis Johnson."  I don't know what else we are going to pick up because we haven't been able to talk to the witnesses.  But I will tell you those two.

You might want to ask why would Mr. Gaiters and these other people lie about this?  But I believe these gentlemen have already raised the question better.

At the conclusion of the evidence, you will also find that Mr. James Roane did not kill Torrick Brown because he chose to advance his position in some drug group.  There are three reasons for murder.  Passion, greed, and crazy.  Drugs is greed.  This was passion.  That's all it was.  It is bad, it is sad,

0878

and it should have been prosecuted in state court. But it is not related to drug activity.  In fact, Robin Cooper will tell you that.  Robin Cooper will tell you "Torrick Brown got killed because of our relationship."

The United States of America is going to ask you to kill these people.  The United States of America is going to ask you to kill James Roane.  I would submit to you that in the evidence the United States is going to present, there is going to be a lot of smoke, a lot of smoke.  But if you listen to the people who were there, or the people who know the scientific evidence, they will convince you beyond a reasonable doubt that Mr. James Roane was not involved in any capital murders.  None.  Not one.

This is a scary case because the stakes are so high.  It is also scary because I do not know if the witnesses will change their stories again.  And believe me, there will be ample evidence that they have.  But I can tell you this:  If they stick to the

**JA372**

story they have given thus far, you will acquit Mr. James Roane of all capital offenses. You will acquit him of being a drug kingpin. You will find him not guilty of a conspiracy. You may find him guilty of independent substantive acts of selling drugs. But

0879

you will find in a conspiracy -- and the Court will charge you and you will hear the evidence, we are going to ask them questions -- in order to be a conspiracy, it has to be a common goal. "Let's do this together," right? We are going to ask the witnesses is there an interdependence; does Mr. Roane's drug activity depend on someone else's drug activity? No, it doesn't. Without that interdependence, there is no conspiracy.

MR. VICK: Misstatement of the law.

THE COURT: Sustained.

MR. BAUGH: You will hear the questions and you will find out.

Listen to all the evidence. I know you are not taking notes yet, but there are a few people you want to look out for. I want to tell you one more time, Gina Taylor will tell you that their witnesses who are going to come to Court and raise their hand to God upon the loss of their mortal soul, they are going to come to Court and lie to you like a rug. If anyone gets up here and says there were two guns out there that night, Anne Jones will say they are lying like a rug.

I don't know if we can punch holes in all the government's witnesses, because we will tell you

0880

candidly as attorneys who have cross-examined many people, some of these lawyers are spectacular in their abilities. But we will try to bring to you the truth, and that's the promise we make to you.

Thank you for your time; thank you for your attention. Listen to all the evidence. Don't be tricked by the smoke. We don't have to prove why they are doing this. We don't have to prove they are lying. But I will tell you this, at the conclusion of the evidence, you will find that my client, the government has not proven beyond a reasonable doubt my client's participation in these murders as they have alleged. Thank you.

THE COURT: All right. Counsel for Ms. Reavis?

MR. WAGNER: Your Honor, could these be taken down, please?

THE COURT: Sure.

(Display of murder victims removed.)

MR. WAGNER: Good afternoon, ladies and gentlemen. My name is Robert Wagner. And I represent Ms. Sandra Reavis in this case. Over the

**JA373**

course of this trial, you will see very clearly that Sandra Reavis is not guilty of the one charge that she faces in this trial. She is Not guilty of being part of any organization; not guilty of being a member of this group; not guilty of the conspiracy that she is charged with.

There are two very important reasons why she is not guilty. First, she was separate from any criminal activity of the people charged with this conspiracy. And second, she did nothing in furtherance of the criminal activity that the government will try to show you.

I'd like to tell you a little bit about Sandra Reavis. She was brought up in Baltimore, Maryland, eight brothers and sisters, from a very poor family. But she worked her way up. She became a nurse's aide, worked as a nurse's aide for a number of years. She had a son and moved here to Richmond.

MR. VICK: Your Honor, I don't see how this is evidence that will come out at trial.

THE COURT: Overruled.

MR. WAGNER: Thank you. In December of 1991, Sandra Reavis met James Roane and they started a romantic relationship. This was simply a romantic relationship. The relationship she had with James Roane had nothing to do with any criminal activity. On February 2nd, in the early morning hours of February 2nd, 1992, Sandra Reavis was in the wrong place at the wrong time with the wrong person. She was found there with James Roane and taken down to the police station.

Now, the government has told you she was arrested that night, but she was not arrested that night. She was questioned that night. She was questioned about her activities with these people that were in the house with her. The only reason she was in that house was because of her romantic relationship with James Roane and nothing more. The police questioned her that night. They didn't find any drugs on her, didn't find any large sums of money on her or anything. In fact, every time the police talked to her -- they brought her in six or seven times from her house -- they never found any drugs on her, never found any large sums of money on her. Each time they requested her about her involvement with these people. Each time Sandra Reavis said she didn't know about the violence here. She didn't know what was going on out there. And there is a letter that you will see from James Roane which confirms this. James Roane wrote her from the jail and said, "I'm sorry about what's happened to you. You didn't know about the killings. You didn't know about what

**JA374**

I was doing out there." But still the police

0883

questioned her. In fact, they threatened her.

They wanted her to become, to steal an analogy from Mr. Cooley, to become a bounty hunter. But she wouldn't do that. They threatened her by telling her that she was in great danger; that she was on the list of these people possibly being killed. For that reason, she was in great fear, fear for her life and also in fear for the life of her 15-year-old son who lived with her. These are the facts that you will hear from the stand during this trial.

From these facts you will see that Sandra Reavis is not guilty of the conspiracy she is charged with, not guilty of participating in any criminal activity of the people charged with this conspiracy. But I'd like you to focus on those two points that I brought out to you. First, she was separate from the criminal activity, independent of any of the criminal activity of these people.

Foremost, she had absolutely nothing to do with any of the violence here. Sandra Reavis never pointed a gun at anyone, certainly never shot a gun at anyone. Sandra Reavis never held a knife to anyone, certainly didn't stab anyone. Sandra Reavis never even held a fist to anyone, or struck anyone. She was not involved in any violence in this case.

0884

But additionally, you will see that Sandra Reavis' only involvement here was on a romantic level with James Roane. She was separate from any other activity that James Roane might have been involved with.

Now, you will also hear some testimony is that Sandra Reavis was involved with drugs. That testimony is going to come out on the stand. But any involvement she had with drugs was very separate from the involvement that any of these other people charged had with drugs. She is not on trial her for her lifestyle. She is not on trial for being romantically involved with James Roane. She is on trial for taking an important part in a criminal organization. And you will see there is absolutely no evidence to support that.

So because she was separate from the criminal activity of the people charged in this conspiracy, she is not guilty of the conspiracy. But she is also not guilty of the conspiracy because she did nothing in furtherance of the conspiracy, nothing in furtherance of the criminal actions that you will hear about in this case. Sandra Reavis was involved in a romantic relationship with James Roane and what she did was in furtherance of that romantic

0885

**JA375**

relationship and not in furtherance of any criminal activity.

You will hear a statement from a witness of the government who will testify he was in a jail cell with Cory Johnson. And Cory Johnson told him that Sandra Reavis had nothing to do with the conspiracy. Please, look carefully for that.

MR. VICK: Misstatement again, Your Honor.

THE COURT: He is giving his understanding.

MR. VICK: Yes, sir.

MR. WAGNER: You have heard the statement of the government that Sandra Reavis sent $1,200 to New York. She did. Her name appears on two separate Western Union money transfers. But that was by no means done in any furtherance of any criminal activity. She was with Valerie Butler, the girlfriend of Cory Johnson, and she did it to help out Valerie Butler. Valerie said she didn't have any identification, so Sandra Reavis sent the money for her. She didn't know who it was for, didn't know who it was going to. Valerie Butler is going to testify about this, and she is one of the government's bounty hunters.

Also, you are going to hear testimony that the government has stated about a gun that she gave to "Whitey," a .38. Ladies and gentlemen, there will be no competent testimony to support that statement. The testimony that you will hear will be hearsay, and again, it will be from bounty hunters. It will be totally unreliable. No one will testify that they ever saw her deliver a gun to him. And no one will have any details about any delivery of a gun from Sandra Reavis to Richard Tipton.

So because Sandra Reavis did nothing in furtherance of the conspiracy, in furtherance of the criminal activity that's charged here, she can't be found guilty of being a member of the conspiracy.

There is one other point I ask you to think carefully about. And that's the question of fear. Sandra Reavis was told by the police when she was brought in for questioning that these people were dangerous; these people had killed people. And they told her about Linwood Chiles. Linwood Chiles, you will hear, presented evidence against, or at least told the police department about some of the criminal actions of these people. And he ended up dead. So please, listen very carefully to the evidence that you hear from the stand here and evaluate that evidence in terms of Sandra Reavis and what role she had as a member of this organization. You will find from the evidence that she is not guilty. Thank

**JA376**

you.

THE COURT: All right. That completes the opening statements in the matter. I have just a few instructions I want to give you before we release you for the evening. Let me emphasize a few things. First of all, as I've said over and over again, I say it over and over again because I want you to keep it in mind: The government has charged the defendants with certain criminal offenses. The charge or the indictment is just that, an accusation. They must prove the accusations, the charges, beyond a reasonable doubt. Unless and until they do that, they are presumed innocent as charged.

Now, you heard a few of the lawyers mention things about the law. They may have been right or close to being right in circumstances, but I want you to understand this: Your source as to the law is the Court. I will instruct you very carefully and at some length as to what the law is in this matter. And it will come from me.

Now, secondly, let me emphasize a previous instruction. I told you, and perhaps now you understand why. The evidence in this matter is what comes from the witness stand, the exhibits, and any stipulations. The statements, comments, arguments by lawyers are not evidence and should not be accepted by you as such. A classic example is that we had a couple of objections. Mr. Vick titled his objections misstatement of facts. Well, how would I know? How would you know? The defense lawyers are stating what they understand the evidence to be. Mr. Vick has his understanding. The evidence will come before you in the form that I have indicated. Understand that.

And one final thing before I make the admonishment and let you go: The defendants are charged in a number of counts, and there are obviously four defendants. Each defendant is entitled to individual consideration. They cannot be grouped. When the time comes for you to decide guilt or innocence, you will consider each defendant individually as it relates to each count in which that defendant may be charged.

Now, I am going to admonish you again not to discuss this case with anyone, and if anyone tries to talk about it with you, bring it to the Court's attention promptly. And I guarantee you, I will deal with it in a hurry.

Tomorrow we are starting at 10 o'clock, as I've indicated. And I would appreciate it if you were timely, here in your place at 10 o'clock so we don't waste any time waiting on people who will be late. That would inconvenience other people and that would

**JA377**

not be right.  In the meantime, you all have been given a tremendous and heavy responsibility, and I know the weight of it is going to come down on you tonight.  But we are assured by our questions of you and our having dealt with you over the last few days that you are able to handle it.  So you all go home and have a good evening and we will start out fresh on tomorrow morning at 10 o'clock.

Everyone remain seated while the jury leaves the courtroom.  Just a second.  They tell me you have to report to a different place in the morning.  Check in at Room 302.  It is on the third floor in this hallway down this way.  That's Room 302 for your check-in.  Thank you.  We will see you tomorrow.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(Proceedings adjourned at 5:11 p.m.)

0890

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                          Plaintiff;

     v.                                CRIMINAL ACTION
                                          92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                          Defendants.

-----------------------------------------

VOLUME V

January 15, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge

**JA378**

not be right.  In the meantime, you all have been given a tremendous and heavy responsibility, and I know the weight of it is going to come down on you tonight.  But we are assured by our questions of you and our having dealt with you over the last few days that you are able to handle it.  So you all go home and have a good evening and we will start out fresh on tomorrow morning at 10 o'clock.

Everyone remain seated while the jury leaves the courtroom.  Just a second.  They tell me you have to report to a different place in the morning.  Check in at Room 302.  It is on the third floor in this hallway down this way.  That's Room 302 for your check-in.  Thank you.  We will see you tomorrow.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(Proceedings adjourned at 5:11 p.m.)

0890

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                                    Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                                    Defendants.

----------------------------------------
VOLUME V

January 15, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge

**JA379**

APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                  Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                  Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                  Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                  Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                  Counsel for Defendant Reavis.
                  JEFFREY B. KULL
                  OFFICIAL COURT REPORTER

0891

P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, James Roane, Jr. and Sandra Reavis, the fifth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

MR. VICK:  In light of opening statements by defense counsel yesterday, I do believe the government should now be allowed in direct examination of its witnesses who have been provided protection and money to be able to testify why it is indeed that they have been provided money by the government, and that's simply because they have been in protective custody.  Not a single witness has been provided any money other than necessity money to put them in hotels, put them in witness protection.  In light of opening, although that's not normally allowed, in light of the arguments that were here for an hour-and-a-half yesterday, we think that's proper testimony.

0892

THE COURT:  Well, Mr. Vick, I would not make a decision like that based on opening statements.  Opening statements are full of sound and fury and signify nothing.  If they do as they have indicated and bring out this information in cross-examination, then you can do that in rebuttal.  You can't do it in direct.

MR. VICK:  Yes, sir.

MR. GEARY:  May I be heard?  Your Honor, in

**JA380**

regard to the New Jersey witnesses that are going to appear today, and I assume most if not all of those witnesses will appear today, on behalf of defendant Tipton we would like to have a continuing objection, without the necessity of getting up for each witness, to any testimony which will flow into this case based on New Jersey incidents that happened in terms of the motion in limine, in those time frames, for the reasons that we expressed in those motions. Also, Judge, because we feel that this evidence, if it is proper, is more properly before the Court at a second phase. Because what it does is in effect put the caboose in front of the engine, bringing in the criminal history from New Jersey in the guilt or innocence phase of the case.

Secondly, on behalf of Tipton we would like to

0893

have the government proffer to you that in regard to its lead-off witnesses, that in fact Mr. Scott has no record of criminal convictions anywhere. Thank you.

MR. VICK: I have never represented that to anyone. I have represented that indeed he has been convicted in federal court in Trenton, New Jersey. He is pending sentencing on those federal charges and is testifying -- and I told that to everyone -- testifying pursuant to a 5K.1 proceeding in federal court. So he has indeed been convicted.

Additionally, I have told counsel repeatedly that he has two misdemeanors which would not be properly brought out in impeachment, but I will bring them out on direct examination, that indeed he has two prior misdemeanor convictions.

As to Anthony Howlen, I would also represent that he has also been convicted of a felony marijuana charge in New Jersey, and that he has pending charges in the State of New York, the exact nature of which I have forgotten, to tell you the truth. I will ask him before we put him on the stand, but he has pending charges in New York. He has a prior felony conviction, also.

THE COURT: I can go ahead and rule on Mr. Geary's request. Your objection will be continuing.

0894

MR. HENDERSON: If it Please the Court, on behalf of defendant Roane, we would likewise reurge our motion in limine with respect to any matters coming into evidence against defendant Roane about anything going on in New Jersey, being highly prejudicial, having nothing whatsoever to do with defendant Roane. We would likewise request a continuing objection to that evidence coming in today.

THE COURT: All right. Your objection is noted and it will be continuing.

**JA381**

MR. COOLEY:  May it please the Court, on behalf of defendant Johnson, we would join in Mr. Geary's motion.

THE COURT:  All right.  Your objection will be noted and it will be continuing.  Anything else? Let's bring in the jury.

Mr. Vick, did you submit a witness list?

MR. VICK:  Yes, sir.

(The jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Mr. Vick, call your first witness.

MR. VICK:  The government would call Greg Scott.

(Notebooks proffered to jurors.)

0895

MR. VICK:  The page is not able to be heard in the hallway according to the Marshals.

### A.  Gregory Taylor Scott

GREG TAYLOR SCOTT, called as a witness by and on behalf of the @ having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Mr. Scott, I want to ask you to speak loudly and into that microphone so everyone in the courtroom can hear your answers.  State your name for the Court, record and jury, please.

A    My name is Greg Taylor Scott.

Q    How old are you, Mr. Scott?

A    24.

Q    Are you also known by a nickname?

A    Yes.

Q    What's that?

A    "Sweets."

Q    How far did you go in school, Mr. Scott?

A    I have my GED.

Q    Now, Mr. Scott, do you have a prior criminal record?

A    Yes, I do.

Q    Could you tell the ladies and gentlemen of the

0896

jury what prior crimes you have been convicted of?

A    Been convicted of two misdemeanors, one still in New York City, and stealing gold chains in New York City.

MR. GEARY:  I didn't hear the last response.

BY MR. VICK:

Q    Repeat the last misdemeanor conviction.

A    Stealing gold chains.

Q    Additionally, you are currently facing

sentencing in federal court  --

MR. GEARY:  Objection to leading.

THE COURT:  Overruled, Mr. Geary.

BY MR. VICK:

Q    You are currently facing sentencing in federal court in Trenton, New Jersey on drug charges?

A    Yes.

Q    When is it you are scheduled for sentencing?

A    Sometime in April.

Q    What is it that you are facing; what kind of penitentiary sentence are you facing?

A    20 to life.

Q    Now, is that 20 years to life?

A    Yes.

Q    Now, you are testifying here pursuant to an

0897

agreement that you have reached with the federal government; is that correct?

A    Yes.

Q    Could you explain in your own words, please  --

MR. GEARY:  We have not seen any agreement that this man has with the federal government.  It has not been tendered.  I think we are entitled to the tender of the agreement.

MR. VICK:  I don't have a copy of it.

THE COURT:  The objection is overruled at this point.

BY MR. VICK:

Q    Could you state to the ladies and gentlemen of the jury what you understand your agreement with the government to be?

A    My agreement is if I tell the truth, they will speak up for me in behalf of somehow I'll get a deal. And if I don't, whatever I said today or before in reference to this case will be held against me.

Q    Let's break that down.  If indeed you come to testify, who will speak up for you?

A    The U.S. Attorney.

Q    To whom?

A    To the Judge.

Q    All right.  In what regard, what will the U.S.

0898

Attorney tell the Judge?

A    That I cooperated.

Q    And what purpose would that statement be made to the Judge for?

A    To help me hopefully get a deal.

Q    When you say a deal, what do you mean?

A    To reduce my sentence.

Q    Less than 20 years?

A    Yes.

Q    Has anybody represented to you that indeed you will receive a sentence less than 20 years?

A    No, they have not.

**JA383**

Q   As you understand it, whose decision is it as to what your sentence will be?

A   The Judge's.

Q   Has anyone from the federal government, either the Assistant United States Attorney who prosecuted you in New Jersey or myself, represented to you that indeed you will receive a sentence reduction?

A   No.

Q   Now, what is your understanding as to what is incumbent upon you here today when you testify; what do you have to do?

A   Just tell the truth.

Q   What happens if you do not tell the truth if it is able to be proven that you have not told the truth?

A   Whatever I have said to you or anyone else would be used against me.

Q   Now, you were arrested on June 4th, 1991; is that correct?

A   Yes.

Q   That's the subject of the charges in federal court?

A   Yes.

MR. GEARY:  I think we have to stop the leading at some point.  He is telling exactly what they did in the Grand Jury.

THE COURT:  Sustained.  You passed preliminaries, Mr. Vick.

BY MR. VICK:

Q   Could you tell the ladies and gentlemen of the jury what your prior work history is?

A   Well, in 1988 to 19  --

MR. GEARY:  I object.  I don't know what his work history has to do with a conspiracy in Richmond.

THE COURT:  Sustained.

MR. VICK:  I was just trying to put before the jury some of the background as to this man.

THE COURT:  Sustained.

BY MR. VICK:

Q   In 1989, did you have occasion to lose your job?

A   Yes, I did.

Q   What happened when you lost your job; what did you do?

A   I went to see some friends that were selling drugs in Trenton, New Jersey.

Q   Who were those friends that you saw?

A   "V," "C.O.," "Whitey," "Heavy D," also known as Darryl Matthews, "Light," "L.A.," "Double O," "Beef," some others.

MR. GEARY:  Excuse me, I don't mean to

**JA384**

interrupt Mr. Vick.  Could we get that slowed down?

THE COURT:  All right.

BY MR. VICK:

Q   Go through them again, please.

A   "Light," "L.A.," "Double O," "Heavy D," "Beef," "Whitey," "C.O.," "V."

Q   Do you know the real names of "V," "C.O.," and "Whitey"?

A   Yes.

Q   Could you tell the Court and jury that, please?

A   Richard Tipton.

0901

Q   That's who?

A   "Whitey." Cory Johnson is "C.O.," and Lance Thomas is "V."

Q   Was he also known by another name?

A   Yes, Vernon Lance Thomas.

Q   Do you see any of those individuals in the courtroom today?  Take your time, stand up, look around if you need to, and see if you see any of them in the courtroom.

A   "C.O.," also known as Cory Johnson, and "Whitey."

Q   How is "C.O." dressed?

A   Gray sweats.

MR. McGARVEY:  I'll stipulate he will identify the defendant.

BY MR. VICK:

Q   And "Whitey," do you see him in the courtroom?

A   Yes.  Sitting behind this gentleman with the blue suit on.

Q   How is he dressed?

A   Blue jacket on, glasses.

MR. VICK:  Could the record reflect the identification of both defendants?

THE COURT:  The record will so reflect.

BY MR. VICK:

0902

Q   How did you know those people?

A   Sold drugs with them in Trenton.

Q   When did you first meet "V"?

A   Me and "V" grew up together.

Q   Where was that?

A   155th and Amsterdam, New York.

Q   How is it that you came to go to Trenton, New Jersey?

A   I had lost my job in 1989 and I knew some friends selling drugs and needed quick money.

Q   Did you indeed go to Trenton, New Jersey?

A   Yes.

Q   What did you do when you went there?

A   Got into the drug life.

Q   Those people that you have named previously today in your testimony, were they all present in New

Jersey?

A    Yes.

Q    Did you see all of those people in New Jersey?

A    Yes, I did.

Q    When was it in 1989 that you went to Trenton, New Jersey?

A    November of 1989.

Q    All right.  When was it that you began selling drugs in Trenton, New Jersey?

A    From there on.

Q    Until when?

A    Until my arrest in 1990.

Q    And  --

A    January of 1990.

Q    You were arrested for what at that point?

A    Possession.  I was arrested for two  --

Q    Possession of what?

A    Controlled substance.

Q    What happened to that charge?

A    It got thrown out, I think.

Q    You were in jail for how long on that occasion?

A    Ten days to be exact.

Q    You were arrested after that again, were you not?

A    Yes.

Q    When was that?

A    January 31st.

Q    Of that same year?

A    Yes.

Q    And what happened?  What were you arrested for then?

A    Possession.

Q    What happened to that charge?

A    It was downgraded.

Q    To what?

A    A misdemeanor.

Q    How long were you in jail on that charge?

A    A month.

Q    You were arrested a third time in Trenton?

A    Yes.

Q    When was that arrest?

A    June 4th.

Q    Of what year?

A    1991.

Q    Is that the federal charge that you have testified to?

A    Yes.

Q    All right.  From November of 1989  --  let me back up again.  Your second arrest in New Jersey, how long were you in jail on your second arrest?

A    A month.

Q    From November of 1989 until your arrest on June

**JA386**

4th, 1991, except for those occasions when you have indicated you were in jail, were you continuously involved in the sale of drugs in Trenton, New Jersey?

A    Yes, I was.

Q    All right.  Those people that you have testified to as being the people that you went to join in New Jersey, were those people continuously involved with you in that same time frame?

A    Yes, they were.

Q    Was Cory Johnson involved in that same time frame in the sale of drugs in New Jersey?

A    Yes, he was.

Q    Were you actually involved with him?

A    Yes, I was.

Q    Was Richard Tipton involved in the sale of drugs in New Jersey?

A    Yes, he was.

Q    Were you actually involved with him in the sale of drugs?

A    Yes.

Q    All right.  This group of people that you went from New York to join, approximately how many people were in that group?

A    15 to 30.

Q    How many?

A    15 to 30 people.

Q    Did you have a name that you used?

A    Yes.

Q    What was that name?

A    The New York Boyz.

Q    How did you get that name?

A    The police officers from Trenton gave us that name.

Q    Did you like that name?

A    Yes.

Q    Why is that?

A    To let people know we were from out of town and we were taking over.

Q    What sort of drugs was it you sold in Trenton?

A    Crack cocaine.

Q    Now, in what sort of quantities were you selling crack cocaine?

A    Large amounts.

Q    Were you selling them on the street corners of Trenton, New Jersey?

A    We were selling them on street corners and houses.

Q    This group of people that you said are the New York Boyz, did they get together to do anything in the drug distribution business?

A    Yes.

**JA387**

Q    What was that?
A    We got together whenever we had a problem.  We would discuss it, to retaliate or not to retaliate, and we would get together when it was time to go Uptown to cop.  "Cop" means buy more drugs.

0907
Q    What is Uptown?
A    New York City, where the big dealings are located.
Q    When indeed the New York Boyz ran out of drugs, what would you do?
A    We would get together and whoever was going up, we would put the money together and go up and buy more drugs.
Q    For who?
A    All of us.
Q    If indeed you ran into a problem of a physical nature, a problem with someone in Trenton, New Jersey, what would you do?
A    We would get together and retaliate.  We would discuss it first.
Q    Who is we?
A    All of the New York Boyz.
Q    Have you ever been in discussions regarding retaliation with Mr. Cory Johnson, Mr. Richard Tipton, or "V," Lance Thomas?
A    Yes.
Q    All right.  On how many occasions would you estimate that you have been in discussions with of that sort with them?
A    Several.

0908
Q    Did the New York Boyz ever use acts of violence to further their cocaine distribution activities in Trenton, New Jersey?
A    Yes.
Q    Tell the ladies and gentlemen of the jury what acts of violence were used and why.
A    We used bats, razor blades or our fists to take over street corners and blocks.
Q    Did you indeed, Mr. Scott, ever use a bat?
A    Yes.
Q    For what purpose?
A    Take over a street corner.
Q    What would you do to take over a street corner?
A    Tell the Trenton people they would have to move out.
Q    If they didn't?
A    We would take our acts of violence out on them.
Q    Did that happen?
A    Yes.
Q    On how many different occasions did you use the bat?
A    Several.

**JA388**

Gregory Taylor Scott (Direct)

Q    How did you learn how to use a bat to beat people; who told you that?

A    I was taught by Vernon Lance Thomas.

Q    Have you ever seen Mr. Cory Johnson or Mr. Richard Tipton use a bat to beat people in Trenton, New Jersey?

A    I have seen Cory Johnson.

Q    On how many different occasions have you seen Mr. Cory Johnson use a bat to beat people in New Jersey?

A    Several.

Q    For what reason?

A    Over drugs, over turf, many different reasons.

Q    Were all those reasons related to drugs?

A    Yes.

Q    All right.  What kind of bats would you use?

A    Aluminum.

Q    Why is that?

A    They don't break.

Q    Did you have guns?

A    Yes, we did.

Q    What were the guns there for?

A    To retaliate.

Q    Did you ever use the guns in retaliation?

A    No, we did not.

Q    There was an occasion when you had -- the New York Boyz had a problem with individuals in the Dolley Homes section of Trenton; is that correct?

A    Yes.

Q    And could you tell the ladies and gentlemen of the jury about that?

A    Well, we had a problem.  One of the guys in the New York Boyz who got beat up, "E.B."  --

Q    What's his real name?

A    Edgar Black.

        MR. VICK:  If I could show the witness Government Exhibit 1.

     (Document proffered to counsel and witness.)

BY MR. VICK:

Q    I'll ask you to look at Government Exhibit 120 and ask you if you can identify that.

A    Edgar Black.

Q    I would move Government Exhibit 120 into evidence.

        THE COURT:  It will be admitted.

        MR. VICK:  If I can have Government Exhibit 135 shown to him, also.

     (Document proffered to witness.)

     Look at Government Exhibit 135 and see if you can identify that person

A    Vernon Lance Thomas.

Q    Also known as?

**JA389**

A     "V."

0911

Q     I would move Government Exhibit 135 into evidence.  This problem that Edgar Black had -- how was he known?  Was he called also by a nickname?
A     Just "E.B."
Q     Tell us about the problem he had and what you did.
A     Edgar Black had got beat up by a crew of guys from the Dolley Homes section.  It was over a water fight, and the Dolley Homes guys lost.  And they beat him up in retaliation because they lost.  So we decided to retaliate, which we didn't  --
Q     When you say "we," who is that?
A     The New York Boyz.
        MR. McGARVEY: I object.  I don't understand what a water fight has to do with anything.
        THE COURT:  Doesn't call for an objection, calls for clarification.  What is a water fight?
        THE WITNESS:  It was the summertime of 1991 and we were having a water fight with the Dolley Homes section.
BY MR. VICK:
Q     What's that?
A     Water balloons, water guns.  It was real hot outside.  It was something to do to keep out of trouble, I guess.  But later on that day it got us

0912

into trouble.
Q     Tell us what happened.
A     A group of guys had cornered "E.B." on the corner and beat him up.  I ran in the middle and pulled him out.  Later on that evening we all got together, the New York Boyz, and decided to retaliate.  We pulled out the guns and we were thinking about shooting up the block.  But we decided not to because it would mess up the money we were making and we couldn't have the police on our backs all the time.  So we decided had not to.
Q     When you say the New York Boyz got together and thought about retaliating, how did you think it would help you?
        MR. GEARY:  I think he can speak for himself.
        THE COURT:  Ask him by himself.
BY MR. VICK:
Q     Were you present in the discussion?
A     Yes.
Q     Who else was present?
A     "V," "C.O.," "Heavy D," Gary Williams to be exact, "Hess," and "Black" and "Peanut."
Q     And how did you think that would help you to retaliate?

0913

**JA390**

A    That would let them know that they can't just come push us around just like that.

Q    How would that help your drug business?

A    It would let people know we were in charge.

Q    Did that retaliation take place?

A    No.

Q    Did you have guns?

A    Yes, we did.

Q    Who had the guns?

A    "V," "C.O.," "Heavy D," "Peanut," myself, and "Black."

Q    Now, did the New York Boyz have people who worked for them?

A    Yes, we did.

Q    Who was that?  What type of people would you have work for you?

A    The local people that were living in Trenton.

Q    How many of those people worked for the New York Boyz?

A    Several, about 20.

Q    All right.  And would you recruit them?  How would it come that they would work for you?

A    They would come buy from us and hustle on the block and sell to someone else.  They would buy from us again.

Q    Were they considered part of the New York Boyz?

A    No.

Q    Why?

A    They weren't family.  They were outsiders.

Q    What do you mean by  --  go ahead.

A    They did not come from the city.  All of us that came from the city stuck together.

Q    What do you mean by "family?"  You said that they were not family.  Tell us exactly what you mean by "family."

A    We all considered ourselves as brothers and cousins, I guess because we all grew up together and lived in New York City.  If we considered ourselves cousins then the next person wouldn't belong to any of us in the group.

Q    Were you actually cousins or brothers?

A    No.

Q    Did you represent yourself to people to be brothers and cousins?

A    Yes.

Q    Did you grow up with "C.O." or "Whitey" in New York City?

A    No, I did not.

Q    Do you know how they came to be part of the New York Boyz?

A    They were in Trenton before I got there.  They knew some of the members that were already in the

**JA391**

crew.

Q    Were they from New York, do you know?

A    Yes, they were.

Q    Were the New York Boyz different than the workers?

A    Yes.

Q    All right.  If a worker had a problem, got in a fight like "E.B." did over a water fight, would there be retaliation by the New York Boyz?

A    No.

Q    Would there be any retaliation by the New York Boyz for any reason if a worker had a problem?

A    Only if the worker got robbed.

Q    Robbed of what?

A    Drugs.

Q    And why is that?

A    Because that would be our work.  That would be our drugs, to be exact.

Q    In what parts of the City of Trenton did you sell drugs?

A    All parts; west, east, north and south.

Q    Who was selling the drugs there?

A    All of the New York Boyz.

0916

Q    Specifically, was Richard Tipton a member of the New York Boyz?

A    Yes.

Q    Was Cory Johnson a member of the New York Boyz?

A    Yes.

Q    Have you ever seen Richard Tipton or Cory Johnson in fistfights over drugs?

A    Yes, I have.

Q    On how many different occasions?

A    Several.

Q    Have you ever known of Richard Tipton or Cory Johnson to use razor blades?

        MR. GEARY:  Objection.  Known to use?

        THE COURT:  The problem I have with the question, Mr. Vick, is let's make it specific to a defendant.  You asked a generalized question and you don't get an answer.

BY MR. VICK:

Q    Do you know of a specific occasion when Mr. Richard Tipton and Mr. Cory Johnson together used razor blades?

A    Yes.  One incident when I just moved down to Trenton to sell drugs in November of 1989, some of the New York Boyz were talking and some of the Trenton locals were talking  --

0917

        MR. GEARY:  I object.  It is clear that this is all hearsay.

        THE COURT:  The way he is framing it now, sustained.

**JA392**

MR. VICK:  If I can explain why it is not hearsay?

THE COURT:  Ask a valid question and get a valid answer.  Sustained.

BY MR. VICK:

Q    Why was it that these people were talking  -- why were the New York Boyz talking about what Mr. Tipton and Johnson had done?

A    They were bragging about it.

MR. GEARY:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did that further the drug business in some way?

A    Yes, that let people know --

MR. BAUGH:  Objection.

THE COURT:  Still sustained.  He has to tell us about what he knows, what these folks have done and what he saw.

MR. VICK:  801(d)(2)(E) would be the basis for moving it in.

THE COURT:  Not on the New York Boyz evidence.  No, sir.  The objection is sustained.

BY MR. VICK:

Q    Now, how much drugs were you selling on a daily basis?

A    200 to 300 grams a day.

Q    Of what?

A    Crack cocaine.

Q    And who were you primarily working with selling cocaine?

A    "Light."

Q    What's "Light's" real name?

A    Rufus Alvarez.

Q    Did you ever have occasion to sell drugs to Richard Tipton?

A    No.  "Light" mostly took care of Richard Tipton.

Q    Did you ever have occasion to see Richard Tipton come and get drugs from "Light"?

A    Yes.

Q    What drugs?

A    Crack cocaine.

Q    Did you ever sell drugs to Cory Johnson?

A    Yes.

Q    What type?

A    Crack cocaine.

Q    Did you ever witness Cory Johnson get drugs from "Light"?

A    Yes.

Q    Now, if you and "Light" ran out of drugs, what would you do to get more drugs before going to Uptown to buy more?

**JA393**

A    I would buy from "C.O." and "V."
Q    Did you ever buy any drugs from Mr. Cory Johnson, "C.O."?
A    Yes.
Q    On how many different occasions?
A    Several.
Q    What type of drugs?
A    Crack cocaine.
Q    And in what quantity?
A    Ten grams.
Q    Have you ever bought drugs from Lance Thomas, "V"?
A    Yes.
Q    What type of drugs?
A    Crack cocaine.
Q    On how many different occasions?
A    Several.
Q    Do you know what quantity of drugs the New York Boyz as a group were distributing on the streets of

0920

Trenton, New Jersey?
        MR. McGARVEY:  Objection.  Basis of knowledge?
BY MR. VICK:
Q    Based upon your involvement with the New York Boyz, did you fellows talk about what was going on, how much drugs were being sold?  Did you know how much drugs were being sold by the group in general?
A    Yes.  We would sell 200  --
        MR. BAUGH:  Objection.  He has to get it from someone else and it is not under 801(d)(2)(E).
        THE COURT:  I'll let him answer that.
BY MR. VICK:
Q    Go ahead.
A    We were selling 200 to 300 grams a day.
Q    Do you know how much on a weekly basis the group was moving in Trenton?
A    A key-and-a-half.
Q    When you say a key-and-a-half, what do you mean?
A    A kilo of crack cocaine.
Q    A kilogram?
A    Yes.
Q    Was it all crack cocaine that you sold?
A    Yes, it was.

0921

Q    From November of 1989 until June of 1991 when you were arrested, was "V" continually in New Jersey, in Trenton, selling crack cocaine with the New York Boyz?
A    Yes.
Q    Was Cory Johnson continually in Trenton selling cocaine with the New York Boyz?
A    Yes.

**JA394**

Q    Was Richard Tipton there on a continuous basis?
A    No, he was always away on spurts, gone for two months here, a month here.
Q    Did you ever have occasion to talk to Mr. Richard Tipton about Richmond, Virginia?
A    Yes.
Q    And what did Mr. Tipton tell you about Richmond, Virginia?
A    That there was big money down here.
Q    Big money in what regard?
A    Selling drugs.
Q    How did he say it was big money?
A    Said you could sell three times as much as what you were selling in New Jersey.
Q    Three times the quantity, or a gram of cocaine would sell for three times more?
A    A gram of cocaine would sell for three times

0922

more.
Q    On June 4th, 1991, there was a search of a residence that you were living in; is that correct?
A    Yes.
Q    What residence was that?
A    491 Martin Luther King Boulevard.
Q    Trenton?
A    Yes.
Q    Again, that's what you are pending sentencing for?
A    Yes.
Q    Who else lived in that house with you?
A    Darryl Matthews, also known as "Heavy D," "C.O.," also known as Cory Johnson, "V," Vernon Lance Thomas, and Gary Williams.
Q    And were drugs seized from that house?
A    Yes, they were.
Q    Were you present at the house when the search was conducted?
A    Yes.
Q    Based upon your presence at the house, did you know where the drugs were seized?
A    Yes.
Q    Where were they seized from?
A    Mostly from Darryl Matthews's room and "C.O."

0923

and "V's" room.
Q    The drugs seized from Darryl Matthews's room, whose were they?
A    Matthews's.
Q    How were they packaged?
A    In a big plastic bag.
Q    The drugs seized from the room of Cory Johnson, "C.O.," and "V," how were they packaged?
A    In crack vials.
Q    What room was that?

## Gregory Taylor Scott (Direct)

A    The second bedroom to the right.
Q    Do you know how much cocaine that was, approximately?
A    About 150 grams.
Q    All right.  Now, was that crack cocaine?
A    Yes.
Q    Is that the crack that was distributed on the streets of Trenton?
A    Yes, it was.
Q    Were there firearms seized from that residence, also?
A    Yes, there were.
Q    What sort of firearms were seized from that residence?
A    An MP .45, .25 caliber automatic, and two

0924

shotguns.
Q    Whose guns were they?
A    "C.O." and "V's."
Q    How do you know that?
A    I gave them to them.
Q    What did you give them to them for?
A    They wanted them.
Q    What did they want them for?
A    Protection.
Q    Now, there was a time when Richard Tipton, "Whitey," had a problem  --
         MR. GEARY:  Objection to the leading questions.
         MR. VICK:  I'm trying to direct him.  I'm not suggesting an answer.
BY MR. VICK:
Q    When he had a problem in the Caravan, are you familiar with that?
A    Yes.
Q    Could you tell the ladies and gentlemen of the jury what is the Caravan and what the problem was?
A    That's a club located on Clinton Avenue in Trenton, New Jersey.  "Whitey" was having some problems with some fellows out there hustling.
         MR. GEARY:  I object.  Is this Based on his

0925

knowledge, or somebody else told him, or what?
BY MR. VICK:
Q    Did Mr. Tipton tell you this?
A    Yes.  "Whitey" was having some problems in the Caravan based on him selling drugs.  They wanted him out of there.  He was the only one at the time selling at the Caravan out in East Trenton.  Right after he had gotten beat up by a group of fellows, he ran to my house.  We got the fellows together to discuss retaliation, "the fellows" meaning the New York Boyz.  We decided not to retaliate because he couldn't hustle back over there if we retaliated.

**JA396**

The police would not let him or the fellows would not let him, the guys that beat him up.

Q    Did you retaliate in any way?

A    No, we did not.

Q    Do you know whether "V," Lance Thomas, used drugs?

A    No.

Q    Do you know whether "Whitey" used drugs?

A    Yes.

Q    What sort of drugs did "Whitey" use?

A    Smoked marijuana, blunts you call it.

Q    What's a blunt?

A    Marijuana rolled up in a cigar.

Q    How often would you see him smoking blunts?

A    Every day.

Q    How many times a day?

A    Four or five times a day.

Q    Do you know whether Mr. Cory Johnson used drugs?

A    Same.  Smoked blunts.

MR. VICK:  Beg the Court's indulgence for a moment, Your Honor.

(Counsel conferring.)

MR. VICK:  I have one further question.

BY MR. VICK:

Q    Now, Mr. Scott, in these meetings that you had with the New York Boyz where violence, the use of violence and retaliation was discussed, what would happen if one of the New York Boyz said he would not engage in violence?

A    They would stop messing with him, leave him alone, because he was a traitor.

Q    Why is that?

A    Because he wasn't down with the program, wasn't with the program of hurting anybody or taking over a property.

Q    Would he any longer then be a member of the New York Boyz?

A    No, he would just be like anybody who lived in Trenton.

MR. VICK:  Could we state for the purposes of the record, as a matter of judicial notice, the amount of weight of a kilogram of cocaine?  2.2 pounds?

THE COURT:  All right.  Are you finished, Mr. Vick?

MR. VICK:  Just a couple other questions.

BY MR. VICK:

Q    Do you know whether Mr. Richard Tipton or "Whitey" ever had possession of razor blades?

A    Several times.

Q    And did you actually see him with them?

**JA397**

A    Yes.
Q    Where would he carry them?
A    In his mouth.
Q    Do you know if Mr. Cory Johnson ever had possession of razor blades?
A    Yes.
Q    Where did you see them?
A    In his mouth.
Q    Did you see that yourself?
A    Yes, several occasions.
Q    Have you ever seen the clothes Mr. Tipton is wearing before?
A    Yes.
Q    Where have you seen those clothes?
A    They happen to be mine.
Q    How did he get those?
A    The day I got locked up at 491 Martin Luther King Boulevard, I just think they stole all my clothes.
          MR. BAUGH:  Objection.
          THE COURT:  Sustained.  I direct the jury to ignore that.
          MR. VICK:  I have no further questions.
               CROSS-EXAMINATION
          MR. GEARY:  May I have Mr. Tipton stand up?
          THE COURT:  Sure.
     (Defendant Tipton stood.)
BY MR. GEARY:
Q    Tell the jury which of the clothing this man is wearing is your clothing.
A    The pants.
Q    Just the pants?
A    Yes.
Q    Not the coat?
A    No.
Q    Not the shirt?
A    No.
Q    Not the shoes?
A    No.
          MR. VICK:  I assume the objection is withdrawn.
          THE COURT:  You bring up some ridiculous stuff and then he cross-examines on it.  We don't care whose clothes they are.
BY MR. GEARY:
Q    When you came in here, the first question he asked you was "Tell the ladies and gentlemen of the jury your name."
A    Yes.
Q    Tell the ladies and gentlemen of the jury your name again.

A    Greg Taylor Scott.
Q    On your birth certificate in New York, what does it show?
A    Greg Taylor Scott.
Q    Have you ever been called Gregory Scott?
A    Sometimes.
Q    You also indicated you had a nickname, didn't you?
A    Yes.

0930
Q    Tell the jury what your nickname is?
A    "Sweets."
Q    Do you have any other names besides "Sweets," Greg Scott, or Gregory Scott?
A    None that I can recall.
Q    Why wouldn't you be able to recall?
A    Sometimes Trenton police officers named you as anything.
Q    What did Trenton police officers name you?
A    Couldn't tell you that.
Q    You are the "Sweets" of the New York Boyz in Trenton, New Jersey; is that correct?
A    Yes, I am.
Q    You know the Trenton police officers, don't you?
A    Yes.
Q    Do you know Officer Thomas?
A    No, I do not.
Q    Do you know Officer Robinson, the undercover officer, Thomas?
A    Can you repeat that?
Q    Do you know Officer Thomas from Trenton?
A    No.
Q    Armistead Robinson from Trenton?
A    Yes.

0931
Q    Is he here today?  Have you seen him today?
A    No.
Q    Have you seen Officer McMillian today?  Do you know him?
A    No, I do not.
Q    You didn't see him at 491 Martin Luther King Boulevard in June of 1991 when the search warrant took place?
A    No.
Q    You are "Sweets"?
A    Yes, I am.
Q    You said in response to Mr. Vick's questions that the New York Boyz were a group that grew up together in the upper part of Manhattan, a specific address; is that correct?
A    Yes.
Q    Tell the jury again what that address is.
A    155th and Amsterdam.

**JA399**

Q    When you say 155th and Amsterdam, I assume you are not talking about one little square block; you are talking about two or three blocks or more?
A    Talking about one block.
Q    Tell the jury the names of the people you were engaged with in Trenton who lived on that block. Tell them their real names and tell them their

0932

nicknames.
A    "V," also known as Vernon Lance Thomas, "Double O," also known as Marcus Brown.  "Beef," also known as Darryl Brown.
Q    Darryl Brown?
A    Yes.  Gary Williams, also known as "Pop." "Light," also known as John Matthews.  "L.A.," also known as Lamont Saab.
Q    Is that about eight or ten people?
A    Yes.
Q    Those eight or ten people, and Greg "Sweets" Scott, ran the New York Boyz, correct?
A    Yes.
Q    Darryl Matthews is whom?
A    "Heavy D."
Q    You didn't mention "Heavy D" to these people. Who is "Heavy D"?
A    "Heavy D" is one that lived in the building.
Q    Excuse me?
A    One that lived in the building.
Q    Which building?
A    1909 Amsterdam Avenue.
Q    He is a New York Boy from the block?
A    Yes.
Q    You and he ran the New York Boyz in Trenton,

0933

true?
A    Not true.
Q    You know that Mr. Robinson gave a search warrant affidavit to a judge in Trenton to come to 491 Amsterdam --
        MR. VICK:  This is improper cross-examination.  He has never seen the search warrant.
        MR. GEARY:  I'm not asking him what's in the search warrant, Judge.
        MR. GEARY:  There is a witness they have not brought, the officer that recorded everything against the New York Boyz.  His name is Armistead Robinson.  His testimony would be, based on what they have shown us, that this fellow is the New York Boy.
        THE COURT:  How are you going to cross-examine him?
        MR. GEARY:  To see if he will admit it.
        MR. VICK:  He already denied it.
        MR. GEARY:  I'll wait.  We will subpoena.

**JA400**

Gregory Taylor Scott (Cross)

THE COURT:  You can try to get the witness.

MR. GEARY:  My I speak to Mr. White?

THE COURT:  Sure.

(Counsel conferring.)

0934

BY MR. GEARY:

Q    You left New York City in November of 1990?

A    1989.

Q    I'm sorry.  You left Manhattan and went to Trenton; is that correct?

A    Yes.

Q    Which of the New York Boyz that you have just named for the jury were already in Trenton when you got there?

A    "Heavy D," "V," "C.O.," "Whitey," "Light," "LA."

Q    Excuse me, you didn't name "C.O." and "Whitey" before as people who lived on the block.

MR. VICK:  Objection.  He is misstating his testimony.

MR. GEARY:  No, I'm not.

THE COURT:  Mr. Geary, you asked him the question which of the New York Boyz were there.

MR. GEARY:  That lived on the block.

THE COURT:  That lived on the block.

MR. GEARY:  That's what he said the New York Boyz was first.

THE COURT:  Mr. Scott, you indicated when you gave your previous testimony neither Mr. Tipton nor Mr. Johnson lived on the block.  Answer the question as it relates to people who lived on the

0935

block.

THE WITNESS:  Can I say a question first?

THE COURT:  Answer the question.

BY MR. GEARY:

Q    Tell the jury, when you got down to Trenton in November of 1989, which of the New York Boyz from the block, 155th and Amsterdam were already in Trenton?

A    From the block?

Q    Yes, sir.

A    Okay.  "Light," "L.A.," "Heavy D," "Beef," "Double O," and "V."

Q    And then after you got there, some other people came down from the block to Trenton; is that correct?

A    No.

Q    In addition to the people on the block from New York that were in Trenton, there were other people who you have testified to, including these two gentlemen here, who are not from the block but who were in Trenton; is that correct?

A    Correct.

Q    You have testified that Richard Tipton, a/k/a

**JA401**

"Whitey," used to smoke four or five blunts a day; is that correct?

A    Yes.

0936

Q    I'm going to ask you to listen to me give you some names.  Hopefully they won't be names you have already told the jury.  I'm going to ask you first what the real names of some of these people are.  Can you do that?

A    Yes.

Q    "Hess" is who?

A    George Delaio.

Q    Tell the jury what other alias he has?

A    James Wilkerson.

Q    Anybody who is named James Wilkerson in this case from New Jersey is Delaio; is that correct?

        MR. VICK:  Objection.

        THE COURT:  All right, Mr. Geary, you have made your point.  Don't summarize.

BY MR. GEARY:

Q    Do you have someone named "Peanut"; who is that?

A    I don't know his real name.

Q    I assume he is not from the block?

A    No.

Q    The Amsterdam block in New York?

A    No.

Q    Is he from New York at all?

A    Yes.

0937

Q    You have someone you named as "Black"; is that correct?

A    Yes.

Q    Who is that?

A    Robert Silla.  S-I-L-L-A.

Q    Is he from the block in New York?

A    No.

Q    Is he from New York?

A    Yes.

Q    You have already named, I believe, Gary Matthews; is that correct?

A    Gary Williams.

Q    Was there a Gary Matthews, also?

A    Darryl Matthews.

Q    I'm sorry.  Is Gary Williams Gary Dean Williams?

A    Yes.

Q    Was he from the block in New York?

A    Yes.

Q    Kimberly Whittaker; who is she?

A    She was Gary Williams' girlfriend.

Q    Is she from Trenton or New York?

A    Trenton.

Q    She was one of the persons who was arrested in

**JA402**

## Gregory Taylor Scott (Cross)

June of 1991 on the house in Martin Luther King Boulevard; is that correct?

A    Yes.

Q    There is also Alecia, or Aieesha DeShawn Harris; who is she?

A    "C.O.'s" girlfriend.

Q    From Trenton, New York, or where?

A    Trenton.

Q    Someone named Karen Murchison.  Who is she?

A    I don't have any idea.

Q    Gail Hess?

A    I think she was one of the owners of the house.

Q    The house on Martin Luther King Boulevard in Trenton?

A    Yes.

Q    Richard Cooper.

A    I cannot answer that one.

Q    "A.D."

A    Aljon Mitchell.

Q    Aljon Mitchell?

A    Yes.

Q    Where is he from?

A    New York.

Q    From the block?

A    No.

Q    From Manhattan?

A    Yes.

Q    Paulette Brown.

A    Do not know.

Q    Tireek Miller?

A    From Trenton.

MR. BAUGH:  Is the spelling on that T-I-R-E-E-K, Mr. Scott?

THE WITNESS:  I don't know.

BY MR. GEARY:

Q    Clifton Jones?

A    I don't know.

Q    Bonita?

A    No.

Q    Someone named Shawn?

A    No.

Q    "Lord," L-O-R-D?

A    Yes.

Q    Who is that?

A    Larry Williams.

Q    Larry what?

A    Williams.

Q    Was he from the block in New York?

A    Yes.

Q    Nickname "Law," L-A-W?

A    What I just said.  Larry Williams.

**JA403**

Gregory Taylor Scott (Cross)

Q    That's Larry Williams?
A    Yes.
Q    Someone named "Knowledge" from Trenton?
A    No.
Q    Someone named "Kay"?
A    No.
Q    Someone named "Shaw"?
A    No.
Q    "Trigger"?
A    No.
Q    Were all the people that I have just named and that you have just named before for the jury who were from the block, were all those people people that you considered to be in the New York Boyz?
A    Some.
Q    Okay.  Are you able to tell the jury which of the people I named are not in the New York Boyz or were not in the New York Boyz in Trenton in November of 1989 to June of 1991?
A    Tireek Miller.
Q    What was his association with the New York Boyz, if any?
A    Friend.
Q    He was a friend?
A    Yes.

0941
Q    He didn't sell drugs?
A    He sold drugs.
Q    He sold drugs.  Who gave him the drugs?
A    He bought his own drugs.
Q    Who did he buy them from?
A    He would go Uptown or buy from one of us.
Q    "Uptown" means?
A    New York.
Q    New York is where the big dealers lived; Trenton is where the small dealers lived?
A    Yes.
Q    How often between November of 1989 and June of 1991 did you stay in New York?
A    Repeat the question.
Q    Between November of 1989 when you left New York to go to Trenton and June of 1991 when you were arrested on Martin Luther King Boulevard, how often were you in New York?
A    Not very often.
Q    You and Darryl Matthews were the ones that would go to New York to buy the crack to bring back to Trenton?
A    No.
Q    Who went to New York to make the purchases?
A    "V" and "C.O."

0942
Q    Where was Darryl Matthews?
A    Mostly hanging out.

**JA404**

Q    What does that mean, "hanging out"?
A    Riding around.
Q    Riding around.  In answer to Mr. Vick's questions, you said that you had two misdemeanor convictions in New York City?
A    Yes, I did.
Q    I think you said one was for stealing  --
A    Gold chains.
Q    The other was for stealing, also?
A    Yes, sir.
Q    Two different offenses, two different dates?
A    Yes.
Q    Were those convictions before you left New York to go to Trenton in November of 1990?
A    Yes.
Q    What Court do you go to in New York, criminal court, is it a lower court, misdemeanor court?
A    Criminal court.
Q    Is that what they call a criminal court?
A    Yes.
Q    Did you plead guilty on those two charges?
A    Yes, I did.
Q    If you have a recollection, can you tell the jury what sentences you received in those two misdemeanor charges?
A    Probation.
Q    And can you tell the jury approximately when the convictions took place?
A    In 1984.
Q    1984?
A    Yes.
Q    Both of them?
A    One 1984, one 1985.
Q    How old were you in 1984?  How old are you now?
A    I'm 24.
Q    24 now.  What's your date of birth?
A    8-29-68.
Q    One conviction was in 1984, and one conviction was in 1985; is that correct?
A    Yes.
Q    Were you off probation by 1989 when you left New York to go to Trenton?
A    Yes.
Q    Did you have any other convictions in between 1985 and June of 1991 when you were arrested as a result of the raid on the house in Martin Luther King Boulevard?
A    Yes.
Q    Where was that?
A    Trenton, New Jersey.
Q    Did you have any other convictions in New York City or New York State during that period of time?

**JA405**

A    No.

Q    You had a third, from what you told Mr. Vick, you had a third conviction, misdemeanor conviction in Trenton; is that correct?

A    Yes.

MR. VICK:  I hesitate to rise, but we have explored this.  It is not proper impeachment.  We are wasting time.

MR. GEARY:  I think cross-examination of the government's star witness is not wasting time.

THE COURT:  Mr. Geary, please.  Let's get something straight right now.  I don't want any editorializing.  He made an objection, I was about to overrule it.  There is no reason for you to give a speech.  Go ahead.

BY MR. GEARY:

Q    Mr. Scott, you were convicted how many times in Trenton between November of 1989 and June of 1991?

A    Once.

Q    Were you arrested twice; is that correct?

A    Yes.

Q    The first time you said you did ten days in jail?

A    Yes.

Q    And that was January of 1990?

A    Yes.

Q    Then you were arrested again and did 30 days in jail; is that correct?

A    Yes.

Q    Other than those approximately 40 days, were you locked up at all between November of 1989 when you left New York and when you got arrested in June of 1991 in Trenton; were you locked up at all other than those 40 days?

A    No.

Q    Since June of 1991, have you been continuously locked up until now?

A    No.

Q    Are you incarcerated at the present time?

A    No, I'm not.

Q    From June of 1991 when you were arrested in Trenton, you were arrested originally on Trenton drug charges; is that correct?

A    Yes.

Q    Those were later changed to federal charges, correct?

A    Yes.

Q    How long were you locked up at that point?

A    Eight months.

Q    Which would have brought you to when, February of 1992?  When did you get out?

A    January 10th.

**JA406**

Q    January 10th of?
A    1992.
Q    What procedure was used to get you out of jail, prison, at that time?
A    I made a deal to get out.
Q    You made a deal?
A    With the government.
Q    The deal with the government, is it the United States Government or the State of New Jersey or State of New York?
A    United States Government.
Q    At some point after you were arrested in June of 1991 until you got out in January of 1992, at some point those federal charges were brought against you in the United States District Court in Trenton; is that correct?
A    Yes.
Q    Do you recall what month you first appeared in federal court in Trenton?

0947

A    No.
Q    Okay.  You had a lawyer?
A    Yes, I did.
Q    What's your lawyer's name?
A    Jack Furlog.
Q    Jack Furlog?
A    Furlog.
Q    Like a horse runs a furlong?
A    F-U-R-L-O-G.
Q    Who was the United States Attorney in Trenton?
A    Paul Shapiro.
Q    You tell the jury that you on your side and your lawyer made a deal with Mr. Shapiro in January of 1992 for you to be released from custody; is that correct?
A    Yes.
Q    Was that in regard to this prosecution here or was it in regard to something else?
A    Something else.
Q    The something else was your agreement to testify against other persons who were arrested with you in Trenton, New Jersey in June of 1991?
A    Yes.
Q    Have you in fact testified against any of those people?

0948

A    No.
Q    Have any of those people pled guilty since you have agreed to be a government witness?
A    Yes.
Q    As far as you know, who has pled guilty, mr. Scott?
A    Gary Williams, Darryl Matthews, and James Wilkerson.

**JA407**

Gregory Taylor Scott (Cross)

Q    When you made this deal with the prosecution, the federal prosecutors in New Jersey, did you sign something?
A    No.
Q    Did you sign an agreement?
A    Yes, I did.
Q    Do you remember approximately how long it was, an eight or ten or 12-page document, one page, two pages?
A    I can't recall.
Q    Did your lawyer, Mr. Furlog, bring it to you and you went over and discussed it?
A    Yes.
Q    Have you ever appeared in front of a federal judge in New Jersey in regard to the plea agreement you made in that case up there?
A    Yes, I did.

0949

Q    Do you recall who the judge was?
A    Judge Liflin.
Q    Judge Liflin?
A    Yes.
Q    He is in Trenton?
A    No, he is in Newark now.
Q    Newark.  The agreement that you made in Trenton or Newark or in New Jersey, does that agreement have anything to do with your coming here to testify?
A    No.
Q    Were you charged in federal court in New Jersey with a conspiracy to sell cocaine in regard to the New York Boyz in Trenton, New Jersey?
A    Repeat that again, please.
Q    Were you charged in the United States District Court in Trenton with a conspiracy with other people, these people you call the New York Boyz, to sell or distribute cocaine, crack cocaine, in the State of New Jersey?
A    Yes.
Q    How many counts were there in the indictment that was charged against you in federal court in New Jersey?
A    Three.
Q    Did the conspiracy count, Mr. Scott, say that

0950

you conspired with other people to sell crack cocaine in New Jersey from November of 1989 to June of 1991?
A    No, it did not.
Q    Do you recall what the time period in the indictment was?
A    No, I cannot.
Q    How many other people were charged in that conspiracy charge?
A    Several others.
Q    Can you tell the jury who they were?

**JA408**

A    Darryl Matthews, James Wilkerson, Kimberly Whittaker, Greg Scott, myself, and Darryl Matthews.

Q    And as far as you know, everybody has pled guilty; is that correct?

A    Yes.

Q    When is the first time since you were let out in January of 1992 that anybody on behalf of the United States Government contacted you in regard to your testifying in this case?

A    Repeat that again.

Q    When is the first time since you were bonded out or whatever happened to you up in New Jersey in January of 1992 that somebody has talked to you about your testifying in the case here in Richmond?

A    Several months ago.

0951

Q    You say several months ago.

A    About one, two months ago.

Q    Talking around Christmastime or Thanksgiving?

A    Around Christmas.

Q    How was contact made, through your lawyer or the prosecutor up in New Jersey?

A    Through my lawyer.

Q    Did your lawyer call you in and talk to you about it?

A    Yes.

Q    Did your lawyer tell you, Mr. Scott, that it was part of your agreement that you signed up in New Jersey that you would have to, quote, cooperate with the government in regard to this case; did he tell you that?

A    Yes.

Q    After he told you that, at some point did you meet with somebody from the U.S. Attorney's Office or the Richmond Bureau of Police or the Commonwealth's Attorney's Office in Richmond to discuss this case?

A    Yes.

Q    Do you recall who that person was?

A    Yes.

Q    Who was it?

A    Toby Vick.

0952

Q    Mr. Vick sitting right here?

A    Yes.

Q    Did anyone else from down here discuss this case with you besides Mr. Vick?

A    The police officers that were involved.

Q    Mr. Woody?

A    No, it was not.

Q    Mr. Jackson?

A    No.

Q    Mr. Fleming here?

A    Yes, it was.

Q    Anybody else besides Mr. Vick and Mr. Fleming?

A    His partner, Mr. Scott.

Q    Michael Scott, M.D. Scott?

A    Yes.

Q    How many times would you say that they have talked to you before you came into Court this morning about this case?

A    About three times.

Q    Is that three with Mr. Vick?  How many times with Mr. Vick?

A    Twice.

Q    How about Mr. Fleming and Mr. Scott?

A    Once.

Q    And when was the last time before you walked in here this morning that they talked to you?

A    Monday.

Q    Monday of this week?

A    Yes.

Q    You understand from either your lawyer or the prosecutor up in New Jersey or from Mr. Vick here in Richmond that your ability to get what you call the deal -- did they also call it a 5K motion up in New Jersey?

A    Yes.

Q    Your ability to do that depends on what they call your cooperation here; is that correct?

A    Yes.

Q    When you and Mr. Vick were talking before about the deal being based upon your telling the truth, that's what you said, isn't it?

A    Yes.

Q    Mr. Vick, Mr. Fleming, Mr. Scott, Richmond detectives, they were not up in Trenton or at 155th and Amsterdam Avenue in Manhattan.  They don't know what the truth is, do they?  They are relying on you to tell them what the truth is?

A    Yes.

Q    There were no police officers in New York to verify or corroborate what you are saying; is that correct?

A    Correct.

Q    What is your expectation, what is your hope in regard to going back to the federal judge in New Jersey when this is over and you finish testifying?

            MR. VICK:  His hope has nothing to do with it.

            THE COURT:  Overruled.

BY MR. GEARY:

Q    You expect to get a sweet deal, Mr. Scott?

A    Yes, I do.

Q    You expect a sweet deal?

A    Yes.

Q    Because you have cooperated.

**JA410**

A    Yes, I do.
        MR. GEARY:  Judge, if I may?
    (Counsel conferring with co-counsel.)
BY MR. GEARY:
Q    I want to ask you about some other people in addition to the ones I've already asked you about in New York.  Maybe I'll start asking you about these people in groups of three and see if you can tell me if you know any of these people.  Do you know someone named James Roane or Sandra Reavis or Jerry Gaiters or Sterling Hardy?

0955

A    No, I do not.
Q    Let me shortcut the process.  Do you know anybody in Richmond, Virginia besides Mr. Vick, Mr. Fleming, and Mr. Scott?
A    No, I do not.
Q    The New York Boyz, Mr. Scott, ended on June 4th, 1991 in Trenton?
        MR. VICK:  Asking for a legal conclusion, Your Honor.
        THE COURT:  Sustained.
        MR. GEARY:  Judge, if I might?
        THE COURT:  You can ask him if his involvement in the operation stopped.
BY MR. GEARY:
Q    You didn't have anything more to do with the New York Boyz after June of 1991?
A    No.
Q    You were talking about the New York Boyz plus your associates in Trenton.  I take it you were talking about 40 or 50 people, were you not?
A    No.
Q    You said 20 local people in Trenton.  You said the New York Boyz were how many?
A    15 to 30.
Q    15 to 30.

0956

A    Yes.
Q    Do you know where any of them went after June 4th, 1991?
A    No.
Q    Some of them were locked up with you at the time, right?
A    Yes.
Q    The ones that weren't locked up, did any of them go back to New York?
A    Some.
Q    Some came to Richmond?
A    Yes.
Q    Some went other places.
A    Yes.
Q    Went to the four corners of the globe, so to speak?

**JA411**

A    Yes.

MR. GEARY:  I have no further questions, but I would like to approach the bench.

(At Bench.)

MR. GEARY:  I'd like to reserve the right to cross-examine pending the government's getting us a copy of the indictment and the plea agreement.  I think it is very important.

THE COURT:  He is not going anywhere, is he?

MR. VICK:  He is leaving today.  If we need to get him back, we can get him back in a day.

THE COURT:  Can't you get a fax of that?

MR. VICK:  I'll get Pam to work on it during the break.  We can put him on a plane tonight.  He has to be at work tomorrow.

THE COURT:  All right.  They should be able to get it faxed down.

(In Open Court.)

MR. GEARY:  Your Honor, at this time I have no further questions.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Mr. Scott, you were arrested in June of 1991 on the federal charges, correct?

A    Yes.

Q    Federal drug charges?

A    Yes.

Q    And let's see, with respect to this search warrant that was executed at 491 Martin Luther King Boulevard, who was present in the house when they executed the search warrant?

A    Darryl Matthews, Gary Williams, James Wilkerson, Kimberly Whittaker, and Aieesha.

Q    Neither Mr. Tipton nor Mr. Johnson were present in the house at the time; is that correct?

A    Correct.

Q    And you made mention to Mr. Geary of a plea agreement, correct?

A    Yes.

Q    And within that plea agreement, as you have indicated to the ladies and gentlemen of the jury, you have indicated that you agreed to testify truthfully in return for some dispensation with respect to some very serious charges; is that correct?

A    Yes.

Q    Do you recall when you entered into that agreement?

A    When did I do it?

Q    Yes, sir.  Approximately.

A    January 10th, I think.

**JA412**

Gregory Taylor Scott (Cross)

Q    January 10th?
A    Yes.
Q    Of 1992?
A    Yes.
Q    All right.  And had you had discussions with either DEA, Trenton Police, anybody else prior to that; had you been debriefed prior to actually

entering into an agreement?
A    No.
Q    You hadn't told the police about the people in the house in this conspiracy, this New York Boyz thing, before you entered into the agreement?
A    No.
Q    You were charged in state court, correct?
A    Yes.
Q    How many charges were you charged with in state court?
A    Ten.
Q    And what were they, near as you can recall?
A    I can't recall any.
Q    Were you charged with weapons in the house, sir?
A    Yes.
Q    And when you were charged in state court, had you cooperated with the police at all?
A    No.
Q    You had not given them any statement up until that point?
A    No.
Q    You indicated that you were indicted along with, I believe it was, five other individuals?
A    Yes.

Q    Neither Mr. Tipton nor Mr. Johnson were indicted; is that correct?
A    Correct.
Q    And subsequent to your cooperating with the police and you had told them all this information about the New York Boyz, to your knowledge were Mr. Tipton or Mr. Johnson indicted at that point?
A    No.
Q    Had you given them the information about Mr. Tipton and Mr. Johnson at that point?
A    Yes.
Q    When you agreed to cooperate, had you given them that information?
A    I have given some information.
Q    Did you give them the same information that you are giving the jury today?
A    No.
Q    When did you decide to give this information about Mr. Tipton and Mr. Johnson?
A    When I was called to and asked to give my

**JA413**

testimony today.

Q    You have indicated today that they were part of this conspiracy, correct, this conspiracy in Trenton, New Jersey?

A    Yes.

0961

Q    Yet you had not given them this information when you were cooperating on the New Jersey charges, correct?

A    Yes.

Q    You decided to give this information when Mr. Vick or one of the individuals that you have indicated that you have talked to, that's when you decided to give this information; is that correct?

A    Yes.

Q    Now, you further indicated that Mr. Johnson, and I believe you said Mr. Tipton, were in Trenton prior to your arriving in Trenton; is that correct?

A    Yes.

Q    And I believe you further said that they were dealing drugs?

A    Yes.

Q    When you got there.

A    Yes.

Q    Street dealing?

A    Yes.

Q    Nonetheless, somehow when you got there you took over the operation; you were the head man?

A    No.

        MR. VICK:  Mischaracterization of his testimony.

0962

        THE COURT:  He asked a question and he responded no.

BY MR. McGARVEY:

Q    You were not?

A    No.

Q    You indicated that they bought drugs from you, correct?

A    Yes.

Q    I take it you were their supplier?

A    Yes.

Q    You were buying drugs in bulk?

A    No, I was working for someone else.

Q    Higher than you?

A    Yes.

Q    In New York?

A    In Trenton.

Q    But they secured drugs from you?

A    Yes.

Q    So in this conspiracy that you are talking about in Trenton, you were up the ladder.

A    Yes.

Q    Yet you came to Trenton sometime afterwards.

**JA414**

A    Yes.
Q    After they had been there.  When Mr. Johnson, according to your testimony, secured drugs from you

0963

he paid you for those drugs; is that correct?
A    Yes.
Q    And when he secured those drugs from you and you assumed, as you said, that he went out and dealt them, did you tell him  --
          MR. VICK:  Again a mischaracterization of the testimony.
          THE COURT:  You can stifle that objection.  If he asks a question, the witness can tell him whether it is wrong or not.
          MR. VICK:  Thank you.
BY MR. McGARVEY:
Q    Assume that was the case.  Did you tell him where to go deal these drugs?
A    No, I did not.
Q    Did you have anything to do with how Mr. Johnson might have set the price?
A    No, I did not.
Q    Did you receive any of the profits, since he had already paid you for the drugs he got from you?
A    No, I did not.
Q    So you had nothing to do with whatever street dealing Mr. Johnson might have been doing; is that correct?
A    Correct.

0964

Q    Now, you further indicated that when the police entered the apartment --  is it a house or an apartment, by the way?
A    A house.
Q    Neither Mr. Tipton nor Mr. Johnson were in there, correct?
A    Correct.
Q    There were four guns in the house.
A    Yes.
Q    You indicated on direct examination that they were your guns but you had given them to Mr. Johnson?
A    Yes.
Q    Did you decide to give them to Mr. Johnson before or after the police came in?
A    Before.
Q    Before.  You made up your mind as the police were entering that they were their guns, you had given them to them?
A    No.
Q    Who secured the guns?  Who got the guns?  Who bought the guns, purchased the guns?  Who got the guns inside the house?  You did, isn't that a fact?
A    Yes.

**JA415**

Gregory Taylor Scott (Cross)

Q     And when you were to be charged on these items with respect to the guns, is that when you decided that they were no longer your guns?

A     No.

Q     Where did you get the guns?

A     Rufus Alvarez.

Q     Was he your supplier?

A     No.  He was my  --  I worked for him.

Q     Sir, you talked about getting together with the New York Boyz and discussing whether or not you were going to retaliate, correct?

A     Yes.

Q     When you testified on direct examination, you were speaking in very, very general terms.  Can you be a little more specific about each and every incident when you got together with who -- who was there every time on every incident?  Do you recall?

          MR. VICK:  That's improper.

          THE COURT:  Ask one question.

BY MR. McGARVEY:

Q     Do you recall who was there on every incident in which you said that you got together with the New York Boyz to discuss whether or not to retaliate?

A     Yes.

Q     All right.  Tell us about the first time you got together.

A     The first time we got together to retaliate was on South Trenton when we beat a guy down with bats.

Q     Who is we?

A     The New York Boyz.

Q     Who is "we," specific individuals?  Who is "we?"

A     "Light," "L.A.," myself, "Black."

Q     Were you present when this individual was beaten?

A     Yes.

Q     Did you do the beating?

A     No.

Q     Who did the beating?

A     "V" and "C.O." and other members.

Q     "V" and "C.O."?

A     Yes.

Q     I thought you said that "C.O." wasn't present at the meeting.

A     I said he was present.  You didn't let me finish.

Q     When was this?

A     South Trenton.

Q     When?

A     In the summertime.  I cannot give you the correct date.

**JA416**

Q    The summer of 1991?
A    1990.
Q    Where did you meet?
A    Out South Trenton, Ferry Street.
Q    Where did you meet to discuss this?
A    We met on Ferry Street.
Q    Just outside on the street, you were having a discussion on the street; is that what you are saying?
A    Yes.
Q    Who was the individual?
A    Nickname was Alajawan.
     MR. McGARVEY:  If I might have one second, Your Honor.
     THE COURT:  All right.
     (Counsel perusing notes.)
BY MR. McGARVEY:
Q    Let's talk about that.  Alajawan, he was about what, six-foot-three, 200 some pounds?
A    Yes.
Q    He had beaten up a friend of yours by the name of "Black"; is that correct?
A    Yes.
Q    This wasn't over any kind of a drug debt or anything like that, was it?

0968

A    No.
Q    It was a personal thing, correct?
A    Yes.
Q    All right.  And when you are talking about somebody that got beat up, the odds were pretty even because this guy was a big guy.  He was a bad dude, was he not?
A    Yes.
Q    So it had nothing to do with drugs, right?  It was a personal beef, correct?
A    Yes.
Q    Now, when was the next incident that you have personal knowledge of?
A    A time when "Smooth" had got cut in a fight.
Q    "Smooth?"
A    "Smooth."
Q    Where did you have this discussion?
A    27 Clinton Avenue.
Q    Who was present at that discussion?
A    "Smooth," myself, Law" "L.A.," "Light," "C.O.," "V," "Heavy D," Gary Williams.
Q    What happened?
A    We discussed about retaliation and we did it.
Q    Who did it?
A    All of us.

0969

Q    What did you do?
A    Everyone I just named.

**JA417**

Q    Who did you do?
A    We beat up some guys out in West Trenton.
Q    What had precipitated that; was that the one over "E.B."?
A    No.
Q    What was that over?
A    That was over a fight with "Smooth."
Q    Somebody had a fight with "Smooth?"
A    Yes.  They stabbed him.
Q    So once again, it was a personal beef, right?
A    I don't know what his fight was over.
Q    As far as you were concerned, they beat up a friend of yours, so you were going to help your friend, correct?
A    Yes.
Q    You don't know whether or not "Smooth's" fight was over drugs or whatever; all you knew is that one of your buddies got beat up and you all were going to help him out, right?
A    Exactly.
Q    Is that the same thing you did up in New York on Amsterdam Avenue?  If one of your friends got beat up you came to his aid?
A    Yes.
Q    That's the same thing you would do at any time, correct?
A    Yes.
Q    Drugs, no drugs, didn't make any difference, correct?
A    Yes.
Q    If your buddy gets beat up, you will come to his aid, correct?
A    Correct.
Q    With respect to all of these incidents that you are talking about, that's what they were about.  One of your friends got beat up and you went to his aid, correct?
A    Correct.
        MR. McGARVEY:  If I might have one second?
        THE COURT:  Sure.
BY MR. McGARVEY:
Q    Mr. Scott, other than being prepared as a witness in this case today, you have never been in Richmond, Virginia before, have you?
A    Never.
        MR. McGARVEY:  Thank you.
        THE COURT:  Any questions for the witness?
        MR. BAUGH:  Yes, Your Honor.

                    CROSS-EXAMINATION
BY MR. BAUGH:
Q    Good morning, Mr. Scott.  Have you already pled guilty up in New Jersey?

**JA418**

Gregory Taylor Scott (Redirect)

A    Yes.
Q    So you are awaiting sentencing?
A    Yes.
Q    And did your lawyer, Mr. Furlog, tell you that if you plead guilty and you are awaiting sentencing on a drug offense, you can't get out on bond unless your charges are going to be dismissed or unless the government says  --
          MR. VICK:  Misrepresentation.
          THE COURT:  Let him ask the question.
BY MR. BAUGH:
Q    You are awaiting sentencing on a drug offense with a minimum of 20 years, right?
A    Yes.
Q    Did your lawyer tell you you can't get out on bond in the United States while awaiting sentencing in a drug case like that unless you are going to be found not guilty or unless the United States is going to recommend you not go to prison; did your lawyer tell you that?
A    No.

0972

Q    Has anyone ever told you the fact that you are out on bond means the government is probably  --
          MR. VICK:  Objection.  It does not mean that.
          THE COURT:  Sustained.
          MR. VICK:  I would ask the jury be instructed.
          THE COURT:  All right.  As I told you all over and over again, when it comes to the law, I'll be the one explaining it to you.  Go ahead and ask questions.
BY MR. BAUGH:
Q    Has anyone told you there is a possibility you won't get any sentence?
A    No.
Q    All right.  Now, a couple other questions on how this thing works.  You said you were selling 200 to 300 grams a day in New Jersey?
A    Yes.
Q    That's ten ounces a day, isn't it?  28 grams to the ounce.  That's about ten ounces a day that you were selling yourself.
A    Yes.
Q    And that works out to about 70 ounces a week that you were selling yourself.

0973

A    Correct.
Q    That's almost four pounds you were selling yourself.
A    Correct.
Q    But didn't you just tell this jury the whole group was only selling 1.5 kilos, which is less than

**JA419**

three pounds?

A    I was selling weight.  They weren't.

Q    Oh.  So you were just  --  you were like a wholesaler.

A    Yes.

Q    Did these people you sold to, did you tell them what hours they had to work?

A    No.

Q    Did you tell them what price they had to charge?

A    No.

Q    Did you tell them where they could work and couldn't work?

A    No.

Q    Did you tell them what to do at all?

A    No.

Q    Could they buy from other people if they wanted to?

A    If they wanted to.

Q    And by the way, you have friends who aren't involved in the drug business, don't you?

A    Yes, I do.

Q    If one of them came to you and said, "I've been beaten up and I need some help," you would help them, wouldn't you?

A    Correct.

Q    The fact you helped these people had nothing to do with drugs.

A    No.

          MR. BAUGH:  Thank you.
          MR. WAGNER:  No questions.
               REDIRECT EXAMINATION
BY MR. VICK:

Q    Mr. Scott, these fights that you had in addition to helping a friend, did they further the goals of the New York gang?

          MR. GEARY:  Objection.
          MR. McGARVEY:  Objection.
          MR. BAUGH:  Objection.
          THE COURT:  Let me listen one at a time. The appropriate objection is he is leading the witness, and that will be sustained if anybody wants to make that one.
          MR. BAUGH:  I will.

          MR. GEARY:  Thank you.
BY MR. VICK:

Q    In addition to helping friends, was there another reason that the New York Boyz would retaliate in fistfights?

          MR. McGARVEY:  I have the same objection. This question was asked by myself and Mr. Baugh.
          THE COURT:  He can answer the question.

**JA420**

Gregory Taylor Scott (Redirect)

MR. BAUGH:  I have an objection.  It is conclusory, unless there is a basis of knowledge.

THE COURT:  He can answer the question.

THE WITNESS:  To take over the territory and letting people know we was in town.

BY MR. VICK:

Q    How would that help the drug distribution activities?

A    We could take over more blocks.

Q    How would that work?

A    If we took over a block, people would watch out for us and wouldn't try to sell on that block.

Q    What did the fistfights, what did they have to do with that?

A    Let people know we could use our hands, bats, knives, whatever.

Q    Did it have anything to do with letting these people in Trenton know who the group was?

A    Yes.

Q    How did that help you?

A    Gave us fame.  We thought we were on top of the world.

Q    What did fame have to do with things?

A    Made ourselves big.

Q    How so?

A    More people knew we were in town.  They would buy from us.

Q    How would that help the drug business?

A    Make more money.

Q    Now, in response to Mr. McGarvey's question about the size of Mr. Alajawan, you have never spoken to Mr. McGarvey prior to today?

A    No.

Q    You didn't tell him about the size of Alajawan, did you?

A    No, I did not.

MR. GEARY:  Objection.

THE COURT:  Overruled.  Anything else?

BY MR. VICK:

Q    Has anyone in their conversations with you, either Mr. Fleming, myself, the New Jersey prosecutor, told you what the answers you should give should be?

MR. GEARY:  Nobody suggested that with this witness.

THE COURT:  He can answer the question.

BY MR. VICK:

Q    Anybody provided you answers?

A    No.

Q    Has anybody told you what the truth is?

A    No.

Q    Has anybody told you what you should say in your

**JA421**

testimony?

A    No.

Q    Now, in response to your questions about telling the New Jersey authorities about Mr. Tipton and Mr. Cory Johnson's activities, did they specifically ask you in detail about their activities?

A    No, they did not.

Q    Did you respond to the questions that they asked you?

A    Yes.

Q    Now, Mr. Geary asked you about  --

MR. GEARY:  I object to him proffering and telling the witness what I asked.

MR. VICK:  I'm trying to direct him to the subject.

0978

THE COURT:  Ask the question.

BY MR. VICK:

Q    In reference to the New York Boyz from 155th and Amsterdam Avenue, are they the only New York Boyz?

A    No.

Q    Mr. Richard Tipton, "Whitey," is not from 155th and Amsterdam Avenue, is he?

A    No.

MR. GEARY:  He did that on direct examination.

THE COURT:  Overruled.

BY MR. VICK:

Q    Is he part of the New York Boyz?

A    Yes.

Q    Mr. Cory Johnson, is he from 155th and Amsterdam Avenue?

A    No.

Q    Is he part of the New York Boyz?

A    Yes, he is.

Q    Have I told you, Mr. Scott, that you will receive a sweet deal from the government?

A    No.

Q    Has the prosecutor in New Jersey told you that you will receive a sweet deal?

MR. BAUGH:  He wasn't asked what he was

0979

told.  He was asked what does he expect.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. VICK:

Q    You have said that you went to New York to get drugs.

MR. GEARY:  I object to him telling him what the testimony was.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did you go to New York to get drugs on some occasions?

**JA422**

Gregory Taylor Scott (Recross)

A    Sometimes.

Q    Would those be distributed to the New York Boyz?

A    Yes.

Q    To your knowledge, did "C.O." ever go to New York to get drugs for the New York Boyz?

A    Sometimes.

MR. GEARY:  Objection.  Outside the scope of the cross-examination.

MR. VICK:  It is not.

THE COURT:  Mr. Vick, we are not going to rehash everything we have gone through.  Please wrap it up.

0980

MR. VICK:  That wraps it up, Your Honor.

THE COURT:  All right.

MR. GEARY:  If I might, on the part about what the government was telling him?

THE COURT:  The part about what the government was telling him?

MR. GEARY:  In regard to the conspiracy here.  I'd like to ask him some questions about his involvement with anybody here in this conspiracy case.

THE COURT:  All right.

MR. McGARVEY:  May I approach counsel so we don't have to belabor this?

THE COURT:  All right.  Let me say, so that counsel don't expect a pattern to come out of this, I'm doing this because Mr. Vick raised a new matter.

RECROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Scott, I understand from what you said that from January of 1989 up until November of 1989 when you left for Trenton, you were in New York City during those 11 months or so; is that correct?

A    Yes.

Q    Were you, during those 11 months, part of any drug conspiracy in Richmond, Virginia?

0981

A    None.

Q    From November of 1989 --

MR VICK:  That would lead to the conclusion, Your Honor.

THE COURT:  He can answer that.

BY MR. GEARY:

Q    From November of 1989 when you left New York to come to Trenton, until June 4th, 1991 when you were arrested in Trenton, were you a member of any drug conspiracy in Richmond, Virginia?

A    No.

MR. VICK:  He is asking for a legal conclusion again.

THE COURT:  This witness can answer that

**JA423**

question.  I will explain to them the theory surrounding conspiracy, but his understanding of whether he was in one is relevant.

BY MR. GEARY:

Q    From June 4th, 1991 when you were arrested in Trenton until today, have you been in any drug conspiracy in Richmond, Virginia?

A    No, I have not.

MR. GEARY:  Thank you.  No further questions.

THE COURT:  All right.  You may stand down, sir.  All right, I think I'm going to give the jury a ten-minute break while you get the next witness together.  Everyone remain seated while the jury leaves the courtroom.  Ten minutes.

(The jury left the courtroom.)

MR. GEARY:  The plea agreement from New Jersey is being faxed down, Your Honor.

THE COURT:  All right.

(The defendants were removed from the courtroom.)

(Recess taken from 11:30 a.m. to 11:40 p.m.)

MR. GEARY:  Judge, on behalf of Mr. Tipton, my motion is to renew the previously-made motion based on Mr. Scott's testimony that in fact anything that the government seeks to offer in regard to Trenton from January of 1989 up until and including February of 1992 is outside the scope of this conspiracy.  I think we have proved it conclusively.

THE COURT:  Everybody joins?

MR. BAUGH:  Yes.

MR. McGARVEY:  Yes.

MR. BAUGH:  We have a different perspective, of course, the two defendants on this side.

THE COURT:  I understand it.  Those motions as renewed will be denied.  Bring in the jury, please.

(The jury entered the courtroom.)

THE COURT:  All right, Mr. Vick, call your next witness.

MR. VICK:  The government would call Officer Dennis Malone.

DENNIS PATRICK MALONE, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Sir, I'll ask you to speak up and into the microphone.  Could you state your name for the Court, record, and jury, please?

**JA424**

Dennis Patrick Malone (Direct)

A    Dennis Patrick Malone.
Q    How are you employed?
A    The City of Trenton, New Jersey as a plainclothes officer.
Q    How long have you been so employed?
A    19 years.
Q    In what capacity are you employed?
A    Right now as a plainclothes officer.
Q    On June 4th, 1991, did you have occasion to be on duty for the Trenton Police Force?
A    Yes.
Q    Did you have occasion to conduct a search of a residence located at 491 Martin Luther King Boulevard?
A    Yes, sir.
Q    What was the basis of that search; why was that search conducted?
A    It was a narcotics investigation that lasted approximately three months.
Q    And the culmination was the search?
A    Yes.
Q    What was your role in that search?
A    I was the assigned evidence officer.
Q    And what does that mean, if you could explain that to the ladies and gentlemen of the jury.
A    As evidence officer, I was the one who handled and collected all of the evidence.
Q    You weren't the only officer in the house, were you?
A    No, sir.
Q    How many officers went into the house?
A    I would say approximately 16.
Q    If evidence was found, you as the evidence officer would do what?
A    I would be called to where the items were located.  They would then be photographed and I would seize them.
Q    You actually retrieved any items of evidence or value that were received from that house?
A    Yes.
Q    Did you receive items of evidentiary value at that house?
A    Yes, we did.
Q    What items of evidentiary value were seized in that search on June 4th, 1991?
A    There was a large amount of crack cocaine seized, along with weapons and other paraphernalia.
Q    And when you say a large amount of crack cocaine, could you tell the ladies and gentlemen of the jury exactly or approximately how much crack cocaine was seized from that residence?
A    I believe it was well over 200 grams.

**JA425**

Dennis Patrick Malone (Direct)

Q    Could you describe the house?
A    It is a three-story single home.  The first floor when we entered was vacant, no furniture.  The refrigerator was not working and the stove was not working.  The front door was barricaded with a two-by-four and latches and the first-floor front windows were secured on the inside with three-quarter plywood hinges.
Q    And how did you gain access to that house?
A    With a ram.
Q    Indeed, were any individuals found in the house?
A    Yes, there were.
Q    Do you know an individual by the name of Greg Scott?
A    Yes, I do.
Q    Was Greg Scott found in that house on June 4th, 1991?
A    Yes, he was.
Q    Was Mr. Greg Scott arrested in that house?
A    Yes.
Q    That case has resulted in a federal prosecution; is that correct?
A    Yes, sir.
Q    Now where, if you could you describe for the jury, did you seize crack cocaine in that house?
A    The second floor had four bedrooms.  The crack cocaine seizure was made in the front bedroom and also in the front middle bedroom.
Q    And could you describe the items that were seized in the front middle bedroom?
A    There was, in a closet in a black Nike bag, we obtained 99 vials containing crack cocaine, 101 vials suspected crack cocaine, 100 vials suspected crack cocaine, and 50 vials.
Q    Those were four separate findings in that same room?
A    All in the same bag, different bags.  Same room, different bags.
Q    What do you mean by a vial?
A    It is a small plastic vial with a plastic cap, and inside that there is crack cocaine, either $10 or $20 worth.
Q    What do you base that statement upon?
A    My experience and knowledge.
Q    All right.  Could you describe for the ladies and gentlemen of the jury what a $10 or $20 piece of crack cocaine looks like?
A    $10 would be a smaller vial and a larger vial, double that size, would be a $20 vial.
Q    What exactly is crack cocaine, based upon your knowledge and experience as a police officer?

**JA426**

A    It is cooked cocaine.

Q    How are you able to ingest that cocaine as the user?

A    You smoke it.

Q    All right.  And all of those vials were found in

0988

the single room?

A    Yes.

Q    There was other cocaine, crack cocaine, found in the house; is that correct?

A    Yes, there was.

Q    Where was that found?

A    That was found in the front second floor bedroom.

Q    What did you do with the cocaine that you seized from that house?

A    I seized the cocaine after it was photographed, and then I took it to the Vice Enforcement Unit office, where it was placed in the property room and submitted to the New Jersey State Police for analysis.

Q    I show you what has been previously marked as Government Exhibit 131 and ask you if you would look at that, please.  That is the Darrell Matthews lab report.  Have you seen that before?

A    Yes, I have.

Q    Is that the lab report that was prepared pursuant to your forwarding to the laboratory of the items seized from that residence?

A    Yes, sir.

Q    Did that lab report indicate that the items

0989

seized from that residence were indeed crack cocaine?

A    Yes, sir.

Q    All right.  In what quantities?

A    Specimen Number 4 was 51.7 grams and the other ones I can't read.  They are unreadable on here.

Q    Do you remember approximately how much they were?

A    Yes, sir.  They were all above 50 grams.

Q    All right.  So the total crack cocaine seized in those vials, do you remember how much total crack cocaine was seized?

A    It was over 200 grams.

        MR. VICK:  I would move Government Exhibit 131 into evidence, Your Honor.

        THE COURT:  It will be admitted.

BY MR. VICK:

Q    Did you also seize from that residence certain firearms?

A    Yes, sir.

Q    I would ask you to look at Government Exhibit 135-6 and ask you if you can identify that.

**JA427**

A   Yes.  This is the photograph which was taken out of the house.

Q   And what is that photograph of?

0990

A   This is of the third floor attic area.  The weapons were located underneath the floorboards.  It was two .12 gauge pump shotguns, one of which was sawed-off, and the other one is a .45 caliber semi-automatic assault pistol.

MR. VICK:  I would move Government Exhibit 135-6 into evidence.

MR. BAUGH:  Before that exhibit is admitted, we would ask for a cautionary instruction.  The jury is not to consider these items against the defendant Roane or against defendant Reavis until such time as this is connected up later.  This is highly inflammatory.

THE COURT:  We don't have to constantly make cautionary instructions to the jury.  I've already told them that the defendants are to be considered individually.  The evidence that comes in, you consider who if anybody it might apply to.

MR. VICK:  I have no further questions of this witness, Your Honor.

THE COURT:  Any questions?

CROSS-EXAMINATION

BY MR. GEARY:

Q   Mr. Malone, there were a number of other people arrested at that time in addition to Greg Scott; is

0991

that correct?

A   Yes, sir.

Q   As the recorder for the search, you prepared some documents that went to your Trenton Police Department; is that correct?

A   Yes, sir.

Q   I think in answer to Mr. Vick's question, you said that the search warrant for 491 Martin Luther King Boulevard on June 4th, 1991, was the result of approximately a three-month investigation by the Trenton Police; is that correct?

A   Yes, sir.

Q   The officer in charge of that investigation was Officer Armistead Robinson; is that correct?

A   Yes, he was.

Q   He prepared an affidavit to show probable cause to bring to a Judge of the Superior Court of Mercer County, where Trenton is, to get the search warrant; is that correct?

A   Yes, sir.

MR. VICK:  If they want to enter the search warrant, I have no objection.

MR. GEARY:  I'm not asking to have it introduced.

**JA428**

THE COURT: All right.

BY MR. GEARY:

Q    Have you, in preparation for your testimony, reviewed Officer Robinson's affidavit? Have you also reviewed the paperwork that you did in regard to the search warrant in this case?

A    I reviewed my paperwork. Yes, sir.

Q    In your paperwork you indicated that certain items were turned over to you by the officers who were conducting the search of each of the rooms in the three-story house; is that correct?

A    Yes, sir.

Q    I ask you to take a look at a page in your report, what you have marked as page four of seven, in regard to the search warrant of 491 Martin Luther King Boulevard. Do you have the page where it says that forced entry was made?

A    Yes, sir.

Q    If you would go down about ten lines and see a paragraph that begins with plainclothesman Michael Mihailic?

A    Yes, sir.

Q    Encountered Greg Scott. Is that correct?

A    Yes, sir.

Q    Did you also seize at the apartment or the house a probation card in the name of Gregory Scott from New York City?

A    Yes, I believe so.

Q    Do you know where that probation card is?

A    It would be in our evidence.

Q    And this was in June of 1991, correct?

A    Yes, sir.

MR. GEARY: No further questions, Your Honor.

THE COURT: All right. Any questions, Mr. Cooley or Mr. McGarvey?

MR. McGARVEY: No questions.

MR. BAUGH: No questions, Your Honor.

MR. WAGNER: No questions.

THE COURT: All right.

(Witness stood aside.)

MR. VICK: The government would call Anthony Howlen. He is in the lock-up;

### B. Anthony Howlen

ANTHONY HOWLEN, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

**JA429**

Q   Mr. Howlen, I'll ask that during your testimony you sit up and speak into the microphone so everyone can hear you.  Can you state your name for the Court, record, and jury, please?

A   Anthony Howlen.

Q   Mr. Howlen, how old are you?

A   26.

Q   And Mr. Howlen, you currently are incarcerated in New York City; is that correct?

A   Yes, sir.

Q   You have been brought down here to testify?

A   Yes.

Q   What are you incarcerated in New York City on?

A   Possession of cocaine.

Q   That's pending charges, correct?

A   Yes.

Q   You have to speak nothing about those pending charges.  Mr. Howlen, you have been previously convicted in New Jersey of a felony; is that correct?

A   Yes.

Q   What was that felony you have been convicted of?

A   Possession.

Q   Possession of what?

A   Marijuana.

Q   And when was that that you were convicted of possession of marijuana?

A   Years ago.

Q   What sort of sentence did you receive for that?

A   Probation.

Q   You were rented down here to testify; is that correct?

A   Yes.

Q   The government has made no deal with you, have we?

A   No.

Q   You are here testifying because we have subpoenaed you, in essence.

A   Yes.

Q   Do you know Mr. Richard Tipton, "Whitey"?

A   Yes.

Q   Do you know Mr. Cory Johnson, "O," or "C.O."?

A   Yes.

Q   Take your time, stand up if you need to, look around the courtroom, and see if you see those individuals in the courtroom.

A   The two sitting right there.

Q   Would you tell us which one of those individuals is "Whitey," Richard Tipton?

A   The one on my left is "Whitey."  The one on my right is "C.O."

MR. VICK:  Could the record reflect the

**JA430**

0996

identification of the defendants Tipton and Johnson?

THE COURT:  The record will so reflect.

BY MR. VICK:

Q    How is it that you know those people?

A    Through confrontation.

Q    You were a drug dealer in Trenton, New Jersey in 1989; is that correct?

A    Yes.

Q    What kind of drugs were you selling?

A    Cocaine.

Q    And where was it in Trenton that you were selling your cocaine?

A    South Trenton.

Q    What kind of cocaine were you selling?

A    Crack cocaine.

Q    Where would you sell it, on the streets?

A    Yes.

Q    Did you have occasion to meet Mr. Tipton and Mr. Johnson through selling crack cocaine?

A    Yes.

Q    Tell the ladies and gentlemen of the jury about how you met them.

A    I met them through a confrontation about a sale.

Q    Tell the ladies and gentlemen of the jury what

0997

happened.

A    Well, I saw a guy coming down the hill which owed me from previous sales.  I wanted them to deal with me and they wanted them to deal with them.  So we got in a confrontation about it and started fighting.  I wasn't going to let him deal with them because he had owed me.  We started fighting.

Q    What had he dealt with you previously about, what kind of deals?

A    Well, I was giving him stuff on top.

Q    By "stuff," what do you mean?

A    I was giving him the crack on top.

Q    Which meant what?

A    I was giving him crack and then he was supposed to pay me later.

Q    When he came down the hill towards you, where were Mr. Tipton and Mr. Johnson, near you?

A    Yes.  We was standing on the same corner.

Q    What were they doing out on that corner from your observation?

A    We was all hustling.  We was all selling.

Q    Selling what?

A    Crack.

Q    All right.  When he came down the hill, what did they do toward that man?

0998

A    They approached him just like I approached him.

**JA431**

We was approaching him to make the sale.

Q    And what happened  --  and that upset you?

A    Yes, it did.

Q    So what happened?

A    So I told them that they couldn't deal with him, that he was going to deal with me because he owed me.  So we got  --  we started fighting over it.

Q    Who is "we"?

A    Me and the gentlemen right there.

Q    How were you fighting?

A    With fists.

Q    Were there any weapons used by anybody?

A    Not that I knew of at the time.

Q    And that fight ended that day?

A    Yes.

Q    All right.  Did you have occasion approximately one week later to see Mr. Richard Tipton again?

A    Yes.  I seen "Whitey," me and my girlfriend.  This is a week later.  We was going out and we was going to a restaurant to eat.  And we went into the restaurant called Salaam's and I seen "Whitey" there.  Me and my girlfriend, like no sweat.  He was like "I got something for you."  And he left.  When he came back like five minutes later, he had a whole posse of guys with him.

Q    When you say a whole posse, what do you mean by posse?

A    Group of guys.

Q    Did that surprise you?

A    Yes.

Q    All right.  How many was in this group of guys, would you say?

A    Between ten and fifteen.

Q    Did they come into the restaurant?

A    Yes.

Q    What happened when they came into the restaurant?

A    "C.O." approached me.  I was at the table.  He goes like "I want to get a fair fight.  I want to straighten it out from the drama we had last week."  I was like "This ain't the time because I'm with my girl and I'm by myself."  He was like "Well, this is the time, because we ran across one another."  I was like "No, I'm with my girl."  So I assumed that -- he was offering me a fair fight.  I assumed I could take this fair fight or either get jumped, because I wasn't with nobody but my girl.  I said, "All right, you want to fight fair, we will go outside and fight fair."

Q    Did you go outside?

A    I went outside, gave my girl my jacket and gold and stuff, said, "I'm going to fight."  She was like

**JA432**

Anthony Howlen (Direct)

"No, let me call somebody for you."  I said, "No, it will be a fair fight."  He was like "I'm going to give you a fair one."

Q    Who is he?

A    "C.O."  "I'm going to give you [a fair|affair] one."

Q    What did you mean by fair fight?

A    Straight up fight, just me and him.  Just our hands, and just me and him.  I was like "All right."  Boom.  Came outside, went to the corner.  I went to get in the fair fight.  He spit razors out of his mouth.  I said, "I thought you were going to give me a fair fight."  He says, "This is how it is."  I'm looking, getting surrounded.  I went "Damn, I'm caught up in this here."  So when I seen a way to break through, I took off running.  Now, what I am saying is because the odds was against me.  I was trying to get away.  I got away.

I went like two blocks up towards the projects.  I looked back, I didn't see nobody.  I didn't see nobody running.  I thought they had went back.  So I'm walking.  I'm tired because I've been running for like two blocks.  I'm out of breath.  I'm worried about my girl, what's going on with her.  I am hesitating to go back and see what's up with her or should I go get some of my friends.  But I didn't.  I was going to go home, make a phone call, get my friends, and go back.  But I didn't get a chance to because when I was walking a taxicab pulled up alongside of me and four guys jumped out of that taxicab.

Q    Who?

A    "C.O.," "Whitey," and two other guys.  I didn't know; you know what I am saying?  I didn't pay attention.  When I turned, I seen it was them.  So I took off running again.  But they caught me this time.

Q    What happened when they caught you?

A    Well, while one was cutting me, the other was holding me.  One was kicking me, the other was cutting me, the other was holding me.

Q    Who caught you?

A    I don't know exactly which one caught me.

Q    Which ones were fighting you?

A    All of them was fighting me.

Q    Were "C.O." and "Whitey" amongst the group fighting you?

A    They was the ones cutting me.

Q    Who cut you?

A    "C.O." and "Whitey" both cut me.

Q    What did they cut you with?

A    Razors.

**JA433**

Anthony Howlen (Direct)

Q   It was over the fight the week before?
A   Yes.
Q   All right.  Have you ever heard of the word New York Boyz?
A   Yes.
Q   What does that mean to you?
A   It means a group of guys from New York.
Q   Do you know whether "Whitey" and "C.O." were part of them?
A   Yes.
        MR. WHITE:  Objection as to how he knew.
BY MR. VICK:
Q   How do you know?
A   Through confrontation and through guys on the street; you know what I am saying, talking about them.  I knew about them because I had a beef with them.  We had a confrontation.  Couldn't nobody --
Q   When "C.O." and "Whitey" cut you that day in 1989, how badly did they cut you and where did they cut you?

1003
A   They cut me bad.  They cut me in my face.
Q   With what?
A   Razors.
Q   Did each of them have razors?
A   Yes.
Q   How many times did they cut you?  Tell us exactly.
A   Like five times.  I got three long razor cuts right here, one here, and one across my lip.
    (Witness indicating.)
Q   Did you have to go to the hospital?
A   Yes.
Q   Did you receive stitches?
A   I got 169 stitches.
Q   Were you hospitalized for some time?
A   For like a week.
Q   Because of those wounds?
A   Yes.
Q   Did you take out charges against them at that point?
A   Yes.
Q   What happened to those charges?
        MR. WHITE:  Objection unless he asks how he knows.
BY MR. VICK:

1004
Q   Do you know what happened to those charges?
A   Well, I knew the charges was pending because in New Jersey, the prosecutor's assistant or someone kept trying to get in touch with me.  But every time he made a court appearance, they canceled it to another date.
Q   So that case has never been to court in New

**JA434**

Jersey as far as you know?

A    As far as I know.

MR. VICK:  If I could ask that Mr. Howlen get down off the stand and approach the jury so they can look at his face and see the cuts on his face.

THE COURT:  All right, come on.

(Witness approached jury.)

MR. WHITE:  May I approach?

MR. VICK:  All right, Mr. Howlen, turn right where you are.  Can everybody see his face?

(Jury examining witness.)

All right, that's fine, you can have a seat, Mr. Howlen.

MR. VICK:  I have no further questions of Mr. Howlen.

THE COURT:  All right.  Mr. White, do you have anything?

MR. WHITE:  May I have a minute with Mr. Geary, please?

(Counsel conferring.)

CROSS-EXAMINATION

BY MR. WHITE:

Q    You indicated you have a pending cocaine charge in New York City?

A    Yes.

Q    Is that a distribution-related offense, sir?

A    No.

Q    That's a possession-related offense?

A    Yes.

Q    How much were you found to be in possession of?

MR. VICK:  It would be unfair to ask this man to testify about a pending Court proceeding, as Mr. White knows.

THE COURT:  Mr. White, you have already got out that it was a possession charge.

BY MR. WHITE:

Q    The only other record you have is marijuana possession?

A    I didn't say the only other record I have.

Q    So you have a record other than for marijuana possession?

A    Yes.

Q    Was the marijuana possession, was that a felony?

A    Yes.

Q    Okay.  And how much marijuana did you have in your possession at that time?

A    It was bagged up in bags.  I was selling marijuana.

Q    Okay.  Were you also selling crack cocaine at the time?

A    No.

**JA435**

Q    This was before your crack cocaine activities?
A    This was around the same time.  I just wasn't selling crack cocaine at the time.
Q    So you said you had another record, more of a record?
        THE COURT:  Mr. White, that's not the appropriate way to ask that question.
BY MR. WHITE:
Q    Sir, have you been convicted of any other drug-related offenses?
A    Yes, I have been convicted of other drug offenses.
Q    Which other drug-related offenses were you convicted of?
A    Possession.
Q    Of?

1007
A    Cocaine.
Q    And?
A    That's it.
Q    No PCP?
A    Just cocaine.
Q    PCP and cocaine are the same thing?
A    Crack.  Controlled dangerous substance.
Q    Are you saying that PCP is crack cocaine?
A    I haven't been in possession of PCP.
Q    You haven't?  You weren't arrested for that on September 6th, 19  --
A    Yes, but that was dropped down to marijuana.
        THE COURT:  You see, Mr. White, that demonstrates what I am trying to tell you.  That's the inappropriate way to ask the question.
BY MR. WHITE:
Q    All right, Mr. Howlen  --
        THE COURT:  Let me  --  never mind.  That charge was dropped.  All right?
        MR. WHITE:  If the Court please, the charge was not  --
        THE COURT:  His response was that it was dropped.  The question was, has he got any other felonies; you can ask him about that.
BY MR. WHITE:

1008
Q    Now, sir, you were convicted of the felony of aggravated assault, were you not?
A    No, sir.  The charges was dropped.
        MR. VICK:  This is so improper.
        THE COURT:  Mr. White, please.
BY MR. WHITE:
Q    Mr. Howlen, you have indicated that fighting is away to settle certain disputes?
A    No, I didn't indicate that fighting was, no.  I said we were fighting.
Q    Yes, sir.

**JA436**

Anthony Howlen (Cross)

A    Over a sale.

Q    And you were fighting with Mr. Tipton and Mr. Johnson over who was going to sell crack to a particular individual?

A    I was fighting -- we was fighting over the guy that owed me some money.  He came down there and if he was going to purchase something from anyone, he was going to purchase from me.

Q    When this person came up to the street corner, was this day or night?

A    It was broad daylight.

Q    Were there a number of people on the street corner there?

A    Yes, there was.

Q    Were there people other than you and Mr. Tipton and Mr. Johnson out there selling crack cocaine?

A    No.  We was the only ones selling.

Q    You were the only three selling?

A    That's right.

Q    Now, did the person who you were concerned about go to them first?

A    No.

Q    He came to you first?

A    He didn't come to nobody.  He was coming down the hill and we all was approaching him.  We seen him coming.  We was approaching him to get the sale.

Q    The three of you together, you approached this person with Mr. Tipton and Mr. Johnson?

A    I didn't have to approach nobody.  It was other people that were approaching them and bringing them down the hill.

Q    You had runners out there on the corner who were going to bring this individual to you so you could sell them crack cocaine?

A    I didn't have runners.  They was doing it because they knew me.  I was in the neighborhood.

Q    These people wanted to make sure that the local people would get the business; is that correct?  Is that what you are saying?

A    I'm saying they done it because they knew me. That's what I am saying.

Q    Then it was approximately  --  there was no fistfighting or nobody rolling around on the ground or scuffling that day?

A    Yes, there was.  We were fighting.

Q    Who were you fighting with?

A    Both "C.O." and "Whitey," and then "C.O." on me.

Q    You swung first?

A    Yes, I swung at "C.O." first.  But he was within reach.  If I wouldn't have swung on him he would have swung on me.

**JA437**

Q    It was just a couple of swings and misses; is that basic basically it?
A    It wasn't misses.  It was some hits.
Q    How long did this fight last?
A    Lasted awhile.  Because my cousin came out there and he got cut in the face the same day.
Q    Was that Willie Howlen?
A    Yes.
Q    Also known as "Chill Will?"
A    Yes, it is.
Q    Was he in the same fight with Mr. Tipton and Mr. Johnson or did he help break the fight up that day?

A    Well, after he seen me fighting he was trying to break it up.  He didn't want me to fight.
Q    He had gotten cut in another incident?
A    No, he got cut in that incident.  He tried to break it up.  He couldn't break it up.  He got cut trying to break it up.  He was trying to break it up.  He was like saying, "Go ahead," and when he was doing that, they cut him.  We didn't know he was cut with a razor.  When you get cut with a razor you don't feel it right then.  After they had left, he Said, "Damn, man, what's up?"  That nigger owed me.  It was a drug scene on the streets.  You have to look at it that way, on that level.  So that's how it is and that's how it was.
Q    And that's a pretty basic level?
A    What you mean?
Q    How much crack cocaine did you have in your pocket?
A    I wasn't carrying nothing in my pocket.
Q    You had it somewhere else?
A    I had it where I was able to sell the cocaine to him.
Q    Well, you didn't have it on your person but you had it somewhere close by?
A    Like I just said, I had it where I could sell it to them.
Q    Was someone holding it or did you have it stashed?
A    That's irrelevant.  I had it where I could sell it to them.  I just told you that three times.
Q    Mr. Howlen, it was approximately a week later that you and your girlfriend went to this restaurant?
A    Yes.
Q    And describe this restaurant for the ladies and gentlemen of the jury.
A    This restaurant is in West Trenton.  We was from South Trenton.  So she wanted to go out and eat.  She was hungry.  I was like "All right, let's go eat."  She wanted to go to Salaam's, so we went so Salaam's

**JA438**

to eat.  She ordered, I ordered, but while we was ordering she was like  --  "Whitey" was like, "Oh, I got something for you."  I ain't paying no attention; you know what I am saying?  I'm --

Q    I was asking you to describe the restaurant.

A    I'm describing the restaurant.

Q    Is this a nice place or like a burger place, fast-food place?

A    It is a fast-food place, but it got tables in it and --

Q    People work there, right?

A    Yes.

MR. VICK:  I would ask that Mr. White not continue to ask the questions.  If he would please allow the witness to finish answering his questions.

THE COURT:  Let him answer.

BY MR. WHITE:

Q    Did they have telephones in there?

A    Yes.

Q    Did anybody physically drag you out of the restaurant?

A    No.

Q    You went willingly?

A    Yes, I did.  Because we was going to have a fair fight.

Q    You were fully prepared to engage in that.

A    In a fair fight.

Q    Did you have  --  never mind.  Strike that. Now, who went out first?

A    Excuse me?

Q    Who went outside first?

A    The niggers was already outside.  They had already set it up.  I went by myself.

Q    How far outside the front door were you?

A    I was right outside.

Q    You were right there at the front door?

A    No, we wasn't at the front door.

Q    How far away from the door were you, sir?

A    A couple doors down from that store on the corner.  We went to the corner to fight.

Q    What were you in front of at the time?

A    We was on the corner.  We was in the middle of the street on the corner.

Q    Outside?  In the street?

A    Outside.

Q    Is this in a business district?

A    No.

Q    It is like kind of a lot of vacant houses?

A    Wasn't no vacant houses.  There is a vacant house on the corner, one.

Q    Was it an intersection controlled by a streetlight?

**JA439**

A   We were on a corner.  Cars go this way, cars go that way.  It was 1:30 at night.  This restaurant opens up, it stays open.  That's where everybody goes at night to eat.  The restaurant stayed open later than any other restaurant in town.

Q   Sir, how tall are you?

A   Five-five.

Q   How much do you weigh?

A   Like 140.

Q   Pretty trim, right?

A   Yes, pretty trim.  But I can handle myself.

Q   You are pretty trim, right?

A   Yes.

Q   You said that after running two blocks you were out of shape?

A   That's right.  I was out of shape.  Because I wasn't in shape as far as running.  I wasn't prepared for that type of drama.

Q   Were you under the influence of crack cocaine?

A   No, I wasn't under the influence of no crack cocaine.

Q   That did not contribute to your inability to run great distances?

A   No.  What contributed to my inability was laying up.  You know what I am saying?  The good life, just laying up.  I didn't have to do nothing.  That's what it was.

Q   The good life was a function of your crack distribution?

A   The good life was the function of my business and my mentality.

Q   Mr. Howlen, you said that you would run a couple blocks and then you started walking?

A   I ran a couple blocks until I looked back, and I didn't see nobody and I felt it was safe to walk.

Q   Do you know people in that neighborhood?

A   Yes.  I know people all over Trenton.

Q   You are from there originally?

A   Yes.

Q   You indicated  --  well, I don't want to put words in your mouth.  Are there people in that neighborhood who know you and what you do for a living?

A   Not everybody, because everybody -- you know what I am saying?  No.

Q   Are there some people in that neighborhood?

A   Yes.

Q   Are there people within a two-block radius of that restaurant who know you?

A   Where I could have stopped at their house?

Q   Yes.

A   I'm on a footrace.  You think I'm going to try

**JA440**

to run up on somebody's porch when guys are chasing me at 1:30 or 2 o'clock in the morning, when they are asleep?  I'm not going to take the chance of running up on somebody's porch and getting trapped.  I'm going to try to run and get away from him to where I got keys in my pocket and I can get in the house.

They scared.  They see people out on the porch, they call the police.  By the time the police come, I'm dead.

Q    You indicated that you had been walking awhile before  --

A    No.  I didn't indicate that.  After I was running I turned back, I didn't see them.  I was tired.  I started walking.  I took like ten steps --

Q    I can't even get a question in edgewise.

THE COURT:  You ask a question and wait until he finishes.

MR. McGARVEY:  Your Honor, Jeff may be having trouble with the microphone.

THE REPORTER:  No, I'm with him.

BY MR. WHITE:

Q    My question to you is, sir, how long from the time that you stopped running -- in other words, there came a point in time when you realized there was no one following you.

A    I'm going to tell you.  I stopped running.  I took like maybe ten steps at the most before the taxicab pulled up beside me.  They must have jumped out right after  --  that must have been the reason why they stopped running, because they seen a taxi.

Q    When you were running  --

A    When I was running, I stopped running.  I must have took ten steps forward and the taxicab pulled up alongside of me.  Is that clear enough?  Ten steps.  That's how much time.  Now, you count.  Can you imagine how much time it takes you to walk ten steps?  Like from here to the wall, maybe not even that far.

(Witness gesturing.)

Q    Mr. Howlen, when you started running, during the course of those two blocks that you ran did you ever look behind you?

A    Yes, I did.  Because I wasn't just running straight.  I was going zig-zag cars.  I was trying to get away.  They was on my back at first.

Q    There came a point in time when they were not on your back, right?

A    Well, when I turned around and noticed they wasn't on my back, I stopped running.

Q    Okay.  That's when you started, took the ten steps?

**JA441**

A    I started walking around about ten steps, not exactly.

Q    When you looked around right before you stopped running and right when you started walking, you turned around and you realized they weren't following you, correct?

A    Correct.

Q    That was the first time that you had looked back since you had started  --

A    Is you crazy?  I was looking back the whole time.  Niggers trying to kill me, man.

Q    Do you know at what point they got in the cab?

A    I don't know what point they got in the cab.  I know what point they got out the cab.

Q    You don't know how long they were in the cab?

A    What?

Q    They must have been in the cab  --

A    I don't know.  No.  I have no knowledge of how long they were in the cab.

Q    And  --

A    Oh, yeah, I know how long they was in the cab.  Like five minutes, from the time I start running to the time they got out the cab to get me.  They was behind me.  They must have saw the cab, jumped in the cab, and, boom!  Just like that.

Q    Was it five minutes or ten steps?

A    Man, you add it up.

Q    Now, may I have a minute, please, Judge?
     (Counsel conferring with co-counsel.)

          MR. WHITE:  Judge, no further questions.
          THE COURT:  Anything for this witness?
               CROSS-EXAMINATION
BY MR. McGARVEY:

Q    Good afternoon, Mr. Howlen.

A    Good afternoon, sir.

Q    If you calm down, I'll promise I'll calm down.  Okay?

A    Yes, sir.

Q    You said that you were dealing cocaine in Trenton since when, relative to this incident?

A    What you mean?  Since this incident how long was I dealing?

Q    Just approximately, sir.

A    It was just starting to come out.  It was the new thing, so it wasn't long.

Q    Did you have other people like working for you, running for you, wholesale, people helping you out some?

A    No, I worked for myself.  I wasn't that large.

Q    Totally by yourself?  You didn't have any runners?

A    No, I didn't have no runners.  If somebody knew

**JA442**

Anthony Howlen (Cross)

me and knew I had it, if they brought it to me they brought it to me.  I didn't pay them for it.

1021

Q    I take it even if you were first starting out, selling cocaine on the street is somewhat of a secretive business; is that correct?
A    Excuse me?
Q    A secretive business.  It is not something that you want to advertise, correct?
A    That's right.
Q    It is not something you want to be out in the open?
A    That's something that I would rather not advertise.  Everybody hustles differently.
Q    I understand that.  But let's say in your example, it is something that you don't want, if you are standing on the street corner dealing cocaine you don't want to be handing money like this or handing cocaine like that.
A    That's something you have to do if you are going to get the money.
Q    Listen to my question, if you would.  It is not something that you want to be blatant about, right?
A    Wide open about?
Q    Right.
A    No.  Something I don't want to be wide open about.
Q    On this day when you had the initial

1022

confrontation with "C.O." and "Whitey," how close were you all together?
A    We were all relatively close.  And we was wide open that day.  I was beside myself; we all was beside ourselves.
Q    You were standing right next to each other?
A    We wasn't like shoulder to shoulder.
Q    You were some distance away, correct?
A    Like you and me is right now.
Q    Are you telling the ladies and gentlemen of the jury that they were handing money to people and taking cocaine, or selling cocaine just like this, wide out in the open?
A    I'm not telling people that they was doing that.  I'm saying the confrontation was about a sale.
Q    I understand.  And are you telling the ladies and gentlemen of the jury that you actually saw cocaine change hands and money change hands?
A    Ain't nobody get a chance to exchange cocaine.
Q    So when you tell the ladies and gentlemen of the jury that that was what they were doing out on a street corner that day, you were making an assumption that day, correct?
A    No, more than that.  Ain't none of us gets that

**JA443**

particular money on that particular sale.

MR. VICK:  He needs to finish the answer.

BY MR. McGARVEY:

Q   On that particular day you are making an assumption because you didn't see any drugs or money changing hands?

A   Yes, I saw drugs and money changing hands that day, but that incident, no.  Ain't nobody got no money.  We started fighting.  The guy got scared and left.

Q   Listen to the question.

A   I did.  I made transactions and they made transactions that day.

Q   Are you actually saying you saw money and cocaine changing hands like that?

A   Yes.

Q   When this confrontation began, Mr. Howlen, it was you who approached them; is that correct?  It was you who approached them and said, "You folks aren't doing this; I'm going to take this guy," right?

A   Well, well  --

Q   Answer the question, please.

MR. VICK:  There is no reason to argue with the witness.

THE COURT:  He was starting to answer the question.

THE WITNESS:  It was like the guy was coming down with someone and it was like I seen him, we all like spotted the customer at the same time, the customer coming down the hill.  So when we spotted him, I lay back.  I said, "Let's get this money."  It is a money thing.  We try to get the money.

MR. McGARVEY:  Your Honor, I asked a very simple question, which required a yes or no answer.  Did he approach them?  I would ask that the witness be directed to answer the question.

THE WITNESS:  Did I approach the customer?

BY MR. McGARVEY:

Q   Did you approach Mr. Johnson or Mr. Tipton?

A   No, I didn't.  I approached the customer.

Q   I see.  Then what happened after that?

A   They approached the customer, too.

Q   What conversation did you have?

A   I was like "Look, I ain't trying to do you nothing.  The guy owes me.  I gave him something.  He owes me.  If he going to do any business he is going to do business with me because he owes me."

Q   All right.  Now, when you had this altercation with them, it was just you who had the altercation with them on that date?

**JA444**

A    On that day, I don't know if anybody else had altercations with them that day.

Q    When you had the altercation with them, are you telling the ladies and gentlemen of the jury that you went after Mr. Tipton and Mr. Johnson?

A    No, I didn't go after them. I didn't go after them. We was within reach. After we going down the floor with words, tension came upon the situation. You could feel the drama in the air. There was like tensity. You could feel it in the air.

Q    After you testified earlier that you had a fight --

A    Yes, I did.

Q    You are telling the ladies and gentlemen of the jury that by yourself you attacked these two individuals over here; is that what you are telling them?

A    Yes.

Q    Is that what you are saying?

A    Yes.

Q    As a practical matter, you had five to ten of your friends, of your cohorts with you that attacked them that day; isn't that a fact?

A    No, sir.

1026

Q    So you attacked them by yourself?

A    Because I swung at "C.O."

Q    They were together; that's what you testified.

A    Yes, they were together.

Q    So your testimony is you didn't have five or ten of your other buddies?

A    No, I didn't have five or so anybody else.

Q    You didn't see anybody hit Richard Tipton upside the head with a beer bottle?

A    No. But after everything was all over with I found out he got hit in the head.

Q    Who hit him?

A    I never found out.

Q    You testified it was just you.

A    That's right. I didn't see nobody hit him in the head. I didn't know somebody hit him in the head at that time because they took off running. You know what I am saying? I didn't know.

          MR. McGARVEY: I have no further questions.

          THE COURT: All right. Mr. Baugh, do you have any questions for this witness?

          MR. BAUGH: No, Your Honor.

          MR. WAGNER: No questions, Your Honor.

          THE COURT: All right. Anything further?

1027

          MR. VICK: I have nothing further.

          THE COURT: All right, sir. You may be excused.

**JA445**

Richard E. Bice (Direct)

(Witness stood aside.)

MR. VICK:  We would call Richard Bice. While we are waiting, could we approach?

(At Bench.)

MR. VICK:  We have received and I have given out the plea agreement from New Jersey with Mr. Scott.  I will recall Mr. Scott with the Court's okay and introduce the plea agreement into evidence.

MR. GEARY:  The indictment simply says, the indictment didn't have  --  we need the indictment to see what charges have been dropped.  This is a plea to one count of a superseding indictment.

THE COURT:  As far as I'm concerned, he testified how many counts was in the indictment.  I think that's enough.

RICHARD E. BICE, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you speak into the microphone and state your name for the Court, record, and jury?

A    Richard Edward Bice.

Q    Speak up so the court reporter can understand you.  How are employed?

A    Security, Oakland Park Apartments.

Q    Where is that?

A    Trenton, New Jersey.

Q    How long have you be employed as security?  You were employed there in April of 1989?

A    Yes.

Q    Do you know Mr. Anthony Howlen?

A    Yes.

Q    You have seen Mr. Anthony Howlen here today, have you not?

A    Yes.

Q    Where have you seen him before?

A    Out there on my job in the apartment complex.

Q    Did you see him in April of 1989?

A    Yes.

Q    Specifically on April 28th, 1989, did you have occasion to witness Mr. Anthony Howlen get hurt?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what you saw?

A    We were sitting in the guard shack, me and two other guards, and we seen people running from Hoffman Avenue, like three to four people, and they ran through the middle of the apartments, and they ended up two guys on top of one guy, on top of Anthony.

**JA446**

Richard E. Bice (Direct)

Q    Anthony was the guy that the two guys were on top of?

A    Yes.

Q    And what were those two guys on top of Anthony doing?

A    One was holding him down and the other one, he was making motions like he was either hitting him or cutting him.

Q    What did you do?

A    Me and the two other guards ran over to them and one guy stood up and said, "Guards are coming," and they started -- one guy started running, and the other two guards got the one guy and I got the other guy that was on top of him.

Q    Take your time, stand up, and look around the courtroom if you need to, and see if you see the individuals that you got.

A    Yes.

Q    Point them out.

A    Right over there.

Q    How is he dressed?

A    Wearing a blue suit.

Q    What color shirt?

A    Blue.

Q    Does he have on glasses?

A    Yes.

MR. VICK:  Let the record reflect the identification of Mr. Tipton.

THE COURT:  The record will so reflect.

BY MR. VICK:

Q    What did you do when you got Mr. Tipton?

A    Brought him back to the guard shack.

Q    Do you see anyone else in the room who was present at that time?

A    Yes.

Q    Who is that?

A    The guy sitting next to Mr. Tipton.

MR. VICK:  Could the record reflect the identification of Mr. Cory Johnson?

THE COURT:  The record so will reflect.

BY MR. VICK:

Q    Where was Mr. Johnson and Mr. Tipton in relation to Mr. Anthony Howlen?

A    Where were they?

Q    Where were they.  When you came up you saw two people on top of Mr. Howlen.  Where were they?

A    They were on Coolidge Avenue.

Q    Were they the two people?

A    Yes.

Q    Did you come to find out what kind of injuries Mr. Howlen sustained?

A    After we got them, he ran, I think, to his

**JA447**

Richard E. Bice (Cross)

sister's house or somebody.  I didn't really see the injuries.

Q    Was there any blood at the scene?

A    Yes.

Q    How much blood was there?

A    It was a lot there, but it was dark out and I couldn't really tell.  I wasn't really looking for blood.

Q    What did you do with Mr. Tipton and Mr. Johnson after you stopped them and subdued them?

A    We brought them back to the guard shack.  Our boss came out.  And he took care of it from there.

Q    Were they arrested?

A    Yes.

Q    Did they resist your efforts to stop them?

A    Just one of them did.

Q    Who was that?

A    Cory.

1032

Q    What did he do?

A    The other two guards took care of him.

        MR. VICK:  I have no further questions.

                CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Bice, the name of the apartments is Oakland Park Apartments?

A    Yes.

Q    Is that a high rise, a group of high rise buildings?

A    No.  It is row apartments, like eight of them, between eight to ten buildings there.

Q    And approximately how many apartments are there altogether, couple hundred?

A    174, I think.

Q    And you mentioned something called a guard shack.  Is that at the corner of Coolidge?

A    Yes.

Q    Coolidge and Oakland?

A    Yes.

Q    Describe briefly what the guard shack looks like so the jury can understand.

A    It is a square booth.

Q    And yourself and someone named Ellis and somebody else were in there about 1:30 in the

1033

morning?

A    We were sitting outside in chairs.

Q    And does your booth face out into one street or is that an intersection or what?

A    Well, where we are sitting you can see straight down Coolidge Avenue, straight down Oakland Street.

Q    You saw somebody running on Oakland?

A    No, on Coolidge.  I mean Hoffman Avenue.

Q    Where is that in relation to the guard shack?

**JA448**

Richard E. Bice (Cross)

A    The next block down.
Q    Right, left, straight or right ahead?
A    To my left.
Q    Were the people running towards you or running away?
A    They were running straight down Hoffman because there is fences in the lot.
Q    Were they going toward you?
A    No, no, they were going down Hoffman, away from me.
Q    The first thing that you saw, you say you saw three or four people running?
A    Yes.
Q    Were the three or four people in the same group?
A    No, there was three of them together.  It was like other people were running behind them, too. People that were just watching, I guess.
Q    At first you thought that these were a bunch of juveniles fooling around; is that correct?
A    Yes.
Q    You were interviewed on May 16th or thereabouts by an officer, Major Howskey of the Trenton Police. Did you gave him a statement?
A    I don't remember.
Q    You were interviewed by the police sometime afterwards; is that correct?
A    Yes.
Q    You and Mr. Ellis and the other officer, you watched, you thought they were kids fooling around, and then at some point you saw a fight.
A    Yes.
Q    When the fight took place, how far away were you from the fight?
A    About from here to the back of the wall.
Q    Maybe 50 to 60 feet?
A    Yes, maybe.
Q    Are you still outside the guard shack?
A    Yes.
Q    You see these two persons you have identified, you see them in a fight with a third person.  That third person you know today to be named Anthony Howlen?
A    Yes.
Q    Did you know Mr. Howlen before that time?
A    Yes.
Q    Well-known in Trenton, I take it?
A    Where I work at, you get to know everybody out there.
Q    There was also a girl out there apparently, some woman screaming?
A    Yes.

**JA449**

Richard E. Bice (Cross)

Q    You and the other officers left your guard shack area and went to where the fight was taking place.
A    Yes.
Q    And you told the Trenton police officer that what you saw was someone go to the ground and two people punching him; is that correct?
A    I seen one holding and one was on top of him. It looked like he was punching him.
Q    What you told the police officer was, "punching and kicking him around the head and body"; is that correct?
A    Yes.
Q    It was a matter of seconds before you and the other two officers were over there and the two guys

1036

tried to take off.
A    Yes, one guy stood up and said, "Guards are coming."
Q    So I imagine that the three of you at 50 to 60 feet were over there in a matter of seconds; is that correct?
A    Yes.
Q    You all or the Trenton police officers searched Johnson and Tipton; is that correct?
A    I didn't search nobody.
Q    The police came to the guard shack and arrested the two of them; is that correct?
A    Yes.
Q    In your presence, were they patted down?
A    I wasn't standing around there when the police came.
Q    Okay.  This was a street fight in your apartments in Trenton, New Jersey on an April night four years ago?
A    About that.
        MR. GEARY:  Thank you very much.
                CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good morning to you.  Mr. Bice, you indicated that you had seen Mr. Howlen on previous occasions.

1037

You got to know him because if you are in that area you know everyone; is that correct?
A    Yes.
Q    When you normally saw him was he with a group of folks?
A    No.  He was mostly by himself.
Q    Would he stand on a street corner?
A    With a couple of friends once in awhile.
Q    With a couple friends?
A    That I saw.
Q    And you had some knowledge of what he was doing?
A    That night?

**JA450**

Richard E. Bice (Cross)

Q    The times that you saw him.
A    No, not really.
Q    I see.  Did you know whether he was a user of drugs?
A    No, I didn't.
Q    All right.  Now, on the evening that you made this observation, did you see a taxi?
A    No.
Q    Did you see a taxi pull up and folks jump out of it and approach Mr. Howlen?
A    No.
Q    And you said, I believe, that in the course of

1038

your observations of the folks you have identified today, there were punching actions that you observed.
A    Yes.
Q    You did not, nor did any other officer in your presence, recover at the scene or from either of these folks a razor, razor blade, or any other kind of weapon; is that correct?
A    No.
Q    Did you notice any injury to either of these two folks?
A    No, I didn't.
Q    Did you see any blood around the ear of a person described as Mr. White?
A    No.
Q    Now, did you have occasion to be interviewed and talk with Patrolman Pachouka, Pachouta?
A    I don't remember offhand.
Q    You don't remember offhand.  Did you indicate at any point in time to the officers that you in fact took Cory Johnson into custody rather than Mr. Tipton?
A    It was three of us and they were both with us when we came up to the guard station.
Q    When you charged toward the scene, these folks

1039

separated; is that correct?
A    Excuse me?
Q    When you all came toward the scene of this confrontation, these fists being thrown that you observed, the folks involved in the fight got up and fled; is that right?
A    Yes.
Q    You pursued one?
A    Yes.
Q    And other folks pursued the other?
A    Yes.
Q    You indicated today in your testimony that the person that you pursued was the gentleman seated in the blue jacket.
A    Yes.

**JA451**

Q    Did you ever tell any of the officers, particularly, if you recall, the Patrolman Pachouta, or any other officer taking the report that you, rather than approaching this gentleman, approached the gentleman in the gray sweater, Mr. Johnson?

A    No, sir.

Q    You are not sure, meaning you may have said that?

A    I may have said it, but  --

Q    You would have been wrong if you said that?

1040

A    Yes.  The one I know the most is Tipton.

Q    Are you confident that you pursued Mr. Tipton?

A    Yes, sir.

Q    No question about that in your mind.

A    No.

Q    All right.  And if you made that statement to a police officer then, you would have either been in error or you don't recall.

MR. VICK:  Asked and answered.

THE COURT:  Sustained.  He already said he doesn't know.

BY MR. COOLEY:

Q    You saw on this occasion a young lady out there; is that right?

A    I didn't see a lady.  I heard a lady.  --  I heard a lady say that there was people fighting.

Q    Did you identify that young lady as Hope Richardson?

A    No.

Q    You did not?

A    No.

THE COURT:  Mr. Baugh, do you have any questions?

MR. BAUGH:  No questions, Your Honor. Thank you.

1041

MR. WAGNER:  No questions.

MR. VICK:  No redirect, Your Honor.

(Witness stood aside.)

MR. VICK:  The government would recall, with Court's approval, Mr. Greg Scott for the limited purpose of the introduction of his plea agreement.

(Witness Gregory Scott reassumed the witness stand.)

MR. VICK:  I believe we can introduce this by stipulation.  This is the plea agreement that Mr. Greg Scott entered.

THE COURT:  Mr. Geary?

MR. GEARY:  Stipulate.

THE COURT:  Mr. McGarvey?

MR. McGARVEY:  Yes.

MR. BAUGH:  Stipulate.

MR. WAGNER:  Yes, sir.

**JA452**

MR. VICK:  Could Mr. Scott be released at this point?

THE COURT:  Mr. Scott can be released.

MR. VICK:  I would move Government Exhibit 136 in by agreement.  It is a copy of the plea agreement from New Jersey of Mr. Greg Scott.

THE COURT:  All right.  Do you have anything brief, Mr. Vick?

1042

MR. VICK:  We have a fairly brief police witness, Your Honor.

MR. PARCELL:  Patrolman McMillian, please?

JAMES E. McMILLIAN, JR., called as a witness by and on behalf of the Government having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please tell the ladies and gentlemen of the jury your name and occupation?

A    James E McMillian, Jr.  Patrolman with the Trenton Police Division, Trenton, New Jersey.

Q    How long have you been a police officer?

A    Seven years.

Q    What has been your specific assignment the last four-and-a-half to five years?

A    I've been assigned to the Trenton Police Special Operations Division Proactive Unit 1.

Q    What does that mean?

A    Proactive Unit is a unit That's used to enforce the narcotics code on the street level basis.  We go after drug dealers on the street, things like that.

Q    Were you so employed in that capacity on May 30th, 1990?

1043

A    Yes, I was.

Q    Did you have occasion to make an arrest of a Robert Baker?

A    Yes, I did.

Q    Do you see Mr. Baker in the courtroom today?

A    Yes, I do.

Q    Would you please point him out for the ladies and gentlemen of the jury?

A    The light-complected black male with the glasses on.

Q    Would you please tell us what drew your attention to him based on your observations, what you did and what came from that?

A    At that time we were on patrol in that area of Trenton, the corner of North Clinton Avenue and Sherman Avenue.  I observed Mr. Baker and another black male standing on the corner.  At the time Mr. Baker was showing an unknown object to the other black male.  When they noticed our presence, Mr.

**JA453**

Baker quickly closed his hand and walked into the store at the corner. We exited our vehicle and I entered the store and found Mr. Baker in the back of the store. At the time his back was turned to me. Having turned around, I noticed his right hand was still clenched. I asked him what he had in his right hand. He said, "Nothing." Then he opened his hand and revealed a small piece of crack cocaine and a single-edge razor blade.

Q   Based on those observations, what if anything did you do to Mr. Baker and that contraband?

A   Confiscated the objects in his hand and placed him under arrest for CES offenses.

Q   You took what you suspected to be cocaine and did what with it?

A   I inventoried same on our property forms and turned it into the desk lieutenant down at headquarters.

Q   When you submit those drugs for analysis, you assign a particular number to that, don't you?

A   Yes, sir, a case number.

Q   I show you Government Exhibit 130. Can you identify that document?

A   This is the New Jersey State Police Special And Technical Service Lab Form.

Q   Indicating your contraband came back what?

A   Came back as specimen number one, cocaine, controlled dangerous substance, Schedule II, 1.85 grams of same.

MR. PARCELL:  That would be Government Exhibit 130, please.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q   Sir, you have identified who you arrested as Mr. Baker as the young man in the blue coat and blue shirt.

A   Yes, sir, with the glasses on.

Q   How did you derive that name?

A   Robert Baker was the name he gave when he was arrested. And through investigation at headquarters, it was found he also had an active warrant in that name.

Q   So that's why you arrested him by that name; is that correct?

A   Yes, sir.

Q   Do you know his true name?

A   We were later told through our ID bureau that his name was Richard Tipton.

MR. PARCELL:  Let the record reflect he has identified the defendant Tipton.

THE COURT:  The record will so reflect.

BY MR. PARCELL:

**JA454**

Q    Can you tell the ladies and gentlemen of the jury whether you ever saw Mr. Tipton or Baker, whatever name he uses, after you made the arrest on May 30th, 1990?

1046

A    Yes, two to three other times around town in the areas where there is a lot of narcotics activity.

Q    You didn't make any arrest on those occasions; is that correct?

A    I didn't see him really doing anything out of the ordinary except associating with people involved in those activities.  I didn't ever arrest him or investigate him after the first incident.

MR. PARCELL:  The government has no further questions of this police officer.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY: No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  All right.  Thank you very much, sir.  You may be excused.  All right, we are going to stop now for lunch.  If you all could come back at 2 o'clock.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

(Luncheon recess taken from 1:00 p.m. to 2:00 p.m.)

THE COURT:  All right.  Let's bring in the jury.

1047

(The jury entered the courtroom.)

All right, Mr. Vick, would you call your next witness, please?

MR. VICK:  Officer Bill Thomas.

WILLIAM THOMAS called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    William Thomas.

Q    And how are you employed?

A    City of Newark Police Department.

Q    How long have you been so employed?

A    Since 1985.

Q    What capacity are you currently employed in?

A    The Drug Enforcement Administration Task Force in Newark.

Q    I direct your attention to November 18th, 1991. In what capacity were you serving at that time?

A    As a DEA Task Force Officer.

**JA455**

Q    On that date, did you have occasion to come in contact with an individual by the name of "V"?

1048

A    Yes, I did.

Q    I'm going to show you what has been previously marked Government Exhibit 135-1. I ask you if you can identify that photograph.

(Document proffered to witness.)

THE COURT: Could I have the date again?

MR. VICK: November 18th, 1991.

BY MR. VICK:

Q    Can you identify that?

A    Yes, I can. This is Lance Thomas, a/k/a "V," and a/k/a Anthony Mack.

Q    Could you tell the ladies and gentlemen of the jury the nature and circumstances surrounding your encounter with "V," Lance Thomas, on November 18th, 1991, where it occurred and what occurred?

A    It was in Trenton, New Jersey on Stuyvesant Avenue. And my dealings with "V" as he is known were for crack dealings. On November 18th I made a $60 crack purchase from Lance Thomas and one of his employees. I came back the next day and we made arrangements for a $250 transaction to take place the following -- that Friday, which Lance Thomas never showed up at that time at.

Q    On the transaction on November 18th, 1991, did you indeed receive a product from Lance Thomas?

1049

A    Yes, I did.

Q    What was that product?

A    It was a chunk of crack cocaine.

Q    I'm going to show you what has been previously marked Government Exhibit 132. I ask you if you can identify that item.

A    Yes, I can. This is the Trenton Police Department's property and evidence sheet that was made that day as well as the New Jersey State Police lab results.

Q    And what did you do with the item you got from Lance Thomas that day?

A    It was submitted by my partner -- I'm trying to think of his last name, from the Trenton Police Department -- I believe it is Detective Armstrong.

Q    He submitted it to the laboratory for analysis?

A    Yes, he did.

Q    That's the subject of Government Exhibit 132?

A    That's correct.

Q    Government Exhibit 132 shows indeed what?

A    It shows that the substance was in fact crack cocaine.

Q    In what amount?

A    1.43 grams.

Q    Could you tell the ladies and gentlemen of the

**JA456**

William Thomas (Cross)

jury, could you describe exactly what occurred during the transaction?

A    Well, during the course of the transaction I was with a cooperating individual who introduced me to Lance Thomas.  We had a short, brief discussion.  He asked me what I wanted.  I told him $60 worth of crack.  He directed one of his employees to take me to an alleyway between an apartment building and semi-abandoned house, where his runner, as the terminology is in the street, delivered the piece of cocaine.  At that point, I paid the runner $60 cash, and as myself and the cooperating individual began to walk away, that particular runner went back to "V" and handed him the $60.

Q    You witnessed that?

A    Yes, I did.

Q    When did you engage in discussions with "V" about a further purchase of cocaine?

A    It was the following day, I believe on the 19th.

Q    What were those discussions?

A    Basically, "V" said that he had all the crack cocaine that I would need and that he could supply me with every amount that I needed.  The deal that was to take place that Friday was for $250 worth.

Q    And did "V" indicate that he could supply that $250 worth of crack cocaine?

A    Yes, he did.

Q    But that transaction never took place?

A    No, it did not.

Q    Did you go and attempt to transact that?

A    Yes.

Q    Were you able to locate "V" again?

A    No.

MR. VICK:  I move Government Exhibit 132 into evidence, Your Honor.

THE COURT:  It will be admitted.

MR. VICK:  The government tenders the witness, Your Honor.

THE COURT:  Any questions for the witness?

MR. GEARY:  Tipton has no questions.

MR. WHITE:  No.

MR. McGARVEY:  Yes, I have some.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Officer Thomas, good afternoon, sir.  You indicated that he had  a runner with him that day?

A    That's correct.  There were, I think, three additional males seated with him.

Q    Did you know who those other males were?

A    One of them.

**JA457**

Q    Who was that?

A    Clifton Jones.

Q    And do you have any idea where Mr. Thomas went to -- excuse me, where "V" went to secure this cocaine, what his source was?  Do you have any idea where he got that from?

A    No.

Q    Okay.  Do you have any idea -- strike that. You have no idea where the cocaine came from that he gave to you, correct?

A    His source?  No.

Q    Thank you.

THE COURT:  You may stand down, sir.

(Witness stood aside.)

MR. VICK:  The government would call Antwoine Brooks.

### C.  Antwoine Brooks

ANTWOINE BROOKS, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record and jury, please?

A    Antwoine Brooks.

Q    And how old are you, Mr. Brooks?

A    21.

Q    How far have you gone in school?

A    Twelfth grade.  I graduated.

Q    Now, Mr. Brooks, you are testifying here today pursuant to an agreement that you have reached with the United States Government; with the U.S. Attorney's Office here in the Eastern District of Virginia; is that correct?

A    Yes.

Q    Would you tell the ladies and gentlemen of the jury what you understand that agreement to be?

A    I get immunity for my testimony.

Q    What sort of immunity?

A    That what I say won't be used against me.

Q    If you could be prosecuted through actions other than your own words, through testimony other than what you have given us yourself, you could indeed be prosecuted for this, for these charges; is that correct?

A    Yes.

Q    So what you have is use immunity; your words won't be used against you.  Is that correct?

A    Yes.

Q    What is your understanding that you must give in return for receiving that use immunity?

A    Excuse me?

Q    What must you do to receive that use immunity?

A    Tell the truth.

Q    And what is your understanding as to what would happen to that use immunity that's been given you if indeed you were caught telling a lie?

A    I would be prosecuted.

Q    The words you have told us would be used against you; is that correct?

A    Yes.

Q    You have a prior criminal record, do you not?

A    Yes.

Q    Tell the ladies and gentlemen of the jury about your prior criminal record.

A    I got cocaine, intent to distribute, and the marijuana intent to distribute conviction.

Q    You arrested in September of 1991 for possession with the intent to distribute cocaine; is that correct?

A    I was arrested in March, but I went back to do my time in September.

Q    And you were arrested  --  when were you arrested for the marijuana charge, prior to that?

A    Yes.

Q    Did you receive any jail time for that?

A    Yes.

Q    For the marijuana?

A    It was just 30 days.

Q    How much time did you spend in jail for the cocaine charge?

A    12 months.

Q    Where was it that you spent time in jail for that?

A    In the Henrico County Jail.

Q    Nobody from the U.S. Attorney's Office or the Richmond Bureau of Police has done anything to help you in any way regarding any of those charges, have they?

A    No.

Q    Do you know an individual by the name of Richard Tipton, "Whitey"?

A    Yes.

Q    Do you see him in the courtroom today?

A    Yes.

Q    Would you point him out, please?

A    There.

     (Witness indicated.)

Q    How is he dressed?

          MR. WHITE:  We will stipulate he can identify him.

**JA459**

Antoine Brooks (Direct)

MR. VICK:  Record will reflect the identification of Richmond Tipton, "Whitey."

BY MR. VICK:

Q    Where did you meet "Whitey"?

A    We met at  --  we sort of grew up together.

Q    How long have you known him?

A    I'd say about five years, probably.  It was off and on through the years.

Q    Where is Central Gardens?

A    Off of Mechanicsville in Henrico County.

Q    For the five years that you have known Mr. Tipton, has he always been living in Central Gardens?

A    No.

Q    Where would he go?

A    Back and forth to New York.

Q    I direct your attention to August or September of 1990.  Did you have occasion to talk to Mr. Tipton in that time frame about the sale of cocaine?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury about that conversation?

A    He told me that, you know, he was going to go

1057

back home to New York and that when he came back, we could hook up together and then we could like make some money selling drugs.

Q    Did you agree to do that with him?

A    Yes.

Q    Did he indeed leave and go to New York?

A    Yes.

Q    Did he come back from New York?

A    Yes.

Q    Did you indeed hook up with him?

A    Yes.

Q    Tell the ladies and gentlemen of the jury when you next saw Mr. Richard Tipton, "Whitey."

A    Well, I think he came back, it was like  --  it was a couple of months later he had came back.  I don't remember which exact months.  It was a couple months after that, the first time he came back.

Q    Did he come talk to you?

A    Yes.

Q    Where?

A    He came to my mother's house.

Q    Was he by himself?

A    No.

Q    Who was he with?

A    A Hispanic.

1058

Q    Who?

A    A Hispanic.

Q    Do you know his name?

A    No.

**JA460**

Antoine Brooks (Direct)

Q    Had you ever seen him before?
A    No.
Q    Have you seen him since?
A    No.
Q    Did you have a conversation with Mr. Tipton at that time?
A    Yes.
Q    Tell the ladies and gentlemen of the jury about that conversation.
A    He had just told me, you know, that he had some that we could sell, and you know, and it was just like, you know, at the time it was like we would join up together and we could be partners and go ahead and start hustling.
Q    Did you agree to that?
A    Yes.
Q    Did he have anything with him when he came back from New York to sell?
A    Yes.
Q    What did he have?
A    He had about four ounces.

1059

Q    Four ounces of what?
A    Crack.
Q    Did you see that four ounces?
A    Yes.
Q    Did you do anything with that four ounces with Mr. Tipton?
A    Yes, we sold it.
Q    How did you sell it?
A    How?
Q    How.  Did you sell all four ounces together?  Did you break up the four ounces?  Tell us how you went about selling that.
A    We recruited a couple people we knew that was out there already selling, and all of us went out and sold.
Q    Who was it that you recruited?
A    Maurice, Hussone, and me and him.
Q    Who is Maurice?
A    Maurice Saunders.
Q    Who is Hussone?
A    Hussone Jones.
Q    You say you recruited them.  Tell us exactly what you mean by recruited them.
A    We told them that we could get them so they would get their percentage.

1060

Q    Did you indeed sell that four ounces of crack cocaine?
A    Yes.
Q    Where was it sold?
A    In Central Gardens.
Q    In what quantities was that four ounces of crack

**JA461**

Antoine Brooks (Direct)

cocaine sold?

A    We had mostly chopped it up into dimes and bagged it up into 300 sacks.

Q    Tell the ladies and gentlemen of the jury what a dime is.

A    $10 worth of cocaine.

Q    Approximately what quantity of cocaine would that be?

A    As far as what?

Q    Like a gram, half a gram?

A    Tenth of a gram.

Q    And what is a 300-sack?

A    That's just  --  that's 30 dimes, you know, 30 dimes.

Q    30 $10 pieces of cocaine?

A    Yes.

Q    How would you package that cocaine?

A    Just put them up in little like small bags and then put them in a regular sandwich bag and then just put it away and give it to the person who wanted to sell it.

Q    Where would you sell the cocaine?

A    Central Gardens.

Q    Where in Central Gardens?

A    On Catchpenny.

Q    Where would you keep the cocaine that you sold?

A    Well, we would like -- sometimes I would hide it like at my mama's house or hide it anywhere that nobody knows where it was at.

Q    What was your business relationship with Richard Tipton, "Whitey"?

A    We was like partners.

Q    What was the relationship between Hussone Jones and Maurice Saunders and "Whitey"?

A    They was the workers.

Q    What was the difference between you as the partner and they as workers for "Whitey"?

A    You know, they always had to bring back the percentage that they were supposed to bring back, like out of 300, they have to bring back 200 and keep a hundred.  With me, it was just up to me.  I took care of business.

Q    What does that mean; you didn't owe him a certain amount of money for the drugs?

A    No.

Q    Whatever you could sell the drugs for you could keep?

A    Yes.  Then we put it up all together.

Q    Re-up time, what is re-up time?

A    Each time we get some more cocaine to sell when we ran out.

Q    Who would go get the cocaine?

**JA462**

Antoine Brooks (Direct)

A    Either me or him.  Most of the time probably me and him.

Q    Where would you get the cocaine?

A    Either somebody in Richmond or go to Norfolk.

Q    Did "Whitey" ever tell you that he got cocaine from New York?

A    The first time when he came down.

Q    Did he tell you that he owed anybody in New York money for cocaine?

A    Yes.

Q    How much was that?

A    $2,000.

Q    Now, did "Whitey," as far as you saw, ever direct Maurice Saunders or Hussone Jones to do anything related to the distribution of cocaine?

A    I mean really, you know, we would just go out and sell it.  That was it.

1063

Q    How would you decide who sold when and who sold where?

A    Sometimes one of us, you know, we would set up so somebody would go out like on the morning shift and then one of us come on in the evening.

Q    Who made those decisions?

A    He came up with the idea and I went along with it.

Q    Did he direct people to go out at certain times?

        MR. WHITE:  Objection to leading.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Would he or would he not direct people  --

        MR. WHITE:  Objection, it's the same question phrased a different way.  Still leading.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Now, you began in approximately August of 1990 dealing with Mr. Tipton?

        MR. WHITE:  Objection as to the leading nature.

        THE COURT:  Go ahead.

BY MR. VICK:

Q    From August of 1990, dealing with Mr. Tipton in

1064

the distribution, how long did that distribution activity continue?

A    Me, I got out about January or February.

Q    January or February of what year?

A    1991.

Q    From August of 1990 to January or February of 1991, did you deal continuously with Mr. Tipton in the sale of narcotics?

A    Yes.

Q    All right.  What sort of narcotics did you

**JA463**

Antoine Brooks (Direct)

sell?

A    Crack.

Q    Did you ever sell anything but crack?

A    Sometimes maybe marijuana, but that was it.

Q    Primarily crack?

A    Yes.

Q    What sort of quantities would you sell in that time period on a weekly basis?

A    Could you rephrase that?

Q    From August of 1990 until January or February of 1991, what sort of quantities on an average week of crack cocaine would you sell?

A    Probably two to three ounces a week, maybe.

Q    Is that you individually or is that you in connection with Mr. Tipton?

A    That's all of us together.

Q    How much was that again?

A    Two to three ounces a week.

Q    How much money were you making on a weekly basis from the sale of that cocaine?

A    Me personally?

Q    You personally.

A    I was probably making between $3,000 and $5,000.

Q    How much money, based upon your involvement with Mr. Tipton, was Mr. Tipton making on a weekly basis, if you know?

A    I don't really know.  Probably close to what I was making.

Q    What do you base that upon?

A    As far as what he made?  As far as just him hustling and plus the workers paying us.

Q    You were there when they would make the payments?

A    Yes.

Q    Did you have any guns in your possession in Central Gardens?

A    I had some on me sometimes.  Most of the time we would just leave them outside.

Q    Where would you leave them outside?  And why would you leave them outside?

A    Just we would put them there like behind bushes or anything just in case some people rolling around tried to stick us up or something like that.

Q    All right.  And where did you get those guns?

A    Well, mostly from people that was getting high, people that come trading and stuff for drugs.

Q    Did you use any of the crack cocaine?

A    Yes, I have.

Q    How often would you use crack cocaine?

A    Probably every day.

Q    All right.  How often every day?

**JA464**

Antoine Brooks (Direct)

A    Probably like maybe once, like late in the evenings or something.

Q    What's the most money that you have ever seen Mr. Tipton with?

A    Probably about $5,000, $6,000.

Q    All right.  And when approximately was that?

A    Like when we were going to re-up or something like that.

Q    Where was it that you saw that money?

A    Where?  He had it right in his pocket.

Q    You went to jail in September of 1991; is that correct?

A    Yes.

1067

Q    You came out in March of 1992?

A    Yes.

Q    All right.

A    No, I went in  --  yes, that's right.  Yes, that's right.

Q    When you came out in 1992, did you have occasion to see Mr. Tipton again?

A    Yes.

Q    And did he talk to you about the sale of cocaine again?

A    Yes.

Q    What did he ask you?  What was that conversation about?

A    He was just telling me, you know, that he could give me some, like half a key or something if I am in the neighborhood, get me some people to work with. It was just like that.

Q    And did you do that?

A    No.

Q    Do you know when you came out whether Mr. Hussone Jones and an individual by the name of Charles Townes were working with Mr. Tipton?

A    Yes.

        MR. WHITE:  Objection unless he can show how.

1068

        THE COURT:  He asked did he know.  What can he do but give an answer, yes or no?

        THE WITNESS:  Yes.

BY MR. VICK:

Q    Who told you about that?

A    Hussone.

Q    What did Hussone Jones tell you?

        MR. WHITE:  Judge, objection.  This is hearsay.

        MR. VICK:  Admission against interest by Mr. Hussone Jones.

        THE COURT:  Objection is sustained.

BY MR. VICK:

Q    Did you have occasion to buy any cocaine from

**JA465**

Mr. Hussone Jones?

A    Yes.

Q    Why was that?  When was that?

A    It was after I came home.  It was just one evening I went around there.  And I got it because he had --

MR. WHITE:  Can he speak up, please?

THE WITNESS:  I got it because he had told me the problem he had, you know, and I just bought it and then I eventually gave it right back to him.

BY MR. VICK:

Q    What was the problem he stated he had?

A    He owed  --

MR. WHITE:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Have you ever met an individual by the name of "C.O."?

A    One time.

Q    Do you see "C.O." in the courtroom today?

A    Yes.

Q    Would you point him out, please?

A    There.

Q    What's he dressed in?

MR. McGARVEY:  We will stipulate this.

MR. VICK:  May the record reflect the identification of Cory Johnson.

BY MR. VICK:

Q    Where and how did you meet Mr. Cory Johnson?

A    I met him on a basketball court one day in Central Gardens.

Q    Who was he with?

A    He was with Rich.

Q    By Rich, who do you mean?

A    Richard Tipton.

Q    How did Tipton introduce you to him?  What did he say?

A    He just told me that that was his brother.

Q    Have you ever had occasion to talk to Mr. Richard Tipton, "Whitey," about killing people?

A    Well, it was one time he talked to me, he told me that he was -- like you'd get a certain feeling from him, you know.  It was just like you would get a certain feeling like power from him, some drive or something.

Q    Where was it that you had this conversation?

A    Sandy Lane.

Q    How was Mr. Tipton describing this to you?

A    It was just one day sitting up in the house and he just was telling me about him.

Q    Did you live on Sandy Lane?

A    Yes.

**JA466**

Q    Who did you live on Sandy Lane with?

A    Me, Rich, Hussone, Maurice, and "Hess," and "Studie."

Q    Who is "Hess"?

A    Rich's friends.

Q    Where was "Hess" from?

A    New York.

Q    And when was this that you were living in Sandy Lane with them?

A    During the period, it was during the period of time from like August, I'd say we moved in there probably like close to December, November-December.

Q    Of 1990?

A    Yes.

Q    In the time frame you were dealing cocaine with Mr. Tipton?

A    Yes.

Q    Tell us about "Hess."  Was he dealing cocaine with you?

A    Yes.

Q    All right.  And he was from where?

A    New York.

Q    And what did "Whitey" tell you about him, if anything?

A    He just told me, you know, that if we ever needed anything done he could take care of it, and then just leave because nobody would know.

Q    What was he talking about, what sort of thing done?

        MR. WHITE:  Speculation.

        THE COURT:  Overruled.  Your basis of knowledge?  Tell us if you know what he was talking about.

        THE WITNESS:  He was talking about the fact that if we had any problems with people or something, that he could take care of it and leave.

BY MR. VICK:

Q    What sort of problems?

A    As far as anything that came up.  As far as somebody trying to get us or robbing us or anything.

Q    Did "Whitey" have occasion to talk to you about whether he was associated in some way with people in New York?

A    Yes.

Q    Tell the ladies and gentlemen of the jury about that.

A    He said he had some friends up there that he could call whenever he needed and they would be there for him.

Q    And why was he talking about that?

        MR. WHITE:  Objection unless he shows some basis.

**JA467**

THE COURT:  Sustained.  How is he going to tell you what he was talking about?

BY MR. VICK:

Q    In what vein, what context, did that conversation come up in?

MR. WHITE:  Objection.

THE COURT:  Overruled.

1073

THE WITNESS:  Saying that if  --  in so many words, like he had enough power to call home and get people down here, wouldn't worry if anything was to happen to either one of us, him or anything.

BY MR. VICK:

Q    And what would these people do if they came down?

MR. WHITE:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    As Mr. Tipton told you in that conversation?

A    Just if the people came down they would come down and take care of whoever or whatever was the problem, you know.

Q    Did there come a time when you went once with Mr. Tipton to Church Hill to purchase cocaine?

A    Yes.

Q    Who else was with you?

A    It was me, him, "Hess," and this man Keith.

Q    Do you know "Hess's" full name, real name?

A    No.

Q    How long was "Hess" down here?

A    Probably two to three months.

Q    In what time frame was that?

A    Same time we was selling drugs.

1074

Q    Where would "Hess" live?

A    With us on Sandy Lane.

Q    Was "Hess" actually selling drugs with you?

A    Yes.

Q    When you went to Church Hill, what occurred?

A    Well, we went over there the first time.  The dude was like hanging on us to see him.

Q    What dude is this?

A    I don't know who it was because we never did get to meet him.  We had to go home and get our scale. And when we came back it was Keith knew him, and so Keith had two other dudes with him and they knew the man and we got the word through them so we had to give the man our money.  So when he went in the house, he told us he was going to leave his brother with us.

Q    Why is that?

A    Just, you know, to insure the money, to let us know that he weren't trying to rob us or nothing.

Q    What did you do with your money?

**JA468**

A    He took the money into the house to the dude to buy the drugs, and then it was like taking a long time, so then eventually we got nervous, going around the block one time, then I went up and knocked on the door and told them to hurry up, just bring the money back out.  Eventually they just brought the money back out.

Q    How long did that take?

A    30 minutes to an hour.

Q    What happened to the fellow they left with you, where was he?

A    He was in the car with us.

Q    Did anything happen to that person while he was in that car?

A    Yes, he got hit with a gun a couple of times.

Q    Who hit him with a gun?

A    Rich.

Q    Why?

A    Because he kept looking up.  He told him to keep his head between his legs.  He kept looking up.

Q    Where did he hit him with the gun?

A    In the head.

Q    What kind of gun was it?

A    I don't know the name.  It was a long gun.  It was like a rifle or something like that.

MR. VICK:  I beg the Court's indulgence.

(Counsel conferring with co-counsel.)

Q    Do you know an individual by the name of Greg Scott?

A    No.

Q    Have you ever met Greg Scott or talked with him?

A    No.

Q    Do you know an individual by the name of Anthony Howlen?

A    No.

MR. VICK:  Tender the witness, Your Honor.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. WHITE:

Q    The truth is, Mr. Brooks, with the exception of that one incident in Church Hill, you and Rich and none of the other guys in Central Gardens never had any trouble with anybody; isn't that right?

A    True.

Q    No hint of violence, correct?  You guys never went out and stabbed anybody, did you?

A    No.

Q    Never went out and shot anybody, did you?

A    No.

Q    Never went out as a group or either individually or went out and beat anybody up, did you?

**JA469**

A    No.
Q    Central Gardens was a pretty peaceful place, wasn't?

A    Yes.
Q    Nice neighborhood?
A    Yes.
Q    You were from there?
A    Yes.
Q    Born and raised there?
A    You could say that.
Q    Now, there were a lot of people in Central Gardens that you knew who had associations with drugs, correct?
A    Yes.
Q    How long had you known "May-May" or "Man-Man?"
A    I knew him, you know, we went to school and stuff together.  A lot of years.
Q    "May-May" is Clarence Townes?
A    Yes.
Q    Also go by "Man-Man"?
A    Yes.
Q    Lot of people called him "May-May," correct?
A    Yes.
Q    Was he a resident of Central Gardens?
A    Yes.
Q    How about Hussone?  Curtis Hussone Jones?
A    Yes.
Q    He was a resident of Central Gardens?

A    Yes.
Q    You have known him for how long, sir?
A    All my life.
Q    All your life?
A    Just about.  We went to school together.
Q    Do you Consider "May-May" a friend?
A    Yes.
Q    How about Hussone?
A    Yes.
Q    How about Keith Winston; is that the Keith that you are referring to as one of the guys that lived at Sandy Lane?
A    Yes.
Q    Prior to moving into Sandy Lane, how long had you known Keith?
A    I didn't know him.
Q    Do you know where he came from?
A    I know his nephew.
Q    His nephew?
A    Yes.
Q    Whose nephew?
A    Keith Winston's nephew.
Q    Who was Keith Winston's nephew?
A    Lafayette.

**JA470**

Antoine Brooks (Cross)

Q    Was he from Central Gardens?

A    Yes.
Q    So Lafayette was Keith's entry into Central Gardens?
A    No, the whole thing was from Central Gardens.
Q    Keith also?
A    Yes.
Q    How about "Studie"?  Tell them what his name is.
A    I don't know.
Q    You don't know "Studie's" name?
A    "Studie," is all I know.
Q    He lived on Catchpenny with his mom, right?
A    Yes.
Q    "Studie" spent a lot of time at Sandy Lane, right?
A    Yes.
Q    "Studie," was associated with you guys, at least knew about the drugs in Central Gardens, right?
A    Yes.
Q    Okay.  Thomas Green, does that ring a bell?  Is that his real name?
A    Yes.
Q    How about Maurice Saunders?
A    Yes.
Q    Friends of you all's?

A    Yes.
Q    Had association with you in terms of crack selling around Central Gardens, right?
A    Yes.
Q    You all had known Maurice for a long time?
A    Yes.
Q    Maurice was from Central Gardens, right?
A    Yes.
Q    Do you know Maurice Green?  "Resee"?
A    No.
Q    Don't know "Resee"?  How about Maurice Green?  That name doesn't ring a bell?
A    No.
Q    How about Ty?  Ty sold drugs in Central Gardens, didn't he?
A    Who is Ty?
Q    Do you know Ty who sold drugs in Central Gardens?
A    No.
Q    How about Jay?
A    No.
Q    You never got drugs from Jay in Central Gardens?
A    I don't know Jay.
Q    How about Pauline?

**JA471**

A    I know her.
Q    She lived at the corner of Catchpenny, right?
A    Yes.
Q    She sold drugs in Central Gardens?
A    Yes.
Q    Pat, Mike?
A    Yes.
Q    Pat, Mike.  Tell the ladies and gentlemen of the jury who Pat, Mike was.
A    People who just got high.
Q    Junkies, basically?
A    Yes.
Q    And did a lot of drugs over there?
A    Yes.
Q    They lived in the apartments just down Beck, right?
A    Yes.
Q    How about "Skinny Pete"?
A    Yes.
Q    Do you know "Skinny Pete"?
A    Yes.
Q    "Skinny Pete" got high over there, would sell a little crack, right?
A    Yes.
Q    How about "Rah-Rah"?  Do you know "Rah-Rah"?
1082
A    Yes.
Q    Who is "Rah-Rah"?
A    Just a friend of mine.
Q    Another guy in Central Gardens who does crack, sells a little bit, too, right?
A    He don't do no crack.
Q    He doesn't?
A    No.
Q    Does he sell it?
A    No.
Q    How about "Baldy"?  Pauline 's son.
A    I know him.
Q    He hung out with you guys from time to time?
A    Yes.
Q    Came over to Sandy Lane?
A    Yes.
Q    Party had with you guys, right?
A    He didn't really party with us.
Q    Sandy Lane was not a business address, was it, Mr. Brooks?
A    I mean, we sold the drugs out of there.
Q    But it wasn't  --
A    We didn't attempt to from the start, but people just kept coming over.
Q    Tell the ladies and gentlemen of the jury where
1083
Sandy Lane is.
A    It is like off Laburnum and Creighton Road, you

**JA472**

know.

Q    Now, Central Gardens, there is a golf course out there, right?

A    Yes.

Q    Sandy Lane runs along that golf course.

A    Creighton Road switches over to Sandy Lane.

Q    Sandy Lane is maybe a minute or two off of Central Gardens, right?  From the corner of Catchpenny and Beck you could get there in a minute, right?

A    Yes.

Q    When you all moved into Sandy Lane together, that was what, fall of 1990?

A    Yes.

Q    Okay.  Around August, late August, early September?

A    Something like that.

Q    All right.  And that was "Studie's" house originally, wasn't it?

A    Yes.

Q    Do you know how "Studie," came to be living at that house?

A    All I know is he had a wife and daughter and everything.  Then he got all strung out on drugs and she left him.

Q    He was a little older than you guys, right?

A    Yes.

Q    You said his wife left him because he was on drugs.

A    Yes.

Q    "Studie," was kind of like the neighborhood junkie, right?  He sold a little drugs every once in awhile, kind of to make it for himself?

A    Never really seen him sell drugs.  All I seen him do was use them.

Q    You guys moved in with "Studie."

A    Yes.

Q    Who moved in first, or did you all together?

A    It was just about all of us together.

Q    You all were looking for a place to hang out, right?

A    Yes.

Q    In truth, Mr. Brooks, you and Richard Tipton were friends first, right?

A    Yes.

Q    Okay.  And the same could be said for many of the people that you associated with in Central Gardens, right?

A    Yes.

Q    Selling crack was something that you all sort of grew into, right?

A    Yes.

**JA473**

Antoine Brooks (Cross)

Q     Okay.  And it was a very informal thing in Central Gardens, wasn't it?
A     What do you mean?
Q     Well, you talked about workers.  You characterized "May-May" and Hussone as workers, right?
A     Yes.
Q     Was that a word that you sort of came up with or did someone suggest that phrase to you?
A     I guess you could say we just came up with it. It is true.  They worked for us at the time.
Q     Well, you say they worked for you.  Were you responsible on a daily basis for "May-May" and Hussone?
A     I mean, we tried our best to look out for them, you know, messed around with them and everything.
Q     You guys would go to the movies from time to time, right?
A     We would meet each other, right.
Q     You'd go to Pizza Hut together, right?
A     Yes.
Q     You guys would go out and play a lot, right?
A     Yes.
Q     There were times when you would put the crack aside and go out and have fun.
A     Yes.
Q     You would buy Heinekens and get some pot and hang out for several days and drink and party and have a good time, right?
A     Yes.  We still made money.
Q     You still made money but you were still having fun and still being friends together.
A     Yes.
Q     So the business relationship is really secondary to the personal relationship, right?
A     Business came first.
Q     Business came first?
A     Yes.
Q     All the time?
A     Every once in a while we kicked back and had fun.  But the business was first.
Q     Let's talk about Hussone for a little bit. Hussone had a girlfriend, right?
A     Yes.
Q     She didn't live in Central Gardens?
A     No.
Q     Hussone would sometimes disappear for a couple weeks at a time, right?
A     Days.  Not weeks.
Q     But days; he would kind of disappear for days at a time and hang out with his girlfriend, right?
A     Yes.

**JA474**

Antoine Brooks (Cross)

Q    Nobody got angry because he wasn't available to sell drugs on his appointed rounds, did they?
A    No.
Q    He could come and go as he pleased?
A    Yes.
Q    Same with "May-May," right?
A    "May-May" never worked for me.
Q    "May-May" didn't work for you?
A    "May-May," when I was home, "May-May" wasn't selling drugs.
Q    "May-May" wasn't?
A    No.
Q    This was when?
A    When I was home.  I'm talking about before I got locked up in September.
Q    Now this was September of 1991 or 1990?
A    1991, I think.
Q    1991.  Okay.  And you were living in Sandy Lane at the time?

1088

A    We had moved.  I moved out of Sandy Lane.
Q    Where were you living at the time?
A    With my mother.
Q    Where was that?
A    At 2915 Maidens' Lane.
Q    That's in Central Gardens?
A    Yes.
Q    You all had sort of dispersed from Sandy Lane, right?
A    Yes.
Q    Tipton had gone over and was living off of what, Brookland Park at the time?
A    Yes.
Q    He was living over there by himself, right?
A    Yes.
Q    Keith had taken off, right?  Where was Keith living at the time?
A    In Central Gardens.  Probably back with his mother.
Q    "Hess," nowhere to be seen, right?
A    "Hess" with living with him.
Q    With who?
A    Richard.
Q    Brookland Park?
A    Yes.

1089

Q    Who else was at Sandy Lane?  How about "Studie"?  Did "Studie" stay at Sandy Lane?
A    No, he went back home to Catchpenny.
Q    He went back to live with his mom, right?
A    Yes.
Q    So you had moved back in with your mother in September of 1991, or how much  --
A    Not September of 1991.  I'm talking about after

**JA475**

-- it was like after New Year's.

Q   It would be like January 1st, 1991?  You are talking about that New Year's?

A   I got locked up in 1991.

Q   What month was it that you got locked up in?

A   I got locked up in March and then got out on bond and then I went back in September.

Q   So in March, March is when you were arrested?

A   Yes.

Q   March of 1991?

A   Yes, me and Rich.  We had broke up in like January, the end of January, February.  We just stopped hustling together.

Q   Did something happen?

A   We just weren't getting along, you know.  We weren't getting along.  Things weren't going right.

Q   What was the source of the  --  you guys didn't pull guns on each other, did you?

A   No, we just left each other alone.

Q   Was there like an active dispute about money?

A   I mean, you know, like I say, both of us figured we could make more money by ourselves so we just separated.

Q   In truth, there were good times and bad times, right?

A   Yes.

Q   There were weeks where you guys were really what they call skinning it?  You know, were having bad weeks, right?

A   Yes.

Q   There would be times for example you got a week's worth of rainy weather, and there was no place to hustle, right?

A   Sometimes.  Like I say, people always came over to Sandy Lane, though.

Q   There were some times when you simply couldn't find stuff to sell, right?

A   Sometimes.

Q   So there was not a constant, steady source or supply of cocaine that was rolling through Sandy Lane.

A   Yes, there was.  I mean, it would be like a day without it at the most, a day or two days.

Q   I just thought you said a week would go by.

A   I didn't say that.  You said that.

Q   What are you saying?

A   I'm saying that sometimes it got slow, but it never stopped completely.

Q   Never stopped completely.

A   It would be like a day at the most when it would just stop completely.

Q   Who was responsible for getting the cocaine?

**JA476**

Antoine Brooks (Cross)

A    Either me or Rich.
Q    So sometimes you would go, right?
A    Most of the time I would go or he would go or we would go together.  Most of the time we would go together.
Q    You went all over the place looking for it, right?
A    Sometimes.
Q    Did you ever go to New York together?
A    No.
Q    Did you ever go to Trenton together?
A    No.
Q    Newark together?
A    No.
Q    It was always here around this area, right?

1092

A    Or to Norfolk.
Q    That was your contact?
A    No.
Q    It was his contact?
A    Yes.
Q    All right.  And you say that you guys were averaging two to three ounces a week?
A    Yes.  As far as the whole group.
Q    As far as the whole group.  And the whole group would include you and Rich, right?
A    Yes.
Q    "May-May"?
A    No.
Q    Hussone?
A    Yes.
Q    Who else?
A    Maurice.
Q    Maurice.  Who else?
A    "J.T."
Q    "J.T." is a white guy that hangs out in Central Gardens?
A    Yes.
Q    Is that the guy -- he just got popped again out in Central Gardens, right?
A    Yes.

1093

Q    Who else?
A    Then some people in Charles City.
Q    Uh-huh.  So there were a lot of people who combined to distribute that two to three ounces of cocaine.
A    Yes.
Q    When you talk about the two or three ounces of cocaine, are you talking about  --  you got it as powder, right?
A    No, most of the time we got it as rock.
Q    You already got it as rock?
A    Yes.

**JA477**

Antoine Brooks (Cross)

Q    How did you split it up?
A    We would chop it up into dimes and put them into sacks.
Q    What's two-for-one?
A    $300 worth of cocaine, two for one.  You would get $200 and they would get $100.
Q    You would give somebody a 30-sack, and they could sell that 30-sack out on the street for $300, right?
A    Yes.
Q    And they would give you $100, right?
A    $200.
Q    Excuse me.  Then they would keep $100 for themselves?
A    Yes.
Q    Out of the $200 that you would get, how much of that would you have to save to re-up?
A    It depends on the time.  You know, it was like the next day, all of it would be spent on it.  It depends on the time.  If we was going to re-up the next day, then we probably would spend the whole $200 on that.
Q    So there would be times when you wouldn't re-up the next day, correct?
A    Yes.
Q    And how many  --  would you do a two for one every day?
A    If the person needed it.
Q    Well, how about you personally; you were actually out on the streets yourself selling crack, right?
A    Yes.
Q    Would you do a two-for-one every day?
A    No.
Q    You would not average at least a two for one every day?
A    No.
Q    Would you say that you would average a two-for-one every other day?
A    Probably so.
Q    So if you were averaging -- now, this is just you personally, right?  Right?
A    Yes.
Q    Now, how many people would you say you were giving two-for-ones to on a daily basis?  In other words, did you have people who were, using your term, working for you, where you would give them a two-for-one and they would go out and sell it and give you the $200?
A    I'm saying I just told you that everybody we had working for us, they was the people we gave it to. We didn't just go find anybody and give it to him.

**JA478**

At the same time we were working our own two-for-one, too, you know.

Q    So correct me if I am wrong; you said that you personally, in terms of your selling, you would average a two-for-one at least every other day?

A    I'm saying as far as me selling it.

Q    Right.  Now, as a group, and the group would include you, Rich, Hussone, "J.T.," you know, how many two-for-ones were you running on a daily basis, a couple a day, maybe?

A    I don't know.  Sometimes it would be every day. Because really they sold more than me.  They would be out there all the time.

Q    Who is they?

A    Like Hussone, "J.T.," Maurice.

Q    So sometimes Hussone and "J.T." and Maurice would actually make more money than you?

A    Because they would be out there more.

Q    Okay.  When you talk about making money just yourself, did you separate the money you made yourself from the money that you got from other people?

A    No.

Q    Did you just put it all together?

A    Put it all together.

Q    Let's say, take a given week, an average week. Now, you are going to sell what, three or four two-for-ones yourself?

A    Probably two.

Q    Probably two.

A    Yes.

Q    And you will probably be responsible or you will probably participate in getting maybe what, four or five two-for-ones to other guys who were associated with you?

A    Yes.

Q    Okay.  Now, you weren't re-upping every day, were you?

A    No.

Q    You weren't re-upping every other day, were you?

A    No.

Q    You probably re-upped maybe what, on an average of once a week or less?

A    Sometimes.

Q    Sometimes less than that?

A    Sometimes more.

Q    Depending on who was rolling through the neighborhood, right?

A    Yes.

Q    Depending on where you felt like traveling, right?  Were there many times where you guys were

**JA479**

sort of going out and sort of wandering around looking for crack like you did up in Church Hill that time?

A   I mean, if we  --  if we couldn't get it from people we used, we would try to get it from somebody else.

Q   So you were taking chances from time to time.

A   Yes.

Q   Now, at the beginning of your testimony, Mr.

1098

Brooks, you were talking about immunity.  Right?

A   Yes.

Q   Okay.  Assume for the sake of argument that somebody caught you in a lie.  What's your understanding of what you would be prosecuted for?

A   Conspiracy to sell drugs.

Q   Is that it?

A   As far as I know.

Q   Okay.  Now, you indicated that you had only met Mr. Johnson on one occasion.  Right?  Cory Johnson?

A   Yes.

Q   That's when he was just kind of riding through the neighborhood with Rich?

A   I met him  --  no, I met him at the basketball court.

Q   Which Court was that?

A   Central Gardens.

Q   That was the time you met him, the one time you met him?

A   I've seen him like when I would ride [enthusiasm|enthusiastic] the neighborhood but as far as meeting him and saying what's up  --

Q   Being introduced to him?

A   Yes.

Q   That was the extent of your association with

1099

him?

A   Yes.

Q   Did you ever see the gentleman over there in the blue coat and white shirt sitting against the wall? Do you know him?

A   Yes.  I met him in jail.

Q   You met him in jail?

A   Yes.

Q   No other time out on the streets?

A   No.

Q   How about the lady who is sitting over there in the purple jacket; did you ever meet her out on the streets?

A   No.

Q   Okay.  Now, if you were  --  when you got arrested in March of 1991, you were pretty much in a position where you had to clean up your act for awhile, right?

**JA480**

A    Yes.
Q    You got out on bond.
A    Yes.
Q    Trial was in September?
A    Yes.
Q    Going to Court, pleading guilty.
A    Yes.
Q    Is that what you did, went into court and pled guilty?
A    Yes.
Q    How much coke were you caught with; do you recall?
A    A half ounce.
Q    And you got your 12 months in jail, right?
A    Yes.
Q    You got out in March of 1992.  So really, your dealings with Mr. Tipton in terms of drugs were prior to March of 1991?
A    Yes.
Q    Right?
A    Yes.
Q    Let's go back a little bit in time.  You said that you had known Mr. Tipton; you sort of grew up together?
A    He would leave and come back, back and forth, like that.
Q    You know that his father and his step-mother lived at the corner of Catchpenny and Beck, right?
A    Yes.  It wasn't his real mother.
Q    Brenda Williams?
A    Yes.
Q    Brenda and Aieesha; they still live there, right?  He was living with them, right?
A    When I first met him he was living on Cleary.  They used to live on Cleary first.
Q    You knew them before he lived at the corner of Catchpenny and Beck?
A    Yes.
Q    He was in school back then like everybody else in the neighborhood?
A    Sometimes.
Q    And you said that sometimes he would go away for a month or so at a time?
A    It would be more than just a month.
Q    You know he had family up in New York City?
A    Yes.
Q    Okay.  You had indicated that there were times where you did have some fun together, right?
A    Yes.
Q    Okay.  Would you say that there were more good times than not in the course of your relationship with Richard Tipton?

Antoine Brooks (Cross)

A    Yes.

Q    Now, you never saw him driving a fancy car, did you?

A    No.

Q    Didn't have a car, did he?

1102

A    No.

Q    Didn't have any fancy clothes?

A    No.

Q    As a matter of fact, at times he would go to the store and go buy some clean underwear, right?  He just wasn't the kind of guy who would keep clothes lying around.  You all did that when living at Sandy Lane, right?

A    Yes.

Q    You were not living the life of luxury, were you?

A    No.

Q    No luxurious surroundings, right?

A    No.

Q    When you were talking about the money, you were talking about the money, the $3,000 to $5,000, that's all together, right?

A    At the end of the week.  Sometimes I had that much, plus theirs.

Q    Well, if you are averaging  --  if you yourself personally are averaging a two-for-one every other day, that's $200, right?

A    Yes.  But see, I could keep -- see, plus the workers would come.  Sometimes they would pay me, sometimes they will pay him.

1103

Q    You talk of them as workers.  They were not employees, were they?

A    They could always do what they wanted to do. But the simple fact was, they always came back to us.

        MR. VICK:  I ask that he not editorialize.

        THE COURT:  Don't make the editorial comment.

BY MR. WHITE:

Q    Let me ask you this:  Have you ever had a job?

A    Yes.

Q    Where have you worked before?

A    I worked Tyson Foods.

Q    You go in, you have a schedule, right?

A    Yes.

Q    You get a paycheck, right?

A    Yes.

Q    You get some benefits, right?

A    Yes.

Q    You are a worker, right?

A    Yes.

Q    "May-May" or Hussone, none of those guys were

**JA482**

workers in that sense of the word, right?
A    No.
Q    They were just associates, right?

1104
A    Yes.
Q    They were just guys that you would hang out with; sometimes you had a good time, sometimes you dealt a little crack, right?
A    I mean, it was all the time really.
Q    You were hanging out all the time.
A    We was dealing  --  we didn't deal crack like every hour of the day, but throughout the day, we always  --  and like I said, they always would have our product.  That's just how we worked it.
Q    Now, when you would have your 30-sack, would you carry that around with you?
A    Yes.
Q    Would there be occasions where you would run into someone and you would say, or somebody would want to get like five or ten vials from you?
A    Yes.
Q    There would be occasions?
A    Yes.
Q    If you knew that person you would front it to them, right?
A    It depends on the person.
Q    But you have done that?
A    Yes.
Q    Now, tell the ladies and gentlemen of the jury

1105
what it means to front.
A    It is like having credit, you know, as far as if you feel like a person is trustworthy and they will bring you money back, you give it to them and then they will bring the money back.
Q    And you knew that some of those people that you were fronting small amounts to, like four or five vials at a time, were going and selling a couple just enough so that they could have a couple vials for themselves, right?
A    I didn't never get involved in what they did with it.  They would just tell me when they would pay me, or they would tell me they would pay me and then they would pay me.
Q    Did you look at those people as workers?
A    No, because most of the time they were getting high.
Q    You didn't actually see them getting high?
A    No.
Q    You didn't know what they were doing with it.
A    No.
Q    Was  --  did you smoke pot?
A    Yes.
Q    Did you like to smoke pot?

**JA483**

Antoine Brooks (Cross)

A     Yes.

1106

Q     Did Rich like to smoke pot?
A     Yes.
Q     Most of the guys liked to smoke pot?
A     Yes.
Q     Called them blunts, used to roll some pretty big, fat cigars?
A     Yes.
Q     You all would smoke a fair number of those on a daily basis, right?
A     Right.  He would smoke his.
Q     Would it be a rare day where you didn't smoke any blunts?
A     We just about got high every day.
Q     You would start pretty soon after you got up in the morning, right?
A     Or later on in the evening.
Q     Right.  And you would have conversations with people like Richard Tipton at all times of the day, right?
A     Yes.
Q     Tell the ladies and gentlemen how you felt when you smoked a blunt, feel kind of light-headed?
A     Feel high.
Q     You don't feel bad, do you?
A     No.

1107

Q     Is it a good feeling?
A     Yes.
Q     Do you believe everything you hear from people out on the streets?
A     No.
Q     You don't.
A     No.
Q     Okay.  Did you believe everything that you heard from Hussone?
A     No.
Q     Did you believe everything you heard from "Studie"?
A     No.  I don't believe everything I hear from nobody.
Q     Including Richard Tipton?
A     True.
Q     Listen, the truth is, Mr. Brooks, out on the streets, especially when it comes to drugs and business, people like to make themselves look good to other people, right?
A     Yes.
Q     Okay.  And a lot of times they might like to make themselves out to be more than what they really are, right?
A     Yes.

1108

**JA484**

Antoine Brooks (Cross)

Q    It is kind of like a false security?
A    Yes.
Q    Did you learn that from  --
         MR. VICK:  This is not questioning.  This is simply talking to the jury.
         THE COURT:  Sustained.
BY MR. WHITE:
Q    So a lot of times when Richard Tipton talked to you about stuff that was going on or friends up in New Jersey or New York or whatever, you took it that some of it was probably just plain old bragging, right?
A    I figured it was the truth because that's where he was from.  You live up there just about all your life, you got to know somebody.
Q    Did you have any basis whatsoever for knowing that that was the truth?
A    No, except for that's something he told me.
Q    Just something he told you.
A    Yes.
         MR. WHITE:  If I can have just a minute, please?
      (Counsel perusing notes.)
BY MR. WHITE:
Q    Have you ever been convicted of any crimes of violence?
A    No.
         MR. WHITE:  No further questions.
         MR. VICK:  I would ask that there be a proper basis in the future for asking a question like that.
         THE COURT:  All right.  I'll deal with that later on.
                    CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good afternoon to you.  Mr. Brooks, I just have a very few questions for you.  I just want to ask a couple things.  You said you all divided these things up into 30 dime bags.
A    Yes.
Q    And put them into little bags.
A    Yes.
Q    And a dime bag means it sold for  --
A    $10.
Q    $10.  And it had a tenth of a gram in a bag?
A    Just about, right.
Q    A dime bag is a tenth of a gram?
A    Yes.
Q    The whole thing that you had there that you gave to somebody and they went out and sold, I assume was $300.  30 times ten is $300, right?
A    Yes.

**JA485**

Q    That weighed three grams.

A    I mean, not exactly.  We was eyeballing it, you know.  We just eyeballed it.  Sometimes we would make them bigger.  It just depends on how you want to do it.

Q    So they might have sold it for less than $300 or might have sold it for more?

A    Yes.  Because they can take shorts.

Q    Might have been a little bit less than three grams, a little bit more.  More often than not it might have been a little bit less?

A    More often.

Q    The general sales price was $300 for three grams, $100 a gram.

A    Yes.

Q    Did you ever stop to figure out how much you were paying when you bought the stuff before you divided it up and sold it; do you know how much it worked out to?

A    No.

Q    Never figured that out.  You certainly were paying for it, were you not?  You weren't getting this cocaine free.

A    I was buying it.

Q    And you put your money together and you went out and bought it in larger quantities or wholesale and then you brought it back and broke it up and gave it to somebody else.

A    Yes.

Q    They got for selling it a third, basically; is that right?

A    Yes.

Q    If they could sell it for more than that I guess they made more, but they brought back to you $200?

A    Yes.

Q    Out of that $200, you then set a certain amount of it aside to buy more product.  Is that right?

A    We didn't do too much setting aside.  Sometimes we did, but most of the time we would just put it in our pocket and when the day came up to re-up, we would just dig in our pockets and see how much we got.

Q    At some point, whether you did it day to day, take it in and put it in a piggy-bank or the pocket, you would have to come up with money to buy more, right?

A    Yes.

Q    In the first place, you had to come up with money to buy some, right?

A    Yes.

Q    So the profit to you is the difference between the $200 these folks are bringing back to you and

Antoine Brooks (Cross)

whatever you got to pay out for it; isn't that right?

A    Yes.

Q    All right.  Now, in terms of the monies, I thought you answered Mr. Vick that you thought you were making two  --  did you say $2,000 to $5,000 a week yourself?

A    Yes.

Q    You said that you thought you maybe were selling two to three ounces a week, the group?

A    Yes.

Q    All right.  Now, if we take two ounces, roughly 28 grams in an ounce, does that sound right?

A    Yes.

Q    So street value for an ounce would be about $2,800, $100 a gram?

A    We would buy like wholesale.

Q    You sold it on the street; it would have been one ounce.  If you sold two ounces a week it would have been double that $2,800.

A    If you sold a gram.

Q    If you sold it that way.  If you sold in larger quantities it would be less, wouldn't it?

A    Yes.

Q    That's the most you could get out of it, double the $2,800, $5,600; is that right?

A    Yes.

Q    Out of the $5,600, one-third of that, the first hundred off of every 300 would have been given to the person who sold it; that's what they kept, right?

A    Yes.

Q    So they brought back to you two-thirds of whatever was sold.

A    Yes.

Q    And you think you were paying roughly a third of that.  Were you paying like $100 for three grams?  Do you think that you all's profit was basically a third of the total that was sold?  Do you think it was that much?

A    I don't know.

Q    You don't even know if it was that much.  Would that be fair to say?  Assume it was a third.  A third of the $5,600, the two ounces street value, a third of that $5,600 would be $1,866; does that sound reasonable?

A    Yes.

Q    So the profit for the  --

MR. VICK:  That's an assumption.  He is asking a question now based upon his own figures.

MR. BAUGH:  Excuse me.  I object.

MR. VICK:  The witness has already stated he doesn't know.

**JA487**

Antoine Brooks (Cross)

MR. COOLEY:  His answer was  --

MR. BAUGH:  I object to the form of the objection.  That was not an objection.  That was a speech.

THE COURT:  Your objection is overruled.

MR. BAUGH:  Thank you.

MR. COOLEY:  His answer to me was that he doesn't know if he was making that much.

THE COURT:  You can't go too far.  He has indicated two to three ounces per week.  I think you have got a fair basis.

BY MR. COOLEY:

Q    Assuming that the group was making  --  that the profit was in there of a little over 18  --

MR. VICK:  That's my objection.  There is no basis for that assumption.  He has said he doesn't know.

THE COURT:  Sustained.  You are making an assumption on something that you have suggested that was not accepted, Mr. Cooley.

MR. COOLEY:  I'm not trying to argue to the Court.  As I understood his response, when I asked him as to the profit, his indication was he didn't know if he was making even as much as one-third of the gross street sales price.  So with that response, it seems to me that I'm entitled to ask him, based on the figures he has answered, then that one-third is exactly the figure that I gave.

THE COURT:  I think you have covered this enough.

MR. COOLEY:  All right.

BY MR. COOLEY:

Q    What kind of a car did you have?

A    Cadillac.

Q    You had a Cadillac.  What year?

A    1979.

Q    A '79 Cadillac?

A    No, '76.

Q    Do you remember how much money you paid for that?

A    My mother gave it to me.

Q    You didn't give her any of these drug funds to make that purchase?

A    No, she already had it.

Q    She gave you this '76 Cadillac?

A    Yes.

Q    Just a couple more questions if I can for you. Will you tell the ladies and gentlemen of the jury what it is that you understand to be the immunity that you have?

A    Just the fact that whatever I say won't be used against me.

**JA488**

Antoine Brooks (Cross)

Q    But if other folks supply them information about you, do you understand that you can be charged based on that?

A    Yes, if the information is true.

Q    And if someone said to them Antwoine Brooks was selling drugs on the streets of Central Gardens, that would be true, wouldn't it?

A    Yes.

Q    That's what you have been telling us.

A    I got locked up for that.

Q    If they told them that that would be true --

A    Yes.

Q    -- that would be a proper basis to charge you, wouldn't it?

A    Yes.

Q    All right.  Now, when you have talked to these folks, have you told them about everything that you have told the ladies and gentlemen and us today in this courtroom?

A    Excuse me?

Q    When you talked to the police and to the government and to the U.S. Attorneys, did you tell them everything?  You didn't just announce what you have testified to today; that's not the first time they have heard it, is it?

A    No.

Q    You have told them all about these sales and who was doing what, haven't you?

A    Yes.

Q    You told them Hussone Jones was selling out there with you?

A    Yes.

Q    Didn't you?

A    Yes.

Q    And you told them  --

A    They had already known.

Q    They already knew that.  But you told them about that.

A    Yes.

Q    That would be true about Hussone, wouldn't it?

A    Yes.

Q    Maurice Saunders, you told them about that, also; is that correct?

A    Yes.

Q    Each of these other folks, "J.T." and that, you have told them all about those sales; is that correct?

A    Yes.

Q    Let me ask you, have you been charged with any of those things?

A    I mean, I'm saying I already been in jail for that.  But not this time.

**JA489**

Q    You got caught with a quantity on you?
A    Yes.
Q    But have you been charged for any of those sales out on the street?
A    No.
Q    Do you know if Hussone has been charged?
A    I don't know.
Q    You don't know.
A    No.
Q    Do you know if "J.T." has been charged?
A    No, I don't.
Q    But you know you haven't been charged.
A    Yes.
Q    Have you talked to Hussone or to "J.T --
A    No.

Q    -- since all of this happened?
A    No.
Q    Have you talked to any of the other folks that you have named?
A    No.
Q    So you don't know whether they have said the same thing about you that you have said about them.
A    No, I don't know.
Q    Now has anyone, I don't mean just the United States Attorneys and the police, but has anyone, attorney or otherwise, suggested to you that if you come in and testify that you will not be charged at all?
A    No.
Q    Not that your statements won't be used against you, but that you won't be charged with any of these things.
A    Say that again.
Q    Has anyone suggested to you that you are not going to be charged, period?  Not just that your statements aren't going to be used, but that you are not going to be charged at all for any of these things.
A    Yes, somebody told me that.  They said unless -- it is all depending upon the truth.

Q    As long as you tell the truth.  And no matter what anybody says about you, you are not going to be charged; is that right?
A    Yes.
Q    That's what you understand?
A    Yes.  That's what I understand.
            MR. COOLEY:  Thank you very much.
            MR. HENDERSON:  No questions.
            MR. WAGNER:  No questions.
                  REDIRECT EXAMINATION
BY MR. VICK:
Q    When you have spoken to myself and Detective

**JA490**

Fleming in anticipation of your testimony, have we told you how to answer any question?

A    No.

Q    Did we tell you that we wanted to say any people were workers for you?

A    No.

Q    Did we tell you who workers were and who workers weren't?

A    No.

Q    The people who sold drugs in Charles City, were they workers for you?

A    Yes.

Q    Were they workers for "Whitey"?

A    Yes.

Q    Who were they, how many people?

A    Two.

Q    The person that you got cocaine from in Norfolk, who knew that person to get the cocaine from?

A    Rich.

Q    Where was that person from?

A    From New York.

Q    And he knew him from New York?

A    Yes.

Q    Now, with the money you made, what did you do with the money you made?

A    Just blew it.

Q    Thousands of dollars a week?

A    Yes.

Q    You could have bought a car if you wanted to.

        MR. WHITE:  Objection.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Could you have bought a car if you wanted to?

A    I could have.

Q    Could you have bought fancy clothes if you wanted to?

A    I went shopping as far as clothes.

Q    It was your choice not to.

A    Yes.

Q    It was Mr. Tipton's choice what he did with his money?

        MR. WHITE:  Objection.

        THE COURT:  Sustained.

BY MR. VICK:

Q    When "Whitey" was speaking to you in Sandy Lane in the kitchen about killing people, did you believe --  as to the feeling he got when he killed people, did you believe he was telling the truth about his feelings?

A    At the time, yes.

        THE COURT:  All right.  You may stand down, sir.

**JA491**

(Witness stood aside.)

MR. VICK:  The government will call Detective Ralph Fleming.

RALPH FLEMING, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Would you state your name for the Court, record, and jury, please?

A    Detective R.T Fleming with the Richmond Police Department.

Q    Detective Fleming, how long have you been with the Richmond Police Department?

A    20 years.

Q    And you are currently assigned to the narcocide unit investigating narcotics-related homicides; is that correct?

A    Yes.

Q    Indeed, you have been assigned this investigation that led to the indictment in the instant case; is that correct?

A    Yes, I'm one of the investigators.

Q    Pursuant to that assignment, did you have occasion in June of 1992 to travel to New York City to be present when Mr. Cory Johnson, "C.O.," was arrested?

A    Yes, that was on June 23rd, 1992.

Q    Did you have occasion after Mr. Johnson, "C.O.," was arrested to Mirandize him, to provide him with his constitutional rights?

A    Yes, I did.  That was at approximately 8:30 p.m.

Q    And what rights were those that you advised him of?

A    I advised him that he was being charged with murder, conspiracy to distribute cocaine, and that he had the absolute right to remain silent and make no statement to us; that his silence would be respected by the police; that any statement that he made without counsel could be used as evidence against him; if he could not afford an attorney, the lawyer would be appointed for him; that if he didn't understand those rights, I would go over any part of it that he didn't understand.  And he indicated that he understood those rights.

Q    Did you have occasion to ask Mr. Johnson questions after you had advised him of his rights?

A    Yes, I did.

Q    Did he seem to understand his rights?

A    Yes, he did.

Q    Did he answer the questions that you posed to him?

A    Yes, he did.

Q    Did you ask him indeed whether he had ever been in Virginia, lived in Virginia?

A    Yes, I did.

Q    What was his response?

MR. BAUGH:  Objection.  801(d)(2)(E).  He is under arrest.

THE COURT:  Overruled.

BY MR. VICK:

Q    What was his response as to whether he had ever lived in Virginia?

A    His first response was no, but then he indicated that he had.

Q    When did he indicate that he had lived in Virginia?

A    He said he came to Virginia in 1991.

Q    And where in Virginia?

A    Richmond, Virginia.

Q    Did you ask him whether he had ever distributed drugs in Richmond, Virginia?

A    Yes, I did.  He indicated he distributed drugs to a person here in Richmond, Virginia to sell.

Q    On more than one occasion?

A    On several occasions he had done this.

Q    Did you ask him in  --  what sort of drugs?

A    Crack.

Q    Crack cocaine?

A    That's correct.

Q    And did you ask him whether he indeed had ever had any conversations, three-way conversations with individuals in the Richmond Jail?

A    Yes, I did.  He indicated that he had.

Q    The next day you had occasion to talk to him again; is that correct?

A    Yes, I did.  I heard him make a statement to two DEA agents in which he said that he had been arrested by the Transit Police in New York City for having a Glock in his possession.

MR. VICK:  I have no further questions.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Good afternoon, Detective.  You went to transport Mr. Johnson back to Virginia; is that correct?

A    I went to arrest him.

Q    In New York?

A    That's correct.

Q    At the time that you got to New York, he was already under arrest; is that correct?

A    That's incorrect.

**JA493**

Q    That's not correct?

A    It is incorrect.  I was there when he was arrested.  I was one of the officers who participated in the arrest.  It was at 154th and Amsterdam Avenue.

Q    At what point did you Mirandize him, as you said?

1127

A    It was after we had handcuffed him, put him in the police vehicle, and we were enroute to the DEA office in New York.

Q    Was anyone else present besides Mr. Johnson?

A    There were two DEA agents, Special Agent Delane, and I don't recall the other agent's name.

Q    And did you tape this conversation, sir?

A    No, I did not.

Q    You did not?

A    I didn't have a tape recorder.

Q    You did not have a tape recorder?

A    No, I did not.

Q    How long have you worked for the Richmond Bureau of Police?

A    Over 20 years.

Q    And these statements, did you make notes on these statements as he was making these statements or did you make them at some later time?

A    I made them later on.  We were in the car riding and I was unable to write at that time.

Q    Are either one of these DEA agents present today here?

A    No.

Q    All right.  He made all of these statements to you in that car going downtown?

1128

A    Yes, he did.

Q    Did he tell you where Jimmy Hoffa was buried, too?

A    I didn't ask him that.

        MR. VICK:  Objection.

        THE COURT:  That's idiotic and inane.  Mr. McGarvey, you are better than that.  Please don't do that.

        MR. BAUGH:  Could I reserve any cross?  I have not seen any 6's or Jencks on this.

        MR. VICK:  It has been provided in discovery, both the typewritten notes and the handwritten notes that Detective Fleming made.

        MR. BAUGH:  We still reserve our right.

        THE COURT:  All right.  He is here.

        MR. WAGNER:  No questions.

        THE COURT:  Thank you very much.

    (Witness stood aside.)

    All right, ladies and gentlemen, we have exhausted the witnesses that we can present to you

**JA494**

today.  The next potential witness would be a lengthy witness, and rather than have that testimony broken up, we might as well let you go now.  You have all been working pretty hard all week.  What I am going to do is release you now and ask you to come back Monday morning at 10 a.m. and we will get started with the next witness.  You all have a very safe weekend.  We will look forward to seeing you Monday at 10 o'clock.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. PARCELL:  You said you wanted to view the Chiles video.  We have that to give it to the Court.

MR. VICK:  I could proffer to you, though, we will review it again this weekend.  If the Court would rather, I'm not sure we will be offering it into evidence.

THE COURT:  I don't want to waste my time looking at it if you are not going to use it.  So review it and let me know on Monday and I'll set aside some time on Monday to look at it.  All right. We will be in adjournment.

(Proceedings adjourned at 3:30 p.m.)

**END OF SECOND DISK TO CO-COUNSEL        END DISK II**

**JA495**

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

**JA496**