CASE NO. 22-5

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

RICHARD TIPTON, II,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

**JOINT APPENDIX - VOLUME II OF III**
**(Pages 497 - 1073)**

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
 FOR THE WESTERN DISTRICT
 OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720

Jeffrey L. Ertel
FEDERAL DEFENDER
PROGRAM, INC.
101 Marietta Street NW, Suite 1500
Atlanta, GA 30303
404-688-7530

Joseph Attias
Richard D. Cooke
OFFICE OF THE UNITED
STATES ATTORNEY
919 East Main Street, Suite 1900
Richmond, VA 23219
804-819-5400

*Counsel for Appellant*    *Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF III

                                                                                          JA Page

District Court Docket Sheet [3:92-cr-00068-DJN-1].............................................JA1

Judgment in a Criminal Case
    Entered June 1, 1993 ..................................................................................JA10

Amended Motion to Vacate Conviction Under 28 U.S.C. § 2255
In Light of *United States V. Davis*, __U.S.__, 139 S. Ct. 2319 (2019)
    Filed February 22, 2022 [ECF159] ............................................................ JA14

    Ex. 1:    Superseding Indictment, April 24, 1992...................................... JA61

    Ex. 2:    Verdict Form, February 3, 1993 .................................................. JA84

Government's Response in Opposition
    Filed 2022.04.27 [ECF172]......................................................................... JA92

Reply In Support of Motion to Vacate Conviction
and Sentence Pursuant to 28 U.S.C. § 2255
    Filed June 17, 2022 [ECF179]...................................................................... JA120

Memorandum Opinion
    Entered October 6, 2022 [ECF186]............................................................... JA134

Order (Denying § 2255 Motion)
    Entered October 6, 2022 [ECF187]............................................................... JA164

Notice of Appeal
    Filed December 5, 2022 [ECF195] .............................................................. JA165

i

**Transcripts:**

**Excerpt of Trial Transcript, Volume IV (January 14, 1993)** ....................... JA315

**Trial Transcript, Volume V (January 15, 1993)** ................................................. JA379

    Testimony of Gregory Taylor
        Direct Examination ......................................................................... JA382
        Cross Examination ........................................................................... JA398
        Redirect Examination ...................................................................... JA418
        Recross Examination ....................................................................... JA423

    Testimony of Dennis Patrick Malone
        Direct Examination ......................................................................... JA424
        Cross Examination ........................................................................... JA428

    Testimony of Anthony Howlen
        Direct Examination ......................................................................... JA429
        Cross Examination ........................................................................... JA435

    Testimony of Richard E. Bice
        Direct Examination ......................................................................... JA446
        Cross Examination ........................................................................... JA448

    Testimony of James E. McMillian, Jr.
        Direct Examination ......................................................................... JA453

    Testimony of William Thomas
        Direct Examination ......................................................................... JA455
        Cross Examination ........................................................................... JA457

    Testimony of Antoine Brooks
        Direct Examination ......................................................................... JA458
        Cross Examination ........................................................................... JA469
        Redirect Examination ...................................................................... JA490

Testimony of Ralph Fleming
    Direct Examination........................................................................JA492
    Cross Examination.........................................................................JA493

## **VOLUME II OF III**

**Trial Transcript- Volume VI (January 18, 1993)** ............................................... JA497

    Testimony of Charles Townes
        Direct Examination ................................................................. JA501
        Cross Examination ................................................................. JA532
        Redirect Examination ............................................................. JA574

    Testimony of Jeanne Keim
        Direct Examination ................................................................. JA577
        Cross Examination ................................................................. JA580

    Testimony of Maurice Saunders
        Direct Examination ................................................................. JA581
        Cross Examination ................................................................. JA606
        Redirect Examination ............................................................. JA625

    Testimony of Jeanette Pauley
        Direct Examination ................................................................. JA625
        Cross Examination ................................................................. JA630
        Redirect Examination ............................................................. JA636

**Trial Transcript- Volume VII (January 19, 1993)** ........................................... JA639

    Testimony of A.D. Merz
        Direct Examination ................................................................. JA640

    Testimony of Fred Bolling
        Direct Examination ................................................................. JA642

    Testimony of Johnny Lee Byrd
        Direct Examination ................................................................. JA642
        Cross Examination ................................................................. JA650
        Redirect Examination ............................................................. JA671
        Recross Examination .............................................................. JA672

Testimony of Sherry L. Gay
 Direct Examination ....................................................................... JA673
 Cross Examination .......................................................................... JA675

Testimony of Wayne Hines
 Direct Examination ....................................................................... JA676
 Cross Examination .......................................................................... JA681

Testimony of Richard Farmer
 Direct Examination ....................................................................... JA686
 Cross Examination .......................................................................... JA687

Testimony of George Wynn
 Direct Examination ....................................................................... JA688
 Cross Examination .......................................................................... JA692
 Redirect Examination...................................................................... JA694

Testimony of Rebecca Talley
 Direct Examination ....................................................................... JA694

Testimony of Hussone Curtis Jones
 Direct Examination ....................................................................... JA696
 Cross Examination .......................................................................... JA719
 Redirect Examination...................................................................... JA748

**Trial Transcript- Volume VIII (January 20, 1993)** ....................................... JA754

Testimony of Denise Robin Berkely
 Direct Examination ....................................................................... JA757
 Cross Examination .......................................................................... JA786
 Redirect Examination...................................................................... JA812

Testimony of Rodney Rodriguez
 Direct Examination ....................................................................... JA815
 Cross Examination .......................................................................... JA819
 Redirect Examination ..................................................................... JA822

Testimony of Ralph Fleming
    Direct Examination ............................................................ JA822
    Cross Examination ............................................................. JA824
    Redirect Examination ........................................................ JA827

Testimony of John Dorman
    Direct Examination ............................................................ JA827
    Cross Examination ............................................................. JA829

Testimony of Ralph Fleming
    Cross Examination ............................................................. JA831
    Redirect Examination ........................................................ JA832

Testimony of Paul Tuttle
    Direct Examination ............................................................ JA833
    Cross Examination ............................................................. JA839

Testimony of Pamela Denise Williams
    Direct Examination ............................................................ JA840
    Cross Examination ............................................................. JA849
    Redirect Examination ........................................................ JA856

**Trial Transcript- Volume IX (January 21, 1993)** ........................................ JA861

Testimony of Robert "Papoose" Davis
    Direct Examination ............................................................ JA862
    Cross Examination ............................................................. JA877
    Redirect Examination ........................................................ JA899
    Recross Examination ......................................................... JA901

Testimony of Ronita Hollman
    Direct Examination ............................................................ JA902
    Cross Examination ............................................................. JA909
    Redirect Examination ........................................................ JA919

Testimony of David Burt
    Direct Examination ............................................................ JA921
    Cross Examination ............................................................. JA922

Testimony of Thomas Searles
  Direct Examination ...........................................................................JA923
  Cross Examination ...........................................................................JA927

Testimony of Anne D. Jones
  Direct Examination ...........................................................................JA929
  Cross Examination ...........................................................................JA934
  Redirect Examination..........................................................................JA935

Testimony of Dennis Keith Moody
  Direct Examination ...........................................................................JA936
  Cross Examination ...........................................................................JA942
  Redirect Examination..........................................................................JA950

Testimony of Dr. Marcella Fierro
  Direct Examination ...........................................................................JA951
  Cross Examination ...........................................................................JA959
  Redirect Examination..........................................................................JA964

**Trial Transcript- Volume X (January 25, 1993)** ...............................................JA967

Testimony of Stanley Smithers
  Direct Examination ...........................................................................JA971
  Cross Examination ...........................................................................JA981
  Redirect Examination .........................................................................JA989

Testimony of Mary Johnson
  Direct Examination ...........................................................................JA990

Testimony of William C Brereton
  Direct Examination ...........................................................................JA991

Testimony of Gary Brunelli
  Direct Examination ...........................................................................JA993

Testimony of Anne D. Jones
  Direct Examination ...........................................................................JA996
  Cross Examination ...........................................................................JA999

Testimony of Sterling R. Hardy
    Direct Examination ....................................................................... JA1001
    Cross Examination ......................................................................... JA1017
    Redirect Examination..................................................................... JA1040

Testimony of Martha Jane McCoy
    Direct Examination....................................................................... JA1043
    Cross Examination ....................................................................... JA1052

Testimony of Montez Zeron McCoy
    Direct Examination ....................................................................... JA1057
    Cross Examination ........................................................................ JA1059

Testimony of Gary Brunelli
    Direct Examination ....................................................................... JA1060
    Cross Examination ........................................................................ JA1065

Testimony of Anne D. Jones
    Direct Examination ....................................................................... JA1066
    Cross Examination ........................................................................ JA1070

# **VOLUME III OF III**

**Trial Transcript- Volume XI (January 26, 1993)** ........................................ JA1074

Testimony of Jerry Gaiters
    Direct Examination ................................................................. JA1075
    Cross Examination ................................................................. JA1095
    Redirect Examination ............................................................ JA1131

Testimony of C.T. Woody, Jr.
    Direct Examination ................................................................. JA1133
    Cross Examination ................................................................. JA1135
    Redirect Examination ............................................................ JA1139

Testimony of Dr. Marcella Fierro
    Direct Examination ................................................................. JA1140

Testimony of James Feefer
    Direct Examination ................................................................. JA1148

Testimony of Thomas Searles
    Direct Examination ................................................................. JA1153
    Cross Examination ................................................................. JA1159

Testimony of Anne Davis Jones
    Direct Examination ................................................................. JA1160

Testimony of Charlotte Denise Moore
    Direct Examination ................................................................. JA1162
    Cross Examination ................................................................. JA1166

Testimony of Santo Gutierrez
    Direct Examination ................................................................. JA1168
    Cross Examination ................................................................. JA1170

Testimony of Anne Davis Jones
    Direct Examination ................................................................. JA1171

Testimony of Cynthia Riley
   Direct Examination ...................................................................JA1174
   Cross Examination ....................................................................JA1176

Testimony of Ralph Fleming
   Direct Examination ...................................................................JA1178

**Trial Transcript- Volume XII (January 27, 1993)**.......................................JA1181

Testimony of Walter Tuck
   Direct Examination ...................................................................JA1182
   Cross Examination ....................................................................JA1184

Testimony of Gwendolyn Greene
   Direct Examination ...................................................................JA1186

Testimony of Prisilla "Pepsi" Greene
   Direct Examination ...................................................................JA1189
   Cross Examination ....................................................................JA1198
   Redirect Examination................................................................JA1209

Testimony of Ralph Fleming
   Direct Examination ...................................................................JA1210
   Cross Examination ....................................................................JA1212
   Redirect Examination ...............................................................JA1213

Testimony of Nellie Pulley
   Direct Examination ...................................................................JA1213

Testimony of Carolyn Chiles
   Direct Examination ...................................................................JA1214

Testimony of C.T. Woody
   Direct Examination ...................................................................JA1215
   Cross Examination ....................................................................JA1216

Testimony of Wanda B. Brown
   Direct Examination ...................................................................JA1216

Testimony of David S. Tweedie
    Direct Examination ...................................................................JA 1217

Testimony of Greg Noble
    Voir Dire ...................................................................................JA1223
    Direct Examination ..................................................................JA1225
    Cross Examination ...................................................................JA1229

Testimony of Ralph Fleming
    Direct Examination ..................................................................JA1230

Testimony of Leroy Slater
    Direct Examination ..................................................................JA1231
    Cross Examination ...................................................................JA1236

Testimony Of Dr. Marcella Fierro
    Direct Examination ..................................................................JA1246

Testimony of Ralph Fleming
    Direct Examination ..................................................................JA1252
    Cross Examination ...................................................................JA1252

Testimony of Rodney Rodriguez
    Direct Examination ...................................................................JA153

Testimony of Anne D. Jones
    Direct Examination ..................................................................JA1254
    Cross Examination ...................................................................JA1258

Testimony of Valerie Lee Butler
    Direct Examination ..................................................................JA1259
    Cross Examination ...................................................................JA1282

**Trial Transcript- Volume XII (January 28, 1993)**.......................................JA1295

**Trial Transcript- Volume XIV (January 29, 1993)** ..................................... JA1318

Testimony of Thomas Leonard
    Direct Examination ............................................................... JA1329
    Cross Examination ................................................................ JA1331

End of the Government's Case ............................................................... JA1332

Testimony of Gloria Anne Bridges
    Direct Examination ............................................................... JA1332
    Cross Examination ................................................................ JA1336

Testimony of John J. Cox
    Direct Examination ............................................................... JA1338
    Cross Examination ................................................................ JA1341

Testimony of C.T. Woody, Jr.
    Direct Examination ............................................................... JA1344
    Cross Examination ................................................................ JA1345
    Redirect Examination............................................................ JA1345

Testimony of Maurice D. Scott
    Direct Examination ............................................................... JA1346
    Cross & Redirect Examination ....................................... JA1347

Testimony of Billy Baylock
    Direct Examination ............................................................... JA1348
    Cross Examination ................................................................ JA1350

Testimony of C.T. Woody
    Direct Examination ............................................................... JA1351
    Cross Examination ................................................................ JA1353

Testimony of Rodney Tucker
    Direct Examination ............................................................... JA1355
    Cross Examination ................................................................ JA1356

Testimony of C.T. Woody
    Direct Examination ............................................................... JA1357

Testimony of Ralph Fleming
Direct Examination ..................................................................JA1359
Cross Examination ..................................................................JA1360
Redirect Examination...............................................................JA1360

Testimony of Robin Cooper
Direct & Cross Examination....................................................JA1363

Testimony of Dr. Pamela Royal
Direct Examination ..................................................................JA1364
Cross Examination ..................................................................JA1366

Testimony of Gina Taylor
Direct Examination ..................................................................JA1367
Cross Examination ..................................................................JA1369
Redirect Examination...............................................................JA1372

**Trial Transcript- Volume XV (February 1, 1993)**........................JA1377

Testimony of Steve A. Dalton
Direct Examination ..................................................................JA1378
Cross Examination ..................................................................JA1384
Redirect Examination...............................................................JA1385

Government Guilt Phase Closing Argument .............................JA1395

Robert P. Geary, Esq.  Guilt Phase Closing Argument .............JA1427

Craig S. Cooley, Esq. Guilt Phase Closing Argument...............JA1444

**Trial Transcript- Volume XVI (February 2, 1993)** ....................JA1468

David P. Baugh, Esq. Guilt Phase Closing Argument...............JA1470

Robert J. Wagner, Esq. Guilt Phase Closing Argument...........JA1491

Government Guilt Phase Rebuttal ............................................JA1502

Court Instructions to the Jury re: Guilt Phase.........................JA1511

**Trial Transcript- Volume XVII (February 3, 1993)** ....................................JA1553

Jury Verdict .........................................................................................JA1554

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION


-----------------------------------------

UNITED STATES OF AMERICA,



                          Plaintiff;

    v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                          Defendants.

-----------------------------------------
                      VOLUME VI

                 January 18, 1993
                 Richmond, Virginia
                    10:00 a.m.

BEFORE:       HONORABLE JAMES R. SPENCER
              United States District Judge


APPEARANCES:  HOWARD C. VICK, JR., ESQ.
              WILLIAM H. PARCELL, III, ESQ.
              Office of the United States Attorney;
                  Counsel for Government;

              ROBERT P. GEARY, ESQ.
              ERIC D. WHITE, ESQ.
                  Counsel for Defendant Tipton;
              CRAIG S. COOLEY, ESQ.
              JOHN F. McGARVEY, ESQ.
                  Counsel for Defendant Johnson;
              DAVID P. BAUGH, ESQ.
              ARNOLD R. HENDERSON, V, ESQ.
                  Counsel for Defendant Roane;
              ROBERT J. WAGNER, ESQ.
                  Counsel for Defendant Reavis.
                JEFFREY B. KULL
              OFFICIAL COURT REPORTER
```

(January 18, 1993 at 10 o'clock a.m.)

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, James H. Roane, Jr., and Sandra Reavis, the sixth day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready to proceed.

MR. GEARY: Defendant Tipton is ready, with two housekeeping matters.

MR. McGARVEY: Defendant Johnson is ready.

MR. HENDERSON: Defendant Roane is ready.

MR. WAGNER: Defendant Reavis is ready.

MR. GEARY: Judge, the government brought to your attention last week during the individual voir dire that one among the defendants had not agreed to stipulate to certain testimony and evidence coming in from Trenton, New Jersey. The Court made a comment about that, and I was the person who was refusing to stipulate. I then talked to Mr. Vick that night and we worked out an arrangement by which defendant Tipton would agree, in exchange for the government, at night, providing us a list of witnesses for the next day -- we were given by Mr. Vick Friday afternoon the names of the people in the purported order that they were going to be called. A key witness is a Charles Townes. That person was listed either near the end of today or maybe tomorrow morning.

Mr. Vick advised us this morning after all of us prepared for the other witnesses first that Mr. Townes was going to be the lead-off witness. He says to me there was a problem somewhere internally with the Marshals or somewhere else. And he knew about that yesterday afternoon. I think if that's the case, although all of us don't have fax machines, most of us have what are called VoiceMail and they simply call us to tell us that someone like Townes is going to be the lead-off witness; therefore we can prepare for it. I think I gave up something purportedly in exchange for that and I think the government should be held to that.

MR. VICK: I told counsel for the defendants Friday afternoon who our witnesses would be this morning. I did not by my memory rank them. I told them I anticipated leading off with Mr. Maurice Saunders. Indeed, we were not able to see Mr. Maurice Saunders this weekend. We were not even sure he would be here today. The Marshals also asked that we lead with Mr. Townes, who as the Court knows is a protected witness, because they have scheduling and logistics problems and there is the anticipation of another protected witness being in the City of Richmond this afternoon. And so they asked that we

**JA498**

lead off with Mr. Townes. Counsel all knew that Mr. Townes would be testifying today.

THE COURT: All right.

MR. WHITE: Your Honor, if the Court please, on behalf of Mr. Tipton's second matter of housekeeping, we would like to bring to the Court's attention our motion for Court-supervised access to the witnesses. If the court will recall by previous order, the Court authorized the defense counsel would have access to the government witnesses who are in the Witness Protection Program or who are in protection or who are in protective custody. At the time, I think we were going to take a wait-and-see attitude as to how that would work out.

On Friday of this past week after we brought it to the Court's attention that we had not received access to Mr. Brooks, the Court allowed us to have the time to at least meet with Mr. Brooks in the witness room out here in the hall. We did try to do that. We bring that to the Court's attention. Before we could go in, and over my objection, Mr. Vick wanted to address Mr. Brooks first. There was a Richmond police officer in that room at all times. My specific recollection is that Mr. Vick told that person in no uncertain terms that he did not have to speak with us. And after I at least tried to make my pitch while Mr. Vick was still there and Rodriguez was still there, that witness told me he didn't want to talk to me.

It is our position that if access means anything and we are going to have a fair shot at these people, we ought to be able to make our pitch at having these people talk to us in an environment free from government influence. And I think the only way to assure that is to have the Court tell these people that we should be allowed the opportunity to speak to them without any fear of retaliation by the government.

MR. VICK: Mr. White's motion is factually incorrect because it says only part of what was told to Mr. Brooks. The Court should know that Mr. Brooks is in the Witness Protection Program. He would not be in the Witness Protection Program unless he was fearful for his life from retaliation from these defendants. It would be unfair to Mr. Antwoine Brooks, for him to be just confronted by defense counsel for Mr. Tipton, Mr. Johnson, Mr. Roane, without any prior warning by the government, who he has asked to protect him.

Now, we indeed went in that room. And Mr. White is wrong in that I did not state to him he does not have to talk. I said to him, "Counsel for the

defendants want to speak as to you, they have the right to talk to you, you have the right to talk to them if you want to. I cannot tell you to talk to them, cannot tell you not to. It is entirely your decision." He chose not to.

We have the same situation this morning with Mr. Townes. I have presented the same thing. If the Court would like witnesses as to exactly what I am telling these people, I will provide witnesses. And they are choosing not to speak. I don't think that's unusual.

THE COURT: All right. Anybody else?

MR. BAUGH: Yes. Briefly, I wanted to remind the Court that Antwoine Brooks is the same person, we asked for him almost two months ago. We were told he was in witness protection and could not be located. This is the same person who showed up in Henrico on the arm of Cliff Jackson and testified. It appears the United States can find these people

1136

when they feel like it. And we have a statutory right, because it is a death penalty case, to the names of their witnesses so that we can seek them out and interview them. In this instance, the United States has -- either they have an interesting ability to find witnesses when they want them and not find them when we want them. For those reasons, Your Honor, I think that because of the extraordinary circumstances of Mr. Brooks, that we be allowed to sit in with these witnesses and make an effort to get them to -- to give us access to them. Mr. Brooks, we were told he could not be found.

MR. VICK: Mr. White had the opportunity to talk to Mr. Brooks after I spoke to Mr. Brooks, and Mr. White would tell the Court that Mr. Brooks, he had the opportunity to speak directly with Mr. Brooks and Mr. Brooks told him he did not want to speak. Since the production of the witness list, Mr. Antwoine Brooks has been in protective custody.

THE COURT: Anybody else?

All right, on this first issue of the order of the witnesses, any deal that you all made with the government, that's between you all. I didn't have anything to do with that. If you want to stipulate, that's fine. As I told you before, it takes two to

1137

stipulate. If you all made a deal with that, that's fine. If you are not satisfied with how the government is reacting to that deal, you can pull out of your side if you want to do that. I don't have anything to do with that. I can't tell the government what order to call their witnesses in and I am not going to do that.

On the other issue, all that you are all are

**JA500**

entitled to, as far as I'm concerned, is access to the witness.  That does not mean that the witness will see speak to you and you all no as well as I do, 99 percent of the time the witness for the other side will not talk to you.  He has an option whether he wants to or not, to speak to you.  If they do, you have a chance to sit down with them in a room.  If not, there is nothing I can do about that.  I'm not going to supervise access to the witness as requested.  So that motion will be denied.

MR. WHITE:  If the Court please, notwithstanding the Court's ruling, we still have not had a chance to at least meet with Mr. Townes, and we would at least have the opportunity before he is called to see him in a room.

THE COURT:  Let me say this, Mr. Vick:  I do want you to give these folks a meaningful opportunity to speak with the witnesses.  And if they need time, we will take the time.

MR. VICK:  At 9:30 this morning I asked counsel did they want to meet with Mr. Townes.  They said not until they had this motion to the Court.

THE COURT:  All right.  Let me say this directly to you, Mr. White:  You have been mugging a lot, your facial expressions indicating displeasure with the way things are going on.  Please don't do that.

MR. WHITE:  I apologize.

THE COURT:  Especially when the jury is in here.  Try not to do that.  If you all want some time now to make an attempt to talk to Mr. Townes?

MR. WHITE:  Yes, sir, if the Court please.

THE COURT:  All right.  We will take a brief recess.  I will give you, say, ten minutes.  Let me know something.

(Recess taken from 10:15 a.m. to 10:25 a.m.)

(Witness on stand.)

THE COURT:  All right.  Bring in the jury.

(The jury entered the courtroom.)

All right, the witness will be sworn.

## I.  Charles Townes (1138)

CHARLES TOWNES, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'm going to ask that you pull that microphone close to you and speak loudly and clearly.  Could you state your name?

Charles Townes (Direct)

A    Charles Townes.
Q    Mr. Townes, how old are you?
A    20.
Q    You are known by a nickname, also; is that correct?
A    Correct.
Q    What's your nickname?
A    "May-May."
Q    Mr. Townes, how far did you go in school?
A    To the tenth grade.
Q    You have a prior criminal record; is that correct?
A    Correct.
Q    What is your prior criminal record?
A    Possession of cocaine.
Q    Where did that take place?
A    New Jersey.
Q    Was that purchase pursuant to your arrest on March 20th, 1992?
A    Correct.
Q    Now, Mr. Townes, you are testifying for the federal government pursuant to an agreement that's been reached between you and the United States Attorney's Office for the Eastern District of Virginia; is that correct?
A    Correct.
Q    Could you tell the ladies and gentlemen of the jury in your own words what you understand that agreement to be?
A    To give my testimony for immunity.
Q    Now, that's immunity from use of your words in the prosecution; is that correct?
A    Yes.
Q    In other words, what you tell us we will not then use against you to convict you of the crime of conspiracy to distribute cocaine.
A    Correct.
Q    Now, have we told you whether you could indeed be prosecuted by other prosecutorial forces or other investigative agencies if they indeed mount an investigation and convict you based upon evidence other than your own words?
A    Correct.
Q    So you could by your understanding be prosecuted that way?
A    Yes.
Q    What's your understanding as to what you must give us in order to receive that use-immunity?
A    Testimony.
Q    And what happens if we were able to show that indeed you had knowingly lied from the stand?
A    You would prosecute me.

**JA502**

Q    Prosecute you for what?

A    Lying, perjury.

Q    The words that you have given us in regards to your cooperation with the federal government would then be used against you, also?

A    Correct.

Q    So you could indeed be charged and prosecuted for this offense.

A    Yes.

Q    Now, in anticipation for your testimony, you have had occasion to meet with myself, Detective Fleming, and other people involved in this investigation on numerous occasions; is that correct?

A    Correct.

Q    In all of those occasions, during any of those occasions, have we provided you with the answers that we would like you to give us in response to the questions that we have asked you?

A    Repeat that question again.

Q    Have we ever told you what your answers should be?

A    No.

Q    Where are the answers that you are  --  that is, where is the subject of your testimony coming from?

A    The truth.

Q    Now, have you received any money for your testimony?

A    No.

Q    Do you know the defendant in this case, Mr. Richard Tipton?

A    Yes.

Q    Do you see Mr. Tipton seated in the courtroom?

A    Yes.

Q    Could you point him out, please, and describe what he is wearing?

        MR. WHITE:  We will stipulate he can identify Mr. Tipton.

        THE COURT:  Record will so reflect.

BY MR. VICK:

Q    How long have you known Mr. Tipton?

A    About nine years.

Q    Where did you meet him?

A    In Central Gardens.

Q    Where is Central Gardens?

A    Richmond, Virginia.

Q    Is that where you grew up?

A    Yes.

Q    Do you know, based upon your involvement with Mr. Richard Tipton, whether he has a nickname?

A    "Whitey."

Q    Do you know, based upon your involvement with

**JA503**

Charles Townes (Direct)

"Whitey," how he supported himself?
A    Yes.
Q    What is that?
A    Drugs.
Q    Doing what with drugs?
A    Selling drugs.
Q    What kind of drugs did Mr. Tipton sell?
A    Cook-'em-up.
Q    What is cook-'em-up?
A    Crack.
Q    I direct your attention to the fall, approximately the fall of 1990.  Did you have occasion in that time frame to approach "Whitey," Mr. Richard Tipton, and talk to him about becoming

1144
involved with him in the sale of crack cocaine?
A    Yes.
Q    Could you tell the ladies and gentlemen of the jury what you did and what that conversation was?
A    I asked him can I have like a 300-sack of coke to sell.
Q    What is a 300-sack of coke?
A    30 "cook-'em-ups."
Q    30 separate pieces of crack cocaine?
A    Correct.
Q    Which would sell for how much each?
A    $10 apiece.
Q    What did Mr. Tipton say when you asked him could you get a 300-sack from him?
A    He gave it to me.  He said yes.
Q    Did you indeed sell that cook-'em-up, that crack cocaine?
A    No, I gave it back to him the next day.
Q    Why is that?
A    I didn't really want to get involved with drugs.
Q    Why was that?
A    I was afraid, really.
Q    Do you know an individual by the name of Hussone Jones?

1145
A    Yes.
Q    Do you know an individual by the name of Maurice Saunders?
A    Yes.
Q    In that time frame, in the fall of 1990, do you know whether those individuals were engaged with Mr. Richard Tipton in any way?
      MR. BAUGH:  Objection.  If it is going to be based upon his own knowledge, of course, we would have no objection.  But if it comes from conjecture --
BY MR. VICK:
Q    I'll ask that.  Based on your own knowledge and

**JA504**

Charles Townes (Direct)

observations, do you know that Mr. Saunders and Jones in the fall of 1990 or thereabouts were involved with Mr. Richard Tipton in any way?

A    Yes.

Q    How was that?

A    Drug selling.

Q    How do you know that?

A    I seen it done.  Plus they told me.

Q    Now, on that 300-sack of cocaine that Mr. Tipton gave you, did you have an arrangement with him as to how you would pay him or did you pay him at the time you received the cocaine?

1146

A    I would pay him after I finished selling it.

Q    What payment were you to make then?  Was there a split?

A    Yes, 60-40 split.

Q    Do you know an individual by the name of Antwoine Brooks?

A    Correct.

Q    Based upon your own observation, do you know whether Mr. Antwoine Brooks was engaged with Mr. Tipton in any activity in the fall of  --

MR. WHITE:  I object.  I think it is basically a leading question.  He can say what he knows about about Mr. Brooks and what activities he was engaged in, but I think the United States is suggesting an answer and relationship.

THE COURT:  Overruled.

BY MR. VICK:

Q    Do you know whether in the fall of 1990, based upon your own personal observation and knowledge, whether Mr. Antwoine Brooks was engaged with Mr. Richard Tipton, "Whitey"?

A    Yes.

Q    In what fashion was that?

A    A partnership.

Q    Now, in anticipation of your testimony, has

1147

anyone told you that you should ever use the word "partnership" in your testimony?

A    No.

Q    Where did that word come from?

A    It came from me.

Q    Now, could you describe what you mean by partnership when you say that Mr. Antwoine Brooks was in a partnership with Mr. Tipton?

A    Like "Whitey" and Antwoine did distribute the drugs to the workers.

Q    Who are the workers?

A    Hussone, Maurice.  That was about it at the time.

Q    When you got that 300-sack of cocaine from Mr. Tipton, did you become a partner of Mr. Tipton?

**JA505**

Charles Townes (Direct)

A    No.

Q    What were you for Mr. Tipton?

A    A worker.

Q    Did anyone tell you in anticipation of your testimony, anyone from the prosecution, that you should indeed use the word "worker?"

MR. McGARVEY:  I object.  Mr. Vick is bolstering his witness.

THE COURT:  Overruled.

THE WITNESS:  No.

1148

BY MR. VICK:

Q    Do you know an individual by the name of "Hess?"

A    Yes.

Q    Who is "Hess?"

A    "Whitey's" best friend.

Q    Do you know where "Hess" lives or where "Hess" was from?

A    New York.

Q    In the fall of 1990, did you see "Hess" with Mr. Richard Tipton, "Whitey?"

A    Yes.

Q    Where was that?

A    Central Gardens.

Q    Now, based upon your own observation and knowledge, did you see the individuals that you have testified to here today -- Mr. Maurice Saunders, Mr. Hussone Jones, Mr. Antwoine Brooks, and Mr. Richard Tipton -- selling cocaine in Central Gardens in that time frame?

A    Correct.

Q    Where was it that they were selling cocaine?

A    On Catchpenny.

Q    Did there come a time when these individuals lived on Sandy Lane; are you familiar with that house?

1149

A    Yes.

Q    Is that the time frame that you are testifying about?

A    Correct.

Q    Have you ever seen "Whitey" prepare crack cocaine, prepare cook-'em-up?

A    Yes.

Q    Where have you seen that take place?

A    On Sandy Lane.

Q    All right.  And what quantity of cocaine was Mr. Tipton, "Whitey," cooking?

A    Powder.

Q    In what amount?  How much?

A    16 ounces, 16, 17 ounces.

Q    Is that based upon your own personal observation?

A    Yes.

**JA506**

Charles Townes (Direct)

Q    Do you know how much cocaine, based upon your own personal observation and knowledge, Mr. Hussone Jones and Mr. Maurice Saunders were selling for Mr. Tipton in that time frame?
A    500 apiece.
Q    500 apiece?  What do you mean by 500?
A    50 "cook-'em-ups."
Q    All right.  And is that $500 worth of cocaine?

A    Yes.
Q    How often would they sell that amount of cocaine?
A    Every other day.
Q    Do you know if there came a time when "Hess," "Whitey's" friend from New York, had some problems in New York or New Jersey?
A    Yes.
Q    And how do you know that?
A    He told me.
Q    Who is he?
          MR. BAUGH:  We have a continuing 801(d)(2)(E) objection as it pertains to the defendant James Roane on all of this testimony.
          THE COURT:  The objection is noted and continued, as I told you before.
BY MR. VICK:
Q    "Whitey" told you what about "Hess?"
A    Well, he said he had to go back to New Jersey -- not New Jersey, but New York, to go to Court.
Q    Did he say why he had to go to Court?
A    Yes, he said  --
          MR. WHITE:  If the Court please, we would object.  We don't see how this is related to this particular conspiracy.

          THE COURT:  Overruled.
BY MR. VICK:
Q    Go ahead.
A    He said their house got raided.
Q    Do you know or have you ever heard of the name the New York Boyz?
A    Yes.
Q    Where did you hear that name?  Where did you first hear that name?
A    Back in the fall, like on Catchpenny.
Q    Who did you hear that name from?
A    "Whitey."
Q    Did you ever hear it from "Hess?"
A    No.
Q    What did "Whitey" say about the New York Boyz?
A    He didn't say too much about them.  He just said they was like in some kind of trouble up there.
Q    Was "Whitey" always in Central Gardens?
A    Not always, no.

**JA507**

Q   Where was he?  Where did he go; do you know?
A   No, not all the time.
Q   Do you know whether from your own personal observation  --
        MR. BAUGH:  Objection, leading.
        THE COURT:  Sustained.

BY MR. VICK:
Q   Do you know an individual by the name of Cory Johnson, "C.O.?"
A   Yes, I do.
Q   Do you see Mr. Cory Johnson or "C.O." in the courtroom today?
        MR. McGARVEY:  We will stipulate he will identify the defendant.
        MR. VICK:  Record so reflect?
        THE COURT:  Record will so reflect.
BY MR. VICK:
Q   When did you first meet Mr. Cory Johnson, "C.O.?"
A   It was  --  I can't remember what date it was, exactly when I met him.  It was after "Whitey" had went to New York for a couple of months and then he came back.
Q   Now, when you first got that 300-sack of cocaine and chose not to sell it, did you get any more cocaine from Mr. Tipton in that immediate time frame, immediately after that?
A   No.
Q   Did there come a time when you indeed got involved with Mr. Tipton, "Whitey," in the sale or distribution of cocaine?

A   When he was living off Leigh Street.
Q   When was that?
A   December.
Q   December of what year?
A   1991.
Q   All right.  So from the fall of -- November, 1990 to December of 1991, you didn't actually distribute cocaine with Mr. Tipton?
A   No.
Q   All right.  When in relation to your beginning to deal cocaine in approximately December of 1991 with Mr. Tipton was it that you met "C.O.?"  Cory Johnson?
A   Repeat that again.
Q   If you began to deal cocaine with Mr. Tipton again in December of 1990, when was it in relation to your beginning to sell cocaine with Mr. Tipton that you first met  --  1991,  excuse me  --  when was it that you first met Cory Johnson, "C.O.?"
A   When they were living off Leigh Street, he had asked me did I want to sell, and I said yeah.

**JA508**

Q   So was it in the same time frame?
A   Correct.
Q   And where was it that you met Mr. Cory Johnson?
A   In Central Gardens.

1154

Q   Did "Whitey" introduce you to "C.O.?"
A   Yes.
Q   How did he introduce him?
A   As a brother.
Q   Do you know, based upon your own personal observation and your involvement with Mr. Richard Tipton, "Whitey," and Mr. Cory Johnson, "C.O.," whether there was a business relationship of sorts between Richard Tipton and Cory Johnson?
A   Yes.
        MR. WHITE:  Objection.  If the Court please, that's a conclusion.  He can state what he saw them do.  It is up to the jury to draw their own inferences.
        THE COURT:  Sustained.
BY MR. VICK:
Q   When you got involved with Mr. Tipton in the sale of cocaine, did you indeed receive crack cocaine from Mr. Tipton in about December of 1991?
A   Correct.
Q   What quantity of crack cocaine did you receive from Mr. Tipton?
A   $300 worth.
Q   And what arrangement did you have with Mr. Tipton for payment for that cocaine?

1155

A   60-40 split.
Q   Did indeed you sell that cocaine?
A   Yes.
Q   Where did you sell that cocaine?
A   Central Gardens.
Q   Did you have a 60-40 split, did you pay Mr. Tipton, "Whitey," 60 percent of the money that you made from that sale?
A   Correct.
Q   Did you continue to get cocaine from Mr. Tipton, "Whitey," after that?
A   Correct.
Q   You were arrested in New Jersey in March of 1992; is that correct?
A   Yes.
Q   From December of 1991 to March of 1992, were you continually involved with Mr. Tipton?
        MR. WHITE:  Objection, it is a leading question.  He can state how frequently he was with him.
        THE COURT:  Sustained.  Just ask him how long.
BY MR. VICK:

**JA509**

Q   How long were you involved with Mr. Tipton in the sale and distribution of cocaine?

1156

A   About two years.
Q   From December of 1991 when you got involved again with Mr. Tipton, when was it that you quit?
A   After I got locked up.
Q   In New Jersey?
A   Correct.
Q   Did Mr. Tipton ever talk to you, "Whitey" ever talk to you about the Leigh Street area of Richmond, the Newtowne section of Richmond?
A   Yes.
Q   What did he tell you about that?
A   He had said --
        MR. WHITE:  Objection, unless it is in furtherance of some conspiracy.  Idle chatter between two people is not necessarily in furtherance of a conspiracy.
        THE COURT:  You can't have it both ways. Either he leads, directs him, or he asks an open-ended question.  Go ahead.
BY MR. VICK:
Q   Go ahead.
A   He said his cousin was getting out of jail and he said he had a spot over there by Leigh Street.
Q   What did he say that he was going to do if anything with that spot over there by Leigh Street?

1157

A   Said he was going to lock it down.
Q   What did you understand him to mean?
A   That area belongs to him, really.
Q   Belongs to him in what regard?
A   Drug-related.
Q   And when he said his "cousin," did you know who he was talking about?  Did he identify who his cousin was?
A   He just said James, yes.
Q   Did you come to find out at a later date who that person was?
A   Yes.
Q   Who is that?
A   James Roane.
Q   Do you see Mr. James Roane in the courtroom today?
A   Yes.
Q   Could you please identify Mr. James Roane? Describe where he is sitting and what he is wearing.
A   Second seat, white striped shirt, blue blazer.
        MR. VICK:  Could the record reflect the identification of defendant James Roane, Your Honor?
        THE COURT:  Record will so reflect.
BY MR. VICK:
Q   Do you know where Mr. Tipton was living at that

**JA510**

1158

time?

A    Yes, on Leigh Street.  No, not Leigh Street  --

Q    Do you know whose house he was living in?

A    No, I can't remember at the time.

Q    Did you have occasion to go to that area of town, the Newtowne section, and see Mr. Richard Tipton?

A    Yes.

Q    What did you go there to see him for?

A    Associating to get drugs.

Q    Did you indeed get drugs from him?

A    Yes.

Q    And how often was it that you were getting drugs from Mr. Richard Tipton?

A    Every other day.

Q    In what quantity were you getting drugs from Mr. Tipton?

A    $300 bag.

Q    All right.  Did you come, based upon your involvement with Mr. Tipton in the sale and distribution of cocaine, to understand the business relationship, if any, between "Whitey" and "C.O.?"

    MR. WHITE:  Objection.  If the Court please, one objection to the business relationship has already been sustained.  He can testify as to

1159

what he saw.

    MR. VICK:  It was given at that time, Your Honor.

    THE COURT:  I'm going to sustain the objection.  Just ask him what went on, if he knows, between them.

BY MR. VICK:

Q    What went on between Mr. Cory Johnson and Mr. Richard Tipton?

A    They sold drugs, a partnership.

Q    Were you a partner?

A    No.

Q    What was the difference between their partnership and you?

A    I had to bring money back with me.

Q    Do you know what went on between Mr. James Roane, Mr. Cory Johnson, "C.O.," and Mr. Richard Tipton?

    MR. BAUGH:  Your Honor, objection.  He can ask what he observed.

    THE COURT:  "What went on" is fine.  He can answer the question.

BY MR. VICK:

Q    Go ahead.

A    A partnership.

1160

Q    All right.  Were you a partner with Mr. James

Charles Townes (Direct)

Roane?

A No.

Q That first 300-sack of cocaine that you got from Mr. Tipton in December of 1991, did you indeed go and sell that cocaine?

A Yes.

Q How long did it take you to sell that cocaine?

A A half a day.

Q And where was it that you got that cocaine? Where was Mr. Tipton when you got that cocaine from him?

A Off of Leigh Street.

Q Was he in a house?

A A house.

Q Could you describe the house for us, please?

A Yellow, brown trimming, upstairs, two-story.

Q Do you know whose house it was?

A James' father's house.

Q When you say James, who do you mean?

A James Roane.

Q All right. Did you go back to get more cocaine after that?

A Correct.

Q Do you know an individual by the name of Curt,

1161

Curt Thorne?

A Correct.

Q How do you know him?

A I knew him when I used to go over off of Leigh Street and see "Whitey."

Q What was Mr. Curt Thorne doing to support himself?

A He had a job but he also sold drugs, too.

Q Who was he selling drugs for?

A "Whitey."

Q How do you know that?

A I have seen him get them, a sack of drugs.

Q Do you know an individual by the name of "Mousey," Dorothy Armstrong?

A Correct.

Q How do you know her?

A I knew her the same way I knew Curt.

Q What is that? You need to say it.

A Like when I would go around and see "Whitey."

Q Do you know an individual by the name of Sandra Reavis?

A Correct.

Q Could you look around the courtroom and see if you see Sandra Reavis in the courtroom?

A Correct.

1162

Q Could you identify her, please?

A White striped shirt, gray blazer.

MR. VICK: May the Record reflect the

**JA512**

Charles Townes (Direct)

identification of Ms. Sandra Reavis?

THE COURT:  The record will so reflect.

BY MR. VICK:

Q    How did you know Ms. Sandra Reavis?

A    From when I used to go around there and see "Whitey."

Q    Do you know if she was involved in any way with Mr. Tipton in the sale and distribution of cocaine?

A    Correct.

Q    How do you know that?

A    When I was over at Carver School, they said  --

MR. WAGNER:  Objection.

BY MR. VICK:

Q    Who was it, the "they" that you mentioned?

A    "Whitey" and "C.O." was talking.

Q    What were they saying?

A    They said she had friends finishing off sacks and would come back and get more.

Q    Do you know an individual by the name of Jerry Gaiters?

A    Correct.

Q    Who is Jerry Gaiters?

A    A worker.

Q    A worker in what regard?

A    Drug worker.

Q    Did you have conversations with "Whitey," Richard Tipton, about his relationship with Curt Thorne, "Mousey," Dorothy Armstrong, Sandra Reavis, and Jerry Gaiters?

A    Repeat that again.

Q    Did you have conversation with "Whitey," Richard Tipton, about his relationship in the sale or distribution of cocaine with Curt Thorne, Dorothy Armstrong, Sandra Reavis, and Jerry Gaiters?

MR. WAGNER:  I object.  I would ask if he ask individually of each of those.  It is a compound question.

THE COURT:  Sustained.

BY MR. VICK:

Q    As to Mr. Thorne, did you have a conversation with Mr. Tipton as to his relationship?

A    Correct.

Q    As to Ms. Dorothy Armstrong, did you have a conversation with Mr. Tipton, "Whitey," about his relationship with her?

A    No, not really.

Q    As to Sandra Reavis, did you have a conversation with "Whitey" as to his relationship with her?

A    No.

Q    As to Jerry Gaiters?

A    One conversation.

Q    What did Richard --

**JA513**

Charles Townes (Direct)

A    The conversation, I was like listening to what he was talking about.
Q    Who was he talking to and what was he talking about?
A    "C.O."  He had said something like if you murder -- I mean either you take the other person's life or we take yours.
Q    That was to whom?
A    Jerry Gaiters.
Q    Did you talk to -- did "Whitey" tell you anything specifically about his relationship with Curt Thorne?
A    No, not exactly, no.
Q    Okay.  Do you know where Richard Tipton, "Whitey," was getting the cocaine that you sold?
A    New York.
Q    Have you ever heard the name "Light?"
A    Yes, not a lot of times.
Q    Where have you heard that name?
A    I heard "Whitey" and "C.O." talk about it one time.
Q    What did they say about "Light?"
A    I can't remember.
Q    Do you know an individual by the name of Doug Talley?
A    Correct.
Q    How do you know Doug Talley?
A    I knew him when I used to go around and see "Whitey."
Q    Go around where and see "Whitey?"
A    Off of Leigh Street.
Q    Do you know whether, based on your own personal observation and involvement, whether Mr. Doug Talley was involved with "Whitey" in the sale and distribution of cocaine?
A    Yes.
Q    What do you know that involvement to be; what was he doing?
A    He used to take him back and forth to New York.
Q    For what reason?
A    To get coke.
     (Photograph proffered to counsel.)
Q    I show you what has been previously marked Government Exhibit 1-1 and ask you if you could look at that.
A    Yes.
Q    Can you identify what is depicted in that photograph?
A    A gray Classic, Caprice Classic.
Q    Whose car was that?
A    Doug Talley's.
     MR. VICK:  I move that.

**JA514**

Charles Townes (Direct)

THE COURT:  It will be admitted.

BY MR. VICK:

Q    Did you ever see Mr. Talley, or were you present when Mr. Talley left with "Whitey" to go to New York?

A    Once, yes.

Q    Do you know from your conversations with "Whitey" how often Mr. Talley was taking him to New York?

A    Like every other day.

MR. WHITE:  Beg your pardon?

THE WITNESS:  Every other day.

BY MR. VICK:

Q    Were they getting something in New York?

MR. BAUGH:  Objection to "they."

BY MR. VICK:

Q    Talley and "Whitey," were Talley and "Whitey" getting anything in New York on those trips?

A    Drugs.

MR. McGARVEY:  I would object unless there is a foundation laid.

BY MR. VICK:

Q    Based upon your conversations with "Whitey," do you know what "Whitey" and Talley were going to New York to get?

A    Drugs.

Q    Did indeed they come back with drugs?

A    Correct.

Q    Based upon your involvement with "Whitey," do you know whether they brought drugs back to the City of Richmond?

A    Yes.

Q    What kind of drugs?

A    Powder.

Q    Did you indeed get some of that?  Excuse me, did you say powder?

A    Powder.

Q    What would be done with that powder when they got back?

A    It would be cooked up.

Q    In the Newtowne section of town, have you ever seen Mr. Richard Tipton, "Whitey," cook cocaine?

A    No.

Q    Did you ever get powder cocaine to distribute from Mr. Richard Tipton?

A    Once, yes.

Q    What was the primary  --  what kind of drugs were you selling for Mr. Tipton primarily?

A    Crack.

Q    Do you know what quantity of cocaine Tipton was bringing back from New York on these trips?

A    Like a half a key.

**JA515**

Q    Every other day?
A    Correct.
Q    How much cocaine were you selling for Mr. Tipton on a weekly basis?
A    $300 worth.
Q    $300 worth per week?
A    Yes.
Q    All right.  What would you do?  Was relationship concerning payment always the same on that cocaine; did you always have the same arrangement with him?
A    Yes.
Q    What was that?
A    60-40.
Q    Over the entire time that you sold cocaine for Mr. Tipton, from December of 1991 to March of 1992,

1169

would you tell the ladies and gentlemen of the jury approximately how much in a monetary form, how much money you made selling cocaine for Mr. Tipton?
A    $10,000.
Q    How much money did you pay Mr. Tipton?
A    60 percent of it.
Q    So if you made 10,000 total, you would have paid him 60 percent of that $10,000?
A    Right.
Q    The other money would have gone in your pocket?
A    Correct.
Q    Do you know whether, based upon your own knowledge and involvement, whether there were other people in that time frame involved with Mr. Tipton selling cocaine?
A    Yes.
Q    Who were they?
A    Jerry, Curt, Sandra, Hussone and me.
Q    Has Mr. Richard Tipton ever asked you to deliver anything to Sandra Reavis?
A    Yes.
Q    Tell the ladies and gentlemen of the jury about that.
A    I never delivered anything to her.
Q    Did he ask you to deliver something?

1170

A    Yes.
Q    What did he ask you to deliver to her?
A    Crack.
Q    Did you indeed deliver crack to her?
A    No.
Q    Why is that?
A    I didn't want to go back over in that area over there.
Q    Do you know an individual by the name of Lance Thomas, "V," or "V" Mack?
A    Correct.

**JA516**

Q   When did you meet him?
A   End of December, early January.
Q   Of what year?
A   1991-1992.
Q   Where did you meet him?
A   Off of Leigh Street.
Q   Who introduced you to him?
A   "Whitey."
Q   How did "Whitey" introduce him to you; what did he say about him?
A   As a cousin.
Q   Do you know where "V," Lance Thomas, had come to Richmond from?
A   New York.

1171

Q   Do you know an individual by the name of "E.B."? "E.B.?"
A   Correct.
Q   Who is "E.B."?
A   A friend, I guess.
Q   Friend of whose?
A   "V" Mack, "C.O.," and "Whitey."
Q   When did you meet him?
A   At the same time I met "V."
Q   Where was it that you met him?
A   Off of Leigh Street.
Q   Do you know where he came from?
A   New York.
Q   Do you know how old he was?
A   About 16.
Q   Did Mr. Tipton ever refer to you as a cousin or a brother?
A   No.
Q   Have you ever heard him refer to "V"  --  I've already asked that question.  Based upon your involvement in the sale and distribution of cocaine from December of 1991 until March of 1992, do you know what the relationship between "Whitey," "C.O.," "J.R.," and "V" was?
            MR. BAUGH:  Objection.  That is compound.

1172

            THE COURT:  Sustained.
            MR. WHITE:  And conclusory.
BY MR. VICK:
Q   Do you know what the relationship between "Whitey" and "C.O." was?
            MR. WHITE:  I think it asks for a conclusion which should be drawn by the jury.
            THE COURT:  Overruled.
            THE WITNESS:  Partnership.
BY MR. VICK:
Q   Do you know the relationship between "Whitey" and "J.R."?
A   Partners.

Q   Do you know the relationship between "Whitey" and "V?"

A   Partners.

Q   Were any of the other people that you have identified as your knowing sold cocaine with "Whitey," "C.O.," thought of as a partner?

MR. BAUGH:  Objection.  Thought of?  That is conclusory.

THE COURT:  Sustained.

BY MR. VICK:

Q   Were any of the other people that you have testified to as having sold cocaine classified as partners?

A   No.

Q   Have you had occasion to have conversation with Mr. Richard Tipton about the murder of Mr. Douglas Talley?

A   Yes.

Q   When did that conversation take place?

A   About a day or two after it happened.

Q   Where did that conversation take place?

A   Off of Leigh Street.

Q   Who was present for that conversation?

A   Just me and "Whitey."

Q   What did "Whitey" tell you about the murder of Doug Talley?

A   I said, "The man who used to take you up to New York?"  He said yes.  He said, "I just murdered him."

Q   Did he tell you where he had murdered him?

A   He just said, "The other day."

Q   Did he tell you where he had murdered him?

A   Southside.

Q   Did he tell you how he had murdered him?

A   Yes.

Q   How did he tell you he murdered him.

A   He said he knifed him in the head, stabbed him in the head.

Q   Did he tell you whether anyone else was present?

A   Yes.

Q   Who was that?

A   Hussone.

Q   Did he tell you why he had killed Doug Talley?

A   Yes, he did.

Q   What did he state was the reason he killed Doug Talley?

A   He thought he thought he was with the police.

Q   What did he think Doug Talley was doing as a policeman?

A   I guess snitching up or whatever.

Q   Snitching on who?

**JA518**

A    "Whitey," "C.O.," "V," James.

MR. COOLEY:  I object to that, if that's the term that was used by Mr. Tipton, no objection. If that's his understanding of what was meant, then I do object.

THE COURT:  Clarify it, Mr. Vick.

BY MR. VICK:

Q    Who did Mr. Tipton say that he was fearful -- based upon your knowledge, involvement in this with Mr. Tipton in that time frame, do you know who Mr. Tipton was fearful of Doug Talley snitching on?

MR. BAUGH:  Objection.  That's calling for a conclusion.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did he state specifically who he was concerned about Talley snitching on or about?

A    Yes.  Himself, "C.O.," and James "V."

Q    Did he tell you where Mr. Talley was when he was killed?

A    Southside.  On the street.

Q    And where did the murder take place?  Did it take place in a house, on the street?  Did he tell you that?

A    In a car.

Q    Whose car?

A    Doug Talley's car.

Q    The car depicted in Government Exhibit 1.1 that you just saw?

A    Correct.

Q    Did you ever have a conversation with Richard Tipton, "Whitey," about what he intended to do regarding the drug business in Newtowne?

A    Repeat that again.

Q    Did you ever have conversation with "Whitey" about what he intended to do about the drug business in Newtowne, about Newtowne?

A    To sell drugs.  To sew it up.

Q    When you say sew it up, what do you mean?  What did you understand him to mean?  What do you mean?

MR. BAUGH:  Objection.  What he means would not be the issue.

MR. VICK:  It is the issue, Your Honor.

BY MR. VICK:

Q    When you say sew it up, what do you mean?

A    The area belongs to him.

MR. BAUGH:  Objection.

THE COURT:  Hold on.  I'll sustain the objection.

MR. VICK: I'm just asking him to tell the jury what he means.

THE COURT:  He was explaining his

understanding in using the term "sew it up."  I don't know whether that's the other folks's term or his.

BY MR. VICK:

Q    Is that your term or Mr. Tipton's term, "sew it up?"

A    That's my term.

Q    What do you mean?

MR. BAUGH:  Objection.

THE COURT:  Overruled.

THE WITNESS:  The area belongs to him drug-related wise.

BY MR. VICK:

Q    Did he tell you what he would do to take it over?

A    No.  Not exactly.

Q    Did he ever have a conversation with you about a man who had a gauge, a shotgun in his hand?

A    Yes.

Q    Tell us about that conversation.

A    He didn't say too much.  He just said there was a big dude walking around with a gauge in his hand.

Q    He said what?

A    He said he would get the nigger.

Q    This was person going around with a shotgun in his hand?

A    Off of Leigh Street, around in that area.

Q    When was it that he had that conversation with you?  Was it after or before the conversation you had with him about the murder of Doug Talley?

A    After.

Q    I direct your attention to February 1st, 1992.  On that date, there occurred a triple homicide in Church Hill; are you familiar with that?

A    Correct.

Q    Were you with Mr. Tipton on the day of that triple homicide?

A    Yes.

Q    Where were you?

A    Over in Southside.

Q    What were you doing over in Southside?

A    No, I'm sorry.  That's the wrong statement.

Q    There was a triple murder in Church Hill.  Are you familiar with the murder of Dorothy Armstrong?

A    Yes.

Q    Were you with Mr. Tipton on the day that that murder occurred?

A    Correct.  We was in Central Gardens and we had went off of Leigh Street.

Q    Who is we?

A    Me and "Whitey."

Q    What time of day was this?

A    Nighttime.  Evening.

Charles Townes (Direct)

Q    Did you see anyone when you went to that area off of Leigh Street?
A    Yes.
Q    Who did you see?
A    "C.O.".
Q    How did you get from Central Gardens to Newtowne?
A    We used the Kenny car.
Q    What kind of car?
A    Pontiac 6000.
Q    How did you get to use that car?
A    "Whitey" gave him coke to use it.
Q    You took that car to Newtowne?
A    Correct.
Q    Who drove?
A    I did.
Q    And you saw Mr. Cory Johnson?
A    Yes.
Q    "C.O."  What did you do when you saw Cory Johnson?
A    We had parked the car and got out.  He said he had to go take care of business.  He said Jerry was going to take him over to Southside.
Q    Who said he had to go take care of business?
A    "C.O."
Q    And he said who was going to take him there?
A    Jerry.
Q    What did you understand him to mean when he said "take care of business?"
        MR. McGARVEY:  Objection.
        MR. WHITE:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Did you get back in the car?
A    Yes.
Q    Where did you go?
A    A house over by Carver School.
Q    Could you describe that house, please?
A    Regular townhouse or whatever.
Q    Do you know the address of that house?
A    1212, I think.
Q    1212.  Do you know the street name?  Do you just know it by 1212?
A    1212.
Q    Why did you go to that house; who lived at that house?
A    "C.O." and "V," "E.B."
Q    On that day, February 1st, why did you go to that house at 1212?
        MR. WHITE:  I object to that question.  He is giving him dates.  That is leading this witness.
        THE COURT:  Overruled.

**JA521**

Charles Townes (Direct)

BY MR. VICK:

Q    Go ahead.

A    To pick up weapons.

Q    Did you indeed do that?

A    Correct.

Q    Who went with you?

A    Me, "Whitey," "C.O." and Jerry.

Q    And where were the weapons picked up?

A    "C.O." went in the back and got them.

Q    Around the back of what?

A    The house.

Q    Inside the house?

A    No, outside.

Q    Did he bring those weapons in the house?

A    He just brought one in.

Q    What kind of weapon was that?

A    A Tec-9.

Q    All right.  And what did he do with that weapon?

A    Gave it to Jerry.

Q    Is that the only weapon that you saw there that day?

A    Yes.

Q    Do you know if Mr. Cory Johnson, "C.O.," was armed in any way that day?

A    Yes.

Q    How was he armed?

A    With a Glock.

Q    Did you see that Glock that day?

A    Not that day, no.

Q    How do you know he had a Glock on him?

A    Basically, you know, the gun was his.  He used to carry it with him all the time.

        MR. McGARVEY:  I couldn't hear.

        THE WITNESS:  The gun was basically his. He would carry it all the time.

        MR. BAUGH:  Objection.  "How do you know he was armed that day?"  The answer is not responsive.

        THE WITNESS:  He said he was going to take care of business.  Actually, I don't know if he was armed that day.  Let's put it that way.

BY MR. VICK:

Q    When you got the gun, did you get in the car after you got the gun?

A    Yes.

Q    Where did you go?

A    To Central Gardens.

Q    And what did you go to Central Gardens for?

A    I told them to drop me off.

Q    When you got the gun, when you went to 1212 to get the gun, who was present at 1212?

A    "V" and "E.B."

Charles Townes (Direct)

Q   Was Jerry Gaiters present?
A   Correct.  Yes.

1183

Q   Was "C.O." present?
A   Correct.  And "Whitey."
Q   And "Whitey."  And that Tec-9 was given to whom?
        MR. BAUGH:  Asked and answered.
        THE COURT:  Sustained.
BY MR. VICK:
Q   How did that  --  was the Tec-9 carried into the house in anything?
A   A little black handbag.
Q   Could you describe that handbag, please?
A   Like a little black gym bag.
Q   Do you know what was written on there?
A   "Salem," I think.
Q   Did you have conversations with "C.O." after that day about his giving that Tec-9 to Jerry Gaiters?
A   Yes.
Q   What did he tell you in that conversation?
A   He said he gave the Tec-9 to him because "Mousey" was turning to fire; he knew the gun was going to jam.
Q   After the Tec-9 was given to Gaiters, did you get in the car?
A   Correct.

1184

Q   Who got in the car with you?
A   Me, "Whitey," "C.O." and Jerry.
Q   Who drove?
A   I did.
Q   Did you know where they were going?  When you got in the car and left 1212, where did you go to?
A   Central Gardens.
Q   What happened when you got to Central Gardens?
A   I got out.
Q   Did you have any conversation with "Whitey" on the drive from 1212 to Central Gardens?
A   Yes.
Q   Tell us about that conversation.
A   He just said, "Why don't you come with us?"  I told him no.  He said, "You pussy-ass nigger."
Q   What did he want you to come with them and do?
        MR. BAUGH:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q   Where were they going?
        MR. BAUGH:  Same objection.
        THE WITNESS:  To Church Hill.
        THE COURT:  Ask him what Tipton told him.
BY MR. VICK:
Q   Did you have conversations with Tipton and

**JA523**

1185

"C.O." about where they were going that day?

A    To Church Hill.

MR. WHITE:  Which one?

BY MR. VICK:

Q    Did you have conversation with Mr. Richard Tipton, "Whitey," as to where he was going that day?

A    Church Hill.

Q    Did you have conversation with Mr. "C.O." as to where he was going that day?

A    Church Hill.

Q    For what reason?

A    To murder "Mousey."

Q    And is that the vein that Mr. Richard Tipton, "Whitey," was speaking in?  Is that why he called you a pussy, because you wouldn't go with him?

MR. WHITE:  Objection.  That's speculative.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MR. VICK:

Q    Did you have conversations after that day with Richard Tipton about what occurred in Church Hill on that day?

A    Yes, I did.

Q    Could you tell the ladies and gentlemen of the

1186

jury who was present for those conversations?

A    It was me and "Whitey" and "C.O." and "Studie."

Q    Where did this conversation take place?

A    Central Gardens.

Q    What did Tipton say happened in Church Hill that day?

A    He just said he drove to Church Hill and waited in the car.  "C.O." and Jerry got out and went and knocked on the door.  Someone opened the door.  They went in and started shooting.

Q    Repeat that.

A    "Whitey" and "C.O." and Jerry went to Church Hill.  He said they got out, "C.O." and Jerry, and went to the door, knocked on it.

Q    Who knocked on the door, according to "Whitey?"

A    I guess Jerry.  Jerry, because he knew the house was located there.

Q    What happened?

A    The door was opened far enough.  They just went in and started shooting.

Q    Did they tell you who did the shooting?

A    "C.O."

Q    Did he tell you whether Jerry shot?

A    He tried, but the gun jammed.

Q    Did you have conversations later that day with

1187

"C.O." about "Mousey" Armstrong?

**JA524**

A    Not that very day, no.

Q    No, but later?

A    Yes.

Q    What was that conversation?

A    He just said, "Man, you don't have to worry about it, that happening to you, because things like that happen." He just said something like "Mousey," the way he usually treated her, like a queen or something like that, she had shit on him.

Q    So what did you understand him to mean when he said that?

MR. COOLEY: Objection.

THE COURT: Sustained.

BY MR. VICK:

Q    After the murder of Dorothy Armstrong on Church Hill and after you had these conversations with him, did you continue to sell cocaine with Richard Tipton?

A    Correct.

Q    Why did you continue to sell cocaine at that point?

A    I don't know. I didn't feel threatened by him.

Q    I direct your attention to February 19th, 1992. Are you familiar with the fact of  --

MR. BAUGH: Objection. "Familiar with the fact," that is leading.

THE COURT: Sustained.

BY MR. VICK:

Q    Are you aware that indeed there occurred two murders on February 19th, 1992, Curt Thorne and Linwood Chiles?

A    Yes.

Q    Were you with Mr. Richard Tipton, "Whitey," on that day, February 19th, 1992?

A    Correct.

Q    Where was it that you were with "Whitey" on that day?

A    We was over in Southside: me, John, "Whitey" and "Studie." Me and John was taking "Whitey" and "Studie" over to Southside to drop them off until he got a beep from "C.O."

Q    Where were you when he got beeped by "C.O.?"

A    Southside.

Q    How do you know he was beeped by "C.O.?"

A    Because he said who it was when he got out of the car.

Q    And what did he get out of the car and do?

A    To page "C.O." back.

Q    Did he come back to the car after paging "C.O." back?

A    Yes.

Q    Did "Whitey" say anything when he came back to

**JA525**

the car?

A    Yes.  He said "C.O." had just got all four of them.  "Studie," said, "Who?"  He said, "Linwood, Curt," and then he had cut it short.

Q    What did you do at that point?

A    We had dropped him off.

Q    Dropped who off?

A    "Whitey" and "Studie."

Q    Where did you drop them off?

A    Southside, laid even and glory house.

Q    Where is that in Southside?

A    Up the street from Hillside Court.

Q    And then what did you do when you dropped him off?

A    Went home.

Q    To Central Gardens?

A    Correct.

Q    Do you know what time it was  --  who were you with that day?

A    Me and John.

Q    John who?

A    Knight.

Q    Do you know what time it was when you got back to Central Gardens?

A    It was quarter to ten, before 10 o'clock.

Q    How do you know that; what makes you remember that?

A    Because John Knight had to be home because he had to work the next day.

Q    Are you sure you were home before 10 o'clock?

A    Correct.

Q    Did you have conversations with "Whitey" in Central Gardens a day or two later about what occurred after you dropped him off on February 19th, 1992?

A    Yes.

Q    Would you tell the ladies and gentlemen of the jury what "Whitey" told you occurred on that day?

A    He wasn't really talking to me.  He was talking to "C.O."  I was coming out of the bathroom.  I walked in on the conversation.  And "C.O." said he was driving around to try and find a place  --  a spot for the murder to take place.  And he said he got out of the car and got in the car with Linwood and Curt.  I guess he said a few words and then he shot Linwood first and Curt second.

Q    Who said that?

A    "C.O."

Q    All right.  And then what did he say?

A    "Whitey" asked him was he sure the girls was dead, and he said yes.

Q    Do you know, based upon the conversation that

Charles Townes (Direct)

occurred there, why Curt was killed and why Linwood was killed?

A    Curt was like messing up the money.

MR. WHITE:  Objection unless we know who the statements were made by.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did "Whitey" tell you  --  did "C.O." tell you why Curt was killed?

A    He was messing up the money.

Q    Messing up what money?

A    The drug money that he owed him.

Q    Did "C.O." tell you why Linwood Chiles was killed?

A    Yes, because he had gotten locked up on the same charge as "V" had, but he had got out and "V" didn't.

Q    And what conclusion did "C.O." tell you he drew from that?

A    Same thing.  He thought he was snitching on him.

Q    When you say "snitching," what do you mean?

A    To tell on him.

Q    To who?

A    "C.O," tell the police on him.

Q    Did "C.O." tell "Whitey" anything about whether Linwood or Curt knew what was going to happen that evening?

A    Yes.  Linwood knew "C.O." was going to kill Curt, and Linwood thought him and "C.O." was buddy/buddy.  But he was surprised.

Q    Could you tell us how "Whitey," Richard Tipton, was dressed that evening, on February 19th, 1992?

A    Bluejeans, gray hoody.

Q    What do you mean by gray hoody?

A    Sweatshirt with a hood on the back.

Q    What color gray?

A    Grayish-white.

Q    Now, did "C.O."  --  did you overhear "C.O." tell "Whitey" anything concerning what he made one of the girls in the car that night do?

A    Yes.  He told one of them to get on their knees.

Q    Then what did he do?

A    He shot her.

Q    Did you continue to sell cocaine with "C.O." and "Whitey" after that?

A    Correct.

Q    Do you know an individual by the name of Charlotte Denise Moore?

A    Yes.

Q    "Studie" Green?

**JA527**

A    Yes.
Q    How do you know them?
A    They stayed across the street from me.
Q    Do you know whether they ever purchased anything for "C.O." and "Whitey?"
A    Correct.
Q    What was it that they purchased for "C.O." and "Whitey" and how do you know it?
A    Two guns.  Well, after they came back, Denise and "Studie," they said they needed more money to get extra clips and bullets.
Q    Do you know what kind of guns they bought for "C.O." and "Whitey?"
A    Glocks.
        MR. COOLEY:  Objection.  He is leading him into who they purchased them for.  He is asking how he knew that and he has not responded to that.
        THE COURT:  Sustained.

1194

BY MR. VICK:
Q    How do you know who they bought those guns for?
A    Because I was there when they gave them the money.
Q    Who gave who the money?
A    "Whitey" gave Denise the money.
Q    Was "C.O." present?
A    No.
Q    All right.  Did indeed Denise, do you know based upon your own involvement whether Denise and "Studie" bought those guns?
A    Yes.
Q    How do you know that?
A    Because I was there when they had purchased the guns -- I mean when they came and gave them to them.
Q    Who did they give the guns to?
A    "Whitey."
Q    What kind of guns?
A    Glocks, 9mm's.
Q    How many?
A    Two.
Q    Was that before the February 19th murder of Linwood and Curt?
A    Correct.
Q    Was it after or before the murder of  --

1195

        MR. WHITE:  Objection.  This is leading.
        THE COURT:  Overruled.
BY MR. VICK:
Q    Before or after the murder of Dorothy Armstrong on Church Hill?
A    It was  --  they got them after that.
Q    After February 19th, 1992, did there come a time when "Whitey," Richard Tipton, and Cory Johnson, "C.O.," left to go to New York?

**JA528**

Charles Townes (Direct)

A    Correct.
Q    And did they give you anything prior to going to New York?
A    Yes.
Q    What was it that they gave you?
A    Cook-'em-up, crack.
Q    Was that prior to your arrest in New Jersey or after your arrest in New Jersey?
A    Before.
Q    And what were you to do with that cook-'em-up?
A    Sell it.
Q    Did you indeed sell it?
A    Uh-huh.
Q    What did you do with the money?
A    Some of it got messed up and I gave the rest, what was left.

1196

Q    When you say messed up, what do you mean?
A    Got spent.
Q    By who?
A    Me.  Me and Hussone.
Q    Why did Hussone spend some of the money?
A    Why?
Q    Did you sell those drugs by yourself?
A    No.
Q    Who did you sell those drugs with?
A    Me than Hussone.
Q    Where did you sell those drugs?
A    Central Gardens.
Q    Of that six or seven ounces  --
        MR. WHITE:  Objection.  He didn't mention any amounts.
        THE COURT:  Sustained.
BY MR. VICK:
Q    I thought you did.  I apologize.  Could you tell the ladies and gentlemen of the jury how much  --
A    Four to six ounces.
Q    Of that four to six ounces, how much did you sell?
A    All of it.
Q    What did you do?  Did you ever give any money to Richard Tipton for that?

1197

A    Yes.
Q    And how was it that you got money to Richard Tipton that you made from the sale of that cocaine?
A    Repeat that again.
Q    How did you get the money to him; how did you pay him?
A    He had came  --  I sent some through Western Union.  And he came down and got the rest of it.
Q    When you say you sent some through Western Union, how did you do that?  What did you do?
A    Went to Western Union and mailed it to him.

**JA529**

Q   How much did you mail to him through Western Union?
A   $300.
Q   You say you gave some through Valerie Butler. Who was Valerie Butler?
        MR. WAGNER:  I didn't hear that, Your Honor.  Objection as to leading the witness.
        MR. VICK:  He said he gave some to Valerie Butler.
        THE COURT:  No, he did say that. Overruled.
BY MR. VICK:
Q   What do you mean when you say you gave some to Valerie?

A   I don't know how she got it to "Whitey."  I gave some to her.
Q   Why did you give it to Valerie Butler?
A   "Whitey" said he needed to get the money to get "C.O." out of jail.
Q   Do you know where "C.O." was in jail?
A   Not exactly, no.
Q   Do you know what "C.O." was in jail for?
A   He got locked up with a gun.
Q   What gun is that?
A   The Glock.
Q   Was "Whitey" concerned about that?
A   Yes.
Q   Why was he concerned about that?
        MR. WHITE:  Objection.
BY MR. VICK:
Q   If he told you.
A   If he was in jail long enough for them to be able to trace the gun, he probably wouldn't have got out.
Q   Traced the gun to what?
A   To the murders.
Q   When you say murders on the gun, what do you mean?
A   The gun was used to kill people.

Q   And who is Valerie Butler?
A   "C.O.'s" girlfriend.
Q   How much money did you give Valerie Butler?
A   About 5,000 at the most.
Q   Did there come a time after that when you saw Richard Tipton in Richmond, Virginia again?
A   Yes, I seen him one more time.
Q   When was that?
A   This was like a couple of weeks after that.
Q   All right.  Did you have conversations with Mr. Tipton about the sale of the cocaine that he had left for you?
A   Yes.

Q    What did he tell you about that?
A    I can't remember the conversation on that too well.
Q    Did there come a time when you traveled to New Jersey with Mr. Tipton?
A    Correct.
Q    What was the reason  --  were you by yourselves?
A    Me, "Whitey" and Hussone.
Q    And how did you get to New Jersey?
A    Valerie's car.
Q    What was the reason you were in New Jersey?

A    To go get drugs.
Q    All right.  And what occurred in New Jersey?
A    We got locked up.
Q    Did you have any money with you at the time you got locked up?
A    Yes.
Q    And how much money did you have?
A    $3,000.
Q    How long were you in jail?
A    24 hours.
Q    That $3,000, what were you going to do with that $3,000?
A    Going to buy drugs.
Q    Where was it you were going to buy drugs?
A    New York.
Q    After your arrest in New Jersey, did you ever see Mr. Richard Tipton in Richmond, Virginia again?
A    Once, yes.
Q    Where was that?
A    In Central Gardens.
Q    Did Mr. Richard Tipton want you to do anything for him?
A    Yes.  He wanted me to bring a cooking pot to Southside.
Q    For what reason?

A    Cocaine.
Q    How soon after your arrest in New Jersey was this?
A    Like the month after, like a month-and-a-half after that.
        MR. VICK:  Beg the Court's indulgence.
     (Counsel conferring with co-counsel.)
BY MR. VICK:
Q    Do you know, based upon your conversation with "C.O." and "Whitey," why on the evening of February 19th, 1992 the girls who were with Curt and Linwood were shot?
A    No.
        MR. COOLEY:  Objection.
        MR. VICK:  I tender the witness.

**JA531**

MR. WHITE: Could we have a short break? Just two minutes at the very least, sir?

THE COURT: All right. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

We will make it ten minutes. Remove the witness, Mr. Marshal.

(The witness was removed.)

Remove the defendants. Ten minutes.

(Defendants removed from courtroom.)

(Recess taken from 11:30 a.m. to 11:41 a.m.)

THE COURT: Let's bring in the jury.

(The jury entered the courtroom.)

CROSS-EXAMINATION

BY MR. WHITE:

Q   Good morning, Mr. Townes.
A   Good morning.
Q   Mr. Townes, you said you were how old, sir?
A   20.
Q   20. And your date of birth?
A   6-10-72.
Q   6-10-72?
A   Right.
Q   Now, you said you lived in Central Gardens?
A   Correct.
Q   Where specifically did you live in Central Gardens?
A   2711 Catchpenny Road.
Q   At that address, that means you lived next to Shirley Greene?
A   Across the street, yes.
Q   Across the street. And let's see, Shirley Greene had some sons; is that correct?
A   Correct.
Q   Who were her sons?

A   Hussone Jones, Maurice Saunders, George Jones.
Q   Is George also known as "Studie?"
A   No. That's another one.
Q   Is "Studie" related to Shirley Greene?
A   Correct.
Q   Is he her son?
A   Correct.
Q   So Maurice, "Studie," and Hussone are all brothers from the same mother?
A   No. Hussone and Maurice is adopted.
Q   But they had all been living with her for a fairly long period of time?
A   Correct.
Q   As long as you could remember?
A   Correct.
Q   All very close?
A   Correct.

**JA532**

Q    You were very close with him?
A    Correct.
Q    Would you say they were a tight-knit family?
A    Repeat that.
Q    Would you say they were a fairly tight-knit family?
A    Correct.
Q    They basically treated you as a member of the family, too?
A    Correct.
Q    Ms. Greene would often buy you Christmas presents and treat you like a son?
A    Correct.
Q    Now, Mr. Townes, you have lived in the neighborhood all your life?
A    Correct.
Q    And you knew a great many people in Central Gardens?
A    Correct.
Q    You knew young people and you knew old people?
A    Correct.
Q    Got along with everyone, right?
A    Correct.
Q    Would you say the same was true for "Studie," and Maurice and Hussone?
A    Correct.
Q    You had indicated that you knew Mr. Tipton for about nine years.
A    Correct.
Q    And you knew that Mr. Tipton's step-mother lived right there on -- is it Catchpenny, the corner of Catchpenny and Beck?  Her name is Brenda Williams?
A    Correct.
Q    Mr. Tipton knew a great many people in the neighborhood as well?
A    Correct.
Q    Everybody got along?
A    Correct.
Q    Now, when you met Mr. Tipton you were about 12 --
A    13.
Q    -- when you were 13.  That was around the basketball courts.  Is that where most of the kids really got to know each other?
A    Yeah.
Q    Okay.  At the time he was living over on Cleary, was he not?
A    I didn't know him when he was living over there.
Q    So you knew him only when he was living with Brenda Williams?
A    Correct.

**JA533**

Q    Do you know that 'Twoine used to live over on Cleary?
A    Yes.
Q    'Twoine is who?  What's "Twoine's real name?
A    Antwoine Brooks.
Q    You all had been good friends for a number of years.
A    Correct.
Q    And basically enjoyed life in the neighborhood?
A    Yes.
Q    With very little incident, right?
A    Yes.
Q    Would it be fair to say that you and Maurice and Hussone and Richard Tipton and "Studie" all respected the people in the neighborhood?
A    Correct.
Q    Now, sir, you said that it was in October of 1990 when you approached Mr. Tipton first about selling drugs?
A    Yes, around that time.
Q    You came to him.
A    Correct.
Q    He did not seek you out?
A    Correct.
Q    And at the time you knew that Maurice Saunders was already selling, right?
A    Correct.
Q    And you know that Maurice had been selling in connection with other people, right?
A    Correct.
Q    Maurice knew people in Church Hill?

A    Correct.
Q    Did you meet his friend "Nini?"
A    Correct.
Q    There were other neighborhoods where Maurice would go to buy and sell drugs; is that correct?
A    Yes.
Q    Same would be true for 'Twoine, also?
A    Correct.
Q    I should have covered this before.  Have you always known Richard Tipton as "Whitey," in other words, from 13 years old?  Is that what he was always called around the neighborhood?
A    Rich or "Whitey."
Q    Rich or "Whitey."  Okay.  Now, before you gave some thought to selling crack cocaine, had you experimented with drugs yourself?
A    Yes.
Q    Okay.  Had you ever sold any drugs yourself?
A    Not up to that time, no.
Q    Never sold any pot or anything like that?
A    That's correct.  Yes, marijuana.

**JA534**

Q    You had sold a little marijuana?
A    Yes.
Q    Primarily just to get for yourself, sell enough to cover the cost of what it would cost to get it for yourself?
A    Yes.
Q    You had tried crack cocaine before?
A    No, I have never tried crack cocaine.
Q    You don't smoke crack?
A    No.
Q    Mr. Tipton doesn't smoke crack, either, does he?
A    No.
Q    Some of the guys in the neighborhood did?
A    Yes.
Q    Maurice did?
A    Yes.
Q    'Twoine did?
A    Yes.
Q    Okay.  You indicated that to the best of your knowledge and based on your relationship with Mr. Tipton, all he ever sold was crack.  Right?
A    Correct.  Yes.
Q    Now, aside from the individuals that we have just talked about, Hussone, Maurice, "Studie," and Rich, or "Whitey," you knew a great many other people in the neighborhood who had associations in some way, shape, or form with drugs; is that correct?
A    Correct.

Q    Now, you know who Sam was, right?
A    Correct.
Q    Sam Taylor, I think is his last name?
A    Yes.
Q    How long had you known Sam?
A    Basically all my life.
Q    Sam not only used drugs, but he also sold crack as well?
A    No, he doesn't use drugs.
Q    He doesn't use, he just sells?
A    No. He used to.
Q    He used to sell.
A    Correct.
Q    He sold out on Catchpenny around the same time everybody was selling at Catchpenny and Beck, right?
A    Correct.  No, not everybody was selling. Because Sam came in like  --  well, Sam came in like by himself.
Q    By himself?
A    Yes.
Q    So in other words, he was not recruited by or didn't work with any of the other guys like Rich or "Whitey" or Maurice or Hussone?

**JA535**

A    Correct.
Q    How about J.T., J.T. Williams?  Do you know J.T., a white guy who used to run around the neighborhood with 'Twoine?
A    Yes.
Q    "J.T." also used and sold in the neighborhood, right?
A    Correct.
Q    He didn't have any associations or business relationships with "Whitey" or Hussone or Maurice or "Studie," right?
A    Repeat that again.
Q    He didn't have any business relationships with "Whitey" or Maurice or Hussone, did he?
A    Yes.
Q    He did?
A    Yes.  He sold drugs.
Q    He sold drugs, but wasn't he selling a bunch with 'Twoine?
A    Correct.
Q    He would sell with 'Twoine aside from their relationship with the others, right?
        MR. VICK:  Mr. White is testifying.  He is not posing questions.
        THE COURT:  No, no, that's a fair question.  Objection overruled.
BY MR. WHITE:

Q    "J.T." and "Twoine used to run together by themselves, didn't they?
A    Correct.
Q    All right.  Now, how about Keith Winston?  Keith was at Central Gardens, wasn't he?
A    Yes.
Q    You had known him all your life?
A    Yes.
Q    Hung out with him, right?
A    Yes.
Q    Smoked pot with him?
A    Correct.
Q    Was Keith selling?
A    No.
Q    But Keith was hanging out with some of the guys who did sell, right?
A    He handled drugs.  He lived with them.
Q    He lived at Sandy Lane?
A    Yes.
Q    He wasn't forced to live there, was he?
A    No.
Q    As a matter of fact, he and "Studie" were the first guys to live at Sandy Lane, weren't they?
A    Correct.
Q    Actually, "Studie" was the very first one;

**JA536**

1212

that's where he lived with his wife and child?
A    Correct.
Q    That's when "Studie," at some time after that, "Studie's" wife and child left and Keith moved in, right?
A    Correct.
Q    All right.  Now, do you know who Buck is, right?
A    Correct.
Q    Buck is a guy who sells in Central Gardens, right?
A    Correct.
Q    Buck has done business with Hussone before, and Maurice?
A    Correct.
Q    He doesn't have  --  he was not a partner or a worker or anything for "Whitey" or Rich, right?
A    No.
Q    And how about Bug?  There is also a guy in Central Gardens named "Bug" who does some business, sells a little crack?
A    Correct.
Q    Same thing, sometimes he would do business for Maurice or 'Twoine or Hussone or some of the other guys, right?

1213

A    Correct.
Q    He was not a partner with or worker for "Whitey," right?
A    No.
Q    Now, there were also some people in the neighborhood that you guys, or you, would normally do business with like Greg and Mario, right?
A    Correct.
Q    Greg and Mario were not sellers, were they?
A    No.
Q    They were mostly users, junkies?
A    Correct.
Q    Tell the ladies and gentlemen of the jury what a junkie is in your terms.
A    A person that smokes crack.
Q    And they had a house in Central Gardens or did they live in the apartments?
A    A house in Central Gardens.
Q    And from time to time, some of the guys, including Maurice, Hussone, "Whitey," would go by their house just to see who was hanging out and see if they needed anything, right?
A    Correct.
Q    You would go with them, right?
A    Not all the time.

1214

Q    But you had gone with them from time to time?

**JA537**

Charles Townes (Cross)

A    Correct.

Q    As a matter of fact, Mr. Townes, you spent a lot of time, even though you were not selling, you spent a great deal of time with these people?

A    Correct.

Q    You saw them just about every day, didn't you?

A    Correct.

Q    You knew exactly what they were doing, right?

A    Correct.

Q    All right.  How about Epps, the older guy in the neighborhood?

A    Yes.

Q    Epps didn't have any association with Maurice or Hussone or you or Rich, right?

A    Yes.

Q    He sold crack?

A    No.

Q    What did he sell?

A    He didn't sell anything.  He was in the music industry.

Q    Wasn't selling crack?

A    He was a junkie, too.

Q    He was a junkie, too?

A    Yes.

Q    Pat and Mike were also neighborhood junkies?

A    Say that again.

Q    Pat and Mike were also neighborhood junkies?

A    Correct.

Q    How about Pauline McDuffy; you know Pauline, right?

A    Correct.

Q    She lives at the corner of Catchpenny and Beck?

A    Yes.

Q    Right across the street from Brenda Williams, right?

A    Correct.

Q    Pauline was also in the crack business in the neighborhood, wasn't she?

A    No.  She was in the powder business, cocaine.

Q    Powder.  Okay.  So she was selling cocaine in the neighborhood; she simply wasn't selling crack, right?

A    Right.

Q    She was not associated in any way, shape, or form with you or Maurice or Hussone or "Whitey" or that bunch, right?

A    No.

Q    And would it be fair to say, sir, that there was really no competition or in-fighting between Hussone and Maurice and Rich and people like Pauline or Buck or "Bug" who were also selling in the neighborhood?

A    Correct.

**JA538**

Q    Everybody basically got along, right?
A    Yes.
Q    Quiet neighborhood?
A    Correct.
Q    Mostly single-family houses?
A    Correct.
Q    People gardening out there all the time, right?
A    Correct.
Q    Now, Pauline's son "Baldy" hung around with you guys, didn't he?
A    Yes.
Q    And as a matter of fact, he probably spent more time with you guys than he did at his mom's, right?
A    Correct.
Q    Did he sell sometimes for both, or with both?
A    Sell sometimes for "Whitey," yes.
Q    And sometimes with his mom?
A    I don't know about that.
Q    Sometimes with other people in other neighborhoods, right?
A    Yes, you could say that.
Q    Now, there was "Rah-Rah," and did he sell?

1217
A    No.
Q    He just was a user?
A    No.
Q    He was not a user?
A    No.
Q    How about Kenneth Johnson?  You indicated Kenneth Johnson is a guy who you borrowed a car from, right?
A    Yes.
Q    Was he just someone who kind of rolled through the neighborhood to buy drugs?
A    Yes, smoke it.
Q    When you guys borrowed the car from him on the night you talked about before, that was just a chance meeting, right?
A    Yes.
Q    Now, when all the guys were living in Sandy Lane, you were still living with your mom, right?
A    Correct.
Q    But you would basically be at Sandy Lane just about every day?
A    No.
Q    How often would you go there?
A    Twice a week.
Q    Twice a week?

1218
A    Yes.
Q    And you know that Rich or "Whitey" shared a room with Maurice, right?
A    Yes.
Q    'Twoine had his own room over there?

**JA539**

A     Yes.  Hussone and 'Twoine shared, yes.
Q     Hussone and 'Twoine shared a room.  Shirley Greene had a job, right?
A     Right.
Q     Do you recall what her schedule was?  She used to usually work the evening -- the afternoon-to-evening shift, like 3 to 11, somewhere around there?
A     Correct.
Q     That would be around the time where you would see most of the guys; that's when they would leave Sandy Lane and hang out over at Catchpenny and Beck, right?
A     Correct.
Q     That's when they did most of their selling?
A     Correct.
Q     From time to time they would sort of go over and use Shirley's house or the bathroom because they knew she wasn't home, right?
A     Correct.

Q     Out of respect for her, when she got home they would clear out and go back to Sandy Lane?
A     Correct.
Q     Now, so in the morning is when everybody was goofing around or hanging out or going shopping or going to the movies or going out to eat and stuff like that?
A     Yes.
Q     You would accompany them on occasions when you saw them, right?
A     Yes.
Q     Okay.  Now, while the guys were  --  when I say "the guys," I'm talking Hussone, Maurice, 'Twoine, "Whitey," when they were hanging out at Sandy Lane Maurice and Hussone were pretty much free to do what they wanted to do in terms of hustling, right?
A     Correct.
Q     They could go anywhere they wanted to go?
A     Correct.
Q     Sell to anybody they wanted to sell to?
A     Correct.
Q     They could set whatever price they wanted to set, right?
A     No.  That's not right.  What you mean by "set a price?"

Q     If they want to give somebody a good deal, they could sell it for whatever they wanted, right?
A     Yes.
Q     If they wanted to sell them for a nickel instead of a dime, they were free to do that, right?
A     Yes.
Q     Okay.  A lot of times, you would see a bunch of

**JA540**

Charles Townes (Cross)

people like Hussone, Maurice, Rich or "Whitey," 'Twoine, J.T., Sam, everybody would be congregated on the corner at the same time sometimes selling, right?

A    Correct.

Q    Everybody would actually either have vials in their pockets or stashed behind a bush or stashed behind a car somewhere, right?

A    Correct.

Q    And that was because there would be a flow of customers coming through.  And sometimes, you know, there were more than one person there buying at the same time, right?

A    Correct.

Q    Nobody ever got in any fights about that, right?

A    No.

Q    Okay.  As a matter of fact, you know from speaking to Maurice and speaking to Hussone that sometimes they had better days than 'Twoine or Rich did, right?

A    Yes.

Q    As a matter of fact, they would actually sell more, right?

A    Correct.  Yes.

Q    Now, from time to time people would sort of float in and out of this  --  it was a fairly loose group, wasn't it?

A    Yes.

Q    Maurice got busted once, right?  Back when he got busted the first time?

A    Yes.

Q    He sort of had to cool out for awhile, right?

A    Yes.

Q    He was locked up for awhile, right?

A    Yeah.

Q    Remember when he got out of Hanover Learning Center and he basically kind of came back and started running with the guys again, right?

A    Yes.

         MR. VICK:  Mr. White is not asking questions.  He is just simply testifying.

         THE COURT:  All right, Mr. White, I've given you as much leeway as possible.  But make it a question.

BY MR. WHITE:

Q    When Maurice got out of Hanover Learning Center, didn't he come back and kind of get back involved with the rest of the guys?

A    Correct.

Q    Nobody held a gun to his head to do that, did they?

**JA541**

A     No.
Q     And similarly, 'Twoine got arrested once, didn't he?
A     Correct.
Q     And sort of got out of the flow of things, didn't he?
A     Correct.
Q     When he got out, don't you recall he kind of floated back into the group and started selling again himself?
A     Correct.
Q     And nobody forced him to do that, did they?
A     No.
Q     Okay.  You characterized, or did you characterize 'Twoine as a partner of "Whitey's"?
A     Yes.

Q     All right.  Antwoine had his own car, right?
A     Correct.
Q     'Twoine basically knew more people than anybody else in the group, didn't he?
A     Correct.
Q     He had the most contacts; would that be a fair statement?
A     Correct.
Q     He had contacts in other neighborhoods that he could draw on to get drugs for the rest of the guys?
A     Correct.
Q     And would it also be fair to say that in terms of his business, his attitude towards business, that he was probably the most aggressive of the group in terms of selling?
A     No.
Q     He wasn't?
A     No.
Q     Do you recall there being a fight once between 'Twoine and Maurice when 'Twoine slapped Maurice about messing up some money?
A     Yeah, I remember that.  Yeah.
Q     Now, Hussone, he probably floated in and out as much as anyone, didn't he?
A     Yeah.

Q     Hussone spent a lot of time with his girlfriend?
A     Correct.
Q     And, you know, he would get  --  wouldn't he get a 30-sack sometimes and sell it and then just disappear for a week or two at a time?
A     Correct.  Yes.
Q     Now, would it be fair to say, Mr. Townes, that there were plenty of people in Central Gardens who were willing to hustle?
A     Yes.

**JA542**

Charles Townes (Cross)

Q    And really, the question of who you were associated with would be a function of who had crack or coke at the time?
A    Correct.
Q    Would it be fair to say that sometimes Rich and 'Twoine had cocaine and sometimes they didn't?
A    Yes.
Q    And sometimes the other guys would have it and guys like Maurice and Hussone would go get coke from them and sell it, right?
A    Repeat that question again.
Q    In other words, well, would it be fair to say that on some occasions when 'Twoine or "Whitey" didn't have any coke themselves or any crack, that

1225

Hussone and "May-May"  --  excuse me, you are "May-May" --  Hussone and Maurice would go see friends in other places and get crack for them to sell?
A    No.
Q    I thought you said Maurice did get crack for other people.
A    I'm saying if they didn't have the coke, they just  --
Q    Just would find it somewhere else?
A    No, they just didn't sell any drugs, really.
Q    All right.  In the times that you spent at Sandy Lane, you would smoke pot with the guys?
A    Correct.
Q    Fair amount of pot smoked there, right?
A    Yeah.
Q    You all drank a lot of beer?
A    Yeah.
Q    Partied a lot?
A    Correct.
Q    Had a lot of good times together?
A    Correct.
Q    When you would go out to eat you would go to places like Pizza Hut?
A    Yes.

1226

Q    And you would go to McDonald's a lot, right?
A    Not really.
Q    But the rest of the guys would go to Pizza Hut. Do you remember a food fight at Pizza Hut where everybody went  --
A    A food fight?
Q    You weren't there for that?
A    No.
Q    Now, there came a point in time where the guys split up from Sandy Lane; isn't that correct?
A    Correct.
Q    Do you recall that was about January of 1991?
A    Yes, around that time, yes.

**JA543**

Q    You recall that because New Year's Eve, a lot of you guys had been together.  You all had taken some pictures of each other at Shirley Greene's house; do you remember that?

A    I wasn't with them.

Q    It was shortly after New Year's Eve when the guys split up and everybody went their separate ways, right?

A    Yes.

Q    Part of the reason was because there were some differences about who was being invited over to Sandy Lane?

A    No.

THE COURT:  Mr. White, please, ask a question.  You have been talking for a minute-and-a-half now and you haven't asked a question.

BY MR. WHITE:

Q    Do you remember "Whitey" putting a lock on his room at Sandy Lane?

A    No.

Q    You don't remember that?

A    No.

Q    Do you remember he and "Twoine having any disagreements about who was being invited over and a lot of people coming over there?

A    No.

Q    You don't remember that, either.

MR. VICK:  I would ask that Mr. White quit making editorial comments as to whether he remembers or not.  Perhaps he never knew in response to his questions.

THE COURT:  Sustained.

MR. WHITE:  I apologize for the editorialization.

BY MR. WHITE:

Q    You said you recalled an incident about "Hess" being locked up in New York?

A    Correct.

Q    Okay.  And was this while everyone was living at Sandy Lane?

A    Correct.  Yes.

Q    And let's see, he went up  --  did Manny go by himself or "Whitey" go by himself?

A    Yes.

Q    Now, prior to that, had Maurice taken a trip up to New York with "Hess?"  Do you recall that?

A    Yes, I remember that.

Q    They went by themselves and went up to buy vials, was that right?  You know, the vials that they packaged crack in?

A    They went up there.  I don't know what they went

up there for.
Q    You don't know.  Okay.  Now, sir, did you continue to see Mr. Tipton regularly between January of 1991 and December of 1991?
A    Yeah.
Q    Okay.  Was there a period of time when Mr. Tipton was not around?
A    Yes.
Q    Can you recall about when that was?
A    No, I can't.

1229

Q    Well, can you recall when Maurice got busted on the corner of Catchpenny and Beck?
A    Correct.
Q    And do you recall you were there that day?
A    No.
Q    You were not there?
A    No.
Q    Do you recall that being in May of 1991?
A    I can't remember them dates.
Q    You can't remember the dates.  Okay.  Now, when you saw Mr. Tipton in December of 1991, where was that, sir?
A    Repeat that question.
Q    Where was Mr. Tipton when you hooked up with him in December of 1991?
A    December of 1991?  Sandy Lane.
Q    Now  --
A    What you mean by "hooked up with him"?
Q    This is  --  I thought everybody split up from Sandy Lane in January of 1991, right?
A    Yes.
Q    You said you didn't ask to get involved with any crack activities until December of 1991; is that right?
A    Correct.

1230

Q    Now, where was that when you saw Mr. Tipton and asked him for some drugs?
A    That was Sandy Lane.
Q    He was still at Sandy Lane?
A    That's when I first asked him for them.
Q    I'm not talking about when you first asked him for it.  You said that from the time  --  Your Honor, may I try to clarify this with him?  I don't want to testify, but  --
        THE COURT:  No, the best you can do is ask a question and get an answer.  If it is not one you want, move on.
BY MR. WHITE:
Q    Before, when you first asked Mr. Tipton for coke, you gave it back to him, right?
A    Right.
Q    That was at Sandy Lane?

A    Correct.
Q    Then wasn't there a long period of time before you asked him again?
A    Yes.
Q    Now, that's what I am asking you about, that next time.  That was when?
A    That's when they were living off of Leigh Street.  I don't remember the date.

1231

Q    Okay.  Now, you were aware, were you not, sir, that before Mr. Tipton  --  before you saw Mr. Tipton at Leigh Street, he had also been staying with a friend out in Henrico County?
A    Correct.
Q    Do you remember a guy named "Wild?"
A    Correct.
Q    Do you recall about when that was?
A    No, I don't remember the date.
Q    Okay.  Could it have been within a couple of months of the time that you saw Mr. Tipton in Newtowne?
A    Correct, yes.  Before that, yes.
Q    Do you know what Mr. Tipton was doing then when he was staying at "Wild's?"
A    Selling drugs.  Not up in that area, though.
Q    Not up in what area?
A    The area where he was living in Henrico.
Q    Was he still hanging out in Central Gardens?
A    Yes.
Q    Would he come from "Wild's?" Where was "Wild;" could you tell the ladies and gentlemen of the jury where "Wild" lived?
A    In the country.  I don't know the name of the street.

1232

Q    In the country?
A    Yes.  In Henrico.
Q    Was it out near the McDonald's off West Broad Street?
A    Yes.
Q    He would take a bus and get a ride over to Central Gardens?
A    Correct.
Q    And so was he still doing that fairly regularly?
A    Correct.
Q    Up until shortly before you and he hooked up on Leigh Street in Newtowne?
A    Correct.
Q    Okay.  Now, did you say or can you recall whose house or where it was on Leigh Street that you met Mr. Tipton?
A    When I met him?
Q    Yeah.

**JA546**

A    Repeat that question again.

Q    Can you recall whose house or apartment or where it was around Leigh Street where you hooked up with Richard Tipton in December of 1991, or the second time when you decided that you wanted to sell drugs?

A    It was Roane's house, James' father's house.

1233

Q    That's the yellow house you spoke of?

A    Correct.

Q    How did you know he was there?

A    Because he showed me where he was living at.

Q    Was that before that particular time that you got the drugs from him?

A    It was after.  After I knew he was living there.

Q    How did you find out he was living there?

A    I took him home.  Me and "Studie" took him home one day.

Q    Since you and "Studie" drove around a lot during that time frame; you would drive all over the city, right?

A    Correct.

Q    Drive over to Southside?

A    Correct.

Q    Didn't Mr. Tipton stay with people on Southside from time to time?

A    No.

Q    You know Gloria?

A    Yeah.

Q    And Gloria was who?  Tell the ladies and gentlemen of the jury who Gloria was.

A    A friend of Rich's.

1234

Q    Where did she live?

A    Southside.

Q    Would Mr. Tipton stay there from time to time?

A    Correct.

Q    You would drop him off at her house sometimes?

A    Correct.

Q    In was in the time frame, the fall of 1991, leading into the winter of 1991?

A    Correct.

Q    Would it be fair to say that Mr. Tipton just kind of lived all over?

A    Correct.

Q    He stayed at a lot of different places?

A    Correct.

Q    Did he stay with Pat and Mike from time to time?

A    Correct.

Q    Even during this time frame that we were talking about?

A    Correct.

Q    As a matter of fact, sir, even after you started

getting drugs in Newtowne, Mr. Tipton would spend a night in Central Gardens from time to time, right?
A   Correct.
Q   At Pat and Mike's sometimes?

A   Correct.
Q   And he would also spend the night over at Gloria's sometimes, right?
A   Correct.
Q   You would know that how, sir?
A   He would sometimes tell me where he was staying.
Q   Sometimes you would take him over there, right?
A   Correct.
Q   Now  --
        MR. WHITE:  Your Honor, if I can have just a moment.
        (Counsel perusing notes.)
BY MR. WHITE:
Q   Do you recall how long it was after you first got drugs from Richard Tipton in Newtowne that you first met Jerry Gaiters?
A   No.
Q   You don't?
A   No.
Q   Okay.  Do you actually recall seeing Jerry Gaiters getting crack from Rich or "Whitey?"
A   No, I hadn't.  I never actually seen him get crack from him.
Q   You never saw it?  Okay.  You said you met Curt Thorne?
A   Uh-huh.
Q   Did you ever see Curt actually getting drugs from "Whitey?"
A   Correct, yeah.
Q   How many times would you say you saw that?
A   Once or twice.
Q   Once or twice.  Now, you said when Hussone  -- excuse me, did you say that Hussone went to Newtowne sometimes with you?
A   Correct.
Q   To get drugs?
A   Well, me and Hussone never actually went together.  Either I would go over there and get two sacks, one for Hussone, or he would get two sacks, one for me.  We both did.
Q   Did you alternate or was it really not that formal?
A   It wasn't really that formal, no.
Q   Whoever had a car?
A   Correct.
Q   Did you have a car at that time?
A   No.

Q    Did Hussone have a car?
A    Yeah.

Q    He did?  Now, you said you were selling about a 30-sack.  A 30-sack is also called a two-for-one, right?
A    Correct.
Q    Explain to the ladies and gentlemen of the jury why it is called a two-for-one.
A    I give "Whitey" 200, I keep 100.
Q    After selling the 30 vials it would be how much?
A    300.
Q    You keep $100 for yourself?
A    Correct.
Q    And you were doing this how many times a week?
A    Every other day.
Q    Every other day.  All right.  Now, did you ever see, did you ever actually see Sandra Reavis getting drugs from Richard Tipton?
A    No.
Q    Okay.  How about anyone else; did you ever actually see anyone else getting drugs from Richard Tipton?
A    Mike.
Q    During your trips to Newtowne, whether you were with Hussone or by yourself, did you ever see anyone else getting any drugs from "Whitey?"

A    Doug Talley.
Q    Okay.  How many times was that?
A    Once.  I seen him do it once.
Q    One time.  And did you ever see Curt exchange money with "Whitey?"
A    Once, yeah.
Q    Okay.  Do you recall or do you know from that exchange whether he was on a similar percentage as you?
A    He was, yes.
Q    And you and Hussone, were you and Hussone basically on the same relationship with "Whitey?"  Same percentages?
A    Correct.
Q    Two-for-one?
A    Correct.
Q    Now, how often during the period from December of 1991 through March of 1992, March of 1992 is when you were arrested in New Jersey, right?
A    Yes.
Q    Do you recall the date?
A    March  --  I don't remember the date.
Q    In that time frame, how often would you see "Whitey" in Central Gardens?  How often would he come back over to that neighborhood?

**JA549**

1239

A   After I had got locked up?
Q   No, no, I'm talking about between December of 1991 when you started to do business with him until the time you got locked up in March of 1992.  How often would he come back over to Central Gardens?
A   Twice a week.
Q   Twice a week?
A   Yes.
Q   And he would come to hang out with you guys, right?
A   Correct.
Q   He would come over to sometimes do a little hustling over there, right?
A   Correct.
Q   Part business, part pleasure; would that be a fair statement?
A   Correct.
Q   And on the days that "Whitey" was not around Central Gardens in that time frame, you and Hussone were basically free to do whatever you wanted to do, right?
A   Correct.  Basically we were free to do anything we wanted anyway.
Q   So nobody was telling you what to do, where to go, how to do it?

1240

A   No.
Q   You certainly didn't get any kind of a paycheck did you, Mr. Townes, for what you were doing?
A   No.
Q   Were you responsible for making your own money?
A   Correct.
Q   As long as you gave "Whitey" $200, he didn't really care what you did, right?
A   Correct.
Q   Now, sir, you had indicated that you were in this car, Kenneth Johnson's car.
A   Correct.
Q   And do you recall where you met Kenneth Johnson in Central Gardens that evening?
A   Glenwood Apartments.
Q   Okay.  Now tell the ladies and gentlemen of the jury where Glenwood Apartments are.
A   At the end of Central Gardens, right there across the street from the golf course.
Q   How far from the corner of Catchpenny and Beck?
A   Two blocks.
Q   That was a chance meeting, was it not?
A   Correct.
Q   Prior to that time, "Whitey" had not said, "Hey, we need to find us a car because we are going to go

1241

do a murder tonight," did he?

Charles Townes (Cross)

A    No.

Q    And on the way after you had borrowed the car, basically what you were going to do, sir, isn't it true that you were going down to Newtowne to find some pot, right?

A    Correct.  Yes.

Q    And you had done that with Mr. Tipton before, had you not?

A    Correct.

Q    And weren't there some Jamaicans living down on Chamberlayne Avenue that you guys used to go score pot from on a regular basis?

A    Chamberlayne?

Q    Or close to Newtowne?

A    No.  I never knew any Jamaicans.

Q    Did you go down into that neighborhood to buy pot?

A    Correct.

Q    How often would you do that?

A    Three times a week.

Q    Okay.  Three times a week?

A    Yes.

Q    When you went down there, how much would you buy?

1242

A    20 percent at the most.

Q    20 what?

A    20 percent at the most.  $20 worth.

Q    $20 worth.  Okay, and so when you got Kenneth's car, did "Whitey"  --

A    I didn't get Kenneth's car.

Q    When "Whitey" got Kenneth's car, did he say, "Come on, "May-May," let's go get some pot"?

A    Correct.

Q    Did you go get pot first?

A    No, I don't believe we went and got any.  We were down there, but wasn't nobody there.

Q    Wasn't anybody there.

A    Correct.

Q    Then you decided that you would go ride through the neighborhood and see if you could find somebody, right?

A    No, we saw "C.O." standing there.

Q    Just a chance meeting?

A    Correct.

Q    You don't recall "Whitey" being beeped or anything, did you?

A    No.

Q    When you saw "C.O.," where was he standing?

A    At the corner.  I think it was Clay Street.

1243

Q    Corner of Clay Street?  Do you recall what intersection it was?

A    It was down at the corner store.

**JA551**

Q    Corner store.  Okay.  Who was he standing there with?
A    Him and Jerry Gaiters.  No, he was standing by himself, but Jerry Gaiters had came up.
Q    The corner where they were standing, was that a corner where you would normally expect drug activity?
A    Correct.
Q    And did you all park the car?
A    Yes.
Q    Were you driving at that time?
A    Correct.
Q    When you went up to  --  did you all approach "C.O." or did he approach you?
A    We approached him.
Q    Would it be fair to say that "Whitey" spoke first?
A    Correct.
Q    Would he have said something like "What's up, what's up?"
A    Yes.  That was exactly what he said.
Q    He said that a lot, didn't he?

1244

A    Yes.
Q    And then what happened then?
A    A few words were said.
Q    What few words were said?
A    I don't know what was said.
Q    Then after these few words were said, what did you do next?
A    "C.O." said he had to go take care of some business and then we got in the car and went to the house over by Carver School.
Q    When "C.O." said that, did he say anything else?
A    He talked to Jerry about taking him to "Mousey's."
Q    Did he say, "We are going to take care of some business, and then me and Jerry are going to go to "Mousey's" house"?
A    He didn't say the exact words.  He said Jerry was going to take him to where "Mousey" was located.
Q    After he said those things, where did you all go?
A    The house over by Carver School.
Q    You and "Whitey" stayed in the car?
A    No.  Everybody went in.
Q    Everybody went in.  And what did you do when you

1245

got inside?
A    Sat down for like two or three minutes.
Q    Weren't you and "Whitey"  --  you and "Whitey" were smoking blunts, weren't you?  Didn't you all have some blunts with you that evening?

A   Earlier that day, yes.  But not that night.
Q   Tell the ladies and gentlemen of the jury what a blunt is.
A   Reefer.
        THE COURT:  Don't tell them.  They have already heard three or four times.  Let's not repeat stuff.  Come on.
BY MR. WHITE:
Q   So you sat in the house for a couple three minutes, right?
A   Yes.
Q   And then what happened next?
A   We got back in the car, went to Central Gardens, and they dropped me off.
Q   What was the nature of the conversation between the time that everybody got back in the car and the time that you got back to Central Gardens?
A   It wasn't too much said.  He had said, "Won't you come with us?"  And I said no.  That's when he said "pussy-ass nigger."

Q   At that point in time you had seen guns?
A   I seen a gun.
Q   You saw one gun.  That was in the possession of who?  Jerry Gaiters?
A   Correct.
Q   You didn't see a gun in "Whitey's" possession, did you?
A   No.
Q   You didn't hear "Whitey" complaining about "I got to go to Church Hill," right?
A   No.
Q   He was just inviting you along, right?
A   Correct.
Q   And nobody said, "We are going up to do a murder," right?
A   Correct.
Q   Okay.  And that was basically it before you got to Central Gardens, right?
A   Right.
Q   Anything else that you may have learned you learned through conversations after whatever occurred occurred, right?
A   Correct.
Q   So "Whitey" was not a party to any conversations before that murder about a murder, right?

        MR. VICK:  If he knows, Your Honor.  He is testifying again.  He has done this through his entire questions.
        THE COURT:  All right.  Mr. White, why don't you all come up here for a second.
        (At Bench.)
        THE COURT:  All right.  Now obviously, Mr.

Charles Townes (Cross)

White, I want to give you every advantage.  But there comes a time when you must ask questions.  It is very easy to frame questions, but you won't ask questions.  Please do that.  Try not to bring up attitude.  When you make a point, leave it.  You keep going on after you have made the point.
        (Mr. White and Mr. Geary conferring.)
        (In Open Court.)
BY MR. WHITE:
Q     Now, Mr. Townes, you said that there was a point in February, or was there a point in February when you were with Mr. Tipton on Southside?
A     Correct.
Q     With John and "Studie?"
A     Yes, we were dropping him off over there, yes.
Q     Who was driving, sir?
A     John Knight.
Q     John Knight?

A     Yes.
Q     Who is John Knight?
A     My best friend.
Q     Where is he from?
A     Central Gardens.
Q     And you were where, sir?
A     Southside.
Q     And where on Southside, specifically, were you?
A     Up the street from Hillside Court.
Q     What were you all doing over there that evening?
A     I wasn't over there.  We were dropping him off.
Q     Dropping?
A     "Whitey" and "Studie" off over there, yes.
Q     And where had you been just before that?
A     Central Gardens.
Q     Okay.  And did Gloria live in Hillside Court?
A     Correct.  No, I'm sorry.  She lived in Southside.  She lived up the street from Hillside.
Q     About how far would that be?
A     A block or two.
Q     Did "Whitey" say anything about going to see Gloria?
A     No.  He was going over there with "Studie" to stay over there, spend the night.

Q     He was going to spend the night?
A     Correct.
Q     And you said that you got back to Central Gardens at what time, sir?
A     About quarter to ten.
Q     And to get from Hillside Court to Central Gardens, what route did you all take; do you recall?
A     A highway.
Q     Which highway was that?

**JA554**

A    64.

Q    64?

A    Off Commerce Road.

Q    Isn't that 95?

A    Yeah, I'm sorry.  Yes, 95.

Q    You took 95 out to which exit off of 95 or off of 64?

A    Out by the racetrack.

Q    Mechanicsville?

A    Right.

Q    How long would you say it would take from the time you get onto 95 at Commerce Road until the time that you get to the Mechanicsville exit?  It is about a couple minutes, maybe?

A    Five minutes.

Q    And so if you had to estimate, sir, how long would it have taken you to get from Hillside Court back home to Central Gardens?

A    About seven minutes.

Q    And did you get Mr. Knight or did Mr. Knight get home in time to the best of your recollection?

A    Correct.

Q    Now, sir, you said that there was a conversation a couple of days later about something that happened that night?

A    Correct.

Q    Who was a party to that conversation?

A    It was "Whitey," "C.O.," and "Studie," and I came in.

Q    "Whitey," "C.O.," "Studie," and you?

A    Yes.

Q    Where did this conversation take place?

A    In Ms. Greene's house.

Q    Do you recall what time of day it was?

A    It was during the daytime, 4 o'clock, after Ms. Greene had went to work.

Q    Do you know of your own personal knowledge how everyone had gotten there?

A    No.  I had just came in.

Q    Okay.  Did "O" have a car, "C.O." have a car?

A    No.

Q    Did "Whitey" have a car at that time?

A    No.  "Studie" had a car.

Q    And when you got into the conversation  --

A    I didn't get in the conversation.

Q    When you walked in, who was talking?

A    "C.O."

Q    And what was "C.O." saying?

A    I don't really know what he was saying when I first walked in.  I just caught like the end of it.

Q    Was he explaining certain things that he had done?

**JA555**

A    Yeah, I guess so.  He had to, because he was talking about the murder after I came out of the bathroom.

Q    And "Whitey" was asking him questions about what happened?

A    About what happened to the girls, yeah.

Q    And what about anything else that happened? Were "Whitey" and "Studie" asking questions about anything else that happened?

A    No.  Not that I remember.

Q    Do you recall who left first?

A    No.  Left from out Ms. Greene's house?

Q    Yes.

A    No.  I mean, we didn't leave.  We stayed over there.

Q    You stayed over there for awhile?

A    Yes.

MR. WHITE:  Can I have a minute with Mr. Geary, please?

THE COURT:  Yes.

(Counsel conferring.)

BY MR. WHITE:

Q    You indicated that you had had a conversation with Mr. Tipton about Doug Talley, right?

A    Correct.

Q    And where was that when you had that conversation?

A    Off of Leigh Street.

Q    Do you recall whose house?

A    It was in Hillside.  We was walking through the neighborhood.

Q    Had you and he been together for awhile?

A    No, I had just got gotten over there.

Q    Was he bragging or was he just talking?

A    Talking.

Q    Okay.  How many times had you met Doug Talley?

A    I met him once.  I seen him a couple times over there.

Q    And you had seen him.  Would it be fair to say that you had seen him with people other than "Whitey?"

A    No, I never seen him  --  only time I seen him, he would be sitting in the house or he would be taking him to New York.

Q    You had said that Mr. Talley was going to New York every other day?

A    Correct.

Q    And bringing back how much?

A    About a half a key.

MR. VICK:  No need for the editorialization, facial expressions.

THE COURT:  Sustained.  Mr. White, I've

spoken to you about that before.  Please don't do it anymore.

BY MR. WHITE:

Q    Were you actually there when these guys got back from each of these trips?

A    Not each and every one of them, no.

Q    So you don't know exactly how much they were bringing back on these individual trips.

A    No.

Q    Now, Mr. Townes, you indicated that the entire amount of money that you estimated you made in your dealings with Mr. Tipton was about $10,000?

A    That's correct.

Q    Okay.  And your share of that would have been how much, sir?

A    $4,000.

Q    And sir, over what period of time was that that you made that?

A    Two years' time I was selling for him.

Q    Two years' time you were selling?

A    Correct.

Q    I thought you were only selling from December of 1991 to March of 1992.

A    No.  Well, that's about right then.  That's how much I made probably in the time I was selling for him.

Q    But sir, you have testified before under oath about this case, haven't you, sir?

A    Correct.

Q    And didn't you specifically testify under oath that you had been selling  --

        MR. VICK:  Objection.  May we approach?

     (At Bench.)

        MR. VICK:  In light of everything else that's gone on, I want to make sure this is done properly, that he is given the opportunity to review his Grand Jury transcript and all of that prior to just asking him.  He has never seen it.  On a personal note, I apologize, but if I could get a minute to sprint down the hall, I think I had too much coffee.

        MR. WHITE:  Before he sprints, could Mr. Townes be given the opportunity to review his Grand Jury testimony?

        THE COURT:  We will be in place.  You can set up the review and stay in place, if you would like.

        MR. VICK:  I'll leave it to Mr. Parcell.

     (Mr. Vick left the courtroom.)

     (In Open Court.)

BY MR. WHITE:

Q    Mr. Townes, you said you had recalled  --

**JA557**

MR. PARCELL: I think to establish a proper foundation, he needs to review the transcript.

THE COURT: Mr. White, do it the right way. I take it you are trying to use some prior testimony?

MR. WHITE: Yes, sir.

BY MR. WHITE:

Q   Have you had occasion to review your testimony before the Grand Jury in this matter?

A   Correct.

Q   When was the last time you had occasion to review that testimony?

A   Last year around about  --

Q   In November of this past year?

A   Yeah.

Q   And do you recall reviewing your testimony about how long you had been selling drugs with "Whitey?"

A   Correct.

MR. PARCELL: Once again, it is not the proper way to do it.

THE COURT: Mr. White, give him the questions and the response.

BY MR. WHITE:

Q   I'm trying to lead into it.  Do you recall being asked the question that you have been for the last two years at least selling drugs for "Whitey," have you not?

A   Correct.

Q   And do you recall your answer:  "Yes, sir?"

A   Correct.

MR. PARCELL: If he is going to ask questions and get responses, Mr. White is both asking the question and giving the answer.  The proper way is to give it to him.

THE COURT: For this point we are not going to waste any more time.  You have done it.  Move on.

BY MR. WHITE:

Q   Sir, do you recall being asked the question, "So you gave him at least 6,000 or more over the last two years in drug profits?"

A   Correct.

Q   Do you recall what your answer was?

A   Not exactly, no.

MR. WHITE: May he be shown the transcript?

THE COURT: Go ahead.

MR. PARCELL: Same thing he has testified to today.

MR. BAUGH: Objection.  That is an editorial comment.

THE COURT: The objection is sustained. I don't know how many ways we can attack this.  He

**JA558**

has testified being involved from December to March. He has also testified as to a two-year period. What else can you get out of it?

MR. WHITE: Well, Your Honor, I think there is --

THE COURT: He testified. Is there anything in there different from that 6,000/4,000 split?

MR. WHITE: Difference in time frame.

THE COURT: Then let's not waste any time.

BY MR. WHITE:

Q    Sir, would you please tell the ladies and gentlemen of the jury exactly what "Whitey" told you about the murder of Doug Talley?

A    He said "May-May." "Do you remember the man used to take us back and forth to New York"? I said, "Yes." He said, "I murdered him the other day." He said he had murdered him the other day. I asked why. "Because I thought he was 5-0." And that was it.

Q    That was it, the extent of the conversation?

A    Yeah.

Q    Nothing else?

A    Correct.

MR. WHITE: No further questions, Judge.

CROSS-EXAMINATION

BY MR. COOLEY:

Q    Good afternoon, Mr. Townes. Mr. Townes, you indicated that -- Mr. Vick asked you if on numerous occasions you had had conversations with him, with the other attorneys for the government, police officers, detectives, agents. And you responded yes to that.

A    Correct.

Q    How many numerous occasions; how many have there been; do you know? Can you count? Do you remember?

A    Three, two or three times.

Q    Just two or three times?

A    Yes.

Q    Do you remember who you have spoken with?

A    On each time?

Q    Yes.

A    Toby Vick.

Q    Just Mr. Vick?

A    Correct.

Q    Never spoke to the detective over here?

A    I spoke to the other detective.

Q    The other detective. Mr. Jackson, Mr. Woody?

A    Jackson.

Q    Mr. Jackson. Mr. Woody, did you speak with him at any time?

A    Mr. Woody? I don't think I know that name.

**JA559**

Charles Townes (Cross)

Q    You think you have only spoken with Mr. Vick twice then?
A    No.  Mr. Vick, about three or four times.
Q    Three or four times.
A    At the most.
Q    And he asked you in his beginning question to you:  "You have never been told what your answers should be; is that correct?"  Wasn't that his question to you?
A    Repeat the question again.
Q    "You have never been told what your answers to these questions should be."
A    What my answers should be?
Q    Yes, sir.
A    No.
Q    The government has not told you you should answer this way or suggested what your answer should be?
A    No.
Q    Never?
A    No.
Q    And he asked you what was the source of this information, and you said you were.  Is that correct?
A    Repeat that question again.
Q    He asked you at the beginning of your testimony this morning who was the source of the information that you gave to the government in response to their questions.  And you said  --  what did you answer?
A    Me.
Q    Okay.  Now today, did you tell us about a juvenile, a sixteen-year-old fellow?
A    Correct.
Q    What was his name?
A    "E.B."
Q    What role did he play in any of this?
A    He didn't play any role.
Q    Didn't play any role?
A    No.
Q    Not a seller?
A    No.
Q    No involvement, just happened to be around.
A    Correct.
Q    All right.  You didn't see anybody attempt to involve him in any actions?
A    No.
Q    How about Jerry Gaiters; was he a worker?
A    Yes, that's correct.
Q    Did he also commit some murders for these folks?
A    Well, he had said, "You take the other person's life, we will take yours."  I don't know if it

**JA560**

continued onto that.  No, really.

Q    So you don't really know that?

A    No.

Q    Maybe he did, maybe he didn't.

A    Maybe.

Q    Mr. White asked you if you recall your testimony before the Grand Jury back on April 21st of last year.

A    Correct.

Q    Now, would you like a copy of that to look at?  Would that help you to recall it?

MR. VICK:  Again, this is improper use of Grand Jury testimony.  If they are representing there is something inconsistent  --

THE COURT:  Just impeach if you have something.  If not, let's go on.

BY MR. COOLEY:

Q    Do you recall on the date of April 21st in the Grand Jury Mr. Vick questioning you?  Do you remember that?

A    Correct.

Q    You responded.

A    Correct.

Q    Do you recall him asking about giving you names and asking what people did, what roles they played?

A    Correct.

MR. COOLEY:  This is page six.

BY MR. COOLEY:

Q    Did he ask you how about Jerry Gaiters, and you responded,  "Yes."  Did he ask you -- and this is Mr. Vick's question:  "He sold for them?"

A    No.

MR. VICK:  This is so improper.  This is not inconsistent with what he is saying here today.

THE COURT:  Overruled.  Go ahead.

BY MR. COOLEY:

Q    And you responded yes.  And Mr. Vick asked you, "He also committed some murders for him, didn't he?"  And you responded:  "Yes, sir."  Do you recall that?

A    No, I don't recall that.

Q    You don't recall that.

A    I don't remember that.

Q    Do you deny that?

A    I don't deny it.  I don't remember it.

Q    You just don't remember it.

A    Yeah.

Q    If that was your response on that day, would that have been wrong or would your response today be wrong?

A    My response today would be wrong.

Q    Your response today would be wrong.  I see.  Now, do you recall  --  excuse me.  Today you have

testified that you are aware of why "Mousey," Ms. Armstrong, was killed; is that correct?

1264

A    Correct.

Q    Do you recall your testimony before the Grand Jury on April 21st of 1992 related to that?

A    Correct.

Q    All right.  Do you recall, on page nine, you were being asked about a situation in which "Whitey," you said "Whitey" and "C.O.," Jerry Gaiters, that you had ridden with them and you were asked:  "Did they tell you why they were going to kill "Mousey"?'  And you responded:  "They never said why."

A    Correct.

Q    All right, sir.  And no one has ever suggested what your answers should be; is that correct?

A    That's correct.

Q    Now, a few moments later, do you recall before the Grand Jury being asked this question, and this is Mr. Vick again.  Mr. Vick and only Mr. Vick questioned you;  Is that correct?

MR. VICK:  May we approach?

THE COURT:  Let's go on and get through this.

MR. VICK:  My objection is, his testimony there is being used as if it is inconsistent.  He said in the car today that there was no  --

THE COURT:  Mr. Vick, please.  Don't make

1265

that kind of comment.  You can ask questions to correct after his questions are made, if necessary. Go ahead, Mr. Cooley.

BY MR. COOLEY:

Q    You told us just a minute ago your response was "They never said why."

A    Correct.

Q    A few moments later before the Grand Jury, Mr. Vick asked you this question in this phrase:  "The killing of "Mousey," they were mad at "Mousey" over drugs, weren't they?  It was about drugs?"  And your response was yes.

A    I don't remember that.  I don't remember him saying that to me, no.

Q    He then asked you, "Do you know why they wanted her dead?"  And you said, "No, sir, I didn't."  And his question to you was:  "Just you know it was about drugs."  And your answer was yes.

Do you recall that?

A    No.

Q    Do you deny you made that statement?

A    I do not deny it, no.

Q    Assuming that you answered as I've suggested, which one of those was correct?

MR. VICK:  Your Honor, objection to the

1266

form of that question.

          THE COURT:  Sustained.

BY MR. COOLEY:

Q    Did they ever tell you why?

A    Who?  Repeat the question again.

Q    Did any one of these folks that you have testified today about ever tell you why "Mousey" was killed?

A    No.

Q    Your first response, "I don't know why."  The second response, Mr. Vick says in his question "It was because of drugs," and you said, "Yes."  No one has suggested an answer to you; is that correct?

A    Correct.

Q    Now, you indicated today in your testimony that Curt Thorne was killed because he messed up money and drugs.

A    Correct.

Q    Is that correct?

A    Yes.

Q    Is that the reason that you have known from beginning to end?

A    Correct, yes.

Q    All right.  I'm going to ask you to recall your testimony again before the Grand Jury.  That was an

1267

under-oath statement, wasn't it, when you were before the Grand Jury?

A    Yes.

Q    You were asked at line two:  "Why did they say they were going to kill them?"  Your answer was:  "He said Curt and Linwood was snitches."

A    Correct.

Q    And then the question was put to you:  "'Whitey' and 'C.O.' believed that Curt and Linwood were snitches cooperating with the police about them, didn't they?"  And you responded, "Yes, sir."

A    Correct.

Q    Do you recall if you ever mentioned on that day that the purpose of killing Curt was because he had messed up drugs?

A    From my point of view, yes.  They had said like a week before.

Q    So that was the reason?

A    Yes.

Q    And you didn't mention it then.

A    Back then, I don't remember.

Q    You did not mention then because  --  excuse me, you have not mentioned today the purpose or the reason was because he had in fact messed up drugs.  Is that correct?

1268

          MR. VICK:  Objection.

**JA563**

Charles Townes (Cross)

THE COURT: Sustained.

BY MR. COOLEY:

Q    Was it because he was a snitch or because he messed up drugs? Which was it?

A    Messed up drugs.

Q    Let me ask you about your perception or understanding of your immunity. Tell the ladies and gentlemen of the jury what you understand to be your deal, if you will, about immunity.

A    Protection.

Q    Protection. What about your being charged with anything?

A    Correct.

Q    What do you understand about that? Are you going to be charged with anything?

A    No.

Q    And if you testify you will not be charged; is that correct?

A    Correct.

Q    Did anyone mention to you that if the government got independent information about you having sold these drugs or participated, that they could prosecute you? Did anybody mention that to you?

A    Repeat that question again.

Q    Did anybody from the government, law enforcement, police officer, detective, attorney, tell you that if they got independent evidence of you committing crimes, these crimes, as opposed to just your statement admitting you committed certain crimes, that you could still be prosecuted; anybody ever tell you that?

A    Yes, I could still be prosecuted.

Q    So if Hussone or Antwoine or any of these folks gave them information --

MR. VICK: Objection.

THE COURT: Let him finish the question.

BY MR. COOLEY:

Q    -- that you sold drugs, participated in these things, that their testimony could be used to prosecute and convict you; did anybody tell you that?

A    No.

MR. VICK: Objection. It is speculative and asking for a legal conclusion.

THE COURT: The objection is overruled.

BY MR. COOLEY:

Q    No one told you that?

A    If Hussone's testimony  --

Q    If Hussone told them, sir, "I know that Mr. Townes sold drugs on the corner, purchased and sold drugs," that you could be prosecuted with that gentleman's testimony.

**JA564**

A    No.

Q    Your understanding is that you are not to be prosecuted at all; is that fair to say?

A    Yes.

Q    Yes, sir.  Now, as I understand it today, you have told these ladies and gentlemen of the jury that these folks, after the killings up in Church Hill, that they talked to you about them after that; is that correct?

A    They wasn't really talking to me, no.

Q    They talked in your presence.

A    Correct.

Q    And told you in the course of things how things happened.

A    Correct.

Q    That's what you testified to today.  Do you recall in your testimony before the Grand Jury being asked about that type of thing?

A    Yes.

Q    Do you recall being asked this question:  "Did you talk to them after "Mousey" was killed?"  And do you recall your response:  "No, sir, I didn't."

Do you recall that response?

A    No.

Q    Do you deny that response?

A    Yes, I deny that response.

Q    All right, sir.

(Counsel conferring.)

MR. COOLEY:  Could we have a very brief bench conference?

(At Bench.)

MR. COOLEY:  This is in part because of my uncertainty of procedures, but it would be my intention to move the Grand Jury testimony into evidence.  I don't see any problem with it.

MR. VICK:  I don't have any problem with it going in at all.

MR. GEARY:  We just wanted to make sure.

(In Open Court.)

MR. COOLEY:  On second thought, I have no further questions.  Thank you Mr. Townes.

THE COURT:  All right.  Questions by Mr. Baugh?

MR. VICK:  In light of that, may we approach?

THE COURT:  No, I understand your position.  We will deal with that later.  Go ahead, Mr. Baugh.

CROSS-EXAMINATION

BY MR. BAUGH:

Q    My name is David Baugh and we have not met, have we?

Charles Townes (Cross)

A    No.

Q    Now, a few moments before you started testifying, you did meet with some of these attorneys back here in the lock-up; am I correct?

A    Correct.

Q    Present was this gentleman right here in the gray suit, the first guy.  He was there, wasn't he?

A    Yes.

Q    And the gentleman next to him, he was there, wasn't he?

A    Yes.

MR. VICK:  What relevance is there to this line of questioning?

THE COURT:  If you have some, let's hear it.

MR. BAUGH:  I will.

THE COURT:  Let me hear about it before you do it.

MR. BAUGH:  I'm just going to bring up the fact that a few questions were asked and he answered them.  And then I was going to ask him what he said. Specifically, Your Honor, Eric White asked the question, "Do you know Sandra Reavis?"  And in the presence of these other people, he said, "I don't know her, I just know of her."

MR. PARCELL:  That's not correct.

MR. VICK:  This is impeachment by extrinsic evidence, clearly out of line.

THE COURT:  What is the point for you, Mr. Baugh?

MR. BAUGH:  The point for me?  That he has made prior inconsistent statements to today.

MR. VICK:  That gets us into putting on Buddy or something else.

THE COURT:  I will not allow it.

MR. VICK:  I would move the Grand Jury transcript into evidence of Mr. Townes.

THE COURT:  I won't let it in.

BY MR. BAUGH:

Q    On the night "Mousey" was killed, did Mr. Gaiters have a gun?

A    Yes.

Q    Thank you.  Now also, it is your testimony that in 1992, you were running around trying to get some money to get Mr. Johnson out of jail; am I correct?

A    Correct.

Q    And you had to sell some drugs, about six ounces worth.

A    Correct.

Q    And you were the only one selling that six ounces; am I correct?

A    No.

**JA566**

Q    Who else was selling with you?
A    Me and Hussone.
Q    Hussone.  Hussone is the young man who is like a brother to you?
A    Not like a brother.  He is a friend, good friend.
Q    Did you stay at his house on occasion?
A    Like spend the night or something like that?
Q    Didn't you testify a moment ago in response to Eric White's questions that you sometimes stayed at the Jones' house in Central Gardens?
A    Correct.
Q    And I assume you spent the night.
A    Correct.
Q    And in fact, I believe the question was you were like another child in that house.
A    Correct.
Q    That would be Hussone Jones?

1275
A    Yes.
Q    And Maurice Saunders?
A    (Witness nodded.)
Q    You have to give oral responses.
A    Correct.
Q    Who else?
A    "Studie," and George Jones.
Q    What's "Studie's" real name?
A    "Studie," that's it.
Q    His mother gave him the name of "Studie?"
A    I don't know his real name.  All I know is "Studie."
Q    Who is the fourth one?
A    Georgie.
Q    What's George's real name?
A    Georgie Jones.
Q    Hussone is an informant in this case?
A    Correct.
Q    Maurice is an informant in this case, correct?
A    He is?
Q    I'm asking you.
A    I don't know.
         MR. VICK:  "Informant" is Mr. Baugh's characterization.
BY MR. BAUGH:

1276
Q    He is a snitch, also, isn't he?
         MR. VICK:  Your Honor, that's just so improper.
         MR. BAUGH:  He objected --
         THE COURT:  You can ask the question.
BY MR. BAUGH:
Q    He is a snitch, too, correct?
A    Correct.
Q    Okay.  Now, before you sat down you took an

Charles Townes (Cross)

oath; am I correct?

A    Correct.

Q    Do you believe that if you tell a lie under oath your soul goes to hell and stuff like that?

            MR. VICK:  Objection.

BY MR. BAUGH:

Q    Withdraw it.  Never mind.  Now, did you ever get drugs from Mr. Roane?

A    No.

Q    Did Mr. Roane ever tell you where to go sell or what to sell or anything like that?

A    No.

Q    And it is your testimony that Mr. Tipton knew Mr. Roane before Mr. Roane got out of jail?

A    Correct.

Q    All right.  And were you present when they met?

1277

A    No.  Not when they first got together, no.

Q    All right.  You said that my client, Mr. Roane, was a partner with someone.  But he never gave directions to you; am I correct?

A    Correct.

Q    Never gave you drugs.  Ever get any money from you?

A    No.

Q    Did you ever see him with any money that you had prior?

A    No.

Q    Do you know of your own knowledge whether Hussone Jones has ever seen a murder before?

A    From what he told me, yes.

Q    That he had seen one before, before Mr. Talley?

A    No.

Q    Mr. Talley was the first one you believe he ever saw?

A    Correct.

Q    And this is the same Mr. Hussone Jones that let you stay in his house, right?

A    Correct.

Q    In the past year since that occurred, did Hussone ever tell you, "I saw someone murdered"?

A    No.

1278

Q    You have seen him on numerous occasions since that date, haven't you?

A    Correct.

Q    And did you ever go to him and say, "I heard you saw a murder; you saw someone get knifed in the brain.  What did you see?"  Did you ever ask him that?

A    He said he seen it when he pulled up behind Doug Talley.

Q    Hussone Jones did talk to you about it, then?

A    Not beforehand, no.

**JA568**

Charles Townes (Cross)

Q    Afterwards?
A    Yes.  Afterwards, yes.
Q    On how many occasions?
A    Once.
Q    Did you seek him out or did he seek you out to communicate this information?
A    He sought me out.
Q    Did he tell you that Mr. Roane was present?
A    No.
Q    Did he tell you that Mr.  --  he didn't tell you Mr. Roane was there?
A    No.  At the Doug Talley murder, no.
Q    All right.  Now, for what time period was Mr. Talley driving to New York to get drugs?  A month, two months?
A    A month.
Q    A month?
A    Yes.
Q    And it was your testimony previously today that Mr. Talley was driving to New York once every other day.
A    Correct.
Q    And they were bringing back a half a key.
A    Correct.
Q    At a time.
A    Correct.
Q    Now, a half a kilogram, that's 500 grams, isn't it?
A    Approximately.  I don't know.
Q    Approximately?
A    I don't know.  Half a kilo.
Q    Well, am I correct that when you all sell crack cocaine, you sell it for $10 a hit?
A    Correct.
Q    And a hit is about one-tenth of a gram?
A    I don't know about that one-tenth and all of that.  It is $10 a pop.
Q    Well, let me ask you this:  How much drug would you get in 30 hits?  In a 300-sack?
A    30 "cook-'em-ups."
Q    But how much drug was in there; was it three grams?
A    I don't know that.  I don't know.
Q    Well, you don't know how many grams are in an ounce?
A    No.  28 grams, yes.
Q    Do you know how many grams are in a kilogram?
A    No.
Q    Do you know how many days are in a month?  Do you?
A    You trying to make a fool of me or something?
Q    Do you know how many days are in a month?

**JA569**

A    Yeah.

Q    How many, approximately?

A    31 at the most.

Q    If he is bringing back a half a kilo every two days, that's about 15 kilos a month, isn't it?  15 kilograms.  Am I correct?

A    I guess you are.

Q    Excuse me?

MR. VICK:  This is so improper.  There is no reason for Mr. Baugh, Mr. White, and everyone to make editorial comments with their looks.

THE COURT:  Ask a question and get an answer.  You are doing gyrations with your body.  Ask a question.

BY MR. BAUGH:

Q    15 kilograms.  Now am I correct, sir, that 15 kilograms a month at $10 a hit would generate approximately $1,500,000 a month?

A    I don't know.

Q    Excuse me?

A    I don't know.

MR. VICK:  Relevance.  It is irrelevant.

BY MR. BAUGH:

Q    But it is your testimony that's how much drug was being sold and brought back here?

A    Correct.

Q    With that kind of volume, it is your testimony that these people had to come get money from you to pay a bond for Mr. Johnson in April?

A    Correct.

Q    Did you ever see as much as $1,500,000 a month?

A    No.

Q    Did you ever  --  like you mentioned, you would dine at Pizza Hut.  Did you dine at the better restaurants in the city?

A    No, I didn't dine in the better restaurants, no.

Q    Did you ever see any indication that anyone was making $1,500,000?

A    No.

Q    Did anyone give you that figure from the United States?

A    No.

Q    Or is that figure based upon what you saw with your own eyes.

A    Yes.

MR. BAUGH:  Pass the witness.

THE COURT:  Mr. Wagner.

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good afternoon, Mr. Townes.  Mr. Townes, you have testified that you have spent a significant

amount of time with Richard Tipton; is that right?

A    Correct.

Q    You have gotten to know him pretty well?

A    Correct.

Q    You know him to be a funny person, don't you?

A    Yes.

Q    You know him to joke around a lot; isn't that right?

A    Yes.

Q    He is sarcastic a lot of times?

A    Yes.

Q    Tells a lot of stories?

A    Correct.

Q    Now, you also know of Sandra Reavis; isn't that right?

A    Yes.

Q    You know she was J.R.'s girlfriend?

A    Correct.

Q    She was referred to as Sandra, right?

A    Correct.

Q    There is also a person who was selling drugs named Saunders, right?

A    Saunders?

Q    Yes, maurice Saunders.

A    Yes.

Q    How many times have you seen Sandra Reavis prior to today?

A    Six other times at the most.

Q    How many times have you spoken with Sandra Reavis?

A    Actually, I never spoke to her.

Q    You never spoke to her?

A    No.

Q    You never really have met Sandra Reavis, have you?

A    No.

Q    Now, you were over in Newtowne about every other day to buy drugs, weren't you?

A    To buy drugs?

Q    Uh-huh.

A    Not every other day, no.

Q    Wasn't that your testimony?

A    Three days a week.  You could say that, yes.

Q    And you rode around with "Whitey" a lot; isn't that right, in addition to going over to Newtowne about every other day.

A    Correct.

Q    You never saw "Whitey" give any drugs to Sandra Reavis; isn't that right?

A    Correct.

Q    Now, you have testified that you never had any conversations with "Whitey" about Sandra Reavis and

**JA571**

the selling of drugs; is that correct?
A    No, I never had a conversation with him, no.
Q    All right.  Now, Mr. Vick asked you about conversations about Curt Thorne in the selling of drugs.  He asked about "Mousey" and the selling of drugs; is that right?
A    Yes.
Q    He also asked you, or you testified that

1285

"Whitey" wanted you to send something to Sandra Reavis; isn't that right?
A    Correct.
Q    But didn't you testify that you have never had any conversations with him about drugs involving Sandra Reavis?
A    Yes, that's correct.  That's correct.
Q    Well, which is it then?
A    Yes, I had one conversation.  It wasn't a conversation.  He asked me to take some over to Sandra Reavis', over there, and I said yes.  But I never went over there, though.
Q    You didn't consider that to be a conversation about drugs?
A    No.
Q    You didn't consider that to be a conversation about drugs?
A    About drugs, yes.  I'm sorry.
Q    All right.  You testified that you overheard a single conversation between "Whitey" and "C.O."; is that right?
A    Correct.
Q    Involving Sandra Reavis; is that right?
A    Correct.
Q    When did this conversation take place?

1286

A    When I was over at 1212 over by Carver School.
Q    When did it take place?
A    I don't know when.  They was living over there.  I don't know the exact date.
Q    Do you know the month?
A    No.
Q    Do you know if it was in 1991?
A    Yes, during the wintertime.  Yes.
Q    November, December?
A    December.
Q    December, middle of December, towards Christmas?
A    Beginning.
Q    Beginning of December.
A    Yes.
Q    First week of December?
A    Beginning of December.
Q    All right.  Approximately what time of day was it; do you recall?

**JA572**

Charles Townes (Cross)

A    It was during the day.

Q    So this took place a year ago; is that right? Over a year ago.

A    Right.

Q    Now, you have testified that you gave $5,000 to Valerie Butler to send to "C.O.," is that right?

1287

A    Yeah. Not all at the same time, but about that much, yes.

Q    That $5,000 was indeed sent to "C.O.?"

A    Correct.

Q    All of it?

A    I guess. I gave it to her. I don't know what happened to it after that.

Q    You were using drugs at the time you were selling drugs in December of 1991; isn't that right?

A    Correct.

Q    You were using marijuana?

A    Correct.

Q    Smoked marijuana on a regular basis?

A    Correct.

Q    Did you smoke it about as often as "Whitey" did?

A    Correct.

Q    You were involved in selling drugs with people charged in this conspiracy; is that right?

A    Correct.

Q    And you have testified about violence that you heard about; is that right?

A    Yes.

Q    Despite the violence, you remained involved in the selling of cocaine; is that right?

1288

A    Repeat the question.

Q    Despite the violence that you heard about, you remained involved in the selling of cocaine; is that right?

A    Yes.

Q    For all of this that you were involved with, you have not been charged with any crimes in the federal court; is that right?

A    Correct.

Q    You have not been charged with conspiracy; is that right?

A    Correct.

Q    Not been charged with possession?

MR. VICK: Asked and answered.

THE COURT: Mr. Wagner, when you ask the question, "Have you ever been charged with any crimes, he certainly hasn't been charged with individual crimes."

BY MR. WAGNER:

Q    You haven't been charged with any crimes in the state system; is that right?

**JA573**

A    Yes, when I got locked up in New Jersey.  That's about it.

Q    But that wasn't through this process here.

A    No.

1289

Q    Now, did the government tell you that the minimum sentence you could receive on a conspiracy is ten years?

MR. VICK:  Objection.

THE COURT:  Overruled.

BY MR. WAGNER:

Q    Did they tell you the minimum sentence you could receive on a conspiracy to sell drugs is ten years?

A    I don't recall that.

Q    They didn't tell you that?

A    At the beginning, yes.  The detective told me.

Q    Did they threaten you you could be charged as part of this conspiracy if you didn't cooperate?

A    Correct.

Q    Did the government tell you that the maximum for this conspiracy is life in the penitentiary?

A    No.

Q    Did they say you could be subject to spending the rest of your life in the penitentiary for being involved in this, for not cooperating with them and being charged in this conspiracy?

A    Yes, that's right.

Q    Did the government tell you that you could get more time in a federal penitentiary because you have a conviction for a felony?  Did they tell you that?

1290

A    No, I don't remember that.

Q    And did they tell you you could get even more time if you knew about the violence; did they tell you that?

A    No.

MR. WAGNER:  I have no further questions.

THE COURT:  All right, Mr. Vick.  Brief redirect.

REDIRECT EXAMINATION

BY MR. VICK:

Q    Prior to your testimony at Grand Jury, did you have occasion to be debriefed by myself and Detective Jackson of the Richmond Police?

A    Correct.

Q    In anticipation of your Grand Jury testimony?

A    Correct.

Q    In that process of talking to us, did you provide us with answers?

A    I provided, yes.

Q    Were those answers that you provided us to your memory the subject of the Grand Jury investigation?

A    Correct.

Q    Therefore, if I asked you a question in there,

was it based upon, as you remember your Grand Jury testimony, based on what you had told us in

1291

debriefing prior to that?

MR. GEARY:  This witness would have no way of knowing that.

THE COURT:  Sustained.

BY MR. VICK:

Q    Have I ever told you  --

MR. McGARVEY:  Your Honor, it was asked and answered.

THE COURT:  It has been asked and answered many times, Mr. Vick.

BY MR. VICK:

Q    You first got involved in the fall of 1990 when you asked  --

MR. GEARY:  I know it is rebuttal, but he is leading him right to the yes or no.

THE COURT:  Sustained.

BY MR. VICK:

Q    When was it that you first asked "Whitey" for crack cocaine?

A    It was around, I think, the end of November when he was living on Sandy Lane.

Q    That was what year?

A    1991.  1990.

Q    Which one, 1990 or 1991?

THE COURT:  It was 1990.  We have been

1292

through this.  Please, let's not repeat ourselves.

BY MR. VICK:

Q    Have you ever read your Grand Jury transcript?

A    No.

MR. BAUGH:  Asked and answered.  He just said he went over it several months ago in anticipation.

THE COURT:  He answered that question.  I see no reason to ask it again.

MR. VICK:  No, sir, I beg the Court's indulgence; I did not ask him whether he has ever read his Grand Jury testimony.  I asked if in anticipation of Grand Jury we met and talked.

THE COURT:  I'm talking about not by you, but the question was asked "Did you read your Grand Jury testimony?"  And he answered, gave us a full and complete answer to that.

MR. BAUGH:  I believe Mr. Vick was out of the courtroom.

THE COURT:  That may be true.  That was dealt with while you were out of the courtroom.  I'm sorry.

BY MR. VICK:

Q    Now, did "C.O." tell you why he had killed "Mousey" Armstrong?

**JA575**

1293

MR. McGARVEY:  Same objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Now, did indeed your conversation with Mr. Tipton, did he tell you how Doug Talley had been murdered?

MR. GEARY:  Asked and answered on direct examination.

THE WITNESS:  That's correct.

THE COURT:  You can answer.

BY MR. VICK:

Q    How did he tell you he was killed?

A    He said he had stabbed him in the head.

MR. VICK:  I have no further questions.

THE COURT:  All right.  We are going to stop now, and if you all would come back at 2:15 after lunch, we will get started with the afternoon session.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Everyone remain seated while the witness is removed from the courtroom.

(The witness left the courtroom.)

MR. VICK:  I assume that Mr. Townes may be excused?

1294

THE COURT:  As far as I'm concerned.  All right, again, everyone remain seated while the defendants are removed.

MR. WHITE:  With regard to Mr. Townes being excused, I believe we issued a subpoena for him and the Court granted that subpoena, subject to call in our case in chief.

THE COURT:  Well, if you call him in your case in chief, which will be weeks, possibly, down the road, they can make him available.  As far as I'm concerned right now, he is excused.  Remove the defendants.

(The defendants left the courtroom.)

All right, we will be in lunch recess until 2:15.

(Luncheon recess taken from 1:15 p.m. to 2:15 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT:  All right.  Government, call your next witness.

MR. PARCELL:  Jeanne Keim.

JEANNE KEIM,

called as a witness by and on behalf of the

1295

Government, having been first duly sworn by the

Jeanne Keim (Direct)

Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?

A    Officer Jeanne Keim.

Q    How are you employed?

A    By the Trenton Police Department in Trenton, New Jersey.

Q    How long have you been a police officer?

A    Four-and-a-half years.

Q    Were you so employed in that capacity as a police officer on March 20th, 1992?

A    Yes, I was.

Q    Would you please tell the jury what your assignment was on that date?

A    I work in the proactive unit.  I was in full uniform and we had a patrol wagon, and our duties were to mainly deal with drug dealers throughout the day.

Q    Ma'am, did there come a point in time when you were stationed in an automobile and you saw a 1985 Pontiac violate a traffic infraction?

A    That's true.

Q    Would you please tell the jury what you saw, and based on what you saw, what if anything you did following that observation?

A    I noticed a car run right through a stop sign almost striking our police wagon.  So I turned the wagon around.  I was driving.  And I had a partner with me.  And I followed the car onto Monmouth Street, then made a left-hand turn onto a street called Walnut Avenue, which is, in our city, one of the worst streets for drugs and that type of activity.

MR. BAUGH:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. PARCELL:

Q    Go ahead.

A    As we were following the car up Walnut Avenue, the car was picking up speed and I saw objects being thrown out the passenger's side window.  I believed those objects to be drugs because of the way they were packaged in clear packages.  They were small. We radioed to some other proactive units that were in the area.  I chose to continue following the car instead of going after the packages.  I finally got the car stopped on Locust Street, and the driver of that car got out of the car.  The front passenger got out of the car and me and my partner told them to stay where they were.  They wouldn't listen to us. There was also a gentleman in the backseat.  He stayed where he was.  The driver got out and went to

**JA577**

Jeanne Keim (Direct)

the front of the car.  The passenger got out and went to the right side of the car.  My partner stopped the right front passenger and I finally got the driver stopped at the front of the car.

Q    Would you please tell the ladies and gentlemen of the jury who the driver of that automobile was?

A    Richard Tipton.

Q    Do you see him in the courtroom today?

A    Yes, I do.

Q    Would you please identify him if you can?

A    (Witness pointing.)  Sitting behind that gentleman there.

Q    Describe how he is dressed.

A    A blue, I think it is a navy blue suit jacket with a light blue shirt.  He is wearing glasses.

MR. PARCELL:  Let the record reflect she has identified the defendant Tipton.

THE COURT:  The record will so reflect.

BY MR. PARCELL:

Q    When you asked him for his identification, what if anything did he tell you?

A    He didn't have any identification on him.  He

1298

didn't have a driver's license.  I asked him if he ever had a driver's license.  He told me no.  He had absolutely no ID on him.

Q    What name did he give you?

A    Manny Wilkerson.

Q    And he was placed under arrest by you; is that correct?

A    That's correct.

Q    You gave him his summonses and tickets under what name?

A    Manny Wilkerson.

Q    During your entire contact with him that day, did you ever learn his name was not Manny Wilkerson?

A    No, I did not.

Q    Did you arrest some other individual?  Did you or your partner arrest some other individual within that car?

A    Yes.

Q    That was who?

A    Charles Townes.

Q    And he gave you his true name?

A    Yes.

Q    And there was another gentleman in the backseat.

A    Yes, sir.

1299

Q    What was his name?

A    Hussone Curtis.  I have it in my report, if I could check.

Q    Yes, ma'am.

(Officer perusing records.)

**JA578**

Jeanne Keim (Direct)

A    Hussone Curtis Jones.
Q    And Mr. Jones was not arrested for anything; is that correct?
A    That's correct.
Q    As you continued your investigation of the stop, did you or your colleagues try to go back and recover what came out of that vehicle as you pursued the vehicle?
A    Yes, we had other officers who we called to the area. They showed up within a minute, and we sent them back. I tried to give him exact locations of where I saw these packages being thrown. They had no luck.
Q    You recovered nothing?
A    Recovered nothing.
Q    After you got all of the three individuals out of the vehicle, did there come a point in time when you asked whose vehicle they were operating?
A    Yes.
Q    You were told by whom what?

A    I was told by Townes that the car belonged to a Valerie Butler.
Q    In Richmond, Virginia?
A    Yes.
Q    And did you ask for the registration of that vehicle?
A    Yes, I did.
Q    You were told what?
A    Charles Townes told me to go, that it was in the glove compartment. And by this time he was very, I would say, arrogant. And he told me to get the registration.
Q    At that point in time you went inside the vehicle?
A    I went inside the vehicle on the passenger's side because he told me the registration was going to be in the glove compartment. As I bent down to go in the glove compartment I noticed a white substance on the floor along with a razor blade. I believed that substantial to be crack cocaine. I confiscated it along with the razor blade and told my partner to place Townes under arrest.
Q    What you suspected to be cocaine you sent to your state laboratory for analysis?
A    Yes.

Q    It came back what?
A    No controlled dangerous substance.
Q    Mr. Townes was charged with that offense and ultimately pled guilty to that offense; is that correct?
A    He was charged with it. I'm not sure.
       MR. PARCELL:  I will notice admit that lab

**JA579**

report as Government Exhibit 133.

THE COURT: Ma'am, did I understand you correctly to say that it came back no controlled substance?

MR. PARCELL: That's correct, sir.

MR. BAUGH: What's the relevance of the lab report? I object to relevance.

THE COURT: Why do we need a lab report?

MR. PARCELL: Very well, the government withdraws.

BY MR. PARCELL:

Q    As you continued to search for the registration of that vehicle, did you find anything else that meant anything to you?

A    Yes. When I opened the glove compartment to get the registration, there was a brown paper bag that was open, exposing numerous small bundles of money.

Q    And did you ultimately seize that money?

A    Yes, I did.

Q    Would you please tell the ladies and gentlemen of the jury how much money you seized from that vehicle?

A    $3,000.

Q    What denominations was that money in?

A    It was all small bills, mainly twenties. And it was in bundles of 100, and each bundle was wrapped off with a rubber band, the majority of the bundles.

MR. PARCELL: No further questions by the government, Judge.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Officer, the proactive unit that you were in, is that the same one that Officer McMillian was in that was here Friday, the same unit?

A    No. There is four proactive units. I work in a separate unit than he.

Q    The proactive units in Trenton are to deal with street level drug dealers; is that correct?

A    That's correct.

Q    When Mr. Townes was charged, what was he charged with? What was the crime he was charged with?

A    Possession of CDS.

Q    Possession of what?

A    CDS.

Q    What is that?

A    Controlled dangerous substance, possession of drug paraphernalia. And if I may, I need to look at my report.

(Witness perusing document.)

Tampering with evidence, allowing an unlicensed driver to operate, and no seatbelt.

Q    I take it then if he pled guilty to something it

was not for possession of CDS because the lab report came back not a controlled drug; is that correct?

A    Well, that's correct.  He would have gone to Court the next day, and I never  --  I didn't follow through.  I don't know how he pled to those charges.

Q    The driver of the car who identified himself to you as Manny Wilkerson, and who you have identified today as Richard Tipton, was issued traffic summonses in regard to going through the stop sign and almost hitting the police car; is that correct?

A    That's correct.

Q    The person in the backseat was not charged at all; is that correct?

A    Yes.

MR. GEARY:  No further questions.

MR. COOLEY:  We have no questions.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  All right.  Mr. Vick, redirect?

MR. PARCELL:  No redirect by the government.

THE COURT:  You may stand down.  Thank you very much.

(Witness stood aside.)

MR. VICK:  The government would call Maurice Saunders.  He is in the hall.

## II.  Maurice Saunders (1304)

MAURICE SAUNDERS, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'll ask you to speak into the microphone so everyone can understand you.  Could you state your name for the Court, record, and jury, please?

A    Maurice Saunders.

Q    Mr. Saunders, how old are you?

A    18.

Q    When did you turn 18?

A    December 29th, 1992.

Q    1992?

A    Yes.

Q    So you have been 18 for just a couple of weeks?

A    Yes.

Q    How far have you gone in school?

A    Ninth grade, but I've got my GED.

Q    You are testifying here today pursuant to an agreement that you have reached with the federal

Maurice Sanders (Direct)

government, the U.S. Attorney's Office for the Eastern District of Virginia; is that correct?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what you understand that agreement to be?

A    The agreement is that nothing that I say could be used to prosecute me, only statements of others can prosecute me.

Q    What would happen if there was independent evidence of the crimes about which you will testify? That independent evidence could result in prosecution? Has the U.S. Attorney's Office agreed to protect you from any other prosecution?

A    No.

Q    What's your understanding of the use-immunity that you have been granted by the U.S. Attorney's Office? What do you need to do in return for that use-immunity?

A    Tell the truth.

Q    What would happen as you understand it if you were caught knowingly telling a lie?

A    I could be prosecuted.

Q    Have you used drugs before?

A    Yes.

Q    What type of drugs have you used?

A    Heroin.

Q    When was it that you used heroin?

A    1990.

Q    One other preliminary question. I forgot to ask you, Mr. Saunders, you and I have had occasion to talk on several occasions, along with Detective Jackson, in anticipation of your testimony; is that correct?

A    Yes.

Q    And during those conversations, have either myself, Detective Jackson, or any other individual from the investigative team of this case told you what your answers should be to particular areas of the questions?

A    No, never.

Q    All of the answers that you have given, all of the answers you will give here today, come from what source? Where do they come from?

A    Me.

Q    During that process, you indeed asked about a job; is that correct?

A    Yes.

Q    Now, who did you ask about a job?

A    I asked you.

Q    What did you ask me about a job for? How did that come up?

A    Because I wanted to get out of drug-running.

**JA582**

Maurice Sanders (Direct)

Q    Why is it that you wanted a job?
A    Because I wanted to change myself around.  You made me feel like I could change my life around.
Q    Did I suggest someone you should call?
A    Yes.
Q    Did I give you a telephone number?
A    Yes.
Q    To do what type work?
A    To call and set up interviews.
Q    Warehouse work?
A    Yes.
Q    Did I tell you that you would get a job?
A    No.
Q    Did I tell you that I knew someone who might hire someone like you?

1308

A    Yes, you did.
Q    All right.  Was that in return for your testimony?  Did I tell you that if you testified I would do that for you and if you didn't, I wouldn't?
A    No, you did not.
Q    Have you indeed received a job?
A    No, I have not.
Q    Now, back to your heroin use, when did you begin using heroin?
A    Let's see, roughly '90, '89.  '90.
Q    How often were you using heroin?
A    Practically almost every day.
Q    How were you ingesting it?  How were you getting it into your body?
A    Nasal passages.
Q    Snorting it?
A    Yes.
Q    All right.  Do you know the defendant in this case, Mr. Richard Tipton, also known as "Whitey?"
A    Yes, I do.
Q    Do you see him in the courtroom today?
A    Yes, I do.
Q    Could you point him out, please?
A    Right there with the glasses on.
Q    How is he dressed?

1309

          MR. WHITE:  Stipulate.
          MR. VICK:  May the record reflect the identification of the defendant Richard Tipton?
          THE COURT:  The record will so reflect.
BY MR. VICK:
Q    When did you first meet Mr. Tipton?
A    Roughly 1986, 1987, something like that.
Q    Where was it you met him?
A    Central Gardens.
Q    In 1986 or 1987, did you come to be involved with Mr. Tipton in any illegal activity?
A    Yes.

**JA583**

Maurice Sanders (Direct)

Q    Would you tell the ladies and gentlemen of the jury about that.
A    A few gang fights with the neighborhood, drugs, and that's about it.
Q    Did you indeed end up involved in the distribution of narcotics with Mr. Tipton?
A    Yes, I did.
Q    When did that begin?
A    I was around 13.  So I guess about 1987, 1986, something like that.
Q    And what happened?
A    It increased, but you know, it increased over time.

1310
Q    Back to when this first began, how did you first become involved with Mr. Tipton?
A    He came back from  --  he came from New York, as I understand it, from what he says.  He said he was, you know, this and that and the other, on the run for different things.  One time he said because he hurt somebody, he would come back and forth, things like that.
Q    Did you come to find out that he was selling any illegal substances?
A    Yes, I did.
Q    What kind of illegal substances?
A    Marijuana one time, and crack cocaine.
Q    How did it happen that you got involved with him?  Did he approach you or did you approach him?
A    Yes.  He came out with the words, you know, "Let's make moves together."  But when we first met, we just was hanging, you know.
Q    When he said to you "Let's make moves together," what did you understand him to mean?
A    His words were "Let's make moves," meaning let's get money together, let's get paid.
Q    Did you agree to do that with him?
A    Yes.
Q    Did you end up getting cocaine from him?

1311
A    Yes.
Q    Did you end up selling that cocaine?
A    Yes.
Q    What kind of cocaine was it?
A    Crack cocaine.
Q    Back in 1987, how often was it that you were getting crack cocaine from him?
A    Almost every day, almost.  Every two days or every day.  Depends on how fast I moved.
Q    Where was it in 1987?  Where was it you were selling this cocaine?
A    Fairfield Court.
Q    And what was the agreement between yourself and Mr. Tipton as to how you would pay for that cocaine?

**JA584**

A     Always a 60-40 split.

Q     Who got the 60 percent?

A     I got the 40 percent, he would get the 60 percent.

Q     Would you pay for that after the sale of the cocaine or before?

A     Afterwards.

Q     How long did you continue?  From when you began in 1987, how long did you continue with Mr. Tipton selling drugs?

A     It was more of a, you know, it wasn't no complete time span.  It would be off and on.  Like I said, he was back and forth.

Q     All right.  Did Mr. Tipton, in that time frame, 1987, would he hand the cocaine directly to you?

A     No, he would not.

Q     Tell the ladies and gentlemen of the jury how he would go about delivering the cocaine to you.

A     He would set it in certain places, tell me where it is at.  "Go get this, go get that."  He never handed it to me.

Q     Back in 1987, based upon your involvement with Mr. Tipton in the sale of crack cocaine, did you come to find out whether he was involved with anyone else in that time frame in the sale of cocaine?

A     Yes.  He used to throw names out, like different names, like "Alpo" and "A.Z.," different people.  I don't really know them.

Q     Did you come to find out where "Alpo" and "A.Z." lived?

A     Yes.  A mobster house in  --  there is a group in New York.

Q     What group is that in New York?

A     He didn't give them a particular name.  But you know, just a few guys in New York.  He just came up with individual names.

Q     Were "Alpo" and "A.Z." part of this group in New York, according to Mr. Tipton?

A     Not at that time, I don't think.  He didn't specifically say that.

Q     Do you know at that time frame whether Mr. Tipton was selling any drugs in Charles City?

A     Not around that time.  I don't think so.

Q     Did there come a time later when he was selling drugs in Charles City?

A     Yes.

Q     When approximately was that?

          MR. WHITE:  Objection, unless he has personal knowledge.

BY MR. VICK:

Q     From your own personal knowledge.

A     Yes, personal knowledge. 1989, I guess.  1989,

**JA585**

Maurice Sanders (Direct)

something like that.
Q    So between 1987 and 1989, tell us about your involvement with Mr. Tipton.  Was it continual involvement, sporadic involvement in the sale of cocaine?
A    It was still random, back and forth.
Q    In 1989, were you still involved with Mr. Tipton?
A    Yes.

1314

Q    Did you come to find out about whether he was selling drugs in Charles City?
A    Yes, I did.
Q    Did you come to find out with whom he was selling drugs in Charles City?
A    Yes.
Q    Who was that?
        MR. WHITE:  I don't know what relevance Charles City has to any of this.  It certainly doesn't relate to New Jersey, Central Gardens, certainly doesn't relate to Newtowne.
        THE COURT:  Overruled.
BY MR. VICK:
Q    Who was he selling drugs with in Charles City?
A    His cousins, "Pom-Pom," George, a few of them. Wayne Pugh.
Q    What type of drugs was he selling in Charles City?
A    Crack cocaine.
Q    In 1989, what quantity of drugs from your own personal observation do you know that Mr. Tipton was distributing of crack cocaine on a weekly basis?
A    Around '89, I don't know.  I know  -- ounce-and-a-half, something like that, every day.
Q    Every day?

1315

A    Yes.
Q    Do you know where Mr. Tipton was getting his cocaine?
A    Just friends would get it from New York.
Q    What do you base that on?
A    He would take trips back and forth.
Q    You got locked up in April of 1990 for drug distribution; is that correct?
A    Yes.
Q    How much drugs did you have in your possession when you were arrested?
A    Like 40 some caps, 42 caps.
Q    You were a juvenile?
A    Yes.
Q    Were you prosecuted?
A    Yes.
Q    What happened in that prosecution?
A    I was sent to Hanover Learning Center for

**JA586**

Maurice Sanders (Direct)

juveniles.

Q    You say you had 40-some caps.  Of what?

A    Crack cocaine.

Q    How much crack cocaine would have been in each cap?

A    They was going for $10 a pop.  But it was more than $50 in each.

1316

Q    All right.  Where did you get the cocaine that you were arrested with?

A    I got that from 'Twoine at that time.

Q    And who is 'Twoine?

A    Antwoine Brooks.

Q    Do you know where Antwoine Brooks got that cocaine that you were arrested with?

A    I didn't see the transaction, but I'm pretty sure it was  --

MR. WHITE:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did Mr. Brooks tell you where he got that cocaine?

A    Several times before that.

Q    Who?

A    "Whitey."

Q    Did you know from your own personal involvement whether Mr. Brooks was involved with Richard Tipton, "Whitey," at that time in the distribution and sale of cocaine?

A    Yes.

Q    All right.  What did you know about that?

A    Pretty much when I was buying from "Whitey" at that time.

1317

Q    Have you ever seen Richard Tipton cook powdered cocaine into crack cocaine?

A    Yes.

Q    On how many separate occasions?

A    More like twice at our house in Sandy Lane.

Q    And what sort of quantities did you see him cook into crack cocaine?

A    The most I ever saw him cook personally was three ounces.

Q    What does that process do; what does that make?

A    It hardens the cocaine into a much-concentrated substance, crack.

Q    How do you ingest the crack?

A    From smoking it in a pipe or whatever.

Q    Were you the only individual, based upon your knowledge and involvement with Mr. Tipton, who was -- in 1990 now -- who was involved with Mr. Tipton in the sale of crack cocaine in the Central Gardens area?

A    Was I the only person?

**JA587**

Maurice Sanders (Direct)

Q     Right.
A     No, I was not.
Q     Who else was dealing with him in the Central Gardens area?
A     Damien, Sam, "Pom-Pom," George, me, 'Twoine, my brother Hussone, "May-May" a little, but that was about it.
Q     And what was the relationship that you had? What was the business relationship that you had with Mr. Richard Tipton concerning the sale of cocaine?
A     Around the early part of when we was together in '90.  I was just a worker.
Q     How about these other individuals?  Do you know what their relationship was?
          MR. WHITE:  Objection, unless he has some facts.
BY MR. VICK:
Q     Based on your knowledge and involvement.
A     'Twoine was more of a right-hand man.  More a lieutenant.
Q     Does that mean in your words  --
          MR. WHITE:  Objection.
          THE COURT:  Sustained.
BY MR. VICK:
Q     Was 'Twoine on the same level as you?
A     No, he was not.
Q     Describe what you mean to the ladies and gentlemen of the jury.
A     'Twoine was getting it in more quantity than the others.  He was allowed to keep the money.

Q     Were you allowed to do that?
A     No, I was not.
Q     How about the other individuals other than 'Twoine?  What was their relationship based on your own personal observation?
A     All workers, same as me.
Q     In 1990, what sort of quantities of drugs were you getting from Mr. Tipton on a weekly basis?
A     More like three-and-a-half ounces every week.
Q     How much money were you making off that cocaine?
A     $2,500 to $3,000.
Q     Is that money in your pocket?
A     In my pocket.
Q     How much money were you giving Mr. Tipton? "Whitey?"
A     Altogether, around three G's every week.
Q     In that time frame in 1990, do you know where Mr. Richard Tipton, "Whitey," was getting the crack cocaine that you were distributing?
A     Yes.  New York.
Q     Excuse me, I didn't understand that.

**JA588**

Maurice Sanders (Direct)

A    New York.
Q    Do you know how he was getting it down here from New York?

1320

A    Bus.
Q    Based upon your knowledge and involvement with Mr. Tipton, do you know whether Mr. Tipton ever had any business losses?
A    Yes.  We had business losses.
Q    What sort of business losses?
A    One time we ran into some bad drugs.  And then we tried to package too small, called liquid shots, and it didn't go too well.  It slowed everything down.
Q    Was it tough to sell that cocaine?
A    Yes, it was.
Q    When did you come home from the learning center?
A    I came home from the learning center in October of 1990.
Q    And what you have just testified to is in that time frame when you came home?
A    Yes.  Until like December or whatever.
Q    When you came back out from the learning center, you got back involved with Mr. Tipton?
A    Yes, I did.
Q    Did he approach you or did you approach him at that time?
A    He approached me.

1321

Q    And what did he say to you at that point?
A    Same words as the first time, "Let's make moves."
Q    And what was the arrangement that you had with him at that time concerning the price of the cocaine and how you would pay for it?
A    Well, at the first I was just a worker, me and my brother.  By December sometime, we moved in together and we all became partners.
Q    Where did you move in at?
A    Sandy Lane.
Q    And back when you described yourself as a worker, what did you have to pay Mr. Tipton for that cocaine; was it the same as it was in 1987?
A    Yes.
Q    Which is what?
A    It was a 60-40 cut.  Unless he gave us some fine jobs, it was a three-to-two cut.
Q    Did you ever see Mr. Tipton tell people to do things in regard to the sale of cocaine?
A    Yes.
Q    What did you see him do?
A    At one time, 'Twoine Brooks had too much clientele on our block.  He told 'Twoine to stay off

**JA589**

Maurice Sanders (Direct)

the block and use the beeper.

Q    Why did he want him off the block and to use the beeper.  What exactly did he mean by that?
A    Because he had  --
        MR. WHITE:  Objection as to what he may have meant.  He can say what he said.
        THE COURT:  Sustained.
BY MR. VICK:
Q    What did he say exactly?
A    Those are his exact words.
Q    And "use a beeper" meaning what?
A    Work off a pager.
Q    Based upon your knowledge, did you understand what was meant by that?
A    Yes, I did.
Q    What was that?
        MR. WHITE:  Objection.  His understanding is not relevant.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Did Antwoine Brooks indeed do that?
A    Yes, he did.
Q    Did you ever have a conversation with Mr. Tipton in that time frame about dealing with someone other than him in the sale and distribution of cocaine?
A    Yes.  More than one time.  What was said was, "You only deal with me if you value your life."  That type of thing.
Q    Did he ever tell you what would happen if you did deal with someone other than him?
A    He always said he will go for bad if we all cross him.
Q    What is your understanding of what he meant?
A    "Go for bad" is he is not going to take it, you know, turning to anybody else besides him.  And if it was to come down to that, he would do anything as far as to kill for.
Q    Did Mr. Tipton ever tell you whether or not he was connected to anyone in New York?
A    Yes.  He always talked about his New York Boyz and this and that, the crew they had.
Q    Did he ever make any statements to you concerning bringing any of those people down from New York?
A    Yeah, he would always say if anything was to happen to him, that they would come down and just kill everything.
Q    Did Mr. Tipton have weapons with him at that time?
A    Yes, he always kept a razor in his mouth, or a little knife, or guns were in the house.

**JA590**

Maurice Sanders (Direct)

Q    What kind of razor?
A    One-edged razor with the back on it.
Q    Where did he used to keep it?
A    In his mouth.
Q    Where?
A    Right inside his mouth.
Q    Would it be visible?
A    No, you couldn't see it.
Q    You say he had a knife.  What kind of knife did he have?
A    Big knife.  Really, any type of knife he could get his hands on.
Q    And guns?
A    Yes.
Q    What kind of guns?
A    At that time, we had an M-1 machine gun, .32 automatic, and that's about it.  And a 9.  We had a 9.
Q    How soon after you came out of the learning center was it that you moved into Sandy Lane with Mr. Tipton?
A    End of November.
Q    And how long was it that you stayed at Sandy Lane with Mr. Tipton?
A    I believe January or February, the beginning of

1325

February.
Q    What happened to end that?
A    Mainly we all wanted to get up out of there because it was getting too hot, too many police riding past the house and different things like that.  And also, we had a lot of arguments about paying the rent.
Q    You said just a minute ago that during that time you moved up to be a lieutenant or so for Mr. Tipton.  What did you mean by that?
A    I moved up on my quantity.  He trusted me more, you know, and I was told to do more.  I did more.
Q    What was it that you would do?
A    I made a trip to New York.  I would weigh out certain things and give it to certain people that he said give it to.
Q    Would he tell you who to give it to?
A    Yes.
Q    Would he tell you how much to give a certain individual?
A    Yes, he would.
Q    Did you do those things?
A    Yes, I did.
Q    In that time frame then, could you tell us how much cocaine, based upon your own personal

1326

observation --
          MR. WHITE:  What time period?

**JA591**

THE COURT:  Let him ask the question again.

BY MR. VICK:

Q    The time frame that you were living on Sandy Lane and acting as his lieutenant, when was it?  What quantity of cocaine was Mr. Tipton -- were you able to see how much Mr. Tipton was distributing?

A    Him personally himself, he didn't distribute too much.  But overall, he had it all.  And it looked like a good key of cocaine.

Q    How often?

A    Like every month, unless we couldn't get back to New York.  If we couldn't get to New York it would be lower because we would have to buy from here.

Q    Did he call you by a nickname?

A    Yes.

Q    What was that?

A    Used to call me "Black Reese's Cup" or "Little Black."

Q    Did he tell you why he called you that?

A    Because I reminded him of somebody named "Black."

Q    How many people was Mr. Tipton directing you to deliver cocaine to?

A    It was never delivered.  They always would come to the house on Sandy Lane and get it.  It would be a good three or four different people.

Q    Give us the names.

A    As far as our group, you want our group?  As far as our group, 'Twoine, Hussone, Sam, Damien, "J.T."

MR. BAUGH:  I could not make out the last name.

THE WITNESS:  Damien, and "J.T."

BY MR. VICK:

Q    As to another group?

A    I don't know the people, but they was from other areas of the city.

Q    What other areas of the city?

MR. WHITE:  Objection unless he knows.

THE WITNESS:  Church Hill, Southside, Charles City.  That's it.

BY MR. VICK:

Q    Why do you not include them in "our group"?

A    Because they wasn't on the level that we was.

Q    Okay.  Do you know an individual by the name of "Hess?"

A    Yes.

Q    Who is "Hess?"

A    "Hess" was a Dominican that was from White Springs, New York, one of "Whitey's" friends from New York.

Q    Where did you meet "Hess?"

Maurice Sanders (Direct)

A    I met "Hess" in Richmond when "Hess" came to Richmond.

Q    Who was he with?

A    He was by himself.

Q    Did "Whitey" introduce you to "Hess?"

A    Yes.

Q    What did "Whitey" introduce him as?  How did he introduce him?

A    He introduced him as an enforcer, like when "Hess" came down here, his purpose  --

MR. WHITE:  Objection to his purpose.

MR. VICK:  Based on what you know from Mr. Tipton.

THE COURT:  You have to ask the first question.  In what manner was he introduced to you?

BY MR. VICK:

Q    What manner?

A    As one of his New York Boyz.

Q    Did he speak of "Hess" in any vein concerning violence?

A    Yes.  When they was in New Jersey, they used to talk about that.

Q    What did he tell you about that?

MR. WHITE:  Objection to relevance of violence in New Jersey.

THE COURT:  Overruled.

THE WITNESS:  Violence, where people they knew did harm to a New Jersey group who they had to do harm to, things like that.

BY MR. VICK:

Q    What was the purpose, as Mr. Richard Tipton told you, that "Hess" came to Richmond?

A    "Hess's" purpose was to be a strong arm, like he kind of  --  kind of to be an enforcer, take care of things.

Q    Was there a particular problem that Mr. Hussone Jones had?

A    Yes, my brother was robbed in Catchpenny Lane in Central Gardens.

Q    Did "Hess's" coming to Richmond have anything to do with that?

A    Yes.  When he came, that's the first thing he talked about taking care of.

Q    Now, Mr. Tipton, when he talked to you about New Jersey and New York, did he indicate to you whether he had any problems with New Jersey or New York?

A    Yes, he did.

Q    What did he say?

A    He said he had to go on the run from New Jersey himself.

Q    Why was that?

A    He didn't say specifically.  He just said he was

**JA593**

Maurice Sanders (Direct)

on the run.

Q    I direct your attention to after Christmas of 1991; did you have occasion to make a trip to New York with "Hess?"

A    Yes, I did.

Q    What was the purpose of that trip?

A    To bring back crack cocaine and some vials.

Q    Who were you going to get crack cocaine for?

A    For Rich.

Q    You mean "Whitey?"

A    Yes.

Q    Tell us about that trip.

A    We made the trip up on the bus.  We got off of the bus.  We walked in Uptown and I got some gold to put in my mouth.  Then we took a train to -- I think it was like Amsterdam and 155th Street, something like that.

Q    Had you been there before?

A    Never been there before.  That's the first

1331

time.

Q    Where was it precisely, if you can remember?

A    Spanish Harlem.

Q    Do you remember the precise street addresses?

A    No, I do not.  Amsterdam, 155th.

Q    What's there; is there a particular building or group of buildings?

A    Yes.

Q    Describe it.

A    Projects, you know; they go straight up.

Q    Do you know an individual by the name of Greg Scott?

A    No, I do not.

Q    Have you ever talked to Greg Scott in anticipation of your testimony?

A    No, I have not.

Q    When you got to that location, 155th and Amsterdam, what did you do?

A    We went up, stood outside for a little while, kicked around with some of "Hess's" friends.  We made our way in the building, made our way upstairs.

Q    Who did you see there?

A    I saw a few other people.  Pointed out to me was a guy named "E.B.," and pointed out to me was a dude named -- he said "Light," I think it was "Light." I'm

1332

not sure.

Q    Had you ever heard the name "Light" before?

A    Yes, from Rich.

Q    Who else was there?

A    A girl was there, a few other people I don't really know.

Q    Did "Hess" or "Whitey" ever tell you who these people were, "Light" and "E.B."?

**JA594**

Maurice Sanders (Direct)

A    Yes.
Q    Who was that?
A    Part of the New York crew.
Q    Did you meet an individual by the name of "Supreme" or "Born Supreme?"
A    I recall meeting somebody named -- who they had called "Supreme," but I don't know who it is.
Q    Did you get anything in that building that day?
A    I did not purchase it myself, but "Hess" did come up with some crack.
Q    How much?
A    A whole square block of it, like a whole key of it.
Q    Are you familiar with the relative weights of cocaine?
A    Yes, I am.
Q    Based upon that familiarity, would you tell how

1333

much --
A    It was about a key of cocaine.
Q    What did you do with that cocaine?
A    We got on the bus again.  First we went and got some bottles, then we went to the bus and we sat it over top of some people sitting in the seats across from us and we sat in the back and watched it.
Q    And did you come back to Richmond?
A    We came back to Richmond, took the cab to Sandy Lane.
Q    What did you do with that kilogram of crack cocaine?
A    It was distributed out between us and other people that "Whitey" told to distribute it.
Q    When you got to Sandy Lane, what did you do with it?
A    It was given away.
Q    Who gave you the money to purchase that kilogram of crack?
A    "Whitey."
Q    Who did you give that money to in New York?
A    I did not give it to anybody.  "Hess" gave it.
Q    To who?
A    To whoever he went into the apartment with.
Q    Do you know how much money it was that you

1334

carried to New York to buy cocaine?
        MR. WHITE:  Objection, unless he saw it.
        THE COURT:  Overruled.
        THE WITNESS:  I guess $17,000, $18,000.
BY MR. VICK:
Q    $18,000?
A    Yes.
Q    All right.  Did "Whitey" tell you anything about "Light" or "Born Supreme?"
A    The exact words was "Act like you don't know and

forget what you have seen."

Q    Did "Whitey" ever talk to you about Trenton, New Jersey?

A    Yes.  He used to tell us war stories from there.

Q    What would he tell you?

A    Different stories about how they, you know, used to bat people down and beat them, different things.

Q    Did "Hess" point out a certain individual to you when you were in New York and say something about that individual?

          MR. GEARY:  I object.  Mr. Tipton wasn't there.  "Hess" is not charged in the conspiracy.

          THE COURT:  Overruled.

          THE WITNESS:  There was this guy that had a mark on his face, on his cheek.  I can't remember which side it was, but it was a disfiguration of the guy's cheek.

BY MR. VICK:

Q    What did "Hess" say about that?

A    He said, "That's 'Whitey's' doing."

Q    Did there come a time when you took a second trip to New York?

A    Yes, with "Whitey."

Q    When was that?

A    Beginning of February, something like that.

Q    Now, let me back up.  As to that kilogram of cocaine that you brought back from New York, how much of that did you actually get for distribution?

A    Roughly sold three-and-a-half of that myself.

Q    Did you watch and help distribute that cocaine to people other than yourself?

A    Yes, I did.

Q    Who came and got part of that cocaine?

A    Again, he didn't give names, but he only gave areas, where they was from.  Church Hill, Southside, Charles City.

Q    How long did it take to distribute that kilogram of cocaine?

A    That time it went fast, like two or three weeks.  Well, in a day, all of it was gone as far as out of his hands.  But as far as workers getting it off, probably two weeks.

Q    The second trip to New York, who did you go with?

A    "Whitey."

Q    How soon after the first trip was this second trip to New York?

A    Roughly a good month later.

Q    Where did you go on that trip?

A    We went different spots.  Went back to Spanish Harlem, projects called Forest.

**JA596**

MR. WHITE: Excuse me, could the Court ask Mr. Saunders to take his hand away from his mouth? I can't hear him.

THE COURT: Keep your hand away from your mouth, sir.

BY MR. VICK:

Q Where did you go?

A Spanish Harlem again, Forest Projects. I don't exactly remember what part that is.

Q When you say Spanish Harlem, what location do you mean?

A Same location as Amsterdam and 155th.

Q Who did you see up there?

1337

A I saw the same faces.

Q Did you see "Light" again?

A Yes. I did.

Q Did you see "Born Supreme" again?

A That trip, yes, I did.

Q Did "Whitey" say anything to you about them?

A Same again, "Act like you don't know and forget what you see."

Q Did you get cocaine on that trip?

A Yes, we did.

Q How much?

A Roughly a good two-and-a-half, three kilos.

Q Two-and-a-half or three what?

A Kilos.

Q Kilograms?

A Yes.

Q How much money did you take with you on that trip to get that cocaine?

A Roughly 40-some, 40-some thousand dollars.

Q 40-some thousand what?

A Dollars.

Q Who had that money?

A He did.

Q When you say "he," who do you mean?

A "Whitey."

1338

Q Whose money was it?

A "Whitey's."

Q How did you carry that -- did you bring that cocaine back to Richmond?

A Same way. Bus. We put it in a duffel bag.

Q Did you do anything to that cocaine in order to bring it back?

A Same thing, distributed it.

Q Did that cocaine sell quickly?

A No, it did not.

Q Why is that?

A The way we packaged it, and then of course we took the loss and the coke wasn't that good.

Q How did you package it?

**JA597**

Maurice Sanders (Direct)

A    In caps, nickels.
Q    When you say you took a loss, what do you mean?
A    It didn't move as fast.  The money didn't come back as fast so we spent more than we was making.
Q    Shortly after that, did you have occasion to -- did there come a time when you moved away from "Whitey?"
A    Yes, I did.  Me and my brother did.
Q    When was that?
A    That was right after February sometime.  February, right after the trip.

1339

Q    How did he transport the money to New York that you went up with on those two occasions?
A    On his person.
Q    How would he carry it?
A    All over.
Q    Taped on?
A    Yes.
Q    You will have to speak up a little bit.
A    Taped on.
Q    After you moved away from Mr. Tipton, did you continue to see Mr. Tipton in the Central Gardens area?
A    Yes.
Q    What was he doing?
A    Selling still, still hustling.
Q    Did he have any people, based upon your observation, who were working with him?
A    Sam and Damien still.
Q    On May 22nd, 1991, you got arrested again; is that correct?
A    Yes, I did.
Q    And what did you get arrested for on that occasion?
A    Possession of crack cocaine with intent to distribute.

1340

Q    Now, where had you gotten the crack cocaine that you were arrested with that day?
A    I got that from "Whitey." I had just got that from him.
Q    All right.  So had you begun dealing with him again?
A    The first time like that.
Q    How much cocaine did you get from him on that occasion?
A    About 500.  Something like that.
        MR. BAUGH:  I could not understand that.
        THE WITNESS:  About 500 worth.
BY MR. VICK:
Q    Did you get incarcerated on that charge; did you go to jail?
A    Yes, I did.

**JA598**

Maurice Sanders (Direct)

Q    When was it that you went to jail?
A    I was locked up May 22nd, I came out on bond July 18th.  I went back September 25th and I stayed in until like November 19th of last year, of 1992. 14 months exactly.
Q    On the time you were out on bond between July and September of 1991, did you have occasion to meet an individual by the name of Cory Johnson, "C.O.?"
A    Yes, I did.

1341

Q    Do you see him in the courtroom?
A    Yes, I do.
Q    Could you point him out, please?
A    Behind the man with the glasses with the green sweats on.
        MR. VICK:  May the record reflect the identification of the defendant, Cory Johnson?
        THE COURT:  The record will so reflect.
BY MR. VICK:
Q    Where did you meet him?
A    Central Gardens.
Q    Who introduced you to him?
A    "Whitey."
Q    How did "Whitey" introduce you to him?
A    As his little brother.  He also said that he was
  --
        MR. WHITE:  Objection, not responsive to any question.
        THE COURT:  Sustained.
BY MR. VICK:
Q    What else did he say about "C.O.?"
A    He said "C.O." was down here to make sure that we don't take no losses this time.
Q    Did "Whitey" make any statements to you concerning what if anything he would do if things

1342

went bad for him?
A    He would go for bad.
Q    What did he mean by that, as you understand it?
        MR. WHITE:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Once you went into jail, did you have occasion to speak with "Whitey" on the telephone?
A    Yes, I did.
Q    Approximately how often would you speak with him on the telephone?
A    Maybe once or twice a month.  I would see if I could catch him at my house.
Q    Did he tell you that he was  --  did you talk to him about the cocaine business and whether he was involved in the cocaine business?
A    Yes, we talked.  He said he found a new spot. He was telling me about the spot.

**JA599**

Maurice Sanders (Direct)

Q     Where did he describe the spot?  Where was that?
A     He said it was Newtowne.
Q     Did he tell you whether he was involved with anyone else in that area?
A     Yes.
Q     Yes.

1343
A     "V" had came down, his cousin James, I can't remember the name, and "C.O." still, "E.B."
Q     Did he tell you whether he had any people distributing cocaine for him in that area?
A     No, he did not specifically say that.
Q     Did he tell you other than specific names whether he did?
A     No.
            MR. WHITE:  Objection.
            THE COURT:  Sustained.
BY MR. VICK:
Q     Do you know his cousin James?
A     No, not really.  I only met him on one occasion.
Q     Who was that?
A     When?
Q     Who is that?
A     Who is James?
Q     Right.
A     That's his cousin, he said.
Q     What's his name?
A     James Roane.
Q     Do you see Mr. James Roane in the courtroom today?
A     Yes, I do.  Right in the back.

1344
Q     How is he dressed?
A     Got the blazer on with the striped shirt.
            MR. VICK:  Could the record reflect the identification of the defendant, James Roane?
            THE COURT:  The record will so reflect.
BY MR. VICK:
Q     Did you have occasion to have telephone conversations while you were in jail with Mr. James Roane?
A     Yes.  One time, I think.
Q     And tell us about that conversation.
            MR. BAUGH:  Objection, unless there is a predicate of how he knew that was James Roane. Unless he had spoken with him or met him prior to this.
            THE COURT:  Go ahead.
BY MR. VICK:
Q     How do you know it was James Roane you were speaking to?
A     Because of his name.  He told me who he was on

**JA600**

the phone.

Q    What was that conversation about?

MR. BAUGH:  Unless he can identify the person with whom he was speaking as this person  --

THE COURT:  Sustained.

MR. VICK:  He identified himself as James Roane according to his testimony.

THE COURT:  A person identified himself as James Roane.

BY MR. VICK:

Q    Have you met him since he was locked up in jail?

A    Yes.

Q    Have you talked to him in jail?

A    Yes, for a second.

Q    Did he identify himself to you in jail?

A    Yes, he did.

Q    Is that the same person that you spoke to on the telephone?

A    Yes, it is.

Q    What was that conversation that you and he had?

A    He asked who was Hussone's brother, and I went over to him and the conversation was he don't believe Hussone was snitching, and also, that they wanted to get "May-May" and Sterling's girlfriend.

Q    This was in jail, this conversation?

A    Yes.

Q    Why did he believe that Hussone was not snitching?

MR. BAUGH:  Objection as to how Mr. Roane could think of anything.

BY MR. VICK:

Q    What did he tell you as to why he believed Hussone wasn't snitching?

A    Because they would have more charges than what they had.

Q    What exactly did he say to you about "Man-Man"?

A    That he had a hit on "Man-Man," something like that.

Q    You say "a hit."

THE COURT:  Say that again.

THE WITNESS:  He had a hit on "Man-Man," a hit.

THE COURT:  Don't get too close to the microphone.

THE WITNESS:  He had a hit on "Man-Man."

BY MR. VICK:

Q    When you say that, what do you mean?

MR. BAUGH:  What he means is irrelevant.

MR. VICK:  Is that a usual term?

THE COURT:  Overruled.

THE WITNESS:  That means running a contract

**JA601**

on a person for their life to be taken for a sum of money.

BY MR. VICK:

Q   Did he talk to you about Sterling Hardy?
A   Yes.  Not Sterling, but his girlfriend.
Q   What did he say about his girlfriend?
A   They wanted his girlfriend.
Q   And why did they want his girlfriend?
A   He did not say.
Q   When you talked on the telephone to "J.R." prior to meeting him in the jail, could you tell us what that conversation was about?
A   On the phone, it wasn't about much, you know, just that he was getting money, and that was it.
Q   Did he tell you how he was getting money?
A   No, he did not say.  He didn't say that.
Q   Why was it that you spoke to "J.R.," how did you come to speak with "J.R.?"
A   There was a few people at the house at the time.
Q   Whose house?
A   At my mother's house.
Q   Who else was there?
A   "Studie." "Whitey." "C.O." "V."
Q   Did you call there to talk?
A   Yes, I did.
Q   Did you talk to all of those people?
A   Yes, I did.

Q   Have you had occasion to speak with Mr. Tipton about some murders?
A   Not specifically.  He wasn't talking straight to me when I was on the phone.
Q   Who was he talking to?
A   He was talking to "C.O."
Q   You overheard that conversation?
A   Yes, I did.
Q   Did you overhear him talk about a triple homicide  --
            MR. WHITE:  Objection to leading.
            MR. VICK:  I'm directing his attention.
            THE COURT:  Go ahead.
BY MR. VICK:
Q   Did you hear him talk about a triple homicide that occurred in Church Hill?
A   Yes.
Q   What did he say about that?
A   He just said someone named "J.G." went up there and started sparking off.
Q   What who was "J.G." with, according to him?
A   He did not say.  Well, he said -- his words was that him and he ran in after him.  That was his exact words.

**JA602**

Maurice Sanders (Direct)

Q    Him and who?

A    "C."
Q    "C" meaning who?
A    "C.O."
Q    Did you ever have occasion to talk to him about homicides that took place in a station wagon?
A    He wasn't talking straight to me, but I overheard when he was on the phone.
Q    Again, who was he talking to?
A    "C.O."
Q    And where did that conversation take place?
A    I was at my mother's house.
Q    And what did you hear him say about that?
A    He just said wasn't nobody listening to him. "You acted too fast."  And that was it.
Q    What did he call a station wagon?
A    A "hooptie."
Q    Did he talk about where the murders took place?
A    He just said in the "hooptie."
Q    He said it wasn't supposed to be in --
A    In the "hooptie."
        THE COURT:  He just explained it.
        MR. VICK:  Tell Mr. Baugh what a "hooptie" is.
        THE WITNESS:  To him, that's a station wagon.

BY MR. VICK:
Q    Who called that a station wagon?
A    "Whitey."
Q    Did he say why those murders took place in the "hooptie," the station wagon?
A    No, he did not.
Q    You were out on bond.  Did you ever have occasion to get drugs from "C.O.?"
A    Yes.
Q    From "C.O.," Cory Johnson?
A    Yes, I did.
Q    What quantity of drugs did you get from him?
A    Nothing more than a five-sack, 50 caps.
Q    Did you sell that?
A    Yes, I did.
Q    Who did you pay for that?
A    I paid "C.O."
Q    How did it come that you got drugs from "C.O?" How did that happen?
A    It just came about that was me approaching him at that time.  I approached him because I didn't have any money.  And at the time, that's how I knew to get money.
Q    How did you approach "C.O.," and how did you know he was involved in the sale of cocaine?

**JA603**

Maurice Sanders (Direct)

A    Because he was out there selling it.
Q    Did "Whitey" ever say anything to you about hurting members of his family, his own family?
A    He used to get real mad at his stepdad.
        MR. WHITE:  Objection.  What relevance could it possibly have about his own family?
        THE COURT:  Sustained.
BY MR. VICK:
Q    I'm going to show you, Mr. Saunders, what has been previously marked Government Exhibits 112-1, 2, 3, and 4.
    (Exhibit proffered to counsel.)
BY MR. VICK:
Q    While we are waiting for that, in your testimony you have several times referred to "C."  Who is "C?"
A    "C.O.," Cory Johnson.
Q    Have you ever seen "Whitey" hurt anyone?
A    No, I have not.
        MR. VICK:  I would note these pictures have been previously provided.
        THE COURT:  All right.
        MR. McGARVEY:  Copies thereof.
    (Photographs proffered to witness.)
BY MR. VICK:
Q    Can you identify those?

A    Yes.
Q    What are they?
A    Pictures we took when we first  --  when I first came home.
Q    First came home from where?
A    From Hanover.
Q    Who are in those pictures?
A    Me, 'Twoine, Hussone and "Man-Man."
Q    Is "Whitey" in those pictures?
A    Yes, he is.  Not Charles Stiles, but Germaine Johnson.
Q    He was also called "Man-Man"?
A    Yes.
        MR. VICK:  I would move Government Exhibits 112-1 through 4, Your Honor.
        THE COURT:  Admitted.
BY MR. VICK:
Q    I show you what has been previously marked as Government Exhibit 96.  And I will ask you if you can identify that.
    (Document proffered to counsel.)
    (Document proffered to counsel.)
BY MR. VICK:
Q    Has anybody provided you money for your testimony here today for the government?

A    No, sir.
    (Exhibit proffered to witness.)

**JA604**

THE COURT: When you are answering these questions, try to speak up a little louder. Don't move closer to the mike, just speak louder from where you are.

BY MR. VICK:

Q    Have you had occasion to review Government Exhibit 96?

A    Yes, I have.

THE COURT: Speak louder than that.

THE WITNESS: Yes, I have.

BY MR. VICK:

Q    What is government Exhibit 96?

A    A letter that was written to me by him in jail.

Q    Who is "him?"

A    "Whitey."

Q    Have you had occasion to read through there?

A    Yes, I have.

Q    That letter speaks about who?

A    "V," him  --

MR. GEARY: I think the letter speaks for itself. There is no point in asking him his impressions of the letter, since the letter talks.

THE COURT: Sustained.

1354

BY MR. VICK:

Q    If I could ask him several questions based on the letter, because it is not self-explanatory in some regards.

MR. WHITE: Objection.

THE COURT: No, go ahead.

BY MR. VICK:

Q    In there is referred to "Pep" and "The Boy." Who is "Pep" and "The Boy?"

A    "Pep" is Hussone and "The Boy" is "Man-Man."

Q    Later in that letter it says, "I won't shit on "Pep" or him, but it all depends on him and him." What was he talking about when he said, "I won't shit on Pep or him"?

A    Just means he wouldn't do anything wrong.

MR. GEARY: That's objectionable. He is interpreting someone else's words.

THE COURT: Sustained.

BY MR. VICK:

Q    Throughout here he refers to a birthday party. Had you ever heard Mr. Tipton, "Whitey," refer to birthday parties before?

A    Yes, I have.

Q    What did he refer to birthday parties as?

A    That's somebody's death.

1355

Q    It says, "Because I'm blowing out no candlesticks." Did you ever hear him speak that way before?

A    Yes.

**JA605**

Q    What did he mean when he spoke that way?

A    That means he won't hurt nobody.

MR. GEARY:  Repeatedly you rule in our favor, and he repeatedly goes back to what he was doing before.

THE COURT:  Stop, Mr. Vick.  You can ask him questions if it is explanation or a descriptive term, but you keep asking him what did somebody else mean when they say something.  He can't possibly tell you that.

MR. VICK:  I asked him had he heard him say it before.

THE COURT:  You asked him had you heard him say it before, and your next question is, "What did he mean by that."  He can't tell you what's in somebody else's mind.

MR. VICK:  I would move Government Exhibit 96 into evidence.

THE COURT:  It will be admitted.

MR. VICK:  I tender the witness, Your Honor.

THE COURT:  All right.  Cross for Mr. Tipton?

MR. WHITE:  May we have a very short break, about two minutes.

THE COURT:  We will break in place if you need a personal break.

CROSS-EXAMINATION

BY MR. WHITE:

Q    Good afternoon, Mr. Saunders.

A    Good afternoon.

Q    Mr. Saunders, is it true that you did not want to speak with defense counsel before taking the stand here today?

MR. VICK:  Your Honor?

THE COURT:  Sustained, sustained, sustained.  What matters is what goes on in this courtroom.  Would you all leave that alone once and for all?

BY MR. WHITE:

Q    Now, Mr. Saunders, you have a couple brothers?

A    Yes, I do.

Q    Hussone?

A    Yes.

Q    "Studie?"

A    Yes.

Q    Georgie?

A    Yes.

Q    Very close to them, right?

A    Yes.

Q    Closer to them than you are to Mr. Tipton, right?

A    Yes.
Q    "May-May" is your neighbor?
A    Yes.
Q    Uh-huh.  From across the street.
A    Yes.
Q    Lifelong friend.
A    Yes.
Q    Uh-huh.  You are very close with him.
A    Yes, I am.
        MR. VICK:  I ask we not go through the very same sort of speechmaking.
        THE COURT:  Ask a question.  Don't get into is this "uh-huh, uh-huh, uh-huh, uh-huh."  Frame questions.
BY MR. WHITE:
Q    Are you friends with Mr. Tipton?
A    Yes, I am.
Q    How long have you been friends?
A    For a long time.  Since I was about 13 years

1358

old.
Q    Mr. Tipton is how many years older than you?
A    I don't know his exact age.
Q    When you first started dealing with him he was a juvenile, too, wasn't he?
A    Yes.  That's true.
Q    So you all started out as kids together, correct?
A    Yes, we did.
Q    When you first met Mr. Tipton he was living over in Central Gardens on Cleary?
A    Yes.
Q    Next to 'Twoine?
A    Yes.
Q    Would it be fair to say that you and 'Twoine and Hussone and "May-May" all sort of grew up with drugs together?
        MR. VICK:  Objection.  Again, that's not a question.  That's a statement.
        MR. WHITE:  This is cross-examination.
        THE COURT:  He can answer that.
        THE WITNESS:  Yes.
BY MR. WHITE:
Q    And you supported and encouraged each other, right?

1359

A    Yes, we did.
Q    As a matter of fact, you said that when you moved into Sandy Lane together, you all were moving in as partners together, right?
A    Yes.
Q    Part of the reason for that was that you were selling as much, if not more, than Mr. Tipton, correct?

**JA607**

Maurice Sanders (Cross)

A    Yes.
Q    Now, sir, the story about all of these guns, Mr. Tipton did not get all those guns, did he?
A    I don't know how the guns were purchased.  I wasn't there when they was purchased.
Q    Didn't 'Twoine come up with some of those guns?
A    Like I said, I wasn't there when they was purchased.
Q    You are not saying the M1 and other guns that you are making reference to belonged to Mr. Tipton?
A    I'm not saying that.
Q    You indicated that you had never seen "Whitey" hurt anybody?
A    No.
Q    Now, sir, when you got out of Hanover Learning Center in October of 1990, you were using heroin on a daily basis; is that correct?

1360

A    Yes, I was.
Q    You weren't getting that from Mr. Tipton, were you?
A    No.
Q    You were getting that from Church Hill?
A    No, I wasn't getting it from Church Hill.
Q    You weren't?  You weren't getting it in Central Gardens, were you, sir?
A    No, I wasn't.
Q    You were dealing with other people other than Mr. Tipton?
A    Yes.
Q    What other neighborhoods in Richmond were you dealing in?
A    At that time, it was just Central Gardens.  At that time, until I moved away from him.
Q    What time are you talking about?
A    Like the time I came home through February.
Q    February of 1991?
A    Yes.
Q    Is that after Sandy Lane?
A    Yes.  After Sandy Lane.
Q    And where were you dealing after Sandy Lane?
A    Church Hill.
Q    Church Hill?

1361

A    Yes.
Q    You came back to Central Gardens?
A    Yes, I did.
Q    And shortly after  --  were you still sleeping in Central Gardens?
A    Yes, I was.
Q    So you were continuing to see "Whitey" and the rest of the gang on a daily basis?
A    Yes.
Q    You know Charles Townes, correct?

**JA608**

A    Yes.
Q    Was Charles Townes dealing with "Whitey" during that time frame?
A    No.  Charles Townes dealt under me.
Q    Charles Townes was dealing under you?
A    Yes, he was.
Q    Now, sir, I think you said you were using heroin on a daily basis?
A    Yes.
Q    How much heroin were you using on a daily basis?
A    A pill or two a day.
Q    What?
A    A pill or two a day.
Q    In addition to other things that you were using,

like alcohol?
A    I didn't drink much.
Q    You didn't drink much.  Did you smoke pot?
A    No.
Q    Now, what kind of effects did heroin have on you, Mr. Saunders?
A    Drowsy effect, nausea.  That's about it.
Q    You don't remember things as clearly when you are doing heroin, do you, sir?
A    No, I do not.
Q    That daily use continued from the time that you got out of Hanover Learning Center until you got arrested in May of 1991; isn't that correct?
A    No.  "Whitey" helped me get over that.
Q    He helped you get off heroin?
A    Yes, he did.
Q    Now, sir, you said you were making how much money over in Central Gardens?
A    I was making a good three G's for myself a week.
Q    Who were you selling to?
A    I was selling to mainly the people who get high.
Q    Such as?
A    Names?  I don't really know too many names.

Q    You mean to tell me that you would sell $3,000 worth of drugs a week to people that you didn't know?
A    That's how it goes in the game.  You don't know who certain people are.
Q    Didn't you have regular customers?
A    Yes.
Q    You never even got a nickname?
A    Yes, a few nicknames.  No real names.
Q    Such as?
A    "Dune," "Rain," Angie, different names.
Q    Just hard to remember the details, right?

**JA609**

MR. VICK:  Objection.  Editorializing.

MR. WHITE:  I don't think that's editorializing.  He is obviously showing a difficulty in remembering details.

THE COURT:  How about "Sir, was it hard to remember the details?"

BY MR. WHITE:

Q    Sir, was it hard to remember the details?
A    No, it wasn't.
Q    Then who were you selling to?
A    Just them names.  Wayne.
Q    Rain?
A    Wayne.  "Dune." Angie.

1364

Q    Boon?
A    "Dune." A lot of other people.
Q    A lot of other people?
A    A lot of other people.
Q    How much was Wayne buying on a weekly basis?
A    I didn't keep count of what he was buying.
Q    Was he a big purchaser?
A    Everybody was, man.
Q    Everybody was?  Now, you indicated that  --  is it true Mr. Tipton wasn't selling himself as much as you were?
A    No, he wasn't.
Q    As a matter of fact, you told Mr. Tipton on more than one occasion that you were outdoing him with his own dues, correct?
A    Yes.  He would ask me.
Q    So you look at yourself as a partner, as an equal, correct?
A    Yes, I was.
Q    Was 'Twoine an equal?
A    Yes, he was.
Q    So everybody at Sandy Lane was an equal?

MR. VICK:  Objection.  That's not what he testified to.  He said 'Twoine and himself.

THE COURT:  Mr. White, let me see if I can

1365

explain this to you again.  You asked him about two people.  And he answered your question.  And the next words out of your mouth were "So everybody at Sandy Lane was an equal."  Now, is that a question?  No, it is not.  It can be placed in a question, but it doesn't follow from the previous two.

BY MR. WHITE:

Q    Was Hussone an equal?
A    No, he wasn't.
Q    Did you direct Hussone?
A    Yes, I did.
Q    Now, when people split up from Sandy Lane, there were a number of small problems between you all; is that a fair statement?

**JA610**

A    Not between me and "Whitey."
Q    Not between you and "Whitey?"
A    No.
Q    Between whom?
A    Between 'Twoine and "Whitey," maybe.
Q    Do you recall "Whitey" putting a lock on his room?
A    Yes.  He locked his room.
Q    And do you recall "Whitey" complaining to 'Twoine about a lot of people coming over and doing drugs?

1366

A    Yes, he did.
Q    And from Sandy Lane, do you know where "Whitey" went?
A    No, I do not.
Q    You don't know he went to Brookland Park?
A    In a rooming house, yes.  He did go to a rooming house.
Q    But your testimony is that you had no dealings with him from February of 1991 until shortly before you got busted in Henrico?
A    Yes, shortly before I got busted.
Q    When you got busted in Henrico you didn't tell the authorities who you were getting your drugs from, do you?
A    No.
Q    Same situation in April of 1990; when you got busted you didn't tell anybody?
A    No, I did not.
Q    Did you ever meet someone named "Alpo?"
A    No, I did not.
Q    Did you ever meet someone named "A.Z.?"
A    No, I did not.
Q    Would it be fair to say, Mr. Saunders, that you heard a lot of names that you never connected with faces?

1367

A    Yes.
Q    Would it also be fair to say that Mr. Tipton kind of bragged a lot about a lot of things?
A    Yes.
Q    "Whitey" was always talking big, wasn't he?
A    Yeah.
Q    Would it also be fair to say that a lot of other people in the neighborhood or in that group also talked big from time to time?
A    Yes.
Q    Would that include yourself, sir?
A    No.
Q    You never talked big?
A    No.
Q    Did you actually observe "Pom-Pom" or Wayne Pugh doing anything?

**JA611**

Maurice Sanders (Cross)

A     Yes, I did.
Q     Where?
A     I have been to Charles City with them before.
Q     You have been to Charles City with them before?
A     Yes, I have.
Q     Okay.  Now, sir, the razor in "Whitey's" mouth, you never saw him use that except for drug use; is that correct?
A     No.

1368

Q     Was the razor -- did the razor ever have a function with regard to cutting up crack cocaine?
A     Yes, it did.
Q     Did he use that on the street corner from time to time to chop up crack?
A     Yes, he did.
Q     When you said that "Whitey" directed the delivery of amounts of cocaine, where were you when all that was going on?
A     Sandy Lane.
Q     Did you actually deliver yourself?
A     No, I did not.
Q     How did that happen, sir?
A     Everybody always came and got it from him.
Q     Did you know any of the people who came to get it?
A     Besides our group, no, sir.
Q     Do you recall "Whitey" ever giving you any names?
A     No, sir.
Q     Were these people that you had ever seen before?
A     Only when, you know, giving out drugs would I see them.
Q     How would that work?  Would someone actually

1369

drive up to Sandy Lane and get out of the car and ring the doorbell and say, "I'm here for my package."
A     Knock on the door and we would let them in.
Q     Who is "we?"
A     Whoever is at the door; whoever is in the living room.
Q     Were you given physical descriptions?
A     No, I was not.
Q     You don't recall any names?
A     No, I do not.
Q     Now, do you recall meeting "Whitey's" sister in New York, his younger sister, Nicole?
A     No, I do not.
Q     Do you remember meeting a guy named Willie?
A     Huh-uh.  I do not remember.
Q     Is it possible that  --
A     It is possible that I have met them.

**JA612**

Q    Is it possible that the person who you got drugs from was Willie instead of "Light?"
A    It is possible.  I did not purchase drugs myself.
Q    And you said you are not sure whether it was "Light" or not?
A    No.

1370

MR. VICK:  Objection, Your Honor.  Again, he has taken the question and testified.  That was not a question.  That's rephrasing what he said.
MR. WHITE:  Judge  --
THE COURT:  Sustained.  Mr. White, just ask a question and you get an answer and you move to another question.
BY MR. WHITE:
Q    How many times would you say you have spoken to Mr. Vick?
A    Seven, eight times, I guess.
Q    Seven or eight times?
A    Yes.
Q    Okay.  Have you spoken to Mr. Fleming?  Do you know Mr. Fleming?
A    He is the detective right there.
Q    Have you ever spoken to Mr. Fleming?
A    Yes, I did.
Q    When Mr. Vick was not there?
A    Yes.  I spoke with him.  But Buddy was with him.
Q    And Buddy is?
A    He is the lawyer right in the middle with the glasses on.
Q    How many times did you speak to Fleming and Mr.

1371

Parcell?
A    I think it was twice.
Q    Twice?
A    Yes.
Q    Did you speak with any other law enforcement individuals in connection with this case?
A    Only Detective Jackson.
Q    Detective Jackson?  How many times did you speak to Mr. Jackson?
A    Regular basis.
Q    Regular basis?
A    Uh-huh.
Q    About the facts in this case?
A    No.
Q    When you were discussing immunity with the authorities, did they explain to you what you could be charged with?
A    Yes, they did.
Q    What is your understanding of how much time in the penitentiary you could be exposed to if you did

**JA613**

Maurice Sanders (Cross)

not cooperate?

A    That wasn't said.

Q    You never discussed the amount of time you could get in the penitentiary?

A    No, we did not.

1372

Q    Did the government, through any of its agents or attorneys, ever discuss with you the kind of case they had against "Whitey" or the rest of the guys?

A    No, they did not.

Q    Never told you what they had?

A    Never told me what they had.

Q    Now, sir, you talked about some phone conversations in which "Whitey" talked about murders.

A    But he wasn't talking to me directly.

Q    Where were you when these phone calls took place?

A    I was in jail.

Q    You were in jail?  Where in jail were you?

A    A-1 Left Tier, Richmond City Jail, 17th Street.

Q    Are you saying that you were present when "Whitey" was speaking to someone on the phone?

A    I was in the room but I was on the phone.  I wasn't with them.  But me and him was on the phone.

Q    You were together on the same phone?

A    I called him at my mother's house, same connection from the jail to my mother's house.

Q    You called  --

A    I called to my mother's house.

Q    And who was at your mother's house?

1373

A    "Studie," him.

Q    It was a three-way?

A    No.  No, it wasn't.

Q    All right.  In this conversation, you said that there was a conversation about murders in Church Hill.

A    Not as far as in Church Hill.  Church Hill was never said.

Q    Church Hill murders were never discussed between you  --

A    He never said the area Church Hill.

Q    What about "J.G.?"

A    He said "J.G."

Q    Where was Mr. Tipton when this conversation took place?

A    He was at my mother's house.

Q    He was at your mother's house?

A    On the phone.

Q    And there was someone else who was a party to the conversation?

A    Yes, there was.

Q    Who was that?

**JA614**

Maurice Sanders (Cross)

A    That was  --  he said it was "C.O."
Q    Where was "C.O.?"
A    "C.O." was at my mother's house, too.

1374

Q    So you heard "Whitey" talking to "C.O." at your mother's house?
A    Yes.  I did while I was on the phone.
Q    While you were on the phone speaking to who?
A    "Whitey."
Q    So "Whitey" was talking to you and telling "C.O." about what was going on?
A    He wasn't talking directly to me at the time. He had said, "Hold on" and he was conversating with "C.O."
Q    He would break off in his conversation with you to talk to "C.O." about murders?
A    Yes, he did.
Q    And how many times did this happen?
A    It only happened twice.
Q    Twice.  All right.  Now, what was your recollection of what Mr.  --  what "Whitey" said about "J.G.?"
A    He said he just went in and started sparking off.  He just went in and started sparking off.  And he said, "We ran in behind."
Q    Who ran in behind?
A    He said we.
Q    So it was your understanding from that telephone conversation that "Whitey" went into that house?

1375

A    He never said his name.  He never said him himself.  He never said his name.  He just said we.
Q    And what was the other one that they talked about?
A    The other one was something about a "hooptie." It was about "hooptie."
Q    About the "hooptie?"
A    Yes.
Q    Did he mention any names?
A    No, he did not.
Q    Do you remember when that conversation was?
A    That was  --
Q    Was it before the one you just spoke of?
A    I can't exactly remember which conversation was first.
Q    You can't remember which conversation was first?
A    Which conversation was first.
Q    Now, what did you hear Mr. Tipton say, in as exact words as possible, about the "hooptie" murders.
A    His exact words were "He moved too fast; it wasn't supposed to be done there."
Q    "He moved too fast; it wasn't supposed to be

**JA615**

done there?"

1376

A    Yes.  That's his exact words.
Q    Did he say anything else?
A    No, he did not.
Q    Was there anyone else in the group at Sandy Lane who was selling as much as you were?
A    'Twoine.
Q    'Twoine was selling as much as you were?
A    Uh-huh.
Q    Was 'Twoine getting coke from anybody other than "Whitey?"
A    Nobody besides "Whitey" at that time.  Depends on what time period you were talking about.
Q    There were time periods before and after Sandy Lane when 'Twoine was getting it from other people, correct?
A    From the beginning when I came home all the way until we broke up from Sandy Lane, that's when 'Twoine started to get it from other people.
         MR. WHITE:  If I can have just a moment?
     (Counsel conferring.)
BY MR. WHITE:
Q    If I can ask you one more time about the conversation between "Whitey" and someone else at your mother's house about a "J.G."  To the best of your recollection, sir, what was it that was

1377

specifically said?
A    He said "'J.G.'" ran in and just started sparking off and we ran in after him."
         MR. VICK:  It has all been asked and answered.
         MR. WHITE:  That's all.
         THE COURT:  Mr. Cooley, Mr. McGarvey, any questions?
                CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good afternoon, Mr. Saunders.  Mr. Saunders, how many of you folks lived over on Sandy Lane?
A    Me -- the most at one time was me, Hussone, 'Twoine, "Whitey," and "Hess."  Five people.
Q    Five of you at one time.  What were the least number that lived there during that time?
A    Four of us.
Q    So between four and five of you there.  And as I understand your response to Mr. Vick in direct examination, you said that you all used to have a lot of arguments about paying the rent.
A    Yes.
Q    Is that right?
A    Yes.
Q    How much was the rent?

1378

**JA616**

Maurice Sanders (Cross)

A    It was about like 500.
Q    About $500 a month?
A    Yes.
Q    And you all were fighting over whether you could -- who would contribute what; is that right?  Or who would pay it?
A    The argument was that, you know, each one of us would do different things for the house and then when the rent come around, we feel like we had done a lot for the house, paid maybe this bill or something else.
Q    The dispute, the argument, was over whether you should have to put up your hundred dollars.
A    Yes, whether you should have to put up your money if you done something else.
Q    How many times altogether have you been arrested for possession or possession with intent to distribute?
A    Twice.
Q    Twice?
A    Yes.
Q    Just twice.
A    Twice.
Q    And one was in April of 1990?
A    Uh-huh.

Q    And one was in May of 1991; is that right?
A    Yes.
Q    And do you remember what the quantities of drugs that were taken from you were on each of those occasions?
A    The last time I didn't have nothing but a gram or something.
Q    Was it a gram?
A    It was close to a good gram or so.
Q    Was it taken from you?
A    Yes, that was.
Q    Or was that taken in part from a stash?
A    It was taken from a stash.
Q    So you had a little bit on you.
A    Yes.
Q    And then there was a little bit also somewhere else; is that right?
A    Yes, there was.
Q    But the total weight that you had that day was around a gram?
A    No, that wasn't the total weight that I had.
Q    Back in April of 1990, you were arrested with some in your underwear; is that right?
A    Yes, I had 42 caps.
Q    And the total weight of that was how much?

A    I don't remember what it was.
Q    Let me ask you if you would -- look at this

**JA617**

document here.

MR. VICK:  We have already marked them and put in our marked copies.  It might be simpler.

MR. COOLEY:  I don't have any objection to that, Judge.

THE COURT:  All right.  Just go ahead and use it to get the information in.

BY MR. COOLEY:

Q    Mr. Saunders, right there where it says "Results."  The total weight, does the document say forty-six-one-hundredths of a gram?

A    Yes, it says .46 gram.

Q    Forty-six-one-hundredths of a gram.

MR. VICK:  Which report are you referring to?  May 4th, 1990?  That will, for purposes of the record, subsequently be entered into evidence as Government Exhibit 86.

MR. COOLEY:  That's fine.

THE WITNESS:  Point forty-six-one-hundredths of a gram.

MR. COOLEY:  All right.  Now Judge, can I formally -- lest it be forgotten, we would move to introduce this.  I have no objection to it coming

in.

THE COURT:  What was the number, Mr. Vick?

MR. VICK:  Number 86, Your Honor.

THE COURT:  86 will come in.

BY MR. COOLEY:

Q    Now, Mr. Saunders, Mr. Vick -- do you know him as Mr. Vick?  Do you call him by any other name?

A    Vick, Toby.

Q    When he asked you when you first got on the stand, he asked you about some things that you had been promised by the government, things that you haven't been promised.  Do you remember that?  Do you remember his asking you things that had been promised?

A    Yes.

Q    He asked you about a job reference, and you said that he had  --

MR. VICK:  I didn't ask about a job reference, Your Honor.  There has been no job reference.

THE COURT:  Whatever you want to call it.

BY MR. COOLEY:

Q    He asked you if it wasn't true that he had given you the name of somebody that you could contact for a job; isn't that right?

A    Who might be hiring, yes.

Q    And when was that in time; how long ago was that?

A    That wasn't too long ago.

**JA618**

Maurice Sanders (Cross)

Q    Couple weeks?
A    Yes, maybe.
Q    Could it have been less than that?  Ten days?
A    Three weeks maybe.
Q    Now, did that arise because  --  did a police officer or Toby or, as you called him, Buddy, did one of them come to you and say, "You have been observed doing things?"
A    No.
Q    Nobody told you you have been observed being around drug dealers?
A    No.
Q    Being on the corner or doing something that you shouldn't be doing, and to get away from that?  Didn't somebody come and tell you that?
A    His words was not exactly that.
Q    What exactly were they?
A    His words was that he saw potential in me.
Q    Did he warn you about what you had been observed recently doing?
A    Yes.  He told me that hustling would only lead to jail and that he didn't want to see that for me.
Q    Did he tell you that you had been observed on corners and in places you shouldn't be again, and that you were leading yourself to jail?
A    Oh, yes.  Yes, he did.
Q    And that because of that, did you say, "Well, I'm really looking for a job" or did he say, "Instead of doing that, why don't you go see this person and see if they will give you a job;" is that how it happened?
A    I expressed my interest to him about the job before he started coming down on me very hard about that.
Q    Before he started coming down on you real hard?
A    Right.
Q    He was coming down, you thought, real hard on you because he knew since you had struck this deal with the government that you had been back on the street doing things that you shouldn't do recently; isn't that right?
A    No.
Q    You didn't think that's why he was going to come down hard on you?
A    No.
Q    Why do you think he was, then?
A    I think because he just didn't want to see me go to jail, as far as he said.  He said he saw potential in me, wanted me to do good.
Q    It didn't have anything to do with the fact you had been observed doing something you shouldn't?
A    No, I expressed interest in the job before

**JA619**

that.

Q   In terms of immunity, you told these folks that in your response to Mr. Vick that you understood what use-immunity was.  You understood that what you are saying here today or what you said to them would not be used to prosecute you; is that right?

A   Yes.

Q   But you also understand that if someone else gives them information about you, that that could be used to prosecute you.

A   Yes.

Q   Let me ask you this:  Have you told them in the course of these, what sound like 11 or 12 meetings, and then the regular discussions with Detective Jackson beyond that, have you told them about Hussone Jones and what he was doing while you were doing these things?

A   Yes.

Q   Have you told them about Antwoine Brooks?

1385

A   Yes.

Q   "J.T.?"

A   Yes.

       MR. VICK:  Objection as to relevance.
       THE COURT:  He has already said he has.

BY MR. COOLEY:

Q   You have told them about all those things, right?

A   Yes, I did.

Q   Do you know if any of those folks have been charged?

A   To my understanding, they haven't.  Only one I can really speak for -- only ones I can speak for is Hussone, 'Twoine.

Q   And do you know if they have been charged?

A   I know they have not been, from my understanding, from what they told me.

Q   Do you know from talking with these folks, the detectives and agents and Toby and Buddy, do you know from talking with them that these other folks like Hussone and other folks have told them what you were doing?

A   Yes.  My understanding was at first my brother wasn't saying anything, but then he started.

Q   Did he do that because they asked you to

1386

intervene with your brother and get him to start talking about things?

A   No.  I don't know his reason for doing that.

Q   But you are confident from what they have told you these other people have told them things independently about you?

A   Yes.

Q   And you understand that they could use that to

**JA620**

prosecute you?

A    Yes, sir, I do.

Q    But you have not been prosecuted.

A    He said that the Commonwealth wishes not to prosecute me.

Q    Wishes not to prosecute you.  So you know you are not going to be prosecuted so long as you come in and testify to what  --

A    Well, he did not say that.  He said if I didn't tell the truth, I would be prosecuted.

Q    The truth is based on what they believe you to have done.

A    What I have told them.

Q    In any event, you are not going to be charged?

A    No.

Q    Even if they have this independent information; is that what you understand?

1387

A    That's my understanding.

Q    All right.  And did I understand your response to Mr. White to be that in the course of these things, nobody told you, particularly when they first approached you, that you could be charged with conspiracy, in a drug conspiracy which carries a minimum ten years; didn't somebody tell you that?

A    They did not tell me no time limit, but they told me I could be charged.

Q    They told you you could go to prison for a long time.

A    Yes.

Q    Didn't they tell you what the maximum was?

A    No.

Q    If you came in to testify, then you would not face that, you would not be prosecuted; is that correct?

A    If I tell the truth, I won't be prosecuted.

        MR. COOLEY:  That's all the questions I have.

        THE COURT:  All right.  Mr. Baugh?

                CROSS-EXAMINATION

BY MR. BAUGH:

Q    Mr. Saunders, when you said Mr. Jackson, you meant Detective Cliff Jackson?

1388

A    Yes.

Q    And he was like your contact person?

A    Yes.

Q    He knew who you were all the time.

A    He knew where I was at.

Q    He knows where you are all the time?

A    Yes, he does.

Q    How long have you had this relationship with Mr. Jackson?

A    Since I've been home.

**JA621**

Maurice Sanders (Cross)

Q    How long has that been?
A    Two months, I guess.
Q    For the past two months you have been in daily contact with Mr. Jackson?
A    Yes.  My instructions is to beep him every morning.
Q    To beep him every morning?
A    Yes.
Q    Do you leave a number and he calls you back?
A    Yes.
Q    And the conversations you have had with Mr. Vick, the seven or eight, have they occurred in the last two months?  The conversations you have had with Toby, have they all occurred in the last two months?
A    No, they have not.

1389
Q    How many of them have?
A    I can't give a specific number of meetings because I still don't know the specific number of meetings.
Q    Approximately.
A    I can say this much.  I saw him, I think, two times when I was in jail.
Q    When did you get out of jail?
A    November.
Q    November of this year?
A    Yes.  Last year.
Q    Of 1992.
A    Yes.
Q    Now, you said you spoke with a man named "J.R." when you called your mother's house one time, or a man named James?
A    Yes.
Q    When was that?
A    That was like the first times I have spoke to "Whitey" since I was locked up.
Q    What month was it?
A    November, December sometime.
Q    Of what year?
A    The year before.  It was year before last when I first got locked up.

1390
Q    You are saying that in November of 1991, you called your house and you spoke with someone that you know to be James?
A    I did not know them at the time.
Q    He identified himself as James?
A    He says, "It is James."  It was  --  I don't know.  I can't remember exactly when I spoke to him.
Q    Look, if you don't know what month, let's go to year.  Was it in 1991?
A    It was when I first got locked up, first couple of months of being locked up.
Q    You were first locked up in May of 1991?

**JA622**

A    No, when I got out on bond.  I got locked up on September 25th.

Q    It was after September of 1991?

A    Yes.

Q    Was it in 1991 that you called him?

A    I had talked to him several times before.  As I said before, I can't pinpoint when the conversations took place, on what days.  I can't pinpoint those conversations.

Q    Can you narrow it down any more than a year?

A    I was not  --

MR. VICK:  He has.  He said it was after September of 1991.

THE COURT:  He can answer that.

BY MR. BAUGH:

Q    Thank you.

A    It was like I said, first couple months I was locked up.

Q    So it would be September or October?

A    No.  I guess anywhere between September to the end of December anyway, between that month.

Q    And this person that identified himself as James, how long did you talk with him on the phone?

A    A second.

Q    A second?

A    Not too long.  A couple of seconds.

Q    When was the time that you met this  --  strike that.  Is it true that you met that gentleman over there, you saw him in October or November of last year, 1992?

A    1992.  Yes, it was.

Q    You talked to somebody for a few seconds in 1991, and you saw that man in 1992 and you walked up and you said, "Are you the guy I talked to a year ago?"

A    No.  He asked, "Who is Hussone?"  "I am Hussone's brother."  Those were the exact words.

Q    You were a juvenile?

A    Yes.

Q    You were kept on the juvenile tier?

A    Yes.

Q    Juveniles are not allowed to mingle with adults, are they?

A    They are not.

Q    The only time that's different is when someone is showing a movie; is that correct?

A    Yes, it is.

Q    However, am I correct that when they show a movie, an inmate comes in, starts the movie and he has to leave while the juveniles are in there?

A    They did not leave.  If that's the policy.  It does not work out that way.

Q    You are making all these phone calls.  Did you ever talk to your brother Hussone?
A    I used to talk to Hussone while he was at Janet's house on Poplar Street.
Q    Did you talk to him in January of last year?
A    I talked to Hussone all the way up until the time that they put him away, wherever they put him.
Q    When was that?
A    I talked to Hussone from the time I got locked back up.  Maybe the Monday I got locked up I started really talking to him, all the way until January or

February sometime, February.
Q    January or February of this year?
A    No, no, no.  It was like March, I think.
Q    March?
A    Something like that.
Q    Of last year?
A    Of this year.  Of 1992.
Q    So from September of 1991 until March of 1992, you would talk to your brother Hussone frequently?
A    Yes, I talked to him frequently.
Q    Every day?
A    Every other day, something like that.
Q    All right.  And when you would have these conversations, would you call him at home?
A    No.  He would be on Poplar Street.
Q    How would you get hold of him on Poplar Street?
        MR. VICK:  I don't see the relevance of any conversations he might have with Hussone.
        THE COURT:  No, I'll let him ask the questions.
BY MR. BAUGH:
Q    How often?  You called him on Poplar Street?
A    Yes.
Q    That's another house where you could reach him?
A    Yes.

Q    During these conversations, did your brother Hussone ever tell you what he had told the United States?
A    No.
Q    He didn't mention he was helping them?
A    No, he did not.
Q    Did he ever tell you that he had seen a murder?
A    No, he did not.
Q    Did he ever tell you that he had been present when someone stabbed someone to death?
A    No, he did not tell me that.
Q    When you spoke with this person in 1991 sometime, whenever it was, for a few seconds who identified himself as James, did he have a strange accent, anything about his voice that would make it unusual so you could remember it?

**JA624**

A    No.
Q    Talk with a lisp or anything?
A    Nothing unusual.
Q    And you only talked to him one time?
         MR. VICK:  Asked and answered.
         THE COURT:  Sustained.
BY MR. BAUGH:
Q    When you called this other place, did anyone else ever call themselves James?

A    Nobody else.
         MR. BAUGH:  Thank you.  Pass the witness.
         MR. WAGNER:  No questions.
         THE COURT:  Anything else?
                  REDIRECT EXAMINATION
BY MR. VICK:
Q    At the time when you were selling drugs, in response to Mr. White's question about you might have been selling more than "Whitey," whose drugs were they that you were selling?
A    It was "Whitey's."
         MR. WHITE:  Asked and answered.
         THE COURT:  Overruled.
         THE WITNESS:  It was "Whitey's."
         MR. VICK:  No further questions.
         THE COURT:  All right.  The witness may stand down.
     Call your next witness.
     (Witness stood aside.)
         MR. PARCELL:  Jeanette Pauley, please.

## III. Jeanette Pauley (1395)

                  JEANETTE PAULEY,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
                  DIRECT EXAMINATION

BY MR. PARCELL:
Q    Ma'am, would you please state your name?
A    Jeanette Pauley.
Q    Your age?
A    33.
Q    Ma'am, do you have any prior criminal record?
A    No, I do not.
Q    Where do you live?
A    1016 West Clay Street now.
Q    As of December through February of 1991 through 1992, where did you live?
A    On Hancock Street.
Q    Newtowne section of the City of Richmond?
A    I believe so, yes.
Q    During the course of your living in that

Jeanette Pauley (Direct)

neighborhood, did there come a point in time when you knew somebody named Sandra Reavis?

A    Yes, I do.

Q    Do you see her in the courtroom today?

A    I don't think I see her.  Oh, yes, right there.

MR. WAGNER:  We stipulate the identification.

MR. PARCELL:  Let the record reflect identification of the defendant Reavis.

THE COURT:  The record will so reflect.

1397

BY MR. PARCELL:

Q    How did you know Ms. Reavis?

A    Through buying drugs.

Q    What do you mean by buying drugs?

A    I bought a couple rocks from her.

Q    What are rocks?

A    Cocaine.

Q    What money would you give her?

A    About $10 or $20.  Either a 10 or a 20.

Q    Where were you when you obtained that cocaine from her?

A    On the corner.

Q    Of what streets?

A    Clay and Hancock.

Q    Ma'am, do you know someone by the name of James Roane?

A    Yes.

Q    Do you see him in the courtroom?

A    Yes.  Right there.

Q    Would you please describe what he is wearing?

MR. BAUGH:  Stipulate.

THE COURT:  All right.

BY MR. PARCELL:

Q    How long had you known Mr. Roane?

A    I've been knowing him for years.

1398

Q    More than five?

A    Uh-huh.

Q    More than ten?

A    About ten.

Q    How did you know him?

A    When I was living on the projects when I was younger, before I had my kid, I was living in the projects and so was he.

Q    In the last year, year-and-a-half, have you had any business dealings with him?

A    Yes, once or twice.

Q    Would you please tell the ladies and gentlemen of the jury what kind of business dealings you have had with him?

A    I bought rock from him once or twice.

Q    Rocks of what?

A    Cocaine.

**JA626**

Q    What denominations would you buy, what quantities?

A    About the same amount, about a dime or a 20.

Q    The crack cocaine which you bought from Ms. Reavis and Mr. Roane, how would you use that cocaine?

A    I would smoke it.

Q    Ma'am  --

MR. WAGNER:  I object to the compound question.  I ask he separate the two.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    The crack cocaine that you bought on several occasions from Ms. Reavis, how would you use that cocaine?

A    I would smoke it.

Q    And the cocaine that you bought from Mr. Roane?

A    The same, smoke it.

Q    And did there come a point in time when Mr. Roane asked you a favor?

A    No, he didn't.  What kind of favor?

Q    Did he ever ask you to use your house  --

MR. BAUGH:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    Did he ever come to your house?

A    Yes, he has.

Q    Did he ever do anything in your house?

A    I mean, specify what you mean "do" in my house.

Q    Did he ever use your oven?

MR. BAUGH:  Objection.

MR. HENDERSON:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  I don't understand.  Did he ever use my oven?

BY MR. PARCELL:

Q    Yes, ma'am.

A    No, he never used my oven.

Q    Did he ever use your stove?

A    My stove, yes.

Q    For what purpose?

A    For to cook.

Q    Cook what?

A    Crack.

Q    And how do you know he used  --  were you there when he did that?

A    Yes.

Q    Did he have a conversation with you about it?

A    He asked me could he do it, and I told him yes.

Q    Who was with him?

A    A girlfriend of ours named Denise.

Q    Denise what?

**JA627**

Jeanette Pauley (Direct)

A    Berkley.
Q    What did he have with him when he came to your house?
A    He had a bag.  I don't know what was in it.  He just had a bag.
Q    And did he cook the crack cocaine at your

1401
house?
A    Yes.  I gave him permission.
Q    When he finished cooking the crack, would you describe for the jury what it looked like?
A    It was in a brown coffee pot.
Q    Did you see it when the cooking was done?
A    No, I came after it was done.
Q    When you came back, the cooking had taken place; is that correct?
A    Yes.
Q    Did you see the cocaine?
A    Yes, I did.
Q    Would you describe its appearance for the ladies and gentlemen?
A    It was a round piece about that round at the bottom of a coffee pot.  (Witness indicating.)
Q    Once again, show the Judge and jury how big you mean.
A    I can't be precise, but like that, I guess, round.  (Witness indicating.)
Q    How thick was that round disc?
A    About that much, I guess.  I don't know.  I didn't really examine it.
Q    And was the crack cocaine still in the coffee pot when you got there?

1402
A    No, it was dumped out.
Q    Did you receive anything for allowing him to use your house?
A    Yes, I did.
Q    What did you receive?
A    A couple of rocks.
Q    Of what?
A    Of crack cocaine.
Q    What did you do with that cocaine that you got from Mr. Roane?
A    I smoked it.
Q    And how did the cocaine leave your house?
A    It left with him.
Q    Do you know from your own personal knowledge what he did with that?
A    No, I do not.
Q    What month of what year was that, approximately?
A    Well, I believe about November or December of 1991, I believe.
Q    Ma'am, turning your attention to February of

**JA628**

1992, were you aware that something happened to a Mr. Linwood Chiles and Curtis Thorne?

A    Yes, from what I read in the paper, yes.

Q    Had you seen them the day before something happened to them?

A    Yes, I did, the night before.

Q    Who had you seen together?

A    It was Linwood Chiles, Priscilla Greene, Gwendolyn Greene, and Curtis. I don't know his last name.

Q    Where did you see him?

A    In front of my house. They came to pick me up.

Q    For what purpose did they pick you up?

A    They wanted me to ride with them. My mother told me I couldn't ride in the car.

Q    Do you recall who was driving?

A    Linwood Chiles.

Q    Do you recall who was in the front seat of that automobile?

A    Priscilla Greene.

Q    Do you recall who was in the backseat?

A    Gwendolyn Greene and Curtis.

Q    Do you recall about what time of day or night this was?

A    About something to eight, because I know the corner store was closed.

Q    In the morning?

A    In the evening. Afternoon. In the night.

Q    And do you know someone by the name of "C.O." or "O?"

A    Huh-uh.

Q    Do you know someone by the name of "Whitey?"

A    No.

Q    Have you ever seen  --

A    I have seen them as far as knowing them by the papers, you know, the pictures in the paper.

Q    As far as you seeing them on the street in Newtowne, have you ever seen them in Newtowne?

A    Yes, once or twice.

        MR. GEARY: He has asked about two people. Which?

BY MR. PARCELL:

Q    Have you seen "Whitey" in Newtowne?

A    Once or twice.

Q    Do you see him in the courtroom?

A    Yes. Right there with the glasses on behind that dude.

Q    Let the record reflect she has identified the defendant Tipton.

        THE COURT: Record will so reflect.

BY MR. PARCELL:

Q    Have you seen an individual by the name of "O"

**JA629**

and "C.O." in Newtowne?

A    Once or twice.

1405

Q    Do you see him in the courtroom?

A    Yes, that's him back there.

Q    Would you describe what he is wearing?

A    He is behind this gentleman right here.  I can barely see him.  Right there, with the sweater on.

MR. PARCELL:  Let the record reflect identification of the defendant, Cory Johnson.

THE COURT:  The record will so reflect.

MR. PARCELL:  Pass the witness, Judge.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Ms. Pauley, you told the jury that you saw a picture of the person you identified as "Whitey" show up in the Richmond newspapers?

A    Yes, sir.

Q    Did you see him in Newtowne before or after his picture was in the paper?

A    I think it was before.  I looked at the paper and I said I thought  --

Q    You saw him sometime.

A    Before.

Q    When Mr. Parcell asked you about where you lived, you said the 1000 block of West Clay; is that correct?

1406

A    Yes, 1016.

Q    Back between December of 1991 and February of 1992, what was your address back then?

A    404 North Hancock Street.

Q    North Hancock Street.  Would you tell the ladies and gentlemen of the jury, the area that Mr. Parcell referred to as Newtowne, do you yourself refer to that area as Newtowne?

A    No, I don't.

Q    When is the first time you have ever heard of anybody refer to the area where you live on North Hancock or West Clay as Newtowne?

A    When I read in the paper about all of this.

Q    When this guy, "Whitey's" picture was in the paper?

A    No, all the pictures was in the paper.  They said the Newtowne Gang and I assumed they called that the Newtowne area.

Q    But you had never heard that before?

A    No, I haven't heard it called Newtowne.

Q    How long have you lived in the Hancock-West Clay Street area?

A    Seven or eight years.

Q    Is that area bounded by Interstate 95 in the back and Chamberlayne Avenue?

**JA630**

Jeanette Pauley (Cross)

1407

A    I'm not good at directions.
Q    West Clay Street?
A    Yes.
Q    West Lee?
A    Yes.
Q    West Moore.
A    Yes.
Q    Hancock.
A    Yes.
Q    Harrison.
A    Yes.
Q    Catherine?
A    Yes.
Q    Any more streets in that area that you can think of?
A    Gilman, Goshen, Norton, and Harrison.
Q    Those are the north-south streets, right?
A    Yes, I guess so.  Some are on one side of Hancock, some on the other.
Q    The night you saw the four people -- the Greenes are sisters, are they not?
A    Yes.
Q    You think it was around 8 o'clock?
A    Yes.
Q    I assume it was dark at that time?

1408

A    It was.
Q    The car that Linwood Chiles was driving, can you describe that, what it looked like, to the jury?
A    It was a brown and beige station wagon.
Q    Did they come by or did somebody in the car talk to you?
A    I talked to all of them.
Q    Did you come outside and talk to them?
A    Yes, because they blowed their horn in front of my house.
Q    The prosecutor asked you if you knew certain people and you told him.
A    Yes.
Q    Did you know a girl named Katrina Rozier?
A    Yes.
Q    Was her nickname "Nat?"
A    It was "Nat."
Q    Do you know if she was murdered in January of 1992?
A    I know she was killed January 21st.
Q    Where did she live?
A    With me.
Q    That would have been on North Hancock?
A    Yes.
Q    Do you know somebody named Jerry Gaiters?

1409

A    Yes.

**JA631**

Q    Did Jerry Gaiters hang around what's called by the prosecution the Newtowne area?

A    Yes.  That's what it had in the paper.

Q    Did Jerry Gaiters see Katrina Rozier on a regular basis?

A    Not that I know of.  She be on the street all the time of night and day.  I don't know who she might see out there.

Q    Did Jerry sell crack, rock, to her?

A    He probably did.

MR. GEARY:  Nothing further.  Thank you, Judge.

THE COURT:  All right.  Any more questions?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Ma'am, in follow-up to Mr. Geary's  --

MR. McGARVEY:  May we approach?

MR. VICK:  Maybe we ought to talk about this first.

(At Bench.)

MR. McGARVEY:  We did not have a current address on the witness.  I requested in follow-up to Mr. Geary's questions, it is my understanding from one of the tapes that led me to believe that in talking to "Pea Sue," that she saw Mr. Gaiters and Ms. Rozier leaving the night that she was murdered. And I'd like to ask her about that.  I realize it is beyond the scope of direct.  But it might save the Court some time.

THE COURT:  I don't have any problem.

MR. VICK:  I don't have any problem.  My only concern is, the street part, is that Gaiters, I don't want to get into hearsay and have to stand in front of the jury and say hearsay.

THE COURT:  Lead her.

BY MR. McGARVEY:

Q    Ms. Pauley, you indicated that you lived with Katrina Rozier?

A    Yes.

Q    You also indicated that you knew Mr. Gaiters.

A    Yes.

Q    Jerry Gaiters.

A    Yes.

Q    The night or the morning that you subsequently discovered that Anette or Katrina Rozier had been murdered, did you have occasion to see her the night before?

A    Yes.  I did.

Q    Who was she with?

A    She was with me.  Me and her was in the house and she had left about six or seven and she told me

Jeanette Pauley (Cross)

she was just going as far as the corner.  And I haven't seen her since.

Q    You did not see her again?

A    No.

Q    Did you see her with Mr. Gaiters that night at all?

A    No.

Q    Did you ever tell the police that?

A    Yes.

Q    Did you ever tell the police that you had seen her with Mr. Gaiters?

A    Oh, no.  I haven't.

MR. McGARVEY:  Thank you.

CROSS-EXAMINATION

BY MR. HENDERSON:

Q    Good afternoon.  My name is Arnold Henderson.  I represent Mr. Roane.  Ms. Pauley, you indicated that you had children, did you not?

A    Yes.  I have children.  I didn't remember saying that.

Q    How old are your children?

A    One is 12 and one is ten.

1412

Q    Do they live with you?

A    In here?

Q    Do they live with you?

A    Oh, yes, they do.

Q    Were they living with you during the period of time that you said Mr. Roane came to your home?

A    Yes, they was living with me, but they weren't there then.

Q    They weren't.

A    Can I ask a question?

THE COURT:  No, ma'am.

BY MR. HENDERSON:

Q    On this particular occasion that you said Mr. Roane came to your home, you indicated that when you came back you saw what you said was crack cocaine come out of a pot.

A    That's right.

Q    Where did you come back from?

A    From the store, because my mother wanted me to go get some ice, a bag of ice.

Q    The store is how far away from your home?

A    On Grace and Harrison.

Q    How far would that be from your house?

A    Two or three blocks, I believe.

Q    When you left the home, how many individuals

1413

were in the home?

A    There was two in there, not including my mama and her old man.  They was in the back.

Q    Total then, there were four persons in there?

A    Yes, when I left.

**JA633**

Q    Now, when you left, this substance that you say was in the bottom of the pot when you got back, was that there when you left?

A    He was doing it then.  It hadn't been cooked up and stuff until I got back.

Q    Had not been?

A    No.  Or finished.

Q    When you got back it was cooked up?

A    Yes.

Q    Is it a fair statement to say you didn't actually see it?

A    No, I did not actually see it.

Q    Is it also fair to say you didn't see James Roane cooking it up?

A    You are absolutely right, uh-huh.

MR. HENDERSON:  That's all I have, Judge.

THE COURT:  All right.  Anything?

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good afternoon, Ms. Pauley.

A    Good afternoon.

Q    Are you familiar with the term "on the pipe"?

A    Uh-huh.

Q    And that means smoking a lot of cocaine, doesn't it?

A    Uh-huh.

Q    Were you on the pipe?

A    Yes, I was.

Q    Are you still now on the pipe?

A    Not now, because I'm pregnant.

Q    You testified that you bought drugs from Sandra Reavis.

A    Yes, I have.

Q    You bought them on a corner in Newtowne?

A    Yes.

Q    What time frame do you know that she was selling cocaine?

A    See, I can't remember all that, because that happened so long ago.  I know I bought it from her. I don't know what time frame.

Q    Do you remember testifying before the Grand Jury?

A    No.  This is the first time I ever been in the courtroom.

Q    Do you remember Mr. Parcell asking you some questions in a small room with some other people there?

A    Uh-huh.

Q    And do you remember what you responded to that particular question?

A    Huh-uh.

Q    The question concerning what time frame you know

**JA634**

she sold cocaine.

A    Well, I know it was during December and January and stuff back then, because I was on the pipe and I was buying from everybody.  I don't know all the details.

Q    Okay, December, 1991, January of 1992.  You knew where she was getting her cocaine from, didn't you?

A    No.

Q    Did you know a man named "Bip?"

A    Yes.

Q    You know Sandra was going to a man named "Bip" for cocaine?

A    No.

Q    You knew her pretty well?

A    Not pretty well, but I noticed her.

Q    You all become friends?

A    Yes.

Q    Spent lot of time together?

A    Yes.

Q    She never lived in a fancy apartment, drove a fancy car, had no fancy jewelry, right?

A    No.

Q    You know her 15-year-old son, don't you?

A    Yes.

Q    You mentioned that you know who Jerry Gaiters is.

A    Yes.

Q    And he knew "Nat" Rozier; isn't that right?

A    Yes, he did.

Q    I direct your attention to the night of January 29th, 1992, early morning hours of January 30th, 1992.  That was the night of the Louis Johnson murder.  Do you recall that night?

A    Louis Johnson?  I don't know Louis Johnson.

Q    Jerry Gaiters on that night, did he come into your house in a very agitated state?

A    Yes, he did.  But I don't know that that's the same.

Q    You remember that night?

A    Yes.

Q    He was very nervous?

A    Sure was.

Q    Upset?

A    Yes.

Q    He had a gun in his hand, didn't he?

A    Yes.

Q    It was a .38?

A    I don't know the name.

        MR. PARCELL:  This is going beyond the scope of direct examination.  If he wants her as his witness, he may call her.

        THE COURT:  Go ahead and exhaust the

witness.
BY MR. WAGNER:
Q    He had a .38 in his hands, didn't he?
A    I know he had a gun.
Q    It was a revolver?
A    I don't know.  See, it was dark.  I didn't have electricity at the time.
Q    You know the difference between a revolver and an automatic?
A    No, I sure don't.
Q    All right.  He was running around the house very excited?
A    Yes.
Q    With the gun in his hand?
A    Not in his hand.  I wouldn't allow him to do that.

1418
Q    He had the gun on his person?
A    Yes.
Q    After he left the house he hid the gun, didn't he?
A    Somewhere, I guess.  I don't know what he did after he left the house.
Q    Didn't you see him outside put it under the porch next-door?
A    I didn't see that, no.
Q    But you saw he had a gun?
A    Yes.
Q    You were good friends with "Nat" Rozier; isn't that right?
A    Yes, we were lovers.
Q    Did you view her body?
A    No, I did not.
          MR. WAGNER:  I have no further questions.
          THE COURT:  Any redirect for this witness?
               REDIRECT EXAMINATION
BY MR. PARCELL:
Q    You indicated that in 1991 Mr. Roane came to your house and asked you about cooking crack in your home; is that correct?
A    Yes.
Q    Who brought whatever was brought into your house

1419
into your house?
A    He had it with him in the bag.
Q    And did the woman who was with him have anything with her?
A    I don't know.  I didn't pay no attention, because she was living with me.  I didn't give it no mind.
Q    After the cocaine was cooked in the crack form, who gave you some crack?
A    I got it off  --  it was on the table.
Q    Who did you ask?

A    He put it on the table.

Q    Who did?

A    I don't know who put it on the table.  When I got back, he said, "There you go."  So I grabbed it.

Q    Who took the remaining cocaine when they left?

A    He did.

Q    He being whom?

A    "J.R."

Q    Mr. Roane?

A    Uh-huh.

MR. PARCELL:  No further questions.

THE COURT:  All right, ma'am, you may stand down.  Well, it is 4:30, and we are stopping here. As I promised you before, we will stop at 4:30 if we can, and today it worked out very well.  We finished right at 4:30.  I am going to release you again and you will appear tomorrow morning at 10 o'clock a.m. Same admonishment:  Don't discuss the case with anybody and don't review any newspaper, TV, or radio items related to this case.  We will see you tomorrow at 10 a.m.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

(Proceedings adjourned at 4:30 p.m.)

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

**JA638**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

Plaintiff;

v.                                            CRIMINAL ACTION
                                                   92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                            Defendants.

----------------------------------------

VOLUME VII

January 19, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S
THE CLERK:  Case Number 92CV68: United

States of America versus Richard Tipton, Cory Johnson, James H. Roane, Jr., and Sandra Reavis.  The seventh day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  One matter to take up, Judge.  In regard to the Court's ruling yesterday, I think it was that the defense cannot inquire when these witnesses tell the Court or tell us out there that they don't want to talk to us.  I think that goes directly to the bias and credibility.  For instance, the witness said this morning, "I don't want to talk to you; have a nice day," and virtually threw everybody out of the room.  I think the jury is entitled to know that.

THE COURT:  No, sir.  Your objection is noted.  Call the next witness.

MR. VICK:  A.D. Merz, Your Honor.

THE COURT:  Let's bring in the jury then.

A.D. MERZ,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?
A    Investigator A.D. Merz.
Q    Your occupation?
A    I'm employed with the Henrico County Division of Police.
Q    Sir, were you in that capacity on April 27th, 1990?
A    Yes, sir, I was.
Q    What was your assignment in April of 1990?
A    At that time I was assigned to the Criminal Investigative Division.  I was assigned to the School Liaison Program.
Q    Was one of your schools Highland Springs High School?
A    Yes, sir, it was.
Q    Did you have an occasion to get a communication which led you to go to that location?
A    Yes, sir.
Q    When you got there, what did you do?
A    The principal of the school relinquished a plastic baggie to me.  That baggie contained 15 plastic vials which all contained a white rock-type substance.

Q    After he gave that to you he advised that he had retrieved that from  --
MR. WHITE:  Objection.
BY MR. PARCELL:

Q    Who did he tell you he retrieved it from?
A    From a student who was in the office with him at the time.  The student was identified to me as Maurice Saunders.
Q    And you had occasion to advise Mr. Saunders of his rights?
A    Yes, sir, I did.
Q    He indicated to you  --
            MR. WHITE:  Objection.  Hearsay.
            MR. BAUGH:  That's hearsay.
            THE COURT:  Sustained.
BY MR. PARCELL:
Q    The things you retrieved from the principal, you did what with them?
A    I subsequently submitted them to the state lab for analysis.
Q    And Officer, I will show you a copy of this report.  It is Government Exhibit 86.
      (Document proffered to witness.)
      Could you identify that exhibit, please?
A    Yes, sir.  That is a certificate of analysis

1425

that I received on the items that I submitted to the state lab, an analysis for the items that I recovered from the principal of the school.
            MR. PARCELL:  That will be Government Exhibit 86, please.
            THE COURT:  Admitted.
BY MR. PARCELL:
Q    Mr. Saunders admitted to you that  --
            MR. WHITE:  Objection, leading question, hearsay.
            THE COURT:  Sustained.
            MR. PARCELL:  Your witness.
            MR. WHITE:  No questions, Your Honor.
            THE COURT:  All right.
            MR. COOLEY:  No questions.
            MR. BAUGH:  No questions.
            MR. WAGNER:  No questions.
            THE COURT:  All right.  You may stand down, sir.
      (Witness stood aside.)
            MR. GEARY:  Judge, I object to counsel arguing with us.
            THE COURT:  Mr. Parcell, if you have any comments to make to the defense lawyers, make it so that we can hear it, please.

1426

            MR. PARCELL:  Yes, sir.  Investigator bowling, please.
                        FRED BOLLING,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**JA641**

Fred Bolling (Direct)

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Your name, sir?

A   Fred Bolling.

Q   Occupation?

A   I'm a police officer with the Henrico County Police Department.

Q   How long have you been a police officer?

A   For 18 years.

Q   Were you in that capacity on May 22nd, 1991?

A   Yes, sir, I was.

Q   Would you please tell the ladies and gentlemen of the jury in what capacity?

A   I was working in the narcotics section in the Organized Crime Covert Section.

Q   Did you have occasion to be working in the area of 2711 Catchpenny Road in the eastern part of Henrico County?

A   Yes, sir.

Q   Did there come a point in time that you were part of an arrest of Maurice Saunders?

A   Yes, sir.

Q   Did you or your colleagues retrieve anything from Mr. Saunders?

A   Yes, sir, we did.

Q   Would you tell the jury about that?

A   He sold one of the undercover officers a $20 rock of crack cocaine.  After he was arrested we recovered seven more $20 rocks of crack cocaine.

Q   What were the other rocks located?

A   He had them hidden behind  --  beside the wheel of a truck which was parked directly in front of his house.

Q   And as you concluded your investigation, the items were submitted to the state laboratory for analysis?

A   Yes, sir.

Q   This is Government Exhibit 87.  Would you please review this document and identify it, sir?

A   This is the analysis, the result of the substances that were submitted to the Consolidated Laboratory for testing.

Q   It came back what weight of crack cocaine?

A   The first sample submitted came back .116 grams.  And the second, which was the seven rocks, came back 0.872 grams.

MR. PARCELL:  That will be Government Exhibit 87.  Please.

THE COURT:  It will be admitted.

MR. PARCELL:  No further questions.  Pass the witness.

THE COURT:  Any questions for this

witness?

MR. WHITE: No questions, Your Honor.

MR. McGARVEY: No questions.

MR. BAUGH: No questions.

MR. WAGNER: No questions.

THE COURT: All right. You may stand down.

(Witness stood aside.)

I hate to do this, but I have to bounce you all out and bring you back in. This will be just a matter of minutes. Just about as soon as you get in there, we will be bringing you back. But we have to send you out.

(The jury left the courtroom.)

MR. VICK: The government's next witness will be Johnny Lee Byrd, who is a protected witness. He is in the protective witness program.

MR. PARCELL: May I have permission to go to the hall for a second?

THE COURT: Sure, go ahead.

(Mr. Parcell left the courtroom.)

THE COURT: All right. Let's bring the jury back in.

(The jury reentered the courtroom.)

All right, the witness will be sworn.

## I. Johnny Lee Byrd  (1429)

JOHNNY LEE BYRD, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'll ask that during your testimony you speak up and speak toward the microphone so everyone can hear you. Could you state your name for the Court, record, and jury, please?

A    Johnny Lee Byrd, Jr.

Q    How old are you?

A    39.

Q    You are presently incarcerated; is that correct?

A    Yes, sir.

Q    What are you serving a sentence for?

A    Bad checks, forgery of a check.

Q    All right. What is your current sentence? How much time are you sentenced to serve in the penitentiary?

A    17 months.

Q    Now, do you have a felony record in addition to the time -- in addition to the charge for which you

are spending time in the penitentiary now?

A    Yes, I have a felony record.

Q    What is your felony record?

A    B&E's, taking small things, money, stuff like that.

Q    Now, Mr. Byrd, you are a drug addict; is that correct?

A    Yes.

Q    What kind of drugs were you using?

A    Crack cocaine.

Q    Were these thefts done to support your drug habit?

A    Yes, they were.

Q    Now, Mr. Byrd, has the United States Government agreed to do anything for you concerning any reduction in sentence or anything else in return for your testimony here today?

A    No, sir.

1431

Q    Why are you testifying?

A    I'm testifying because they killed my best friend, a friend of mine, and his mother  --

          MR. BAUGH:  Objection, relevance.

          THE COURT:  Sustained.  He has answered enough.

BY MR. VICK:

Q    Do you have any  --  how far did you go in school?

A    Eleventh grade.

Q    And what work history do you have?

          MR. McGARVEY:  Objection, relevance.

          THE COURT:  No, overruled.

BY MR. VICK:

Q    Go ahead.

A    Served in the Armed Forces.

Q    For how long?

A    13 years, 14 years, something like that.  I got a medical status, release from the Army.  I got an honorable discharge, good record in service.

Q    What was the rank, the highest rank you achieved?

A    Sergeant E-5, a supply sergeant.  I worked with mortars  --

          MR. GEARY:  That's a little far afield.

1432

          THE COURT:  Sustained.

BY MR. VICK:

Q    Mr. Byrd, did you know an individual by the name of Doug Talley?

A    Yes, I did.

Q    How did you meet Doug Talley?

A    I met Doug Talley on Clay and Adams Street.  We used to smoke a little crack together and talk.

Q    When did you meet him?

Johnny Lee Byrd (Direct)

A    Somewhere in about August or September.  Been about two or three months.
Q    Two or three months prior to what?
A    His slaying.
Q    Did you have occasion to distribute any drugs with Doug Talley?
A    Yes, I did.
Q    Could you tell the ladies and gentlemen of the jury when it was that you began distributing drugs with Doug Talley?
A    I was distributing the drugs starting on the second a little bit  --
Q    The second of what?
A    The second of January.
Q    What year?
A    1991.  1992, I mean.

1433

Q    How do you remember that day?
A    Because I was with some people on New Year's Eve and January the 1st, and I didn't come back across town until January 2nd.
Q    What kind of drugs were you distributing with Doug Talley?
A    Crack cocaine, rock crack.
Q    Now, were you with Doug Talley when he went to get that crack cocaine?
A    Yes, I was.
Q    Do you know where it was that he went to get that crack cocaine?
A    We went over on Clay Street.  I can't recall the address, but it was where "Papoose" lived at.
Q    Who is "Papoose?"
A    He was one of the individuals that Douglas told me "Don't mess with him."
            MR. GEARY:  Objection to what Douglas told him.
            THE COURT:  Sustained.
BY MR. VICK:
Q    Did you have occasion -- do you know an individual by the name of Richard Tipton, "Whitey?"
A    Yes, I do.
Q    Do you know an individual by the name of Cory

1434

Johnson, "C.O.?"
A    Yes, I do.
Q    Do you know an individual by the name of James Roane, "J.R.?"
A    Yes, I do.
Q    Take your time and stand up if you need to, look around the courtroom, and see if you see those individuals in the courtroom.
A    One there -- Roane here, Tipton there, and Cory right there.
            MR. VICK:  Let the record reflect the

**JA645**

identification.  Could you describe what Mr. Tipton is wearing?

MR. GEARY:  Stipulate.

MR. VICK:  Let the record reflect the identification of the defendants.

THE COURT:  Record will so reflect.

BY MR. VICK:

Q    How did you meet Mr. Tipton?

A    I met Mr. Tipton when he came on January 3rd. He came around on Clay Street looking for Douglas. And he wanted to borrow my field jacket.  And I gave him the field jacket and he gave it to Cory Johnson.

Q    Did your field jacket  --  what field jacket was that?

1435

A    My Army field jacket.

Q    Did it have your name written on it?

A    No, it didn't have any name on it.  It had my eyeglasses in it; my dog tags was in it; some medication I got from the VA Hospital and a letter from the VA Hospital.  That was it in the jacket.

Q    All right.  Where did you give that coat to Mr. Tipton?

A    On the 3rd.

Q    Where?

A    On Clay Street, 201 West Clay Street.

Q    Tell the ladies and gentlemen of the jury how that occurred.  Exactly what occurred that resulted in your giving him the jacket?

A    Tipton and Johnson came by to borrow the coat because it was raining or something.  And I had just came downstairs when they rang the bell at the house.  And he said he wanted to borrow the field jacket, so I gave it to him, the field jacket, and Tipton gave it to Johnson.

Q    When did you first meet Mr. Cory Johnson, "C.O.?"

A    Met him on January 3rd, too, off of Clay Street, him and Roane.  And over in Newtowne.

Q    What were they doing when you met them?

1436

A    Sort of like look-outs.

Q    For what, where?

MR. BAUGH:  Objection.  That is certainly a conclusion.

BY MR. VICK:

Q    Describe what led you to draw that conclusion?

A    Douglas pointed them out to me.

MR. GEARY:  Objection to the hearsay.

MR. VICK:  Could we approach on the hearsay objection?

THE COURT:  No, just get him to describe what was going on there.

BY MR. VICK:

**JA646**

Johnny Lee Byrd (Direct)

Q    What were they doing?
A    They were standing out on the corner and one was standing by the alley.
Q    Near what?
A    I don't know the name of the street, but that's where they were standing.  It is off of Clay Street.
Q    Was it near a house?
A    It was near where "Papoose" lived at.
Q    Where in relation to "Papoose's" house?
A    I don't know the street, but it was in a basement.  I mean alley.  I was living at 201 West Clay.  I think it was about six blocks.

Q    Where were Mr. Johnson and Mr. Roane in relation to "Papoose's" house?
A    Johnson was by the alley, Roane was by the corner.
Q    All right.  Did Doug Talley state anything to you about Mr. Tipton, Mr. Roane, and Mr. Johnson?
A    Yes, he did.
         MR. GEARY:  Objection.
         MR. VICK:  801(d)(2)(E), and there is also the 803 residual hearsay, and UNITED STATES v. THEBUS.
         MR. GEARY:  This is hearsay, pure and simple.
         THE COURT:  Come on up and make your record.
     (At Bench.)
         MR. VICK:  If the statement was that he told Mr. Byrd not to mess up their drugs, they were big guys, don't mess up their drugs, it is in furtherance of the conspiracy; telling him how he should act during this conspiracy.  Additionally, the defendants can't hide behind the confrontation of a witness when they indeed were the cause of the witness' murder and object to him being here to testify.  UNITED STATES v. THEBUS.

         THE COURT:  The objection is sustained.  It is hearsay.
BY MR. VICK:
Q    Did Doug Talley get any drugs to distribute on January 3rd, 1992?
A    Yes, we went by "Papoose's" house to get the drugs.
Q    How much drugs were gotten?
A    I think it was about a thousand dollars worth of drugs.
Q    Did you help him distribute those drugs?
A    Yes, I did.
Q    Where was it that you distributed those drugs?
A    I started on Clay Street, then I went over in Highland Park.

Q    Did you have occasion to go and get more drugs after distributing those drugs?
A    Yes.  After I brought them the money back, we went and got some more drugs.
Q    Where did you go to get more drugs?
A    Same place, "Papoose's" house.
Q    On how many different occasions did you go and get drugs on that day?
A    I think it was about four or five times.
Q    In all occasions did you go to the same

1439

location?
A    Yes, we did.
Q    Did you smoke some of those drugs?
A    Yes, I did.
Q    How much of that cocaine did you smoke?
A    About $100, $200 worth.
Q    Did you sell some?
A    Sold some.
Q    How much did you sell?
A    About $500 worth.
Q    On January 4th, 1992, did you have occasion to see Mr. Doug Talley again?
A    Yes, I saw Doug Talley that morning.
Q    Where was it that you saw him?
A    In front of my house on 201 West Clay Street.  I was coming from Highland Park.
Q    And describe to the ladies and gentlemen of the jury what you saw.
A    When I was coming across, where the junior high school is, coming across that big parking lot up where the playground is, I saw Doug Talley, Tipton, Johnson, and Roane in the car.  They knocked on my door, but I wasn't there.
Q    Where were you at that time when you saw them?
A    I was standing by the wall across the street

1440

about 15 feet away from the car.
Q    Why didn't you go over to them?
A    Because I had messed up the money and I knew they was coming to get the money.
Q    What money had you messed up?
A    I messed up the drugs and the money that Douglas told me not to mess up.
Q    When you say you messed it up, what do you mean?
A    Spent it, spent the money, splurged with a couple girls and stuff, had a good time.
Q    That money was payment for what?
A    The money was for to give back to Douglas and them.  I mean Roane and them.  Money I made, I was supposed to give it to Douglas and Douglas was  --
        MR. BAUGH:  Objection to what Douglas was supposed to do with it.

**JA648**

THE COURT: Overruled.

BY MR. VICK:

Q   How did you make that money?

A   Selling standing on the corner.

Q   Selling what?

A   Selling drugs standing on the corner.

Q   Crack cocaine?

A   Yes, sir.

Q   Was that the drugs you got from "Papoose's" house?

A   Yes, it was.

Q   Tell us what you saw when you saw them that day, on January 4th.

A   They knocked on the door. They rang the bell. I saw them knock on the door, then they rang the bell. And somebody came to the door but I couldn't see who it was at the door, and they told them I wasn't there. So I saw Johnson and Roane get back in the car. And Roane hit Douglas in the face.

Q   Where was Douglas sitting, Doug Talley sitting?

A   Doug was in the driver's seat. Tipton was in the front seat. Johnson was behind the driver's seat and Roane was behind Tipton.

Q   And tell us what you saw.

A   I saw Johnson -- I mean Roane -- hit Douglas in the face.

Q   With what?

A   With his fist.

Q   Where in his face?

A   Right here on the side by his eye.

MR. BAUGH: Could the record reflect he is indicating the side of his right eye?

THE COURT: Done.

THE WITNESS: Johnson was on the --

MR. BAUGH: Objection. I didn't hear a question.

THE COURT: Sustained.

BY MR. VICK:

Q   Could you describe what Mr. Roane did?

A   Roane got back in the car, took his fist, and hit him in the face.

Q   What did you see next?

A   I just saw Tipton wave his hand and they drove off.

Q   Did you ever see Mr. Talley again?

A   I didn't see him no more.

Q   What time of day was that on January 4th, 1992?

A   I think it was in the morning time sometime.

Q   Now, on January 3rd, you said that you had given Mr. Tipton your Army fatigue jacket; did you ever get that jacket back?

A   Never got it back.

**JA649**

Q    Have you seen that jacket since that day?
A    Only time I seen the jacket was when I turned myself in to Henrico and J.J., Detective J.J. Cox came and talked to me.  And a homicide was placed on me with my field jacket and dog tags in there.
        MR. VICK:  Beg the Court's indulgence.

        (Counsel retrieving exhibit.)
BY MR. VICK:
Q    I'm going to show you what has been marked Government Exhibit 137 and ask you if you have ever seen that.
A    That's my field jacket.
Q    Is that the same field jacket that you gave Mr. Tipton on January 3rd?
A    Same one.  The lining and everything.
        MR. VICK:  I tender the witness, Your Honor.  Excuse me, I have further questions.
BY MR. VICK:
Q    Mr. Byrd, do you know an individual by the name of Maurice Saunders?
A    No, I don't.
Q    Do you know Charles Townes, "Man-Man?"
A    No, I don't.
Q    Hussone Jones?
A    No.
Q    Denise Berkley?
A    No.
Q    Dorothy Armstrong?
A    No.
        MR. VICK:  No further questions.
        THE COURT:  All right.  Mr. Geary?

        MR. GEARY:  Thank you, Judge.
                CROSS-EXAMINATION
BY MR. GEARY:
Q    Mr. Byrd, is it your testimony that it was in August or September of last year when you first started smoking crack with Doug Talley?
A    Yes.
Q    Is that correct?  That's when you and Doug got together and started smoking crack?
A    Douglas was already  --
        MR. VICK:  Misstatement.
        MR. GEARY:  Excuse me, I'd like to do my own cross-examination.
        MR. VICK:  He is taking facts and misstating them.
        MR. BAUGH:  Objection.
        THE COURT:  Would you please let me respond?  Mr. Geary, ask your questions.  But you said so and so.  You can ask a question.  That's not what he said.  So ask a question.
BY MR. GEARY:

Q    When did you and Doug Talley get together and start to smoke crack cocaine?
A    Douglas Talley was already smoking crack.
Q    Mr. Byrd, listen to the question.  When did you and Talley get together and start smoking crack, the two of you?
A    We got together within months.
Q    Months of what?
A    Somewhere around August.
Q    Of 1991?
A    Of 1992.
Q    And you smoked crack with Doug Talley every day up until January 5th?
A    I didn't see him smoke crack every day.
Q    How often did you smoke crack with him?
A    He might have come over about once a week, whatever, during that time.  But not every day, not until he got together to decide on me making some money with him.
Q    Doug got together with you for him to decide how much you were going to make; is that correct?
A    I didn't say that.
Q    What's "Papoose's" address?
A    I don't know the address.
Q    What street is it on?
A    Off of Clay Street.
Q    Where on Clay Street?
A    I can't give you the name of the street.
Q    Mr. Byrd, you lived at 201 West Clay; is that correct?
A    Right.
Q    Is that in the Newtowne section or in Jackson Ward?
A    I don't know what section it is in.
Q    If you were to be in a car, Mr. Byrd, and were going westbound on Clay Street, how far would you go on Clay Street to get to where "Papoose" lived?  How many blocks?
        MR. VICK:  From where?
        MR. GEARY:  201 West Clay Street.
        THE COURT:  Overruled.
BY MR. GEARY:
Q    From 201 West Clay?
A    I would say it is about five or six blocks.
Q    You have lived in Richmond all your life, haven't you?
A    No.
Q    How long have you lived in Richmond?
A    I guess about ten years.
Q    You know the city pretty well, certain areas of it?
A    Certain parts.

Q    Tell the jury where "Papoose" Davis' house is.
A    What I just told you.  I don't know the name of
the street.
Q    Tell the jury what is around so we can go out
there and look and find it.
A    I can't describe it.
Q    You can't describe it, can you?
A    I can take you there.
Q    You are kind of hostile to the lawyers.
         MR. VICK:  Objection, he is arguing with
the witness.
         THE COURT:  Mr. Geary, you ask a question.
If he says, "I don't know," you have to ask another
question.  Don't get mad because he doesn't answer
your question.
BY MR. GEARY:
Q    Doug Talley was your best friend; is that your
testimony?
A    Yes.  That's my testimony.
Q    You are testifying here because they killed him;
is that correct?
A    That's right.
Q    Isn't that what you said?
A    I'm doing it on my own.
Q    Doing it on your own.
A    That's what I said.
Q    Your testimony is about three days; is that
correct?  January 2nd, January 3rd, and January 4th;
is that correct?  That's what you are testifying to
when Mr. Vick asked these questions about you,
January 2nd, 3rd, and 4th.
A    Don't you have it on record?
         MR. GEARY:  Judge, this is a totally
hostile witness.
         THE WITNESS:  I'm not hostile.  You are.
I'm trying to answer your question to the best of my
ability.
         MR. BAUGH:  Objection.
         THE COURT:  Mr. Byrd, answer his question.
He asked you a very simple question.
         THE WITNESS:  I told him yes, the 2nd, 3rd,
and 4th.
         THE COURT:  Just answer the question.
         THE WITNESS:  Yes.
BY MR. GEARY:
Q    You are upset about testifying in regard to your
field jacket; isn't that correct?
A    I'm not upset about that.
Q    Not upset about anything, are you?
A    No.
Q    Your testimony is that you went to "Papoose"
Davis' house four times on a particular day to buy

**JA652**

crack; is that correct?

A    Went to his house about six times.

Q    Which date was that, 2nd, 3rd, or 4th of January, 1991?

A    The third.

Q    The 3rd of January.

A    The third.

Q    How did you and Doug Talley get to "Papoose's" house?

A    In his car.

Q    When you left his car, where did you go?

A    When I left the car?  I never left his car.

Q    When you left the house, where did you go?  You bought the drugs and you left.

A    Went down on Clay Street.

Q    Where on Clay Street?

A    I just told you I don't know the name of the street.  I know how to get there.

Q    How do you get there?

A    It is on Clay Street.

Q    How did you get there?  Where on Clay Street?

A    I would have to take you there to see.

Q    You sold crack?

A    I answered that, too.  Yes.

Q    You have to answer our questions.

A    I'm answering your question.  What do you want?

Q    I want you to tell the truth, is what I want.

MR. VICK:  Objection.  This is so improper.

THE COURT:  Sustained.  Stop fighting with this witness.  Answer the question.

BY MR. GEARY:

Q    Did you go to Highland Park to sell drugs?

A    Yes.

Q    And the six times you went to "Papoose's" house on January 3rd, did you give up any money to buy drugs?

A    I gave up money that belongs to Douglas.

Q    How much money did you give to Douglas on January 3rd for him to give to "Papoose" Davis for the drugs?

A    I think it was about $800.

Q    $800 of your own money?

A    Not my money, his money.  Douglas' money.

Q    Did Douglas have any money besides the $800 that you gave him?

A    I have no idea.

Q    Who did he buy the drugs from?

A    Went down to "Papoose's" house.

Q    Who was there?

A    I don't know.  I'm sitting in the car.

**JA653**

Johnny Lee Byrd (Cross)

Q    You never got out of the car?
A    I never got out of the car.
Q    Each time you left you went to either Clay Street or Highland Park to sell the drugs; is that correct?
A    That's right.
Q    Now, what day was it that you saw the four guys in the car by your place?  Was that January 4th?
A    Yes, sir.
Q    What time in the morning was it that you saw the four of them in the car?
A    I guess about 10, 11 o'clock.
Q    Ten or eleven in the morning?
A    It was in the morning.
Q    That's outside of 201 West Clay Street?
A    Yes.
Q    When you saw the car, Mr. Byrd, approximately how far away from the car are you?
A    About 15 feet.
Q    Excuse me?
A    15 feet.  15 feet.
Q    About the distance between you and me?
A    No.  Might be 20 feet, somewhere in between.  I'm not sure.

1452

Q    About to the first row here?
A    Take three seats back, that's the car, and I'm right here.  It is about that distance.
Q    When you saw the car, are you on the sidewalk or on Clay Street?
A    I was in a little alleyway right by the playground.
Q    When you are looking at the car, are you looking at it from the front or back or one of the sides?
A    Looking at it from the side, looking straight forward.
Q    Is there a door on the other side of the car?  Can you see the door?
A    I saw a form in the car.
Q    You are looking on the driver's side; is that where you can see first, the driver's side?
A    If you go down Clay Street the driver's side is on what side?  The left side?
Q    You are on the left side?
A    I'm on the right side.
Q    You see somebody go to your door?
A    I didn't say I saw somebody.  I saw the people go to my door.
Q    I'm just asking you some questions.
A    You are saying "somebody."  I'm telling you who

1453

I saw go to the door.  It is not no "somebody."  It is the people that I saw go to the door.
Q    Who did you see go to the door?

**JA654**

A    Roane and Johnson.
Q    And where were Talley and Tipton?
A    They were in the car.
Q    How long did you see all these four people outside of your place on Clay Street that morning?
A    About five, ten minutes.
Q    Five or ten minutes?
A    Yes, because they was ringing the bell.  They even drove around in the alley.
Q    You were standing there watching them; is that correct?
A    I was watching them right there on the playground.
Q    When is the first date that you talked to Detective J.J. Cox about this case?  The date?
A    I can't give you no date.
Q    How long after January 5th do you recall talking to Detective Cox?
A    I can't give you the answer.  I'm not sure about that.
Q    Was it within a day?
A    I can't give you no answer.

1454

        MR. GEARY:  Judge, could you direct the witness to answer the question?
        THE COURT:  Mr. Byrd?
        THE WITNESS:  I can't give no direct date if I don't know.
        THE COURT:  You have answered that.  He is going to try to ask you something else.
BY MR. GEARY:
Q    Was it in the same year?  If Doug was killed on January 5th, 1991, did you talk to Detective Cox in the same year?  1992, I mean.  Excuse me.
A    I'm not sure.
Q    You are not sure.  It wasn't yesterday, was it?
A    Don't be funny.
Q    Was it yesterday?
A    Don't be funny.
Q    You are the funny man.
A    I doubt it.
        MR. VICK:  Your Honor?
        MR. GEARY:  Excuse me, Judge, I shouldn't have said that.
                  CROSS-EXAMINATION
BY MR. McGARVEY:
Q    Good morning, Mr. Byrd.
A    Good morning.

1455

Q    Mr. Byrd, you indicated that you gave that field jacket to Mr. Tipton?
A    Yes, I did.
Q    What was the date, approximately?
A    January 3rd.

**JA655**

Q    January 3rd?

A    Yes.

Q    And you indicated further that your dog tags were inside the coat?

A    Dog tags, some medicine.

Q    What kind of medicine was that?

A    I don't remember what kind.  From the VA Hospital.

Q    Was it for you?

A    It was for me.

Q    Was it something that was prescribed for you?

A    Prescribed from the VA.

Q    Something to maintain your health then, I presume?

A    Yes.

Q    So I presume that the medicine was somewhat important to you; is that correct?

A    Well, I had two bottles.  I had one in my pocket in my field jacket and one in the room.

Q    I understand.  And you also indicated that you had glasses inside the coat as well?

A    Uh-huh.

Q    What type of glasses?

A    Reading glasses.

Q    Do you need them to read?

A    Yes.

        MR. BAUGH:  I couldn't hear the answer with his hand over the mouth.

        THE WITNESS:  He asked me did I need glasses to read.  I said yeah.

BY MR. McGARVEY:

Q    I presume you were real good friends with Mr. Tipton and Johnson, best friends?

A    I wasn't never no friends with them.

Q    Are you often in the habit of lending your field jacket to someone that is not a friend with your glasses, medicine, and your  --

A    Well, at the time I was thinking  --

Q    Sir, could you answer my question?

A    No.

        MR. VICK:  He is trying.

        THE COURT:  Sustained.  Just go ahead and answer the question.

        THE WITNESS:  No.  Not no good friends with them, but I figured since Douglas said it was all right and all, I just went on and gave them the coat.

BY MR. McGARVEY:

Q    Douglas was there when they came?

A    No, Douglas wasn't there.  I'm saying when I talked to Douglas, we were getting drugs from them.  He said  --

**JA656**

Q    I thought you indicated you got the drugs from "Papoose."

A    "Papoose's" house.  I'm trying to explain something to you.

Q    Sir, with respect to this jacket, you had on some occasion talked to Detective Cox; is that correct?

A    Uh-huh.

Q    And do you recall telling Detective Cox that you had given the jacket to an unknown black male; did you say that to Detective Cox?

A    I said something to Detective Cox.

Q    Did you say that to him?

A    I said something to him.  But I don't recall.

Q    You don't recall saying that to him?

A    I recall saying something to J.J. Cox.

Q    Do you recall saying to J.J. Cox on another occasion that you gave it to an unknown black male in a blue Chevrolet?

A    I didn't tell him no unknown black male.

Q    You never said "unknown black male"?

A    No.

Q    Do you recall telling Detective Cox on another occasion  --  excuse me, do you recall telling an Investigator Barton at State Police headquarters, do you recall telling him that you had given it to a Skip Talley?

A    Yes.  I remember that.

Q    Okay.  That apparently is at least two versions you have given.

A    It is not a version.

MR. VICK:  Objection.

THE COURT:  You can go ahead and ask the question.

BY MR. McGARVEY:

Q    The question is, which version is the truth, the one you are telling today or the one you told then?

A    No, all of it is the truth.  But I had to get it together to find out what was what, why Douglas was killed.

Q    Now, did you tell them before or after you were charged with the murder of Douglas Talley; did you tell them that version?

A    I wasn't charged with no murder.

Q    You were never charged with the murder of Douglas Talley?

A    No.  I was a suspect because of my field jacket.

Q    Speaking of that, sir, when Mr. Vick was asking you about your prior record, you were going a little bit fast there.  Isn't it a fact you have been

**JA657**

convicted of five burglaries?

A    That was back awhile ago.

Q    Were you convicted of five burglaries?

A    That was back awhile ago.

THE COURT:  Mr. Byrd --

THE WITNESS:  That's not now.

THE COURT:  Mr. Byrd, listen to me.  He asked you a very simple question and you will get off a lot sooner if you just answer the question.  Were you convicted of five burglaries, yes or no?

THE WITNESS:  No.

BY MR. McGARVEY:

Q    I might as well do this all at one time.  Sir, isn't it a fact you have been convicted of three forging and uttering checks?

A    No.

Q    Okay.  Isn't it a fact that you have been convicted of grand larceny by fraud?

A    I was convicted of that.

Q    And isn't it a fact that you have been convicted of three misdemeanor worthless checks?

A    No.

MR. McGARVEY:  Your Honor, may I ask that the witness refresh his recollection?

MR. VICK:  Your Honor, this is improper.  The NCIC printouts are, as the Court knows  --  it has been improper impeachment.

THE COURT:  You have asked the questions.  If you want to do something else with that, you will have to do it differently.

MR. McGARVEY:  All right, sir.

BY MR. McGARVEY:

Q    Back to talking to Detective Barton; when you were interviewed by him you were a suspect in that murder at that point; is that correct?

A    No, I wasn't.

Q    You were not?

A    No.

Q    Was Detective Cox present at the time as well?

A    I don't know.

Q    Had Detective Cox, when you were talked to by Investigator Barton at State Police, had Detective Cox told you that your jacket was found inside that car?

A    He told me that on the ride from Henrico to there.

Q    On the day that you were talked to by Investigator Barton, had Detective Cox told you that before you talked to Investigator Barton?

A    Detective Cox told me that before, that my coat was found in Douglas' car.

Q    Before.  Had Detective Cox told you that Douglas

Talley had been stabbed before you talked to Investigator Barton?

A     Yes.  He showed me the pictures.

Q     He told you that before you talked to Investigator Barton; you are absolutely sure of that?

A     Yes.

Q     Sir, you indicated that you have not gotten anything for your testimony here today; is that correct?

A     Nothing.

Q     Had you told the government about your sale of cocaine that you testified here today to?

A     Have I told the government?

Q     Have you told Mr. Vick?  Have you told Mr. Parcell?  Have you told Detective Fleming?

A     I have been selling it.

Q     Did you tell them about that?

A     I told them.

Q     Have you been charged with that?

A     Charged with it?

Q     Have you been charged with selling cocaine?

A     I wasn't charged with it.

Q     You were not?

A     I was not.  I was charged with writing bad checks.

Q     I understand that.

A     Okay.

Q     My question is, have you been charged with selling cocaine that you testified before these ladies and gentlemen today?

A     No, I have not been charged with no selling no cocaine.

Q     You have not been  --  earlier you indicated you have not been charged with the murder of Douglas Talley as well, correct?

A     No, I haven't.

         MR. McGARVEY:  Thank you.  That's all I have.

                    CROSS-EXAMINATION

BY MR. BAUGH:

Q     Mr. Byrd, a few follow-up issues, if I might. You are receiving VA treatment or you were receiving VA treatment up until the time of your arrest?

A     Uh-huh.

Q     And for that treatment you were receiving some medication?

A     Uh-huh.

Q     What is the ailment that you need the medication for?

A     For my leg.

Q     What about your leg?

**JA659**

A    It has been broke eight times.
Q    And the medication is supposed to do what?
A    Relax me.
Q    So these are muscle relaxers?
A    I can't say.
Q    Or are they like pills to take the stress off of you?
A    I can't say.
Q    Are you still taking the medication?
A    Yes, I am.
Q    Thank you.  How often do you take -- I'm holding up a thing that says "Richmond VAMC dated 12-18-91, one of six, take two tablets by mouth at bedtime." Is this yours?
A    Elavil.
Q    Elavil?
A    Is that what it is?
Q    No, this is Am --
        MR. VICK:  Perhaps the witness could be shown.
        MR. BAUGH:  We will do it later.
        THE COURT:  All right.
BY MR. BAUGH:
Q    You had other prescriptions besides this one?
A    Uh-huh.
Q    Now, how many pairs of glasses did you keep?
A    I had two pair of glasses.
Q    Just like you had two bottles of medication; am I correct?
A    No.
Q    Well, didn't you say you had two bottles of medication, one that you kept in your jacket and one that you kept in your bedroom?
A    Yes.  I got that and others.
Q    Now, so you also have two pairs of glasses, one you kept in your jacket and one you kept where?
A    Across town.

Q    All right.  Where across town?  Where you were living at the time?
A    I can't tell you that.  I take the fifth on that.
Q    You take the fifth on where you were living?
A    I can't tell you that.
Q    Where you were living  --
        MR. VICK:  He doesn't want to give us his address.  I think that's completely understandable.
        MR. BAUGH:  The address is in the discovery material.  It is 201-4.  Is that where you kept your glasses?
        THE WITNESS:  I can't tell you.  Ask me something else different.
Q    Okay.  No, no, let's go back to this.  With whom

**JA660**

Johnny Lee Byrd (Cross)

were you living?

A    I can't tell you that, either.

Q    Okay.  This person with whom you were living, was it more than one person?

A    That I am living with in the house, in the building?

Q    I don't know because you won't tell me. Wherever it is you were living.  Were you living with more than one person?

A    I guess there were four or five people living in the building.

Q    Were they all relatives?

A    Just associates.  Friends.

Q    Associates?

A    Friends, that's all.  People I know.

Q    And were they all crackheads, too?

A    I don't know.

Q    Well, were you dealing crack with them?

A    I don't know.

Q    You don't know if you were dealing crack with them?

A    Not with the people in the house.

Q    Were you smoking crack with the people in the house?

A    No.

Q    So  --  you also had some VA papers in there. What type of VA papers were in your jacket?

A    I can't remember.  I know they were in there. Dog tags was in there, too.

Q    Well, don't you have to have an identification card to go to the VA Hospital?

A    I got that.  I got three or four of them.

Q    Did you leave one in the jacket?

A    I don't remember.

Q    Well, did you check your jacket pockets before you loaned this out?

A    No, I did not.

        MR. BAUGH:  Could I have the jacket, please?

    (Jacket proffered to Mr. Baugh.)

        THE WITNESS:  That's my jacket.

BY MR. BAUGH:

Q    This is your jacket.

A    That's right.

Q    This is an Army-issue camel field jacket; is that right?

A    That's right.

Q    This is the way the military issued it to you when you were a sergeant; is that right?

A    That's right.

Q    Did the military also sew the small  --

A    I had my glasses in there.

**JA661**

Johnny Lee Byrd (Cross)

Q    You had a pair of glasses that fit in this patch right here?
A    Right.
Q    See, I had the case and the glasses.
        MR. BAUGH:  We ask that this be published to the jury at this time, please.
        THE COURT:  Fine.
    (Jacket proffered to jury.)

1468
        MR. VICK:  Your Honor, we should move that Government Exhibit 137 into evidence.
        MR. BAUGH:  No objection.
        THE COURT:  It will be admitted.
        MR. GEARY:  No objection.
        THE COURT:  Pass that along.
    (Jury inspecting jacket.)
BY MR. BAUGH:
Q    While this is happening, sir, when you were picked up by Henrico, or surrendered to Henrico, Mr. Cox came out and saw you.  Do you mean to tell me that Mr. Cox never told you that in his estimation you were a suspect in the murder of Douglas Talley?
A    He said I was one of the suspects.
Q    Wait a minute.  The question I asked you was, did he ever tell you that you were a suspect; the answer is you were a suspect, am I correct?
A    Yes.
Q    Okay.  Now, when did you tell the government -- strike that.
    Was Mr. Cox the first person that you told about all this stuff that you said happened on the 4th of January?
A    I don't remember.
Q    Well, did you tell Mr. Cox about all this?

1469
A    I told him a few things.
Q    Did you tell Mr. Cox this story about you selling drugs and the four guys being in the car in front of your house?
A    I didn't tell J.J. that at all.
Q    You didn't tell J.J. that?
A    No.
Q    Even though J.J. has told you you are one of the murder suspects, you never told him that?
A    I was cleared of that at the State Police building.
Q    When did you tell the government  --
A    I don't know.
Q    No, no.  Time out.  When you told the government the first time ever that someone else besides you might have done this murder, was it summertime?
A    I don't remember.
Q    Well, was it warm outside?
A    I still don't remember.

**JA662**

Q    Were the leaves turning brown?
A    I don't remember.
Q    Well, I know what; when is your birthday?
        MR. VICK:  This question, he has answered the question.
        THE COURT:  Overruled.

BY MR. BAUGH:
Q    When is your birthday?
A    I don't remember.
Q    You don't remember your birthday?
A    Yeah.
Q    All right.  When is your mama's birthday?
A    I don't know.
Q    All right.  Okay.  Did you tell the government about this murder before July 22nd  --  we would like to take judicial notice that this last indictment was returned on July 22nd.
        THE COURT:  All right.
BY MR. BAUGH:
Q    Did you tell the United States that you thought or that you believed these people had murdered Mr. Talley before they indicted them on July 22nd, before they indicted these people?  Because you know that Mr. Roane is not charged with the murder, don't you?
A    I told somebody.
Q    You told somebody.  Okay.  Was the person you told white or black?
A    I don't know.
Q    They were close.  You couldn't tell what race they were, or you don't remember to whom you spoke?
A    I know who I talked to.

Q    Tell me who it was.  Tell the jury who it was,
A    About the murder, who I thought?
Q    Who was the first person you told about the murder?
A    My lawyer.
Q    Who was your lawyer?
A    I forgot his name.  He is in Chesterfield.
Q    Well, did you tell that lawyer you were a suspect in a murder case?
A    No.
Q    All right.  Now, you also mentioned -- backing up for just a second, we'll come back to it.  Grand larceny by fraud, that means you tricked people out of money?
A    No.
Q    Well, what's fraud?
        MR. VICK:  Your Honor, he has established that he has been convicted of that.  To go into the facts of that particular conviction is irrelevant, improper, and a waste of the jury's time.
        THE COURT:  Not under these circumstances.

**JA663**

BY MR. BAUGH:
Q    You did a fraud on some people and got them to give you some money you weren't entitled to, right?
A    No.

Q    Well, did you plead guilty to grand larceny by fraud?
A    I pleaded guilty.
Q    What did you plead guilty to, or don't you know that, either?
A    I don't know that, either.
Q    All right.  How many B&E's did you do?
A    The B&E's ain't got nothing to do with that.  Those was back in 1981.
Q    How many B&E's did you do?
A    I don't know.
Q    Were there so many you have lost count?
A    I don't know.
Q    Well, also you are charged with forgery.  Forgery is not bad checks, is it?  Forgery is writing someone else's name on the check, correct?
A    I did that.
Q    Whose checks did you steal?
A    My church.
Q    How many checks from your church did you steal?
A    Two.
Q    And you negotiated them both?
A    No, just one.
Q    And when was that?
A    I don't remember the date.

Q    Well, give me what year.
A    I don't remember that.
Q    Well, was it before your best friend, Doug Talley, died, or after your best friend, Doug Talley, died?
A    It was before.
Q    Was it before you and your best friend started doing coke, or after you and your best friend, Doug Talley, started doing coke?
A    I can't answer that.
Q    Why not?
A    Because I don't know.
Q    Did you use the money for crack or something else?
A    I used the money for crack cocaine.
Q    So it had to have been after September, because that's the first time you smoked crack, right?
A    It was before then.
Q    You were smoking crack before you and your friend started smoking crack; am I correct?
A    Yes.  It was before.
Q    Did you happen to negotiate that check around Christmastime, $240, something like that?

**JA664**

A      $240?
Q      Never mind, withdrawn.

1474
A      You got the wrong person.
Q      Mr. Cox will be along, I'm sure, won't he?  You know Mr. Cox is going to be here, don't you?
        MR. VICK:  That's not a question.
        THE COURT:  Sustained.  Come on, Mr. Baugh.
BY MR. BAUGH:
Q      Now, sir, you have been in the Richmond City Jail for how long?
A      I guess about six or seven months.
Q      When did you first go there, this last visit?
A      The last visit when I got there?
Q      Yes.
A      I guess about a month ago.
Q      About a month ago?
A      Yes.
Q      Prior to that time you were not in the Richmond City Jail?
A      I was there.
Q      When did you first go in the Richmond City Jail in 1992?
A      I think it was  --  I don't know what day it was, but it was after my trial over in Henrico.
Q      What month was that, sir?
A      I can't remember.

1475
Q      Was it in the spring?
A      I don't know.
Q      Well, let me ask you this:  You do know when your trial was, approximately.  Did you tell the government or anyone in the law enforcement community about the murder of your friend, Doug Talley, before your conviction in Henrico?
A      I didn't tell anybody anything.
Q      That means you did not tell them before your conviction?
A      I haven't talked to anybody.
Q      You have never told anyone in the government about what happened or what you saw with Doug Talley?
A      No.
Q      You have never told anybody in the government until you came in here and testified to that today?
A      I told people when I got to Richmond City Jail.
Q      All right.  When did you first tell the authorities?  Was it before or after your Henrico conviction, sir?
A      I don't know.
Q      All right.  Approximately how long have you been in the Richmond City Jail?  Were you in the Richmond City Jail in 1992?

**JA665**

Johnny Lee Byrd (Cross)

1476

A    I was in the Richmond City Jail, yes.
Q    Approximately how long were you there, sir?
A    I guess about six, seven months.
Q    All right.  So you would have gone in, am I correct, in the summertime sometime?
A    It could be, yes.
Q    And that would have been after your Henrico trial; am I correct?
A    Yes.  I went straight the next day after my Henrico trial.  But I don't know what date it was.
Q    During the time you have been in the Richmond City Jail, have you gone to movies?
A    No.
Q    You have never gone down to the movies on weekends?
A    No.
Q    Now  --
A    I don't even go out in the yard, either.
Q    The yard at the Richmond City Jail?
A    Yeah, I stay in.
Q    Now, did you ever carry a weapon in  --  wait a minute.  Did you sew that pocket in that jacket?
A    I put that in there.
Q    Did you ever carry a weapon in that?
A    No, I did not.

1477

Q    The only thing you ever kept in that was your glasses?
A    My glasses in a glass case.
Q    The glasses and the glass case fit in that pocket?
A    Right.  Just slides right in.
Q    Who was accountable for these drugs that you were selling; was Mr. Talley responsible for getting the money, or were you responsible for the money?
A    Mr. Talley.  It was Douglas Talley's idea.
Q    Actually, you messed up Mr. Talley's money, didn't you?
A    I messed his money up.
Q    Did you ride around with Mr. Talley in his car while you were selling all these drugs on the 2nd, 3rd, and 4th?
A    No.
Q    You never rode in his car?
A    I rode in his car, but not on January 2nd, 3rd, and 4th.  Only about the second or third, yes.
Q    Excuse me.  Did you pick up drugs on January 3rd?
A    I didn't pick up no drugs.
Q    Did you go with Mr. Talley?
A    Yes.

1478

Q    How did you and Mr. Talley get to "Papoose's"

**JA666**

house?

A    In his car.

Q    What date?

A    January 3rd.

Q    Did you sell drugs on the fourth?

A    No, I didn't.

Q    Did you sell drugs the evening of the third?

A    I took the drugs with me.

Q    Where?

A    Highland Park.

Q    How did you get there, the bus?

A    I walked.

Q    You walked to Highland Park from where?

A    From Clay Street to Highland Park.

Q    Your friend didn't give you a ride?

A    No.

Q    And the two of you were selling this together?

A    Uh-huh.

Q    You say you smoked about $200 worth.  Did the two of you smoke it together?

A    We did at one time.

Q    Was Mr. Talley upset with you because you had messed up his money?

A    I didn't see Talley.  Not until I saw him on the fourth.  He probably was.

Q    All right.  You have now told us you were convicted in Henrico, and directly thereafter you went to the Richmond City Jail and you have been there since; am I correct?

A    Uh-huh.

Q    Now, did you talk to any of the people at this table prior to the time you first went to the Richmond City Jail?

A    No.

Q    All right.  Specifically, Detective Fleming over here, did you talk  --

A    I never talked to none of them.

Q    When was the first time you told these people a story that would implicate some other people besides you in the murder of Doug Talley?

A    When did I tell them?

Q    Yes.

A    I didn't tell them.  I told somebody higher than them.

Q    Who?

A    Cullen.  The United States Attorney.

Q    Mr. Richard Cullen himself?

A    Yes.

Q    Where did you meet with Mr. Cullen?

A    I wrote him a letter.

Q    When did you write this letter?

A    I don't remember.

**JA667**

Q    You wrote a letter to the United States Attorney's Office?

A    Yes, I did.

MR. BAUGH:  Your Honor, pursuant to 3500, I would ask for the tender of that letter before I complete my examination.

MR. VICK:  Right here, Your Honor.

(Document proffered to counsel.)

MR. BAUGH:  May I have a moment, please?

THE COURT:  Go ahead.

(Counsel perusing document.)

BY MR. BAUGH:

Q    Who is Mr. W.M. Rumphs, R-U-M-P-H-S?

A    That's my mother.

Q    I'm sorry, excuse me.  W.M. Rumphs is your mother?

A    Right.

MR. VICK:  Your Honor, I'm going to cover up that address.  I would like the envelope for the date.

(Counsel redacting envelope.)

BY MR. BAUGH:

1481

Q    Am I correct, sir, that you wrote a letter to Mr. Richard Cullen asking to be  --

MR. VICK:  The letter speaks for itself. It has been marked Government Exhibit 138 into evidence.  We now move it into evidence.

MR. BAUGH:  I haven't offered it, Your Honor.

THE COURT:  Well, it certainly will save us a lot of time.  You can ask questions about it.

MR. BAUGH:  Let me pass it to co-counsel and I'll ask about something else.

(Document proffered to defense counsel.)

BY MR. BAUGH:

Q    While you were housed in the Richmond City Jail, did you see any of these defendants?

A    Yeah.  Saw Tipton in the church, Roane was on detail.

Q    What kind of detail?

A    I don't know.  Some kind of detail, which he wasn't supposed to be on detail.

Q    Thank you.  After you wrote to Mr. Cullen, how long after that did someone show up to talk to you? Can we stipulate the letter is postmarked September 17th?

MR. VICK:  Yes, 1992.

1482

BY MR. BAUGH:

Q    How long after that did someone show up and talk to you?

A    I have no idea.

Q    Was it a week, a month?

Johnny Lee Byrd (Cross)

A    I don't know.  Can't give you something I don't know.

Q    Your best friend, Douglas Talley, that's how you described him, right?

A    Friend, good friend.

Q    Didn't you tell this jury a moment ago  --

A    It doesn't matter.  I'm telling you he is a friend, best friend.  He is a good friend.  Best friend.

Q    Did you go to his funeral?

A    No, I did not.

Q    Did Mr. Cox tell you during any of your interviews that the murder weapon utilized in the death of Douglas Talley was found in that pocket of that jacket?

          MR. VICK:  That's not true, Your Honor.

          THE COURT:  Sustained.

          THE WITNESS:  No.

          MR. BAUGH:  Excuse me, sustained that it is not true?

          THE COURT:  Sustained.

          MR. VICK:  Improper, and that's a misstatement of facts.

          THE COURT:  Sustained.  Mr. Baugh, come up here a moment.

     (At Bench.)

          THE COURT:  You have done a very good job.

          MR. BAUGH:  Do you want me to tell the jury they can disregard him?  I'll sit down.  I swear I will.

          THE COURT:  You are pushing this thing.  I don't know whether it is a misstatement or not.  I would have to have a proffer from Mr. Vick.

          MR. BAUGH:  I can only work off of what they have given me.

          MR. VICK:  The knife has been analyzed and all of that was given to them.  There is nothing indicating that was the murder weapon.

          THE COURT:  You can say it was a knife, but you can't say it was the murder weapon.

          MR. BAUGH:  We are having a slight Jencks problem here.  No one thought that letter was germane to this case.  Believe me, if I had gotten that letter, I had no idea what this guy was going to say until this morning.  I just got blindsided.  I did something to this guy only because God likes me.

          THE COURT:  You don't have any problem examining this witness.

          MR. GEARY:  My impression on direct examination is he said he lived at 201 West Clay Street.  Later I understood that he lives in like the 2400 block of West Clay Street.  I want that on the

**JA669**

record.

MR. BAUGH:  It was not Newtowne.

THE COURT:  Mr. Vick, it seems to me that this letter would be germane.

MR. VICK:  Not as specificity as to people.  He just says he has knowledge of drugs, the Newtowne drug gang.

MR. McGARVEY:  One other issue.  I was under the impression there was a stipulation with respect to the NCIC records.  Am I in error?

MR. VICK:  There is no stipulation as to the authenticity.  Anybody who has been in the business knows that NCIC records are historically incorrect sometimes.  I have given them so that you can check them.  I can't tell you which ones are good or bad.

THE COURT:  On this last issue, you can ask questions whether or not there was a knife in the pocket.

MR. VICK:  It is not the murder weapon.

MR. BAUGH:  Oh.  I didn't know that.

THE COURT:  But bear in mind what I said, Mr. Baugh.

(In Open Court.)

BY MR. BAUGH:

Q    Did Mr. Cox tell you that a knife was found with the jacket?

A    No, he didn't.

Q    But from the time that Mr. Cox first talked to you until the time you sent that letter to Mr. Cullen, you knew you had been a suspect in the murder, right, sometime in that period; am I correct?

A    I figured they put the murder on me.

Q    And secondly, while figuring they were going to put the murder on you, you never told anyone in law enforcement the story that you have told here today.

A    I had to put it all together before I could get it right.

Q    The reason you didn't tell anyone, even though you were a suspect in the murder, was because you were doing your own investigation, correct?

A    I told my lawyer.  He knew about it.

Q    When did you tell your lawyer?

A    When we came back from Chesterfield.

Q    When was that?

A    I don't remember.

Q    Ballpark.

A    I don't remember that particular day.

Q    What's the lawyer's name?  The reason I'm asking you, you know I'm going to call him at lunch.

MR. VICK:  Objection.  This is so

**JA670**

improper.
            THE COURT:  Sustained.
BY MR. BAUGH:
Q    What was your lawyer's name in Chesterfield?
A    I forgot what his name is.
            MR. BAUGH:  Your Honor, we ask this witness
not be excused.
            THE COURT:  All right.  Mr. Wagner?
            MR. WAGNER:  I have no questions.
                    REDIRECT EXAMINATION
BY MR. VICK:
Q    I'm going to show you what has been previously
marked Government Exhibit 137-2, 3, and 4, and ask
you if you can identify those items, please.
     (Exhibits proffered to witness.)
            MR. BAUGH:  I must object.  If the United

1487

States is now going to tell us that those glasses are
the glasses he is talking about, I demand the right
to cross-examine on those issues not brought up on
direct.
            THE WITNESS:  I had reading glasses and I
had these glasses.
            THE COURT:  You can sit down.  If you need
to ask further questions, you may.
            THE WITNESS:  This is my stuff.
BY MR. VICK:
Q    Where was that stuff?  When is the last time you
saw it?
A    Last time I saw it was on the third.
Q    Where was it?
A    I had it up in the closet and I gave it to
Tipton and them.
Q    Are those the items you have described as being
in the coat at the time you gave it to them?
A    Yes, medicine, dog tags, the sunglasses, and I
had a pair of reading glasses.
            MR. VICK:  137-2, 3, and 4 into evidence,
Your Honor?
            THE COURT:  Admitted.
BY MR. VICK:
Q    I show you what has been previously marked

1488

Government Exhibit 138 and ask you if you can
identify that.
A    Yup.
Q    What is that?
A    It is a letter I sent to my mother and told her
to see if she can contact Richard Cullen.
Q    Is that the letter you described in your
cross-examination by Mr. Baugh?
A    Yes.  This is the letter.
            MR. VICK:  I move Government Exhibit 138.
            MR. BAUGH:  Objection.  I would ask the

Court to review it.

THE COURT: Let me have a look at it.

(Document proffered to Court.)

MR. GEARY: May I speak to Mr. Baugh for a minute?

THE COURT: Sure.

MR. BAUGH: We will withdraw the objection, because Mr. Geary told me to.

THE COURT: All right. 138 will be admitted. Anything else, Mr. Vick?

BY MR. VICK:

Q   Very briefly, could you take 147, the coat, and show us how the glasses fit in there; what you described? I'll be brief after this, Your Honor.

A   Those are my reading glasses. My sunglasses was in this pocket. The reading glasses sat right up in here with the case, the eyeglasses in a case, and slid down in here.

BY MR. VICK:

Q   If January 5th, 1992 or January 4th, 1992 was the last time that you had seen Mr. Talley, when was the time that you began to smoke cocaine with him?

A   When was the time I began to smoke? It was about, I guess, about two months before we were smoking.

Q   November and December of 1991?

A   Yes.

Q   Now, why didn't you want to give up the address that you were asked about on cross-examination?

MR. BAUGH: Objection.

THE COURT: Sustained. Anything else?

MR. VICK: No.

MR. BAUGH: In light of that, the Court's ruling this morning concerning our asking the Court -- the Court's ruling that we had outside the presence of the jury, we would ask now the Court to suspend that order so we can make inquiry.

THE COURT: No. Do you have any other examination you wanted to do with this witness?

MR. BAUGH: Just a little bit, if I might, please.

RECROSS-EXAMINATION

MR. BAUGH: I would ask the United States to tender any documents that might have been found in the papers of that coat.

MR. VICK: Counsel has seen all of the documents we have.

BY MR. BAUGH:

Q   Did Mr. J.J. Cox show you the VA papers? Strike that. Isn't it true they stopped you at the VA Hospital going in on February 24th?

A   Who, the detectives?

Q    Yes.
A    Stopped who?
Q    Withdrawn.  Have you seen your glasses since then, or the case?
A    No.
Q    Thank you.
          MR. BAUGH:  Pass the witness.
          THE COURT:  All right.  The witness may be excused.
          MR. VICK:  We will, just for everyone's edification, need to set up a TV screen.
          THE WITNESS:  Can I say one thing, please?

          THE COURT:  No, sir.  You only respond to questions.
     (Witness left the courtroom.)
          MR. BAUGH:  Excuse me, Your Honor, the witness is muttering.
     (Witness muttered unintelligible words as he left the courtroom.)
          THE COURT:  All right.  We are going to take about a ten-minute break.  Everyone remain seated while the jury leaves the courtroom.
     (The jury left the courtroom.)
     All right, remove the defendants.
     (The defendants were removed from the courtroom.)
     (Recess taken from 11:25 a.m. to 11:35 a.m.)
          MR. VICK:  Your Honor, prior to the jury coming in, we needed to set this up now.  As you can see it is fairly large, but there will be some witnesses who testify prior to getting the videotape.  So that will be in the way.
          THE COURT:  All right.  Well, I think the jury will be able to see the witness.  All right, bring the jury in.
     (The jury entered the courtroom.)
     All right, call your next witness.

          MR. PARCELL:  Officer Sherry Gay, please.
                    SHERRY L. GAY,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
                    DIRECT EXAMINATION
BY MR. PARCELL:
Q    Ma'am, would you please state your name?
A    Officer Sherry L. Gay.
Q    Your occupation?
A    Police officer, Richmond Bureau of Police.
Q    Were you so employed in that capacity on January 5th, 1992?
A    Yes, sir.
Q    Assigned to what precinct?

A    Second Precinct, Southside.

Q    Did you have occasion to respond to 13th and Stockton in the City of Richmond to investigate a suspicious vehicle?

A    Yes, sir.  On January 5th.

Q    Would you please tell the ladies and gentlemen of the jury who you were with and what time you arrived?

A    At approximately 7:50 in the morning we received a radio call to respond to 13th and Stockton, that there was a black male hanging out the driver's side of the car.

Q    Did you respond to that location?

A    Yes, sir.

Q    Would you please tell the jury what you found when you got there?

A    When I arrived there, I saw a grayish-colored vehicle.  The driver's side door was open.  There was a black male hanging out the driver's side.  One of his hands was on the ground.  His head was hanging out.  There was a big puddle of blood, like he had been stabbed several times in the back of the head.

Q    I show you what's been labeled Government Exhibit 1-2.  Does that represent when you found when you got there?

A    Yes, sir.

       MR. PARCELL:  This will be Government Exhibit 1-2.  I'll ask it be passed to the jury.

       THE COURT:  Have you all seen that?

       MR. McGARVEY:  We haven't seen the color picture.

    (Document proffered to counsel.)

       MR. BAUGH:  We would object.  There is no need to publish it at this time.  It is not any more dispositive than what's on the videotape.  We have already seen that.

       THE COURT:  If we can take time, I think he is right.  It will be admitted.

BY MR. PARCELL:

Q    You and your colleagues did what to protect that crime scene until the detective and forensics technician got there?

A    Automatically we roped the whole area off.

Q    To keep it from being contaminated by  --

       MR. BAUGH:  Objection to the leading.

BY MR. PARCELL:

Q    Why did you rope it off?

A    To keep anything from contaminating the crime scene.

Q    And then the detectives did arrive?

A    Yes, sir.

Q    Can you tell the jury whether anybody went to

**JA674**

that vehicle prior to Detective Wayne Hines arriving to process it?

A    No, sir.

MR. BAUGH:  Excuse Your Honor, there are no issues in controversy concerning the crime scene or the chain of custody from the crime scene, if that would help, Your Honor.  Counsel does not have to accept it, of course, but we would offer the stipulation.

MR. PARCELL:  I have no further questions.

THE COURT:  Fine.  Any questions?

CROSS-EXAMINATION

BY MR. GEARY:

Q    Officer Gay, what time was it when you got to 13th and Stockton?

A    Approximately 7:55 a.m.

Q    How many other officers were there within five or ten minutes?

A    Within five or ten minutes  --

Q    Let me ask you this.  What time do you think you had the crime scene cordoned off with the yellow tape?

A    We did it within five minutes.

Q    Okay.  Do you know what time Detective Hines got there?

A    Yes, sir.  Detective Hines got there about 8:25.

Q    Was there a large crowd gathering in the process while the police cars were there?

A    Yes, sir.

Q    Do you remember seeing people on the corners?

A    Yes, sir.  Some people.

MR. GEARY:  No further questions.

THE COURT:  Any other questions?

MR. McGARVEY:  No questions, Your Honor.

MR. BAUGH:  I just observed that the witness was reading from something, Your Honor. Could we have those notes, please?

THE COURT:  Go ahead.

MR. VICK:  They have been previously provided.

MR. BAUGH:  All right.  No questions.

MR. WAGNER:  No questions.

THE COURT:  Ma'am.  You may stand down. Thank you very much.

(Witness stood aside.)

Call your next witness.

MR. PARCELL:  Detective Wayne Hines, please.

WAYNE HINES, called as a witness by and on behalf of the government, having been first duly sworn by the

Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Sir, would you please state your name?

A   My name is M. Wayne Hines.

Q   Your occupation?

A   I'm a detective with the Richmond Bureau of Police assigned to the forensic unit.

Q   Would you please explain to the ladies and gentlemen of the jury what you mean by being assigned to the forensic unit?

A   Yes, sir.  The forensic unit is part of the Violent Crimes Section of the Richmond Bureau of Police Detective Division.  We do investigations of crime scenes that involve physical evidence, the collection and preservation, the labeling and so forth, of that evidence.  We do the photographic work and videotaping of the scenes.

Q   What training have you had to qualify you to be a forensic detective?

A   Numerous state-sponsored classes.

MR. GEARY:  Defendant Tipton will not challenge the qualifications of the expert witness.

THE COURT:  All right.

MR. BAUGH:  Same.

MR. McGARVEY:  Likewise.

THE COURT:  Go ahead.

BY MR. PARCELL:

Q   Were you so employed as a forensic detective on January 5th, 1992?

A   Yes, sir.

Q   Did there come a point in time when you received a call to go to 13th and Stockton in the City of Richmond south of the James?

A   Yes, I did.

Q   Would you please tell the ladies and gentlemen of the jury what time you arrived at that location and, when you arrived, what if anything you were confronted with?

A   I arrived at 13th and Stockton at quarter after eight on that morning.  The scene had already been secured by other officers.  There was crime scene tape around and there was a Chevrolet vehicle with the driver's door open and the remains of an individual partially out of the car.

MR. PARCELL:  I will ask he be allowed to see Government Exhibit 1-2.

(Photograph proffered to witness.)

BY MR. PARCELL:

Q   Does that photograph mean anything to you?

A   Yes, sir.  That would be the condition of the vehicle when I arrived.

**JA676**

Q   And I will ask you to look at this diagram, which has been labeled Government Exhibit 8. Would you please identify this photograph, and detail that photograph?

A   Yes, sir. I had this photograph taken by an aviation unit and I labeled it.

MR. PARCELL: I would ask he be allowed to approach the ladies and gentlemen of the jury and explain to them the streets and where he found the automobile within that diagram.

THE COURT: All right. Sure.

(Witness approached jury.)

(Counsel approaching jury.)

THE COURT: Go ahead.

THE WITNESS: This is Stockton Street running in this direction, so labeled in red for those of you if you can see it. 13th Street intersects Stockton Street. The vehicle that I was discussing as displayed in that picture was parked right here where this red arrow is and was facing towards the intersection of 13th and Stockton. The car was facing in this direction.

(Witness displaying photograph to the jury.)

(The witness resumed the witness stand.)

MR. PARCELL: The government would move the introduction of Government Exhibit 8, please.

MR. GEARY: No objection.

THE COURT: What number again?

MR. PARCELL: Number 8.

MR. GEARY: May I have the exhibit when the Clerk is finished with it?

THE COURT: Sure.

MR. PARCELL: May I have 1-1 and 1-2, also, please?

(Photographs proffered to counsel.).

THE COURT: Give Mr. Geary Number 8.

(Document proffered to Mr. Geary.)

BY MR. PARCELL:

Q   Would you identify -- you have already identified Government Exhibit 1-2. Identify if you can Government Exhibit 1-1 and 1-3, 4, 5, 6, and 7.

MR. PARCELL: May he be allowed to reapproach the jury and explain these photographs?

THE COURT: All right. After they have been identified and admitted, certainly.

BY MR. PARCELL:

Q   Who took those photographs?

A   I did, sir.

MR. PARCELL: They will be Government Exhibit 1-1 through 1-7. 1-2 has already been introduced as well as 1-1.

THE COURT: Hearing no objection, they will

**JA677**

be admitted.

THE COURT: All right, Detective Hines, you can stand down.

(Witness approached jury.)

THE WITNESS: Ladies and gentlemen, this shows the vehicle as I approached from the driver's side. As you can see, the victim's hand is on the street right there. Looking into the doorway, this is a photograph of the victim inside the car behind the wheel, partially out of the car. That's the condition I found him in when I arrived.

MR. BAUGH: You might want to admonish the witness to keep his voice up.

THE COURT: Be sure to speak up.

MR. PARCELL: I would ask that detective Hines identify each photograph as 1-1, 1-2 as he describes them.

THE COURT: Let's identify them by the exhibit number. And jurors, take a good look, but rest assured you will have an opportunity to see these pictures all you want.

THE WITNESS: 1-1 represents the picture of the car as I approached from the driver's side. 1-2 is looking into that open door. And there is the victim behind the steering wheel of the car with the door partially opened. 1-6 is a photograph of the driver's door and the other frame and what appeared to be some ridge detail near that frame, ridge detail from fingers or palms. I put a scale next to the car when I took the picture so we could preserve it for evidence.

1-5, a similar photograph with the scale included. 1-4 is a photograph of the backseat on the passenger's side and it shows some stain and a cigarette butt. There is a scale, a small ruler laying on the seat to show approximate size and relative position within the seat. This is a close-up photograph, 1-3, which shows actual lines or ridges on the seat with a scale to show their size in reality. This is a one-inch scale, six inches. Each one of these was an inch. 1-7 is the front passenger's door of the automobile. And it shows some apparent ridge detail with smearing and there is a scale that was placed on it to show the size and relative location on that window. That's all of the photographs, ladies and gentlemen.

THE COURT: All right.

(Witness resumed witness stand.)

BY MR. PARCELL:

Q   Would you please tell the ladies and gentlemen of the jury in regards to 1-5, 1-6, and 1-7, as well as 1-3, 4, and 5, what drew your attention to those

**JA678**

particular markings within that vehicle?

A    There was a great deal of what appeared to be blood all over the inside of the car.  And there is some places on the outside.  These particular things that I mentioned appeared to have ridge detail in them appeared to be in that same medium.  It appeared to be some type of perhaps body fluid.

Q    That was what was depicted in 1-3, 4, 5, 6, and 7; is that correct?

A    If I may look once again.  1-7, the detail in 1-3 and 1-4 on the seat cushion, 1-5, and 1-6.  Yes, sir.

Q    There came a point in time when you attempted to lift prints from that vehicle; is that accurate?

A    That's correct.

Q    I'll show you this, which has been labeled Government Exhibit 102, Judge.  Sir, I'll ask you to look at this item and identify it if you could for the ladies and gentlemen of the jury.

(Document proffered to witness.)

A    Yes, sir.  This is a lift that I made off of the Caprice.

Q    Is that the same ridge detail that you observed in the photograph in what's been labeled Government Exhibit 1-7?

A    Yes, sir, it is.

Q    And will you explain to the ladies and gentlemen of the jury what markings if any you made on the back of that latent print to identify its origin?

A    I have the date, the license number of the automobile, the description of the automobile, the location is referenced as passenger's side front window.  The physical location, 200 13th Street.  That it was processed at the scene by me.  It has my code number on it, and a rough sketch of the location on the one the way I recovered it.

MR. PARCELL:  That will be Government Exhibit 102, please.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask that the witness be shown Government Exhibit 137-1, 2, 3, and 4, Judge.

THE COURT:  All right.

(Exhibits proffered to witness.)

BY MR. PARCELL:

Q    Sir, do those items mean anything to you?

A    Yes, sir.

Q    Identify them if you would, sir.

A    This coat was found laying in the rear floorboard of that car, laying on the driver's side in the rear floorboard.  And these items were inside

the coat.

Q    Would you explain to the ladies and gentlemen what you mean by a lift or ridges when you removed that item from the vehicle?

A    All right.  If you will look at your hands, you will notice that on your hands and fingers there appears to be lines.  Some of them run circular, some of them run across the fingers.  If you look in the palm you will see the same type of lines.  Not the flex lines of your palm, but the little ridges.  These ridges are present on everyone's hands, fingers, feet, and toes.

On these ridges are small sweat glands that exude different fluids from your body.  When you touch something and you move your hand from it, you can leave an impression.  We call it a latent impression; that is, not readily visible until some type of procedure or process is applied to it to make it visible.  In this particular case, this lift, I used something called black powder, which is carbon black, took a light brush and brushed it around, and it adhered to that ridge detail and made it more visible.  I then took a piece of tape and simply ran it across the location of those ridges, pulled it up evenly, and applied it to a white background, which made the ridges stand out more so they are more easily seen and examined.

That's all that's involved in lifting a fingerprint.

Q    And these things you have talked about, these ridges, the common term is called a fingerprint?

A    That's correct.

Q    And your attention was drawn to what's been labeled Government Exhibit 102 because of this appearance on the right passenger window; is that correct?

A    1-7, yes, sir.

Q    That was the photograph 1-7?

A    Yes, photograph 1-7.

Q    As you continued your processing of this crime scene, did there come a point in time when you had occasion to video that crime scene?

A    Yes, sir.

MR. PARCELL:  I would ask that the video crime scene be shown for identification purposes by Detective Hines.  He can explain to the ladies and gentlemen of the jury what that crime scene meant to him and what he did in relation to that crime scene.

THE COURT:  All right.  We will show the video.  Counsel, you can move around as you wish.

(Videotape played.)

BY MR. PARCELL:

Wayne Hines (Cross)

Q    Detective Hines, you may describe, sir, what these things were as you go through the crime scene video.

A    The street sign was the first thing we saw. Then we moved in toward the driver's side of the automobile. You are now looking in through the driver's open door. That's the way I found the vehicle when I arrived. You will notice the fluids are still dripping. They have not coagulated entirely. That's a rear view of the automobile. And you can see its relative position toward the intersection. That's the view of the passenger's side. That's what was represented in photograph, I believe it is number 1-7. It is the lift that I was shown a little while ago.

Q    The 1-7 photograph?

A    That's right. That's showing that part of the passenger rear seat that had the cigarette butt and the scale I showed the photograph of.

(Videotape ended.)

Q    You made that video; is that correct?

A    Yes, I did.

1508

MR. PARCELL:  Pass the witness.

THE COURT:  Mr. Geary, any questions?

CROSS-EXAMINATION

BY MR. GEARY:

Q    Detective Hines, judging by the time that's showed on the video, you were over there filming by about twenty after eight that morning; is that correct?

A    Yes, sir.

Q    And were there a number of police officers there with you at that time?

A    Yes, sir.

Q    And the area was cordoned off. When you began your examination, what did you do first, take the video first?

A    Yes, sir.

Q    And approximately how long after you took the video did you begin to dust for fingerprints?

A    It was sometime afterwards. My normal procedure in a situation like this, sir, is to when I first get there, approach whoever is in charge of the scene, determine what in fact I have to work with, then I videotape. Next I'll take still photographs, and then I will actually begin to get inside and collect the evidence and process for fingerprints. The last

1509

thing that I did before I left that car was to collect the contents inside the car and process for fingerprints.

MR. GEARY:  May I have the aerial photograph and the photographs that are referred to

**JA681**

as 1-7 and 1-6?

(Documents proffered to counsel.)

BY MR. GEARY:

Q    So we can have the location, when you pointed out to the jury Stockton Street, 13th Street is a one-way street; is that correct?

A    I believe so.  Yes, sir.

Q    And is Hull Street over here somewhere?

A    Hull Street would be --  13th Street would be running in the direction of Hull Street.

Q    Over here.  And Stockton is an up-and-down street, traffic on both sides?

A    Yes, sir.

Q    The car that you found was about 15 or 20 feet from that pole that says Stockton and 13th; is that correct?

A    If I can refer to my notes, I'll be glad to give you the information.  The front of the vehicle was 28 feet and seven inches from the southeast corner of 13th and Stockton.

1510

Q    Pointed towards Hull Street; is that correct?

A    Pointing towards Stockton and Hull, yes, sir.

Q    And these photographs were the second things you would have done, is that correct, after you took the video?

A    Yes, sir, that's correct.

Q    And then the next thing would have been the processing of the car?

A    To look on the interior of the car and see what was involved inside the car that needed to be processed and what needed to be collected.

Q    In addition to the coat that's been introduced, and the items in the coat, what if anything did you remove from that car?

A    I removed the key ring.  There was a key for the trunk that I found in the automobile.  From inside the car, also, there was a package of Certs that I found on the seat.

Q    Let me ask you this:  How about the ignition key?  Was that in the ignition when you got there?

A    Yes, sir.

Q    It was --

A    No, sir, that was on the driver's floorboard.

Q    The keys were in the floorboard; is that correct?

1511

A    Yes, sir.

Q    What else did you find?

A    Found a calendar book in the trunk of the automobile.

Q    I'm not talking about the trunk now.  Just the contents of the car.

A    The victim's clothes.

**JA682**

Q    Did you find a registration?

A    No, sir.

Q    Did you determine who owned the car?

A    Detective Cox got into who owned the car and so forth, sir.  I wasn't involved in that evidence.

Q    When you began to process the car, when you began to look for things to dust, did you dust every window in the car?

A    Yes, sir.

Q    Did you dust the items inside the car that are normally dusted to see if there are ridges or fingerprints to be found?

A    Yes, sir.

Q    Would you tell the members of the jury in terms of the interior of the car, what did you dust for fingerprints?

A    I dusted the rearview mirror, the driver's area around the -- that I could get to in the driver's area.  One of the problems I had in processing some of this was there was a large amount of blood that would preclude actually using a dust processing of that particular area.  I dusted the interior of the windshield, actually around the outside of the chrome areas, the exterior of the car around all four doors, the interior windows, and the door handles on the inside.

Q    In regard to the interior of the car, did you recover what you call a latent fingerprint or fingerprints?

A    I didn't recover any ridges of value inside the car, no, sir.

Q    So you did not recover any fingerprints of Douglas Talley; is that correct?

A    That's correct.

Q    You are telling the jury there was nothing of value in terms of ridges or fingerprints located on the inside of this car that's identified by the Government Exhibit 1-1; is that correct?

A    That's correct.

Q    You then dusted the outside of the car; is that correct?

A    Yes, sir.

Q    Did you dust anything besides the windows?

A    On the exterior of the car?

Q    Yes, sir.

A    Yes, sir, around the door handles, the doors, the roof of the car, the area of the car that extends out past the windshield, the upper fender, so forth.  And along the edges of the trunk, around the rear of the trunk, near the lock, and on top of the trunk.

Q    Did you recover what you call latent fingerprints anywhere on the exterior of the car

besides the right passenger window?

A    No, sir.  Nothing of value.

Q    The exhibit that you have identified and the government has asked you to talk about, 1-7, what window is that in the car?

A    The front passenger door.

Q    So for Exhibit 1-1, what you are talking about is the door over here where the police officer is standing; is that correct?  The right passenger door.

A    Yes, sir, front door, passenger side.

Q    When did you bring whatever you found on that door to the attention of the Commonwealth's Attorney's Office for the City of Richmond?

A    That was all reported in my packet when I turned it over to Detective Cox.  When he brought it to the

attention of the Commonwealth's Attorney, I don't know, sir.

Q    When did you, as far as you remember, Detective Hines, when did you turn your package over to Detective Cox?

A    That would have been sometime within that week.

Q    The week of January 5th?

A    Yes, sir.

Q    And Detective Cox would be the detective who was assigned the homicide; is that correct?

A    Yes, sir.

        MR. GEARY:  No further questions at this time, Your Honor.

        THE COURT:  Any questions for from Mr. Cooley or McGarvey?

        MR. COOLEY:  No questions.

        MR. McGARVEY:  No questions.

        MR. BAUGH:  No questions.

        MR. WAGNER:  No questions.

        THE COURT:  Any redirect?

            REDIRECT EXAMINATION

BY MR. PARCELL:

Q    In regard to 1-7, the lift of the latent off the front passenger window, would that have been some type of body fluid to you?

        MR. GEARY:  Objection, calls for a conclusion.

        THE COURT:  Sustained.

        MR. PARCELL:  They have agreed to his qualifications as an expert.

        THE COURT:  Sustained.

BY MR. PARCELL:

Q    What drew your attention to this?

A    It was a reddish-brown color and it appeared to be smeared.

        MR. PARCELL:  That's all, sir.

THE COURT: All right, sir. You can stand down. Call your next witness.

(Witness stood aside.)

MR. PARCELL: May we approach?

(At Bench.)

MR. VICK: He is on his way yet. We are getting close. If we could have recess for lunch now, our witnesses will move more quickly after lunch. The next witness is not here yet. He should be here any minute.

THE COURT: We will stop.

(In Open Court.)

THE COURT: Ladies and gentlemen, we are going to stop early for lunch to get witnesses in place. If you all could come back at 1:15, we will get started with the afternoon session. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, Mr. Marshal, remove the defendants.

(The defendants were removed from the courtroom.)

We will be in recess until 1:15.

(Luncheon recess taken from 12 o'clock p.m. to 1:15 p.m.)

MR. PARCELL: One thing, if I may. I've advised counsel that I need to call Detective Hines back for one question that I overlooked.

MR. GEARY: No objection.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT: All right. We had a few more questions for Detective Hines.

REDIRECT EXAMINATION (Cont'd.)

BY MR. PARCELL:

Q   Detective Hines, as you were processing, viewing the exterior of the vehicle, Mr. Talley's vehicle, did you make any other observation of the vehicle which had any significance to you?

A   Yes, sir. There was a dent on the driver's door just forward of the handle on the door.

Q   Did you pick that up in the photographs that the jury saw earlier?

A   Yes, it was visible.

MR. PARCELL: No further questions.

THE COURT: Anything based on that?

MR. GEARY: No, Your Honor.

MR. BAUGH: No, Your Honor.

THE COURT: Fine, you may be excused.

(The witness stood aside.)

MR. VICK: The government would call Deputy Richard Farmer.

**JA685**

## II. Richard Farmer (1517)

RICHARD FARMER, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    Richard Lee Farmer, Jr.

Q    And you are employed how?

A    I'm employed now as a Sergeant in Patrol for Hanover County Sheriff's Department.

Q    How long have you been a police officer?

A    Since August of 1979, going on 14 years.

Q    In April of 1992, specifically on April 30th, 1992, what was your assignment?

A    I was assigned to the Drug Enforcement Administration Task Force out of Richmond, sworn under federal authority as a Task Force officer.

Q    Did you have occasion to become involved in the investigation that led to the indictments in the instant case pursuant to that assignment?

A    Yes, sir. I was assigned through the DEA office to assist Richmond Narcocide in an ongoing homicide investigation.

Q    Specifically, on April 30th, 1992, did you have occasion to come in contact with defendant Richard Redfield Tipton?

A    Yes, sir, I did.

Q    Also known as "Whitey?"

A    Yes, sir, I did.

Q    Could you tell the ladies and gentlemen of the jury the circumstances surrounding your encounter with him?

A    I responded to the U.S. Marshal's Office, which I believe is located right next to this room here, and it was to help process and fingerprint and photograph several individuals who had been arrested under indictments handed down.

Q    Do you see Mr. Tipton in the courtroom today?

A    Yes, sir, I do.

Q    Could you describe what he is wearing?

MR. GEARY:  Stipulate identification.

MR. VICK:  Record so reflect.

BY MR. VICK:

Q    I show you what has been previously marked Government Exhibit 101 and ask you if you can identify that.

(Document proffered to witness.)

A    This is a fingerprint card, a federal

**JA686**

fingerprint card that I used to fingerprint Mr. Tipton on the 30th of April.

Q    Have you had occasion to review that fingerprint card prior to your testimony here today?

A    Yes, sir, I did.

Q    Is there handwriting on there that's familiar to you?

A    Yes, sir, the handwriting in the black where my signature is, and the date and then the personal information in the black that says Richard Redfield Tipton, "Whitey," different height, weight, eye, hair color, and date of birth are what I put on there.

And then the signature above it, I put an X there indicating where Mr. Tipton should sign, and he signed it in front of me.

Q    How did you prepare that card, the fingerprints themselves?

A    I rolled them myself in a room in the Marshal's Office.

Q    And whose hand did you use to roll those prints

A    Richard Tipton's.

Q    Are those his known fingerprints on that card?

A    Yes, sir.

Q    How many times have you prepared fingerprint cards of that sort?

A    I would have to say as little as 500, as many as 800.

Q    And did Mr. Tipton sign that card after you prepared his fingerprints?

A    Yes, sir, he did.

Q    Rolled his fingerprints.

A    Yes, sir.

        MR. VICK:  I have no further questions.

        THE COURT:  All right.  Mr. Geary?

        MR. VICK:  I would move Government Exhibit 101 into evidence.

        MR. GEARY:  No objection.

        THE COURT:  Admitted.

                CROSS-EXAMINATION

BY MR. GEARY:

Q    Sergeant Farmer, the indictments that you are speaking of and the arrest thing of Mr. Tipton and the fingerprinting on April 30th, those indictments is this case; is that correct?

A    As far as I know, yes, sir.

        MR. GEARY:  Thank you, no further questions.

        THE COURT:  All right.  Anything from anybody else?

        MR. BAUGH:  No questions.

        THE COURT:  All right.  You may stand down, sir.

**JA687**

(Witness stood aside.)

MR. VICK:  The government would call George Wynn.

## III. George Wynn (1521)

GEORGE WYNN, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    George D. Wynn.  The last name is spelled W-Y-N-N.

Q    And Mr. Wynn, how are you employed?

A    I'm employed by the Federal Bureau of Investigation as a fingerprint specialist.

Q    And how long have you been so employed?

A    I've been with the FBI approximately 32 years.

MR. GEARY:  Stipulate as to expertise.

THE COURT:  All right.

BY MR. VICK:

Q    In your term as a fingerprint analyst for the FBI, approximately how many fingerprints have you had occasion to analyze?

A    During the period of some 32 years, while I haven't kept an exact record of the number of prints I have compared or analyzed, I would say that that number would easily run into the millions, perhaps 10 to 12 million.

Q    Could you explain to the ladies and gentlemen of the jury what a latent fingerprint is?

A    Yes, sir.  A latent fingerprint is an outline or an impression of the ridges present on the fingers. And that statement would also be true of the palms. An outline of a print left by a finger or a palm in sweat or some foreign substance when the finger touches a surface.  Generally, a latent print cannot be seen.  Those prints have to be treated either with powders or chemicals in order so that they can be seen and be made useful for comparison purposes.

Q    Could you tell the ladies and gentlemen of the jury what an ink fingerprint is, or a known fingerprint?

A    Likewise, a known fingerprint is simply a reproduction of the ridges present on the fingers using a different substance to reproduce those prints, generally black printer's ink.  Now, ink prints are almost always much more clear than are latent prints.  Ink prints are recorded, again, by

**JA688**

George Wynn (Direct)

placing a thin film of printer's ink on a smooth surface.  To get a print of that finger, all one has to do is roll the finger in the ink and then place that finger on a suitable contrasting background, which generally consists of a standard fingerprint card.

Q    How are fingerprint comparisons made in your line of work, Mr. Wynn?

A    Fingerprints are compared by comparing the basic ridge structure in the two prints to determine if those prints originated from the same source.

1524

Q    When you say the two prints, do you mean the latent print and the known fingerprint?

A    That is correct.  And to compare latent prints and ink prints, one looks at four basic characteristics.  That would be the ending ridges present on the fingers, the dividing ridges, the dots, and the closure formations.  These characteristics form the basis whereby one compares two prints, one with the other.

Q    Are fingerprints specific as to each individual?

A    Absolutely.  The two basic premises on which fingerprint identification rest are the fact that the ridge arrangement of every finger of every person is different.  And this ridge arrangement is permanent from the time it is formed, which is well before the birth of the person, until that person is deceased. These basic ridge characteristics will remain the same and they can thereafter be compared by competent people to do so.  And those two prints can be matched to the exclusion of all other prints of all other persons.

Q    So is it possible for two different people to have the same fingerprint?

A    It is not possible for two different people to

1525

have the same basic ridge fingerprint characteristics appearing in the same general position.

Q    Now, based upon your knowledge and expertise, can you state that to a scientific certainty?

A    Yes, sir, I can.

Q    Have you had occasion to compare the known fingerprints of one Richard Redfield Tipton to a latent fingerprint forwarded to you from the Richmond City Bureau of Police?  I will show you what has been marked Government Exhibit 101 and 102.

    (Documents proffered to witness.)

A    Yes.  Exhibit 101 consists of a standard fingerprint card on which appears the ink prints of ten fingers indicated as being fingerprints of Richard Redfield Tipton.  And Exhibit 102 consists of a fingerprint lift.  Now present on the lift, Exhibit

**JA689**

Number 102, were two latent fingerprints of value for identification purposes.

Q  Go ahead.

A  Those two prints appearing on Exhibit 102 were compared by me with the ink prints present on Exhibit 101, and I found that those two prints were made by the same two fingers that made the prints appearing in the left middle and the left ring finger block of that card, which is Exhibit 101. Now, those prints

1526

are again the left middle finger, which would correspond to this finger, and the left ring finger, which would correspond to the second finger that I am holding up presently. (Witness indicating.)

Q  Now, did you prepare a chart enlargement illustrating the identification?

A  Yes, sir, I did.

Q  Do you have that with you?

A  Yes, I do.

Q  Could you please show that to the jury and explain to them exactly what process you went through and how the identification was made?

THE WITNESS: Your Honor, if I might stand down to do this?

THE COURT: Sure, move down in front of the jury. And counsel, you can move as you desire.

(Witness approached jury.)

THE WITNESS: The pictures I'm holding in front of you consist of one of the fingerprints from the lift, Exhibit 102, and the corresponding portion of the left ring finger from the fingerprint card of Richard Tipton, Exhibit 101. Now, I mentioned earlier the comparisons are based on matching the characteristic points of detail present in the two prints. And in those two prints I have marked nine

1527

corresponding points of identity. In addition to these points, there are other points present, keeping in mind that there is no specified number of points required to make an identification.

Now, if I might have your attention just briefly, please, to illustrate some of the points which I have marked. You look at the portion of the ink print marked  --  the portion of the exhibit marked "Ink Fingerprint," upper portion of the photograph, there is a Number 1 drawn to the end of a ridge. The ridge, of course, is the skin formation present on the fingers and the palms. From point number one with no ridges intervening and upward, this ridge joins the one above it with one ridge ending in upward, the ending ridge marked point number three. In order for two prints to have come from the same finger, the same source, we must go to the latent print or the print present on the lift,

**JA690**

George Wynn (Direct)

find the same points of identity occupying the same position on both prints.  And if you look at the latent print, point number one, point number two, and point number three correspond to the ridges marked on the fingerprint portion of the chart.

Now, all the other points that I have marked would be explained in simply the same manner.  That is to say, that they correspond to the ridges present on the latent print.  And it is on this basis that I found, after careful consideration in comparing these prints, that this print, which is present on the lift, Exhibit 102, and this print, which is present on the fingerprint card of Richard Tipton, were made by one and the same finger.

In addition to that, there is present on the lift Number 102 an additional print that came from the same source or the same finger as the finger that made the print appearing in the Number 8 fingerprint block card present on this exhibit.

BY MR. VICK:

Q    If I could interrupt, on the blow-up chart here, which finger is that that that represents?

A    The blow-up you are looking at presently represents the Number 9 or the left ring finger. That print would correspond to the print in the Number 9 fingerprint block on this card.

Now, you will notice that the latent print has on there a number of dark-looking streaks.  Folks, this is nothing more than a smear or a moving motion of the finger after the print was placed down.  So it gives it that smeared effect.  And in this case, that had nothing to do with my ability to say that these two prints came from the same finger.  And it is my opinion that the prints present on the lift, Exhibit 102, came from the same person that left prints on the card, Exhibit 101.

Q    Mr. Wynn, as to the blow-up --

MR. VICK:  In fact, we could probably go back to the podium and ask the rest of the questions.

(Witness resumed witness stand.)

BY MR. VICK:

Q    As to the material you brought to demonstrate your testimony, there are noted on there from that finger nine separate points of identification.  Are they the only points of identification that you made on that particular finger?

A    No, sir.  In addition to those nine points of identification on that particular print, I found about six or seven additional points that could have been marked also.

Q    And in addition to the analysis that you have made of the fingerprint noted in your demonstration

chart, did you also analyze the other finger for points of identification?

A    Yes, I did.

Q    And did you indeed find points of identification on that finger consistent with the known print of Richard Tipton?

A    That's correct.  On the second print present on the lift, Exhibit 102, both prints were compared, and in both prints I found more than a sufficient number of points of identity to match with the known ink prints.

Q    Now, was there prepared pursuant to that analysis a report indicating the results of the analysis?

A    Yes, sir, there was.

Q    I'll show you what has been previously marked Government Exhibit 99 and ask if you can identify that.

     (Document proffered to witness.)

A    Yes, Exhibit 99 is the report that was prepared after the examination was conducted, and this report was returned to the contributor here in Richmond.

Q    Based upon your expertise in the field of fingerprint analysis and your examination, can you state to a scientific certainty that indeed the fingerprint left, picked up on latent 102, is the same as those fingerprints on the known print, Exhibit 101, of Richard Redfield Tipton?

A    Yes, I can state absolutely that the prints present on the lift were made by the same fingers that made the two prints present on the fingerprint card.

          MR. VICK:  I would move Government Exhibit 99, 99-2, the chart, 101 and 102 into evidence.  I believe 101 and 102 are already in evidence.  I have no further questions.

          THE COURT:  They will be admitted.  Mr. Geary?

                    CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Wynn, for purposes of the next few questions, could you assume that what you call the lift on 102 came off glass?  If I were to walk up here to one of these monitors --

          MR. GEARY:  Judge, may I?

          THE COURT:  Go ahead.

     (Counsel demonstrating.)

BY MR. GEARY:

Q    If I were to put my ring and middle finger on some glass here?

          MR. VICK:  I would note that Mr. Wynn can't see.

**JA692**

BY MR. GEARY:

Q    If I were to put these fingers here, press them here, how long in your opinion would those prints last?

(Counsel redemonstrated for the witness.)

A    As to the length of time that those prints would remain, I could not say.

Q    Well, is glass considered a good conductor of fluids that are in the fingers so that the print would stay on glass longer than some other substances?

A    Not necessarily, no.

Q    Well, as an expert, Mr. Wynn, tell the jury in terms of substances how long to expect a print to last on glass if it was left on this TV monitor.  If the monitor was left here, we all left the room and didn't come back for six months, would you expect as an expert to find those prints on that monitor?

A    Now, with regard -- I'll state again, with regard to the length of time those prints will remain, I do not know.  I don't know.

Q    Is there an expert in the field that would know how long a fingerprint would last?

A    Not to my knowledge.

Q    But you are an expert for the FBI; is that correct?

A    I have qualified to testify regarding latent prints many times, yes.

Q    Is your expertise solely limited to identifying a print as to, for instance, your expertise as to that this and this are the same?

(Counsel displaying Exhibits 101 and 102.)

A    Generally speaking, my time has been spent comparing and identifying prints, yes.

Q    Do you have any expertise, Mr. Wynn, in regard to the lifting of fingerprints; of being able to testify, for instance, if somebody were closing a door, put their hand or fingers on a door, how long those fingerprints would stay on that door?

A    I do have experience in preparing print lifts. However, I do not know of any way to determine specifically how long a latent print will last once it has been deposited on the surface.

Q    Would it be fair to say that if a lift is taken from a piece of glass, say, on January 5th, 1992, you would not be able to say whether the person who made that lift with his ring and middle left finger made that impression on January 5th, January 4th, January 3rd, January 2nd, or whenever; isn't that correct?

A    Could you repeat that, sir?

Q    Mr. Wynn, you are not testifying to when a fingerprint is made.  My question is, simply, if the

evidence in this case, for instance, were that the lift was made on January 5th, 1992 off a piece of glass, you are not telling this jury that that impression would have been made that day, or on January 4th, or January 3rd, or January 2nd, or in December; is that correct?

A    That is correct.

MR. GEARY:  Thank you.  No further questions.

THE COURT:  Any questions, Mr. Cooley and Mr. McGarvey?

MR. McGARVEY:  No, Your Honor.

MR. COOLEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

REDIRECT EXAMINATION

BY MR. VICK:

Q    As to the assumptions that Mr. Geary asked you to make, Mr. Wynn, indeed if this print had been left upon a finger, on a piece of glass outside of an automobile that was exposed to the elements, would that have an effect, the elements, on how long that fingerprint would last there?

A    Oh, absolutely.  Yes, indeed.

Q    What indeed could affect that print?

A    That would depend upon a number of things. First of all, what the print was deposited in; secondly, the extent of the atmospheric conditions, the heat, the cold, whether the print had been wet in the interim, and any number of things.

Q    If indeed that car and that print had been left and that car had been exposed to the elements, the chances of picking up a print like that are less?

MR. GEARY:  I think that's total speculation.

THE COURT:  Sustained.  Anything further?

MR. VICK:  I have no further questions.

THE COURT:  All right.  You may stand down, sir.

(Witness stood aside.)

Call your next witness.

MR. PARCELL:  Ms. Rebecca Talley, please.

## IV. Rebecca Talley (1536)

REBECCA TALLEY, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?
A    Rebecca Talley.
Q    Ms. Talley, do you know somebody by the name of

1536

Douglas Talley?
A    He is my ex-husband.
Q    How long were you married?
A    Eight years.
Q    You had one child as a result of that marriage?
A    Yes.
Q    Did it come to your attention on or about January 5th, 1992, that he was deceased?
A    Yes.
Q    I'll show you this photograph, ma'am.  It has been labeled Government Exhibit 4-5.  Can you identify that person, if you would, ma'am?
          MR. BAUGH:  Your Honor, we would have an objection to this photograph, particularly showing it to this witness.  Please.  I would ask that the Court inspect it.
          THE COURT:  All right.  Come on up.
     (At Bench.)
          THE COURT:  Mr. Baugh?
          MR. BAUGH:  There is a picture of the deceased right over there on that wall while he was alive.  There is no need to show this photograph to this witness.
          THE COURT:  This is identification of the body.

1537

          MR. PARCELL:  That's the clearest photograph we have of him.
          THE COURT:  I don't have a problem with the picture.
          MR. BAUGH:  Note our objection.
     (In Open Court.)
BY MR. PARCELL:
Q    Can you identify that photograph, please?
A    It is Douglas.
Q    That's how he appeared after decease; is that correct?
A    Yes.
          MR. PARCELL:  That was Exhibit 4-5.
          THE COURT:  It will be admitted.
BY MR. PARCELL:
Q    You attended his funeral?  You know he has passed?
A    Yes.
          THE COURT:  Any questions for this witness?
          MR. GEARY:  No questions.
          MR. BAUGH:  No questions.
     (At Bench.)
          MR. VICK:  We have another protective

**JA695**

witness now, and I know you wanted the jury out.

1538

MR. BAUGH:  Your Honor, it is my understanding that we have forensic people listed on this witness list who could also identify the person.

THE COURT:  I can't tell the government which witness to use.

MR. BAUGH:  You can if it is done in a manner calculated to stimulate prejudice against the defendants.

THE COURT:  I could say that, but I don't see it.

MR. BAUGH:  Note our exception.

(In Open Court.)

I have to send you all out again so we can get another witness in place.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. WAGNER:  Is there any way to move the video?

MR. VICK:  It will be used with the next witness, Mr. Hussone Jones.  I would note also, just as we had noted, Hussone Jones will be the next witness.  He will probably take some time.  I know he will take a little time on direct and I imagine he will take more time on cross.  I note that it is 2

1539

o'clock.  Our next scheduled witness is also a protected witness not available until Thursday morning.  We could do some filling in with some police officers, but it would be my request of the Court that things would come in a more understandable method if we could wait to get the next protected witness.

THE COURT:  Let's see how long this takes.

(The jury entered the courtroom.)

## V. Hussone Curtis Jones (1539)

HUSSONE CURTIS JONES, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record and jury, please?

A    Hussone Curtis Jones.

Q    Mr. Jones, how old are you?

A    21.

Q    I'm going to ask you to speak up.  It is a big courtroom and it is tough for everybody to hear.  How far did you go in school?

A    Twelfth grade.

Q    Where was that?

A    Highland Springs High School.

Q    Do you have a prior work history?

A    Yes, I do.

Q    What kind of jobs did you work?

A    I worked at hospitals, factories, and construction.

Q    Do you have a prior criminal record, ever been convicted of a crime?

A    No, I haven't.

Q    Now, you are testifying here pursuant to an agreement that you have reached with the U.S. Attorney's office for the Eastern District of Virginia; is that correct?

A    Correct.

Q    Does that agreement give you immunity from prosecution based upon the words that you have told us; is that correct?

A    Correct.

Q    In other words, we can't use the words that you have given us against you to prove that you are indeed involved in this conspiracy; is that correct?

A    Correct.

Q    Have you been told whether you could indeed be prosecuted if independent evidence of your wrongdoing other than your words was found by an investigative agency?

A    Yes.

Q    You could indeed be prosecuted?

A    Yes.

Q    In order to get the use immunity that I have just outlined, what is necessary, what do you need to do?

A    Tell the truth.

Q    What would happen if indeed if were able to be shown  --

        MR. BAUGH:  In light of the Court's ruling about our questioning on this very topic, we would object to this line of questioning.

        THE COURT:  I don't have any problem with the line, but Mr. Vick, you have done it.  We have been through it a number of times.

BY MR. VICK:

Q    One last question.

        MR. BAUGH:  Are we going to be allowed to ask?

        THE COURT:  Your objection is overruled.

BY MR. VICK:

Q    What would happen if indeed we were able to establish that you had knowingly lied?

A    I would be prosecuted.

1542

Q    Do you know the defendant in this case, Mr. Richard Tipton, also known as "Whitey," or Rich?
A    Yes, I do.
Q    Take your time, get up, look around the courtroom and see if you see him in the courtroom.
A    Behind that man right there.
        MR. GEARY:  Stipulate.
        THE COURT:  All right.
BY MR. VICK:
Q    Did there come a time in 1990 when you got involved with Mr. Tipton in any illegal activity?
A    Yes, I sold drugs for him.
Q    How did it come that you ended up selling drugs for him?
A    I asked him.
Q    Where was that that you asked?
A    In Central Gardens.
Q    What did he say when you asked him?
A    He said yes.
Q    I'm going to ask you to speak up.  And did you indeed get drugs from Mr. Tipton?
A    Yes, I did.
Q    When was that in 1990, approximately what  --
A    It was during the summertime.
Q    And what kind of drugs did you get from Mr.

1543

Tipton to sell?
A    Cocaine.  Rock.
Q    Is that also  --  was it crack cocaine?
A    Cook-'em-up.
Q    Cook-'em-up.  Do you know that also to be crack cocaine?
A    Yes.
Q    What was the first time that you got cocaine from Mr. Tipton; what quantity of cocaine did you get from him?
A    It was $300 worth.
Q    What did you do with that cocaine?
A    I sold it.
Q    What was the arrangement that you had with Mr. Tipton concerning payment for that cocaine?
A    I would get 100, he gets 200.
Q    How long did it take you to sell that?
A    A day or two.
Q    Did you call packages of that sort any particular name where you would get 200, he would get 100?
A    Yes, two to one.
Q    What did you do after you had sold that cocaine?
A    I would go get some more.

1544

Q    How soon after you sold that cocaine did you get

some more cocaine?

A    Every time I sold out I would go get some more.

Q    How long did you continue selling cocaine like that with Mr. Tipton in 1990?

A    December, during Christmastime, that's when I stopped.

Q    Could it have been into early 1991?

A    No, I stopped around Christmastime.

Q    From the summer of 1990 to Christmas of 1990, did you continuously sell drugs, cook-'em-up, crack cocaine, for Mr. Tipton?

A    Yes, I did.

Q    Approximately on an average week, could you tell the ladies and gentlemen of the jury how much cook-'em-up you would sell?

A    $600 to $700 a week.

Q    Of that $600 to $700 a week, how much money would you give Mr. Tipton?

A    He would get most of the profit.

Q    Where was it that you were selling?

A    In Central Gardens.

Q    Based upon your involvement with Mr. Tipton, did you come to know in that same time frame whether there were other people who were selling drugs for Mr. Tipton?

A    Yes, my brother.

Q    Who is that?

A    Maurice Saunders.

Q    Was there anyone else that you know of?

A    J.T. Taylor.

Q    And who is he?

A    He was just a friend of ours.

Q    How do you know that they were selling drugs for him?

A    Because we would all go to the same person to get it.

Q    Now, do you know an individual by the name of Antwoine Brooks?

A    Yes, I do.

Q    Who is Antwoine Brooks?

A    He was partners with "Whitey" during the time.

Q    Now, in anticipation  --  when you say partners with "Whitey," what do you mean?

A    Partners like there is a difference between workers and partners.  Partners get most of the money, workers get a little percentage of it.

Q    What did you classify yourself, what were you?

A    A worker.

Q    What was Maurice?

A    A worker.

Q    What was Taylor?

A    A worker.

**JA699**

Hussone Curtis Jones (Direct)

Q   Do you know an individual by the name of J.T. Williams?
A   Yes.
Q   Was he involved?
A   Yes, he was.
Q   What was he?
A   He was a worker, also.
Q   Now, in anticipation of your testimony has anyone told you to use the term worker or partner?
A   No.
Q   Where did those terms come from?
A   From the streets.
Q   In November of 1990 or approximately November of 1990, did you have occasion to move to Sandy Lane?
A   Yes, I did.
Q   Who moved in there with you?
A   Me, Antwoine, "Whitey," my brother "Studie."
Q   Were all of those people selling drugs?
A   Yes, we were.
Q   Was "Studie" selling drugs?
A   Except "Studie."
Q   What was "Studie," not selling drugs?

1547

A   No, he wasn't.
Q   Did "Studie" smoke drugs?
A   Yes.
Q   Smoke cook-'em-up?
A   Yes.
Q   Where was he getting it?
A   From "Whitey."
Q   In return for what would "Whitey" give him cook-'em-up?
A   To do favors for him.
Q   What sort of favors?
A   Liking to the store, wash clothes, cook.
Q   Did you actually witness "Studie" doing those things for him?
A   Yes, I did.
Q   And how often would "Whitey" give "Studie" cocaine for doing those sorts of chores?
A   Whenever he asked for him to do a chore.
Q   Approximately Christmas of 1990, did there come to be a time when Antwoine Brooks and "Whitey" had a disagreement of sorts?
A   Yes, they did.
Q   What was that over?
A   Antwoine didn't like the fact that  --
        MR. GEARY:  I object.  Mr. Brooks has

1548

already testified.
        THE COURT:  Overruled.
BY MR. VICK:
Q   Go ahead.
A   Antwoine didn't like the fact that Hess came

**JA700**

down to say whatever he had to say about it.  They didn't feel the money was going right.

Q    Who was Hess?

A    A friend of "Whitey's."

Q    Where did he come from?

A    Uptown.

Q    What do you mean?

A    New York, New Jersey.

Q    How is it he came to Richmond?

A    I think by bus.

Q    What caused him to come here?

A    "Whitey" asked him to.

Q    Did he sell cocaine when he got here?

A    Yes.

Q    Was he considered a worker for "Whitey" or partner?

A    After Christmastime they became partners.

Q    After the argument between Antwoine and "Whitey," what happened?

A    Everybody went their separate ways.

Q    And what do you mean by that; did you continue to deal with "Whitey" in the sale of cocaine at that point?

A    No, we didn't.

Q    During that time frame that you were dealing with "Whitey" from the summer of 1990 through Christmas of 1990, did you have guns that were used in any way during the sale of cocaine?

A    Yes, to protect ourselves.

Q    Where were those guns kept?

A    On the block.

Q    And where would you keep the cocaine?

A    On the block.

Q    Where did you get those guns?

A    Antwoine had the guns.

        MR. GEARY:  I'm sorry, I didn't hear the last answer.

        MR. VICK:  Antwoine had the guns.

BY MR. GEARY:

Q    Did you ever talk to "Whitey" about whether he had been involved with any people in New York or New Jersey?

A    No, he told us.

Q    What did he tell you about that?

A    He was telling us about the things they would do Uptown, like fighting and stuff like that.

Q    And what did he say about that?

A    He said he kept razors in his mouth and if he gets into a fight he will spit it out and cut him.

Q    Did he say he had ever done that in New York or New Jersey?

A    Yes.

**JA701**

Q    What did he tell you?
A    He said he got in a fight with a kid and he cut the kid up.
Q    Did you ever see "Whitey" with razor blades in his mouth in Richmond?
A    Yes.
Q    Where would he keep them in his mouth?
A    He would chew on them, keep them on the side of his mouth.
Q    Did there come a time in the fall of 1990, around Christmas of 1990, that your brother Maurice went to New York with Hess?
A    Yes, he did.
Q    What was the purpose of that trip?
A    I really didn't know.  I just knew my brother --
     MR. BAUGH:  Objection.
     THE COURT:  Sustained.
BY MR. VICK:

1551

Q    When "Hess" and your brother Maurice came back to Richmond, did they have anything with them?
A    They came back with little capsules.
Q    What sort of capsules?
A    Plastic.
Q    What were they used for?
A    To put the coke in.
Q    Was there cocaine present at the time they came back from New York?
A    Yes, there was.
Q    Did you sell that cocaine?
A    Yes, I did.
Q    Who gave you that cocaine to sell?
A    Richard Tipton and Antwoine Brooks.
Q    In that time frame from the summer of 1990 through Christmas of 1990, what's the most cocaine that you saw Mr. Richard Tipton -- crack cocaine that you ever saw him with in that time frame?
A    Two ounces.
Q    After you broke off from him around Christmas --
     MR. GEARY:  I don't think that's the evidence.  I think the witness testified everybody went their separate ways.
     THE COURT:  That's another way of phrasing it.  I don't have any problem.

1552

BY MR. VICK:
Q    After you broke off from Mr. Tipton around Christmas of 1990, did you still have occasion to see "Whitey" or Richard Tipton in the Central Gardens area?
A    Yes, I did.
Q    What was he doing?
A    He was out there trying to get Sam to sell.
Q    Indeed did that happen?

**JA702**

A    Yes, it did.
Q    I direct your attention now to the summer of 1991.  Did you have occasion in that time frame to meet an individual by the name of Cory Johnson, "C.O."?
A    Yes, I did.
Q    Do you see him in the courtroom?
A    He is behind the guy right there.
Q    What's he dressed in?
A    I can't see.  He has on an aqua blue and black shirt.
         MR. VICK:  Could the record reflect  --
         THE COURT:  I don't see an aqua and blue shirt.  Stand up and see if you see Mr. Johnson.
         THE WITNESS:  Right there, a sweater.
BY MR. VICK:

Q    What color is the sweater?
         MR. McGARVEY:  We stipulate.
         MR. VICK:  May the record reflect the identification.
         THE COURT:  Record will so reflect.
BY MR. VICK:
Q    How did you come to meet Mr. Cory Johnson?
A    "Whitey" introduced me to him.
Q    How did he introduce you to him?
A    As his brother.
Q    Where was that that you were introduced to him?
A    Catchpenny in Central Gardens.
Q    Did you see anybody else with him at that time?
A    No.
Q    Do you know based in that time frame, did you see Mr. Tipton and Cory Johnson together in Central Gardens?
A    Yes, I did.
Q    What were they doing together?
A    They were selling cocaine.
Q    Did they have anyone else working with them?
A    Sam Taylor was selling at the time.
Q    I direct your attention to approximately December of 1991, after Christmas of 1991.  Did there come a time when you got reinvolved with Tipton in the sale of cocaine?
A    No.
Q    Could you tell the ladies and gentlemen of the jury how that occurred?
         MR. GEARY:  He said no.
         MR. VICK:  I'm sorry.
         THE COURT:  He said no.  What occurred?
BY MR. VICK:
Q    Around Christmas of 1991, did you have occasion to get reinvolved with Mr. Tipton in the sale of cocaine?

**JA703**

A    Yes, I did.
Q    I'm sorry, I misunderstood the answer.  Could you tell the ladies and gentlemen of the jury how that occurred?
A    Well, I had just got laid off from my job and I went round and talked to my friend, Charles Townes.  And he told me "Whitey" was  --  that I better talk to "Whitey."
Q    Where was it that you talked to "Whitey"?
A    Over on Leigh Street.
Q    What did you talk to "Whitey" about?
A    See if I can get some coke from him to sell.
Q    Did "Whitey" tell you anything about what he was doing in that Leigh Street area?

A    He said he was just selling cocaine.
Q    Did he tell you how much money he was making?
A    He said he was making more over there than in Central Gardens.
Q    Did he agree to give you cocaine could sell?
A    Yes, he did.
Q    How did you know where to go and find "Whitey"?
A    Charles Townes took me.
Q    Is Charles Townes himself known as "Man-Man"?
A    Yes.
Q    Did he say anything to you, Tipton that is, did he say anything to you about an individual by the name of "J.R."?
A    Yes, he did.
Q    What was it that he said to you about "J.R."?
A    He said that was his cousin.
Q    Was he concerned about "J.R."?
         MR. BAUGH:  Objection to the leading nature of that question.
         THE COURT:  Sustained.
BY MR. VICK:
Q    Did you come to know "J.R."?
A    Not too good, but I knew him.
Q    How did you meet him?
A    With "Whitey."

Q    Do you see him in the courtroom today?
A    Yes, I do.
Q    Could you point him out, please?
A    Right there.
         MR. BAUGH:  Stipulate.
         THE COURT:  All right.
BY MR. VICK:
Q    After you asked "Whitey" for cocaine, did you indeed get cocaine from him?
A    Yes, I did.
Q    And in what quantity did you get cocaine from him?
A    $150 worth.

**JA704**

Hussone Curtis Jones (Direct)

Q    All right.  What kind of cocaine was that?
A    Cook-'em-up.
Q    Where did you sell that?
A    In Central Gardens.
Q    Why did you sell it in Central Gardens?
A    Because that's the area I was in.
Q    Did you ever have a conversation with Richard Tipton about where you should sell your cocaine in that time frame?
A    He just said I should stay in Central Gardens, me and "Man-Man."
Q    When you got that cocaine, where was it that you

1557

went to get cocaine from Mr. Tipton?
A    At Leigh Street, Newtowne.
Q    Do you know whose house it was?
A    It was Curt's.
Q    Do you know Curt's last name?
A    No, I don't.
Q    Do you know if Curt was involved in any way with "Whitey" in the sale or distribution of cocaine?
A    Yes, I have seen Curt deal with "Whitey," give "Whitey" money.
Q    How much money, could you estimate?
A    No, I couldn't.
Q    On how many different occasions?
A    Two different occasions.
Q    When was it that you first met "J.R.," or James Roane?
A    In Newtowne.
Q    Where was it that you met him?
A    It was at Curt's house.
Q    Who introduced you to him?
A    "Whitey."
Q    After you started selling cocaine in 1991 with Mr. Tipton again, how often would you get cocaine from him?
A    Twice a week.

1558

Q    In what quantities were you getting cocaine from him?
A    Two to one.
Q    Is that the same quantity you testified about previously?
A    Yes.
Q    So the total value of the drugs was $300?
A    Yes, it was.
Q    How many times a week would you get that?
A    Twice.
Q    Where would you go and sell that cocaine?
A    Central Gardens.
Q    Did you indeed watch "Man-Man" or Charles Townes sell cocaine, also?
A    Yes, I did.

**JA705**

Q    Do you know where he was getting his cocaine?
A    From "Whitey."
Q    Do you know where "Whitey" was getting his cocaine?
A    No, I didn't.
Q    Have you ever had conversations with "Whitey" about trips out of Richmond?
A    Just told me he was going out of town.
Q    Did he tell you where he was going?
A    No, he didn't.

Q    Do you know an individual by the name of "V"?
A    Yes, I do.
Q    Who is "V"?
A    He was partners with "Whitey" when he came back.
Q    When you say partners, what do you mean?
A    He would tell him how much to give out.
Q    And do you know "V's" real name?
A    No, I don't.
Q    Where was it that you first met "V"?
A    In Newtowne.
Q    And who introduced you to "V"?
A    "Whitey."
Q    And when approximately was that that you met "V"?
A    During the wintertime.
Q    Did you come to know based upon your involvement with Richard Tipton what his relationship with James Roane, "C.O.," and "V" was?
A    He just said "J.R." was his cousin, "C.O." was his brother, and "V," I'm not too sure what he said about that.
Q    Did he talk about whether or not they had a business relationship?
        MR. BAUGH:  Objection.  Leading.

        THE COURT:  It is leading.  Sustained.
BY MR. VICK:
Q    Do you know whether "Studie," your brother, ever made trips with "Whitey"?
A    Yes, he did.
Q    Where were those trips to?
A    Uptown.
Q    For what reason?
A    I guess to buy coke.
        MR. BAUGH:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Do you know why?
A    To get drugs.
        MR. BAUGH:  Objection.
        THE COURT:  Sustained.  Can't guess about this.

**JA706**

BY MR. VICK:

Q    Did you have occasion to talk to "Studie" or "Whitey" about those trips?

A    No.

Q    Now, you got arrested with Charles Townes  -- you were with Charles Townes and "Whitey" in New Jersey in March of 1992, March 20th, 1992; is that correct?

A    Yes.

Q    Were you present when they were arrested?

A    Yes, I was.

Q    From approximately Christmas of 1991 until that time, did you continue to sell drugs?

A    Yes, I did.

Q    With Mr. Tipton?

A    Yes.

Q    And in the same quantity that you have testified to here today, approximately, on an every-week basis?

A    No.

Q    Tell us how it was different.

A    Him and "C.O." had left and went Uptown and they left us with coke.

Q    How much did they leave?

A    They said it was 12 ounces.

Q    And what kind of cocaine was that?

A    Cook-'em-up.

Q    Did you sell that?

A    Yes, I did.

Q    How much money did you make from that?

A    $3,000.

Q    What did you do with that money?

A    I was going to Uptown to get some more.

Q    Is that when you got arrested?

A    Yes.

Q    With that $3,000 with you?

A    Yes, it was.

Q    And that $3,000 was going to be used for what?

A    To buy drugs.

Q    Was that the only money, that $3,000, was that the only money that you made from the sale of that cocaine that had been left with you?

A    Yes, it was.

Q    Do you know an individual by the name of Valerie Butler?

A    Yes, I do.

Q    Who is she?

A    We used her car to go up there.

MR. BAUGH:  I could not understand that.

THE WITNESS:  We used her car to go up there.

BY MR. VICK:

**JA707**

Q    How did you come to know her?
A    She was "C.O.'s" girlfriend.
Q    Have you ever had occasion to give money to Valerie Butler?
A    Yes.
Q    For what reason?

1563

A    To get "C.O." out of jail.
Q    When was that?
A    December, late December.
Q    How much money did you  --
     MR. BAUGH:  Did you say late December?
BY MR. VICK:
Q    When approximately was that?
A    During the wintertime.
     MR. BAUGH:  That is not the answer he gave a moment ago.
     MR. VICK:  That's what cross-examination is for.
     THE COURT:  Just hold on, Mr. Baugh.  He says late December.  Do you recall a month?  You gave an answer before including the month.  Do you recall what month it was?  You said later winter?
     THE WITNESS:  Yes.
     THE COURT:  What month?
     THE WITNESS:  November or December.
     THE COURT:  November or December.  All right.  Go ahead, Mr. Vick.
BY MR. VICK:
Q    And the 12 ounces of cocaine that had been left with you, who left that with you?
A    "C.O." and "Whitey."

1564

Q    Where did you actually get that?
A    From "Whitey."
Q    And who helped you sell that cocaine?
A    Clarence Townes.
Q    Did you have on your trip to New Jersey, did you have a connection in New York or New Jersey that you intended to get cocaine from of your own?
A    No, I didn't.
Q    How were you going to get cocaine up there?
A    "Whitey" knew somebody.
Q    Did you ever get cocaine from "V"?
A    No, I haven't.
Q    Did you ever see "V" give cocaine to "Whitey"?
A    Yes, I have.
Q    On how many different occasions have you seen "V" give cocaine to "Whitey"?
A    Several.
Q    What would happen?  Did you ever get that cocaine from "Whitey" after "V" had given it to him?
A    Sometimes, yes.
Q    Have you ever gotten cocaine from "C.O."?  Cory

**JA708**

Johnson?

A   One time.

Q   And in what quantity did you get that?

A   Two to one.

Q   And why was it that you got cocaine from him; how did that come to happen?

A   We couldn't find "Whitey."

Q   Who is we?

A   Me and "C.O."

Q   Did you consider yourself to be working for someone?

A   "Whitey."

Q   And why did you consider yourself to be working for "Whitey"?

A   I would get the drugs from him.

Q   Do you know if "C.O." was considered to be working for "Whitey"?

      MR. GEARY:  Objection.  How would he know that?

      MR. VICK:  Based upon your knowledge and involvement.

      THE COURT:  I'll sustain the objection.

BY MR. VICK:

Q   Based upon your knowledge and involvement with Charles Townes, do you know who he worked for?

A   "Whitey."

      MR. BAUGH:  Objection.  That's what "Man-Man" told him.  But he can't make a conjecture about it.

      THE COURT:  I'll sustain the objection.

BY MR. VICK:

Q   I direct your attention to January 4th, 1992. Did you have occasion -- do you remember that day?

A   Yes, I do.

Q   Did you have occasion to go to see Richard Tipton, "Whitey," on January 4th, 1992?

A   Yes, I did.

Q   What was your reason for going to see him?

A   To get drugs.

Q   What occurred that day when you went to get drugs from him?

A   Him and James Roane had a conversation about a guy named Doug.

Q   Did you hear that conversation?

A   No, I just heard Doug Talley's name.

Q   What did they say about Doug Talley?

      MR. GEARY:  Objection.  He didn't hear the conversation.

      THE COURT:  Please.  All right, the witness just responded he didn't hear the conversation.  And you went on and asked him about the conversation.

      MR. VICK:  All I heard was something about

**JA709**

Doug.  I'm just asking what was it all that he heard.

THE COURT:  He said he heard something about Doug.

BY MR. VICK:

Q    What all did you hear about Doug Talley?

A    James Roane said he thought he was 5-0.

Q    What do you know 5-0 to mean?

A    Police.

Q    Now, where did that conversation take place?

A    Over on Leigh Street in the yellow house.

Q    Do you know whose house that was?

A    It was his uncle's.

Q    Who was living there?

A    "C.O.," "Whitey," James Roane, "V," and "E.B."

Q    When on January 4th did that conversation take place?

A    In the nighttime.

Q    What kind of car did you drive?

A    A white Dodge Aries.

Q    Did you have occasion to take "J.R." anywhere that evening?

A    Yes, I took him over to Blackwell to pick up some female.

MR. GEARY:  I couldn't hear the last part of the answer.

THE COURT:  Pick up some female.

BY MR. VICK:

Q    Who did you take?

A    James.

Q    Did you indeed pick up a female?

A    Yes, we did.

Q    What did you do after you picked up that female?

A    Took her back to Newtowne.

Q    To where?

A    Leigh Street.

Q    To the same house?

A    No, it was a white house beside Curt's.

Q    Who was present at that house?

A    Some guy.

Q    Did you have occasion later that evening to see Richard Tipton, "Whitey"?

A    Yes, I did.

Q    Where was that?

A    In Newtowne in the yellow house.

Q    The same house you had been in previously?

A    Yes.

Q    Tell us what occurred there.

A    James Roane came back up and said Doug Talley was outside.

Q    Who did he say that to?

**JA710**

A    "Whitey."
Q    You heard that?
A    Yes, I did.
Q    What did you do?
A    "Whitey" told me to come on and follow him.
Q    Did you do that?
A    Yes, I did.
Q    Where did you follow "Whitey" to?
A    Downstairs, and I got in my car and him and James Roane and the girl got in Doug's car.
Q    What kind of car was Doug Talley driving?
A    A gray car.
Q    Can I see Government Exhibit 1, please?
     (Document proffered to witness.)
     Have you ever seen that car before?
A    Yes, I have.
Q    What car is that?
A    That's the car Doug Talley drove.
Q    Was that the car he was driving that evening?
A    Yes, it was.
Q    When you left that house, where did you go?
A    We went and dropped the girl off over in Blackwell.
Q    And then where did you go?
A    Circled around the block, then I parked behind them.
Q    Who was in the car with you?
A    Nobody.
Q    You were driving what car?
A    White Dodge Aries.
Q    Who was in Doug Talley's car?
A    "Whitey" and James Roane.
Q    Where was "Whitey" seated?
A    In the front.
Q    And where was Doug Talley seated?
A    He was driving.
Q    Where was James Roane seated?
A    In the backseat.
Q    Could you describe for the ladies and gentlemen of the jury approximately what time of night this was that you were following them?
A    It was late, about 3 o'clock, between three and five.
Q    Where did you go?
A    To Blackwell.
Q    Did you follow that car?
A    Yes, I did.
Q    Did the car come to a stop someplace?
A    Yes, it did.
Q    Do you know where it stopped?
A    Stopped on the corner by a streetlight.

**JA711**

Q    And where were you?  When that car stopped, what did you do?
A    I parked behind it.
Q    How far behind that car did you park?
A    A car or two lengths.
Q    And could you see Doug Talley's car from where you were stopped?
A    Yes, I could.
Q    How well could you see it?
A    Very well.
Q    Why is that?
A    There was a streetlight.
Q    What occurred there at that time, Mr. Jones?
A    Richard Tipton and "J.R.," they got out, went behind the vehicle.  They was doing something.
          MR. BAUGH:  Objection.
          THE COURT:  Just tell us what you saw.
          THE WITNESS:  They was laughing something up.  Then they went -- they started to the car and then stopped and went back.  And then they went back to the car.
BY MR. VICK:
Q    Where was Doug Talley at this time?
A    In the car.

1572
Q    You said it was about 3 o'clock in the afternoon, 3 o'clock in the morning?
A    Morning.
Q    So the morning after you went over there on January 4th, you had gone into the early morning hours of January 5th?
A    Yes.
Q    All right.  Now, when they walked back to the car, what did they do?
A    James Roane got in the back and stayed behind the driver, Doug Talley.  "Whitey" got in the front seat.  And James Roane grabbed Doug Talley from behind and "Whitey" started stabbing him.
Q    How did he grab him?
A    Around the neck.
Q    With what?
A    His arm.
Q    Could you show us exactly?
A    He had him like this.
     (Indicating.)
Q    Do you know which arm he had around his neck?
A    No.
Q    And when "Whitey" started stabbing him, where did he start stabbing Talley?
A    In the body.

1573
Q    What did you see?  Tell us exactly what occurred.
A    As "Whitey" was stabbing him, Doug was trying to

**JA712**

fight back but he couldn't do nothing.  James Roane had him around the neck.

Q    And what happened; did James Roane stay in the car through the entire thing?

A    No. After awhile James got out.

Q    What did James do?

A    He got in my car.

Q    Where were you at this time?

A    Still parked behind them.

Q    How far behind?

A    A car or two lengths.

Q    Did you sit there?

A    Yes, I did.

Q    All right.  Did there come a time when you moved?

A    James Roane told me to pull up.

Q    Did James Roane say anything to you when he got in that automobile?

A    He was checking to see if "Whitey" stabbed him.

Q    What did he say?

A    He said, "Cuz almost got me."

Q    Was he bleeding in any way?

A    I couldn't see.

Q    When James Roane asked you to pull up, did you indeed pull up?

A    Yes, I did.

Q    Where did you pull up to?

A    Beside Doug's car.

Q    When "Whitey" started stabbing Doug Talley, where was "Whitey" in that automobile?

A    In the front seat.

        MR. BAUGH:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  In the front seat.

BY MR. VICK:

Q    When you pulled up, between the time that James Roane got out and came back, did you watch "Whitey" the entire time?

A    Yes, I did.

Q    Could you estimate for the ladies and gentlemen of the jury approximately how many times you saw "Whitey" stab him?

A    A lot.

Q    Do you know how long a time period this took?

A    Between three and five minutes.

Q    When you pulled up, where did you pull up to?

A    Beside the car.

Q    Did you see where "Whitey" was?

A    Yes, I could.

Q    Where was "Whitey" at that point?

A    He was standing outside the car.

Q    How did "Whitey" get out of the car?

**JA713**

A    I didn't see that.
Q    When he was standing outside of the car, where was Doug Talley?
A    He was hanging out of the car.
Q    Hanging out how?
A    He was trying to get out.
Q    And what was "Whitey" doing?
A    He was still stabbing him.
Q    Could you hear that?
A    I heard the last stab.
Q    Did you see where he stabbed him for the last time?
A    In the head.
Q    With what?
A    A knife.
Q    What kind of knife?
A    It was like a military knife.
Q    And could you describe what that sounded like?
A    Sounded like wood splitting.
Q    What did "Whitey" do after he stabbed him in the head that last time?
A    He had to push off the car to get the knife out of his head.
Q    How long did that take?
A    A second or two.
Q    How did he push off?
A    He pushed his foot against the car.
Q    Against what part of the car?
A    The door.
Q    Did he cause any damage to the car that you saw?
A    After he pushed off with the knife he kicked the door in, tried to shut Doug in, and kicked in the door.
Q    Where was Doug Talley's body at the time he kicked that door?
A    Hanging out the car.
Q    Did the door shut?
A    No, it didn't.
Q    What did "Whitey" do after that?
A    He got in my car and we drove off.
Q    Where did you go?
A    I dropped James Roane back on the street where the girl was.
Q    What were you thinking during the murder of Doug Talley?
         MR. BAUGH:  Objection.
         THE COURT:  Sustained.
BY MR. VICK:
Q    Why did you not go to the police about that murder?
         MR. GEARY:  Objection.  There is no

**JA714**

evidence he didn't go.

THE COURT: He can answer.

BY MR. VICK:

Q    Why did you not immediately go to the police and tell them about that murder at that time?

A    Because if I would have told them about that --

MR. BAUGH: Objection. He is going to state a conclusion as to what would have happened, not what his thought process was.

THE COURT: Sustained.

BY MR. VICK:

Q    After "Whitey" got in your car, where did you go?

A    Took him to "Wildman's" house.

Q    Who is "Wildman"?

A    He was somebody "Whitey" used to stay with.

Q    And did "Whitey" have the knife with him in your car?

1578

A    Yes, he did.

Q    Did you see the knife more clearly?

A    Yes, I did.

Q    What kind of knife was it?

A    It was a design knife, like it had U.S. Government on it.

Q    Show us with your hands approximately how big it was.

A    I'd say about this long.

(Witness indicating.)

Q    When "Whitey" came back to your car and got in your car, did he make any statements to you about what had gone on?

A    After we had dropped "J.R." off, we was riding to "Wildman's" house. And he was kind of laughing. He said Doug was fighting back.

Q    Did he think it was funny?

MR. BAUGH: Objection, please.

THE COURT: Sustained as to what he thought.

BY MR. VICK:

Q    How long did he laugh?

A    Like a split second.

Q    When you got to "Wildman's" house, what did you do?

1579

A    He gave "Wildman" the knife to wash off; he took a shower.

Q    And did "Wildman" wash that knife off?

A    Yes, he did.

Q    Did "Whitey" have much blood on him?

A    Just on his hands.

Q    Do you know if "J.R." had blood on him?

A    Huh-uh.

Q    Did you ever get your package of cocaine that

Q   night?
A   No, I didn't.
Q   What was "Whitey" wearing that night?
A   He was wearing bluejeans, boots, and a heavy coat.
Q   What was done with those clothes?
A   He left them at "Wildman's" house.
Q   Is that the only  --  did you ever have occasion to talk to "Whitey" about any other crimes of violence that he might have committed?
A   He just told us sometimes -- he just would say he had to get somebody because he thought they was trying to get him.
Q   Who was that?
A   I don't know.
Q   Did he describe that person in any way?

A   No, he didn't.
Q   Have you ever had occasion to talk to "Whitey" about "J.R." shooting someone where little kids were present?
A   Yes, he told me and Charles Townes.
Q   What did "Whitey" say about that?
A   He told us "J.R." wanted to get somebody.  He left the kids.  And he told them "J.R." should go back and get the kids.
Q   Excuse me, "Whitey" said what?
A   He should go back and get the kids.
Q   Why did he want "J.R." to go back and get the kids?
        MR. BAUGH:  Objection.
BY MR. VICK:
Q   Based upon what you heard him say?
A   No survivors.
Q   Why did he want no survivors?
A   Couldn't be a witness.
Q   Did you ever have occasion to talk to "Whitey" about some murders that took place in a station wagon?
A   Yes.
Q   Do you know whose murders they were?
A   Curt's, his girlfriend named "Pepsi," and some other guy.
Q   What did "Whitey" say to you about those murders?
A   He said "C.O." got them.
Q   Did he talk to you about those murders, about Curt?
A   Yes, he did.  He told us that "C.O." said he shot Curt one time and then Curt didn't die and Curt said, "Don't shoot me again because I'm dying anyway," and "C.O." shot him again.
Q   Did "Whitey" talk to you prior to those murders

**JA716**

about Curt?
A    No, he didn't.
Q    Did he tell you why those murders were committed?
A    He thought they knew too much.
Q    Who knew too much?
A    Curt and his girlfriend and the driver.
Q    Knew too much about what?
A    About what they were doing.
Q    What is it?
A    That they did.
Q    What is that?
A    Went up to New York and New Jersey and got drugs.

Q    Your brother, "Studie," has a girlfriend.  Is that correct?
A    Yes.
Q    Denise Moore?
A    Yes.
Q    Do you know whether Denise Moore ever purchased any firearms for "Whitey" and "C.O."?
A    Yes.  "Whitey" told me.
Q    What did "Whitey" tell you about that?
A    "Whitey" told me he had Denise to put the guns in her name.
Q    What kind of guns?
A    Glocks.
Q    After the murder in the station wagon, did "Studie" have occasion to go to New York with "Whitey"?
A    He took him and "C.O." up there.
Q    What did they go up there for?
A    In a rental car.
Q    Who rented that car for them?
A    Valerie.
Q    What did they go up there for?
A    To get some drugs.
Q    You have testified that you gave some money to Valerie.  How much money did you give to Valerie?

A    I can't recall.
Q    Where did you get the money that you gave to Valerie?
A    From selling drugs.
Q    Why did you give it to Valerie?
A    To get "C.O." out of jail.
Q    Was Valerie worried about the arrest in any way?
     MR. WAGNER:  Objection.
     THE COURT:  You all, stand up when you make your objections.  Don't get in that habit.
BY MR. VICK:
Q    Do you know where "C.O." was selling cocaine

**JA717**

from in the Newtowne area?

A    Out of a white house, like in the basement.

Q    Whose house was that?

A    Woman named "Mousey."

MR. COOLEY:  Objection, unless it is his observation.

THE COURT:  Overruled.

BY MR. VICK:

Q    Whose house was it?

A    "Mousey."

Q    Who is "Mousey"?

A    She was the lady who lived in the house.

1584

Q    Do you know Sandra Reavis?

A    I heard of her, yes.

Q    How have you heard of Sandra Reavis?

A    She was "J.R.'s" girlfriend.

Q    Do you know whether Sandra Reavis -- did you ever hear "Whitey" talk about Sandra Reavis?

A    Yes.

Q    What did "Whitey" say about Sandra Reavis?

A    He wanted her to sell drugs for him.

Q    Do you know if "Whitey" or "C.O." lived in a house over behind Carver School?

A    I don't know where Carver School is at.

Q    Okay.  The yellow house you described in the Newtowne section, is that the only house that you ever went to see them in in Newtowne?

A    Him and "C.O." together, yes.

Q    Is that the only house you ever saw them in in that area?

A    No, there was another house.

Q    Can you describe that house?

A    It was like houses put together, like apartment houses.

Q    Do you know the address?

A    No.

Q    Did you give money to Valerie for the cocaine

1585

and for "C.O.'s" bail after or before Doug Talley's murder?

A    After.

Q    All right.  After or before the murder in the station wagon?

A    After.

Q    After or before your trip to New Jersey?

A    After.

MR. VICK:  Beg the Court's indulgence.

THE WITNESS:  No, it was before.

MR. VICK:  Before your trip to New Jersey?

THE WITNESS:  Yes, it was.

MR. VICK:  Your Honor, if we could play the videotape for him just to have him view it very briefly.

**JA718**

Hussone Curtis Jones (Cross)

THE COURT: All right. Go ahead.

BY MR. VICK:

Q   I'm going to ask you to look at the video screens when they come on.

(Videotape played.)

BY MR. VICK:

Q   Do you recognize that automobile that's in the picture?

A   That's Doug Talley's.

Q   Where was your car parked in relation to that automobile on the night of the murder?

A   In front of the car behind it.

Q   Where was it?

A   In front of the car behind it.

Q   All right. And approximately how many feet behind that car? Approximately how many feet behind Doug Talley's car?

A   A car or two lengths.

Q   Is that the way you described  --  is that the way you last saw  --

THE COURT: Let's get through the tape and then ask the questions.

MR. VICK: This is the last question. If I could just get this tape back to where we were.

(Video restarted.)

BY MR. VICK:

Q   Is that the way the car was when you left it that evening?

A   Yes, it was.

Q   Where was Doug Talley's body?

A   Hanging out the door.

MR. VICK: I have no further questions. I'm going to show you what's been Government Exhibit 139 Government Exhibit 139. I will ask you if you can identify that.

(Document proffered to witness.)

A   That's the house, like the apartment house.

Q   Who lived in that house?

A   Some guy, I don't know what his name was.

Q   Did "Whitey," "C.O.," or "V" or "J.R." ever live in that house?

A   They had been in the house, yes. They was cutting their coke, cook-'em-up.

Q   Do you know whether they lived there or not?

A   No.

MR. VICK: I have no further questions.

THE COURT: All right. Mr. Tipton's counsel?

CROSS-EXAMINATION

BY MR. GEARY:

Q   Mr. Jones  --

THE COURT: Mr. Geary, before you get

**JA719**

started, Mr. Vick, can we move this thing?

MR. VICK:  We can.  Yes, sir.

THE COURT:  Why don't we take about ten minutes and let you get this stuff out of the way and then we will start the cross.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. BAUGH:  Your Honor, could I look at the tape before it is removed?

THE COURT:  All right.  Remove the defendants.

(The defendants were removed from the courtroom.)

All right, Mr. Baugh, you can look at it briefly while we are out of session.  We will be in recess for ten minutes.

(Recess taken from 2:45 p.m. to 2:55 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Jones, in regard to January 5th of last year, you say you were over at 13th and Stockton between three and five in the morning?

A    Yes.

Q    Was that the worst thing you have ever seen in your life?

A    Yes.

Q    Did it shock you?

A    Yes, in a way.

Q    Were you horrified?

A    No.

Q    Didn't horrify you?  But it is the worst thing you have ever seen?

A    Yes.

Q    That was on January 5th, 1992.  Is that correct?

A    Yes.

Q    On April 21st, 1992, some three-and-a-half months later, you appeared before a Federal Grand Jury in this building; is that correct?

A    Yes.

Q    On March 20th, 1992, in Trenton, New Jersey, you were in a car with Richard Tipton and Charles Townes and were stopped by the Trenton police; is that correct?

A    Correct.

Q    You were let go; is that correct?

A    Correct.

Q    Richard Tipton, "Whitey," what name did you call him?  What was your name for him?

A    "Whitey."
Q    "Whitey." After March 20th, 1992 and before April 21st, 1992, about 31 days, did you talk to any police officers or any prosecutors about this case?
A    No.
Q    When you appeared before the Federal Grand Jury on 4-21-92, was that as a result of a subpoena?
A    Yes.
Q    Before you walked into that room downstairs in April of 1992, had you spoken to any police officers or prosecutors about the drug case or anything else?
A    I had talked to Detective Jackson.
Q    Detective Cliff Jackson?
A    I don't know his first name.
Q    Okay.  When in regard to your appearance downstairs on 4-21-92, how soon before that date had you talked to Detective Jackson?
A    I couldn't tell you.
Q    Well, was it a week before?  It was in between getting stopped in Trenton and appearing downstairs, correct?
A    Yes.
Q    Okay.  Where did you get Detective Jackson's name from?
A    He came to see me.
Q    He came to see you.
A    Yes.
Q    Where were you when he came to see you?
A    At my cousin's house.
Q    Your cousin's house is located where?
A    In Central Gardens.
Q    What's your cousin's name?
A    Janice Johnson, Grey Jones, Maria Jones, Leah Jones.
Q    What was the address that Detective Jackson came to?
A    Poplar Street.
Q    Did you know him before that day?
A    No, I didn't.
Q    Did you know he was coming to see you?
A    No, I didn't.
Q    When he came to see you, did he tell you who had given him your name?
A    No, he didn't.
Q    Do you know whether or not he had talked to Charles Townes or Maurice Saunders before he came to see you?
A    No, I didn't.
Q    Did he talk to you by yourself?
A    Yes, he did.
Q    Did he tell you that the Henrico Police were going to arrest you on a drug conspiracy charge?

**JA721**

A    No, he didn't.

Q    What did Detective Jackson tell you when he saw you on Poplar Street in Central Gardens?

A    He just said -- he told me that Richard Tipton had been arrested and that he wanted me to testify.

Q    Detective Jackson told you that "Whitey" had been arrested?

A    Yes.

Q    Did Detective Jackson tell you what "Whitey" was arrested for?

A    No, he didn't.

Q    Did he mention drugs or murders; did he say anything to you about that?

A    No, he didn't.

Q    What did you tell Detective Jackson at that time?

A    I told him I had to think about it.

Q    Okay.  What was he offering to you, Mr. Townes --  excuse me, Mr. Jones -- in return for your testimony?

A    Nothing.

Q    Nothing at all?

A    Nothing at all.

Q    Now, how soon after that did you talk to Detective Jackson again?

A    Before I  --

Q    Before you came to the Grand Jury in April of last year, when was the next time you talked to Detective Jackson?

A    I didn't after that.

Q    Did he come and pick you up on April 21st and bring you over here to the Grand Jury?

A    Yes, he did.

Q    Did he have any of your cousins or friends with him at the time?

A    Charles Townes.

Q    Charles Townes.  That's "May-May."

A    Yes.

Q    Did he agree to pick you up at the same time and at the same place?

A    No, he didn't.

Q    Who was picked up first?

A    I was.

Q    Was it a marked police car or unmarked police car?

A    Unmarked.

Q    The two of you, with Detective Jackson, drove down here from Central Gardens; is that correct?

A    Correct.

Q    Was there any conversation in the car about what you were expected -- the topic of the conversation before the Federal Grand Jury?

**JA722**

A    No, there wasn't.
Q    Did anybody else talk to you after you got out of the car, when it parked here and you and "May-May" got out of the car and came into the building, did anybody else talk to you before they brought you into the Grand Jury room downstairs?
A    The DA, the district attorney.
Q    What's the DA's name?
A    Toby Vick.
Q    This man here?
A    Yeah.
Q    Anybody else?
A    That detective right there.
Q    Detective Fleming?
A    Yes.
Q    So before you walked into the Grand Jury room, you had been with Detective Jackson twice and you had met with Mr. Vick and Detective Fleming on 4-21-92; is that correct?
A    Yes.
Q    Did they debrief you or interview you before you walked into the Grand Jury room?
A    Yes, they did.
Q    And what were they asking you?  What were the topics of conversation?  What were they asking you about?
A    They were asking me to testify and tell the truth in front of the Grand Jury.
Q    Did they tell you what they were talking about, what case?  Did they mention names to you?
A    Yes, "Whitey."
Q    Did they mention anybody besides "Whitey"?
A    "C.O.," James Roane, and "V."
Q    "C.O.," James Roane, and "V."
A    Yes.
Q    Did Mr. Vick talk to you and ask you questions before you walked into the Grand Jury about what your knowledge was?
A    Yes, he did.
Q    How long did that conversation take place?
A    I'd say an hour-and-a-half.
Q    An hour-and-a-half?
A    Yes.
Q    Did that take place downstairs near the Grand Jury room, or take place in the U.S. Attorney's office?
A    Near the Grand Jury room.
Q    What did you and Mr. Vick talk about; tell this jury the subjects that you and Mr. Vick talked about before you walked into the Grand Jury.
          MR. VICK:  Your Honor, this is really irrelevant.  His preparation for Grand Jury is really

**JA723**

1596

irrelevant.

THE COURT:  I wish you would narrow it down.  What they talked about?  I wish you would narrow it.  Go ahead.  I'll let you do it.

BY MR. GEARY:

Q    What subjects did you talk about, you and Mr. Vick, for an hour-and-a-half?

A    About this case.

Q    This case.  Did you say anything to Mr. Vick at that time or say anything to the Grand Jury on 4-21-92 about being at 13th and Stockton on 1-5-92 between three and five in the morning?

A    No, I didn't.

Q    You had not told Detective Jackson about that; you didn't tell Mr. Fleming about that; and you didn't tell Mr. Vick about that; and you didn't tell the Grand Jury about that.

MR. VICK:  He is not asking a question.  He is testifying, recapitulating the testimony, and I object.

THE COURT:  The objection is sustained as to the form.  Mr. Geary, don't compound it.  You can ask him each question if you want.

BY MR. GEARY:

Q    Mr. Jones, before you walked into the Grand

1597

Jury, you did not tell Mr. Vick about Stockton and 13th Street.

A    No, I didn't.

Q    You hadn't told Mr. Jackson about it.

A    No.

Q    And you hadn't told Mr. Fleming about it.

A    No, I didn't.

Q    And you didn't tell the Grand Jury about it.

A    No.

Q    Before today's date, before coming in here today, has Mr. Vick talked to you?

A    Before today?

Q    Before today.

A    No.

Q    Has Detective Fleming talked to you?

A    No.

Q    Has Mr. Parcell talked to you?

A    No.

Q    When is the last time before today, before right now when you came in this courtroom, that any people from the prosecution have talked to you about your testimony?

A    Sunday.

Q    Sunday?

A    Yes.

1598

Q    Who talked to you on Sunday?

**JA724**

A    Toby Vick.
Q    How long approximately did that conversation take place?
A    20 or 15 minutes.
Q    15 or 20 minutes.  From January 5th of 1992 until sometime before you appeared before the Grand Jury, how many times do you think you saw "Whitey" in Richmond or Central Gardens?
A    Repeat that.
Q    Between January 5th, 1992 and April 21st when you went to the Grand Jury, how many times would you say you saw "Whitey" during that three-and-a-half months?
A    Ten or more.
Q    Excuse me?
A    Ten or more.
Q    Ten or more times.  You were still, I take it, selling drugs during that period of time.
A    Yes, I was.
Q    And obviously you were with him on 3-20-92 when you were in Trenton; is that correct?
A    Yes.
Q    Were you with him anymore after March 20th, 1992?

A    No, I wasn't.
Q    You came back.  One way or another, you got back to Richmond from Trenton?
A    Yes.
Q    The next time you saw Richard Tipton is when you walked into the courtroom today?
A    Yes.
Q    As far as you know  --  strike that.
     When did you stop selling crack cocaine?
A    After that.
Q    After what?
A    After I got back from Trenton.
Q    So after March 20th, you stopped selling crack; is that correct?
A    Correct.
Q    You were able to identify the two houses before in the pictures; is that correct?
A    Correct.
Q    And as far as you know, Mr. Jones, those houses are located over in the Newtowne section?
A    Yes.  It was just one house.
Q    Excuse me?
A    They just showed me one house.
         MR. VICK:  Government Exhibit 139, which I inadvertently forgot to move into evidence.  I would so move.
         THE COURT:  It will be admitted.
BY MR. GEARY:

**JA725**

Q    When you told the jury on direct examination that "Whitey" lived in such and such a place, how would you determine where he was living?
A    I don't understand what you are saying.
Q    Didn't he live in a lot of different places all the time, move from house to house and back and forth?
A    Yes.
Q    He lived in two or three different places around Central Gardens, didn't he?
A    Sandy Lane.
Q    Sandy Lane?
A    That's all I can recall.
Q    You said he lived in Newtowne, one or two of these houses; is that right?
A    A yellow house.
Q    When you answered Mr. Vick's question, you said it was "Whitey" living at such and such a place.  How would you decide in your own mind where "Whitey" was living?
A    He had furniture, TV, and stuff like that.
Q    He had furniture?

A    Yes.
Q    How do you know it was his?
A    It was in the house.
Q    You assumed because it was there, he was there, that these things were his; is that correct?
A    The TV and the VCR was his.
Q    You and "Whitey" got along pretty well, didn't you?
A    Yes, sort of.
Q    You and your brothers and "May-May" and the rest of them got along with him real well, too, didn't you?
A    Yes.
Q    You considered him sort of a clown, didn't you?
A    No.
Q    He was joking all the time; he didn't joke all the time?
A    He joked a lot.
Q    Made you all laugh, didn't he?
A    Yes, sometimes.
Q    He told you on January 4th that he wanted you to follow him somewhere; is that right?
A    Yes.
Q    Had you ever been over to Blackwell before?
A    Yes, I have.

Q    Before January 5th, how often would you say you were over there?
A    I would drive by.  I would drive back over to my grandmother's house.
Q    Where does she live?

**JA726**

A    Over in Southside.
Q    Were you familiar with the street 13th and Stockton?
A    Stockton, yes.
Q    The videotape you saw today, have you seen that before?
A    One time.
Q    When was that?
A    About two weeks ago.
Q    About two weeks ago.  Who showed you the videotape?
A    Toby Vick.
Q    Was that before the Sunday meeting you talked about or is that that same meeting?
A    Before.
Q    So you had another meeting with Mr. Vick before that Sunday meeting?
A    Yes.
Q    He went over the videotape with you?
A    Yes.

Q    He asked if you could identify the car that was in the picture?
A    Yes, he did.
Q    What place did you leave in Richmond, north Richmond, before you went to Southside that night?
A    Which place?
Q    Yes, where were you?
A    I was in Central Gardens.
Q    Then you went to Newtowne; is that right?
A    Yes.
Q    Which house did you go to?
A    The yellow house.
Q    The yellow house.  At some point Doug Talley showed up; is that what you are saying?
A    Yes.  I left.  I went over there to get some drugs.  He didn't have any.  So me, him and Jimmy Roane went to a little club and we was talking about --
Q    "Me, him and James Roane went to a little club."  Who is "me, him, and James Roane?"  Who is "him"?
A    "Whitey."
Q    You all went to some club where?
A    Near Broad Street.
Q    Were you drinking alcohol?

A    No, I wasn't.  They were.
Q    Were they drinking?
A    Yes.
Q    How long were they in this club?
A    Ten to fifteen minutes.
Q    From there, did you drive the car over there?
A    Yes, I did.

**JA727**

Q    And the three of you from there went to where?
A    I dropped "Whitey" back off in Newtowne, took James Roane over to Blackwell to pick the female up.
Q    Then you came back to where?
A    Newtowne.
Q    What did you do when you got back to Newtowne?
A    Dropped James Roane and the girl off.
Q    From there?
A    I went back to Central Gardens.
Q    What time was it approximately, if you know, that you got back to Central Gardens?
A    I don't know.
Q    Did you ever leave Central Gardens after that?
A    Yes, I did.
Q    What time did you leave Central Gardens?
A    Around between one and two.
Q    Where were you going at that time?
A    Back to Newtowne.

1605

Q    What was your purpose in going back to Newtowne?
A    To get some drugs.
Q    Talking about crack?
A    Cook-'em-up.
Q    Were you going to use it or sell it?
A    Sell it.
Q    Did you use cook-'em-up?
A    No, I didn't.
Q    When you got back to Newtowne, which house did you go to?
A    I went to the house beside Curt's.
Q    Do you know what street that's on?
A    No.
Q    Who do you say was there?
A    James Roane, the girl, and "Whitey."
Q    And at some point, did somebody that you knew as Doug Talley show up?
A    Yes, after we left and went back to the yellow house.
Q    Had you ever seen Doug Talley before?
A    No, I haven't.
Q    This is the first time you had ever seen him?
A    Yes.
Q    At some point in your testimony to the jury,

1606

someone told you to follow them to Blackwell.
A    Yes.
Q    And that was "Whitey" that told you that?
A    Yes, it was.
Q    And he got into a car with Doug Talley?
A    Yes.
Q    And you weren't his main stickman, were you?
A    No, I wasn't.
Q    Who was "Whitey's" main stickman in the drug

**JA728**

business?
A    "C.O." James Roane.  "E.B." "V."
Q    How about Maurice?
A    He was locked up during this time.
Q    How about "Majie"?
A    No.
Q    "Man-Man"?
A    No, I wouldn't say he was.
Q    You certainly were not, were you?
A    No, I wasn't.
Q    And how did you get over to Blackwell?
A    Took the highway.
Q    Took 95?  Did you stay right behind them the whole time?
A    Yes.

Q    Was anybody high as far as you know?
A    "Whitey," like before he left the yellow house he went behind this sheetrock and got some powder and sniffed it.
Q    Got some what?
A    Powder and sniffed it.
Q    What is powder; what does that mean?
A    Powdered coke.
Q    Powdered cocaine?
A    Yes.
Q    So you drove over to Blackwell.  After what you claim happened there you are in the car; you take everybody home.  Is that right?
A    Yes.
Q    Then you forget about it, right?
A    No, I didn't forget about it.
Q    You have told people before that it wasn't any of your business, haven't you?
A    Yes, that is correct.
Q    You didn't consider that to be your business?
A    No, it wasn't.
        MR. GEARY:  No further questions.
        THE COURT:  All right.  Mr. Cooley or Mr. McGarvey?
        MR. COOLEY:  Yes, sir.

                CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good afternoon.  Mr. Jones, what's your understanding about the requirement that you be truthful?
A    I get immunity.
Q    You get what?
A    I get immunity.
Q    If you are truthful.  And if you are not truthful, will you be prosecuted for perjury?
A    Yes, I will.

**JA729**

Hussone Curtis Jones (Cross)

Q     And that requirement that the government has placed upon you and you have agreed to deals with any time you are under oath in answering questions; is that right?

A     Correct.

Q     And that would have been true for the Grand Jury and it would have been true for today; that is correct?

A     I didn't swear up in the Grand Jury.

Q     You didn't swear?

A     I don't think I did.

Q     You are telling the ladies and gentlemen of the jury you did not swear to tell the truth when you appeared in front of the Grand Jury?

A     I can't recall.

Q     So it was okay to fib to the Grand Jury; is that right?

A     No, it wasn't.

Q     What?

A     No, it wasn't.

Q     Did you tell the truth to the Grand Jury?

A     The questions they asked me I told the truth.

Q     I see.  Now, you have told the ladies and gentlemen of the jury today that you bought cocaine on an occasion from Cory Johnson; is that right?

A     Never bought it.

Q     Did you get it from him?

A     Yes, one time.

Q     You didn't buy it from him, just got it from him?

A     Yes.

Q     And that happened one time?

A     One time.

Q     Do you recall when the question was put to you, this is page eight, do you recall when the question was put to you by Mr. Parcell at the Grand Jury, it started this way:  "Did you ever get cocaine to sell from 'J.R.'?"  You answered to that no.  His next question was:  "How about "O"?"  That's Cory Johnson, isn't it?

A     Yes.

Q     And you answered, "No, I didn't." Do you recall that answer?

A     No, I can't.

Q     You don't.  Do you deny that answer?

A     I can't deny it or can't say I said it.

Q     Let me ask you this:  Does your memory, has it gotten better in the nine months since your April 21st, 1992 testimony before the Grand Jury?  Has it gotten better between now and today?

A     I had time to think about it.

Q     You have had time to think about it.  Well, you

**JA730**

had some months to think about it before your testimony to the Grand Jury, didn't you?

A    No.

Q    No?  You had been testifying to the Grand Jury and to these folks about things from 1990, 1991, have you not?

MR. VICK:  Objection.  It is a misstatement, again.  He is not correctly stating the facts as they have been testified to here today.

THE COURT:  What is the misstatement?

MR. VICK:  The testimony that Mr. Jones has given is that he was picked up and taken to the Grand Jury and was not spoken to prior to that day.  He has not had an opportunity to think about it, as Mr. Cooley has said, for months prior.

THE COURT:  That will be overruled.

BY MR. COOLEY:

Q    Back in April, 1992 when you appeared before the Grand Jury, you had had a year, year-and-a-half to think about the things that had occurred to you since 1990, had you not?  You had had all that time since they purportedly occurred, haven't you?

A    I never thought about it.

Q    Until Mr. Jackson started talking to you?

A    Right.

Q    And then Mr. Vick started talking to you?

A    Right.

Q    Mr. Parcell talked to you?

A    Right.

Q    Detective Fleming talked to you?

A    Correct.

Q    Then you began to think about it; is that right?

A    The things I knew then, I told them.

Q    You told them about the things you knew then.

A    Yes.

Q    On April 21st, 1992, you told them about the things you knew then.

A    Yes.

Q    And since then you have been thinking some more?

A    Yes.

Q    You have thought of some more things you could say; is that right?

A    Yes.

Q    All right, sir.  So when you have told the ladies and gentlemen today that you got cocaine one time from Cory, that's because you have been able to think of that since April of 1992; is that right?

A    Correct.

Q    I see.  Now, today you told these ladies and gentlemen that Mr. Tipton told you about a number of

murders and why folks had been killed; is that right?

A   Correct.

Q   And do you remember testifying under oath, or not under oath, back in April of 1992 before the Grand Jury and talking about "Whitey's"  --

MR. VICK:  Objection.  Improper use of Grand Jury testimony.  He was not asked about it anywhere in that, and I would defy Mr. Cooley to show me where he was.

THE COURT:  Mr. Cooley, if you have something there, ask him about it.

MR. COOLEY:  Judge, I can't impeach him until he answers my question.

MR. VICK:  It was not asked him in Grand Jury.  It is improper use of Grand Jury.

THE COURT:  Mr. Cooley?

MR. COOLEY:  I'll call direct attention to the page.

THE COURT:  All right.

MR. COOLEY:  Page 12.

BY MR. COOLEY:

Q   I call your attention to page 12 of the Grand Jury testimony, your Grand Jury testimony. Specifically, line 14.  That's where this exchange begins:  "Did he," and he being "Whitey," "tell you who they killed?  Answer:  No, he didn't.  Question: Did he tell you how many people he killed?  Answer: No, he didn't.  I told him I didn't want to  --"

MR. VICK:  Objection.  Again, improper use of Grand Jury.

(At Bench.)

MR. COOLEY:  From here to here.

MR. VICK:  It is impossible to tell who -- he is talking about a specific event there.

MR. COOLEY:  He is talking about  --

THE COURT:  Please be quiet.

(Court perusing Grand Jury testimony.)

Now what is your problem?

MR. VICK:  My problem is he has taken that particular line out of context.  At the top of page 12 he said, "what did "Whitey" tell you?  Told me that "J.R." and "C.O." went over and supposedly killed somebody over there but they messed up and "J.R." didn't go back to get him."  He didn't talk about killing.  He has quoted out of context.

THE COURT:  I don't have any problem with that.  You can straighten it out.

MR. VICK:  Can I move this into evidence?

THE COURT:  You can ask him about it.

(In Open Court.)

BY MR. COOLEY:

**JA732**

Q    The question was put to you by Mr. Parcell, "did he tell you who they killed?"  Your response:  "No, he didn't."  Parcell asked the question "Did he tell you how many people he killed?"  Your response:  "No, he didn't.  I told him -- this is "Whitey," isn't it?  I told him I didn't want to hear it.  Whatever he did was his business.  I don't want to know about it."
     Do you recall that testimony before the Grand Jury?

A    Yes.

Q    So you had told Mr. Tipton you didn't want him to tell you about any of these acts; is that correct?

A    Yes.  He told me anyway.

Q    He told you anyway.  And though you made no mention of this particular incident that you have testified to today involving the party who was stabbed  --

A    I didn't know his name.

Q    You didn't know his name and you didn't make any mention of it whatsoever to the Grand Jury; is that correct?

A    Correct.

Q    Nor to Mr. Vick before the Grand Jury, nor to any of these other members of law enforcement or the prosecution.

A    Correct.

Q    Is that correct?

A    Yes.

Q    All right, sir.  How many times did you go to the Newtowne area yourself between, say, late  -- well, say fall of 1991 and February of 1992?  How many times do you think you went over there?

A    I started going in December.

Q    Started going there in December?

A    Yes.

Q    How many times do you think you went?

A    I can't recall.

Q    Don't recall?  Can you give us a general idea; was it less than five?

A    It was more than five.

Q    Was it less than ten?

A    I'd say between ten and fifteen.

Q    Ten and fifteen times.

A    Yes.

Q    Did you make extended visits there?  Did you go over and stay for long periods of time or did you go and make a pickup and come back?

A    Go make a pickup and come back.

Q    Did you ever stay and stand around to see who was selling to whom and what was going on in Newtowne?

**JA733**

A   No, I didn't.
Q   Never did that?
A   Huh-uh.
Q   Just went and made a pickup and came back.
A   Yes.
Q   Did you ever make a pickup from Cory Johnson?

A   Just one time.
Q   That's the one time you have told us about today that you did not tell the Grand Jury.
A   Yes.
Q   All right.  And that was a total of how much?
A   Two to one.
Q   Two to one.  30 hits.
A   Excuse me?
Q   30 hits?
A   Yes.
Q   I see.  Now, has anyone throughout these proceedings, these interviews that you had, these preparations for Grand Jury, preparation for trial today, has anyone from the government, prosecution, the prosecutors themselves, the detectives, or anyone else suggested to you what your answers should be?
A   No, they didn't.
Q   And no one has supplied an answer for you; is that correct?
A   No, they haven't.
Q   Now, I'm going to call your attention again one last time to your Grand Jury testimony, page nine.
        MR. VICK:  May we approach?
        THE COURT:  Come up.
    (At Bench.)

        MR. VICK:  In light of Mr. Cooley's continuing use of this acting as if I supplied answers, I think the jury should be instructed that it is perfectly proper to ask leading questions in Grand Jury.  That does not mean that you are supplying someone with an answer.  That's what Mr. Cooley is trying to make them think and I think that's improper.
        MR. GEARY:  The first thing, he is talking too loud.
        THE COURT:  All right.  I don't see any need for any instruction at this point.  I may change my mind.
        MR. VICK:  If I could, Your Honor, that was the whole purpose of his opening.  Now he said that I am giving him answers by leading him in the Grand Jury.  That's perfectly proper Grand Jury practice.  And it should be as a matter of law taken judicial notice of.  He is acting as if I have done something improper.
        MR. COOLEY:  Mr. Parcell was asking these

**JA734**

questions, actually.

(In Open Court.)

BY MR. COOLEY:

Q    I call your attention to page nine of your testimony before the Grand Jury.  The question that this relates to, questions about a person who is driving a station wagon; do you remember that general tone of questions or area of questions?

A    No.

Q    Let me ask you if you recall this exchange: "What was the guy in the station wagon?  What was his name?"  And you answered:  "I don't know."  Next question from Mr. Parcell:  "Was it Linwood?"  Your response:  "It was a kind of a chubby guy."  Mr. Parcell's next question:  "Linwood Chiles?"

MR. VICK:  I would note also we have asked no questions to him about Linwood Chiles today.

THE COURT:  That objection will be sustained.

MR. COOLEY:  Judge, may we approach?

THE COURT:  There is no need to approach.

MR. COOLEY:  Judge, it is being offered as -- I'm sorry.

BY MR. COOLEY:

Q    You did not provide names throughout your testimony, did you?

A    Not the station wagon driver.

Q    Would that also be true as to other folks?

MR. VICK:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. COOLEY:

Q    Would that also be true of other folks?

A    I just heard them say Doug.  I knew Curt and I knew Pepsi.

Q    When you didn't know the response, was the question similar to those that I just read to you?

A    About the driver?

Q    Yes.

A    Yes.

Q    Yes?

A    I still didn't know.

Q    Now you understand, as you were asked at the beginning on direct examination, about immunity.  You have indicated to me you have been granted immunity. Do you believe if you testify as anticipated, that you will not be charged for anything?

A    I didn't know.

Q    I'm sorry?

A    They told me just to tell the truth.

Q    And what?

A    I would get immunity.

Q    You will get immunity.

**JA735**

A    Yes.
Q    What does that mean to you?

1621

A    I'm just free.
Q    You are going free, not going to be charged with anything.
A    Right.
Q    You have certainly given them information in the course of telling them about who was doing what, just as you have testified here today.  You have told them about Antwoine Brooks' involvement, right?
A    Right.
Q    J.T. Williams' involvement?
A    Correct.
Q    Charles Townes' involvement?
A    Yes.
Q    And your brother Maurice's involvement?
A    Right.
Q    Do you know because of your discussions, particularly in that ride over to the Grand Jury with Charles Townes, you know that other folks have told them about what you were doing; is that right?
A    I didn't know that.
Q    You didn't know that.  Do you understand that if those folks gave them information you could be prosecuted using their testimony?
A    I didn't know that, either.
Q    Your understanding is as long as you testify as

1622

anticipated, you will not be prosecuted.
A    Correct.
        MR. COOLEY:  Thank you, sir.
        MR. COOLEY:  Could I ask leave at a subsequent time to proffer the balance of the statements?
        MR. VICK:  I'll move the Grand Jury transcript into evidence.  We will have it marked Government Exhibit 139 and put into evidence.
        MR. BAUGH:  Objection at this time, Your Honor.
        THE COURT:  All right.  Sustained.
                CROSS-EXAMINATION
BY MR. BAUGH:
Q    Good afternoon, sir.  Now, during these conversations  --  wait, withdraw that.
      You met with Mr. Vick on Sunday, this past Sunday, am I correct?
A    Talked to him on the phone.
Q    You talked to him on the phone.  And when you talked to him on the phone, he didn't have time to go over everything, did he?
A    No, he didn't.
Q    But during the twenty minutes that you did talk, did he ask you which arm that Mr. James Roane had

**JA736**

Hussone Curtis Jones (Cross)

1623

been stabbed in?

A    He wasn't stabbed in the arm.

Q    Did you ever tell Mr. Vick that Mr. Roane came back to the car and said, "I got stabbed up there," or showed you a wound?

A    No, he said, "I think cuz got me in my hand."

Q    "In my hand?"

A    Yes.

Q    And you pointed just now in front of this jury, you just pointed to your hand, right?

A    Yes.

Q    When James Roane according to you got back in that car, where did he sit?

A    Behind me.

Q    He got in the backseat.  So you turned around to him because he saw him point to his hand, am I correct?

A    No, I didn't.

Q    How did you know which hand he pointed to unless you turned around, or are you saying you didn't know?

A    I saw him.  He was holding his hand up like this.  I could see from the corner of my eye.

Q    He was sitting directly behind you and he held his hand up so could see it?

1624

A    Right.

Q    The streetlight would have been in front of you, right?

A    Right.

Q    And the light from the streetlight would have been coming through the front windshield, correct?

A    Correct.

Q    And he held his hand up in the light; am I correct?

A    On the side.  I wouldn't say it was in the light.  I said he just had it on the side.

Q    Other than the glass of the windshield, what was between the light and Mr. Roane's hand, anything?

A    I don't think so.

Q    Wait a minute.  Your car was two car lengths back, so the front car wouldn't have been in the way, wouldn't it?

A    There was no car in front of me.

Q    No car in front of you?

A    No.

Q    No car parked two car lengths in front of you?

A    Just Doug Talley's.

Q    That's the one I'm talking about.  Was his car blocking the light?

A    No.

1625

Q    You remember him holding up the left hand and

**JA737**

Hussone Curtis Jones (Cross)

pointing towards where?

A    He didn't point.  He just held his hand.

Q    Didn't you just point and say "my hand?"

A    I said he said he cut his hand.  I didn't say he pointed.

Q    Now, are you being paid now?

A    No, I'm not.

Q    Has the United States paid you any money in the last year?

A    No, they haven't.

Q    Do they pay your rent?

A    Yes, they do.

Q    Did they get you a job?

A    No.

Q    Do they pay for your meals?

A    No, they don't.

Q    How do you pay for your meals?  Do you have a job?

A    Yes, I do.

Q    All right.  Did they get you the job?

A    No, they didn't.

Q    And during this time period that you were selling drugs, did you have any bills?

A    Just a hospital bill.

Q    Just a hospital bill.  Now, you had already been selling drugs and quit once before, am I correct?

A    Correct.

Q    There was no problem when you quit, was there?

A    No, there wasn't.

Q    You went and got yourself a job.

A    Correct.

Q    All right.  And you earned a salary.

A    Correct.

Q    And then you got laid off.

A    Correct.

Q    And then you went back into the drug selling business.

A    Correct.

Q    And the whole time you were out, you didn't have any hassle with anyone about "Why don't you come back and sell drugs again," did you?

A    No, I didn't.

Q    No one came threatening you and saying, "We want you to sell drugs for us?"

A    No, they didn't.

Q    Even though at that time your brother, Maurice Saunders, went to jail, right?

A    He went to jail before I got my job, yes.

Q    Okay.  Well, during this time in January when you came back to sell drugs, Maurice was in jail, wasn't he?

A    Correct.

Q    But you were living at home with your mother?
A    No, I wasn't.
Q    Well, where would he call you?
A    I would go see him.
Q    How often would you go see your brother Maurice?
A    I would try to go see him every Sunday.
Q    That's when his visitation was in Henrico?
A    No, in Richmond.
Q    You could get to see him on Sunday in visitation?
A    Yes.
Q    You saw him about every Sunday?
A    I tried to see him every Sunday.
Q    Did you try to see him every Sunday in January?
A    No.
Q    Was he in jail in January of 1992?
A    Yes, he was.
Q    But you didn't go any Saturday or Sunday  --
I'm sorry, did you go any Sundays in January?
A    Yes.
Q    Every Sunday in January?

A    No, I didn't go every Sunday.
Q    In February?
A    I can't recall.
Q    Did you ever talk to him on the phone during that time period?
A    Yes, once or twice.
Q    Well, where would he call you?
A    He would call his girlfriend, and she would get ahold of me.
Q    Where would she call you?
A    At my sister's house.
Q    Now, in any of those conversations that you had with your brother, did you ever tell him that you had witnessed a murder?
A    No, I didn't.
Q    Slip your mind?
A    Not on the telephone.
Q    Not on the telephone?
A    No.
Q    You are saying it wouldn't be proper to discuss something like that on the telephone?
A    Yes.
Q    When he got out, did you talk to him about it?
A    No, I didn't.
Q    Have you ever told him about it?

A    Yes.  When he was locked up.
Q    Wait.  How did you talk to him when he was locked up?
A    When I went to see him.
Q    You didn't want to talk on the telephone, but

**JA739**

you went into the visitation room in Richmond and discussed a murder with an inmate?

A    Yes.

Q    Now, am I correct, tell the ladies and gentlemen of the jury, when you go in the visitation room in Richmond, there is a long line of windows with little telephones, right?

A    Correct.

Q    And there is a little board about ten inches thick on either side of it.

A    Correct.

Q    And I mean there is no privacy; you can just lean over and listen to the other person's conversation if you want to, correct?

A    Correct.

Q    It is your testimony that you told your brother, Maurice Saunders, while he was in custody in the Richmond City Jail, that you had witnessed a murder?

A    Correct.

Q    Did you tell him who the victim was?

1630

A    No, I didn't.

Q    What did Doug Talley look like?  How tall was he?

A    I don't know.

Q    Approximately.

A    I never saw him.

Q    You never saw Doug Talley?

A    Huh-uh.

Q    What was he wearing that night?

A    I don't know.

Q    Didn't you just tell the ladies and gentlemen that before you got in the cars in Newtowne you saw and were introduced to him?

A    No, I didn't.  James Roane came and got "Whitey" and said Doug was downstairs.

Q    You never saw him standing up, never saw his face or anything like that?

A    No.

Q    Wait a minute.  James Roane told "Whitey" in your presence what?

A    Doug was downstairs.

Q    Doug. And you had heard, according to you, you had heard Mr. Roane earlier talking about Doug Talley being 5-0, right?

A    Correct.

1631

Q    So you figured the person downstairs in the car was Doug Talley, right?

A    Yes.

Q    Didn't you just tell this lawyer over here you didn't tell because you didn't know who Doug Talley was?

A    I didn't know his face.  I just heard them

**JA740**

talking about him.

Q   Wait a minute.  When asked why you didn't talk about this before, didn't you just tell this lawyer, and correct me if I am wrong, that one of the reasons you didn't tell is because you didn't know the dead man's name?

MR. VICK:  I don't believe he testified to that.

THE COURT:  He can ask the question.

BY MR. BAUGH:

Q   Didn't you just, correct me if I am wrong, because God knows I make mistakes, didn't you just tell one of these lawyers that one of the reasons why you did not tell the authorities or tell anybody is because you didn't know the dead man's name.

A   I didn't know his face.

Q   No.  I didn't ask you that.  I asked you, did you just tell these people in response to one of these people's questions that the reason, or one of the reasons, you didn't bring it up is because you did not know the dead man's name?

A   That was during the Grand Jury.

Q   You didn't know the dead man's name during the Grand Jury?

A   I just knew he was Doug. I didn't know his last name.

Q   When did you remember about this conversation where Mr. Roane said, "Doug Talley is 5-0;" when did you remember that?

A   I had already knew that.

Q   You knew that before Grand Jury.

A   Yes, I just knew Doug.

Q   Back up.

MR. VICK:  This is argumentative with the witness.  It is not  --  he is not allowing him to answer.

THE COURT:  I'll let you go ahead.

BY MR. BAUGH:

Q   Sir, let me get this right.  Did you hear the name Doug Talley before you went into the Grand Jury?

A   Yes, one time.

Q   All right.

A   Twice.

Q   Twice.  Douglas Talley, both names.

A   Doug Talley, and then Douglas.

Q   So you knew that when you went into the Grand Jury, right?

A   I couldn't remember his name.

Q   Who refreshed your recollection?  Who reminded you of the man's name?

A   I read it in the paper.

**JA741**

Q    You read what in the paper?

A    When they had the paper out on the Newtowne Gang, I was reading it.

Q    After they were arrested?

A    Yes.

Q    You are telling me that you read that article before you went into the Grand Jury or after you went to the Grand Jury?

A    When it came out in the paper. I don't know if it was before or after Grand Jury.

Q    This article?

     (Counsel displaying newspaper.)

A    Yes, that's the one.

Q    Okay. Did you read the whole article?

A    Yes.

     MR. VICK: I don't know how the witness could be expected to see and tell that that's the same one he read. If he wants to show it to him and ask him to look at it --

     MR. BAUGH: Thank you.

BY MR. BAUGH:

Q    Now --

     THE COURT: Mr. Baugh?

     MR. BAUGH: He hadn't gone wrong yet.

     THE COURT: Mr. Vick had an objection on the board, and I had not responded to it.

     MR. BAUGH: I'm sorry.

     THE COURT: The objection is overruled. Go ahead.

BY MR. BAUGH:

Q    Thank you. Did you read the whole article?

A    I was looking at the whole article.

Q    Did you just tell me that you read the article?

A    Reading and looking is the same thing, to me anyway.

Q    Did you look at the individual words and did you try to discern them?

A    I looked at the whole article.

Q    In the article, were there words?

A    Yes, there were.

Q    Did you happen to read those words?

A    Looking and reading, to me, is the same thing.

Q    In that article do you recollect them saying something about a man being stabbed more than 80 times in a parked car?

A    On Stockton Street?

Q    Excuse me? On Stockton Street? We will get to that point later. Do you remember reading something about how many times the man was stabbed and where he was stabbed?

     MR. VICK: He is not allowing him to answer the questions.

**JA742**

THE COURT:  Let him answer your questions.

BY MR. BAUGH:

Q    Do you remember reading in the article about how the man was killed, i.e., stabbed; do you remember that?

A    Yes.

Q    Do you remember reading in the article how many times he was stabbed?  Remember that?

A    It was two people stabbed in the article.  One was 87 times and the other one I can't remember.

Q    87 times.  You remember the exact number?

A    You just said it.

Q    All right.  You read that in the paper.

A    Yes.

Q    And you saw this article before or after you were in the Grand Jury?

A    I can't remember.

MR. VICK:  Asked and answered.

THE COURT:  He has already answered that.

MR. BAUGH:  Your Honor, he just said he didn't remember this time.

THE COURT:  That's what he said the last time.

BY MR. BAUGH:

Q    All right.  Well, did you know all that information before you went into the Grand Jury?

A    Not all of it.

Q    What didn't you know?

A    Some of the murders I didn't know about.

Q    Know about Mr. Talley?

A    About Talley?

Q    Did you know all of that before you went in there?

A    No, I didn't count the number of times he was stabbed.

Q    Did you know that information?

A    No.

Q    All right.  Now, during the time you were having interviews with Mr. Jackson, did he ever ask you prior to the time you went into the Grand Jury about any murders?

A    No, he didn't.

Q    He didn't ask you did you know about any violence or anybody carrying guns or anybody getting shot?

A    Guns, yeah.

Q    Bringing up the guns, do you know anything about people getting murdered?

A    No.

MR. VICK:  Asked and answered.

THE WITNESS:  He just asked me if "Whitey" and "C.O." were carrying guns, and I said yes.

**JA743**

BY MR. BAUGH:

Q    When Mr. Jackson would ask you these questions, would he write things down?

A    No, he didn't.

Q    Did they ever show you a picture of Mr. Talley?

A    No. They did not.

Q    Now, also, Charles Townes, "Man Man," he was a close personal friend of yours?

A    Yes.

Q    To the point where he sometimes stayed in your house, your mother's house?

A    No.

1638

Q    He didn't?

A    He never stayed at my mother's house.

Q    Did you talk to him after the death of Mr. Talley?

A    Yes.

Q    You talked to him how many times, approximately?

A    About the murder?

Q    No, how many times did you talk to him?  We will bring up the murder later.

A    Every day I seen him.

Q    Was he a person you would see every day?

A    Yes.

Q    All right.  And you would see him on the streets of Central Gardens?

A    Yes.

Q    And you would see him in the company of Mr. Tipton?

A    Sometimes, yes.

Q    During all those times, you never mentioned that you had seen a murder?

        MR. VICK:  Objection.  He just said  --

        THE WITNESS:  Talked to him about it one time.

BY MR. BAUGH:

1639

Q    When was that?

A    I can't recall the date.

Q    Approximately.

A    I can't recall.  It was during the daytime.

Q    Were you afraid of Mr. Tipton?

A    No.

Q    You had seen him kill someone, you said.  You weren't afraid to get in the car with him and go up to New Jersey or someplace, were you?

A    No, I wasn't.

Q    He didn't scare you, did he?

A    No, he didn't.

Q    When did your brother get out of jail?

A    I don't know the date.

Q    What month?

**JA744**

A    I don't know.
Q    What season?
A    Winter.
Q    In the winter?  Was it recently, when he got out of the Henrico charges?
A    Henrico?
Q    Did he ever go to jail in Henrico?
A    Yes.
Q    When did he get out; what year was that?
A    I don't know.  He went to Hanover Boys'

Correctional Facility.
Q    When did he get out?
A    I don't know.
Q    Do you know what time of year he got out of Henrico, off of their charges?
A    It was during the spring or summer.
Q    Of which year?
A    '90.
         MR. VICK:  I hesitate to rise.  This is beyond the scope of direct.  This is irrelevant.
         THE COURT:  Sustained.  You have asked enough questions about that, Mr. Baugh.
BY MR. BAUGH:
Q    Well, let me ask you this:  On the occasion that you told your brother and you told Charles Townes about this murder, was that before or after you went to the Grand Jury?
         MR. VICK:  Objection to the form of the question.  He has not testified it was the same occasion and he told them at the same time.
         MR. BAUGH:  I didn't say that.
         THE COURT:  Sustained.
BY MR. BAUGH:
Q    On either of the occasions, either one of them, whenever they occurred, assuming they didn't happen

at the same time, did either of them occur prior to your Grand Jury testimony?
A    I don't understand the question.
Q    Did you tell your brother, Maurice Saunders, that you had witnessed a murder before you went to the Grand Jury?
A    I can't recall.  Because the Grand Jury stuff came so fast.
Q    The what?
A    The Grand Jury thing came so fast.
Q    Wait a minute.
A    I can't recall.
Q    Did you know your brother had been to the Grand Jury?
A    No, I didn't.
Q    You never talked to him about that?
A    No, I didn't.

**JA745**

MR. VICK:  He has not, Your Honor.

MR. BAUGH:  Can I cross-examine him?

THE COURT:  Mr. Baugh, you all come up here.

(At Bench.)

THE COURT:  I'm tired of your attitude. Just ask the question and get a ruling.  When there is an objection, give me time to rule on it and I won't be curt with you.

MR. BAUGH:  There was no objection.

THE COURT:  You are right about that.  I'm talking about generally.

MR. VICK:  I would state for the Court up here, I will offer Maurice Saunders.  He is misleading.  Maurice has not been to the Grand Jury.

(In Open Court.)

BY MR. BAUGH:

Q    I do not mean to be repetitious.  But however, let's do it this way.  You saw Charles Townes in the street in the daytime and you told him you had seen a murder, right?

A    Yes.

Q    All right.  And this occurred in Central Gardens; am I correct?

A    Correct.

Q    And were you still selling drugs at that time?

A    Yes, I was.

Q    All right.  And was this before or after you all went to New Jersey and got busted?

A    It was before, I guess.

Q    All right.  And you got busted in New Jersey when, in March?

A    Yes.

Q    So you testified in the Grand Jury in April; am I correct?

A    Correct.

Q    So therefore, you had to have told Charles Townes about the murder that you allegedly witnessed before the Grand Jury, before you testified in the Grand Jury.  Am I correct?

A    Yes.

Q    So therefore, you had thought about and knew in your mind about this murder before you went in and were questioned by these people; am I correct?

A    Yes, sir.

Q    Now, when you talked to Charles Townes, did you tell Charles Townes the name of the person you allegedly saw murdered?

A    No, I didn't.

Q    All right.  Did you know the name at that time?

A    No, I didn't.

Q    But wait a minute.  Wasn't your conversation

**JA746**

with Charles Townes  --  you hadn't remembered?
A    No.
Q    Do you remember when someone gave you the name
so you could remember it?
A    I read it in the papers.
Q    All right.

What did you tell Mr. Townes, if you recollect, as
much as you do recollect it?
A    I just told him me, "Whitey" and James Roane was
over in Blackwell and James Roane and "Whitey" was
stabbing the dude in the car.  And I told him, "I
wanted to leave, but if I left, they might do
something to my grandmother over there."  Because I
didn't really care about myself.
Q    Hadn't you left the drug selling business before
this?
A    No, I'm talking about if I left the scene of the
murder.
Q    When you were witnessing this, you are saying it
was so bad you were thinking about leaving that
night; you were thinking about just driving away?
A    It wasn't so bad.  It was just I felt I
shouldn't have been there; that that wasn't my
business.
Q    It didn't bother you someone was being killed;
it was just none of your business.
A    Correct.  I was concerned about my family.  I
wanted to leave.
Q    Are you talking about your brother, Maurice
Saunders?
A    No.

Q    What about your friend, Mr. Charles Townes? Were
you concerned about him?
A    He didn't know about it.
Q    Did you warn him about it, that he might be in
danger from associating with these people?
A    No, I didn't.
Q    Who did you tell immediately?  Who did you
warn?
A    I didn't warn nobody about it.
        MR. BAUGH:  Can I have just one moment,
please, Your Honor?
    (Counsel conferring with co-counsel.)
BY MR. BAUGH:
Q    When Mr. Roane, according to you, and Mr. Tipton
left the house with you, what was Mr. Tipton
wearing?
A    He was wearing a big brown coat, bluejeans, and
boots.
Q    What was Mr. Roane wearing?
A    I can't remember what he was wearing.
        MR. BAUGH:  Pass the witness.

**JA747**

Hussone Curtis Jones (Redirect)

THE COURT:  Mr. Wagner?

MR. WAGNER:  I have no questions, Your Honor.

THE COURT:  Redirect?

1646

REDIRECT EXAMINATION

BY MR. VICK:

Q    Mr. Jones, in Grand Jury were you asking the questions or were you having questions asked of you?

A    It was asked of me.

Q    Were you responding to the questions that were asked of you?

A    Yes, I was.

Q    There was only one murder that was asked about in Grand Jury; is that correct?

MR. GEARY:  Objection.

MR. BAUGH:  That's leading.  Objection.

BY MR. VICK:

Q    Do you remember being asked in Grand Jury  --

MR. BAUGH:  I have an objection on the floor.

THE COURT:  The objection is overruled.

MR. BAUGH:  Thank you, Your Honor.

BY MR. VICK:

Q    You were asked only about one murder in Grand Jury; is that correct?

A    Yes.

Q    That was about a murder on Church Hill.

A    Correct.

Q    Is it that murder that you gave the response to

1647

that you did not want to know what "Whitey" had to tell you about?

A    Correct.

MR. COOLEY:  Leading.

THE COURT:  Overruled.

BY MR. VICK:

Q    You were not asked about the murder of Doug Talley in Grand Jury, were you?

A    No, I wasn't.

Q    You were not asked in Grand Jury to offer all the knowledge that you had, either, were you?

A    No, I wasn't.

Q    You were only asked questions and asked to respond to them; is that correct?

A    Correct.

Q    Have you ever told anybody that James Roane got in that automobile and was cut on his arm?

A    No.

MR. VICK:  Your Honor, I would move into evidence the Grand Jury transcript of that proceeding.  I'll have it marked Government Exhibit 139 and moved into evidence.

MR. GEARY:  May we approach the bench?

**JA748**

(At Bench.)

MR. GEARY:  Judge, what they are attempting to offer is substantive testimony which is actually Grand Jury testimony, which for my client I strongly object.

MR. BAUGH:  I object, too.

THE COURT:  Anybody else want to voice an objection?

MR. WAGNER:  Yes.

THE COURT:  Well, I am going to say this so that maybe in the future you will understand.  In the ordinary circumstance the Grand Jury testimony would not be admissible.  By the nature of the way you use it you might make it usable.  I'm not going to let it in at this time.  Everybody get my message here real loud and clear?  Thank you so much.

MR. BAUGH:  Not all of us examined on that issue.  Some of us did not.

BY MR. VICK:

Q   You were asked on cross-examination about "Whitey's" stickmen.

MR. GEARY:  I object to him leading the witness.

MR. VICK:  I'm directing hits attention.

THE COURT:  Overruled.

BY MR. VICK:

Q   Who did you say were "Whitey's" stickmen?

MR. GEARY:  He answered that when I asked him.

THE COURT:  The objection is sustained.  He has indicated it already.

MR. VICK:  You indicated "C.O.," "J.R." --

MR. GEARY:  Objection.

THE COURT:  Sustained.  Ask a question.

MR. VICK:  I can't with out predicating.

BY MR. VICK:

Q   Why did you say certain people --

MR. GEARY:  Objection.

THE COURT:  No.  That's all right.

BY MR. VICK.

Q   Why did you say certain people were his stickmen and not include yourself or Maurice or "Man-Man" or other people who sold drugs for them?

A   Because they was closer.

Q   What do you mean by stickman?

A   They knew each other longer than me and him knew each other.

Q   You have indicated on cross-examination that the government, the United States Government, has paid your rent.  Is that correct?

A   Correct.

**JA749**

1650

Q    Why has the United States Government paid your rent?

A    My well-being and safety.

Q    And tell us why.

A    For my testimony.

Q    All right.  And how did that come to pass; why is it for your safety?

A    Because I'm in so much danger.

Q    Where do you live now?

A    I can't tell you.

Q    Don't tell me the exact place.  Do you live in Richmond?

A    No, I don't.

Q    Why is that?

MR. BAUGH:  Objection.  He is asking why the government moved him?  That's conclusory.

MR. VICK:  He asked why the rent was paid.

THE COURT:  I think he has answered it enough.  Leave this alone, Mr. Vick.

MR. VICK:  No further questions.

THE COURT:  All right.  Let me ask you, let me have you all up here.  How are we standing on witnesses?

(At Bench.)

MR. VICK:  I would move to call Detective

1651

Fleming for prior consistent statement given the cross-examination of this man concerning this testimony about Doug Talley.  Then I don't have any other witnesses until Denise Berkley.  While we are here, in light of the question  --  in light of Mr. Cooley's opening about people being paid for testimony, in light of the question by Mr. Geary on cross that "They paid your rent," I think the jury should be instructed that these people -- the defense attorneys make it seem like we have bought testimony, led them to answers, and it is not the fact, as the Court knows.  They know it is not the fact.  And unless I can explore it on redirect, I think the jury should be instructed.

THE COURT:  I have no problem with you asking the questions.  But "Where do you live?"

MR. VICK:  That was a ridiculous question.

THE COURT:  In terms of the Witness Protection Program, I don't have any problem with it.

MR. VICK:  Yes, sir.  Then I have some more questions of him.  I would call Detective Fleming for prior consistent statement after that.

MR. BAUGH:  Could we have a proffer?

THE COURT:  Yes.

1652

MR. VICK:  The proffer is he has told us in

debriefing previously exactly what he has told us on the stand here today.  They had raised the inference that he has fabricated this.

MR. GEARY:  That's not his testimony.

THE COURT:  No.  I won't allow it.

MR. VICK:  Before I ask these questions about the Witness Protection Program, I'll ask the Marshals to make sure I'm not stepping on their toes.

THE COURT:  You have to be very careful about this.  Check with them.  And do it briefly.

(In Open Court.)

BY MR. VICK:

Q    Mr. Jones, are you currently in the federal Witness Protection Program?

A    Yes, I am.

Q    Is that how it came to be that the United States Government paid your rent?

A    Yes, it is.

MR. VICK:  I have no further questions.

THE COURT:  All right, ladies and gentlemen, I am informed that we have no more witnesses available for today, and I understand we might have this problem again on Thursday.  But after that, we will get into clearer sailing and use all of

our time much better than we have been.  So what I am going to do now is release you all to return on Thursday morning at 10 o'clock.  We have tomorrow off, as I indicated to you before.  Thursday morning at 10 o'clock.  And we will get started.  Again, do not discuss the matter with anyone and do not review or view any media items relating to this case.  Thank you so much and we will see you Thursday morning at ten.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. COOLEY:  Your Honor, might I be allowed to proffer the balance of the question that I was putting to the witness?

THE COURT:  All right.  Why don't you submit it as an appellate exhibit just for the entire thing and I'll take it and it will go into the record and it will be done.

MR. VICK:  I would just note that if this has to do with the Grand Jury testimony, we will move the entire transcript in.

THE COURT:  I understand.  You have moved it several times, but I'm not going to let it in.  But sure, it will be on the record as an appellate exhibit.

MR. COOLEY:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Marshal, would you remove the witness, please?

(The witness left the courtroom.)

All right, Mr. Marshal, would you remove the defendants?

(The defendants were removed from the courtroom.)

All right, counsel, Mr. Baugh especially, I just got a note that the  --  let me see you up here.

(At Bench.)

THE COURT:  I just had a note that one of your folks wanted to examine Mr. Roane while he is in town.

MR. BAUGH:  I was going to talk to you about that before we left.

MR. VICK:  I have yet to receive the first item of discovery from Mr. Roane.

MR. BAUGH:  I'm sorry, Your Honor, we have not done any exams yet.  We haven't got them.

THE COURT:  I wash my hands.  I just wanted to let you know.

(In Chambers.)

MR. BAUGH:  I need an order directing the Marshals to have Mr. Roane here in the lock-up at nine so he can be examined by the doctor.

THE COURT:  We can do it.  No problem.  I'll take care of it.

(Proceedings adjourned at 4:02 p.m.)

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                                Plaintiff;

        v.                              CRIMINAL ACTION
                                             92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                                Defendants.

------------------------------------------

VOLUME VIII

January 20, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:         HONORABLE JAMES R. SPENCER
                United States District Judge


APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                JEFFREY B. KULL
                OFFICIAL COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S
        THE CLERK:  Case number 92CR68:  United
States of America versus Richard Tipton, Cory

**JA754**

Johnson, James H. Roane, Jr., and Sandra Reavis. The eighth day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready.

MR. GEARY: Defendant Tipton is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. BAUGH: Defendant Roane is ready.

MR. WAGNER: Defendant Reavis is ready.

MR. VICK: One pretrial matter, Your Honor, in response to the Court's rulings the other day about non-admission of the testimony of -- excuse me, non-admission of the statements made by Dorothy Armstrong, who I believe the government would prove and has already established was murdered by these conspirators. I have pulled some cases. I have left them up on the Court's bench. They deal with not precisely that issue -- we don't have any cases that deal precisely with that issue -- but deals with the confrontation, the hearsay problem that goes along with a murder victim who would have testified or could have testified. And those cases generally hold that when a defendant murders someone, he indeed waives his confrontation objection.

The other item that needs to be shown before that evidence would indeed be admissible as hearsay is that indeed it has some indicia of reliability. In the cases I have cited, the HOPKINSON v. SCHILLINGER case, 856 F.2d 1185, deals with some of the factors that should be looked at when determining whether there is a sufficient indicia of reliability; would indeed there be a reason for this person to fabricate this testimony. Would she take action which was consistent with that statement, that indeed she had been threatened or thought they were going to hurt her or et cetera. I won't belabor it, like I said. It does not come up in any of the witness testimony this morning. It will indeed come up in a particular witness' testimony later, so I cite those cases to the Court for review.

THE COURT: All right.

MR. GEARY: I would defer to Mr. Baugh on that issue.

THE COURT: I don't need to hear anything. Does the witness need to be in the box?

MR. GEARY: Yes, sir.

MR. WHITE: If the Court please, one housekeeping matter. With regard to the witness who is about to be brought in, Denise Berkley, I would like the Court to know that we attempted to interview Ms. Berkley and she indicated she did not want to talk to us or answer any of our questions. The subject of that Court's ruling is still off limits?

THE COURT: Absolutely.

**JA755**

MR. BAUGH:  We were advised by the United States that Mr. Dennis Moody -- as the Court may remember I mentioned his name.  He was the person who allowed me to interview him during this case prior to trial who told me that my client had fired a weapon.  And we mentioned his name during opening.  I've been advised by the United States that Mr. Moody has, quote, flown the coop.  We were of course relying -- we mentioned that in chambers that as to those witnesses we would rely on that.  We would ask for a warrant to arrest Mr. Moody, that it be entered into NCIC.  And further, in the event he is not able to testify, that we continue the trial of Mr. Roane until his presence is secured.

THE COURT:  I'll issue a warrant for Mr. Moody.  You are not going to get a continuance under any circumstances.

MR. BAUGH:  I have a written request.  I'd like the mother of Mr. Moody, who lives at 3910 Chamberlayne Avenue, Apartment Q, who was present during the conversation, I would ask either for a subpoena or a warrant for her arrest as well so we can interview her as well as to what she overheard during the conversation.

THE COURT:  I'll subpoena her.

MR. BAUGH:  We run into a problem with witnesses not wanting to talk.  When they do talk, somebody told them that something happened in Court and they show up missing.  Mr. Moody was no problem.  Now all of a sudden he has flown the coop.  He couldn't be threatened by these defendants because his testimony is actually favorable.

THE COURT:  Mr. Moody is anticipated as a witness, and if he is not present when called, a warrant will be issued.  If you want to subpoena the mother, whether or not that testimony will be allowed, if you want to subpoena her, that's fine.  Is that it?  All right.  Let's bring in the witness.

(The witness entered the courtroom.)

MR. VICK:  Could I have 135-1, 1-1, to show to this witness?

THE COURT:  All right.

(The jury entered the courtroom.)

## I.  Denise Robin Berkley (1660)

DENISE ROBIN BERKLEY, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    During your testimony, I'm going to ask that you speak up and speak into the microphone.  If you get too close to it it gives you feedback.  Speak up so everyone can hear.  Could you state your name for the Court, record and jury?
A    Denise Robin Berkley.
Q    And Ms. Berkley, how old are you?
A    30.
Q    How far did you go in school?
A    Eighth grade.
Q    Have you ever been convicted of a felony?
A    No.
Q    Have you ever been convicted of a crime involving lying, stealing, or cheating?
A    No.
Q    Have you been a drug user in the past?
A    Yes.
Q    What sorts of drugs have you used?
A    Crack, marijuana.
Q    When did you begin using crack?
A    About November.

1662

Q    Of what year?
A    Of 1990.
Q    All right.  And how often did you use crack cocaine?
A    I was using it every day.
Q    How many times a day?
A    Four or five times.
Q    When did you first start using marijuana?
A    I was about 18.
Q    And how often have you used marijuana since then?
A    Off and on, not as much as coke.
Q    Are you currently using any drugs?
A    No.
Q    How long has it been since you have used any drugs?
A    A year.
Q    You are testifying here for the United States Government; is that correct?
A    Yes.
Q    Could you state to the ladies and gentlemen of the jury what led you to testify for the United States Government in this trial?
A    Because of things I have seen and some of my friends that got killed.

1663

Q    Did you indeed contact members of this investigative team?
A    Yes.
Q    Who is it that you contacted?
A    Mr. Fleming.
Q    Detective Ralph Fleming?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury how it was you contacted him?

A    I went to the police station  --

MR. BAUGH:  I object to this as irrelevant to the issue of the circumstances of the conspiracy.

THE COURT:  Overruled.

BY MR. VICK:

Q    Go ahead.

A    I went to the police station and tried to turn myself in, and that's when I told them that I knew about what had happened, the murders and the people.

MR. McGARVEY: I'm sorry, I couldn't hear the last response.

BY MR. VICK:

Q    Repeat that.

A    I said that I had went to the police station because of the murders and plus I felt that my life was on the line.

1664

Q    All right.  Is that how you ended up speaking to Detective Fleming?

A    Yes.

Q    In preparation for your testimony, have you had occasion to meet with myself, Detective Fleming, Mr. Parcell, and other people involved with this investigation?

A    Yes.

Q    And approximately on how many occasions would you say that you have met with us in preparation for your testimony?

A    I'd say about three times.

Q    In any one of those meetings, has anyone from the prosecution team or the investigative team told you how you should answer any particular question?

A    No.

MR. McGARVEY:  We will stipulate she will say no to that question.

THE COURT:  We don't need that kind of stipulation, Mr. McGarvey.  How can you stipulate to what the witness is going to say?  Don't be ridiculous, please.

BY MR. VICK:

Q    I didn't hear your answer.  Has anybody told you how to answer any particular question?

1665

A    No.

Q    Has anybody provided you, from the investigative team, has anybody provided you with the answers or any information concerning your testimony?

A    No.

Q    The subject of your testimony comes from where?

A    From me.

Q    I direct your attention to approximately

**JA758**

November of 1991.  Do you remember that time frame?

A     Yes.

Q     In that time frame, around Thanksgiving of 1991, did you have occasion to meet an individual by the name of "C.O." or "O"?

A     Yes.

Q     Where was that?  I withdraw that.  Did you have an occasion in that same time frame to meet an individual by the name of James Roane or "J.R."?

A     Yes.

Q     Did you have occasion to meet an individual by the name of Richard Tipton or "Whitey"?

A     Yes.

Q     Do you know an individual by the name of Sandra Reavis?

A     Yes.

Q     I'll ask you to stand up, look around if you need to, review the courtroom, and see if you can identify, individually, Mr. Richard Tipton, "Whitey."

A     There.

Q     Could you tell us how he is dressed?

A     Blue suit.

        MR. GEARY:  Stipulate.

        MR. VICK:  Let the record reflect the identification of Richard Tipton.  Could you look around and see if you see Mr. Cory Johnson?

        MR. McGARVEY:  Stipulate ID.

        THE COURT:  All right.

BY MR. VICK:

Q     James Roane?

A     Yes.

        MR. BAUGH:  Stipulate.

BY MR. VICK:

Q     Do you see Ms. Sandra Reavis?

A     Yes.

        MR. WAGNER:  Stipulate ID.

BY MR. VICK:

Q     Of these individuals, who did you meet first?

A     "Whitey."

Q     And where did you meet "Whitey"?

A     On the corner of Hancock and Clay.

Q     And what was "Whitey" doing to your observation on the corner of Hancock and Clay when you met him?

A     He was standing out on the corner talking.

Q     Who introduced you to "Whitey"?

A     "J.R."

Q     How did you come to know "J.R."?

A     By "Pea Sue."

Q     Do you know "Pea Sue's" full name?

A     No.

Q     How do you know "Pea Sue"?

**JA759**

A    I was living with her.

Q    Approximately two days after that introduction, did you have occasion again to see "C.O." and "Whitey"?

A    Yes.

Q    Where was that?

A    On the corner.

Q    What were they doing on that corner?  Same corner?

A    Yes.

Q    What were they doing?

A    They was talking to people and selling drugs and stuff like that.

        MR. McGARVEY: I object.

        MR. VICK:  Based upon your own personal observation what were they doing?

        THE WITNESS:  Selling drugs.

BY MR. VICK:

Q    Did you have occasion to have a conversation with Mr. James Roane concerning whether you wanted to make any money or not?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what that conversation consisted of?

A    He asked me did I want to make money or get drugs, and I told him yes.  He wanted me to go to -- to clean a house on Norton Street for "Whitey."

Q    Could you describe that house?

A    The house is like yellow, with bricks.  It is a big house.  It is a two-story house.

Q    Did you indeed agree to do that?

A    Yes.

Q    After you agreed to do that, what did you do, what occurred?

A    They gave me money to go to the store and get cleaning supplies, to go to the house, and gave me the key to go to the house and clean it.

Q    When you say "they," who do you mean?

A    "Whitey" and "J.R."

Q    When approximately was that?

A    It was a couple days before Thanksgiving.

Q    Of 1991?

A    1991.

Q    Did you continue your association with them after that time?

A    Yes.

Q    Tell the ladies and gentlemen of the jury what your continued association with them was.

A    I was to clean up the house for them, go make groceries, and do little odd things, watch out for them and stuff like that.

Q    When you say "them," who do you mean?

Denise Robin Berkley (Direct)

A    "J.R.," "O," "Whitey."

Q    All right.  Where did you live at that time?

A    I was staying with "Pea Sue" and them, but then I moved up to the house on Norton Street.

Q    Who was living in that house?

A    It was "Whitey," "O," "J.R."

Q    What were you given in return for cleaning that house and doing the odd jobs that you testified about?

A    Crack cocaine.

Q    How often would you be given crack cocaine?

A    Every day.

Q    How many times a day?

1670

A    About four or five times.

Q    Is that  --

A    Maybe more.

Q    You have testified about your drug use.  Is that where you got the drugs that resulted in your drug use?

A    Yes.

Q    There came a time in February of 1992 -- let me withdraw that.  Do you know an individual by the name of Dorothy "Mousey" Armstrong?

A    Yes, I do.

Q    How do you know her?

A    Because we used to hang together.

Q    Did there come a time in February of 1992 that you came to find out that she had been murdered?

A    Yes.

Q    Were you at that point, when you found out that Dorothy Armstrong, "Mousey," had been murdered, were you still involved with "J.R.," "Whitey," "C.O."?

A    Yes, I was.

Q    Were you still doing the same things you have testified to?

A    Yes.

Q    Where were you living at that point?

A    I was staying on the street, on Norton Street,

1671

and then I started staying with some other people.

Q    What other people did you start staying with?

A    I was staying with this one old guy across the hall from Sandra, where she lived.

Q    When you found out that "Mousey" had been killed, what did it cause you to do?

A    That's what caused me to know it was time for me to leave.  I had to get out because I knew I was next.

        MR. BAUGH:  Objection.

        THE COURT:  Overruled.

BY MR. VICK:

Q    Is that when you approached Detective Fleming?

A    Yes.

**JA761**

Q   All right.  From the time of around Thanksgiving, 1991, through the date that "Mousey" was killed in February of 1992, were you continuously involved with these people that you have testified about here this morning?

MR. COOLEY:  He has to narrow it to the specifics, what involvement she had with each individual.

MR. VICK:  We will get into that.

MR. COOLEY:  Same objection.

BY MR. VICK:

Q   Between November of 1991  --

THE COURT:  Hold on, Mr. Vick.  The objection will be overruled.  Go on.

BY MR. VICK:

Q   Between November of 1991 when you first met these individuals and the killing of "Mousey," were you associated continuously with these people?

A   Yes.

Q   All right.  After the killing of "Mousey," when you went to see Detective Fleming, did you associate in any way with these people anymore?

A   No.

Q   Now, did there come a time  --  withdraw the question.

Do you know an individual by the name of "V"?

A   Yes, I do.

Q   And I will show you what has been previously marked Government Exhibit 135-1 and ask if you can identify that.

(Document proffered to witness.)

A   Yes.  This is "V."

Q   How did you come to meet "V"?

A   I met him through "O" and "Whitey."

Q   When was it that you met him?

A   It was at the house on Norton Street.

Q   Did you come to stay with him, live with him?

A   Yes.

Q   Where was that?

A   It was on Norton Street and Moore Street.

Q   I'm going to show you what has been previously marked Government Exhibit 139 and previously introduced into evidence for the record and ask if you can identify that.

(Document proffered to witness.)

A   This is 1212 West Moore Street, the house.

Q   If you first associated with them and moved into Norton Street, when was it that you moved into that house?

A   It was about somewhere in December.

Q   How is it you got to move into that house?

A   They had moved in  --

**JA762**

MR. BAUGH: Objection. Withdrawn.

THE COURT: Go ahead.

THE WITNESS: They had moved there and me and "Mousey" started going there and staying with them.

BY MR. VICK:

Q    When you say "they," who exactly do you mean?

A    "V," "E.B.," "Whitey," "O," "J.R."

Q    And do you know who "E.B." is?

A    Yes, I do.

Q    Who is "E.B."?

A    He is the youngest of the group.

Q    I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit Number 120 and ask if you can identify that.

(Document proffered to witness.)

A    Yes.  This is "E.B."

MR. VICK:  That's Government Exhibit 120, Your Honor.

BY MR. VICK:

Q    Did you come to find out how they were supporting themselves?

A    Yes.

Q    What was that?

A    By crack cocaine.

MR. COOLEY:  Same objection to that.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did you come to find out how Richard Tipton, "Whitey," was supporting himself?

A    Yes.

Q    How?

A    By cocaine.

Q    Cory Johnson?

A    Yes.

Q    How was that?

A    Cocaine.

Q    Did you come to find out how James Roane, "J.R.," was supporting himself?

A    Yes.

Q    How was that?

A    Cocaine.

Q    Did you come to find out whether Sandra Reavis was associated with them in any way in the sale or distribution of cocaine?

A    Yes.

Q    What was that that you determined?

A    She was in on it with the cocaine.

Q    How did you come to know that?

A    Because I was there when they was all together.

Q    Have you seen her receive cocaine from any one of these three individuals?

**JA763**

A    Yes.
Q    Who?
A    "J.R.," "O."
Q    What kind of cocaine?  You said they were distributing cocaine.  What kind of could cocaine?
A    Crack.
Q    Is that also called cook-'em-up?

1676

A    Yes.
Q    How often would these people be distributing in that time frame, distributing crack cocaine?
A    Every day.
Q    As to "V," did you come to find out how he was supporting himself, Lance Thomas or "V"?
A    Yes.
Q    How was that?
A    Crack cocaine.
Q    As to "E.B.," did you come to find out how he was supporting himself?
A    Crack cocaine.
Q    Do you know where it was that they were getting their crack cocaine?
A    Yes.
Q    Where?
A    New York.
Q    Do you know from whom in New York they were getting that crack cocaine?
        MR. McGARVEY:  I object as to  --
BY MR. VICK:
Q    Based upon your own knowledge and observations.
A    Yes.
Q    Who was it they were getting crack cocaine from?

1677

A    They called it New York Boyz.
        MR. WAGNER:  I object unless they are referring to Sandra Reavis, also.
        THE COURT:  When you talk about specific allegations of wrongdoing, you have to be specific about the defendants.
BY MR. VICK:
Q    Of the people you testified that you lived with, who was it that was responsible for getting crack cocaine and bringing it to Richmond?
A    "J.R.," "O," "Whitey," "V," "E.B."
Q    Did you know who those people, where they were getting their crack cocaine from?
A    From New York.
Q    Were you actually present when they would indeed show up with crack?
A    Yes.
Q    Were you present at Norton Street on occasions when they showed up with crack cocaine?
A    Yes.

**JA764**

Q    Were you present on Moore Street on occasions when they showed up with crack?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury how often it was that they would have crack

1678

cocaine, show up with new crack cocaine?  I'll withdraw that question.  Did you ever see Richard Tipton, "Whitey," cooking powdered cocaine into crack cocaine?

A    Yes.

Q    On how many different occasions would you say you have seen that?

A    I've seen it about three or four times.

Q    Where was it that you saw him do that?

A    Once on Hancock Street, and Moore Street.

Q    All right.  In what quantity did you see him cooking crack cocaine?

         MR. WHITE:  Objection, unless she can say how she knows.

BY MR. VICK:

Q    Did you see the cocaine?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury approximately the size  --  what was it contained in, the powdered cocaine?

A    Sort of a sandwich bag.

Q    How big?

A    About like this.

Q    Would you say approximately eight inches?  Eight inches apart?

1679

A    Yes.

Q    How wide would that bag have been?

A    About like this.

     (Witness indicating.)

Q    Approximately six inches wide?

A    Yes.

Q    How much of that -- was it a clear plastic bag?

A    Yes.

Q    How much of that bag would be filled with powdered cocaine when you saw that?

A    About half, a little bit more.

Q    On how many different occasions did you see bags containing powdered cocaine of that sort?

A    I've seen it off and on, about four or five times.

Q    Did you come to find out based upon your association with those people whether they had any other people selling drugs or distributing drugs with them?

A    Yes.

Q    Do you know an individual by the name of Robert "Papoose" Davis?

**JA765**

A    Yes.
Q    What did you come to find out his involvement was?

1680

A    He was selling cocaine, crack cocaine for them.
          MR. BAUGH:  Your Honor, "them" again.
          THE COURT:  Let's get specific.
BY MR. VICK:
Q    As to Mr. Richard Tipton, "Whitey," Mr. Cory Johnson, "C.O.," Mr. James Roane, "J.R.," and Lance Thomas, "V," did you come to find out whether they were associated in some way?
          MR. BAUGH:  That's a multiplicious question.
          THE COURT:  Overruled.
BY MR. VICK:
Q    Did you come to find out what their relationship was in the sale of cocaine?
          MR. WHITE:  "Come to find" out suggests something other than personal knowledge.
BY MR. VICK:
Q    Based upon your own knowledge and observation?
A    Yes.
Q    What did you find out?
A    That all of them  --  well  --
Q    Name them.
A    "J.R.," "O," "Whitey," "V," "E.B.," all them, they was giving out the amount of what they wanted people to sell.

1681

Q    All right.  Now, were you present when cocaine came back from New York?
A    Yes.
Q    What would they do with that cocaine when it came back from New York?
          MR. WAGNER:  Objection.
BY MR. VICK:
Q    "J.R.," "O," "Whitey," "V," "E.B."  --
          MR. BAUGH:  Multiplicious question.
          THE COURT:  Overruled.
          THE WITNESS:  What did they do when they came back?
BY MR. VICK:
Q    Right.
A    They would either go to Moore Street or either Harrison Street and they would, after they cook it up, they would break it down.
Q    Break it down how?
A    They would cut it up.
Q    All right.  And what would they do with it after they cut it up?
A    Put it in the little plastic bags.
Q    Who would get part of that cocaine, as to that group; what did they do with that cocaine?

**JA766**

A    After they cut it up and bagged it, they would count it up and put it in little bags.

Q    Would "Whitey" get part of that?

A    Yes.

Q    Would "C.O." get part of that?

A    Yes.

Q    Would "J.R." get part of that?

A    Yes.

Q    "V"?

A    Yes.

Q    "E.B."?

A    Yes.

Q    Did they ask you to do anything on those occasions while they were there cooking or cutting cocaine?

A    Yes, they asked me to watch out for the police.

Q    Based upon your involvement with that group of people, did you come to find out whether there were other people who were associated with them selling cocaine?

A    Yes.

Q    As to Ms. Dorothy "Mousey" Armstrong, what did you come to find out her role was?

A    She was selling it for them.

Q    Do you know Jerry Gaiters?

A    Yes.

Q    What was Jerry Gaiters doing?

A    Selling for them, too.

Q    Curt Thorne?

A    Selling.

Q    Do you know Linwood Chiles?

A    Yes.

Q    What was he doing?

A    He was mostly taking them around to different places where they had to go.

Q    What would he get in return for that?

A    Cocaine.

Q    Sandra Reavis?

A    She was  --  she would get some from them.

Q    Based upon your own personal observation and knowledge, was there a difference between the people you have just outlined: yourself, "Mousey" Armstrong, "Papoose," Jerry Gaiters, Curt Thorne, Linwood Chiles, and "Whitey," "C.O."?

       MR. GEARY:  I think she can say what she saw, observed; it is up to the jury.

       THE COURT:  She can answer the question.

BY MR. VICK:

Q    "Whitey," "C.O.," "J.R.," "V," and "E.B.," was there a difference between you and them?

A    Yes.

**JA767**

Q    What was that difference; could you explain that to the ladies and gentlemen of the jury?
A    They was, "V," "E.B.," "J.R.," "Whitey," and "O" and them, they was like, they was like one family; they was the boss.  And the people like me, "Mousey," and the rest of them, they was like the workers.
Q    Now, in anticipation of your testimony, has anyone told you to use those words?
A    No.
Q    Have you ever heard the word New York Boyz?
A    Yes.
Q    Who did you hear that from?
A    From all of them.
Q    What would they say about the New York Boyz?
A    They just said New York Boyz; they were going to see New York Boyz.
Q    How well did you know Dorothy Armstrong?
A    I knew her pretty well.
Q    In that time frame, where was she living?
A    She was staying on Hancock Street with her brother, "Papoose."
Q    And did you observe her sell cocaine?
A    Yes.
Q    On how many different occasions would you estimate for the ladies and gentlemen of the jury did you observe her sell cocaine?
A    Every day.
Q    Could you tell the ladies and gentlemen of the jury approximately how many people she was selling cocaine to on a daily basis?
A    Between 50 and 100.
Q    While you lived on Norton Street, and later at 1212 West Moore Street, could you tell the ladies and gentlemen of the jury approximately how many people would come and see "J.R.," "C.O.," "Whitey," "V," and "E.B." to get cocaine?
A    It was a lot.
Q    How many?  Give us an estimate.
A    About, I'd say, between 30 and 40 people maybe.
Q    Is that in addition to the people you have testified to specifically: yourself, "Mousey" Armstrong, "Papoose," Jerry Gaiters, Curt Thorne?
A    Yes.
Q    Did you know all of those people?
A    Yes, I did.
Q    Did you know all of their names?
A    Mostly knew them by their nicknames.
Q    Give us some nicknames.
A    Dorothy Armstrong was "Mousey."
Q    No, the other 30 or 40 people that used to come to the house.
A    Oh, one was "Wolfman" something.

**JA768**

Denise Robin Berkley (Direct)

Q    Did you know all of them, all the other 30 or 40 people?

MR. BAUGH:  Objection, asked and answered.

THE COURT:  She can answer.  Go ahead and answer.

BY MR. VICK:

Q    Did you know by name all of the other 30 or 40 people?

A    About one or two of them.  That's about it.

Q    Now, how often  --  withdraw the question.

Have you ever seen Mr. Cory Johnson, "C.O.," deliver cocaine to Dorothy Armstrong?

A    Yes.

Q    How many different occasions have you seen that?

A    About two or three times.  Maybe more.

Q    Have you ever seen "Whitey" deliver cocaine to Dorothy Armstrong?

A    About one or two times.

Q    Have you ever seen "J.R." deliver cocaine to Dorothy Armstrong?

A    Not really, no.

MR. BAUGH:  I could not hear that answer.

THE WITNESS:  No.

BY MR. VICK:

Q    Did there come a time  --  would there be times when Dorothy Armstrong would run out of cocaine?

A    Yes.

Q    How often would that happen?

A    I'd say about sometimes two, about three or four days.

Q    What would she do when that happened?

A    She would go and send word to "O" that she was out and that she needed some more.

Q    How often in an average week would you see that group that you have described: "J.R.," "C.O.," "Whitey," "V," "E.B.," cook and cut up cocaine and distribute it amongst themselves?

A    How often do I see them?

Q    On a weekly basis.

A    I'd say about twice a week, something like that.

Q    You have previously described the size of the bag that they would get their cocaine from and cut it up.  Was the size of that bag consistent?  What size would the bag be that you would see them cut up two or three times?

MR. WHITE:  Asked and answered.

MR. VICK:  She testified to only one occasion.

THE COURT:  Overruled.

BY MR. VICK:

**JA769**

Q    What amount of cocaine was it that they were cutting up two or three times a week and distributing amongst themselves?

MR. HENDERSON:  Objection to "they."

MR. VICK:  I've identified the group.

MR. WHITE:  Objection as to the amount.

THE COURT:  Overruled.

BY MR. VICK:

Q    Describe it.

A    Describe the bag?

Q    Right.

A    It is more like a sandwich bag.

Q    Hold your hands up and show the ladies and gentlemen of the jury.

A    It is a sandwich bag about like this, and this wide, and it be about half full, maybe more.

Q    Same as you described before?

A    Yes.

Q    Did you ever ask "Pea Sue" if "J.R." and "V" could use her house for something?

A    Yes.

Q    What was it that you asked?

A    I asked her could they use her house for to cook cocaine.

Q    And what did she say?

A    She said yes.

Q    Did that indeed happen?

A    Yes, it did.

Q    Who went there?

A    It was "J.R.," "V," and some other two guys.

Q    How often would you see Robert Davis, "Papoose," selling cocaine?

A    Every day.  Just about every day.

Q    Did you ever know whether there was any cocaine cooked at his house?

A    Once sometime.

Q    Who was it that cooked that cocaine?

A    It was "O." Excuse me, it was "Whitey."

Q    How was that cooked?

A    In a coffee pot.

Q    How was it cooked at "Pea Sue's"?

A    I really don't know.  Because I had left.

Q    Did you come to find out how often Curt Thorne was selling cocaine?

A    Yes.  Every day.

Q    And did you ever have occasion to deliver anything to Curt Thorne?

A    Yes, I did.

Q    What did you deliver to Curt Thorne?

A    A bag full of crack.

Q    Who gave you that bag full of crack to deliver to him?

**JA770**

A     "O."
Q     Is that the only time you delivered cocaine to Curt Thorne?
A     Yes.
Q     How often would you see Jerry Gaiters selling cocaine?
A     Off and on.
Q     Do you know "Pepsi" Greene?
A     Yes.
Q     How do you know "Pepsi" Greene?
A     Because she and Curt was living together.
Q     Did you know whether she was involved with them in any way in the sale or distribution of cocaine?
A     Yes.
Q     What was that?
A     She was selling for them, crack.
Q     Do you know whether Linwood Chiles ever traveled out of town?
A     Yes, he did.

Q     With who?
A     He traveled out of town, went to New York with "O," "V," "Whitey."
Q     And when they came back on that trip, were you around?
A     Yes, I was.
Q     What was it they came back with?
A     Crack cocaine.
Q     I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit 1-1 and 4-5 and ask if you can identify those.
        (Photographs proffered to witness.)
A     Yes.
Q     What is 1-1?
A     It is a gray -- I don't know the name of it, but I have seen this car many times around the house on Norton Street.
Q     All right.  And as to the other, 4-5, I believe, can you identify that person?
A     Yes.  He was the guy that  --  this was his car.
Q     He drove that gray car, 1-1?
A     Yes.
Q     Do you know what that person did, did he ever make a trip out of town with these people?
A     Yes, he did.
            MR. BAUGH:  Objection to "these people."
            THE COURT:  Sustained.
BY MR. VICK:
Q     Who did he make a trip with?
A     It was mostly "O," "V," mostly "O" and "V."  And some other guy.

**JA771**

Q    And where was it that they would go?
A    To New York.
Q    Are you knowledgeable of the fact that Katrina Rozier, "Nat" Rozier, was murdered?
A    Yes.
Q    How did you know her?
A    She was my best friend; we used to hang together.
Q    Did there come a time when Linwood Chiles took some of the people that you have testified about, I'll ask you to be specific, to New York in that time frame?
A    Yes.
Q    Who did he take to New York in that time frame?
A    He took "V," "O," "E.B."
Q    To New York?
A    Yes.

Q    All right.  When did you find out?  When was it that they left to go to New York?
A    They left on a Friday.
Q    What time of night?
A    It was around between nine or ten.
Q    When did you find out that "Nat" Rozier had been found murdered?
A    The next day, by Jerry Gaiters.
Q    I direct your attention to January 13th, 1992. I beg the Court's indulgence.
     (Counsel conferring.)
BY MR. VICK:
Q    Prior to that, the individual you have identified as driving the gray car went to New York with these people, with the people you identified; when they came back from New York, would they be in possession of anything?
A    Yes.  Cocaine.
Q    I direct your attention to January 13th, 1992. Are you familiar with the fact that on that date, an individual by the name of Doug Moody, "Little Doug," was killed?
A    Yes.
Q    Were you near where Doug Moody was killed?
A    Yes, I was.

Q    Could you tell the ladies and gentlemen of the jury where you were at the time just prior to Doug Moody's killing?
A    I was at the house on the corner of Clay and Harrison.
Q    Whose house was that?
A    It was Albert Walters' house.
         MR. BAUGH:  I didn't hear the name.
         THE WITNESS:  Albert Walters.
BY MR. VICK:

**JA772**

Q    Who were you there to see?
A    Me and "Mousey" went to see -- I forgot his name.
Q    What occurred while you were there?
A    We had went in and we had sat around and we had just started smoking crack cocaine.
Q    And who was sitting with you?
A    It was me and "Mousey," the guy, and some other girl.
Q    Did there come a time when something happened after you had been in there for awhile?
A    Yes.  We heard a loud bang.
Q    What did it sound like to you?
A    Sounded like a gun or something.
Q    All right.  Where did that noise come from?

A    From the back of the house.
Q    Where in the back?
A    It is a house -- it is another apartment in the back.
Q    I'm going to show you what has been previously marked Government Exhibits 9-1, 9-2, 9-6, and 9-7.
    (Photographs proffered to counsel and to witness.)
BY MR. VICK:
Q    I ask you to look at those photographs and see if you can identify them.
A    Yes.  This is the house.
Q    What number is on that picture?
A    9-1.
Q    And what house is that?
A    This is the house, in the back of the house that we was at on Harrison and Clay.
Q    The next picture?
A    This is the back door of the first house that we was in.
Q    What number is on that picture?
A    9-2.
Q    All right.  The next picture?
A    This is the alley between the house, the back of the house that we was at.

Q    And what number is on that picture?
A    9-6.
Q    The next picture?
A    This is the back of the house.
Q    What number is on that picture?
A    9-7.
Q    Do those pictures depict the location you were at the evening Doug Moody was killed?
A    Yes, they do.
        MR. VICK:  I would move those exhibits into evidence.
        THE COURT:  They will be admitted.

**JA773**

BY MR. VICK:

Q    After you heard that shot, what occurred next? Or what sounded like a shot.  What occurred next?

A    We heard a window break.

Q    Where did the sound of that window breaking come from?

A    From the back of the house or the apartment.

Q    Would that have been in the same location that you heard what you thought to be a shot?

A    Yes.

Q    What did you do in response to that?

A    We thought it was the police, so we started gathering up the stuff and throwing it away.

1697

Q    Then what did you do?

A    Then me and "Mousey" and the rest of us, mostly me and "Mousey," went outside.

Q    What did you start gathering up to throw away?

A    Gathering the crack cocaine.

Q    When you got outside, where were you and "Mousey"?

A    We was on the sidewalk.

Q    And what did you see when you got outside?

A    Doug Moody hollering and screaming, telling "J.R." to stop, leave him alone.

Q    And where was "J.R."?

A    "J.R." was -- he was standing near Doug Moody.

Q    And what was he doing?

A    He started stabbing him.

Q    Did you see what he was stabbing him with?

A    It looked like a butcher knife.

Q    Could you tell the ladies and gentlemen of the jury based upon your own observation that evening approximately how many times you think you saw James Roane stab Doug Moody?

A    Between 18 and 19 times.

Q    When you say "J.R.," did you indeed mean the James Roane you identified earlier?

A    Yes.

1698

Q    What did you do when you saw that?

A    I just stood there and looked.

Q    What was Doug Moody saying, if anything?

A    He was trying to get away, he was telling him to leave him alone.

Q    Did he call a name when he said that?

A    He was hollering "J.R., please leave me alone."

Q    Who was present with you?

A    "Mousey," me, "J.R.," Sandra.

Q    Sandra who?

A    Sandra Rollins  --  I don't know her last name.

Q    Do you see that Sandra in the courtroom today?

A    Yes, over there.

Q    Who else was present?

**JA774**

Denise Robin Berkley (Direct)

A    Linwood, "Pepsi,", and Curt.
Q    After the 18 or 19 stabs, what occurred?  Where did they occur; where exactly did that occur that you saw "J.R." stabbing Doug Moody?
A    At first it was like in the yard then Doug Moody was trying to jump over the fence behind the house.
Q    What was behind that fence?
A    It was an alley.
Q    Is that the alley depicted in the pictures you just saw?
A    Yes.

1699

Q    The fence he jumped, is that the fence you saw in the pictures you just looked at?
A    Yes.
Q    Okay.  Tell us where he ended up in that alley, Doug Moody?
A    He ended up in the middle of the alley.
Q    After the 18 or 19 stabbings, what did "J.R." do?
A    After he did that, he came back towards us and gave the knife to "Pepsi," and told her to get rid of it.
Q    Then what happened?
A    Then "Pepsi," "J.R.," Sandra, Curt, and Linwood got into Linwood's station wagon and pulled off.
Q    What did you and "Mousey" do?
A    We stayed there and watched.
Q    You watched what?
A    We was watching the police and ambulance and stuff.
Q    I'm going to show you what has been marked Government Exhibit 4-6.
     (Exhibit proffered to witness.)
A    This is Doug Moody.
Q    Is that the same man you saw "J.R." stabbing?
A    Yes.

1700

     MR. VICK:  I would move Government Exhibit 4-6.
     THE COURT:  It will be admitted.
     MR. VICK:  We would move to have the Clerk change the number on that picture to 12-five.
     THE COURT:  All right.
BY MR. VICK:
Q    Where was it that you and "Mousey" went after this?
A    We went to "Papoose's" house on Hancock Street.
Q    What did you do there?
A    We told "Papoose" what had happened, and then we had left from there and we went up to Norton Street.
Q    Did you ever have a conversation with James Roane about Doug Moody and why he was killed?
A    Did I have a conversation?

Q    With James Roane, where James Roane said something about Doug Moody?

A    Something about  --  I heard something about a tape.

Q    What was it that you heard about that tape?

A    Something about it was some  --  I'm not sure what was on the tape.  He just said something about a tape.

Q    Do you know whether "Little Doug" Moody ever got cocaine from "Whitey," "C.O.," James Roane, "V," "E.B."?

        MR. BAUGH:  We object unless he is getting it from all of them.

        MR. VICK:  By one of those people.

        THE COURT:  Overruled.

        THE WITNESS:  He was getting it mostly from "O."

BY MR. VICK:

Q    Did "J.R." ever say anything about that?

A    Not that I recall.

Q    When you went to Norton Street, who was present  --  excuse me, when you and "Mousey" went to Norton Street, who was present there?

A    Nobody.

Q    All right.  Later you went to Moore Street; is that correct?

A    Yes.

Q    Who was present at Moore Street when you went there?

A    When I went there, when we got there it was "Whitey," "O," "V," "E.B."

Q    All right.  And what were they talking about?

A    What had happened.  Mostly "Whitey" was lying on the floor and he was saying that Doug was trying to kill him with a gun or something, and he was all excited, you know, about what had happened.

Q    All right.  What was he talking about?  When you say what had happened, what are you talking about?

A    Talking about what had happened, him and Doug Moody had gotten to fighting at the house on Harrison Street.

Q    And could you describe "Whitey's" demeanor that evening?  How did he seem when he was describing what had happened?

A    He was more excited.

Q    All right.  And was "J.R." there?

A    No, he didn't come until the next day.

Q    Did "V" and "O" and "Whitey" say anything about what they had to do because of what had happened?

A    Yes, "V" and "O" told "Whitey" that he had to get away from around there for awhile.

Q    When did you next see "J.R."?

**JA776**

A    The next day.
Q    All right.  If Doug Moody was killed on January 13th, 1992, you next saw "J.R." when?
A    The next day.
Q    So that would have been January 14th, 1992?
A    Yes.
Q    On that day, did you have occasion to come to find out that  --
        MR. BAUGH:  Objection to the leading nature.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Did you see any guns that day, january 14th, 1992?
A    Yes, I did.
Q    And who did you see with guns that day?
A    "V" and "J.R." and them when they came in the house.
Q    Be specific as to who, "V" and "J.R." and them, who else was there?
A    "V," "J.R.," "O," "Whitey," me, and "E.B." was there.
Q    What house is that?
A    The house on Norton Street.
Q    What did they come in with?
        MR. GEARY:  I object, unless she says who came into the house with the guns.
        THE COURT: Overruled.  Go ahead and answer.
        THE WITNESS:  "V" and "J.R." came in the house with the guns.
BY MR. VICK:
Q    Who else came in the house with them?
A    It was them two.  The rest of us was already at the house.
Q    Who else?  Say again so we are perfectly clear as to who else was there.
A    It was me, "E.B.," "V," "O," and "J.R." But "V" and "J.R." came in the house with the guns.
Q    Did you see "Whitey" that day?
A    No.  "Whitey" didn't come in until late.
Q    When?
A    He came in about a half-hour after.
Q    What did they have, "V" and "J.R.," have with them when they came into that house?
A    They had a case that had guns in it.
Q    What kind of guns?
A    It was  --.
    (Counsel retrieving exhibits.)
        MR. BAUGH:  I don't believe the witness answered the question.
BY MR. VICK:

**JA777**

Q     What kind of guns?

A     They was something like handguns.

Q     I'm going to show you what has been previously marked Government Exhibit 104 and ask you have you seen a gun like this before?

A     Yes, I have.  Because I took and held one in my hand.

Q     All right.  Was that type of gun present that day when "J.R." and "V" brought the guns?

A     Yes.  It was two of them.

Q     I'm going to ask you, have you seen what has been previously  --

MR. BAUGH:  Can we have the first one identified by exhibit number?

MR. VICK:  104.  I hand you 105 and ask you if that was the type you saw that day.

MR. COOLEY:  Leading.  "Have you seen this?"

THE COURT:  Overruled.

THE WITNESS:  It was something like that.

BY MR. VICK:

Q     I'm going to show you what has been previously marked Government Exhibit 106 and ask you if that gun was of the type that you saw that day.

A     Yes, it was something like that.

Q     When those guns were in that house, was anybody using those guns or playing with those guns or controlling those guns?

A     Well, "J.R.," "V," "O," "Whitey," me, and "E.B.," all of us was  --  we was putting the bullets in the clips and they was holding it and playing with it.

Q     And what was their attitude?

MR. BAUGH:  Objection to their attitude.

THE COURT:  Sustained.

BY MR. VICK:

Q     Did they ask you to do anything in regard to those guns?

A     Yes.

Q     What was that?

A     They told me to take the case  --

MR. BAUGH:  Excuse me.  Who told her to do what?

THE COURT:  Sustained.

BY MR. VICK:

Q     Who told you?

A     It was all of them.  "J.R.," "V," "Whitey," "O." Not "Whitey." "J.R.," "O," "V," and "E.B."

Q     What did they ask you to do?

A     They asked me to take the case and throw it away.

Q     Did you give them anything that day?

A    I gave them a handbag.
Q    I'm going to show you what has been previously marked Government Exhibit 107 and ask if you have

1707

ever seen that item.
A    Yes, I had bought that at the corner store off of Hancock and Clay.
Q    Could you describe that?
A    It is a handbag.
Q    What's written on that?
A    "Salem Lights."
Q    Was that your handbag?
A    Yes, it was.
Q    What did you do with that handbag?
A    What did I do with it?
Q    Yes, what did you do with it?
A    I gave it to them.
Q    Who is them?
A    I gave it to "O," "Whitey," "V," and "E.B."
Q    And what did they use that handbag for?
A    They put the guns in it.
Q    On that day, January 14th, 1992, after they had all played with the guns, what did they do with those guns?
A    Took them with them.  Took them, put them in the handbag.
Q    Did there come a time later that day when some of those guns were retrieved?
A    Yes.

1708

Q    Who retrieved those guns and when was that later that day?
A    It was later on that night.  The same night that they got the guns.
Q    Who came and retrieved those guns?
A    It was "V" and "O," "E.B.," and "J.R."
Q    All right.  Did they say anything when they got those guns?
A    Yes.  They said wasn't nobody was going to fuck with them.
Q    And where were you later that evening when those guns were retrieved by the people you just testified about?
A    It was at the house.
Q    What house?
A    The one on Norton Street.
Q    Later that evening, did you have occasion to see "J.R." and "E.B." on the street together?
A    Yes, I did.
Q    Where was that?
A    It was right there on the corner of Catherine and  --  Harrison and Catherine.
Q    And did you talk to "J.R."?
A    Yes, I did.

Q   What did "J.R." ask you or say to you?

A   He asked me have I seen Maurice Johnson.

Q   What did you say?

A   I told him he had just went around the corner on Clay Street.

Q   Did he ask you anything else?

A   He asked me have I seen "V" or "O." And I told him that they was at Moore Street.

Q   Where did you go then?

A   Then I went back to the house on Norton Street.

Q   And what occurred when you got back there?

A   I'd say about 20 minutes later, I seen the police, sirens and lights out on the streets, on the corner from up the street.

Q   Did you have occasion to see what those were responding to?

A   Yes, I walked up to the corner of Clay and Harrison.

Q   What did you find that those police sirens were responding to?

A   Maurice Johnson was in the house, dead.

Q   I'm going to show you what has been previously marked Government Exhibit 20-7 and ask you if you can identify that.

    (Photograph proffered to witness.)

A   Maurice Johnson.

        MR. VICK:  I would move Government Exhibit 20-7 into evidence.

        THE COURT:  It will be admitted.

BY MR. VICK:

Q   Did you see those guns again after that?

A   Yes.

Q   When did you see those guns again?

A   On Moore Street.

Q   Now, from the time frame that you said  --  from January 14th when these guns were purchased through February, when exactly, if "Mousey" was killed, do you remember what day of the week it was when "Mousey" was killed?

A   on a Saturdayurday.

Q   "Mousey" was killed on a Saturday; when was it that you left these people?

A   A day after.

Q   From January 14th until the day after "Mousey" was killed and you left, did you see those guns again?

A   No.

Q   All right.  And did you see that bag again?

A   No.

Q   All right.  Did there come a time on Moore Street when you were asked  --  are you familiar with

the fact that --

MR. BAUGH:  Objection to "familiar with the fact."

MR. VICK:  I don't believe this will be a point in controversy.

BY MR. VICK:

Q    Are you familiar with the fact that indeed Moore Street was searched by the police?

A    Yes.

Q    What day was that?

A    Well --

Q    Do it for us in relation to the killing of "Mousey."

A    That Saturday morning.

Q    Before that, had you been asked by "O" to do anything with the Salem Lights bag?

A    Told me to take this bag with the guns in it and take them outside somewhere and hide them.

Q    Outside of where?

A    The house on Moore Street.

Q    Did you do that?

A    Yes.

Q    That bag that you have identified?

A    Yes.

Q    How soon was that prior to that house being searched by the police?

A    A couple of days before the house was searched by the police.

Q    And where exactly was it that you put those guns in relation to the house at 1212 West Moore Street?

A    Near the fence behind the house.  Near the fence, behind some trees.

Q    I'm going to show you what has been previously marked Government Exhibit 140.

(Exhibit proffered to witness.)

A    Yes, this is the backyard of the house on Moore Street, near the highway.

Q    And Government Exhibit 140, do you see the area that you placed these guns in?

A    Yes.  It was back there behind -- near the fence with the trees.

Q    Did you tell anybody where you had placed those guns?

A    Only person I told was "O" where I had put it at.

Q    Directing your attention to "Nat" Rozier, do you know whether Katrina, "Nat" Rozier, was involved with these people in any way?  When I say these people, I mean "Whitey," "C.O.," "J.R.," "V," "E.B."?

A    She was buying crack from them.

Q    Did you have occasion to see whether she and "E.B." ever had a disagreement?

**JA781**

A    Yes.
Q    Could you tell the ladies and gentlemen of the jury about that?
A    Mostly it was me and "E.B." was at the house on Norton Street, and "Nat" came to the house and "E.B." went down the steps with a broom and started beating and hitting "Nat" and saying that "She is not allowed to be here."
Q    What was "E.B." upset about from what you observed?
A    He didn't like it because it wasn't nobody else -- none of the buyers was supposed to come to the house.
Q    What house was that?
A    The house on Norton Street.
Q    Was "O" present at that time?
A    No.
Q    Do you know why it was that "Nat" Rozier had come to that house?
A    She was looking for "O."
Q    Did "E.B." say anything to her after he hit her with the broom?
A    He told her, "Don't come back here no more" or he will hurt her.
Q    Have you ever heard "O" or "Whitey" or "V" say anything about "Nat" Rozier in regards to the cocaine that they had given her?
A    I have heard "O" say that "Nat" owed them money for the crack cocaine.
Q    What exactly did he say about that?
A    He just told her that she needed to have this money.
Q    Do you remember when it was that you found out that "Mousey" was killed?  You found out on what day that she was killed, the same day?
A    That Saturday.
Q    I direct your attention to approximately two days or three days prior to that.  Did you have occasion to go with "Mousey," or were you with "Mousey" at "Papoose's"?
A    At "Papoose's" house?
Q    Yes.
A    Yes.
Q    Did "E.B." have occasion to come and get you?
A    Yes, he came and got me and "Mousey."
Q    What did he want you to do?
A    He said that "O" wanted to see us.
Q    Where was it that "O" wanted to see you?
A    The house on Norton Street.
Q    Did you go with "E.B." to see "O"?
A    Yes.
Q    What occurred when you got there?

**JA782**

Denise Robin Berkley (Direct)

A    When we got there, we was sitting in one of the rooms waiting on "O" to get there.  When he got there, he asked us, you know, how was things and had told us that he had given us three twenties to sell.

Q    Who had given you three twenties?

A    "O."

Q    Is that the person you previously identified as Cory Johnson?

A    Yes.

Q    What had you done with those three twenties?

A    I told him I smoked them.

Q    When you say three twenties, what exactly do you mean?

A    In a little bag, three twenties of crack cocaine.

Q    Did you have the money to pay "O" for the cocaine he had given you?

A    No, I didn't.

Q    Did he say anything to you about that?

A    He told me I needed to get his money.

Q    And was he concerned about it?

A    Yes, he was.

Q    Did "Mousey" say anything about this?

A    "Mousey" tried to tell him that it was her fault, but he didn't want to hear it.  He told her to shut up because she didn't have anything to do with it.

Q    What did "O" do after that?

A    Then there was like, on a dresser, there was a little piggy-bank, and some of his money was missing.  And he got mad at me and "Mousey" and took it and slammed it on the ground and broke it and told us it was our responsibility to get the money.

Q    What did you do after that?

A    Well, he left then.  Then after that, me and "Mousey" decided -- she said she had to get away.  So I went with her and we went to her brother's house in Church Hill.

Q    Who was her brother?

A    Bobby Long.

Q    Where was that house in Church Hill?

A    I'm not sure of the street.  It was across from a school.

Q    Why was it that she went to that house?

A    She wanted to go and stay for a couple days with her brother.

Q    Why?

A    To --

            MR. McGARVEY:  Hearsay.

            THE COURT:  Overruled.

            THE WITNESS:  She was scared and I was scared.

**JA783**

BY MR. VICK:

Q    Scared of what?

A    "O," "V," "Whitey," "J.R.," "E.B." and Sandra.

Q    What were you scared they were going to do to you?

A    They was going to kill me.

Q    How long did you stay there?

A    I stayed there until that Friday.

Q    The Friday before the murder of "Mousey"?

A    Yes.

Q    Then where did you go?

A    I came back on Hancock Street.

Q    What happened when you got back on Hancock Street?

A    I met Sandra.

Q    When you say Sandra, who do you mean?

A    Sandra Rollins.

Q    The person you previously identified here in the courtroom today?

1718

A    Yes.

Q    What occurred when you saw her?

A    She told me that "O" was looking for me, that he was upset he didn't know where I was.

Q    So what did you do in response to that?

A    So I went over with her to the house on Moore Street.

Q    To see who?

A    To see "O."

Q    And why was it that you went to that house?

A    Because that's where they was.

Q    Who told you that's where they were?

A    She did.

Q    Who was present at that house?

A    It was "O," "V," "E.B.," and some other guys.

Q    Do you know the other guys' names?

A    "Man-Man."

Q    When you got there, who did you go into the house with?

A    I went in the house with Sandra.

Q    And did you see "O" when you got to that house?

A    Yes, I did.

Q    Where was "O"?

A    He was sitting on the couch.

Q    What was "O's" response upon seeing you?

1719

A    He was upset.

Q    What occurred?

A    There was a coffee table in front of us, and I bent down to talk to "O" and he punched me in the face.

Q    With what?

A    His fist.

Q    Where on your face?

**JA784**

A    My right eye.

Q    What happened next?

A    Then him and Sandra went in the back room; they was talking.  And "E.B." had a stick and he started beating me with it.

Q    What kind of stick?

A    It was something like a tree branch or something.

Q    How long did he beat you?

A    He beat me for about five, ten minutes.

Q    What caused him to stop beating you?

A    "V" grabbed him.

Q    Did "V" say anything to you?

A    Yes.

Q    What did he say?

A    He told me that he didn't believe  --  he was upset, he couldn't believe that I had, you know, left and all this.  And then he just came out and told me, he said if he had a baseball bat he would have broken both of my legs.

Q    Where did you go after that?

A    Then Sandra came out and told me that "O" wanted to talk to me.

Q    And where did Sandra come from?

A    From out the back.

Q    Did you go in the back to talk to "O"?

A    Yes, I did.

Q    Where did you go to see him?

A    In the bathroom.

Q    What happened when you went in that bathroom?

A    I sat down in front of him and he told me he wanted me to do something for him.

Q    What was it that he wanted you to do?

A    He told me that he wanted me to kill "Mousey" or he was going to have Sandra kill me.

Q    Did he tell you why he wanted "Mousey" killed?

A    No, he didn't.

Q    What did you say?

A    I had no choice.  I told him, "Yeah."

Q    Did you leave that house at that time?

A    Yes, I did.

Q    Did you intend to kill "Mousey"?

A    No.

Q    Where did you go?

A    Then "O" gave me $5 and told me to go get some oil for the house on Norton Street.

Q    Did you do that?

A    Yes.

Q    Then what happened?

A    After I got that, I went to do all that and then I came back to the house on Moore Street and I told him that's what I did, that I had got the oil.

**JA785**

Q    During that conversation in the bathroom between you and "O" where he asked you to kill "Mousey," who else was present, if anyone?

A    I think Sandra was.  I'm not sure.

Q    When was it that you left these people?

A    That Sunday after I found out "Mousey" was dead.

Q    Is that when you sought to get in contact with Detective Fleming?

A    Yes.

Q    I show you what has been previously marked Government Exhibit 141.  I ask you if you can identify that.

A    This is Bobby Long's house where I was with "Mousey."

Q    Is that where you last saw "Mousey"?

A    Yes.

MR. VICK:  I would move Government Exhibit 141 into evidence.

THE COURT:  It will be admitted.

BY MR. VICK:

Q    Have you talked to anyone about your testimony here today other than myself, Mr. Parcell, Mr. Fleming?

A    No.

Q    Have you talked to anyone else that you might think is a witness in this case about your testimony?

A    No.

Q    Have you even had occasion to see anyone else that you might think is a witness in this case?

A    No.

MR. VICK:  Beg the Court's indulgence, Your Honor.

THE COURT:  All right.

MR. VICK:  I tender the witness, Your Honor.

THE COURT:  Tipton's counsel.

MR. GEARY:  Thank you.

CROSS-EXAMINATION

BY MR. GEARY:

Q    I take it from your testimony that you were smoking crack from about November of 1990 until January of 1992?

A    Yes.

Q    And you were using, smoking three or four times a day?

A    Yes.

Q    What was that costing you per day?

A    Excuse me?

Q    What was it costing you per day to smoke crack?

A    I wasn't paying money for it.

Q    From November of 1990 until you met a person

**JA786**

described as "Whitey" or "O" in 1991, in that one-year period of time, was someone giving you cocaine?

A    No.

Q    Were you buying cocaine?

A    Before I met them, yes.

Q    How much a day were you spending between November of 1990 and November of 1991?

A    About $30.

Q    $30 or $40 a day?

MR. VICK:  She said $30.

BY MR. GEARY:

Q    $30 a day.  Who were you buying from from November of 1990 until Thanksgiving of 1991?

A    I was buying it from other people.

Q    Well, tell the jury who the other people are.

A    I don't know those people.

Q    Excuse me?

A    I do not know these people.

Q    What area of Richmond were you buying the crack in?

A    From the same area, but a different location.

Q    Does that area have a name where you lived?

A    It was Poe Street.

Q    Is it fair to say you were buying crack three or four times a day, or would you buy once a day and smoke four times a day?

A    Can you repeat that?

Q    How many times a day did you buy?

A    About twice every other day, something like that.

Q    So basically once a day.

A    Yes.

Q    So from November of 1990 to November of 1991, you would have bought maybe 350, 360 times; is that correct?

A    Yes.

Q    You are telling this jury that you can't give them the name of one person in that area of the City of Richmond who you bought crack cocaine from; is that correct?

A    Yes.

Q    You can't tell them who they are?

A    No.

Q    Maurice Johnson might be one of them?

A    No.

Q    Ronita Hollman?

A    One time from her.

Q    You did buy from Ronita Hollman?

A    Yes.

Q    Tell the jury now, honestly --

MR. VICK:  Objection to the

**JA787**

characterization.

THE COURT: Overruled.

BY MR. GEARY:

Q   Before you met these people, who were you buying crack from; you know who they are. Tell the jury who they are. You are smiling, but tell them.

A   I was buying it from, Anita.

Q   Who else besides her?

A   I don't know the rest of them.

Q   Did they associate with Ronita Hollman?

A   No.

Q   Who did they associate with?

A   They associated with other people besides her.

Q   How many people were buying crack in that area of the city with you between November of 1990 and 1991?

A   I seen a lot of people.

Q   Tell the jury some names of people.

A   I don't know their names.

Q   So the only person that you can tell this jury who was involved with crack in this area of the city for a whole year is that you are buying and Ronita Hollman is selling; is that correct?

A   Yes.

Q   All the rest of the people, you can't remember who they are?

A   No.

Q   You remember everything this man does over here; is that correct?

A   Yes.

Q   You have a perfect memory about him, don't you?

A   Yes.

Q   When did you start smoking marijuana?

A   When I was about 18 years old.

Q   Were you smoking marijuana and smoking crack during the same period of time?

A   No.

Q   When you were smoking crack from November of 1990 until you stopped in January of 1992, were you ever smoking marijuana?

A   Not really. Off and on.

Q   Off and on. Tell this jury what the effects of crack cocaine are; why do you smoke crack? What does it do for you?

A   It just gets you high for a little while and that's it.

Q   How long is a little while?

A   I'd say about 20 minutes.

Q   Have you ever drunk alcohol?

A   Yes.

Q   Have you ever gotten drunk?

A   Yes.

**JA788**

Q    Can you compare and tell the jury the difference between a high on crack and a high on alcohol?
A    Alcohol, it stays in your system a little longer.  You feel real loose and you feel real drunk.  It make you real sleepy.
Q    How about a high on crack?
A    The crack, it keeps you up, makes your eyes and whatever real big.
Q    How are your faculties in terms of being able to walk or drive a car when you are high on crack; does it affect you that way?
A    It can.
Q    Have you ever driven a car under the influence of crack?
A    I don't drive.
Q    Have you ever walked while you had crack in you; does it affect your walking ability?
A    Not really.
Q    If you were on crack right now would we be able to tell?
A    Yes.
Q    How would you be acting different from how you are acting now?
A    My eyes would be big, and I would be looking around real  --  real paranoid.
Q    "Paranoid" meaning what?
A    Paranoid, feel like somebody is watching you all the time.
Q    You were doing this three or four times a day; is that correct?
A    Yes, I was.
Q    Were you real paranoid during that period of time?
A    Not really.  Because I was mostly around them.

Q    Well, if crack makes you paranoid and you were smoking crack three or four times a day, why weren't you paranoid?
A    I was paranoid to a certain extent, but I was not really paranoid around them.  Mostly if I was walking by myself or whatever.
Q    You told Mr. Vick that you thought it was sometime around Thanksgiving of 1991 that you saw "Whitey" in that area where you lived; is that correct?
A    Yes.
Q    Did you know him as "Whitey"?  Is that the only name you knew him by?
A    Yes.
Q    You saw him, I think you said, on what street corner?
A    On the corner of Clay and Hancock.
Q    Is that what they call a drug corner where

people congregate to buy crack?

A    Yes.

Q    How many other corners in that area of the city can you tell this jury are crack corners?

A    That one mostly is the one.

Q    How about some others in the area?

A    Either the other corner, Hancock and Catherine.

Q    Okay.  Now, beginning in the time period before you met "Whitey" in November of 1991, what was your address before you met him?

A    I was staying with "Pea Sue."

Q    What was the address?

A    On Hancock Street.

Q    Give me the address.

A    I'm not sure of it.

Q    Do you remember what hundred block of Hancock that was?

A    It was --

Q    1000 block?

A    Something like that.

Q    Where would that be, where you were living with "Pea Sue," in relation to the corner of Catherine and Hancock?

A    About a five-minute walk.

Q    Okay.  And would it be fair to say that any time you wanted to buy crack, you would leave your apartment in the 1000 block of Hancock and walk to Hancock and Catherine; is that fair?

A    Yes.

Q    Before you met "Whitey" you would walk down to that corner and buy crack; is that correct?

A    Yes.

Q    Would you be able to buy crack any time of the day or night at that corner?

A    Sometimes.

Q    What would be the busiest time of the day or night for people congregating there and buying and selling crack?

A    The busiest time?

Q    Yes.

A    Any time.

Q    Any time.  Is the buying and selling more prevalent in the daylight hours or nighttime hours?

A    Mostly days.

Q    And when you would go there before Thanksgiving in 1991, when you would walk out there on a nice day in the daytime, typically, how many sellers would be out there on the corner of Catherine and Hancock?

A    Maybe one.

Q    Were there times it would be more than one?

A    One or two.

Q    Times it would be more than one or two?

A    No.
Q    Would there be a number of people buying?
A    I didn't keep up the count.
Q    As far as you know, did people from other areas in the city come to that block to buy crack besides

1732

the residents nearby?
A    Not really, no.
Q    Excuse me?
A    No.
Q    So if people came by, they usually walked up rather than come by car?
A    Yes.
Q    How soon was it after you met "Whitey" that you moved off of the 1000 block of Hancock?
A    I'd say about two days after.
Q    Two days afterwards?
A    Yes.
Q    Okay.  That move was from the 1000 block of Hancock to where?
A    To Norton Street.
Q    That's the two-story yellow house?
A    Yes.
Q    Tell the jury how far -- do you recall what block that's on on Norton Street, the 800 block?
A    I'm not sure.
Q    How many blocks would it be from where you were staying with "Pea Sue" in the 1000 block of Hancock?
A    About two-and-a-half blocks.
Q    And about how long do you think you stayed living in that yellow house on Norton Street?

1733

A    I stayed there for awhile.
Q    Are you talking about a week, a month, do you have any idea?
A    About a month.
Q    From the Norton Street house, where did you go from there?
A    Moore Street.
Q    That's 1212 West Moore Street?
A    Yes.
Q    And how long do you think you stayed there?
A    Until after what happened to "Mousey."
Q    Okay.  So you would have stayed from just before Thanksgiving of 1991 until you went to see Detective Fleming, you would have stayed at a house on Hancock Street and one on Norton Street and one on Moore Street; is that correct?
A    Yes.
Q    When you saw Detective Fleming, is that the point in time when you stopped smoking crack?
A    Uh-huh.
Q    What did you have to do to give up your addiction; did you get medical treatment for it?

**JA791**

A    No.  I just gave it up.
Q    Cold turkey, so to speak?
A    Uh-huh.

1734

Q    Before "Whitey" and anyone else from New York arrived here, the $30 a day you were spending on crack, where would you get that money from?
A    From a friend.
Q    From a friend?
A    Yes.
Q    What's that friend's name?
A    I'm not going to say his name.
Q    Excuse me?
A    I am not going to say his name.
Q    Why don't you want to say his name?
A    Because.
Q    Because why?
A    I just don't want to say his name.
Q    Tell the jury, if you are so anxious to talk about these people, why you are not willing to say your friend's name?
A    Because these people did something that this person does not do.
Q    What does this person do besides give you money to buy crack?
A    He works.
Q    Where?
A    He works at a hospital.
Q    He supported your crack habit; is that correct?

1735

A    Yes.
Q    You never had to do anything illegal to support your crack habit?  Did you ever have to do anything illegal to buy crack?
A    Depends on what you are talking about.
Q    You know what "illegal" means.
A    Yes.
Q    You know what Richmond General District Court means, don't you?
A    Yes.
Q    Did you ever have to do anything illegal to support your crack habit?
A    No.
Q    After January 13th of last year, did you ever see "Whitey" again until you came into the courtroom this morning?
A    No.
Q    That was the day that Doug Moody was killed, correct?
A    I guess it was, yes.
Q    If it is.  You saw him that night, you saw "Whitey" that night at 1212 West Moore Street, correct?
A    Yes.

**JA792**

Q He told you, among other people, that Doug Moody had a gun, had tried to kill him.

A Yes.

Q Is that what he said to you?

A Yes.

MR. GEARY: May I have a minute, Judge?

THE COURT: Sure.

(Counsel conferring.)

MR. GEARY: Pass the witness, Judge.

THE COURT: All right. Mr. Johnson's counsel?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q Ms. Berkley, starting with Katrina Rozier, you indicated that you had lived with "Mousey" as well; had you lived with "Mousey" other than those days prior to --

A Well, we was -- I was staying over at the house, over at the other house on Hancock Street with her, yes.

Q You also indicated that you had lived with "Papoose," right?

A Yes.

Q Did you and Katrina and "Papoose" live together?

A No.

Q Now, with respect to Ms. Rozier, you indicated she was your best friend; is that correct?

A Yes, she was.

Q And Ms. Rozier did a lot of crack, correct?

A Yes, she did.

Q And isn't it a fact that Ms. Rozier would get crack wherever she could get crack for the most part?

A Yes.

Q And her sole source were not these individuals; she got crack from just about anybody she could get it from.

A Besides them, yes.

Q And one of those people that she would get crack from even before, say, these individuals came -- you indicated that you met "O" back in what, November? Correct?

A (Witness nodded.)

Q You have to say it. I'm sorry.

A Yes.

Q The court reporter can't hear it unless you say it.

A Yes.

Q How long have you known Jerry Gaiters?

A I knew him for a little while.

Q And Mr. Gaiters hung around in that particular

**JA793**

Denise Robin Berkley (Cross)

area as well as in the Fan; is that correct?

A    Yes.

Q    And Ms. Rozier, or "Nat" as you knew her, is it "Net" or "Nat"?

A    "Nat".  N-A-T.

Q    "Nat" got cocaine, long before you met "O," from Jerry; Jerry was one of the people she got cocaine from; is that correct?

A    Before I met "O" and them?

Q    Yes.

A    No.

Q    Are you telling the ladies and gentlemen of the jury that Jerry and "Nat" didn't smoke cocaine?

A    Oh, they smoked it, yes.

Q    They had smoked cocaine together for years, correct?

A    As far as I know.

Q    And is it fair to say that if "Nat" had some cocaine, that she might sell it or share it with Jerry?

A    Yes.

Q    Prior to that.  And is it fair to say that if Jerry had some cocaine, he would share it or sell it to "Nat," correct?

A    Sometimes.

Q    For years, right?

A    As far as I know.

Q    In terms of Ms. Rozier, with respect to her drug habit, Ms. Rozier also owed a number of people money for drugs; isn't that correct?

A    Probably so.

Q    And in fact, it was almost a joke in the community -- not necessarily a joke; I don't mean to characterize it that way -- but that Ms. Rozier would just about do anything for drugs, correct?

A    Yes.

Q    And that included beating people out of drugs if she could do it, right?

A    Yes.

Q    Now, you indicated that Mr. Gaiters was the one who told you that "Nat" was murdered, correct?

A    Yes.  Dead.

Q    And he told you that the next morning; is that correct?

A    Yes.

Q    That was the morning that she was found dead; is that correct?

A    Yes.

Q    Now, when you indicated that Mr. Chiles, Linwood Chiles, took  --  and if I don't have this right, please correct me  --  but "O," "J.R.," who else did he take up to New York?

**JA794**

A    It was "O," "V," "E.B.," and some other people.

Q    Didn't "Whitey" go, too?

A    Not that I know of.

Q    In other words, you didn't see him leave with them; is that correct?

A    Yes.

Q    You saw all of them leave.  Somebody indicated to you that they were going to New York and you saw them leave about 9 o'clock the morning before this happened; is that correct?

A    Yes.

MR. VICK:  She testified it was 9 o'clock the evening before it happened.

MR. BAUGH:  The witness just answered the question.

MR. VICK:  He is prefacing the question with a misstatement of fact.

THE COURT:  Mr. Vick, you can clear it up on redirect.  Go ahead.

BY MR. McGARVEY:

Q    You indicated that it was Jerry Gaiters who told you the following morning when "Nat" was found dead.

A    Yes, he came to the house on Moore Street and told me.

Q    Wasn't that about 9:00, 9:30 the next morning?

A    It was around about that time in the morning.

Q    About 9:00 or 9:30 a.m. the morning her body was found; is that correct?

A    Yes.

Q    Now, you also indicated that Dorothy Armstrong, to your recollection -- and again, ma'am, I'm not trying to put words in your mouth, but these are what my notes say that you said -- sold about 50 to 100 pills what, per day?  50 to 100 $10 hits of cocaine per day?

A    They was twenties.

Q    They were twenties?

A    Yes.

Q    You are talking about during the period of time, November to December, right?

A    Yes.  To the date that she was killed.

Q    I'm sorry, November to January.  And each one of these sold for $20 apiece?

A    Yes.

Q    50 to 100 per day?

A    Yes.

Q    And you also indicated that the gentlemen that you have talked about here, "O" and "Whitey" and "J.R.," were also selling a lot more than that, correct?

A    Yes.

Q    What was that amount?  How much did you say they

were selling?

A    It was 20 capsules  --  25 capsules of twenties in a bag.

Q    You indicated that they were getting a bag about like eight inches, I believe was the U.S. Attorney's estimate, and it was about half full.

A    Maybe more.

Q    Maybe even more?

A    Yes.

Q    That was powder?

A    Yes.

Q    And how many times a week would they be getting that?

A    About  --  when they was was going up there to get it?

Q    Yes.

A    It was like every two weeks or something like that.

Q    Every two weeks?

A    Yes.

Q    They would take that bag and cook that up; is that right?

A    Yes.

Q    And that's a lot more than 50 to 100 twenties per day?

A    Right.  I'm just giving estimates.

Q    I understand that.  So I presume that selling it at that amount, they were making a tremendous amount of money, correct?

A    Yes.

Q    Tremendous.

A    Yes.

Q    Did "Whitey" own a car?

A    He was using a car.

Q    Did he own a car, to your knowledge?

A    No.

Q    You were there.  Did "O" own a car?

A    Yes.

Q    "O" owned a car?

A    Yes.

Q    What kind of car was that?

A    It was something like a Grand Prix.

Q    Grand Prix.  Do you have any idea, was it a late model, or older car, or what?

A    It was a used car.

Q    A used car?

A    Yes.

Q    Can you estimate about how old it was?

A    No.

Q    What did it look like?  Were there rust spots on it?

A    It was black.

**JA796**

Q    I understand it was black.  But you indicated it was a used car.  Was it beat up?

A    No, it wasn't really beat up, no.

Q    And "J.R.," did he own a car?

A    No.

Q    Did "O" have a lot of diamonds, gold, jewelry, all that good stuff?

A    Not that I know of, no.

Q    How about "Whitey," did he have a bunch of diamonds, gold, jewelry or anything?

A    No.

Q    How about "J.R.," did he?

A    No.

Q    Now, you indicated that you moved in with them back in November, 1991.  And you were basically a housekeeper, and the way you were paid was with cocaine, correct?

A    Yes.

Q    And you indicated it was about four to five a day.  Four to five what, tens or twenties?

A    Some of them was tens, some was twenties.

Q    When you were given this, did you smoke this immediately?

A    Some days, yes; some days, no.

Q    Would you explain to the ladies and gentlemen of the jury how you smoke cocaine?  What do you smoke it in?

A    Some people use  --

Q    What did you use?

A    At first I was using a can, and then I started using a pipe.

Q    Since you were getting this where, both at Norton and 1212 West Moore Street?

A    Yes.

Q    Since you were using it there, I presume that you kept it there; is that correct?

A    Yes.

Q    The pipe or the can, whatever?

A    Yes.

Q    When you use a pipe, you have to use steel wool; is that right?

A    Yes.

Q    Do you use steel wool?

A    Yes.

Q    I don't mean to belabor this, but I'm not sure the ladies and gentlemen of the jury understand.  What all implements would you have to have to use cocaine, to smoke cocaine?

A    A lighter.

Q    Steel wool?

A    Yes.

Q    Some kind of a pipe, correct?

**JA797**

A    Yes.
Q    And the type of pipe that you used was?
A    It was a long stem.
Q    Was it glass?
A    Yes.
Q    It was glass.  Were other people using drugs at the 1212 West Moore Street house?
A    "Mousey."
Q    "Mousey" was?
A    Yes.
Q    Did she smoke out of the same pipe or did she have her own?
A    She had her own.
Q    Did she keep that there?
A    Yes.
Q    You indicated  --  withdraw that.  You were asked by Mr. Vick whether or not you had any prior

1747

criminal record, correct?
A    Yes.
Q    You indicated that you  --  excuse me, that's not what you were asked.  You were asked if you were convicted of any felonies?
A    Yes.
Q    You were asked if you were convicted of any misdemeanors giving falsehoods, or lying, stealing, or cheating; is that correct?
A    Yes.
Q    You indicated you had not, right?
A    Yes.
Q    You were born December 11, 1962; is that correct?
A    Yes, I was.
Q    Is your Social Security Number 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?
A    Yes.
Q    Isn't it a fact that you were convicted on August 30th, 1991 of petty larceny in the General District Court of Richmond?
A    Petty larceny?
Q    Petty larceny, stealing less than $200, shoplifting, something like that, petty larceny?  Were you convicted of that August 30th of 1991?
A    I don't recall.

1748

Q    You don't recall?
A    No.
Q    When you answered the question from Mr. Vick, did you not understand it then?
A    I understood the question.
Q    Are you saying you were or you don't recall?
A    I don't recall.
Q    So when you said no, now you don't recall; is that correct?
A    Yes.

**JA798**

Q   Okay.  Now, you indicated that you went to the Richmond Bureau of Police right after "Mousey" Armstrong was discovered, was killed.  You have also indicated in your direct testimony that you tried to turn yourself in.

A   Yes.

Q   That's an interesting phrase, ma'am.  What do you mean by that?

MR. VICK:  Objection to the form of the question.  He needs not editorialize.

THE COURT:  Sustained.

BY MR. McGARVEY:

Q   What did you mean by trying to turn yourself in?

A   I was trying to do something -- I don't know, trying to get myself turned in.

Q   Turning yourself in for what?  Did you feel that you had committed some crime?

A   No, I just felt that I needed to get behind bars away from these people.

Q   Ma'am, when you indicated that you saw Doug Moody killed, and you waited out there and watched the police and the ambulance and all of that, did you go up and tell the police anything?

A   No, I didn't.

Q   Anything that you have told here today?

A   No.

Q   When you were with these individuals you have testified to and you were helping them clean up and cook up crack and the like, did you tell anybody about that before you talked to Detective Fleming?

A   No.

Q   Okay.  When you talked to Detective Fleming or anybody else associated with the United States Government, including Mr. Vick, including Mr. Parcell, did anyone ever say to you that you might be charged with a conspiracy?

A   No.

Q   No one ever said that to you?

A   No.

Q   As a practical matter, you haven't been charged with any conspiracy, have you?

A   No.

Q   You haven't been charged with being an accessory after the fact to a murder or anything like that, have you?

A   No.

MR. McGARVEY:  Your Honor, if I might have one minute, please.

THE COURT:  Sure.

BY MR. McGARVEY:

Q   Now, you indicated that you were at "Mousey's"

**JA799**

house and you got a message from -- I'm sorry, my notes don't reflect that, but that "O" wanted to see you; is that correct?

A    Yes.

Q    And you have indicated earlier that these individuals were selling, according to your testimony, a massive amount of crack cocaine; is that correct?

A    Yes.

Q    And the reason when you got there that "O" told you that he wanted you there was because he wanted you to sell three twenties?

A    No, you got that backwards.  He wanted to see me because I had  --  he wanted to find out how was I doing as far as selling those three.

Q    He had given you three twenties to sell?

A    Yes.

Q    Three.

A    Yes.

Q    These are the same  --  this is the same individual that you indicated was going to New York every two weeks and getting  --

A    Yes.

Q    And that he wanted you to kill "Mousey," you?

A    Yes.

Q    Ma'am, when you were associated with this group, had you ever killed anybody?

A    No.

Q    Had you ever done any violence to anybody?

A    No.

Q    Are you known in the neighborhood as a bad kind of a person, a real vicious person?

A    No.

Q    But he asked you to kill "Mousey"?

A    Yes.

Q    I see.

        MR. McGARVEY:  Thank you.

        THE COURT:  All right.  Counsel for Mr. Roane?

        MR. VICK:  Your Honor, once again, I would object to Mr. McGarvey's comments after answers, editorializing.

        THE COURT:  All right.

                CROSS-EXAMINATION

BY MR. BAUGH:

Q    Ms. Berkley, my name is David Baugh.  I'm one of the lawyers for Mr. Roane.  How much cocaine was being brought back from New York?

A    Sandwich bag.

Q    About how much in weight?

A    It was about half and maybe more.

Q    Have you ever seen an ounce before?

**JA800**

A    Have I seen an ounce before?
Q    Yes.
A    Yes.
Q    Have you ever seen two ounces or three ounces before?
A    Not really.
Q    Being as how you have seen an ounce before, can you estimate how much was in that bag that they were bringing back from New York each time?
A    Like I said, about half of the bag.
Q    You have seen an ounce; can you estimate the

1753

weight of it?
A    It was a little bit more than an ounce.
Q    A little bit more than an ounce?
A    Yes.
Q    And how often would these people bring back a little bit more than an ounce?
A    Every other two weeks.
Q    They would bring back an ounce every other week?
A    Yes.
Q    And you were living with these people daily for some of that time, weren't you?
A    Yes, I was.
Q    Did you ever see a half a kilogram?
A    No.
Q    Now, you lived up in the  --  what do you call that part of town up there around Harrison and Clay?
A    Newtowne.
Q    You call it Newtowne?
A    Yes.
Q    You have lived up there for some period of time?
A    Yes, I have.
Q    About how long?
A    I was living there ever since I was 18 years

1754

old.
Q    And during the whole time you have lived up there, have you ever had a job?
A    No.
Q    When was the last time in your life you ever had a job?
A    I was about 20 years old.
Q    What type of job was that?
A    It was working at a brickyard company on Southside.
Q    That was about ten years ago?
A    Yes.
Q    In fact, up there it is not unusual for people not to have jobs, is it?
A    Up there?  What you mean?
Q    Newtowne.  A lot of people in Newtowne don't

**JA801**

have jobs.

A    Right.

Q    Now, during the time that you have been smoking crack cocaine, did you ever buy any crack cocaine or receive any crack cocaine from Jerry Gaiters?

A    No.  Not that I recall.

Q    What about "Bip" Gaiters?

A    Don't know him.

Q    What about Peyton Maurice Johnson; did you get

1755

asked that already?

A    I have bought one or two times from him.

Q    You bought one or two times from Peyton Maurice Johnson.  Was that before November of 1991?

A    Yes, it was.

Q    Was Peyton Maurice Johnson selling cocaine up there in Newtowne before November of 1991?

A    Yes, he was.

Q    Who did Peyton Maurice Johnson have selling for him?  Was Lewis Johnson working for him?

A    Old man Lewis Johnson?

Q    I don't know.

A    I don't know.

Q    What about somebody named "Little Keith"?

A    Yeah.

Q    "Little Keith" was selling up there before November of 1991?

A    Yes.

Q    And am I correct that "Little Keith" is about 15 or 16 years old, about five-foot-three, five-foot-four, very dark-complected?

A    I think so, yes.

Q    But real young.

A    Yes, he is young.

Q    And he was selling drugs for about a year prior

1756

to November of 1991; am I correct?

A    I'm not sure.

Q    Did you ever buy from him?

A    I bought about one or two times from him, yes.

Q    Crack cocaine; it wasn't that hard to get off of it?

A    What you mean?

Q    To give it up?

A    Not to me it wasn't.

Q    Once you made up your mind.

A    Yes.

Q    Have you ever done powder cocaine?

A    Yeah, I have a long, long time ago.

Q    Is there that much difference in the high?

A    Not really.

Q    Well, do only black people do crack cocaine? Have you ever seen a white person do crack?

A    Yes.

**JA802**

Q     You have.  Thank you.
      MR. VICK:  What possible relevance?
      MR. BAUGH:  I'm trying to find out if I should be asking about other people selling drugs and other people buying drugs.
      THE COURT:  The objection is sustained.
BY MR. BAUGH:

Q     You knew Doug Moody's mother over on Catherine Street; you have seen her, haven't you?
A     I might have seen her one or two times.  I'm not sure who she is, no.
Q     You also know that 1200 West Clay is a nip joint, right?
A     It was.
Q     Back when all this was going on it was a nip joint, right, a guy named "Stinker" ran it?
A     Yes.
Q     His mother, actually "Stinker" helped her.
A     Yes.
Q     1200 West Clay Street is on the corner of Clay and Harrison; am I correct?
A     Yes.
Q     Directly behind that is 810 North Harrison Street, right?
A     I guess that's the address.
Q     Now, you were in 1200 West Clay Street?
A     I was in the front, yes.
Q     The deal you have with the United States, have they given you immunity?
A     Immunity?
Q     What have they told you they are going to do for you?  Have they told you you won't be prosecuted for anything you talk about?
A     Yes.
Q     All right.  And further, have they been paying your bills?
A     Yes.
Q     Did they move you?
A     Yes.
Q     And when you say they are paying your bills, they pay your food, clothing, your rent, everything?
A     Yes.
Q     And when this is all over they are going to  -- did they say anything about getting you a job?
A     Yes.
Q     So am I safe in assuming it is your plans never to go back to Newtowne and the hard life in Newtowne ever again?
A     That's right.
Q     The United States is going to help get you out of there.
A     As far as I know, yes.

**JA803**

Q    Now, did they tell you that you could pick and choose what you talk about?
A    What you mean by pick and choose?
Q    Did they tell you that you have to answer every question and tell the truth?  Right?  They told you

1759

that, didn't they?
A    Yes, I have to tell the truth.
Q    Who bought drugs for you?  Tell me the truth.
A    Who bought drugs --
Q    You said someone was helping support your drug habit.  You have to tell the truth to keep your deal.  Who was buying drugs for you?  Tell us in order to keep your deal.
A    I was buying my own drugs.
Q    Who was giving you money to buy drugs?
A    I can't say that.
         MR. BAUGH:  Your Honor  --
         MR. VICK:  What relevance?
         THE COURT:  The objection is sustained.
BY MR. BAUGH:
Q    So is it your understanding you don't have to tell the truth unless they ask it, right?
         MR. VICK:  Objection, Your Honor.
         THE COURT:  Sustained.
BY MR. BAUGH:
Q    When Doug Moody was getting stabbed was he lying down or standing up?
A    At first he was standing up.
Q    All right.  Is it your testimony that James Roane sat on his chest and stabbed him?

1760

A    No, it wasn't my testimony.
Q    All right.  How was James Roane, according to your testimony, how was his body situated while he was stabbing him?
A    He was standing in front of him.
Q    When he fell down, did James Roane continue to stab him?
A    I think so.
Q    All right.  Now, is it your testimony, and you mean to tell this jury in response to this man's questions and in response to that man's questions over there that you stayed there from the time you came out and saw him being stabbed until the police and ambulance arrived; did you tell them that?
A    Yes.
Q    Did you see the woman come out of 810 North Harrison, come out and do CPR on Doug Moody and cut his clothes off and try to stop the bleeding?
A    All I seen was a lady come out of the house screaming.  That was it.
Q    How far away from Doug Moody were you standing?
A    When he was laying in the alley?

**JA804**

Q    When he was laying in the alley.
A    After all of this had happened?  Explain.  I don't understand what you are saying.

1761

Q    You saw Doug Moody fall in the alley.
A    Yes.
Q    How long was it before you left from the time he fell?
A    Right after "J.R." and all of them left.
Q    How long did you stay in the alley?
A    I didn't stay in the alley long.  I stayed on the corner of Clay and Harrison.
Q    How long did you stay in the vicinity watching Mr. Moody?
A    Until the police and ambulance got there.
Q    About how much time was that, ma'am?
A    It was about, I don't know, about 30 minutes.
Q    And during the 30 minutes, it is your testimony you did not see someone come out and attempt  --
        MR. VICK:  She has not testified to that.
BY MR. BAUGH:
Q    I'll rephrase it.  Did you see  --  you know what CPR is, don't you?
A    Yes.
Q    Chest compression?
A    Yes.
Q    Did you see someone come out other than ambulance attendants and attempt CPR on Doug Moody?
A    No, I didn't.

1762

Q    All right.  Did you see someone go back in, come out with a butcher knife and cut his clothing off?
A    No.
Q    I will ask you specifically  --  strike that.
     Did you see the police talk to the woman that you saw come out screaming, you say?
A    Yeah, she was talking to them, yes.
Q    Could you overhear what she was saying?
A    No.
Q    Was "Little Keith" a friend of yours?
A    Not really a friend, no.
Q    He was just someone you bought drugs from?
A    Yes.
Q    Did you see little Keith Barkley, age 15, dark-complected, sitting on Doug Moody's chest stabbing him to death on that night?
A    No.
Q    Have you ever seen the woman in 810 North Harrison before?
A    No.
Q    Before that night?
A    No.
Q    That's the house on the other side of the alley.

**JA805**

Denise Robin Berkley (Cross)

A    I know.  No.

Q    In all your drug dealing and drug running and using drugs up there for as long as you did, you never saw that woman using drugs, did you?

MR. VICK:  Objection to the form of the question.  There has been no basis for drug running, drug dealing, et cetera.

THE COURT:  She can go ahead and answer the question.

BY MR. BAUGH:

Q    In all the time you were up there, from November of 1990 up until the time that Doug Moody was killed, when you were, by your own admission, helping to bring drugs down, helping to move drugs, selling drugs and using drugs out on that street, you never saw that woman using drugs, did you?

A    No.

Q    All right.

Q    Is it also your testimony that from November of 1991 until February of 1992, you were involved in the distribution of crack cocaine with my client, Mr. James Roane?

A    Yes.

Q    And that involvement and periodic meetings with my client continued up until the time that Dorothy "Mousey" Armstrong was killed in Church Hill.

A    Yes.

Q    And that you would see my client every couple of days up until the time that "Mousey" Armstrong was killed; am I correct?

A    Yes.

Q    As far as you know, 1212 Moore Street was raided early in the morning before "Mousey" was killed; am I correct?

A    That's what I heard.

Q    All right.  Was he arrested that morning?

A    They said he was.

Q    In your discussions with the government, did they ever ask you about "Little Keith" and those other people selling drugs or did they just ask questions about these people?

A    They just asked questions about them.

Q    Did you ever volunteer any information or did you just tell them things they wanted to hear?

A    I volunteered.

Q    But you did not volunteer any of your other drug-dealing friends or you did not volunteer the name of the person who supported your habit; is that correct?

A    Right.

Q    Did they ever ask you that and you said you

**JA806**

weren't going to tell them?

A    No.

Q    The things you knew about and they asked about you told.

A    I volunteered to tell them everything I knew.

Q    Did you tell them about "Little Keith"?

A    No, I didn't.

Q    What other parts of  --  strike that.
     Were you protecting "Little Keith" by not telling on him?

A    I wasn't thinking about "Little Keith."

Q    You were only thinking about these people.

A    Yes.

Q    And they seemed to be only concerned with these people.

A    I guess so.

Q    Were you looking forward to getting out of Newtowne and getting a job?

A    Yeah, I was going to do that anyway.

Q    And you were going to do that before you were  --  before the police and the United States offered you money and all of this to leave?

A    Yes.

Q    You were going to do that?

A    I was going to leave anyway, yes.

Q    While you are sitting here right now, tell me the name of one place you made an application for employment at in 1991.

        MR. VICK:  What relevance does this have, Your Honor?  That's a personal attack.

        THE COURT:  Sustained.

        MR. BAUGH:  Your Honor, excuse me, that is not a personal attack.  I have nothing personal against this woman.  I object to that.
Could I have a ruling on this editorial comment on personal attack?  That was not a personal attack.

        THE COURT:  The objection was sustained.
Ask a question.

BY MR. BAUGH:

Q    You said you were trying to get out.  You were taking steps to get away from the hard life in Newtowne before the government put you up someplace else; am I correct?

A    Yes.

Q    And included in those steps, I asked you, well, if you didn't make a job application, did you try to go back to school?

        MR. VICK:  All of this is irrelevant.  I object.

        THE COURT:  Sustained.

BY MR. BAUGH:

Q    Ma'am, isn't it true that you didn't like living

in Newtowne and you had no way to get out?

MR. VICK: Objection. Same objection.

THE COURT: The first part of the question is perfectly all right.

BY MR. BAUGH:

Q   Isn't it true, ma'am, that you hated living in Newtowne and you had no way to get out until these people moved you?

A   Not really, no.

Q   All right. In light of that answer I will ask again, subject to the objection, about the steps you took to get out of there other than tell these people what they wanted to hear. You didn't apply for a job. Did you try to get  --

MR. VICK: Same objection.

THE COURT: Sustained.

MR. BAUGH: Note my exception. No further questions, Your Honor.

THE COURT: All right. Ms. Reavis' counsel.

CROSS-EXAMINATION

BY MR. WAGNER:

Q   Good afternoon. You have given some testimony about a night on Moore Street, a night that Sandra Reavis brought you to Moore Street; do you remember that night?

A   Yes, I do.

Q   You said you had a bad time that night; isn't that right?

A   Yes.

Q   You were threatened that evening?

A   Yes.

Q   "O" threatened you?

A   Yes.

Q   He made that threat in the bathroom; is that correct?

A   Yes.

Q   You are not sure, though, if Sandra Reavis was in that bathroom or not; is that right?

A   Yes.

Q   You never planned to kill "Mousey," did you, after that threat?

A   No.

Q   You didn't kill "Mousey," did you?

A   No, I didn't.

Q   Sandra Reavis didn't kill you, did she?

A   No, she didn't.

Q   So that was an idle threat; wasn't it?

MR. VICK: Objection. It is his characterization.

THE COURT: Overruled.

BY MR. WAGNER:

**JA808**

Q    That was an idle threat, wasn't it?
A    I guess it was.  I'm not sure.
Q    Turned out to be absolutely meaningless.
A    Seemed that way, yes.
Q    Now, Sandra Reavis never did anything to harm you, did she?
A    No.
Q    You were not scared of Sandra, were you?
A    To a certain extent, yes.
Q    All right.  You were scared of her, yet after you moved from the Norton Street-Moore Street group there, you moved to a house right next-door to Sandra, didn't you?
A    Yes, I did.
Q    You saw Sandra there on a regular basis, didn't you?
A    Every now and then, yes.
Q    You wouldn't avoid her, would you?
A    Would I avoid her?  I didn't have no choice.
Q    You chose to move right next-door to her, right?

1770
A    I was staying there before I even knew she was living next-door.
Q    You didn't know she was living next-door to the guy you moved in with there?
A    Not at first, no.
Q    After you found out you didn't move away, did you?
A    No.
Q    You didn't avoid her, did you?
A    Not really.
Q    You really weren't scared of her, were you?
A    In a way, I was.
Q    I see.  Now, you testified that you saw Sandra on occasion at Moore Street; isn't that right?
A    Yes.
Q    And at Norton Street; is that right?
A    Yes.
Q    She would be there with "J.R."; is that right?
A    Yes.
Q    She was romantically involved with him, wasn't she?
A    Yes, she was.
Q    You didn't speak to her that much, did you?
A    No.
Q    You might say, "Hey, how are you doing?"

1771
A    We would walk together down the street sometimes, yes.
Q    How many times would you say you saw her at Moore Street?
A    About two or three times.
Q    That's over about two months?

**JA809**

Denise Robin Berkley (Cross)

A    Yeah.

Q    How many times would you say you saw her at Norton Street?

A    About the same, two or three times.

Q    What was the first time that you saw her at either Moore Street or Norton Street?

A    The first time I seen her?

Q    Please.

A    It was on the corner of Harrison  --  Hancock and Clay.

Q    At either Moore Street or Norton Street, when is the first time you saw her at one of these locations?

A    The first time I seen her was on Harrison Street.

Q    I'm sorry, maybe I'm not being clear.  You say you have seen her at Moore Street two or three times, Norton Street two or three times.

A    That's right.

Q    When was the first time you saw her at Moore Street?

A    What you mean?

Q    You saw her two or three times there.  Can you give an approximate date for the first time?

A    No.

Q    How about the first time at Norton Street?

A    It was about a couple of days after they moved to Moore Street.

Q    I was talking about Norton Street now.

A    I don't understand.

Q    I first asked you about Moore Street.  You said you weren't sure when you first saw her at Moore Street.  Then I asked you about Norton Street.  I'm asking you now, what is the first time you saw her at Norton Street?

A    Right after  --  the Saturday after I cleaned the house.

Q    That would be in early December?

A    It was in November.

Q    Late November?

A    It was a couple of days before Thanksgiving.

Q    Was she there with "J.R."?

A    No.

Q    Now, just about all the time you were there on Moore Street and Norton Street, you were high on crack cocaine; isn't that right?

A    The majority of the time, yes.

Q    You say you were smoking crack cocaine four or five times a day; isn't that right?

A    Yes.

Q    You saw a lot of people come in and out of those two residences, didn't you?

**JA810**

A    Most of the ones that lived there, yes.
Q    But also people who came in to sell crack?
A    Yes.
Q    And to buy crack?
A    No, mostly to sell, for them to give the crack to.
Q    The night of the Doug Moody murder you were high on cocaine, weren't you?
A    A little.
Q    You testified that just right before you heard the shots you were smoking some cocaine with some people; isn't that right?
A    I had just started taking a hit.  Yes.
Q    After you heard the shots, you said you thought it was the police.
A    Yes.
Q    Who said it was the police?

1774

A    We all thought it was the police.
Q    And how long did it take you after you thought it was the police to put your cocaine away?
A    We just swept it off in the trash can.  It didn't take but a second.
Q    Put it in the trash can of the house?
A    Yes.
Q    What did you do with the trash can?
A    I don't know.  Just threw it and that was it.
Q    Left it there?
A    Yes.
Q    Did you keep any of the cocaine on yourself?
A    No.
Q    Any pipes on yourself?
A    No.
Q    Then you walk outside to where you say you heard the shots from, right?
A    Yes.
Q    Right outside to where the police were.
A    Right.
Q    Right after you had just smoked some cocaine?
A    Yes.
Q    You weren't afraid of the police?
A    No.  Not at the time I walked out, no.
Q    You have not been charged with any crimes by the

1775

government in this case, have you?
A    No.
        MR. VICK:  Asked and answered.
        THE COURT:  I'll give him the chance.
BY MR. WAGNER:
Q    Did they tell you that you could be charged in this conspiracy, the government?
A    No, they didn't.
Q    Did they tell you you could serve a minimum of ten years on a charge involving these people in the

**JA811**

conspiracy?

A    No.

MR. VICK:  Asked and answered.  We have been over this.  I will stipulate we have not so told her.

THE COURT:  Overruled.

BY MR. WAGNER:

Q    The same thing about any time  --  well now, you sold drugs, you have testified, for some of these people here; isn't that right?

A    Just that one time that I was supposed to have sold drugs for "O" but I didn't sell it.

Q    You just testified in response to Mr. Baugh's questions that you sold drugs for "J.R."  Isn't that right?

1776

A    No.

Q    You didn't say that in response to Mr. Baugh's questions?

A    No, I didn't.

Q    You didn't get drugs from "J.R."?

A    I got drugs from "J.R.," but not to sell.

Q    You didn't sell?

A    No.

Q    But you had delivered drugs for one or more of these people; isn't that right?

A    Yes.

Q    In addition to selling the drugs, right?

A    Yes.

Q    Did you ever tell the government that you were selling drugs?

A    Yes.  They knew that.  I told them.

Q    But the government never told you about any charges you might face?

A    No.

MR. WAGNER:  No further questions.

THE COURT:  Mr. Vick?

REDIRECT EXAMINATION

BY MR. VICK:

Q    You are currently in the Federal Witness Protection Program; is that correct?

1777

A    Yes.

Q    Pursuant to your being placed in the Federal Witness Protection Program  --  let me back up.  Why were you placed in the Federal Witness Protection Program?

MR. GEARY:  I object.

THE COURT:  Sustained.  We don't need the why.

BY MR. GEARY:

Q    Did you ask to be placed in the Federal Witness Protection Program?

A    Yes.

Q     For what reason?

A     For my safety.

Q     Was it in response to your testimony here, in anticipation of your testimony here?

A     Yes.

Q     Your being in the Federal Witness Protection Program, is that why you have been receiving money from the federal government?

A     Yes.

Q     Have you been relocated?

A     Yes.

Q     All right.  I'm going to show you what has been previously marked Government Exhibit 124.

        MR. GEARY:  This is beyond the scope.

        MR. VICK:  No, it is not.  I can proffer if the Court wants.

        THE COURT:  Overruled.

     (Exhibit handed to witness.)

BY MR. VICK:

Q     Have you ever seen that weapon before?

A     Yes.

Q     Where have you seen that weapon?

A     "E.B."

Q     Have you ever seen anyone other than "E.B." with that weapon?

A     No.

        MR. VICK:  I would move Government Exhibit 138 into evidence.

        THE COURT:  Admitted.

BY MR. VICK:

Q     As to Government Exhibit 104, 105, 106, 107, the guns and handbag that you gave them, have you ever seen anyone other than the people you testified had those guns have those guns?

A     No.

Q     Has anyone else ever had access to those guns from what you know?

A     No.

Q     So the only people that have ever had access to those guns are "Whitey," "C.O.," "J.R.," "V," and "E.B.", is that correct?

A     Yes.

Q     When was the last time you saw "Whitey"?

        MR. GEARY:  I object to this.  He is going back into this witness after she has testified that she didn't see this fellow from January 13th until she walked into Court today.

        THE COURT:  Overruled.

BY MR. VICK:

Q     Could you tell us the last time you saw "Whitey"?

A     The last time I saw "Whitey" was the night that

**JA813**

Doug Moody was killed.

Q    All right.  You had said that there were 50 or 100 customers coming -- on cross-examination you said there were 50 or 100 pills being sold.  Could you tell the ladies and gentlemen of the jury which, 50 to 100 customers coming and getting drugs, or were they selling 50 or 100 pills.

MR. COOLEY:  Objection.  That was not the testimony.

THE COURT:  Overruled.

THE WITNESS:  It was the customers.

BY MR. VICK:

Q    On how many times a week would you see them with new bags of the cocaine?

A    About two, three weeks.

Q    Would they go to New York every two to three weeks or have new bags of cocaine every two or three weeks?

MR. GEARY:  Asked and answered.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did these people make enough money, "J.R.," "C.O.," "Whitey," "V," did they make enough money to buy gold if they wanted to?

A    Yes.

MR. GEARY:  I object.

MR. BAUGH:  We ask the jury be asked to disregard the answer.

THE COURT:  Sustained.

BY MR. VICK:

Q    Do you know what they did with their money?

A    Counted it, wrapped it up, and would keep it until the next time they would go to New York.

Q    Who stabbed Doug Moody?

A    "J.R."

Q    Why were you scared of Sandra?

A    Because she had her ways.  I mean, she was just -- one minute she is nice and the next minute she is, you know, she's got a bad attitude.

MR. VICK:  I have no further questions.

THE COURT:  Would counsel come up?

(The witness stood aside.)

(At Bench.)

THE COURT:  What's next?

MR. VICK:  We have a police officer witness that will not be that long.  We have got another protected witness  --

THE COURT:  Can we do the protective witness after lunch?

MR. VICK:  Should be here now or within the next 15 minutes.  If I do see her at lunch, we can put her on after lunch.

**JA814**

THE COURT:  So one more after lunch.  We will have to let the jury go early.

MR. PARCELL:  We have three more fairly short police officers that we can get to before the next protective witness.  There is one police officer who I told him we needed by  --

THE COURT:  If you have got a short one, we can take him.

(In Open Court.)

THE COURT:  Ladies and gentlemen, we are going to take about ten minutes now to get ourselves together.  Then we will have some brief witnesses that will get us to around 1 o'clock, and then we will stop.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. VICK:  Just for the Marshal's edification, may this witness be released pending recall as the others have?

THE COURT:  Absolutely.

(The witness stood aside.)

(Defendants removed from courtroom.)

(Recess taken from 12:15 p.m. to 12:30 p.m.)

MR. VICK:  I would move in Government Exhibit 140; Government Exhibit 107, the tote bag; Government Exhibit 104, which is the Glock pistol she identified; 105, a Tec-9 semi-automatic; and 107, which is a Tec-9, also.

THE COURT:  They will be admitted.  Let's bring in the jury.

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL:  Detective Rodney Rodriguez.

## II.  RODNEY RODRIGUEZ

RODNEY RODRIGUEZ,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Would you please state your name?
A    "J.R." Rodriguez.
Q    Your occupation?
A    I'm a detective in the Organized Crime Division for the Richmond Police Department.
Q    How long have you been a police officer?
A    Approximately eight years.
Q    Were you so employed in that capacity on February 2nd, 1992?

A    Yes, sir, I was.

Q    Did you have occasion to join some of your colleagues for the execution of a search warrant at 1212 West Moore Street in Richmond on that date?

A    Yes.

Q    What time did you all arrive at that location for the purpose of executing the search warrant?

A    I arrived after the execution.  By the time I arrived, it was approximately right when they were getting ready to leave.  It would have been about 7:30.

Q    Were you given an assignment; were you asked to search any particular area?

A    Once I arrived at the scene I was given the assignment to search and videotape some things.

Q    And did there come a point in time on which you had occasion to go to the backyard at 1212 West Moore Street?

A    Yes.

Q    What purpose was that for?

A    At that point, I was part of the search team. And I started to search the back area and the yard.

Q    I show you what has been labeled as Government Exhibit 140.

     (Document proffered to witness.)

     Does that photograph mean anything to you?

A    Yes, sir, it does.

Q    Did you find anything in that area which had some significance to you later on in your investigation?

A    Yes, sir.

Q    Would you please explain to the ladies and gentlemen of the jury what that photograph means to you and what you found where?

A    This photograph represents the rear of 1212 West Moore Street.

     MR. PARCELL:  I would ask him to be allowed to approach the jury and explain to the jury what he found where.

     THE COURT:  Go ahead.

     (Witness approached jury.)

     THE WITNESS:  I searched the rear area here where there were some trash cans, boxes, that sort of thing.  Back along the backyard there is a fence, a wire fence, which divides the yard area from Interstate 95.  Along that fenceline there is also some trees and brush.  I walked back there.  It is approximately less than 50 yards, approximately 50 yards at the most, from the rear door of 1212 West Moore Street.  And right along the fenceline in this tree area, I discovered a gym bag, a black nylon gym bag, and there were some items also in that gym bag.

MR. PARCELL: No further questions in front of the jury.

THE COURT: All right. Have a seat.

(Witness resumed witness stand.)

BY MR. PARCELL:

Q    I'll ask you to identify what has been listed as Government Exhibit 107. And can you tell the jury whether that means anything to you with regard to that seizure?

A    Yes, sir, this is the gym bag I recovered on that date.

Q    Were some things inside that gym bag?

A    Yes, sir, there was.

Q    I'll show you what's been labeled Government Exhibit 104. Does that have any significance to you?

A    Yes, sir.

Q    What is that?

A    That's the Glock 9mm semi-automatic pistol that I recovered in that gym bag.

Q    And can you tell us whether it was loaded or unloaded?

A    That had a magazine in it and it was fully loaded.

Q    I'll show you Government Exhibit 104; are they the -- is that the clip and the secondary clip that fits that Glock?

A    Yes, sir, it is.

Q    And as you indicated previously, the weapon was loaded with those magazines, with one of those magazines?

A    Yes, sir, one of those was in there.

MR. PARCELL: That will be Government Exhibit 104, A and B.

THE COURT: They will be admitted.

BY MR. PARCELL:

Q    I ask you to look at Government Exhibit 105 and advise the jury whether that means anything to you.

A    Yes, sir, that's the Intratec Tec-9 9mm semi-automatic pistol which I also recovered in the gym bag.

Q    Was it loaded or unloaded?

A    That also was loaded.

Q    I show you what's been labeled as Government Exhibit 105-A, and ask you to advise us if that's the clip that was contained within that gun?

A    Yes, sir.

MR. PARCELL: That will be introduced as 105-1, Judge.

THE COURT: Admitted.

BY MR. PARCELL:

Q    I ask you to look at Government Exhibit 106 and

identify it if you can.

A   Yes, sir, that also is a 9mm semi-automatic pistol, AA Arms brand, and that also was found in the black gym bag.

Q   Was it loaded or unloaded?

A   That, too, was loaded.

Q   I show you Government Exhibit 106-A and ask you to identify it, if you will.

A   Yes, sir.

Q   That's the clip that was in 106?

A   Yes, sir.

Q   All right.

MR. PARCELL:  I'll move its introduction, also.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q   I show you Government Exhibit 108, and please advise us if you recovered that item, also?

A   Yes, sir, that's a digital scale.  I also recovered that in the black gym bag.

Q   That's its purpose?

A   That's used to weigh items, small items.

MR. PARCELL:  Government Exhibit 108, Judge.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q   I'll ask you to look at what's been labeled as Government Exhibit 109.  Advise us whether or not that means anything to you.

A   Yes, sir, four clear plastic baggies.  They were recovered in a brown paper bag.  The brown paper bag I recovered also in the black nylon gym bag.

Q   And do you know how many individual baggies are contained within those four large baggies?

A   Yes, sir, each plastic baggie contains 30 individual baggies of crack cocaine.

Q   After you seized those items, did you have occasion to take them to the state laboratory for analysis?

A   Yes, sir, I did.

MR. PARCELL:  That would be Government Exhibit 109, please.

THE COURT:  Admitted.

MR. BAUGH:  Can I see the exhibit?

(Exhibit proffered to counsel.)

BY MR. PARCELL:

Q   You sent them to the laboratory for analysis?

A   Yes, sir.

Q   I show you Exhibit 85, and tell the jury what that report represents.

A   That report represents the testing the state lab would have done.  I submitted the drugs to test if it

was positive for a controlled substance.  It came back positive for crack cocaine, approximate weight was 18.83 grams.

Q    Is that the laboratory analysis?

A    Yes, sir.

MR. PARCELL:  Government Exhibit 85 for admission, Your Honor.

THE COURT:  It will be admitted.

MR. BAUGH:  Your Honor, there is a list of names on 85 that has to be redacted.

THE COURT:  Take a look at it and see if there is anything on there that needs to be redacted.

MR. PARCELL:  May I approach?

THE COURT:  Go ahead and talk about it or bring it up here.  We can deal with that.  Go ahead and ask a question.

BY MR. PARCELL:

Q    I'll ask you to examine what's been labeled Government Exhibit 110 and advise us whether or not that means anything to you.

A    Yes, sir.  These are  --  that's 39, .38 caliber bullets, silver-tip bullets.  I recovered those as it is right there also in the black nylon gym bag.

MR. PARCELL:  Government Exhibit 110's introduction, please?

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask you to examine the contents of this bag and see if you can identify the contents of that bag for us.  This is Exhibit 111.

A    Yes, sir, this is a brown paper bag containing empty small zip-lock baggies and also some razor blades.  I recovered this again in the black nylon gym bag, also.

Q    Based on your training and experience, what are those things used for?

A    They are commonly used for packaging small amounts of crack cocaine.

MR. PARCELL:  Government Exhibit 111 for admission.

THE COURT:  It will be admitted.

MR. PARCELL:  Government Exhibit 85 for admission.

THE COURT:  All right.  It will be admitted.

MR. PARCELL:  Pass the witness, Judge.

THE COURT:  Any questions, Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q    As a result of the police activity at 1212 West Moore on the morning of February 2nd, 1992, were any

**JA819**

Rodney Rodriguez (Cross)

state court charges brought against Richard Tipton?

A    I'm not sure, sir.

Q    Do you ever have a warrant issued for the arrest

1792

of Richard Tipton on a state court charge?

A    Yes, sir.  An arrest warrant was issued for the drugs.

Q    Now, the drugs that you have just talked about?

A    Yes, sir.

Q    And you went to a magistrate; is that correct?

A    Yes, sir.

Q    After the raid, or the search warrant  --

MR. PARCELL:  I hate to rise.  Why is this relevant to why we are here?

MR. GEARY:  I'll connect it up.

THE COURT:  Go ahead.

BY MR. GEARY:

Q    Mr. Tipton was not in custody at the time the search warrant was completed at 1212 West Moore Street; is that correct?  He was not present when the police arrived; is that correct?

A    When I arrived, he wasn't present.

Q    And he was not arrested at 1212 West Moore Street; is that correct?

A    That's correct.

Q    Someone directed you to go to the magistrate and get a warrant for Mr. Tipton for possession of cocaine with intent to distribute; is that correct?

A    Yes, sir.

1793

Q    And you had to swear under oath to a magistrate that there was probable cause to arrest Richard Tipton for that offense; is that correct?

A    Yes.

Q    What did you tell the magistrate, sir?

MR. PARCELL:  Objection.

THE COURT:  Sustained.

BY MR. GEARY:

Q    The state court charges were, based upon your information, supplied under oath to the magistrate; is that correct?

A    The charges were based on the complete investigation.

Q    No.  When you went to the magistrate you swore under oath, correct?

MR. PARCELL:  Objection, asked and answered.

THE COURT:  Mr. Geary, you are going to have to tell me something more than I am seeing from here.

BY MR. GEARY:

Q    When you went to Court on these charges, the Commonwealth of Virginia dropped the charges against Mr. Tipton; is that correct?

**JA820**

MR. VICK:  I object.

THE COURT:  Sustained.

MR. GEARY:  I think I can show what they were doing with these charges.

THE COURT:  Sustained.

MR. GEARY:  May I make a proffer at some point?

THE COURT:  I just gave you an opportunity and you stood there and asked another question.

MR. BAUGH:  He invited you.

MR. GEARY:  I'm missing something.

THE COURT:  Come up here.

(At Bench.)

MR. GEARY:  The proffer that would be made by Tipton was that he was arrested as a result of Detective Rodriguez swearing out warrants for him for possession of cocaine, with intent to distribute. Those charges were entered at the General District Court level or Circuit Court level and not prosecuted by the Commonwealth.  The purpose of the warrants was simply to get Tipton into custody pending the indictment.  There was actually no merit to that.

THE COURT:  The objection is still sustained, but your proffer is on the record.

MR. GEARY:  I have no further questions.

THE COURT:  Any questions?

CROSS-EXAMINATION

BY MR. COOLEY:

Q    Good afternoon.  Detective Rodriguez, a few moments ago in direct examination the government, Mr. Parcell, asked the Marshal to give to you certain exhibits that were contained in envelopes.  And specifically he gave you two envelopes that had  -- that were numbered 104-A and B and he said, "These are the clips that match up to the Glock?"  And you responded "Yes, they were."  Is that correct?

A    Yes, sir.

Q    Did you open those envelopes at that time to determine whether they were or not?

A    No, sir, I didn't.

Q    You accepted what was offered to you?

A    Yes, sir.

Q    All right, sir.  And in your search of 1212 West Moore, I understand you were not the only person there.  But did you recover at any point in time any paraphernalia consistent with the use of drugs?  Did you recover any pipes or anything that would be used to smoke?

A    No, sir.

MR. COOLEY:  Thank you very much.

THE COURT:  Any questions?

**JA821**

MR. HENDERSON: Defendant Roane has no questions.

MR. WAGNER: No questions, Your Honor.

THE COURT: You may stand down. Do you have redirect?

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Your job was not to search the interior of that residence; is that correct?

A    Yes, sir.

Q    Other officers did that and not yourself?

A    That's correct.

Q    In regard to the question Mr. Cooley asked you about when you were given the 104 exhibit which was the Glock, A and B, did you open up and verify that they in fact fit that weapon?

MR. McGARVEY: Objection, asked by Mr. Cooley.

THE COURT: Mr. Cooley asked him the method that he utilized to ID. He indicated, and now Mr. Parcell wants to clear that up. Go ahead.

THE WITNESS: Repeat the question, please.

BY MR. PARCELL:

Q    Would you please open up 104-A and B and tell the ladies and gentlemen of the jury whether or not these fit the 104 Glock?

A    Yes, sir, these are the ones. In fact, they say "Glock" on them.

THE COURT: All right. That's fine. Are you finished?

MR. PARCELL: Yes, sir.

THE COURT: Okay.

MR. VICK: We call Detective Ralph Fleming.

(Witness stood aside.)

RALPH FLEMING, called as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    You are Detective Ralph Fleming?

A    Yes, sir.

Q    Previously sworn?

A    Yes.

Q    Previously, you testified that you were one of the investigators, one of the detectives assigned to this investigation; is that correct?

A    That's correct.

Q    Were you present on February 2nd, 1992 at the execution of the search warrant at 1212 West Moore Street and present for the arrest of certain

individuals there?

A    Yes.

Q    Could you state to the ladies and gentlemen of the jury who was present at 1212 West Moore Street and who was detained at that time?

A    Present was "V," "E.B.," James Roane, Sandra Reavis.

Q    And who was arrested of that group?

A    Everyone except for Sandra Reavis.

Q    Why was she not arrested?

MR. BAUGH:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    Now, Detective Fleming, you heard the testimony of Denise Berkley; is that correct?

A    That's correct.

Q    Did she indeed approach you concerning her cooperation?

A    Yes, she did.

MR. GEARY:  I object.  There has been no evidence to suggest she didn't.

THE COURT:  Overruled.

BY MR. VICK:

Q    Now, when Ms. Berkley approached you, what did she state to you?

MR. BAUGH:  That would be hearsay.  That is an out-of-court statement.

MR. VICK:  If I could proffer, Your Honor?

THE COURT:  You can proffer.  But Mr. Vick, I'll tell you I don't see why you need to go over what she has explained.

BY MR. VICK:

Q    When you spoke to her, did she condition her cooperation on  --

MR. BAUGH:  That's a leading hearsay issue.

THE COURT:  Overruled.

BY MR. VICK:

Q    Did she condition her cooperation with you upon being moved out of the Newtowne area?

A    No, she did not.

Q    When was it that witness protection for Denise Berkley was first mentioned?

A    Later on.  About the time of the Grand Jury, if I am not mistaken.

Q    Is that when this investigation was in federal court?

A    That's correct.

Q    Who suggested that?

A    The government did.

Q    Did Denise Berkley suggest that?

A    No.

Q    Did she provide cooperation well in advance of her being offered the Witness Protection Program?

A    She provided information from the very first time I spoke to her when she came down to police headquarters.

MR. VICK:  No further questions.

MR. GEARY:  No questions.

CROSS-EXAMINATION

BY MR. COOLEY:

Q    Good afternoon.  Detective Fleming, you were aware that she was living for part of the time at 1212 West Moore; is that correct?

A    She told me of the location she had stayed and who she was involved with.

Q    And that was some of these folks that are before the Court today; is that right?

A    That's correct.

Q    But she told you that she was living at 1212 West Moore?

A    She mentioned Norton Street, the address that she had previously lived with "Pea Sue."

1801

Q    My question is, did she tell you she was living at any time at 1212 West Moore Street?

A    She mentioned on all the addresses.  Right now I can't specifically recall 1212.

Q    You don't know whether she told you she was ever living at 1212 West Moore Street?

A    She mentioned locations.  And I remember Norton Street, I remember 1212, but as far as whether she did or did not say she actually lived there, I can't recall.  I know she said she went there on many occasions.

Q    Did you keep notes of that?  Did you tape record her statement?

A    No, I didn't.

Q    Did you keep notes of her statement?

A    I have some notes as to in essence what was said, but not every word.

Q    Now, you were in the midst of an investigation of this magnitude, as you have indicated, and you did not keep notes of what she said word for word, or a tape record, or videotape her versions to you; is that correct?

A    I was talking to her on an almost daily basis.

Q    When she first approached you is what the U.S. Attorney asked you.  What date was that?

1802

A    I don't recall the exact date, but it was in February after the death of Dorothy Armstrong.

Q    Let me ask you this:  Was it specifically  -- did you place her into a motel room or something as of that date?

A    No, I did not.

**JA824**

Q    So it was sometime before that occurred, is that correct, that she came to you?

A    She came to me and advised me what had happened. She was upset. And she had talked to --

Q    I'm sorry. My question to you is, it pre-dated you placing her in a motel room.

A    Yes, she was staying somewhere else before any of this and I met with her several times before she was placed in any kind of secure location.

Q    And you know it was in February. Wouldn't your notes reflect the date that she first came to you?

A    It may or may not.

Q    Do you have your notes with you?

A    No, I don't have them.

Q    Are they somewhere that you could retrieve them reasonably?

A    Yes.

Q    And you think that they may have the date that she came in?

1803

A    It may have.

Q    Would it not be reasonable for you to record when she came to talk to you? You would normally do that in the course of your investigation, wouldn't you?

A    It depends on the person.

Q    When she came to you, she indicated to you, did she not, that she was aware that 1212 West Moore Street had already been raided and searched; is that correct?

A    We went through a number of things.

Q    If you would, just either yes or no.

MR. VICK: I ask he be allowed to answer his questions.

THE COURT: No, no.

MR. VICK: This is well beyond the scope of what I called him for.

THE COURT: No, I think Mr. Cooley is right. Just answer his questions, Mr. Fleming. You will get on and off a lot quicker. Just answer the question as given.

THE WITNESS: 1212 had already been raided when she came to me.

BY MR. COOLEY:

Q    She knew that and told you that; is that

1804

correct?

A    Yes.

Q    She came to turn herself into you, did she not?

A    She used the phrase turn herself in. Can I tell you how?

Q    I'm not going to cut you off from explaining, but if you would just answer first. Did she tell you she already knew -- you have answered that. Did she

**JA825**

tell you she was turning herself in to you or turning herself in in general?

A    I don't recall if she used those words.  There were no charges on her, to my knowledge.

Q    But she was aware that the residence in which she had been living had been raided and searched at the time she came to you.

THE COURT:  He has already answered that.

MR. COOLEY:  Judge, if I might, I would ask that he be allowed to retrieve his notes so that we could conclude my questions relating to today.

THE COURT:  If you have the notes as to the first meeting  --  are they in Court?

THE WITNESS:  I don't believe so.

THE COURT:  You can call him back and ask that question later.

MR. COOLEY:  Thank you.

1805

THE COURT:  Mr. Baugh?

                    CROSS-EXAMINATION

BY MR. BAUGH:

Q    Detective Fleming, while you were interviewing Ms.  --  her last name?

A    Berkley.

Q    When you were interviewing her, would she tell you something, you would write something down, she would tell you something else, you would write something down?

A    No.  When people tell you things, if you start writing they become paranoid.  So I let them talk and let them loosen up.  And if the person appears to be someone who is going to say something and disappear again, then later on I'll make notes.  But if the person is very open and sincere and very willing to explain what they know about the situation, there would be no problem in contacting that person again.  You know how to get in touch and they are willing to assist  --

Q    We already covered that.  What did you do?

MR. VICK:  Objection, he cut him off.

MR. BAUGH:  He said the same thing twice.

THE COURT:  Mr. Fleming, again, the question was, did she make a statement and did you

1806

write it down?  And the answer that is apparent from what you are saying is no.  But see how much time we save by that?

THE WITNESS:  I'm sorry.

THE COURT:  Just answer the question.

BY MR. BAUGH:

Q    Viewing back over in your subsequent interviews with Ms. Berkley, have you talked to her and read from your notes?

A    Have I talked to her and read from my notes?

**JA826**

John Dorman (Direct)

Q    Yes.

A    No.

MR. BAUGH:  Thank you, no further questions.

THE COURT:  Mr. Wagner?

MR. WAGNER:  No questions.

REDIRECT EXAMINATION

BY MR. VICK:

Q    Was what she told you consistent with what she said here today?

MR. BAUGH:  Objection, outside the scope.

MR. VICK:  They have asked that on cross.

THE COURT:  Overruled.

THE WITNESS:  Very consistent.

MR. BAUGH:  We have an objection as "consistent" unless they are saying it is identical.

THE COURT:  He has answered the question.

BY MR. VICK:

Q    Detective Fleming, at the time Denise Berkley showed up at the police station to talk to you, did you have any basis to arrest her?

A    No, I did not.

MR. VICK:  No further questions.

THE COURT:  All right.  You may stand down.

MR. GEARY:  Can he be directed to get his notes during the lunch break?

THE COURT:  Detective Fleming, if you have those notes, try to get them during the lunch hour. All right.  You had some training person?

MR. PARCELL:  Officer John Dorman, please.

JOHN DORMAN, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    I'm going to show you Government Exhibit 9-1, 2, 6, and 7.  Sir, would you please state your name?

A    John Dorman.

Q    Your occupation?

A    Traffic Division, Richmond Bureau of Police.

Q    Did you have occasion to respond to 810 North Harrison Street in the City of Richmond on January 13, 1992?

A    Yes.

Q    What was the purpose of you responding to that location?

A    Got a report of a shooting at that location and I responded.

Q    You responded.  Would you please tell the ladies and gentlemen of the jury what if anything you

**JA827**

found?

A    When I responded to the area, there was a woman screaming.  I found a black male, 30, 40 years old, maybe a little older, who was in the alley on the west side of the street of the 800 block of North Harrison.  He was laying there with his clothes, appeared to be unconscious at that time.

Q    Did there come a point in time that the rescue squad arrived and moved him from that location and took him to MCV?

A    That's correct.

Q    He was still alive when you left that location?

A    They were still trying to revive him at that time.  I'm not sure if he was declared dead before he left for the hospital or if he was declared dead at the hospital.

Q    I show you Government Exhibit 9-1, 2, 6, and 7 and ask if those photographs mean anything to you.

A    Repeat the question.

Q    Are those items meaningful to you in regard to where you responded and what you found?

A    This is the area that I found the victim that was unconscious.

            MR. PARCELL:  I ask he be allowed to approach the jury and explain Government Exhibit 9-6 and 9-7, where he found the victim when he arrived.

            THE COURT:  You may stand down.

        (Witness approached jury.)

            THE WITNESS:  When I arrived on the scene, the body was -- head was laying toward the brick right here, and he was in a horizontal degree.  His head was there, foot was there.  He appeared to have blood on him, eyes rolled back, appeared to be unconscious.

        (Witness resumed witness stand.)

Q    To the best of your knowledge, were any people with him or around him when you arrived?

A    There was a woman standing -- I'm not sure if she was on the porch or if she was on the sidewalk in front of that address.  She was screaming loudly that the man was injured, had been stabbed.

Q    And from the time you got there until the time he left in the rescue squad, did anyone go up to where his body was lying other than yourself and the rescue squad people?  Did anyone else go to his body from the time you arrived other than yourself and rescue squad people prior to him departing the scene?

A    Yes, there were other officers there with me.

Q    But it was under secured conditions; no other citizen assisted him other than yourself, fellow officers, or the rescue squad?

John Dorman (Cross)

A    That's correct.

Q    Did there come a point in time after he left that you had occasion to maintain that crime scene until Detective Tuttle arrived?

A    That's correct.

MR. PARCELL:  No further questions.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Good afternoon, Mr. Dorman.

A    Good afternoon.

Q    When you secured the area, did you meet a Ms. Gina Taylor?

A    Yes, I did.

Q    She gave her address as 810 North Harrison Street?

A    I'm not sure of the exact address she gave me. She said she lives in the house near 810 North Harrison.

Q    Did you have occasion to prepare four handwritten pages of notes concerning your interview of  --  strike that.  Did you interview the woman who lived there?

A    No, I did not.  I did not interview her.

Q    I show you four pages, copies of documents, and ask you are those your handwritten notes.  Woops, I have another page.

MR. VICK:  I would indicate that they are not this man's.  They are Steve Dalton's notes.

THE COURT:  All right.

BY MR. BAUGH:

Q    The woman that you saw there  --  oh, when you were at the scene did you have your emergency equipment on?

A    I had my flashing emergency lights, flashlights on.

Q    You turned onto the street and your lights were revolving?

A    No, they were not.

Q    What safety lights did you have on?

A    I had my flashing lights, emergency flashing lights.

Q    You came down the street?

A    That's correct.

Q    All right.

A    I was not in the way of traffic, didn't need the lights.

Q    This woman told you what?

A    She said, "Someone has been stabbed."  She was yelling loudly.

Q    Did you go over to the person that was injured

at that time?

A    Yes, I did.

Q    Was this before the ambulance got there?

A    That's correct.

Q    Had somebody just -- some of his clothing had been removed?

A    It was ripped but still on his body.

Q    Were his shoes off, also?

A    I don't remember.

1813

Q    Was he conscious?

A    I'm not qualified, medically-trained, to say if he was conscious or unconscious.

Q    Was he talking?

A    No, he was not.

Q    Were you there when Mr. Dalton came on the scene?

A    Yes.

Q    Did you refer him to this woman?

A    Yes, I did.

Q    Did you refer him to this woman because you thought she was a witness to the death of this man or the impending death of this man?

A    I said, "We have a possible witness and she lives at this address and she is standing on the porch right there."

        MR. BAUGH:  Pass the witness.

        MR. WAGNER:  No questions, Your Honor.

        THE COURT:  Anything further?

        MR. PARCELL:  No, sir, he may be excused.

        THE COURT:  All right.  You may be excused.

    (Witness stood aside.)

    All right, we are going to stop for the luncheon recess.  If you all would come back at 2:05 we will

1814

get started with the afternoon session.  Everyone remain seated while the jury leaves the courtroom.

    (The jury left the courtroom.)

    All right, Mr. Marshal, you can remove the defendants.

    (Defendants removed from courtroom.)

        THE COURT:  Linda, is my afternoon hearing downstairs?

        THE CLERK:  We hadn't determined that.

        THE COURT:  We haven't decided?

        THE COURT:  We will be in luncheon recess.

    (Luncheon recess taken from 1:05 p.m. to 2:05 p.m.)

        MR. VICK:  Our first witness is going to be Paul Tuttle.  That's why we have the TV screen set up.  I don't anticipate his testimony being all that lengthy.  After him we have another protected witness, so we will need to let the jury out,

**JA830**

although I don't know if we need to do that in light of the cross-examination.

THE COURT: No, we will continue to do that. You can take this out in between those witnesses.

MR. VICK: Yes, sir.

MR. COOLEY: Might I inquire about the notice of protective witness?

THE COURT: Go ahead.

MR. PARCELL: Judge, the contents of those notes are contained within the Chiles offense report that all counsel have been given a copy of, which indicates that Detective Fleming first talked to her on February 21st, 1992 at approximately 9 o'clock p.m. The basic contents of the initial conversation are contained within that paragraph.

MR. COOLEY: I think I asked him about the contemporaneous notes he took when he was questioning her. He indicated he talked to her a number of times. I think we are entitled to those based on his ultimate response on redirect that her entire testimony was consistent with what she told him.

THE COURT: If you have the notes --

THE WITNESS: I don't have them.

MR. COOLEY: I would like to hear a response from the detective. Either he has them and can get them or doesn't have them at all.

THE COURT: Detective Fleming, do you have the notes?

THE WITNESS: To my knowledge, I don't have any of those notes.

MR. COOLEY: I would ask the Court, I believe I'm entitled to call him back to the stand, concluding my cross by asking him just that.

THE COURT: That's fine with me. I don't care.

MR. COOLEY: Can we do that before the next witness comes in?

THE COURT: Yes.

MR. COOLEY: Thank you.

(All right, let's bring in the jury.)

MR. VICK: We will start with Detective Fleming on the stand?

THE COURT: Yes, just have him on the stand and let Mr. Cooley ask him the question.

(Cross-examination continued of Detective Fleming.)

(The jury entered the courtroom.)

CROSS-EXAMINATION (Cont'd.)

BY MR. COOLEY:

Q   Detective Fleming, good afternoon to you again. When I last inquired of you, I asked you if you had

**JA831**

made contemporaneous notes at the time that you were speaking with this young lady; is that correct?

A    That's correct.

Q    Did you in fact keep contemporaneous notes?

A    I told you I made some notes after the interview about what in general was said, and I have those in my reports.

Q    You have taken a summary of your investigation at some point in time; is that correct?

A    I typed the summary of the conversations in my reports.

Q    You have no other contemporaneous notes?

A    Not to my knowledge, no.

Q    Either they didn't exist in the beginning or they are no longer in existence.  Which is it?

A    To the best of my knowledge, I don't have any of those notes.  I typed  --  I don't know the exact date I typed that, but that was typed shortly after the interview.

Q    My question is, were there contemporaneous notes made and not kept; is that what happened?  You made notes but you didn't keep them?  Or were there no notes made at all?  Which are you telling us?

A    I'm trying to think.  There was people I interviewed. I don't believe I had any notes on her. I typed those notes from memory of what our conversation was.

Q    She came in on a number of occasions, you said, between the first time, or you talked to her on a number of occasions between the first time and the time you put her into a motel room in protective custody; is that right?

A    She came in on February 21st at approximately 9 p.m. and I talked to her again.  I believe I spoke to her the following day, I believe, the day after that.  And it was almost on a daily basis for a few months.

Q    All right.  And on none of those occasions did you take notes, did you videotape her, or use just an audio tape recording?

A    No.

        MR. COOLEY:  That's all I have.

        THE COURT:  All right.

            REDIRECT EXAMINATION

BY MR. VICK:

Q    Why did you not take the steps of videotaping her?

A    She was very consistent in everything that she told me and she didn't indicate to me that she was being false with any of the information.  She was being straightforward and consistent.

        MR. COOLEY:  I object to the conclusory

**JA832**

statements.

MR. VICK: I show you Government Exhibit 142 and ask you if you can identify that.

(Document proffered to defense counsel.)

BY MR. VICK:

Q    You made typewritten notes of that interview?

A    I'm sorry?

Q    You made typewritten notes of that interview?

A    Those are the typewritten notes.

(Document proffered to witness.)

Q    Can you identify that item?

A    This is the original copy of my typed notes.

Q    And that's Government Exhibit what?

A    142.

MR. VICK: I would move Government Exhibit 142 into evidence, Your Honor.

THE COURT: It will be admitted. All right, you may stand down, detective. Call your next witness.

MR. PARCELL: Detective Paul Tuttle, please.

PAUL TUTTLE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Would you please state your name and occupation?

A    My name is Paul Tuttle. I'm a detective assigned to the forensic unit of the Richmond Police Department.

Q    Tell the ladies and gentlemen of the jury what you mean by being assigned to the forensic unit?

A    I respond to crime scenes to collect evidence, document, photograph, submit items of evidence to the appropriate agencies for further analysis if necessary. I do fingerprint work. I am recognized in both the state and the federal courts as a witness in crime scenes.

Q    And were you so employed in that capacity on January 13th, 1992?

A    I was.

Q    Did you have occasion to respond to the intersection of Clay and Harrison Street in the City of Richmond to investigate a shooting?

A    Yes, sir.

Q    Would you please tell the ladies and gentlemen of the jury when you arrived what you initially observed?

A    There was an area that had been roped off. There were some items of clothing in an alley and

**JA833**

there were some items of clothing in the street across the street. At that time I parked my van and I began videotaping the area.

Q    Sir, I'll ask permission for him to approach the jury and explain what this diagram represents.

(Witness approached jury.)

THE WITNESS: This is an aerial photograph showing the location where I had gone to. This is Clay Street, and if you could look up top, you can see it is labeled "Clay Street." This street here is labeled "Harrison Street." And the location to which I responded was right in here. I have an arrow and a little marking here called "The Alley." As you can see, it is right here. That's the alley where the items of clothing were when I went to that location. And there was  --  it was across the street, approximately in this location, that other items of clothing were found. Across the street on Harrison Street itself.

Q    Would you point out, did you have occasion to continue the investigation, go inside a house?

A    Yes, sir, I did.

Q    Would you please point that out to the jury, also?

A    There was an apartment located in the 800 block of North Harrison Street, and the entrance to that apartment is right here where this little arrow is. You can see, it looks like a porch right through there. The actual entrance is over here on this side, but that little porch area is the apartment we are referring to. The arrow is pointing to it right there.

Q    You can have a seat.

(Witness resumed witness stand.)

MR. PARCELL: Judge, that will be Government Exhibit 17-1, sir.

THE COURT: It will be admitted.

BY MR. PARCELL:

Q    One of the first things you do when you arrive at a crime scene is what?

A    I videotape the area after I have talked to some of the witnesses, some of the police officers on the scene, to determine the extent of the crime scene itself.

Q    Did you do so in this situation?

A    Yes, sir, I did.

Q    I'll ask you to look at some video on the monitor. Walk through it with the ladies and gentlemen of the jury and the Court and explain to them what you found and what observations you made while you describe the scene.

**JA834**

A    Yes, sir.

(Videotape began.)

That's the front door of the apartment right next to the alley. If you are looking in the photograph, it will be on the right of the alley, that little house on the corner. I'm standing on the sidewalk and I'm doing a 360-degree sweep of the area to show you the surrounding area, to give you a feel for what actually that neighborhood looks like down there on the street rather than from the air.

That intersection where the flashing light is is the intersection of Clay and Harrison streets. That little porch you see directly in front of you is the porch I referred to earlier, the apartment. I am just sweeping the alley itself so that you can see what I had seen when I first arrived. At the center of that photograph right there, toward the lower right-hand corner, are some items of clothing. There was a shoe -- it is on the left of the screen right now -- and some other items.

That's a kitchen knife that I found next to the porch. That's a portion of the belt that was cut off and some other items of clothing that were tossed off to the side. That area there, it doesn't show very well, but it is some blood spatter and some portions of blood that were left behind. That's the shoe which I referred to earlier, and some more blood. These are some items of medical equipment that were discarded, box of an IV set, for example, some pads from a monitor, more items of clothing.

That's a bullet that was found in the alley. As you can see, it is still a live round. That is another area of blood that was left. That is the other boot, the other shoe. This is coming from the back of the house walking back toward that alley to give you another perspective. That's a sock. This is another sweep, 360-degree view. That's the other item of clothing that I found across the street. Now these items of clothing were left behind by the paramedics and the firefighters in the rescue attempts. The clothes were cut off and tossed to the side.

That's just a close-up of the address where the clothing was found. This is the door of the apartment which we spoke of earlier. If you look at the top of the window, you can see that the glass is broken and part of the windowframe is missing. The screen has been removed. These are some shards of glass and part of the windowframe, some more pieces of the window here. We are entering the kitchen area of the apartment. This is the rest of the apartment. It appeared to be a little living area

**JA835**

with a bed.  That is a part of the window shade that had been pulled down from the window showing signs of some kind of a struggle.  That's the window that was broken.  We previously saw the outside view.  There is the curtain.  That spot there on that mirror is a bullet hole.  That doorway that you saw was going toward the bathroom.

(Tape ended.)

Q    As you processed this crime scene, you took photographs of what you indicated was the things you found in the alleyway as well as some things you found inside the residence: the broken window, the bedroom, and the hole in the mirror; is that correct?

A    Yes, sir.

Q    There are some other photographs, nine-whatever. I would ask that he be allowed to approach the jury and explain what those photographs represent.

THE COURT:  Go ahead.  Keep your voice up when you are over here, please.

THE WITNESS:  This photograph shows the entrance to that apartment I had just videotaped.

BY MR. PARCELL:

Q    If you would, please identify each photograph by its number.

A    This is 9-1.

Q    Thank you.

A    9-2 is a photograph of the window that was broken, and you can see on the sidewalk there is some shards of glass, the broken window up at the top, a piece of the frame missing.  Would you like me to do these in order, how they are numbered?

MR. PARCELL:  Yes, sir.

THE WITNESS:  Photograph 9-3 is a photograph of the inside of the window showing the broken window and part of the curtain or the shade that had been torn down.

9-4 is just another angle of the window, and you can see part of a curtain on the floor.  This is that portion right here.  And on the mirror, there is a spot right there, and that is the bullet hole.  This is the curtain, this is the bullet hole.  Photograph 9-5 is a photograph of the bullet hole in the mirror.  Photograph 9-6 is a portion of the alley showing back here one shoe, the sock, the other shoe, and the items of clothing, the shoe way back here with the sock, the other shoe and the clothing.

Photograph 9-7 is taken from the opposite side showing the shoe, the sock, but here you can see some blood over by the side of the building.  There was a pool of blood up next to the building, right here. This is from the back of the alley looking towards

Harrison Street.

Photograph 9-8 is spots of blood in the alley. Some of the pieces of discarded medical equipment are here, and the shoe.

Photograph Number 9-9 is more of the clothing, another angle of the clothing. This is the corner of the house. It doesn't show you too much, but this is the corner of the house right here.

(The witness resumed the witness stand.)

BY MR. PARCELL:

Q    I move the admission of those photographs, 9-1 through 9, please?

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q    You indicated there was a butcher knife with blood on it near the clothing. As you continued the investigation, was that knife of any significance to you?

A    It was significant. At the time, we did not know where it came from, but as the investigation continued we found out that that  --  that an individual with some medical training attempted a rescue and they used the knife to try to cut some of the clothing away from the wounds.

Q    So that had nothing to do with the death of Douglas Moody?

A    That's correct.

MR. McGARVEY:  I object. That's a conclusion this gentleman cannot make.

THE COURT:  Overruled.

BY MR. PARCELL:

Q    As you continued your investigation, did you have occasion to go back with Detective Fleming seated to my right and retrieve the bullet that was recovered from behind the mirror?

A    Yes, sir.

Q    I'll ask that these photographs labeled 14-1, 2, 3, and 4 be proffered to you.

(Exhibit proffered to counsel and witness.)

BY MR. PARCELL:

Q    Would you approach the jury briefly and explain those photographs?

(Witness approached jury.)

A    Photograph 14-1 is Detective Fleming pointing to the mirror. We removed the mirror from the wall. When we went back into the apartment, it appeared to have been as we left it the night the incident occurred. We took the mirror from the wall in an attempt to locate the hole behind the mirror. Obviously, that bullet had gone through the mirror. We did find that hole and this is a photograph showing the dresser pulled away from the wall with

**JA837**

Paul Tuttle (Direct)

the hole.  This is photograph 14-2.  You can see right here by my index finger, this is the hole that was made behind the mirror.  The mirror is up here next to the wall and this is the dresser.  This is the hole that was made.  Now, that hole did not go all the way through.  There was a hole that was made by the impact, and the actual projectile fell onto the floor.  We were prepared to open up the wall in an attempt to retrieve that bullet, but we did not have to.  This is a photograph of the bullet as it lays on the floor.  This is 14-3.  This one is a little difficult to see, but by my index finger here, right here, this is the actual bullet.  It had gone through the mirror, struck the wall, created that hole, and then fell to the floor.

MR. BAUGH:  Could we ask the witness to circle it?

THE COURT:  Sure.

(Witness complied.)

THE WITNESS:  That is now circled in blue.  That's the bullet.  Photograph 14-4 is a close-up of the bullet with a scale to show you its relative size.

MR. PARCELL:  I'll move the introduction of those four photographs as Government Exhibit 14-1, 2, 3, and 4.

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q    Did you retrieve that bullet and send it in for analysis?

A    Yes, sir.

Q    I'll show you Exhibit 15 and identify it if you can, sir.

(Exhibit proffered to witness.)

A    This is the bullet that I located on the floor that you saw in the photographs.

Q    And you later on submitted that to Anne Jones of the state firearms laboratory for analysis?

A    Yes, sir.

MR. PARCELL:  That will be Government Exhibit 15, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Can you identify this next item?

A    Yes, sir.  This is a bullet that was recovered from the body by the Medical Examiner.

Q    And you in turn submitted that to the state laboratory to Anne Jones for analysis as well?

A    Yes, I did.

MR. PARCELL:  That will be Government Exhibit 16.

THE COURT:  Admitted.

**JA838**

MR. PARCELL:  No further questions.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Good afternoon, Mr. Tuttle.

A    Good afternoon, sir.

Q    Did you see any evidence that anyone had jumped out of that window?

A    At the time, we did not know how the glass was broken.  But apparently the information was developed later on that that may have indeed been the case.

Q    And so someone told you or someone told someone else that the victim had jumped out of the window?

A    Well, at the time when I was doing the photographing and the videotaping, we had no information to that effect.

Q    Did you measure how big the opening is in that window?

A    No, sir.

Q    It is about the size of two panes; am I correct?

A    Yes, sir.

Q    It is kind of small?

A    Yes, sir.

Q    Additionally, whose shoes were those in the alley?

A    Those apparently were the shoes from the victim.  They were cut off by the paramedics and tossed to the side.

Q    I assume you checked the soles of those shoes to see if there was glass ground into them as though someone had landed on broken glass?

A    I didn't have the capability of doing that at the time.

Q    Has it been done since?

A    No, sir, I don't believe so.  Those shoes were collected and taken to our property section.

Q    Did you inspect the clothing of the deceased for broken glass in the fabrics?

A    No, sir, I didn't.  Not at the time.

Q    Well, based on the shoes or the clothing or footprints in the broken glass, at the time you were there you saw no indication anyone had jumped out of that window, had you?

A    As I stated, we did not know how the glass was broken at the time.  So no, we didn't have any idea that anyone had jumped out.

Q    The question is, now that you have seen it, looking back on it a year later, as you look back on your crime scene with all the information that's developed since, do you recollect any indication that

someone jumped out of that window or through that window?

A    At the time, no.

Q    I'm asking now.

A    I can see how that could have occurred.

Q    Could you show the jury the height and width of the opening in the window?

A    The height?

Q    How big is the opening?

A    It would be two panes of glass side by side, about like that.  So we will say  --

Q    12 by 18?

A    I would say that would be a fairly close guess, sir.

MR. BAUGH:  Pass the witness.

THE COURT:  Anything, Mr. Wagner?

MR. WAGNER:  No questions.

MR. VICK:  We need to move the equipment.

THE COURT:  Go ahead.  You may stand down, sir.

(Witness stood aside.)

We are going to take ten minutes now and get the next witness situated and get this equipment out of the way.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Recess taken from 2:55 p.m. to 3:10 p.m.)

## III. Pamela Denise Williams (1834)

PAMELA DENISE WILLIAMS
called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Speak up and speak up toward that microphone so your voice can be heard by everyone in the courtroom.  Could you state your name for the Court, record, and jury, please?

A    My name is Pamela Denise Williams.

Q    How old are you?

A    29.

Q    How far did you go in school?

A    To the tenth grade.

Q    Do you have any children?

A    Yes, I do.

Q    How many?

A    Three.

Q    What's your prior criminal record; do you have any prior felony convictions or any convictions of any sort?

**JA840**

A    No, I don't.

Q    You are currently facing prosecution here in Federal Court on firearms charges; is that correct?

A    Yes.

Q    Indeed, you are facing prosecution here in Federal Court on firearms charges that are the subject of your testimony here today; is that correct?

A    Yes.

Q    All right.  Now, has anyone from the United States Government, myself, Mr. Parcell, Detective Fleming, or anyone else, told you what will happen to those charges that are pending against you in Federal Court?

A    No.

Q    That case has been continued; is that correct?

A    Yes, it has.

Q    Why has that case been continued to your understanding?

A    Because I've been out of town.

Q    All right.  Has anyone represented to you that those charges will be dismissed against you or will result in any particular type of sentence?

A    No.

Q    You have been fully truthful about your involvement in those?

        MR. BAUGH:  Objection to leading.

        THE COURT:  Sustained.  We have been through enough of this.

BY MR. VICK:

Q    Do you know Anita Bracey?

A    Yes, I do.

Q    How do you know Anita Bracey?

A    We grew up together.

Q    I direct your attention to January 13th, 1992.  Do you remember that date?

A    Yes, I do.

Q    Did you have occasion to be introduced by Anita Bracey to any people on that date?

A    Yes.

Q    Who was that that she introduced you to?

A    Three guys by the name of "J.R.," "C.O.," and a guy called "V."

Q    Is that the only names you knew them by?

A    Yes, it was.

Q    Do you know their full names now?

A    I have heard of the one named "J.R.," I have heard his name called Jerome.  But I met him by the name of "J.R."

Q    Look around the courtroom and see if you see the individual that you know as "J.R."  Stand up and look around if you need to.

**JA841**

(Witness stood.)

A    Yes.

Q    Where?

A    Sitting over there.

Q    How is he dressed?

          MR. BAUGH:  Stipulate ID.

          THE COURT:  All right.

BY MR. VICK:

Q    Do you see the person that you knew as "O" or "C.O."?

A    Yes.

Q    Where is he?

A    Sitting over there.

Q    What's he dressed in?

1838

A    With the sweater on.

          MR. VICK:  Let the record reflect the identification of the defendant, Cory Johnson, defendants Cory Johnson and James Roane.

          THE COURT:  The record will so reflect.

BY MR. VICK:

Q    Why did Anita Bracey introduce you to "J.R." and "C.O." and "V"?

          MR. BAUGH:  Objection.

          THE COURT:  Rephrase the question.

BY MR. VICK:

Q    Were you present  --  what did Anita Bracey say to you that caused you to go and meet "J.R.," "C.O.," and "V"?

A    She had came to my house the day before and she asked me did I want to get a sixteenth of crack cocaine, because I was addicted at the time.  And so I told her yes.  So we walked down to her house.

Q    On the day before, what did she tell you you needed to do in order to get that sixteenth of crack cocaine?

A    I needed to go and purchase a gun.

Q    On January 13th, did you indeed go to her house?

A    Yes, we did.

1839

Q    What did you go to her house for?

A    I went to her house to meet the three guys, "J.R.," "C.O.," and "V."

Q    And when you got to her house, what occurred?

A    We went in the back door.  "C.O." was sitting in the living room and "J.R." wanted to talk to me upstairs.  So "J.R.," myself, Lolita, and the car driver, and "V," we went upstairs in her bedroom and he started asking me about the guns; would I get these guns for them for some crack cocaine.

Q    Did you agree to get guns for them for crack cocaine?

A    Yes, I did.

**JA842**

Q    When you say "the car driver," what car driver?
A    The first car driver the first day.
Q    What car did he drive?
A    It was a little yellow car, I believe.
Q    Did you ride in that car with him later that day?
A    Yes, I did.
Q    Could you describe the car driver?
A    He was tall, kind of had like a curl  -- was wearing a jeri curl.  He had a cap on his head and he was kind of big.  I didn't pay am much attention.
Q    What was his complexion?

A    light-skinned.
Q    When you went upstairs and had the meeting with "J.R." and "V," what exactly did they tell you they wanted you to do?
A     "J.R." was doing most of the talking.  He asked me to  --  he said he would give me a sixteenth if I would go and purchase a gun for them.  So I agreed.  I said okay.
Q    What happened after that conversation?
A    So after that conversation, we went downstairs and we headed out the back door towards the car to go to the gun station.  The gun store, I mean.
Q    And did you indeed go to the gun store?
A    Yes.  The driver, Lolita, "V."
Q    Who is Lolita?
A    The girl that introduced me to "J.R."
Q    What's her name?
A    Her name is Lolita, but they call her Nita.
Q    That's Nita Bracey?
A    Right.
Q    Who else went?
A    The driver, "J.R.," "V," Lolita Bracey, and myself.
Q    All right.  Where was it that you went?
A    To the gunshop on Midlothian, Southern Gunshop.

Q    I'm going to show you what has been previously marked Government Exhibit 91.  I will ask if you have ever seen that document.
     (Document proffered to witness.)
A    Yes, I have.
Q    On that document is a signature of Pamela Williams; is that your signature?
A    Yes, it is.
Q    Noted down at the bottom of that document is the place, the store that issued that document; is that the store that you went to?
A    Yes, it is.
Q    What's the name of that?
A    Southern Police Equipment Company.
Q    Where was that located?

A    7906 Midlothian Turnpike.

Q    On January 13th when you went to that store, what did you do when you got there?

A    "J.R.," Lolita Bracey and myself, we walked in and we just were looking around at the guns, and I guess when he decided what kind of guns that he wanted --

MR. BAUGH:  Objection to her guess.

THE COURT:  Sustained.

BY MR. VICK:

Q    Tell us what happened.

A    We went inside the gunshop.  "J.R.," Lolita and myself was walking around the store.

Q    What was "J.R." doing while walking around the store based upon your observation?

A    He was walking around the store checking out what kind of guns he wanted for me to purchase.

Q    Did he talk to you while in the store?

A    He was really talking to Lolita.  She was delivering the messages to me.

Q    Did Lolita indeed deliver messages to you concerning the particular type of guns that "J.R." wanted purchased?

A    Yes.

Q    What type of guns were they that he wanted purchased?  Did you know the guns yourself?

A    No, I didn't know the guns myself.

Q    Were those guns ultimately listed on the gun report?

A    Yes.

Q    You had nothing to do with picking out the type of guns?

A    No.

Q    And on January 13th, 1992, did you indeed pick out guns?

A    Yes.  I picked them out.  They was picked out on the 13th.

Q    And did you get those guns on the 13th?

A    No, I didn't.

Q    Tell the ladies and gentlemen of the jury what occurred, what you had to do.

A    After the guns was picked out, they had to run a check on my ID to see if I have any kind of federal records, and they ran a check on it and he told me that I can come back the next day if they were approved and I could pick the guns up.

Q    In order to run a check on you, did you provide them with any identification, the gunshop people?

A    Yes.

Q    What sort of identification did you provide?

A    Social Security Card and my picture ID.

Q    Noted on Government Exhibit 91, the gun record

**JA844**

in front of you, if you would look at that, please, there is a Social Security Number listed on there. Is that your Social Security Number?

A    Yes, it is.

Q    Is the identifying information at the top of that form, your name and height, weight, and address?

A    Yes.

1844

Q    Did you provide that information to Southern Police Equipment Company?

A    Yes, I did.

Q    What happened on the 13th after you had picked out the guns and provided that information; what did you do?

A    Well, we left the store and the man told me to call back the next day about 12 o'clock.  So we left the store and we went back down to Lolita Bracey's house, and we went inside the house.

Q    Who went inside?

A    "J.R.," Lolita, the driver, and "V" and myself.

Q    Where was "C.O." at the time?

A    "C.O." stayed at the house the whole time.

Q    Who stayed at the house with him?

A    It was Willie Green and a guy named Virgil.

Q    Did you receive payment of any form on the 13th of January, 1992 for what you did?

A    Yes, I did.  They gave me -- "C.O." gave me half of some crack cocaine.

Q    All right.  And how many pieces of crack cocaine did he give you?

A    About four or five pieces, rocks.

Q    Where was that that he gave you that crack cocaine?

1845

A    In Lolita Bracey's house.

Q    On January 14th, did you have occasion to once again see any of those individuals?

A    Yes, sir.

Q    And who did you see on January 14th?

A    "V," "C.O.," "J.R.," and there was another driver, a different driver on the second day.

Q    Where did you see them?

A    At Lolita Bracey's house.  Tangerine had came to my house.

Q    Who is Tangerine?

A    One of Lolita's friends.  She had came to my house and let me know that they was there, and that "C.O.," "J.R.," and "V" was down there.  So I walked down to Lolita Bracey's house, but they hadn't gotten there yet.  But then they had came.

Q    What time of day was this?

A    It was after 12.

Q    All right.  And what did you do when you got

**JA845**

there?  When you got to Lolita's house, what did you do?

A    Oh, well, once the three guys came in, "J.R.," "C.O.," and "V," they was ready to go pick up the guns.  So I had changed my mind.  I said I wanted to back out.  I said I didn't want to go and get the guns.  Once I changed my mind they got violent with me.

Q    Who did?

A    "V," "J.R."

Q    When you say violent, what do you mean?

A    It was like "Bitch, you agreed to this.  You're going to get these guns.  You agreed to it."

Q    Why didn't you want to go get the guns?

A    Why?  Because I had realized that it wasn't worth it the night before.

Q    All right.  And when they got violent with you, what did you do?

A    After he got real nasty and violent, my friend, Willie Green, was standing out there, too.  And they was coming up towards him.  So I just said, "Well, I'll go ahead and get the guns."

Q    Did you agree to go with them back to Southern Police Equipment?

A    Yes.  After they got violent, I agreed to go up there and pick the guns up.

Q    Who went with you?

A    "J.R.," "V," the driver, Lolita, and myself.

Q    Could you describe the driver; do you remember what he looked like?

A    The second day it was a dark-skinned, kind of small guy.  He wasn't saying too much.  So I guess --

        MR. BAUGH:  Objection.

        THE COURT:  Sustained.

BY MR. VICK:

Q    What kind of car was he driving?

A    It was a station wagon.

Q    Do you remember the color?

A    It was like green sort of like, the station wagon.

Q    And where was "C.O." at the time that you got in the station wagon to go back to Southern Police Equipment?

A    He stayed at the house, at Lolita Bracey's house.

Q    When you got to Southern Police Equipment, what occurred?

A    Well, when we got to the police department  -- the store, I mean, we went in the inside.

Q    And did you get the weapons inside?

A    Yes, I did.

Q    Did you have to pay for the weapons?
A    Yes.
Q    And I will show you what has been previously marked Government Exhibit 90 and ask you if you can

1848

identify that item.
     (Document proffered to witness.)
A    Yes, I can.
Q    What is Government Exhibit 90?
A    It is a receipt.
Q    For what?
A    For $1,492.
Q    And where did you get that  --  where have you seen that receipt before?
A    This is the receipt that I got when I purchased the guns.
Q    Is that the receipt Southern Police Equipment gave you?
A    Right.
Q    Is that the cost of the purchase of the guns that you made for "C.O.," "J.R.," and "V"?
A    Yes, it is.
Q    Now, that 1400-some dollars, where did you get the $1,400 to pay for those guns?
A    From "J.R."
Q    Where did you get that money?
A    In the gunshop.
Q    Did you see where "J.R." got that money?
A    "J.R."  --  "V" gave "J.R." the money in the car before we went in the store.

1849

Q    Who went into the store?
A    "J.R.," Lolita and myself.
Q    Where did "V" stay?
A    "V" stayed in the car.
Q    And how was that money; was it in cash?
A    Yes, it was.
Q    What denominations in cash?
A    Hundreds, $50s, $20's.
Q    In addition to the guns that you purchased, did you purchase anything else there that day?
A    Yes.
Q    What else did you purchase?
A    Some bullets.
Q    And who picked out those bullets to purchase?
A    "J.R."
Q    What did you do with the money "J.R." gave you?
A    For the guns?
Q    Yes.
A    Gave it to the cashier.
Q    And did you get the guns from the cashier?
A    Yes.
Q    All right.  And how many guns did you get, the guns listed on the report?

**JA847**

A    Yes.  Three of them.

Q    What did you do with those guns when you got them?

A    Well, when the man put them in a bag I grabbed the bag and we walked out the door towards the car. And then I gave the bag to "J.R."

Q    All right.  What did you do at that point?

A    We got in the car and then "V" asked "J.R." did we get the guns, and he said yes, and he was happy. And they was giving each other high fives.

Q    Where did you go from there?

A    We was on our way back home and I asked what were they going to do with the guns.  They said they had a sale for them in New York.

Q    Did you go back to Lolita or Nita Bracey's house?

A    Not that day.  When we got down towards her house, when I got out of the car, "V" gave me the other half of the crack cocaine.

Q    How much crack cocaine did "V" give you?

A    Four or five rocks.

Q    Did "V" give you anything else?

A    He gave me $30 before we went to pick up the guns, the same, the day before.

Q    What was that $30 for?

A    I suppose for breaking my kitchen window out and pay for the kitchen window and report the guns were stolen.

Q    Who asked you to do that?

A    "J.R." and "V" was discussing this so the guns weren't traced back to me.

Q    When you got through at Southern Police Equipment, where did they take you to?

A    Well, he parked back to Lolita Bracey's house, but I didn't go in.  I went on home.

Q    Did you see "C.O." at that time?

A    No, I don't think so.  I didn't see "C.O." that time.

Q    Where did "J.R." and "V" go?

A    They left.  They left.  "C.O." came out the door, and all three of them and the driver; they pulled off.

Q    And where were the guns?

A    The guns stayed in the car because they was getting ready to leave.

Q    Have you seen any of those individuals, "J.R.," "C.O.," or "V" since that day?

A    No, I haven't.

Q    Do you know an individual by the name of Charlotte Denise Moore?

A    No, I don't.

MR. VICK:  I will move Government Exhibit

**JA848**

1852

90 and 91 into evidence, Your Honor.

THE COURT:  They will be admitted.

MR. VICK:  I tender the witness.

THE COURT:  Any questions, Mr. Geary?

MR. GEARY:  No, Your Honor.

MR. VICK:  Just for the jury's edification, there is an agreement.  It is not a contested fact that indeed Government Exhibit 90 and 91 are true and accurate copies of the business records of Southern Police Equipment.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. COOLEY:

Q    Good afternoon to you, Ms. Williams.  Let me ask you about one of your last responses to Mr. Vick, as I understand it, was that on the second day when you came back from the purchase of these guns, you came back to Lolita's house?

A    Yes.

Q    And you saw "C.O." there?

A    The second day after I purchased the guns?

Q    Yes.

A    Yes, he was coming out the back door.

Q    That was at Lolita's house.

A    Right.

1853

Q    Is Lolita the same person as "Nita"?

A    Her name is Lolita but they call her Nita.

Q    So they are the same person?

A    Yes.

Q    Do you recall testifying before the Grand Jury some months ago?

A    Yes.

Q    Do you recall that back on April 21st, 1992, do you recall testifying?

A    Yes.

Q    Do you recall this question being asked of you by the United States Attorney:  "When you got back to Anita's house, did "C.O." leave with those guns"? And your response being:  "When I got back to Southside, I didn't go back in her house.  I got off and went up to my house."

MR. VICK:  Objection.  That's completely consistent with her testimony.

THE COURT:  That's not an objection, Mr. Vick.  You can deal with it when you do your redirect.  Go ahead.

BY MR. COOLEY:

Q    Do you recall that?

A    Excuse me, can you repeat the question?

Q    Let me read you the entire transaction.  "When

1854

you got back to Anita's house, did "C.O." leave with

those guns?" Answer: "When I got back to Southside, I didn't go back in her house. I got off and went up to my house." Question: "Have you seen them since then?" Answer: "No." Question: "Is that the only time you have seen those people?" Answer: "Yes."

Is that correct? Do you remember that exchange, the questions and answers?

A    Do I remember that?

Q    Yes, ma'am.

A    Yes, I did get out of the car and went home.

Q    You did not see "C.O." on that occasion, did you?

A    The second day when I came back with the guns, "C.O." came out the back door and all three of them got in the car and they left. That's the last time I ever seen the three.

Q    Now on the occasion, as I understand it, this happened over two days; is that correct?

A    Yes.

Q    Did you tell, when you testified before the Grand Jury, did you tell anyone in the Grand Jury in response to questions or otherwise that this happened over two days, or did you speak of it as if it occurred on one day?

A    I really can't answer that.

Q    Not sure. Is it possible you talked about meeting with them, going up there and making the purchase and coming back? Is that how you described it?

A    This happened  --

MR. VICK:  Anything is possible, Your Honor.

THE COURT:  She can answer the question.

BY MR. COOLEY:

Q    Is that how you described it? That you met with "J.R.," who took you upstairs with "V" and some others; you had a discussion; you agreed to go purchase; you rode with him; he and Nita and you went inside; you made the purchase on that day, gave the guns to "J.R.," and came back. Is that how you testified?

A    I don't know, but it didn't happen like that.

Q    But you don't recall how you might have testified to the Grand Jury about that.

A    At the time, I really don't know because I was nervous. And if I said that, it didn't happen like that. This happened over two days. It was a two-day thing.

Q    Now, on the first occasion then as you described it today, the first day that this occurred, the conversation relating to you purchasing guns for folks, "C.O." was not even in the room with you; is

that correct?

A   No, he wasn't.

Q   He was downstairs and you were kind of taken up to an upstairs room and this was discussed with you; is that right?

A   Right.

Q   And you never received any money from "C.O."

A   No, I didn't.

Q   You never gave any guns to "C.O."

A   No.

Q   You never saw "C.O." with any of these guns.

A   No.

Q   And I take it the description of your answer a few minutes ago was that when the discussion came up about what was going to happen with the guns, they were going to be sold to someone up in New York; is that right?

A   Right.

Q   Cory Johnson did not go with you to make the purchase; is that right?

A   Who is Cory Johnson?

Q   You don't know who Cory Johnson is?

A   I only know them by their nicknames.

Q   The person you have described as "C.O.," did that person go with you?

A   No, he didn't.

Q   Did "V" go with you?

A   Yes.

Q   Did "V" go in or stay in the car?

A   He stayed in the car.

Q   Someone else, you, the young lady and one of the other folks went inside; is that right?

A   "J.R."

Q   Have you ever been shown a photograph of "C.O." by the detectives or by the attorneys?

A   Yes.

Q   Okay.  And you were asked, "Is this "C.O."?

A   No.

Q   You weren't asked that.

A   No.  They asked me could I identify their face.

Q   But that was the picture that was shown to you; is that right?

A   All three of them.

Q   Now, as I understand it, you have pending charges relating to firearms in the Federal Court here in this building; is that correct?  You have pending charges against you?

A   Yes.

Q   Now, when were those levied against you?  Was it in February last year?

A   No, it was in May.

Q   It was in May of last year?

**JA851**

A    Of last year.

Q    And you, of course, have discussed  --  you have not come up for trial on that yet; is that correct?

A    No.

Q    And it has been explained that you have a right to have your trial brought up within a certain period of time, but if you waive that right, your trial date can be extended and extended -- is that correct -- until it is reasonable for you to be brought forward and tried; is that right?

A    Yes.

Q    And would it be fair to say that your hopes are that your trial will be delayed past that  --  did they tell you 70 days was the requirement; did they tell you that from the time you were charged, did your attorney or anyone else tell you that in 70 days you had a right to be tried within those 70 days from last May, but if you wanted to, you could keep continuing it?  They told you that, didn't they?

A    I don't remember.

1859

Q    But your hope is that your case has been continued until after you testified in this case, right?  And that you would get some benefit when your case came to trial, right?

A    Yes.

Q    And is it fair to say that folks from either your counsel or your dealings with the detectives or investigators or U.S. Attorneys have been that "We can't make you any promises, but we will see about your case when it comes up after you have testified in this case"; is that right?

A    Yes.

Q    They haven't made any promises.

A    No, they haven't.

Q    But what are you hoping for, Ms. Williams?

        MR. VICK:  Her hope, Your Honor, is irrelevant.

        THE COURT:  I'll let her answer.

BY MR. COOLEY:

Q    What are you hoping for?

A    I ain't hoping for nothing.  I just take one day at a time.

Q    Are you hoping, specifically related to your pending charges, are you hoping it will be dismissed?

1860

A    I hope so.

Q    Do you think there is some possibility if you have come out here and testified that that will happen?

A    No, I don't.

Q    You don't think that's going to happen?

A    No.

Q    You don't think there is any possibility of that happening?

A    No.

Q    Have people talked to you about what your sentence would be?

A    Yes.

Q    And what are you hoping for in terms of your sentence?

A    I hope I don't get sentenced, first of all because I wasn't even involved.  I wasn't in with their plan.  I wasn't aware they was going to go kill nobody.

Q    So if you testify today, you won't get sentenced at all; is that fair to say?

A    No, I'm not here because I'm going to jail.  I'm just here because  --

Q    My question to you is, is that what you are hoping for?

A    No.

Q    You are not hoping for that.  You are not hoping you will go to jail, are you?

A    No, I'm not.

Q    In fairness, aren't you hoping you won't go to jail?

THE WITNESS:  Yes.

MR. VICK:  She has Answered that three times now.

MR. COOLEY:  No  --

THE COURT:  Mr. Cooley, I don't think she can get any clearer.  She is hoping she doesn't even get sentenced.  All right.

BY MR. COOLEY:

Q    Has anyone mentioned to you a motion called a 5K1 motion; has anybody told you about that even if you are convicted, that the government can come in and file a 5K1 motion and ask the Court to reduce your sentence because of your cooperation with the government?

A    No.

Q    Your attorney and no one else has told you that your cooperation will be brought to the attention of the Court and will work to your advantage?

A    Oh, yes.

Q    They have told you that.  And that certainly contributes to why you are here, doesn't it?  You really want to reduce your sentence, don't you?

A    Not really.

MR. VICK:  This has been exhausted.

THE COURT:  Sustained.

MR. COOLEY:  Can I have a moment?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

**JA853**

MR. COOLEY:  Thank you, that's all the questions I have.

THE COURT:  All right.  Counsel for Mr. Roane?

CROSS-EXAMINATION

BY MR. HENDERSON:

Q    Good afternoon, Ms. Williams.

A    Good afternoon.

Q    My name is Arnold Henderson.  I represent Mr. Roane.  You indicated that you had three children; is that correct?

A    Yes.

Q    What are their ages, ma'am?

A    15, 11, and 5.

Q    And do the three of them reside with you?

A    Yes, they do.

1863

Q    All three of them?

A    Yes.

Q    And I would be correct if I were to say that you definitely hope that you are not separated from your children by having to go to jail, correct?

A    Yes.

Q    Now, on this particular day, are you testifying with respect to two days, I take it?

A    Uh-huh.

Q    The first day that you met James Roane, and the second day is when you went in and purchased these weapons.

A    Right.

Q    And you had no further contact with them after that day?

A    No, I didn't.

Q    In response to I think Mr. Cooley's questions, you indicated that the first time this conversation came up you went upstairs in the house and the question was posed to you about purchasing some weapons, correct?

A    Yes.

Q    And I just want to be very clear with you.  Was I wrong, did I hear you say that the first time the question was posed to you it was by your friend

1864

Anita?

A    Yes.

Q    The day before that.

A    Right.

Q    And her name is also Lolita.

A    Right.

Q    So she was actually the first person to mention the purchase of weapons to you.

A    Yes, she was.

Q    And then she took you over to a house and a number of individuals were there.

**JA854**

Pamela Denise Williams (Cross)

A    She took me to her house.
Q    And a number of persons were at that house?
A    Right.
Q    Now, on the day that you went into the store to purchase these weapons, this store was over in Southside?
A    Right.
Q    You actually went into the store with the other persons, correct?
A    Yes.
Q    You were actually walking around the store and looking at weapons yourself; is that correct?
A    Yes.
Q    Now, the money that you got from James Roane, that wasn't Roane's money, was it?
A    Excuse me?
Q    The money you got from James Roane, you indicated you got some money from James Roane to purchase these weapons that you were purchasing in the store that day.
A    Yes.
Q    That was not Roane's money, was it?
A    I don't know.
Q    Who did James Roane get that money from?
A    "V."
Q    So that wasn't his money, was it?
         THE COURT:  She just answered.
         MR. VICK:  The facts speak for themselves.
BY MR. HENDERSON:
Q    Where did that transaction take place, ma'am? Was it in the vehicle?
A    Right.
Q    And when you went in the store and you came out of the store, you gave the guns to "J.R."?
A    Yes, I did.
Q    And who did "J.R." give the guns to after you got back in the car?
A    Nobody.  They was just looking at the guns back and forth, him and "V."  They was opening them up, looking at the guns and the bullets and everything that was inside the bag.
Q    "V" was in the car when you got back in the car?
A    Yes, "V" stayed in the car.
Q    Now, on the second morning or the second day, you indicated that you decided that you did not want to go through with the purchase.  And you made the comment that James Roane and some other individuals got violent.  Did anyone strike you?
A    No, didn't no one strike at me.
Q    No one struck you.  Your boyfriend was there, correct?

**JA855**

A    Yes, he was.
Q    They basically verbalized their displeasure with your decision or changing of mind, correct?
A    Yes.
Q    No one pushed you, did they?
A    What?
Q    No one pushed you?
A    No one pushed me.
Q    Now the crack, you indicated that you had been given some crack in exchange for purchasing these weapons; isn't it correct that you and your boyfriend smoked that crack?

1867
A    Yes, we did.
Q    And when you came back that next morning, isn't it also a fact that what you really wanted, you wanted to get additional crack, didn't you?
A    Uh-huh.
Q    And you talked about receiving some money.  You talked about $30 for a window.  You wanted some more money, also, didn't you?
A    No.  I didn't want any more money.
Q    Just more crack?
A    No, I wanted money in place of the crack.  When I decided to change my mind, after I had a chance to think about it the night before, and I realized that it wasn't worth it, so I would rather have had the money if I was going to go through this.
Q    So now you are saying that the statement you just made about yes, you wanted more crack, is not in fact correct?
        THE WITNESS:  The crack wasn't no big deal.
        MR. VICK:  Objection.
        THE COURT:  Overruled.
        THE WITNESS:  I was changing my mind because I realized that it wasn't worth it.
BY MR. HENDERSON:

1868
Q    So my question now is, your response a few seconds ago when you said yes, you wanted more crack, that is really not the case.  You actually wanted more money and not more crack?
A    Right.
Q    And that's why you came to James and the others and indicated you weren't going to go through with the purchase, correct?
A    Right.
        MR. HENDERSON:  That's all I have.
        THE COURT:  Mr. Wagner?
        MR. WAGNER:  No questions.
        THE COURT:  Redirect?
            REDIRECT EXAMINATION
BY MR. VICK:

**JA856**

Pamela Denise Williams (Redirect)

Q   On the first day, January 13th, 1992, although "C.O." did not go with you to Southern Police Equipment, did "C.O." pay you anything that day for your going to Southern Police Equipment?
A   Yes.
MR. McGARVEY:  I object.  That question has been asked and answered.  She indicated she had gotten $30.
THE WITNESS:  Not from "C.O."
THE COURT:  Hold up.  The objection is

1869

sustained.  She answered the question.
MR. VICK:  Your Honor, Mr. Cooley's cross-examination covered everything but that.  He didn't go; he didn't have anything to do with that. I believe I have a right to ask did he have anything to do with that transaction that day.
THE COURT:  You have already asked the question and she has already answered it.  It is on the record.
MR. VICK:  Yes, sir.
THE COURT:  All right.  Let me see you all.
(At Bench.)
MR. VICK:  I think if they are going to try to cleave out everything but what she did say he did, I have a right to go back on redirect and establish he did something.
THE COURT:  It is already in the evidence. It is there.  There is no need to get into it.  If it was unclear, I would let you do it.  What's the next step?
MR. VICK:  We have another prisoner witness that might take some time, not a protected witness, but a prisoner witness.  We could start in the morning with the prisoner witness, whatever the

1870

Court's pleasure.  She might take some time.
MR. PARCELL:  She will probably be 15 or 20 minutes.  I imagine she will be quite lengthy on cross.
MR. McGARVEY:  We don't mind if we do direct and do cross tomorrow.
THE COURT:  Do you have anything else?
MR. VICK:  We have to put on another protected witness before we get to the next murder. We have some police witnesses. There is nothing that they could testify about that's in evidence yet.
MR. PARCELL:  We won't go past 4:30.
THE COURT:  No, I hate to split up the examination.
MR. VICK:  We are moving along on a more rapid pace than we all anticipated.
MR. PARCELL:  Stick to 4:30?

**JA857**

THE COURT: We will stop. You have indicated how many more protected people?

MR. VICK: We have two more tomorrow. We have five more total. Two of them, the mother and the son they are bringing in together, so we won't have this problem. And then from then to the last one is quite a large gap of testimony. So we won't have a problem on that, either.

THE COURT: All right. I'll just stop now. That's fine.

MR. VICK: It slipped my mind. We could call Detective Fleming just to link up the firearms by serial number and the Southern Police report, the firearms seized by J. Rodney Rodriguez.

MR. BAUGH: That's fine. We will stipulate.

MR. VICK: We don't need to call him then.

(In Open Court.)

MR. VICK: The stipulation is that Government Exhibit 90, which is the Southern Police Equipment receipt reflecting the purchase of the three firearms with serial numbers, those firearms have indeed been compared by Detective Fleming and other police officers and are the same serial numbers that are found on Government Exhibit 104, 105, and 106; that is the Glock Model 17 .9 millimeter and the Intratec Tec-9 9mm and the AA Arms 9mm, those guns that were introduced by Detective Rodriguez and Denise Berkley as having been seized from the 1212 West Moore Street residence.

THE COURT: All right. Ladies and gentlemen, once again, I think I warned you about this on Tuesday, but we are going to have to quit early again, primarily because of witness logistics. But I'm told that this is not going to be a problem in the future. This will be the last of this kind of problem. So we are stopping a little early. But we just can't avoid it. I would like you all to come tomorrow at 10 o'clock in the morning. We will get started, hopefully get a full day in tomorrow.

Again, do not discuss the case with anyone, and do not review any media items relating to it. We will see you tomorrow at 10 o'clock a.m. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Marshal, would you remove the witness, please.

(The witness stood aside.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

We will be in recess until the matter at 4:45.

(In Chambers.  3:55 p.m.)

MR. HENDERSON:  Your Honor, previously the Court granted our ex parte motion to allow expenses for Crane and Snead to transcribe the interview tapes.  And Mr. Meade Howard at Crane and Snead contacted my office yesterday and indicated that he had reached the $1,000 limit and still had three tapes left to go.  And he is in the middle of one interview, two tapes on one interview that's very important to us.  And we would request that the Court allow us the expense to have him complete the three tapes.

THE COURT:  Has he given you an indication how much it will cost to finish?

MR. HENDERSON:  He did not, but he has gone through approximately fourteen tapes and reached the $1,000 limit.

THE COURT:  Go ahead.

(Proceedings adjourned at 4:00 p.m.)

**JA859**

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                  CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                     VOLUME IX

                 January 21, 1993
                 Richmond, Virginia
                   10:00 a.m.

BEFORE:       HONORABLE JAMES R. SPENCER
              United States District Judge


APPEARANCES:  HOWARD C. VICK, JR., ESQ.
              WILLIAM H. PARCELL, III, ESQ.
              Office of the United States Attorney;
                  Counsel for Government;

              ROBERT P. GEARY, ESQ.
              ERIC D. WHITE, ESQ.
                  Counsel for Defendant Tipton;
              CRAIG S. COOLEY, ESQ.
              JOHN F. McGARVEY, ESQ.
                  Counsel for Defendant Johnson;
              DAVID P. BAUGH, ESQ.
              ARNOLD R. HENDERSON, V, ESQ.
                  Counsel for Defendant Roane;
              ROBERT J. WAGNER, ESQ.
                  Counsel for Defendant Reavis.
                JEFFREY B. KULL
              OFFICIAL COURT REPORTER

                     P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CR68:  United
States of America versus Richard Tipton, Cory

**JA861**

Johnson, James H. Roane, Jr., and Sandra Reavis.  The ninth day of trial.  Are the parties ready to proceed?

MR. VICK:  Government is ready.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

MR. WAGNER:  Defendant Reavis is ready, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, the witness will be sworn.

## I. Robert "Papoose" Davis (1875)

ROBERT DAVIS, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'm going to ask that during your testimony today you speak up.  Everyone in the courtroom needs to hear you.  If you get too close to the microphone, you will get feedback.  Could you state your name for the Court, record, and jury, please?

A    Robert Davis.

Q    Are you known by a nickname?

A    "Papoose."

Q    How old are you, Mr. Davis?

A    40.

Q    And how far did you go in school?

A    I graduated from high school, went to college, Minnesota School of Art, Richmond Business College.

Q    Have you had any work experience?

A    United States Army, seven years, TASCOM, United States Finance Center, St. Louis, and Philip Morris.

Q    Are you currently on Social Security disability payments?

A    Yes.

Q    Do you have any prior felony convictions?

A    No felonies.

Q    You have some misdemeanor convictions; is that correct?

A    Yes.

Q    What sort?

A    Drunk in public, one petty larceny, shoplifting.

Q    Do you know the defendants in this case?

Specifically, do you know an individual by the name

**JA862**

of "Whitey?"

A    Yes.

Q    Also known as Richard Tipton.  Do you see "Whitey" in the courtroom today?

MR. GEARY:  Stipulate.

THE COURT:  Record will reflect the ID.

BY MR. VICK:

Q    Do you know an individual by the name of "C.O.?"

A    Yes.

Q    Do you see him?

MR. McGARVEY:  Stipulate.

MR. VICK:  "J.R." or James Roane?

MR. HENDERSON:  Stipulate.

BY MR. VICK:

Q    Sandra Reavis.

A    Yes, I do.

Q    Do you see her in the courtroom today?

A    Yes.

MR. WAGNER:  Stipulate.

BY MR. VICK:

Q    Do you know an individual by the name of "V," Lance Thomas?

A    Yes.

1878

Q    Do you know an individual by the name of "E.B.?"

A    Yes, I do.

Q    I'm going to show you what has been previously marked and entered into evidence Government Exhibit 120 and ask you if you could identify that person.

(Document proffered to witness.)

A    This is "E.B." right here.

Q    That's who?

A    "E.B."

Q    Of those people that you have just identified, who did you first meet?

A    "C.O."

Q    And when was it that you first met "C.O.?"

A    Between September and November.

Q    Of what year?

A    1991.

Q    And how was it that you came to meet him?

A    He was introduced to me by a guy named Swain.

Q    What's Swain's name, do you know?

A    No, I don't.

Q    Why did Swain introduce him to you; what was the purpose?

A    He said that he had to have a place to stay until he gets himself together.

MR. VICK:  Could I see Government Exhibit

1879

135?

THE CLERK:  135-1?

MR. VICK:  Yes.

(Document proffered to witness.)

**JA863**

BY MR. VICK:

Q    Do you know that person depicted in 135-1?

A    That's "V."

Q    That's already been introduced into evidence, Your Honor.

MR. BAUGH:  The exhibit number?

MR. VICK:  135-1.

BY MR. VICK:

Q    Now, when you first met "O," did you have occasion to talk to him?

A    Yes.

Q    What was it that you talked about?

A    He wanted to know if he could stay there, make some money selling some crack cocaine.

Q    Stay where?

A    At my crib.

Q    When you say "your crib," what do you mean?

A    Hancock Street, my apartment.

Q    What area of town is that located in?

A    Newtowne.  Well, Central Gardens  --  not Central Gardens, Newtowne.  The Carver District.

Q    Near Carver School?

A    Yes.

Q    Did "O" indeed end up staying at your apartment for some time?

A    Yes.

Q    How long did he stay at your apartment?

A    About one or two weeks, off and on.

Q    What would he do while staying there?

A    Sell some crack cocaine.

Q    Who would he sell crack cocaine to?

A    People I bring to the house.

Q    So would you go out and actually find people who wanted crack and bring them to him?

A    Yes.

Q    Why did you do that?

A    I was on welfare.  I needed some money.

Q    Did you get anything for doing that?

A    Yes, I got $20 of crack cocaine.

Q    Each time you brought in people?

A    No, different days.

Q    How many people would you bring him on a daily basis?

A    Between one and ten.

Q    There came a time about two weeks later that he drifted away from you?

A    Yes.

Q    I direct your attention to approximately November of 1991.  Did you have occasion to once again come in contact with "O?"

A    Yes.

Q    Was he with anybody else at that time?

**JA864**

Robert "Papoose" Davis (Direct)

A    "Whitey."
Q    And did they talk to you about anything when you saw them?
A    Said he was a master cook, master chef.
Q    Who said that?
A    "O."
Q    Who was he saying that about?
A    "Whitey."
Q    Did he refer to him in any other way?
A    As his brother.
Q    Did they talk to you about getting involved in the sale or distribution of cocaine?
A    Yes.
Q    In November of 1991?
A    Yes.
Q    Tell us what they told you.
A    Would I sell some crack cocaine for them.
        MR. COOLEY:  Who?
BY MR. VICK:

1882

Q    Did "O" and "Whitey" talk to you about getting involved with them in the distribution of crack cocaine?
A    Yes.
Q    Which one of them spoke to you?
A    "O."
Q    What was it he said?
A    He asked me if I wanted to make some money.
Q    What did you say?
A    Yes.
Q    Did you get involved?
A    Yes.
Q    What was it that you did?
A    I gave him packages of crack cocaine to sell and I would pay them.
Q    Who gave you packages of crack cocaine to sell?
A    "Whitey"  --  I mean "O."
Q    Did you ever get any from "Whitey?"
A    No.
Q    How many pieces of crack cocaine would be in the packages you got?
A    Sometimes they would give me two or three, and sometimes five, six.
Q    Were you involved with them from November of 1991 when you saw them again?  How long were you

1883

involved with them after that selling cocaine?
A    Until I went to the hospital.
Q    When was it that you went to the hospital?
A    In 1992.
Q    Do you remember the date when your sister -- indeed, your sister is Dorothy Armstrong, "Mousey," is that right?
A    Yes.

**JA865**

Q    Your brother is Bobby Long?
A    Yes.
Q    Do you remember when it was that they were killed?
A    I was in the hospital.
Q    So you worked from November of 1991 until they got killed?
A    Right.
Q    For who?
A    For "O." "Mousey" worked for "O," Bobby Lee don't.
Q    Who did you work for?
A    "O."
Q    On an average week, how much crack cocaine did you get from "O" to sell?
A    A week?
Q    On an average week.

1884

A    Depends on how much I sold.
Q    What's the most you would ever get from them in a week?
A    In a week's time, about 30.
Q    When you say 30, you mean 30 rocks?
A    Yes.
Q    Now, did they ever use your apartment for anything else?
A    Yes.
Q    What did they use your apartment for?
        MR. WAGNER:  Objection to "they."
BY MR. VICK:
Q    Did "V," "C.O.," "J.R.," "Whitey," or "O" use your apartment?
        MR. BAUGH:  Again, same objection.
        THE COURT:  Overruled.  He can answer that question.
        THE WITNESS:  They come to the house and talk.
BY MR. VICK:
Q    Did they ever cook anything in your apartment?
A    Yes.
Q    Who cooked something in your apartment?
A    "Whitey."
Q    What was it that "Whitey" cooked in your

1885

apartment?
A    Powdered cocaine.
Q    On how many  --  how often on a weekly basis would "Whitey" use your apartment to cook crack cocaine?
A    About one or three times.
Q    One or how many times?
A    One to three times.
Q    Did you see the quantities of powdered cocaine that he was cooking into crack?

**JA866**

A    Yes.
Q    Could you describe that to the ladies and gentlemen of the jury?
A    Sandwich bags.
Q    How full would those bags be?
A    Half full.
Q    Of powdered cocaine?
A    Yes.
Q    What was it that "Whitey" would use to cook that powdered cocaine into crack cocaine?
A    A glass coffeepot.
Q    Would you be asked to do anything with that glass coffeepot after it was used?
A    Clean it up.
Q    Did you see what they did with that crack cocaine?
          MR. BAUGH:  Objection to "they."
BY MR. VICK:
Q    Did you see what "Whitey" did with that?
A    Put it in a plastic sandwich bag.
Q    When you say "they," who do you mean?
A    "Whitey" and "O."  They would put it in a sandwich bag and give me some for myself and tell me to clean up the rest and keep for myself and do what I want with it.
Q    When did you first meet "V?"
A    November, last November, December.
Q    Do you know where "V" was from?
A    I heard he was from New York.
Q    And how did you come to know him; who introduced you to him?
A    Swain.  Swain and "O."
Q    And "O?"
A    Yes.
Q    All right.  When was it you met "J.R." for the first time?
A    Through Swain.
Q    When was that?
A    Between October and November.
Q    Of 1991?
A    Yes.
Q    Have you ever seen "V" cut up cocaine?
A    Yes.
Q    On how many different occasions have you seen "V" do that?
A    Once or twice.
Q    Where was that that you saw him?
A    Norton Street.
Q    Whose house?
A    "J.R.'s" father's house.
Q    Could you describe that house for me?
A    It was a yellow house on the corner of Norton

Robert "Papoose" Davis (Direct)

and Catherine.

Q    Do you know where it was that "Whitey" and "O" and "V" and "J.R." were getting their cocaine that they were processing?

MR. BAUGH:  That's assuming a fact not in evidence.  There has been no testimony about my client.

BY MR. VICK:

Q    I withdraw that question.  Was "J.R.," to your knowledge and based on your observations, involved in any way with "O," "Whitey," "V," and "E.B." in the sale or distribution of cocaine?

A    Yes.

1888

MR. BAUGH:  Indicate what he saw.

THE COURT:  That's a leading question.  The objection is sustained.  Ask a question.

BY MR. VICK:

Q    What do you know about "J.R.'s" involvement with those people?

A    To me he seemed a partner.

MR. BAUGH:  Objection.  "Seemed?"  There is a problem.

THE COURT:  That's his wording.

BY MR. VICK:

Q    What do you base that upon?

A    The business they did.

Q    Who else was partners with "J.R.?"

A    Sandra.

Q    Who else?

A    "E.B.," "V," "Whitey," "O."

Q    Were you a partner?

A    No, I don't consider myself a partner.  I was sort of like a worker.

Q    Your sister "Mousey" ended up selling cocaine?

A    Yes.

Q    Was she a partner?

A    I thought she was because she said she was going with "O."

1889

Q    Did you come to find out different?

A    Yes.

Q    What did you find out?

A    She came in crying and said that "O" had brought his girlfriend from New York  --

MR. McGARVEY:  I object.  This is a statement out of Court.

THE COURT:  Sustained.

BY MR. VICK:

Q    Do you know Jerry Gaiters?

A    Yes, I do.  He is my cousin.

Q    And was Jerry Gaiters, did you see whether he was involved in any way in the sale or distribution of crack?

**JA868**

A    Yes, I do.
Q    From whom was he getting his cocaine?
A    Sometimes from "J.R."
Q    Did you actually witness that?
A    Once.
Q    Was he a partner or worker?
A    He was a worker.
Q    Do you know an individual by the name of Curt Thorne?
A    Yes, I do.
Q    Do you know if he was involved in any way?

A    Yes.
Q    How was he involved?
A    He was a worker.
Q    All right.  Doing what?
A    He would sell.
Q    On how many  --  have you ever seen Sandra Reavis receive crack cocaine?
A    Yes.
Q    On how many different occasions have you seen Sandra Reavis receive crack cocaine?
A    Once or twice.
Q    From whom?
A    "J.R."
Q    Did you witness that?
A    Yes.
Q    Do you know an individual by the name of Denise Berkley?
A    Yes, I do.
Q    Who is she?
A    She is a friend of mine.  She was sort of the made of the house that they were staying at on Norton.
Q    When you say "they," who do you mean?
A    "O," "Whitey," and "V," "E.B.," where they stayed at.

Q    Did you consider her a partner?
A    She was a worker.
Q    Who was Curt working for?
A    "O" and "Whitey."
Q    Now, your sister, "Mousey," Dorothy Armstrong, where was she living in this time frame?
A    Okay, before she was living in a vacant house with her boyfriend.  I told her to move in with me.
Q    Did she move in with you?
A    Yes.
Q    Where was your apartment?
A    On Hancock Street.
Q    And was she distributing cocaine from your apartment?
A    Yes, she was.
Q    What kind of cocaine?

**JA869**

Robert "Papoose" Davis (Direct)

A    Rock, crack.
Q    Where was she getting it?
A    From "O."
Q    On how many different occasions have you seen "O" deliver her cocaine?
A    Many times.
Q    And how many people would you say would come to your house on a daily basis to get cocaine, crack cocaine from your sister, "Mousey?"

1892

A    Well, sometimes it was so crowded, sometimes there were 20 people in the house.
Q    What's the most you would say you have ever seen come to your house on a single day to get crack cocaine?
A    In one day?  From 1 to 20, 1 to 50.
Q    Did there come times when she would run out of cocaine?
A    Yes.  And she would take mine.
Q    Would you see "O" when she ran out of cocaine?
A    Yes.
Q    What would he be coming for?
A    Money and to give her some more.
Q    Did you see her give him money?
A    Yes.  She give me money to give to him.
Q    Do you know "Pepsi" Greene?
A    Yes, she is my cousin.
Q    Was she involved in any way in what you are testifying about?
A    She was going with Curt Thorne.
Q    Do you know an individual by the name of "Nat" Rozier?
A    Yes.
Q    Was she involved in any way?
A    She used to bring people to come and get some

1893

rock cocaine.  She knew the people who wanted to buy it.
Q    Of those people who were selling cocaine that you have testified to, who controlled the money that was being made from the sale of that cocaine?
A    Usually if "O" didn't have it, "V" was the one that I saw mostly have it.  The times I've seen "V," he had most of it.
Q    Have you ever talked to "O" about other areas of the City of Richmond:  Southside, Church Hill?
A    I haven't talked to him, but he has mentioned Southside, Central Gardens, North Side, West End.
Q    How did he mention that?
A    Have to go places like that.
Q    What did he say he had to go get?
A    I heard him mention money.
Q    Did you ever hold any guns for "O" or "J.R." or "Whitey" or "V" or "E.B.?"

**JA870**

A    I held guns for them.
Q    Do you remember the killing of "Little Doug" Moody?
A    Yes.
Q    And were you living in that area when "Little Doug" Moody was killed?
A    Yes.

1894

Q    Were you holding guns for these people in that time frame?
        MR. GEARY:  I object.
        THE COURT:  Sustained.
BY MR. VICK:
Q    Were you holding guns for anyone at that time?
A    At that time I was holding two pistols.
Q    Describe those pistols.
A    One was a long chrome pistol, looked like a .357.  The other one was a long black pistol, looked like a .22 or 30-aught.
Q    Who were you holding those guns for?
A    For "O."
Q    When did you get those guns?
A    I got the .22 and  --  the two hand pistols from "O" and "J.R."
Q    When did they give them to you?
A    Well  --
Q    In relation to when Doug Moody was killed, when did you get those guns?
A    About a week before.
Q    Did there come a time around the murder of Doug Moody that anyone came and retrieved those guns?
A    One of the pistols disappeared and "J.R.," he asked about one.

1895

Q    When was that in relation to the murder of Doug Moody?
A    That was like a day or two before.
Q    Did you give a pistol to "J.R." a day or two before the murder of Doug Moody?
A    Yes.
Q    Did you ever see that gun back again?
A    No.
Q    Where were you when Doug Moody was killed?
A    I was at the house with my sister.
Q    And you came to find out that he was killed?
A    My sister came to me and she was crying because she was high, drunk, talking about mad, and I didn't know what was wrong.  She wouldn't talk to me.  Next I no, someone else came down.  I'm not sure, I think it was a young lady who came to the house.  She said, "Do you know they  --"
        MR. McGARVEY:  Objection, hearsay.
BY MR. VICK:
Q    Did you come to find out that Doug Moody had

been killed?

A    Yes.

Q    Did you have occasion to see "J.R." and "Whitey" after that?

A    Yes, I did.

1896

Q    Where did you see "J.R." and "Whitey?"

A    They came to my house in the rain; running, huffing, and puffing.

Q    How soon was that after you found out Doug had been killed?

A    My sister came and told me.

Q    How soon after that did "Whitey" and "J.R." show up?

A    "Mousey" left and they came.

Q    Same evening that Doug Moody was killed?

A    Yes.

Q    Did they say anything?  Did you hear them talk about anything when they were in your house that night?

A    At the bottom of the steps in my doorway, they said, "Yeah, I got him, I got him."  Said, "Yeah, man, we can't stay out here, man.  This is hot anyway."

Q    Who were they talking to?

A    They were talking to each other, but they were referring to my house.

Q    If Doug Moody's murder took place on January 13th, 1992, on January 14th, the very next day, did you have occasion to get any other guns from these people?

1897

A    Yes.

Q    Who specifically on January 14th, 1992 did you receive guns from?

A    I got a black bag, a Salem black bag that had two Uzis and a black 9mm.

Q    Who did you get those from?

A    "O," "J.R.," and "E.B."

Q    I'm going to show you what has been previously marked and introduced into evidence as Government Exhibit 107, a black bag; 105, a black semi-automatic weapon; 106, a black semi-automatic weapon; and 104, a black handgun.  And I ask if you have ever seen those items and if you can identify those items.

A    Yes, I have seen them before.

Q    Where have you seen those items before?

A    They are the ones that "O" and "E.B." and "J.R." brought to my house.

Q    The day after the killing of Doug Moody?

A    Yes.

Q    What did you do with those guns when they brought them to your house?

A    They asked me to put them away.  So I took them

**JA872**

## Robert "Papoose" Davis (Direct)

in the back yard and put them in the trash can.  I didn't want them in the house.  I'm against guns.

Q    What time of day was that when they brought you those guns?

A    It was about between five and seven.

Q    Later that evening, did they come back and get those guns from you?

A    Yes.

Q    About what time did they come back and get the guns from you?

A    After 7 o'clock.

Q    Who came back to get those guns?

A    "J.R.," "O," and "E.B."

Q    Did you come to find out that evening that Peyton Maurice Johnson had been killed?

A    Yes, I did.

Q    After you found out that Peyton Maurice Johnson was killed, did you have occasion to see "E.B.," "J.R." and "O" again?

A    Yes, I did.

Q    Where did you see them?

A    They came back to the house.

Q    To your house?

A    Yes.

Q    What did they have with them when they came back to the house?

A    The same weapons.

Q    Did they ask you to do anything about those weapons?

          MR. BAUGH:  Objection to "they."

BY MR. VICK:

Q    Did any of those three people ask you to do anything?

          MR. BAUGH:  Objection, irrelevant.

          THE COURT:  Overruled.

          THE WITNESS:  "J.R.," "O," and "E.B.," they sat on the bed -- on the couch, rather, by my bed, took them out of their clothes  --

Q    Took them out of what?

A    Out of the clothes.  Said, "Hey, you got towels; wipe these off."

Q    Who said that?

A    "O."

Q    Wanted you to wipe the fingerprints off what?

A    Off the weapons.

Q    Did you do that?

A    Yes, I did.

Q    Did you hear them talking to each other that evening?

A    Yes.  The words, somebody said, "I was in the kitchen."  And they said, "Yeah?  How did they shoot?"  "Shoot cool.  Shoots all right."  "Did you

**JA873**

get them?"  "Yeah, man.  All of them."

Q    When you wiped the fingerprints off those weapons, what did you do with those guns?
A    Threw them back outside in the trash can.
Q    The next day, January 15th, 1992, did anyone come and get those weapons?
A    Yes.
Q    Who was that?
A    "O."
Q    And have you seen those weapons since then?
A    I saw them one time.
Q    Where was that?
A    On Norton Street.
Q    On January 14th, 1992, when they asked you to wipe the fingerprints off those weapons and you did that, were you given anything for doing that?
A    I got a rock.
Q    A rock of what?
A    Crack cocaine.
Q    Who gave you that rock of crack cocaine?
A    "O."  He said they was out there target practicing.
Q    Later on Norton Street when you saw those guns, who had those guns?
A    They was on the floor upstairs at Norton Street.

Q    What house was this?
A    "J.R.'s" father's house.
Q    Who had the guns?
A    "O," "E.B.," "V," anybody that was in the house.
Q    When you say "everybody," who do you mean?
A    "O," "Whitey," "E.B.," "V," "Mousey," Denise.
Q    Did you ever have a conversation with "O" about your sister and your sister's distribution of drugs?
A    Yes.  My sister stabbed me in the eye.
Q    With what?
A    A pair of scissors.
        MR. GEARY:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q    That's what the patch is about?
A    Right.
Q    Did you have a conversation with "O" about the sale of drugs?
A    He sent me out to get some reefer for him.  He said, "Your sister messing up our money, you know?"  I said, "What can I do about it?  You should give me some."  He said no.  I said, "Well, just don't give her more, that's all."
BY MR. VICK:

Q    Where were you when you heard of the murder of your sister?

A    I was in the hospital, just had surgery.

Q    Could I retrieve the pictures I passed around over here?  Do you know the exact date your sister was murdered?

A    No.

Q    I'm going to show you what has been previously marked Government Exhibit 48-5 and ask you if you can identify the person depicted in that picture.

A    My baby sister, "Mousey."

Q    I would move Government Exhibit 48-5 into evidence.

          THE COURT:  It will be admitted.

BY MR. VICK:

Q    I show you what has been previously marked Government Exhibit 53-7 and ask you if you can identify that.

A    My brother, Bobby Lee Long.

Q    I would move Government Exhibit 53-7.

          THE COURT:  Admitted.

BY MR. VICK:

Q    In both of those pictures those people are dead; is that correct?

A    Yes, they are.  After they told me  --

1903

          MR. McGARVEY:  Objection.

          THE COURT:  Sustained.  There is no question.

BY MR. VICK:

Q    After you had been discharged from the hospital  --  you were in the hospital when you found out your sister was killed?

A    Yes.

Q    What did you do?

A    I went to the nurse's station and I asked him could I have permission to leave.  They said no, I had to wait.  I didn't wait.  I put on my clothes and left the hospital.

Q    And for what reason?

          MR. BAUGH:  Objection.

          THE COURT:  Sustained.

BY MR. VICK:

Q    Do you remember the day that Linwood Chiles and Curt Thorne were killed?

A    Yes.

Q    Did you have occasion on that date to see Linwood and Curt?

A    Yes, I did.

Q    Where was it that you saw Linwood and Curt?

A    I saw Linwood.  Linwood was at his car.  The

1904

police was talking to him about an accident.

Q    What kind of car did he have?

**JA875**

A    A station wagon.  And after the police finished talking to him about the accident, he turned to me and asked me did I want to make some more money.  He told him yeah.  He said, well, I can go out in the county with him and cut some grass, help him cut some grass and have some money in my pocket.

Q    Did you see Curt that day?

A    Yes.

Q    Curt Thorne?

A    Yes.

Q    When did you first see Curt that day?

A    I saw him that same morning.

Q    Did you ask him for anything?

A    I asked him did he have any rock cocaine.

Q    What did he say?

A    He said yeah, but I needed some money.  So I went out to try to hustle a couple of dollars, people that owed me some money.  When I came back, I had the money.  He said he had smoked it all and he was scared because he had to go talk to  --  get some more from "O" and stuff and didn't have all the money.

Q    Later that evening, did you have occasion to see Curt and Linwood together in a car?

A    Yes.

Q    Who was with them?

A    "Pepsi" and Gwen.

Q    Whose car were they in?

A    They was in Linwood's car, a station wagon.

Q    Did you ask Curt for any cocaine?

A    Yes.

Q    What did Curt say to you?

A    He said he would be back at his house.  He was going to see "O."  He knew where he was at because he had his beeper number.

Q    Why did he say he was going to see "O?"

A    To pay him and get some more.

Q    Was he nervous at that time?

A    Yeah, he was scared.

MR. McGARVEY:  Objection.  That's a conclusion.

THE COURT:  Sustained.

BY MR. VICK:

Q    Describe his demeanor.

A    He was scared.

MR. McGARVEY:  Same objection.

THE COURT:  Overruled.  Go on.

THE WITNESS:  He was acting like  --  I know Curt, right, and he was mumbling with his words and he said, "Man, I don't have all the money.  I don't know what he is going to do."

MR. McGARVEY:  Sustained

**JA876**

MR. McGARVEY: I object.

THE COURT: Sustained.

BY MR. VICK:

Q   You never saw them again?

A   No.

Q   Did you have occasion to speak with your sister, "Mousey," and find out whether she was scared in any way?

A   Yes, I did.

MR. BAUGH:  I object.

THE COURT:  Sustained.

MR. VICK:  This is the question I was dealing with.

THE COURT:  I read the cases.  You can come up and make a proffer.

MR. VICK:  No need.  The Court knows where I was going.

THE COURT:  All right.

BY MR. VICK:

Q   Why are you testifying?

A   My brother and sister got killed.  And I felt that I would be next.

Q   Have you had any conversations with anyone involved with the prosecution about immunity or anything?

A   No.

Q   Has that been part of your thought process concerning why you testified?

A   No.

MR. VICK:  I tender the witness.

THE COURT:  Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q   Mr. Davis, do you have any idea how long you were in the hospital after your sister's stabbing?

A   Excuse me?

Q   How long were you in the hospital after you were stabbed?

A   About two days.  One or two days.

Q   Was that at MCV?

A   Yes.

Q   I think you said you were not in the hospital on January 15th, 1991; is that correct?

A   Yes.

Q   You were in there on February 1st when your sister was killed, correct?

A   Yes.

Q   Before you first met "O," I think you said it was between September and November of 1991; is that correct?

A   Right.

Q   Had you used crack before that time?

A    Oh, yeah.

Q    How long a period of time before then had you used crack?

A    Off and on, about a year.

Q    That would have been off and on back to September of 1990 or November of 1990?

A    Yes.

Q    And when you say off and on, that year's period of time, how many days would you say in that year you used crack?

A    Two or three.

Q    Two or three times a week?

A    Yes.

Q    Were you living on Hancock Street during that time?

A    No.  I moved around.

Q    Where were you living between September of 1990 and November of 1991?

A    I moved from Catherine Street, moved from Marshall Street.  From Marshall Street I moved to Clay Street.  From Clay Street I moved to Hancock Street.

Q    Is that all in the Newtowne area?

A    Yes.  I was on welfare.  It was hard to get a place to rent.

Q    Tell the ladies and gentlemen of the jury who you were buying your crack from?

A    Different people.

Q    Who were they?

A    I can't call the names.  People I see in the street and stuff.

Q    People you see in the street?

A    Yes.

Q    Could they have nicknames?

A    Just people I know from the streets.

Q    What streets are you talking about?

A    Downtown, Church Hill.

Q    Newtowne?  You didn't buy crack in Newtowne?

A    Yes.  I don't know the names.

Q    Peyton Maurice Johnson?

A    Yes.

Q    Jerry Gaiters?

A    Yes.

Q    Ronita Hollman?  Did you buy from her?

A    No.

Q    Where did you go in Newtowne?  What corners would you go to buy crack?

A    Corners?  I just walked down Moore Street.

Q    100 block of Moore Street?

A    Anybody would confront me.

Q    You had no trouble buying crack in Newtowne before you first met "O.," is that correct?

A    I had trouble with rock.
Q    When is the last time you used rock?
A    Last time I used it?  This is 1993.  1992.
Q    What month in 1992?
A    March.
Q    March of 1992?
A    Yes.
Q    Who were you buying crack from in March of 1992?
A    I did it once, not March, when is the last time -- before I went to the hospital.
Q    Before you went to the hospital?
A    After I came from the hospital.
Q    So your testimony to the jury is that after you were released from the hospital until -- from the stab wound until today, you have not used any rock, crack cocaine; is that correct?

1911

A    Yes.
Q    Have you used any other illegal drugs since that time until today?
A    I smoked a reefer.
Q    Just marijuana.
A    Yes.
Q    Did the people you have referred to, "O," "Whitey," the rest of them, did they smoke marijuana?
A    Yes.
Q    A lot, didn't they?
A    Yes.
        MR. GEARY:  That's all I have, Judge.  Thank you.
            CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good morning to you, Mr. Davis.
A    Good morning.
Q    Mr. Davis, were you approached by the police at some point on this?
A    Well, I approached and they also approached.
Q    It was a mutual walking toward each other?
A    Yes.
Q    When did that first occur?
A    I was in the Salvation Army.  And I was going to

1912

save me enough money so I could buy me a pistol.
Q    So while you were there at the Salvation Army saving up to buy a pistol, did a detective come see you, find you there?
A    The detective didn't know who I was.  No one knew who I was.  I was pointed out.
Q    You were pointed out by somebody?
A    Yes.
Q    To a detective or police officer?
A    Right.

**JA879**

Q    They approached you?
A    We approached each other.
Q    Somebody, the policeman, came to the Salvation Army.  Do you remember who that was?
A    The policeman?
Q    Yes.
A    Or the person who pointed me out?
Q    The policeman.
A    Yes.  There was two of them.
Q    Who were they?
A    Detective Fleming.
Q    Mr. Fleming over here?
A    And another.  I don't see him here.
Q    Another gentleman.  You don't remember his name.  Would it have been Mr. Woody, or Mr. Jackson?  You don't remember his name?
A    No.
Q    Was it Mr. Scott?
A    Yes.
Q    And the two of them, you were pointed out to them by somebody else at the Salvation Army and as they began to walk toward you, you began to walk toward them; is that right?
A    Right.
Q    That was the first contact you had and the first beginning of any discussion?
A    I wasn't planning on coming to the police.  I was saving my money to buy my own weapon, get even one by one, to pay them back for killing my sister.
Q    You were anticipating revenge?
A    I was.
Q    That was your purpose in saving enough to buy the gun.
A    And protect being myself in case I needed protection.  I knew I needed protection.  If they killed my brother and sister, I knew I was  --
          MR. McGARVEY:  Objection.
          THE COURT:  Sustained.
BY MR. COOLEY:
Q    Your anticipation of buying a gun is to get revenge if somebody injures you or harms you?
A    Yes, protection.
Q    Your comment that you were going to get even one by one would seem more than just protection.  You had an intention  --
A    If they approached me I would have some protection on me.
Q    And as I understand it, the first time that you met "O," he was going to stay at your house.
A    Right.
Q    And he stayed, in fact, for a week?
A    A week or two, yes.

**JA880**

Q    A week or two?
A    Yes.
Q    And at first, I take it he just stayed there, and then you wanted to get something, you wanted some extra money; is that what you said?
A    No.  I was on welfare, right.
Q    You were on welfare and needed some extra money?
A    They asked me if I wanted some extra money.  I said, "Yeah."
Q    Instead of money, you got a little bit of  --
A    I got money, too.  I got money sometimes, sometimes cocaine.

1915

Q    It wasn't cocaine each day.  You got some money, also?
A    Yes.
Q    Then you began to sell for him and you would get, as I understand your answer to the U.S. Attorney in terms of what you got to sell, you said you got sometimes two, sometimes three, five, or six pieces?
A    Right.
Q    So this would have been like  --  was this a $10 piece?
A    20.  20 or 10.
Q    20 or 10.  So you might get to sell two $10 rocks, and sometimes you might get to sell three $20 rocks, some mixture; is that right?
A    Right.
Q    And the most  --  now, how many times  --
A    Some of them will be big enough where I can split them in half and double my money.
Q    You could take them, cut them in two and make a little extra and then the other folks, they would never know that, right?
A    They would know it.
Q    Whatever you could get for it as long as you gave back to them  --
A    What they wanted.

1916

Q    If you got a $10 rock, how much money were you supposed to give back to them?
A    They wouldn't get it.
Q    You said two sometimes.
A    Two.  They get $5 or $10 back.
Q    So if you could double your money and sell, make two for one, sell it for $20, and you got to keep 15 and give them five back?
A    No.  They will get more than I do.
Q    All right.  Now, the testimony you have given would seem to indicate that you were selling in Newtowne.
A    Yes.
Q    You were out selling crack cocaine?

**JA881**

A   I wasn't out selling.  I would be in my house mostly.
Q   Okay.  You were inside your home selling.  And you understand that that was illegal, don't you?  You knew that then, didn't you?
A   Well, I knew that was illegal.  But I needed the money.
Q   You understand now that was illegal, don't you?
A   Yes.
Q   You were working with other folks as you described selling for them; is that right?

A   Right.
Q   You understand what the charge of conspiracy to distribute crack cocaine is, don't you?
A   Yes.
Q   And you understand that you could be charged with those things, can't you?
A   Yes.
Q   But you are not going to be charged, are you?
A   I don't know.
Q   You don't know.  Nobody has suggested to you that if you testify, that your testimony will not be used against you?
A   No, I don't know.
Q   And nobody has suggested that if they find independent evidence about your sales and involvement in any kind of conspiracy that you would not be prosecuted?
A   I do not know.
Q   You don't know.  And do you have an attorney?
A   No.
Q   I see.  Has the government ever said to you that you are not going to be prosecuted?
A   No.
Q   But you are not being prosecuted; is that correct?

A   I don't know.
Q   You have no charges against you now, do you?
A   No.
Q   All right, sir.  You have told them all about what you did on these occasions; is that right?
A   Yes.
Q   All right.  Now, you said there was a time when you were cooking  --  excuse me, someone was cooking at your house.  Now, your house at that point in time and "Mousey's" house were the same thing; is that right?  She lived with you at that time?
A   At that time, yes.
Q   Can you remember how many times you saw somebody cooking cocaine?
A   It was between one and three times a week.
Q   One to three times a week?

A    Yes.
Q    Who was present besides you when that was happening?
A    Well, sometimes my sister.
Q    "Mousey?"
A    Yes.
Q    And who else?
A    "Whitey," sometimes "J.R.," he comes through.
Q    How about Denise Berkley; do you know her?

1919

A    Yes.
Q    Was she there?
A    Yes, once or twice.
Q    Did "Mousey"  --
A    "Whitey" or "O" sat out there.
Q    As I understand it, you said "Mousey" was "O's" girlfriend; is that right?
A    That's what I thought, because she had a very big crush on him.
Q    And you got  --  your suggestion when some mention was made that she was messing up the money, your suggestion was "You ought to be letting me do it.  I won't mess it up."
A    No, I just said, "Hey, you know, you said she is messing the money, right?  Well, don't give her no more."
Q    Don't give her any more.  I thought you also said  --
A    "I would be glad to sell some for you."
Q    So it was not only don't give her any  --
A    I would be glad to sell some.
Q    You volunteered your services.
A    Yes.
Q    Nobody was forcing you to do any of these things?

1920

A    No.
Q    And you maintained some of these guns, including what you have described as Uzis, at your premises; is that right?
A    Right.
Q    And I think you said that, as I understand it, at least your first response to Mr. Vick, that there was a time that you saw Linwood Chiles and Curt and that Curt said to you he was going to pay "O" and get more drugs from him; is that right?
A    Yes.
Q    And that was the day of the situation, the day that he was killed; is that right?
A    Yes.
Q    That he was going to give him money and to get more drugs?
A    Right.
Q    All right, sir.  And did you indicate that there

was some point in time when you were told that they had been target practicing?

A    Yes.

Q    That's why you were wiping off the pistols?

A    Yes.

Q    Though Mr. Vick asked you about fingerprints, you were just asked to wipe off the guns?

1921

A    Wipe off the guns and get rid of the fingerprints.

Q    That exact language was used?

A    Yes.

Q    But you kept them.  Did you wear gloves when you were doing this?

A    No.

Q    Just wiped them off and took them and put them down into the trash can?

A    I put them back in the bag.

Q    Then you put the bag in the trash can?

A    Yes.

Q    Okay.  As I understand it, in terms of the timing of this, let me ask you this:  You indicated that you saw "Mousey" selling.

A    Right.

Q    That's your sister.  And at different times you thought she might sell to from 1 to 20 people a day?

A    Right.

Q    That's what you saw?

A    That's what I saw, yes.

Q    Might be one person a day for three or four days and then one day it might jump up some?

A    Right.

Q    And just so I can understand the timing of this

1922

now, you had these guns and you held these guns at different times.

A    Uh-huh.

Q    And stored, I think, was the word you used?

A    Stored?  No.  I just put them out in the trash can.

Q    You kept them there.  Didn't the government ask you didn't you store these guns for them?

A    Yes.

Q    From your military service, clearly you know how to use guns; is that right?

A    Yes.

Q    And as I understand it timing-wise, your sister stabbed you in the eye?

A    Yes.

Q    And then am I correct that two days later she was killed?

A    Two days later?

Q    Yes, sir.  I think that's what you responded to Mr. Geary's question.

A     It wasn't two days later.

Q     A week later?

A     Because I went to the hospital.  I was in the street for a week before I went to the hospital.  It was "O," "Whitey," Jerry Gaiters, all of them gave me reasons to tell me to go to the hospital.

MR. COOLEY:  Can I ask him to be responsive to the question?

THE COURT:  It sounds responsive to me.

MR. COOLEY:  I asked him the time, how much time, and he started telling me  --

THE COURT:  He was telling you it was a week and how he recalls it was a week.

THE WITNESS:  I was being told by these people  --

MR. BAUGH:  That's not responsive.

THE COURT:  There is no question pending.

BY MR. COOLEY:

Q     So it was about a week from the time you were stabbed and your sister was killed?

A     Yes.

MR. COOLEY:  That's all the questions I have.

THE COURT:  All right.  Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q     Sir, you didn't see Mr. James Roane out there in October of 1991, did you?

A     Excuse me?

Q     You didn't see James Roane out in the streets in October of 1991, did you?

A     I said between September and November.  That's when I seen him.

Q     You know, of course, that he was in prison until the middle of November

A     I don't know when he was in prison.

Q     Did you see him out there in October?

A     I said between October and November.

Q     Now, also, you know that at the time of your sister's death, Mr. Roane was in jail; you know that, don't you?

A     No, I did not know until I read the paper.  Like I said, I don't know who killed my sister.

Q     You read in the paper about this?

A     Yes, and I saw it on the news.

Q     You read the facts contained in the newspaper articles?

A     Yes.

MR. VICK:  May we approach?

MR. VICK:  Once again, Mr. Baugh is stating as a fact in his question something that he knows is not a fact.  "Mousey" was killed on February 1st.

**JA885**

"J.R." was arrested on February 2nd. He knows that. It is improper.

MR. BAUGH: I didn't know that.

1925

MR. VICK: That's part of the indictment.

THE COURT: Clear it up.

BY MR. BAUGH:

Q I may have made a false statement. Mr. Roane was arrested on February 2nd, 1992.

A Right.

Q What day did your sister and your brother die?

A Well, in the paper and on television, I think --

Q No, no.

A Excuse me. I do not know what day it was. I think it was the first of February.

Q When was their funeral?

A Like I say, I do not know the date it was my sister got killed. I was in the hospital. My mind was on being in the hospital.

Q When you heard your sister had died you were so frightened you immediately ran out of the hospital, correct?

A No, I wasn't frightened.

Q You stayed for two days, correct?

A I left the hospital after I had an operation. They let me out of the hospital, right, put me on a heart monitor, right, they said I was all right. They put me in room. On the television there was a

1926

big shooting, and it was happening at my brother's house, Bobby Lee Long, on the corner of 29th and whatever street it is.

Q You don't know where they lived?

A Bobby Lee is on 29th Street.

Q 29th and what, sir?

A I don't know the other street.

Q Did you get stabbed actually inside the eyeball?

MR. VICK: I thought this was found objectionable by counsel on direct.

THE COURT: Sustained.

MR. BAUGH: Was that an objection?

THE COURT: It was objected to about getting into the details of his eye, which I sustained, and I sustain it now.

MR. BAUGH: I don't remember someone objecting to that, the details about how he was stabbed.

THE COURT: Go on and ask another question.

BY MR. BAUGH:

Q Sir, you said that you didn't like having guns around?

**JA886**

Robert "Papoose" Davis (Cross)

A    Right.

Q    Isn't it true you were convicted of carrying a concealed weapon in 1981?

A    No.

MR. VICK:  Improper use, again.

MR. BAUGH:  No, Your Honor, this is impeachment.  I can ask him that question.

MR. VICK:  If you have a basis for it.

MR. BAUGH:  I have a basis.

(At Bench.)

MR. VICK:  You know, we have been through those before.  They are not accurate.

MR. BAUGH:  That is a good-faith basis.

THE COURT:  No.  I think you have a basis to ask the question.

(In Open Court.)

BY MR. BAUGH:

Q    Are you known as Robert M. Davis?

A    M?

Q    Have you ever been known as Robert M. Davis, C. or W?

A    Robert Caheemis McLain Ward Davis.

Q    What is your date of birth?

A    2-25-52.

Q    And am I correct that your Social Security Number is 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?

A    Yes.

Q    And you were living in the City of Richmond in 1980?

A    Yes.

Q    And you lived continually -- you were there in 1990; am I correct?

A    Yes.

Q    All right.

MR. BAUGH:  Your Honor  --

BY MR. BAUGH:

Q    Have you ever given a false date of birth or a false Social Security Number on one of your arrests?

A    No.

Q    All right.  How many misdemeanor  --

MR. VICK:  I object.  That criminal print-out has a different birth date.

MR. BAUGH:  I object.  This has 3 DOB's and two  --

THE COURT:  The objection is overruled.  Just ask the question.

MR. BAUGH:  Would you please admonish the United States not to offer trivial, unnecessary objections to information he knows is incorrect?

THE COURT:  I would only do that unless I got in the habit of addressing all counsel when they

**JA887**

Robert "Papoose" Davis (Cross)

address trivial objections, and I won't do that.

BY MR. BAUGH:

Q    Now, you have been arrested on several occasions in the City of Richmond, correct?

A    Oh, yes.

Q    Each time, police officers would take your name and your Social Security Number based upon what you gave them; am I correct?

A    Yes.

Q    And you would of course give them your date of birth, correct?

A    Yes.

MR. VICK:  Objection.  This whole line of questioning is so far out of the bounds of what we are here for.  It is irrelevant.  It is improper impeachment.

THE COURT:  Overruled.

BY MR. BAUGH:

Q    Now, you told in response to this man's questions that you had one petty larceny conviction, right?

A    I had one petty larceny?  I have a petty larceny charge.

Q    How many?

A    One that I know of.

Q    One that you know of.  Let me ask you this:  Did you get one on February 21st, 1980, some four days before one of your birthdays?

A    That was Safeway?  That's the only thing I know.

Q    What about November 12th, 1982, Columbus Day?

A    I don't know about that.

Q    Do you remember going to court in the City of Richmond on a petty larceny?

A    That must be  --  only thing I know is when I got locked up for that Safeway.

Q    What year was that?

A    I don't know.

Q    You also had one in 1990; am I correct?

A    1990?

Q    Yes, April 1st.

A    1990?  Petty larceny?

Q    April 1st, 1990.

A    No.  Not me.

Q    All right.

A    Only thing I've been to jail for is not paying my fine.  I had a concealed weapon, a stick with two razors on the edge of it.

Q    You have gone to jail one time for petty larceny?

A    Yes.

Q    Have you possibly been convicted of others and

only got a fine?

A    All I got were fines for not appearing in court.

Q    You said that when you were first  --  when someone approached you about selling drugs out of your house, you said you were on welfare so you agreed to do it to make some money.

A    Right.

Q    And did you need that money?

A    Yes.  Because the guy I rented from, I can't remember his name now, he let me stay there for a month because I didn't have the money to pay him.  My check didn't come.

Q    Did you have any qualms about breaking the law to make money at that time?

A    Well, yeah, I did.

Q    All right.  Now, when you had this conversation about your sister messing up the money, you offered to take it over and cut her out, right?

A    Yes.  Because she was taking from me.

Q    She was stealing from you, too?

A    Yes.

Q    You offered to cut her out of the drug business

1932

and you take over that profit?

A    Not to cut her out, but just go ahead and give me the majority of it.

Q    So you could sell it.

A    No, I was going to buy it.

Q    And also, did you need the money?  Did you need money?

MR. VICK:  Asked and answered.

THE WITNESS:  The majority of the time  --

THE COURT:  Hold up.  The objection is overruled.  And sir, don't answer unless you are asked a question.

BY MR. BAUGH:

Q    Am I correct the only source of income you had while you were doing drugs was either welfare or money you were making off the sale of drugs; am I correct?

A    No.

Q    What other source of income did you have?

A    I'm an artist.

Q    You were selling artwork?

A    Yes.

Q    And you were still receiving welfare?

A    Yes.

Q    Now, could I ask you ball park figures?  How

1933

much would you receive a week in welfare?

A    A week?  In welfare?

Q    Or a month.

A    I think welfare is 100-some-dollars a month.

Robert "Papoose" Davis (Cross)

Q    100-some-dollars a month?
A    Yes.
Q    Any other aid such as food stamps?
A    Food stamps, yes.
Q    Rent assistance?
A    No.
Q    Fuel assistance?
A    Fuel assistance during the wintertime.
Q    How long after your sister's death did you come forward to tell the United States what you knew?
A    After my sister's death?  Two weeks.
Q    Two weeks?
A    About one or two weeks.
Q    Two weeks after your sister's death in the middle of February, you were staying at the Salvation Army; that's your testimony?
A    Yes.
Q    You came forward to tell the police that?
A    About four days, four or five days a week.
Q    As a consequence of your coming forward and doing this, did you go into witness protection?

        MR. VICK:  Could we approach?
    (At Bench.)
        MR. VICK:  He has been instructed a number of times not to tell people that.
        THE COURT:  Don't ask that question.  Tell him that he can't answer that.
    (In Open Court.)
        THE COURT:  The question is whether or not you were placed into the Witness Protection Program.  Yes or no?
        THE WITNESS:  Yes, I was.
BY MR. BAUGH:
Q    And do you receive money from them now?
A    I receive lodging.
Q    What?
A    They give me -- like coming here to Court, they pay my way.
Q    Do they pay your rent?
A    No, I'm on SSI.
Q    You are on SSI?
A    Yes.
Q    Disabled?
A    Yes.
Q    As a consequence of your eye injury?
A    Yes.  And seizures.  And hip problems.  I'm trying to get on disability, too.
Q    Trying to get on disability, too?
A    Right.
Q    You read in the newspaper article what had happened?
A    Yes.

**JA890**

Q    And when did you read that in the paper?
A    In the room in the hospital.
Q    What room?
A    I saw it on television.
Q    Did you ever read an article about all these allegations?
A    All allegations on who?
Q    On everybody.
A    Who is "everybody?"
Q    Did you ever read the newspaper article about all of this?
A    I read the article about my sister getting shot and all that, yes.
Q    That was the only one?
A    And my brother.
Q    Now, prior to the time that you first met these people, you had no trouble getting drugs out there, did you?
A    Who, me?

1936

Q    Yes.
A    Well, being this is my home  --
Q    Sir, did you have trouble getting drugs out there?
A    Yes and no.
Q    All right.  Could you find drugs any day if you needed them over there?
A    Not any day, no.
Q    Did you know a large number of people over there who were either using drugs or selling drugs?
A    Yes.
Q    In fact, would it be fair to say that a significant portion of the people over there use drugs or sell drugs, or live off the profits of drugs?
A    Not a whole lot, but  --
Q    What percentage would you estimate?
A    I'd say about five or ten percent.
Q    And this is in what area?  How big an area is Newtowne?
A    Oh, I can't say.  What size population?
Q    How many blocks is it?
A    How many blocks?
Q    Yes.
A    Well, Newtowne and Carver District is a whole

1937

lot of blocks.
Q    Approximately how many?
A    About 40.
Q    About 40?
A    40, 50 blocks.
Q    When you were an artist, were you trying to get out of Newtowne?
A    When I was an artist?

Q    Yes.
A    No, I came back to Carver District because I had just came from St. Louis.
Q    Were you trying to get out of that area, sir?
A    Yes.
Q    And are you out of it now?
A    Yes.
Q    And are you out of it as a consequence of the United States paying your way?
A    No, I planned on leaving anyway.
Q    Excuse me?
A    I planned on leaving anyway.
Q    They helped you go, didn't they?
A    Well, yeah.
Q    Now, all these things  --  strike that.
     If you went and first saw the police a few days after your sister was killed, did you continue to go back and live in Newtowne?
A    No -- yes.  Yes.
Q    Which one was it, yes or no?
A    Yes.
Q    Wait a minute.  Where were you living when you told the police about your sister's death and your knowledge?
A    Okay, I stayed for awhile, then I moved in with a friend of mine on Leigh Street.
Q    The Leigh Street portion of Newtowne?
A    Yes.  I went back to my house.
Q    How long did you stay there?
A    Two or three days.
Q    Were you buying crack cocaine then?
A    No.
Q    Where did you move after that?  Was it witness protection or did you say someplace else?
A    Witness protection.
Q    When did you go into witness protection?
A    I couldn't tell you.
Q    Give me a ball park figure in relationship to when your sister died, which was February 1st, in case you forgot --
A    In March.
Q    In March you went into witness protection?
A    Yes.
Q    Didn't you just tell this jury that you were using crack cocaine up until March?
A    No, I didn't.
Q    You didn't say you were using crack cocaine  --
     MR. VICK:  The memory of the jury controls.  He has answered the question.
     THE COURT:  Sustained.
BY MR. BAUGH:
Q    I'll ask you this.  When is the last time you

**JA892**

used crack cocaine?

MR. VICK:  Asked and answered.

THE COURT:  He can answer.

THE WITNESS:  February, March of 1992.

BY MR. BAUGH:

Q     Excuse me?

A     February or March of 1992.

Q     And you were getting it from Curt Thorne at that time?

A     Curt Thorne, yes.

Q     While you were living with Curt Thorne, were you continuing  --

A     I never lived with Curt Thorne.

Q     You didn't stay in a hotel room with Curt Thorne?

A     One time.

Q     Were you continuing to receive  --  you weren't still selling drugs or helping direct drugs, were you?

A     No.

Q     Were you still receiving your welfare payments? How were you buying drugs at that time?

A     How was I buying drugs?

Q     Yes.

A     That was from money I saved.  I saved a couple dollars.  I received one check, right, when I got out of the hospital.

Q     You saved up your money?

A     I tried to save up some money.

Q     And you used the money that you saved to buy crack cocaine?

A     I was going to leave.

Q     I thought you said you were using some of it also to buy crack cocaine at this time?

A     I wasn't using no money as to buy crack cocaine.  I said I was saving the money to  --

Q     How were you buying crack cocaine?

A     How was I buying it?

Q     Yes.

A     With the money I had.

Q     Now, were you saving your money to leave or were you using your money to buy crack cocaine?

A     Both.

Q     All right.  When you went forward to the police, was that partly in revenge?

A     Not really.

Q     And you were not guided or driven by animosity or anger in any way?

A     I was angry, yes.  Really it was not anger. Okay  --

Q     Did you visit while you were doing this -- did you go to your sister's funeral?

**JA893**

A    No, I didn't.
Q    Were your sister and your brother buried together?
A    No.
Q    How old was your sister when she died?
A    I think "Mousey" was 27, 28.
Q    What was her date of birth?
A    November 22nd.
Q    How was your  --  how old was your brother, Bobby?
A    Bobby Lee was 35, 36.
Q    Do you know?
A    34 or 35.

1942

Q    Do you know?
A    No.  It took me 26 years to find my family.
Q    I assume for the last ten years you have known where they are?
A    I met Bobby Lee.  I have been knowing Bobby Lee about seven years.
Q    And it was concern and revenge about these people in part that drove you to talk to them?
     MR. VICK:  Misstatement.  He has never stated that.
     THE COURT:  Sustained.
BY MR. BAUGH:
Q    Now, you mentioned that these people, you mentioned they were partners.  Did you see drugs come from New York?
A    I wasn't there when they came from New York.  I just know --
Q    Were you there when the drugs were divvied up?
     MR. VICK:  If he could quit cutting the witness off.
     THE COURT:  He wasn't finished answering your question.
     MR. BAUGH:  He was getting into hearsay and I did not ask for hearsay.
     THE COURT:  The objection is sustained.

1943

Let him finish.
BY MR. BAUGH:
Q    Did you see drugs come down from New York?
A    I saw drugs come from their state, "O"  --
     MR. BAUGH:  Non-responsive.  Did he see drugs come from New York?
     THE COURT:  The question is, did you see drugs come from New York?  If you didn't  --
     THE WITNESS:  Yes, I saw them.  Powdered coke.
BY MR. BAUGH:
Q    Come from New York?
A    I don't know whether they come from New York.  They said they came from New York.

**JA894**

Robert "Papoose" Davis (Cross)

BY MR. BAUGH:

Q    Here is the question.

MR. VICK:  He has gotten a full response on this.

THE COURT:  Ask the question again and listen carefully to it.  If you didn't see the drugs come from New York, then your answer should be no.

BY MR. BAUGH:

Q    Did you see drugs come from New York?

A    I saw drugs that it was stated they came from New York.

1944

Q    All right.  And did you see these drugs get divvied up?

A    Yes.

Q    All right.  And is it your testimony that you saw these defendants divide the drugs amongst themselves?

A    Yes.

Q    All right.  Now, am I correct that, say, for instance Mr. Roane, would get some of those drugs for himself to either use or sell or do what he wanted to do with them; am I correct?

A    Yes.

Q    And other people would get drugs to use or sell or do with what they wanted to; is that correct?

A    Yes.

Q    Now, based upon your -- whatever the term they use -- knowledge and observation, whatever it is -- was it your understanding that Mr. Roane could do anything he wanted to do with his drugs?

A    Yes.

Q    All right.  And what he did with his drugs wasn't dependent upon what anybody else did with their drugs; am I correct?

MR. VICK:  Objection.

THE COURT:  Overruled.

1945

MR. BAUGH:  Thank you.

MR. VICK:  Your Honor, Mr. Baugh's theatrics  --

THE COURT:  Mr. Baugh, please, nobody asked for your expressed gratitude.  Ask the question.  The objection was overruled.  Ask the question.

BY MR. BAUGH:

Q    In case somebody has an objection, is it correct, sir, that Mr. Roane was not dependent upon anybody else as to what he did with his drugs; am I correct?

A    I'm not aware of that.

Q    All right.  Now, did you ever see these people put money together?

A    Yes.

Q    All right.  And am I correct, the money would be

put together  --

MR. WAGNER:  I object to "these people," Your Honor.

BY MR. BAUGH:

Q    Did you ever see Mr. Roane, Mr. Tipton, or Mr. Johnson put money together?

A    Yes.

Q    All right.  And after they put their individual money into a pot, to buy drugs?

1946

A    I don't know who they did it for, but I know they put their money together.

Q    When you saw this, sometime later would you see drugs come in?

A    Yes.

Q    They would divide the drugs up the same way we talked about the other drugs, right?

A    Yes.

Q    Were the drugs divided up equally or based on how much money they put in?

A    I'm not aware of that.

Q    Okay.  You mentioned that your sister, "Mousey -- " did she ever buy drugs from James Roane, my client?

A    No.

Q    She certainly never worked for him?

A    No.

Q    And you never saw her take any orders or directions from him?

A    Once or twice.

Q    What sort of things?

A    Well, she asked him questions and he said, "Well, go on and ask 'O.'"

Q    He wouldn't answer her?

A    Right.

1947

MR. BAUGH:  Thank you.  Pass the witness.

THE COURT:  Mr. Wagner?

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good morning.  Mr. Davis, you have testified that you were using a lot of cocaine over the past, say, three or four years?

A    I didn't say three or four years.  I said about one year.

Q    Just for one year?

A    About one year, yes.

Q    During the time you knew these people you were using a lot of cocaine; isn't that right?

A    Yes.

Q    You were also drinking a lot of alcohol, weren't you?

A    Yes, I'm alcoholic.

Q    How much alcohol would you say you were drinking

**JA896**

over the period you knew these people?
A    I drink wine and beer every day.
Q    How much wine would you drink?
A    About four or five fifths.
Q    A day?
A    Yes.  If I could buy it.
Q    How about beer?

A    About three or four quarts.  I took top and bottom, mix my wine and beer together.
Q    How were you paying for the wine?
A    I would go out and do favors for people and make money and go out and buy it.
Q    How many times would you say you smoked crack in the course of a day?
A    If I had it, I would smoke probably three-fourths of it, sell the rest, have some money in my pocket.
Q    But how many times would you be smoking the crack, four or five times a day?
A    Not that much.
Q    How much?
A    About two or three times, if I had it for myself.
Q    All right.  You testified about some of the people you have bought drugs from.  Did you ever buy any drugs from someone named Rochelle?
A    Yes.
Q    That's Ronita Rochelle Hollman?
A    I don't know her.  I only know her by the name Rochelle.
Q    How many times would you say you went by her house to buy drugs?

A    If I couldn't find more and I knew she had some.
Q    How many times would you say you bought from her?
A    Six or seven times.
Q    How many times did you go by Norton Street?
A    I used to live on Norton Street.
Q    You lived there?
A    Used to.
Q    The house that James Roane's father owned. How many times did you go by that house on Norton Street?
A    By the house or to the house?
Q    Did you go into the house and see people who were in the house?
A    About ten times.
Q    Ten times.  How many times would you go to the Moore Street house where some of these people hang out?
A    Nope.

**JA897**

Q    Never went to Moore Street?
A    No.
Q    You knew that Sandra Reavis was involved in a romantic relationship with "J?"
A    I didn't know, but I had a pretty good idea.

1950

Q    Pretty good idea of that.  You say you saw Sandra Reavis get drugs from James Roane on one or two occasions; is that right?
A    Right.
Q    Did you refer to Sandra Reavis as a worker or partner?
A    I considered her a partner.
Q    She was in a romantic partnership with James Roane, wasn't she?
A    I don't know.
Q    But you only saw her receive drugs from "J.R." on one or two occasions; is that right?
A    Yes.
Q    You testified you wanted to pay all these people back for killing your brother and sister; isn't that right?
A    I said revenge.
Q    I'm sorry?
A    Protection and revenge.
Q    Revenge.  But your words were that you wanted to pay these people back.
A    Well, I think that's a pretty good answer.
Q    You wanted to do whatever you could to see these people punished?
A    I will let the law do it.

1951

Q    Now, you have testified about people giving you instructions to other people.  You never saw Sandra Reavis give instructions to anyone, did you?
A    Yeah.
Q    You never saw her give drugs to anyone, did you?
A    Yes.
Q    Did you ever  --  did anyone from the government ever tell you that you could be charged for your involvement with some of these things that are going on that you have testified about?
A    No.
Q    No one from the government ever told you that? They didn't tell you you could be charged for distribution of cocaine?
A    No.
Q    You were helping them with their cocaine, weren't you, at times?
A    I was helping them?  I was helping myself, mostly.
Q    But you sold cocaine, didn't you?
A    Yes.

**JA898**

Q    You helped them with their guns, didn't you?
You testified to that?
A    Yes, I did.

1952

Q    But the government never told you you could be
charged with anything despite this; is that correct?
            MR. VICK:  Asked and answered three or four
different times.
            MR. BAUGH:  I object.
            THE COURT:  You are objecting to the
objection?
            MR. BAUGH:  Yes, I am.  Because counsel
well knows that question  --
            THE COURT:  Sit down, Mr. Baugh.  The
objection is sustained.  It has been asked three or
four times.
BY MR. WAGNER:
Q    You have been put in protective custody; is that
correct?
A    Yes.
Q    And you are staying in a pretty nice place?
A    I don't call it nice.
Q    Is it a hotel?
A    No.
Q    It is a house?
A    No.
            THE COURT:  Mr. Wagner, that's enough of
that.  Don't answer anything else.
BY MR. WAGNER:

1953

Q    Before you were placed in protective custody,
you were moving around a lot, weren't you?
A    I was staying at the Salvation Army.
Q    All right.  You were selling drugs to help pay
for things; isn't that right?
A    I was  --  out of the Salvation Army?
Q    Before the Salvation Army, in the year before
you were put in protective custody.
A    I needed money in my pocket, and did that
instead of going and stealing and knocking somebody
upside the head.
Q    You didn't have any stable job?
A    I was on welfare.
Q    You were on welfare at the time?
A    I had seizures.
            THE COURT:  Mr. Vick?
                REDIRECT EXAMINATION
BY MR. VICK:
Q    Who suggested that you go into the Witness
Protection Program?
A    Denise.
Q    And that was not  --
            MR. BAUGH:  Can we get a full name on that,
please?  What Denise suggested he go into witness

**JA899**

protection?

BY MR. VICK:

Q   Denise who?

A   I don't know her last name.

Q   When was that suggested to you?  Was it after you began cooperating?

A   I was in the Salvation Army and I was approached by Denise.

Q   Where were you when "Mousey" got killed?

A   In the hospital.

Q   Did you kill "Mousey?"

A   No, I didn't.  I was crazy about my sister.

Q   Did you ever see Sandra receive directions from "J.R.?"

A   Not directions, but I seen them pass  --

MR. BAUGH:  Objection, not responsive, Your Honor.

THE COURT:  Sustained.

BY MR. VICK:

Q   Who did you see Sandra give instructions to?

A   I saw her talking to some young ladies.

Q   Who did you see Sandra give drugs to?

A   Couple of young ladies.

MR. VICK:  No further questions.

MR. BAUGH:  We would ask for recross in light of that last answer concerning Denise.

THE COURT:  Go ahead.

RECROSS-EXAMINATION

BY MR. BAUGH:

Q   The Denise who suggested that you go into witness protection, is that a black woman, kind of stocky, actually built like me, actually?

A   No.  She is not built like you.

Q   Denise Berkley?

A   Yes.

Q   All right.  I used to be young.  Denise Berkley, that's the one you are talking about?

A   Yes.

Q   And she was a friend of Ms. Rozier's, a friend of "Nat" Rozier's and "Mousey's" and "Pea Sue?"

A   Yes.

Q   And this was a few days after your sister's death?

A   Yes.

Q   And before you went to the police, she walked up to you and suggested you go into witness protection?

A   She advised me she thinks that I should go and talk to the police because I might be next.

Q   Did you and Ms. Denise Berkley go over what you knew and what you had heard about some of these killings?

A    No.

Q    Did you discuss it that day at all?

A    No.

Q    You and Denise talked about your going into witness protection, but you never talked about any murders?

A    I was told by Denise, she said, "You should get yourself some  --"

Q    I'm asking you were you not told  --

MR. VICK:  Allow him to answer the question.

THE COURT:  All right.  The objection is overruled.  But finish up this examination, Mr. Baugh.

BY MR. BAUGH:

Q    Am I correct then that you never, ever discussed murders with Denise before you went into witness protection?

A    She told me that my sister got killed and my brother got killed and all.  She had the feeling she knew who did it and who was involved.

Q    She had a feeling she knew who did it?

A    Yes.

MR. BAUGH:  Pass the witness.

MR. WAGNER:  I have a little recross.

                RECROSS-EXAMINATION

BY MR. WAGNER:

Q    You said that Ms. Reavis gave instructions to some young ladies.  Who were they?

A    I don't know their names.

Q    You don't know their names?  When did she give these instructions?

A    Various times.

Q    Can you remember the dates or approximate times?

A    Two years ago, sir.

Q    Two years ago?

A    Yes.

Q    Okay.  And is it the same about when she gave the drugs to some ladies, that was two years ago?

A    Yes.

MR. WAGNER:  Thank you.  No further questions.

THE COURT:  All right.  The witness may stand down.  I need to talk to you all.

(At Bench.)

What's the status?

MR. VICK:  We have another prisoner witness and we have got some police officers to fill in.  We are trying to get the other protective witness here around one or two.  I don't know that we can.  They are trying.  But that means going through Washington

Ronita Hollman (Direct)

and everything else.

THE COURT: I just wanted to know.

(In Open Court.)

All right, we are going to take about ten minutes now. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.).

All right, Mr. Marshal, you can remove the witness.

(The witness left the courtroom.)

(The defendants were removed from the courtroom.)

(Recess taken from 11:25 a.m. to 11:47 a.m.)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

RONITA HOLLMAN, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, I'm going to ask you to speak loudly into the microphone so the ladies and gentlemen of the jury can hear you. Tell us your name.

A    Ronita Hollman.

Q    How old are you?

A    21.

Q    Do you have any children?

A    Yes, three.

Q    Their ages?

A    Four, two, and one.

Q    Where are you presently residing right now?

A    VCCW, Virginia Correctional Center for Women.

Q    Is that as a result of an arrest on January 8th, 1992 at Norton Street in the City of Richmond?

A    Yes.

Q    What were you charged with?

A    Distribution of cocaine with intent.

Q    Possession of a firearm?

A    Yes.

Q    You were found guilty of those offenses in state court?

A    Yes.

Q    Has the United States Government made you any promises for your testimony today?

A    No.

Q    You have already been sentenced for those crimes you were involved in?

A    Yes.

Q    Going back prior to January 8th, 1992, can you tell the ladies and gentlemen of the jury have you

**JA902**

Ronita Hollman (Direct)

been a drug user?

A    Yes.

Q    What kind of drugs have you used?

A    Crack cocaine.

Q    How long and what time period prior to your arrest?

A    Since I was the age of about 16.

Q    And did there come a point in time when you got involved in the distribution of crack cocaine?

A    About the age of 17.

Q    When you were arrested, you were living with whom?

A    Peyton Maurice Johnson.

Q    You all were living together on January 8th, 1992?

A    We weren't living together.

Q    You all were sharing the same  --

A    Yes.

Q    The same building.

A    Yes.

Q    Ma'am, the cocaine with which you were arrested, who did you get that from?

A    Peyton.

Q    Were you also partners?

A    Yes.

Q    Were you selling cocaine you got from Peyton?

A    Yes.

Q    What area were you selling it in?

A    On Norton Street and out of my apartment.

Q    Out of your apartment?

A    Yes.

Q    Is that called Newtowne?

A    Yes.

Q    I think I asked you this before.  The cocaine you were arrested with came from Peyton?

A    Yes.

Q    Would you please explain to the jury you all's business arrangement on the cocaine that you got and sold?

A    I would sell most of it and give him the majority of the profit and then he would pay the bills and so forth, help me with my kids.

Q    Pay your living expenses?

A    Yes.

Q    You occasionally would get some money from him for your own personal use?

A    Yes.

Q    Ma'am, can you tell us who some of your customers were?

A    Katrina Rozier, Jerry Gaiters, lady named "Pea Sue," another one named "Peaches."

Q    A woman by the name of "Pepsi?"

**JA903**

Ronita Hollman (Direct)

A     Yes.  "Pepsi," also.

Q     How about a gentleman named Mr. Lewis?

A     Yes.

Q     When you sold them cocaine, that was inside your apartment on Norton Street; is that correct?

A     Yes.

Q     And can you tell us what was the largest amount of cocaine you ever had in your possession at any one given time?

A     An eighth of a kilo.

Q     Going back to a couple months prior to your arrest in January of 1992, did anyone come to you and offer you a different business proposition than you and Peyton had?

A     Yes, before I was arrested, James Roane and Richard Tipton came to me and told me -- James Roane told me that I was making the area hot and that I needed to be cool.  And Richard Tipton told me that they were going to open up a bunch of crack houses and split everything half and half, and there was a lot of money out there and that they would get theirs even if bodies had to be laid.

Q     He Told you what?

A     There is a lot of money out there, and they would get theirs even if a number of bodies had to be laid.

Q     Killed?

A     Yes.

Q     Do you see Mr. Tipton in the courtroom today, or Mr. Roane, either one?

A     Roane.

Q     Would you point him out for the ladies and gentlemen of the jury?

        MR. HENDERSON:  Stipulate.

        MR. PARCELL:  Do you see Mr. Tipton?

    (Witness rose and scanned the courtroom.)

A     Yes.  Over there.

Q     How is he dressed?

        MR. WHITE:  Stipulate ID.

        MR. PARCELL:  Let the record reflect she has identified the defendants Roane and Tipton.

        THE COURT:  Record will so reflect.

BY MR. PARCELL:

Q     Was Peyton there when you were having this conversation with Mr. Roane and Mr. Tipton?

A     No.

Q     You later brought to his attention that you had this discussion with these two gentlemen?

A     Yes.

Q     Did he encourage you or discourage you from getting involved?

        MR. WHITE:  Objection to leading.

**JA904**

MR. McGARVEY:  Objection to hearsay.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    Based on your conversations with Mr. Johnson, did you get involved with the offer from Mr. Roane and Mr. Tipton?

A    No.

Q    Did they tell you how much cocaine they would bring --

MR. WHITE:  Objection to "they."

BY MR. PARCELL:

Q    Did Mr. Roane or Tipton, either one, tell you what amounts of crack cocaine they wanted to get involved with you with?

A    At one point in time, they asked me could they front me an eighth of a kilo.

Q    What kind of arrangement would you all have with that eighth of a kilo?

A    We never discussed that.

Q    Once again, did Mr. Roane make any comments to you about your drug dealings on Norton Street?

A    No.

Q    About you making the area hot?

MR. BAUGH:  Asked and answered.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    Did there come a point in time that they came back to you again and had another conversation with you about the sale and distribution of crack cocaine?

A    No, at another point in time  --

MR. GEARY:  I can't hear the witness.

THE COURT:  You need to speak up.

THE WITNESS:  No, at another point in time they came to my house and wanted me to let them cook up an eighth of a key.

MR. McGARVEY:  Who is "they?"

THE WITNESS:  Richard Tipton, James Roane, and Cory Johnson.

BY MR. PARCELL:

Q    Do you see Cory Johnson in the courtroom?

MR. McGARVEY:  Stipulate ID.

A    Yes.

Q    Was this before or after Peyton's death?

A    Before.

Q    It was before or after your arrest?

A    Before.

Q    Tell the ladies and gentlemen of the jury exactly what they said and who said what when they came to you about that proposal.

A    James Roane came to me first alone by himself and asked me could they cook up the eighth of a key.

**JA905**

Ronita Hollman (Direct)

At one point I told him it was okay.  All three, Roane, Tipton, and Johnson, came to my apartment and asked me was it okay, could they cook it up then? And I told them no, Peyton was at home.

Q    That didn't go down, either, did it?

A    No.

Q    A minute ago you said they were going to front you an eighth of a kilo of cocaine.  Tell the jury what a front means.

A    To give you drugs at the price that they are worth, and plus you pay them an additional price.

Q    When they front you that, does that mean you didn't have to give them the money at that point in time?

A    No, you would sell the drugs and give them the money later.

Q    In regards to your January, 1992 arrest, when the police got there where did you have your cocaine stored?

A    It was in a drawer.  And I saw the police coming and I put it in the baby's pamper.

Q    That's where the police recovered it?

A    Some of it.

Q    As a matter of fact, you told the police where it was, didn't you?

            MR. BAUGH:  Sustained.

            THE COURT:  Sustained.  That's leading.  Go ahead.

            THE WITNESS:  Yes.

BY MR. PARCELL:

Q    How did the police know where to find the cocaine?

A    I wanted my neighbor to come and get the kids.

            MR. BAUGH:  Objection.  One of her neighbors told them?

            THE COURT:  Overruled.

BY MR. PARCELL:

Q    Answer the question.

A    I told the police that I wanted one of my neighbors to come and get my kids.  So they knew immediately to check the baby's pampers.

Q    You told the police where it was?

            MR. GEARY:  I'd like to have the witness testify, please.

            THE COURT:  Sustained.

BY MR. PARCELL:

Q    Who told the police where the cocaine was?

A    I did.

Q    And after your arrest, did there come a point in time where you had occasion to make bond?

A    Yes.

Q    When did you make bond?

Ronita Hollman (Direct)

A     February 19th.

Q     And  --

MR. McGARVEY:  I'm sorry, the date?

THE WITNESS:  February 19th.

BY MR. PARCELL:

Q     Was that before or after Peyton's death?

A     After.

Q     How long had you known Mr. Roane prior to his first proposal in the cocaine business?

A     Not at all.

Q     How long had you known or seen "C.O." or "Whitey?"

A     A few times.

MR. COOLEY:  Could we ask it be singular rather than plural?

BY MR. PARCELL:

Q     How many times did you see Mr. Tipton, or "Whitey?"

A     I basically seen him around the neighborhood day-to-day.

Q     Did you ever see anything unusual about him?

A     No.

Q     Did he carry anything on his person that was unusual?

A     No.

Q     Did you ever see anything in his mouth?

MR. GEARY:  He is not getting the answer he wants.  Objection.

THE COURT:  Sustained.

THE WITNESS:  No, I was told  --

MR. WHITE:  Objection.

THE COURT:  Don't answer.

BY MR. PARCELL:

Q     Did it come to your attention that Mr. Tipton ever carried a razor blade around?

MR. McGARVEY:  Objection.  Leading, and hearsay as well.

THE COURT:  Sustained.

BY MR. PARCELL:

Q     Did you ever see Mr. Tipton with a razor blade?

A     No, I didn't.  But Sandra  --

MR. WHITE:  Objection.

THE COURT:  Sustained.

MR. PARCELL:  Sandra Reavis made a statement to her.

THE COURT:  Sustained.

BY MR. PARCELL:

Q     Did you ever have a conversation with Ms. Reavis about Mr. Tipton?

A     Yes.  And the night that he beat up a guy named Swain  --

MR. WHITE:  Objection.

**JA907**

THE COURT:  Sustained.

BY MR. PARCELL:

Q    Were you aware of any acts of violence Mr. Tipton did to anyone else?

MR. WHITE:  Objection, unless she has personal knowledge, she saw it.

THE COURT:  Ask her.

BY MR. PARCELL:

Q    Do you have personal knowledge that Mr. Tipton assaulted anybody?

A    No.

Q    Did you have any conversations with Ms. Sandra Reavis?  Do you see her in the courtroom?

A    Yes.

Q    Did you have any conversations with her about Mr. Tipton?

A    Yes.

Q    What were those conversations related to?

MR. WHITE:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  The guy, Swain, that Richard Tipton  --

MR. WHITE:  Objection unless  --

THE COURT:  Sustained.  Now, ma'am, you have to listen to the question and answer it specifically as it is phrased to you.  You are getting off the top about what some guy told somebody else, and you can't do that.  Go ahead.

BY MR. PARCELL:

Q    Regarding Ms. Sandra Reavis, do you know whether or not she was in the business of selling crack cocaine?

A    Yes.

Q    How do you know that?

A    I saw her make a deal before, sell on the street.

Q    Do you know whose cocaine she was selling?

A    She said hers.

Q    Do you know where she got cocaine?

A    James Roane.

MR. WAGNER:  Objection, Your Honor.  She said it was  --  I'm sorry.  Withdraw.

THE COURT:  Overruled.

BY MR. PARCELL:

Q    Did you ever see James Roane  --

MR. WAGNER:  I'm sorry.  If I could object to that and ask if it is based on her personal knowledge.

MR. PARCELL:  By way of cross-examination?

THE COURT:  Ask her the question.  She made a comment that indicated that one thing, and one that indicated something else.  Clear it up.

**JA908**

BY MR. PARCELL:

Q   Do you know where Sandra Reavis was getting her cocaine from?

MR. WAGNER: From personal knowledge, Your Honor.

THE COURT: Just ask her. You already asked her that question. Ask her how does she know.

MR. PARCELL: How do you know?

THE WITNESS: Her son told me.

MR. WAGNER: Objection.

THE COURT: Sustained.

MR. WAGNER: I would move to strike the previous answer to the question, Your Honor.

THE COURT: All right. It will be stricken. Ladies and gentlemen, the previous response where she related something that Ms. Reavis' son told her was of course hearsay, and is not to be accepted by you or utilized as evidence in this case.

MR. PARCELL: Pass the witness, Judge.

THE COURT: Mr. Geary?

MR. GEARY: No questions, Your Honor.

THE COURT: Mr. McGarvey?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q   Good afternoon. Ms. Hollman, would you characterize yourself as a worker? You worked for Peyton Maurice Johnson?

A   Yes.

Q   Okay. And the proposal that you indicated that Mr. Tipton or Mr. Roane, whichever one it was that you testified to here today, they were also proposing that you act as a worker; is that correct?

A   Right.

Q   Okay. And the deal that they offered you was 50-50?

A   Right.

Q   Not 60-40, but 50-50?

A   No.

Q   All right. Now, ma'am, how long have you lived in Newtowne?

A   A year.

Q   A year from 1992 or a year prior to these events?

A   A year prior to the time of my arrest.

Q   Okay. And during that period of time, I take it you were actively involved in the drug trade or at least some portion of it, correct?

A   Yes.

Q   Okay. And Ms. Hollman, while you were actively engaged in that role, did you have a lot of contact with Newtowne residents?

**JA909**

A    Yes.
Q    Okay.  Did you have a lot of contact with Newtowne residents with reference to the sale or the purchase of crack cocaine?
A    Yes.
Q    Was it your experience that for the most part, people in Newtowne bought from people in Newtowne?

A    Yes.
Q    Okay.  And how much would you estimate  --  how many would you estimate your customers were, on an average?
A    How many people?
Q    Yes.  How many people over that period of time. It's about a year; is that right?  Is it a year, or less than a year?
A    A year.
Q    About a year.  How many people would you estimate -- and I'm not talking about the same people buying from you on a number of occasions.  I'm talking about how many people in total would you estimate bought from you?
A    I can't really say.
Q    50 to 100?
A    Maybe.
Q    More, less?
A    Maybe.
Q    All right.  How many people -- I mean, Newtowne is a very small area; is that correct?
A    Yes, it is.
Q    Was there anybody that you knew of in Newtowne who wasn't involved in the drug trade in some way, purchase or sale?

A    No.
Q    No.  I mean, Newtowne is a drug area.  People buy drugs.  They sell drugs.  And especially crack cocaine and reefer; is that correct?  Reefer or marijuana, right?
A    Right.
Q    Okay.  Now, you indicated that you were selling for Peyton Johnson; is that correct?
A    Yes.
Q    All right.  And with reference to Peyton Johnson, how long was Peyton Johnson in the drug trade?  As long as you were?
A    Yes.  Longer.
Q    That you were aware of.  And in your association with Mr. Johnson, Mr. Johnson carried a gun; is that correct?
A    Yes.
Q    Did you purchase that gun for him?
A    No.
Q    You did not?

**JA910**

Ronita Hollman (Cross)

A    No.
Q    Okay.  How long had he had a gun prior to the events that you are speaking of right now?
A    A long time.
Q    A long time?

1977
A    Yes.
Q    Peyton was known to carry a gun, isn't that correct, in that very small community of Newtowne; correct?
A    Yes.
Q    Peyton was known as, for want of a better phrase, a bad dude, wasn't he?  I mean, you got along with him but for the most part in Newtowne, Peyton was known as a bad dude.  You didn't want to mess with Peyton Johnson; is that true?
A    He was fine with me.
Q    He was fine with you.  I'm talking about his reputation in the community.
        MR. PARCELL:  That's the same objection they made against the government.  That's hearsay.
        THE COURT:  Overruled.  She can answer that if she knows.
BY MR. McGARVEY:
Q    Within the community itself he was known as a bad dude, someone you didn't want to cross, someone you didn't want to mess with, correct?
A    I don't know.
Q    You don't know?
A    No.
Q    Why then did he carry a gun; do you have any

1978
idea?
A    I guess all drug dealers probably do tote a gun to protect their drugs.
Q    Did you?
A    No.
Q    I guess all drug dealers do not then, right?
A    The majority do.
Q    The majority in your experience do.  It is nothing unusual for someone who deals drugs to carry a gun; is that your testimony?
A    No.
Q    Okay.  With respect  --  Mr. Parcell brought up the slaying of Peyton Johnson.  Isn't it a fact that Peyton Johnson was talking about killing "J.R." Roane?
A    I can't say that it is a fact because I wasn't there.
Q    Well, ma'am, did you testify that way in the Grand Jury?
A    Yes.  That's what I was told.
Q    Were you told that by Peyton Johnson?
A    No, I wasn't.

**JA911**

Q    Was Peyton Johnson  --  strike that.
     And you knew that he had a weapon; is that correct?

1979

A    Yes.
Q    And with respect to any beef or any argument or any dispute between Peyton Johnson and James Roane then, if you didn't know whether or not he was threatening about that, you don't know what the nature of that dispute was; is that correct?
A    Yes.
Q    All right.  In fact, in your Grand Jury testimony you indicated that you thought that it was personal; is that correct?
A    Yes.
Q    Wasn't that what you testified to?
A    Yes.
Q    Isn't it a fact that Peyton Johnson also, and yourself as well, I believe, sold "Mousey" drugs?  That's a compound question.  Answer that if you would, one at a time.
A    Yes.
Q    You sold her drugs as well as Peyton Johnson?
A    Yes.
Q    You talked about Katrina Rozier.
A    Yes.
Q    I believe the question was who did you get drugs from.  Who did she get drugs from?  And you indicated you?

1980

A    Yes.
Q    Isn't it a fact that Katrina Rozier would get drugs from anybody she could get drugs from, right?
A    Yes.
Q    Katrina Rozier was an absolute junkie; she would do anything for drugs.  Wasn't that your experience with her?
A    She always had money.
Q    Wouldn't she do anything for crack cocaine?
A    That I don't know.
          MR. PARCELL:  I don't see how she can know --
          MR. McGARVEY:  Question withdrawn.
          THE COURT:  The question is withdrawn.
BY MR. McGARVEY:
Q    Did you know Linwood Chiles in the neighborhood?
A    I didn't really know him, but I knew of him.
Q    Isn't it a fact that Linwood Chiles dealt with a lot of people in Newtowne; isn't that correct?
A    Yes.
Q    He was, let us say, on the periphery of the drug trade.  He may have used drugs, but he wasn't a seller, correct?

**JA912**

Ronita Hollman (Cross)

A    No.

Q    Okay.  Ma'am, with respect to your ten years -- I'm sorry.  You received ten years as a result of your conviction for possession of cocaine with intent as well as possession of a firearm while in possession of cocaine, correct?

A    Yes.

Q    You have suspended time on you with respect to that, correct?

A    Yes.

Q    By the way, you indicated that you didn't use a firearm.  Whose firearm was that that they found in your house?

A    Peyton's.

Q    It was Peyton's?

A    Yes.

Q    When were you popped on these charges?  January 8th, 1992?

A    Yes.

Q    And Peyton's firearm was in the house that night?

A    Yes.

Q    The night you were popped.  Did Peyton's firearm stay in your house?

A    The majority of the time, yes.

Q    The majority of the time.  And with reference to that charge, did I understand you correctly, that you had put the cocaine that you were found in possession of in your baby's pamper?

A    Yes.

Q    Ma'am, Mr. Parcell asked you about whether or not you have been promised anything.

A    Correct.

Q    By my calculations, you have been incarcerated for about what, seven to eight months right now?

A    No.

Q    How long?

A    Ten.

Q    Ten months?

A    Yes.

Q    So you have got about another seven months before you are eligible for parole; is that correct?  17 months, correct?

A    Yes.

Q    Has Mr. Parcell or Mr. Vick spoken to you about writing a letter to the Parole Board for you?

A    No.

Q    For your testimony here today?

A    No.

Q    Have they talked to you about a time cut?

A    No.

**JA913**

Q     Have you talked to them about it?
A     No.
Q     You have not?
A     No.
          MR. PARCELL:  That's factually incorrect.
We could not get one if we wanted to.
          THE COURT:  She answered no.
BY MR. McGARVEY:
Q     Ma'am, have they talked to you with respect to a conspiracy charge in the federal court?
A     No.
Q     Are you aware that you could be charged with conspiring to distribute drugs in federal court?
A     No.
Q     You haven't been charged with that, though, correct?
A     No.
          MR. McGARVEY:  Thank you.  That's all I have.
                    CROSS-EXAMINATION
BY MR. HENDERSON:
Q     Good afternoon, Ms. Hollman.
A     Good afternoon.
Q     Your full name is Ronita Hollman, correct?
A     Yes.

Q     Rochelle, is that your middle name?
A     Yes.
Q     All right.  And Ms. Hollman, you indicated that you had been using crack since the age of 16; has that been continuously?
A     Yes.
Q     How old were you, ma'am, when you had your first child?
A     16.
Q     You were 16 years old.  So you were using crack at that time?
A     Yes.
Q     How old were you at the time that you had your second child?
A     18.
Q     And  --
A     17.
Q     And you were likewise smoking crack at that time?
A     Yes.
Q     What other drugs were you ingesting in addition to crack?
A     That's it.
Q     And your third child is how old?  You were how old when you had your third child?

A     19.
Q     Continuing to ingest crack at that time?

**JA914**

Ronita Hollman (Cross)

A    Yes.
Q    This is the same child that you placed the drugs in to try to remove the drugs from the home, in the diaper?
A    Yes.
Q    Thank you.  In response to Mr. Parcell's question, I believe Mr. Parcell asked you did you inform the police as to where the drugs were at the time; was this before or after they decided to check the child?
A    Before.
Q    It was before?  You just volunteered this information after you put the crack into the pamper?  You said, "Oops, I put the crack in the pamper, you better check it out"?
A    No.
Q    So it was after, wasn't it?
A    Yes.
Q    It was after?
A    Yes.
Q    Okay.  Now, ma'am, you were arrested at 808 Norton Street; is that correct?
A    Yes.

Q    You had been selling crack for approximately how long?
A    About a year.
Q    About a year?
A    Yes.
Q    Had you ever sold  --  you mentioned several names.  Had you ever sold any crack to a gentleman by the name of Robert Davis, "Papoose?"
A    Uh-huh.
Q    You didn't mention his name earlier.
A    Yes, I have.
Q    You have sold to him?
A    Yes.
Q    Approximately how many times, ma'am, would you estimate?
A    I can't recall.
Q    Would you say it has been more than ten times?
A    Yes.
Q    Would you say it has been more than 20 times?
A    Maybe.
Q    Maybe more than  --  somewhere around 20 times?
A    Yes.
Q    So if he indicated that it was only six times, he was probably telling something that wasn't true; is that correct?

A    Yes.
Q    Who else in addition to  --  you mentioned "Nat," Jerry Gaiters, "Pea Sue," "Peaches," "Pepsi," and Mr. Lewis.  Who else, in addition to Mr. Robert

**JA915**

Davis, have you sold to?

A　Various people.

Q　Can you give me a number, an idea of how many more persons other than these six people that you named? Would you say it is probably three times the number that you have mentioned names of?

A　More than likely, yes.

Q　More than three times?

A　Yes.

Q　Ten times, maybe?

A　Probably.

Q　Would I be fair in saying that you have probably sold to hundreds of people over there?

A　Maybe.

Q　So you weren't being quite honest with us when you said just six people.

A　No, those are some of the people.

Q　Some of the people.

A　Some of the people.

Q　Now, you in fact worked for Peyton Johnson; is that correct?

1988

A　Right.

Q　Did a gentleman by the name of "Little Keith" also work for Peyton?

A　No, he didn't.

Q　Did he work for you?

A　No.

Q　Did he sell drugs?

A　No.

Q　"Little Keith" did not sell drugs?

A　No.

Q　Okay. You know a person by the name of Marvin?

A　Yes.

Q　What's Marvin's full name?

A　Bonner.

Q　Marvin Bonner. He worked for you, didn't he?

A　No.

Q　He worked for Peyton?

A　No.

Q　Did he buy drugs from you?

A　Yes.

Q　Did he sell those drugs?

A　No.

Q　He smoked all those drugs?

A　Yes.

Q　You are sure of that?

1989

A　Yes.

Q　How about "Peanut," do you know "Peanut?"

A　Yes.

Q　What's "Peanut's" full name?

A　I'm not sure.

Q　Did "Peanut" work for you?

**JA916**

A    No, "Peanut" is blind.
Q    Did "Peanut" smoke crack or sell crack?
A    Yes, he smoked.
Q    He smoked crack?
A    Yes.
Q    Other than selling drugs for Peyton Johnson, what did you do for him as far as working for him?
A    That's it.
Q    Now, in the community, would it be fair to say that you were considered somewhat of an enforcer over there?
A    Not to me.
Q    But other persons considered you an enforcer, correct?
A    Maybe.
Q    And in addition to Maurice being considered a bad dude, as Mr. McGarvey said, you were considered to be pretty tough yourself, weren't you?
A    No.

1990

Q    You weren't?
A    No.
Q    You indicate that you didn't carry a weapon.
A    Right.
Q    Have you thought about that answer since you gave that; is that correct?  Did you not have a weapon, ma'am?
A    Yes.
Q    You did have a weapon or did not?
A    No.
Q    Did not?
A    No.
Q    Have you ever used a weapon before?
A    No.
Q    Never used a weapon?
A    No.
Q    Do you know a gentleman, a person by the name of "K.K.?"
A    Yes.
Q    You do know "K.K.?"
A    Yes.
Q    And "Peaches," what is "Peaches'" full name?
A    I'm not sure.
Q    "Peaches" lived across the street from you, correct?

1991

A    Yes.
Q    Didn't there come a time, ma'am, when "Peaches" began to sell drugs to some of your customers?
A    Uh-huh.
Q    About when was that?
A    Maybe December, November.
Q    Of 19  --
A    1992.

**JA917**

Ronita Hollman (Cross)

Q    You didn't particularly like the idea of her taking your customers, did you?
A    It didn't bother me none.
Q    Didn't bother you any?
A    No.
Q    Isn't it a fact that you went over to her home along with "K.K." and pulled a shotgun on her?
A    No.
Q    That's not true?
A    No.
Q    You didn't walk into her home and reach in your coat pocket and pull a shotgun out?
A    No.
         MR. PARCELL:  Asked and answered.
         THE COURT:  She answered no.
BY MR. HENDERSON:
Q    With respect to Mr. Roane, you have never seen Mr. James Roane cook any cocaine, have you?
A    No.
Q    Have you ever given any money to James Roane?
A    No.
Q    Never got any money from James Roane?
A    No.
Q    Ma'am, with respect to Douglas Moody, what was his relationship to Peyton Johnson; did he work for Peyton Johnson?
A    At one time he did.
Q    And what was he, as far as his duties, what was he doing for Peyton Johnson?
A    Well, selling drugs.
Q    Selling drugs?
A    Yes.
Q    Crack cocaine?
A    Yes.
Q    How often would he get drugs from Peyton Johnson?
A    Not too much.
Q    Would he come  --  you say you all lived in the same building, you and Peyton Johnson?
A    No.
Q    Describe your living arrangements; I didn't quite understand that.
A    I lived at 808 Norton Street, and most of the time Peyton was over there.
Q    He was over there most of the time?
A    Yes.
Q    He was selling out of your residence?
A    Yes.
Q    And people were coming to your door and knocking at all times of night, I imagine?
A    Yes.
Q    Would Douglas Moody likewise come over there and

**JA918**

get drugs?

A    No.

Q    How would he get his drugs from Peyton?

A    It wouldn't be in front of me.

Q    These other individuals that would come, they would actually come to the residence and purchase the drugs from either you or Peyton?

A    Yes.

Q    And did your kids live there at the same time you were living like this?

A    Two of them, yes.

Q    Two of them did.  Were they there quite often when the persons with these drug transactions would be taking place?

A    Yes.

MR. HENDERSON:  No further questions.

THE COURT:  Mr. Wagner?

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good afternoon.  You testified that you lived in the Newtowne area for about a year?

A    Yes.

Q    You would see Sandra Reavis around the area sometimes, wouldn't you?

A    Yes.

Q    But you have only seen her sell drugs on one occasion; isn't that correct?

A    Yes.

Q    That was the only occasion that you testified to here; is that right?

A    Yes.

Q    Did you carry a shotgun in the back of your car?

A    No.

MR. WAGNER:  No further questions.

THE COURT:  Any questions for the witness?

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, one of the defense lawyers asked you did everybody in Newtowne sell cocaine.  There were some other people who lived in that community who were not involved in the drug business; is that correct?

A    Right, yes.

Q    Ma'am, in regard to the firearm that was seized on your arrest on January 8th, 1992, that was seized before Doug Moody's death and before Peyton Maurice Johnson's death; is that correct?

A    Yes.

Q    That was Peyton's only weapon, to your knowledge?

A    Yes.

MR. GEARY:  She has no way of knowing

that.

THE COURT:  Overruled.

BY MR. PARCELL:

Q    That weapon was seized by the police?

A    Yes.

Q    And was never returned?

A    Yes.

Q    In lieu of their questions, can you tell the ladies and gentlemen of the jury why you testified today?

MR. BAUGH:  That's outside the scope of cross.

THE COURT:  I'm going to sustain that.  We don't need that.

MR. PARCELL:  Very well.  No further questions.

THE COURT:  All right.  The witness may stand down.

(The witness stood aside.)

(At Bench.)

THE COURT:  Okay?

MR. VICK:  Our fears have come true.  They say they can't get him here before 3:45.  If I could have five or ten minutes with him at 3:45, I'll put him on and we will try to fill with police officers here to do the crime scene on Peyton Maurice Johnson and perhaps some other witnesses we can put on this afternoon.  I apologize, but there is not much I can do.

THE COURT:  I understand.  3:45 is just too late.

MR. BAUGH:  We are going to have him back on Monday?

THE COURT:  He will have to be here.

MR. VICK:  They have already said that's okay.

THE COURT:  I don't want to start him today.  You want to get started with some police officers now?

MR. VICK:  We can get started now or take an extended lunch and hopefully we will be here late.

THE COURT:  How many officers do you have?

MR. VICK:  We only have two right now.

MR. PARCELL:  We can do the Peyton Johnson and Louis Johnson crimes, too.  We will need to set up the video equipment for the crime scenes.

MR. VICK:  Judge, if we could, in light of the fact that the witness protection things have come out clearly, and I know it is no big deal, but I wouldn't mind if the jury were apprised that our logistic problems are not through inefficiency.

**JA920**

THE COURT:  I don't think they care one way or the other.

MR. BAUGH:  I don't think they know about it.

THE COURT:  I'll tell you what, let's go on and stop for lunch now, come back in at 1:30.

MR. VICK:  We will be ready with the police officers.

THE COURT:  If we exhaust them, we do.

(In Open Court.).

THE COURT:  Ladies and gentlemen of the jury, we are going to stop for lunch and let you go now.  Come back at 1:30 and we will get started back in the afternoon session.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in recess until 1:30.

(Luncheon recess taken from 12:30 p.m. to 1:30 p.m.)

THE COURT:  All right.  Let's bring in the jury, please.

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL:  Officer David Burt.

DAVID BURT, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    David E. Burt.

Q    Your occupation?

A    Police officer for the City of Richmond.

Q    How long have you been a police officer?

A    Since November of 1989.

Q    Were you employed as a Richmond City Police Officer on January 14th, 1992?

A    Yes, sir, I was.

Q    Did you have occasion to be logged on a call at approximately 8 o'clock p.m. that evening?

A    That's correct.

Q    Tell the jury where you went and what you found when you got there.

A    I received the first call to respond to the 1000 block of Kinney street on a shooting call.  Shortly after arriving in that area, a second call came in stating to respond to the 1200 block of West Clay Street, and I would find my victim inside of an

apartment.

Q    What did you do, basically, on the second communication?

A    I responded to the 1200 block of Clay Street.

Q    Would you please tell the ladies and gentlemen of the jury what if anything you found when you got there?

A    Yes.  At that time the door was slightly ajar. I pushed it open and the room was completely dark. There was nothing, no type of lighting in the room at that time.  And I could see from the lights from my flashlight a male on the couch.

Q    At that point in time what did you do next?

A    I entered the room, myself and another officer, and we approached him.  He was not breathing.  I could tell that he had been possibly shot a number of times.

Q    At that point in time, did you notify the Detective Division and maintain the crime scene until they got there?

A    Yes.

Q    I'm going to have you shown 20-1 and ask whether or not that is the person you found when you arrived at that address.

        (Photograph proffered to counsel and to witness.)

A    Yes, sir.

Q    Were you able to determine that person's name?

A    Yes, sir.

Q    That was what?

A    Peyton Maurice Johnson.

Q    That will be Government Exhibit 20-1, sir.

        THE COURT:  It will be admitted.

        MR. PARCELL:  Pass the witness.

        THE COURT:  Any questions, Mr. Geary?

        MR. GEARY:  No.

        MR. McGARVEY:  Yes, sir, just briefly.

            CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Sir, did you happen to discover whether or not the electricity was on in the house?

A    No, sir, I didn't.

Q    Just that the lights were out?

A    That's correct.

Q    And with respect to this house, did you notice any liquor in the house?

A    That was not recovered until the forensic unit arrived at the scene.

Q    Okay.  Were you present when the forensic unit arrived?

A    Yes, sir, I was.

Q    Did you notice a number of bottles of liquor in

the house?

A   Well, I did not at that time.

Q   All right.  Sir, this house is what is commonly referred to as a nip joint; is that correct?

A   Possibly.

Q   What's a nip joint?

A   A place where maybe illegal alcohol is sold.

Q   Did you say illegal alcohol?

A   Yes.

Q   And did you find any drugs, cocaine specifically, in the house?

A   No, sir, I did not myself.

Q   Were you present when someone else found drugs in the house?

A   Yes, sir.

Q   Can you give the ladies and gentlemen an estimate of the quantity that was found?

A   I don't recall.

Q   You don't recall.  Did you find any paraphernalia or did anybody in your presence find any paraphernalia for either smoking or using cocaine in the house?

A   Yes, sir.

Q   Okay.  What was that, pipes, what?

A   I don't recall exactly what the items were.

Q   Thank you.

        THE COURT:  Any questions from Roane's counsel?

        MR. BAUGH:  No questions, Your Honor.

        MR. WAGNER:  No questions, Your Honor.

        THE COURT:  All right.  Thank you, officer.  You may stand down.

    (Witness stood aside.)

    Call your next witness.

        MR. PARCELL:  Detective Thomas Searles, please.


                THOMAS SEARLES,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
                DIRECT EXAMINATION
BY MR. PARCELL:

Q   Sir, would you please state your name?

A   Thomas R. Searles.  I'm a detective.

Q   With whom?

A   The Richmond Police Department.

Q   Your present assignment?

A   Present assignment is assigned to the Forensic Science Unit.

Q   How long have you been a police officer?

A   For 18 years.

**JA923**

Thomas Searles (Direct)

Q    What training and experience have you had in the field of forensic police work?

A    I've been assigned to the Forensic Science Unit for 14 years.

MR. BAUGH:  We are all familiar with Mr. Searles and we have no objection to his qualifying as to his training in forensic science and chemistry.

BY MR. PARCELL:

Q    Were you so employed in that capacity on January 14th, 1992?

A    Yes.

Q    Did you have occasion to get a call to respond to the 1200 block of  --

A    I received a call approximately 1700 hours -- excuse me, 1900 hours, approximately 7 o'clock, on January 14th, 1992.

Q    What did you respond to?

A    I responded to 1200 West Clay Street.

Q    City of Richmond?

A    Yes, sir.

Q    When you arrived there, what if anything did you begin to do upon your arrival?

A    After I arrived there, I talked to the detective who was assigned the case at that time, Detective Reid.  And after talking to Detective Reid I began to go through the procedure and process the crime scene.

Q    During the course of your processing the crime scene, did there come a point in time when you had occasion to make a video of the scene as you found it?

A    Yes, sir.

Q    We will show the ladies and gentlemen of the jury that video.  Would you please describe the things which you found as you made this video?

A    Yes, sir.

(Videotape played.)

This is a photograph taken of the front of the building located at 1200 West Clay Street, the front entrance door.  This part of it is just adjacent buildings that were located next to 1200 West Clay Street.  What I am doing now is just scanning the general area outside of the building.  This is just as I entered the door.  I found the subject lying on the sofa back in the corner of the room.

Q    Were you able to determine who he was?

A    No, sir, I did not know who he was at the time.

Q    You later found out who he was?

A    Later on I found out that it was Peyton Maurice Johnson.  This is standing in the doorway.  This is standing on the other side of the room facing toward the door, scanning the room with the video.  This is

**JA924**

showing the doorway to another room behind the front room.

Q    Was that the condition of that door when you arrived?

A    Yes, sir.  The room itself and everything in it was in the condition that I found it.  This area is still in the front room here showing that there was a bed in the opposite corner from the sofa.  This portion of the room is showing the door and the condition of the door separating the two rooms.  This was a bar area over in one of the corners, some bar stools.  And there were some tables sitting around in this particular room here.  This area is showing a room that's behind the second room, the door to the back.

Q    Does that door face West Clay or is it  -- where is that door in relationship to West Clay Street?

A    It is behind  --  it is directly behind West Clay Street.  It is to the rear.  But to my knowledge, it wasn't open.  This is a close-up of Peyton Maurice Johnson on the sofa.

(Videotape ended.)

Q    Sir, did there come a point in time when you started discovering some things in that residence which had significance to you?

A    I took still photographs and began to collect some physical evidence.

Q    What physical evidence, if any, did you recover?

A    I recovered 12 cartridge cases, 9mm, and six bullets from the front room of that residence.

Q    Sir, in your preparation for your testimony today, did there come a point in time when you prepared a crime scene diagram of this residence?

A    Yes, sir, I did.

MR. PARCELL:  I would ask he be allowed to approach the jury and explain to them his diagram and the things which he recovered from there.

THE COURT:  All right.

(Witness approached jury.)

THE WITNESS:  This is just a blown-up diagram of the room, the front room, and this portion up here is Clay Street.  This is the front of 1200 West Clay Street.  Numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 were the cartridge cases and the approximate locations where they were found in the room.  Number 11 was underneath the edge of the victim's body and Number 12 was underneath the sofa on the floor.  Items 13 through 18:  13, 14 were found on the floor behind the sofa.  And 15 through 18 were found lodged in the wall behind the sofa of

**JA925**

the residence.  And the victim was in this portion of the sofa right here.

MR. PARCELL:  You may return to your seat. That has been labeled as Government Exhibit 18.  We ask for a its admission.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    I'll ask you to examine this bag labeled Government Exhibit 22, and advise the ladies and gentlemen of the jury whether or not that means anything to you.

A    Yes, sir.  This is the cartridge cases and bullets that I showed you in the chart that I recovered from the residence.

Q    They are labeled items 1 through 18?

A    1 through 18.

Q    After you recovered those items from the crime scene, did there come a point in time you had occasion to give them to someone else?

A    Yes, sir.

Q    That was whom?

A    I took them to the Forensic Science Lab on February 2nd, 1992 and turned them into the forensic lab for examination.

Q    That was Ms. Anne Jones?

A    I turned them into the state lab for her examination.

Q    And did there come a point in time when you retrieved some other items from the Medical Examiner's Office related to this crime?

A    Yes, sir.

Q    I'll move the admission of Government Exhibit 22.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    If you would, look at Government Exhibit 23 and tell us what they are.

A    These are the bullet and bullet fragments that I received from the Medical Examiner's Office on January 16th, 1992.

Q    That came from whom?

A    I signed it out from the ME's Office down on Moore Street.

Q    They were recovered from whom, though?

MR. BAUGH:  I think that calls for hearsay, unless he recovered them.

THE COURT:  Sustained.

MR. BAUGH:  I'm sorry, we will stipulate to that.

THE COURT:  Go ahead.

MR. PARCELL:  There's a stipulation between the government and the defense that these came from

**JA926**

the Medical Examiner's Office to Detective Searles, who in turn gave them to Anne Jones.

THE COURT:  All right, that's fine.

MR. PARCELL:  They came from Peyton Johnson's body as a result of the autopsy.  They will be Government Exhibit 23.

THE COURT:  Admitted.

MR. PARCELL:  Pass the witness.

MR. WHITE:  No questions, Your Honor.

THE COURT:  Mr. McGarvey?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Good afternoon, sir.  I understand that your primary responsibility there was to process the scene, correct?

A    That's correct.

Q    All right.  Sir, when you were shown the videotape and also the diagram, I noticed a number of tables, okay?  This is a private residence, correct?

A    I'm not sure that it was a private residence, sir.  I'm not familiar with the place.

Q    You didn't see an ABC license posted on the wall or anything like that?

A    No, sir.

Q    How long have you been a police officer?

A    18 years.

Q    This place was a nip joint, right?

A    From the appearance of the place, it looked like it was a little small restaurant of some type, maybe.

Q    Did you notice any liquor?

A    Yes, sir.  There was some alcohol in there.

Q    All right.  Did you find any cocaine in the house?

A    No, sir, I did not.

Q    In your presence, did anyone find any cocaine in the house?

A    I don't recall if anybody else did.

Q    How about when you were processing the scene?  Did you find any paraphernalia relating to cocaine, glassine pipes, bags, anything like that?

A    No, sir, I did not.

Q    Anybody in your presence find any?

A    Not to my knowledge.

Q    When you arrived, was there anybody at the scene, anybody outside the police officers or anybody related to the Richmond Bureau of Police; was there anybody there?

A    There were officers there when I arrived.

Q    Outside the police officers, were there any private citizens within the house?

**JA927**

A    No, sir, there was no one in the house when I arrived.

Q    Did you specifically see a gentleman by the name of Stanley Smithers there?

A    No, sir, I did not.

Q    To your knowledge, was Stanley Smithers there?

A    If he was, sir, I wouldn't know because I do not know him.

Q    Sir, with respect to the diagram that you showed, as well as the videotape -- I thought the diagram showed it a little better -- you indicated that there were two doors to the residence, correct?

A    Yes, sir.

Q    One of them faced on West Clay, correct?

A    Front door of West Clay Street, that's correct.

Q    Is that the way you entered?

A    Yes, sir, it is.

Q    When you got there, I presume that door was open; is that correct?

A    When I arrived it was shut.

Q    It was shut?

A    Yes.  It wasn't sitting open, no, sir.

Q    All right.  With respect to  --  did you have to knock on the door to get in?  Was it locked, anything like that?

A    No, sir, it was not locked.

Q    With respect to the back door, I noticed the back door borders on what, what is that, an alley, what?

A    I'm not sure.  I think it enters onto a porch off the side, but I'm not positive.

Q    Is there a street behind there or is there an alley behind there?

A    I'm not familiar with it.

Q    The picture that I saw, that door was shut as well.

A    Yes, sir.

Q    Do you recall whether that was locked or unlocked?

A    I do not recall, sir.

        MR. McGARVEY:  Thank you, Detective Searles.  That's all I have.

        THE COURT:  Mr. Baugh?

        MR. BAUGH:  No questions.

        MR. WAGNER:  No questions, Your Honor.

        THE COURT:  All right.  You may stand down, sir.  Thank you very much.  Call your next witness.

        MR. PARCELL:  Anne D. Jones, please.

            ANNE D. JONES,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**JA928**

Anne D Jones (Direct)

                    DIRECT EXAMINATION
BY MR. PARCELL:
Q    Ma'am, would you please state your name?
A    My name is Anne Davis Jones.
Q    Your occupation?
A    I'm a forensic scientist in the field of firearms identification for the Virginia Division of Forensic Science here in Richmond.
Q    What training and experience have you had to allow you to do your job?
            MR. McGARVEY:  Stipulate her expertise on behalf of all of us.
            MR. BAUGH:  That's correct.
BY MR. PARCELL:
Q    Were you so employed in that capacity on February 3rd, 1992?
A    Yes, sir, I was.
Q    Did you have occasion to receive from the Richmond Bureau of Police through Detective Rodriguez three semi-automatic 9mm handguns?
A    Yes, sir, I did.
            MR. PARCELL:  I'll ask she be allowed to look at Government Exhibit 104, 105, and 106 for identification.
            THE COURT:  All right.
BY MR. PARCELL:
Q    Do those weapons mean anything to you?
A    Yes, sir, I examined those firearms in the laboratory.
Q    And based on your examination of those weapons, did you have occasion to prepare a preliminary working condition status report for those weapons?
A    Yes, sir, I did.
Q    Is that labeled Number 92-1097?
A    Yes, sir, that's correct.
Q    I'll show you the original of that which has been labeled Government Exhibit 89.
        (Exhibit proffered to counsel and witness.)
        Did you prepare that report?
A    Yes, sir, this is the report I prepared.
Q    Can you please tell the ladies and gentlemen of the jury how you prepared that report with those firearms?
A    Yes, sir.  I received the firearms at the laboratory and I examined each firearm to determine if it was in mechanical operating condition and the safety features were functioning properly.  I determined that they were.  Then I test-fired each weapon into a water tank and collected the bullets and the cartridge cases from each firearm for a reference purposes for later examinations.
Q    And how do you determine the markings of both

**JA929**

Anne D Jones (Direct)

the projectile and the casing itself for future identification purposes?

A    Each firearm has got what's commonly called a blueprint which is set forth by the manufacturer prior to manufacture.  These firearms all are what is called rifled firearms.  That means that they have barrels that have rifling within the barrel.  The rifling is placed in the barrel to impart a spin on the bullet, kind of like a football with  --  putting a spin on a football for better trajectory in flight.

Each one of these firearms have barrels which have unique class characteristics set forth by the manufacturer.  One of the firearms would have six lands or grooves and climb to the right.  There are raised and lower portions that are placed in the barrel.  It is called the rifling, lands and grooves.

Also, each of these firearms has got parts on them, for example, firing pins, breachface markings, extractor and injector markings, all parts of the firearm which place unique markings on the components or ammunition components that are fired from a particular weapon.  All of those markings are used to identify ammunition components that are submitted to the laboratory.

Q    After you tested those firearms and you prepared what's been introduced as Government Exhibit 9, did there come a point in time when you received some projectiles and cases submitted to you by Detective Searles from the crime scene?

A    Yes, sir, I did.

Q    I ask you to look at Government Exhibit 22. Would you open that bag and remove each item and tell the ladies and gentlemen of the jury on each, one through eight, whether or not you were able to determine what weapon that projectile casing came from, and how?

THE WITNESS:  May I ask Mr. Parcell to repeat the question?

BY MR. PARCELL:

Q    Item Number 1.  Explain if you could, based on your examination, whether or not you were able to determine where that bullet or casing came from as far as being fired from a weapon?

A    Yes, sir.  Item number one is a 9mm caliber cartridge case.  And I determined that, based on microscopic examination of this cartridge case with test-fired components from these weapons, that it was fired in the item one Glock pistol.

Q    Do you see the item one Glock pistol in front of you?

A    Yes, sir.

Q    Would you please  --

**JA930**

Anne D Jones (Direct)

A    This firearm right here.

Q    That's Government Exhibit 104?

A    That's correct.

Q    Proceed, please.

A    Item Number 2 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 104, the Glock.

Item Number 3 is a 3D Impact-brand caliber 9mm luger cartridge casing which was also identified as having been fired from Government Exhibit Number 104, the Glock.  Item Number 4 is a 3D Impact-brand caliber 9mm luger cartridge casing also identified as having been fired from Government Exhibit Number 104, the Glock.  Number 5, Number 6, Number 7, and Number 8 were all 3D Impact-brand caliber 9mm luger cartridge cases which were all identified as having been fired from Government Exhibit Number 104, the Glock.

Number 10 and Number 12 are also 3D Impact-brand caliber 9mm luger cartridge cases which were identified as having been fired from Government Exhibit Number 104, the Glock.  I'll go back to Number 9.  Number 9 is a 3D Impact-brand caliber 9mm luger cartridge case which was identified as having been fired in the Government Exhibit Number 106, the AA Arms pistol.  Number 11 is a 3D Impact-brand caliber 9mm luger cartridge case which was identified as having been fired in the Government Exhibit 106, the AA Arms pistol.

Number 13 is a caliber 9mm luger, jacket and hollow-point bullet which had rifling characteristics consistent with those produced by the Government Exhibit Number 106 pistol.  However, because of the lack of sufficient microscopic markings in comparison to the bullets test-fired in this pistol, it was my opinion that it could not be identified with this pistol or eliminated with this pistol.

Numbers 14, 15, 16, 17, and 18 are all caliber 9mm luger bullets that are jacketed hollow-point bullets that were all identified as having been fired in Government Exhibit 104, the Glock pistol.

Q    Now, ma'am, did there also come a point in time when you received some bullets that came from the Medical Examiner's Office through Detective Searles to you for examination and comparison with those weapons?

A    Yes, sir.  That's true.

Q    I'll ask you to be relieved of Government Exhibit 22 and be given Government Exhibit 23, please.

THE COURT:  All right.

BY MR. PARCELL:

**JA931**

Anne D Jones (Direct)

Q    There is contained in that 20-A through 20-K. Starting with 20-A, would you please relate to the ladies and gentlemen of the jury whether or not you were able to determine the firing weapon for each one of those bullets?

A    Yes, sir.  Item Number 20-A is a piece of lead core which was found to be not suitable for identification with any firearm.  Item Number 20-B is also a piece of the lead core consistent with 9mm, but is also not suitable for identification with any firearm.  Item 20-C is a semi-jacketed hollow-point bullet which has rifling class characteristics similar to those on the Commonwealth Exhibit 104, the Glock pistol.  However, it was my opinion that there were insufficient markings to identify or eliminate this bullet as having been fired from that pistol.

Item Number 20-D was a caliber 9mm luger jacketed hollow-point bullet which was identified as having been fired in the Commonwealth Exhibit 106, the AA Arms pistol.  Number 20-E is a caliber 9mm luger jacketed -- bullet jacket and core from a 9mm jacketed hollow-point bullet which had general rifling characteristics produced by Commonwealth Exhibit 104, the Glock.  However, there were insufficient markings to identify or eliminate this bullet as having been fired from that pistol.

Item Number 20-F is a caliber 9mm luger jacketed hollow-point bullet which was identified as having been fired from the Exhibit 106, AA Arms pistol.

Item Number 20-G is a bullet jacket and lead core with lead fragments which had general  --  the bullet jacket had general rifling class characteristics like those produced by Government Exhibit 104, the Glock pistol.  However, it was my opinion that there were insufficient microscopic markings to identify or eliminate this bullet as having been fired from that pistol.

Number 20-H is bullet jacket fragments that were identified as having been fired from the Government Exhibit Number 106, the AA Arms pistol.

Number 20-I is a caliber 9mm luger bullet jacket which was identified as having been fired from the Government Exhibit 104, the Glock pistol.  Number 20-J is a 9mm luger jacketed hollow-point bullet which was identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 20-K consisted of copper bullet jackets and a portion which appeared to be a portion of a brass key which was considered unsuitable for identification with any firearm.

MR. PARCELL:  I would ask they be retrieved and put back in the bag labeled Government Exhibit

**JA932**

23.

BY MR. PARCELL:

Q    Ma'am, based on your testing, did there come a point in time you prepared a laboratory analysis of the things which you just testified about?

A    Yes, sir, I did.

Q    I will show you what's been labeled Government Exhibit 21 for your identification.

(Document proffered to witness.)

A    Yes, sir, this is the report I prepared.

Q    And that report states the same thing you have just told the ladies and gentlemen of the jury; is that correct?

A    Yes, sir, that's correct.

MR. PARCELL:  That will be Government Exhibit 21.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    Now, Ms. Jones, just for the jury's clarification, when you make your examinations, what things do you use to pick up these characteristic marks?  After you test-fire a weapon into the water tank, get the projectile out, you have your casing. What things do you use to enhance your abilities to pick up the microscopic markings?

A    A comparison is made under a microscope called a comparison microscope.  It is two compound microscopes joined at the top by an optical bridge --

MR. BAUGH:  In light of the fact that we are still stipulating, I don't believe that would be necessary.  We object to its relevance at this time.

THE COURT:  Overruled.  She can explain how she does it.

BY MR. PARCELL:

Q    Proceed.

A    As I was saying, it is two compound microscopes joined, combined, by an optical bridge at the top so you can put a test-fired bullet or cartridge case under one microscope and the questioned bullet or cartridge case under the other microscope and do a direct comparison, one to the other.  All the microscopic markings around one bullet are compared with the questioned bullet.  When you get to the point you have got a comparison all the way around the bullet, that will correlate one bullet as to the other bullet.

Q    That's how you conducted your testing?

A    That's correct.

MR. PARCELL:  I have no further questions. Just to publish the stipulation, in regard to Government Exhibit 22, the stipulation is they were

**JA933**

taken by Detective Searles, taken to Ms. Jones for analysis.  She made a report, which is Government Exhibit 21.  Also, Government Exhibit 23, the bullets that came from the Medical Examiner's Office which were gotten from Peyton Maurice Johnson, they went to Detective Searles who submitted them to Ms. Jones for examination.  That's the stipulation.

THE COURT:  All right.

(At Bench.)

MR. VICK:  I just note that we have got a juror who has been asleep for the last few minutes, the older fellow in the front row.  I think we might need a break.  Front row, he has been asleep.

MR. BAUGH:  It seems kind of warmer in here.

THE COURT:  I'll take a break.  Sometimes they are just thinking.

MR. VICK:  His head has been nodding.

MR. GEARY:  Your predecessor used to have exercise sessions, have everyone stand up once in awhile.

(In Open Court.)

THE COURT:  All right, we are going to just take a brief break now and you all can get some coffee or have a Coke or something, and we will be back in in about ten minutes.  Everyone remain seated while the jury leaves the courtroom.

(Recess taken from 2:25 p.m. to 2:37 p.m.)

THE COURT:  All right.  Bring in the jury.

MR. PARCELL:  I would introduce Government Exhibit 89, which has already been testified to by Ms. Jones.

THE COURT:  It will be admitted.

(The jury entered the courtroom.)

THE COURT:  Any questions, Mr. Geary?

MR. GEARY:  No questions.

MR. McGARVEY: No questions.

THE COURT:  Any questions, Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Ms. Jones, the Intratec and the AA Arms, those are not fully automatic, are they?

A    No, sir.

Q    They are not like machine guns?

A    No, sir.

Q    Also, the Intratec, one of the larger guns, you found no bullets or brasses connected to that gun at all, did you, the Intratec 9mm?

A    That's correct.

MR. BAUGH:  Thank you.  No further questions.

THE COURT:  Mr. Wagner?

**JA934**

Anne D Jones (Redirect)

MR. WAGNER:  No questions.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please describe to the jury how these guns work as far as the full clip and the firing procedure?

MR. BAUGH:  Objection.  I think that's outside.

THE COURT:  Overruled.  Just in general terms, tell us how the weapons operate.

THE WITNESS:  May I have one of the guns, please?

(Exhibit proffered to witness.)

I'll explain Exhibit 104.  This is the Glock semi-automatic pistol.  How you would operate this weapon, this is the magazine.  Cartridges would be placed in the magazine.  This particular magazine will hold 17 cartridges when fully loaded.  With one in the chamber for this gun, there would be 18 capacity for this gun when fully loaded.  One would put the cartridges in the magazine, place the magazine in the butt of the weapon, pull the slide to the rearmost position.  This particular gun has got a function that when the magazine is placed in the weapon and there is no cartridges in it, the slide will come back and stay back.  And you know that the weapon is empty.

So to demonstrate this, I'm going to take the magazine back out just so you know what I am doing.  You would put the magazine in the butt, pull the slide to the rearmost position, and allow it to go forward.  The top cartridge in the magazine has just been placed in the chamber of this weapon.  From that point in time, all one would have to do would be to pull the trigger on the firearm.  The slide would automatically come back, extract and eject the empty cartridge case, go forward again, load the next cartridge from the magazine.  You pull the trigger again, and that sequence would continue as fast as you could pull the trigger until there was no more ammunition in the magazine.

BY MR. PARCELL:

Q    Is that the same function with the other two weapons?

A    That's correct, with the exception of the fact that in the AA Arms pistol, the magazine contains 22 cartridges and one in the chamber makes a total capacity of 23.  And the Intratec pistol has a total capacity of 36, 35 in the magazine and one in the chamber.

MR. PARCELL:  No further questions.  Thank

**JA935**

you.

THE COURT:  All right.  Thank you, ma'am. You may stand down.  Call your next witness.

(Witness stood aside.)

MR. VICK:  The government would call Dennis Moody.

DENNIS KEITH MOODY, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    During your testimony I will ask you to speak up and speak toward that microphone.  Don't get too close to it.  State your name for the Court, record and jury.

A    Dennis Keith Moody.

Q    And Mr. Moody, how old are you?

A    32.

Q    Mr. Moody, you have a prior criminal record; is that correct?

A    Yes.

Q    What is your prior criminal record?

A    Possession of firearms.

Q    And you have just been released recently from the Richmond City Jail; is that correct?

A    Yes.

Q    You and I have had occasion along with detectives from the Richmond Bureau of Police to talk on several occasions concerning your testimony here today; is that correct?

A    Yes.

Q    Indeed, you and I have had occasion on today to speak concerning your testimony; is that correct?

A    Yes.

Q    What if anything are you receiving from the federal government in return for your testimony?

A    Excuse me?

Q    What if anything are you receiving from the federal government in return for your testimony?

A    Witness Protection Program or something.

Q    When did that conversation come up?

A    Well, three times.

Q    When?

A    The first time I was incarcerated in the City Jail.

Q    And who brought that subject up?

A    You.

Q    All right.  And when is the last time that conversation took place?

A    Today.

Q    Who brought the conversation up today?

**JA936**

A    It was you again.
Q    All right.  What was your response to that conversation?
A    Yes.
Q    Why is that?
A    Because of for my own protection.

2031

Q    All right.  Is that the only benefit you have received?  Or have you even received that benefit yet?
A    I haven't received it yet.
Q    Do you understand that you will be sponsored for that program?
A    Yes.
Q    Do you know the defendant in this case, Mr. James Roane?
A    Yes.
Q    Do you see him seated in the courtroom?
A    No.
Q    Stand up, look around, take your time.
     (Witness stood and looked around courtroom.)
A    Yes.
          MR. BAUGH:  Stipulate.
          THE COURT:  All right.
BY MR. VICK:
Q    I direct your attention to January 29th, 1992.  Did you have occasion to be with some people when ultimately a murder took place?
A    Yes.
Q    I'm going to show you what has been previously marked Government Exhibit 24-1.  And I ask if you have had occasion to see that picture before.

2032

A    This is my first time seeing this picture.
Q    Can you identify that picture?
A    I don't even know who the victim is on this picture.
Q    Is that the scene of the murder that you were at on January 29th, 1992?
A    Yes.
          MR. VICK:  I would move Government Exhibit 24-1.
          THE COURT:  It will be admitted.
BY MR. VICK:
Q    I direct your attention to that evening.  Who were you with on that evening prior to that murder?
A    Sterling Hardy.
Q    And where were you?
A    We was up in Newtowne.
Q    Where in Newtowne?
A    I don't know the particular name of the street, but I think it was  --  we was on a couple different streets up there.
Q    What were you doing with Sterling Hardy?

**JA937**

A    We just came up to get with all our associates, I guess.

Q    Did you have occasion to go with Sterling Hardy to any particular location that night to do

something?

A    Yes.

Q    What was that?

A    We had got high off coke.

Q    Where was it that you got high off coke?

A    I don't know the particular place.

Q    Who was present with you when you got high on coke?

A    Me, Sterling Hardy, this other dude, I don't know who he is.  I don't see him in here.

Q    All right.  Do you know an individual by the name of Jerry Gaiters?

A    Yes.

Q    Was he present with you?

A    Yes.

Q    Did you know the individual who is depicted in that picture?  The murder victim?

A    I can't identify that man with that yellow lying over his face like that.  But to my knowledge, he was the victim.

Q    Were you with him earlier that evening?

A    Yes, sir.

Q    Where was it  --  were you with him smoking cocaine?

A    Yes.

Q    Did you see  --

        MR. COOLEY:  Judge, his answer was he couldn't identify him.

        MR. VICK:  He identified the scene, Your Honor, as being the scene.

        THE COURT:  He identified the scene, but then you go on and ask him, "You were with him?"

BY MR. VICK:

Q    The person who was murdered at that scene that evening, were you with him that evening?

A    Yes.

Q    Where was it that you were with him earlier that evening?

A    We was smoking coke.

Q    Who was there together indulging in coke?

A    Me, Sterling, and Gaiters.

Q    And that person?

A    Yes.

Q    Did you have occasion that evening to see James Roane, "J.R."?

A    I seen him talk to Sterling.

Q    When did you see him talk to Sterling?

A    That was in the evening.  Earlier that evening.

**JA938**

Q    All right.  And in relation to when you were in the building smoking cocaine, when was it that he spoke to Sterling?  Was it before that or after that?
A    He spoke to him before then.
Q    Did there come a time when you left that building?
A    On one occasion, we may have walked down the alley and came back up there.
Q    Did there come a time when you left that building with the murder victim?
A    Yes.
Q    All right.  And tell us about that.  What did you do?
A    We walked down the alley.  We was going to the store.
Q    Who was walking down the alley with you?
A    Me, Sterling, and Gaiters, and the guy who got killed.
Q    What occurred?
A    Well, James Roane pulled around in his car and the victim seen him; I was across the street with Sterling.
Q    How far from the victim were you at that point?
A    He was about maybe seven feet, eight feet away.
Q    What kind of car was it that you saw James Roane in?
A    It was a brown car.  It could have been a Regal.
Q    What occurred?
A    James Roane got out of the car and asked him a question, "What's up?"
Q    Asked who a question?
A    The victim that got killed.
Q    What question did he ask?
A    Just asked him what's up.
Q    What occurred next?
A    I went to turn and a gun went off.
Q    Whose gun went off?
A    To my knowledge, it was Roane's gun that went off.
Q    What happened when Roane's gun went off?
A    The victim fell.
Q    What happened after the victim fell?
A    James Roane ain't do nothing.  Another victim came up to him and shot him.
Q    Another victim?
A    I don't know who it was.  He had a hood on his face.
Q    After that, he came up and shot who?
A    This dude that was riding with James Roane came up to the dude and shot him.

**JA939**

2037

Q    And explain to the ladies and gentlemen of the jury, describe for the ladies and gentlemen of the jury exactly how that occurred.  After James Roane shot, the victim fell, what occurred next?

A    He was on the ground, I guess he was going to get up.  Next thing, another guy came and shot him a few more times.

Q    When you say "the next victim," who do you mean?

A    I couldn't identify him.  It was 10 o'clock at night.

Q    Where did he come from?

A    Out of Roane's car.

Q    What did he do to the murder victim?

A    He shot him.

Q    How many times did he shoot him?

A    Twice.

Q    Was there anyone else present there that evening?

A    Things was so much in confusion and it took place so fast, and by me being intoxicated off cocaine, you know, it just happened too suddenly.  It wasn't a victim I could identify.  One man got out of the car.

Q    When you say "victim" you mean the person who

2038

was firing the shots.

A    He got out of the car and shot the guy.  Yeah.

Q    In addition to James Roane.

A    Yes.  I don't know if Roane's gun hit him or not but I know James Roane fired at him.  I can't get on the stand and swear that James Roane pulled the fatal shot at him.

Q    What happened after that?

A    Another dude came around and proceeded to shoot the guy.

Q    Where did he shoot him?

A    Twice in the body and once in the head.

Q    Where was the victim lying at that point?

A    In the street.

Q    After the shooting took place, what occurred?

A    They got back in the car and James Roane told Sterling to drive this car.  I told Sterling, "Don't drive his car."

Q    Is that Sterling Hardy?

A    Yes.

Q    Did Sterling get in Roane's car?

A    Yes, he drove.  I waited around until he got back because Gaiters told me to go home.  I told Gaiters I was not going home until I seen Sterling again.

2039

Q    The second person who you saw shoot that murder

victim that night, where did he go?

A    He got back in Roane's car.

Q    Where did James Roane go?

A    He got back in his own car, the passenger's side.

Q    Where did that car go; did you see it leave?

A    Yes, I saw it leave.  I don't know where it went.  I just waited there until I seen Sterling again.

Q    After that evening, did you have occasion  -- when was the last time you have spoken to James Roane?

A    I have spoke to him about a week after that.

Q    When is the last time you spoke to him?

A    The last time I spoke to him?  Last time we talked, I was in jail.

Q    Did James Roane talk to you about this shooting?

A    James Roane just told me to come in and tell the truth.  He didn't talk to me; he didn't tell me what to say out of my mouth or anything.  He just said, "Tell the truth."  He said, "My gun locked.  My gun ain't go off."  But like I said, it happened so fast, I can't get up here and say his gun did go off.

Q    Do you think his gun went off?

A    Yes, I think his [gun|begun] went off.

Q    From your conversation in jail, did he admit being there that evening with a gun?

A    He didn't have to admit that.  I know he was there.

Q    Did he tell you who else was there with him when you spoke to him?

MR. BAUGH:  Objection.  I do not believe that could be in furtherance of 801(d)(2)(E).  I assume that someone else  --

THE COURT:  Overruled.

BY MR. VICK:

Q    Did he tell you who else was there that evening with him?

A    Vaguely, but I didn't know these people.  He told me that it wasn't the person who I thought it was.

Q    Did he tell you a name of a person who was there with him that evening, Mr. Moody?

A    Yes, he told me a person's name, but  --

Q    What was the name he told you?

MR. BAUGH:  May the witness be permitted to answer?

THE WITNESS:  I don't remember his name.

BY MR. VICK:

Q    Have you previously talked to myself and the detectives concerning your testimony?

**JA941**

A    Yes.

Q    You told us the name at that point, didn't you?

A    I said I thought it was "Whitey."

Q    All right.  In your conversation with Mr. Roane, did he tell you the name of the person who was present with him that night?

A    Yes.

Q    What did he state that name to be?

A    I don't remember his name.  It could have been Cory.  But he might have said somebody else.

MR. VICK:  I have no further questions.

MR. GEARY:  May Mr. Vick and I approach the bench?

(At Bench.)

MR. GEARY:  Judge, my client is not charged with this.  I'd like to have the government proffer.

MR. VICK:  I can clean that up.  The man is confused.  What he said  --  no, he told us that when he went down to jail and saw all these people he thought the second shooter was "Whitey."  But he has never said he could testify to that for a fact.  The only thing he has told us before today, and I'll clear that up  --

MR. GEARY:  I just want the jury to be told now that the government is not charging my client.

THE COURT:  Who is the guy who was killed in this?

MR. VICK:  This is Lewis Johnson.

THE COURT:  Is that Count Eleven, Twelve, and Thirteen?

MR. COOLEY:  Yes.

MR. McGARVEY:  Did he tell you today anything about Cory?

MR. VICK:  He just said James said on the telephone the other guy with him was Cory.

MR. COOLEY:  Not to voice an objection, but that statement by this man as to Cory is not in furtherance of the conspiracy.

MR. VICK:  It is an admission against interest.

THE COURT:  I don't have any problem with that.  I'm trying to clear up the other.  All right.

(In Open Court.)

Mr. Geary, do you have any questions?

MR. GEARY:  No, Your Honor.

MR. McGARVEY:  No, Your Honor.

MR. BAUGH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Good afternoon, Mr. Moody.

A    How are you doing?

Q    Fine.  You and I have talked before, haven't

**JA942**

we?

A    Yes.

Q    In fact, we spoke as recently as last night.

A    Yes.

Q    Now am I correct, sir, the first time that anyone approached you about this case, some police officers came to you while you were in the jail, right?

A    Yes.

Q    Am I correct that the first words out of their mouth were if you help them, they would do what for you?

A    They would give me security.

Q    At that time, had they asked you what you knew yet before they offered you anything?

A    It was like  --  all that was like in the same conversation.

Q    Sir, isn't it true that the first time they spoke to you before you told them anything, they said --

2044

        MR. VICK:  Your Honor, I don't have an objection to this, but perhaps we should approach again.

        THE COURT:  Come on up.

    (At Bench.)

        MR. VICK:  He is making himself a witness unless he was there.

        MR. BAUGH:  We have heard Mr. Vick say, "Didn't I talk to you a number of times?"  If the issue is one of witnesses, then I demand to have somebody appointed to help me like he has.  I have to do my own investigation.

        THE COURT:  Mr. Baugh, ask a question, get an answer, and move on.

    (In Open Court.)

BY MR. BAUGH:

Q    Isn't it true, sir, that you were told in that first conversation that if you help them, they would move you to where you wanted to go, would set you up, and would get you a job if necessary?

A    Yes.

Q    All right.  And they told you that the first day you talked to them.

A    Yes.

Q    All right.  And then based on that, you told the

2045

police some information, didn't you?

A    Yes.

Q    And included in that information that you gave the police, you told  --  was it Detective Fleming?

A    It was these two policemen right here.

Q    Which two?

A    This first gentleman and the gentleman beside

**JA943**

him.

Q    This gentleman right here, Mr. Vick?

A    Yes.

Q    And the gentleman with the blond hair?

A    Yes.

Q    And these two gentlemen came to you in the jail?

A    Yes.

Q    And during your first conversation, they offered you those things.

A    Yes.

Q    Now, at that time when they offered you those things, had you told them about shooting or seeing anybody shot or anything like that?  Had you gotten into the details yet?

A    Well, it was, like I say, it was like all in the same flow of the conversation.

Q    When they left there that day, were you under the impression that you were going to be moved somewhere, were going to get a job and get a new start in life?

A    Most definitely.

Q    All right.  And after they made these promises to you, did you give them more facts?

A    I gave them no more facts than I gave them the first time.

Q    Now, on that first occasion, did you tell them you had seen my client, James Roane, shoot somebody?  You told them you saw them shoot him, didn't you?

A    Yes, I said I saw them shooting, yes.

Q    You said you saw him get hit and fall when my client shot him.  You said that?

A    Who is that?

Q    James Roane.  You saw James Roane shoot that young man and have him fall.  You said you saw that, right?

A    Right.

Q    All right. And it isn't  --  strike that.
     Now, when you talked to James Roane in the jail, you asked James Roane what you should say, right?

A    No.

Q    Wait.  Didn't you ask him about you were going to testify and he told you to tell the truth?

A    Yes.  But James Roane made no suggestion to me of what to say about this case.

Q    Didn't he tell you to tell the truth?

A    Yes.

Q    You stood next to him, you are saying, and you told him you were going to testify, didn't you?

A    I told James Roane -- this is how I feel: I didn't want nothing to do with this case.  I made them understand that I didn't want anything to do

with this case.

Q    When was the last time Mr. Vick  --  when is the first time you spoke with Mr. Vick and Mr. Parcell and they offered you all this new lease in life stuff?

A    That was back in the early part of December, I believe.

Q    All right.  Now, did you later have a conversation with them, say within a week or ten days after that, when they said no, they changed their mind?

A    Excuse me.  There is one thing I want clear. I'm testifying on this thing on one person's strength, and that's Sterling Hardy, because that's my friend.  That's the only person I wanted to clear of the murder that night.  Sterling had nothing to do with this murder.  This is to clear that man.  This man didn't have anything to do with this.

Q    Isn't it true Sterling Hardy's family came to your house and visited with you and your mother  --

A    Sterling did not come to my house and visit with me and my mama.

Q    Sterling Hardy's family came to your house  --

MR. VICK:  Asked and answered.

THE COURT:  Overruled.

BY MR. BAUGH:

Q    Isn't it true -- in fact, you made this statement in the presence of your mother, didn't you?

A    I went to Sterling and I have talked to his mother.

Q    Were you contacted by Sterling Hardy's family?

A    No. I went to them.  They did not come to me.  I went to them.

Q    Sir, not more than two weeks ago, did you not just sit in your living room with your mother there and say that you were contacted by Hardy's family and asked to help him?

A    I went to them, man.  This thing is so confusing.

Q    The question I asked you, sir, is did you sit in your living room  --

MR. VICK:  He won't let him answer the question.

THE WITNESS:  I went to Sterling Hardy's family.

MR. BAUGH:  Excuse me, sir.  Yes, Your Honor?

THE COURT:  Overruled.  Go ahead.

BY MR. BAUGH:

Q    Isn't it true that you sat in your house with your mother, with a large deer up on the wall, the

deerhead, and didn't you sit there and say in the presence of your mother that Sterling Hardy's people had come to you and asked you to help?

A    I'm telling you again, no.  I went to them.

Q    If you told James Roane you were going to testify as you just told this jury, why are you afraid now?  Why are you asking these people to move you now?  You told him you were going to testify.

A    Who told you I asked these people to move me?  That's the proposition they brought to me.  I didn't tell you I agreed with them about anything.

Q    Who brought up witness protection, you or them?

A    Them.

Q    They offered it to you again?

A    Yes.

Q    But didn't you just say you were going to take it for your protection?

A    I said, "I probably will.  I'm thinking about it."  I didn't say I will do anything yet.  I haven't made up my mind about anything.  I made up my mind to come in here and clear Sterling.

Q    Are you contemplating your available options?

A    Man, I ain't got nothing to hide, man.

Q    Last night at 9 o'clock in the rain, didn't you and I have a chat; you had a sheet wrapped around your shoulders?

A    Ain't you the same man that came to my house and talked against this man?  Wasn't you the same man that said, "He is a sucker; he is going to get what's coming to him"?  Aren't you the same man that told me that?

Q    No, I'm not.  Aren't you the same lying little man who sat in Court and said  --

A    Don't try to have it go all one way.

    MR. BAUGH:  We want to subpoena his mother.

    MR. McGARVEY:  I think this is argumentative.

    MR. BAUGH:  This man is not responding to questions.

    THE WITNESS:  Man, this is the same man that came to me and told me what they going to get, this and that.

    THE COURT:  Mr. Moody?

    THE WITNESS:  You be that man's lawyer.

    THE COURT:  Just answer the question and quit arguing with Mr. Baugh.  Just ask questions.

BY MR. BAUGH:

Q    Mr. Moody --

A    Ask me a question.

Q    Are you the same man last night who sat down with your mother and said that you saw James Roane

**JA946**

shoot somebody?

A    I am the same man last night you came to my house and requested me was everything all right, and I told you yeah, and you left.  You did not have a conversation with me.

Q    Didn't you tell these people  --  did you ever tell these people you weren't going to show up for Court?

A    I didn't never tell those people that.  I told them  --  from the very beginning I told them I didn't want nothing to do with this case, period.

Q    In the last week, have you told this man right here that you were not going to show up in Court because you were concerned for your personal safety?

A    Know what, man?  I don't even want to talk to you no more, man.

Q    Bet you will.

        MR. BAUGH:  Your Honor, direct him to answer the question, please.

        THE COURT:  Answer the question.

        MR. BAUGH:  Thank you.

BY MR. BAUGH:

Q    Mr. Moody, did you tell this man in the last seven days you were not going to show up in Court?

A    I told  --  that man understood that from day one.

Q    The question I'm asking you is did you tell this man in the last seven days you were not going to show up in Court?

A    No, I did not tell that man I wasn't going to show up in court.

Q    You did not tell him?

A    I did not tell him I wasn't going to show up in Court.

Q    Was your mother present during all our conversations?

A    Was my mother present during all our conversations?  Yes.

Q    All right.  You indicated at one time, did you say that you wanted to help Mr. Roane?

A    Did I make that statement one time?  I don't recall myself making no statement to you like that.

Q    You didn't say that you wanted to do whatever was necessary to help him?

A    I don't recall myself making those statements with you like that.

Q    Did you make the statement  --  who did you make the statement to?

A    I don't recall talking to you about that at all.

Q    Who did you make the statement to?

A    I made a conversation; you wasn't there, right?

**JA947**

I don't recall making it to you.

Q   Who did you make it to?  Are you having trouble with the words?

A   I didn't make it with nobody.

Q   You never made the statement?

A   No.

MR. VICK:  Asked and answered.

BY MR. BAUGH:

Q   What did they offer you today?

A   What did they offer me today?

2054

MR. VICK:  Asked and answered.  The Witness Protection Program.  Asked and answered.

THE COURT:  Sustained.

BY MR. BAUGH:

Q   When they said "Witness Protection Program," what do you understand that to mean they are going to give you, money?

A   No.

Q   Did they say they would move you to another place?

A   I don't know what's going on with this Witness Protection Program.  I don't even have details about this thing yet.  But understand, you are asking me questions I can't answer.  I can't answer these questions.  I don't know what's up with this, man.

Q   Didn't at one time you just testify the first time, "They told me --"

A   They told me what they would offer to me.

Q   Was that the Witness Protection Program the first time?

A   From my knowledge, yes, it was.

Q   And as part of that, did they tell you they would move you?

A   I been moved nowhere yet.

Q   Did they tell you they would move you?

2055

A   Yes.

Q   Did they tell you they would pay you?

A   They didn't tell me they would pay me nothing.

Q   Did they say they would put you up and pay the rent and things?

A   They said they would secure me.

Q   Did they say they would pay your rent and bills?

A   They said they would secure me.

Q   Find a new job?

A   Yes, they said that.

Q   You haven't had a job in years, have you?

A   I've been working all my life, sir.

Q   When did you get out of jail last?

A   I only had 60 days in jail.  I went back to work.  It was a simple -- let me say this correctly. It was a petty larceny charge.

**JA948**

Q    One last time:  It is your testimony that James Roane jumped out of that car, fired a shot from one gun, and the man fell.  Right?
A    Right.
Q    And it is your testimony that someone else then got out of that car and fired some more bullets, right?
A    True.

2056

Q    And in fact when you and I talked, you gave up a name on that occasion, didn't you?
A    True.
Q    And these people came to you and said, "That's the wrong person."
A    No.
Q    Okay.  Two guns out there that night, two people shot, right?
A    True.
Q    Did anyone tell you, including these people, that all the bullets out there came from one gun? Did these people tell you that?
A    As a matter of fact, they did tell me that.
Q    Did they tell you that since this trial started?
A    Yes.
Q    Did they tell you that the lab report  --
A    From the ballistics.
Q    They told you about the ballistics report?
A    No, he said the guns; that this man was shot with one gun.
Q    When did they tell you that?
A    He told me this down in jail.
Q    When?
A    This happened about in December.

2057

Q    They told you about one gun and you told them they were wrong?
A    Yes.
Q    And it is still your testimony  --
A    If they tell me it was one gun, then Roane's gun couldn't have shot him.  It couldn't have been James Roane's gun.  Because the guy who shot him did it more than once.
Q    Did they tell you all the bullet brasses came back from one gun?
A    Yes.
Q    All right.  After you told them that, am I correct they indicated at that time, "Never mind, we are not going to offer you the move and all that sort of stuff"?
A    No, they didn't say that.
Q    How long after you told them that did they come back, did you find out you were not going to get these benefits?

**JA949**

A   They never told me I wasn't going to get these benefits.

Q   Didn't the police  --  who came and talked to you about a week later?

A   The same investigator.

Q   The same investigator?  Which investigator?

2058

A   The ones behind you.

Q   These two gentlemen right here you are calling investigators?

A   I don't know what they are.

Q   So you told them one time that story.  Did they come back another time and at that time they told you they decided not to move you?

A   No, they told me that they couldn't do what they say  --  all the things they said they could do.

Q   All right.  They came to see you and offered you a whole bunch of stuff; you told them that there were two guns and two people firing; and then they came back and said, "We can't do that stuff for you." Right?

A   Not everything.  They said they could still move me or something like that.  Stuff like that.

Q   But the other stuff they offered you they weren't going to do.

A   Being so much conversation hung up in this, man, this is just confusing, man.  The whole thing has been confusing, man.  If you all think a man can't get up on that stand  --

MR. BAUGH:  I don't care.

THE WITNESS:  He can be confused.

MR. BAUGH:  No further questions.

2059

THE WITNESS:  I'm tired of this.

THE COURT:  Mr. Moody, there are no questions before you.  Mr. Vick, do you have questions of this witness?

REDIRECT EXAMINATION

BY MR. VICK:

Q   You were told if you were sponsored  --

MR. HENDERSON:  Leading.

THE COURT:  Sustained.

BY MR. VICK:

Q   Have you been told what the Witness Protection Program consisted of?

A   Have I been told what it consisted of?  Briefly, yes.  That's just protection.

Q   And that's all that anyone from the government has ever promised you in terms of your testimony; is that correct?

A   Yes.

MR. HENDERSON:  Objection to leading.

THE COURT:  Overruled.

MR. GEARY:  May I on one minor point?

THE COURT: No, sir. All right. The witness may stand down.

Call your next witness.

(Witness stood aside.)

MR. PARCELL: Dr. Marcella Fierro.

We have a stipulation. We have agreed that Lieutenant Rodriguez would cover the weapons from West Moore Street, the ones that Ms. Jones tested. No prints were lifted off those weapons for comparison. That will be Government Exhibit 88.

THE COURT: Admitted. Is there any reason to hold on to this guy? He has just been held on a bench warrant.

MR. BAUGH: I don't have a reason. I'll put it on the record. If he still wants the program, we will put him in.

MR. COOLEY: I'm sorry?

THE COURT: I wanted to know if anybody needed this witness any further.

## II. Dr. Marcella Fierro (Talley & Moody Murders) (2061)

DR. MARCELLA FIERRO, called as a witness by and on behalf of the @ having been first duly sworn by the Clerk, was examined and testified as follows:

MR. GEARY: Before the direct examination begins, I'd like to note the previous objections that we had on behalf of Mr. Tipton in regard to this witness.

MR. BAUGH: Same as Defendant Roane, Your Honor.

THE COURT: Your objections are noted. And before we get started, I did want to say this to the jury: Ladies and gentlemen, Counts Eleven, Twelve, and Thirteen of the indictment relating to the murder of one Louis Johnson, I just wanted to reiterate to you that Mr. Tipton is not charged in those counts. All right.

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Ma'am, would you please state your name?

A   Marcella F. Fierro. F-I-E-R-R-O.

Q   And your occupation?

A   I am Professor of Pathology at East Carolina University in Greenville, North Carolina. I was formerly Deputy Chief Medical Examiner for the Central District, Commonwealth of Virginia, until the end of September of 1992.

Q   How long were you chief Medical Examiner for the Commonwealth of Virginia?

A   I was Deputy Chief for 17-and-a-half years.

**JA951**

Q    Ma'am, what training and experience  --
          MR. GEARY:  We will stipulate the qualifications.
          MR. McGARVEY:  We stipulate.
          THE COURT:  All right.  Go ahead.

BY MR. PARCELL:

Q    In laymen's terms, would you please tell the ladies and gentlemen of the jury what degrees you have and to do what?

A    I'm a doctor, a physician.  My training consists of special training in the branch of medicine called pathology.  Pathology is the special branch that deals with the causes and nature of disease.  My subspecialty or my special area of interest within pathology is forensic pathology.  And forensic pathology is the branch of medicine wherein doctors study persons who die sudden, unexpected, or violent death in order to figure out the cause of death, the disease, or injury that caused their death; to collect medical evidence such as bullets, hairs, or fibers; to reconstruct how the person received his injury:  was it from the front, from the back, were they up or were they down.

Q    In the course of you being Chief Deputy Medical Examiner, how many autopsies have you either performed or observed during your career?

A    Several thousand.

Q    In the month of January and February of 1992, were you employed as a Deputy Chief Medical Examiner?

A    I was.

Q    And did you have a particular title in regards to the records of that office?

A    I was custodian of the records while I was Deputy Chief for the records of the Central District.

Q    That was all the records?

A    The records for the Central District.

Q    Ma'am, did there come a point in time when you have had occasion to review an autopsy performed on an individual by the name of Douglas A. Talley?

A    Yes.  I have reviewed it.

Q    Ma'am, were you present when that autopsy was performed?

A    There is no record that I was.  I may have been, but I don't have a record that I was.

Q    Ma'am, how did you review that report in preparation for your testimony today?

A    I reviewed the record by going through the paper record and reviewing the photographs and other ancillary documents.

Q    Ma'am, was there a final autopsy report prepared

**JA952**

Dr. Marcella Fierro (Direct)

for Mr. Talley based on the examination of Dr. Weicking?

A    There was.

2064

Q    Can you tell the ladies and gentlemen of the jury why Dr. Weicking is not here today?

A    Dr. Weicking had a stroke in September, a few days after I left the office, and he is not able to communicate well enough to bring his records to Court.

Q    I will show you what's been labeled Government Exhibit 3.

(Exhibit proffered to counsel and witness.)

I'll ask you to look at that document and identify it if you can, ma'am.

A    This is a copy of the final autopsy report prepared by Dr. Weicking which I have certified as a true copy.

Q    Ma'am, on page four of that document --

MR. PARCELL:  That will be introduced as Government Exhibit 3, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    After reviewing that record and the photographs involved with that autopsy, can you tell the ladies and gentlemen of the jury what the cause of death of Mr. Talley was?

A    The cause of death was multiple stab wounds to the head and neck.

2065

Q    Can you tell us how many such stab wounds he received?

A    Yes.  This gentleman had 84 stab wounds.  Of these, 47 were to the right scalp and neck.  Of those wounds to the right scalp and neck, 12 actually penetrated to the bone of the skull.  Six penetrated through the bone of the skull, and two entered into the brain.  There were 14 stab wounds to the face and forehead, essentially the front of the face and forehead.  There were 11 stab wounds to the anterior neck and upper chest, nine stab wounds to the right upper back, and three to the right wrist and hand.  Of the stab wounds, the stab wound to the mid- and right base of the neck perforated, cutting muscles of the right neck, the right carotid artery, a major vessel with the diameter of my finger, and the anterior jugular vein which lies next to the carotid.  This resulted in massive bleeding both into the posterior pharynx and exteriorly out of the body.  He also had blunt force injury.  He had swelling and hemorrhage around his left eye.

Q    Could you determine whether or not the injury to his left eye was an old or fresh injury?

A    It was an acute injury, meaning that it had

**JA953**

occurred close to the time of death.  But it was

probably older than the actual stab wounds because there was considerable hemorrhage and swelling, and once he received these stab wounds he didn't live very long.

Q    On page two of your report it is indicated a bloodless vascular system.  What does that mean?

A    That means that he bled to death, that the blood that ordinarily circulates in the closed system of the blood vessels came out the cut wound or the stab wound in his neck.

Q    You keep pointing to the right side of your neck.  Were the majority of his injuries received from the right side of his body?

A    Yes.

Q    Would that indicate to you that his attacker was to his right, to his left, behind, or in front of him?

A    It either means that someone is behind him stabbing this way, or in front of him stabbing this way. (Witness indicating.)

Q    And did you have occasion to review the autopsy photographs in preparation for your testimony today?

A    I did.

        MR. PARCELL:  I would ask she be allowed to approach the jury with Government 4-1, 2, 3, 4  --

        MR. BAUGH:  We object to these photographs.

        THE COURT:  Objection is overruled.

        MR. GEARY:  The second objection is what they are going to do is have her testify again.  She has already testified.  This is an attempt to further inflame the jury by testifying again to what she has just testified to.

        THE COURT:  Overruled.

        MR. PARCELL:  May we use the easel?

        THE COURT:  Sure.

BY MR. PARCELL:

Q    Ma'am, you have had occasion to review the entire set of autopsy photographs that you looked at in preparation for your testimony at trial, correct?

A    Yes.

Q    These are the Government Exhibits 4-1, 2, 3, and 4.  Would you please explain what they are?

A    These are photographs taken at the time of the post mortem examination or autopsy to document, first of all, who the decedent is so that's not a question, and to document the presence or absence of injuries. In addition, the photographs are taken to show the kind of injury and the distribution of injuries.

Q    Ma'am, the number up there that says CME 13-92,

what's that number?

A   That's an accession number for his case record so we have a way to file it and a way to find it.

Q   With regard to 4-1, is that a photograph of the victim as he came to the morgue?

A   It is.

Q   4-2 is what?

A   This is a photograph of the right side of his shoulder, the right side of his face, and the right lateral neck to show the distribution of stab wounds over those areas.

Q   4-3?

A   4-3 is a photograph showing first of all who he is, because it shows his face.  And secondly, showing the location -- first of all, showing not only the location of where his stab wounds are, but also that they are stab wounds as opposed to cuts, as opposed to gunshot wounds, or other kinds of injury.  It also shows the lethal stab wound right here.

Q   4-4?

A   4-4 is a photograph of the body from behind, above and to the right to show, now that the hair has been shaved, to show the distribution of stab wounds to the scalp and the right neck, the back of the right neck, and the right shoulder.

MR. PARCELL:  You may return to your seat, ma'am.

MR. PARCELL:  We move that 4-1, 2, 3, 4. I'll ask it to remain here.

BY MR. PARCELL:

Q   Doctor, based on your review of that autopsy report and your examination, were you able to determine what type of instrument was used in this killing?

A   A sharp blade was used.

Q   Was there any indication of its width or depth?

A   Yes, this was a sharp blade.  One edge was blunt, which means that when you look at the stab wounds, one end is sharper than the other.  And what that tells us is that this is a single-edged blade. When looking at the wounds in their totality and looking for the most frequent measurement, what it tells you is that the most frequent size of the stab wound is three-quarters of an inch, which in all probability indicates that the blade is close to three-quarters of an inch or is three-quarters of an inch in its width.

Q   You indicated that this victim had two stab wounds to his skull which actually penetrated the brain.

A   That's correct.

Q   Can you give us an idea of how much force was

used to insert that weapon and remove it once it entered the brain?

A   These entered through the vault of the skull, the thick part.  So this would take moderate to severe force to penetrate the skull.

Q   Would it take  --  what are the chances of that instrument being stuck inside that cavity on injury?

A   Sometimes blades get stuck in the skull.

Q   How much force would be used to remove it?

A   Moderate to severe force.

MR. PARCELL:  No further questions in regard to this murder.  We will go to the Moody one next, Judge.  But we can have cross-examination for these folks now.

THE COURT:  No.  I think it might be better if we just went through the whole thing.

BY MR. PARCELL:

Q   Did you have occasion to perform the autopsy on an individual by the name of Kareem Abdul Hakim, also known as Douglas Moody?

A   I did.

Q   During the course of your examination of that body, did you make certain findings and put them in

2071

the form of an autopsy report?

A   I did.

Q   Also, did you take photographs of this victim as you proceeded with your examination?

A   I did.

Q   Have you reviewed those photographs in preparation for your testimony today?

A   I have.

Q   Did you select certain photographs to assist you in your testimony for that autopsy?

A   I did.

THE COURT:  Mr. Parcell, let her describe her findings utilizing the photographs.

MR. PARCELL:  I was waiting for counsel to review the exhibits before I begin my questioning.

BY MR. PARCELL:

Q   Government Exhibit 11, is that document familiar to you?

A   This is a copy of the final autopsy report which I prepared on Mr. Hakim and which I have certified as a true copy of the original report.

MR. PARCELL:  That will be Government Exhibit 11.

THE COURT:  It will be admitted.

BY MR. PARCELL:

2072

Q   I'll ask you to approach  --

MR. McGARVEY:  I would have an objection prior, and I request the Court's permission to approach the bench, or at the Court's convenience.

**JA956**

(At Bench.)

MR. McGARVEY: Judge, the only problem I have with the report, I think this should be redacted. It is hearsay. It is a rendition of what -- that it is possibly related to other murders. That's the only problem I have.

MR. PARCELL: I have no objection.

MR. McGARVEY: Anything that is hearsay.

THE COURT: All right.

MR. McGARVEY: That would apply to the first autopsy report as well.

THE COURT: They are willing to remove it. There is no problem.

MR. PARCELL: I'll remove it and restamp this Government Exhibit 11.

(Witness approached easel.)

BY MR. PARCELL:

Q    What do those photographs mean to you?

A    These were taken for the same reason that the other gentleman's were. Namely, to show who he is, to document the kinds of injuries that he had and didn't have, and to show the distribution of those injuries. In the totality, if you look at all these photographs at once, this gentleman has three types of injury. He has stab injury, he has gunshot injury, and he has blunt force injury. What that means is he got beat on with something hard. The first photograph of the right side of his right upper shoulder and face shows abrasion, which is blunt force injury to the right side of his head.

Now, if we look here at the second photograph, which shows the top of his head and his forehead, we can see that he has abrasion and a cut here around the left eye. And if we look at the left arm on this surface, on the lateral surface, there is a patterned abrasion which is indicative of an impact by a weapon, some edges of which would make these tracks. So whatever it was had edges on it.

So we have blunt force injury to the right face, to the left brow, to the left forehead, the left cheek, and the left arm. Here is the left arm in detail that shows that pattern. And the left eye, showing more detail of that abrasion there to his cheek and of his lid. So that's one kind of injury.

The second kind of injuries are stab wounds. Of the stab wounds, he had stabs and cuts that totaled in total number 18. These were caused by a blade that was single edged in that the stab wounds, these wounds, if you will look at them, show one blunt edge and one sharp edge, telling us that this is a single-edged blade. The most frequent measurement of these wounds along their surface was five-eighths to

**JA957**

three-quarters inches, so the blade is in that range.  Of these injuries that are stab wounds, one, two, three, four, five, six that we can see well here, of those, this one and one other perforated through the chest wall into the left lung causing hemorrhage to the left chest space.  There were other cuts.  There were cuts to the left forehead, the anterior neck, and the left lateral chest.  Then he himself had cuts to the hand, which would be characterized as defensive-type cuts.

The third kind of injury, we said he had blunt force injury, he has stab injury, and he has gunshot injury.  The gunshot injury is to his right upper back.  Here is one gunshot entrance hole at the upper part of his right back shoulder and a second gunshot injury just below the right shoulder blade.  The bullets that entered these gunshot entrance holes penetrated the right lung, and they caused extensive hemorrhage into the left chest space.

Q    Ma'am, based on your examination, were you able to determine what the cause of death was, whether it was the stab wounds or the gunshot wounds?

A    The stab wounds and the gunshots are, to me, equally lethal.  Either one of these injuries was sufficient to account for his death and both of them caused lethal hemorrhage into the chest space.

Q    As you continued your examination of him, did you have occasion to remove those bullets from his body?

A    I did.

Q    They were submitted to Ms. Anne Jones for ballistics testing?

A    Yes.

MR. PARCELL:  I would ask that she be allowed to resume the stand.  And I'll need Government Exhibit 16.  I move the introduction of Government Exhibit 12-1, 2, 3, 4, and 5.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    Dr. Fierro, in regard to your job as a Medical Examiner, as Mr. Cooley affectionately calls you, you are not "Quincy" on TV; you are the person that makes scientific findings or makes the cause of death report.  In other words, you don't actually solve the homicide or the cause of death by force, you just report your scientific findings; is that correct?

A    The taxpayers paid me to figure out what killed people, not who did it.

Q    I ask you to examine that item and identify it if you can.

A    This bullet is the bullet that I recovered in the right front chest of Mr. Hakim.  At the time of

recovery, I took that bullet, made out a card for identification. I put it in this envelope and I sealed it. Then I receipted it to the investigating officer.

MR. PARCELL: That's already been received as Government Exhibit 16.

BY MR. PARCELL:

Q In regard to Mr. Moody's height and weight, can you tell the ladies and gentlemen of the jury how tall he was and how much he weighed at the time of death?

A At the time of autopsy he was five-foot-six-inches tall and 160 pounds.

MR. PARCELL: No further questions, Judge. Pass the witness.

THE COURT: All right. Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q Dr. Fierro, on the Talley autopsy, that was performed, the autopsy itself, was performed by Dr. Wiecking on January 6th; is that correct?

A That's correct.

Q When did you begin your review of the paperwork in that case?

A I reviewed it as I passed through the office on its way to becoming a final copy because I reviewed all records in their processing procedure. Then I reviewed it when I was notified the cases would be coming to Court.

Q Do you recall approximately when that was, when you were notified?

A No.

Q Did you do a further examination of the paperwork once you were notified you were going to be testifying?

A Yes, I reviewed it several times.

Q You didn't actually see the autopsy for Douglas Talley; is that correct?

A There is no record that I did. And I don't remember.

Q I don't know if it is your first page, Dr. Fierro, but there is a pathological diagnosis that I have as page one; is that correct?

A Yes.

Q And midway down, two-thirds of the way down, it has a post-mortem toxicology of the blood.

A Yes.

Q Could you pronounce that substance that appears next to the word blood?

A Benzoylecgonine.

Q And is it .08 milligrams?

A That's right.

Dr. Marcella Fierro (Cross)

Q     Could you tell the jury what that substance is?
A     Benzoylecgonine is a metabolite or a metabolic by-product of cocaine.
Q     Now, in regard to the Moody autopsy, you performed that one yourself; is that correct?
A     I did.
Q     And you had as Page 1 of 1 a certificate of analysis which also deals with a toxicology study?
A     Yes, I do.
Q     You indicated that the blood results showed the presence of cocaine; is that correct?
A     Yes.
Q     How do you read that?
A     0.4 milligrams.
Q     Would you pronounce the next item below that?

2079
A     Cocaethylene.
Q     What is that system?
A     Cocaethylene is a metabolite of cocaine that is formed when cocaine and alcohol or ethanol are in the bloodstream at the same time.
Q     And the next one is the  --
A     Benzoylecgonine.
Q     That was present in the Talley autopsy also?
A     That's correct.
Q     Was there any alcohol in that autopsy?
A     Yes.  0.05 percent.
Q     Let me ask you one further question with regard to the Talley autopsy.  Was there any stab wound chart done in that autopsy as far as you know?  I know you did it for Moody.
A     On Talley?
Q     Yes, ma'am.
A     No stab wound chart was prepared on that case.
          MR. GEARY:  No further questions, Your Honor.
          THE COURT:  All right.  Mr. McGarvey?
               CROSS-EXAMINATION
BY MR. McGARVEY:
Q     Good afternoon, Dr. Fierro.
A     Good afternoon.

2080
Q     Ma'am, I don't mean to damn you with faint praise, but I, too, am as impressed and that's why we stipulated your credentials.  All of us know you here, and all of us respect you.  And pardon my ignorance, but I have to ask this question.  You indicated that it was a knife wound, or one of three types of wounds was a knife wound with respect to  --  excuse me, the Talley homicide was a knife wound, correct?
A     Yes.
Q     Okay.  And with respect to the knife wounds, is there any way -- you said it was a single-edged

instrument?

A    Yes.

Q    It must have been single edged based on what you looked at in terms of the records, right?

A    The wound characteristics are those of a single-edged blade.

Q    I don't mean to sound ignorant, again, but the single-edged -- if the other side of the knife was serrated, is there any way to tell that?  Is there any way from the wounds themselves?  You had enough to choose from here.  Is there any way to tell whether or not the other side of the knife was serrated, a jig-jag pattern?

A    Are you asking me if this is a double-edged blade of which one side is serrated, or a single-edged blade and the single edge is serrated?

Q    I can simplify it.  Have you ever seen an Army knife like a survival knife, and on one side of it it is sharp, and on the other side of it it is flat-edged up to about an inch from the hilt, and then it starts to be serrated?  It is still flat, but it is serrated.  Do you understand?

A    Yes.

Q    Like a saw blade.  Is there any way that you can tell whether or not that's  --

A    Ordinarily, serrated edges are not as sharp as those that are just plain sharp.  But I can take another look.

Q    Again, I'm not sure you understood my question.  It is not  --  the serrations are not sharp.  They are about a 32nd or an inch long.  It is for sawing.

A    And they cause a ragged edge.  Characteristically, those types of wounds caused by a serrated edge cause a less sharp  --  at best, a less sharp edge, and at worst, a shaggy edge.  So if I don't see that, I can't say that it was consistent with serrated.

Q    I understand.  In your review of Dr. Wiecking's medical records, did you note anything to suggest that it was a serrated  --  that there were serrations on the other side of the sharp edge?

A    From my review of the photographs and the re-review, I don't see anything that tells me that.

Q    Thank you.  Now, you indicated to the ladies and gentlemen of the jury, and again we stipulated your expertise -- everybody involved here knows you -- you indicated that with respect to any record you were not present at the autopsy, correct?

A    Right.

Q    Okay.  And as a professional, as a doctor, as someone well-respected in the community, ma'am, is there anything wrong with you taking a look at an

Dr. Marcella Fierro (Cross)

autopsy report or any kind of a medical report prepared -- and I'm not talking about something outside your specialty, but something that you specialize in -- with you taking a look at that, you going over that, and then you rendering your opinions as they have been presented here today?

A    No.

Q    Do you consider them any less valid than if you had done the autopsy yourself?

A    Well, the person who performed the autopsy always has the edge because he saw the actual body.

Q    I understand that.  But do you consider your opinion to the jury that you have rendered here today, quite articulately, any less valid  --

MR. GEARY:  Can we approach the bench?

THE COURT:  Come on up.

(At Bench.)

MR. GEARY:  My client is getting caught in the crossfire.  He is on the Talley autopsy and his client is not charged with it.  He is telling the jury what a great witness she is.

MR. McGARVEY:  Why don't you wait just a minute.

THE COURT:  I don't have any problem.  If that's an objection, I'll overrule it.  But get on with it, Mr. McGarvey.

(In Open Court.)

BY MR. McGARVEY:

Q    Same question, Dr. Fierro.  Do you consider it any less valid?

A    I'm not sure I remember the question.

Q    You stand by what you told the jury based on Dr. Wiecking's autopsy?

A    Right.

Q    Correct?

A    Yes.

Q    Okay.  And in your community, your professional community, there is nothing wrong with that?

A    No.  As custodian of the record it was my duty to bring the records to Court and interpret that report.

Q    As a doctor.

A    Right.

Q    Thank you.

THE COURT:  Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Good afternoon.

A    Good afternoon.

Q    Did you see any indication in the report of a bruise or an abrasion to the right eye or right side of the face consistent with being struck by a fist?

**JA962**

A    Yes.
Q    I'm sorry, on the first one, Mr. Talley.
A    Right.  Mr. Talley had a bruise to his eye.
Q    Left eye or right eye?
A    Well, let's take a look here.  Left eye.
Q    Left eye.  Am I correct that there is no notation of any bruises or abrasions consistent with a blow to the right eye or the right side of the face?

2085

A    There is no notation.
Q    Additionally, is there any notation of bruises, scratches, or injuries consistent with being throttled while he was being attacked, being held by his throat?
A    There are no bruises or abrasions.  The problem with throttling is that you can have throttling occur without external injury.  In this gentleman, he has so much hemorrhage in his neck that you could have throttled him ten times and wouldn't be able to tell it.
Q    In fact, there are actual wounds in the neck.
A    That's correct.
Q    Lastly -- and because we understand of course that you are more than just a doctor -- the kind of weapon, you said the weapon was like three-fourths of an inch in width?
A    I said the most frequent blade size, wound size, was three-quarters of an inch.
Q    But the blade could not have been bigger than that then?
A    It could be if it were longer, if you had a great long blade and this much of it is three-quarters of an inch.  At that point it is three-quarters of an inch.

2086

Q    We are talking about the width of, for those of us who don't know, like an average steak knife?
A    Three-quarters is usually bigger than an average steak knife.
Q    Certainly not a butcher knife or something like that?
A    Only if it is three-quarters of an inch down at the tip.
Q    Was the depth of these wounds determined?
A    An estimate was made of depth, and it was three inches, two-and-three-quarters.  Three inches would be the average.
Q    Have you ever done an autopsy on a wound from a bayonet?
A    Yes.  It doesn't look like this.
Q    This is not like an Army blade, is it?
A    No.
        MR. BAUGH:  Thank you.  No further

**JA963**

questions.

REDIRECT EXAMINATION

BY MR. PARCELL:

Q    In regard to the Talley autopsy, the instrument appeared to be a single-bladed knife; is that correct?

A    That's correct.

Q    You don't know whether it had straight edges above the  --  Mr. McGarvey was asking you about could it have had a serrated top part of the knife.

A    It could have.  If that edge didn't go through, you won't see any reflection of it and the wound doesn't show any serration.

Q    Mr. Baugh asked about a bayonet.

A    I don't know squat about bayonets, but if it has that dimension it would be all right.  The bayonets I remember from the movies looked bigger.

Q    You don't know whether it was a butcher knife, Army knife, or kitchen knife, do you?

A    It should have a dimension of its width about three-quarters of an inch.

THE COURT:  All right.  Thank you, Doctor. You may stand down.

(Witness stood aside.)

(At Bench.)

All right.  Government, where are we?

MR. VICK:  I'll defer to the Court on this. We could do the Louis Johnson crime scene.  Our anticipation would have been better after some other witnesses that were there.  We need to do Stanley Smithers next, who is the witness that won't be here.

THE COURT:  Well, a crime scene isn't really a good place to stop.

(In Open Court.)

THE COURT:  We will stop here.

All right, ladies and gentlemen, I'm going to release you now to return on Monday morning at 10 o'clock.  And we will get started with additional government witnesses at that time.  In the interim, as I admonish you on every occasion that we leave one another, please do not discuss the case with anyone and do not review or observe any media items related to this particular case.  We will see you on Monday morning at 10 o'clock a.m.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. COOLEY:  Very briefly, there was an exhibit introduced yesterday that was  --  that purported to be and is in fact the report from Detective Fleming that was introduced as his notes recorded subsequent to his interview of another

**JA964**

Dr. Marcella Fierro (Redirect)

witness.  There are certain items in that that need to be redacted.  I think that's his entire page of his report.  It appears that one small paragraph on that page is related to that witness.  And I would ask if we could --

2089

THE COURT:  Take that up with the government.

MR. VICK:  We might even  --  yes, sir.  We will take care of it.

MR. BAUGH:  I have a copy right here if it will help.

THE COURT:  You all can deal with that. Mr. Marshal, remove the defendants, please.

(Defendants were removed from the courtroom.)

MR. VICK:  For the Court's edification, I know I had stated the other day that indeed there would be no more of these witness problems.  But in light of what occurred, I understand now that the next set of witnesses who were intended, who were going to be overlapped, are not going to be overlapped, either.  So we are doing the best we can and the Marshals are, too.  But it is for security.

THE COURT:  All right.  We will be in adjournment until 10 o'clock Monday morning.

(Proceedings adjourned at 3:55 p.m.)

**JA965**

JA966

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

```
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
                           RICHMOND DIVISION

         ----------------------------------------

         UNITED STATES OF AMERICA,


                                  Plaintiff;

              v.                                 CRIMINAL ACTION
                                                     92CR68
         RICHARD TIPTON, CORY JOHNSON,
         JAMES H. ROANE, JR., AND
         SANDRA REAVIS,
                                  Defendants.

         ----------------------------------------
                               VOLUME X

                           January 25, 1993
                           Richmond, Virginia
                              10:00 a.m.

         BEFORE:        HONORABLE JAMES R. SPENCER
                        United States District Judge


         APPEARANCES:   HOWARD C. VICK, JR., ESQ.
                        WILLIAM H. PARCELL, III, ESQ.
                        Office of the United States Attorney;
                            Counsel for Government;

                        ROBERT P. GEARY, ESQ.
                        ERIC D. WHITE, ESQ.
                            Counsel for Defendant Tipton;
                        CRAIG S. COOLEY, ESQ.
                        JOHN F. McGARVEY, ESQ.
                            Counsel for Defendant Johnson;
                        DAVID P. BAUGH, ESQ.
                        ARNOLD R. HENDERSON, V, ESQ.
                            Counsel for Defendant Roane;
                        ROBERT J. WAGNER, ESQ.
                            Counsel for Defendant Reavis.
                        JEFFREY B. KULL
                        OFFICIAL COURT REPORTER
```

                        P-R-O-C-E-E-D-I-N-G-S
              THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

**JA967**

Johnson, James H. Roane, Jr. and Sandra Reavis, the tenth day of trial.

MR. VICK:  Government is ready to proceed.

MR. GEARY:  Defendant Tipton is present. I'd like to take one matter up before we get started.

THE COURT:  All right.

MR. GEARY:  Judge, I'll give the copy to Mr. Vick and ask that the original go to the Clerk for the appellate file.  On Saturday morning on the front page of the Times Dispatch there was an article dealing with "Gunshot Hits Auto Carrying Detectives" and relating it to this case.  On behalf of Mr. Tipton, would we ask that the Court perhaps a little more extensively voir dire the jurors and see if they have read anything about this case, in particular if they read the Saturday morning paper.

THE COURT:  All right.

MR. WHITE:  We would join in that motion on behalf of defendant Johnson.

MR. BAUGH:  Defendant Roane as well.

MR. WAGNER:  Defendant Reavis, too.

THE COURT:  All right.  Anything else from anybody?  All right, let's bring in the jury.

(The jury entered the courtroom.)

Ladies and gentlemen, before we get started, as you know, when we leave here every day I admonish you not to review any media items, read any newspaper reports.  I just want to check this morning.  There apparently was an article relating to this case that appeared in the Times Dispatch on Saturday morning. Any member of the jury read this article?

(No response.)

Fine.  You are following my directions.  I appreciate it.

MR. GEARY:  Did someone raise your hand?

THE COURT:  Did somebody raise your hand?

A JUROR:  I saw the article.

THE COURT:  Step down and come up here.

(At Bench.)

THE COURT:  Actually, we will talk to you back here.

(This is Juror Edward Cooke. )

(In Chambers.)

BY THE COURT:

Q    All right, sir, did you read the article in total?

A    I read the article before I knew what it was about.

Q    Okay.

A    Not to the last did I realize that it was connected with this case whatsoever.

**JA968**

Q    All right.  Now, is there anything about this article that would prevent you from being fair to both sides in this case?

A    No, it didn't bother me at all.

THE COURT:  Anybody?

BY MR. GEARY:

Q    Are you speaking about the article on the first page?

A    On the front page.

Q    About the detectives being shot at?

A    But I had read that before I knew it was connected with the case.

THE COURT:  All right.  It was not intentional.

MR. WHITE:  Has he mentioned it with any other jurors?

THE JUROR:  No, I have not mentioned it.

MR. BAUGH:  Did you discuss it with anyone else, period?

THE JUROR  No.

THE COURT:  Thank you, Mr. Cooke.

MR. GEARY:  Thank you, Judge.

THE JUROR:  I'm sorry I read it.  It was the end before I knew what I was reading.

(Juror left Chambers.)

(This is Juror Jacquelyn D. Hayes.)

THE COURT:  Come on in.  We just need to ask you a few questions.  You saw this article Saturday morning?

A    Yes.  I read the article because the heading, you know, I went to the mailbox and just saw the heading and I started reading it.  Then once I saw it was about Newtowne, it was too late then.

Q    Okay.  Is there anything about that article that would prevent you from being fair to both sides in this case?

A    Well, it did kind of frighten me a little bit.

Q    Okay.

A    You know  --

Q    It scared you a little bit?

A    Yes, it did.

Q    Let's talk about that fear.  Is it such that you think you can't be fair now?  Are you afraid of the defendants?

A    Yes.  Because you know, just the fact that, you know, anybody can walk in and out of the courtroom and see us.

Q    Uh-huh.

A    You know, and I don't know, it is such a small city.

Q    You would rather not serve?

A    If I can get out of it, I would.

**JA969**

Q    All right. Anybody got any questions?

MR. BAUGH: How about whether or not she discussed it with any jurors?

THE COURT: Have you talked about this with anybody else, any of the other jurors? You haven't mentioned it or talked to them?

THE JUROR  No.

MR. BAUGH: I'll make the motion.

MR. VICK: I'll defer to the Court on this, Judge.

THE COURT: All right. Ma'am, what was your name and number again?

THE JUROR: Jacquelyn Hayes. Originally it was 180, I think.

THE COURT: All right.

MR. BAUGH: Could we discuss some things?

MR. BAUGH: My co-counsel is getting a little upset with my motion.

(Counsel conferring.)

MR. VICK: I would have a motion, too.

THE COURT: All right.

MR. GEARY: Defendant Tipton has a motion, Judge. I don't know about the other two.

THE COURT: The government made a motion anyway. So on mutual motions of the parties, Ms. Hayes, we are going to remove you from the jury at this point and seat an alternate and excuse you. It wasn't your fault. The article, I saw it, and it certainly didn't identify anything about Newtowne the heading, and these things just happen. But we don't --

MR. VICK: Would it be appropriate to take this time just to thank her, for all of us? I know we have asked a lot of you and taken a lot of your time and I'm sorry it turned out this way, but those things happen.

THE COURT: All right. And please don't discuss the case with anybody until this case is over. You still are under the Court's orders not to discuss it with anybody.

THE JUROR: All right.

THE COURT: You can leave your notes. Did you have another notebook? This is it?

THE JUROR  No.

THE COURT: And you can be excused.

THE JUROR: I left my purse in there.

THE COURT: It is in your seat?

THE JUROR: Yes.

(Purse proffered to juror.)

THE COURT: Again, thank you very much. Until this case is over, do not discuss it with anyone. Again, thank you very, very much.

**JA970**

Okay, we will seat Alternate Number 1.

THE CLERK: Debra Dabney. She is the second one from the bench.

(In Open Court.)

All right, Ms. Dabney, won't you have a seat?

(Alternate juror took her seat in the jury box.)

THE COURT: All right. The witness will be sworn.

## I. Stanley Smithers (2097)

STANLEY SMITHERS, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q   During your testimony, I want to ask that you speak up, speak toward the microphone. Don't get too close, though.

Could you state your name for the Court, record, and jury, please?

A   Stanley Smithers, Jr.

Q   You also are known by the nickname "Stinker"; is that correct?

A   Yes.

Q   How old are you, Mr. Smithers?

A   30.

Q   How far did you go in school?

A   Eighth grade.

Q   Now, Mr. Smithers, you have a prior criminal record; is that correct?

A   Yes.

Q   You have been convicted in 1986 of the distribution of cocaine; is that correct?

A   Yes.

Q   What was the sentence that you received on that?

A   Eight years, four suspended.

Q   You are currently still on probation on that charge or parole on that charge; is that correct?

A   Yes.

Q   Indeed, you have a pending show cause order in front of Judge Duling in the state court on that?

A   Yes.

Q   That show cause has been continued; is that correct?

A   Yes, it has.

Q   Until June of this year?

A   Yes.

Q   Why has that show cause been continued?

A   Because of this case here.

**JA971**

Q    Now, Mr. Smithers, you are currently in the Witness Protection Program; is that correct?

A    Yes, I am.

Q    Is that the reason the show cause order has been continued?

A    Yes.

Q    I direct your attention, Mr. Smithers, to November of 1991.  And in that time frame, did you have occasion to live in a house at Clay and Harrison Streets in the City of Richmond?

A    Yes, I did.

Q    Could you give the ladies and gentlemen of the jury the address of that house?

A    1200 West Clay.

Q    At that house you ran an after-hours spot of sorts; is that correct?

A    Yes, I did.

Q    Tell the ladies and gentlemen of the jury what that was.  What it is you did there?

A    It is a nip joint where you sell liquor at.

Q    All right.  Who would you sell liquor to?

A    To anyone who wanted any.

Q    Do you know the defendant in this case, Mr. Richard Tipton, also known as "Whitey?"

A    Yes.

Q    Do you see him?  Stand up and look around if you need to.  Do you see him seated in the courtroom?

A    Yes.

Q    Could you point him out, please?

         MR. WHITE:  Stipulate.

         MR. VICK:  Will the record reflect identification of the defendant, Richard Tipton?

         THE COURT:  The record will so reflect.

BY MR. VICK:

Q    Do you know Cory Johnson or "C.O.?"

A    Yes.

Q    Do you see him seated in the courtroom today?

A    Yes, sitting over there in the green sweats.

         MR. VICK:  Could the record reflect his identification?

         THE COURT:  The record will so reflect.

BY MR. VICK:

Q    Do you know an individual by the name of James Roane or "J.R.?"

A    Yes.

Q    Do you see him in the courtroom today?

A    Yes.

Q    How is he dressed?

         MR. HENDERSON:  Stipulate ID.

         THE WITNESS:  Black blazer.

BY MR. VICK:

Q    Do you know Sandra Reavis?

**JA972**

A    Yes.
Q    Do you see her seated in the courtroom?
         MR. WAGNER:  Stipulate ID.
         MR. VICK:  If the record will so reflect.
BY MR. VICK:
Q    How did you first meet Mr. Tipton, "Whitey?"
A    He came into the nip joint.
Q    Who was he with?
A    The First time I met him I think he was with "J.R."
Q    Did you ever see him in the company of Mr. Cory Johnson, "C.O.?"
A    Yes.
Q    On how many different occasions?
A    Every now and then you would catch them together.
Q    Did you come to find out how Richard Tipton was supporting himself?
A    Yes.
Q    How was that?
         MR. WHITE:  Objection unless he has personal knowledge of what he saw.
BY MR. VICK:
Q    Based upon your own personal knowledge and observation, did you come to find out how Mr. Tipton was supporting himself?
A    Yes.
Q    How was that?
A    Distribution of crack cocaine.
Q    Did you come, based upon your own personal knowledge and observation, to determine how "C.O.," Cory Johnson, supported himself?
A    Yes.
         MR. COOLEY:  Same objection.
         THE COURT:  He asked the question based on his personal observation.
BY MR. VICK:
Q    What was that?
A    Distribution of crack cocaine.
Q    Did you come to know based upon your own personal observation and knowledge whether Mr. James Roane was involved in the sale or distribution of cocaine?
         MR. BAUGH:  Same objection.
         THE COURT:  Overruled.
BY MR. VICK:
Q    What was his involvement?
A    Distribution of crack cocaine.
Q    Do you know whether Ms. Sandra Reavis, based upon your own personal knowledge and observation, was involved in the sale of crack cocaine?
         MR. WAGNER:  Same objection.

**JA973**

THE WITNESS: Overruled.

BY MR. VICK:

Q   What do you know her involvement to be?

A   She used to distribute crack cocaine.

Q   Did you have occasion -- do you know an individual by the name of Jerry Gaiters?

A   Yes.

Q   How do you know Jerry Gaiters?

A   He used to live and stay with me.

Q   Do you know how Jerry Gaiters -- whether he was involved selling cocaine?

A   Yes, I do.

Q   Do you know where he got the cocaine that he was selling?

MR. WHITE: Objection unless he saw it.

THE COURT: Overruled.

BY MR. VICK:

Q   Do you know where he got the cocaine he was selling?

A   Yes.  He got it there "Whitey."

Q   How do you know that?

A   Because I have known him to go get if from him.

MR. WHITE: I didn't hear the last response.

THE WITNESS: Because I've loaned him money to go get it.

BY MR. VICK:

Q   When you say loan him money, who do you mean?

A   I would loan Jerry the money.

Q   All right.  Now, have you had occasion to get cocaine from Sandra Reavis?

A   Yes.

Q   On how many different occasions?

A   A couple.

Q   What kind of cocaine did you get from Sandra Reavis?

A   Crack cocaine.

Q   All right.  Do you know where "J.R.," "Whitey," and "O" were living?

A   On Norton Street.

Q   In whose house?

A   I assume it was "J.R.'s."

Q   Were they living together?

A   Yes.

Q   Do you know an individual by the name of Keith Ross?

A   Yes.

Q   How do you know Keith Ross?

A   He was my cousin.

Q   Do you know if Keith Ross was involved in any way with the sale or distribution of cocaine?

A   Yes, he was.

**JA974**

Q    Do you know from whom Keith Ross was getting his cocaine?

A    Yes, from "O."

Q    What kind of cocaine was Keith Ross selling?

A    Crack cocaine.

Q    Do you know an individual by the name of, or did you know an individual by the name of Curt Thorne?

A    Yes.

Q    How did you know Curt Thorne?

A    He was selling crack cocaine, also.

Q    Do you know from whom Curt Thorne was getting

2106

the cocaine that he was selling?

A    Yes.  From "Whitey."

Q    How do you know that?

A    Because Curt used to tell me this and  --

        MR. WHITE:  Objection as to hearsay.

        THE COURT:  Sustained.

BY MR. VICK:

Q    And?

A    And when "Whitey" used to come around he used to put us out so he could get his package.

Q    Do you know an individual by the name of "Mousey," Dorothy Armstrong?

A    Yes.

Q    Do you know whether she was involved in the sale or distribution of crack cocaine?

A    Yes, I do.

Q    Could you tell the ladies and gentlemen of the jury from where she was selling her crack cocaine?

A    From the basement on Hancock Street.

Q    Whose house was that?

A    It was her brother's house.

Q    Do you know his name?

A    "Papoose."

Q    Do you know from whom she was receiving crack cocaine to sell?

2107

A    From "O."

Q    Do you know, based upon your observation, the relationship between "J.R.," "C.O.," and "Whitey" in the distribution of cocaine?

        MR. WHITE:  Objection.  Calls for a conclusion.  He can say what he saw.

BY MR. VICK:

Q    Based on his own observation.

        THE COURT:  The objection is sustained.

BY MR. VICK:

Q    As to Keith Ross, Curt Thorne, "Mousey," and Jerry Gaiters, do you know what relationship they had, based upon your own knowledge and observation, with Mr. Richard Tipton, Cory Johnson and James Roane?

        MR. WHITE:  Same objection.  He can say

**JA975**

what he saw.

MR. BAUGH: Additionally, Your Honor, that presupposes a relationship between the three that the witness has not testified to.

THE COURT: Sustained.

BY MR. VICK:

Q    As to the relationship of "Mousey" Armstrong with "O," do you know what that relationship was?

A    She used to work for him.

Q    Where did you get that term, "worker?"

A    It is a street term when somebody is selling somebody else's product.

Q    When you say worked for her, what do you mean?

A    Well, you would give somebody a percentage of what you sell.

Q    Was there a difference between "O" and "Mousey?"

A    Yes.  Well, "O" is the supplier and "Mousey" was the worker.

Q    As to Jerry Gaiters, in his relationship with "Whitey," do you know what that relationship was?

A    Yes.

MR. WHITE: Objection. Same objection. He can say what he saw.

THE COURT: Overruled.

BY MR. VICK:

Q    Go ahead.

A    He would supply  --  "Whitey" would supply and Jerry was the worker.

Q    Do you know whether "Whitey," "J.R.," and "O" would get their cocaine together?

MR. BAUGH: Objection. Again that presupposes a relationship.

THE COURT: Overruled.

THE WITNESS:  As far as I know, yes.

BY MR. VICK:

Q    What do you base that upon?

A    Because they used to leave, go pick up the product, the drugs, and then come back.

Q    Where would they leave and go?

A    Where they would go to, I don't know for sure.

Q    Have you ever seen Richard Tipton, "Whitey," beat anyone?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what you saw?

A    I saw him stomp this dude, John Williams.

Q    When you say "stomp this dude," what do you mean?  Tell the ladies and gentlemen of the jury exactly what you saw.

A    I saw him jump up and land on his head.

Q    Where was John Williams?

A    He was on the ground unconscious.

Q    How many times did you see "Whitey" jump on his head?
A    I came at the end of it.  I picked the dude up and took him home.
Q    How badly hurt was he?
A    He was unconscious.
        MR. WHITE:  Objection.  He is not a doctor.
        THE COURT:  Overruled.
BY MR. VICK:
Q    You may answer.
A    He was unconscious.
        MR. WHITE:  Objection.  We haven't established any relevance to any distribution of anything in connection with this.
        THE COURT:  Overruled.
BY MR. VICK:
Q    Did you ever have a conversation with "Whitey" concerning the sale of cocaine?
A    Yes, I have.
Q    Could you tell the ladies and gentlemen of the jury about that conversation?
A    Well, he was saying that he was eventually going to sew up the city.
Q    In what regard?
A    In the drug distribution  --
        MR. BAUGH:  Objection, conclusion.
        THE COURT:  Sustained.
BY MR. VICK:
Q    I direct your attention, Mr. Smithers,  --  let me back up first.  Exactly what did he say to you; give us the exact words that he said when you talked to "Whitey" about cocaine.
A    He said eventually, you know  --
        MR. WHITE:  This has been asked and answered.
        THE COURT:  Overruled.
        THE WITNESS:  He said eventually he was going to have the city sewed up because they were making big bucks.
BY MR. VICK:
Q    I direct your attention to January 14th, 1992.  Did you have occasion to be in your residence in the evening hours of that night?
A    Yes, I was.
Q    When Peyton Maurice Johnson was murdered?
A    Yes, I was.
Q    Could you tell the ladies and gentlemen of the jury exactly what occurred that evening?
A    Well, I just got home and there was a knock on the door.  It was Maurice.  I said, "Sit down."  He was waiting for a telephone call, to speak to his

**JA977**

girl.  I told him to come in, so he sat down.  A few moments later I heard a knock on the door.  It was "J.R."  He came in and he left out.  I mean he asked was the club open.  I said no, it wasn't open yet.

Q    All right.  If we could get the easel.  You have had occasion in anticipation of your testimony here today to see a diagram of that residence; is that correct?

A    Yes.

(Easel displayed.)

Q    I'm going to show you what has been previously marked Government Exhibit 18 and see if that is a diagram of that residence.

A    Yes, it is.

(Document displayed to jury.)

Q    Now, perhaps it would be easier for Mr. Smithers to come down off the stand for this portion of his testimony.

(Witness approached easel.)

BY MR. VICK:

Q    Using that pointer, if you would, Mr. Smithers, show the ladies and gentlemen of the jury what door you are speaking about when you said "J.R." came through a door.

A    This is where it is.  Here is where the front door would have been.

THE COURT:  Keep your voice up.

BY MR. VICK:

Q    Where was Peyton Maurice Johnson sitting?

A    Over here.

Q    Was there a back door to this residence, to this room?

A    It went into the club area.  But this would have been the back, and this would have been the front door.

Q    Is that the door through which James Roane came?

A    Yes.

Q    When you say he came into the residence, did he come the entire way in the residence?

A    Yes.  He came in, you know, he asked was the club open.  And I said no, so he left.

Q    All right.  Where was Peyton Maurice Johnson at that point?

A    He was sitting here.

Q    Were there lights on in there?

A    Yes.  There was a light on this table here.

Q    Did James Roane say anything to Peyton Maurice Johnson when he walked in?

A    Nothing at all.

Q    Did Peyton Maurice Johnson say anything to Roane?

Stanley Smithers (Direct)

A    Nothing at all.
Q    Where were you?
A    I was sitting here on the loveseat.

Q    What occurred after James Roane left?
A    About two minutes after he left, "O" came in, him and another guy.
Q    Came in through where?
A    The front door.  They knocked on the front door. I said, "Come in," and they came in.  They took the guns and just started shooting Maurice.
Q    What kind of gun?
A    I don't know, some kind of semi-automatic weapon, I guess.
Q    What color was that gun?
A    It was black, I guess.  You know, once they started to shoot, I started to move.
Q    Did you actually see that gun fire prior to your moving?
A    Yes.
Q    Where was that gun fired at?
A    They shot Maurice.
Q    Where was Peyton Maurice sitting at that point at the time he was shot?
A    In the same spot.
Q    Where was "O" at the point he started firing?
A    Right here in the doorway.
Q    And the other person with "O," could you describe him for the ladies and gentlemen of the

jury?
A    I couldn't see him because I was moving.
Q    Could you tell the ladies and gentlemen of the jury how "O" was dressed?
A    He had on a black hooded-like sweatshirt.  And he was standing in the doorway.
Q    Where were you when "O" came in and started shooting?
A    I was here when the shooting started.  I went through this door right here.
Q    And did you hit anything on your way out that door?
A    Yes, there was a door in between.  I broke the door down going through there.
Q    What did you do when you went through that door?
A    I laid on the floor because I thought maybe they was going to shoot at me, too.
Q    How long was it that you lay on that floor?
A    Until the shooting stopped and then they left -- and seconds later I heard them leave.
Q    Were the lights on at that point?
A    No.
Q    How were the lights out?

**JA979**

A    There was an extension out across here.  I kicked the extension cord when I went through the door and the lights went out then.

Q    There was a door at this exit from that room; is that correct?

A    Right.

Q    And that door, was it open when "O" came in?

A    No.  It was shut.

Q    How did you get through that door?

A    I busted it open.

Q    After you lay in the back room and decided to get up and leave, did you go back through this room?

A    Yes.  I went back through here.

Q    Were the lights on at that point?

A    The lights was out.

Q    Did you check Peyton Maurice Johnson to see if he was alive?

A    I didn't check him because there was blood flowing like water.

Q    What did that tell you?

A    That he was probably dead.

Q    Did you ever have thoughts about that?

       MR. BAUGH:  Objection.

       THE COURT:  Sustained.

BY MR. VICK:

Q    All right.  You can return to your seat.

       (Witness resumed witness stand.)

       When "O" came into that residence prior to shooting, when "O" came in prior to shooting Peyton Maurice Johnson, did he say anything to Peyton Maurice Johnson?

A    Nothing at all.

Q    Did Peyton Maurice Johnson say anything to "O" or the other individual that came in with him?

A    Not that I know of.

Q    Now, where did you go when you left that residence that night?

A    I went and got my uncle so he could call the police.

Q    Did you ask him to call the police?

A    Yes.

Q    Where did you go after that?

A    I went to my mother's house.

Q    I'm going to show you what has been previously marked Government Exhibit 20-3.  And I ask if you can identify that item.

       (Document proffered to witness.)

A    Yes, this is Maurice.

Q    Is that the way he was dressed that evening?

A    Yes.

Q    Now, have you ever had a conversation or

**JA980**

overheard a conversation between "Whitey," "J.R.," and "O" where they were talking about violence?

A    Well, there was an expression they used to use. They said, "Don't fuck me."  I mean, "Don't shit on me" or something like that.  Excuse my language.

Q    Or what?

A    "Or you will be shit on."

MR. BAUGH:  What?

MR. McGARVEY:  I don't know if the  -- objection.  I don't know if this is the conversation or his summarization of what the meaning of it was.

THE COURT:  Overruled.

BY MR. VICK:

Q    Now, Mr. Smithers, you have testified that you are in the Witness Protection Program.  Has going into the Witness Protection Program affected your life?

A    Yes.

MR. BAUGH:  Objection, leading.

THE COURT:  Sustained.

BY MR. VICK:

Q    Your Honor, in light of the previous cross-examination of other  --

THE COURT:  Let's wait until the cross-examination.

MR. VICK:  Yes, sir.  Beg the Court's indulgence.  I tender the witness, Your Honor.

CROSS-EXAMINATION

BY MR. WHITE:

Q    Good morning, Mr. Smithers.  How long have you lived in Newtowne, sir?

A    Off and on, the majority of my life.

Q    The majority of your life?

A    Yes.

Q    In the course of your living in Newtowne, you came to meet many people who were living in the neighborhood; is that correct?

A    Yes, I did.

Q    Prior to your meeting any of the other people in this case, you knew Peyton Maurice Johnson, didn't you?

A    Yes, I did.

Q    Hadn't you also met Ronita Rochelle Hollman?

A    Yes.

Q    You knew both of them to be involved in the distribution of crack cocaine?

A    Yes.

Q    Did you also come to meet Douglas Moody?

A    Yes.

Q    He was also involved in the use and distribution of crack cocaine?

A    I didn't know about it at that point, but I knew

Stanley Smithers (Cross)

him forever.

Q    You knew Denise Berkley?  Did you know Denise Berkley, sir?

A    Denise Berkley?  I can't remember.

Q    Did you know Louis Johnson?

A    No.

Q    But you knew a lot of people from the streets in Newtowne; is that correct?

A    Yes.

Q    Now, sir, this distribution of cocaine case that you had, this was when?

A    In 1986.

Q    And you got what sentence?

A    Eight years, four suspended.

Q    Would it be fair to say that the four years that were suspended were suspended on the condition that you keep the peace and be of good behavior and not violate any laws of the Commonwealth?

A    Yes.

Q    Do you recall the Judge telling you that?

A    Yes, I do.

Q    You did not do that, did you, sir?

A    No.

2121

Q    As a matter of fact, you continued to use crack cocaine after you got out of jail, right?

A    Right.

Q    And you also were in possession of firearms; isn't that true?

A    No.  I didn't have a firearm.

Q    Weren't you arrested by the police shortly after --

A    Yes, but that was not my firearm.

Q    You had one in your possession, didn't you?

A    No, it was in the same house, the same room I was in.

Q    You were also operating this nip joint, were you not?

A    Yes, I was.

Q    That was in violation of the law, wasn't it?

A    Yes, it was.

Q    Now, sir, before this arrest for distribution of cocaine, you were selling on the streets of Newtowne?

A    Yes.  Yes, I was.

Q    Would you have considered yourself at that point a neighborhood dealer?

A    I guess you would call me that.

Q    In the course of your dealings with other people

2122

in the neighborhood, you would have occasion, wouldn't you, to front people drugs?

A    Front people?  No.

Q    In other words, you never gave people any drugs

**JA982**

without them having to pay for it right then and there?

A    Oh, no.

Q    People always gave you money?

A    Yes, or I wouldn't give it to them.

Q    Now, Mr. Smithers, you indicated that you saw Mr. Tipton every now and then.

A    Yes.

Q    Okay.  And would it be fair to say that sometimes you saw Mr. Tipton on the street corners in Newtowne?

A    Yes.

Q    And on some occasions you saw him selling crack cocaine on the street corners in Newtowne?

A    Yes.

Q    You never actually saw him hand anything to Jerry Gaiters, did you, sir?

A    No.

Q    You never actually saw him hand anything to Curt Thorne, did you, sir?

A    No.

Q    All right.  Now, sir, this fight with John Williams -- was that his name?

A    Yes.

Q    Now, you came in on the end of that fight?

A    Yes.

Q    So you don't have any idea, you didn't actually see what started it.

A    No.

Q    You didn't actually hear what was said between Mr. Williams or Mr. Tipton, if anything?

A    No, I didn't hear what was said.

            MR. WHITE:  If I can have just a minute, please.

            THE COURT:  Sure.

            MR. WHITE:  No further questions, Judge.

                    CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Mr. Smithers, just a few follow-up questions here.  With respect to your eight years with four suspended, you recall talking to Detective Dalton?

A    Yes.

Q    And Detective Dalton indicated to you that he would try to help you in terms of that show cause; isn't that correct?

A    No.  I mean  --  what you mean?

Q    Your probation violation; that they would speak to the Judge for you.  Didn't he tell you that?

A    Just told me that they couldn't give me no promises about it.

Q    But they said they would speak to the Judge for you; isn't that correct?

**JA983**

Stanley Smithers (Cross)

A     Yes.
Q     And when this happened back on January 14th, you went to the police; is that correct?
A     Yes.
Q     Well, did you go to the police that night, sir?
A     No.  I waited until Detective Reid got in contact with me.
Q     I see.  Weren't you subsequently arrested?
A     Arrested for what?
Q     On your probation violation.
A     Yes.
Q     And you talked to the police before or after you were arrested on your probation violation?
A     I talked to them before I was arrested.
Q     Did you turn yourself in?
A     No.  They came and got me and took me downtown to talk.
Q     You were in the jail when you talked to the police initially; is that correct?

A     No.
Q     Were you released on bond?
A     No.  I got eventually released on bond, yes.
Q     Now, when you were talking about  --  when you were asked by Mr. Vick, he was going through a number of people, I believe, such as Keith Ross, Curt Thorne, "O," "Whitey," "J.R.," and you were talking about they were all involved in the drug trade, correct?
A     Yes.
Q     With respect to, let's say, Cory Johnson, did you ever take drugs from him?
A     Purchase, you mean?
Q     Purchase drugs from him.
A     Yes.
Q     How many times?
A     A few times, I guess.
Q     How many times?
A     To be direct, I don't know.  Three, four.
Q     And where did that take place?
A     Different places.  Once down in the basement up where he used to live.
Q     Basement where?
A     Where "Papoose" lived.  Once down at the club.
Q     Your club?

A     Yes.
Q     Okay.
A     And another time I might have been down in the basement or something.
Q     Did you pay him for those drugs that day?
A     Yes.
Q     Handed him money that day?
A     Yes.

**JA984**

Q    Now, you indicated that  --  well, let me ask you about your club.  You sell liquor out of your club; is that correct?

A    Yes.

Q    And do you take -- I presume you take money for that liquor?

A    Yes.

Q    Did you ever take cocaine for that liquor?

A    No.

Q    Do you sell cocaine there as well?

A    No.

Q    Or did you sell cocaine there as well?

A    No, I did not.

Q    This was an illegal operation, as you indicated in your direct testimony.  Correct?

A    Yes, sir.

Q    And did you keep the door locked or unlocked?

A    I usually would keep it locked when the club was open, yes.

Q    You indicated that when, I think you said, both "J.R." and Cory, when they knocked on the door you said, "Come in."  Was the door unlocked that day for some reason?

A    See, the club wasn't open.  I was in where I lived at in the front part.

Q    Well, you were living in the Newtowne section; is that correct?

A    Yes.

Q    And I presume that from your direct testimony, crime is somewhat of a problem in that area, correct?

A    Well, after awhile it became, yes.

Q    And you left your door unlocked?

A    Yes.  Well, it was shut but it was unlocked, yes.

Q    You also indicated that there was one light on?

A    Yes.

Q    And that light was in the corner, according to the diagram.

A    Right.

Q    You indicated that there was another individual that came in with the person you identified as Cory, correct?

A    Right.

Q    And you don't know who that individual was, or you didn't have time to see who that individual was?

A    I didn't have time to see who it was.

Q    You indicated that Mr. Johnson had a hood on; is that correct?

A    Yeah.

Q    A hooded sweatshirt.

A    Yes.

**JA985**

Q    Would you estimate for the ladies and gentlemen of the jury approximately, if you didn't have time to see the second guy, approximately how long did this take before you went down on the floor?
A    Estimate the time?
Q    Yes, sir.
A    I don't know.  It was happening like this, you know.
Q    Milliseconds, correct?
A    You know, I mean, when I see him come in the door I see the gun, I see him go click, and when he go click and started to shoot, I started moving, you know.
Q    We are talking about a matter of seconds or milliseconds?

2129
A    I cannot be exact on the time.
Q    When did you decide to come out of the back room?
A    After I heard them leave out the front door.
Q    How did you hear them leave out the front door?
A    Because I was laying on the floor.  After the shooting stopped you couldn't hear nothing else.
Q    My question is, though, did you hear the door locked?  Did you hear the door slammed?  What did you hear that made you come out of the back room?
A    When I heard the door shut.
Q    You are certain the door was shut, correct?
A    It was shut until I opened it.
Q    On January 14th, you had a lot of dealings with Maurice Johnson, correct?
A    Yes.  I mean, we was friends.
Q    You knew each other.
A    Yes.
Q    As of January 14th, Maurice Johnson was no longer involved in the drug trade; is that correct, after he caught his charge?
A    No.  He wasn't involved, no.
Q    He was not involved in the drug trade.
A    Not as far as I know.
        MR. McGARVEY:  May I have one second, Your

2130
Honor?
        THE COURT:  Sure.
        MR. McGARVEY:  That's all.
        THE COURT:  All right.  Mr. Baugh?
            CROSS-EXAMINATION
BY MR. BAUGH:
Q    Mr. Smithers, the two people that came into your club that night, you said you saw one of them click the gun.  You mean you saw somebody pull the slide back and actually put a round in the chamber?
A    No.  It is like click-click and then he started shooting.

**JA986**

Q    Whoever came in  --  do you know what that means when they pull the slide back?

A    Yes.  It puts a bullet in the chamber.

Q    Whoever did the shooting, when they came in the gun was not ready to fire?

A    Evidently not.

Q    Further, the other person that came in, the one you can't identify, did you ever give a description of that gentleman to the police?

A    Yes.

Q    Did you describe him as a short, dark-skinned black male?

A    Yes.

Q    All right.  It was certainly not James Roane, was it?

A    No, it wasn't.

Q    Further, did you ever tell the police it was some five minutes between the time Mr. Roane came in and the time that someone came in and shot Mr. Johnson?

A    No, I never said it was five minutes.

Q    Did you give a statement to Detective Dalton at the Richmond Bureau of Police?

        MR. VICK:  We will move the entire statement into evidence.

        MR. BAUGH:  Please.  Objection.

        THE COURT:  Sustained.

BY MR. BAUGH:

Q    Do you recollect giving a statement down at the Richmond Bureau of Police to Detectives Reid and Dalton?

A    Yes.

Q    At that time, did you know that conversation was being recorded?

A    Yes.

Q    Did they tell you beforehand?

A    I don't remember the exact  --  I knew it was being recorded, yes.

Q    I couldn't understand you.

A    I can't remember if they told me before or after I had it, but I knew it was being recorded, yes.

Q    During that conversation you had with Detective Reid, do you recollect making the statement the only person  --  page eight of the affidavit:  "The only person I know was "C.O."  Like I said, "J.R." came in and five minutes later..."  Do you remember making that statement?

A    Well, I might have said five minutes.  But it was less than five minutes.

Q    All right.  Now, this nip joint place that you and your family operate over there, it is open about every night, isn't it?

**JA987**

A    Yes, it was.
Q    And in fact it is the only place you can get a drink around there.
A    Right.
Q    There are no clubs over there besides yours?
A    No.
Q    Is there a nip joint -- they call it a nip joint because you sell drinks by the nip, right?
A    Yes.
Q    You don't have regular hours then; am I correct?

2133

A    We would stay open until at least 11 or 12 o'clock.
Q    But there is no set time.  It is around that time it opened?
A    Yes.
Q    This particular night, the alcohol had not arrived yet?
A    No.  I had the alcohol.  It is just I wasn't open in that part, you know, because you know, like I had a job, also.
Q    It was not uncommon for Mr. Roane to come there and have a drink at your place, was it?
A    No.
Q    It was not uncommon for Mr. Johnson to come there, either, Peyton Maurice Johnson?
A    No.
Q    In fact, both of them were regular customers of yours?
A    Yes.
Q    Was it uncommon for Mr. Roane to come in and ask you -- what did they call you, "Stinker?"
A    Yes.
Q    "'Stinker,' is the place open yet?"
A    Well, at that time of day, maybe, yes.
Q    All right.  Would you say that Mr. Roane would

2134

visit your establishment, say, two, three, four times a week normally?
A    Sometimes, yes.
Q    Mr. Peyton Maurice Johnson would visit it as often?
A    Yes.
Q    It would not be uncommon to find Mr. Johnson there.
A    Well, it is not like he was there all the time, you know.
Q    In fact, there is a phone near that corner, too, isn't there?
A    There is one down like a half a block away or a block away.
Q    Isn't it true that sometimes people will come wait in your club to use the phone before they go

down the street?

A    Well, it depends on if I was open or not.

Q    All right.  And did you know at that time that Ms. Sandra Reavis was having a romantic relationship with Mr. Roane?

A    Yes.

Q    And have you ever seen her receive drugs from anybody other than Mr. Roane?

A    No.  I haven't seen her receive drugs.

MR. BAUGH:  Thank you.  Pass the witness. No further questions.

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  Anything further for this witness?

REDIRECT EXAMINATION

BY MR. BAUGH:

Q    How long has it been since you have been involved in the distribution of drugs?

A    Since '85 or about there.

Q    When you got arrested on the charges, you have not been involved in the distribution of drugs since then?

A    No.

Q    How long has it been since you have used drugs?

A    I used it off and on until before I got in the program.

Q    But you haven't used them since you have gotten in the program?

A    No.

Q    After you would see "Whitey" get together with Curt Thorne, what would Curt have?

A    He would have  --

MR. BAUGH:  I think this is outside the scope of cross.

THE COURT:  Sustained.

MR. VICK:  He asked whether he ever saw -- on cross, Mr. White asked whether he had ever seen him actually deliver drugs to Curt Thorne.  I'm asking what he had after the meeting.

THE COURT:  Sustained.

BY MR. VICK:

Q    How long was it after James Roane walked into the residence, saw Peyton Maurice Johnson sitting there, that "C.O." came in and shot Peyton Maurice Johnson?

MR. BAUGH:  Asked and answered.

THE COURT:  He can answer.

THE WITNESS:  A matter of a minute or two, you know.  It wasn't that long.

MR. VICK:  No further questions.

THE COURT:  All right.  Ladies and gentlemen, we are going to have to take a break

**JA989**

here.  It is going to be fairly lengthy, because we have something else that we have to do.  So you all get in the jury room and we will get back to you as soon as we can.

(The jury left the courtroom.)

All right, Mr. Geary and Mr. Baugh may be excused.  You all get back as soon as you can.

MR. BAUGH:  Yes, sir.

THE COURT:  All right.

MR. VICK:  Your Honor, he needs to be taken out of the courtroom.

THE COURT:  Mr. Marshal, the witness may be removed.

(The witness left the courtroom.)

All right, the defendants will be removed.

MR. PARCELL:  With the Court's permission, we will set the TV's up during the recess.

THE COURT:  I appreciate that.

(The defendants were removed from the courtroom.)

All right, we will be in recess awaiting Mr. Geary and Mr. Baugh's return.

(Recess taken from 10:53 a.m. to 11:52 a.m.)

MR. BAUGH:  Your Honor, Mr. Geary and I thank you for your patience.

MR. VICK:  I would move 20-3 into evidence.  It was the picture.  I forgot to move it in.

THE COURT:  All right.  It will be admitted.

All right, do we need to have the witness on the stand?

MR. VICK:  Our next four witnesses are in the hallway.

THE COURT:  All right.  Bring in the jury.

(The jury entered the courtroom.)

MR. PARCELL:  Ms. Mary Johnson, please.

MARY JOHNSON,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?
A    Mary Johnson.
Q    Ma'am, do you work?
A    Yes, I do.
Q    Where do you work?
A    Richmond Memorial Hospital.
Q    You knew someone named Louis Johnson, Jr.
A    Yes.
Q    How do you know him?

**JA990**

## William C. Brereton (Direct)

A    He is my son.

Q    Ma'am, did something happen to him on January 29th, 1992?

A    Yes, he was killed.

Q    Was he killed on Kinney Street in the City of

2139

Richmond?

A    Yes, he was.

Q    Had you seen your son earlier that day?

A    Yes.

Q    Did your son work?

A    Yes, he did.

Q    Where?

A    At Richfood.

Q    How long had he been working at Richfood?

A    For about eight or nine years.

Q    Had you ever seen your son with a weapon?

A    No, I have not.

Q    How long had it been since you saw him that day before you were notified he was killed?

A    Him and my younger son came to pick me up from work.  And he had been over to my house helping my husband around the house.  And they came to pick me up.  He was over there until about 6 or 6:30 that evening.

Q    That's the last time you saw him?

A    That's the last time I saw him.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

2140

MR. WAGNER:  No questions.

THE COURT:  Thank you very much, ma'am. You may stand down.

(Witness stood aside.)

MR. PARCELL:  Officer Brereton.

WILLIAM C. BRERETON, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    William C. Brereton.

Q    Occupation?

A    I'm a police officer with the Richmond Police Department.

Q    How long have you been a police officer?

A    Almost five years, sir.

Q    Were you so employed with the Richmond Bureau of Police on January 29th, 1992?

A    Yes, I was.

Q    Did you have occasion to respond to the 900

block of Kinney Street in the City of Richmond?

A    Yes, sir, I did.

Q    Were you the first police officer to arrive?

A    Yes, sir.

Q    Would you please tell the ladies and gentlemen of the jury what if anything you found when you arrived at that location?

A    I found a black male laying in the street in the 900 block of Kinney Street in front of 901 Kinney Street.

Q    What was his condition upon your arrival?

A    It appeared that he had been  --  that he had injuries to his head.  I checked for a pulse and I found no pulse.  The ambulance a arrived and they took over.

Q    When you got there, did other individuals accumulate on the street?

A    Yes, sir, a crowd had started to filter down from the other streets.

Q    That was prior to your arrival?

A    Yes, sir.

Q    And you did the best you could to keep that crime scene protected until Detective Brunelli could get there?

       MR. BAUGH:  Objection to the leading nature.

       THE COURT:  Sustained.

BY MR. VICK:

Q    What if anything did you do after you arrived and determined the person was deceased?

A    I secured the scene, did not let anybody within a 15 to 20-foot radius.

Q    Were you able to determine the name of the person deceased?

A    Yes, sir, I did.

Q    That was whom?

A    Mr. Johnson, Mr. Louis Johnson, Jr.

Q    First name was Louis?

A    Yes, sir.

       MR. PARCELL:  Pass the witness.

       MR. GEARY:  No questions.

       MR. McGARVEY:  No questions.

       MR. BAUGH:  No questions.

       MR. WAGNER:  No questions.

       THE COURT:  All right, sir, you may stand down.  Thank you very much.

    (Witness stood aside.)

       MR. PARCELL:  Detective Gary Brunelli.

              GARY BRUNELLI,

called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**JA992**

Gary Brunelli (Direct)

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Sir, would you please state your name?

A   Gary L. Brunelli

Q   Your occupation?

A   Assigned to the forensic unit as a detective with the Richmond Police Department.

Q   Would you please tell the ladies and gentlemen of the jury what you mean by being a forensic detective?

A   I respond to crime scenes and do the investigation as far as physical evidence within those crime scenes.

Q   Were you so employed in that capacity on January 29th, 1992?

A   Yes, I was.

Q   Did you have occasion to respond to the 900 block of Kinney Street within the City of Richmond?

A   I did.

Q   When you arrived was Officer Brereton there?

A   Yes, he was.

Q   As you arrived, sir, would you please tell the ladies and gentlemen of the jury what you did?

A   At that time, I had videotaped the crime scene and taken the pictures of the crime scene and also collected physical evidence and sketched.

Q   Now, sir, as part of your investigation and part of your preparation for Court today, have you reviewed the video crime scene?

A   Yes, I have.

Q   And in preparation for your testimony today, did you prepare a crime scene diagram?

A   That is correct.

MR. PARCELL:  I'll ask that he be allowed to be shown the video, as well as the jury, and describe to them what if anything he found within that crime scene video.

THE COURT:  All right.

(Videotape played.)

THE WITNESS:  You are looking at 901 Kinney Street.  That is the house directly where the victim was lying in front of.  The victim was lying in the street.  You will see it coming up.  The victim here is identified as Louis J. Johnson, a black male, 29 years old at this time.  In line with a square piece of white paper you see is a cartridge case right at the top part of it.  That was the furthest cartridge case from the body.  A little toward the stain, and you will see that it is very hard to see, but there will be another cartridge case right at the center of the screen.  I believe that area right there shows

**JA993**

approximately three or four more cartridge cases. There is one right to the right of it, another cartridge case right off the top of the head back.

Q   Was this Mr. Johnson as he was when you arrived?

A   That is correct.  After he was uncovered, I could see the exact position.  He was there.  He had been shot in the head several times.

(Tape ended.)

MR. PARCELL:  I need the easel.

(Easel displayed.)

BY MR. PARCELL:

Q   Once again, in preparation for your testimony, did you prepare a crime scene diagram which has been labeled Government Exhibit 25?

A   Yes, I did.

MR. PARCELL:  I will ask for him to have permission to approach the jury and ask that he describe the physical evidence which we will offer.

THE COURT:  All right.

(Witness approached jury.)

BY MR. PARCELL:

Q   With the use of that diagram, would you please describe to the ladies and gentlemen of the jury what that means to you?

A   Yes.  This is the 900 block of Kinney Street, an alley off that with the streetlight that was working at that time, at the time I arrived.  Here is a sidewalk.  The house you saw would be right in this area here.  The items 1 through 6, one being here, two by the hand, three, four, five, and six, were all cartridge cases.  Item seven is right in here between six and eight.  It was a bullet.  Eight and nine, right off the left-hand, were more cartridge cases. Item Number 10 right here was a stocking-type black cap.  Item Number 11 right down here, which actually showed  --  it was laying under the body, was a bullet.  Item Number 12, which is not on here, was a cartridge case.  When the victim was picked up, it fell.  I was unable to locate that item directly back to where it came from.

Q   I'll show you what's been labeled as Number 1. Would you please tell us what that is and where you located it?

A   Item Number 1 shown right here was right on the curb.  It was three inches up on the curb here.  It was a 9mm cartridge case.

Q   Number 2?

A   Number 2 was by the victim's hand, also a 9mm cartridge case.  Number 3, right off the victim's head, is another 9mm cartridge case.  Number 4 is right beside number three there off the victim's

head, a 9mm cartridge case.  Number 5 is shown right here.  It is another 9mm cartridge case.  Number 6 right beside Number 5 near the victim's shoulder, a 9mm cartridge case.  Number 7 was right here, the remains of a bullet.  Number 8 was right beside number 7, and it is a 9mm cartridge case.

Number 9 was right here, 7, 8, and then 9 is right here.  It is a 9mm cartridge case.  Number 10 I'll show you.  It is a cap which appeared to have holes in it.  I collected it and sent it to the state lab along with the rest of the evidence.  Number 11 is also the remains of a bullet.  This was found under the victim.  The underline represents it was under.  This was -- the cartridge case didn't show on the diagram, Number 12, that we found after we had removed the victim.

MR. PARCELL:  I will ask you to return to your seat.  I would move for the introduction of Government Exhibit 25, please.

THE COURT:  It will be admitted.

MR. PARCELL:  And these two bags collectively labeled as Government Exhibit 30-1.

THE COURT:  They will be admitted.

MR. PARCELL:  The bag containing the stocking cap will be 30-2.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    After you collected these pieces of physical evidence, what did you do with the casings and bullets?

A    Casings and bullets were put in the property room until February 4th, and all of it was submitted to the state laboratory for examination and comparison.

Q    Ms. Anne Jones with the state lab?

A    That's correct.

MR. PARCELL:  Pass the witness.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions, Your Honor.

MR. COOLEY:  No.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  Thank you, sir.  You may stand down.

MR. PARCELL:  I will ask that this been labeled as Government Exhibit 24-2 and 3 also be submitted after identification by the witness.

BY MR. PARCELL:

Q    Did you take those photographs, sir?

A    Yes, I did.

Q    24-2 and 3.

MR. PARCELL:  We move their introduction.

MR. BAUGH: We would object to them. They are cumulative to the videotape, clearly.

THE COURT: Overruled. Anything based on that?

(No response from counsel.)

All right, you may stand down, sir.

(Witness stood aside.)

MR. PARCELL: Anne D. Jones, please?

ANNE D. JONES, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Ma'am, would you please state your name?

A   My name is Anne Davis Jones.

Q   Same lady who testified last week in this trial?

A   Yes, sir.

Q   I'll ask you, did there come a point in time, specifically on February 4th, 1992, that you had occasion to receive some bullets and casings from Detective Gary Brunelli?

A   Yes, sir, I did.

Q   And did you make an examination of those items which were listed as 1 through 12?

A   Yes, sir, I did examine items 1 through 12.

Q   I ask you to be shown those exhibits.

(Exhibits proffered to witness.)

That's Government Exhibit 30-1 and 2.

As far as what's been labeled number one, could you please advise us as to whether or not you examined that particular casing and whether you were able to match it to anything?

A   Excuse me, I don't have item ten.  Oh, excuse me.

Q   With regards to Item Number 1, ma'am?

A   Item Number 1 was a 3D Impact brand 9mm cartridge casing identified as having been fired in Government Exhibit 104, the Glock pistol.

Q   That Glock pistol was one of two other weapons that you examined which was in your lab report which you testified about last week; is that correct?

A   That was one of the three weapons that I explained last week.  Yes, sir.

Q   Proceed.

A   Item Number 2 is a 3D Impact-brand caliber 9mm luger cartridge casing identified with Government Exhibit 104, the Glock.

Q   Number 3?

A   It was a 3D Impact-brand caliber 9mm luger cartridge casing, which was identified as having been

**JA996**

Anne D. Jones (Direct)

fired in the Government Exhibit 104, the Glock pistol.

Q    Number four?

A    It was a 3D Impact-brand caliber 9mm luger cartridge casing, which was identified as having been fired in the Government Exhibit 104, the Glock pistol.

Q    Number 5?

A    Number 5 was a 3D Impact-brand caliber 9mm luger, cartridge casing, which was identified as having been fired in the Government Exhibit 104, the Glock pistol.

Q    Six?

A    It was a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 104, the Glock pistol.

Q    Number 7?

A    Number 7 was a caliber 9mm luger jacketed bullet, which had class characteristics like those

2152

produced by the Government Exhibit 104, the Glock pistol.  However, it was my opinion that there were insufficient microscopic markings corresponding to the test bullets to identify or eliminate this bullet as having been fired from Government Exhibit 104, the Glock pistol.

Q    Number 8?

A    Number 8 was a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 104, the Glock pistol.

Q    Number 9?

A    Number 9 was a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in the Government's Exhibit 104, the Glock pistol.

Q    Number 10?

A    10 consisted of a stocking cap and a bullet. The bullet I found to have class characteristics like those produced by Government Exhibit 104, the Glock pistol.  However, it was my opinion that it could not be identified or eliminated as having been fired from the Government Exhibit 104, the Glock pistol.

Q    And did you perform any tests on the stocking cap that was sent to you by Detective Brunelli?

A    Yes, sir, I did.

2153

Q    What observations, if any, did you make in regard to the stocking cap?

A    The stocking cap had three holes in it.  And I examined it microscopically, and did the chemical examination on it to determine that there were lead residues present which were consistent with at least one of those holes having been in contact with the muzzle of a weapon at the time of firing.

**JA997**

Anne D. Jones (Direct)

Q    What does that mean?
A    It means there was the muzzle of a weapon on contact or close to the hat at the time that it was fired.
Q    That's why the stocking cap picked up the residue?
A    That's correct.
Q    Item 11?
A    Item 11 was a jacketed 9mm caliber bullet which had rifling class characteristics like those produced by the Government Exhibit 104, the Glock pistol. However, it was my opinion that there were insufficient corresponding microscopic markings to identify or eliminate this bullet as having been fired from Government Exhibit 104, the Glock pistol.
Q    Number 12?
A    Number 12 was a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in Government Exhibit 104, the Glock pistol.
Q    Ma'am, did there come a point in time that you received three other items from the Medical Examiner's Office labeled 13-A, B, and C?
A    Yes, sir, they were.
Q    I'll ask that she be shown this exhibit labeled Government Exhibit 31 for identification purposes.
          THE COURT:  All right.
     (Item proffered to witness.)
BY MR. PARCELL:
Q    Can you identify those items?
A    Yes, sir, I can.
Q    What is 13-A and what comparison did you do with that?
A    13-A is a bullet recovered from the victim, and it is a jacketed hollow-point bullet which was identified as having been fired from Government Exhibit 104, the Glock pistol.
Q    13-B?
A    13-B was a caliber 9mm luger full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.
Q    13-C?
A    13-C was a jacketed bullet, caliber 9mm luger, which had class characteristics like those produced by Government Exhibit 104, the Glock pistol. However, it was my opinion that there were insufficient corresponding microscopic markings with tests fired from that pistol to identify or eliminate it as having been fired from Government Exhibit 104, the Glock pistol.
          MR. PARCELL:  I move the introduction of Government Exhibit 31, please.

**JA998**

THE COURT: It will be admitted.

BY MR. PARCELL:

Q Ma'am, as a result of your examinations, did there come a point in time you prepared a laboratory analysis which put in writing what you have told the ladies and gentlemen of the jury today?

A Yes, I did.

Q I will show you what's been labeled Government Exhibit 28. I ask you if you can identify that item.

(Document proffered to witness.)

A Yes, sir. This is the report I prepared concerning these items.

Q That report is consistent with what you have testified about?

A That's correct.

MR. PARCELL: That will be Government Exhibit 28.

THE COURT: It will be admitted.

MR. PARCELL: Through stipulation there was a residue test done on the deceased that showed he had residue on his right web and right palm of his right hand. That will be Government Exhibit 29.

THE COURT: It will be admitted.

MR. PARCELL: Pass the witness.

MR. GEARY: No questions, Your Honor.

THE COURT: Mr. McGarvey, Mr. Cooley?

MR. McGARVEY: No questions.

THE COURT: Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q Good afternoon, Ms. Jones. You indicated that there were four bullets that you could not identify as coming from Government Exhibit 104, the Glock. You said there were class characteristics consistent with the Glock, but couldn't identify them; is that correct?

A That's correct.

Q Is it also correct based on our earlier conversations that a Glock has a relatively unusual barrel in that it doesn't have lands and graphs?

A This particular Glock had six lands and grooves, but polygonal rifling, which are not truly-defined lands and grooves like one would normally see.

Q It is like a six-sided figure?

A Like a polygon. Yes, sir.

Q Even though couldn't identify whether those balls came from the Glock, if I could have 105 and 106, please, could you show them to the witness, please?

(Weapons proffered to witness.)

Do you recognize those two weapons as weapons

you have tested previously and had before you last week?

A    Yes, sir.

Q    Could any of the balls have been fired out of those two weapons?

A    No, sir.

Q    You also indicated that you recovered some 14 or 15 brasses.  Could any of the brasses recovered have been fired out of those two weapons?

A    No, sir.

Q    Thank you.  You also indicated by stipulation that there was a test done on the web and palm of the deceased's hand.

A    Mr. Baugh, I have nothing to do with that test.

Q    All right.  Am I correct that barium and, you call it, antimony --

A    Antimony.

Q    A-N-T-I-M-O-N-Y.  Those are chemicals found in the primer of bullets?

A    Yes, sir, but that is trace evidence examination.

Q    Those are things that are found in the primer of bullets; am I correct?

A    The primer in the cartridge case.

Q    All right.  Even though you did not do that test and even though you normally don't do trace element work, am I correct that you know from your training and experience that evidence of barium and antimony in the right web and palm of the deceased means that he fired a weapon in the not-too-distant past before his death?

A    I don't know the reason.

Q    Based on your examination of all  --  assuming all the evidence was found, how many weapons were fired out there that night?

A    Based on all the examinations that I conducted on the evidence that was submitted to me at the laboratory, the evidence represents one firearm.

            MR. BAUGH:  Thank you.  Pass the witness.
            THE COURT:  Mr. Wagner?
            MR. WAGNER:  No questions.
            THE COURT:  Anything further?
                REDIRECT EXAMINATION
BY MR. PARCELL:

Q    Also, you weren't there and you don't know whether  --

            MR. BAUGH:  Objection, leading.
            THE COURT:  Overruled.

BY MR. PARCELL:

Q    You weren't there and you don't know whether there was one, two, or three weapons used, do you?

A    No, sir.  Based on what I had to examine, I only

had one firearm involved with what I had to examine.

Q    But you can't tell us how many weapons were used, can you?

A    That's correct.

MR. PARCELL:  No further questions.

THE COURT:  All right.  You may stand down, ma'am.

(Witness stood aside.)

Call your next witness.

MR. VICK:  The government's next witness is Sterling Hardy.

THE COURT:  Mr. Vick, are you going to use this video any time soon?

MR. VICK:  After Mr. Hardy's testimony, but I imagine that will be some time.

## II.  Sterling R. Hardy (2160)

STERLING R. HARDY, called as a witness by and on behalf of the Government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    During your testimony, I'm going to ask you to speak up and speak toward that microphone.  Don't get too close to it or you will get feedback.  State your name for the Court, record and jury, please?

A    Sterling R. Hardy.

Q    Mr. Hardy, how old are you?

A    28.

Q    How far have you gone in school?

A    Tenth grade.

Q    You have been previously convicted of possession of heroin; is that correct?

A    Yes, sir.

Q    In 1986 or thereabouts?

A    Yes, sir.

Q    And you have been previously convicted of possession of cocaine; is that correct?

A    Yes, sir.

Q    That was in 1990?

A    Yes, sir.

Q    That's two prior felony convictions?

A    Yes, sir.

Q    In addition to that, Mr. Hardy, you are currently facing sentencing in Federal Court, in this Federal Court, concerning your involvement in the conspiracy that is on trial now; is that correct?

A    Yes, sir.

Q    Indeed, you have pled guilty to three counts of that indictment, to several counts of that

**JA1001**

indictment; is that correct?

A   Yes, sir.

Q   You have pled guilty to the conspiracy, to the murder of Torrick Brown, to the wounding of Martha McCoy and charges that flow from that; is that correct?

A   Yes, sir.

Q   Indeed, you have had occasion to enter a written plea agreement in this courtroom in this proceeding; is that correct?

A   Yes, sir.

Q   I'm going to show you what's been previously

2162

marked Government Exhibit 126 by stipulation, Your Honor.  It is a copy of his plea agreement.

(Document proffered to witness.)

A   Yes, sir.

Q   That's your plea agreement in this case.

MR. VICK:  I would move Government Exhibit 126 into evidence.

MR. BAUGH:  Objection to the introduction of the plea agreement.  It is not dispositive of any issue.

THE COURT:  Sustained.

BY MR. VICK:

Q   Now, Mr. Hardy, do you know the defendant in this case, Mr. James Roane?

A   Yes, sir.  I do.

Q   Do you see Mr. James Roane seated in the courtroom?

MR. BAUGH:  Stipulate ID.

BY MR. VICK:

Q   How long have you known Mr. James Roane?

A   Half of my life.

Q   I direct your attention to November of 1991. Late in the year of 1991.  Did you have occasion to begin to associate with Mr. James Roane?

A   Yes, sir.

2163

Q   And would you tell the ladies and gentlemen of the jury why you began to associate with Mr. James Roane?

A   James came to my attention, and he came to Gilpin Court where he used to live at.  And me and him rode together that day and we rode in something like three or four different projects and we rode  to Broad Street to meet two girls from Danville.  And like James told the dude named Linwood Chiles to take me home.

Q   Did Linwood take you home?

A   Yes, he did.

Q   What car was it that you drove in, what kind of car?

A   A station wagon.

**JA1002**

Q    What exactly did Linwood -- what exactly did James say to Linwood?
A    Told Linwood to take me home, he was going to take care of me later on or something like that.
Q    Have you had occasion to go to  --  do you know a house belonging to an individual by the name of "Papoose"?
A    Yes, I did.
Q    Have you had occasion to go to that house with an individual by the name of "C.O." or be present when "C.O." was there?
A    Yes, I did.
Q    Do you see "C.O." in the courtroom today?  Take your time and look around.
A    Nope.
Q    Stand up and look all around the courtroom.
     (Witness stood and looked around courtroom.)
A    Yes, right there.
Q    How is he dressed?
A    Gray sweats on.  White shirt.
          MR. VICK:  Could the record reflect the identification of defendant Cory Johnson?
          THE COURT:  The record will so reflect.
BY MR. VICK:
Q    Have you ever had occasion to receive cocaine from "C.O."?
A    Yes, I did.
Q    What kind of cocaine?
A    Crack cocaine in a vial.
Q    Where was it you received that?
A    At "Papoose's" and "Mousey's" house.
Q    When was that, approximately?
A    One day I went down to James, James left me down there, and he had left and came back and he asked me did I get high, and I told him no, that I was going to a Narcotics Anonymous meeting.  I told him I needed $5 to go to my meeting.  He gave me a vial and I gave it to the girl named Denise and she gave me $5 for it.
Q    Who gave you the vial?
A    Cory Johnson.
Q    What was contained in that vial?
A    Crack cocaine.
Q    You did what with it?
A    Gave it to Denise.
Q    All right.  And you say you are in Narcotics Anonymous?  Why is that?
A    For drugs, using drugs.
Q    At the time frame of the subject of your testimony, were you using drugs in November of 1991, thereabouts?
A    Was I using drugs then?

**JA1003**

Sterling R. Hardy (Direct)

Q    Right.
A    No.
Q    When is the last time you used drugs?
A    I think it was in 1990.  If I am not mistaken, it was in 1990.
Q    I direct your attention to January 29th, 1992. Do you remember that day?
A    Yes, I do.

2166

Q    Why is it that you remember the date of January 29th, 1992?
A    Because that's my mother's birthday.
Q    Did you have occasion to be present and witness a murder that occurred on that day?
A    Yes, I did.
Q    Where did that murder take place?
A    Off of Leigh Street.
Q    All right.  Could you tell the ladies and gentlemen of the jury where you had been prior to that murder?
A    Earlier that day, James had came through Jackson Ward.
Q    Who do you mean?
A    James Roane.
Q    All right.
A    He had came through Jackson Ward and I was sitting on the bench with my girlfriend.  And he asked me what was I doing.  I told him I was going. He asked me later on could I come up there where he was at.  I told him all right.  About seven or eight, me and my friend, Dennis Moody, had left and went up there to the area where James be at, and I seen Jerry Gaiters and Jerry was selling coke.  And I asked Jerry, I said, "Have you seen James?"  He told me

2167

no.  He said, "But he should be back in a little while."  So later on, James came through in the car. And he was talking to Gaiters and Sandra Reavis, and Cory was in the car.  So at that time he told Gaiters to tell me  --
Q    When you say Sandra Reavis, do you see her in the courtroom?
A    Yes.  Sitting besides James.
Q    In what car was that?
A    A burgundy Regal.
Q    Whose car was that; do you know?
A    Roane's.
Q    Go ahead.
A    So he told Gaiters to tell me to stay with him until he get back because he had to go take care of some business.  Later on that night, it was getting late, me, my friend  --
Q    When you say "your friend," who do you mean?
A    Dennis Moody.  And Gaiters walked through an

**JA1004**

alley.  It was getting late.  It was 11 or 11:15, somewhere around that time, and we had walked to a house all the way up to the end of the alley on Leigh Street and we went to the back door.  So Gaiters knocked on the door with the gun, with a little .38. It looked like it was a .38.  The dude opened the door for him and there was a dude in the house with the other dude and he asked Gaiters did he have anything.  Gaiters said that he had some, and he went in several rooms and was talking.  At that time, me and my friend was in another room, in the front room. I was sitting on the bed and he was sitting on a creek or something and the dude came in there  --

Q    Who do you mean?

A    Lewis Johnson.

Q    All right.  Lewis Johnson came in and what was he doing?

A    Smoking crack cocaine.

Q    With who?

A    Gaiters and Dennis Moody.

Q    How long did you stay there smoking crack cocaine?

A    I'd say approximately might have been 45 minutes.

Q    Did you smoke any crack cocaine that night?

A    Not at all.

Q    Did there come a time  --  who was present in that house that night?

A    Jerry Gaiters, Dennis Moody, me, and the dude that I guess the house belongs to.

Q    Was Lewis Johnson present?

A    Yes, he was.

Q    Is that the same man who you saw murdered?

A    Yes, it is.

Q    Did there come a time when you left that house that evening with Lewis Johnson?

A    Lewis Johnson left out the door and I told Dennis, I asked was he ready.  Dennis said, "Yeah." So as we were walking towards to leave out the front room to go towards the middle of the room, Gaiters asked where we were going.  We said we was going outside so we can catch him in case he came through there.  Gaiters came in front of us.  My friends were behind Gaiters and I was behind my friend.  At that time, Dennis Moody called James; James came through the alley in the car.  Dennis Moody called James, and Gaiters told Dennis not to do that.

Q    When you say James, who do you mean?

A    James Roane.

Q    And where were you at this point?

A    We was coming down the back step of the house.

Q    The house that they had been smoking crack

**JA1005**

cocaine in?

A    Yes, sir.

Q    What occurred next?

A    At that time, James came through the alley and we was down the step.  We was on the end of the alley, so we came out the alley to the end.  Me, Dennis Moody, and Jerry Gaiters was standing across the street.  At this time the dude, Lewis Johnson, was standing across the street by the curb.  James said, "Sterling, come here."  At this time  --

Q    How had James gotten there?

A    He had came back around in the car, in the Regal.

Q    Where was that car parked?

A    Right across the street from the alley.

Q    All right.

A    At an angle.

Q    Where was Lewis Johnson at this point?

A    He was standing on the corner, on the edge of the corner in the street.

Q    How far was he from the Regal?

A    From here to back there, a little farther.

Q    20, 25 feet approximately?

A    Yes.

Q    What occurred?

A    At that time, James called me to the car.  When I went to the car, James told me to get in the car.  James had an Uzi in his hand and Cory Johnson and Anthony Mack had handguns.

Q    Do you know Anthony Mack by the name of "V"?

A    Yes, I do.

Q    All right.  What occurred?  What kind of handgun did Cory Johnson have?

A    Could have been a semi-automatic.

Q    Do you know what color it was?

A    From where he was standing there, it looked like it could have been black.

Q    What occurred?

A    James got out the car.  He told me to get in the car.  At this time, I didn't know what was going on.  He told me to get in the car and my friend was standing beside Jerry.

Q    Your friend who?

A    Dennis Moody was standing beside Jerry Gaiters.

Q    Where was Jerry Gaiters?

A    Standing across on the other side of the corner from Lewis Johnson.

Q    All right.  What happened?

A    Cory, Anthony Mack, and James Roane went over there and all three of them shot the dude down.

Q    Who shot first?

A    I couldn't see who shot first.  Fire came from

**JA1006**

all three of the guns.

Q   Where were you at the time of the firing?

A   Sitting in the car looking over there at them shoot Lewis Johnson.

Q   And what happened next?

A   So at that time, James was walking back towards the car.  Anthony Mack or either Cory Johnson went back and shot him, went back and shot him again.

Q   Are you sure which one of them did that?

A   I couldn't tell you right now which one did it, but it was one of the two.

Q   Where was Lewis Johnson when one of those two walked back to shoot him?

A   Laying down on the ground, like he was trying to cover himself up.

Q   All right.  And what happened after that?

A   James came back to the car, gave me the keys, and told me for to go to Clay Street and take the left on Clay.  My friend ran behind the car.

Q   When you say "your friend," who do you mean?

A   Dennis Moody.  He ran behind the car.

Q   Who got in the car with you?

A   Cory Johnson, Anthony Mack, and James Roane.

Q   So who was driving?

A   I was driving.

Q   And where was James Roane seated?

A   James was sitting on the other side of me.

Q   Did he have a gun with him at that point?

A   Yes, he did.

Q   What kind of gun?

A   An Uzi.

Q   Where was Cory Johnson seated?

A   In the backseat.

Q   Where was "V" seated?

A   In the backseat with Cory Johnson.

Q   You took them where?

A   To Clay Street.  We went down Clay Street and went to Harrison Street to 1212, behind the school.

Q   All right.  And what did you do when you got there?

A   James told me he would see me tomorrow.

Q   Why did you go to 1212; what is at 1212?

A   The apartment that I got arrested at, and they got arrested, too.

Q   Who lived there?

A   James and Cory.

Q   Was anyone else there?

A   Anthony Mack was there.

Q   When you took them to  --  is that 1212 West Moore Street?

A   Yes, sir.

Q   When you took them there, what did you do?

**JA1007**

A    I left.  I went back to back up on Harrison Street where my friend was at.  And at this time the police was around in the area, so Gaiters took me and Dennis to some girl's house named -- they call her, it could be, Priscilla, somewhere around up there. They took us to an apartment right there and told us to stay in there until the police weren't around. And at this time, Gaiters gave Dennis $5 so we can catch a cab home.

Q    Did you ever have occasion to talk to James Roane about Lewis Johnson?  Did he ever tell you anything about Lewis Johnson?

A    James stated to me earlier that he didn't like the dude because one time he and him had went to a house where his daddy used to stay at, and the dude had a shotgun on the side of his arm.  And he said that he didn't like the guy.

Q    All right.  I direct your attention to approximately two days later, January 31st, 1992. Did you have occasion to be with James Roane on that day?

A    Yes, I did.

Q    All right.  Where was it that you were with James Roane on that day?

A    James picked me up again over at Gilpin Court.

Q    Did you take James anywhere?

A    Me and James rode around all that night until something like 5:30 or 6 o'clock that morning.

Q    The morning of February 1st?

A    February 1st.

Q    And whose car did you drive around in?

A    James' Regal.

Q    In that morning, where did you go?

A    That morning we went over to James' children's mother's house.

Q    Where does she live?

A    Over in Southside.

Q    Do you remember her name?

A    I don't remember her name.  I know her sister's name.

Q    What's that?

A    Barrett or something like that.

Q    Where was it she lived in Southside?

A    In the bottom of Lynhaven Apartments.

Q    What did you do when you were over there?

A    At this time, James went to the back door, to her back window, and knocked on the window so she could open the door for him.  And I sat in the car until he came back.  So at this time, we both went in the house.  And James was talking to her and he asked

me could I take her sister to the beauty parlor that

Sterling R. Hardy (Direct)

morning.

Q   Did you do that?

A   Yes, I did.

Q   What did you do after that?

A   I went over to my girlfriend's house.  I left my girlfriend's house  --

Q   How did you get there?

A   I drove in James' Regal.

Q   Did there come a time later on that evening, February 1st, 1992, that you went back to 1212 West Moore Street looking for James Roane?

A   That evening?

Q   Yes.

A   Yes, I did.

Q   And when you got there, who did you see?

A   At 1212 it was Cory Johnson and Anthony Mack.

Q   All right.

A   And Linwood Chiles.

Q   When you went in, did you talk to Cory Johnson?

A   I knocked on the door and I asked Cory was James up there.  Cory said no, and he asked me where did I leave James at.  I told him, "Over to Southside."  He said, "That's the kid that James had trouble with."

Q   What happened next?

A   He told the juvenile, "E.B.," for to go outside and get the bag.

Q   When you say "juvenile," why do you call him a juvenile?

A   Because he is a juvenile.

Q   Less than 18?

A   Yes, sir.

Q   Did "E.B." go outside and get a bag?

A   Yes, he did.

Q   What kind of bag?

A   A black tote bag.

Q   What was in that bag?  Did he ever come back in the house with that bag?

A   Yes, I seen him come back in the house.

Q   What was in the bag?

A   I think guns was in the bag.

Q   What do you say that for?

A   Because at that time, they took the bag and went in the kitchen with the bag.

Q   Who is they?

A   Cory Johnson and Anthony Mack.

Q   Also known as "V"?

A   Yes, sir.

        MR. VICK:  Could I see Government Exhibit 107, please?

        (Exhibit proffered to counsel.)

BY MR. VICK:

Q   I ask you to look through Government Exhibit

**JA1009**

107.    Have you seen that?

A    Yes.

Q    What is that?

A    The tote bag.  The black tote bag.

Q    Who brought that into the house?

A    "E.B."

Q    When you brought it into the house, where did they go?

A    In the kitchen, and shut the kitchen off.

Q    All right.  What did you hear at that point?

A    At that time, I heard them put the clips into the guns.  I got up and started walking towards the door.  Linwood came out of the kitchen and asked me where was I going.  I told him "Back over to my girlfriend's house."  He asked me could I follow him over to Southside, because they may need a ride.  I told him I would.

Q    Who went to Southside?

A    Cory Johnson and Anthony Mack and Linwood Chiles.

Q    In whose car did Cory Johnson and Anthony Mack ride?

A    Linwood Chiles'.

Q    How did you get to Southside?

A    James' Regal.

Q    Did you follow them to Southside?

A    Yes.

Q    Where was it you went?

A    To the Lynhaven Apartments.

Q    Is that the same apartment that you had previously left James Roane at?

A    Yes.

Q    What happened, where did you go?

A    At the time I pointed to the complex.  I went to park the car to get out the car.  Linwood Chiles told me I didn't have to get out the car.

Q    Where was Linwood Chiles?

A    He had parked his car, I think it was a car or two cars down from James' car.

Q    Is that the same station wagon that you had driven in previously, that you had been ridden home in?

A    Yes, it was.

Q    Did you see where "V" and "C.O." went?

A    When I got back in the car, they was going towards the apartments where James  --  where I left James at.

Q    How was "C.O." dressed that evening?

A    "C.O." was dressed in a bubba coat, a big coat.

Q    And how was "V" or Anthony Mack dressed that evening?

A    A hood.  He had a hood on.

**JA1010**

Sterling R. Hardy (Direct)

Q    When you say a hood, what do you mean?
A    A jacket with the hood, with the hood on it.
Q    Was it like a sweatshirt?
A    Yes, it was.
Q    What color was that?
A    Black.
Q    All right.  Did they have weapons with them that evening?
A    I didn't see no weapon.
Q    All right.  So all you heard were the weapons being loaded at 1212?
A    Uh-huh.
Q    All right.  Where was Linwood Chiles?
A    He was in the car.
Q    Did he stay out in the car all that evening while you were at Lynhaven?
A    Yes, he did.
Q    All right.  After "V" and "C.O." got out of the car, did there come a time, a few minutes later, when you heard something?

2181
A    Yes, I did.
Q    What was that that you heard?
A    At that time, something like it would be 11 or 12 minutes, I heard something like 50-some shots.
Q    What did they sound like, what sort of sequence?
A    Automatic guns.
Q    Like what?  Just tell us.
A    Just going pop, pop, pop, pop, pop.
Q    Where was that sound coming from?
A    From the apartments.
Q    Did you have occasion to see after the firing stopped, did you have occasion to see anyone come back to the cars?
A    At that time, I seen three heads come towards where I was at at the car, but they went to Linwood's car.
Q    All right.  And did Linwood's car pull up to you shortly thereafter?
A    Yes, it did.
Q    Did you see who was in that car?
A    Yes, I did.
Q    Who was that?
A    James Roane was in the front seat, Cory was in the backseat, and Anthony Mack was in the backseat.

2182
Q    Who was driving?
A    Linwood Chiles.
Q    Had he been in that car the whole time that the firing took place?
A    Say that again.
Q    Had Linwood been in his car the whole time the firing took place?

**JA1011**

Sterling R. Hardy (Direct)

A    To my knowledge, he was in the car.
Q    All right.  Now, when you left 1212 West Moore Street to go over there to Lynhaven, did you know that a crime of violence was about to be committed?
A    Yes, I did.
        MR. BAUGH:  Objection.
        THE COURT:  The objection is overruled.
BY MR. VICK:
Q    Had did you ever have occasion to talk with James Roane about anyone over at Lynhaven; did he complain about anyone over there?
A    James Roane had stated to me earlier that day when I took him to the shopping center that he didn't like the guy that was driving a burgundy  --  it was either a red Thunderbird or a red Cougar.  I'm not certain which one it was, but it was red.
Q    After Linwood pulled up in the car with James Roane, Cory Johnson, and "V," where did you go?  What did you do?
A    We went back down Commerce Road, got on the highway and got off on Chamberlayne, and went back to 1212 to their apartment.
Q    When you got back to 1212 West Moore Street, what happened?
A    At that time, I got out the car.  James, Anthony Mack, Cory Johnson, Linwood Chiles got out of the car.  They went in the house.  I was behind them in the house.  Anthony Mack said that "The bitch weren't dead."
Q    Did you see any guns in that house?
A    I seen one gun.
Q    What gun was that?
A    The Uzi that James had.
Q    When you say an Uzi, what kind of gun do you mean?
A    I guess a riot rifle.  It was automatic.
        MR. VICK:  Could I see Government Exhibits 105 and 106, please?
    (Exhibits proffered to counsel.)
BY MR. VICK:
Q    I'll just ask you, have you ever seen guns of that sort?
        MR. BAUGH:  Objection to "guns of that sort."
        THE COURT:  Overruled.
        THE WITNESS:  Yes, I have.
BY MR. VICK:
Q    Is that the type gun you saw James Roane with that evening?
A    I basically seen him with this one.
        MR. BAUGH:  Could we have an exhibit number, please?

**JA1012**

Sterling R. Hardy (Direct)

THE MARSHAL:  105.

MR. BAUGH:  The Tec-9, by agreement?

BY MR. VICK:

Q    Is that the one you identified?

A    Yes, sir.

Q    All right.  And what happened; where did you see him with that gun?

A    At this time, James, when Anthony Mack said to James that "The bitch weren't dead," James said, "The bitch is dead," because he knows he can shoot.

Q    What did Anthony Mack say?

A    At that time, they went in the back room.  They went in the back room to put the guns up.  James said he was going to have some fun.

Q    Did you take James anywhere that evening?

A    Yes, I did.

Q    Where was that?

A    I took James -- first I took James to go see where Sandra Reavis was.  Sandra weren't at home.  We went to  Harrison and Broad.  We left there and rode over to Whitcomb Court.

Q    What did James do when he got to Whitcomb Court?

A    He bought some heroin from over in Whitcomb Court and got sick.

Q    Did you have occasion to take him back to 1212 West Moore Street that night?

A    Yes.

Q    Did you have occasion to pick up anyone else that evening?

A    That night?

Q    That night.

A    We checked and seen was Sandra at home.  Sandra was at home at this time.  James had the gun with him.  James  --

Q    That gun that you have identified as an Uzi?

A    Yes.  James got out the car to go get Sandra Reavis.  James left the gun in the car on the passenger's side of the car, on the floor.  Sandra got in the car.  Me, Sandra and James Roane went back to 1212.

Q    What happened to that gun?

A    At that time when we came to 1212, James Roane told "E.B." to put the gun up.

Q    Did "E.B." do that?

A    Yes, he did.

Q    You got arrested that evening, did you not?  Or early the next morning?

A    Yes, I did.

Q    All right.  And you were arrested there at 1212 West Moore?

A    Yes, I was.

**JA1013**

Sterling R. Hardy (Direct)

Q    Who was present at that house when you were arrested?  Who else was at the house?
A    Anthony Mack, Cory Johnson, Sandra Reavis, and the juvenile, "E.B."
Q    Was Cory Johnson present and arrested that evening?
A    No, he weren't there.
Q    Who was arrested that evening?
A    Anthony Mack  --
     MR. WAGNER:  Objection, personal knowledge.
     THE COURT:  Overruled.  Go ahead.
BY MR. VICK:
Q    Who was arrested that night.

2187
A    James Roane, Sandra, and the juvenile.
Q    All right.  When you were in jail, did you have occasion to overhear "J.R." and Anthony Mack, also known as "V," and an individual by the name of "Whitey," in a conversation?
A    Yes, I did.
Q    Do you see "Whitey" in the courtroom today?
A    Yes, he is.
Q    Could you point him out, please?
     MR. GEARY:  We stipulate identification.
     THE COURT:  All right.
BY MR. VICK:
Q    What did you hear them talking about?
     MR. GEARY:  I object to "them" again.  We have three people he is listening to.
     THE COURT:  Sustained.
BY MR. VICK:
Q    Were they in a conversation together that you overheard?
A    Yes, they was.
Q    Who was speaking?
A    James Roane, "Whitey," and Anthony Mack.
Q    What were they talking about?
     MR. GEARY:  I object.
BY MR. VICK:

2188
Q    Specifically, tell us who you heard say what.
A    All three of them was talking among themselves. They said they was trying to find out the female that --
     MR. GEARY:  Objection.
     MR. BAUGH:  Objection.
     THE COURT:  Sustained.  Mr. Vick,  --
BY MR. VICK:
Q    Which one of them did you hear talking about the female?  Or did all three of them speak about the female?
A    They was talking; all three of them was talking among themselves.

**JA1014**

Sterling R. Hardy (Direct)

Q     Which one of them did you hear, or did all three of them speak about the female?

A     I couldn't say exactly which one, but among the three, they were trying to figure out who  --

MR. BAUGH:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q     Were they speaking to anyone else or just those three speaking?

A     Just them three.

Q     Where were you?

A     I was in the bullpen with them.

2189

Q     What did you hear them talking about?

A     They were trying to figure out who  --

MR. BAUGH:  Objection.

THE COURT:  Overruled.

BY MR. VICK:

Q     Go ahead.

A     They was trying to figure out a female that they gave a knife to.

Q     All right.  Did they tell you what  --

MR. HENDERSON:  Objection, leading.

BY MR. VICK:

Q     Did you hear what they were concerned about that knife about?

A     Not at that time.

Q     Did you find out later?

A     Yes, I did.

Q     How was that?

A     I was locked up in a jail that one of the dudes in this case said  --

MR. GEARY:  I object.  There are about forty of them in this case.

THE COURT:  Sustained.

BY MR. VICK:

Q     Who was that?

A     Johnny Byrd.

2190

MR. VICK:  I withdraw that question.

THE COURT:  All right.

BY MR. VICK:

Q     Did you ever have occasion to talk to Anthony Mack in jail about Linwood Chiles?

A     Yes, I did.

Q     Could you tell the ladies and gentlemen of the jury what you talked to Anthony Mack about about Linwood Chiles?

MR. BAUGH:  Excuse me.  At this point I would impose an objection, 801(d)(2)(E), unless there is a predicate it was in furtherance of  --

THE COURT:  Overruled.

BY MR. VICK:

Q     Did you have occasion to talk to Anthony Mack,

"V," Lance Thomas, about Linwood Chiles?

A    Yes, I did.

Q    Tell the ladies and gentlemen of the jury about that conversation.

A    Prior to my arrest on the 2nd with Martha McCoy, Linwood Chiles got arrested.  Linwood got out, had possession with intent to distribute crack cocaine.

Q    Was that after his arrest with you on February 2nd?

A    He weren't there at that time.  They arrested him a week after.

Q    All right.  Tell the ladies and gentlemen of the jury.

A    So the police officer said to me that  --

MR. BAUGH:  Objection to what the police officer might have said.

THE COURT:  Sustained.

BY MR. VICK:

Q    Did you say anything to "V" based upon what you learned from a police officer?

A    Yes.

MR. BAUGH:  Objection to what he learned from a police officer.

BY MR. VICK:

Q    What did you state  --

THE COURT:  The objection is sustained. Let's deal with the conversation with Lance Thomas.

BY MR. VICK:

Q    What did you say to "V"?

A    I said to "V" that the police said Linwood Chiles said that he testified against everybody in the case.  Anthony Mack told me not to worry about that, because what he did for Cory and "Whitey," that they will take care of that for them.

Q    Was that the extent of that conversation?  Is that the conversation you had with "V" about Linwood?

A    Yes, it is.

Q    Now, you are testifying here pursuant to your plea of guilty in this case; is that correct?

A    Yes, sir.

Q    You have pled guilty to the murder of Torrick Brown that took place on February 1st, 1992; is that correct?

A    Yes, sir.

Q    And the wounding of Martha McCoy; is that correct?

A    Yes, sir.

Q    Now, pursuant to that plea agreement, you understand that the United States might indeed, based upon your testimony, file what is known as a 5K1.1 with the Court; is that correct?

**JA1016**

A    Yes, sir.

Q    Now, that would tell the Court that you have indeed testified and cooperated in this case; is that your understanding?

A    Yes, sir.

Q    Has anyone told you that you will indeed receive any specific sentence pursuant to your plea of guilty and testimony in this case?

A    No, sir.

Q    Has anybody told you that you will receive a lesser sentence than you would normally receive based upon your testimony and cooperation?

A    No, sir.

Q    That's what you hope, isn't it?

A    Yeah.

Q    But nobody has told you that.

A    No.

Q    Indeed, do you know who will make that decision ultimately?

A    The Judge.

Q    And has anyone from the prosecution told you that we will assure you that the Judge will give you a lesser sentence based upon your testimony?

A    No, sir.

Q    All right.  Has anyone told you how you need to testify today, told you what your answers should be?

A    No, sir.

Q    Have we told you what would happen if indeed it was determined that your testimony here today was untruthful in some way?  That you lied to us?

A    Yes, sir.

Q    What is that?

A    I would be charged with perjury.

Q    Would you get your 5K1.1 sentence reduction?

A    No, sir.

Q    Or motion?

A    No.

Q    Now, do you know if Anthony Mack, "V," was arrested on February 2nd with you?

A    Yes, he was.

        MR. VICK:  I beg the Court's indulgence.

    (Counsel conferring with co-counsel.)

    I tender the witness, Your Honor.

        THE COURT:  All right.

            CROSS-EXAMINATION

BY MR. GEARY:

Q    What was your address  --

        MR. BAUGH:  We would make a motion that we break for lunch rather than break up the cross.

        THE COURT:  All right.  I was just thinking this is probably the best place to stop.  It is quarter to one.  We will stop now for lunch.  If you

**JA1017**

all would come back at ten minutes to two, we will get started with the cross-examination.

(The jury left the courtroom.)

Remove the defendants from the courtroom.

(Defendants removed from courtroom.)

(Recess taken from 12:50 p.m. to 1:56 p.m.)

THE COURT:  All right.  Let's bring in the jury, please.

(The jury entered the courtroom.)

CROSS-EXAMINATION

BY MR. GEARY:

Q    On February 2nd of last year you said you were arrested at 1212 West Moore Street?

A    Yes, sir.

Q    About what time of day was the arrest made?

A    Around 9:30, 9:45.

Q    In the morning?

A    Yes.

Q    At that time, were you living at 1212 West Moore Street?

A    No, I weren't.

Q    What was your address at that time?

A    813 North 21st Street, Apartment B.

Q    Had you ever spent the night at 1212 West Moore Street other than that night on February 1st?

A    No, sir.

Q    And had you ever in the period, the three or four months before February 1st, had you ever sold cocaine?

A    No, sir.

Q    Had you ever used cocaine during that three or four-month period from November to February?

A    No, sir.

Q    And of course, you would never possess cocaine with intent to distribute it during that three or four-month period, would you?

A    He gave my some coke and I gave it to  --

Q    That's the $5 vial you talked about?

A    Yes.

Q    Other than that you never possessed during that period from November of 1991 to February of 1992, you never possessed cocaine with the intent to distribute it, did you?

A    No, sir.

Q    When you were arrested on February 2nd, the arrest was by the Richmond Bureau of Police, was it not?

A    Yes, sir.

Q    You were brought to 501 North 9th Street?

A    Yes, sir.

Q    Before they took you through the deputies and through the processing or booking, were you

**JA1018**

interviewed by any police officers?

A    Not that I recall.

Q    So you went through processing and booking.  Did you get taken down to the City Jail at that point or stay in the lock-up overnight?

A    Stayed in the lock-up until Monday morning.

Q    Did any detectives or police officers talk to you until Monday morning when you were arraigned in General District Court in Richmond?

A    Prior to my arrest, they said that I was  --  that they had  --  they was holding me for investigation.  At that time I wasn't arrested.

Q    Who told you that?

A    The arresting police officer, I think.  And it was somebody named Rodriguez.

Q    J. Rodney Rodriguez?

A    I believe so.

Q    Are you saying to the Court and jury that when you got, quote, arrested on February 2nd, they never served warrants on you?

A    They never said I was arrested.

Q    They never served any warrants on you?

A    At that time, no.

Q    Since February 2nd until this very day, Mr. Hardy, have you ever been served with arrest warrants for anything that you may have done on February 1st or February 2nd by Richmond Bureau of Police officers?

        MR. VICK:  All of this is irrelevant, how he was processed, what charges.

        MR. GEARY:  If there is an objection  --

        THE COURT:  Sustained.

BY MR. GEARY:

Q    Your plea agreement, you have read it many times, have you not?

A    Yes, I have.

Q    You pled guilty in Count Thirty-two to possession of cocaine, did you not?

A    I don't have no cocaine charge.

        MR. GEARY:  May I give him a copy of the indictment?

    (Document proffered to witness.)

BY MR. GEARY:

Q    Take a look at Count Thirty-two of the indictment, please.

        MR. VICK:  I move Government Exhibit 126, his plea agreement, into evidence.

        MR. GEARY:  I'd like to do it myself.

        THE COURT:  Go ahead.

BY MR. GEARY:

Q    With the indictment.  Does that charge you with possession of cocaine with intent to distribute?

**JA1019**

A    I was charged with it, but  --
Q    Just read that and tell the jury if that charges

2199

you on February 1st with possession of cocaine  -- February 1st or February 2nd -- with possession of cocaine with intent to distribute it.

(Witness perusing document.)

A    That's what I am charged with.

Q    And when you were first arraigned in front of Judge Spencer you pled not guilty; is that correct? The first time you were in front of the Judge?

MR. VICK:  This is all irrelevant.

THE COURT:  Sustained.

MR. GEARY:  This is not a legal area.

THE COURT:  Sustained.

BY MR. GEARY:

Q    Did you plead guilty to that charge?

A    I pleaded guilty to attempted murder or murder, some kind of crime, I would say, within that conspiracy.

Q    You did not plead guilty to possession of cocaine with intent?

A    To my knowledge, it was  --

Q    Tell the jury what you did, Mr. Hardy, to make you guilty of conspiracy to distribute cocaine.

MR. VICK:  This is a legal area.

THE COURT:  Sustained.

MR. GEARY:  This lawyer has asked everybody

2200

who is involved in the conspiracy.  When we want to ask him what he did, they object to this.

THE COURT:  The objection is sustained.

MR. GEARY:  Mr. Marshal, may I get the indictment back?

(Document proffered to Mr. Geary.)

BY MR. GEARY:

Q    How long were you held for investigation, Mr. Hardy?

A    At that time, I was held for investigation something like four or five hours.

Q    Okay.  And were you released then?

A    No.

Q    What were you charged with to keep you in custody?

MR. VICK:  Same objection.

THE COURT:  Overruled.  He can answer that.

BY MR. GEARY:

Q    What were you charged with then?

A    At that time I was charged with possession of cocaine with intent to distribute it.

Q    And where were you supposed to have possessed cocaine with intent to distribute it, and what date?

A    I don't remember.

**JA1020**

2201

Q    Was it part of this charge here?

A    Yes, it was.

Q    At some point after you were locked up, did any detectives start talking to you?

A    They told me what I was charged with.

Q    Were you ever interviewed by any detectives?

A    I don't remember.

Q    Do you know a detective by the name of Dalton? Does that name ring a bell?

A    No.

Q    Detective Woody?

A    Uh-huh.

Q    Did Detective Woody interview you?

A    He might have asked me what I am going up on, like the time of my arrest, something like that.

Q    When is the first time you met either Mr. Vick or Mr. Parcell?

A    I don't really recall myself.

Q    You've talked to Mr. Vick before today, haven't you?

A    Besides when I came in Court to plead guilty in this case?

Q    Have you talked to him any other time besides that?

A    I talked to my lawyer.

2202

Q    That's Mr. Everhart?

A    Yes.

Q    Was Mr. Everhart carrying messages back and forth between you and Mr. Vick about this case?

A    I don't think so.  I never got no messages.

Q    Okay.  Do you understand that you have an attorney-client privilege with Mr. Everhart?

          MR. VICK:  Irrelevant.

          THE COURT:  Sustained.  Mr. Geary, please, get on with it.

BY MR. GEARY:

Q    Did you plead guilty to the conspiracy charge because you were guilty of it, or because you weren't guilty of it, Mr. Hardy?

          MR. VICK:  Objection.

          THE COURT:  Overruled.  He can answer.

          THE WITNESS:  I pleaded guilty because my lawyer said I was there; that even though I didn't kill nobody, that he thinks I should have pleaded guilty because I took part, was involved in the moving of individuals.

Q    Moving what?

A    The individuals.

Q    From Moore Street to Lynhaven.

A    Well  --

2203

Q    What did your lawyer cite to you about pleading

**JA1021**

guilty to the conspiracy charge, conspiracy in regard to drugs?

A    He told me it would be best for me to plead guilty.

Q    Are you in fact guilty of conspiracy?

A    No.

Q    Thank you.

        MR. GEARY:  No further questions.

        THE COURT:  All right.  Mr. Cooley?

        MR. VICK:  Your Honor, prior to Mr. Cooley's examination, may we approach?

    (At Bench.)

        MR. VICK:  I had objected to asking for legal conclusions from this man.  Mr. Geary knows that by joining that conspiracy on the night of the murder he is guilty of everything that that conspiracy does.  And I think the jury should be instructed about that.

        THE COURT:  I don't think the jury needs to be instructed.  Mr. Vick, if this guy thinks he is guilty, don't object.

    (In Open Court.)

                CROSS-EXAMINATION

BY MR. COOLEY:

2204

Q    Good afternoon to you.

A    Good afternoon, Mr. Cooley.

Q    Mr. Hardy, you responded when Mr. Geary asked you about when you got arrested on February 2nd of 1992 if you had been interviewed by a detective or two detectives.  He asked about Detective Dalton. You said you didn't recall that.  Then he asked you about Detective Woody, and you said you did talk to him and thought you answered a couple questions from him.  Is that what you told these folks?

A    Yes, sir.

Q    In fact, you were interviewed by those two detectives for about an hour-and-a-half, weren't you, on February 2nd?

A    No.

Q    The morning after you were arrested, later that morning, they had a number of folks sitting out there and they were bringing you all in one at a time, weren't they?  Didn't they do that?

A    Yes.

Q    They interviewed you, asked you a lot of questions, didn't they?

A    They asked me what I was doing up there at that house.

Q    That house being 1212 West Moore Street.  That's

2205

all they asked you?

A    Just about.

Q    Let me withdraw that question.  Did you know at

Sterling R. Hardy (Cross)

the time when you were talking to those folks that they were taping your responses?

A    Huh-uh.

Q    Did you know at the time that not only was there an audio tape, but that they were videotaping you?

A    Huh-uh.

Q    Did you know that until I just told you that?

A    No.

Q    All right, sir.  Now, let me ask you some questions about what was asked of you and what was said by you during that interview on February 2nd. They asked you had you been over to Southside that day, that night before, and you said you had never gone to Southside; do you recall that?

A    Right off, I can't recall it.

Q    Do you recall telling them that you had never gone to Southside, but you were there when other people came back and had talked about being in Southside at Lynhaven?

A    First of all, they never asked me about Southside.

Q    Never asked you about that?

A    Not that I recall.

Q    So you deny that you said you weren't at Southside.

A    I never denied nothing.

Q    I'm asking you now, you are saying that you have never told them that on that day; is that right?

A    I told the truth.

Q    I understand that's what you are telling us today.  Didn't they ask you on that occasion, "Did you go to Southside?"  And you told them no, you had not been to Southside?

A    I don't remember.

Q    Okay.  Do you recall telling them that there had been two cars: a station wagon that Linwood Chiles and "O" were in, and a burgundy car that James, a juvenile -- I assume that would have been "E.B." -- and a tall guy were in?  Do you remember telling them that?

A    They asked me about a car.  They asked me what kind of car was I driving.

Q    What did you tell them when they asked you what kind of car you were driving?  Did you tell them a blue Toyota?

A    I believe so.

Q    You think you did.  Okay.  You have told the ladies and gentlemen today that when you drove you were driving a Regal, James' Regal; is that right? That's what your testimony was a few minutes ago.

A    Uh-huh.

Q    All right, sir.  And they asked you about the

**JA1023**

tall guy that was in James' car with the juvenile.
And first you said you didn't know who it was, and
then when they asked you could it have been Jerry
Gaiters, you said, "Yes, it could have been"; is that
right?
A    No.  They never asked me about no tall guy.
Q    Never asked you that?
A    No.
Q    You deny that?
A    Yes, I do.
Q    And they asked you about the activities in the
house at 1212 West Moore Street, and your response to
them was that these folks kept you in the dark and
they talked about some things, and you assumed maybe
they were talking about drugs; do you remember making
that statement?
A    Say that again.
Q    The police asked you about the activities that
occurred up at 1212 West Moore Street, and you
responded that these folks kept you in the dark; you
really didn't know what was going on up there because
they kept you in the dark.  You heard them talking
and you thought maybe, or assumed maybe, they were
talking about drugs; do you remember that?
A    Yes, I do.
Q    Okay.  And you said you really didn't hang
around because they come and get you and take you to
the movies.
A    I didn't say "they."  I didn't say no movies.
Q    You didn't say movies at all?
A    No.
Q    Never mentioned that.  When we talk about -- I
may have used the word "they."  Did you say that
James would come pick you up and you would go to
movies or somewhere else?  Do you remember anything
like that?
A    I never said that we went to movies.  I said we
might have went to the shopping center or had a
couple drinks or something like that.  I didn't say
no movies.
Q    Now today, you have testified that you were
there on Leigh Street with Jerry Gaiters and Dennis
Moody when Lewis Johnson was shot.  That's what you
have told these ladies and gentlemen; is that right?
A    Yes, I did.
Q    Back on February 2nd when the detectives asked
you did you know about the guy who got killed up
there, that Lewis boy, you responded, "I don't know
nothing about that.  I don't know nothing about no
killing."  Do you remember that comment by you to the
detectives?
A    Yeah, because I was trying to keep it in.

**JA1024**

Q    You remember saying that, and that's what you said to the detectives?

A    Uh-huh.

Q    All right.  And you told them that you left Moore Street and walked up and at some point saw "J.R.," Roane's mother; is that right?  And that she was concerned that he might have been injured so she asked you to go back down to Moore Street and check on him or tell him to come see her; do you remember telling them that?

A    I said Roane's mother was going to the school. She was coming up that way going to the school and she asked me if I had seen her son.

Q    You told her something related to that.

A    Yes.

Q    Do you remember after that statement Detective Dalton, that would be one of the two detectives, Mr. Woody is the tall black gentleman with kind of graying hair, graying beard, and the other detective is a medium to shorter-sized white fellow; do you remember those two talking with you that day?

A    No.

Q    Do you remember the detective telling you, "I promised you if you tell the truth, I will go to the Commonwealth's Attorney and help you"; do you remember that?

A    Huh-uh.

Q    All right.  And do you remember Detective Dalton saying to you, "You are lying about seeing James' mama at 8:30, no one left that house since 5 o'clock a.m."; do you remember him telling you that?

A    No.

Q    Do you remember him telling you that you were dancing around with them?

A    No.

Q    You don't remember that.

A    Huh-uh.

Q    Do you remember talking to them about that you had two charges; that one was for possession with intent and you had served some time on that, and that you had an imposition of sentence suspended on possession of cocaine at that point; do you remember telling them that?

A    No.

Q    That would be true, wouldn't it?

A    Yes.

Q    You just don't recall telling them that.

A    Huh-uh.

Q    Do you recall telling them that you were on probation and that your urines were coming up clean?

A    Yes, I do.

Q    All right.  So you do remember some discussion

**JA1025**

about what was pending against you.

A    Uh-huh.

Q    And you told them, did you not, the discussion between you and the detectives was that imposition of sentence suspended on the cocaine charge meant that you had as much as ten years over your head in the state system for that charge that you had already been convicted of and was sitting out there; do you remember that discussion?

A    No.

Q    Okay.  Do you deny it or just don't know?

A    I don't remember.

Q    Do you remember they asked you if you went to Church Hill that night and you told them the only thing you did in Church Hill was go with James to Whitcomb Court and got one $30 bag of cocaine; do you remember that?

A    No.

Q    That you went to Cunningham's house?

A    No, I don't.

Q    Or to Tina Cunningham's house?

A    I never said that he had no bag of coke.  I said he had a bag of heroin.

Q    Oh, heroin.  I'm sorry.  It was a $30 bag of heroin, not cocaine?

A    Uh-huh.

Q    But you remember saying that that's what occurred; you went up there.

A    Yes.

Q    Now, do you recall the detectives asking you specifically if you know about certain murders, specifically the shooting on West Clay Street, Maurice Johnson?  And you said, "I don't know anything about that"; do you remember that?

A    Huh-uh.

Q    Do you deny that or you just don't remember?

A    I don't remember nobody asking me nothing like that.

Q    Do you remember commenting you knew nothing about the killing of the girl in the railroad tracks?  That would have been Katrina Rozier; do you remember that?

A    Huh-uh.

Q    Do you recall telling them that you knew nothing about the dude found in Newtowne on the street, that Lewis boy; do you remember telling them that, Lewis Johnson, the one you testified to today?

A    Huh-uh.

Q    Okay.  You are not denying that; you just don't recall that.

A    I don't recall it.

Q    You certainly made no mention of you ever going

**JA1026**

Q    to Southside driving people over there, did you, on that occasion?

A    After my arrest?

Q    Yes, on February 2nd, the day later.  You made no mention of that?

A    No.

Q    You made no mention of Torrick Brown, anything about the Torrick Brown matter?

A    I don't know Torrick Brown.

Q    The Lynhaven matter.  You told them you didn't know anything about that; is that right?

A    No.

Q    Are you saying no, you didn't know anything about it?

A    I don't remember saying what you said.

Q    You don't remember telling them anything about you driving them over to Lynhaven, people having guns; you didn't tell them any of that, did you?

A    No.

Q    In fact, you denied being with these other folks, except that you were at West Moore Street when they came back from somewhere and talked about Southside; is that right?

A    Say that again.

Q    You told the police you hadn't been with these other folks, James or Gaiters or these other folks that evening, but that you were at Moore Street when they came back in cars and they were talking about something about Southside; isn't that what you told them?

A    I don't remember.

Q    Don't remember.  Okay.  Do you remember them asking you specifically this quote:  "You are sure you have told me everything that you know about this, you are positive?"  And you responding:  "I said I've told you everything I know.  I told you everything I know, and my mama, my mama advised me to tell."  Do you remember that?

A    Huh-uh.

Q    You don't deny that; you just don't remember it.

A    I don't remember it.

Q    And then you saw Detective Woody again in an interview  --  let me stop for a moment.  You were in fact, on that February 2nd, 1992 day, the day that you were talking to these detectives, you were in fact charged, were you not, on that date with possession of cocaine with intent to distribute, possession of a firearm while in possession of cocaine, and conspiracy to distribute cocaine on that day, weren't you?

A    Yes.

**JA1027**

Q   You were charged with those three things.
A   Yes.
Q   I am correct that at some point thereafter, all three of those charges were dropped in the state court; is that right?  They were all nol prossed, weren't they?
A   I don't know.
Q   You don't know.  Were you not going to trial on those?  You haven't gone to trial on those since February of 1992, have you?  You haven't been up to Richmond and been tried by either a judge or jury on those three charges, have you?

2216

A   No.
Q   Okay.  On February 18th of 1992, you again talked with a detective down at police headquarters; is that right, was it Mr. Woody?
A   What you say?
Q   On February 18th, 1992, you had another interview and discussion with Detective Woody; do you remember that?
A   I think that's when they brought me them other cases.
Q   The new charges, the murder charge of Torrick Brown and stuff like that; is that right?
A   Uh-huh.
Q   Did you know that that conversation was being videotaped?
A   No.
Q   Did you know that until I just said that right now?
A   I never knew it.
Q   Now, on that occasion, Mr. Woody brought you in and he advised you that you were being charged with the murder of Torrick Brown, with the use of a firearm in the murder of Torrick Brown, the conspiracy to commit murder, and the aggravated assault of Martha McCoy; isn't that what he told

2217

you?
A   Yes, he did.
Q   Then again, after he told you what he was charging you with, you denied that you had been over there at all, didn't you?  You said, "I wasn't there, I don't know anything about it."  Isn't that what you told him?
A   I can't recall.
Q   You don't deny that.  You just don't recall it.
A   I just don't recall it.
Q   All right.  You did tell him that you were at Moore Street when other people arrived, did you not?  Did you tell him on that occasion that you had never gone to Southside, but you were at Moore Street, 1212 West Moore Street, when Jerry Gaiters and "V,"

**JA1028**

Anthony Mack, and "E.B." came back?

A    You said Jerry Gaiters, "E.B." I never said that no Jerry Gaiters was at no house.

Q    You never said that Jerry Gaiters was  --

A    To my knowledge, no, I didn't.

Q    Did you say that Jerry Gaiters was riding in a car with you?

A    With me?

Q    No, with them when they came back.

A    No, I don't recall that.

Q    You deny saying that?

A    I don't remember saying nothing like that.

Q    Do you recall telling them that you went with "J.R." to Whitcomb Court again?  You told them that again on that occasion, didn't you?

A    I can't remember.

Q    All right.

        MR. VICK:  May we approach?

        (At Bench.)

        MR. VICK:  This is improper impeachment of a witness.  It is not a statement under oath.  It is while he was  --  it was after he was arrested without advice of counsel there.  For a man to deny his involvement in a crime there, Mr. Cooley, I would assume you would expect nothing less.  I think it is improper impeachment.  He has not even had occasion to review that tape.  I'll sit on my hands again, but it is improper impeachment.

        THE COURT:  Objection overruled.  Mr. Cooley, while you are up here, you are starting to repeat yourself.  Don't ask the same question twice.

        (In Open Court.)

BY MR. COOLEY:

Q    Right after you again denied ever going to Southside, do you recall Mr. Woody saying to you, "If you are honest with me, Lynhaven will be okay, too"; do you remember that statement being made to you by Detective Woody on February 18th of last year?

A    No.

Q    You again told him you didn't go to Lynhaven, did you not, right after he told you that?

A    No.

Q    You deny that?

A    I don't remember exactly.

Q    And then in fact at that point in time, as you made reference to in your direct examination, at that point in time Mr. Woody began to tell you, "You are fibbing to us and we know that because Linwood Chiles told us this, this, and this, and because another person, "E.B.," the juvenile told us this, this, and this, and we can put this on you.  We know you were there; we think you were a shooter."  He went into

**JA1029**

those things and told you what they thought had occurred, did he not?  And that scared you, didn't it?  Didn't that happen?

A    Say it again.

Q    He went into a variety of things telling you -- in fact, he started his comment by saying, "I'm going to do something I don't usually do.  I'm going to tell you what some of these other folks have said," and he said, "Linwood Chiles told us you did this, this, and this over in South Richmond and "E.B." told us you did these things and we are going to charge you.  And that's why you are charged with the murder of Torrick Brown and the conspiracy to commit murder and the aggravated assault."  He told you those things, didn't he, and that scared you, didn't it?

A    He didn't scare me, but that's what he said.

Q    That's what he told you.  He told you what their version was and then he said, "We want you to tell us the truth and if you are honest with me, things will be okay even at Lynhaven," right?  That was what you understood, wasn't it?

A    I believe so.

Q    Okay.  And then for the first time, you told him the same thing or similar to the things that were advised to you by Detective Woody; you started telling him now, "Yes, I dropped "J.R." over there," didn't you?  That's when you first started telling him about it, wasn't it?

A    No. I think I told the truth.

Q    Right then; is that right?

A    Yes.

Q    At least your version changed.  Instead of "I wasn't in South Richmond at all," then you began to tell him, "I dropped "J.R." off  --"

A    I wasn't saying I was not in South Richmond.

Q    You deny ever saying that?

A    I don't recall.

        MR. VICK:  He testified several times he doesn't recall.

        THE COURT:  Sustained.

BY MR. COOLEY:

Q    I apologize.  Now, you told Detective Woody even then that you never saw at that point in time the black Salem tote bag; isn't that right?  You told him you hadn't seen that black Salem tote bag.

A    Prior to my arrest or after  --

Q    On the trip to South Richmond, when you went from Moore Street to South Richmond.

A    Run the last part back.

Q    You told Detective Woody that when you left Moore Street and were going to South Richmond, you didn't see the black Salem tote bag; isn't that

correct?

A    When I left from --

Q    Moore Street.

A     -- then I seen the tote bag.  The juvenile brought the tote bag in the house.

Q    I understand you just said, evidently you said.

Do you remember what you told Detective Woody on that date?

A    I don't recall.

Q    So you don't recall denying that you saw the black tote bag in that trip?

          MR. VICK:  He doesn't recall, Your Honor.

          THE COURT:  Sustained.  Mr. Cooley, the witness has responded to your questions "I don't recall," and you keep asking the question as if he answered it in the affirmative.  Don't do that.

          MR. COOLEY:  I'm sorry, Your Honor.

BY MR. COOLEY:

Q    Mr. Hardy, did you advise the detective on that occasion that when you left Moore Street, you picked up someone in a  --  they picked up someone in a military jacket, a tall person in a military jacket on the way to South Richmond from Moore Street?  Do you recall telling him that?

A    Huh-uh.

Q    Do you recall telling them that you had no gun and that you did not shoot anyone?

A    I don't recall saying that.

Q    You didn't tell them that.

A    No.

Q    Do you recall telling them how many shots you heard in South Richmond?  Did you tell them you heard one shot?

A    No, not that I recall.

Q    All right, sir.  Now, you understand that you have pled guilty and Mr. Vick asked you about three charges, or some charges.  You have pled guilty to five charges here in the Federal system; is that correct?  Do you understand that?

A    Can you repeat what five charges I got, sir?

Q    Yes, I can.  Did you not in fact plead guilty to Count One, which is conspiracy to distribute drugs, and that carries a penalty of ten years up to life and a $4 million fine; you understand that, don't you?

A    Yes.

Q    You also understand and have indicated by your signature to these things that you are not eligible for parole and that you cannot be placed on probation, and you cannot have any sentence suspended, any execution of sentence suspended; do you understand that, except for a 5K1 motion; do you

**JA1031**

Sterling R. Hardy (Cross)

understand that?

A    Yes.

Q    You are also charged  --

MR. VICK:  We will move the plea agreement in again.

MR. BAUGH:  Objection.

MR. VICK:  It will save time.

MR. BAUGH:  I object to the United States intentionally offering this.  They know they wrote it and they know it is not admissible.

THE COURT:  All right.  The plea agreement will be admitted.  Mr. Cooley, you go and ask any questions you want about it.

MR. COOLEY:  Thank you, sir.

BY MR. COOLEY:

Q    Also, you asked what five things.  Let me ask you again.  You were charged with Count Fourteen.  Count Fourteen says that you did knowingly, intentionally, and unlawfully cause the murder of Torrick Brown as part of a racketeering activity; do you understand that?

A    Yes, sir.

Q    All right.  And you understand that as to that penalty, or excuse me, that offense, the maximum penalty is again life and a fine of up to $50,000 Do you understand that?

A    Yes, sir.

Q    And that you can't be  --  you are not eligible for parole and you can't have it suspended, and you can't be placed on probation; do you understand that?

A    Yes.

Q    You also pled guilty to Count Sixteen, excuse me, Count Fifteen, which is the use of a firearm in the commission of that murder of Torrick Brown.  Do you understand that you did that, don't you?  You pled guilty to that.

A    Yes, sir.

Q    All right.  And you also pled guilty to Count Sixteen, which is that you did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy; you understand that, don't you?

A    Yes, sir.

Q    And you understand that that also carries a penalty, do you not?

A    Say that again.

Q    That it also carries a penalty?

A    Yes.

Q    And Count Thirty-two, you pled guilty to Count Thirty-two, which is that you did knowingly and intentionally possess with intent to distribute a

**JA1032**

Sterling R. Hardy (Cross)

Schedule II narcotic-controlled substance, that is, 50 grams or more, excuse me, more than 50 grams of a mixture, that being crack or cook-'em-up; do you know you pled guilty to that, don't you?

A    No.

Q    You didn't realize you pled guilty to that?

A    No, because that was dismissed or something.

Q    You think that was dismissed?

A    Yes.

Q    All right, sir.  You would agree that whatever is in the plea agreement that the government has just asked to be entered and the Court has entered is in fact what you have been convicted of; you would agree with that, wouldn't you?

A    Uh-huh.

Q    You agree you signed that along with your counsel, didn't you?

A    Uh-huh.

Q    All right, sir.  Now, in speaking of the plea agreement, was it pointed out to you a specific paragraph in that plea agreement, paragraph number 15, in which -- I'll just read it to you and you see if this rings a bell to you.  "The parties understand and agree that the United States reserves its option to seek any departure from the applicable Sentencing Guidelines pursuant to Section 5K of the Sentencing Guidelines and policy statements, or Rule 35(b) of the Federal Rules of Criminal Procedure.  If in its sole discretion the United States determines that the defendant's substantial assistance has been completed and that such a departure is appropriate, the parties understand that defendant's ultimate sentence resides in the sound discretion of the Court and not the United States Attorney's Office."

It was pointed out to you that if you cooperated, if you testified, and I think I'm using Mr. Vick's terminology, that you tell the truth and if we found out you have lied to us, you wouldn't get the 5K motion, but if you come up here and testify as anticipated, that you would get the benefit of a 5K1 motion which would allow this Court or the sentencing court to reduce your sentence; that's what you understand, isn't it?

A    Say that again.

Q    I'll try.  You were advised that if you get up and testify as anticipated, that you will get the benefit of the government filing a 5K1 motion which will allow the Court, the sentencing court for you, to reduce your sentence below what the guidelines call for.  That's what you understand, isn't it?  That's why you are here testifying, isn't it?

A    From my lawyer.

**JA1033**

Sterling R. Hardy (Cross)

2228

Q   From your lawyer.  And that's contributing to why you are here, isn't it?  That's why you have come to testify, right?

A   I came here to tell the truth.

Q   And the fact that you might get some benefit from that has nothing to do with it?

A   Regardless of the benefits, I feel like I'm setting up here telling the truth for myself.  I know what I didn't do, and I quite feel everybody else knows.

Q   You are really here to tell us what you didn't do.  You have already pled guilty to the murder of Torrick Brown, right?

A   Right.

Q   And you are here to tell us and this Court and these ladies and gentlemen of the jury the truth, what you didn't do.  Isn't that right?

A   Yes, sir.

Q   And isn't it correct that you anticipate the benefit to you being a reduction in the sentence that you know you must get unless they file that 5K1 motion?  Right?

A   That's what my lawyer said.

Q   That's what your lawyer said.  All right, sir.
Now, the five charges that were levied against

2229

you by Detective Woody on February 18th of last year, the murder, use of a firearm, felonious assault, use of a weapon in a felonious assault, and conspiracy to commit murder, you were charged on February 18th with those five charges by Detective Woody, weren't you, in the state court?

A   Yes, I was.

Q   All of those were subsequently nol prossed, not prosecuted in state court; is that correct?

A   I do not know.

Q   You haven't been to trial on any of those, have you?

A   No.

Q   And you entered into your plea agreement on what date, do you recall?

A   Could I see the original plea agreement?

THE COURT:  All right.

MR. VICK:  It will be a matter of the Court record.  We can check.

(Document proffered to Mr. Cooley.)

BY MR. COOLEY:

Q   Did you plead guilty last spring?  Did you plead guilty on July 28th, 1992?  Is that when you came into Court and pled guilty to those five charges in Federal Court?

2230

A   That's right.

**JA1034**

Sterling R. Hardy (Cross)

Q   And you haven't been sentenced as of now; is that correct?
A   No.
Q   Why is there a delay; do you know?
A   No.
Q   Isn't it to allow you to testify so that the value of your  --
        MR. VICK:  He has testified he doesn't know.
        THE COURT:  Sustained.
BY MR. COOLEY:
Q   Has your lawyer told you why?
        MR. VICK:  He says he does not know.
        THE COURT:  Sustained.
BY MR. COOLEY:
Q   Mr. Hardy, last question:  When you met with Detective Dalton and Detective Woody on February 2nd of last year, the day you were arrested up there on West Moore Street, and you told them you had never been over to Southside  --
        MR. VICK:  Objection to the form of the question.
        THE COURT:  Sustained.
BY MR. COOLEY:

2231

Q   Do you recall what the last statement you made to them was on that day?
A   I do not recall.
Q   Let me ask you  --
        MR. VICK:  Objection.  He does not recall.
        MR. COOLEY:  I'm entitled to ask the question.
        THE COURT:  Go ahead and ask the question.
BY MR. COOLEY:
Q   Do you recall being asked if you have told them everything at this point, and you said, "I swear that's all I know.  And that's my word.  You can get everything off on me."  Do you remember telling them that?
A   I don't remember telling them that.
        MR. COOLEY:  That's all the questions I have.
        THE COURT:  Mr. Baugh?
            CROSS-EXAMINATION
BY MR. BAUGH:
Q   Mr. Hardy, did anybody from the United States Attorney's Office show you the firearms report on Lewis Johnson's killing?
A   No, sir.
Q   They haven't had a chance to show you that.

2232

A   No, sir.
        MR. VICK:  Objection.
        THE COURT:  Sustained.

**JA1035**

Sterling R. Hardy (Cross)

BY MR. BAUGH:

Q    Is your testimony now, under oath, that on the night that Lewis Johnson died, you watched three people fire three different guns into him?

A    Yes, I did.

Q    And you watched the empty bullets jump out?

A    I couldn't see the bullets.  I seen the fire.  I didn't see no bullets jump nowhere.

Q    All right.  Now, you knew that Lewis Johnson and James Roane didn't like each other, didn't you?

A    No.

Q    Well, hadn't you heard something about a shotgun?

A    One time that I went up there, me and James had went in the house and he had a shotgun on the side of his leg.

Q    Did you and Mr. Roane talk about that at all?

A    James said he didn't like the guy.

Q    So you knew that there was a dislike between Mr. Roane and Mr. Johnson; am I correct?

A    No.

Q    You didn't know that?

A    No.

Q    Well, do you know why Mr. Lewis Johnson was shot?  Was it  --  strike that.

      Torrick Brown:  Did you know what Mr. Torrick Brown and Mr. Roane had against each other?

A    No.

Q    Did you know Mr. Roane's girlfriend, Robin Cooper?

A    Yeah, I knew her.

Q    She is the mother of some children by Mr. Roane?

A    Yes, sir.

Q    And had you been told that Mr. Brown had been seeing her?

A    From the time that I was over Southside with James?

Q    Any time.

A    No.

Q    All right.  When you were locked up after leaving 1212 West Moore Street, am I correct that they took you and Mr. Roane and some others down to the Richmond City Jail?

A    Me, James, Anthony Mack.  That's it.

Q    You mentioned while you were down there you heard a conversation between them; am I correct?

A    Yes.

Q    How many days had you been in custody before you heard that conversation?

A    From February until June.

Q    So when did you hear this conversation?

**JA1036**

A     In between that time.

Q     Could you narrow it down a little bit more?  How many days after your arrest did you hear this conversation?

MR. VICK:  Could we get which conversation?

THE WITNESS:  I couldn't say how many days after.

THE COURT:  Hold up.  What was that, Mr. Vick?

MR. VICK:  I just wanted to know which conversation he is talking to.  He has testified about a couple, I believe.

BY MR. BAUGH:

Q     Do you remember talking about a conversation you overheard in the jail?

A     Yes.

Q     With Mr. Roane involved?

A     Yes.

Q     How many conversations were involved with Mr. Roane?

A     At that point, one.

Q     Okay.  Now, approximately how many days after your arrest?  Was it a week afterwards?

A     I don't think so.

Q     Was it more than that, you think?

A     I believe so.

Q     And this occurred  --  so it was no longer in lock-up.  This had to occur in the Richmond City Jail, correct?

A     Yes.

Q     Where in the Richmond City Jail did it occur?

A     In the bullpen going back and forth to Court.

Q     Which Court?

A     I believe it was Government Court.

Q     Government Court?

A     Uh-huh.

Q     Did Mr. Everhart, your attorney, tell you about other clients he might have had who had 5K's and what they got?  Did he tell you that he had other clients who got appreciably-reduced sentences?

A     No.

Q     He never told you about that?

A     No.  Only thing my lawyer said to me, he said he thinks it will be better if I plead guilty, even though they know I haven't shot nobody.  He said that they should something like -- to my knowledge, he said that all of it would come out in Court, something like that.

Q     Torrick Brown's shooting didn't have anything to do with drugs?

A     I don't know.  I don't know.

**JA1037**

Q    So you are not here testifying that it did?
A    No.  I don't know.
Q    The same with Lewis Johnson; am I correct?
A    I can't say.
Q    When you were over there with Torrick on Southside, you weren't over there having anything to do with drugs, were you?
A    What?
Q    When you went over to Southside to Lynhaven, did you go over there about anything involving drugs?
A    No.
Q    Did you hear anyone mention drugs that day?
A    No.
Q    And lastly, when you got there, James Roane was already in Lynhaven, right?  He didn't ride over there with you.
A    Earlier, James told me for to check back up to 1212  --

2237

Q    For you to go check 1212.
A    See how they got back up there.
Q    When you left 1212 to go to Southside with the two cars, Mr. Roane was already on Southside, wasn't he?
A    He was still on Southside.
Q    He left with you all in the car?
A    He did not leave with me.
Q    But he left with the two cars with you all?
A    Yes.
Q    From there he went to Whitcomb Court?
A    No.
Q    Where did he go?
A    He went directly back to 1212.
Q    All right.  Now, what time approximately was it when you took him over to Whitcomb Court to get the heroin?
A    Could have been between 7:30, 8 o'clock.
Q    In the evening?
A    At night.  It could have been a little later than that.  I'm not for sure.
Q    Were you with him all afternoon or most of the afternoon?
A    Yes, I was.
Q    All right.  And about 7 o'clock or whatever time

2238

it was, you took him over to get the heroin, which he used and got sick; am I correct?
A    Right.
Q    You took him to 1212, right?
A    Uh-huh.
Q    And he stayed there and you stayed there all night.
A    I asked him was he going to take me home.  He told me when he felt a little better he would take me

**JA1038**

home.

Q   From approximately, say, 3 o'clock in the afternoon until the next morning when you were arrested, you and James Roane were together somewhere. Am I correct?

A   Not the whole time.

Q   Okay.

A   Because I left.

Q   For how long, to go pick up Sandra Reavis?

A   No. I left James sometime during that evening around four or five, and I went to my girlfriend's house. And James told me later on sometime to check up there and see if they had arrived back.

Q   What time did you get back to meeting with Mr. Roane?

A   When I got back with Mr. Roane, it was -- it could have been around 7:00 or 7:30.

Q   And you took him straight from there to Whitcomb Court?

A   Did I take James Roane, or what you call it, from 1212?

Q   Yes.

A   No. No.

Q   Where did you pick up Mr. Roane before you took him to Whitcomb Court?

A   I didn't pick him up nowhere. He rode with Linwood in the station wagon until he got to the apartments. At that time, when we got to the apartments he told Cory and Anthony Mack that he was going out to have some fun.

Q   That's when the two of you left?

A   Right.

Q   What time did the two of you leave?

A   Could have been between 7:30 and 8 o'clock. It could have been a little later.

Q   But regardless, from that moment until the time of your arrest, you and Mr. Roane were together.

A   Yes, we was.

Q   All right. And he did not go up to Church Hill or anyplace else except with you. He didn't go anyplace else except with you?

A   At all.

Q   In fact, most of that time he was sick, and either throwing up or asleep at 1212.

A   When I took James back to the house I asked James, I said, I asked him is he going to take me home.

Q   About what time was that?

A   That was in the morning, around three, 2:30 in the morning, something like that. He said that as soon as he feels a little better he would take me home.

Q   What time did he get sick approximately?
A   He was sick before then.
Q   About 9 o'clock in the evening?
A   Might be a little later than that.  A little later.
        MR. BAUGH:  Thank you.  Pass the witness.
        THE COURT:  Mr. Wagner?
        MR. WAGNER:  No questions.
                REDIRECT EXAMINATION
BY MR. VICK:
Q   Mr. Hardy, are you a lawyer?
A   No.
Q   Do you know about the laws of conspiracy; do you know what conspiracy involves, entails?

A   No.
Q   Did your lawyer, Mr. Everhart, when you were getting ready to plead guilty, did he tell you that by helping them, by helping James Roane and "C.O.," by carrying them back from Lynhaven, you were guilty of joining their conspiracy?
A   Yes.
        MR. GEARY:  Leading question.
        THE COURT:  Overruled.
BY MR. VICK:
Q   Did he tell you that once you were guilty of joining their conspiracy, you were guilty of whatever they had done?
A   Even though I didn't do anything.
Q   All right.  You were guilty of the drugs they possessed that night once you joined that conspiracy; is that correct?
        MR. WAGNER:  Objection.
        MR. BAUGH:  Objection.
        THE COURT:  Sustained.
BY MR. VICK:
Q   Now, you were cross-examined by Mr. Cooley about interviews that were conducted at the Richmond City Bureau of Police.  You haven't had occasion to review any of those interviews, any of those tapes prior to your testimony here today, have you?
A   Say that again.
Q   You didn't review any of those tapes that were made of you, did you?
A   No, sir.
Q   All right.  Now, at that time that you were interviewed on the two occasions you were interviewed, you were facing charges; is that correct?  Including charges of murder?
        MR. GEARY:  That's Mr. Vick's phrase.  That's a misstatement of the evidence.
        THE COURT:  Overruled.
BY MR. VICK:

**JA1040**

Q    At the time you were interviewed by Detective Woody and perhaps Detective Dalton, you were facing charges in state court, weren't you?

A    Yes, I was.

Q    You didn't have an attorney between you and them, did you?

A    Attorney between my cases?

Q    Between yourself and those detectives. There was no attorney.

A    No.

        MR. COOLEY: I would object to that.

        THE COURT: Sustained.

2243

BY MR. VICK:

Q    You knew you were the subject of their investigation when you talked to them, didn't you?

A    Yes, I did.

Q    All right. You knew they were concerned about what they were asking you about, correct?

A    Yes.

Q    And you said in response to Mr. Cooley that you were trying -- about the murder of Lewis Johnson and about the murder over at Lynhaven, that at that point you were trying to keep it in. Why were you trying to keep it in at that point?

A    Because I was trying to protect somebody that I knew was going to end up getting on charged.

Q    You were trying to protect yourself?

A    No.

Q    Did we tell you before coming in here that you had to testify as anticipated? Has anybody ever told you that you had to testify as anticipated?

A    No.

Q    Have we told you what you must testify to?

A    The truth.

Q    At the time you had conversations with Detectives Woody and Dalton, were you under oath?

A    No. I don't remember having a conversation with

2244

Dalton. I don't even know him.

Q    Now, the state charges that Mr. Cooley outlined for you, did you know that those state charges are the subject of the Federal charges?

        MR. BAUGH: "Did you know," that is a leading question.

        THE COURT: Sustained.

BY MR. VICK:

Q    Do you or do you not know whether those charges have been transferred?

        MR. GEARY: This man is not a lawyer. It is not a proper question.

        THE COURT: Overruled.

BY MR. VICK:

Q    Do you know that those charges were transferred

**JA1041**

to Federal Court and are the subject of what we are doing here now?

A    Huh-uh.

MR. VICK:  I have no further questions.

THE COURT:  All right.  The witness may be excused.

(Witness stood aside.)

Call your next witness.

MR. PARCELL:  Martha McCoy, please.

MR. VICK:  Judge, this is a protected witness.

THE COURT:  All right.  We are going to have to take a few minutes.  You will have to go out.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right, ten minutes.

(Recess taken from 2:50 p.m. to 3 o'clock p.m.)

MR. BAUGH:  Before you bring in the jury, could I consult with the counsel from the United States for one brief second?

THE COURT:  Go ahead.

MR. BAUGH:  We would like to approach.

(At Bench.)

MR. BAUGH:  Thing I'm concerned with is about watching the witness since she came in.  She looks on edge, and we are afraid there might be an outburst that would cause a mistrial.  We would like to have the United States admonish her.

MR. VICK:  She has done nothing but look at them.  She was shot six times by them.

MR. BAUGH:  We are concerned, and we think there might be an outburst that would cause a mistrial.

THE COURT:  You have voiced your concerns.

MR. BAUGH:  Thank you.

MR. PARCELL:  I'll approach and ask if she is okay.

THE COURT:  You can ask her.

(In Open Court.)

(Government counsel speaking with witness.)

THE COURT:  All right, Mr. Vick, are we ready to proceed?

MR. VICK:  I think not, Your Honor.

(Counsel conferring with witness.)

THE COURT:  Mr. Vick, if you need some time, we will take it.

MR. VICK:  I think a couple of minutes would be wise, Your Honor.

**JA1042**

THE COURT:  All right, remove the witness.

(The witness left the courtroom.)

MR. VICK:  May we go speak to her?

THE COURT:  Go ahead.

(Brief recess in place taken.)

MR. VICK:  She is coming back now, Your Honor.

THE COURT:  All right.

(Witness reentered courtroom.)

All right, bring in the jury.

(The jury entered the courtroom.)

The witness will be sworn.

MARTHA JANE McCOY, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?

A    Martha Jane McCoy.

Q    Your age?

A    24.

Q    Ma'am, during the months of November, December, January, and February of 1991 and 1992, can you tell the jury where you lived?

A    2614 Lynhaven Avenue, Apartment A, I think.

Q    Who did you live there with?

A    Myself and my kids.

Q    And your kids' names and ages?

A    My oldest one is eight and his name is Montez McCoy.  I got a daughter, she is five, and her name is Jaquarta Dekeisha McCoy.  And I have a daughter that's three, and she is -- her name is Jenae Latasha McCoy.

Q    Do you know someone by the name of Torrick Brown?

A    Yes.

Q    Was he any relation to you?

A    Yes.

Q    What relation was he to you?

A    He is my half-brother.

Q    Ma'am, turning your attention to November of 1991, did there come a point in time when you had occasion to come in contact with an individual you know as James Roane and "J.R." Roane?

A    Yes.

Q    Do you see him in the courtroom?

A    Yes.

Q    Would you please point him out?

MR. HENDERSON:  Stipulate.

THE COURT:  All right.

BY MR. PARCELL:

**JA1043**

Martha Jane McCoy (Direct)

Q    Ma'am, when you saw him in November of 1991, where did you see him?

A    November of 1991?

Q    Yes, ma'am.

A    He appeared at my doorstep.

Q    Did you all have a conversation?

A    Yes.

Q    Did he come inside your apartment?

A    Yes.

Q    Would you please tell the jury about that conversation?

A    He brought me a letter and the letter had something his girlfriend had wrote asking about  --

MR. BAUGH:  Objection to the contents.

BY MR. PARCELL:

Q    Based on that letter, did you all continue your conversation?

A    Yes.

Q    Did he ask you certain questions about his girlfriend, Robin Cooper?

A    Yes.

Q    You gave him responses to those questions?

A    Yes.

Q    Did there come a point in time when he said anything else to you about anything else other than Robin Cooper?

A    Repeat that.

Q    After you had the conversation about Robin Cooper, was anyone else there at your apartment?

A    Was anybody else there?

Q    Yes, ma'am.

A    Yes.

Q    Who was there?

A    My brother's wife.

Q    Torrick's wife?

A    My cousin, yes.

Q    After you all talked about the letter and Robin Cooper, did you all talk about something else?

A    What?

Q    Did James Roane ask you something else other than about the letter?  Did he make any suggestions to you?

A    Yes.  He asked me was him  --  I mean was Robin messing with anybody while he was locked up and could I tell them that I can trust him.

Q    What was your response to that question?

A    I told him I didn't know, that I ain't got nothing to do with it.

Q    Did he say anything else to you that day?

A    No.  Because I was trying to avoid my cousin finding out, you know.  I didn't want her to hear none of the conversation.  So I tried to avoid

**JA1044**

talking a bunch about it as much as I could.

Q    Did there come a point in time when you had another occasion to have a conversation with Mr. Roane in November of 1991?

A    Yes.

Q    Tell the jury about that.

A    It was during the same week.  It was a few days later.  He came over there and we discussed -- we was talking.  I forgot what he came over there for, but it was something.  And we was talking.  And we started talking about him being locked up and about the past, about my children's father, Doug Cunningham.  We talked about him and he was saying about the involvements and stuff, about us and a lot of stuff.  He talked about his brother, Doug's brother, Weasel, about how they made hits and stuff.  And he said he did all the killing.  And we was going on and he said, "Dude my friend."  A lot of stuff.  We talked about a lot of stuff.  Then he says -- he took off his clothes, all his clothes  --

MR. BAUGH:  Objection to the relevance of this to these charges.

THE COURT:  Sustained unless you have a proffer.

BY MR. PARCELL:

Q    There was some discussion about that event, then there came a point in time where he left?

A    He eventually left when my daughter pulled up and he told me if they wouldn't have came that he was going to get me.  Whatever.

Q    Between that period in November and February 1st, did you see him again at your house?

A    Between what?

Q    Between that event and February 1st, did you see him again at your apartment?

A    Yes, I did.

Q    When was that?

A    February  --  the night of February 1st.

Q    My question was, between the time in which you said he took his clothes off and February 1st, to your knowledge, did he come to your apartment again?

A    No.

Q    Did you see him in the neighborhood?

A    Yes, I seen him.

Q    Where did you see him?

A    Over at Robin's house.

Q    I'll show you this photograph which has been labeled Government Exhibit 32-5.  And advise the ladies and gentlemen of the jury as to whether or not you can identify that photograph.

(Document proffered to counsel and to witness.)

A    Yes.  Right there where the red curtain is at.

**JA1045**

Q    Is that the last apartment to your right?
A    Uh-huh.

2253

Q    How far is that from your front door, if you know?
A    Maybe a yard or so.
Q    Is it as far as from where Judge Spencer is sitting to the back of the courtroom, or further?
A    It is about a little further than that.
        MR. BAUGH:  We can work out a stipulation if the United States wishes.
        THE COURT:  All right.  We have the idea. Let's move on.
        MR. PARCELL:  That's Government Exhibit 32-5, sir.
        THE COURT:  Admitted.
BY MR. PARCELL:
Q    And directing your attention to February 1st, 1992, were you at home?
A    Yes.
Q    Who was at home with you?
A    My kids and my brother.
Q    And  --
A    Step-brother.
Q    Did there come a point in time when you heard a knock on the door?
A    Uh-huh.
Q    Prior to the knock on the door, what were you

2254

doing?
A    We had just ate and Torrick was back in the room.  And we had just ate dinner.  I had just got finished eating dinner.  The kids were still at the table eating.  And I heard the knock on the door.
Q    I'll ask you to look at what's been labeled Government Exhibit 32-6.
    (Document proffered to counsel and witness.)
    Would you describe what that photograph means to you?
A    This is my dining room and the front door, the refrigerator.
Q    That table and chairs, is that when your children were eating dinner?
A    Yes.  And I was standing right here where I had just put my drink in the refrigerator.  I was standing about right there when I heard the door, somebody knock at the door.
        MR. PARCELL:  I would ask she be allowed to approach the jury and explain to the jury where she was and her children were when she heard the knock at the door.
        THE COURT:  All right.
    (Witness approached jury.)
BY MR. PARCELL:

**JA1046**

Martha Jane McCoy (Direct)

2255

Q    Show the photograph.

A    The apartment is kind of small in this area. And the kids was sitting right here. I was sitting here at first. My son was sitting here and my little daughter was sitting here, and my older daughter was sitting there. And I had got up from right there to go put my drink in the fridge. And I heard a knock on the door, so I was standing about right up in here at the time when I heard the knock at the door. And I put the drink in the refrigerator. When I heard the knock, I just --

MR. PARCELL: You may return to your seat. This is government 32-6.

THE COURT: Admitted.

BY MR. PARCELL:

Q    When you heard the knock, did you go to the front door of your apartment?

A    Yes, I did. I don't have a back door. I went to the door. I heard the knock. I said, "Who is it," first. And then I went to the door.

Q    I'll ask you to look at that photograph which has been labeled Government Exhibit 32-4. What is that, ma'am?

A    That's the front of my door.

MR. PARCELL: That will be 32-4.

2256

THE COURT: Admitted.

BY MR. PARCELL:

Q    Ma'am, tell the jury what happened when you went to your door.

A    When I went to the door, okay, I said, "Who is it?" And they said, "James." And then I opened the door and he said, "Is your brother here?" So I just called my brother from the back because he was in the back of my room. So I called him, you know, and I said, "James wants to talk to you." And so my brother came, was coming out of his room, and as he was coming out of his room I turned back and was watching them because it was three of them. And I was turning back and was watching them just standing there. And I seen -- they had their hands like this, and then they raised them up and I saw the gun and I jumped over the couch and they just started shooting. (Witness indicating.)

Q    Now ma'am, you said there were three of them. There were three of them at your door?

A    Uh-huh. Yes. It was three of them.

Q    And tell the ladies and gentlemen of the jury how they were dressed.

A    They had on black hoods, and I think one of them had on a skullcap up under the hood. He had the hood

2257

over top of it and some glasses. And the other one

Martha Jane McCoy (Direct)

just had the hood on, and "J.R.," I don't think he had on his hood. He didn't have on his hood. But the other two did.

Q   As you were facing the outside of your door, was Mr. Roane to your left, in the middle, or to your right?

A   He was in the middle of them, of the other two guys.

Q   Do you see anyone else in the courtroom who was with Mr. Roane that night?

A   I really can't say. But it looked like him right there in the green shirt right there. It looked like he was the one that was on the left side.

MR. PARCELL: Let the record reflect she has identified the defendant --

MR. McGARVEY: She has not.

THE COURT: We heard what she said. The record will reflect that the witness has pointed to Mr. Johnson as he who looked like the individual who appeared.

BY MR. PARCELL:

Q   You indicated you saw them bring something from behind their back?

A   Yes, I did. I just saw Lance bring the gun from behind his back. But the other two guys already had their guns out.

Q   Then what happened?

A   They just started shooting.

Q   What did you do?

A   I jumped over the other side of the couch. They were still shooting. They started shooting at Torrick.

Q   And did you get shot?

A   Yes, I did.

Q   Tell the jury how many times you got shot.

A   Six times. I had 12 wounds.

MR. PARCELL: I would ask that she be allowed to approach the jury and show them where some of her shots were, where she received some of her wounds.

MR. BAUGH: In light of the previous ruling on the impact issue, I'll object.

THE COURT: Overruled.

BY MR. PARCELL:

Q   I'll ask you first if you can identify Government Exhibit 32-7?

A   This is my living room.

Q   Is that the couch you jumped over when the shooting began?

A   Yes.

MR. PARCELL: I'll ask that she be allowed

**JA1048**

to reapproach the jury and point to her external wounds.

THE COURT:  All right.

(Witness approached jury.)

THE WITNESS:  The door from the other picture -- the door was on this side of the living room.  The door was right here beside the window.  And when I opened the door, they were standing there.  And as you can see, this couch is like more this way.  And when I opened the door, I jumped.  I fled over to that side of the room, over the couch.  And they were shooting like up in this area.  And my brother, he was like on the side.  There is like a hallway right here.  The apartment is not very big, so you know, everything was kind of like close.

MR. PARCELL:  Everyone see that?  This will be Government Exhibit 32-7.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    Ma'am, would you please describe to the ladies and gentlemen of the jury where you were shot?  Show them on your arm.

A    I was shot here on the forearm one time.  It was an in and out wound.  And I was shot up here.  You can't really see it because I can't lift this up, but I was shot right here, and this was an in and out wound.  It came out here.  You can see that.

I was shot right here.  It went in here and came out here, which went through my bone and broke my bone.  And I was shot on my left leg and it went in through the back and came out right here.  And I was shot right here in my breast and it went in  --  it went in this way, came out more down.  And I got a graze on my side, left a hole right there.

(Witness resumed witness stand.)

BY MR. PARCELL:

Q    Now ma'am, after you realized you had been shot, what happened next?

A    After I got shot?

Q    Yes, ma'am.

A    After the shooting happened, I was laying on the side of the couch.  I guess they thought I was dead.

MR. BAUGH:  Objection to what they might have thought.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    What did you do next?

A    I was laying on the side of the couch and I was looking like  --  I was like at the end of the couch peeping around the couch to see the front door to see if they was leaving or was they going to come in and kill me or kill my kids or whatever.  I was just

trying to see, know what they was doing at the time. And I was looking, and I saw they was standing there, and then they eventually left. They started running. And so I told my brother, I said, "Hold on, it will be all right." I said, "We going to be all right." And it was like he was trying to say something but he couldn't because he was like clogged up. Because he had got shot right there, and he couldn't -- and he stopped breathing.

(Witness crying.)

He stopped breathing and I knew he was dead, but something in my mind just told me, you know, "He is going to be all right, you know, he is going to be able to pull through this and you are going to be all right." But I just knew he was dead because when I heard the last -- when he started, when I heard him breathing and then he just stopped, I knew it was something, you know. I knew that he was dead. But I didn't know for sure, you know. And so I told my kids, I told them to run back in the room and to grab some clothes and put them on. And so they was just standing there. And my daughter, she was standing there in the hallway, standing over top of him, my youngest daughter. And I told her to go back in the room, and they went back in the room. I told my son to shut the door because he was closer to the door. So I told him -- I jumped up and I ran to shut the door and knocked it behind because he didn't move. He wouldn't move. When I told him to shut the door he wasn't moving fast enough. And I paused for awhile and I walked around the house because I didn't know what to do. I was scared to go outside. I didn't know if they was coming back and I didn't know what was going on. I didn't know if they was going to come back to kill us or finish us off or what they was going to do. I didn't know.

So I just paused for a minute, and then I thought about my brother's car outside. And I reached in his pocket and I got his keys out of the pocket and I told the kids to come on. And they was half dressed, but they got into the car. And I tried to start the car but the car wouldn't start. It kept, you know, clicking and it wouldn't start. So I told my son to try to start it. And he couldn't do it. He couldn't even turn the ignition. So I just held it. I held the gear and just, you know, did it, because my arm was broke. I knew I was hit. But I tried not to think about what was wrong with me. I was just trying to, you know, make sure my kids was okay and make sure that, you know, I could try to get some help or get somebody to help, you know, me and my brother. I didn't know what to do.

So the car finally started and I backed back to pull out and it cut off. And I sat in the car and a car came behind me and I was scared. I didn't know what to do. So I blew the horn. I kept blowing the horn. And somebody came out. The car stopped or somebody came out and I asked them could they call the police or ambulance or something because I had been shot. And they was asking me all these questions. And I just told them -- I just told them that "Just could you call the police? Just please hurry." And they did. They called and the police came, and they took me to the hospital.

Q    I'll ask you to look at what's been labeled Government Exhibit 32-9. Can you tell us what that is?

A    This is my brother's car seat.

Q    Is that the automobile you tried to flee in with your three children?

2264

A    Yes.

MR. PARCELL:  32-9.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask you if you would to look at what's been labeled 32-3 and advise who that is and is that as that person was the last time you saw them?

(Document proffered to counsel and witness.)

MR. BAUGH:  Your Honor, we will stipulate that the picture is a picture of the body of Torrick Brown.

THE WITNESS:  Oh, God.

MR. BAUGH:  We will stipulate the picture as the crime scene photo.

THE COURT:  What's the number on that?

MR. PARCELL:  32-3, Judge.

THE COURT:  32-3 will be admitted with the stipulation.

BY MR. PARCELL:

Q    That is your brother; that is how he was?

A    (Witness sobbing.)  Yes.

MR. PARCELL:  I tender the witness.

THE COURT:  All right. Ladies and gentlemen, we are going to break here. Everyone remain seated while the jury leaves the courtroom.

2265

(The jury left the courtroom.)

All right, Mr. Marshal, why don't you remove the witness.

(The witness left the courtroom.)

We will take 15 minutes. Remove the defendants.

(The defendants were removed from the courtroom.)

Let me see counsel up here.

**JA1051**

(At Bench.).

THE COURT: All right. You have got Montez McCoy. You intend to call him?

MR. VICK: He can identify Roane.

THE COURT: Which one, James Roane?

MR. VICK: James Roane.

THE COURT: We will have to have the voir dire of the witness beforehand. Do you think that's necessary? You already have an identification of him. It is your case.

MR. VICK: Yes, sir, I do.

MR. PARCELL: We don't know what the defense is. He might say he had an alibi.

MR. BAUGH: We concede the shooting.

MR. VICK: In light of a two-tiered trial, I do think it is necessary that this murder was carried out in front of a seven-year old child.

MR. BAUGH: It wouldn't be germane to the issues at this juncture.

THE COURT: No, it is not a witness who cannot testify. I can't stop them from putting him on.

MR. BAUGH: Voir dire outside the presence?

THE COURT: Yes. We will do that outside the presence of the jury.

(Recess taken from 3:30 p.m. to 3:50 p.m.)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

CROSS-EXAMINATION

BY MR. BAUGH:

Q    How long had you lived in Lynhaven prior to that?

A    How long have I lived there?

Q    Yes. How long had you lived there prior to February of 1992?

A    About two years.

Q    You moved in in 1990, 1989?

A    Probably 1989 or 1990.

Q    Were there occasions when your half-brother would stay over at your apartment?

A    Yes. He lived with me.

Q    Did he live with you the whole time?

A    No, he did not.

Q    Robin Cooper. Did you know prior to November that your brother was seeing Robin Cooper?

A    Did I know that?

Q    Yes.

A    I knew of that.

Q    All right. And am I correct that James got out

**JA1052**

Martha Jane McCoy (Cross)

of prison in November of 1991?

A    Yes.

Q    All right.  Is it your understanding that the events that led to the death of your brother were because of Robin Cooper?

MR. PARCELL:  Objection.  How would she know why her brother was killed?

THE COURT:  Sustained.

BY MR. BAUGH:

Q    Other than Robin Cooper, did your brother and James Roane have any disagreements over anything else?

MR. PARCELL:  Objection, unless she knows from personal knowledge what that problem was.

2268

THE COURT:  She can testify to it.

BY MR. BAUGH:

Q    Other than Robin Cooper, did your half-brother and James Roane have any other basis for disagreeing?

A    On one occasion.

Q    And when was that?

A    When Robin fled my brother's car.  I mean the tire on his car one day.

Q    Robin and  --

A    My brother.

Q    They had a problem?

A    Yes.

Q    But as far as James Roane and your brother, all their disagreements had to do with Robin Cooper, directly or indirectly?

MR. PARCELL:  Objection.

THE COURT:  Sustained.

BY MR. BAUGH:

Q    Was your brother involved in drug activity?

A    No.

Q    Was he involved in any activity with James Roane, to your knowledge?

A    No.

Q    All right.  Do you know if they ever spoke about

2269

anything except Robin Cooper?

A    No, they haven't.  He didn't even know him.

MR. BAUGH:  Thank you.  One second, please.

(Counsel conferring with co-counsel.)

MR. BAUGH:  No further questions.

MR. WAGNER:  No questions.

THE COURT:  Anything from any other counsel?

MR. PARCELL:  May we approach?

(At Bench.)

MR. PARCELL:  I would like to ask her, by stipulation ask her the question if she in fact is in

**JA1053**

Martha Jane McCoy (Cross)

the Witness Protection Program.

THE COURT:  She wasn't crossed on that. No.

(In Open Court.)

MR. PARCELL:  No redirect by the government.

THE COURT:  All right.  Ladies and gentlemen, I know it is going to seem like we are bouncing you up and down.  But this is necessary.  We have to send you out again.  I guess it is hard to say it won't be as long this time, but I don't think it will be as long this time.  We will get you back in as soon as we can.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, what we will do now in this order, we will have the Marshal remove the witness, then remove the defendants.  You can go ahead and remove the witness.

(Witness left the courtroom.)

Then as it relates to the next witness, I want all counsel to come into chambers and we will do the voir dire in there.

All right, you may remove the defendants.

(The defendants were removed from the courtroom.)

All right.  As soon as the witness protective people are set up, come on back.

(Recess taken from 3:45 p.m. to 3:50 p.m.)

(In Chambers.)

(Witness Montez McCoy was escorted into chambers.)

THE COURT:  All right.  Montez, this fellow over here is taking down everything that you say and that I say.  What is your full name?

THE WITNESS:  Montez Zeron Austin -- I mean McCoy.

BY THE COURT:

Q    McCoy?

A    Yes.

Q    I didn't understand that middle name.  What grade are you in?

A    Third.

Q    How do you spell your middle name?

A    I forgot.

Q    Pronounce it again.

A    Zeron.

Q    Zeron.

A    Montez Zeron McCoy.

Q    How old are you?

A    Eight.

Q    When did you turn eight?  What is your

**JA1054**

Martha Jane McCoy (Cross)

birthday?

A    July 13th.

Q    Okay.  You are in the third grade right now?

A    Yes.

Q    All right.  Montez, you are getting ready to testify.  You have been called as a witness to testify in Court, and they are going to swear you in.  You have to raise your right hand and swear to tell the truth, the whole truth, and nothing but the truth.  Do you know what the truth means?

2272

A    Yes.

Q    What does it mean?

A    Not lying.

Q    Not lying.  And you understand that once you take that oath to tell the truth, that you will have to do that, not lie?  You will have to tell us the truth, what happened?

A    Yes.

Q    Do you understand that?

A    Yes.

Q    Have you talked to your mother about this testimony?  Have you talked to your mother about telling the truth?

    (Witness shook his head in the negative.)

    Have you talked to Mr. Vick before?

A    Yes.

        THE COURT:  When did this happen?

        MR. VICK:  February 1st, 1992.

BY THE COURT:

Q    All right.  Do you remember when you lived on Lynhaven?

A    Yes.

Q    Do you remember that?

A    Yes.

Q    Where did you live before that?

2273

A    I lived  --

Q    Try to remember, before you moved to Lynhaven.

    (Witness pausing.)

    Can you remember?

A    No.

Q    Can't remember?

    (Witness shook his head in the negative.)

    Did you go to school when you were at Lynhaven?

A    Yes.

Q    What school did you go to?

A    Summerhill.

Q    Summerhill?

A    Summerhill.

Q    All right.  And you went there for kindergarten and first grade?

A    First grade.

Q    First grade.  Did you go to kindergarten?

**JA1055**

(Witness shook his head in the negative.)

All right.

THE COURT: Any questions from anybody?

BY MR. BAUGH:

Q    Have you been shown some pictures?

A    What?

Q    Have you been shown some pictures of some men?

(Witness nodded in the affirmative.)

And who showed you the pictures?

(Witness pointed to Mr. Vick.)

When did he do it? Has it been since Christmas?

(Witness shook his head in the negative.)

Was it before Christmas?

A    No.

Q    Was it after Christmas?

(Witness shook his head in the negative.)

When was it approximately?

A    It was after Christmas.

Q    All right. And when he showed you those pictures, how many pictures did he show you?

A    Five or four.

THE COURT: Have you got some questions on the relevant issue here?

MR. BAUGH: Yes, to find out whether it would reinforce.

BY MR. BAUGH:

Q    Was James' one of the pictures you were shown?

(Witness nodded in the affirmative.)

THE COURT: Anything from anybody else?

(No response.)

All right, I'm satisfied.

THE REPORTER: Montez, when you are testifying in Court, could I ask you to say yes or no rather than shaking your head? Would you say it aloud?

THE WITNESS: Yes.

(In Open Court.).

THE COURT: All right. Let's bring in the jury.

(Open Court session resumed at 3:55 p.m.)

(The jury entered the courtroom.)

MR. BAUGH: For purposes of the record, during the break Mr. Vick asked the witness, told him he was going to be asked to identify James Roane, to look around, and he already has.

THE COURT: Fine.

(The jury entered the courtroom.)

THE COURT: Montez, would you stand up and turn around? We are going to swear you in. Stand up where you are. Turn around and face this lady back here.

**JA1056**

MONTEZ ZERON McCOY, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Montez, I'm going to ask you to speak towards that microphone.  Your name is Montez McCoy; is that correct?

A    Yes.

Q    How old are you, Montez?

A    Eight.

Q    You had an uncle named Torrick Brown; is that right?

A    What?

Q    You had an uncle named Torrick Brown; is that right?

A    Yes.

Q    Now, Montez, did you used to live in the City of Richmond?

A    Yes.

Q    Have you been moved from the City of Richmond?

A    Yes.

Q    Who moved you?

A    The Marshals.

Q    All right.  Montez, were you present when your uncle was killed?

A    What?

Q    Were you there when your uncle was killed?

A    Yes.

Q    Did you see your uncle get killed?

A    Yes.

Q    Did you see who killed your uncle?

A    Yes.

Q    Do you know the man who killed your uncle?

A    Yes.

Q    What's his name?

A    James Roane.

Q    Do you see James Roane seated in the courtroom today?

A    Yes.

Q    Could you point him out to the Court?

(Witness pointed to defendant, James Roane.)

(James Roane stood.)

BY MR. VICK:

Q    Where were you when James Roane killed your uncle?

A    In the kitchen.

Q    Where was your uncle?  Was it  --

A    He was in the hall.

MR. BAUGH:  We would ask the child be given time to answer the question.

**JA1057**

THE COURT:  He said he was in the hall. Give him time.

BY MR. VICK:

Q   Were you in your apartment?

A   Yes.

Q   How far were you from where your uncle was when he was killed?

(Witness pausing.)

Do you know about how far you were?  Were you as far away from him as you are from me?  Were you closer to him than you are to me?

(Witness shook his head in the negative.)

A   No.

Q   Could you see your uncle when he was shot?

A   Yes.

Q   And when James Roane shot your uncle, where was James Roane?  Was he in your apartment?

(Witness nodded in the affirmative.)

You need to say yes or no.

A   Yes.

Q   Who was in the kitchen with you?

A   My sisters.

Q   All right.  Did you see your mother get shot that night?

A   Yes.

Q   And who shot your mother?

A   James Roane.

Q   Was James Roane with anybody else that night?

A   Yes.

Q   How many other people was James Roane with?

A   Two.

Q   Did you look through the door at those two people?

A   Yes.

Q   Could you tell the ladies and gentlemen of the jury how were those people dressed, those other two people?  What were they dressed in?

A   I don't know.

Q   Did you go look through the door at them?

A   Yes.

Q   All right.  Did you see whether they had on anything on their head?

A   They had on a hood.

Q   All right.  What color was it?

A   I think it was black.

Q   All right.  Did you help your mother after she was shot?

A   Yes.

MR. VICK:  Beg the Court's indulgence.

BY MR. VICK:

Q   Did the other two people who were with James Roane, did they fire shots, also?

**JA1058**

A    Yes.

MR. VICK:  I have no further questions.

THE COURT:  Any questions, Mr. Geary?

MR. GEARY:  No, Your Honor.

THE COURT:  Mr. McGarvey?

MR. McGARVEY:  No, Your Honor.

THE COURT:  Any questions, Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Montez, do you know Robin Cooper?

A    Yes.

Q    Okay.  Did she live over there by you?

A    Yes.

Q    Was Ms. Cooper and your uncle, were they friends?

A    Yes.

Q    Did they see each other on occasion?

A    Sometimes.

Q    Okay.  Thank you.  No further questions.

THE COURT:  Mr. Wagner?

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  Let me see you all.

(At Bench.).

THE COURT:  Okay, what's next?

MR. VICK:  The crime scene videos and some more police detectives, if you want.

MR. PARCELL:  Brunelli and firearms.  There are two more witnesses.

THE COURT:  All right.  Thank you.

MR. PARCELL:  Briefly, if I may.  We agreed to a stipulation.  Officer Wilfred Crofton was the first police officer to arrive at this scene.  His wife had an emergency operation today.  He can't be here.  We have agreed to stipulate that he was the first police officer to arrive at the scene at approximately 7:05 p.m.  He maintained the crime scene until Detective Brunelli could arrive to process the scene.

THE COURT:  That stipulation will be entered and accepted.

(In Open Court.)

Ladies and gentlemen, I'm going to have to send you out again.  That's the way it goes.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the witness.

(The witness left the courtroom.)

All right.  Is your next witness outside?

MR. PARCELL:  Yes, sir.  May we set up the video equipment?

**JA1059**

2282

THE COURT:  I'll tell you what.  Let's do this.  Mr. Marshal, remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will take five minutes to get set up.

(Recess taken from 4:15 to 4:20 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

GARY BRUNELLI, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, once again, you are Detective Gary Brunelli, Richmond Bureau of Police assigned to the forensic unit?

A    That's correct.

Q    Were you so employed in that capacity on February 1st, 1992?

A    Yes, I was.

Q    Did you have occasion to respond to 2614 Lynhaven Avenue in Southside of the City of

2283

Richmond?

A    Yes, sir, I did.

Q    When you arrived there, sir, the crime scene was being guarded by Officer Wilfred Crofton?

A    Yes, sir.

Q    At that point in time the crime scene became yours; is that correct?

A    That's correct.

Q    As you prepared your crime scene, did your crime scene investigation, did there come a point in time when you had occasion to video that crime scene area?

A    Yes, I did.

Q    Did you have occasion to review that prior to today?

A    Yes, I have.

Q    Observe the monitor and describe to the ladies and gentlemen of the jury whether this is the crime scene video and what things pertaining to that video ought to mean anything to you in regard to your investigation.

(Videotape played.)

A    Right here we are looking at the front of 2614 Lynhaven Avenue.  This is the front door you see.  There is a cement porch outside.  First thing you

2284

will see, hopefully, I don't know if you will be able

**JA1060**

Gary Brunelli (Direct)

to see it or not, but there is a cartridge laying outside of that door that was just in view, which was open. This is surrounding apartments in that area you are seeing now. That is the cartridge case I just spoke about directly in front of the door. This is a mark on the door. We are not sure as to what it was. We thought it might have been a bullet skim, but we were unable to prove anything concerning it. As soon as we entered the door we started finding cartridge cases. We will come back to them. This is what the interior of the apartment looked like.

On the right side of the picture, you will see a hole in the wall. That hole went through the wall at that point.

Q    Did you recover anything in any other apartment through that hole?

A    There was a bullet recovered from the adjacent apartment.

As you can see, the floor was covered with red stain. We are attempting to show a bullet fragment right in the center of the screen right now.

Q    Do you know what caused that red stain on the carpet?

A    I'd say a person was shot at that point.

Q    Sir?

A    A person was shot at that point, somewhere in there, and was bleeding.

Q    That red stain is blood?

A    Correct. This was being filmed from the doorway. You look directly down from the doorway, we have a cartridge case right in the center of the screen right there. Immediately to the right of the doorway, as soon as you entered the apartment, was the kitchen area. The small blotches you see on the floor are cartridge cases, one of which we are zooming in on right now. These cartridge cases go in a semi-circle around the table. You can see blots. I don't know if it is going to be able to focus on all of them or not. There is one here. You go toward the top of the screen, there will be one more by the chair leg. Come back down, there is two, there is one, and then two cartridge cases. There were two together here. And there is another one.

This is actually the hallway we are going into as you come in the front door. By his foot there is a cartridge case to your right. We have three more cartridge cases in this specific area. Right against the wall is another cartridge case, another cartridge case at that point. Right at his side, there are two bullets. One is pretty well fragmented -- not fragmented, but smashed up. You can see it was roughed.

**JA1061**

Gary Brunelli (Direct)

This is our victim, Torrick Brown. This is a better angle of these bullets. Now you can see the one a little bit better. This is another bullet fragment which is actually the lead from inside the copper jacket of a bullet. Here is another lead core, they call it. The copper jacket is off the bullet. At this point we were over in the living room by where the picture was with the bullet hole beside it. We are going down to the end of the hall. This goes back into the bedroom to the left side of the apartment. There was nothing in that room other than its usual contents.

This was the room at the right rear of the apartment. This just shows a different shot of the victim.

(Tape ended.)

BY MR. PARCELL:

Q    As you prepared yourself to come to Court and testify in these cases, did you have occasion to prepare a crime scene diagram of 2614 Lynhaven Avenue?

A    Yes, I did.

2287

Q    I first ask you to look at what's been labeled Government Exhibit 32-1 and 32-2. Advise us as to whether or not you took those photographs and whether they actually depict the crime scene.

A    Yes, these are the pictures I took.

MR. PARCELL:  32-1 and 32-2, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Would you identify that photograph which has been labeled as Government Exhibit 32-8?

A    This is where the bullet entered the wall.

MR. PARCELL:  We move for its introduction, also.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I ask you to look at this diagram and advise as to whether that means anything to you.

A    Yes.  This is the diagram that I prepared for this Court.

MR. PARCELL:  I would ask he be allowed to reapproach the jury and explain that diagram.

THE COURT:  Go ahead.

(Witness approached jury.)

BY MR. PARCELL:

Q    Did you prepare that diagram?

2288

A    Yes, I did.

Q    The little red circles here, 1 through 22, what do they represent?

A    All the red circles around this area are all pieces of evidence.  As you saw in the videotape,

**JA1062**

Gary Brunelli (Direct)

they are referring back to the cartridge cases or the bullets.

Q    I will hand you this item.

MR. PARCELL:  Judge, these are collectively Government Exhibit 38, 1 through 22.

BY MR. PARCELL:

Q    Would you please identify that and where you found that item?

A    This is Item Number 1, which was found right outside the front door on the concrete.  It is a cartridge case.

Q    Item Number 2?

A    Number 2 is also a cartridge case just as you come inside the door at the corner of the sofa.

Q    Number 3?

A    Number 3 is another cartridge case, back of the sofa.  You come in the front door and just to the left.

Q    Number 4?

A    Number 4 is another cartridge case, actually 4, 5, and 6 are cartridge cases right here.  This is Number 5, and this is Number 6.  They are all cartridge cases.

Q    Number 7?

A    Number 7 is a cartridge case in the door once again, right here.

Q    Number 8?

A    Number 8 is another cartridge case found right at the wall as you saw in the video.  Number 9 is a cartridge case found right here.  Number 10, found right here beside the victim's side, there is a bullet, one of the ones that didn't show up during the first shot of the video, and when I came back at a different angle, it showed up.

Number 11, here at the victim's side, is also a bullet.  Number 12 is right here in front of the television.  It is lead core from a bullet.  If you would take and peel the copper off of one of these bullets, this is what you would have.

Q    By copper, you mean what?

A    The jacket.  Number 13 is right here.  It is also a fragment from inside a bullet.  We move over to the kitchen area as you come in the door, to the immediate right.  This is 14, which is a cartridge case.  Number 15, going around in this semi-circle, is a cartridge case.  Number 16 is right here, and 17, and they are both cartridge cases.  Number 18 and 19 are also cartridge cases.  Number 20 and 21 were found right here at the sink, and they are cartridge cases.  Number 22, all the way down in the corner here by the table, is a cartridge case.

This is the bullet that was recovered from the

**JA1063**

Gary Brunelli (Direct)

apartment next door.  This diagram is actually two-dimensional.  This wall, this is actually the side wall where the picture was hanging, and it is laid open.  Here is where the bullet entered and went through the apartment next door.

Q    That bullet was actually recovered from that adjoining apartment?

A    That's correct.  Finally, Number 25 which is not on the diagram, this was taken from the bottom of the sofa.  We could hear it in there.  There looked like what would be a bullet hole in the sofa.  We cut it open.  We could hear it rolling around.  That's why it is on here.  We could not mark it exactly in the sofa where it was.

MR. PARCELL:  I would move Government Exhibit 38 as well as 33.

THE COURT:  They will be admitted.

(Witness resumed witness stand.)

2291

BY MR. PARCELL:

Q    Did you also have occasion to recover some bullets from the Medical Examiner's Office from the body of Torrick Brown?

A    Yes, sir, I did.

Q    I'll ask you to look at what's been listed as Government Exhibit 39.

(Exhibit proffered to counsel and witness.)

Advise us as to whether or not these are the things you recovered from the Medical Examiner's Office and submitted to Ms. Anne Jones for analysis.

(Witness perusing exhibit.)

A    Yes, they are.

Q    You also submitted what's been labeled by yourself, both with the items in the diagram as items 1 through 25, to Ms. Jones for analysis, also; is that correct?

A    That's correct.

Q    When a 911 call comes in to the police to go out to a shooting, does it also go to a rescue squad EMT and the fire department?

A    Yes.  Usually the fire department through first responders, is what they are called, do respond.  And the ambulance, also.

Q    And they get there actually before the police do

2292

on a lot of occasions?

A    Yes.

Q    They enter the crime scene and determine the status of the victim?

A    That's correct.

Q    Have you found that they sometimes remove things accidentally from a crime scene?

A    Yes.  I found out that a lot of times when they are wearing boots any time with cleats on them, the

**JA1064**

Gary Brunelli (Cross)

bullets will stick to the cleats.  And also the cartridges can stick and be carried out long before we are there.

Q    These folks are usually gone when you arrive yourself to do your processing?

A    That is correct.

MR. PARCELL:  I think I move the introduction of Government Exhibit 39.

THE COURT:  39 is what?

MR. PARCELL:  Judge, that is the projectiles that came from the Medical Examiner's Office given to Detective Brunelli.

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q    And my last question, Mr. Brunelli, is do you always find all the projectiles and cases at crime scenes?

A    We try to find everything that's there, as long as it hasn't been carried out either by a victim, second victim, or the fire or police.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions, Judge.

MR. McGARVEY:  No questions.

THE COURT:  Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q    Detective Brunelli, the fact that the brasses were found in the kitchen, does that indicate to you in which direction the person would have been holding the gun when the weapons were fired?

A    Not being totally familiar with the type of weapon, no.  It could have been a right ejection, top ejection.

Q    But am I correct that the direction the bullet takes when it comes out is determined by where the ejector is situated on the bullet face; am I correct?

A    I'm not a firearms expert.  I can't answer that.

Q    However, in your forensic training, if it is hooked on the right side you are going to look for brasses over on the right side; if it is hooked up over three-quarters you will look back up here; is that correct?

A    That's correct.

Q    Additionally, the doorway into the apartment, when it is opened fully it blocks almost three-fourths of the entranceway to the kitchen, correct?

A    No, sir.

Q    How much of it did it cover?

A    Not hardly any.  Because opened fully, it was up

**JA1065**

against the wall.

Q    However, if someone was standing in the door and it was open, it would be in the way between the living room and the kitchen?

A    You are saying if the door was opened fully, it may block it?

Q    Not all the way against the wall.  As the door opens, does it have to go through the entranceway between the kitchen and living room?

A    Yes, it does.

Q    All right.  Did you determine at the time  -- you submitted all the brasses to the lab?

A    Cartridge cases.

Q    All the cartridge cases?

2295

A    Yes.

Q    You didn't make any determination of how many weapons were involved?

A    I had no idea at that time.

        MR. BAUGH:  Thank you.

        MR. WAGNER:  No questions.

        MR. PARCELL:  No redirect.

        THE COURT:  You may stand down, sir.

    (Witness stood aside.)

        MR. PARCELL:  Anne Jones, please?  May I have Government Exhibit 38 and 39, please?

                ANNE D. JONES,

recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

            DIRECT EXAMINATION

        MR. PARCELL:  I will ask that she be given Government Exhibit 104 and 106, please.  I'm sorry, 105.  106 and 105.

        THE WITNESS:  104 and 105.

        MR. PARCELL:  104 and 105.

    (Weapons proffered to witness.)

BY MR. PARCELL:

Q    Once again, you are Anne Jones and you work for the Bureau of Forensic Science, and you are a

2296

firearms expert?

A    For the Division of Forensic Science, yes.

Q    You had occasion on February 4th, 1992 to receive some projectiles and casings from Detective Gary Brunelli of the Richmond Bureau of Police?

A    That's correct.

Q    I'll hand you what's been labeled Government Exhibit 38-1 through 25, and would you please tell the ladies and gentlemen of the jury whether you did testing on those casings and bullets and what was the result of your testing in relation to the government's exhibits 104 and 105?  Start with number one and advise as to what that is and what relation

**JA1066**

Anne D. Jones (Direct)

that has to the two items in front of you.

A    Item 1 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified with Government Exhibit 104, the Glock pistol.  Item Number 2 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified with Government Exhibit 105, the Intratec pistol.

Number 3 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired from the Government Exhibit 105, the Intratec pistol.  Item 4 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 105, the Intratec pistol.  Number 5 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 105, Intratec pistol.

Number 6 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 105, the Intratec pistol.  Number 7 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 105, the Intratec pistol.

Number 8 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 104, the Glock pistol.  Number 9 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 105, the Intratec pistol.  Number 10 is a caliber 9mm luger full-jacketed bullet which was identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 11 is a 9mm caliber full metal-jacketed bullet which was identified as having been fired from Government Exhibit 104, the Glock pistol.

Number 12 is a caliber 9mm  --  consistent with a caliber 9mm luger lead core which is not suitable for identification with any firearm.  Number 13 is a lead core which is not suitable for identification with any firearm.  Caliber undetermined.

Number 14 is a caliber -- 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in the Government Exhibit 104, the Glock pistol.  Number 15 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 104, the Glock pistol.  Number 16 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit Number 104, the Glock pistol.

Number 17 is a 3D Impact-brand caliber 9mm luger cartridge casing which was identified as having been

**JA1067**

Anne D. Jones (Direct)

fired in the Government Exhibit 104, the Glock pistol.  Number 18 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in the Government Exhibit 104, the Glock pistol.  Number 19 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in the Government Exhibit 104, the Glock pistol.

Number 20 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in

2299

the Government Exhibit 104, the Glock pistol.  Number 21 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in the Government Exhibit 104, the Glock pistol.  Number 22 is a 3D Impact-brand caliber 9mm luger cartridge casing identified as having been fired in Government Exhibit 104, the Glock pistol.  Number 24 is a caliber 9mm luger full metal-jacketed bullet which was identified as having been fired from the Government Exhibit 104, the Glock pistol.  And Number 25 is a bullet jacket and core, the bullet jacket which was identified as having been fired from the Government Exhibit 105, the Intratec pistol.

BY MR. PARCELL:

Q    Did there come a point in time that you received some exhibits from the Medical Examiner's Office through Detective Brunelli?

A    Yes, sir, I did.

Q    I'll ask you to look at those items, if you would, ma'am, and advise as to whether or not they mean anything to you.  They are Government Exhibit 39.

A    Item number 26-A is a full metal-jacketed bullet from the victim which was identified as having been fired from Government Exhibit 105, the Intratec

2300

pistol.  Number 26-B is a 9mm full metal-jacketed bullet from the victim identified as having been fired from  the Government Exhibit 104, the Glock pistol.  Number 26-C was a caliber 9mm luger full metal-jacketed bullet which was identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 26-D was a 9mm caliber full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 26-E is a 9mm caliber full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 26-F is a caliber 9mm luger full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 26-G is a caliber 9mm luger full metal-jacketed bullet identified as having been fired from the

**JA1068**

Government Exhibit 104, the Glock pistol.  Number 26-H is a caliber 9mm luger full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.  Number 26-I is a caliber 9mm luger full metal-jacketed bullet identified as having been fired from Government Exhibit 104, the Glock pistol.

Q    Ma'am, as you have testified, those 11 bullets that you were given from the victim, one came from the Intratec, which is Government Exhibit 105, and the other ten came from the Glock, which is Government Exhibit 104?

A    That's correct.  One came from the Intratec.

Q    Based on your scientific investigation, those projectiles and those weapons, did you prepare a statement of analysis for that testing?

A    Yes, I did.

Q    I'll ask that you look at what's been labeled Government Exhibit 36.

(Document proffered to witness.)

Is that a copy of such report?

MR. BAUGH:  May I look at 105 while she looks at the report?

THE COURT:  Go ahead.

THE WITNESS:  Yes, this is a copy of the report I issued.

MR. PARCELL:  I move its introduction.

THE COURT:  It will be admitted.

MR. PARCELL:  Stipulation.  There is a report prepared by another expert, Division of Forensic Science, indicating that there was residue on the right palm, web, left palm, and left web of the victim, Torrick Brown.  That would be Government Exhibit 36.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    Once again, how many rounds will Government Exhibit 104 hold?

A    The Glock pistol has a magazine capacity of 17 and one in the chamber, which makes a total capacity of 18.

Q    And how many rounds would Government Exhibit 105 hold?

A    The Intratec pistol has a magazine capacity of 35 with one in the chamber, making a total capacity of 36.

Q    In regard to the lab report just introduced through stipulation in regard to the victim having residue on his palms and the webs of his hands, what does that mean, if anything, to you as a firearms expert?

A    It doesn't mean anything to me, sir.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

THE COURT:  Mr. Baugh?

CROSS-EXAMINATION

BY MR. BAUGH:

Q   Would you look at 105, please, the Intratec weapon?  Would I be correct based upon the position of the extractor and the ejector that that round would eject the brass to the right and to the back?

A   It would be up and to the right.  But whether it would go back or not, I don't know.

Q   Okay.  And the Glock, which way would it eject?

A   That would go up and to the right, also.

Q   Am I correct that you found 13 Glock brasses and only eight Tec brasses?

A   Just a minute, I'll count and tell you.

(Witness perusing report.)

I have a record that I think there were 11 cartridge cases that I did find with the Glock.

Q   11?  All right.

A   Yes, sir, there is 11 from the Glock.

Q   How many with the Intratec?

A   From the Intratec  --

Q   Which is that weapon sitting right next to you now.

A   There were seven cartridge cases identified with the Intratec.

Q   All right.  And of the bullets that were sent to you from the Medical Examiner's Office, only one is from the Tec and the remainder were from the Glock?

A   There was one bullet with the victim identified with the Intratec, yes, sir, and eight were identified with the Glock.

MR. BAUGH:  Thank you.  Pass the witness.

MR. WAGNER:  No questions.

THE COURT:  All right.  You may stand down.

(Witness stood aside.)

Thank you very much.

All right.  We are going to stop here.  We worked you a little overtime today, but we wanted to get this testimony in.

Come back tomorrow at 10 o'clock.  And please, remember what I told you.  Try to avoid any newspaper, TV recitation of what might have happened here in the courtroom.  You were here and you have got the best view.  So please stay away from newspaper, radio, or any other coverages of these proceedings.  Tomorrow morning at 10 o'clock a.m.

Everyone remain seated while the jury leaves the courtroom.

**JA1070**

Anne D. Jones (Cross)

(The jury left the courtroom.)

MR. VICK: Just for the Court's edification, we are moving pretty quickly.

THE COURT: You can remove the defendants.

2305

MR. COOLEY: If we could, two very brief matters.

THE COURT: Do the defendants need to be here?

MR. COOLEY: No, sir. As far as I'm concerned, I think we can do it without them.

THE COURT: All right, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, Mr. Cooley?

MR. COOLEY: Judge, there are two matters that I would ask the Court to consider. One is, we have had introduced the plea agreement for Mr. Sterling Hardy and represented that that is in fact the plea agreement. At least the document that I have and the one that was given to me during the course of cross-examination appears to be a blank. It is not signed. I'm not sure in fact that that is the plea agreement that was ultimately achieved. So I would ask at a minimum that a copy of the original from the Court's file be provided.

THE COURT: That's fair.

MR. VICK: The signed copy went into the Court's file.

2306

THE COURT: Well, we can get it, the signed original.

MR. COOLEY: Secondly, my understanding is that Mr. Gaiters will be one of the government's witnesses tomorrow. The government has objected to the form of my cross-examination indicating that they felt that the witness should be given the opportunity to review the tape or the proceedings that I am questioning him about. In order to save time, we would ask that the government either provide, give that opportunity, or allow us to talk with Mr. Gaiters and go over those things with him. I thought if we can do that either this evening or tomorrow before trial, it would save time allowing him that opportunity.

THE COURT: It wouldn't save us one iota of time. You are still going ask the same questions. You asked the questions that were objected to. I thought they were appropriate and you can go on and do it.

MR. COOLEY: Thank you.

THE COURT: All right. We will be in adjournment until tomorrow morning.

**JA1071**

Anne D. Jones (Cross)

(Proceedings adjourned at 5:10 p.m.)

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION