CASE NO. 22-5

---

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

RICHARD TIPTON, II,

*Defendant - Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

---

**JOINT APPENDIX - VOLUME III OF III**
**(Pages 1074 - 1566)**

---

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
 FOR THE WESTERN DISTRICT
 OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720

Jeffrey L. Ertel
FEDERAL DEFENDER
PROGRAM, INC.
101 Marietta Street NW, Suite 1500
Atlanta, GA 30303
404-688-7530

Joseph Attias
Richard D. Cooke
OFFICE OF THE UNITED
STATES ATTORNEY
919 East Main Street, Suite 1900
Richmond, VA 23219
804-819-5400

*Counsel for Appellant*                    *Counsel for Appellee*

---

# TABLE OF CONTENTS

## VOLUME I OF III

JA Page

District Court Docket Sheet [3:92-cr-00068-DJN-1] ................................................ JA1

Judgment in a Criminal Case
 Entered June 1, 1993 ................................................................................. JA10

Amended Motion to Vacate Conviction Under 28 U.S.C. § 2255
In Light of *United States V. Davis*, __U.S.__, 139 S. Ct. 2319 (2019)
 Filed February 22, 2022 [ECF159] ............................................................ JA14

  Ex. 1: Superseding Indictment, April 24, 1992 ..................................... JA61

  Ex. 2: Verdict Form, February 3, 1993 ................................................. JA84

Government's Response in Opposition
 Filed 2022.04.27 [ECF172] ....................................................................... JA92

Reply In Support of Motion to Vacate Conviction
and Sentence Pursuant to 28 U.S.C. § 2255
 Filed June 17, 2022 [ECF179] .................................................................. JA120

Memorandum Opinion
 Entered October 6, 2022 [ECF186] ........................................................... JA134

Order (Denying § 2255 Motion)
 Entered October 6, 2022 [ECF187] ........................................................... JA164

Notice of Appeal
 Filed December 5, 2022 [ECF195] ............................................................ JA165

**Transcripts:**

**Excerpt of Trial Transcript, Volume IV (January 14, 1993)** ....................... JA315

**Trial Transcript, Volume V (January 15, 1993)** ............................................. JA379

    Testimony of Gregory Taylor
        Direct Examination ...................................................................... JA382
        Cross Examination ........................................................................ JA398
        Redirect Examination .................................................................... JA418
        Recross Examination ..................................................................... JA423

    Testimony of Dennis Patrick Malone
        Direct Examination ...................................................................... JA424
        Cross Examination ........................................................................ JA428

    Testimony of Anthony Howlen
        Direct Examination ...................................................................... JA429
        Cross Examination ........................................................................ JA435

    Testimony of Richard E. Bice
        Direct Examination ...................................................................... JA446
        Cross Examination ........................................................................ JA448

    Testimony of James E. McMillian, Jr.
        Direct Examination ...................................................................... JA453

    Testimony of William Thomas
        Direct Examination ...................................................................... JA455
        Cross Examination ........................................................................ JA457

    Testimony of Antoine Brooks
        Direct Examination ...................................................................... JA458
        Cross Examination ........................................................................ JA469
        Redirect Examination .................................................................... JA490

Testimony of Ralph Fleming
    Direct Examination..........................................................................JA492
    Cross Examination...........................................................................JA493

## **VOLUME II OF III**

**Trial Transcript- Volume VI (January 18, 1993)** ..............................................JA497

    Testimony of Charles Townes
        Direct Examination ..............................................................JA501
        Cross Examination ..............................................................JA532
        Redirect Examination...........................................................JA574

    Testimony of Jeanne Keim
        Direct Examination ..............................................................JA577
        Cross Examination ..............................................................JA580

    Testimony of Maurice Saunders
        Direct Examination ..............................................................JA581
        Cross Examination ..............................................................JA606
        Redirect Examination...........................................................JA625

    Testimony of Jeanette Pauley
        Direct Examination ..............................................................JA625
        Cross Examination ..............................................................JA630
        Redirect Examination...........................................................JA636

**Trial Transcript- Volume VII (January 19, 1993)** .......................................JA639

    Testimony of A.D. Merz
        Direct Examination ..............................................................JA640

    Testimony of Fred Bolling
        Direct Examination ..............................................................JA642

    Testimony of Johnny Lee Byrd
        Direct Examination ..............................................................JA642
        Cross Examination ..............................................................JA650
        Redirect Examination...........................................................JA671
        Recross Examination ...........................................................JA672

Testimony of Sherry L. Gay
    Direct Examination ....................................................................... JA673
    Cross Examination .......................................................................... JA675

Testimony of Wayne Hines
    Direct Examination ....................................................................... JA676
    Cross Examination .......................................................................... JA681

Testimony of Richard Farmer
    Direct Examination ....................................................................... JA686
    Cross Examination .......................................................................... JA687

Testimony of George Wynn
    Direct Examination ....................................................................... JA688
    Cross Examination .......................................................................... JA692
    Redirect Examination..................................................................... JA694

Testimony of Rebecca Talley
    Direct Examination ....................................................................... JA694

Testimony of Hussone Curtis Jones
    Direct Examination ....................................................................... JA696
    Cross Examination .......................................................................... JA719
    Redirect Examination..................................................................... JA748

**Trial Transcript- Volume VIII (January 20, 1993)** ....................................... JA754

Testimony of Denise Robin Berkely
    Direct Examination ....................................................................... JA757
    Cross Examination .......................................................................... JA786
    Redirect Examination..................................................................... JA812

Testimony of Rodney Rodriguez
    Direct Examination ....................................................................... JA815
    Cross Examination .......................................................................... JA819
    Redirect Examination ..................................................................... JA822

Testimony of Ralph Fleming
    Direct Examination ........................................................................ JA822
    Cross Examination ......................................................................... JA824
    Redirect Examination .................................................................... JA827

Testimony of John Dorman
    Direct Examination ........................................................................ JA827
    Cross Examination ......................................................................... JA829

Testimony of Ralph Fleming
    Cross Examination ......................................................................... JA831
    Redirect Examination .................................................................... JA832

Testimony of Paul Tuttle
    Direct Examination ........................................................................ JA833
    Cross Examination ......................................................................... JA839

Testimony of Pamela Denise Williams
    Direct Examination ........................................................................ JA840
    Cross Examination ......................................................................... JA849
    Redirect Examination .................................................................... JA856

**Trial Transcript- Volume IX (January 21, 1993)** ......................................... JA861

Testimony of Robert "Papoose" Davis
    Direct Examination ........................................................................ JA862
    Cross Examination ......................................................................... JA877
    Redirect Examination .................................................................... JA899
    Recross Examination ..................................................................... JA901

Testimony of Ronita Hollman
    Direct Examination ........................................................................ JA902
    Cross Examination ......................................................................... JA909
    Redirect Examination .................................................................... JA919

Testimony of David Burt
    Direct Examination ........................................................................ JA921
    Cross Examination ......................................................................... JA922

Testimony of Thomas Searles
　Direct Examination ...................................................................... JA923
　Cross Examination ....................................................................... JA927

Testimony of Anne D. Jones
　Direct Examination ...................................................................... JA929
　Cross Examination ....................................................................... JA934
　Redirect Examination.................................................................. JA935

Testimony of Dennis Keith Moody
　Direct Examination ...................................................................... JA936
　Cross Examination ....................................................................... JA942
　Redirect Examination.................................................................. JA950

Testimony of Dr. Marcella Fierro
　Direct Examination ...................................................................... JA951
　Cross Examination ....................................................................... JA959
　Redirect Examination.................................................................. JA964

**Trial Transcript- Volume X (January 25, 1993)** ............................... JA967

Testimony of Stanley Smithers
　Direct Examination ...................................................................... JA971
　Cross Examination ....................................................................... JA981
　Redirect Examination ................................................................. JA989

Testimony of Mary Johnson
　Direct Examination ...................................................................... JA990

Testimony of William C Brereton
　Direct Examination ...................................................................... JA991

Testimony of Gary Brunelli
　Direct Examination ...................................................................... JA993

Testimony of Anne D. Jones
　Direct Examination ...................................................................... JA996
　Cross Examination ....................................................................... JA999

Testimony of Sterling R. Hardy
    Direct Examination .................................................................... JA1001
    Cross Examination ..................................................................... JA1017
    Redirect Examination ................................................................. JA1040

Testimony of Martha Jane McCoy
    Direct Examination .................................................................... JA1043
    Cross Examination ..................................................................... JA1052

Testimony of Montez Zeron McCoy
    Direct Examination .................................................................... JA1057
    Cross Examination ..................................................................... JA1059

Testimony of Gary Brunelli
    Direct Examination .................................................................... JA1060
    Cross Examination ..................................................................... JA1065

Testimony of Anne D. Jones
    Direct Examination .................................................................... JA1066
    Cross Examination ..................................................................... JA1070

## VOLUME III OF III

**Trial Transcript- Volume XI (January 26, 1993)** ........................................ JA1074

Testimony of Jerry Gaiters
    Direct Examination ................................................................... JA1075
    Cross Examination ................................................................... JA1095
    Redirect Examination ................................................................ JA1131

Testimony of C.T. Woody, Jr.
    Direct Examination ................................................................... JA1133
    Cross Examination ................................................................... JA1135
    Redirect Examination ................................................................ JA1139

Testimony of Dr. Marcella Fierro
    Direct Examination ................................................................... JA1140

Testimony of James Feefer
    Direct Examination ................................................................... JA1148

Testimony of Thomas Searles
    Direct Examination ................................................................... JA1153
    Cross Examination ................................................................... JA1159

Testimony of Anne Davis Jones
    Direct Examination ................................................................... JA1160

Testimony of Charlotte Denise Moore
    Direct Examination ................................................................... JA1162
    Cross Examination ................................................................... JA1166

Testimony of Santo Gutierrez
    Direct Examination ................................................................... JA1168
    Cross Examination ................................................................... JA1170

Testimony of Anne Davis Jones
    Direct Examination ................................................................... JA1171

Testimony of Cynthia Riley
Direct Examination .................................................................... JA1174
Cross Examination ..................................................................... JA1176

Testimony of Ralph Fleming
Direct Examination .................................................................... JA1178

**Trial Transcript- Volume XII (January 27, 1993)** ....................................... JA1181

Testimony of Walter Tuck
Direct Examination .................................................................... JA1182
Cross Examination ..................................................................... JA1184

Testimony of Gwendolyn Greene
Direct Examination .................................................................... JA1186

Testimony of Prisilla "Pepsi" Greene
Direct Examination .................................................................... JA1189
Cross Examination ..................................................................... JA1198
Redirect Examination................................................................ JA1209

Testimony of Ralph Fleming
Direct Examination .................................................................... JA1210
Cross Examination ..................................................................... JA1212
Redirect Examination ................................................................ JA1213

Testimony of Nellie Pulley
Direct Examination .................................................................... JA1213

Testimony of Carolyn Chiles
Direct Examination .................................................................... JA1214

Testimony of C.T. Woody
Direct Examination .................................................................... JA1215
Cross Examination ..................................................................... JA1216

Testimony of Wanda B. Brown
Direct Examination .................................................................... JA1216

Testimony of David S. Tweedie
    Direct Examination ...................................................................JA 1217

Testimony of Greg Noble
    Voir Dire ...............................................................................JA1223
    Direct Examination ................................................................JA1225
    Cross Examination .................................................................JA1229

Testimony of Ralph Fleming
    Direct Examination ................................................................JA1230

Testimony of Leroy Slater
    Direct Examination ................................................................JA1231
    Cross Examination .................................................................JA1236

Testimony Of Dr. Marcella Fierro
    Direct Examination ................................................................JA1246

Testimony of Ralph Fleming
    Direct Examination ................................................................JA1252
    Cross Examination .................................................................JA1252

Testimony of Rodney Rodriguez
    Direct Examination ..................................................................JA153

Testimony of Anne D. Jones
    Direct Examination ................................................................JA1254
    Cross Examination .................................................................JA1258

Testimony of Valerie Lee Butler
    Direct Examination ................................................................JA1259
    Cross Examination .................................................................JA1282

**Trial Transcript- Volume XII (January 28, 1993)**.......................................JA1295

**Trial Transcript- Volume XIV (January 29, 1993)** ....................................JA1318

    Testimony of Thomas Leonard
        Direct Examination ....................................................................JA1329
        Cross Examination .....................................................................JA1331

    End of the Government's Case ................................................................JA1332

    Testimony of Gloria Anne Bridges
        Direct Examination ....................................................................JA1332
        Cross Examination .....................................................................JA1336

    Testimony of John J. Cox
        Direct Examination ....................................................................JA1338
        Cross Examination .....................................................................JA1341

    Testimony of C.T. Woody, Jr.
        Direct Examination ....................................................................JA1344
        Cross Examination .....................................................................JA1345
        Redirect Examination.................................................................JA1345

    Testimony of Maurice D. Scott
        Direct Examination ....................................................................JA1346
        Cross & Redirect Examination ...................................................JA1347

    Testimony of Billy Baylock
        Direct Examination ....................................................................JA1348
        Cross Examination .....................................................................JA1350

    Testimony of C.T. Woody
        Direct Examination ....................................................................JA1351
        Cross Examination .....................................................................JA1353

    Testimony of Rodney Tucker
        Direct Examination ....................................................................JA1355
        Cross Examination .....................................................................JA1356

    Testimony of C.T. Woody
        Direct Examination ....................................................................JA1357

Testimony of Ralph Fleming
    Direct Examination ...................................................... JA1359
    Cross Examination ....................................................... JA1360
    Redirect Examination.................................................... JA1360

Testimony of Robin Cooper
    Direct & Cross Examination.......................................... JA1363

Testimony of Dr. Pamela Royal
    Direct Examination ...................................................... JA1364
    Cross Examination ....................................................... JA1366

Testimony of Gina Taylor
    Direct Examination ...................................................... JA1367
    Cross Examination ....................................................... JA1369
    Redirect Examination.................................................... JA1372

**Trial Transcript- Volume XV (February 1, 1993)**....................................... JA1377

Testimony of Steve A. Dalton
    Direct Examination ...................................................... JA1378
    Cross Examination ....................................................... JA1384
    Redirect Examination.................................................... JA1385

Government Guilt Phase Closing Argument ............................................ JA1395

Robert P. Geary, Esq.  Guilt Phase Closing Argument ............................ JA1427

Craig S. Cooley, Esq. Guilt Phase Closing Argument.............................. JA1444

**Trial Transcript- Volume XVI (February 2, 1993)** ................................... JA1468

David P. Baugh, Esq. Guilt Phase Closing Argument............................. JA1470

Robert J. Wagner, Esq. Guilt Phase Closing Argument.......................... JA1491

Government Guilt Phase Rebuttal ......................................................... JA1502

Court Instructions to the Jury re: Guilt Phase........................................ JA1511

xiii

**Trial Transcript- Volume XVII (February 3, 1993)** .....................................JA1553

Jury Verdict .........................................................................................JA1554

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

        v.                                    CRIMINAL ACTION
                                                  92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                        VOLUME XI

                    January 26, 1993
                    Richmond, Virginia
                       10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

Johnson, James H. Roane, Jr., and Sandra Reavis, the eleventh day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready to proceed.

MR. GEARY: Defendant Tipton is ready.

MR. McGARVEY: Defendant Johnson ready.

MR. BAUGH: Defendant Roane is ready.

MR. WAGNER: Defendant Reavis is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.)

All right. The witness will be sworn.

## Jerry Gaiters (2308)

DIRECT EXAMINATION

BY MR. VICK:

Q During your testimony, Mr. Gaiters, I'm going to ask that you speak up, speak toward that microphone.
Could you state your name for the Court, record, and jury, please?

A Jerry Gaiters, Jr.

Q How old are you?

A 39.

Q And how far did you go in school?

A To the eleventh grade.

Q Have you worked some jobs in your life?

A Yes.

Q What sort of jobs?

A Paint, duct work, Lynne even.

Q When was the last time that you worked?

A It was in January.

Q Of last year?

A Yes.

Q You are currently in custody, incarcerated; is that correct?

A Yes.

Q You are pending sentencing in federal court here on the charges that gave rise to this trial. You were charged in this indictment; is that correct?

A Yes, sir.

Q Indeed, you pled guilty to all of the charges against you in that indictment; is that correct?

A Yes.

Q You have pled guilty to Counts One, Seventeen, Eighteen, Nineteen, 20, 21, 22, 23, and 32 of that indictment; is that correct?

A Yes.

Q Do you know what you are facing at sentencing on this indictment?

A Life.

**JA1075**

Q    You are testifying here pursuant to that plea agreement in an agreement you have reached with the government.  Tell the ladies and gentlemen of the jury what you understand that agreement to be.
A    When it is time to come do sentencing, they will talk to see if I can get a lesser sentence.
Q    We will tell the Court that you indeed cooperated?
A    Yes.
Q    Who is going to make the decision whether you receive life or a lesser sentence?
A    The Judge.
Q    Has anybody told you that you will receive a sentence less than life?
A    No.
Q    Anybody promised you that if you do testify you will receive a sentence reduction?
A    No.
Q    All right.  What is it that you understand that you must testify  --  how must you testify in order for the government to tell the Court that you have cooperated with them?
A    The truth.

2311

Q    And what would happen if you did not tell the truth?
A    I would get the maximum.
Q    I'm willing going to show you what has been previously marked Government Exhibit 125.  I ask if that is the copy of the plea agreement that you have entered into.
     (Witness perusing document.)
A    Yes, it is.
Q
          MR. VICK:  I would move Government Exhibit 125 into evidence.  We will statute substitute signed copies by agreement later.
          THE COURT:  It will be admitted.
BY MR. VICK:
Q    Before being convicted on this indictment, did you have any prior felony convictions?
A    No.
Q    Have you ever used drugs before?
A    Yes.
Q    And when was it that you started using drugs?
A    I was about 17.
Q    And what kind of drugs did you start using?
A    It was powder, powder cocaine.
Q    Over the last few years have you used crack

2312

cocaine, cook-'em-up?
A    Yes.
Q    How long ago did you start using cook-'em-up?
A    It has been five years ago.

**JA1076**

Jerry Gaiters (Direct)

Q    During the events about which you are going to testify, during that time frame, last year, January, February of last year, were you using crack cocaine

A    Yes.

Q    How often were you using crack cocaine?

A    Every other day.  Every week.

Q    Did that use of crack cocaine affect the memory of what you are going to testify to here?

A    No.

Q    Do you know the defendant, James Roane?

A    Yes.

Q    Do you see him here in the courtroom?

A    Yes.

MR. HENDERSON:  Stipulate.

MR. VICK:  Could the record reflect the identification of the defendant.

THE COURT:  So reflect.

BY MR. VICK:

Q    How long have you known defendant James Roane?

A    About five years.

Q    And where did you first meet him?

2313

A    Down in Jackson Ward.  Gilpin Court.

Q    Did you have occasion to see James Roane in January of 1992?

A    Yes.

Q    Did you approach James Roane?

A    Yes, I did.

Q    Did you ask James Roane anything?

A    Yes.  I asked for some cook-'em-up from him.

Q    Why did you ask James Roane if you could get cook-'em-up from him?

A    I needed some bills paid.  I wasn't working.

Q    When you say cook-'em-up, do you mean crack cocaine?

A    Crack cocaine.

Q    What did James Roane say?

A    He said he would let me know.

Q    Was he with anyone at that time?

A    At the time he was with "Whitey."

Q    Do you see "Whitey" in the courtroom?

A    Yes, sir.

MR. GEARY:  Stipulate identification.

THE COURT:  All right.

BY MR. VICK:

Q    Did there come a time after that conversation when you indeed got crack cocaine from James Roane?

2314

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury when that was?

A    That was later on in the day.

Q    The same day that you asked him?

A    Yes.

**JA1077**

Q   Where was it that you got crack cocaine?
A   On Hancock Street.
Q   Where on Hancock Street?
A   It was in a house.
Q   Whose house?
A   It was "Mousey's".
Q   Who is "Mousey?"
A   Dorothy Armstrong.
Q   How was it that you came to be in "Mousey's" house that day?
A   I went there all the time.
Q   Who was down there when you went down there to see James Roane?
A   "Whitey," "Mousey," "Papoose," Curt [EUS/], and Keith Ross.
Q   When you say Curt [EUS/], who is Curt [EUS/]?
A   I don't know his last name.
Q   All right. What were they doing at "Mousey's" house?

2315

A   Sitting there smoking.
Q   Smoking what?
A   Crack cocaine.
Q   Did you get anything from James Roane down there that day?
A   Yes.
Q   What was it that you got?
A   I got a package.
Q   Package of what?
A   Crack cocaine.
Q   How many pieces of crack cocaine were in that package?
A   It was ten.
Q   What arrangement did you have with James Roane about the sale of that cocaine?
A   I give him $70 and I took 30.
Q   Who made that arrangement?
A   James Roane.
Q   Did you take that cocaine and sell it?
A   Yes.
Q   Do you know "Mousey" Armstrong or did you know "Mousey" Armstrong?
A   Yes.
Q   Did you know how she was supporting herself in that time frame?

2316

A   Yes.
Q   How?
A   Selling crack cocaine.
Q   Do you know where she was getting her crack cocaine?
A   Yes.
Q   Who was that she was getting her crack cocaine from?

A    She would get it from "Whitey" or "C.O."
Q    Do you know who "C.O." is?
A    Yes.
Q    Do you see "C.O." seated in the courtroom today?
A    Yes, I do.
Q    Would you point "C.O." [POUT/] [*T/] out, please?
A    Behind  --  next to "Whitey."
Q    What's he dressed in?
A    White shirt.
        MR. VICK:  Could the record reflect the identification of defendant Cory Johnson.
        THE COURT:  So reflect.
BY MR. VICK:
Q    Do you know whether "Papoose" was involved in the sale or distribution of crack cocaine?

2317

A    Yes.
Q    Do you know where he was getting his crack cocaine?
A    From "Whitey" and "C.O." and "J.R."
Q    Do you know whether Keith Ross was involved in the sale or distribution of cocaine?
A    Yes.
Q    Do you know where Keith Ross was getting his crack cocaine?
A    Yes, sir.
Q    Where was that?
A    From "Whitey," "C.O.," and James Roane.
Q    Do you know an individual by the name of Sandra Reavis?
A    Yes, I do.
Q    Do you see her in the courtroom today?
A    Yes.
Q    Could you point her out, please?
A    Right there.
        MR. WAGNER:  Stipulate.
        MR. VICK:  Record reflect that, Your Honor.
        THE COURT:  All right.
BY MR. VICK:
Q    Do you know whether Sandra Reavis in that same

2318

time frame was selling crack cocaine?
A    Yes.
        MR. WAGNER:  Objection.  Personal knowledge.
BY MR. VICK:
Q    Based on your personal observation and knowledge?
A    Yes.
Q    Do you know where based on your own personal observation and knowledge where she was getting her

**JA1079**

Jerry Gaiters (Direct)

crack cocaine?
A    I seen her a couple times get it from "J.R."
Q    That crack cocaine you got from "J.R." down at "Mousey's" house, what did you do with it?
A    I sold it.
Q    When did you sell it?
A    Took me two hours.
Q    The same day you got it?
A    Yes.
Q    What did you do with the money you got from selling that cocaine?
A    I gave $70 to "J.R.," kept 30.
Q    So you made a total of $100 off of that crack cocaine?
A    Yes.

2319

Q    Did you ask "J.R." if you could get any more crack from him?
A    Yes.
Q    What did he state?
A    He told me he don't know.
Q    The following day, did you have occasion to see Richard Tipton and James Roane together again at "Mousey's" house?
A    Yes, I did.
Q    Tell the ladies and gentlemen of the jury what happened that day.
A    Well, I was down there, "Whitey," Richard Tipton and "J.R." and "Mousey" and "Papoose" were in the kitchen.
Q    When "Mousey" and "Papoose" came back out of that kitchen from being with "Whitey" and "J.R.," did they have anything?
A    Yes, they had a package.
Q    Of what?
A    Crack cocaine.    (Package a piece.    (
Q    Did you have occasion to go into that kitchen and speak to "J.R." and "Whitey" that day?
A    Yes.
Q    What was that about?
A    I went back to ask "J.R." was he going to give

2320

me a package.  He said he don't know, I had to check with Richard Tipton because I be waiting for him.
Q    Were those the exact words he used?
A    Yes.    (Working  (
Q    Did you talk to tip Tipton at that point?
A    Yes.
Q    Did Tipton give you any drugs?
A    Yes.
Q    What kind of drugs?
A    He gave me ten rocks.
Q    What was the arrangement that you had with Tipton or "Whitey?"

**JA1080**

A    I give him 75 and I take 25.
Q    All right.  Where was it that he gave you those drugs?
A    At "Mousey's".
Q    Who else was present at that time?
A    "V" was there.
Q    Who is "V?"
A    Anthony Mack.  "C.O." was there but I didn't know him at the time.  And "Papoose," "Mousey," Keith Ross, and Swain.
Q    How often would you be at  --  Swain, who is Swain?
A    Swain is all I know him by.

Q    Do you know whether he was involved in the sale or distribution of crack cocaine?
A    Yes.
Q    Do you know where he was getting his from?
A    Richard Tipton, "C.O.," and "J.R."
Q    And that day  --  how often did you have occasion to be at "Mousey's" house?
A    Just about every day.
Q    Did you ever see people coming to "Mousey's" house?
A    Yes.
Q    Who was that that was coming to "Mousey's" house?
A    It was different people coming there.
Q    How many different people would you say on an average day?
A    On an average day, it would be about at least 60.
Q    What were they coming there for?
A    To buy crack cocaine.
Q    Did you have a conversation with "C.O." where he talked about "Mousey" and crack cocaine?
A    Yes.
Q    What did "C.O." tell you about "Mousey?"
A    He said "Mousey" sell for them at least $400 a night.
Q    All right.  Did he use the words there?
A    Yes.
Q    The crack cocaine you got from "Whitey" down at "Mousey's" house, what did you do with that?
A    I sold some of it.
Q    Did you sell all of it?
A    No, I smoked some of it.
Q    All right.  And so did you have enough money to pay "Whitey" back?
A    No.
Q    What did you do about that?
A    I borrowed some money.
Q    Did you pay him back?

Jerry Gaiters (Direct)

A    Yes, I did.
Q    Where was it that you paid him?
A    On Harrison and Clay.
Q    When you paid him, who was he with?
A    He was with "C.O.," "J.R." and Swain and Keith Ross and them.
Q    Did you ask him or did he ask you if you wanted any more cocaine at that point?
A    He asked me did I want any more and I told him I didn't want any more.  I stopped work.
Q    All right.  When was this?

2323
A    This was in January.
Q    After you sold that pack of cocaine for "Whitey" and you told him you didn't want any more, did you do anything with Curt?
A    Well, I had come to Curt's house, seen people 59 Curt's house to buy drugs.
Q    Would that be Curt Thorne?
A    Thorne, yes.
Q    What would you bring people to Curt Thorne's house for?
A    To buy crack cocaine.
Q    Did you have occasion during that time when you were bringing people to Curt Thorne's house to go with Curt Thorne to 1212 West Moore Street?
A    Yes, I did.
Q    Why was it that you went to 1212 West Moore Street?
A    To get some more crack cocaine from "Whitey."
Q    Did you see "Whitey" when you went to 1212 West Moore Street?
A    Yes, sir.
Q    What did "Whitey" say, if anything?
A    He told Curt that he would bring it over to his house.
Q    Did that happen?

2324
A    Yes, it did.
Q    Did you actually see "Whitey" deliver anything to Curt?
A    Yes.
Q    What was that?
A    It was about 40 or 50 rocks of crack cocaine.
Q    Now, what was your relationship with "Whitey" when you got drugs from "Whitey?"
A    Selling drugs for him.
Q    What was your relationship with "J.R." when you got drugs from "J.R.?"
A    Selling drugs for him.
Q    Were you the same as "J.R." or the same as "Whitey?"
A    No.
Q    Tell the ladies and gentlemen of the jury what

**JA1082**

Jerry Gaiters (Direct)

you thought the difference to be.

A    Well, "Whitey" and "J.R." was like the boss. They ran things.  Selling drugs.

Q    What were you?

A    An employee.

Q    All right.  Was that the same relationship as "Mousey" had with them?

A    Yes.

Q    Was that the same relationship as Curt Thorne had with them?

A    Yes.

Q    Keith Ross?

A    Yes.

Q    Swain Ball?

A    Yes.

MR. BAUGH:  That's assuming a fact not in evidence.  The question was with them.  That's not what the witness said.

THE COURT:  Overruled.

BY MR. VICK:

Q    How about "Papoose?"

A    Yes.

Q    After paying "Whitey" for his cocaine, did you have occasion to talk to "C.O.," Cory Johnson about crack cocaine?

A    Yes, I did.

Q    When was that approximately?

A    Two days later.

Q    What did you ask him?

A    Could I get a package from him.

Q    What was his response to you?

A    He told me he don't know, he don't usually give nothing to nobody that works for his brother.

Q    Did you see him later?

A    Yes, I did.

Q    When he said work for his brother, who did you think he was referring to?

A    Richard Tipton.

Q    Why was that?

A    That's what he called him, his brother.

Q    Did you later see Cory Johnson that same evening, "C.O.?"

A    Yes.

Q    Who was he with?

A    He was with "V" and "E.B."

Q    Where was that?

A    Up on Norton Street.

Q    And what did you talk to him about at that time?

A    Getting a package.

Q    Did he agree to give you a package?

A    Yes, he did.

**JA1083**

Jerry Gaiters (Direct)

Q    Did you get a package from him?
A    Yes.
Q    A package of what?
A    Crack cocaine.
Q    How much was that that you got?
A    15 rocks.
Q    What was the arrangement you had with "C.O." about selling that crack cocaine?
A    I give him 200 and I take 100.
Q    What  --  were you of the same relationship with "C.O." that you testified about with "J.R." and "Whitey?"
A    Yes.
Q    Where was that that he gave you that crack cocaine?
A    On Hancock Street.
Q    Who else was present?
A    "Mousey," "V," Keith Ross, "Papoose."
Q    All right.  Did you sell that crack cocaine?
A    Yes, I did.
Q    And who did you give the money to?
A    I gave it to "C.O."
Q    When "C.O." gave you that cocaine, did you ask him who you should give the money to?
A    Yes.
Q    What did he say?
A    Told me to give it to him.
Q    Are you familiar with the fact that Peyton Maurice Johnson was murdered?
A    Yes.
Q    I direct your attention to the evening of the murder of Peyton Maurice Johnson.  Did you have occasion about a half-hour before the murder of Peyton Maurice Johnson to see "C.O.?"
A    Yes, I did.
Q    Could you tell the ladies and gentlemen of the jury who you saw "C.O." with and what he was doing?
A    I seen "C.O." with "V." and they was going up a girl's house named "Peaches" looking for "J.R."  (Up to (
Q    Did they find "J.R.?"
A    I don't know.
Q    Did "C.O." have anything with him?
A    Yes, he did.
Q    What was that?
A    He had a blue tote bag.
        MR. VICK:  Could I see Government Exhibit 107?
    (Exhibit proffered to counsel.)
BY MR. VICK:
Q    I ask you to look another what's been previously marked as Government Exhibit 107; have you ever seen

**JA1084**

that before?

A   Yes.

Q   What is that?

A   That's the bag that "C.O." had.

Q   All right.  How soon was this prior to when you found out that Peyton Maurice Johnson had been killed?

A   That was about five minutes after that.

Q   That you found out he had been killed?

A   Yes.

Q   All right.  Later, did you have occasion to see "J.R." that evening?

A   Yes, I did.

Q   Was that after the murder of Peyton Maurice Johnson?

A   Yes.

Q   Did "J.R." talk to you?

A   Yes, he did.

Q   What did "J.R." ask you?

A   He asked me have I seen Stanley Smithers.

Q   What did he call him?

A   "Stinker".

Q   How do you know Stanley Smithers?

A   I used to stay with him.

Q   What did you tell him?

A   I told him no.

Q   Did you ever have a conversation with "J.R." about the cocaine business and what he intended to do?

A   Yes, I did.

Q   Could you tell the ladies and gentlemen of the jury about that conversation?

A   He said that himself and "C.O." and "Whitey" were planning on taking over this area.

Q   What area was that?

A   Newtowne.

Q   Do you know an individual by the name of Doug Talley?

A   Yes, I do.

Q   How do you know Doug Talley?

A   I used to work with them doing order jobs.

Q   Do you know if Doug Talley was associated with "J.R.," "C.O.," or "Whitey?"

A   Yes, he was.

Q   What was his association?

A   He was a worker.  He would sell drugs for them and transport them to New York.

Q   How do you know he took them to New York?

A   He had a gray Continental.  Used to come by and tell us that he was taking them there.  He said the next time he go up there he was going to score some for himself.

Jerry Gaiters (Direct)

Q    Did you have an occasion to get drugs from "C.O." again after the time that you have already testified about?

2331

A    Yes.
Q    All right.  And what amount of drugs did you get from him on the second occasion?
A    15 rocks.
Q    Where was it that you got those?
A    It was in the house or Moore Street.
Q    1212 West Moore Street?
A    Yes.
Q    Tell us how you got those rocks.
A    Well, "V" gave it to me, Anthony Mack.  But he couldn't give it to me without "C.O.'s" permission.
Q    All right.  Where did he go to get those drugs?
A    In the back of the house.
Q    Did you sell those drugs?
A    Yes.
Q    What was the arrangement you had with "C.O." about the sale of those drugs?
A    Same.
Q    All right.
A    I give him 200 and I take 100.
Q    Did you pay "C.O." for those drugs?
A    Yes.
Q    How long did it take you to sell them?
A    That took me about a day.
Q    Do you know an individual by the name of "Nat"

2332

Rozier?
A    Yes, I do.
Q    Have you ever had a conversation with James Roane about "Nat" Rozier?
A    Yes.
Q    Could you tell the ladies and gentlemen of the jury what James Roane told you about "Nat" Rozier?
A    He told me that "Nat" was police and we had to get rid of her.
Q    Did he say that about anyone else?
A    Yes, he did.
Q    Who else?
A    Girl named "Dee Dee." I don't know her last name.  And "Peaches."
Q    Mr. Gaiters, are you familiar with the fact that an individual by the name of Louis Johnson was murdered on January 29th, 1992?
A    Yes.
Q    Were you present for that murder?
A    Yes, I was.
Q    Could you tell the ladies and gentlemen of the jury where you had been prior to that murder that evening?
A    I was in a house on Poe Street with Sterling

**JA1086**

Jerry Gaiters (Direct)

Hardy, another guy who I don't know his name and

Louis Johnson.

Q    What were you doing in that house?

A    Selling crack cocaine.

Q    Who were you selling crack cocaine to?

A    Louis Johnson.

Q    Had you seen "J.R." that evening?

A    We seen him that night, the same night that Lewis had left.

Q    So there came a time when you left that house?

A    Yes.

Q    Tell the ladies and gentlemen of the jury what happened when you left that house

A    When we left the house, "J.R." pulled up in a burgundy Regal and Sterling called his name out and that's when he slowed down.  And I hollered to Sterling not to call his name out so loud.  So they pulled off as we was coming down the steps and turned the corner from the alley.  By the time we got down to Catherine and Kinney Street, they came  --  they pulled up behind us.  "J.R." got out the car.

Q    Where was Louis Johnson at this point?

A    He was in no where in sight then.

Q    "J.R." got out the car and what did he do?

A    He walked over to me and he told me to keep the guy in the alley.  I said what guy and I turned

around, there was Louis Johnson coming down the alley.

Q    What did you do?

A    I just turned around and looked at him.

Q    What happened next?

A    Louis Johnson passed me and went across the street on the other side of Kinney.  And that's when "C.O." and "V" got out of the car.

Q    All right.

A    "J.R." had a Mac.

Q    When you say a Mac, what do you mean?

A    A Mac ten, an Uzi.  And he pulled the clip back and stuck it up to his head but the gun wouldn't go off.

Q    Stuck it up to whose head?

A    Louis Johnson 's.

Q    Did you actually see him put it to the head?

A    Yes.

Q    What did "J.R." do?

A    He pulled the trigger but it wouldn't go off.

Q    What happened next?

A    Then Anthony Mack, he fired a gun which was a .38, and he shot  --  he fired the first shot.  Then Lewis turned around, that's when "C.O." started firing.

Q    What kind of gun  --  what color was the gun that Anthony Mack or "V" fired?
A    It was black.
Q    And what kind of gun was it that "C.O." fired?
A    A Glock.
Q    How many times did you see "V" fire?
A    Once.
Q    How many times did you see "C.O." fire?
A    Seven or eight times.
Q    What happened to Louis Johnson?
A    He fell to the ground.
Q    After shooting Louis Johnson, what did "J.R.," "C.O.," and "V" do?
A    They ran back to the car.  Before "J.R." got in the car he hollered to Sterling and told him to get in the car.
Q    Did they leave that scene then?
A    Yes.
Q    What kind of car was it?
A    It was a burgundy Regal.
Q    Do you know whose car that was?
A    I don't know who it belongs to but "V" was driving.
Q    Did you have a gun with you that evening?
A    Yes, sir.

2336

Q    What kind of gun did you have?
A    32.
Q    What did you do after the murder?
A    I ran down to Harrison Street to Sandra 's house.
Q    Sandra Reavis?
A    Yes.
Q    What did you do when you got there?
A    I sat on the porch and she came out on the porch and hollered downstairs, you know, like who the if you can on my porch.  Then she came, when she seen who it was, she came downstairs and I told her I had to hide my [gun|begun].
Q    Did you tell her why you had to hide your [gun|begun]?
A    I said the police was coming and I had a capeas on me.
Q    What did she do?
A    She got the gun and went to the corner of Catherine and Harrison and put it up under a porch.
Q    Do you know why Louis Johnson was murdered?
A    "C.O." thought that he had pulled a gun on him, a shotgun.
Q    When did that occur?
A    I don't know exactly the date, but me and "C.O."

2337

was coming up the street and the guy was trying to  --  Louis Johnson was trying to put the gun in the

**JA1088**

trunk of a truck.  By him turning, he turned towards us as we was coming up the street.

Q    Do you know if Louis Johnson was involved in drug distribution activity in any way?

A    Yes.

Q    What was his involvement?

A    He was using it, plus he was what was called a bodyguard for a drug dealer.

Q    Who was that?

A    I don't know the fellow's name.  His first name is Keith.

Q    Do you know whether Sandra Reavis ever kept guns, kept a gun for "J.R.?"

A    Yes.

Q    Would you tell the ladies and gentlemen of the jury about that?

A    She had a .38 in her house.  It was a Saturday morning.  "J.R.," "C.O.," and Anthony Mack came up to me, I was at the corner and they was talking and "J.R." told Anthony Mack to go get the gun.  So I walked with them up to Sandra 's house, he knocked on the door.  And he told her that he come to get the gun.  So when she handed it to him, he turned around

2338

and put it in his belt buckle and left there.

Q    You have pled guilty, Mr. Gaiters, to the murder of "Mousey" Armstrong; Tony Carter and Bobby Long; is that correct?

A    Yes.

Q    That occurred on February 1st, 1992; is that correct?

A    Yes.

Q    Did you have occasion on February 1st, 1992 to be at 1212 West Moore Street in the evening hours prior to that murder?

A    Yes.

Q    All right.  And did you have occasion to see Sterling Hardy at that house?

A    Yes, I did.

Q    Would you tell the ladies and gentlemen of the jury what occurred at that house when you saw Sterling Hardy there?

A    Sterling had went back to the house, 1212 West Moore, and he told "C.O." and "V" and them that "J.R." was having trouble with some guys over in Southside and for to get the stuff.

Q    Did they get guns that evening?

A    Yes, they did.

Q    What kind of guns?

2339

A    It was a tote bag with a Mac in it and a Glock.

Q    Was it the same tote bag that you had seen?

A    Yes.

Q    The same tote bag you saw the night Peyton

**JA1089**

Maurice Johnson was killed?

A    Yes.

Q    Did people leave the house to go to Southside that night?

A    Yes.

Q    Who left the house to go to Southside?

A    "C.O.," Anthony Mack, Sterling, a guy named Tony, and Linwood Chiles.

Q    All right.  And do you know who actually got in the car and went over there?

A    No.

Q    Now how was "C.O." dressed that evening?

A    He had on dark colors.  He had a blue hood on.

Q    How was Anthony Mack, "V," dressed that evening?

A    He had on a black coat.

Q    And where was that tote bag when they left to go to Southside?

A    It was gone with them.

Q    Later that evening, did you have occasion to see "C.O." again?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury where you saw "C.O." later that evening?

A    I saw him on West Clay Street at Linwood Chiles' house.

Q    Tell the ladies and gentlemen of the jury what occurred when you saw him there?

A    Me and Linwood was talking when "C.O." came up and asked Linwood to show him where "Mousey's" brother lived.  Linwood said he had something to do so he asked me and I told him I would take him over there.

Q    Over to where?

A    "Mousey's" [PHOUS/] house.

Q    Do you know where she was living at that point?

A    Yes.

Q    Where?

A    Church Hill.

Q    At whose house?

A    At her brother 's house.

Q    What was his name?

A    Bobby Long.

Q    And so what did you do with "C.O." when you agreed to do that?

A    Well, "C.O.," Linwood Chiles, myself were talking.  Then a car pulled up and it was "Whitey" and another fellow.

Q    Who was the other fellow in the car?

A    I don't know his name but he was a young guy.

Q    How was he built?

A    He was stout, brown skin.

**JA1090**

Jerry Gaiters (Direct)

Q    Did you get in the car with "Whitey" and that other fellow?
A    Yes.
Q    What kind of car was it?
A    It looked like to me a police car.  It was a brown, tan car.
Q    When you got in the car, who was in the car with you?
A    "C.O.," "Whitey" and the young fellow.
Q    Where did you go?
A    We went around to 1212 West Moore Street.
Q    What did you get at 1212 West Moore Street?
A    Well, they had the bag out there with the guns.
Q    Same bag you have identified?
A    Yes.
Q    All right.
A    And "C.O." got the Glock, I picked up the Mac. I put it back.
Q    All right.  And did there come a time when you left 1212 West Moore Street?
A    Yes.
Q    Where was it that you went?
A    Over to Central Gardens.
Q    What did you do in Central Gardens?
A    We dropped off the young fellow that was driving.
Q    Where did you go after that?
A    Went to 29th and Clay Street.
Q    Who provided the directions to get to 29th and Clay Street?
A    Well, "Whitey" already knew how to get to 29th and Clay.  I just showed them where the house was.
Q    He didn't know where the house was?
A    No.
Q    Which house was "Mousey's"?
A    Yes.
Q    On the way over to Clay Street, what was "C.O." doing?
A    He kept playing with the Glock in the backseat.
Q    Where were you seated in
A    In the front on the passenger's side.
Q    Who was driving that car?
A    "Whitey."
Q    Were you fearful?
A    Yes, I was.
Q    What were you fearful of at that point?
A    That they might try to shoot me in the head or something.
Q    Why did you think they would do that?
A    The way he kept on [plague|playing], it looked funny.
Q    Did "Whitey" say anything to you about that?

**JA1091**

Jerry Gaiters (Direct)

A    Yes.
Q    What?
A    He said he don't know what I am worried about, they not going to do nothing to me because I'm his man.
Q    Did you know what they were going to do to Muslim I?
A    Yes.
Q    To kill her?
A    To shoot her.
Q    Did "C.O." talk to you about what to do when you got to "Mousey's" house?
A    Yes.
Q    What did he say?
A    When we got there we got out of the car.  When he went through the alley.  He said I want you to get "Mousey" to bring out the house.  When I shoot the

2344
bitch in the as I want you to run back to the car.
Q    Did you go to that house that "Mousey" lived in, Bobby Long's house?
A    Yes.
Q    Tell us what happened
A    I knocked on the door and Bobby answered the door, asked who is it.  I said it was G.  So they let me in.  As I went in, "Mousey" hollered what's up, cuz?  And I spoke, turned around and as I was turning Bobby closing the door.  And that's when "C.O." came in.
Q    What happened when "C.O." came?  In?
A    He start [D/] firing.
Q    Who did he fire at?
A    "Mousey."
Q    Did you see if "Mousey" got hit?
A    I saw her get hit the first time.
Q    What did you see next?
A    After that, me and Bobby trying to get out the door.
Q    Did you see another fellow in there besides Bobby Long and "Mousey?"
A    Yes.
Q    Who?
A    The old man that they called pop.  His name was

2345
Anthony.
Q    Did you see him get shot?
A    No, I didn't see that.
Q    When "C.O." started firing at "Mousey," what did you do?
A    Me and Bobby headed towards the door.  We went out the door.
Q    What happened?
A    Bobby fell down liking go out the front door, two steps.  And he missed both of them and fell to

**JA1092**

Jerry Gaiters (Direct)

his knees.

Q    Then what happened?

A    He tried to get up and run.  That's when "C.O." came out there and started shooting.

Q    Shooting who?

A    Bobby.

Q    Did you see him get shot?

A    Yes.

Q    Where did you go?

A    I ran up to the corner ever 29th and Clay, to the alley where we came out, as we got to the alley the car was pulling up.

Q    What car?

A    The car that "C.O." and "Whitey" and myself drove.

2346

Q    Did you get in that car?

A    Yes, I did.

Q    Where did you get in that car?

A    We got in it on 28th Street.

Q    Where were you seated?

A    In the backseat.

Q    Where was "C.O." and "Whitey?"

A    In the front seat.

Q    What were they doing?

A    They was laughing about something.

Q    On the way over there before the murder, on the way to Church Hill that night, did you hear "C.O." say anything about "J.R.?"

A    No, "Whitey" had told "C.O." I thought "J.R." said he was going to take care of that thing for you at 10 o'clock.

Q    What did "C.O." say?

A    "C.O." said 10 o'clock too late, the bitch knows too much about me.

Q    After you got in the car, let me back up.  When "Mousey" was shot, could you describe exactly where she was in that house?

A    She was in between the kitchen sink and the hallway.

Q    All right.  And where was Tony Carter seated?

2347

A    He was sitting in the chair by the table.

Q    Where was it that Bobby Long was shot?

A    Outside the house.

Q    When you got back in the car where did you go?

A    We went to 1212 West Moore Street.

Q    What did you do at 1212 West Moore Street?

A    "Whitey" let us out and he took off.  Me and "C.O." went back to the house and "C.O." said I got to turn on the news and see if I hear about it on 89 news.

Q    Did you sit and watch the news?

A    Yes.

**JA1093**

Q    Did it come on the news?
A    No.
Q    You were looking for the murder of "Mousey" Armstrong and Bobby Long and Tony Carter?
A    Yes.
Q    After it was not on the news, what did you do?
A    We got up and he said he had to go over and check to see if they are dead.  So we went to Linwood's house.
Q    Who said that?
A    "C.O."
Q    You went to Linwood's house and what happened?
A    Curt [EUS/] and possible I will was there.  They got arguing with the landlord and they needed somewhere to say.  "C.O." told me to go back to the house and get the keys and let them in on Norton Street.  But "V" said had the key.
Q    What happened then?
A    So "V," "C.O.," Linwood, Curt [EUS/] and "Pepsi" got in the car and went over to Church Hill.
Q    To check on what?
A    Check to see if "Mousey" and them were dead.
Q    Where did you go?
A    I went to pee soup 's house.
Q    What did you do at "Pea Sue's" house?
A    I got her and another fellow to walk me around to see if I could get a ride to Church Hill.
Q    What were you going there for?
A    To go home.
Q    You weren't going to check to see whether "Mousey" was dead?
A    No.
Q    Did you see Sandra Reavis later that evening?
A    Yes.
Q    Where was that?
A    1212 West Moore.
Q    When was it that you went back to 1212 West Moore?
A    When I went back to 1212 West Moore, there was a fellow there, E W told me don't come around there any more because it was too hot.
Q    Did you see Sandra nine next day?
A    I seen her [Sunday|sun].
Q    What did she say toe you?
A    She didn't say nothing to me.  Her and Denise got in the truck to go to "Mousey's" house for something.
Q    Who was Denise?
A    I don't know her last name.  I just know her by associating with "Mousey."
Q    What did she did do?
A    They got in the car together.

**JA1094**

Q    Did you see Sandra the next day?
A    I seen her that Monday.
Q    What did she say?
A    She told me that "C.O." and "Whitey" were looking for me and I asked her what for, she said she don't know.  Oh, she said, they are trying to get another crew up.
Q    Did you go see them that day?
A    No.
Q    Why is that?
A    I got arrested.

Q    And that led to your being charged in state court?
A    Yes.
Q    Do you know what happened to those state court charges?
A    Yes.  They was dropped for to come over here.
Q    And the charges were brought in federal court against you?
A    Yes.
Q    Has anyone from the prosecution team, myself, Detective Fleming, Buddy Parcell, told you how to answer any questions here today?
A    No.
Q    Have we provided you any information for your testimony?
A    No.
        MR. VICK:  Beg the Court's indulgence.
    (Counsel conferring with co-counsel.  (
        MR. VICK:  I tender the witness, Your Honor.
        THE COURT:  Mr. Geary?
        CROSS-EXAMINATION
BY MR. GEARY:
Q    Do you know a woman by the name of Pam Harris?
A    Yes.

Q    You mentioned a man by the name of Keith Ross.
A    Yes.
Q    Would you describe him to the jury, please?
A    He is "Light"-skinned.  He is about six feet.
Q    About how old?
A    About in his twenties, late twenties.
Q    You mentioned your arrest on state court charges.  As a matter of fact, you were arrested by Detective Blaylock and charged with murder of Katrina Rozier and use of a firearm in that charge; is that correct?
A    Yes.
Q    When you were charged with those offenses, were two lawyers appointed to represent you?
A    Yes.  [No|Know].  It was one at first.
Q    Mr. Johnson or Mr. Collins?

**JA1095**

A    Mr. Johnson.
Q    Robert Johnson?  Do you recall?
A    Yes.
Q    When the charges were as you say brought over here, who was appointed to represent you in federal court?
A    Mr. Collins.
Q    Christopher Collins?
A    Yes.

Q    Did Mr. Collins and you go over the plea agreement that Mr. Vick had referred to today before you pled guilty?
A    Yes.
Q    By Judge Spencer June?
A    Yes.
Q    Did you understand it?
A    Yes.
Q    Did you go over it thoroughly?
A    Yes.
Q    Now, as I understand it, this plea agreement that you have with the government, it doesn't include anything about the murder of Katrina Rozier, does it?
A    No.
Q    When you were arrested on the Katrina Rozier murder, what address did you give to Detective Blaylock?
A    1001 Kinney Street.
Q    Did you say you lived at 1212 West Moore?
A    No.
Q    A thousand [1|one] Kinney street.  That's in what's called the Newtowne area?
A    Yes.
Q    Did you call that the Newtowne area before you got locked up?
A    No.
Q    Did it have a name as far as you know?
A    Hartshorn Homes.   (H A R T S H "O" RN.   (
Q    Approximately how long had you lived in that area?
A    Almost all my life.
Q    That's almost 38, 39 years?
A    39.
Q    And if I understood it right, you started using powder cocaine when you were 17 years old?
A    Yes.
Q    You started using crack, I guess it would have been about 1987?
A    Yes.
Q    Is it correct that you first saw or met a person you described as "Whitey" or Richard Tipton in January of 1992?

**JA1096**

A    Yes.
Q    Richard Tipton didn't have anything to do with whatever drugs you were doing before January of 1992; is that correct?
A    Yes [*F/] [no|know].
Q    How about heroin, have you used heroin?
A    No.

2354

Q    Marijuana?
A    No.
Q    Were you familiar with who was using and who was selling and who was buying crack cocaine in the area that you lived in before January of 1992?
A    Yes.
Q    Tell the ladies and gentlemen of the jury the street intersections, the corners over there where people would congregate to buy crack.
A    It would be up in Newtowne, all down Jackson Ward.
Q    What intersections?
A    It will be Moore Street, Moore and saint James and them.
Q    Any particular intersections?
A    No.
Q    Moore is in the Newtowne area, saint James is in Jackson Ward or Gilpin Court, right?
A    Yes.
Q    The people who you were familiar with in the Newtowne area before you met "Whitey," did they include people like Louis Johnson and Peyton Maurice Johnson?
A    Yes.
Q    Did you know Ronita Hollman?

2355

A    Yes.
Q    "Pea Sue"?
A    Yes.
Q    You knew "Nat" very well, didn't you?
A    Yes.
Q    Katrina Rozier.  You knew "Little Keith"?
A    Yes.
Q    "K.K.?"
A    Yes.
Q    Were all those people I've just mentioned involved in either the use or selling of cocaine prior to your meeting "Whitey?"
A    Selling.  Some of them was using.
Q    Some [R*/] sold, some used?
A    Yes.
Q    Did you before January of 1992, did you ever sell crack cocaine?
A    Yes.
Q    Can you tell the ladies and gentlemen of the jury approximately how many times you sold crack

cocaine before January of 1992?

A    I didn't sell it that much.  But when I needed to pay some bills or something, I sold.

Q    Tell the jury how often that would be.

A    It might be twice a week, maybe once a month.

Q    That goes back to 1987 and 1988?

A    Oh, yes.

Q    Tell the ladies and gentlemen of the jury when you needed to pay some bills to sell crack cocaine, who would you go to to buy the crack cocaine?

A    Who would I go to?

Q    Yes.  Who did you buy it from?

A    I would buy it from drug dealers.

Q    In Newtowne or Jackson Ward?

A    Yes.

Q    Tell the ladies and gentlemen of the jury who some of those people are.

A    I don't know the main guy.

Q    Who are the people, Mr. Gaiters?

A    Okay, down in Jackson Ward, I got it from anybody there.

Q    And were they selling to you so you could then remember sell?

A    Yes, they would sell it to me to remember sell it or either use it.

Q    When you brought to sell, how much would you buy normally?  Would you buy like $100 like you described to "Whitey?"

A    No.

Q    How much would you buy?

A    It would be about $50 worth.

Q    Then you would sell some of that?

A    Yes.

Q    Give it back to whoever sold it to you?

A    No, I paid with my money.

Q    Did you ever buy crack from somebody and remember sell it?

A    Yes.

Q    How often would that take place?

A    It wasn't often.  Just maybe once or twice.

Q    In November and December of 1991, just before you met "Whitey," I assume you were using crack at that time; is that correct?

A    Yes.

Q    How often during that two-month period were you using crack?

A    Whenever I had the money to get it.

Q    If you had the money every day were you using crack every day?

A    Not every day.

Q    What effect would the drug have one you, Mr. Gaiters?

Jerry Gaiters (Cross)

A    It wouldn't have no effect on me now.
Q    How about when you were using back then?
A    It didn't have quite an effect on me.  Just got me a 15-minute high.
Q    15-minute high?
A    Yes.
Q    The name Jerry Gaiters, you are known by other people by different names, aren't you?
A    Yes.
Q    Pam Harris refers to you to the police as Jerry "The Enforcer" Gaiters; you know that, don't you?
A    No.
Q    You never heard yourself referred to as the enforcer?
A    No.
Q    How about Jerry "The Hit Man" Gaiters?
A    No.
Q    What names do you use or what names have you heard about yourself?
A    "J.G.", Jerry, Gaiters, or G.
Q    The weapon that you were carrying that you spoke to Mr. Vick about, the 32, the night you were carrying it, was that concealed that night?
A    Yes.
Q    And you said to the jury that you ran to hide it because there was a capeas out for you; is that correct?
A    Yes.

Q    Was the capeas for a failure to appear or what?
A    Failure to appear.
Q    Richmond General District Court?
A    No, domestic Court.
Q    And you regularly carried a concealed gun, didn't you?
A    No.
Q    How often in January and February did you carry a concealed weapon, firearm?
A    When I was selling drugs.
Q    You had been selling drugs since 1987, haven't you?
A    Yes.
Q    When you sell drugs you carry a gun to protect yourself?
A    Yes.  To protect myself.  But I didn't have any [gun|begun] in 1987.
Q    How far back did you start carrying a gun?
A    I just recently started.
Q    When you say recently, what do you mean?
A    In January of 1992.
Q    You are telling the ladies and gentlemen of the jury that prior to that time you never carried a gun?

**JA1099**

A    I had a [gun|begun].  But I never carried it.

Q    What kind of gun did you have before January of 1992?
A    A .38.
Q    38.  In January you were carrying a .32, himself; is that correct?
A    Yes.
Q    When you were arrested on the Katrina Rozier murder, you were interviewed by Detective C.T. Woody, weren't you?
A    Yes.
Q    Now, Detective Woody did not get the warrant out.  Detective Blaylock did; is that correct?
A    I don't know who got the warrant.
Q    You and Detective Woody had a relationship, did you not?  When he talked to you in January, you two knew each other, didn't you?
A    Yes.
Q    How long had you known Detective Woody?
A    I just knew him when he busted me awhile back.
Q    What did he bust you for?
A    For having a pipe on me.
Q    A crack pipe?
A    Yes.
Q    What year was that you got busted by Detective Woody?

A    I don't know.
Q    A long time ago?
A    Yes.
Q    You and Detective Woody kept in contact over a period of time, didn't you?
A    Yes.
Q    You became what the police regard as an informer for Detective Woody, didn't you?
A    Yes.
Q    You had prearranged signals with Detective Woody when he wanted to talk to you to get information he would do a particular thing to make you go to a particular location to meet him; is that correct?
A    Yes.
Q    You would give him information about things, correct?
A    Yes.
Q    What would Detective Woody do for you in exchange for the information?
A    He wouldn't do nothing.
Q    Why were you volunteering to do this?
A    Well, I did it just at times to keep from going to jail.
Q    What were you afraid of going to jail for?
A    What was I afraid of going to jail?

**JA1100**

Jerry Gaiters (Cross)

Q    About what charge?
A    Possession.
Q    Of cocaine?
A    Yes.
Q    Over the years, tell the ladies and gentlemen of the jury how many times you had these meetings with Detective Woody about giving him information about other people?
A    It was just twice.
Q    Twice?
A    Yes.
Q    What years?
A    I don't know.
Q    And you did that secretly because you didn't want any other people to find out, correct?
A    Yes.
Q    Were you glad to see Detective Woody when you got arrested on the murder charge?
A    Was I glad?
Q    Yes.
A    No.
Q    Did Detective Woody tell you, did he tell you during the interviews he had always been straight with you, Mr. Gaiters?
A    Yes.

Q    Did he tell you that he had a camera above his head that was taking a picture of you in the interrogation room?
A    No.
Q    Did he tell you he was tape-recording the conversation?
A    No.
Q    When did you find that out?
A    I didn't even [no|know].
Q    Did you know from my telling you?
A    Just found out.
Q    Do you know all the lawyers in this case have videotapes of you being interviewed by Detective Woody and other police officers?
A    2340.
Q    You know you have told them a completely different story about Church Hill than you told today; isn't that correct?
A    Did I tell [THEUPL/] a different story?
Q    Yes.
A    I may have.
Q    Don't tell the jury you may have.  Have you in fact told  --
        MR. VICK:  Asked and answered.
        THE COURT:  Overruled.

BY MR. GEARY:
Q    Have you told Detective Woody, the detective who

**JA1101**

you informed for, a rather different version of what happened in Church Hill than what you have told these ladies and gentlemen of the jury today?

A    I may have.

Q    If we had a videotape and could show it to the jury they could make their own decision as to whether or not you told a different version.

MR. VICK: Objection, he is testifying now.

THE COURT: Sustained.

BY MR. GEARY:

Q    On February 1st, you saw "Whitey" in a car; is that correct?

A    I saw "Whitey?" yes.

Q    With a fellow whose name you didn't know; is that correct?

A    Yes.

Q    Does the name "May-May" or Charles Townes ring a bell?

A    No.

Q    When you saw them, who was driving the car?

A    The young fellow.

Q    And I assume "Whitey" was sitting in the passenger's seat?

A    Yes.

Q    Where were you and month or anybody else when you saw them?

A    On Clay Street in front of a house.

Q    They came by and did "Whitey" tell you that he and his buddy were looking to buy some marijuana, mention anything about that?

A    No.

Q    Did the two of you get in the car?

A    Four of us got in the car.

Q    Did you go then to 1212 West Moore Street?

A    Yes.

Q    Who got out of the car to go into 1212 West Moore Street?

A    Me and "Whitey" and "C.O."

Q    Did the other fellows stay in the car?

A    I don't know whether they stayed in or came. I didn't see them in the house.

Q    About what time did you think you got to 1212 West Moore at that point?

A    I think it was eight or 9 o'clock.

Q    About eight or 9 o'clock in the evening?

A    Yes.

Q    Then you left from there; is that correct?

A    Yes.

Q    And from there you went to Central Gardens.

A    Yes.

Q    And dropped off the young fellow who was driving

**JA1102**

the car.

A    Yes.

Q    At that point, Tipton then becomes the driver of the car?

A    Yes.

Q    Your testimony to the jury is that this fellow you met in January, you knew by the way he was from New York, didn't you?

A    Who?

Q    "Whitey."

A    No.

Q    You didn't know he was from New York?

A    No.

Q    Are you telling the ladies and gentlemen of the jury that he knew where 29th and Clay Street was in Church Hill, he just needed you to find out which house [Miss|miss] I was in?

A    Yes.  He didn't.  "C.O." did.

Q    "C.O." did what?

A    "C.O." wanted to know.

Q    Did you have a gun in your hand during this drive?

A    No.

Q    When you left 1212 West Moore to go to Church Hill and before you got there when you dropped the young fellow off in Central Gardens, in the time you left 112 until you went to Central Gardens, was there any discussion in the car about hurting somebody or murdering somebody?

A    No.  Just discussion that  --  what Mr. Tipton told "C.O."

Q    What was that?  Tell the jury in Mr. Townes' presence what Richard Tipton said.

A    Mr. Townes wasn't in the car.

Q    I'm talking about the time, Mr. Gaiters, between the time you left 1212 West Moore and the time you got to Central Gardens.

A    I don't know about that.  Because rip arrested Tipton and the guy was in front, "C.O." was in the back.

Q    So there was no discussion involving Richard Tipton in that period of time.

        MR. VICK:  Objection, he said he didn't know.

        THE WITNESS:  [No|Know].

        THE COURT:  Overruled.

BY MR. GEARY:

Q    In regard to the Katrina Rozier murder, Mr. Gaiters, what's the status of those state court charges now?

A    They have been dismissed.

Q    Nine murder charges?

A    Yes.
Q    Was it dismissed as far as you can remember in General District Court or Circuit Court?
A    General District Court.
Q    Was the prosecutor here, Mr. Vick, was he the person that got the Judge to dismiss them?
A    He was there.
Q    Was Judge Robert son the Judge?
A    I don't know who the Judge was.
Q    Did you know when you walked out from the back, did you know those charges were going to be dismissed that day?
A    No.
Q    Have you ever been interviewed in regard to those charges by Detective Blaylock?
A    No, I've been interviewed by Detective Blaylock here?  Who is Detective Blaylock?
Q    Detective Blaylock is the detective who took out the murder charge on you against Katrina Rozier.

2369
A    I was just interviewed by Woody, Mr. Jackson --
Q    Mr. Fleming over here?
A    Yes.
Q    How many times back in January or February were you interviewed by Detective Woody?
A    How many times?
Q    Yes, sir.
A    In January?
Q    When you got arrested.
A    When I got arrested?  About three times.  Three or four times.
Q    And were those rather lengthy interviews?
A    Yes.
Q    How long do you think in total the three interviews lasted, talking about four or five hours?
A    About an hour.
Q    An hour for each or altogether?
A    An hour each.
Q    Detective Woody was asking you, one, about the Katrina Rozier murder; is that correct?
A    Yes.
Q    He was telling you that you did it and you told him no, I didn't do it; is that correct?
A    Yes.

2370
Q    He was asking you about the Church Hill murders, among other things.
A    Yes.
Q    Was he telling you what to say?
A    No.
Q    Was he giving you any information?
A    No.
Q    You told Detective Woody that you knew that you

**JA1104**

did not know that anything was going to happen to your cousin "Mousey," isn't that correct?

A    That's right.

Q    Was that a lie to Detective Woody?

A    Was that a lie?

Q    Yes, sir.

A    That's what I thought.  I didn't know that nothing was going to happen to her.  I didn't.

Q    That's the truth; is that correct?

A    Yes.

Q    But when you came in here in June in front of Judge Spencer and as you told Mr. Vick earlier, you pled guilty to those charges involving the murder of your cousin, "Mousey," and Bobby and Carter; is that correct?

A    Yes.

Q    You also pled guilty to possessing cocaine in Count Thirty-two on February 2nd, 1992; did you possess any cocaine on February 2nd, 1992?

A    February 2nd?

Q    Yes, sir.  The day you were arrested.

A    I was arrested.  I was in jail then.

Q    Were you arrested about four or five or six being in the morning?

A    No, it was around 11 o'clock in the evening.

Q    You said you got over this plea agreement and you went over the indictment.  One 69 things you pled guilty to was that you possessed cocaine in Count Thirty-two on February 2nd, 1992.  You are telling the ladies and gentlemen of the jury that you didn't possess cocaine; is that correct?

A    No, I didn't.

Q    Were you involved in any conspiracy with Richard Tipton to distribute cocaine prior to January of 1992?

A    Other than January of 1992, [no|know].

Q    And your testimony, I assume, is that you had never met him?

A    I met him in January.

Q    Would it be fair to say, Mr. Gaiters, that when you come back in front of Judge Spencer for sentencing that you are looking for the best you can get?

A    Yes.

Q    You are cooperating because you don't want to get the maximum penalty; is that correct?

A    Right.

        MR. GEARY:  That think you.  No further questions.

        THE COURT:  All right.  Mr. Cooley?

        CROSS-EXAMINATION

BY MR. COOLEY:

**JA1105**

Jerry Gaiters (Cross)

Q    Good morning to you, Mr. Gaiters.  Mr. Gaiters, how many times have you spoken with the detectives or a assistant United States Attorneys in this case?
A    About three or four times.
Q    Three or four times.
A    Yes.
Q    And as Mr. Geary asked you, you certainly spoke with Detective Woody on February 3rd, the day you were arrested and charged with the murder of Katrina Rozier; is that right?
A    Yes.
Q    Was Detective Jackson involved in discussing things with you that day?
A    No.
Q    And you certainly talked with Detective Woody on

2373

February 18th when you were arrested for the capital murder of "Mousey," your cousin?
A    Yes.
Q    And Bobby Long and Mr. Carter.
A    Yes.
Q    Is that right?
A    Yes.
Q    And you in fact talked to them about an hour-and-a-half to two hours the first time with Mr. Woody?
A    I believe so.
Q    You in fact talked to them, to Mr. Woody, about an hour-and-a-half on the February 18th date; isn't that correct?
A    Yes.
Q    As I understand your response to Mr. Geary a few moments ago, you may have given, you concede you may have given a different version of these facts when you talked with those detectives.
A    Yes.
Q    Is that right?
A    Yes.
Q    Now, you have told the ladies and gentlemen of the jury today, as I understand it, that after the shooting over at Church Hill, at "Mousey's," that you

2374

[rode|road] back to Moore Street with "Whitey.", is that correct?
A    Yes.
Q    And with "C.O."
A    Yes, sir.
Q    You went to Moore Street, you all had some discussions, and then did everyone get back in the car and ride back over to "Mousey's," the area of Bobby Long's house where "Mousey" had been killed?
A    It was just "C.O.," Linwood, Curt [EUS/], and "Pepsi," and "V."
Q    Did you go with them?

**JA1106**

A    No.
Q    But you saw them back at Moore Street and they told you that's where they were going?
A    No.  I saw them leave.
Q    You saw them leave?
A    Yes.
Q    How did you know where they were going?
A    Because that's where "C.O." said he wanted Linwood to take them over that.
Q    They told you that when you were over at Moore Street?
A    Yes, when we was walking towards Linwood's house.

Q    That was the same night after the shooting of "Mousey?"
A    Yes.
Q    I'm going to ask you if you would, I'm going to give you a document and ask you, if the Marshal would hand it to you, I'm going to tell you, Mr. Gaiters, that that is a transcript taken by a court reporter of the videotape of your discussion with Detective Woody on February 18th, 1992.  And I'm going to ask you if you would, sir, to look at page 79 of that document.  When you get to page 79 I'm going to ask you a number of things from this document.  Do you see down the left side the little numbers, those are line numbers.  You see them down the left side of the page; do you see the numbers there?
A    Yes.
Q    I'm going to start on line 15 and ask you if you recall this discussion.  You look back there if you like before this, but this is where Detective Woody is asking you about what you did after the shooting at "Mousey's" house.  And you have indicated that you ran, and then he asked you starting on line 15, you didn't get back in the car with him?  Answer:  No, sir.  Question:  They didn't bring you back up the road?  Answer:  [No|Know].  Question:  You haven't seen them any more since then?  Answer:  No, I haven't.
     Do you recall making those comments to Detective Woody on that date?
A    Yes.
Q    I want to ask you to look, if you would, back on page 73, just a few pages become before where you were.  Have you got page 73?  Again in this same discussion relating to the shooting over at "Mousey's," start at line six.  You didn't have a gun?  Answer:  No, sir.  Question:  Okay now, see how you two people locked up  --  when did you see "O" and "Whitey" again after that, after the shooting?  Answer:  I didn't see them [no|know] more.

**JA1107**

Question:  You didn't see them any more at all?  They haven't talked to you since?  Answer:  [No|Know].
     Do you recall that?
A    Yes.
Q    All right, sir.  I ask you to look back to page 28 of the document you have in your hand.  Starting at line 14, this is again after you have described the shooting.  Question:  You ran out around the corner? Answer: Yeah.  Question:  Back towards where the car?  Answer:  There wasn't [no|know] car there.  Question:  Where was the car?  Answer:  I don't know.  Question:  Which way did "O" go?  Answer:  I don't know.  I ran.  Question:  You don't know which way "O" went?  Answer:  [No|Know].  Question:  You don't know what happened to the car?  Answer:  [No|Know].  Question:  The car that brought you all out there?  Answer:  [No|Know].  Question:  And you ran to where?  Answer:  I ran to my kids' mama's house.  Question:  And that's where?  Answer:  That's on Coalter Street.  Question:  It is on Coalter Street and you ran all the way over there?  Answer:  Yeah.  You can run over there.  It ain't far.

          MR. VICK:  We will move the whole transcript into evidence.
          THE COURT:  Let Mr. Cooley proceed the way he wants.
          MR. COOLEY:  Judge, I would think that probably the tape-recording would be the better evidence.  I have no objection to that being introduced.  I still have some questions relating to specifics of it.
          THE COURT:  You can move whatever you want in.  The transcript and tape will come in if you want them in and you can continue to ask the questions.
          MR. COOLEY:  Thank you, sir.  I so move.

BY MR. COOLEY:
Q    Now, Mr. Gaiters, you indicated in your testimony today that you had gotten crack cocaine from "J.R." and from "V" and from "Whitey" and from "C.O.," is that correct?
A    Yes.
Q    And you sold that cocaine and you got back  -- you gave back basically $200 out of every $300 worth that you sold?
A    Yes.
Q    Do you recall how many times you got crack cocaine from "Whitey" and sold it?
A    I got crack from him two or three times.
Q    Two to three times from "Whitey." do you remember how many times you got cocaine from "O" and sold it?

A    I got it from "O" three times.
Q    Three times.  Six times altogether?
A    Yes.
Q    How about from Mr. Joan reason?
A    Once.
Q    Just once.
A    Yes.
Q    How many times did you get it from "V?"
A    "V," once.

2379
Q    So eight times altogether?
A    Once I got it from  --  that's when "O" told me
to give it to me.  (Told him  (
Q    What quantities were they, the ten, fifteen?
A    Twenties.
Q    They were twenties, bricks?
A    The fifteens was twenties.
Q    How many did you get on each occasion?
A    I got ten from "Whitey," ten from "J.R." and 15
from "O."
Q    The ten he is, when you got those you sold them
for a gross sales of $100 each time you got ten,
right?  You gave $70 back and $30 you got to keep; is
that right?
A    Yes.
Q    Or basically two-thirds, one-third; something
like that?
A    Yes.
Q    Did any of these folks tell you where you had to
sell this?
A    No.
Q    Did any of these folks tell you what price that
you had to sell it for?
A    No.
Q    Did anybody tell you how to sell on a specific

2380
corner?
A    No.
Q    Basically you got it from them individually, you
went out there, did what you wanted to, as long as
you brought back a certain amount of money that was
fine with them.
A    Yes.
Q    That would be true for each of the folks we have
named; is that right?
A    Yes.
Q    If you got stuff from "O" you brought the money
back to "O.," is that right?
A    Yes.
Q    If you got money from "Whitey" you brought the
money back to "Whitey?"
A    Yes.  (If you got drugs  (
Q    Now, in the course of your discussions with
Detective Woody, did you talk to him about the

details of your arrival at "Mousey's" house on the night that she was killed?

A    Yes.

Q    All right.  Did you indicate to him at any point in time that certain people stayed in the car and certain people got out of the car?  Do you recall?

A    Yes.

2381

Q    You did do that.  Now, your version to the ladies and gentlemen of the jury today is who got out of the car?

A    Me and "C.O."

Q    You and "C.O."

A    Right.

Q    You got out and went up there.  Why did you go up there, Mr. Gaiters?

A    To take him to the house.

Q    Was he forcing you to go up there?

A    No.

Q    [No|Know].  He was not forcing you to go up there.  Is that right?

A    That's right.

Q    So when you got out of the car and you went up to "Mousey's," there was no indication to you that you had to go up there, nobody forced you to go to "Mousey's".

A    No.

Q    Now, I'm going to ask you, do you recall testifying before the Grand Jury in this case?

A    Yes.

Q    Do you recall that?

A    Yes.

Q    We will come back to that other document in a

2382

few minutes.  But Marshal, if you would?

  (Transcript proffered to witness.  (

        MR. GEARY:  Judge, may I speak to Mr. Cooley for a minute?

        THE COURT:  Go ahead.

   (Counsel conferring.)

BY MR. COOLEY:

Q    I'm going to ask you to look if you would at that document.  I'm going to advise you that that is in fact the transcript of the Grand Jury  --  of your Grand Jury testimony on April 21st, 1992.  Do you remember being in front of the Grand Jury?

A    Yes.

Q    Do you remember that you were placed under oath there; is that right?

A    Yes.

Q    You remember that Mr. Vick asked you some questions; do you remember that?

A    Yes.

Q    I'm going to call your attention to page eight,

**JA1110**

if you would. And Mr. Vick, right up at the top, Mr. Vick was asking you why you went up to the house and knocked on the door at "Mousey's". And your answer there, line [1|one]: I went forcefully.
Do you see that?

A Yes.
Q Question: They threatened you? Answer: He had a gun in my back. Question: Who did? Answer: "O." question: You thought if you didn't go along with them they were going to -- answer: Yes.
Do you remember your testimony on that day, sir?
A Yes.
Q That's different from your testimony today, isn't it, sir?
A Yes.
Q Which one is the truth, Mr. Gaiters?
A The one I'm telling you now.
Q Today is the truth.
A Yes.
Q All right. Now, Mr. Gaiters, did you in fact discuss with Detective Woody that you got out of the car by yourself up there at "Mousey's" and went to the door and knocked on the door?
A No.
Q You never told him that?
A No.
Q You didn't tell him that "O" stayed in the car, that "Whitey" stayed in the car, and you went by yourself?

A No.
Q I would like for you to put that document down and pickup the thicker one, the interview of you, the transcript of your interview on February 18th. And I would like for you first to turn to page 18. And this is on line 15. Do you see that line?
A Yes.
Q Question. This is again when you are getting out up at "Mousey's". Question: Where was "O" when you got out of the car? Answer: "O" was still in the car. He was still in the backseat. Question: So he comes in behind you? Answer: Well, when we -- Bobby wasn't -- wasn't nobody behind me. Do you remember that?
A No.
Q You don't remember saying that?
A No.
Q You deny that that transcript is correct, I take it?
A That's right.
Q Let me ask you to turn to page 21. Just a few pages down.

**JA1111**

MR. VICK:  I ask that he continue to read the transcript.  It edifies what went on.

THE COURT:  Mr. Vick, you will have a

2385

chance to put in whatever you want before the jury.  Go ahead.

BY MR. COOLEY:

Q    Page 21.  Do you see that?  Line 17.  Question: Okay, and when you got out of the car, everybody stayed in the car?  Answer:  Yes.  "Whitey" had the car and the motor running.  He never did [can you tell|cut] the car.

Do you remember that?

A    No.

Q    You don't remember that.  Let's turn to page 25 then, if you would.  This is line three up at the top on page 25.  Let me ask you about that last response.  You said you didn't remember it.  Do you deny that you said that?

A    I deny that I said that.

Q    Line three on page 25:  Question:  And nobody got out but you.  Answer:  But me.  Question:  Jerry, we have people that saw people get out of the car.  Answer:  And there is nobody get out of the car.

Is that right?

A    No, it is not.

Q    You deny that you made that statement?

A    That's right.

Q    All right, sir.  Let's turn to page 48 of the

2386

transcript, if you would.  This is at line 14.  Question:  Okay, all right, did "O" get out of the car when you got out of the car?  Answer: [No|Know].

Do you see that?  Is that correct?  Is that what you told him?

A    No.

MR. VICK:  Your Honor, I object to the form of these questions.  It is improper use of this transcript.  It is clear.

THE COURT:  Mr. Vick, if it is improper, you can demonstrate it by utilizing the whole transcript when you stand up.  Let him ask his questions.

MR. VICK:  Yes, sir.

BY MR. COOLEY:

Q    All right, look on page 49, the next page.  Look at the top.  In fairness, let's start back on the bottom of page 48, the page just before that one.  Look at line 23 on page 48.  Question:  I said why didn't you go ahead and leave; I mean, they wanted to get out I out there; they wanted "Mousey" to come out there.  Answer:  They wanted "Mousey" to come to the car.  Question:  And they were not walking with you;

**JA1112**

why didn't you keep on going?  Answer:  I don't know.  And you go on from there.  Do you recall that?

A    No.

Q    You deny that, I take it?

A    That's right.

Q    Let's turn to page 50.  Look at line three. Question:  All by yourself, Jerry, just listen to me, if you were walking all by yourself, here is a man  --  answer:  I showed them where the house was. Question:  Right, you showed him where the house was.  Answer:  I was right there.  He said you go get "Mousey" for me.
    Do you recall that?

A    No.

Q    All right, sir.  Now if you would, I would ask you to turn to page 55.

        MR. COOLEY:  Judge, for this particular question, I have a copy of pages 55 through 62 of the transcript and I would ask that while we go through this that they be offered to the jury as well as to the Court.

        THE COURT:  No, sir.  Go ahead and ask your questions.

        MR. COOLEY:  All right, sir.

BY MR. COOLEY:

Q    Page 55.

A    I have 56 and 54.

        MR. COOLEY:  Let me offer this.

        MR. VICK:  Could we find out who prepared this transcript?

        MR. COOLEY:  It is on the back.  Crane of need prepared it by order of the Court.

        THE COURT:  Go ahead and ask the questions.

    (Document proffered to witness.)

BY MR. COOLEY:

Q    Do you see page 55?

A    Yes.

Q    All right, sir.  Starting at line 18.  The question from Mr. Woody to you:  They didn't put anything over on you as to  --  they didn't put any finger on you and they have you covered when you went to the door, Jerry.  Didn't they have you covered when you went to the door?  Answer:  No, no, I'm telling you.
    Is that right?

A    No, it is not.

Q    You didn't say that?

A    No.

**JA1113**

Jerry Gaiters (Cross)

Q    That's incorrect then; is that right?
A    It is incorrect.
Q    Let me follow on down there, and let's go down to the bottom of page 56.  He is asking you if you had any awareness that anything was going to happen to "Mousey." your answering go up at the top of page 57:  I had no idea they was going to kill them.  Question:  They were kin to you, said they were going to kill you, you didn't have no idea they were going to kill them?  Afternoons:  Doesn't mean, doesn't mean they were going to kill them.  They could have killed me in the car.  Question:  Jerry?
          MR. VICK:  I object to the editorialization.
          THE COURT:  Mr. Cooley, I'm getting tired of this.
     (At Bench.).
          THE COURT:  Mr. Cooley, you know as well as I do, you can't do editorialization with your voice changes.  Once you have asked the question, do you remember it, do you deny it?  Don't ask that question two or three times.
          MR. COOLEY:  I'm going to be a little while yet.  Would the Court object to the tape-recording as exactly at this point and it is exactly on this point, I think, what I would offer to the Court is to let the jury have the transcript, play the tape, and I will ask no further questions.
          MR. VICK:  Again, I don't care, this is improper use of this.  He did not have an attorney between him and then.
          THE COURT:  [No|Know].  If they want to listen to the tape later on they can listen to it in its entirety.  We are not going to give parts of it.
     (In Open Court.)
BY MR. COOLEY:
Q    What does the term cover mean to you, somebody had you covered; what did that mean to you?
A    I don't understand what you are talking about.
Q    If Mr. Woody, if this statement which you have indicated was not correct was correct  --
          MR. VICK:  Objection to the form of the question.
          THE WITNESS:  I deny that.
          THE COURT:  Sustained.
BY MR. COOLEY:
Q    The term cover doesn't mean anything to you?
          MR. VICK:  Asked and answered.  It was Mr. Woody's term.
          THE COURT:  Sustained.
BY MR. COOLEY:
Q    Turn to page 58.  And this is a long question

**JA1114**

beginning on line ten of page 58.  This is Mr. Woody.  Question:  You are holding back on me, Jerry and you are not telling me the truth.  You are not telling me the truth, Jerry.  You are not telling me the truth.  Somebody made you do something because you felt that your life and family was in danger.  Fine.  You didn't have a choice.  You said you didn't have no choice but to knock on the door.  But yet, you are going to tell me that you were walking down thereby yourself and if you didn't  --  a choice then why were you walking by yourself?  Now, if they had you covered, they had you covered.  And you still didn't have a choice.  You said that you didn't have a choice.  Could that mean that you couldn't get away?  I can't put words in your mouth, Jerry.  If you had a choice, then  --

MR. VICK:  This is not a question.  This is not proper use of it.

MR. COOLEY:  It is a question, Your Honor.

THE COURT:  Overruled.

BY MR. COOLEY:

Q    I can't put words in your mouth, Jerry.  If you had a choice, then that means that Hey, I'm going to look back and say well, they are right there.  Heck, I'm gone.  I ain't going to let my blood get killed by these people.  She wouldn't be hiding from them if she had the money.  Are they going to use me to get in there?  But you said you didn't have a choice.  So if you didn't have a choice, you knew somebody had you covered, Jerry.  That if you hadn't gone and knocked on that door, something might would have happened to you.  I can't put words in your mouth.  If you had a choice, you would have kept on going.  I'm going to get your cousin, get a sister and a brother, and there is a man sitting in the chair, don't even know what's going on.  There are three people dead and you said you didn't have a choice.  So if you didn't have a choice, you did what you were told to do.  I can see you having a choice if you were walking by yourself.  We have got witnesses that saw people hiding behind a truck.  Then there is an inaudible answer from you.  The question continues:  Either way you got to identify, that will be going in, a couple of people were there hear you.  Answer:  In their house.  Question:  At the side house, people knew you.  The house they [built|ability] back up the side, they said there is a house back there.  Answer:  Uh-huh.

It continues on down, start at line eight.  Question:  It was that way.

A    Line eight?

Q    Page 60.  Sorry, the next page.  Question:  It

was that way, Jerry.  They had you covered.  Why do you want to say they have you covered?  You are talking about they didn't have a choice.  But they had you covered.  What's wrong with that?  If you didn't have no choice but to do what you did and three people are dead as a result of what you did, they wouldn't have gotten in any other way.  You say you didn't have no choice.  They have you covered, Jerry.  And then your answer begins:  "O" was behind me.  Question:  That's all I'm asking you, "O" was behind you?  Answer:  With a gun.  Question:  Okay.  So what did "O" do?  [Plane|Plain] Buddy, tell the truth, "O" was behind you with the gun, okay?

A    I told him, I told him, I say they ain't there and he said come on.  (That was an answer:    (

Q    Is that correct?

A    No.

Q    You deny that?

A    Yes.

Q    All right.  You never mentioned a gun; is that correct?  Throughout?

A    Yes, I did mention a gun.

Q    You mentioned before the Grand Jury that the person had a gun in your back; is that correct?

A    Yes.

Q    And you did that under oath.

A    Yes.

Q    And you have told the ladies and gentlemen today [no|know] [gun|begun] in your back when you went up there.

A    Yes.

Q    That's correct is that correct?

A    Yes.

Q    Now, Mr. Gaiters, let me ask you this.

        MR. VICK:  I would just point out that was asked and answered twice and reiterated.  It is improper.

        THE COURT:  Objection sustained.  Mr. Cooley, as I told you, don't go over stuff over and over.

BY MR. COOLEY:

Q    Mr. Gaiters, the United States Attorney asked you to look at Government Exhibit 125, which is your plea agreement.

        MR. COOLEY:  Judge, at this point I would move the introduction of the transcript.  He is indicating it is missing a page.  This is a clean copy with, I believe, all pages.

        MR. VICK:  No objection.

        THE COURT:  It will be admitted.

        MR. BAUGH:  May I speak with Mr. Cooley for a second one very brief moment?

**JA1116**

THE COURT: Go ahead.

(Counsel conferring.)

MR. COOLEY: There seems to be a consensus request for a [break|brake] at this point.

THE COURT: All right. Everyone remain seated while the jury leaves the courtroom. We will take a brief break.

(The jury left the courtroom.)

MR. BAUGH: Your Honor, when we return, we would ask permission, because of the answers, I know the tape has been cued up for the part they just went through. We would ask permission to play the tape, that portion of it.

THE COURT: That permission has already been denied, Mr. Baugh. 1:30. Jeff 11: 45.

THE COURT: All right. Let's have the witness back on the stand.

MR. BAUGH: I would proffer for the record at this time that the tape we are talking about, the portion is only a few minutes long, and I think all of us have reviewed it and it would indicate that the -- a key government witness has just made a statement that is just a blatantly and that the tape-recording, you can readily discern his face and you can hear Detective Woody's [voice|vice] and you can see that his responses are exactly as were propounded by Mr. Cooley's questions and that we would submit that the showing of the tape at this juncture in his testimony so that he can be questioned about the contents of the tape is pivotal. And we would offer that in the form of a proffer and we would note that we have had several tape-recordings during this trial. It has not -- this is not that long a tape. We would proffer that it would be extremely important at this time that the jury observe the tape while they can observe the demeanor and cross-examination of the witness.

THE COURT: Denied.

MR. GEARY: Judge, defendant tip on joins in that request.

MR. COOLEY: Johnson as well.

THE COURT: Everybody joins in. It is denied. Bring the witness in.

(The jury entered the courtroom.)

BY MR. COOLEY:

Q    Look at the plea agreement, which I think is Government Exhibit 135. And that contains the agreement by which you have entered into --

MR. VICK: 125.

BY MR. COOLEY:

Q    I'm sorry, 125. I beg your pardon on. Mr. Gaiters, you have entered a guilty plea to Count One

**JA1117**

of the indictment which was conspiracy.  Is that correct?

A     Yes.

Q     And you understand that that carries a penalty, do you not?

A     Yes.

Q     And that that carries a penalty anywhere from ten years to a maximum of life; is that correct?

A     Yes.

Q     And you understand that under the sentencing guidelines, that you must be sentenced, absent something occurring at the initiation of the government and the Court deciding something to your benefit, that you must be sentenced somewhere between ten years and life on that charge; is that your understanding?

A     Yes.

2398

Q     You also under stand, as that document says, that you cannot be placed on probation; that you are not eligible for parole on that charge, and that you cannot have a suspended sentence; you understand that, don't you?

A     Yes.

Q     Unless the government files the 5K.1 motion; do you understand that?

A     Yes.

Q     Now, I'm not going to belabor each of these but you also pled guilty to Counts Seventeen, Eighteen, and Nineteen which were murder in furtherance of a Continuing Criminal Enterprise; is that correct?

A     Yes.

Q     And those are for the alleged participation in the killings of "Mousey" and Mr. Carter and Mr. Long; is that correct?

A     Yes.

Q     You understand that as to that offense, each of those offenses, there is a mandatory sentence, a minimum sentence of 20 years and a maximum of life for each of those; is that right?

A     Yes.

Q     And that as to that and all these other charges, there is no eligibility for parole, [no|know]

2399

suspended sentence, and [no|know] probation; is that right?

A     Yes.

Q     You also pled guilty to Count Twenty which is a firearm count which carries up to five years; is that correct?

A     Yes.

Q     And you also pled guilty to counts 21, 22, and 23, which were violent crimes in aid of racketeering and that they carry penalties of anything up to

life?

A    Yes.

Q    And [no|know] [patrol|parole]?

A    Yes.

Q    Count Thirty-two, possession with intent to distribute crack cocaine.

A    Yes.

Q    And that that carries a mandatory minimum penalty of ten years and up to life?

A    Yes.

Q    Is that right?

A    Yes.

Q    Now, your understanding is that you must, and this document requires that you be truthful; is that correct?

A    Yes.

Q    And that if you give false testimony under oath, you will be prosecuted for perjury?  Is that correct?

A    Yes.

Q    And I believe you responded to Mr. Vick that if you were not truthful, if you don't testify to the truth, you will get the maximum, that was a quote from you in your direct responses; isn't that correct?

A    Yes.

Q    All right, sir.  Now, you have indicated to us that you did indeed lie to the Grand Jury; isn't that right?

A    Yes.

Q    And has anyone from the government suggested that you are going to be prosecuted for perjury?

A    No.

Q    All right, sir.  Now, on Page 11 of your plea agreement, specifically paragraph 15 of the plea agreement, that tells you that the government reserves its [openings|option] to seek a departure from the Sentencing Guidelines pursuant to Section 5K [1|one], doesn't it?

A    Yes.

Q    It tells you that if in its sole discretion the United States determines that the defendant, and that's you, substantial  --  substantial assistant has been completed and that such a departure is appropriate, they will file a 5K.1 motion and ask the Court to consider all of the good things you have done  --

MR. VICK:  It does not say that.  If he is going to read from it, he should read from it.

THE COURT:  Read from it.

BY MR. COOLEY:

Q    That the government will bring to the attention

Jerry Gaiters (Cross)

of the Court your substantial assistance and they will move the Court to give you a reduced sentence; is that correct?

A    Yes.

Q

MR. VICK:  It does not say that.  If he is if he is going to read from it he should do so correctly.

MR. COOLEY:  I think I am correctly

MR. PARCELL:  Phrasing it.

THE COURT:  Go ahead.

BY MR. COOLEY:

Q    Is that your understanding, sir?

A    What's the question?

Q    Is it your understanding that if you testify as anticipated, that you will receive a 5K.1 motion which will allow the Court to give you a reduction in the sentences that are mandated, required under these statutes?

A    No, sir.

Q    You don't understand that?

A    No.

Q    You don't think you are going to be benefited by your testimony today?

A    Yes, sir.

Q    You do think so.

A    Yes.

Q    You understand that you will be benefited only if the government files this 5K.1 motion; is that right?

A    Yes.

Q    You have talked with your attorney, Mr. Collins?

A    Yes.

Q    And that's your understanding of it.  Mr. Gaiters, in your discussions with counsel or with the detectives or with the assistant United States Attorneys, has anyone talked to you about other folks who have done as you are doing, testify on behalf of the government, and what occurred when their sentence attention came up?

A    No.

Q    Been [no|know] discussion about other folks?

A    No.

MR. COOLEY:  Thank you, sir.  Thank you, Your Honor.

THE COURT:  Mr. Baugh?

CROSS-EXAMINATION

BY MR. HENDERSON:

Q    Good afternoon, Mr. Gaiters.

A    Good afternoon.

Q    Mr. Gaiters, I'm not going to be very long.  Do

**JA1120**

Jerry Gaiters (Cross)

you have any children, sir?

A    Yes.

Q    How many?

A    Four.

Q    Four children.  Do they live with you?

A    No.

Q    And you indicated that you attended school through the eleventh grade.  Was that in the City of Richmond?

A    Yes.

Q    What school was the last school you attended?

A    Maggie Walker.

Q    That's over in Newtowne, isn't it?

A    Yes.

Q    I understand that you began using coke, you said powdered cocaine?

A    Yes.

Q    And I take it you moved or graduated up to crack cocaine?

A    Yes.

Q    Did there come a time, sir, when at any point in time you were ingesting the powdered cocaine at the same time that you were ingesting the crack cocaine?

A    No.

Q    You were not smoking it and snorting cocaine in the same period of time?

A    No.

Q    At any time, on the same day?

A    No.

Q    Sir, with respect to the statements concerning the drug purchases, you indicated you got drugs from a number of different persons.

A    Yes.

Q    And isn't it true, sir, that when you would get these drugs, sometimes you would get them to sell, sometimes you would get them to smoke or do whatever.

A    Right.

Q    On those occasions when you were getting drugs from individuals to then go back and sell the drugs, the person that you received the drugs from, isn't it correct that you would make out and set up whatever arrangement was going to be set up with that particular individual?

A    Just money-wise.

Q    Sir?

A    Just money-wise.

Q    Money-wise.  The arrangements.

A    Yes.

Q    In other words, if you would go to, for example, James Roane, you said you wept to him one time?

A    Yes.

**JA1121**

Q    And you worked out your arrangement with him, I think you said, 70-30?
A    Yes.
Q    And if you would go to another individual then you would work out your arrangements with that particular individual.
A    Yes.
Q    I think you testified that you got drugs from someone else and the arrangement was 75-25.

2406

A    Yes.
Q    Completely different arrangement, completely different agreement.
A    Yes.
Q    Okay.  Now, let me ask you this:  Did you ever see the three individuals that you talked about, Mr. Tipton, Mr. Johnson, Mr. Roane get drugs together, pool their money and purchase drugs?
A    I seen them when they came back from where they was going.
Q    They would divide the drugs up among themselves?
A    No, I didn't see that.
Q    Is that what you understand they did?
A    Yes.
Q    And Mr., say for instance, Mr. Roane would take his drugs and go his separate way and Mr. Tipton or Mr. Johnson would take their drugs and go their separate way, correct?
A    No.
Q    Well, how would that work?
A    You talking about separate ways, you mean going their own  --
Q    In other words, once they would get drugs, Mr. Mr. Roane would get his drugs and if he wanted to

2407

sell you drugs he would take his drugs and give you drugs and you would go do what you want to do  --
Vick convict the form of the question.
        THE COURT:  Overruled.
BY MR. HENDERSON:
Q    Isn't that how it happened?
A    I don't know if they split their drugs up.  I just know that  --
Q    You knew that  --
        MR. VICK:  I ask he be allowed to answer.
        THE COURT:  Let him finish.
        THE WITNESS:  I [no|know] he purchased to one of the sell [ERS/], one of the workers for him.
BY MR. HENDERSON:
Q    Mr. Roane would give his drugs to whom over and they would go out and sell the drugs?
A    Yes.
Q    Mr. Johnson may have his arrangement over here,

correct?

A    Yes.

Q    Isn't it true, sir, that what Mr. Roane did would have absolutely  --  it would depend  --  have absolutely no dependence whatsoever on what Mr. Johnson did?

A    [Why you|I couldn't] answer that.

2408

Q    Okay.  Let me ask you this:  If Mr. Roane, you said you got drugs from Mr. Roane one time.

A    Yes.

Q    If he wanted to sell you those drugs and get a certain amount of money that was completely up to him as to what price he would get for them, right?

A    Yes.

Q    As a matter of fact, if he wanted to give you the drugs completely and not charge you anything, that was his decision, correct?

A    I don't know.

Q    What he did with his drugs wasn't dependent on what anyone else did, correct?

A    I don't know.

Q    Don't know.  You don't know too much about how the  --  how anything was connected with any of those three persons at all, do you?

A    Nothing but they was supplying the drugs to the workers.

Q    You worked for who?

A    All three of them.

Q    Okay.  But you had your separate arrangements with Mr. Roane, your arrangement with Mr. Roane was not the same arrangement that you had  --

        MR. VICK:  Asked and answered.

2409

        THE COURT:  He has already answered that several times.

BY MR. HENDERSON:

Q    Let me ask you about this:  You never witnessed Robert Davis, "Papoose," you know "Papoose," you never witnessed "Papoose" getting any drugs from Mr. Roane, did you?

A    Yes.  One day.

Q    What date was that, sir?

A    I can't recall the date, but it was in January.

Q    In January?  What year?

A    1992.

Q    You witnessed "Papoose" getting drugs from Mr. Roane?

A    Well, I didn't see reason give it to him.  I [no|know] he got it from him.

Q    But you didn't see that take place, did you?

A    No, they was in the kitchen.

Q    With respect to Keith Ross, you never witnessed Keith Ross getting drugs from Mr. Roane, did you?

Jerry Gaiters (Cross)

A    Yes.
Q    What date was that on?
A    I can't recall the date.
Q    What year?
A    1992.

2410
Q    Was it in early 1992 or late 1992?
A    It was in the middle part of 1992.
Q    Saying  --
A    Middle of January.
Q    Summertime?
A    Middle of January of 1992.
Q    Middle of January.  So early January.  Was it in a house or outside?
        MR. VICK:  He just said middle of January and he says early January.
        THE COURT:  Mr. Henderson, he said the middle.
BY MR. HENDERSON:
Q    I apologize.  I meant early in the year.  You first said it was the middle of the year, correct?
A    I said the middle of January, 1992.
Q    Where did it take place?
A    Took place in "Papoose's" house.
Q    In "Papoose's" house.  Who else was present?
A    Swain Ball, "Mousey," "Papoose."
Q    And you say you witnessed "Papoose"  --  you witnessed Keith Ross getting drugs from James Roane?
A    Yes.
Q    And how about Swain Ball; you never witnessed Swain Ball getting drugs, have you?

2411
A    Yes, I have.
Q    Where was that?
A    In the same place.
Q    At the same time?
A    No, it wasn't the same time.
Q    When was that?
A    The days I can't tell you because I don't know the days.  But it was in January, the middle of January.
Q    All of this took place in January of 1992?
A    Yes.
Q    Okay.  With respect to Louis Johnson, do you recall the date of the murder of Louis Johnson?
A    No.
Q    You don't recall that date, either?
A    No, sir.
Q    On direct testimony answering Mr. Vick's questions, did you state that you did recall that taking place?
A    No, I did not.
Q    Do you recall that taking place?
A    Yes, I did recall it.

**JA1124**

Q    You were out there, weren't you?
A    I was out there, yes.
Q    As a matter of fact you had a gun with you, didn't you?
A    Yes.
Q    That was a .32?
A    Yes, sir.
Q    Now, Mr. Gaiters, isn't it true, sir, that you actually saw what happened?
A    Yes.
Q    Isn't it true, sir, that it was not Mr. Roane's [gun|begun] that killed Mr. Johnson?
A    Yes.
Q    That's true, isn't it?
A    Yes.
Q    As a matter of fact, Mr. Roane's [gun|begun] never fired, did it?
A    No.
Q    Isn't it true, sir, that Mr. Johnson did not fall until someone else's bullet hit him?
A    Yes.
Q    So anyone who comes in here and says that something else happened is  --
       MR. VICK:  Objection.
       THE COURT:  Sustained.
BY MR. HENDERSON:
Q    Well, sir, that particular killing, the Louis Johnson killing, that had nothing to do with drugs, did it?
A    Not that I know of.  I don't know.
Q    It was personal, wasn't it?
A    The way  --
       MR. VICK:  He has answered.
       MR. HENDERSON:  That's a different question, Judge.
       THE COURT:  The objection is sustained.
BY MR. HENDERSON:
Q    Sir, do you recall testifying in front of the Grand Jury in April of 1992?  April 21st of 1992, to be specific?
A    Yes.
Q    Do you recall your testimony in front of the Grand Jury?
A    I can't remember.
Q    You don't remember?
A    I remember going before them.
Q    And this gentleman here, Mr. Howard Vick, questioned you about certain things?
A    Yes.
Q    You recall responding to his questions?
A    Yes.
Q    Sir, do you recall Mr. Vick at page ten asking

you questions about the Louis Johnson killing?

2414

A    Yes.

Q    Do you recall being asked and that was over drugs, was it not?  Do you recall that question?

A    No.

Q    You don't recall that question.  If in fact  -- are you saying that it is impossible that you were asked that question?

A    Might have.  I don't recall it.

Q    If I showed you a transcript of that, would it help your recollection, give you some idea as to whether or not that was ever said; would it refresh your recollection?

A    Yes.

THE COURT:  Give it to him, Mr. Henderson, ask the question and give the answer and ask him if he recalls it and that's the end of it.

(Document proffered to witness.)

BY MR. HENDERSON:

Q    Sir, do you recall that the question was and that was over, reading from line 16, do you recall reading  --  being asked the question and that was over drugs, was it not?  Answer:  [No|Know].  That was a personal thing.  On page ten.  The question: And that was over drugs, was it not?  Answer:

2415

[No|Know], that was a personal thing.  He pulled a gun out on him.

A    Yes.

Q    Do you recall saying that?

A    Yes.

Q    That was a personal thing, had nothing to do with drugs, right?

A    Right.

Q    Okay.  Sir, with respect to the "Mousey" Armstrong killing, James Roane wasn't there?

A    No.

Q    James didn't have anything to do with that?

A    No.

Q    Now, you testified that you actually knew the purpose foregoing over to "Mousey" Armstrong's place, correct?

A    When we got over there I did.

Q    You knew as you were going over in the car that they were going over to shoot "Mousey" Armstrong?

A    Yes, when we were near the house.

Q    You knew that.

A    Yes.

Q    Sir, is it fair to say that from that point on, from the point that you realized that "Mousey" was going to be shot, is it fair to say that you were

2416

**JA1126**

going over there to set her up?

A    No.

Q    That's not fair?

A    No.

Q    You knew they were going to shoot her from that point on, didn't you?

A    From that point on, yes, I did.  But there wasn't nothing I could do.  I was in fear of my life.  If I turned them down I might have been shot.

Q    All right.  Sir, "Mousey" Armstrong was your cousin, was she not?

A    Yes.

Q    She was your cousin?

A    Third cousin.

Q    And Bobby Long was her brother, correct?

A    Yes.

Q    He was likewise your cousin.

A    Yes.

Q    So you realized from the point in the car that they were going over there to shoot your own cousins.

        MR. VICK:  Asked and answered several times.

        THE WITNESS:  I didn't even [no|know] Bobby in the house.

        MR. HENDERSON:  Thank you, that's all I have.

        THE COURT:  Mr. Wagner?

        CROSS-EXAMINATION

BY MR. WAGNER:

Q    Mr. Gaiters, you carried a gun around with you when you were selling drugs, didn't you?

A    Yes.

Q    And you had a gun with you on the night of the Louis Johnson murder; is that right is this

A    Yes.

Q    After the murder you said you found your way over to Sandra Reavis' house; is that right?

A    Yes.

Q    You were outside her house on the porch?

A    Yes.

Q    Before you got to Sandra Reavis' house, isn't it true that you went to pee sue 's house?

A    No.

Q    You never went to pee sue 's house?

A    We went to pee sue after "J.R." told Sterling to go up there.

Q    Did you have a gun at "Pea Sue's"?

A    No, I went and picked my [gun|begun] back up.

Q    My question is, did you have a gun at "Pea Sue's" house?

A    Yes.

Q    So you had picked up the gun that had been hidden and brought it over to pee sue 's house?
A    Yes.
Q    That was a .38 or 32?
A    32.
Q    Now "Pea Sue's" house, were you waiving the gun around?
A    No.
Q    Could they  --  could "Pea Sue" see that you had the gun there?
A    She was outside when I picked the gun up.
Q    You were very upset that night, weren't you?
A    No.
Q    You weren't upset?
A    No.
Q    Weren't agitated?
A    No.
      MR. VICK:  Asked and answered.
      THE COURT:  How many times do you have to ask, Mr. Wagner?
      MR. WAGNER:  Very well.
BY MR. WAGNER:
Q    Your 5K agreement with the government states that you must provide substantial assistance; is that correct?
A    True.
Q    In return for your substantial assistance, you would receive a sentence reduction; isn't that right?
      MR. VICK:  Objection.  That's not what it says.
      THE COURT:  Sustained.
BY MR. WAGNER:
Q    You may receive a sentence reduction in exchange for your substantial assistance; is that correct?
A    Yes.
Q    When were you informed of this substantial assistance concept?
A    When was I informed?
Q    Yes.
A    I can't recall the date.
Q    Did Mr. Vick tell you about that?
A    My lawyer.
Q    Your lawyer did.
A    Yes.
Q    Is it your understanding that the more assistance you provide, the better it will be for you?
A    No.
Q    That's not your understanding?
      You testified about a woman named Denise; is that right?

**JA1128**

A    Yes.
Q    You said she got in a car with Sandra Reavis; is that right?
A    In a truck.
Q    In a truck.  Was that the day after "Mousey" was killed?
A    Yes.
Q    Now, was this Denise Berkley, do you know?
A    I think that's her.
Q    Is the woman that was working at 1212 West Moore Street?
A    Yes.
Q    Cleaning up there and cooking?
A    Yes.
Q    Now, was Denise Berkley scared when she got in the car with Sandra Reavis?
A    I didn't notice.
Q    Did she seem to be getting along all right with Sandra Reavis when they were getting in the car?
A    Yes.
Q    Who was driving?

2421

A    Guy named Jim I.
Q    At this time, J and "V" and Sterling Hardy, they were all locked up, weren't they?
A    Yes.
Q    "Mousey" was already dead at this point.
A    Yes.
Q    Did you ever give Sandra Reavis some money to hold?
A    Who?
Q    Sandra Reavis.
A    Who?
Q    Did you ever give Sandra Reavis some money to hold?
A    No.
Q    You never gave her a large sum of money to hold on to?
A    No.
Q    You have pled guilty to a lot of counts here; is that right?
A    Yes.
Q    Counts involving violence, drugs, murder?
A    Yes.
Q    The maximum time you could receive for these counts are several life sentences; is that true?
A    Yes.

2422

Q    You know there is no [patrol|parole] in the federal system.
        MR. VICK:  This has all been covered.
        THE COURT:  We will give him his shot.
BY MR. WAGNER:
Q    Were you told by anyone how much time to expect

**JA1129**

Jerry Gaiters (Cross)

in this case?

A    No.

Q    How much time do you expect?

A    Less time than life.  Less sentence than life.

Q    How much less?

A    Maybe 20 years.

Q    Where did you get that number from, 20 years?

A    I just got it, it came up out of my head.

Q    So you are helping the government with some expectation of maybe getting 20 years.  Is that right?

A    Yes.

Q    Have you told the government  --  you have told the government several different stories about what happened in a lot of these occasions; is that right?

A    Yes.

Q    And each time you said something that a detective didn't agree with, the detective would correct you; isn't that right?

A    Yes.

Q    We have seen many versions and corrections of these things in the conversations that was taped  --

MR. VICK:  Objection to the form of the question.

MR. WAGNER:  Your Honor, he is testifying that he gave different versions he is.

THE COURT:  Overruled.  Just go and ask the question.

BY MR. WAGNER:

Q    We have seen a lot of these different versions in the [take place|tapes] you have before you; is that right?

A    I see them.

Q    And in the Grand Jury testimony, there was different versions in there as well; is that right?

A    What part are you talking about?

Q    Well, just in those documents that are before you there, there are several different versions there; is that right?

A    In this one, yes, several different versions.

Q    And the Grand Jury testimony as well?

A    The Grand Jury is just one.

Q    How many conversations did you have with the government that either weren't taped or weren't part of the Grand Jury?

A    I don't know.

Q    Other than the conversation, the document before you taping the conversation that you had, how many conversations did you have with the government, with the police?

A    About four or five times.

Q    So you have talked to Detective Woody outside of

**JA1130**

that conversation in the document there?
A    No.  Before the U.S. Attorney.
Q    Did these conversations proceed in the same way that the conversation did, that tape right there? The other conversations.  Them asking you questions and then you giving answers and them correcting you?
A    Asking me questions, yes.
Q    Did they correct you in those other conversations as well?
A    What you mean by correct me?
Q    Like they did in the taped conversation there that you have testified to.
A    The tape?
Q    The document sitting right thereby your right arm.
A    They correct me?  They didn't correct me on anything.

Q    Did you mention Sandra Reavis' name in that taped conversation that you can recall?
A    In this conversation?
Q    I'm sorry, the one right by your right-hand.
A    This one?
Q    Yes.
A    [Did I|Dye|Die] mention her name?
Q    Yes.
A    I don't know.  I haven't read it.
Q    So you don't recall mentioning her name in that conversation?
        MR. VICK:  He says he doesn't know.
        THE COURT:  That's what he just said.
BY MR. WAGNER:
Q    How about in the Grand Jury testimony, do you recall mentioning her name in that?
A    No, I don't think so.
Q    You didn't mention anything or you don't recall mentioning anything about Sandra Reavis and guns in those conversations; is that correct?
A    In these conversations here?  I don't know.  I don't think so.
        MR. WAGNER:  I have no further questions.
        MR. GEARY:  Before Mr. Vick begins, we forgot to move the admission of the Grand Jury transcript.
        MR. VICK:  We will move the admission of the Grand Jury transcript.
        THE COURT:  They will be admitted.
    REDIRECT EXAMINATION
BY MR. VICK:
Q    Let's refer to the Grand Jury transcript, page ten, Mr. Gaiters.  The portion just quoted to you by Mr. Henderson about the killing of Louis Johnson. Would you look and read to the ladies and gentlemen,

**JA1131**

I asked you just after the [sex|section]  --

MR. GEARY:  That's not proper redirect to read his Grand Jury testimony.

THE COURT:  Overruled.

BY MR. VICK:

Q    Just after the portion that Mr. Henderson quoted you, I said again that was because, speaking of Louis Johnson, that was because he was a drug salesman up there, too and your response was what?

A    Page ten?

Q    Page ten, line 21.

A    He threatened him over the shotgun.

Q    I asked you next that was because he was a drug salesman up there, too, speaking of Louis Johnson. Do you see your response?

A    Yes.  He was a drug salesman.

Q    All right.  And as to the transcript that has been oft-quoted here today about your interview with Detective Woody, first, let me ask you, when you were interviewed by Detective Woody, you were under investigation by the Richmond Bureau of Police; is that correct?

A    Yes.

Q    You knew that.

A    Yes.

Q    And you knew that whatever you told Detective Woody at that point was going to be used against you, didn't you?

A    Yes.

Q    And you had an interest in not telling Detective Woody everything you knew at that point.

MR. HENDERSON:  I object to the leading nature of the question.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. VICK:

Q    On page 19 quoted by  --  on paining either 19 to 25 and 48, indeed, Mr. Cooley said that you didn't  --  you said that detective  --  that "C.O." had not gotten out of the car.  Indeed in this transcript you told Detective Woody that "C.O." had gotten out of the car, didn't you?

A    Yes.

MR. GEARY:  That's not proper.

MR. VICK:  He kicked in the door.

THE WITNESS:  Yes, he did.

THE COURT:  Sustained.

BY MR. VICK:

Q    You didn't have an attorney present with you at the time you were interviewed by Detective Woody?

A    No.

Q    As to the murder of Katrina Rozier, did you

**JA1132**

C.T. Woody, Jr. (Direct)

fully cooperate with the police officials concerning that?

A    Yes, I did.

Q    Did everything that was requested of you?

A    Yes, sir.

Q    Including taking a test; is that correct?

A    Yes.

MR. GEARY:  I object to that.  Approach the bench?

THE COURT:  There is no need.  The objection is sustained.  Mr. Vick, come on, let's wind up.

MR. BAUGH:  We move for a mistrial at this time.

THE COURT:  Denied.

BY MR. VICK:

Q    Why were you fearful, on the night you went to "Mousey's" house, why were you fearful of "O" and "Whitey?"

A    Because they might have killed me like they killed the rest of the people.

Q    Have you actually seen "O," "Whitey," "J.R.," and "V" come back together from New York with drugs or someplace with drugs?

A    Yes.

MR. BAUGH:  Asked and answered.

THE COURT:  Sustained.

BY MR. VICK:

Q    Have you ever been corrected and told by anybody associated with the prosecution team how you should answer a particular question?

A    No.

MR. GEARY:  Objection.

MR. BAUGH:  We reurge our earlier motion.

MR. GEARY:  Unless we use Detective Woody in that question.

THE COURT:  Overruled.

THE WITNESS:  [No|Know].

MR. VICK:  I have no further questions.

THE COURT:  All right.  The witness may be removed.

(The witness left the courtroom.)

Call your next witness, Mr. Vick.

MR. VICK:  Detective Woody.

C.T. WOODY, JR., called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

**JA1133**

A    C.T. Woody, Jr.  Richmond Bureau of Police, presently assigned to Narcocide Division.

Q    How long have you been so assigned?

A    Narcocide, for approximately four-and-a-half years.

Q    Were you assigned to investigate the murder of Katrina "Nat" Rozier?

A    That is correct.

Q    And did Jerry Gaiters get to be a suspect in that investigation?

A    That is correct.

Q    And did you undertake investigative steps to determine whether indeed Jerry Gaiters had committed that murder?

A    Yes, sir, I did.

Q    At the end of your investigation, what did you do with the charges that had been filed against  --  let me back up.  Indeed, Jerry Gaiters was charged with that murder at some point, is that correct?

A    Yes, sir.

Q    What happened to those charges?

A    They were dismissed or nol prossed.

Q    Could you tell the ladies and gentlemen of the jury why those charges were dismissed against him?

A    Because my follow-up investigation revealed that Jerry Gaiters had nothing at all to do with the homicide of "Nat."

Q    Did Katrina  --  did Jerry Gaiters, were the charges of the murder of Katrina Rozier dismissed against Jerry Gaiters as any benefit for his testimony in federal court?

A    No, sir.

Q    You were reassigned to that investigation; is that correct?

A    That is correct.

Q    Who was the first detective assigned to that?

A    Detective Billy Blaylock.

Q    Do you remember Detective Woody speaking to Mr. Gaiters on February 18th, 1992?

A    Yes, sir, I do.

Q    A fairly lengthy interview with him?

A    That is correct, yes.

Q    At that point, was he charged with some crimes?

A    Yes, sir.

Q    Did he know that he was under investigation?

A    Yes, sir.

        MR. McGARVEY:  Objection to what he knew.

        THE COURT:  Overruled.

BY MR. VICK:

Q    Did you tell him he was under investigation?

A    I advised him, yes.

Q    Did he know that what he told you would be used

**JA1134**

against him at that point?

A    Everything he told me would be used against him.

MR. VICK:  No further questions.  Beg the Court's indulgence.

(Counsel conferring with co-counsel.)

BY MR. VICK:

Q    Just one other question.  Is it unusual, based upon your training and experience and your years as a police officer that investigative conversations of the sort that you had  --

MR. GEARY:  I object to this.  We are talking --

THE COURT:  Let him finish asking the question.

MR. VICK:  -- on February 18th, 1992, with Jerry Gaiters, that at that stage of an investigation that people will not tell you all that they know?

MR. BAUGH:  Objection to "unusual."

THE COURT:  Sustained.

MR. VICK:  I have no further questions.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Woody, how long was Gaiters an informer for you before January 21st, 1992?

A    I've known Jerry Gaiters for approximately ten years.

MR. GEARY:  Could you direct the witness to answer the question?

THE COURT:  Sounds like an answer.  There is no reason for me to direct the witness to answer the question.  You asked a question and he answered it in his own way.

BY MR. GEARY:

Q    You know the difference  --

MR. VICK:  I object.  This is irrelevant. What other information he might have provided Detective Woody about other people is absolutely irrelevant.

MR. GEARY:  I'm sure the government would like it to be irrelevant.

THE COURT:  Go ahead.

BY MR. GEARY:

Q    You did not take the warrant out against Jerry Gaiters, did you?

A    No.

Q    The Bureau of Police is not used to taking out murder warrants when there is no evidence against them?

A    We don't know.  We can't.

Q    Billy Blaylock you have known for a long time. He is a homicide detective?

**JA1135**

A    That's correct.
Q    He doesn't take out warrants against people when there is nothing to indicate that person has not committed a homicide; is that correct?
A    That's correct.
Q    How long has Jerry Gaiters been an informer for you prior to January 21st, 1992?

2435

A    Jerry Gaiters has been an informer of mine for approximately ten years.
Q    How many times have you met with Jerry Gaiters where he was asked by you to give you information?
A    It would be hard to approximate.  I know at least during that particular time, approximately 35 or 40 times prior to January 21st.  He is one of the best informers I have had.
Q    What did Mr. Gaiters get in return for the information?
A    Mr. Gaiters didn't get anything in return for the information.  Mr. Gaiters had got in some petty trouble a couple of times that I knew of that we discussed, but as far as him getting anything or any promises, no, sir.
Q    Given the fact that he was one of your best informers when you began talking to him in regard to the Church Hill murders, would it be fair to say that he lied to you all over the place?
A    Jerry Gaiters never told the truth from the beginning.  You had to prove to him that you knew what he was talking about.
        MR. GEARY:  No more questions.
             CROSS-EXAMINATION
BY MR. COOLEY:

2436

Q    Good afternoon to you.  Mr. Vick asked you about that discussion you had with Mr. Gaiters on February 18th.  Do you recall that?
A    Yes, sir.
Q    And Mr. Gaiters told you throughout that he, at the conclusion of the shootings up at "Mousey's," he fled down an alley and kept on going.
A    That is correct.
Q    Never told you he got in the car with these same folks and went back to Moore Street?
A    Not on the 18th, no, sir.
Q    Didn't tell you that on February 3rd, either, did he?
A    No, sir, he did not.
Q    Did he ever tell you in that interview that he knew they were going up there to shoot "Mousey?"
A    Mr. Gaiters admitted to me that he was aware of what was going to happen at 2917 East Clay Street.  He knew they were going to get "Mousey."
Q    To get "Mousey?"

**JA1136**

A    Kill "Mousey," yes.
Q    Did he tell you they were going up there to shoot her in the butt?  Did he tell you that on the 18th?
A    No.  He didn't use those words.  He just represented to me he knew what time it was, meaning he knew they was going to get "Mousey."
Q    How many times have you talked to Mr. Gaiters altogether, do you think?
A    Through this investigation, approximately six or seven times.
Q    How many hours do you think you spent with him?
A    Hours?  I would say approximately 18.
Q    Did he ever tell you in these terms: that they were going up there to shoot "Mousey" in the butt or some other word for butt?
A    To my knowledge, Mr. Gaiters never admitted to me where they was going to shoot "Mousey."  He admitted to me he knew what time it was, and that they were going to kill "Mousey."
Q    And he did tell you, did he not, first upon your suggestion to him, that he had to have been covered; that he was indeed forced to go up there because someone had a gun on him?  Is that right?
A    Yes, he had fear because of who was sitting in the backseat, and they had a gun, playing with it, admitting to him that "Hey, we are not going to kill you; you are our buddy," something to that effect.
Q    My question is, when he got out of the car and went up to knock on the door at Bobby Long's house where "Mousey" was, did he tell you on February 18th that -- did he start by telling you that he just went up there by himself?
A    Yes.  That's correct.
Q    And he told you that a number of times, didn't he?
A    That is correct.
Q    And you told him you didn't believe that.
A    That's true.
Q    And you told him that no one -- if he had a choice he would have just kept on running, kept on going.  They couldn't see him from where they were.  He was telling you they were both in the car, and if he had gone up there by himself he could have kept going?
A    That is true.
Q    You told him you knew if he was telling you he didn't have a choice, that meant he was covered.  Right?
A    That is correct.
Q    What did you mean by the term "covered?"
A    Someone was watching him; that whoever he was

**JA1137**

with, the people he was with were actually watching him.

Q    Did you suggest to him at any time that he was being covered by a gun?

A    Yes, I did.

Q    And he ultimately admitted to you that he was indeed forced up there because Cory or "C.O." had a gun in his back; is that right?

A    He admitted that "C.O." had a gun behind him. Yes, sir.

Q    In fact, are you familiar with his Grand Jury testimony?

A    Yes, some of it.

Q    You know that he told the Grand Jury that he was forced up there with a gun at his back?

A    That is correct.

Q    All right, sir.  Have you talked with him  -- when was the last time you talked to him before today?

A    Approximately a month ago.

Q    Did you talk to him today?

A    No.

Q    So you have not talked to him?

A    No, sir.

Q    Has he, since the Grand Jury testimony, ever recanted that testimony and told you that he wasn't forced back up there at gunpoint by Cory?

A    He never related to me that he wasn't forced up there.

Q    So if he has testified today that he wasn't forced up there, that's news to you.

A    Yes.

         MR. COOLEY:  That's all I have.  Thank you.

                   CROSS-EXAMINATION

BY MR. BAUGH:

Q    Detective Woody, on all the conversations that you had with Mr. Gaiters in the homicide interview room, those were tape-recorded, weren't they?

A    Yes, sir.

Q    In fact, am I correct that there is a camera or some device in the wall so that people who are in that room can be videotaped?

A    That is true.

Q    And it is situated in such a way that they don't know they are being videotaped?

A    Mr. Gaiters was aware he was being videotaped. Some people are not aware; that's true.

Q    You told Mr. Gaiters before you interviewed him that you were going to videotape his interview?

A    I talked with Mr. Gaiters before he was interviewed and advised him that he would be

**JA1138**

recorded.  Yes, sir.  Taped.

Q    Of course, when this case was investigated, you know that a copy of that tape was turned over to us, the defense attorneys?

A    Yes, sir.

Q    And have you reviewed that tape at all, ever?

A    On many occasions, yes, sir.

Q    On that tape-recording, did you make suggestions to Mr. Gaiters about some of his answers?

A    I wouldn't call them suggestions.  What I related to him was that me knowing Jerry so long is the way I relate to him.  I wouldn't make any kind of suggestions.

Q    As part of your relating, if he said something you didn't agree with, you would tell him that other witnesses had told you other things to get him to change it?

A    Not to get him to change it; to let him know that I knew what I was talking about.  It is an investigative technique.

Q    Would that sometimes cause him to change what he was saying?

A    Yes, sir.

Q    When is the last time you looked at this tape-recording?

A    Approximately a month or so ago.

Q    Do you tape-record all your interviews with suspects or significant witnesses?

          MR. VICK:  Objection.

          THE COURT:  Overruled.

BY MR. BAUGH:

Q    Do you?

A    No, sir.

          MR. BAUGH:  No further questions.

          THE COURT:  Mr. Wagner?

          MR. WAGNER:  No questions.

              REDIRECT EXAMINATION

BY MR. VICK:

Q    You were the investigator originally assigned to the Church Hill triple homicide?

A    That is correct.

Q    You have spoken to a number of witnesses about that?

A    Yes, sir.

Q    Based upon your investigation, have you come to determine whether  --

          MR. GEARY:  Judge, I object.  I assume what's coming out.

BY MR. VICK:

Q    Have you come to find out, based upon what you know Jerry Gaiters is saying now, whether he is

**JA1139**

telling the truth?

MR. BAUGH:  Objection.  That is the ultimate issue.

THE COURT:  Sustained.

BY MR. VICK:

Q    Is what he is saying now consistent with what your investigation has revealed?

MR. BAUGH:  Objection.

THE COURT:  Sustained, Mr. Vick.

BY MR. VICK:

Q    Did he ever tell you that "O" had not gone in that house and shot?

A    No.

Q    Was he always consistent that "O" had gone in that house and shot?

A    "O" was the one behind him.  "O" shoved by him. "O" was the one who started to shoot.

Q    Was he consistent that "O" was behind him in the car?

A    That is correct.

Q    With the gun?

A    That is correct.

Q    Has he ever changed that story at all?

A    No, sir.

Q    Has he changed the story as to why she was killed, ever?

A    No, sir.

MR. VICK:  No further questions.

THE COURT:  You may stand down, Detective.

(Witness stood aside.)

MARCELLA F. FIERRO, recalled as a witness by and on behalf of the government, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Please state your name

A    Marcella F. Fierro.

Q    Ma'am, are you the same lady who testified before the jury last Friday; is that correct?

A    I am.

Q    Ma'am, have you had occasion to review the autopsy of Peyton Maurice Johnson?

A    I have.

Q    Were you in fact present at that autopsy?

A    Yes.

Q    In your preparation for court today, did you have occasion to review your autopsy photographs?

A    I did.

Q    Did you have occasion to request that those photographs be enlarged to assist in your testimony?

A    Yes.

MR. PARCELL:  I need Government Exhibit 23, if I may get it.  31, also.

(Exhibits proffered to witness.)

BY MR. PARCELL:

Q   Ma'am, what's been handed to you has been labeled Government Exhibit 23.  Are you familiar with those individually-wrapped envelopes?

A   These are the bullets that were recovered from  --  this one is Torrick Brown, this is Peyton Johnson.

Q   Ma'am, with the use of those bullets, I'll show you what's been labeled Government Exhibit 20-2, 4, 5, 6, 8, and 9.  Are these the photographs that you have requested to be enlarged for your testimony today?

A   Yes.

Q   Ma'am, with the use of those photographs, could you explain where the projectiles that you recovered from that body came from in relation to those photographs?

MR. BAUGH:  Your Honor, may we object to all of this as being calculated purely to inflame the sensibilities of the jury?

THE COURT:  The objection is noted and overruled.  You may stand down.

(Witness approached the jury.)

THE WITNESS:  These photographs of our Case Number 3292, Mr. Peyton Johnson, show first of all his identification, show who he is; and secondly, they show gunshot entrances and exits as a reflection of his gunshot injuries.  He had 15 gunshot wounds. Of these, eight bullets were recovered, and those were all large caliber.  There were gunshot wounds to the left leg that were superficial, and went just through muscle.  There was a gunshot wound to the left lateral thigh, and that went through.  There was one to the left upper shoulder which I don't think we see very well on this particular picture, and that went through muscle and ended up in the neck.  There was a fourth gunshot wound to the right lateral thigh.  We don't have a photograph of that that you can see.  There was a gunshot wound to the left lower abdomen -- that's an entrance -- and this went into the pelvis and ended up in the right hip.

There was a gunshot wound to the left flank, and that traveled  --  actually, that one is up here.  It traveled forward back to front and went below the ribs and ended up in the bowel inside the abdomen.

Gunshot wound number seven went to the left chest, and that went through the left third rib and went through the right and left lung to cause hemorrhaging to the chest space.  Gunshot wound number eight went

to the posterior neck, and that remained subcutaneous underneath the tissue, and exited.

There was another gunshot wound to the left posterior neck right here, and that was a graze. There was another gunshot wound, number ten, to the left lateral neck, and this went subcutaneously and went on out. There was one to the left upper arm that went through muscle. There was a gunshot wound to the left upper lip, there are two, numbers twelve and thirteen, and one went across through the sinus and ended up in the right jaw, and another one went back and transected the brain stem. Gunshot wound number fourteen was to the left lateral neck, and this remained subcutaneous, just tunneled under and went on out. Number fifteen went to the right upper chest, and this one traveled front to back and went through muscle and the clavicle.

MR. PARCELL: I will ask that the photographs be Government Exhibit 20-respective numbers. She may return to her seat.

MR. BAUGH: Continuing objection, Your Honor.

(Witness resumed witness stand.)

BY MR. PARCELL:

Q    I'm going to pass you some bullets that have been previously identified by Ms. Anne Jones and ask you if you can tell us, first of all, you said there were fifteen wounds to the body; is that correct?

A    That's correct.

Q    And how many projectiles did you in fact recover from that body?

A    Eight.

Q    I will first hand you what's been labeled 20-A, which is identified as a lead core by Ms. Jones. Can you tell us which injury that came from?

A    This bullet came from gunshot wound number five, the one that entered on the left and ended up in the right hip.

Q    20-B, please? That's been identified by Ms. Jones as a lead core, not suitable for comparison.

A    This is from gunshot wound number three.

Q    Which was where, ma'am?

A    To the left upper shoulder, and it went across.

Q    I hand you what's been labeled 20-C, and would you please tell us which wound that bullet came from?

A    This bullet was recovered in the left Petrie's ridge, which is in the head. And that one is number thirteen.

Q    Government Exhibit 20-D, which has been labeled as a bullet from a AA Arms?

A    This was recovered from the body bag. It had

tissue on it, which meant that it had passed through the body and fell out.

Q   20-E, please?

A   This was recovered from the right subclavian area.

Q   20-F?  This is also the AA Arms.

A   This was recovered from the right ischium.

Q   That's wound number what?

A   Number four.

Q   20-G, please?

A   This is wound number twelve, the one to the left upper lip.  That was recovered on the right side.

Q   20-H?

A   Wound number five, the one that entered the left lower abdomen and went across into the floor of the pelvis, from left to right and down.

Q   20-I, which has been identified as coming from the Glock?

A   This is one that entered the left upper shoulder and ended up in the sternal notch.  This is a jacket.

Q   20-J, Glock?

A   This one was wound number seven.  It entered the left lateral chest and traveled through the lung, and was found in the right latissimus dorsi muscle on the right side over there.

Q   20-K?

A   20-K is a fragment.  That was from wound fifteen.

Q   Were you able to determine which of these fifteen gunshot wounds would have been fatal for this victim?

A   Well, several of these wounds were fatal.  Any of the gunshot wounds that entered the head, for example the one that went into the left  --  the two that went into the left upper lip, one of which went into the sinus and across the jaw, and that would cause death by bleeding into the area.  The second left upper lip wound transected the brain stem, which is a very lethal lesion.  The wound that went through the lungs, wound number seven, is a lethal injury. The one that entered the left flank and went forward into the colon would cause death.  Not immediately, but it would ultimately cause death.  The wound number fifteen that went into the pelvic rim would transect and perforate large vessels and had lethal potential.  The others were soft tissue injuries, muscle, which if untreated could cause a problem, but ordinarily would not be lethal.

Q   Ms. Jones identified the projectiles from wound number five as from AA Arms, and wound number seven as coming  --

MR. BAUGH: I believe counsel is leading and informing of what another witness would testify to.

THE COURT: Overruled.

BY MR. PARCELL:

Q Ms. Jones had testified that wound number five, which is the bullet number 20-H that came from the AA Arms, you indicated that was a lethal shot?

A Yes.

Q Lethal injury?

A It had lethal potential because it would perforate large vessels.

Q As well as the 20-J, which is the Glock, wound number seven.

A Wound number seven went through the lungs and was a lethal wound.

Q Ma'am, in regard to your examination of this deceased, were you able to determine whether that person had lost a small amount, a moderate amount, or a great amount of blood prior to your performing your examination?

A He lost considerable blood. The gunshot wounds to the chest resulted in a very small pneumothorax, which there ought to have been a large pneumothorax. What that tells us is he either died very quickly or lost a great deal of blood.

Q After you completed your examination of this victim, did you have occasion to prepare a report of autopsy?

A Dr. Jefferson prepared the report.

Q Based on your supervision?

A Yes.

MR. PARCELL: This has been labeled Government Exhibit 19.

THE WITNESS: This is a copy of the final autopsy report which was prepared and which I have certified as a true copy of the original.

MR. PARCELL: That will be Government Exhibit 19, please.

THE COURT: It will be admitted.

BY MR. PARCELL:

Q Did you also have occasion to be involved with the autopsy of Louis J. Johnson, Jr.?

A I did.

Q Once again, did you prepare photographs of your autopsy to assist in your testimony today?

A Yes.

MR. PARCELL: I'll ask she be allowed to identify this item and approach the jury and explain to them the contents of these photographs.

THE COURT: All right.

MR. PARCELL: This is Government Exhibit

**JA1144**

27-1, 2, 3, and 4.

(Witness approached the jury.)

THE WITNESS:  These are photographs of Louis J. Johnson, Medical Examiner Case Number 6592.  Mr. Johnson had seven gunshot wounds.  Four of these were to the head, three were to the chest.  Two bullets were recovered from the body.  These were large caliber bullets, and one was recovered from his coat.  Gunshots one, two -- one, three, and four all enter on the right side, and we can see them here above the right ear, the right jaw, and the right posterior neck.  This wound here is an exit from this gunshot wound on the other side.  Gunshot wound two was from the left side and that exited right here.

Gunshot wound five was to the left upper back. He is on his side here.  This gunshot wound is number five from the left upper back.  Number six was the left lateral chest.  We don't have a photograph of that.  That one, number six, perforated the lung and the right subclavian vein and nicked the carotid artery, causing bleeding.  That would be a lethal injury.  Wound number seven entered the left lateral biceps, and that would be in here.  We don't see it on this picture, but it would be in this region.

MR. PARCELL:  I would ask that she return to her seat.  That will be moved into evidence is Government Exhibit 27-1, 2, 3, and 4, please.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask you to examine what's been identified as Government Exhibit 31, and relate those projectiles as to where they came from the body, if you know.

A    Three bullets were recovered.  One was recovered from the right arm.  There was a bullet recovered from his coat collar, and one from the left back muscles.

Q    In regard to your final procedure, did you once again prepare a report of autopsy for your findings?

A    I did.

Q    I'll show you what's been labeled Government Exhibit 26

(Document proffered to witness.)

A    This is a copy of the final autopsy report on Louis J. Johnson, Jr., which I have certified as a true copy of the original document.

MR. PARCELL:  That will be Government Exhibit 26, please.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    Did there come a point in time when you had occasion to review the report of autopsy for a

Dr. Marcella Fierro (Direct)

Torrick Brown?

A    I did.

Q    In preparation for your testimony today, did you also once again request enlargements of those photographs for your testimony?

A    Yes.

Q    Can you tell us how many times Mr. Brown was shot?

A    Mr. Torrick Brown was shot sixteen times.  He had three gunshot wounds to the left arm, one to the right chest, seven in a cluster to the left side of the abdomen, two to the left thigh, and flank, and one to the right buttock, one to the back, and one to

the right hand.  Nine bullets were recovered: eight from the body, and one from his shirt.

MR. PARCELL:  I would ask she be allowed to approach the jury and explain these photographs. These are labeled Government Exhibit 35-1, 2, 3, and 4.  I would move their introduction upon her testimony.

THE WITNESS:  These are photographs taken at the time of autopsy of Mr. Torrick Brown.  The Medical Examiner case number is 6792.  The first photograph shows him as he was received, clothed, with his hands bagged.  And primarily it shows the cluster of wounds in his abdomen.  The next photograph shows him lying on his belly and shows the gunshot wounds of the back, number fourteen of the left mid-back, and the shots to the left arm.  This is a photograph of the X-ray to show one, two, three, four, five wounds clustered in the back.  The last photograph is a photograph cleaned up of the body to show the gunshot wounds in a cluster in the abdomen.

MR. PARCELL:  I would move that's introduction and ask that she return to her seat.

THE COURT:  It will be admitted.

(Witness resumed witness stand.)

BY MR. PARCELL:

Q    I ask you to look at Government Exhibit 39 and explain to the jury where each of those projectiles were removed from this body.

A    Gunshot wound 26-A was recovered from the left upper quadrant of the abdomen and originated from one of the clusters of wounds in the left side of his abdomen.  Bullet number 26-B originated in the left upper arm and was recovered from the left upper arm. 26-C was recovered under the skin of the left back. 26-D was recovered under the skin of the left back, and represents one of the ones of the cluster to his abdomen.  26-E was recovered in the left back behind the scapula, which is the shoulder blade.  And that is from one of the ones in the abdomen.  26-F is the

**JA1146**

bullet which fell out of his shirt.  26-G was recovered in the left back.  26-H was recovered in the left back.  26-I was recovered from the left back.  These all originate from those seven in the belly.

Q   Once again, was there a report of autopsy performed on Mr. Brown and a final report prepared?

A   There was.

Q   I'll ask you to look at what's been labeled Government Exhibit 34 and ask you if you can identify that item.

(Document proffered to witness.)

A   This is a copy of the final autopsy report on Torrick Brown, which I have certified as a true copy of the original.

MR. PARCELL:  That will be Government Exhibit 34.

THE COURT:  It will be admitted.

MR. PARCELL:  Judge, I ask she be re-handed Government Exhibit 26, that being the autopsy report of Louis Johnson, please.

(Document proffered to witness.)

BY MR. PARCELL:

Q   You have the Louis Johnson autopsy report.  You indicated he had some entry wounds to the right side of the back of his head as well as the left; is that correct?

A   That's correct.

Q   Indicating to you that  --  where would those bullets have been fired from?

A   Well, the wounds that entered the left side of the head would have come from the left.

Q   The ones from the right?

A   From the right.

Q   Ma'am, were you able to determine whether or not Mr. Johnson, Mr. Louis Johnson, had any cocaine in his system at the time of his death?

A   Yes, he had 0.09 milligrams per liter.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  All right.  Fine.  Thank you very much.  You may stand down.

(Witness stood aside.)

We are going to stop here for lunch.  Everyone remain seated while the jury leaves the courtroom.  Come back at 2 o'clock, please.

(The jury left the courtroom.)

The defendants will be removed.

(The defendants were removed from the

courtroom.)

(Luncheon recess taken from 1:00 p.m. to 2:00 p.m.)

THE COURT:  All right, let's bring in the jury.

(The jury entered the courtroom.).

THE COURT:  Call your next witness.

MR. PARCELL:  Officer Keefer, please, K-E-E-F-E-R.

2460

JAMES KEEFER, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    My name is Officer James Keefer.

Q    Your occupation, sir?

A    I'm a patrolman with the Richmond Bureau of Police.

Q    Were you so employed in that capacity on February 1st, 1992?

A    Yes, I was.

Q    Did you have occasion to get a communication to respond to a location in the City of Richmond in reference to a shooting?

A    I did.

Q    Would you please tell the ladies and gentlemen of the jury where you went and what time?

A    It was approximately 10:15 p.m.  I went to 2817 East Clay Street.

Q    What if anything did you find when you arrived at that location?

A    I found the south door to that residence in a

2461

wide open position.  The lights were on inside.  And as I went inside, I saw a man sitting at the kitchen table who had been  --  who had suffered a gunshot wound to the left side of the neck.

Q    Did you find anything else in regard to another body?

A    Yes, I did.  In the hallway of that room, of that house, there was a woman laying in a prone position who had been also shot several times.

Q    Was she alive or deceased?

A    She was still alive.

Q    Did you find someone else in that area?

A    Yes.  As I went back to the door to summons a patrolman to stand guard at the crime scene, I saw another man lying on his back behind two garbage cans next to what I believe was a garage.

Q    At that point in time did you protect that crime scene as best you could until Detective Brunelli

arrived?

A     Yes.

Q     Were you able to determine the identity of the three people, the two inside and the person outside, at that point?

A     No, I was not able to identify them by name at that time.

2462

MR. PARCELL:  Pass the witness.

THE COURT:  Any questions?

MR. GEARY:  No questions.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  Thank you, Officer.  You may stand down.

Call your next witness.

(Witness stood aside.)

MR. PARCELL:  Detective Brunelli.

GARY L. BRUNELLI, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

BY MR. PARCELL:

Q     State your name.

A     Gary L. Brunelli.

Q     You are the same detective who testified earlier in these matters?

A     That's correct.

Q     Were you so employed as a forensic detective on February 1st, 1992?

A     Yes, I was.

Q     Did there come a point in time that you got a

2463

communication to respond to East Clay Street in the City of Richmond?

A     That is correct.

Q     Would you tell the ladies and gentlemen where you were when you received that communication?

A     The homicide scene on Lynhaven Avenue.

Q     Of Torrick Brown?

A     That's correct.

Q     Were you still processing that crime scene?

A     That is correct.  The time was 10:18 hours.

Q     After you completed your assignment on Lynhaven, you responded to the East Clay Street address?

A     That's correct.

Q     As you arrived at the location did you start videoing the crime scene as you did in the other crime scenes?

A     Yes, I did.

Q     Review this video and explain to the ladies and gentlemen of the jury what it means to you.

(Videotape played.)

**JA1149**

A    We are looking down the street to the right of the actual scene on the TV.  That is 29th Street.  The sign says 29th and Leigh.  You won't be able to read it, though, at this particular moment.  Off to the left, you will see two trash cans with a white sheet behind them.  Underneath that white sheet was the body of Bobby Lee Long.  He was laying  --  the wall to the left is actually garages.  He was laying right alongside the garage there.  Right at the center of the screen will be a 9mm cartridge case.  It is actually on the sidewalk.  Here is the grass and the rope right here.  We will be focusing on another 9mm cartridge case laying at the rear of an old pickup parked between the house and this garage.  You can just see it barely.  There is another 9mm cartridge case.

This house, the back of it is what you are seeing, the white pickup truck will be on your left, then there is a garage after that.  It is 23 feet from the corner of the house to the garage.

Here is another 9mm cartridge case.  What we are doing is actually entering the back door of 2817 Lynhaven Avenue.  Excuse me, East Clay Street.  As we enter this door we are actually in the kitchen area of the house.  The cartridge case directly in front of us is a 9mm.  It is on the floor.  In the sink area there was another 9mm cartridge case.

The hole in the wall here, we were unable to track the bullet, but it was caused by a bullet.  On the kitchen table there is blood.  It had already started to dry.  You notice it is curled up at the edges.  There was blood on the rear wall.  Zooming in on another 9mm cartridge case.

The second victim here you are getting ready to see now is Anthony Carter.  One of the entrance wounds was right here in the neck area.  From the kitchen area we go into a short hall right where the cat is.  This cat -- as we discussed yesterday, things alter a crime scene.  Animals do alter it.  They have a tendency to pick up and move stuff around, blood especially.  This is a 9mm cartridge case laying in the hallway.  Against the wall here, you see a bullet that has exited, apparently.  That's what's left of it.  Where you see the red blood is where the third victim was taken from, Dorothy Armstrong.  She had already been transported to the hospital.  A lady's gold watch is laying in the hallway.

The area you are seeing now is just a short hallway.  Well, it is a rather long hallway going to the living room area, which is at the very front of the house.  There will be a bedroom to the left.

**JA1150**

This would be the Leigh Street side of the house.  It was the living room.  There was no front door.  It was an exit to the right.  The door right here goes actually out to the right, which was 29th Street.  The lighting in this particular scene was very minimal.  That was actually the light from the video camera that was going on and off at this time.  It was getting very dark.  There is a better shot of the sign showing the 2800 block of East Clay Street.

(Tape ended.)

BY MR. PARCELL:

Q   As you prepared your testimony for this trial, did there come a point in time you had occasion to enlarge some of your crime scene photographs and make a crime scene diagram?

A   That's correct.

Q   I show you what's been labeled Government Exhibit 40-1, 2, 3, 4, and 5.  And would you please identify those, if you can?

A   This is the rear entrance to the house, a storm door.

MR. PARCELL:  May he approach the jury and explain to those folks?

THE COURT:  Go ahead.

(Witness approached jury.)

THE WITNESS:  As you saw in the video, this is the rear door entering the house.

BY MR. PARCELL:

Q   Describe the photograph number as you describe each exhibit.

A   This is 40-1.  You saw this in the video. 40-2, the victim right here.

Q   Which victim is that?

A   Anthony Carter.

A close-up of Anthony Carter.  You see one of the wounds right here.

Q   What photograph number is that?

A   40-3.  40-4 shows the blood spattered on the floor and the cartridge case, the feet of Anthony Carter.  This was in the kitchen area.  40-5 is actually the hallway where the blood spatter was and Dorothy Armstrong was moved from.

Q   And she was gone upon your arrival; is that correct?

A   That's correct.

Q   Did you later learn that she expired at MCV?

A   That is correct.

MR. PARCELL:  I'll ask to admit 40-1 through 5.

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q   I'll ask you to look at this diagram, and would

you approach the jury again with the Court's

permission?

(Witness approached jury.)

Would you please explain what that diagram means to you?

A    This is the whole area that you looked at on video of 2817 East Clay Street, the front area right here, the grass, from this being Clay Street, back, the house.  This is where you saw our second victim, Mr. Carter.  This is the hallway.  There was a sidewalk here.  This was an all-concrete area where an old truck was parked, and here is where our garages start.  Bobby Lee Long was laying right here behind the trash cans.

Q    I'll ask you if you can to identify where those particular items came from.

A    Item Number 1 is a cartridge case, right here. It was on the concrete, almost the sidewalk area. Item Number 2, right at the corner of the pickup, you saw it intertwined with the rope and weeds.  It was another cartridge case right here at the corner of the pickup truck.  Item Number 10, right here in the hallway, 9mm cartridge case.  Item Number 2  -- excuse me, Item Number 1, 9mm cartridge case.  Item Number 7, which was found in the kitchen sink, was a 9mm cartridge case.  It is shown right here.  Item Number 9, right here in the hallway, one bullet that showed up.  Item Number 10  --  excuse me, Number 4, a cartridge case found out here on the sidewalk. Item Number 3, cartridge case found in this area between the house and the truck, outside.

Item Number 5 is a cartridge case found inside the door.  Item Number 11, cartridge case found right at the start of that hallway in the kitchen.  Item Number 8, found in the hallway was another bullet smashed out pretty well.  Item Number 12, cartridge case, found right here in the hallway off the table area.

MR. PARCELL:  Judge, I will ask for the admission of these items to be labeled Government Exhibit 46, and the diagram, which is to be Government Exhibit 41.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    After you recovered these, this physical evidence at the crime screen, you in turn submitted them to Anne Jones at the state lab for analysis?

A    That is correct.

Q    Did there come a point in time that you had occasion to go to the Medical Examiner's Office on February 3rd, 1992 and receive some projectile or

**JA1152**

bullet that came from the body of Dorothy Armstrong?

A   That is correct.

Q   I will ask you if you would, sir, see if you can identify that item.

(Exhibit proffered to witness.)

A   Yes, sir, that is the bullet I received from the Medical Examiner.

Q   You in turn submitted that to Ms. Jones on the same date for comparison?

A   That is correct, on the fourth.

MR. PARCELL:  I would ask that they be introduced as Government Exhibit 49, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q   Look at this photograph.  And I ask you, does that actually illustrate what you found at that crime scene, Government Exhibit 15?

A   It is the body of Bobby Lee Long.  It was covered with a sheet.

Q   Government Exhibit 50, Judge.

THE COURT:  Admitted.

MR. PARCELL:  Pass the witness.

THE COURT:  Any questions, Mr. Geary?

MR. GEARY:  No questions.

MR. COOLEY:  No, sir.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  Thank you, sir.  You may stand down.

MR. PARCELL:  Detective Searles, please.

THOMAS R. SEARLES,
recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q   Once again, would you please state your name?

A   Thomas R. Searles.  I'm a detective.

Q   Are you the same Detective Searles who testified last week in this trial?

A   Yes.

Q   Were you so employed as a forensic technician on February 19th, 1992?

A   Yes.

Q   Did you have occasion to receive a communication to go to the Stony Run Drive section of the City of Richmond?

A   Yes, sir, I was.

Q   At what time did you get the communication to go there?

A   At approximately 11 o'clock p.m. at nighttime, I received a call to respond to the 1200 block of Stony

**JA1153**

Run.

Q   Did you respond to that location?

A   Yes, sir.

Q   When you arrived, did you have occasion to video that crime scene and take certain photographs of that crime scene area?

A   Yes, sir, I did.

Q   Did you also recover certain pieces of physical evidence?

A   Yes, sir, I did.

Q   I'll ask you to look at this video and explain to the jury what that means to you, if anything, in relation to this crime scene.

(Videotape played.)

A   This portion of the video is showing Stony Run. It is facing toward Broad Street, or Government Road, from Williamsburg Road.  This is general panning away from the car down the side area, which would be the right side of the vehicle, showing the vacant lot and the area in that location.  This portion of the video is showing the front of the vehicle looking toward Williamsburg Road down Stony Run.  This portion is showing  --  you see some debris and articles up there in front of the vehicle.  That's the location where I found a couple 9mm cartridge cases and some other items lying in the street where one of the victims was at the time.

Q   Were you later able to determine the identity of that victim on the street?

A   No.  I'm not sure which person that was in that particular location.  This is showing that at the right side of the vehicle there is a subject lying out there on the ground, the curbline, later identified as Curtis Thorne.  Underneath the rear of the vehicle in the back there, I found a 9mm cartridge case, also.

Q   Underneath the rear of the right side?

A   Right rear of the vehicle.  Yes, sir.

Q   To the right of that automobile as you see some grass, does that hill slope or is it an incline or decline?

A   It goes on for a little ways and then kind of slopes down to an embankment.  Here the victim, Curtis Thorne, was lying on the curb.  And there is some broken glass on the ground where the windows were broken in the vehicle.  This is a photograph showing the subject inside the vehicle who was later identified as Linwood Chiles, and also some glass fragments on the car.  This shows the right rear door, where they were broken in the vehicle.  This just shows the license plate of the vehicle, which was HGI-188.  This is another photograph showing from

**JA1154**

Thomas Searles (Direct)

the driver's side that the subject sitting behind the steering wheel had blood on him.  He was slumped over in that manner.

Q    This is Chiles?

A    This was later identified as Linwood Chiles. This is a photograph of the backseat with several cartridge cases lying on it, and some glass in the floorboard.  This is the area showing where I recovered a couple cartridges that were on the street up in front of the car where, apparently, one of the subjects had been.  Here again, this is just showing down the street from Broad Street towards Williamsburg Road and Stony Run.  This item is showing a beer can that was near the location lying out there in the grass part.

Q    You later determined that had no significance to your crime scene; is that correct?

A    Sir?

Q    You later determined that beer can had no connection to your crime scene; is that correct?

A    It didn't prove to be any valuable evidence in the crime scene.  This is showing a close-up of Curtis Thorne lying on the ground with blood all over his body, and that's the way he was when I arrived. And this is a closer photograph of the subject inside the vehicle.  Also in the front seat, there was a cartridge case lying in the front seat of the vehicle.

Q    I'll show you what's been labeled Government Exhibit 54-1, 2, and 3.

(Documents proffered to counsel and witness.)

Those are what, sir?

A    This is a photograph of the  --  one of them is a photograph of the left side of the vehicle as I found it when I arrived.  The other photograph  --

MR. PARCELL:  I ask he be allowed to approach the jury and explain those photographs.

THE COURT:  Go ahead.

(Witness approached jury.)

THE WITNESS:  This first photograph is a photograph of the vehicle and the passenger that was in behind the steering wheel of that vehicle when I arrived.  Photograph number two is just a close-up of the subject sitting behind the steering wheel the way he was when I found him, slumped over with blood on him.

This is taken from the right side of the vehicle, inside the vehicle, of Linwood Chiles sitting in the vehicle slumped over with blood all over him and the seat.

MR. PARCELL:  I would move their introduction.

**JA1155**

Thomas Searles (Direct)

BY MR. PARCELL:

Q    In preparation for your trial date, did you have occasion to prepare a crime scene diagram of that area?

A    Yes, sir, I did.

Q    Can you please explain what these things which have been labeled Government Exhibit 62 -- are those things that you in fact recovered from that crime scene both inside and outside that vehicle?

A    Yes, sir.  These are the items that I recovered.

Q    Would you please explain to the jury what this item is and where it was recovered, and this label number?

A    Number one: Item Number 1, which is a cartridge and which is a .32 millimeter, was found lying across the street against the curbing at that location.

Q    Did you later determine it had no significance to your crime scene?

A    Yes, sir.  Sometimes we collect items that may or may not be any value to a crime scene.  If we collect them, we have them.  If we don't collect them, and we need them, we don't have them.

Q    Item two?

A    Item two, 9mm cartridge case found up in the front of the vehicle up here against the curbline, approximately about 13 feet from the vehicle.

Q    Do you have that labeled up in the right-hand corner, sir?

A    Yes, sir.  Right up there against the curbing. Item Number 3 is also a 9mm cartridge case which was found underneath the vehicle in the rear.

Q    On the ground?

A    On the ground, underneath the vehicle.  Item Number 7 is a 9mm cartridge case, and it was found right up here with Item Number 2, which was underneath  --  there is a bag and a bottle there. It was found in that location.  Item Number 8 was also a 9mm cartridge case that was found on the front seat, right side of the vehicle.  Item Number 9 was three 9mm cartridge cases located on the backseat of that particular vehicle.  Item Number 10 was a bullet from the door, the right door of the vehicle.  The bullet was lodged inside the door just above where the window line is.  Item Number 11 was a bullet from the doorjam, which was the rear door of the right side of the vehicle.  This bullet was found in the doorjam.

Item Number 12 is a 9mm cartridge case.  That was found on the floor of the vehicle down beside the seat on the right side.  Item number 13 was fragments, bullet fragments from the door, stuck in

the door on the right side of the vehicle, the front door.  Item Number 14 was fragments from a bullet that were found on the seat on the driver's side, the left side of the vehicle.

Q    15, two beer bottles, they were found where?

A    Item 15, two beer bottles, was found in the front floorboard in a bag.

Q    16?

A    Newport cigarettes that were also found in the floorboard of that vehicle.

MR. PARCELL:  I would move the introduction of Government Exhibit 55, the crime scene diagram, as well as Government Exhibit 62, which are items which Detective Searles has just testified about.

THE COURT:  They will be admitted.

BY MR. PARCELL:

Q    After you recovered those items which have been receipted as Government Exhibit 62, the brass and bullets that you recovered, did you submit those to Anne Jones at the state lab for analysis; is that correct?

A    Yes, sir, I did.

Q    Did there come a point in time that you had occasion to receive some projectiles from Detective Fleming that came from the body of Chiles and Thorne, came from Dr. Weicking?

A    Yes, sir, I did.

Q    I show you what's been labeled Government Exhibit 63 and advise us as to whether or not that means anything to you.

A    These are the items that I received from Detective Fleming reference Linwood Chiles from the state examiner's office.

Q    You submitted both items, 62 and 63, for analysis?

A    Yes, I did.

MR. PARCELL:  I would ask that Government Exhibit 63 be accepted.

THE COURT:  It will be admitted.

MR. GEARY:  I'd like to approach the bench.

(At Bench.)

MR. GEARY:  She stayed on this shot on the video about 20 seconds.  It is unbelievably gruesome to stay on that picture 20 minutes.  This is the same thing.  I ask that the jury not get this.

THE COURT:  No.  Your objection is overruled.  It will be admitted.

THE COURT:  Anything else?

MR. PARCELL:  I'm waiting for these photographs.

(In Open Court.)

BY MR. PARCELL:

Q   I ask you to look at what's been labeled Government 64-1 through 5.  Would you please approach the jury, with the Court's permission, and tell the jurors what those photographs represent?

THE COURT:  Go ahead.

(Witness approached jury.)

THE WITNESS:  This photograph here is showing the front of the vehicle with the  --  with one of the victims lying outside by the car.

BY MR. PARCELL:

Q   Please describe the photograph number you are talking about.

A   64-1.  And this location here, right here, is where one of the victims was against the curbline up above the front of the car.

Q   That victim on the curbline was gone by the time you got there?

A   Yes, sir.  The only subjects that were there were the two gentlemen when I arrived.

This is a photograph showing Number 64-2, showing the vehicle, and Curtis Thorne lying outside of the vehicle as he was when I arrived.

64-3 is another photograph a little closer up showing Curtis Lee Thorne with the blood and all that and the glass fragments on the ground.  64-4 is a close-up of the face of Curtis Thorne when I arrived at the scene.  64-5 is a photograph of a cartridge case and blood and glass fragments lying in the front seat of the vehicle on the right side.

Q   I'll ask you to also look at this.  Did you request an aerial photograph of the crime scene made for you as far as your case preparation?

A   Yes, sir, I did.  This is an aerial photograph showing Stony Run.  It runs from Williamsburg Road to Government Road.  The little arrow here is approximately where the car was parked, the little black arrow right in the center, showing approximately where the vehicle was parked against the curbline.

Q   Did your photograph indicate whether or not there are any trees close to that roadside or near that automobile?

A   On the right side, just before where the vehicle was parked, there was a telephone pole with transformers on it, and there is some trees and things just to the right of that.

Q   Looking at your aerial photograph, where the arrows point towards the automobile, behind that to the right of that arrow is there also a tree close to the crime scene?

A   Yes, sir.  There is one little small tree right

**JA1158**

there against the curbline almost.  Then there is a group of trees down.  As you get in this area right here, right there, it starts and goes down a little embankment a little ways and then goes into a level field.

MR. PARCELL:  This will be Government Exhibit 65, please.

THE COURT:  Admitted.

MR. PARCELL:  I would move the admission of 64-1 through 5?

THE COURT:  They will be admitted.

MR. PARCELL:  As well as 165, when counsel reviews it.

THE COURT:  All right.

MR. PARCELL:  Pass the witness.

THE COURT:  Mr. Geary?  65 will be admitted.

CROSS-EXAMINATION

MR. GEARY:  Can you have Exhibit 65 shown to the witness?

BY MR. GEARY:

Q    Detective Searles, the area there is basically abandoned, is it not?  There is nothing there.

A    That's correct.  There is no houses or anything on that.

Q    On the city side, the west side, there is a Stony Run culvert; is that correct?

A    Yes, sir.  Well, I would say to the north of that would be the culvert.

Q    On the other side there is fields, grass, and woods at least to a baseball field?

A    Yes, sir.  There is a baseball field just above out in the field.

Q    The only lighting in the area from Williamsburg Road and Government Road are the streetlights; is that correct?

A    To my knowledge, that's the only lights on the street.  That's right.

Q    The fact that the area on Williamsburg Avenue, when you turn into Stony Run, is it much better lit on Williamsburg Avenue than on Stony Run?

A    I don't recall.

Q    Williamsburg Avenue is a four-lane road that leads into Stony Run?

A    That's correct.

MR. GEARY:  Thank you.

MR. McGARVEY:  No questions, Your Honor.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  All right.  You may stand down.

(Witness stood aside.)

**JA1159**

Call your next witness.

MR. PARCELL:  Anne Jones, please.  I will need 46, 49, and 104, please.

ANNE DAVIS JONES, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, once again, please state your name.

A    My name is Anne Davis Jones.

Q    Are you the same lady who has been testifying in regard to the firearms and ballistics reports in these respective cases?

A    That's correct.

Q    I'll ask you to look at what's been labeled Government Exhibit 46 and 49.  Start with Exhibit 46, please.  Would you please relate whether or not you have seen those items before and made an analysis of those items?

With regard to the items that came out of the bag, Government Exhibit 46, there is an indication there how many shell casings did you examine from the East Clay Street triple murder?

A    I examined ten cartridge cases.

Q    Are those ten casings in front of you?

A    Yes, they are.

Q    How many bullets did you examine from that crime scene, also?

A    I examined three bullets.

Q    And they came to you from Detective Brunelli from the house at 29th and Clay?

A    Came from Detective Brunelli.  Yes, sir.

Q    Did you do a comparison analysis of those casings and bullets?

A    Yes, sir.

Q    Would you please tell the ladies and gentlemen of the jury what the result of that examination was in regard to a known weapon?

A    Yes, sir.  The ten cartridge cases were all identified as having been fired in the Government Exhibit 104, the Glock pistol.  The Item Number 9 bullet and the Item Number 14 bullet were identified as having been fired from the Government Exhibit Number 104, the Glock pistol.  The Item Number 8 bullet had rifling class characteristics like those produced by the Government Exhibit 104, the Glock pistol.  However, it was my opinion that was insufficient corresponding microscopic markings to identify or eliminate this bullet as having been fired from Government Exhibit 104, the Glock pistol.

Q    In regard to Exhibit 14, which is to your right,

**JA1160**

that bullet came from the body of Dorothy Armstrong; is that correct?

A    I don't know that, sir.

Q    Is that identified as having been shot from Government Exhibit 104?

A    Card marked autopsy 6892.  There is no name on it.

Q    After you did your testing, did you have occasion to prepare a Certificate of Analysis based

2487

on your examination?

A    Yes, sir, I did.

Q    I'll hand you this, ma'am, and advise as to whether or not that's the firearms report you prepared.

(Document proffered to witness.)

A    Yes, sir, this is.

MR. PARCELL:  That will be Government Exhibit Number 44, please.

THE COURT:  Admitted.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions, Your Honor.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  Thank you, Ms. Jones.  You may stand down.

(Witness stood aside.)

MR. VICK:  Good news and bad news.  The good news is that we are almost done.  We might even finish up tomorrow afternoon, possibly into Thursday afternoon.  The bad news, we need a ten-minute break right now to see a witness who just showed up during lunch before taking the witness stand.  It will be the next witness in order.

2488

THE COURT:  Ten minutes.

(The jury left the courtroom.)

Remove the defendants.

(The defendants were removed from the courtroom.)

(A recess was taken from 3:00 p.m. to 3:17 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL:  Charlotte Denise Moore.

## Charlotte Denise Moore (2488)

CHARLOTTE DENISE MOORE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

**JA1161**

Charlotte Denise Moore (Direct)

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?
A    Charlotte Denise Moore.
Q    Your age?
A    24.
Q    Have you ever been convicted of a felony?
A    No.
Q    Have you ever been convicted of any misdemeanors involving lying, cheating, or stealing, such as petty larceny or concealment?
A    Yes.
Q    How many?
A    One.
Q    What year was that in?
A    1988.
Q    What educational background do you have?
A    High school graduate.
Q    What work background do you have?
A    High school education?
Q    What work background do you have?
A    Telemarketing.
Q    Turning your attention to February 5th, 1992, did you have occasion to go to Southern Gun World?
A    Yes, I did.
Q    For what purpose?
A    To purchase guns.
Q    And who were you purchasing guns for?
A    For "Whitey," "Studie," they were together.
Q    Who is "Studie?"
A    My boyfriend.
Q    Who is "Whitey?"
A    "Whitey" there.
Q    Do you see him in the courtroom?
A    Yes.

Q    Would you describe for the jury what he is wearing?
        MR. GEARY:  Stipulate identification.
        THE COURT:  All right.
BY MR. PARCELL:
Q    You indicated that "Studie" gave you the money to go purchase the weapons for "Whitey"; is that correct?
A    Yes.
Q    Who went with you to Southern Gun World?
A    "Studie."
Q    Who told you what to purchase?
A    "Studie" did.
Q    Who gave you the money to make the purchase?
A    "Studie."
Q    I'll show you what's been labeled as Government Exhibit 92.

**JA1162**

MR. PARCELL: Judge, there is a stipulation between the government and the defense counsel that these are the true and accurate records of Southern Gun World, now called Southern Police Equipment. And they have agreed to their authenticity.

BY MR. PARCELL:

Q   I ask you to look at Government Exhibit 92. Can you identify that document?

A   Yes.

Q   What is it?

A   The receipt for the guns.

Q   Is that your name on top of that receipt?

A   Yes.

Q   Is that the address you gave Southern Gun World?

A   Yes, it is.

Q   When you went in to purchase the weapons, did you give your date of birth and Social Security Number and your accurate name?

A   Yes.

Q   They ran a criminal history on you to make sure you are were okay to make a purchase?

A   Yes.

Q   How much time did you have to wait before purchasing the weapons?

A   Maybe 15 minutes.

Q   What kind of weapons did you buy; do you know?

A   They were Glocks.

Q   Were you familiar with what a Glock is?

A   Not then, no.

Q   Had you been promised something for purchasing those two Glocks?

A   Well, "Studie" told me he was going to pay me $100 for buying them.

MR. PARCELL: They will be Government Exhibit 92, please.

THE COURT: Admitted.

BY MR. PARCELL:

Q   I show you what's been labeled as Government Exhibit 93. Can you identify that document?

(Document proffered to witness.)

A   A form I filled out to buy the guns.

MR. PARCELL: That's Government Exhibit 93, please.

THE COURT: Admitted.

BY MR. PARCELL:

Q   After you got your criminal history approved by the gun dealer, you purchased the two Glocks and gave them what for the Glocks?

A   What do you mean, how much money I had?

Q   Yes, ma'am, if you recall the exact amount.

A   I can't recall the exact amount.

**JA1163**

Q   I will ask you be given Government Exhibit 92.
    (Document proffered to witness.)
A   $982.
Q   Who gave you that money?
A   "Studie" did.
Q   After you all purchased the weapons, did you all get back in you all's automobile?
A   Yes.
Q   Who was in the car at that point in time?
A   No one.  Both of us were there.
Q   Did you all go somewhere?
A   Yes.
Q   Where did you go?
A   To "Studie's" mother's house.
Q   When you got out of the automobile, did you go inside the house?
A   Yes.
Q   Did you take the guns with you?
A   Actually, "Studie" carried the guns.  I didn't carry them.
Q   When you got inside the residence, was anybody else there at the house besides you and "Studie?"
A   Yes.
Q   Who?
A   "Whitey."
Q   Same gentleman you pointed to a few minutes ago?
A   Yes.
Q   After you all entered the house, did "Studie" and "Whitey" go off by themselves?
A   Yes, went in the kitchen or the bedroom.

Q   When "Studie" went into that room, did he have the guns with him?
A   Yes.
Q   When he came out, did he have the guns with him?
A   No.
Q   Did you see "Whitey" or the guns any more at his mother's house?
A   No, because he took me home after that.
Q   Who took you home?
A   "Studie" did.
Q   That was on February 5th?
A   Yes.
Q   Later on that evening, did you have occasion to see "Whitey" again?
A   Yes.
Q   Where was that?
A   At my girlfriend's house.
Q   Is that where you were staying?
A   Yes.
Q   Her name is what?

**JA1164**

A    Gloria Burgess.
Q    What's her address?
A    I think it is 2015 Halifax now.
Q    Prior to the February 5th date, how long had you

known "Whitey?"
A    Probably as long as I've known "Studie."
Q    A year, year-and-a-half?
A    Almost two years, or a year-and-a-half, yes.
Q    When you saw "Whitey" back at Gloria's house,
did you all have a conversation or transaction then?
A    He just gave me the hundred dollars.
Q    Who gave you $100?
A    "Whitey" did.
Q    For what?
A    For purchasing the guns.
Q    Did he have any further conversation with you
about the guns at that particular time?
A    Other than to report them stolen, that's about
it.
Q    Tell the ladies and gentlemen of the jury about
that.  What do you mean to report them stolen?
A    Just after a certain amount of time, to report
them stolen.  That's about it.
Q    To whom?
A    The police department.
Q    Did he tell you why he wanted you to do that?
A    No.
Q    Ma'am, do you know a woman by the name of Pam
Williams?

A    No.
Q    Had you ever seen anything unusual about
"Whitey?"
A    Just that he chewed on a razor blade.  Other
than that, that's about it.
Q    I'm sorry?
A    Just that he chewed a razor blade.
Q    During that time period both before and after
February 5th, did you see him on somewhat of a
regular basis?
A    Right after that?
Q    Yes, ma'am.
A    Yeah.
Q    Why was that?
A    Because he was staying  --  he stayed there at
my girlfriend's house.
Q    Every day, or just periodically?
A    I think every day for awhile.
Q    And do you know what "Whitey" did for a living
to your own personal knowledge?
A    Sold drugs.
Q    What kind of drugs?
A    Crack cocaine.

**JA1165**

MR. PARCELL: Pass the witness.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Ms. Moore, were you using crack during this period of time?

A    No, I wasn't.

Q    Were you using crack before this?

A    Before then?  Yes.

Q    For how long were you using crack?

A    I guess about a year.

Q    Who were you getting it from?

A    These people, these other people.

Q    Tell the jury who the other people are.

A    I don't even remember them.  It has been awhile.

Q    You know who they are.  Come on.

A    No, I don't know who they are.

Q    How many different people did you buy drugs from?

A    I don't know.  I've always had friends who were getting it.

Q    This is over where you live at Gloria Bridges' in Southside?

A    No, this was before I moved over there.

Q    Where were you buying drugs, what area?

A    Jackson Ward area at that time.

Q    You and "Studie" were both addicted to crack, using crack?

A    Yes, we was.

Q    Did the government, Mr. Parcell and Mr. Vick, tell you before you walked in here today that the purchase of those guns that you made was illegal?

A    Yes, they did.

Q    Did they tell you that you were going to be charged with a violation of the law for buying those guns?

A    No.  Not as long as I basically told them  --

Q    As long as you cooperated?

A    Right.

Q    They told you if you didn't come in and testify, you were going to be charged with a federal gun violation, right?

A    They didn't say that.  They said I would get immunity because I testified.

Q    You have immunity?

A    I guess that's the term they use.

Q    What does it mean to you?

A    That I am not going to go to jail.

Q    As long as you testify, correct?

A    As long as I tell them what happened.

Q    "Studie" Green, his real name is what?

A    Thomas Green.

**JA1166**

2499

Q    What's his mother's address?
A    2710 Catchpenny Road.
Q    That's in Central Gardens?
A    Yes.
Q    You know who the members of his family are?
A    Yes.
Q    Do you know his brothers?
A    Yes.
Q    Was "Studie" getting his crack from his brothers?
A    I believe so.
Q    How about you?  Were you getting it from them, too?
A    No.
Q    You and "Studie" are boyfriend and girlfriend, and he is getting his crack from his brothers and you are getting your crack from somebody different?
A    Not at that time.  I didn't say that.  You asked me when did I  --  who was I buying it from or when.  I said it has been about a year ago.  That was in Jackson Ward.  "Studie" purchased what he got from his brothers at that time.
Q    Did you and "Studie" use the same drugs together?
A    Did we?

2500

Q    Yes.
A    Yes, we did.
Q    What period of time was it that you say that Richard Tipton was living or staying with Gloria Bridges?
A    Around the time when I purchased the guns.
Q    That date is 2-5-92, right?
A    Right.
Q    Was he over there before 2-5-92?
A    I think so.  I'm not sure.  I can't really remember exactly.
Q    Were you there every night?
A    I had been staying with her for about two or three weeks.
Q    Was he there every night from the time you started staying there?
A    I think so.  Yes.  I'm not sure, but I think so.
Q    Tell the jury where Halifax is, where in Southside?
A    South Richmond, off of Jefferson Davis.  If you go left on Halifax, it is the 2000 block.  That's where she lives now.
Q    Was she living there back then?
A    No, on Lynnmore at the time when I was staying

2501

with her.

**JA1167**

Q    Say that street again.
A    Lynnmore.
Q    Were you in an apartment or house?
A    It was a house.
Q    How long do you think Richard Tipton was living there?
A    A couple weeks off and on, I guess.
Q    Did he have a car?
A    Not that I know of.
Q    Did he have any furniture?
A    Not that I know of.  You mean there in her house?
Q    Yes.
A    No.
Q    You said in answer to the prosecutor's question that as far as you could tell, he earned his living by selling drugs; is that correct?
A    That's pretty much known around the whole neighborhood.
Q    Tell the jury what you saw to make you conclude that he was selling crack; what did he do to make you think that?
A    Well, nothing really.  He just was known because most of us  --

2502

Q    You are testifying based on what people knew about him; is that correct?
A    Yes.
Q    Did you see him smoke marijuana?
A    Yes.
Q    On a regular basis?
A    No.  It wasn't around on a regular basis.
        MR. GEARY:  No further questions.
        MR. McGARVEY:  No questions.
        MR. HENDERSON:  No questions.
        MR. WAGNER:  No questions.
        THE COURT:  All right.  May the witness stand down?
        MR. VICK:  Yes, Your Honor.
        THE COURT:  You may stand down.  Thank you very much.
    (Witness stood aside.)
    Call your next witness.
MR. VICK:  Santo Gutierres.

## Santo Gutierres (2502)

                SANTO GUTIERRES,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
                DIRECT EXAMINATION
BY MR. VICK:

2503

**JA1168**

Santos Gutierres (Direct)

Q    Could you state your name for the Court, record, and jury, please?
A    Santo R. Gutierres.
Q    How are you employed?
A    Employed by New York City Transit Police Department.
Q    How long have you been so employed?
A    Two years.
Q    You were employed in that capacity on February 29th, 1992?
A    Yes, sir.
Q    On that date, did you have occasion to come in contact with a person who subsequently identified himself to you as Kevin Hill?
A    Yes.
Q    Could you state to the ladies and gentlemen of the jury the circumstances surrounding your encounter with Kevin Hill that day?
A    I was plainclothes at 125th Street.  I observed Kevin Hill jumping over a turnstile, which is a misdemeanor.  As I approached him  --
Q    Is this in the subway?
A    In the subway system.  I approached him.  He had no identification.  So at this point in time he was under arrest.  Before I approached to search him, he turned around and said, "Oh, by the way, officer, I have a gun."
Q    Did you subsequently search him and recover that gun?
A    Yes.  The gun was recovered from his jacket pocket.
Q    I'm going to show you what's been previously marked Government Exhibit 123.  And I ask you if you can identify that item.
     (Exhibit proffered to witness.)
A    Yes.
Q    What is that item?
A    It is a 9mm Glock recovered from his jacket.
Q    Located within Government Exhibit 123 are a number of 9mm cartridges, bullets.  Were those also recovered at that time?
A    Yes.
Q    And located also in Government Exhibit 123 are two  --  are cartridge cases, clips, that fit within that Glock.  Were they also recovered?
A    Yes.
Q    Recovered from whom?
A    From the jacket.
Q    And do you see the person who identified himself as Kevin Hill sitting in the courtroom today?  Take your time, stand up, look around if you need to.
A    Yes.

**JA1169**

Q   Could you point out Kevin Hill?
A   Right there wearing a white sweater.
Q   Where is he seated?
A   Second one, first row.
        MR. VICK:  Could the record reflect the identification of defendant Cory Johnson?
        THE COURT:  All right.
BY MR. VICK:
Q   How did you get the name Kevin Hill?
A   When we took him to Command, he informed us that his name was Kevin Hill.  On doublesaul. (Phoenetic spelling.)
Q   That means what?
A   He is homeless.
Q   He was arrested on what charge?
A   Criminal possession of a weapon.
Q   I show you what's been marked Government Exhibit 144 and Government Exhibit 145 and ask you if you can identify those items.
    (Photographs proffered to witness.)
A   Yes, one is a picture of Kevin Hill when he was taken into Command.  This is a picture of the Glock and the rounds.

2506
Q   What happened to those charges against Kevin Hill?
A   They were brought up on him on a criminal possession of a weapon and theft of service.
        MR. VICK:  I move Government Exhibit 144 and 145 into evidence.
        THE COURT:  Admitted.
BY MR. VICK:
Q   Did you seize anything else from Kevin Hill that day?
A   He had keys and a beeper.
Q   And Kevin Hill is the same person?
A   Correct.
        MR. VICK:  I have no further questions.
        MR. GEARY:  No, Your Honor.
                CROSS-EXAMINATION
BY MR. McGARVEY:
Q   Good afternoon, Officer Gutierres.
A   Good afternoon.
Q   Sir, since you have come down here to testify, have you been shown a picture of Mr. Johnson?
A   No.
Q   You have not seen a picture of Mr. Johnson at all?
A   Just the one I took of him when he was in New

2507
York.
Q   You indicated that when you stopped the person you identified as Mr. Johnson, you indicated that he had jumped the turnstile; is that correct?

**JA1170**

A    Correct.
Q    And prior to your doing  --  he was under arrest at that point, correct?
A    At that point in time he was under arrest.
Q    You were going to do a search of him?
A    Yes.
Q    Prior to doing that, he volunteered this weapon to you, told you that he had the gun?
A    Correct.
Q    Did he give you any problem?
A    No, sir.
         MR. McGARVEY:  Thank you, sir.
         THE COURT:  Any questions?
         MR. BAUGH:  No questions.
         MR. WAGNER:  No questions.
         THE COURT:  Thank you, sir.  You may stand down.
    (Witness stood aside.)
    Call your next witness.
         MR. PARCELL:  Anne Jones, please.  We would move the introduction of Government Exhibit 123, and

2508

I would ask that they be given to the next witness.
         THE COURT:  Admitted.
         MR. PARCELL:  We will also need government Exhibits 62 and 63, please, if I may have those.

## Anne Jones (Chiles/Thorne) (2508)

**FRG Note: for some reason no cross here that only one gun used. See next A. Jones testimony *infra*.**

              ANNE DAVIS JONES,
recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:
         MR. PARCELL:  Government Exhibit 62 are the bullets and casings that Detective Searles recovered at the Linwood Chiles/Curt Thorne crime scene. Government Exhibit 63 are the bullets recovered from the bodies at the Medical Examiner's Office.
              DIRECT EXAMINATION
BY MR. PARCELL:
Q    Ma'am, once again, your name?
A    My name is Anne Davis Jones.
Q    Ma'am, did there come a point in time that you received from Detective Searles certain bullets for comparison, which has been labeled as Government Exhibit 62?  I'll show you those and see if you can identify those.
    (Exhibits proffered to witness.)
    (Witness perusing exhibits.)
A    Yes, sir.

2509

Q    Did there come a point in time that Detective

**JA1171**

Anne Jones (Direct)

Fleming, the gentleman over here, brought you a weapon labeled Government Exhibit 123?
(Exhibit proffered to witness.)

A    Yes, sir.

Q    In regards to Item Number 1 of the items that Detective Searles submitted to you, did that .32 casing have any bearing on that weapon?

A    No, sir.

Q    Item Number 2, please?  Describe what it is.

A    Item Number 2 was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired from the Government Exhibit Number 123, the Glock pistol.  Item Number 3 was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired from Government Exhibit Number 123, the Glock pistol. Item Number 7 was a Remington-brand caliber 9mm luger cartridge case which was identified as having been fired in Government Exhibit 123, the Glock pistol. Item Number 8 was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit Number 123, the Glock pistol.  Item Number 9-A is a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit 123, the Glock pistol.

Number 9-B was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit Number 123, the Glock pistol.  Number 9-C was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit Number 123, the Glock pistol.  Do you want me to continue?

Q    Yes.

A    Number 10 was a bullet, jacketed bullet, which was identified as having been fired from the Government Exhibit 123, the Glock pistol.  Number 11 was a jacketed 9mm bullet which was identified as having been fired from the Government Exhibit Number 123, the Glock pistol.  Number 12 was a Remington-brand caliber 9mm luger cartridge casing which was identified as having been fired in the Government Exhibit Number 123, the Glock pistol.

Number 13 was a bullet jacket which had general rifling class characteristics like those produced by this pistol.  However, it was my opinion that there were insufficient markings to identify or eliminate this as having been fired from this Government Exhibit 123, the Glock pistol.  Number 14 was a lead fragment not suitable for comparison.  Number 18-A was glass fragment in grass which were not examined.

Number 18-B was a bullet fragment and lead fragments which were not suitable for comparison purposes.

Q   I'll show you what's been labeled 19-A and 19-B, collectively Government Exhibit 63, which is identified as having come from the body of Linwood Chiles.  Could you please tell us whether or not those bullets had significance to your examination?

A   Yes, sir, I did examine these bullets.

Q   What result did you conclude?

A   19-A is a bullet, a jacketed bullet caliber 9mm luger which was identified as having been fired from the Government Exhibit Number 123, the Glock pistol. 19-B was a bullet jacket and core which was identified, the bullet -- the jacket was identified as having been fired from Government Exhibit 123, the Glock pistol.

Q   Do your notes reflect the serial number of the Glock weapon identified as Government Exhibit 123?

A   Serial number?

Q   Yes, ma'am.

A   My report says a serial number.

Q   What's that?

A   YN533US

Q   Is that the same number as the weapon Number 123?

A   On this particular weapon?

Q   Yes, ma'am.

A   I need to open it.

(Witness perusing exhibit.)

Yes, sir, it is.

BY MR. PARCELL:

Q   After you did your testing on both the crime scene bullets and casings, and the bullets from the Medical Examiner's Office that came from Mr. Chiles, did you have occasion to have a Certificate of Analysis report?

A   Yes, sir, I did.

Q   I'll show you what's been entered as Government Exhibit 61, ma'am.

(Document proffered to counsel and witness.)

Can you identify that exhibit, please?

A   Yes, sir.  This is the last report I issued on these items.

MR. PARCELL:  That would be Government Exhibit 61, please.

THE COURT:  Admitted.

MR. PARCELL:  Pass the witness, Judge.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  All right.  You may stand down.

Thank you.
(Witness stood aside.)
      MR. PARCELL:  Officer Cynthia Riley,
please, R-I-L-E-Y.

## Cynthia Riley

                  CYNTHIA RILEY,
called as a witness by and on behalf of the
government, having been first duly sworn by the
Clerk, was examined and testified as follows:
      MR. PARCELL:  May I have Government Exhibit
54 and 64, please?
                  DIRECT EXAMINATION
BY MR. PARCELL:
Q     Please state your name.
A     Cynthia Riley.
Q     Your occupation, ma'am?
A     Richmond Bureau of Police, Patrol.
Q     How long have you been a police officer?
A     For a year.
Q     Were you so employed as a Richmond city police
officer on February 19th, 1992?

2514

A     Yes.
Q     Did you have occasion to respond to the Stony
Run Drive located in the eastern section of the
city?
A     Yes.
Q     Why did you go there?
A     At approximately 2:36 I received a radio call
for a multiple shooting on Stony Run Drive.
Q     You were directed to that location?
A     Yes.
Q     Were you the first police officer to arrive?
A     No, I wasn't.
Q     How many other units were there when you
arrived?
A     There was one other unit, Officer McKinney.
Q     You all arrived simultaneously?
A     That's correct.
Q     When you arrived, please tell the ladies and
gentlemen of the jury what if anything you observed
or found.
A     Okay.  I observed a 1980 Chevy, license plate
HGI-188, 1992.  It was parked on the side of the
road.  The rear passenger door was opened.  There was
a black male and black female on the front seat, one
female in front of the vehicle on the passenger's

2515

side, and one black male lying in the rear of the
passenger's side of the vehicle.  Both of the males
at the time were deceased and the two females were
still alive.

**JA1174**

Q    I'll show you what's been labeled as Government Exhibit 54-1, 2, and 3.  Advise us as to whether or not that actually represents things as they were when you arrived.
        (Witness perusing photographs.)
A    Yes, it was.
        MR. PARCELL:  I would ask she be allowed to approach the jury and explain where folks were when she got there.
        THE COURT:  All right, fine.
    (Witness approached jury.)
        THE WITNESS:  This is the driver's seat where the male was that I found.  He was at this location when I found him.
BY MR. PARCELL:
Q    As you are describing these photographs, give the number of the photograph.
A    This is photograph 54-2.  This is the black male that was in the passenger's seat when I arrived at the scene.  54-3 just shows another view.  There was a black female beside him at the time.  She is not in the picture.
Q    You indicated in 54-2 that that black male was in the passenger's seat.
A    Driver's seat.
Q    Directly across from him in the front seat was a what?
A    Black female.
Q    Did you notice whether or not she had been wounded?
A    Yes.
Q    Could you tell from your observations where she had been shot?
A    No, I couldn't.
        THE COURT:  Where was the black female?
        THE WITNESS:  I'm sorry, there was a black male and black female in the front seat.  She was in the front passenger's seat of the vehicle.
BY MR. PARCELL:
Q    That's shown on Government Exhibit 54-3.
A    Yes.
Q    What's been labeled Government Exhibit 64-1 through 64-5, would you please stand in front of the jury and describe each photograph and give each number?
A    Okay.  64-1 will be the black male that was laying on the passenger's side of the vehicle towards the front of the vehicle when I arrived there.
Q    With the use of that photograph, could you tell the ladies and gentlemen of the jury whether or not that photograph shows where the black female is located on your arrival in that photograph?

**JA1175**

A     No.  Not in this photograph.

Q     Proceed.

A     64-2 is another view of the same black male lying out in the street.  64-3 is just another shot of the same black male laying on the ground.  64-4 is a picture of the victim up close as he was laying on the ground.

Q     You indicated he was deceased upon your arrival?

A     Yes, he was.

Q     64-5?

A     64-5, I don't know if this is the front or back, I don't remember.  I remember they did find bullets in the vehicle.  But I don't remember.

BY MR. PARCELL:

Q     64-1, would you explain to the ladies and gentlemen of the jury where you found the female outside the vehicle?

A     The female was towards the front of the vehicle on the passenger's side, in front of the vehicle.

Q     Could you show us with your finger approximately where she was?

A     She was about right in here (witness indicating).

Q     Where the blood was?

A     Yes.

Q     That was on that side of the vehicle?

A     Yes.

Q     You found a black female and black male in the front seat?

A     That's correct.

Q     A black male and black female outside the vehicle?

A     That's correct.

Q     As you were there guarding the crime scene, did the EMT and the fire department arrive for rescue?

A     The ambulance crews did arrive there. Truthfully, I can't remember if the fire department responded.  I'm sure they did; they normally do.  The ambulance crews were there.

Q     They responded by removing both females and taking them to MCV?

A     That's correct.

        MR. PARCELL:  I have no further questions of this witness.  I'll pass the witness.

        THE COURT:  Any cross?

            CROSS-EXAMINATION

BY MR. GEARY:

Q     The 10:36 time that you mentioned, is that the call received or is that the time you responded to the 1100 block of Stony Run?

A     I received the call at 22:36.

Cynthia Riley (Cross)

Q    What time did you respond to Stony Run?
A    I don't recall the exact time I got there.  It took me approximately three minutes.
Q    And you and Officer McKinney in separate cars arrived at the same time?
A    That's correct.
Q    Okay.  What time did you leave the scene?
A    I couldn't honestly tell you.
Q    Do you recall being there for an hour or two?
A    We were there for an extensive period of time.
Q    Who was in charge of the crime scene?
A    Let's see, at the time there was numerous detectives there.  I know when the forensic unit got there, Detective Searles got there, he took over the crime scene.  Detective Blaylock was also there.
Q    Detective Blaylock is a homicide detective?
A    Yes, I believe he is.

Q    During the time that you were there, did anybody, any citizen, approach you and tell you they knew anything about the shooting?
A    Yes.  I had several citizens come up to me.
Q    Tell us their names, please?
A    Brenda Richardson and Marcia Woods.
         MR. PARCELL:  For the record, that should be Marcella Woods.
         MR. GEARY:  I would appreciate if the witness would testify rather than Mr. Parcell.
         THE COURT:  Overruled.
BY MR. GEARY:
Q    Were they there when you got there?
A    Yes.
Q    They were on the scene?
A    They were not at the scene.  They had come up right after we had roped it off and they came up to give me their testimony, told me what they had seen.
Q    The area where the shooting took place, is that within your beat area?
A    Yes.
Q    Stony Run, there are no houses or businesses on that road?
A    No.
Q    Except for the lighting from the overhead lights, there are no lights?
A    That's correct.
Q    It is a dark street used by people to get from Williamsburg Avenue to Government Road?
A    That's correct.
Q    From Williamsburg Avenue, approximately how far into Stony Run was the station wagon located?
A    It was  --  well, I couldn't tell you the exact distance.  It was closer to Government than I believe it was to Williamsburg Avenue.

**JA1177**

Ralph Fleming (Direct)

Q    Closer to Government?

A    Yes.  You could see it from Admiral Gravely Boulevard.

MR. GEARY:  Thank you.  I have no further questions, Judge.

THE COURT:  Any questions, Mr. Cooley or McGarvey?

MR. COOLEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  All right.  Thank you.  You may stand down.

(Witness stood aside.)

MR. VICK:  Detective Fleming.

RALPH FLEMING,

recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    You have been previously placed under oath. Detective Fleming, did you have occasion to recover Government Exhibit 123, which has been previously identified by Officer Santo Gutierres?

A    Yes.

Q    From him?

A    I retrieved it from the New York Police Department property section on July 8th, 1992.

Q    And brought it back to Richmond?

A    Yes, I did.  And it was submitted to the state lab.

Q    Have you had occasion to check the serial number on Government Exhibit 123, that Glock, to the serial number on Government Exhibit 93, the ATF purchase form executed by Charlotte Denise Moore?

A    Yes, I have, and it is one and the same.

MR. VICK:  I have no further questions.

MR. GEARY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

MR. McGARVEY:  No, Your Honor.

MR. VICK:  May we approach?

(At Bench.)

MR. VICK:  It is not his fault or our fault; our witness should have been here but he is not.  And our other witnesses we thought would take us to 4:30.  Our other witnesses, Priscilla and "Pepsi." They are not ready until tomorrow morning.

THE COURT:  We will stop.

(In Open Court.)

All right, we are going to stop now and have you return tomorrow at 10 o'clock a.m.  Let me say this,

**JA1178**

just in the outside possibility that we had severe inclement weather on tomorrow morning, I don't expect that, but they say it is a possibility.  I think we have all of your phone numbers.  I want you to make sure before you leave, either see my Clerk or the jury clerk to make sure you give us a number that you can be called at in the morning in case we decide that we can't be in session tomorrow.  And generally, if we do decide that the weather is so bad that we can't be in session tomorrow, it will be broadcast on radio.  I guess 1140.  If you would put it on AM 1140, and we will try to get to you directly in case that happens.

Again, it will have to be serious.  We don't expect it.  But they have indicated some possibility of snow tomorrow.  So I just wanted to tell you that.

All right, everyone remain seated while the jury leaves the courtroom.

And remember what I told you about not watching TV or reading the newspaper regarding the case.

(The jury left the courtroom.)

All right, you may remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in adjournment.

(Proceedings adjourned at 4 o'clock p.m.)

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                    RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,



                        Plaintiff;

     v.                             CRIMINAL ACTION
                                         92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

------------------------------------------
                     VOLUME XII

                  January 27, 1993
                  Richmond, Virginia
                     10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

                     P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

**JA1181**

Johnson, James H. Roane, Jr., and Sandra Reavis, the twelfth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. WHITE:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

MR. VICK:  Before Mr. White gets up, I placed, I believe, on the Court's desk the written motion.

THE COURT:  I have it.

MR. VICK:  And I also placed a supplemental jury instruction.

THE COURT:  All right.

MR. WHITE:  Your Honor, if the Court please, it is my understanding that the government intends to call Priscilla Greene and "Pepsi" Greene to testify this morning.  Based on my review of the medical records during the course of discovery, it is our impression that both of these women sustained very, very serious neurological damage.  Since both women have refused, through the United States Attorney's Office, to speak with us, under the circumstances we would ask the Court to conduct some voir dire to determine if they are competent to testify, given the injuries and the neurological injuries.

THE COURT:  Denied.

MR. BAUGH:  We join.

MR. McGARVEY:  We join.

THE COURT:  Denied, denied, denied.

All right, let's bring in the jury.

(The jury entered the courtroom.)

Call your next witness, government.

MR. PARCELL:  Walter Tuck, please.

WALTER TUCK, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    Walter Tuck.

Q    Where do you work?

A    Reynold's Metals here in Richmond.

Q    Did you work at that place of employment on February 19th, 1992?

A    Yes, sir.

Q    Do you normally take the same route from your home to your place of work?

A    Yes, sir.

Q    Putting yourself on Government Road  --

**JA1182**

Walter Tuck (Direct)

MR. GEARY:  Please have the witness testify rather than the prosecution.

MR. PARCELL:  It is all preliminary.

MR. GEARY:  I don't believe it is preliminary.

THE COURT:  Overruled.

BY MR. PARCELL:

Q    Putting yourself on Government Road heading towards the City of Richmond, describe to the jury where you make your first turn going to your place of employment.

A    Make a left on Stony Run Road and go to Williamsburg Road, make a right, go to Main, and then 14th Street and go to work.

Q    Is that the route that you chose to use on February 19th, 1992?

A    Yes, sir, I go that way every night.

Q    I will show you what's been labeled Government Exhibit 65.  Does that photograph represent the stretch of highway you passed on Stony Run Road?

2529

A    Yes, sir.

Q    And is that the part of the highway you traveled on February 19th?

A    Yes, sir.

Q    And do you recall what time of day or night you were going down Stony Run Drive?

A    It was 10:17 p.m.

Q    How do you know that is the exact time?

A    I heard it on the radio when I came through.

Q    What kind of vehicle were you operating?

A    Pickup truck.

Q    Small pickup or large?

A    Full-sized pickup truck, four-wheel drive.

Q    Do you have anything different on the front of your vehicle than came from the factory?

A    I have a snowplow with booster springs.

Q    Any additional lighting?

A    Two headlights above the hood so I can see the snowplow when I have the blade on it.

Q    Were all your lights working that evening?

A    Yes, sir.

Q    Can you tell these ladies and gentlemen of the jury what if anything you saw as you were heading towards Williamsburg Road?

A    I turned off of Government Road onto Stony Run,

2530

and there is a curve bearing around to the right, and then you come around to the left and you straighten out.  As I straightened out, I saw something fly up in the air and it caught my lights.  When I got straight in the road like where it straightened out my headlights, I saw a car and I thought that somebody had been hit by a car.  When I got up there,

**JA1183**

Walter Tuck (Cross)

I slowed down a little bit. And there was a lady laying in front of the car with blood around her head. I cut my headlights off and took off. I got into Stony Run where it runs into Williamsburg Road to make a right and I was going to the top of the hill to Mr. Akers' place to use the phone, and the police was coming with the lights and everything. So I didn't bother making a phone call.

Q    Did there come a point in time that you notified the police of what you had seen?

A    Yes, sir.

Q    As you were going down Stony Run, was the vehicle that you passed on your left or right?

A    My left, going back toward Government Road.

Q    Do you recall what kind of vehicle it was?

A    No, not really. I wasn't paying that much attention to the vehicle.

Q    Did you see any other persons other than the lady laying in front of the vehicle bleeding?

A    There was a man walking away from the vehicle heading towards the church or those houses over there, walking down a little embankment. All I could see was from the waist up.

Q    What did you see from the waist up?

A    Had on like a light brown-type jacket with a scarf or a bandana around his head. Like I said, when I saw that, I just took off.

Q    Could you tell whether the person was a male or female?

A    My guess would be a male.

Q    Could you tell whether the person was black or white?

A    Black.

Q    Was it a light-skinned, medium, or dark-skinned individual?

A    I would say medium. The color of the coat and the bandana, and I guess it was his neck in between the two, sort of blended together. Brownish, you know.

MR. PARCELL:  Thank you.  Pass the witness.

THE COURT:  Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q    Could you pick out some color in the courtroom which would be consistent with the skin tone of the black male that you saw?

A    I guess about the same color as that wood in that chair.

Q    The wooden chair sitting in front of the lawyers?

A    Yes, the wood on the arm.

**JA1184**

Q    Could you give a color complexion to it?  How would you describe that verbally?

A    Medium.

MR. GEARY:  No further questions.

THE COURT:  Any questions, Mr. McGarvey or Mr. Cooley?

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Sir, you made a report of this to a homicide detective; is that correct?

A    A friend of mine.  I called him and asked him what I should do.

Q    You talked to a homicide detective, Detective Blaylock, did you not?

A    I didn't call him at first.

Q    I'm not asking at first.  At some point you talked to a homicide detective; is that correct?

A    Yes, sir.

Q    Did you tell him that you saw a Nissan 4X4 pickup there as well?

A    No, sir.

Q    You never told him that?

A    No, sir.

Q    And did you ever tell him that you saw -- I think you indicated in your direct examination that you didn't recall what type of car it was?

A    No, sir.

Q    Did you ever tell the detective that you saw a station wagon?

A    It has been over a year ago.

Q    I understand.

A    It is possible, yes.

Q    You are certain you didn't say anything about a Nissan 4X4 pickup?

A    No, sir.

MR. McGARVEY:  That's all I have.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  The witness may stand down.

(Witness stood aside.)

MR. PARCELL:  Gwendolyn Greene, please.

MR. VICK:  May we approach?

(At Bench.)

MR. VICK:  I understood that the Court wanted to get the jury out prior to bringing her in.

THE COURT:  That's right.

MR. PARCELL:  She is right back there.

THE COURT:  Okay.

MR. BAUGH:  These three chairs, nobody is going to sit in those, are they?

THE COURT:  I don't know.  They are there

**JA1185**

Gwendolyn Greene (Direct)

for a reason.  They will move her so the jury can get out.

(In Open Court.)

Everyone remain seated while the jury leaves the courtroom.  This will only be a few minutes.

(The jury left the courtroom.)

(The witness entered the courtroom.)

All right, let's bring the jury back in.

(The jury entered the courtroom.)

## Gwendolyn Greene (2534)

GWENDOLYN GREENE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, I want to ask you to speak into that microphone if you can, please.

A    Okay.

Q    Do you need to go forward?

A    Yes.

(Witness' position adjusted.)

Q    Can you tell the ladies and gentlemen of the jury what your name is?

A    My name is Gwendolyn Elaine Greene.

Q    Ma'am, how old are you?

A    30 years old.

Q    Ma'am, did something happen to you?

A    Yes.

Q    What was that?

A    I got a gunshot to the neck.

Q    Prior to getting the gunshot to the neck, did you have any difficulty walking or moving or taking care of yourself?

A    No.

Q    Do you know where you were when you got shot?

A    Bottom, down in the bottom of Fulton.

Q    Is that in the City of Richmond?

A    Yes, City of Richmond.

Q    Were you inside or outside?

A    Excuse me?

Q    Were you outside?

A    Outside in a car.

Q    Whose car?

A    Linwood Chiles' car.

Q    Who was driving that car?

A    Linwood.

Q    Was there anybody in the front seat?

A    Priscilla Greene.

Q    Who is Priscilla Greene?

**JA1186**

Gwendolyn Greene (Direct)

A    My sister.
Q    Was anybody in the backseat?
A    Just me at first.
Q    And then did there come a point in time when somebody else got in the backseat with you all?
A    Yes.  Curt and a guy got in.
Q    Curt?  Who is Curt?
A    He used to go with my sister.
Q    Go with your sister?
A    Yes.
Q    Which sister?
A    Priscilla Greene.
Q    When Curt got in the car, where did he get in?
A    In the back on the passenger's side.
Q    Did someone else get in the car?

2537
A    The guy on the other side in the back.
Q    Who?
A    "O."
Q    Do you know who "O" is?
A    Yes, I know.
Q    Do you see him?
A    No.
Q    Do we need to move your chair so you can see everybody in the courtroom?
     (Witness' position adjusted.)
A    Yes.  There he is right there.  Right there.
Q    How is he dressed?
A    Got a light blue shirt on.
Q    Is it a shirt or sweater?
A    Can't see too clear.
         MR. COOLEY:  We will stipulate ID.
BY MR. PARCELL:
Q    Does he have a moustache?
A    He is in front there by the lawyer.
         MR. McGARVEY:  We stipulate ID.
         THE COURT:  She pointed him out.
BY MR. PARCELL:
Q    Where did "O" get in the vehicle?
A    In the backseat behind the driver.
Q    Who was the driver again?

2538
A    Linwood Chiles.
Q    And did you see anyone else there?
A    A guy named "Whitey."
Q    Do you see "Whitey" in the courtroom?
A    Yes.
Q    Would you point him out?
A    Behind the other lawyer.
         MR. WHITE:  Stipulate ID.
         THE COURT:  All right.
BY MR. PARCELL:
Q    Where was "Whitey?"  Was he inside the vehicle or outside the vehicle?

**JA1187**

A    Outside.
Q    And how did it come to be that you knew he was there?
A    He called me.
Q    You said were you were on the right passenger's seat in the backseat; is that correct?
A    I was in the middle.
Q    You were in the middle?
A    Yes.
Q    Did he call you from your right or from your left?
A    From this side.  (Witness indicating.)
Q    When you heard him call your name, did you look back?
A    I did.
Q    Is that when you saw him?
A    Yes.
Q    Can you tell the jury how he was dressed?
A    Pair of bluejeans and a brown jacket.
Q    I'm sorry?
A    Bluejeans and a brown jacket.
Q    Was this a straight-collared jacket?
A    No, the brown jacket had a hood on.
Q    And what's the next thing you remember after that?
A    Waking up in the hospital.
Q    I'm sorry?
A    Waking up in the hospital.
Q    Ma'am, after you remember seeing those things, is that when you got shot?
A    Yes.
Q    Do you know who shot you?  Do you recall who shot you?
A    No, I really can't say, although it was in the backseat.
Q    Yes, ma'am.  Prior to you being shot, you had no physical difficulties, did you?
A    No, sir.

Q    Ma'am, are you able to take care of yourself?
A    No.
Q    Are you having to live someplace special for handicapped people?
A    Yes.  I in like a nursing house.
        MR. PARCELL:  I will tender the witness.
        THE COURT:  Any questions?
        MR. WHITE:  If I can have a moment, please?
        THE COURT:  Go ahead.
    (Counsel conferring with co-counsel.)
        MR. WHITE:  No questions, Your Honor.
        THE COURT:  Any questions?
        MR. COOLEY:  No, Your Honor, thank you.

**JA1188**

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  All right.

MR. VICK:  The government would call "Pepsi" Greene, Priscilla Greene.

THE COURT:  All right.  Go ahead and remove the witness.

(The witness was removed from the courtroom.)

All right, Priscilla Greene is next?

MR. VICK:  Priscilla Greene.

## Prisilla "Pepsi" Greene (2540)

PRISCILLA "PEPSI" GREENE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I'm going to ask you just to speak toward that microphone during your testimony.  Don't get too close to it.  Could you state your name for the Court, record, and jury, please?

A    My name is Priscilla Greene.

Q    They also call you "Pepsi?"

A    Yes.

Q    That's your nickname, "Pepsi?"

A    Yes.

Q    How old are you?

A    32.

Q    "Pepsi," I direct your attention to February 19th, 1992.  Do you remember that day?

A    Yes.

Q    You are hard of hearing, are you not?

A    I'm deaf because of my injury.  I'm deaf on the left side.

Q    You got shot on February 19th, 1992, didn't you?

A    Yes.

Q    Where did you get shot?  Where in your body did you get shot?

A    On the left side of my head.

Q    Is that what caused your hearing problem?

A    Yes.  And I'm paralyzed on the left side of my face.

Q    We know you have a cane and a limp.

A    Yes.

Q    Did the shot also cause that?

A    Yes.

Q    When you were shot, did you go to the hospital?

A    Yes.

Q    Did you have a number of operations?

**JA1189**

A     Three.

Q     Have you lost some of your  --  a portion of your brain based upon those operations?

A     Yes.

Q     Prior to those operations and prior to your being shot, you didn't have any of the physical problems that you have now, did you?

A     No.

Q     Do you have any children, "Pepsi?"

A     Three.

Q     Are you able to care for your children now?

A     Not right now, no.

2543

Q     You are living in a handicapped house; is that correct?

A     Yes.

Q     Do you know the defendants in this case, Richard Tipton, also known as "Whitey?"

A     Yes.

Q     Take your time, look around, and see if you see him in the courtroom.

          MR. WHITE:  We will stipulate identification.

BY MR. VICK:

Q     Do you know the defendant Cory Johnson, also known as "O," "C.O.?"

A     Yes.

Q     Take your time and look around and see if you see him in the courtroom today.  Stand up if you need to.

A     That's "Whitey," that's "O."  (Witness pointing.)

          MR. McGARVEY:  Stipulate.

BY MR. VICK:

Q     Do you know James Roane?

A     Yes.

Q     Look around and see if you see James Roane, also known as "J.R.?"

2544

A     Yes.

Q     Do you know Sandra Reavis?

A     Yes.

Q     Do you see Sandra Reavis in the courtroom today?

A     Yes.  That's her.

          MR. VICK:  Could the record reflect the identification of all respective defendants?

          THE COURT:  The record will so reflect.

BY MR. VICK:

Q     Did you know an individual by the name of Curt Thorne?

A     Yes.

Q     What happened to Curt?

A     "O" killed him.

**JA1190**

Prisilla "Pepsi" Greene (Direct)

Q    All right.  Had you dated Curt Thorne?
A    Yes, I had.
Q    In November-December of 1991 and into the early months of 1992, were you dating Curt Thorne?
A    Yes.
Q    How was Curt Thorne supporting himself, "Pepsi?"
A    Well, cocaine.
Q    Selling cocaine?
A    Yes.
Q    What kind of cocaine?

2545
A    Cook-'em-up.
Q    When you say cook-'em-up, you mean crack cocaine?
A    Crack, uh-huh.
Q    Where was he getting his cook-'em-up, his crack cocaine?
A    From "Whitey" and "O."
Q    And did you actually witness them giving him crack cocaine?
A    Yes.
Q    Is that how you met "Whitey" and "O?"
A    Yes.
Q    When you were shot on February 19th, 1992, how long prior to that, prior to your being shot, was it that you met "Whitey" and "O?"  How soon prior to your being shot did you meet them, "Whitey" and "O?"
A    I don't understand.
Q    If you were shot in February of 1992, when was it that you met "Whitey?"
A    Okay, that was in like November of 1991.
Q    Same time you met "O?"
A    Yes.
Q    How about "J.R.?"
A    I met "J.R." before them.
Q    Do you know Linwood Chiles?

2546
A    Yes.
Q    Do you know what happened to Linwood Chiles?
A    "O" shot him.
Q    Did that happen on February 19th, the same time you were shot?
A    Yes.
Q    Do you know if Linwood Chiles, prior to his being shot by "O," was involved with "O" and "Whitey" and "J.R." in the sale of cocaine?
A    Well, Linwood Chiles, he used to take them to go pick up cocaine.
Q    Did he ever take them to New York?
A    Yes.
Q    For what?
A    To pick up some drugs.
Q    How long were you involved with "O" and "Whitey" and "J.R.," were you involved in the sale of cocaine

**JA1191**

with them?

A    I never sold cocaine.

Q    Did you help Curt Thorne when he sold cocaine?

A    Yes.

Q    Based upon your involvement, do you know what the relationship was between "J.R.," "O," and "Whitey" in the sale of cocaine?

MR. GEARY:  She can properly testify to what she saw and heard.

THE COURT:  Overruled.

THE WITNESS:  Partners.

BY MR. VICK:

Q    What?

A    Partners.

Q    What was Curt Thorne, a partner?

A    He wasn't really a partner.  He was just selling drugs.  He wasn't like they were.

Q    Have you ever seen any of them give orders to Curt?

MR. BAUGH:  Objection to "any of them."

THE COURT:  Sustained.

THE WITNESS:  Yes.

BY MR. VICK:

Q    Who have you seen give orders to Curt?

A    "Whitey" and "O."

Q    What sort of orders?

A    Like when they needed the money.

Q    What would they say to him?

A    Tell him like  --

MR. WHITE:  Objection to "they."

THE COURT:  Overruled.

BY MR. VICK:

Q    Go ahead.

A    Like they would tell him a certain time they would need their money, and when he was to come pick up the drugs, go on up.

Q    Did you know a man by the name of Doug Talley?

A    Yes.

Q    Did Doug Talley -- do you know whether Doug Talley helped "O" or "Whitey" or "J.R." in their drug distribution?

A    No.  Talley used to take them to New York before Linwood did.

Q    And what did he take them to New York for?

A    To pick up some drugs.

Q    What kind of car did Talley drive; do you remember?

A    All I know is it was a gray car.

Q    "Pepsi," do you remember an individual by the name of Doug Moody, "Little Doug," he was called?

A    Yes.

Q    Do you know what happened to him?

**JA1192**

A    Yes.
Q    What happened to him?
A    "J.R." killed him.
Q    Were you  --
A    Finished killing him.
Q    Who started killing him?

A    They was in the house.  "Little Doug" jumped out the window.
BY MR. VICK:
Q    Who was in the house?
A    "J.R.," "Whitey."
Q    Were you there?
A    I was on the corner.
Q    In the house where "Little Doug" was killed at?
A    I was on the other side of the street.
Q    Did you hear any shots that night?
A    About two or three.
Q    After you heard those shots, did anyone come out of that house?
A    Did anybody come out?
Q    Right.
A    "J.R." came out, "J.R." and "Whitey."
Q    Where did they go when they came out of that house?
A    Well, Linwood had came  --
Q    I'll withdraw that.  When "J.R." and "Whitey" came out of the house, was it after you heard the shots fired?
A    Uh-huh.
Q    What did they do when they came out of that house?

A    Well, after they came out I didn't have any reason to leave because I was going back in the house.  So I went back in the house to straighten up the house.  Then "J.R.," he came back in the house and asked me for the knife.
Q    What knife?
A    It is a military knife.
Q    All right.  And could you describe that military knife?
A    It had a black handle on it, kind of a big knife.
Q    All right.  Where had you gotten that knife?
A    Well, I got that knife  --  the knife was laying on the table.  They used to bring the knife to Curt for Curt to keep.
Q    Who is they?
A    "Whitey" and "O" and "J.R."
Q    Prior to the night that "Little Doug" was killed, did they ever bring you that knife before?
A    Yes.
          MR. McGARVEY:  I object to "they."  Who

Prisilla "Pepsi" Greene (Direct)

brought it?

BY MR. VICK:

Q    Who brought you that knife?  Was there a particular night where they brought you that knife, where somebody brought you that knife and it was covered with something?

A    Blood.

Q    Who brought you that knife when it was covered with blood?

A    "O."

Q    And was that prior to or after the killing of Doug Moody?

A    That was before.

Q    All right.  On the night of the killing of Doug Moody, did you give that knife to anyone?

A    "J.R."

Q    Did you see "J.R." use that knife that night?

A    I didn't see him use it on him because I had left out the house.

Q    Did "J.R." come back and give you that knife later that night?

A    Yes.

Q    All right.  What did he give you that knife for?

A    He wanted me to get rid of the evidence.  I took and threw it across the fence.

Q    When he gave you that knife back, did it have anything on it?

A    Blood on it.

Q    Is that the same night Doug Moody was killed?

A    Yes.

Q    After Doug Moody was killed, did you go anywhere?

A    Up on Norton Street.

Q    With who?

A    With Linwood, Curt, "J.R.," Sandra.

Q    Do you know whether Sandra Reavis was involved in any way with "J.R.," "C.O.," or "Whitey" in the sale or distribution of cocaine?

A    Yes.

Q    What do you know?  Tell the ladies and gentlemen of the jury.

A    She used to get cocaine from them to sell it.

Q    Did you witness that?

A    What?

Q    You saw that?

A    Yes.

        MR. WAGNER:  I object to "them," Your Honor.  If he would ask specifically who.

        THE COURT:  Mr. Vick, make it specific.

BY MR. VICK:

Q    Specifically, who do you know that Sandra got

Prisilla "Pepsi" Greene (Direct)

cocaine from?

A     "O."  Because "O" was the head man.

2553

Q     Did you ever see her get it from "J.R." or know whether she got it from "J.R.?"

MR. BAUGH:  Objection to know.  First question, "Did you see her," next question, "know."

THE COURT:  Let her answer one question at a time.

BY MR. VICK:

Q     Has Sandra ever told you who she got cocaine from?

A     Yes.

Q     Who did she say she got cocaine from?

A     From "O."

Q     Do you know why "Little Doug" Moody was killed?

A     Yes.

Q     Could you tell the ladies and gentlemen of the jury why "Little Doug" Moody was killed?

A     He was killed because "O" and "Whitey" and them didn't want Maurice and "Little Doug" to work in that area.

Q     Work in that area doing what?

A     Selling cocaine.

Q     When you say Maurice, do you mean Peyton Maurice Johnson?

A     Yes.

Q     Are you familiar with the fact that Peyton

2554

Maurice Johnson was killed?

A     Yes.

Q     All right.  When Peyton Maurice Johnson was killed, the night he was killed, do you remember that?  Do you remember the night he was killed?

A     Yes.

Q     Did you see "O," "V," "J.R.," and "E.B." that night?

A     Yes.

Q     Where did you see them?

A     I was standing -- I had went to the store and got me some beer, and I was standing beside the truck talking to this man.  And they came through the alley running.

Q     All right.  What did they have with them?

A     Okay, "O" and "J.R." came through the alley and "V" and "E.B." came around the corner.  And "J.R." gave "Papoose" the knife  --  I mean the gun -- to put up.

Q     Who was "Papoose?"

A     "Papoose" was  --  who is "Papoose?"

Q     Who is "Papoose?"

A     "Papoose," he used to sell drugs for them, too. He is a neighbor.

Q     Do you know where it was that Peyton Maurice

**JA1195**

Prisilla "Pepsi" Greene (Direct)

2555

Johnson was killed?  Where was he killed?

A    On Clay Street.

Q    Do you know whose house?

A    No.

Q    Did you know "Mousey" Armstrong?

A    Yes.

Q    All right.  Do you know what happened to "Mousey" Armstrong?

A    Yes.

Q    What's that?  What happened?

A    "O" and "V" killed her.

MR. McGARVEY:  I object, unless she is testifying from her personal knowledge.

THE COURT:  Overruled.

BY MR. VICK:

Q    Why do you say that?

A    Because they asked Linwood to take them over to Southside that night.

Q    All right.

A    And Linwood Chiles had told me that they did it.

Q    All right.

MR. McGARVEY:  Same objection, Your Honor.

THE COURT:  That objection will be sustained.

2556

BY MR. VICK:

Q    Did you see "O" and "V" that night in Linwood's car?

A    I saw them, yes.

Q    "Pepsi," I'm going to direct your attention to February 19th, 1992, the day you were shot.  Did you have occasion to go someplace on that day with your sister, Gwen, in Linwood's car?

A    What?

Q    On that day, the day you were shot, did you go someplace with your sister, Gwen, in Linwood's car?

A    Did we go someplace?

Q    Yes.

A    Yes.

Q    Where did you go?

A    We went on Southside to the apartments over on Southside.

Q    Whose apartment did you go to?

A    It was "O's" girlfriend's apartment, I think.

Q    Who did you go over to Southside to see?  What were you going over there for?

A    We went over there to see "O."  Well, Curt went to see "O" but Linwood asked me to go by Southside with him.

Q    Where was that apartment?

2557

A    That apartment was by the Philip Morris parking

**JA1196**

lot, right up from the Philip Morris parking hot.
Q    When you got to that apartment, did you see "O"
and Curt?
A    Yes.
Q    Were they together?
A    They was together.
Q    All right.  What did you do when you got there?
A    Nothing, just sat down.
Q    You got back in Linwood's car after being at
that apartment, didn't you?
A    Yes.
Q    Who got in Linwood's car with you?
A    It was me, my sister, Linwood, and "O."
Q    Could you tell the ladies and gentlemen of the
jury, did Curt Thorne get in the car with you?
A    Yes, Curt was in there with us, too.
Q    Where were you seated in the car?
A    I was sitting in the front seat on the
passenger's side.
Q    Who was driving the car?
A    Linwood.
Q    Where was Curt seated?
A    Curt was sitting behind me in the back.
Q    Where was your sister, Gwen?

2558

A    My sister was in the middle.
Q    Where was "O?"
A    "O" was sitting behind Linwood.
Q    Did you go someplace in that car?
A    Yes.  I thought we were going home, but we
pulled in something like an alley.
Q    Did you see another car behind you that night?
A    I can't recall the car, but there was a car
behind us.
Q    What color car?
A    Gray.
Q    What happened to you that night, "Pepsi?"
A    "O" shot me.
Q    All right.  Did you see "O" shoot anyone else
that night?
A    Linwood.
Q    Tell the ladies and gentlemen of the jury how
"O" shot Linwood.  What happened?
A    Okay.  He told Linwood to turn around and put
his head on the steering wheel.  He turned around and
laid his head on the steering wheel and I saw "O" put
the gun to his head, but I never heard the gun go
off.
Q    What kind of gun?  Did you see the gun?
A    I don't know exactly what kind of gun it was.

2559

Q    Do you remember what happened after that?
A    No.
Q    How long were you in the hospital, "Pepsi?"

Prisilla "Pepsi" Greene (Cross)

A    For seven months.

Q    The last thing you remember was "O" saying to Linwood, "Lay your head on the wheel?"

A    Uh-huh.

MR. VICK:  Beg the Court's indulgence.

BY MR. VICK:

Q    Could you tell the ladies and gentlemen of the jury exactly where you were shot and where the bullet went?

A    I was shot right up in here.  It came out like on the side of my face.  I'm totally paralyzed on my left side.

MR. VICK:  I have no further questions.

THE COURT:  Mr. White?

CROSS-EXAMINATION

BY MR. WHITE:

Q    Good morning, Ms. Greene.

A    Good morning.

Q    Ms. Greene, you were living in Newtowne; is that correct?

A    Newtowne?

Q    Do you know where Newtowne is?

2560

A    Yes.  I was living on Clay Street.

Q    Where on Clay Street were you living, ma'am?

A    I can't recall the address.

Q    Do you recall who any of your neighbors were?

A    I can't hear you.

Q    Do you recall who any of your neighbors were?

A    Do I believe my neighbors?  I just don't understand what you mean.

Q    Ma'am, do you know -- you say you know "Papoose?"

A    Yes.

Q    Did you live close to "Papoose?"

A    Weren't far from him, about a block.

Q    And do you know where Curt was living?

A    Yes.

Q    Where was Curt living, ma'am?

A    On Clay Street.

Q    Okay.  And was that close to "Papoose" as well?

A    About a block up from "Papoose," yes.

Q    Were you staying with Curt from time to time?

A    Yes.

Q    Okay.  Now, ma'am, did you know a lot of people in that area?

A    No.

Q    All right.  Ma'am, would it be fair to say that

2561

your memory has been affected by your being shot?

A    It has affected it.  But I remember that, though.

Q    Remember what, ma'am?

A    What happened.

**JA1198**

Q   Do you know Denise Berkley?
A   Yes.
Q   Okay.  Do you know "Peaches?"
A   "Peaches?"
Q   Yes.
A   I know of her.
Q   Do you know Peyton Maurice Johnson?
A   Yes.
Q   Do you know Ronita Rochelle Hollman?
A   No.
Q   Do you know the little girl who got locked up because of her dealings with Peyton Johnson?
A   No.
Q   Do you know "K.K.?"
A   Yes.
Q   Do you remember Keith West?
A   I can't recall.
        MR. GEARY:  May I speak to Mr. White, please?
     (Counsel conferring.)

2562

BY MR. WHITE:
Q   Ma'am, do you recall ever speaking to a detective by the name of Dalton?
A   No.  I can't think of it right now.
Q   Did you say you couldn't understand?
A   No, I don't remember right now.
Q   Do you remember being served with any papers by a police officer in January of last year?
     (Witness pausing.)
A   I can't recall that.  I'm sorry.
        MR. WHITE:  Your Honor, if the Court please, could we approach briefly?
     (At Bench.)
        MR. WHITE:  Your Honor, if the Court please, rather than belabor the point with this witness, it seems that she is not in a position to recall many statements that she made.  We want to know if the Court is going to consider her unavailable for purposes of cross-examination so that we can bring in her prior statements through Detective Dalton.
        THE COURT:  The answer is no.
        MR. McGARVEY:  We join in that.
        MR. VICK:  While we are here, she stated she doesn't remember.  I don't want to go through the

2563

whole process of reading the transcript again when she says she doesn't remember.
        THE COURT:  Well  --
        MR. WHITE:  Based on the Court's ruling, I was wondering if I could ask her specific questions about statements that she made.
        MR. BAUGH:  For prior inconsistent

**JA1199**

statements.

THE COURT: The woman says she doesn't remember.

MR. BAUGH: Your Honor, we have to say it was prior inconsistent, either by the statement -- we have to get the predicate through her or the statement.

MR. VICK: It is there.

THE COURT: You can do it by putting Dalton on.

MR. BAUGH: That's fine.

MR. WHITE: We can ask Detective Dalton?

THE COURT: Yes.

MR. BAUGH: You don't need that from her.

THE COURT: You don't need it from her is what I am telling you.

(In Open Court.)

MR. WHITE: No further questions, Your Honor.

THE COURT: All right. Any questions, Mr. McGarvey?

MR. McGARVEY: Yes, sir.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Good morning, Ms. Greene.

A    Good morning.

Q    Ms. Greene, after you were shot, is it fair to say that you didn't have any recollection of the shooting itself for a long period of time after you were shot?

A    I couldn't hear you.

Q    You couldn't hear me?

A    No.

Q    Is it fair to say that you didn't have any recollection, you couldn't remember, until recently, what happened the day you were shot? I'm not talking about before the day you were shot. But the day that you were shot, you didn't have any recollection until recently of that; is that correct?

A    Yes.

Q    And is that after you talked to the government, after you talked to Mr. Vick?

A    No.

Q    After you talked to the detectives? Have you talked to them at all about this case?

A    No, not that I remember.

Q    You have never talked to them about this case?

A    Yes.

Q    Can you recall who you did talk to about this case with respect to the government? Am I talking loud enough?

A    I don't hear what you are saying.

Q    Did you talk to anybody with respect to the government -- I'm talking about Detective Fleming over here, Mr. Parcell, Mr. Vick -- about this shooting?

A    Yes, I talked to them.

Q    Is that when you got your memory back about the day of the shooting?

A    No.

Q    How recently was it that you got your memory back about the day of the shooting?

A    Because I kept thinking about it.

Q    How recently, though, relative to when you are testifying here today; do you recall?

A    Do I recall what now?

Q    How recently did you get your memory back about the shooting?

2566

A    From the time I was in the hospital.

Q    Okay.  Ma'am, do you remember a red 4X4 pickup that day being parked behind you?

A    What?

Q    A red 4X4 pickup?

A    What about it?

Q    Did you see one at Stony Run?

A    When?

Q    The day you were shot.  When you were shot.

A    I didn't see no pickup.

Q    Okay.  And ma'am, you indicated on direct examination that you were on the passenger's side in the front, that Mr. Chiles was in the driver's seat, correct?

A    Yes.

Q    That your sister was in the back in the middle, Gwendolyn?

A    Yes.

Q    And Curt was to the right of her, correct?

A    Yes.

Q    And you said that "O" or Cory was to the left; is that correct?

A    Yes.

Q    Okay.  And you have testified that you don't recall hearing a shot.  Is that correct?

2567

A    Right.

Q    You recall, though, "O" telling Linwood to put his head down, correct?

A    On the steering wheel.  He pointed the gun at the back of his head.

Q    And you had not heard a shot up until that.  Did you not hear a shot, period?

A    No.

Q    Okay.  Your sister wasn't shot before this, was she?

A    What?

**JA1201**

Prisilla "Pepsi" Greene (Cross)

Q    Was she shot before this, before he told him, according to you, told Mr. Chiles to put his head on the steering wheel?

A    Shot before then?

Q    Yes.

A    No.

Q    You are sure about that?

A    Yes.

Q    Ma'am, was Peyton Maurice Johnson killed on Southside?

A    Peyton Maurice?  No.

Q    Did I misunderstand you?

A    Peyton Maurice was killed on Clay Street.

Q    He was killed on Clay Street?

2568

A    Yes.

Q    Didn't you indicate that you said that Mr. Chiles took them to Southside when they asked about Peyton Maurice Johnson.

        MR. VICK:  Objection, misstatement of the evidence.

        THE COURT:  That is incorrect.  Your understanding is incorrect, Mr. McGarvey.

        MR. McGARVEY:  I apologize, Your Honor.

        MR. McGARVEY:  That's all, Your Honor.

        THE COURT:  Any questions, Mr. Baugh?

                CROSS-EXAMINATION

BY MR. BAUGH:

Q    Ms. Greene, I just have a few questions for you.  My name is David Baugh, and I represent Mr. Roane.  The knife that you say that Mr. Roane came and got from you on the night that Doug Moody was killed, you said it was a black knife?

A    It was a silver knife with a black handle.

Q    Was it a military-type knife like a bayonet or something?

A    Curt said it was a military knife.

Q    Excuse me?

A    Curt, he told me it was a military knife.

Q    Did you see it yourself?  Did you see it?

2569

A    Did I see it?

Q    Yes.

A    Yes.

Q    All right.  Are you familiar with the kind of knife that soldiers put on the end of their guns; have you seen one of those knives before?

A    No.

Q    All right.  Can you show me about how long was the knife?  About how long was it?

A    It was a long knife.

    (Witness indicating.)

Q    Certainly longer than like your foot?

A    I don't know.

**JA1202**

Prisilla "Pepsi" Greene (Cross)

Q    And can you tell me, can you show me with the fingers of your left hand how wide the blade would have been?

A    Like this.  Wide blade.

Q    Big blade?

A    Yes.

Q    Would you agree that's about three inches or two inches?

A    I don't know.  I can't say.

Q    Could you hold it up again so the jury could see it?

     (Witness indicating.)

That's how wide the blade was, about that long?

A    Yes.

Q    Now, is it your testimony, is that the same knife that you say one of these gentlemen brought over to you covered with blood after Doug Talley was killed?

A    Brought to Curt, yes.

Q    And who told you that Doug Moody jumped out of a window?  Or did you see that?

A    No.  Curt told me.

Q    You didn't see Doug Moody jump out of a window?

A    No.

Q    And who told you that James Roane, quote, finished him off?  Who told you that?

A    Nobody.  I saw him do it.

Q    Do I have this correct: You were out on the corner talking with someone when you heard some gunshots; am I correct?

A    Uh-huh.

Q    And then you went in your house to clean up.

A    Yes.

Q    And where was your house in relation  --  where was your house from where Doug Moody was, across the street, on the next street, where?

A    Well, Doug Moody was out on the porch.

Q    Doug Moody was on the porch.  But I mean, that house that he was in on the porch, where was your house from his?

A    My house was on the corner.

Q    If Doug Moody's  --  the house that Doug Moody was killed at is on the corner of Clay and Harrison; am I correct?

A    Yes.

Q    All right.  Where was the house you went to clean up at?

A    The same house just by the window, Curt's place.

Q    Where was Curt's place, in the same building?

A    Yes.  That was the apartment he was in.

Q    The corner of Clay and Harrison?

**JA1203**

A    Yes.
Q    All right.  Now, after you heard the gunshots you went upstairs.  How long later was it that you --
        MR. VICK:  She never stated that.
        THE COURT:  Go ahead.
BY MR. BAUGH:
Q    Didn't you say that after the gunshots you heard the gunshots, you went to your house -- went to Curt's house and started cleaning up?

2572

A    No, I did not.
Q    How much longer was it before you went to the house, approximately?
A    Maybe an hour.
Q    And then after you got to the house an hour later, is that when James Roane came and asked you for the knife?
A    No.  James Roane asked for the knife because -- okay, "J.R." asked for the knife the first time I went back in the house because I was going in there to get my clothes.
Q    You went to the house twice?
A    Yes.
Q    After Doug Moody was shot, how much  --  you heard the shots.  How much time was it before you went back to the house to clean up the first time?
A    About five, ten minutes.
Q    All right.  So you heard the shots, and then you went to the apartment or to the house to clean up?
A    Not directly to the apartment.
Q    Okay.  Like sometime later.  How much time did you say?
A    About five or ten minutes later.  Because weren't nobody in there.
Q    Then after you went to the house five or ten

2573

minutes later, you started cleaning up.
A    Yes.
Q    And how long had you been cleaning up before Mr. Roane came up and asked you for the knife?
A    Well, he came in the house behind me asking for the knife.
Q    So if I have this correct, you heard gunshots, you stayed out on the corner five or ten minutes  --
A    Yes.
Q    Then you went to Curt's house.
A    Wasn't nobody in there.  That's why I went back in the house.
Q    Wasn't anybody where?
A    In Curt's house.
Q    Could you get in without Curt?
A    The door wasn't locked.
Q    Okay.  You heard the shots.  You stayed outside

**JA1204**

Prisilla "Pepsi" Greene (Cross)

for five or ten minutes. And then you went over to Curt's house and Mr. Roane came with you.

A   Yes.

Q   And when he came with you, you are saying he asked you for this knife which was about this long and about this wide; am I correct?

A   Yes.

Q   And he left with that knife about what, ten minutes after you heard the gunshots?

A   He didn't go nowhere but on the porch.

Q   He went on the porch?

A   Yes.

Q   Did you go out on the porch with him?

A   No, I looked out the window.

Q   You looked out the window --

A   I saw him on the porch.

Q   Mr. Roane?

A   James Roane and "Little Doug."

Q   On the porch of the house?

A   Yes. Doug was laying on the porch.

Q   And did James Roane sit on him?

A   I don't know.

Q   Well, did you see James Roane stab him?

A   No.

Q   So all you are talking about, about seeing Doug Moody and all that, that's all stuff people told you about, right?

A   Yes. That's the last time I seen him, laying on the porch.

Q   Did you ever see Mr. Roane when he came back from New York -- strike that.

Who told you that Mr. Roane went to New York to get drugs?

A   Curt.

Q   Did you ever see him get in the car to go to New York?

A   Yes.

Q   And you saw him when he came back?

A   Yes, I seen him when he came back.

Q   Did he have drugs when he came back?

A   "O" and "Whitey" had the drugs.

Q   Did you ever see Mr. Roane bring back drugs from New York?

A   No.

Q   All right. Do you know how Mr. Roane got his drugs, of your own knowledge?

A   No.

Q   What was Sandra Reavis' relationship with James Roane, if you know?

A   That's his -- they are boyfriend-girlfriend.

MR. BAUGH:  Doug's --

THE COURT:  She said girlfriend and

**JA1205**

boyfriend.

MR. BAUGH:  Forgive me.

BY MR. BAUGH:

Q    They were girlfriend and boyfriend?

A    Yes.

Q    Thank you.  What was the closest you saw Mr.

Roane get to Mr. Moody while Mr. Moody was on the porch; did Mr. Roane go over and touch him?

A    Yes.  Slapped him in the face, tried to wake him up.  But the man came through.

Q    What man came through?

A    "Little Doug."

Q    "Little Doug" came through?

A    Yes.

Q    All right.

A    Because he was unconscious.  He was out on the porch.

Q    Were you there when the police showed up?

A    No.

Q    Were you back inside?

A    No.

Q    Where did you go by the time the police showed up?

A    Linwood, we all got in the car and went over on Norton Street.

Q    Who got in the car and went to Norton Street?

A    Okay.  Me, Curt stayed up there on Norton Street, and Linwood and "O" and "J.R." and Sandra, I don't know where they went.

MR. BAUGH:  Could I have a moment with counsel?

THE COURT:  Yes.

(Counsel conferring.)

BY MR. BAUGH:

Q    Do you know Denise Berkley?

A    Uh-huh.

Q    Was Denise Berkley with you at Curt's before you went out on the corner?

A    I don't know.  I didn't see her.

Q    Let me ask you this:  Were you, Denise Berkley, Curt Thorne, and Linwood Chiles doing drugs, doing crack cocaine in Curt's apartment when the shots were fired?

A    No.

Q    All right.  When you went back to the apartment to clean things up, were you cleaning up crack?  Were you cleaning up drugs?

A    No.

Q    Was Denise Berkley out there on the corner with you that night?  Did you see?

A    I didn't see.

Q    And you were on the corner of Clay and

**JA1206**

Harrison?

A   Yes.

Q   Did you hear the ambulance or the police -- did you hear them when they came?

2578

A   No.  Because I was on Norton Street.

Q   So you had gotten all the way -- if I have this right, you heard the shots, you waited five or ten minutes, you went to --

MR. VICK:  Objection to the form of the question.

THE COURT:  Do not summarize everything that's come out so far.

BY MR. BAUGH:

Q   How long was it after you heard the shots that you got to Norton Street, approximately?

A   Maybe 15, 20 minutes.

Q   And in those 15 to 20 minutes, the police or an ambulance had not arrived?

A   I don't know, because I wasn't there.

Q   Well, ma'am, in ten of those minutes you would have been upstairs --

MR. VICK:  Objection.  He is summarizing again.  It is not a question.

THE COURT:  Mr. Baugh, go ahead and ask the question.

BY MR. BAUGH:

Q   Am I correct that during ten of those minutes you would have been upstairs in 1200 West Clay Street on the corner of Clay and Harrison; am I correct?

2579

A   Upstairs?

Q   Yes.

A   No.  He doesn't have a stairs.

Q   Would you have been in the building on the corner of Clay and Harrison for ten of those minutes?

A   Yes.

Q   That's the same building that Doug Moody was in; am I correct?

A   Yes.

Q   And when you came out of that building to go to Norton, which door did you come out of?

A   The same door I went in.

Q   Which door was that?

A   It was the front door.

Q   All right.  And when you came out, you would be on Clay Street?

A   I would be where?

Q   You would be on Clay Street when you came out the front door?

A   No, Harrison Street.

Q   And then you got in the car with Linwood and he drove over to Norton Street, which is the next street

over; am I correct?

A    Yes.

Q    Are you saying that Mr. Roane brought that knife back to you that night, or someone else?

A    No.  He brought it back to me.

Q    Mr. Roane did?

A    Yes.

Q    This was the same big knife?

A    Yes.

MR. VICK:  Objection to the summarization again.  It was not a question.

THE COURT:  Sustained.  Do you have any more questions, Mr. Baugh?

BY MR. BAUGH:

Q    You are talking about the same knife you described earlier?

A    Yes, the same knife.

MR. BAUGH:  Thank you.  Pass the witness.

THE COURT:  Mr. Wagner, do you have anything?

CROSS-EXAMINATION

BY MR. WAGNER:

Q    Good morning, Ms. Greene.

A    Good morning.

Q    Ms. Greene, you have made statements to the police, haven't you?

A    I can't hear you.

MR. VICK:  Asked and answered.

THE COURT:  No.  Mr. Wagner, you have to speak up.

BY MR. WAGNER:

Q    You have talked to the police, haven't you?  Have you talked to the police about what happened, what you have testified to?

A    Do I have to answer that question?

THE COURT:  She has already answered it about three or four times, Mr. Wagner.

MR. WAGNER:  Very well.

BY MR. WAGNER:

Q    Did the police help you with your testimony at all?

A    No.

Q    Did they go over any of the questions that they were going to ask you today?

A    I can't recall.

Q    You talked about some things that Sandra Reavis said.  Did you talk to Sandra Reavis very often?

A    At that time, I used to talk to her.

Q    You used to talk to her?

A    Uh-huh.

Q    Isn't it true that you really thought that Sandra Reavis didn't like you?

**JA1208**

2582

A    Didn't matter whether she liked me or not.
     MR. VICK:  Completely irrelevant.
BY MR. WAGNER:
Q    Didn't you tell Detective Dalton that you thought Sandra Reavis didn't like you?
A    I can't recall.
Q    Now, you never did see "O" actually give drugs to Sandra Reavis, did you?
A    No.  I just went by what she told me at the time we was getting along and she was telling me.
Q    When did she tell you this?
A    I can't recall when.
Q    Now, you said that you were standing outside with Sandra Reavis the night Doug Moody got killed; is that right?
A    Yes.
Q    You didn't see Doug Moody get killed, did you?
A    No.
     MR. WAGNER:  Thank you.  No further questions.
     THE COURT:  All right.  May the witness stand aside?
              REDIRECT EXAMINATION
BY MR. VICK:
Q    Have myself, Detective Fleming, Mr. Parcell, has

2583

anybody told you how to answer any question?
A    No.
Q    You have had occasion to look at pictures of a knife that was drawn before, haven't you, last night?
A    Yes.
Q    I'm going to show you what's been previously marked Government Exhibit 146 and ask if the knife you got back from "J.R." after Doug Moody was killed -- point out which one of those knives that are drawn there looks like the one you saw?
A    The first one.
Q    At the top of the page?
A    Yes.
Q    Did the knife have any of those edges drawn on the second knife on that page?
A    No.
Q    At the end of that knife, I assume it was a pointed knife  --
     MR. BAUGH:  Objection to the assumption.
     THE COURT:  Overruled.
BY MR. VICK:
Q    It is a pointed knife at the end like any other knife?
A    Yes.

2584

     MR. BAUGH:  Withdraw the objection.

**JA1209**

MR. VICK: I have no further questions.

THE COURT: All right. The witness may stand down.

(Witness stood aside.)

MR. VICK: We would recall Detective Fleming.

## Det. Ralph Fleming (re Green sisters) (2584)

RALPH FLEMING, called as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Detective Fleming, you are under oath, having been previously placed under oath. You were one of the lead detectives investigating the incidents that gave rise to this indictment; is that correct?

A    That's correct.

Q    Have you worked since February 19th, or as soon as Gwen and "Pepsi" Greene were physically able to respond, have you worked with them in this investigation?

A    I have interviewed them in reference to what they recalled about the incident.

Q    Could you tell the ladies and gentlemen of the jury what if any information you provided them about the subject of their testimony?

A    I don't provide them with any information. I keep asking them what they remember and they would tell me. And in the case of Priscilla Greene, as time went on she began to remember more and more and more. It was just amazing because --

MR. GEARY: Objection.

MR. WHITE: Objection to the characterization.

BY MR. VICK:

Q    At first, what was her memory like?

A    She had very little --

MR. WHITE: He is not qualified to make that assessment.

MR. VICK: He talked to her.

THE COURT: The objection is overruled. Let's wrap this up.

THE WITNESS: She had very little recollection at first, but as time went on it got better and better.

BY MR. VICK:

Q    Did you provide her any of the subject of her testimony here today?

A    No.

**JA1210**

Q    Were you assigned to the investigation of the shooting that occurred on February 19th?

A    Yes, I was.

Q    Based upon your investigation, could you tell the ladies and gentlemen of the jury where those people were seated in that car that night?

MR. GEARY:  Objection.  He has to rely on somebody else to tell him that.

THE COURT:  Sustained as to that question. We don't need that, Mr. Vick.

BY MR. VICK:

Q    Detective Fleming, are you familiar with the fact that  --  who was the first person to approach you about this investigation, the first witness?

A    With the entire case?

Q    Yes.

A    Denise Berkley was the first voluntary witness.

Q    She was given use-immunity for her  --

MR. BAUGH:  This is clearly outside the scope.

THE COURT:  Sustained.

MR. VICK:  I'm going to a different subject.  I've called him as a witness.  We can cover it at this point or I can call him back.

MR. BAUGH:  Withdrawn then.

2587

THE COURT:  Go ahead.

BY MR. VICK:

Q    She was given use-immunity at that point; is that correct?

A    That's correct.

Q    Did you have any ability to convict or charge her at the time?

MR. BAUGH:  That is totally irrelevant.

THE COURT:  Come up here.

(At Bench.)

MR. VICK:  Unless they can tell me that they are not going to argue that we gave all these people use-immunity and that we have structured the case for use-immunity, then I have the right to show that the people we gave use-immunity to we did not have any ability to convict at that point, Your Honor.  We have not given this case away, and that's what they are arguing.

THE COURT:  The point is, you asked those questions of the witness when she was on the stand. You can't use another witness to bolster that testimony.

MR. VICK:  But she doesn't know -- Denise Berkley does not know what the investigative state was and whether we could have convicted her or

2588

charged her.  He does, based on what our evidence was.  His testimony will be that as to each one,

**JA1211**

Denise Berkley, "Papoose," "Man Man," Hussone, and Maurice Saunders, at the time they were granted use-immunity we had no authority to convict them.

THE COURT: No, I won't allow it.

(In Open Court.)

MR. VICK: No further questions.

MR. McGARVEY: Your Honor?

THE COURT: Mr. McGarvey?

MR. VICK: I would move Government Exhibit 146 into evidence, and I would like to place a check next to the knife she pointed out.

MR. BAUGH: I assume this is -- this clearly is not to scale. There is no assertion this is to scale.

THE COURT: Just to demonstrate the type of knife.

MR. BAUGH: Thank you.

MR. COOLEY: For the record, could we have the identity of the drawer or the producer?

MR. VICK: I did it.

THE COURT: It doesn't make any difference.

CROSS-EXAMINATION

2589

BY MR. McGARVEY:

Q   Detective Fleming, did you have occasion -- you were the investigator on the Stony Run incident, correct?

A   That's correct.

Q   Did you have occasion to talk to Mr. Tuck and prepare a report?

A   Yes, I did.

Q   And sir, isn't it a fact that Mr. Tuck reported to you that there was a Nissan pickup 4X4, red in color with a gold stripe, jacked up with small tires in the area; is that correct?

A   I asked him about -- we were doing the initial investigation. I asked him in the past had he seen any vehicles in there.

Q   I'm going to ask that you take a look at this report and see if you can identify it just with respect to the question that I asked you.

MR. VICK: He just answered the question.

THE COURT: He didn't answer the question. Detective Fleming, all the times you have been on the stand, you are going to learn this lesson. If he told you that, the answer is yes. Now, if there is any explanation to be made about it, it can be done. But you answer the question and we get through this a

2590

lot quicker.

BY MR. McGARVEY:

Q   Did you prepare that report?

A   Yes, I did.

**JA1212**

Q    Will you read the underlined line with respect to the 4X4 red Nissan pickup to the ladies and gentlemen of the jury?  Sir, will you please read  --

A    I'm looking for the paragraph.  Just give me a second.
     (Witness perusing document.)
     Talking about a Nissan pickup, correct?

Q    Please read that to the jury, the entire statement there with respect to the vehicle that I asked you about.

A    "I asked Mr. Tuck about vehicles he had seen in the area in the past.  He had observed a Nissan pickup 4X4, red in color, with a gold stripe, jacked up with small tires and a Pontiac Bonneville station wagon, faded green in color."
     MR. McGARVEY:  Thank you very much.  That's all the questions I have.
     THE COURT:  All right.  Anything from anybody else?
     MR. BAUGH:  No.

     MR. WAGNER:  No questions.
               REDIRECT EXAMINATION
BY MR. VICK:

Q    Did he state to you, Mr. Tuck, that that red pickup was there on the evening of February 19th, 1992?

A    He did not.
     THE COURT:  You may stand down, sir.
     (Witness stood aside.)
     MR. PARCELL:  Nellie Pulley, please?
               NELLIE PULLEY,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
               DIRECT EXAMINATION
BY MR. PARCELL:

Q    Ms. Pulley, I ask you to speak close to the microphone, but not too close.  Would you please tell the ladies and gentlemen of the jury what your name is?

A    My name is Nellie Pulley.

Q    Ma'am, do you live in Richmond?

A    No.

Q    You live in North Carolina?

A    Yes.

Q    Ma'am, do you have a family?

A    Yes.

Q    How many children do you have?

A    Seven.

Q    And was one of those named Curt?

A    He was the eighth one.  Yes.

**JA1213**

Q    Is he no longer with us?

A    Pardon me?

Q    Has he passed away?

A    Yes.

Q    Do you know when he died?

A    I was told that it was February 19th.  I was notified February 19th.

Q    You assisted in burying your son; is that correct?

A    Yes.

Q    I ask you to look at Government Exhibit 148. Who is that?

A    That's my son.

Q    Curtis Lee Thorne?

A    Yes.

MR. PARCELL:  You all's witness.

MR. GEARY:  No questions.

THE COURT:  Any questions?

MR. HENDERSON:  No questions.

MR. WAGNER:  No questions.

MR. McGARVEY:  No questions.

MR. PARCELL:  I move the introduction, Judge.

(Witness stood aside.)

MR. PARCELL:  Carolyn Chiles, please? Judge, Ms. Pulley may remain in the courtroom, if she wishes, as a spectator.

THE COURT:  The witness is excused.  She can stay in Court if she likes.

CAROLYN CHILES,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?

A    Carolyn Chiles.

Q    Ma'am, are you married or were you married?

A    I was.

Q    Who were you married to?

A    Linwood Chiles.

Q    How old a fellow was he at the time of his death?

A    How old?

Q    Yes, ma'am.

A    35.

Q    Did you have any children as a result of your marriage?

A    Yes.

Q    How many?

A    One.

Q    I'll ask you if you would look at this

photograph and tell the ladies and gentlemen of the jury whether or not that person means anything to you.

(Photograph proffered to witness.)

A    Yes.

Q    Who is that?

A    My husband.

MR. PARCELL:  Government Exhibit 147, please.

BY MR. PARCELL:

Q    Ma'am, do you know when he died?

A    The 19th of February of last year.

MR. PARCELL:  Pass the witness.

MR. GEARY:  No questions.

MR. WAGNER:  No questions.

MR. BAUGH:  No questions.

MR. McGARVEY:  No questions.

(Witness stood aside.)

MR. VICK:  Detective C.T. Woody.

THE COURT:  Why don't we take a break here.

MR. VICK:  Yes, sir.

THE COURT:  We will take about ten minutes.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Remove the defendants.

(The defendants were removed from the courtroom.)

(Recess was taken from 11:30 a.m. to 11:40 a.m.)

MR. VICK:  We have placed the TV here.  We have one quick witness before C.T.

MR. BAUGH:  Is this the last witness for the trial?

MR. VICK:  No, last crime scene video.

(The jury entered the courtroom.)

MR. VICK:  Detective Woody.

C.T. WOODY, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    During the investigation of this case, did you have occasion to talk to Lance Thomas, also known as Anthony Mack, also known as "V," and tell him anything concerning Linwood Chiles?

A    Yes, sir, I did.

Q    What did you tell him?

A    I advised him that I already interviewed Linwood Chiles and that I knew what was going on in reference to the investigation.

**JA1215**

Wanda B Brown (Direct)

MR. VICK:  No further questions.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Did you also have occasion to tell something to Sterling Hardy?

A    Yes, sir, I did.

Q    Was what you told Anthony Mack the same thing you told Sterling Hardy?

A    Yes, I did.

Q    What was that?

A    That I had interviewed Mr. Chiles and that I knew what was happening in reference to the investigation.

MR. GEARY:  Thank you.

THE COURT:  Anything else for this witness?

MR. BAUGH:  Nothing for defendant Roane, Your Honor.

MR. WAGNER:  No questions.

THE COURT:  Thank you, Detective Woody.

(Witness stood aside.)

MR. PARCELL:  Officer Brown, please?

WANDA B. BROWN,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, would you please state your name?

A    My name is Wanda B. Brown.

Q    Would you tell us what your occupation is?

A    I'm a police officer with the City of Richmond.

Q    How long have you been a police officer?

A    13 years.

Q    Ma'am, were you so employed as a Richmond police officer on January 21st, 1992?

A    Yes.

Q    You were working what routine or what shift?

A    I was working the day shift.

Q    Did you have occasion to get a call to respond to the underpass below I-95?

A    Yes, I did.

Q    What time did you get the call and where did you go?

A    I got the call at approximately 8:49, I believe it was.

Q    In the morning?

A    Yes.

Q    Did you respond to that location?

A    Yes, I did.

Q    What if anything did you find which was unusual to you?

**JA1216**

A    I saw a body down at the  --  on the railroad tracks down the hill behind the school.

Q    Were you able to determine whether that person was a male or female?

A    At that time, I thought it was a male.

Q    Was the person black or white?

A    Black.

MR. PARCELL:  Judge, may the witness be shown these photographs?

(Photographs proffered to counsel and witness.)

MR. PARCELL:  I'll ask she be shown Government Exhibit 74-1 through 4.

BY MR. PARCELL:

Q    Advise the ladies and gentlemen of the jury as to whether or not that depicts what you found that morning.

A    Yes.

MR. PARCELL:  That will be Government Exhibit 74-1 through 4.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Did you maintain that crime scene as best you could until Detective Tweedie arrived to process the crime scene?

A    Yes, I did.

MR. GEARY:  No questions, Your Honor.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

MR. McGARVEY:  No questions.

(Witness stood aside.)

MR. PARCELL:  Detective Tweedie, please.

DAVID S. TWEEDIE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    I'm Detective David S. Tweedie.

Q    Your occupation, sir?

A    I work for the City of Richmond Police Department in the Detective Division, forensic unit.

Q    How long have you been a police officer?

A    21-and-a-half years.

Q    How long have you been assigned to forensics?

A    Four years.

Q    What training have you had to allow you to perform your duties as a forensic detective?

MR. WHITE:  We will stipulate his qualifications for crime scene.

THE COURT:  All right.

BY MR. PARCELL:

**JA1217**

Q    Were you so employed in that capacity on January 21st, 1992?

A    Yes, sir.

Q    Did you have occasion to respond to the Maggie Walker High School area near the railroad tracks to process a crime scene?

A    Yes, sir, I did.

Q    When you arrived, what if anything did you find?

A    I found a body down near the railroad tracks and five police officers, a couple of vehicles, police vehicles.

Q    And when you first started to process that crime scene, did you know whether your victim was a male or female?

A    No, sir.  I didn't know at the beginning.

Q    And that person was initially thought to be a person by the name of Jeanette Pauley; is that correct?

A    That's the first I've heard that name, sir.

Q    You later determined the victim was who?

A    Katrina Rozier.

MR. PARCELL:  With the Court's permission, I'll ask he be allowed to look at Government Exhibit 75 and approach the jury and explain to them where he found the victim with those photographs.

THE COURT:  All right.

(Witness approached jury.)

THE WITNESS:  These are two photographs that I took -- I had taken, rather, by the aircraft.

BY MR. PARCELL:

Q    As you describe those photographs, would you give the Government Exhibit Number on each photograph and explain what those things are?

A    Yes, sir.  On Exhibit 75-1, it is an aerial view showing the general scene.  Now, this is the rear area of Maggie Walker, the former Maggie Walker High School, showing the infield of a track here, the track going around.  There is a set of railroad tracks that runs adjacent to it.  This is Interstate 95 northbound to the top, southbound to the bottom of the picture.  We will start with that first, giving you a general view.

When I arrived, there was the body of the victim approximately here adjacent to the railroad tracks.  It appears to be at the end of a little pathway.  It is kind of a drainage ditch where water runs off a higher plateau up around that track down towards the railroad tracks that are considerably further down.  You walk downgrade from the track area down towards those railroad tracks.  So I have labeled there Route 95, railroad, the high school track area, and where

**JA1218**

David S. Tweedie (Direct)

the victim was found on 75-1.  On Exhibit 75-2, it is a different view of the same area where the victim was found.  The Maggie Walker High School track area, the railroad track is shown in more detail, a closer view, Interstate 95, and the approximate location where the victim was found.  It appears to be at the end of that path near a high tension tower.

I put these labels on these two pictures.

MR. PARCELL:  I would ask that they be received as Government Exhibit 75-1 and 2.

MR. BAUGH:  No objection.  Could we approach before the other pictures are shown to the witness?

(At Bench.)

MR. BAUGH:  We have two questions.  The government has some pictures.  The last one is obviously a staged photograph.  The body has been turned over.  As such, it would be irrelevant as to his crime scene as he determined it.  It does not give an identification.  Additionally, I think we have an objection under 404(b), because until such time as the killer of this person is identified, this murder can't come in as evidence of any issue.  It doesn't show intent.  It doesn't show anything.

MR. VICK:  As to the murder being part of the conspiracy, we can link up, as I said in opening, the gun that was used to kill this woman as a gun seized from the place that "Whitey" set up in South Richmond after coming back from New York in April of 1992.  That gun was given to him, the evidence will show, by Sandra Reavis.

MR. BAUGH:  With that, we withdraw.  We still have the objection on the fourth picture.  See, this is how the body was found.  They rolled her over to take this picture.  This could not be  --

THE COURT:  I don't think we need that in.

MR. BAUGH:  Thank you.

(In Open Court.)

MR. PARCELL:  I would ask that he be allowed to reapproach the jury and explain what Exhibit 74 is.

A    These are three photographs that I took at the scene that morning, January 21st, 1992.  Exhibit 74-1 is just a general shot.  All of these are general shots.  Two of them are more intermediate than a close-up of the body the way it was found by me that morning.  74-1 is first.  It is an overview shot somewhat intermediate just to show the general scene.  The photography is one of the first things that's done after a search of the area for any physical evidence so it won't be contaminated.  Nothing has been touched in any way before these were

**JA1219**

taken by the forensic people.  74-2 is a more close-up view.  The victim is in the same position as in the previous picture.  It is just a more close-up shot.  It is a 35mm picture.  Exhibit 74-3 again is a more intermediate shot of the victim from a different angle, from more of a front angle.  Again, the position is the same.

MR. PARCELL:  I would ask that he return to his seat.  I ask that these be received as 74-1 through 3.

THE COURT:  74-1, 2, and 3 will be received.

BY MR. PARCELL:

Q   As you processed this crime scene, did there come a point in time when you had occasion to video the crime scene, also?

A   Yes, sir.

Q   I ask you to run through this video and go over with the Court and jury and explain to them what you see and what you discovered in the investigation.

A   I started with a general scene, as you see here, of the infield of the track area above the railroad tracks directly behind the school.  There is the school coming into view, the main building.  This is a slow pan to show the general scene before I moved closer to the actual scene.  I just stood in one position and turned 360 degrees to show everything as it appeared that morning.

As we swing around, you will be able to see some traffic on Interstate 95 and Route 64.  Those vehicles you see there are going southbound.  I moved a little bit closer to the top of the plateau before looking down the so-called path or gully that led down from that track area down towards the railroad tracks.  The structure you see down there is part of the concrete support for the highway.

Q   The police officer shown in the ditch, that's Officer Brown; is that correct?

A   That's correct.  This scene shows the general view if you were standing at the top of the little path looking downward.  This is the path that was visible in those photograph exhibits, the first two that we saw.  I've come down the path a short distance.  I had stopped the video.  I walked down the path and I restarted.  I just proceeded to walk down the path, slowly approaching the victim on the ground.  Just to the left of the concrete support there, you will just begin to see the form of the body on the ground, brown pants and a blue jacket, just in the shadow there.  The body was not visible from the track area at the top because of the weeds that were between the video and the body.

**JA1220**

The position you see here is the same position you saw in the three photographic exhibits. This video was taken just prior to those still shots being taken. I moved across onto the railroad tracks to look back towards the body in the opposite direction for a different view. This is directly under the highway. The victim is behind me now, and I'm looking across the tracks, the continuation of the support for the highway above. These are Richmond Police personnel, all four or five of them.

Now there will be more intermediate and closer shots of the victim and the scene directly adjacent to the body. The blood you see there apparently came from the area of the head of the victim. There were no wounds observed anywhere on the body, either at this stage or when I rolled her onto her back looking for any evidence that may have been underneath the body and to try to determine identification. The only significance of this shot is to indicate that the hand is gloved and the body is appropriately dressed for the cold temperatures that morning.

I saw two wounds to the head: one approximately between the eyes above the nose, and one on the right rear portion of the head, sort of behind and above the right ear. On the railroad track, a few feet from the body, was what appeared to be a piece of a copper jacket that we thought may have been of some significance, so it was photographed and recovered. This is after the victim had been rolled onto her back.

MR. BAUGH: We ask that it be stopped after the victim is rolled over.

THE COURT: No, he explained what happened.

THE WITNESS: As I mentioned, I did this so I could go through pockets and observe anything that may have been underneath the body that could have been photographed for possible evidence to recover. This is also after the Medical Examiner had been notified, the facts had been described of the scene, and we had been told to transport the body to the Medical -- that the Medical Examiner in this particular case would not respond to the scene, which is their option. The body is only moved in any way after the Medical Examiner has been advised. The right hand is gloved.

(Tape ended.)

That's the conclusion of the video I took that morning.

MR. PARCELL: The government will move the introduction of Exhibit 119, which is a video of all the 11 victims with respect to crime scenes.

**JA1221**

David S. Tweedie (Direct)

THE COURT:  Admitted.

BY MR. VICK:

Q    As you continued your investigation, there came a point in time when Detective Blaylock responded to the ME's Office to retrieve some projectiles from the victim and take them to Anne Jones for analysis; is that correct?

A    Yes, sir, he did.

MR. PARCELL:  That will be Government Exhibit 80, please.

(Exhibit proffered to witness.)

MR. PARCELL:  Pass the witness.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

THE COURT:  You may stand down, sir.

(Witness stood aside.)

MR. VICK:  The government will call Greg Noble.  He is in the lock-up, Your Honor.

THE COURT:  All right.

MR. PARCELL:  As soon as we rewind the video, we will move the projector from out in front of the jury.

THE COURT:  All right.

MR. VICK:  The outside case and the exhibit itself have been previously marked as Government Exhibit 119.

(Videotape proffered to Clerk.)

MR. VICK:  May we approach?

(At Bench.)

MR. VICK:  Deputy Dugger just informed me that Mr. Noble does not wish to testify.  I would proffer to the Court that he is Richard Tipton's, "Whitey's" cousin.

MR. GEARY:  That's not true.

MR. VICK:  That's what he will testify.  He is currently housed at the Richmond City Jail where the defendants are housed.  I understand he said he is not going to testify, that he is  --  that it took three marshals to get him out here.

MR. VICK:  I ask in light of that that I be allowed to lead him.

MR. GEARY:  I think he should be allowed to have a lawyer.

MR. BAUGH:  I think we should voir dire him outside the presence of the jury.

THE COURT:  All right.

Ladies and gentlemen, I'm going to have to send you out again.  Everyone remain seated while the jury leaves the courtroom.)

**JA1222**

(The jury left the courtroom.)

MR. VICK:  Would you like me --

THE COURT:  Just wait a minute.  Are they out yet?  All right.

MR. BAUGH:  Before he is questioned, I would ask the Court to voir dire  --  it is my understanding this man is being held in jail.  If he is being held on pending charges or charges arising out of this, that might trigger other issues besides just one of unavailability.

THE COURT:  You go ahead, Mr. Vick.

GREG NOBLE, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

VOIR DIRE EXAMINATION

BY MR. VICK:

Q    You and I have had occasion to speak in anticipation of your testimony?

A    Yes.

Q    In anticipation of that testimony, you were told that the statements that you gave to us would not be used against you in federal court; is that correct?

A    Yes.

Q    You were told, also, that you have been charged with possession of cocaine with the intent to distribute it in state court, and you are currently serving time on that; is that correct?

A    Right.

Q    That cocaine you got from Richard Tipton, "Whitey," is that what you told me?

A    Is that what I told you?

Q    Isn't that what you told me?

A    Yes.

Q    We have told you we will do nothing for you on those state charges?

A    That's right.

Q    It is my understanding you don't want to testify here today.

THE WITNESS:  Judge, I don't want to testify.

BY MR. VICK:

Q    In anticipation of your testimony, you and I have spoken on several occasions with detectives present?

A    Right.

Q    You have freely and voluntarily on those occasions provided us information concerning your testimony here today; is that correct?

A    Right.

Q    You choose not to testify now because you think

**JA1223**

it might cause you problems at the City Jail and because --

MR. GEARY:  I object to that.

THE WITNESS:  That's not right.

BY MR. VICK:

Q    Why do you refuse to testify?

A    Because that's my cousin.  I can't be a part of it.

THE COURT: All right.  Mr. Noble, let me explain something to you.  You don't have any choice. Once they have indicated to you that anything that you will say will not be used against you and you are called to testify, you are going to have to testify. It is just that simple.  You are going to have to answer questions as you have answered them on prior occasions.  Any questions?

MR. BAUGH:  If I might, for the purpose of argument and the form of argument, it is my understanding the United States has given this gentleman use-immunity, not transactional immunity. He is being held on pending state charges.  He is being asked to testify in a public forum.  Being as how the protection offered by the United States does not extend to all of his liability issues, we would submit he still has a Fifth Amendment right.  He

still has the right.

THE COURT:  All right.

MR. VICK:  It is my understanding he has been convicted on those charges already.

THE COURT:  Let me understand this:  Mr. Noble, have you been convicted in state court?

THE DEFENDANT:  Yes, I have.

THE COURT:  You said yes, sir?

THE DEFENDANT:  Yes.

THE COURT:  Those charges are pending?

THE DEFENDANT:  No.

THE COURT:  Have you been convicted or have you not?

THE DEFENDANT:  I've been convicted of drug charges.

THE COURT:  You have been convicted of drug charges?

THE DEFENDANT:  Yes.

THE COURT:  Are there any other charges pending against you?

THE DEFENDANT:  No.

BY MR. GEARY:

Q    Mr. Noble, were you charged with any drugs as a result of the arrest in South Richmond last April?

A    Yes, I was.

Q    You have already been convicted of those?

A    Yes.

BY MR. BAUGH:

Q    Sir, have you been -- and I am not asking you what you did -- have you been charged for everything that you did illegal on Southside?

A    Say that again.

Q    Did you do other things on Southside for which you have not been charged that the state doesn't know about?

A    No, I haven't.

MR. VICK:  That was the subject of our debriefings with him, Your Honor.

THE COURT:  Mr. Vick, your inquiry will relate to  --

THE WITNESS:  Excuse me.  You asked me have I been charged with something?

BY MR. BAUGH:

Q    Have you been charged  --  has the government charged you for everything that  --

A    Yes, they have.  Yes.

MR. BAUGH:  Okay.

THE COURT:  Mr. Vick, your area of inquiry has to do with what?

MR. VICK:  The area of inquiry -- I will be limited.  It has to do with his being recruited by Mr. Tipton to sell drugs with him in South Richmond in approximately April of 1992; his actual receipt from Richard Tipton of crack cocaine to sell; that that's the crack cocaine that Mr. Noble was arrested with.  We have got a lab report to move that in.  And additionally, Mr. Noble knows that indeed Mr. Richard Tipton was supposed to get a firearm from Sandra Reavis which Mr. Tipton got on 15th Street in Blackwell for his own use.

THE COURT:  All right.  Bring in the jury.

MR. VICK:  May I lead, Your Honor?

THE COURT:  You may lead.

MR. GEARY:  What's the difference?  Sorry, I couldn't resist.

MR. VICK:  I'll show him how to properly lead, Your Honor.

(The jury entered the courtroom.)

## Greg Noble (2616)

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    My name is Gregory Noble.

Q    Mr. Noble, how old are you?

A    24.

Q    Mr. Noble, you and I have had occasion to talk

**JA1225**

in anticipation of your testimony here today; isn't that correct?

A   Yes, we have.

Q   In fact, Mr. Noble, you have been previously convicted for a number of felony charges; is that correct?

A   Yes.

Q   Mr. Noble, you are currently serving time in the Richmond City Jail for a felony narcotics conviction that emanated from your April 10th, 1992 arrest in South Richmond, in Blackwell, with crack cocaine; is that correct?

A   Right.

Q   Now, Mr. Noble, you got that crack cocaine that you were arrested with from Richard Tipton, also known as "Whitey."  Is that correct?

A   Yes.

Q   This is "Whitey" seated here in the courtroom?

A   Yes.

Q   He is family to you, isn't he?

A   Yes, he is my cousin.

MR. VICK:  I would move into evidence Government Exhibit 82 concerning the crack cocaine that Mr. Noble was arrested with in South Richmond at that time.

THE COURT:  Admitted.

BY MR. VICK:

Q   Mr. Noble, we have told you that the testimony you give, we will not use any of the statements against you; is that correct?

A   Yes, sir.

Q   We won't use your statements in your testimony against you; is that correct?

A   Have you told me that?

Q   Is that what we have told you?

A   Yes.

Q   All right.  Mr. Noble, in April of  --  in approximately January of 1992, you were released from jail; is that correct?

A   Right.

Q   In that time frame, you were approached by Richard Tipton, your cousin, who asked you to sell cocaine for him, didn't he?

A   What?

Q   Didn't your cousin, Richard Tipton, approach you and ask you to sell cocaine for him?

A   With him.

Q   You told him that you would, didn't you?

A   Yes.

Q   He went to New York to get cocaine, did he not?

A   Supposedly.

Q   In April  --  in your conversations with Richard

Tipton, Richard Tipton told you about an individual by the name of "C.O.," didn't he?

A    Yes.

MR. BAUGH:  This is outside the proffer of the area about which he was going to be led.

THE COURT:  Sustained.

MR. VICK:  It is all part of the debriefing.

THE COURT:  I'll sustain that, Mr. Vick.

BY MR. VICK:

Q    Did Richard Tipton ever tell you about the fact that he  --  he told you he could not go to the Clay Street area of Richmond because he had hurt people in that area?

A    No, he didn't tell me he hurt nobody.

Q    He did not tell you he could not go to Clay Street because somebody got hurt up there?

A    Yes.

Q    He did say that.  When Richard Tipton came back from New York, he had three ounces of cocaine powder with him, didn't he?

A    Yes, he did.  He had some cocaine.

Q    He made that -- or someone made that cocaine powder into crack cocaine?

A    Yes, someone did.

Q    That crack cocaine, some of that was given to you to sell; is that correct?

A    No, it wasn't.

Q    Some of that crack cocaine was given to you by Richard Tipton, correct?

A    Yes, right.

Q    That was the crack cocaine you were arrested with, right?

A    Right.

Q    What were you to do with that crack cocaine? You were to sell it, weren't you

A    It was my business what I did with it.

Q    You were going to sell it, weren't you?

A    Whatever I chose to do with it was no problem.

Q    Prior to your arrest, have you heard Richard Tipton speak of an individual by the name of Sandra? You have, haven't you?

A    Sometimes.

Q    Indeed, Richard Tipton said that he was supposed to get a firearm from this person named Sandra; is that right?

A    From somebody.

Q    Didn't you tell us  --

MR. BAUGH:  I ask the witness be permitted to answer.

THE COURT:  Let him finish the answer to the question.

**JA1227**

BY MR. VICK:

Q   Go ahead.

A   Ask the question again.

Q   Didn't you tell us in anticipation of your testimony that you knew that Richard Tipton was supposed to get -- "Whitey" was supposed to get, while living in South Richmond, a firearm from an individual by the same of Sandra?

A   I didn't say no name.

Q   You did not say a name?

THE COURT:  That's what he said.

BY MR. VICK:

Q   Do you know the name Sandra Reavis; you have told us that name, haven't you?

A   Yes, from reading it in the newspaper.

Q   You told us that Sandra Reavis was to bring Richard Tipton a firearm, didn't you?

MR. WAGNER:  Objection.

MR. VICK:  Different, Your Honor, Sandra Reavis.

THE COURT:  I'll let him answer that.

THE WITNESS:  I answered your question once.

BY MR. VICK:

Q   You are denying that you said that?

A   That I said her name, anybody's name.

Q   Excuse me?

THE COURT:  That he said anybody's name.

BY MR. VICK:

Q   You don't want to testify here today, do you, Mr. Noble?

A   Sir, I don't want to testify against nobody.

Q   You are testifying here reluctantly, correct?

THE COURT:  It is an unnecessary question. He said he didn't want to testify.

BY MR. VICK:

Q   Richard Tipton went and left from 15th Street in Blackwell to go meet this person Sandra at a service station; isn't that what you told us?

MR. WAGNER:  Objection.

THE COURT:  Sustained.  He said he didn't say any name.

BY MR. VICK:

Q   Did he leave to go meet anyone at a service station to get a firearm?  Didn't you tell us that?

A   Did he leave to go get a firearm?  He left to go meet someone.

Q   Did you tell us that he went to meet them at a service station?

A   Yes.

Q   You told us he came back with a blue tote bag, that he got the gun at the Amoco station; didn't you

tell us that?

A    No, I didn't.

Q    You told us that a number of people came to him on 15th Street in Blackwell and got drugs, didn't you?

A    Could you go back to the question you just asked before?

Q    You told us that a number of people came to get drugs --

A    No, the other question.

Q    Didn't you tell us that Richard Tipton came back from the Amoco station with a gun?

A    No, I did not.

Q    You told us that a number of people came and got cocaine from Richard Tipton, crack cocaine, while he was staying on 15th Street in Blackwell, didn't you?

A    Yes, they came and got it.

        MR. VICK:  Beg the Court's indulgence.

        (Counsel conferring with co-counsel.)

        I tender the witness.

        THE COURT:  Mr. Geary?

                CROSS-EXAMINATION

BY MR. GEARY:

Q    You are related to Richard Tipton on his father's side; is that right?

A    That's right.

Q    Can you tell the jury how the relationship is? Who married who to get you two to be cousins?

A    Well, his father's brother married my aunt.

Q    When you got out of jail, it was around January 28th or 29th of last year?

A    That's true.

Q    Where were you living when you got out of jail?

A    3515 Wainwright.

Q    Where is that?

A    It is in Southside.

Q    Did you know Richard -- did you call him Richard or "Whitey?"  What did you call him?

A    Richard.

Q    When do you think it was you met him after you got out of jail?

A    About February, late February or early March.

Q    Okay.  Then you got arrested again on April 10th and he got arrested the same date; is that correct?

A    He got arrested before me.

Q    He got arrested before then?

A    He got arrested before I did.

Q    Do you recall how many days or weeks it was that he was arrested before you were?

A    One day.

Q    Did you talk to him or did he talk to you about crack?  Do you remember who talked to who first?

**JA1229**

A    No, I don't remember.  We just talked.
Q    And the crack that he had, what did you get?
Did you get any rocks?
A    Yes.
Q    Do you recall approximately how many you got?
A    About five.
Q    What were you intending to do with the rocks
that you got?
A    I would have sold them, used them.
Q    Were you using crack then after you got out of
jail?
A    Occasionally.
        MR. GEARY:  May I speak to my co-counsel
for a moment?
        THE COURT:  Go ahead.
    (Counsel conferring.)

2626
        MR. GEARY:  No further questions, Judge.
        THE COURT:  All right.  Any questions from
anybody else?
        MR. BAUGH:  None for Mr. Roane, Your
Honor.
        MR. WAGNER:  No questions.
        MR. VICK:  No redirect.
        MR. COOLEY:  Judge, can I have a moment?
        THE COURT:  All right.
    (Counsel conferring.)
                CROSS-EXAMINATION
BY MR. COOLEY:
Q    Good afternoon to you, Mr. Noble.  Mr. Vick
asked you if you didn't want to testify.
A    That's right.
Q    Would you tell the folks why you don't want to
testify?
A    Because I don't want to testify.  It is my
family.
Q    One individual in this courtroom is related to
you?
A    Right.
Q    And you just don't want to testify because of
that?
A    Yes.

2627
        MR. COOLEY:  Thank you, sir.
        THE COURT:  All right.  You may remove the
witness.
    (The witness left the courtroom.)
        MR. VICK:  Detective Fleming.
                RALPH FLEMING,
called as a witness by and on behalf of the
government, having been first duly sworn by the
Clerk, was examined and testified as follows:
                DIRECT EXAMINATION
BY MR. VICK:

**JA1230**

Leroy Slate (Direct)

Q    I remind you that you continue under oath. Detective Fleming, pursuant to your investigation of this case, did you ever have occasion to be present when Greg Noble was debriefed to prepare him for his testimony?

A    Yes.

MR. BAUGH:  We object to any under CORDAY v. IOWA, confrontation.  We would submit availability is not the issue.

(At Bench.)

THE COURT:  How do you propose he is going to testify?

MR. VICK:  He has stated on the stand today, after stating he was reluctant he has denied things he told us in the debriefing.  We are going to get to those areas he has denied today.

THE COURT:  You can't do that.  The objection is sustained.

MR. VICK:  Your Honor, if I may, I have every bit as much a right in a reluctant-witness situation like this to impeach them, as they intend to do our witnesses through their calling of police officers.  If the Court is going to hold that they have no right to police officers to impeach statements made by witnesses, then I'll stand by it.

THE COURT:  No.  I'm not going to allow it.

MR. VICK:  No further questions in light of the Court's ruling, Your Honor.

(In Open Court.)

THE COURT:  All right.  You may stand down, Detective Fleming.

(Witness stood aside.)

MR. PARCELL:  Leroy Slater, please.  And I will need Government Exhibit 123, please.

## Leroy Slater (2629)

LEROY SLATER, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    Leroy Slater.

Q    Your age?

A    34.

Q    I'll ask you to speak louder so the ladies and gentlemen of the jury can hear your responses.

A    34.

Q    Have you ever been convicted of a felony?

**JA1231**

A    No.
Q    Do you have some misdemeanor convictions?
A    Yes.
Q    Going back to March and April of 1992, can you tell the jury where you lived?
A    15th Street.
Q    South Richmond?
A    Yes.
Q    Who did you live there with?
A    Belinda Davis.
Q    Did there come a point in time in March of 1992 that you had occasion to meet someone called "Whitey?"
A    Yes.
Q    Do you see him in the courtroom?

2630

A    Yes.
Q    Would you point him out to the ladies and gentlemen of the jury?
A    Right there.
Q    How is he dressed?
A    With glasses on.
         MR. PARCELL:  Let the record reflect he has identified the defendant, Richard Tipton.
         THE COURT:  The record will so reflect.
BY MR. PARCELL:
Q    How did it come to be that you met Mr. Tipton or "Whitey?"
A    I just ran into him one day, and they wanted to come in and get out of the rain.
Q    "They" being whom?
A    Him and another dude due.
Q    I'm sorry?
A    Him and another dude.
Q    What is the other guy's name, if you know?
A    I don't know.  I don't recall it.
Q    Did he have a different accent?
         MR. GEARY:  I object to that.
         THE WITNESS:  Yes.
         THE COURT:  Overruled.
BY MR. PARCELL:

2631

Q    You let him in your house?
A    Yes.
Q    For what purpose?
A    For them to come in out of the rain, get out of the rain.
Q    And how long did they stay at your house?
A    A little bit over a month, or a month.
Q    Did they do anything in your house?
A    Yes, they came in the house.
Q    While they stayed at your house, what did they do while they were there?
A    They sold drugs.

**JA1232**

Q    What kind of drugs?
A    Cook-'em-up.
Q    Did they ever cook cocaine in your house?
A    Yes.
Q    Who did the cooking?
A    "Whitey" done the cooking.
Q    How many times did he cook in your house?
A    Twice.
Q    And the first time he cooked, would you please tell the jury what happened with that cooking experience?
A    It just busted up.  That's all.
Q    How did he try to cook the crack that time?

2632
A    In a jar.
Q    What kind of jar?
A    A baby jar.
Q    What happened to that baby jar as they tried to cook it?
A    It blowed up.
Q    Did they save the cocaine or was the cocaine wasted?
A    It was wasted.
Q    And then did there come a second time when they cooked cocaine in your house?
A    Yes.
Q    Who did the cooking?
A    "Whitey."
Q    Do you know how much weight they cooked?
A    Two ounces.
Q    And what did they do when they finished cooking that cocaine?  It became crack; is that correct?
A    Yes.
Q    What did they do with that crack cocaine?
A    Sold it.
Q    To who?
A    Anybody.
Q    Did you ever sell crack cocaine for "Whitey?"
A    Yes, I sold it.

2633
Q    How many times did you sell?
A    About four or five times.
Q    What did you do with the money you got for that crack cocaine?
A    Gave it back to them.
Q    Did he ever offer you a job?
A    They say, you know, they would pay me a thousand dollars a month.
Q    For what?
A    For helping them.
Q    Helping them do what?
A    Selling cocaine.
Q    Did there come a point in time when you had occasion to bring a gun to your house?

**JA1233**

Leroy Slate (Direct)

A    Yes.
Q    How did that happen?
A    I walked with them to Amoco to meet somebody to get the gun.
Q    Walked with who?
A    Me and "Whitey" walked over there.
Q    Who did you go meet?
A    A girl.
Q    What was the girl's name?
A    I don't know.
Q    Do you see her in the courtroom?  Stand up and look around if you need to, sir.
     (Witness scanned the courtroom.)
A    No, I don't see her in the courtroom.
Q    Look all around the courtroom.
     (Witness scanned the courtroom further.)
A    Oh, yes, I see her.
Q    Would you please point her out to the ladies and gentlemen of the jury?
A    Right there.
Q    How is she dressed?
A    With the gray jacket.
     MR. PARCELL:  Let the record reflect he has identified defendant Reavis.
     THE COURT:  The record will so reflect.
BY MR. PARCELL:
Q    When you and "Whitey" went to the Amoco station, was she there?
A    Yes.
Q    Was anyone with her?
A    Yes.
Q    When you all went up there, did "Whitey" take anything with him?
A    No.
Q    Did he give her anything?
A    I didn't see him give her anything.
Q    Did he leave the house with something he didn't come back with?
A    Yes, some coke left at the house, but he didn't come back with it.
Q    He didn't what?
A    Come back with it.
Q    How did you know that?
A    Because he didn't have any on him.
Q    Did you all get the gun at that point in time?
A    No.
Q    When you got back to the house, what happened next?
A    She came back.
Q    Who is she?
A    The lady.  The girl.
Q    What did she come to?

**JA1234**

A    I can't remember the street.
Q    The place you were living on 15th Street?
A    It was around the corner.
Q    How did you know she came back?
A    Because I went and met her.
Q    And did somebody point her out to you?
A    What?
Q    Did someone point out to you that she was back?
A    Yes.

2636
Q    Who did that?
A    "Whitey" seen the car pulled up on the side.  So I went to the car.
Q    Did he ask you to do something after he told you she was outside?
A    I went to the car and got a blue bag from her.
Q    What kind of bag?
A    Tote bag.
Q    What color was it?
A    It was blue.
Q    Did you give her anything for the tote bag?
A    No.
Q    Did you bring the bag back inside the house?
A    Yes.
Q    And who did you give the bag to?
A    I gave the bag to "Whitey."
Q    Did he open the bag?
A    Yes.
Q    What was in it?
A    A gun was in it.
Q    What kind of gun?
A    A .38.
Q    What color was it?
A    Black.
          MR. PARCELL:  I'll ask to have him shown

2637
Government Exhibit 124.
          THE COURT:  All right.
BY MR. PARCELL:
Q    I'll ask you to look at what's been labeled Government Exhibit 124.  Does that appear to be the same weapon that was in your house?
A    Yes.
Q    And did you ever see that weapon again after you got it from Ms. Reavis?
          MR. GEARY:  I object.  He said it appeared to be the same weapon.  Now he is saying the same weapon.  There's a substantial difference.
          THE COURT:  All right.
BY MR. PARCELL:
Q    Did he ever pull that gun on you?
A    Yes, he pulled the gun playing with me.
          MR. WAGNER:  I can't understand, Your Honor.

**JA1235**

THE WITNESS:  Yes, he pulled the gun out on me.

BY MR. PARCELL:

Q    Did he tell you why?

A    No.

Q    Did you all have a difference of opinion about some money?

A    No.

Q    And when is the last time you saw that weapon?

A    Until now.

Q    Sir?

A    Until now, the weapon.

Q    Before today, when is the last time you saw that weapon?

MR. GEARY:  He didn't identify any gun.  He said it appears to be the same gun.

THE COURT:  All right.  That objection is sustained.  He has indicated that the weapon looks like it.  And you should frame your questions in that way.

BY MR. PARCELL:

Q    The weapon that you saw "Whitey" with the last time you saw it, it was where?

A    At my house.

Q    And did he do anything with the gun the last time you saw it?

A    No.

Q    Did he wrap it?

A    Oh, he wrapped it up in plastic.

Q    That's the last time you saw it?

A    Yes.

Q    Has myself or anyone else with the government told you what to say today?

A    No.

Q    Have we offered you any money?

A    Huh-uh.

Q    Have we gotten you out of jail for anything?

A    No.

Q    Have we told you that as long as you told us the truth, no charge would be placed against you?

A    Yes.

MR. WAGNER:  Objection, leading.

THE COURT:  Overruled.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Slater, when "Whitey" was arrested over on 15th Street, were you also arrested that night?

A    No.

Q    Was anyone else besides "Whitey" arrested?

A    Not that I know of.  I was asleep.

Q    Excuse me?

A    I was sleeping when he was arrested.

**JA1236**

Leroy Slate (Cross)

Q    You lived there with whom besides Ms. Davis; anybody else living there?
A    The kid.
Q    Who is on the lease?
A    Belinda Davis.

2640

Q    And do you know how long she had lived there as of April of 1992?
A    No.
Q    How long had you lived there?
A    I lived there around about three or four months.
Q    Three or four months?
A    Yes.
Q    And before you met "Whitey," you were not a stranger to crack cocaine, were you?
A    Huh?
Q    You were not a stranger to crack cocaine before you met him?
A    What you mean?
Q    Had you ever used or sold crack cocaine before you met "Whitey?"
A    Long time ago.
Q    Long time ago?
A    Yes.
Q    What was the actual address on East 15th, 413 or 415?
A    I can't remember.
Q    Were there cross streets: Stockton, Decatur?  Do you remember what the cross streets were?
A    I just know 15th Street from school.

2641

Q    Do you recall appearing in this building in April to testify before a Federal Grand Jury?  Did you appear here on April 21st, 1992 to testify downstairs in front of a Grand Jury?
A    In front of the Grand Jury?  I don't know.
Q    Do you remember at all  --  have you ever testified under oath about this case before today?
A    I don't know.
Q    Have you ever appeared where Mr. Vick asked you some questions, this man sitting right here?
A    Who?
Q    Mr. Vick.  Have you ever been in front of a jury with Mr. Vick?
A    No.
Q    You never have?
A    No.
Q    Did you ever tell anyone under oath that "Whitey" stayed in the house with you for about a week or less?
A    No.
        MR. GEARY:  If I may, I'd like to go to page eight  --

**JA1237**

Leroy Slate (Cross)

MR. VICK:  Again, this is improper use.  He has the right to see and review it.

MR. GEARY:  If he wants to object, fine,

2642

instead of making a speech.

THE COURT:  Just give it to him and ask him about it.

BY MR. GEARY:

Q    I ask you to go to page eight.

MR. GEARY:  First of all, I'd like to ask him to look at the front page and ask him if it refreshes his recollection if he ever appeared before a Grand Jury.

(Witness perusing document.)

THE WITNESS:  No, I ain't been in front of the jury.

BY MR. GEARY:

Q    Before a Grand Jury, some people like this downstairs back in April of last year with Mr. Vick asking you questions?

A    I really can't recall, sir.

MR. GEARY:  I would have to offer the Grand Jury testimony then.

MR. VICK:  No objection.

MR. BAUGH:  Objection.  Confrontation right.

MR. GEARY:  On behalf of Mr. Tipton, please.

MR. BAUGH:  We object.

2643

THE COURT:  Mr. Geary, go to your part of the transcript and ask the question.

BY MR. GEARY:

Q    Go to page eight, if you would.  Do you see the numbers on the left-hand side of the page that go down from top to bottom?

A    Uh-huh.

Q    Do you see where it says, "Number 3," do you see that?

THE WITNESS:  Yes.

BY MR. VICK:

Q    Mr. Vick says to you, "How long they had been there at the house?"

MR. BAUGH:  Excuse me, we will withdraw our objection.

MR. GEARY:  You answer "Yes."  Then Mr. Vick says, "Let me see, I don't think  --"  or you say  --  I'm sorry.  You answered, "Let me see, I don't think they had been there a week or over a week."

Do you recall telling the Grand Jury that back in April of 1992?

A    I remember I gave the date, but not  --

Q    Excuse me?

**JA1238**

THE COURT:  Mr. Geary, does everybody withdraw the objection to the transcript?

MR. WAGNER:  No, Your Honor.

THE COURT:  You do not?

MR. WAGNER:  I would object.

THE COURT:  Go ahead.

BY MR. GEARY:

Q    I'm sorry, Mr. Slater, are you telling us you don't remember it or do remember it?

A    I remember this piece of paper, but I don't remember, you know, saying it.

Q    Do you remember saying those words on it?  Do you remember telling the jury in answer to Mr. Vick's questions what I just read you there?

A    Yes, but something around  --  but it was longer than this.

Q    It was longer than a week?

A    Yes.

Q    You were mistaken about that?

A    Yes.

Q    You appeared before the Grand Jury not too long after Richard Tipton had been arrested; isn't that correct?

A    He had been there a month or over a month when he got arrested.

Q    How did you get down here to testify; did some policeman come pick you up and bring you down here?

A    No, didn't nobody pick me up.

Q    How did you get here?  How did you know where to go?

MR. PARCELL:  Objection.  That's not relevant.

THE COURT:  Sustained.

MR. GEARY:  May I have a minute, Judge?

(Counsel conferring with co-counsel.)

I would renew my motion on behalf of Mr. Tipton to put the Grand Jury testimony in.

MR. PARCELL:  No objection by the government.

THE COURT:  I won't admit it over objections.

MR. GEARY:  Excuse me?

THE COURT:  I will not admit it over objections, and there is one remaining.  Mr. Wagner, do you have any questions?

MR. WAGNER:  Yes, I do, Your Honor.

                    CROSS-EXAMINATION

BY MR. WAGNER:

Q    You have testified about an evening where Mr. Tipton went down to an Amoco station; is that correct?

Leroy Slate (Cross)

A    Yes.
Q    Do you remember what day?  Do you recall what day that was?
A    No.  I can't recall what day it was.  It has been a long time.
Q    It was before Richard Tipton got arrested; isn't that right?
A    Yes.
Q    Was it about a month before he got arrested?
A    I can't answer that.
Q    You can't even give an approximate date?  Was it springtime?
A    I just know it was warm.
Q    It was warm?
A    Warm.
Q    Had you ever seen Sandra Reavis before?
A    No.
Q    You pointed to a person in the courtroom and you said you saw her that day.  Was it during the day or was it at night?
A    It was during the day.
Q    What time; do you recall?
A    Let me see, in the evening.
Q    I'm sorry?  It was in the evening?
A    Yes.

2647

Q    Was it dark out?
A    No, it weren't dark.
Q    Was it 5 o'clock, 6 o'clock?
A    No, around about 12, 1 o'clock, or 1:30.
Q    I'm sorry, 12 or 1 o'clock in the evening?
A    Yes.
Q    That would be midnight?
A    That's daylight.  You know, during the evening.  During the day.
Q    I guess I'm confused with your version of evening and day.
        MR. PARCELL:  Objection to his comments.  He asked a question.
        MR. WAGNER:  He said evening and then he said daylight.
        MR. PARCELL:  May I finish my objection?
        THE COURT:  Sustained.  He said evening and he explained what he meant.
BY MR. WAGNER:
Q    You said there was someone  --
A    1 o'clock.  I think that's noon, man.
Q    Okay, fine.  Did you say there was someone with this person, with Ms. Reavis, at the time when you met them at the Amoco station?
A    Yes.

2648

Q    Can you describe that person, please?
A    No, I can't.

**JA1240**

Leroy Slate (Cross)

Q    Was it a male or female?
A    It was a male.
Q    Was the male tall or short?
A    Short.
Q    All right.  Was he black or white?
A    He was black.
Q    And if you saw a picture of that man, could you identify him?
A    No.
Q    But you have seen a picture of Sandra Reavis, haven't you?
A    On TV and in the paper.
Q    Did the government show you a picture of Sandra Reavis?
A    Who?
Q    Did the government show you a picture of Sandra?
A    Not that I know of.  The government?  No.
Q    When they talked to you, did they show you a picture and ask you if this is the person who gave that gun or was there at the Amoco station?
A    Yes, I seen her picture.
Q    They showed you a picture and asked you "Is this the person?"  Is that correct?

2649

A    Yes.
Q    And you told them it was, right?
A    Yes.
Q    Did they show you a series of pictures or just show you one picture?  Isn't it true they just showed you one picture?
        MR. PARCELL:  May he be allowed to answer the question?
        THE COURT:  Let him answer the question.
        THE WITNESS:  I think more than one.
BY MR. WAGNER:
Q    You think, but you are not sure.
        MR. PARCELL:  He has answered the question.
        THE COURT:  Sustained.
BY MR. WAGNER:
Q    Now, you said later that this Sandra came back to the apartment; is that right?
A    Yes.
Q    Did you see her there?
A    Uh-huh.
Q    You did?  Did you see her give something to anybody?
A    Look, she came back to the apartment.  She come

2650

back to the house, man, around about three times. But she came back the first time, didn't come in the house until she came back again at night.
Q    Was she with a man when she came back?

**JA1241**

A    Yes.

Q    Same man?  You don't know what he looked like, right?

A    Yes.

Q    Now, do you use drugs, sir?

A    I will say once in awhile, you know.

Q    Did you use drugs during this period of time when you were  --  when "Whitey" was living at your place?

A    Yes.  But drugs, get intoxicated, they don't know what's going on.

Q    How often do you use drugs?

A    Not often, you know.

Q    Not often?  How about at that time?  How often were you using drugs; do you recall?

A    Still not that often.

Q    Not that often?

A    No.

Q    There were a lot of drugs around the apartment, though, weren't there?

A    A lot of drugs everywhere you go.

2651

Q    You didn't actually see "Whitey" hand any package to Sandra at that Amoco station, did you?

A    No.

Q    You didn't see him hand it to the man at the Amoco station, either?

A    No.

Q    You didn't see either the man or Sandra hand anything back to "Whitey" at the Amoco station, right?

A    Huh-uh.

Q    You didn't see either Sandra or this man hand anything to "Whitey" back at the apartment, did you?

A    Not at the apartment.

Q    Now, your involvement with "Whitey," has the government talked about whether or not you could be charged for that involvement?

A    (Witness shook head in the negative.)

Q    Could you please answer?

A    No.

Q    In fact, you provided a place for "Whitey" to sell drugs; is that right?

A    No.

Q    Wasn't he at your house?

A    Yes, but I ain't providing no place for selling drugs.

2652

Q    Didn't you know he was selling drugs there?

A    At the time, no.

Q    You didn't know?

A    At the time I didn't know.

Q    You saw him cooking cocaine on your stove?

A    Wait a minute.

Leroy Slate (Cross)

Q    Please answer the question.
A    Wait a minute.  Wait a minute.  At the time, I knew the man was selling drugs.
BY MR. WAGNER:
Q    He was cooking --
A    But I let him in the house.  I wasn't looking for him to stay.  I was looking for him to catch up with somebody, to leave.
Q    You have testified that you cooked drugs in your apartment and you are now telling the ladies and gentlemen of the jury that  --
        MR. PARCELL:  Objection.  That is not what the gentleman said.
        MR. WAGNER:  I think he can answer the question.
        THE COURT:  Overruled.  Let him answer.
BY MR. WAGNER:
Q    You are testifying to the ladies and gentlemen of the jury that you let this man cook drugs in your

2653

apartment but you didn't know he was selling drugs from your apartment?
A    Man, no.  You are speaking and looking at it the wrong way.
Q    Why don't you tell us the right way, please.
A    When this man entered my home, I didn't know this man had drugs.  And I let him in.
Q    After you found out  --
        MR. PARCELL:  Can he be allowed to give his answer?
        THE COURT:  Go ahead.  He is not finished.
        THE WITNESS:  After I let him in, I didn't know this man sold drugs.  I didn't know nothing.  I let him in just for one night.  One night led to another night.
BY MR. WAGNER:
Q    Did you get any drugs from him?
A    Did I get any drugs from him?  No.
Q    You never used any drugs that were  --
A    I used drugs, you know.
Q    Who did you get the drugs from?
A    From him.
Q    So you did get drugs from him.
A    Man  --
Q    I'm trying to ask you a very simple question.

2654

A    He had to give  --  I had to get drugs from him because I was selling it for him.  You are putting it as a different version, man.  You know, you are going in a different direction from what I am saying, you know, saying something.  You coming off with something different.  You just come straight out.  You are angling at me in a different way.
BY MR. WAGNER:

**JA1243**

Q    You were selling drugs for him?
A    Yes.
Q    Yes, you were.  Did you tell the government that?
A    I really haven't told nobody.
Q    I'm sorry.  The question is, did you tell the government that?
A    Yeah, I said I was selling drugs.
Q    And they haven't charged you for anything, have they?
A    Look, how they going to charge me with something?  They ain't putting it on me.  I ain't done nothing wrong.
        MR. WAGNER:  I have no further questions, Your Honor.
        THE COURT:  All right.  Mr. Cooley or Mr. McGarvey or Mr. Baugh, you all don't have any

2655

questions?
        (Negative response from counsel.)
        MR. PARCELL:  No redirect.
        THE COURT:  All right, the witness may stand down.  I think now is a good time to stop.  You all come up.
        (At Bench.)
        THE COURT:  What do we have left?
        MR. VICK:  We have got Valerie Butler, the only witness that might take some time, maybe an hour, hour-and-a-half.  Belinda Davis will be fairly short, shorter than I would imagine than he just was.  They we have got Anne Jones and Dr. Fierro, and that's our case.
        THE COURT:  All right.
        MR. BAUGH:  Can we make a motion at this time that if the United States does rest today, because we are resting so much earlier than we anticipated, that we take tomorrow off?  We have to marshal all our subpoenas.
        MR. VICK:  We have told them we will help them with the police witnesses.
        THE COURT:  No, that's a possibility.  Let me see how things go.  If not the whole day  --
        MR. VICK:  Excuse me, I forgot one

2656

witness.  Detective Rodriguez seized that weapon, 124.  He will be here just for the seizure of the weapon.
        THE COURT:  All right.  I'll let you all know about tomorrow.
        MR. BAUGH:  I forgot about our motions, too.  We have to do those.
        MR. VICK:  We don't need the jury to do them.  Maybe we can do them tomorrow afternoon.
        MR. BAUGH:  Let's let the jury go to

lunch.

THE COURT: I'll let you know whether or not tomorrow will be off. All right?

MR. VICK: An hour for lunch?

THE COURT: I'll give you an hour and 15 minutes.

(In Open Court.)

All right, ladies and gentlemen, we are going to stop for lunch. And today I want you to come back at 2:15. You get an additional 15 minutes. So if you come back at 2:15, we will get started with the afternoon session. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

MR. GEARY: Can I proffer for the appellate record the 11-page Grand Jury testimony of Leroy Slater on 4-21-92?

THE COURT: We will take it as an appellate exhibit.

MR. PARCELL: The government does not object. We would concur with the admission.

THE COURT: We will retain it as an appellate exhibit. It will not be admitted. All right, the defendants may be removed.

(The defendants were removed from the courtroom.)

(Luncheon recess was taken from 1:00 p.m. to 2:25 p.m.)

THE COURT: All right. Let's bring in the jury, please.

MR. GEARY: Before you do that, I understand the next witness is going to be Belinda Davis. And I would object to any testimony from her that deals with the statutory aggravating facts that the government has filed.

MR. BAUGH: We better approach on that one.

THE COURT: Hold on.

(At Bench.)

MR. GEARY: They filed a statutory aggravating factor -- non-statutory aggravating factor on a specific event which is part of the Grand Jury testimony. I don't think that's proper in terms of -- this is a forced sex act.

MR. VICK: "Whitey" raped her.

MR. GEARY: I don't think that's proper. I don't think it is proper to bring up. It is an aggravating factor for the penalty phase.

THE COURT: Is that what you planned to bring up now?

MR. VICK: In addition to other stuff, his coming in and taking over the house and the seizure

of the weapon.

THE COURT:  I don't think it should come in.

(In Open Court.)

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL:  Dr. Fierro, please.

## Dr. Marcella Fierro

### Long/Carter/Armstrong

MARCELLA FIERRO, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Ma'am, once again, would you please state your name?

A    Marcella F. Fierro.  F-I-E-R-R-O.

Q    Are you the same person who has testified in other cases involved in this trial?

A    Yes, sir.

Q    Did there come a point in time an occasion to review the autopsy for Dorothy Armstrong?

A    I did.

Q    Ma'am, in regard to your preparation for your testimony today, did you have occasion to have some photographs enlarged to assist in your testimony?

A    I did.

MR. PARCELL:  I would ask she be allowed to approach the jury and explain the photographs, the injuries the victim received.

THE COURT:  All right.

(Witness approached jury.)

THE WITNESS:  These are photographs of Dorothy Armstrong, medical Examiner case number 68-92.  These photographs show the gunshot wounds, and one is an X-ray.  The first one of the front of the body shows the gunshot wound to the left flank and one to the right lower abdomen.  It also shows the injury to her left hand.

The second picture of her back shows a gunshot wound to the left back; exits in the subcostal region, but it enters here.  She also has a gunshot wound to the left hip and an injury to her left elbow.  If we look directly at the X-ray photograph of her lumbar spine and pelvis, and the X-ray is tipped to its side, you can see one of the bullets right here, and then these small white things are fragments.  This is a button, so that doesn't count.

**JA1246**

But this is a bullet. Here is her elbow, and this elbow showed a gunshot wound that was through and through, and that fractured the arm. It also shows two gunshot wounds of her left hip. She altogether had nine gunshot wounds. These nine gunshot wounds were distributed with two to the back, two to the abdomen, one to the left side, one to the left elbow, and one to the left hand. And there was a graze to her head. From those nine gunshot injuries, one bullet and one fragment were recovered.

BY MR. PARCELL:

Q   They were in turn picked up by the forensic detectives and sent to Anne Jones for comparison; is that correct?

A   They were.

MR. PARCELL:  I would move the admission of 48-1, 2, 3, and 4.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q   Ma'am, did you have occasion to prepare a certified copy of the report of autopsy for Ms. Armstrong?

A   I did.

Q   I'll ask you to look at this document, Government Exhibit 47.

(Document proffered to counsel and witness.)

Would you please review that document, if you would?

A   This is a copy of the final autopsy report of Dorothy Armstrong which I have certified as a true copy of the original.

MR. PARCELL:  That will be Government Exhibit 47, please.

THE COURT:  Admitted.

BY MR. PARCELL:

Q   Did you have occasion to likewise do the same thing for the autopsy of Bobby Lee Long?

A   Yes.

MR. PARCELL:  I would ask she be allowed to approach the jury with Government Exhibit 53-1, 2, 3, 4, and 5.

THE WITNESS:  These are photographs taken at the time of autopsy on Bobby Long. The Medical Examiner case Number 63-92. The first photograph shows him as he was received, and it is also suitable for an identification photograph. The second one shows the deformity of his right arm which is associated with a fracture of the humerus, and that was due to a gunshot wound. The back photograph shows a gunshot wound to the left back that exited over here on the right. On the left side of his head, here is the eyebrow and the eye. There is

**JA1247**

another entrance gunshot wound. Here is the entrance that exited over here.

The first gunshot wound, the one in front of the left ear, traveled from left to right and traveled back through the brain and was found over in this -- the exit was found over here on the right side behind the ear. This caused a lethal injury to the brain, and no bullet was recovered from that injury. The second one to the left back in here traveled across and to the right and went through the lungs causing extensive hemorrhage into the chest space. That bullet exited also.

The bullet to the right triceps region, which is here, went and perforated, fracturing this arm. If you look carefully here, you can see a little bit of where that bullet hole is.

So he had three gunshot wounds, and no bullets were recovered from the body.

MR. PARCELL: I would ask that be received as Government Exhibit 53-1 through 6.

THE COURT: Admitted.

BY MR. PARCELL:

Q   Ma'am, likewise, did you have occasion to prepare a report of autopsy for his examination?

A   I did.

(Document proffered to counsel and witness.)

This is a copy of the autopsy report prepared by Dr. Weicking, which I have certified as a true copy of the original document.

MR. PARCELL: That will be Government Exhibit 52.

THE COURT: Admitted.

BY MR. PARCELL:

Q   Did you have occasion to also review the report of autopsy for Anthony Carter? And have you examined that report, also?

A   Yes.

MR. PARCELL: I ask she be allowed to approach the jury.

THE COURT: All right.

THE WITNESS: Anthony Carter was Medical Examiner 64-92. He had two gunshot wounds, and there were no bullets recovered from those gunshot injuries. The first one shows him as he came to us showing his clothing and his state of affairs, and is also suitable for identification. He had two gunshot wounds, one behind the left ear which you can see here. As this entered, it nicked the ear. This one traveled across and partially severed the spinal cord and went through the cervical vertebra and exited below the right ear.

The second one was to the left angle of the jaw,

**JA1248**

right here.  And this shows some stippling, some fine little powder stippling, which indicates that the muzzle of the weapon was close to the skin at the time it was fired.  This bullet also traveled across and exited out the right side of the face.  This bullet also traveled through the region of the spinal cord and partially severed it.  These are close-ups of those gunshot wound entrances.  I think you can see the stipple.  These little brown specs inside here are burned and unburned powder that are adherent to the skin.  The two radiographs show bullet fragments left along the path of the bullet as it traveled through the bone.  Once bullets hit bone, especially if they are not jacketed, little pieces are shaved off and deposited in the bone.  We can see the path of these as they cross by the bony fragments.

MR. PARCELL:  That will be Government Exhibit 43-1 through 5.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Did you have occasion to prepare a certified copy of his report, also?

A    Yes.  This is a copy of the final autopsy report on Anthony Carter, which I certified as a true copy.

MR. PARCELL:  Government Exhibit 42, please.

THE COURT:  It will be admitted.

*Chiles/Thorne*

BY MR. PARCELL:

Q    Did you have occasion to also review the autopsy photographs of Linwood Chiles?

A    I did.

Q    I'll ask you to reapproach the jury once again, please.

(Witness approached jury.)

MR. PARCELL:  This is Government Exhibit 57-1 through 5.

THE WITNESS:  Linwood Chiles was case Number 91-92.  Mr. Chiles had two gunshot wounds to the head.  One entered the right posterior parietal skull here.  And the second one entered below the right here.  Both of these bullets traveled from right to left.  The bullet wound from the first bullet injury was recovered as a jacket and a fragment.  One fragment was recovered in the orbit around  --  in the bony casing encasing the eye, and another in the temporal lobe.  The gunshot wound below the right ear also showed stippling, which is not particularly well seen, but you can see some of

it right here.  And that gunshot wound was close. That one penetrated the spinal canal and damaged his spinal cord.

BY MR. PARCELL:

Q    How do you know, based on your scientific examination, that that gunshot was close?

A    Powder residues were deposited on the skin, and that occurs within a short distance.  To see a significant stipple pattern, you would probably need to have it within several inches.  Just in stipple patterns, you would need to do a chemical test on clothing, but this is well-defined and it is close. So he had two gunshot wounds with one bullet and jacket recovered and two of these small fragments. The X-ray shows the big fragment, the maiming or fragment up here.

MR. PARCELL:  That will be Government Exhibit 57-1 through 5.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Look at this document, if you would.

A    This is a copy of the final autopsy report on Linwood Chiles.  And I have certified it is a true copy.

MR. PARCELL:  That will be Government Exhibit 56.

THE COURT:  Admitted.

BY MR. PARCELL:

Q    Also, as you prepared yourself for trial today, did you have occasion to view the autopsy report of Curtis Thorne?

A    I did.

Q    I'll ask you once again to reapproach the jury with what's been labeled 67-1 through 6, and I move its introduction.

(Witness approached jury.)

THE WITNESS:  Curtis Thorne, Medical Examiner case Number 93-92:  Mr. Thorne had two gunshot wounds to the face.  One entered the right cheek and one entered the left cheek.  If we look at this photograph, it shows him as he is.  We can see his condition at the time of receipt.

If we look at the second photograph we see the gunshot wound entrance at the left cheek.  This wound down here is an exit from the gunshot wound to the right cheek.  But this is the entrance.  It went across to the posterior pharynx and caught the carotid.  This vessel has the diameter of a very thick pencil.  It pumps out a great deal of blood in a short time.  It is a high pressure artery.  This bullet went across, hitting this artery, and exited the left neck.  That's this one, the right cheek.

**JA1250**

The right cheek goes across, exited the left neck. This caused extensive hemorrhage into the posterior pharynx.  The gunshot wound to the left cheek went across and struck the mandible and left a few fragments which you can see on the X-ray here.  This bullet exited the right neck right over here.  This caused bleeding into the posterior pharynx, also. This photograph is using knitting needles to show the direction and plane of gunshot wounds.  This is the shot to the right cheek which goes through and across, nicking the left carotid.  This is the gunshot wound from the left side that traveled across to the right.

BY MR. PARCELL:

Q    As a result of that, did you have occasion to prepare a certified copy of the autopsy report labeled Government Exhibit 67?  Strike that -- 66.

A    This is a copy of the final autopsy report prepared by Dr. Weicking, and I certified it as a true copy.

MR. PARCELL:  And I will move its introduction, also.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask you to also look at Government Exhibit 77-1, 2, and 3.  Explain to the jury what that is.

A    These are photographs taken at the time of autopsy of Katrina "Nat" Rozier.  She is case number 43-92.  Ms. Rozier had two gunshot wounds to the head.  She received this one right between the eyes, a little to the left in the midline, and here I think you can see more easily the extensive powder deposition indicating that this weapon was within several inches of her face at the time it was fired. This bullet tunneled back and went to the left and was recovered in the left parietal lobe in the back.

The second wound is behind the right ear.  The hair has been shaved to show this gunshot entrance wound, and it travels right to left and forward and was recovered in the left frontal lobe up in this region within the brain.  The larger photograph here is also an identification photograph to show the stipple pattern.  The hemorrhage around the right eye is the reflection of skull fractures of the orbital bones.  The tissue around the eye is very loose. Obviously you can feel that it gets puffy, and if a person has fractures of the orbits, then those eyes would get big and blue.

Q    Did you also have occasion to prepare  --

MR. PARCELL:  I'll ask for introduction of Government Exhibit 76, the report of autopsy for her.

**JA1251**

(Document proffered to witness.)

THE WITNESS:  This is a copy of the final autopsy report prepared by Dr. Jefferson.  And I have certified it is a true copy of the original.

MR. PARCELL:  I would move its introduction, Judge.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    In regard to all the projectiles with respect to the victims' bodies, they were all in turn picked up by the detectives and sent to Ms. Anne Jones for firearms analysis; is that correct?

A    They were.

MR. PARCELL:  I have no further questions of Dr. Fierro.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions.

THE COURT:  Mr. McGarvey or Cooley?

MR. COOLEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions.

MR. PARCELL:  Just for housekeeping, I would move all the photographs and reports in.

THE COURT:  They are all in.  They are in.  Dr. Fierro may stand down.

(Witness stood aside.)

MR. VICK:  I would call Detective Fleming.

## Detective Fleming (2671) (Tipton Arrest)

RALPH FLEMING, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Once again, I would remind you you are still under oath.  Pursuant to this investigation did you have occasion to arrest Richard Tipton, "Whitey?"

A    Yes, I did.

Q    Could you state to the ladies and gentlemen of the jury when and where you arrested him?

A    It was April 8th, 1992 in front of 413-D East 15th Street, the apartment where Belinda Davis and Leroy Slater was at.

MR. GEARY:  No questions.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Did you have warrants for him at that time?

A    There were warrants on file, I believe.

Q    What were those warrants charging him with?

**JA1252**

A    I can't recall exactly.

MR. VICK:  Irrelevant, Judge.

BY MR. GEARY:

Q    Were they federal charges?

A    I don't believe so.

Q    Let me ask you this:  Were they charges that were taken out by Detective Rodriguez in regard to cocaine that was found on February 1st at 1212 West Moore Street?

MR. VICK:  Objection, relevance.

THE COURT:  Sustained.

MR. GEARY:  No further questions.

THE COURT:  Any questions, Mr. Cooley, Baugh, Wagner?

MR. COOLEY:  No, Your Honor.

MR. BAUGH:  No.

MR. WAGNER:  No, Your Honor.

(Witness stood aside.)

MR. VICK:  I call Detective Rodney Rodriguez.

## RODNEY RODRIGUEZ

RODNEY RODRIGUEZ, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    I would remind you that you continue under oath from your previous testimony.  I direct your attention to April 9th, 1992.  Were you a police officer on that date?

A    Yes, sir, I was.

Q    Did you have occasion to execute a search at 413-D 15th Street?

A    Yes, sir.

Q    That's in Blackwell, the Blackwell section of South Richmond?

A    Yes, sir.

MR. VICK:  Could I retrieve Government Exhibit 124, please?

(Exhibit proffered to witness.)

BY MR. VICK:

Q    I'm going to have shown to you what has been previously marked Government Exhibit 124 and ask you if you could identify that item.

A    Yes, sir.  That's a .38 caliber revolver that I recovered at that location.

Q    Could you tell the ladies and gentlemen of the jury where you recovered it at that location and what

**JA1253**

state it was in when you recovered it?

A    Yes, sir.  I recovered it outside.  When you step out the door at 413, right to the left there is a tall chain link fence.  It goes right down the property line on the left side.  I recovered the gun approximately 20 feet from the door, right at the chain link fence underneath the ground.  It was covered up.  It was wrapped in plastic and in a paper bag, a brown paper bag.

Q    Was it loaded?

A    Yes, sir, it was.

Q    Are those bullets contained in Government Exhibit 124?

2675

A    Yes, sir.

MR. VICK:  I tender the witness.

MR. GEARY:  No questions, Your Honor.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions, Your Honor.

MR. WAGNER:  No questions, Your Honor.

(Witness stood aside.)

MR. VICK:  May we consult, Your Honor?

THE COURT:  Sure.

(Counsel conferring.)

MR. PARCELL:  Anne Jones, please.

## Anne Jones (Stony Run – bullets from Glock)

ANNE DAVIS JONES, recalled as a witness by and on behalf of the government, having been previously duly sworn by the Clerk, was examined and testified as follows:

MR. PARCELL:  I will need Government Exhibits 104, 123, and 124, please.

MR. GEARY:  May I approach other counsel?

THE COURT:  Go ahead.

(Counsel conferring.)

DIRECT EXAMINATION

BY MR. PARCELL:

Q    I'll ask you again, you are Anne Jones, the same lady who has testified in other cases in this trial?

A    Yes, sir, I am.

2676

Q    I'll ask you to be handed, if you would, the Government Exhibit Number 49.

Can you identify that item for me?

A    Yes, sir, I can.

Q    What is that item?

A    It is my C92-01127 case number.

Q    Did you have occasion to be given Government Exhibit 104, please?  Did you have occasion to make an analysis of that projectile in comparison with Government Exhibit 104?

THE COURT:  Could she tell us again what

Number 49 is? I didn't hear her.

THE WITNESS: 49 is marked my case number C92-01127. The name of the deceased is not listed. It is a jacketed caliber 9mm luger bullet and also, too, a bag with a lead fragment.

MR. PARCELL: That is the -- it came earlier through the testimony of the forensic detective who indicated that projectile came from the body of Dorothy Armstrong.

THE COURT: All right. Go ahead.

BY MR. PARCELL:

Q    What is Government Exhibit 49?

A    It is my Item Number 14, the report, I believe. The report was concerning that.

2677

Q    Would you please relate for the ladies and gentlemen the report of your findings, which is Item 14?

A    This bullet, Item 14, was identified as having been fired from the Government Exhibit 104, the Glock pistol.

Q    You had occasion to prepare an analysis which indicated that fact?

A    Yes, sir, I did.

MR. PARCELL: I think that's been introduced as Government Exhibit 44. May I approach?

THE COURT: Go ahead.

(Document proffered to witness.)

BY MR. PARCELL:

Q    What is that?

A    This is the report which I prepared that says that that bullet was fired from that weapon.

MR. PARCELL: She needs to be handed Government Exhibit 123. This was Government Exhibit 61.

(Exhibit proffered to witness.)

Number 63, also, should be handed to her.

(Document proffered to witness.)

BY MR. PARCELL:

2678

Q    Would you please identify those items? Turn your attention to what's been labeled your Exhibit 19-A and 19-B.

A    19-A and 19-B, 19-A is copper jacket fragments and 19-B is a copper jacket which were identified as having been fired from the Government Exhibit 123, the Glock pistol.

Q    And those fragments came from the body of Linwood Chiles?

A    That's what the card says that's enclosed in the bag.

Q    I'll ask you now to look, if you would, ma'am, at Government Exhibit 80, 79, and 124. 79 is her

**JA1255**

firearms report, 76 which -- correction, 80, which is bullets from the Medical Examiner's Office, and Exhibit 124, which is a .38 revolver. And 110, too, Exhibit 110, also.

THE CLERK: 79, 80, and 110?

MR. PARCELL: Yes, ma'am. 110 should be within 107, the black tote bag.

THE CLERK: 79 has not been admitted.

MR. PARCELL: I would move its introduction after identification by the witness.

(Document proffered to counsel and witness.)

BY MR. PARCELL:

Q    In regard to 79, this is a lab report prepared by you, Certificate of Analysis?

A    Yes, sir, it is.

Q    Would you look at Number 80, if you would? Would you identify those items, please? The groups have been identified as the projectiles that have been recovered from Katrina Rozier's body.

A    These are three plastic bags. One of them contains an aluminum bullet jacket, part of a jacket; one of them contains a bullet jacket and lead core; and the other one contains a lead core, which were recovered from Katrina Rozier.

Q    Did you have occasion to determine what weapon those bullets were fired from?

A    Yes, sir. I examined the bullets with tests fired from Government Exhibit 124, the revolver. It was my opinion that the two bullet jackets I just spoke of were -- Government Exhibit 80 -- were fired from Government Exhibit 124, the revolver.

Q    When you received the Government Exhibit 124, the .38 revolver, can you tell the jury whether or not it had any bullets with it?

A    Yes, sir. When I received the revolver there were five Winchester-brand caliber .38 special silvertip cartridges submitted with the revolver.

Q    Did you have occasion to determine whether or not they were similar to ones removed from Ms. Rozier's body?

A    I used two of those cartridges to test-fire the weapon, and they are similar in structure as the bullets recovered from Katrina Rozier.

Q    Did you have occasion to be given the box of .38 silvertipped hollowpoint projectiles also for your review?

A    Yes, sir, I did.

Q    Could you tell us if you made any similarities between that box of bullets --

MR. PARCELL: And Judge, they were recovered from 1212 West Moore Street.

MR. GEARY: Objection.

**JA1256**

MR. PARCELL:  That is the evidence.

THE COURT:  Sustained.  You don't need to go into that.

MR. PARCELL:  Very well.

BY MR. PARCELL:?

Q    In regard to the box of .38 Winchester projectiles, what similar characteristics, if any, did they have to the bullets that came from the gun and came from Ms. Rozier's body?

A    This box of ammunition contains  --  the cartridges contain 95 grain silvertipped bullets which had a design with a flat base.  The bullets recovered from Katrina Rozier and the bullets in the cartridges that were submitted with the revolver have got a similar structural design.

Q    Is that something you have seen regularly in your field of work?

A    I had never in my experience in firearms seen 95 grain silvertipped bullets with a flat base.  Normally in my experience, they have a hollow base.

MR. PARCELL:  I would ask she be allowed to approach the jury and explain what she has testified to.

(Witness approached jury.)

BY MR. PARCELL:

Q    Can you tell the ladies and gentlemen of the jury where you got that item in your hand?

A    This is a cartridge which, when I was asked to look at the box of ammunition, I took one of the cartridges which is comprised of the cartridge casing, the bullet, and the powder and the primer in the cartridge casing, and I have an instrument that I use to pull the bullet from the cartridge without firing it.  And this is the bullet that was recovered.  And you can see that there is an aluminum jacket, and at the base of this bullet you can see exposed lead.  This is a flat-based bullet.  Normally in my experience, I have a dished-out base.  Can I use that?

THE COURT:  Go ahead.

THE WITNESS:  Normally in my experience, 95 grain silvertipped bullets would have a base that's dished out like this one.  It is a structural difference between the two types of cartridges that were loaded.

MR. PARCELL:  I would ask she be allowed to pass both those bullets to the jury so they can actually see it for themselves.

THE COURT:  Go ahead.

(Exhibits proffered to jury.)

BY MR. PARCELL:

Q    You indicated normally you see .38  --

**JA1257**

MR. GEARY:  This is the second time we have had this testimony.

THE COURT:  Sustained.

BY MR. PARCELL:

Q   Have you ever seen a bullet like that other than the one  --

THE COURT:  Sustained.  She has already said she hasn't.

MR. PARCELL:  I think all those reports have been already introduced into evidence.  If not, we will move their admission, as well as all the projectiles.

THE COURT:  Admitted.  Mr. Geary?

CROSS-EXAMINATION

BY MR. GEARY:

Q   When you looked at these items, are you able to recall which murders and which case they are associated with?  Mr. Parcell mentioned Chiles and Thorne.  Do you recall those without the exhibit numbers?

A   Do I recall  --

Q   Let me  --

A   The exact item number?

Q   Number 124, the .38.

A   The .38?  The revolver?

Q   Yes.  You have examined that.

A   Yes, sir, I did examine that.

Q   You have done all the firearms for this entire case; is that correct?

A   That's correct.

Q   The exhibits you were looking at before with regard to Mr. Chiles and Mr. Thorne, do you recall those?

A   The ones he just showed me?  19-A and 19-B?

Q   Is it related to a name of a victim?

A   No, that's not the one.

Q   Let me ask you this.  Does the examination you did in regard to the Chiles and Thorne murders, which we referred to as the Stony Run murders, is there any evidence that a .38 was used?

A   No, sir.

MR. GEARY:  Thank you.  No further questions.

MR. McGARVEY:  No questions.

MR. BAUGH:  No questions.

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  You may stand down.

(Witness stood aside.)

MR. VICK:  The Government would call Valerie Butler, Your Honor.  May I approach?

(At Bench.)

**JA1258**

MR. VICK: Your Honor, this is a protected witness, as well.

(In Open Court.)

THE COURT: All right, I'm going to send you all out. Everyone remain seated while the jury leaves the courtroom.

2685

(The jury left the courtroom.)

All right. I think we will take about ten minutes and get this set up. Remove the defendants.

(Defendants removed from the courtroom.)

(Recess taken from 3:10 p.m. to 3:20 p.m.)

THE COURT: Bring in the jury.

(The jury entered the courtroom.)

All right, Mr. Vick, the witness will be sworn.

## Valerie Lee Butler (2685)

VALERIE LEE BUTLER, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q   During your testimony, I'm going to ask that you speak up and speak toward that microphone. Don't get too close to it. Could you state your name for the Court, record, and jury, please?

A   Valerie Lee Butler.

Q   How old are you?

A   26.

Q   How far did you go in school?

A   Twelfth grade.

Q   Could you very briefly tell the ladies and gentlemen of the jury your prior work history?

2686

A   I was a mail clerk at Virginia Farm Bureau. I worked in pharmaceuticals at A.H. Robins.

Q   Do you have any children?

A   Yes.

Q   Are those children currently living with you?

A   No.

Q   Are you currently in the Government Witness Protection Program?

A   Yes.

Q   Is that why the children are not living with you?

A   Yes.

Q   You have agreed to cooperate with the United States Government in testifying in this case; is that correct?

A   Yes.

Q   Could you tell the ladies and gentlemen of the jury in your own terms what it is you  --  why it is

**JA1259**

Valerie Lee Butler (Direct)

you have agreed to testify?

A    Well, I agreed to testify because I was persuaded by my aunt that it was the right thing to do.

Q    We have told you we won't use anything you say in your testimony against you; is that correct?

A    Right.

2687

Q    Do you know the defendant in this case, Mr. Cory Johnson, also known as "C.O.?"

A    Yes.

Q    Do you see him seated in the courtroom today?

        MR. McGARVEY: Stipulate.

        MR. VICK:  If the record will so reflect?

        THE COURT:  All right.

BY MR. VICK:

Q    When did you first meet Cory Johnson?

A    I met him January 14th.

Q    Of what year?

A    1992.

Q    Where was it that you met him?

A    I met him at a friend's house.

Q    Who is that?

A    Nita.

Q    Could you tell the ladies and gentlemen of the jury the circumstances surrounding your meeting Mr. Cory Johnson?

A    They were there purchasing some  --  they was trying to get this girl to purchase some guns.

Q    When you say "they," who do you mean?

A    "C.O.," "J.R."

Q    Who was the girl that they were trying to get to purchase guns?

2688

A    Girl named Pam.

Q    You said "J.R."  Who do you mean?

A    James Roane.

Q    Do you see Mr. James Roane in the courtroom today?

    (Defendant stood.)

A    Yes.

        MR. BAUGH:  Stipulate ID.

BY MR. VICK:

Q    Tell the ladies and gentlemen of the jury about what you saw that day between  --  what occurred between Mr. James Roane, "C.O.," and the girl that you have testified about.

A    Well, the girl didn't want to purchase the guns because she thought she wasn't getting enough money.  And "J.R." was outside arguing with her.  And "C.O." was in the house with me.

Q    And I might have asked this, I apologize if I have, what was the girl's name?

A    Pam.

**JA1260**

Valerie Lee Butler (Direct)

Q    Do you know her last name?
A    No.
Q    Did you have anything to do with that conversation; did you say anything?
A    No.  Not to "J.R." and "C.O."

2689

Q    Did there come a time when "J.R." left with Pam?
A    Yes.
Q    Where was it that they went?
A    They went to purchase the guns.
Q    All right.  And did you stay at that house, Nita Bracey's house?
A    Yes, I did.
Q    Who stayed at that house with you?
A    "C.O."
Q    Did you talk to him then?
A    Yes.
Q    What was it that you talked about?
A    We just had casual conversation.
Q    Did you talk about the gun purchase?
A    Not him and I.  We didn't talk about it.
Q    Did you hear him speaking about the gun purchase that day?
A    Yes.
Q    What was it that "C.O." said about the gun purchase that day?
A    He was talking to Pam's boyfriend and he was trying to explain to him why Pam had to purchase the guns.
Q    What did he say?

2690

A    He said that she had took a partial payment, so she had to go through with it.
Q    Why is it that you remember the date January 14th?
A    Because the next day was my birthday.
Q    Did you talk to "C.O." about that?
A    Yes.
Q    And what did you all talk about?
A    He was supposed to come back the next day and he was going to spend my birthday with me.
Q    Did he do that?
A    No, he did not.
Q    Did there come a time that day on January 14th, 1992 that "J.R." returned with Pam to that residence?
A    Well, yes, they dropped Pam off.  They didn't get out of the car.
Q    Did there come a time when "C.O." left that residence that day?
A    Yes.
Q    When was that?
A    It was when "J.R." got back.  He got in the

**JA1261**

car.

Q　Do you know whose car they got into?

A　It was Linwood's.

**2691**

Q　Linwood Chiles'?

A　Yes.

Q　What kind of car was that?

A　It was a station wagon.

Q　When was the next time that you saw "C.O.?"

A　Probably like two weeks later.

Q　All right.  Do you remember February 1st, 1992?

A　Yes.

Q　Do you remember the fact that an individual by the name of Martha McCoy was wounded?

A　Well, I didn't know  --  no, I didn't know that.

Q　But did you come to find that out later?

A　Yes.

Q　Does that date, does that indicate when it is that you next saw Cory Johnson?

A　Yes.  I saw him that day.

Q　What time of day was that?

A　It was about between two and four.

Q　Where was it that you saw him?

A　At Nita's house.

Q　What occurred when you saw him?

A　We talked about going to the movies about 8 o'clock.

Q　All right.

**2692**

A　He said he would be back.

Q　8 o'clock that evening on February 1st?

A　Yes.

Q　Did you go to the movies with "C.O." at 8 o'clock that evening on February 1st?

A　No.

Q　When was it that you next saw him?

A　Saw him about 12:30.

Q　Where was it that you saw him?

A　At Nita's house.

Q　If you saw him  --  would that be 12:30 in the morning?

A　12:30 a.m.

Q　Would that be the morning of February 2nd?

A　Yes.

Q　And from 12:30 that morning until the next morning, where were you?

A　We was at Nita's house.  Then we went back to my house.

Q　What time did you go back to your house?

A　About 4 o'clock.

Q　Did you go with "C.O.?"

A　Yes.

Q　All right.  And when you woke up that morning on

**JA1262**

February 2nd, 1992, where was it that you went?

A    I took him back to Moore Street.  But when we got to Moore Street, the house was kicked in.
Q    Is that 1212 West Moore Street?
A    Yes.
Q    Tell us what happened when you got there.
A    When I got there, somebody was in there working on the door.
Q    All right.  How did you find out that it had been kicked in?
A    Because after "C.O." saw the house kicked in, we were going around to "J.R.'s" father's house.
Q    Where was that located?
A    I don't know the street.
Q    Was it near the 1212 West Moore Street house?
A    Yes.
Q    Did you talk to someone there?
A    Yes.
Q    Did "C.O." ask that person anything?
A    He asked them what happened, who was in the house, who got arrested, did they find any guns, did they find any drugs.
Q    Who was that person that you spoke to?
A    I don't know.
Q    What did that person tell "C.O.?"
        MR. BAUGH:  Objection, Your Honor.

        THE COURT:  Finish the question.
BY MR. VICK:
Q    What did that person tell "C.O." about who had been arrested and what had occurred?
        MR. BAUGH:  Objection.
        THE COURT:  Overruled.
        THE WITNESS:  Repeat that.
BY MR. VICK:
Q    What did that person tell "C.O." about what had happened at 1212 West Moore Street, who had been arrested and what occurred?
A    She just told him everybody was arrested.
Q    Who was that?
A    "J.R.," "V," "E.B.," and Sandra.
Q    Did she say anything about the weapons?
A    She said they found some weapons.
Q    Say anything about drugs?
A    And drugs.
Q    After that conversation, what did you do?
A    We drove to Central Gardens.
Q    All right.  Who is "we?"
A    Me and "C.O."
Q    Why was it that you drove to Central Gardens?
A    Because he wanted to find "Whitey."
Q    And did you find "Whitey?"

**JA1263**

Valerie Lee Butler (Direct)

A    Well, he wasn't  --  he went inside of a house. I don't know whether he was there or not.
Q    When you say "he," you mean "C.O.?"
A    Yes.
Q    Where did you stay at that point?
A    I stayed in the car.
Q    How long was "C.O." gone from that car?
A    About 30 minutes.
Q    When "C.O." came back to the car, did he state whether or not he had found "Whitey?"
A    Yes, he said he did.
Q    What did you do at that point?
A    We drove to Henrico.
Q    Back when you had gone to the other house and talked to the girl about 1212, did "C.O." ask anything about "Whitey" to that girl?
A    He wanted to know was he there.
Q    What was her response?
         MR. WHITE:  Objection, hearsay.
         THE COURT:  Overruled.  She can answer that.
         THE WITNESS:  Repeat that.
BY MR. VICK:
Q    What was her response?
A    That he wasn't there.

2696

Q    Where was it that you went in Central Gardens to look for "Whitey?"
A    Glenwood Townhouses.
         MR. McGARVEY:  I couldn't hear the answer.
         THE WITNESS:  Glenwood Townhouses.
BY MR. VICK:
Q    After that half-hour, where did you go?
A    We went out West Broad.
Q    To whose house?
A    To some guy named "Wildman."
Q    Who went out to "Wildman's" house?
A    Me and "C.O."
Q    How long did you stay out there?
A    Not long, about 10 or 15 minutes.
Q    Then where did you go?
A    Then we went back to Nita's house.
Q    After that, did you end up spending some time with "C.O.," some days with "C.O.?"
A    Yes.
Q    How many days, approximately?
A    I don't know.
Q    Did you come to find out how he was supporting himself?
A    Yes.
Q    How was it that he was supporting himself?

2697

A    He was selling crack.
Q    Where was it that he was selling crack?

**JA1264**

A    In Blackwell.
Q    Please speak up a little bit.  It is getting hard to hear you.
          THE COURT:  You missed the last response?
          MR. McGARVEY:  Yes.
          THE COURT:  She said Blackwell.
BY MR. VICK:
Q    Out of whose house?
A    Nita's.
Q    Do you know an individual by the name of "V?"
A    Yes.
Q    Who is "V?"
A    Who is he?
Q    Who is he?
A    He is "C.O.'s" friend.
Q    All right.  Was he one of the people arrested at 1212 West Moore?
A    Yes.
Q    Did "C.O." talk about wanting to get him out of jail?
A    Yes.
Q    What did he say?
A    He wanted to get him out of jail.

2698

Q    All right.  And did he talk about any money that would be necessary to do that?
A    Well, he said he was going to give Sandra $10,000.
Q    Sandra who?
A    Reavis.
Q    Do you see Sandra Reavis in the courtroom today?
          MR. WAGNER:  Stipulate ID.
          THE COURT:  All right.
BY MR. VICK:
Q    Now, those days that "C.O." stayed with you after going to Central Gardens, what were the hours that he would generally come to your house?
A    He would come late, three or four in the morning.
Q    What would he do during the day?
A    I don't know.  I wasn't with him during the day.
Q    Did he tell you what he was doing or did you come to find out what he was doing?
          MR. COOLEY:  Objection.  "Come to find out?"
BY MR. VICK:
Q    Did he tell you what he was doing?

2699

A    No, he didn't tell me what he was doing.
Q    Did you ever see "C.O." with money at that time?
A    Yes.

**JA1265**

Q   Could you tell the ladies and gentlemen of the jury approximately how much money?

A   I don't know.

Q   Was it more than $100?

A   Yes.

Q   Was it more than a thousand dollars?

A   Yes.

Q   Was it more than $2,000?

A   I don't know.

Q   Was it in the thousands of dollars?

MR. BAUGH:  Objection, asked and answered. She said she didn't know.

THE COURT:  Sustained.

BY MR. VICK:

Q   Did you ever take "C.O." to Central Gardens after that first trip?

A   Yes.

Q   On how many different occasions did you take "C.O." to Central Gardens after that first trip?

A   Every day.

Q   Why would you go to Central Gardens?

A   Because he had to meet with "Whitey."

Q   All right.  And did you see "Whitey" on those occasions?

A   Yes.

Q   And what if anything did you see "C.O." and "Whitey" do when they saw each other?

A   They would talk.

Q   How long would those meetings take?

A   Not long.

Q   I direct your attention to a few days after the shooting of Martha McCoy.  Did you come to find out that "C.O." received a weapon?

A   Yes.

Q   What kind of weapon?

A   It was a Glock.

Q   And when was that in relation to February 1st, the shooting of Martha McCoy?

A   One more time?

Q   How many days after February 1st was that?

A   I don't know.  I don't remember.

Q   And where did he get that Glock; do you know?

A   No.

MR. WHITE:  Objection, unless she saw.

THE COURT:  Overruled.

BY MR. VICK:

Q   Did he ask you to do anything with that Glock?

A   He asked me to keep it.

Q   Did you keep it for him on some occasions?

A   Yes.

Q   Did you ever see "Whitey" with a Glock?

A   Yes.

**JA1266**

Q    When did you see "Whitey" with a Glock?
A    When?
Q    Yes.
A    I don't know the day.
Q    Was it in that same time frame?
A    Yes.
Q    You had occasion to rent rental cars; is that correct?
A    Yes.
Q    Who did you rent rental cars for?
A    "C.O." and "Whitey."
Q    I'm going to show you what has been previously marked Government Exhibit 114 and ask if you can identify that.
     (Document proffered to witness.)
A    Yes.
Q    Can you identify that document?
A    Yes.
Q    Is that a rental car agreement executed by you?

2702

A    Yes.
Q    What's the date on there?
A    2-19.
Q    The date of the actual rental, not the date of the return.
A    2-11.
Q    All right.  And how would you pay for that rental car?
A    In cash.
Q    Who gave you that cash?  How much was it that it cost?
A    It was a $300 deposit.
Q    How much was the cost of the rental?
A    The total cost was $446.
Q    Who gave you that money?
A    "C.O."
Q    In cash?
A    Uh-huh.
Q    And who took that rental car?
A    "C.O."
Q    And where did he go with that rental car?
A    To New York.
Q    With who?
A    With "Whitey."
          MR. WHITE:  Objection unless she saw them

2703

leave.
          THE COURT:  Overruled.
BY MR. VICK:
Q    Who?
A    "Whitey."
Q    What did they go to New York for?
          MR. WHITE:  Objection.
BY MR. VICK:

**JA1267**

Valerie Lee Butler (Direct)

Q    Based on your own personal knowledge and observation, what were they going to New York for?
A    They were buying crack.
Q    The Glock that you had gotten from "C.O." to hold, was that before you rented that car for them?
A    I don't remember.
Q    Do you remember when it was that they came back from New York after renting that car on February 11th?
A    They came back Valentine's Day.
Q    Why do you remember that?
A    Because it was Valentine's Day.
Q    Did they have cocaine with them when they came back?
A    Yes.
Q    How much cocaine?
A    I don't know.

2704

        MR. WHITE:  Objection.
BY MR. VICK:
Q    Did you see it?
A    No, not at that point.
Q    Did you see it at a later point?
A    Yes.
Q    How much cocaine did they have?
A    I don't know.
Q    Could you describe it for the ladies and gentlemen of the jury?
        MR. COOLEY:  May we have a clarification of "they?"
BY MR. VICK:
Q    "They" being "Whitey" and "C.O."
        MR. COOLEY:  Which among them?
BY MR. VICK:
Q    Did they come back from New York together?
A    Yes.
Q    Did they have the cocaine together?
A    "Whitey" had it.
Q    He had how much cocaine?
        MR. WHITE:  Asked and answered.  She said she doesn't know.
        THE COURT:  Overruled.
BY MR. VICK:

2705

Q    Did they tell you?
A    No.
Q    Did they ever speak about ounce amounts?
A    Yes.
Q    What ounce amounts did they speak about?
A    36.
Q    And did "C.O." leave and go anywhere at that point when they came back from New York?
A    Yes.
Q    Where was it that he went?

**JA1268**

A    He said he went to North Carolina.

Q    Did "Whitey" end up staying at your house for some time then?

A    Yes.

Q    And how many days did he stay at your house?

A    I don't know.

Q    All right.  When was it that "C.O." came back from North Carolina?

A    That Sunday.

Q    And the night "C.O." left for North Carolina, did anyone come to your house?

A    "Man-Man" and Linwood.

Q    Who is "Man-Man?"

A    His first name Charles.  I don't know his last name.

2706

Q    Could you describe him?

A    Can I describe him?

Q    Yes.

A    He is dark, kind of heavy.

Q    Who is Linwood?

A    He was "C.O.'s" friend.

Q    Is that Linwood Chiles?

A    Yes.

Q    What were they doing at your house?  Who else was there that night?

A    And me.  That's all.

Q    Was "Whitey" there?

A    "Whitey," Charles, and  --  they were there first.

Q    What were they doing there?

A    They was bagging crack.

Q    Was that the cocaine that had been brought back from New York?

A    Uh-huh.

Q    And when "C.O." came back from North Carolina, was he upset about something?

A    He was upset that Linwood was in the house.

Q    Why was that?

A    Because he didn't want Linwood to know that he was back and all.

2707

Q    Did he tell you why he didn't want Linwood to know that?

A    He thought Linwood was a snitch.

Q    Have you ever had occasion to listen to "C.O." and "Whitey" speak about their relationship with "J.R." and "V?"

A    Yes.

Q    What did they tell you their relationship was; what did you find out that their relationship with "J.R." and "V" was?

        MR. BAUGH:  Objection.  The first question was what did he tell them.

**JA1269**

Valerie Lee Butler (Direct)

BY MR. VICK:

Q    Based upon those conversations, what did you come to know?

MR. BAUGH:  That's conclusory.

THE COURT:  State what they told.

BY MR. VICK:

Q    What did they tell you?

A    They didn't tell me anything.

Q    Excuse me?

A    They didn't tell me anything.

Q    What did you overhear them speaking about?

A    That all of them were partners.

Q    Did you come to find out in overhearing those conversations whether anyone worked for them?

A    Yes.

Q    Do you know whether Sandra Reavis worked for them?

A    Yes.

MR. BAUGH:  Objection, unless she can testify  --  that she worked for everyone or worked for an individual?

MR. VICK:  She just testified they were partners.

THE COURT:  Overruled.

BY MR. VICK:

Q    Did Sandra Reavis work for them?

A    Yes.

Q    What was it she did?

A    She sold crack.

Q    Does the name "Pepsi" mean anything to you?

A    She worked for them.

Q    Does the name Curt Thorne mean anything to you?

A    He worked for them.

Q    The name Nita Bracey, did she work for them?

A    Yes.

Q    Did "Man-Man" work for them?

A    Yes.

Q    Hussone Jones work for them?

A    Yes.

Q    Did Linwood?

A    Yes.

Q    Have you ever been with "C.O." when he delivered anything to Sandra?

A    No.

Q    Have you ever been asked by "C.O." to deliver anything to Sandra?

A    Yes.

Q    What was it that "C.O." asked you to deliver to Sandra?

A    I delivered crack to her.

Q    And how much crack did you deliver to Sandra?

A    I don't know how much it was, but I was supposed

**JA1270**

to get $1,400 back.

Q    That's Sandra Reavis?

A    Yes.

Q    Where was it that you delivered that cocaine to her?

A    To Thom McAn in Willow Lawn.

Q    Did you get $1,400 back?

A    No.

Q    When was that that you delivered that cocaine to her?

A    I don't know the date.

Q    Was it after the first  --  was it after you rented that car for "C.O." and "Whitey?"

A    Yes.

Q    You met "C.O."  --  excuse me, you lent "Whitey" your car in March, did you not?

A    Uh-huh.

Q    What happened when you lent him that car?

A    He got arrested in Trenton.

Q    With whom?

A    With Hussone Jones and "May-May," Charles.

Q    Do you know why they were going to  --  where they were going when they borrowed the car from you?

A    They was going to New York to get some crack.

Q    Now, where was "C.O." at that point?

A    He was already in New York.

Q    Did you hear "C.O." and "Whitey" talk about the trip to New York that "Whitey" was going to take with "Man-Man" and Hussone?

A    Yes.

Q    What did "Whitey" and "C.O." talk about?

A    "C.O." talked about killing Charles and Hussone.

Q    Why did he want to kill Charles and Hussone?

A    Because they had messed up their money.

Q    Money for what?

A    For the crack that they had got.

Q    I direct your attention to February 19th, 1992. Are you familiar with the fact that on that day, Curt Thorne and Linwood Chiles were murdered and "Pepsi" and Gwen Greene were wounded?

A    Yes.

Q    Did you have occasion  --  do you know what day of the week that was?

A    It was a Wednesday.

Q    Did you have occasion to see "C.O." on that day?

A    Yes.

Q    All right.  Why do you remember it being a Wednesday?

A    Because my kids go to church on Wednesday.

Q    Did you give anything to "C.O." to use that

**JA1271**

day?
A    I gave him my car.
Q    What time of day was that that you gave him your car?
A    4 o'clock.
Q    Prior to leaving in your car, did "C.O." make any telephone calls?
A    He called Linwood and told him to meet him at McDonald's, and he called "Whitey."

2712

Q    Who?
A    "Whitey."
Q    What did he tell "Whitey?"
A    I don't know.
Q    And did he leave in your car?
A    Yes.
Q    Could you describe your car, please?
A    Gray 1985 Sunbird.
Q    What size car is that?
A    A small car.
Q    What time was it that you next saw "C.O.?"
A    I saw him about 7:30.
Q    Where was it you saw him at 7:30 that evening?
A    He came to Nita's house.
Q    Who was he with?
A    He was with Curt.
Q    What did you do at that point?
A    Curt got out of the car and me and my kids got in and he took us home.
Q    Is that Curt Thorne?
A    Yes.
Q    What time was it that you arrived at home?
A    About quarter to eight, 8 o'clock.
Q    How was Curt dressed that evening?
A    He had on a green plaid-like overcoat.

2713

Q    I'm going to show you what's been previously marked Government Exhibit 68 and ask you if you can identify this, please.
     (Exhibit proffered to witness.)
A    That's the coat.
Q    Can you identify that?
A    That's the coat.
Q    What is that?
A    Curt's coat.
Q    Is that the coat he had on on the evening of February 19th, 1992 when you saw him at Nita's?
A    Yes.
Q    Have you seen that coat since then, since you saw Curt in it?
A    Yes.
Q    Indeed, you gave that coat to Detective C.T. Woody, did you not?
A    Yes.

Q    Where did you get that coat to give it to Detective C.T. Woody?
A    It was left in my car.
Q    When "C.O." took you home from Nita's house, how did he take you home?
A    How did he take me home?
Q    How.

2714

A    He drove.
Q    Your car?
A    My car.
Q    Did he stay with you at that point?
A    No.
     MR. VICK:  I would move Government Exhibit 68 into evidence, Your Honor.
     THE COURT:  It will be admitted.
BY MR. VICK:
Q    And when he drove you home, what did he do?
A    He kept the car because he said he wasn't finished, he had something to do.
Q    And when was it that you next saw him?
A    I saw him about 10:30, quarter to eleven.
Q    How was "C.O." dressed that evening?
A    He had on black jeans, Timberland boots, and a hood.
Q    I'm going to show you Government Exhibit 59 and ask you if you can identify that.
     (Exhibit proffered to witness.)
     Can you identify that?
A    That's "C.O.'s."
Q    Indeed, you gave that black hoodie to Detective C.T. Woody, also, didn't you?
A    Yes.

2715

Q    Where did you get that from?
A    Out of my car.
     MR. VICK:  I move Government Exhibit 59 into evidence, also.
     THE COURT:  Admitted.
 BY MR. VICK:
Q    When "C.O." came to your house at approximately quarter to eleven that night, February 19th, did he bring anything in the house with him?
A    He brought his gun.
Q    How was he carrying the gun?
A    He always carried it in his hand.
Q    What kind of gun was that?
A    A Glock.
Q    And what was it that he wanted to do at that point?
A    He wanted to look at the news.
Q    Did he look at the news?
A    Yes.
Q    What was it that came on the news?

**JA1273**

A    That two --
      MR. McGARVEY:  Objection, relevancy.
      THE COURT:  Overruled.
BY MR. VICK:
Q    Go ahead.

2716

A    That two people was killed and two was wounded.
Q    After "C.O." saw that, what did he do?
A    He left out the house.
Q    When did he come back?
A    He came back like four or five in the morning.
Q    Now, the next morning did you get up and go to work?
A    Yes.
Q    Where were you working at this point?
A    Virginia Farm Bureau.
Q    Did you see Government Exhibit 59 and 68 on that day, the coat that you have identified as being worn by Curt and the black hoodie that you identified as being worn by "C.O." that evening; did you see them that day?
A    Yes.
Q    Where were they?
A    In the backseat of my car.
Q    Now, after work, where did you go?
A    I came home.
Q    And did you have occasion to go to Nita's that night, Nita Bracey's?
A    Yes.
Q    What occurred at Nita's?
A    A station wagon had went by and I thought it was

2717

Linwood's, and that's when she told me that that was Linwood that got killed.
Q    The next day, did you have occasion to talk the next day, February 21st, to "C.O." from your job?
A    Yes.
Q    Did you talk to him about the killing of Linwood Chiles?
A    Yes.
Q    Tell the ladies and gentlemen of the jury about that conversation.
A    Well, I had got the paper that morning and I read it and I called home and I asked him why he didn't tell me that Linwood had died.
Q    What was his response?
A    He was like that was his personal business and to stay out of it.
Q    On February 21st, did you have occasion to once again rent a vehicle for "C.O." and "Whitey?"
A    Yes.
Q    I'm going to show you what's been previously marked Government Exhibit 115 and ask if that's a copy of the rental car agreement that you rented for

**JA1274**

them on February 21st, 1992.

A    Yes.

Q    All right.  And how much money was paid for that?

A    $200 deposit.

Q    And where did you get the money to pay for that rental car?

A    "C.O."

Q    Did he give it to you in cash?

A    Yes.

Q    Where did "C.O." and "Whitey" go with that rental car?

A    They went to New York.

Q    For what reason?

A    To buy crack.

Q    Did "C.O." ever come back from New York?

A    No.

Q    Prior to going  --  I would move that government exhibit into evidence, also.

        THE COURT:  It will be admitted.

        MR. VICK:  Both rental car agreements should be moved into evidence.

        THE COURT:  Admitted.

        MR. VICK:  That's 114 and 115.

BY MR. VICK:

Q    Did "Whitey" come back from New York?

A    Yes.

Q    When was it, approximately, that "Whitey" came back from New York?

A    About two weeks, two to three weeks later.

Q    Now, Ms. Butler, you stayed in touch with "C.O." while he was in New York; is that correct?

A    Yes.

Q    You knew the telephone number that he was staying at?

A    Yes.

Q    Indeed, it was through that telephone number; is that correct, Ms. Butler?  You told that telephone number to Detective Fleming and the other people involved in this case during the investigation; is that correct?

A    Yes.

Q    Is that, to your knowledge, how "C.O." was arrested?

A    Yes.

Q    Did there come a time that you came to find out that "C.O." had been arrested in New York prior to his arrest by Detective Fleming and the other officers involved?

A    Yes.

Q    All right.  And was he arrested under his true name?

**JA1275**

A    No.

MR. McGARVEY:  Objection, that's hearsay.

BY MR. VICK:

Q    Based upon your conversations with "C.O.," do you know if he was arrested under his true name?

A    No, he wasn't arrested under that.

Q    Do you remember the name he was arrested under?

A    Kevin Hill.

Q    Did "C.O." ask you to do anything to help him in that regard?

A    He needed $1,500 wired up.

Q    Did you indeed do that?

A    Yes.

Q    All right.  How did you wire that money to him?

A    I think I wired like $800 one day and about $450 the next day.

Q    That was for what?

A    To get him out of jail.

Q    Was anyone else helping you in that regard, wiring money?

MR. WAGNER:  Objection to helping.

BY MR. VICK:

Q    Were you involved with anyone else in the wiring of the money?

A    Sandra Reavis.

Q    I'll show you what's been previously marked Government Exhibit 116 and Government Exhibit 117 and ask you if you can identify those documents.

(Documents proffered to witness.)

Can you identify those documents?

A    Uh-huh.

Q    What are they?

A    These are the receipts.

Q    And whose name is contained on there?

A    Sandra Reavis.

Q    To whom did you wire that money?

A    Priscilla Wilson.

Q    Why did you wire that money to Priscilla Wilson?

A    To get "C.O." out of jail.

MR. VICK:  I move Government Exhibit 116 and 117 into evidence.  I would note, too, that there has been a previous stipulation as to the authenticity of those records being true and accurate copies of the Western Union wire receipts.

THE COURT:  They will be received.

BY MR. VICK:

Q    Where did you get some of the money that you used to wire up to get "C.O." out of jail?

A    I got some from Charles and Sandra.

Q    When you say Charles, do you mean "Man-Man?"

A    Yes.
Q    Now, you testified previously that "Whitey" was upset on the trip in March, that he wanted to kill "Man-Man" and Hussone.
        MR. WHITE:  That is not what the evidence stated.  It is misrepresentation.  It was someone else who said that.
        THE COURT:  Sustained.
BY MR. VICK:
Q    I misstated.  That's "C.O." "C.O." wanted to kill "Man-Man" and Hussone.  What was it that he wanted to kill them for, why?
A    Because they had messed up their money.
Q    All right.  And from what?
A    From the crack that they had left.
Q    When had  --  who had left crack with "Man-Man" and Hussone?
A    "Whitey."
Q    How much had he left; do you know?
A    No.
Q    When "Whitey" came back from New York, do you know what time that was, approximately?
A    No.
Q    Did he come back from New York with anyone?
A    Yes.

2723

Q    Who was that?
A    He came back with a guy named Paul.
Q    Did you know who Paul was?
A    It was "V's" brother-in-law.
Q    What did they do?
A    They were selling crack in Blackwell.
Q    "Whitey" and Paul together?
A    Yes.
Q    Do you know an individual by the name of Greg Noble?
A    Yes.
Q    Who is Greg Noble?
A    He was "Whitey's" associate.
Q    Did you ever see "Whitey" and Greg Noble talk?
A    Yes.
Q    What was it that you saw them talk about?
A    "Whitey" was trying to get him to sell crack in Blackwell.
Q    And where did that conversation take place?
A    In my car and in my house.
Q    Back when you talked to "C.O.," back up a second to when you talked to "C.O." after he had been arrested in New York under the name of Kevin Hill. Did he express any concern about why he needed to be gotten out on bond?

2724

A    He had gotten locked up with a Glock and he wanted to get out before the ballistics tests came

**JA1277**

back.

Q    Now, was your phone, your telephone, used in any three-way conversations between "V" and "J.R." and "Whitey" and "C.O." when they were in New York?

A    Yes.

Q    Can you tell the ladies and gentlemen of the jury how a three-way conversation works?

A    Somebody calls me and I can call somebody else.

Q    Did you listen to those conversations?

A    Some of them.

Q    Did you listen to a conversation between "V" and "C.O." about Martha McCoy?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury, in the conversation you heard was "V" at the Richmond City Jail at this point?

A    Yes.

Q    Where was "C.O."?

A    In New York.

Q    Can you tell the ladies and gentlemen of the jury about the conversation you overheard between "V" and "C.O." about Martha McCoy?

A    "V" wanted "C.O." to come down and kill her.

Q    Why did he want "C.O." to come down and kill her?

A    Because she could identify him.

Q    Was he concerned that she could identify anyone else?

A    No.

Q    She could identify him in what regard?

A    That he was there the night that they shot her.

Q    Did you ever hear "V" talk to "C.O." concerning the murder of Curt Thorne and Linwood Chiles?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what you heard in that regard?

A    "V" was kind of nervous.  He wanted to get out of jail and he wanted to  --  he wanted "C.O." to kill Martha, so he was kind of upset.  So "C.O." was like "Did I ever let you down?  When you told me about Linwood and them, I took care of that for you."

Q    Now, did you ever have a conversation with James Roane while he was in jail?

A    Yes.

Q    Specifically, did you ever have a conversation with James Roane when he was in jail about the acquisition of more firearms?  About getting guns?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury about that?

A    I was supposed to get money from James' father and buy guns for "C.O."

**JA1278**

Valerie Lee Butler (Direct)

Q    What were you going to do with those guns?
A    Take them to New York.
Q    Give them to who?
A    "C.O."
Q    Did you ever do that?
A    No.
Q    Did you ever talk to James Roane  --  did that conversation take place while James Roane was in the Richmond City Jail?
A    Yes.
Q    Did you ever have a conversation with James Roane about an individual by the name of Peyton Maurice Johnson?
A    Yes.
Q    Could you tell the ladies and gentlemen of the jury about the conversation you had with James Roane about Peyton Maurice Johnson?
A    Me and "J.R." was trying to figure out who was snitching, and he said that it had to be some guy named "Stinker," he said, because only two people was in the house, him  --  he said only three people was in the house: him, "C.O.," and "Stinker."  And they let "Stinker" go.
Q    Had you ever  --  where did you live in Richmond?
A    I lived on the Southside on 35th Street.
Q    Did you ever spend any time in the Newtowne section of town in November or December of 1991?
A    No.
Q    Did you ever spend any time  --  did you know any of these people before meeting "C.O." on January 14th, 1992?
A    No.
Q    Had you ever met Peyton Maurice Johnson?
A    No.
Q    Had you ever heard the name before?
A    No.
Q    In anticipation of your testimony here today, has anyone from the prosecution's team told you how to answer any particular questions?
A    No.
Q    Has anyone told you any information that is the subject of your testimony, given you any of the information that's the subject of your testimony?
A    No.
Q    Did you ever have a conversation with James Roane about Martha McCoy?
A    Well, basically he knew she could identify him.
Q    So what?
A    He was worried because he knew she could identify him.
Q    Did you ever have a three-way conversation with

**JA1279**

"O," "Whitey" and "J.R." where they talked about Martha McCoy and what happened at Lynhaven on February 1st, 1992?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury about that conversation?

A    "Whitey" was telling them how stupid they were from the beginning because they were supposed to kill everything that was moving.

Q    And did they talk about going back and taking care of that?

A    Yes.

Q    Tell the ladies and gentlemen of the jury what they talked about in that regard.

A    They wanted to kill her.

Q    Who wanted to kill her?

A    "J.R." wanted somebody to kill her.

Q    Did he say anything was being done in that regard?

A    He said people was trying to find her.

Q    What did "O" or "Whitey" say about that?

A    Nothing.

Q    What's your answer?

A    Nothing.

Q    Are you familiar with the fact that "Whitey" was arrested on April 8th, 1992 in Blackwell?

A    Yes.

Q    All right.  After his arrest, did you have conversation with "Whitey" in jail?

A    Not for awhile.

Q    All right.  Did he ask you to find anyone for him?

A    Nita and "May-May" and Hussone.

Q    Did you do that?

A    I couldn't find them.

Q    After "Whitey" was arrested, did you have a conversation with "J.R." about "Whitey's" arrest on 15th Street?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what "J.R." had to say about that?

A    "J.R." wanted me to go down there and get the gun and the drugs that was left.

Q    Do you know what kind of gun?

A    A .38.

Q    Do you know where "Whitey" got that gun?

A    From Sandra.

Q    Sandra Reavis?

A    Uh-huh.

Q    Let me ask you, did you ever have a conversation with Sandra Reavis about "J.R." killing someone in an alley?

**JA1280**

A    Yes.
Q    Could you tell the ladies and gentlemen of the jury what Sandra said about that?
A    She said that "Whitey" was in the alley and somebody was trying to hurt him and he started hollering, and "C.O." and "J.R." ran in the alley and killed the guy.
Q    Did you ever have a conversation with Sandra about that .38 that was on 15th Street?
A    Say that again.
Q    About the gun on 15th Street.  How do you know that "Whitey" got that gun from Sandra?
A    Because she had took it to him.
Q    How do you know that?
A    Because she called me because she couldn't find him.  When she got there, he wasn't where he was supposed to be.

2731
Q    Have you ever heard "Whitey" or "C.O." talk about doing violence to anyone, about violence in general?
A    Not "C.O.," but "Whitey."
Q    What would "Whitey" say?
         MR. WHITE:  Objection.  What's the relevance unless it is related to some specific charge in the indictment?
         THE COURT:  Overruled.
BY MR. VICK:
Q    What would "Whitey" say?
A    He would brag on how him and "C.O." used to cut people with razors, see how many stitches somebody could get, who could give the most.
Q    Did you ever see "Whitey" cut anyone?
A    Nita.
Q    Why did he cut Nita?
A    Because she order "C.O." $100.
Q    What did he cut her with?
A    A razor.
Q    Where did he cut her?
A    On her face.
Q    Did he make her do anything else?
A    He made her have oral sex with him.
Q    Over that drug debt?

2732
A    Yes.
         MR. GEARY:  Can we approach the bench?
         (At Bench.)
         MR. GEARY:  In regard to the witness who wasn't called, Ms. Slater, I proffered they were going to introduce that.  You ruled it was inadmissible.  It is entirely improper.
         MR. VICK:  She just testified it was over the drug debt.  That's what her testimony was.
         THE COURT:  Objection overruled.

**JA1281**

BY MR. VICK:

Q    When "J.R." wanted you to go to 15th Street and retrieve that gun and those drugs, what did he want you to do with them when you retrieved them?

A    Give them to Sandra.

Q    I show you what's been previously marked Government Exhibit 95 and ask you if you can identify that.

A    This is a letter from "Whitey."

Q    And to who?

A    To me.

Q    Where did he write that from?

A    The City Jail.

MR. VICK:  I would move Government Exhibit 95, Your Honor.  Beg the Court's indulgence.

THE COURT:  It will be admitted.

MR. VICK:  I tender the witness, Your Honor.

MR. WHITE:  May we have a moment, please?

THE COURT:  Sure.

(Counsel conferring.)

MR. GEARY:  No questions.

THE COURT:  Mr. Cooley, Mr. McGarvey?

MR. McGARVEY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Ms. Butler, you indicated that "Whitey" and "C.O." went to New York.  You had rented a car for them to go to New York; is that correct?

A    Yes.

Q    Do you recall what the date was on that?

A    The first or second trip?

Q    The first trip.

A    The 11th, I think.

Q    February 11th?

A    Yes.

Q    To your knowledge, had they been to New York prior to that?  Since the 14th of January, prior to the 11th of February, to your knowledge, had they been to New York before that?

A    No.

Q    To your knowledge, had Linwood Chiles ever taken them to New York before that?

A    No.  I don't know.

Q    To your knowledge, had an individual by the name of Douglas Talley ever taken them to New York?

A    I don't know.

Q    But you have indicated that you knew Mr. Johnson since January 14th, correct?

A    Yes.

Q    All right.  Now, when Mr. Vick was asking you with respect to February 1st, and he specifically

**JA1282**

mentioned the day that Martha McCoy was shot, when did you find out that Martha McCoy was shot?

A    February 2nd.

Q    February 2nd?

A    Yes.

Q    Ma'am, do you recall February 3rd?  Do you recall what you did on February 3rd?

A    Yes.

Q    February 4th?

A    Yes.

Q    Do you recall seeing "C.O." any time during that period of time?

A    Yes.

Q    You did see him from the 2nd, the 3rd, and the 4th?

A    And the 4th.

Q    How about the 5th?

A    Yes.

Q    So you were seeing him virtually every day; is that what you are saying?

A    Yes.

Q    Is that from January 14th?

A    No.  That's from February 2nd.

Q    From February 2nd.

A    Yes.

Q    Now, you have indicated that you have two children, correct?

A    Uh-huh.

Q    I presume at the time that you knew Mr. Johnson that those children lived in the home with you?

A    Yes.

Q    They did.  Was there drug dealing going on in your home?

A    On one occasion.

Q    On one occasion?

A    Yes.

Q    What was that occasion?

A    That was the 15th of February.

Q    The 15th of February?  What occasion was that?  What happened?

A    A girl came over.  Nita brought a girl over and "Whitey" sold her some drugs.

Q    With that exception -- did that take place in front of your children, by the way?

A    They wasn't there because that was a weekend.

Q    So as a practical matter, there was not drug dealing going on all the time in front of your kids at your house; is that correct?

A    Not in my house.

Q    So when Mr. Vick asked you with respect to drug dealing amongst these individuals, is this what you actually saw or is this what you heard?

A    I actually saw.
Q    You actually saw it.  Was it someplace other than your home?
A    Yes.
Q    Where was it?
A    It was at Nita's house.
Q    How often were you at Nita's house?
A    Almost every day.
Q    Who was taking care of your children while you were at Nita's house?
A    They were there with me.

2737

Q    With you?
A    Yes.
Q    So drug dealing was taking place in front of your children, correct?
A    No.
Q    If they were there and drug dealing was taking place, were they in another room, what?
A    They were outside.
Q    Did you leave them out in the car while the dealing took place?
A    No.
        MR. VICK:  No need to get offensive.
        THE COURT:  Mr. McGarvey, go on.  Ask some more questions.
        MR. McGARVEY:  I asked the question, Your Honor.  I would ask her to answer.
BY MR. McGARVEY:
Q    Where were your kids when the drug dealing was going on at Nita's house?
A    Outside playing with other kids.
Q    With respect to Mr. Johnson, did Mr. Johnson own a lot of diamonds, jewelry, gold, anything like that?
A    No.
Q    Did he have expensive clothes?  I saw the black

2738

hooded sweatshirt; did he own expensive clothes?
A    What he had was expensive.
Q    The black hooded sweatshirt was expensive?
A    No, but the Timberland boots and Guess jeans were expensive clothing.
Q    Guess jeans and Timberland boots.
A    Yes.
Q    Did he have an automobile?
A    No.
Q    He borrowed your automobile?
A    Yes.
Q    When you were asked and then pressed by Mr. Vick for an amount of money that you had seen, first you said that you didn't know.  And then he said "more than a hundred" and you agreed.  And then "up to a thousand  --"

**JA1284**

MR. VICK:  He is testifying himself now. This isn't a question.

THE COURT:  You can go ahead.  Get to the point.

BY MR. McGARVEY:

Q   Ma'am, how much did you actually see?  Was "C.O." carrying around hundred-dollar bills?  I mean, are were we talking like thousands and thousands of dollars here?

A   I didn't see thousands and thousands.

Q   As a matter of fact, you didn't see a whole lot of money with respect to Mr. Johnson, correct?

A   He had more than the average for not to have a job.

Q   What's more than the average, $100, $200?

A   More than a hundred.

Q   More than a hundred dollars.  You also mentioned $10,000, a conversation with respect to "V" and $10,000 to get "V" out.  Did "V" get out?

A   No.

Q   Was $10,000 ever put down, to your knowledge?

A   I never saw it.

Q   Okay.  You have indicated that you have had numerous phone conversations.  Your phone was used three-way; is that correct?

A   Yes.

Q   That three-way would have been to New York, and I presume the Richmond City Jail; is that correct?

A   Correct.

Q   And do you have your phone records with you today with respect to those?

A   No.

Q   Did you keep phone records with respect to that?

A   No, I didn't keep phone records.

Q   Was the phone in your name?

A   Yes.

Q   Did the phone bills come in your name?

A   Yes.

Q   These were all long distance calls, correct?

A   Yes.

Q   Ma'am, as you have indicated, you have two children, correct?

A   Yes.

Q   And you were asked by the prosecution initially why you were testifying.  And you indicated that you were testifying because your aunt said that it was the right thing to do, correct?

A   Correct.

Q   Mr. Vick also brought up the fact that you are -- you have what's called use-immunity, correct?

A   Yes.

**JA1285**

Q    Whatever you say cannot be used against you.
A    Right.
Q    In your conversations with Mr. Vick, with Detective Fleming, with anyone associated with the government, have they advised you that you could be charged with conspiracy?
A    Yes.

2741

Q    And were you advised what the minimum penalty for conspiracy -- a guilty finding on conspiracy is ten years without parole?
A    No.
Q    Were you advised that the maximum is life without parole?
A    No.
Q    When you said that you are here because your aunt told you that's the right thing to do, are you telling the ladies and gentlemen of the jury that the fact that you might be charged with conspiracy and might be convicted of conspiracy has something to do with why you are here today, too?
A    It had something to do with it.
Q    Ma'am, did you provide your phone number to the government?
A    Yes.
Q    Okay.  To your knowledge, has the government ever subpoenaed your phone records?
A    Yes.
Q    They have?
A    Yes.
          MR. McGARVEY:  That's all I have.
          THE COURT:  Mr. Baugh?
               CROSS-EXAMINATION

2742

BY MR. BAUGH:
Q    Ms. Butler, did you ever travel to New Jersey?
A    Yes.
Q    And while you were there on any of those occasions, did you speak to someone that either told you or you later came to find out was Mr. Johnson's girlfriend?
A    Yes.
Q    Now, during the time all this phone calling was going on, it is your understanding that people were trying to get money to get "V" out of jail, right? Am I correct?
A    Say that again.
Q    During the time all these three-way phone conversations were going on, am I correct that people were trying to get money together to get "V" out of jail?
A    No.
Q    Who were they trying to get out?
A    No, they was just concerned about themselves,

**JA1286**

what was going on, how hot the heat was.

Q    Did you mention about getting some money from Roane's father to take guns to New York; am I correct those guns were to be taken to New York and sold for money?

A    I don't know what they were going to do with them when they got to New York.  I was to take them to New York.

Q    And when you spoke  --  well, let me ask you this:  Did Mr. Roane ever tell you how he knew about Peyton Johnson's killing?  Did he ever tell you who told him about it?

A    He was there.

Q    He was there?

A    Yes.

Q    And he saw who was in the house?

A    Yes.

Q    All right.  Did Mr. Roane or did you ever find out how come Torrick Brown and Martha McCoy were shot?

A    No, not really.

Q    Well, did you ever know about the involvement of Martha McCoy in any drug activity?

A    No.

Q    Did you ever get the impression it had something to do with drugs?

A    Yes.  That's what I thought.

Q    You suspected that?

A    Yes.

Q    All right.  But you don't know.

A    I don't know.

Q    Now, you said that when James Roane spoke to you about Peyton Johnson, he was concerned about who might have been in the house and who would know that he had been there earlier that day; am I correct?

A    He was concerned about who could tell because he knew who was in the house.

Q    However, in those conversations, did he ever mention "Hussone Jones saw me grab Doug Talley by the neck while he was stabbed"?  Did he ever mention that?

A    No.

Q    Did he appear to be concerned about that?

A    No.

Q    Did he ever mention "My goodness, everybody in Newtowne, including Denise Berkley, saw me stab Doug Moody to death in the middle of the alley"; did he ever mention that?

A    No.

Q    Did he ever mention to you that everybody in the world, including Jerry Gaiters and Dennis Moody, and a whole bunch of other people, allegedly saw him

Valerie Lee Butler (Cross)

attempt to kill Louis Johnson in the middle of the street; he wasn't worried about that, either, was he?

2745

A    No.

Q    He didn't indicate any concern about anybody connecting him to those activities?

A    No.

Q    Now, concerning the drugs, you indicated that -- did you ever see James Roane with any drugs?

A    No.

Q    Do you know, based upon anything anybody told you, what James Roane did with the drugs that he received?

A    No.

Q    Do you know whether or not the drugs that James Roane received, if he sold them he had to give money to anybody else?

A    No.

Q    Do you know that if you ran down a list of people that you said worked for people -- excuse me, I have a lot of notes here.  Oh, did you know the relationship between Sandra Reavis and James Roane?

A    Yes.

Q    What relationship was that?

A    They were boyfriend-girlfriend.

Q    Did you know when James Roane went to jail?

A    Yes.

Q    When would that have been?

2746

A    That was February 2nd.

Q    All right.  Now, you mentioned Curt.  That's Curt Thorne?

A    Uh-huh.

Q    Do you know if Curt Thorne ever got drugs from James Roane?

A    I don't know.

Q    Do you know if Anita Bracey ever got drugs from James Roane?

A    No.

Q    Do you know whether "Man Man," who was  -- what's "Man-Man's" real name?

A    Charles.

Q    Charles Townes?

A    Yes.

Q    Do you know if Charles Townes ever got drugs from James Roane?

A    No.

Q    Do you know whether Hussone Jones ever got drugs from James Roane?

A    No.

Q    Do you know whether or not Linwood Chiles ever got drugs from James Roane?

A    No.

**JA1288**

Q   If I might, as an aside, when and where was it that you first gave information to the police?
A   I don't know the date.  But we was at the John Marshall Courts Building.
Q   Was it after someone had been arrested, or can you relate it in terms of someone's birthday or Valentine's Day or something?
A   I think it was June 22nd.
Q   And prior to June 22nd, had you given any information to the police about any illegal activity?
A   No.
Q   Did you seek them out or did they come looking for you?
A   They came looking for me.
Q   Is that when you gave them the clothing and all that sort of stuff?
A   Uh-huh.
Q   Was that after you met this girl in New Jersey?
A   Uh-huh.
Q   Have you ever heard of James Roane being in possession of substantial amounts of money?
A   No.
        MR. BAUGH:  Thank you.  Pass the witness.
                CROSS-EXAMINATION
BY MR. WAGNER:

Q   Good afternoon, Ms. Butler.
A   Good afternoon.
Q   Ms. Butler, during the time you were involved with "C.O.," you were using drugs, weren't you?
A   Off and on.
Q   I'm sorry?
A   Off and on.
Q   Were you using heroin?
A   No.
Q   You never used heroin?
A   I've used it, but I wasn't then.
Q   You never used heroin during the month of April of 1992?
A   No.
Q   March of 1992?
A   No.
Q   Were you using cocaine during that time?
A   Yes.
Q   When did you first talk to the police about the situation?
A   June 22nd.
Q   And when did you start cooperating with the government?
A   That day.
Q   That same day?

Valerie Lee Butler (Cross)

A    Yes.
Q    How many times did you see Sandra Reavis from January 14th of 1992 through when you talked to the government?
A    About four or five times.
Q    Four or five times?  And that was over what period of time?
        THE COURT:  You just said from January until when she talked to the government, which is June 22nd.  She said it three times.  Jesus.  Come on, please.  Get through it, Mr. Wagner.
BY MR. WAGNER:
Q    When is the last time you saw Sandra Reavis?
A    I don't remember.
Q    You talked about sending some money to New York.  You asked Sandra Reavis to send the money for you, didn't you?
A    No.
Q    You didn't?  She volunteered to send it?
A    No, she had the money.  I was providing the vehicle to take her to do it and make sure it was being done.
Q    Did "C.O." ask you to send the money to New York?
A    Yes.

Q    So you asked her to help send the money; is that right?
A    No, I had to call her because she owed them money for drugs and he needed the money.
Q    You said that "May-May" gave you money; is that right?
A    Yes.
Q    How much money did "May-May" give you?
A    "May-May" gave me $400.
Q    And do you know how much money was sent?
A    $1,200.
Q    Did you ever offer to send the money yourself?
A    Well, yeah.  When we got there, I was going to send the money.
Q    But you didn't send the money; Sandra sent it.  You talked about an incident over at Willow Lawn; is that right?
A    Uh-huh.
Q    Do you remember what date that was?
A    No.  Yes, I do.  It was the day of the second rental car -- it was the day of the first rental car.  It was the 11th of February.
Q    And when did you get those drugs?
A    The 11th of February.
Q    You gave them to her the same day?

A    Yes.
Q    Did you ever see Sandra Reavis with any guns?

**JA1290**

A    No.

Q    Did you ever see  --  well, aside from this delivery that you spoke of at Thom McAn, did you ever see her with any drugs?

A    No.

Q    Were you ever arrested for your involvement in this situation?

A    No.

Q    Were you ever told that you could be arrested?

A    Yes.

Q    And to avoid getting arrested you had to cooperate; is that correct?

A    Yes.

MR. WAGNER:  Thank you.  No further questions.

RECROSS-EXAMINATION

BY MR. VICK:

Q    The phone bills, you gave them to Detective Fleming?

A    No.  Somebody got them and they showed them to me.

Q    You willingly gave up  --

A    Nobody asked.  They got them and they showed them.

Q    Who brought you to talk to the police on June 22nd?

A    My mother and my aunt.

Q    That girl that you saw in New Jersey, "C.O.'s" girlfriend from New York, did she tell you that anything was going to happen to you or Nita?

MR. BAUGH:  Objection, hearsay.

THE COURT:  Sustained.

MR. VICK:  No further questions.

THE COURT:  All right.

(At Bench.)

MR. VICK:  I want to call Ralph Fleming very quickly to establish how "C.O." was arrested. Very quickly.  Then we are through.  I would ask that we be allowed to rest in the morning so we can go through the exhibit list to make sure we moved in all our exhibits prior to resting.

THE COURT:  We don't have to do that.  Is it really necessary to call him?

MR. VICK:  Then we at this point rest.  No necessity to call him, but we would like the evening to make sure.

THE COURT:  You have to rest.

MR. VICK:  There will be no other witnesses.

MR. BAUGH:  May we have a motion in chambers for a few minutes.

THE COURT:  I will send the jury home to

return, and what I want to do in the morning is hear motions. We can do it at 9:30.

MR. BAUGH: May I make a suggestion? Could I ask that you bring the jury back on Friday at 11 and we make our motions at 9 o'clock on Friday?

THE COURT: No.

MR. BAUGH: There is a reason for it, Your Honor.

THE COURT: Go ahead and make your request.

MR. BAUGH: The reason is, since this case is ending so much earlier than was anticipated, all of us are going to have to get subpoenas served and it is going to be --

MR. VICK: We have been writing witnesses in this week.

THE COURT: You have had time to do whatever it is you needed to do. If the hearing lasts an hour, I'll be surprised.

MR. WHITE: A little later in the morning?

THE COURT: We can do it at 9 o'clock.

MR. HENDERSON: I've got some matters scheduled at nine in another Court.

THE CLERK: You have pretrials, 8:50 to 9:50.

MR. HENDERSON: I have to be in Henrico at nine.

THE CLERK: The pretrials are until 9:55.

(In Open Court.)

All right, ladies and gentlemen, let me explain to you what's going to be happening. I'm informed by the government that they perceive this to be the last witness they are going to call in their case in chief. That being the case, we have some legal stuff to go through. And what I have decided to do is that the lawyers and I will get together tomorrow morning. We will not have you come back and just sit around while we are going through what we have to go through. What I would like for you to do is come back on Friday morning at 10 o'clock, and we will get started with the rest of the case. I think that's the best way to approach it. So Friday morning at 10 o'clock. Not tomorrow, but Friday morning at ten.

All right, again let me admonish you: Please do not review any newspaper, TV, radio items relating to this case, and do not discuss it with anyone. And if anyone attempts to discuss it with you, bring it to the Court's attention promptly. Thank you very much. We will see you Friday morning at 10 o'clock.

(The jury left the courtroom.)

Ms. Marshal, would you remove the witness, please?

**JA1292**

(The witness left the courtroom.)

MR. VICK:  Your Honor, the Marshals need to know at this point, in order to make sure that we have the witnesses in a timely manner, any protective witnesses that the defense counsel want for their case.

THE COURT:  You all ought to know.

MR. WHITE:  If the Court please, on behalf of Mr. Tipton we are not planning on calling any protective witnesses.

THE COURT:  Take that up with the U.S. Attorney.  If you want somebody, you let him know.  All right.  We will meet tomorrow in this courtroom at 9:30 for the motions.

I'm going to have to change that a little bit.  This may help Mr. Henderson out.  We will make it 9:45.  I have pretrials running a little late.  9:45 here in this courtroom for the motions.  Remove the defendants.

2756

(The defendants were removed from the courtroom.)

(Proceedings adjourned at 4:40 p.m.)

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

2757

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                  CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------

                    VOLUME XIII

                 January 28, 1993
                 Richmond, Virginia
                    10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

2758

               P-R-O-C-E-E-D-I-N-G-S
         THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

**JA1295**

Johnson, James H. Roane, Jr. and Sandra Reavis, the thirteenth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

THE COURT:  Mr. Geary?

MR. GEARY:  Before I make the Rule 29 motion on some of the counts in this case, I'd like to renew the motion which we have previously made, I believe twice, during the case.  And that is, in regard to the evidence presented by the government, what we call the New Jersey evidence.  With the exception of the 3-29-92 arrest in Trenton, the indictment charges in regard to the conspiracy -- the indictments filed originally at the end of April, 1992, and the second superseding indictment was in July of 1992 -- so the indictment charges a conspiracy to distribute cocaine from January of 1989 until the filing of the second superseding, which was in July of 1992.  The allegations in the indictment in regard to the ways and means, et cetera, as has been previously pointed out, deal with two locations: New York and Richmond.  The evidence in the case, other than the Trenton allegations and proof, is that down here, cocaine was being purchased in New York and being brought down here.

The evidence in regard to Trenton, for the reasons we have previously set forth to the Court, and for the reasons today, is that the allegations in Trenton do not support the claim made by the government that there was something that was going on in Trenton that was tied to a conspiracy here in Richmond.

So we would again renew our motion to strike the New Jersey allegations and evidence except for the 3-29-92 arrest of Charles Townes in Trenton, who was with defendant Tipton and Hussone Jones.

THE COURT:  All right.  That motion will be denied.

MR. GEARY:  Judge, the defendant Tipton, pursuant to Rule 29, will make a motion for judgment of acquittal.  What I would like to do is go through the counts one by one, saving Count Two, the CCE Count, until last.

Again, the conspiracy charges the Court is familiar with.  The defense has been presented, both in opening statements and in this case, with a number of conspiracies, including Central Gardens,

**JA1296**

Blackwell, and Newtowne; that those conspiracies are not the conspiracy charged in this indictment; wherefrom the legion of cases that the standard that the Court has to address in deciding Rule 29 are viewed in the light favorable to the government: whether a reasonable jury would believe the evidence of guilt beyond a reasonable doubt. I understand what that standard is from a number of cases.

In regard to Count One on behalf of Mr. Tipton, I would move for a judgment of acquittal under Rule 29. In regard to Counts Three and Four, Judge, those are the Talley murder counts, we have no motion on those counts. In regard to Counts Five, Six, and Seven, this is the Douglas Moody counts, it is the murder, a firearm, and a 1959 act of violence. Denise Berkley testified that on January 13th, the day that Moody was killed, she was at the house on the corner of Clay and Harrison. She said that she and "Mousey," Ms. Armstrong, were there to see some guy and had just started smoking crack with the guy and someone else when they heard a loud bang from the back of the house. She heard a window break after a shot was fired. The rest of the evidence from everyone else who testified was after that point, where Moody is either on the porch, the sidewalk, the street, or in the alleyway. The evidence from Ms. Berkley is that evening at 1212 West Moore Street, defendant Tipton said to her that Moody came there to kill him. The government must prove, to get Counts Five, Six, and Seven, particularly in regard to the 848, that in fact there was a murder. They have not established that a murder was committed in regard to defendant Tipton. They have established that a shooting took place.

There were at least three men there. A shooting took place. We don't know whether Moody was the aggressor or not, but based on the evidence in this case from Tipton to Berkley, the aggressor was Mr. Moody. I'm not talking about what happened after he allegedly jumped out of the window, but prior to that time. At this phase of the case, the government has established virtually no evidence to convict Tipton of Counts Five, Six, and Seven in regard to the Moody murders.

He is not charged in Counts Eight, Nine, and Ten with the Peyton Maurice Johnson murders. In Counts Eleven, Twelve, and Thirteen, the Louis Johnson murders, he was indicted. The government has dismissed those murders against him. Fourteen, Fifteen, and Sixteen are the Torrick Brown murder and the maiming of Martha McCoy. It is not charged, Your Honor, this murder is not charged as part of the

Continuing Criminal Enterprise.  1959 murder, 1959 maiming, and a gun violation.

The government's evidence in this case, Judge, supports, strongly supports a motion for judgment of acquittal.  Charles Townes testified that on the evening of February 1st, he was in the company of Richard Tipton.  They were at Central Gardens.  Sometime during the evening, they left Central Gardens to go to Newtowne to get marijuana.  He testified that when they went to 1212 West Moore Street  --

MR. VICK:  I will concede for purposes of this argument that it is not the government's evidence, nor will we argue, that Tipton was present at the murder of Torrick Brown.  That does not mean that he is not properly included in that count.  I'll address that later.  We concede factually that he was not present at Lynhaven when that murder occurred.

THE COURT:  All right.

MR. GEARY:  Judge, Townes went on to say that they went to 1212 West Moore Street.  There was no one there.  He said there was a chance meeting that he testified took place at some corner in Newtowne at Clay Street.  He said they saw Cory Johnson and Jerry Gaiters.  That was confirmed by Gaiters' testimony that in fact Townes and Tipton pulled up.  I think a clear inference may be that that was in between Southside and Church Hill.  At that point in the testimony, Judge, and after Gaiters testified, there is absolutely no evidence whatsoever that Tipton had anything to do with Torrick Brown or Martha McCoy.  It is not a conspiracy charge in regard to that murder.  In the indictment, those counts are substantive counts which contend he either did it or aided or abetted in the doing of it, and there is absolutely no evidence of that.

Counts Seventeen to Twenty-three, Your Honor, are that same evening, 2-1-92, the Church Hill murders, Armstrong, Long, and Carter.  These are CCE murders, Sections 848, 1959, and a gun charge, 924.  So there are seven indictments against Mr. Tipton in regard to the Church Hill murders.  Again, we have the same two witnesses that we had in regard to  --

favorable witnesses for Mr. Tipton in regard to Torrick Brown.  Charles Townes testified that when they got to this corner on Clay Street on 2-1-92, that Tipton said to Johnson, "What's up?  What's up?"  That Johnson said that he had to take care of business.  He said -- Townes quoted Johnson as saying that "Jerry," meaning Jerry Gaiters, "is going to take me to where "Mousey" is located."  From that point, they took Townes back to Central Gardens and

**JA1298**

dropped him off.  At that point, Townes said that Tipton said something to him, "Why don't you go with us?"  Some sort of conversation like that.  He stated that there was no conversation in the car from Clay Street when four of them got in the car until Central Gardens about any murder or violence being done to "Mousey."  At that point, the next government witness is Jerry Gaiters.  It is very difficult to say what Gaiters said.  He said it so many different times in so many different ways.  What we thought he said was that "O" said something about getting his money and shooting her in the rear end.  That's what Gaiters testified to.  The government at this point has got to convince this Court that Tipton would have known what was going to happen, and there is no evidence that he did.

The evidence from Townes, who is on the corner, testifying to Johnson saying he was going to find "Mousey" to take care of some business:  Judge, as the Court knows from hearing the numerous drug cases that you hear, taking care of business with drug dealers means many things, such as getting money, et cetera.  There is no indication from what was in the car that the driver knew what was going to happen or that the driver was part of any plan that took place between Gaiters and anybody else about what was to happen in that case.  On those seven counts, on behalf of Mr. Tipton we move for judgment of acquittal.

With regard to Counts Twenty-four through Thirty -- those are the Stony Run murders of Chiles and Thorne, the maiming of Priscilla Greene and Gwen Greene -- the Court heard the evidence yesterday.  They put him there.  There is no ballistics evidence to indicate that Tipton is a shooter.  We move for the Rule 29 dismissal of those counts.  Count Thirty-two, Your Honor, the date of 2-2-92 in regard to 1212 West Moore Street, possession of cocaine with intent:  That is the morning after the Lynhaven shootings and the Church Hill shootings when the search was conducted by the Richmond Bureau of Police, and when Detective Rodriguez finds the gun, the bag, and the cocaine which was testified to was from New York.  There is again, although Tipton was arrested for that charge on the state charge which was nol prossed, there is absolutely no evidence that any drugs in the property belonged to him.  Again, the government at this point has got to show -- and again, we are not on a conspiracy charge.  This is a substantive charge alleging that he possessed those drugs.

MR. VICK:  One factual thing as to that,

**JA1299**

Valerie Lee Butler (Cross)

Your Honor.  Charged in the indictment -- I know it is not a necessary predicate, legally, to charge the amount.  But that's a sentencing issue.  But charged in the indictment is that more than 50 grams of crack cocaine was seized there on February 2nd.  Indeed, I believe the lab report does not show more than 50 grams of crack cocaine on that particular case.  It is 28 grams.  We would move to amend the indictment to show the proper amount of drugs which were seized in that lab report.

THE COURT:  All right.

MR. GEARY:  In regard to Count Thirty-three, this is the last count in terms of time, it alleges on 4-10-92, when Tipton was arrested in South Richmond, that he possessed with intent the cocaine that was seized the next day by the police. We have no motion to make on that charge.

The remaining charge, Your Honor, is the most substantial charge in the case, for many reasons, and that's Count Two, the Continuing Criminal Enterprise.  Under 848, Your Honor, this becomes the death penalty predicate statute.  It is a narrowing statute which narrows the class of persons eligible for the death penalty.  The government does not get to the second phase on any of the three male defendants unless the jury returns a verdict of guilty in regard to Count Two.

Our position at this point is that the government has failed under Rule 29 to get to Count Two.  The death penalty predicate of 848 requires that the CCE has a number of, four or five, different elements which must be established beyond a reasonable doubt.  I am addressing my concerns at this point, not waiving the other elements, to the element which requires that a defendant in a drug conspiracy occupy a position of, A, organizer, B, supervisor, or C, other position of management.  The evidence in this case, Judge, when we start with the New Jersey evidence in regard to Mr. Tipton, the United States proved conclusively that at the point of time where he was in Trenton, that he was a street-level drug dealer.  The arrest by Officer McMillian up there showed that beyond a reasonable doubt.  When the evidence comes to Richmond, it would appear that the government's evidence raises defendant Tipton to one level above that of a street corner dealer.  He becomes, in effect, a supplier.

And you heard from Central Gardens witnesses time and time again, and some of the Newtowne witnesses time and time again, about this deal that they call the two-for-one, where a supplier, be it Tipton or anybody else, goes to somebody -- and the

Valerie Lee Butler (Cross)

government uses the word "recruit" -- and says to that person, "Do you want to sell drugs?  I have a deal for you.  I give you X amount of drugs, you give me Y amount of money back."  The amounts that were talked about were $300, $200.  "You get 30 rocks or vials, you bring me back $200."  And in effect, the supplier says to the street guy, the corner dealer, "I don't care what you do with the drugs.  You can eat them as far as I'm concerned as long as I get my $200 back."  That was the relationship that all the witnesses described as their relations with defendant Tipton.  That was Hussone Jones, Charles Townes, Maurice Saunders, Antwoine Brooks in Central Gardens; Denise Berkley, Jeanette Pauley, and even Jerry Gaiters described the relationship as in Newtowne. That's what Tipton becomes: a supplier.  The evidence is in many ways uncontroverted about trips to other places to get drugs to bring back, to go to New York and bring the drugs back.  That does not make that person the manager, supervisor, in a position of management, unless there is some control, organization, or administration going on.

The only specific thing the Court and jury heard from all these witnesses in both Newtowne and Central Gardens in regard to Richmond Tipton managing something was when one of the Central Gardens persons, I believe it was Hussone Jones, said that Richard Tipton had told Antwoine Brooks to get off the corner of Catchpenny and Beck because there were too many guys out there selling drugs.  That's the only specific incident that the Court heard or the jury heard.  The rest of what the Court and jury heard were conclusions drawn by witnesses; i.e., "Joe was a partner; Jim was a partner."  These are legal terms devoid of fact content.  When you get right down to it in terms of cross-examination, "Well, what did you see, what did you get?"  "Tipton would tell me this: 'You sell this for me and bring the money back.'"  There is absolutely no indication of the kind of CCE requirement under 848.

Jerry Gaiters is a perfect example.  Jerry Gaiters said, "I was free to cut my own deal.  He supplied the drugs, I went out and did what I did and as long as I gave the money back there wasn't any problem."

Judge, in a system right now in terms of the death penalty in federal courts, there is only one case on appeal where one person has gotten the death penalty, Mr. Chandler in Alabama.  The Federal Courts of Appeals and the Supreme Court eventually will be scrutinizing these cases, particularly the 848 predicates to get the death penalty.  The Court is

**JA1301**

Valerie Lee Butler (Cross)

aware of the scrutiny that the Supreme Court and the appellate courts federally have given to state statutes.  For instance, with the Georgia case and the Virginia statute, which are by comparison very simple statutes.  In Virginia, for instance, you have the category of offenses.  If you kill during the commission of a robbery, first degree murder, and then the death predicate is a finding of future dangerousness, you are eligible for the electric chair.  Here we have a complicated situation, a death penalty trial going on in the middle of a very large, in terms of the number of witnesses, conspiracy trial.  It makes it a very complicated trial.

In looking at the decisions, appellate courts will say -- and it strikes me as unusual because they've already said that about 848 in regard to the amount of money that must be proven, that's kind of a vague standard.  I don't think the courts in looking at death cases will rely or let Congress deal with vague standards; that there have to be specific standards in order to death-predicate people in drug conspiracy murder cases.  I suggest to the Court that if you look at the language of 848, that the witnesses have to give to the Court and to the jury specific fact evidence to narrow down the category of people who get to the second phase.  I suggest under Rule 29, Your Honor, in terms of the CCE, that the government has absolutely failed to do that.  Thank you.

MR. VICK:  Would the Court allow me to respond individually to defendants?

THE COURT:  No, I think it would probably be better the other way.  I think they have a lot of similar arguments.  Mr. Cooley?

MR. COOLEY:  If the Court would allow me, I would seek to adopt Mr. Geary's arguments and those arguments of other counsel that come after me to the extent that they apply to the matters relating to Cory Johnson.  Additionally, I would move to join in Mr. Geary's motion, continued motion to strike the New Jersey evidence, and I will not belabor that.

THE COURT:  All right.

MR. COOLEY:  Thank you.  Pursuant to Rule 29, we would move for judgment of acquittal counts that relate to the defendant Cory Johnson.  I will try to expeditiously move through the counts.

The first count alleges that the conspiracy, and as Mr. Geary has ably pointed out, it appears that the evidence demonstrates a series of conspiracies, multiple conspiracies.  And it seems to me that the evidence fails to establish that the quantity involved in the particular conspiracy alleged to Cory

**JA1302**

Johnson, that being the Richmond situation, it seems that the quantity does not rise to the level that is required under the statute.  It does appear that there were a series of independent contractors and independent contracts, rather than an ongoing conspiracy from New York through New Jersey to Richmond and to various areas of Richmond.

Your Honor, as to Count Two, the Continuing

2773

Criminal Enterprise, as again raised by Mr. Geary, I think the evidence fails to demonstrate on the part of Cory Johnson any management, any supervision, any control, any direction, and certainly no overseeing by him of any parties.  The precious few tidbits of information supplied in this evidence as to Cory Johnson giving or handing to anyone any portion of cocaine -- and they are tiny amounts that are alleged to him and there are very few of those situations -- there is absolutely no suggestion that he demanded of those persons where they would sell, how they would sell, whether they would ingest it themselves.  All that was asked of them from him in those precious few was "You take these ten rocks and you bring me back $70 or $60."  That was it.  Where they sold, what they did, how they dealt with that particular product, was entirely their affair.

And again, I note to the Court I think that clearly the evidence, insofar as alleging Cory Johnson to be a participant in a Continuing Criminal Enterprise, falls far short of the demanding requirements of this statute.  There certainly is a distinction between one who is simply a supplier and someone who is engaged in a Continuing Criminal Enterprise.  And I think that distinction is clear

2774

when the Court sifts away the quantity of evidence and looks at just those few times that it is alleged that Cory Johnson participated in any transaction relating to a controlled substance.

In addition, I think there has been an absolute failure to establish, even under the vague terms of the statute, that there was a substantial income to Cory Johnson, or that there were substantial resources to Cory Johnson.  Clearly, the evidence has been, in terms of his dealings, that the quantities -- I think the highest quantity we have heard relating to him would have been in the $300 gross amount, "You bring back $200, you keep whatever you make."  In addition, there was an allegation addressed to Ms. Valerie Butler in yesterday's testimony, or a suggestion to her, that she had seen him with large quantities of money.  The best she could say was she thought she had seen him with maybe more than a thousand dollars.  But on

**JA1303**

cross-examination, her response ultimately was she had seen him with more than $100, and that he seemed to have more money than other people who didn't have a job. And we will certainly concede that.

But she also indicated that he had no jewelry, no diamonds, no car. And while I understand that is not controlling, those certainly would be indicia of substantial income. And indeed, when she was pressed as to what he had that was of any value, the only thing she could say that he had that was, even in her terms, expensive, was a pair of Guess jeans and a pair of Timberland boots. I would suggest there is no demonstration that this young man was deriving a substantial income or resource from the alleged offenses.

Your Honor, moving on to Count Eight, which is the capital murder as part of a Continuing Criminal Enterprise of Peyton Maurice Johnson, I would suggest to the Court that there was no testimony that that killing was in furtherance of a drug conspiracy. The Court would have to guess or conjecture to arrive at that conclusion. And the jury would have to do that as well.

The use of a firearm, Count Nine, as to Peyton Johnson, would fall. And we urge judgment of acquittal for the same reasons. Count Ten, the causing of the murder of Peyton Johnson: The government has alleged in its count that this was in furtherance of a racketeering activity. And they have defined that racketeering activity throughout the indictment as the drug conspiracy. And I note to the Court again that there is no evidence relating to the killing of Peyton Maurice Johnson that that was indeed the case. Mr. Smithers testified that Peyton Johnson was not selling cocaine at the time, or crack cocaine at the time, and that this was a personal thing.

Count Eleven, the capital murder alleged to have occurred during the Continuing Criminal Enterprise, the killing of Louis Johnson, I note to the Court again, and I think this one is blatantly clear, that this was not tied to any drug conspiracy. It was not in furtherance of a Continuing Criminal Enterprise. Indeed, you have in this case direct evidence from the government's witnesses that this killing was a, quote, personal thing. That comes not from a single government witness, but from two of their principal witnesses. Both Mr. Hardy and Mr. Gaiters indicated that this had to do with Mr. Johnson flashing a shotgun at certain individuals, and that the shooting was, in their terms, and this is a direct quote, "a personal thing." Therefore, we would move for a

**JA1304**

judgment of acquittal on that.

Count Twelve is the use of a firearm during the commission of that act, and we would suggest that it should fall as well.

Count Thirteen is the causing of the murder, as part of a racketeering activity, of Louis Johnson. Again, the racketeering activity defined in the count is the drug conspiracy, the distribution of narcotics. And there is nothing, again, that relates the Louis Johnson killing to that. I am not disputing that Louis Johnson was killed. I am disputing, and we believe the evidence fails to establish, that it falls under this statute. Because there is, contrary to there being any relation to the drug activity, the direct evidence is that, and it is uncontradicted, that it was a personal thing.

Count Fourteen is the causing of the murder of Torrick Brown. In this case, again, like the Louis Johnson case, there is absolutely no demonstration by the evidence that this was a drug-related killing. In fact, again, the racketeering that's alleged, the activity of racketeering, was alleged to be the drug situation. And the testimony from these folks is abundantly clear that this was a domestic situation; that it was not in furtherance of any drug conspiracy or Continuing Criminal Enterprise. And indeed, the direct evidence of the government's witnesses is to the contrary.

And Count Fifteen, the use of a firearm in the commission of the murder of Torrick Brown, should also fall for those same reasons.

Count Sixteen is the assault, the malicious wounding of Martha McCoy. Again, that is tied to a racketeering activity which is defined as the drug activity. Again, the shooting of Martha McCoy is purely a domestic situation. It is not in furtherance of anything relating to drugs under the evidence presented to this Court.

Count Seventeen is the capital murder of Bobby Long under the Continuing Criminal Enterprise. Again, on the same arguments that we raised under Count Two, the government has not established the Continuing Criminal Enterprise. I would suggest that that offense should also be struck and judgment of acquittal granted.

I would remind the Court that while there is certainly no dispute that those folks -- and this argument will apply to Counts Seventeen, Eighteen, and Nineteen, the capital murder of Anthony Carter and Dorothy Armstrong, as well as that of Bobby Long, that there is one witness and one witness alone who alleges that Cory Johnson is the shooter. And that

**JA1305**

Valerie Lee Butler (Cross)

is Jerry Gaiters.  While I understand that the government is entitled to every reasonable inference

2779

at this point in time, I suggest to the Court that Mr. Gaiters' credibility was totally impeached.  I think Mr. Gaiters clearly came before this Court -- he has admitted he has perjured himself before the Grand Jury, he acknowledged that his versions have changed.  I think the evidence is clear that his versions have changed.  In fact, they apparently changed even between the last time he talked to the prosecution and the time he took the stand.  And the government now asks this Court to determine and to let this matter go forward to a jury on the credibility, the sole credibility, of Mr. Jerry Gaiters.  And I suggest to the Court that that would not be appropriate.

Count Twenty is the use of a firearm in those matters.  And for the same reasons, I suggest that that count should fall.

Count Twenty-one, Twenty-two, and Twenty-three are the causing of the murder in the course of racketeering activity of Bobby Long, Tony Carter, and Dorothy Armstrong.  And I suggest again to the Court that the government relies totally and exclusively upon Jerry Gaiters to be the person who fills in the blank as to who committed those offenses.  They have certainly corroborated that the folks are deceased,

2780

and that they were killed, and the manner in which they were killed.  But in terms of who did the killing, the government relies totally and exclusively upon the credibility of Mr. Jerry Gaiters.  And I suggest to the Court that that is not a sufficient basis to let the matters go forward.

Count Twenty-four is the capital murder and the Continuing Criminal Enterprise of Curt Thorne.  I suggest again that the arguments relating to the Continuing Criminal Enterprise play a role here, and if that falls, this alleged offense must also fall.  In this case, I understand the government's position will be that there is circumstantial evidence relating to who committed these offenses.  But I remind the Court that no one testified as to who fired the shot or even heard or saw the shot that was fired at Curt Thorne.  Certainly Ms. Greene, "Pepsi" Greene, did not.  She did not even hear the first shot, was her testimony.  And Ms. Gwen Greene testified she had no recollection as to it at all.

Those same arguments would be applied to Count Twenty-five, which is the capital murder and Continuing Criminal Enterprise in relation to Linwood Chiles.  This was not in furtherance of a Continuing Criminal Enterprise.  There is no direct evidence as

**JA1306**

to the shooting of who did the shooting, and I would suggest the evidence is insufficient as a matter of law.

Count Twenty-six, the use of a firearm, should fall for the same reasons. Count Twenty-seven, Twenty-eight, and Twenty-nine are the causing of the murder in the course of racketeering activity of Mr. Thorne, Mr. Chiles, and the maiming of Priscilla Greene -- excuse me, Count Thirty should also be included in that -- and the maiming of Gwendolyn Greene. As to those, there is no direct evidence as to who fired the shots. And I urge the Court that the evidence is insufficient to support the matter going to the jury, and I ask for judgment of acquittal on those.

Count Thirty-one is the distribution of crack cocaine. I note to the Court that obviously there was no -- while we had an allegation by folks that "I got crack from this person" or that sort of thing, there are only a few lab reports that have indeed tested positive for the cocaine. And as to --

MR. VICK: Perhaps I could help edify on this argument. Our argument will be as to that particular distribution count that the testimony supporting that particular distribution count came from "Papoose" Davis when he testified that he indeed received crack cocaine for wiping the fingerprints off the murder weapon used in the Peyton Maurice Johnson murder. It was smoked.

MR. COOLEY: I note again that while Mr. "Papoose" Davis did indeed say that he received a small quantity from Mr. Johnson for that, that there is no lab report that demonstrates that what he received was in fact crack cocaine. And the Court must look to that as well. I would urge that that matter be struck as well.

Count Thirty-two, I think, is one again that is somewhat blatantly clear. Mr. Johnson is charged with possessing with intent to distribute the crack cocaine found at 1212 West Moore Street on February 2nd, 1992. Obviously, under the evidence he was not there at the time of the arrival of the police. There are no fingerprints which tie him to the items that were seized. And there is no evidence that Cory Johnson ever exercised any dominion or control over those drugs. They are in the vicinity of or the proximity of that home. He is not there, and no one has put him in direct control. Certainly no one has put him in direct possession of those. Certainly no one has testified that he had dominion and control

over those drugs at that location on February 2nd or,

for that matter, in any other situation.

And while those items of controlled substances were in fact tested, they are not tied in any manner whatsoever to defendant Cory Johnson.

Your Honor, that completes my argument. Thank you.

THE COURT: Thank you, Cooley. Mr. Baugh?

MR. BAUGH: Your Honor, likewise, we would adopt the arguments of counsel previous and subsequent. We would also reurge all of our previous motions and objections.

The defendant, James Roane, would first take exception with Count One of the indictment. We would join that it alleges multiple indictments. Additionally, however, Mr. Roane is in the position of there has been no evidence of the interdependence of the activities that occurred in New Jersey with the activities that occurred in Virginia for which James Roane allegedly plugged into this conspiracy. As such, we would add that particularly as to James Roane, these would be separate conspiracies. The Court is well aware that you can have a core group, but -- and if Mr. Roane is out here, perhaps giving them the evidence in the light most favorable, he plugged into this core group. It is like a wheel-hub thing. We have two people, Mr. Johnson and Tipton, allegedly are the hub. Mr. Roane plugs in. That does not make him a conspirator with other people in other places that might have conspired with Mr. Tipton and with Mr. Johnson. So we would submit that as to Mr. Roane, there are separate conspiracies. There is no evidence of interdependence.

As to the CCE, we would adopt the arguments of counsel previously. We would also argue as to Mr. Louis Johnson that the only witnesses that the government has presented as to motive for the killing of Louis Johnson are witnesses who testified it was a personal thing. While Mr. Johnson may have been selling drugs or even moving drugs, there is no indication that this was related in any way to some conflict of drug-related activity between any alleged groups. Every piece of evidence that the government put on as to the motive behind the killing of Louis Johnson -- I mean, it's not a question of inference. Two of their witnesses who were present said this was a personal matter.

As to Torrick Brown in Count Fourteen, the firearms charge alleged in Count Fifteen, again, we have the witnesses, Mr. Hardy, indicating that this was a domestic thing involving Mr. Roane and some girl. We have the only surviving witness, Ms. Martha McCoy, testifying that her brother, Torrick Brown,

**JA1308**

had nothing to do with drugs, and that this was a situation over Robin Cooper. Now of course, the United States might argue that well, all of these people, all of the defendants that were allegedly there, in the light most favorable to them, were drug people. Therefore, it must be in furtherance of drug activity. But I remind the Court that the Court is limited to reasonable inferences. If every time drug people -- it is like saying every time you give me a boost with my car, Your Honor, it is a judicial act. That's not true. That's not a reasonable inference. In fact, again, as to the shooting of Mr. Torrick Brown, every witness that the United States put on who gave any testimony as to motivation for the killing testified directly -- I mean on direct examination when asked, and on cross-examination if they didn't -- that this was a domestic shooting.

The same would apply as to the shooting of Ms. Martha McCoy. Although there has been no evidence offered for the motivation, we would submit that under these statutes, the motivation is an element that must be proven, such as value or like amount.

It is something that must be put there. True, they are entitled to reasonable inferences. But in this instance, Martha McCoy had nothing to do with any drug activity, based on the record. She was shot because she was there. However, under the concept of transferred intent, she was shot because Torrick Brown was shot. Torrick Brown was shot. It was a domestic matter. There is no evidence to support the element that this was furtherance of drug-related activities.

Again, they can say that well, some people might have been involved in this because they wanted to get into this supposed gang or to advance their position. And I'm sure the United States is going to argue that. We would submit there is no evidence of that. But even if there is, there is no evidence that Mr. Roane participated in it to advance. He, according to the evidence, was the jealous one. The other people, while the government might argue they helped him because they wanted to be friends with him or something, that intent is not there as to Mr. Roane. And we would submit if the Court -- I know the Court takes copious notes, as all of us do. There is nothing pertaining to that element that the United States has proven. Nothing.

We would also submit the same as to the firearms charges as they pertain to Ms. Martha McCoy. I would also ask the Court, the United States made a motion to amend their indictment. Did the Court accept that?

**JA1309**

Valerie Lee Butler (Cross)

THE COURT: As to the --

MR. BAUGH: The amounts.

THE COURT: Reduction of the amount?

MR. BAUGH: Yes.

THE COURT: If you want to comment on it, go ahead.

MR. BAUGH: I would. I freely admit, I do not know the status of amendments to indictments in the last five years, but I will tell the Court this: that the indictment under which these gentlemen and this lady are charged is a document that came from the Grand Jury. They are entitled to Grand Jury scrutiny. I do know that several years ago it was not the law; the United States cannot amend that which the Grand Jury does. This is not the United States' document. And additionally, even if they could, jeopardy has attached to these allegations. And after jeopardy has attached, you can't go in there and change the question after we have already presented an attempt to resolve the answer. That's what they are doing. They are attempting to conform the allegations as to what their evidence would have been. I say this particularly in light of the fact that all of us filed a request for a bill of particulars to avoid this exact problem.

There are several arguments as to the CCE which I would, of course, adopt. I hope that the Court doesn't think, because I do not address them directly, that they are not important. But I would particularly emphasize and ask the Court to recollect, even in the light most favorable to the United States, the evidence pertaining to the motivation behind the killing of Louis Johnson, the evidence behind the killing of Torrick Brown, and the ancillary or associated shooting of Ms. Martha McCoy.

THE COURT: Mr. Wagner?

MR. WAGNER: Thank you, Judge. Your Honor, first I would move to join in the motion to strike the New Jersey evidence. Secondly, I would renew my motion for severance for three reasons, two of which previously have been presented in my motion for severance to the Court: the testimony of James Roane exculpating my client here; and secondly, the spill-over evidence of the violence in this case. Thirdly, Your Honor, I would ask that Ms. Reavis' case be severed based on the multiple and separate conspiracies that have been shown by the government and the prejudicial effect that those have on Ms. Reavis. Because of that prejudicial effect, Your Honor, I would submit that her case should be severed. That evidence should not come in against

**JA1310**

her in a joint trial.

Your Honor, I would also submit a motion for judgment based on Rule 29, judgment of acquittal. The evidence is insufficient at this time in the light most favorable to the government to show that she was involved in this conspiracy. First of all, there has been no direct testimony that any of the drugs that may have been transferred to Ms. Reavis by any of the people charged in this conspiracy or involved in this conspiracy were actually distributed by Ms. Reavis. Furthermore, there has been no testimony that Ms. Reavis gave any money to anyone involved in this conspiracy for any of the drugs that she may have received.

Secondly, there has been evidence about guns and Ms. Reavis, but there has been nothing to tie those guns to the conspiracy, nothing to show that any involvement she may have had in those guns was in furtherance of the conspiracy.

Finally, Your Honor, there was testimony about money that she was involved in transferring to New York. I would suggest, also, that there is nothing that the government has offered to show that that was in furtherance of the conspiracy.

For these reasons, Your Honor, I would ask that her one count that she faces, the conspiracy count, that that be dismissed. Thank you.

THE COURT: All right. Mr. Vick?

MR. GEARY: Judge, for Mr. Tipton, I would also join in other counsels' arguments.

THE COURT: All right.

MR. VICK: If the Court wishes, I will address what concerns the Court has concerning the counts.

THE COURT: If I were you, Mr. Vick, I would spend my time talking about Torrick Brown.

MR. VICK: Yes, sir. Your Honor, we have not charged Torrick Brown with an 848 murder. I would like to make one note prior to that. The arguments by counsel all indicate that indeed, all of the 848 murders would fall if any of these defendants were not found to be drug kingpins themselves. That's not the law. All they need to be found is

committing those murders in furtherance of an 848, in furtherance of a Continuing Criminal Enterprise. So indeed -- and I wouldn't argue for a second that this is what the evidence is. Indeed, each of those defendants could be acquitted on Count Two, the CCE Count, and the jury could indeed find that there was a Continuing Criminal Enterprise, perhaps the New York Boyz, and that these murders were in furtherance of that. They would still be guilty of those

**JA1311**

Valerie Lee Butler (Cross)

murders.  That's the law.  Count Two is not a predicate to any of the other murder counts in the indictment.

As to Torrick Brown, Your Honor:  Indeed, that was a murder that flowed from James Roane being mad at Torrick Brown over Robin Cooper.  But for whatever reason defined by the conspiracy, that murder then became, because of Roane's motivation, that murder then became a goal of that conspiracy.  That fact is proven by the participants in the conspiracy -- excuse me, by the participants in the murder, those participants being "C.O." and "V" in addition to James Roane.

THE COURT:  Say that again.

MR. VICK:  The fact that this murder was accepted by the conspiracy was proven by the

2792

participants in the murder.  That murder started with domestic reasons, but it was accepted as a goal of the conspiracy.  Otherwise, there would have been no reason for Cory Johnson and "V" to have joined James Roane in carrying guns over there to kill.  That's why it is a 1959.  You heard the testimony from Greg Scott that indeed, had members of the conspiracy, had members of the New York Boyz, not chosen to engage in a crime of violence, they would have then been ostracized from the gang.  They would no longer be part of the gang.  Once James Roane decided that he was going to murder Torrick Brown, "O" and "V" agreed to join with him in that to maintain their position within the racketeering enterprise, that is, the drug distribution, the New York Boyz, as stated by Greg Scott.

THE COURT:  What is your evidence of that? The evidence is that they agreed to do it.  And you make the leap from that that they agreed to do it --

MR. VICK:  Circumstantially, that's the case.  We have the right to --

THE COURT:  Circumstantially from what?

MR. VICK:  From the fact that they showed up there and killed the man.  What reason could there

2793

be to show up and kill the man if only he had a domestic concern with James Roane?  What reason would there be to join him but for the reasons stated by Greg Scott?  Additionally, go forward in the evidence to Valerie Butler, where we have Butler talking about the three-way conversations from jail with "V" and "Whitey" and "O" in New York where they talked about that murder and wanting to go back and kill  --  that conspiracy didn't end.  That particular murder didn't end.  They wanted to go back and kill Martha McCoy and the kids to cover up who was involved in that

murder, to hide the conspiracy.  That's clear.  They wanted to wipe out all witnesses to that murder for the single purpose of depriving evidence of the involvement of the conspiracy members in that murder.

THE COURT:  They wanted to go back, accepting your evidence, and kill the witnesses to avoid capture and prosecution for murder.

MR. VICK:  Why would "Whitey" be involved in that -- he wasn't there for the murder -- if it is a simple domestic thing?  Why would "Whitey" be concerned about their being caught and prosecuted on that except to hide the knowledge of the overall conspiracy, except to hide the finding of the overall

2794

conspiracy?  Indeed, it was a goal of the conspiracy.  That conspiracy, these people acting together chose to kill Torrick Brown.  That's clear from the evidence.  These people acted together.

THE COURT:  Mr. Vick, on that argument, any action that they decided to take becomes a goal of the conspiracy.

MR. VICK:  That's correct.  Any action that they decided to take  --  in fact, I'll back up a little bit.  We could have charged under the general conspiracy law, we could have charged each one of these defendants with each one of the murders, whether they were actually there to pull the trigger or not.  Because clearly, it is a foreseeable goal of this conspiracy that people would die; that they would use violence to get the ends that they sought for their conspiracy; the control of territory, for example.  The murder of Torrick Brown was clearly part of this conspiracy as proven by the participants in the murder.  I can't go into their mind, Your Honor.  I can't go into the mind of Cory Johnson and tell you exactly what he was thinking, or go into the mind of "V" and tell you exactly what he was thinking when he chose to go and kill Torrick Brown.  Because clearly, he had no domestic dispute with Torrick

2795

Brown.  "C.O." had no domestic dispute with Torrick Brown.  "V" had no domestic dispute with Torrick Brown.  The only reason that they could have gone to join that murder is to further the goals of the conspiracy as they defined them.  I can't tell you how they defined them.  But that's the only reason for them being there together, is to aid James Roane in the killing of Torrick Brown.

THE COURT:  Tell me this, Mr. Vick:  Let's accept the conspiracy as you have outlined it, the involvement of all of the parties, and let's say they went off to Las Vegas to enjoy the proceeds of their illicit conduct.  While they are in Las Vegas, they

**JA1313**

take their women with them and while they are in Las Vegas, somebody hits on one of the women and one of them gets mad. All right? And then they go out in the parking lot and they all kill him.

MR. VICK: Remind yourself, Judge, of the testimony of Greg Scott that indeed actions of that sort had to be agreed upon by the people and indeed were part of your maintaining your position within that organization, joining with the others in murder. Had they agreed not to, remind yourself, and that inference is in our favor, remind yourself of what his testimony was: that indeed, if you had chosen not to join in a violent activity after it had been agreed upon, you would be ostracized, no longer be part of the New York Boyz, no longer be getting the protection that they were there to give each other.

I can't tell you exactly how it is that they defined the goals of the conspiracy in that regard, but the presence of "C.O." and "V" there for the murder of Torrick Brown clearly shows that it was conspiratorially-related in their mind; it was to further the conspiracy in some way.

They had no domestic dispute with Torrick Brown. There could have been no other reason for them to have been there.

THE COURT: Further the conspiracy in what way?

MR. VICK: Furthered the conspiracy in the way -- again, remind yourself of the testimony of Scott. They wanted to portray that you couldn't mess with them, you can't mess with the New York Boyz. "You can't mess with me, James Roane, me, "C.O.," me, "Whitey," or you are going to mess with all of us. We will kill you, we will take you out. Don't mess with us." It furthers their drug distribution activities. That is the very thing that this conspiracy wanted everybody to know: "If you mess with us over anything, we will lay you dead in the street. So don't mess with us. Pay us for your drugs. Don't get in our way, or we will kill you."

THE COURT: All right. Any rebuttal?

MR. BAUGH: Briefly, Your Honor, if I might. First, I must point out, Your Honor, that even giving validity to the argument of the United States, first, motive for an offense: a crime occurs when all the elements occur in one space and time. The question for this Court was what was the motive at the time of the killing of Torrick Brown. What acts were done subsequent, or if maybe the cover-up became furtherance, that's one thing. But the question is what evidence is before the Court now for

the motive at the time of the offense, because that's when the crime occurred.

Additionally, under the analogy given by the United States, if Mr. Roane and Ms. Reavis were to have a baby, they would allege because they are conspirators that that's obviously in furtherance of the conspiracy. And if these gentlemen sent presents, then obviously the baby is a product of the entire conspiracy. But the exact opposite is true. In this instance before the Court, there is no evidence, nothing that would indicate that Torrick Brown was killed for any other reason except domestic.

Now, I would argue that the United States cannot even show any motivation on the part of James Roane that had anything to do with any matter except jealousy based on this record.

THE COURT: All right.

MR. VICK: If I could add one other fact that I think might be important. Remember the testimony about what occurred at 1212 West Moore just prior to that murder where "C.O." very clearly stated to everyone there, we have gotten it from several people who testified, "That's the boy he is having trouble with in Southside. Let's get the gun and go. Let's get the guns and go." He sent "E.B." to get the guns. He gets Linwood Chiles, another member of the conspiracy, to drive them over there with Sterling Hardy. None of these people had any domestic dispute whatsoever with Torrick Brown. Yet all of them joined together to kill him. It makes the testimony of Greg Scott ring true; that indeed, the laying of these dead bodies was perceived by these people to pave their way to riches in dealing drugs by letting everyone know "You can't mess with us, even over a domestic thing. We will kill you."

THE COURT: All right. I will tell you what I am going to do. On all of the Rule 29 motions raised by the defendants, except for the ones relating to Torrick Brown and Martha McCoy, I believe Fifteen, Fourteen, I'll rule right now. The motions will be denied.

What I am going to do with the Torrick Brown and Martha McCoy counts is take some time, review my notes, and go through it thoroughly to see if I can find anything to support the counts. If not, they will die. It is just that simple. And I'll let you know tomorrow if those counts will go to the jury.

All right. That completes the matter. Thank you.

(Proceedings adjourned at 10:50 a.m.)

**JA1315**

V

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

2800

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                CRIMINAL ACTION
                                          92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------

VOLUME XIV

January 29, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER

2801

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

**JA1318**

Valerie Lee Butler (Cross)

Johnson, James H. Roane, Jr. and Sandra Reavis, the fourteenth day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready to proceed.

MR. GEARY: Defendant Tipton is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. BAUGH: Defendant Roane is ready.

MR. WAGNER: Defendant Reavis is ready.

MR. VICK: Your Honor, we have one piece of evidence, Government Exhibit 13, which we apparently did not move in. We would move it in at this point. It has been previously testified to by Anne Jones, simply a report of her examination about the .38. Additionally, Your Honor, we have another witness that we could call, Tommy Leonard. In light of the cross-examination of Valerie Butler about her telephone records, those telephone records were indeed pulled and he has synthesized those telephone records and those telephone records reflect the three-way telephone calls as she testified to. We could call him, or if everyone is in agreement that that's a fact, we could move them in by stipulation.

MR. McGARVEY: The only question I would have, Your Honor, are those the bills that she gave you?

MR. VICK: They were subpoenaed from the telephone company.

MR. COOLEY: We haven't seen them, of course.

THE COURT: Let them take a look at them.

MR. VICK: Yes, sir. Your Honor, additionally, prior to the jury coming in I have a motion in limine concerning the defendants' case. As I understand it, primarily, detectives have been subpoenaed to testify in the defendants' case. The government has an objection to defendants testifying as to anything other than prior inconsistent statements by witnesses called by the government. Indeed, it is my understanding, based upon speaking to the detectives concerning their relative involvement, some of these detectives would be asked to testify concerning, for example, the filing of charges against Gaiters for the murder of Katrina Rozier. It is irrelevant. It is outside the scope, hearsay, impeachment through extrinsic evidence. The only thing they could testify to would be prior inconsistent statements by other witnesses. Rodney Tucker has been subpoenaed by Mr. Wagner to tell him that Cory Johnson said Sandra Reavis didn't have much to do with this. That's hearsay.

MR. GEARY: One of the witnesses that we

**JA1319**

have summonsed, a woman by the name of Pamela Harris, who was interviewed by Detective Woody, she is not available for service. No address. We would request that she be declared unavailable so we can call Detective Woody in regard to her. Defendant Tipton has three police officer witnesses: Detective Cox, the investigating officer, homicide officer for the Talley murder; Detective Blaylock, a homicide officer for the Rozier murder; and Detective Woody, who dealt with Jerry Gaiters. For the government of the United States to come in here and say that evidence that someone else other than my client or one of these defendants did not kill Katrina Rozier, that that's irrelevant to this case, that prevents us from putting on the defense. The evidence we have is that Jerry Gaiters killed Rozier.

THE COURT: Mr. Geary, it is quite all right for you to put on evidence that Jerry Gaiters committed the murder. It is another thing to put on evidence that he was charged with it. The fact that he was charged with it, as far as I'm concerned, is not relevant. What matters is that you have evidence to indicate the actual commission of the offense.

MR. GEARY: We have evidence from the detective that he had probable cause to get the warrant. We can go into that as to what the underlying evidence was.

THE COURT: As I've said, if you have information coming from any officer that would indicate that Jerry Gaiters committed the murder, that is fine. But as to the fact that he was arrested or charged, none of that amounts to a hill of beans.

MR. VICK: My objection goes beyond that. Indeed, if Mr. Geary wants to present that evidence he needs to present the witnesses that indeed made those statements to the police officers. He can't do it through the police officers. That's hearsay.

THE COURT: Well, these objections can be made at the time. I think that's true.

MR. GEARY: One other thing I'd like to raise in regard to Detective Dalton. He was the interviewer of Priscilla Greene late in January of last year. I believe the Court declared her unavailable in terms of her memory of things she has previously told Detective Dalton. We are interested in having Detective Dalton to testify to two pages of the interview. I'm advised today by Detective Fleming that Detective Dalton is on vacation and is in Tennessee. I would ask that the Court allow us to put into evidence pages 14 and 15 of the Dalton-Greene interview on January 28th, 1992 dealing

with the murder of Katrina Rozier.

THE COURT:  Prior inconsistence?

MR. GEARY:  No, sir.

THE COURT:  What is it?

MR. GEARY:  Evidence she had that she gave to Detective Dalton as to who in fact killed Katrina Rozier.

MR. VICK:  She has not been asked about it in her testimony about that, and her memory was purely hearsay.  Hers was hearsay.

MR. GEARY:  That's not hearsay.  She alibis my client, for one thing.  She told Detective Dalton that Tipton was in New York with Linwood Chiles when that happened.

THE COURT:  Mr. Geary, that's hearsay under any way of looking at it, as far as I'm concerned.

MR. BAUGH:  Your Honor, one of the problems we are having in this is that we got this material when we got our Jencks material.  How a witness alibi-ing all of our defendants was not Brady material and we didn't get it in the summertime is an interesting question.  Additionally, I can tell the Court that we tried to serve Ms. Catherine Wallington yesterday and were unable to do it with a private process server under threat of physical violence over there trying to get her served.  She is not going to be here.  I do plan to put Mr. Dalton on and ask him, concerning the murder of Doug Moody, did he go to someone as his initial suspect.  It is my understanding he will say it was Mr. Keith Barkley.  I will ask him what caused him to go seek that person out.  He will say that Ms. Wallington said certain things.  That's why he went and got them.  I will ask for a physical description of Keith Barkley, and that will be corroborated by another witness.  That was not hearsay.  Merely, we are offering it for the truth, that's what he said.  He can give his direct testimony as to the description of Keith Barkley.

THE COURT:  I don't have a problem with anything you have just said.

MR. BAUGH:  Oh, never mind then.

MR. VICK:  Dalton is not here.

THE COURT:  Why isn't he here?

MR. VICK:  He was not served in time.  He is in Kentucky for his son's wedding.

MR. GEARY:  We have a subpoena for him dated January 8th.

MR. VICK:  Then he should be here.

THE COURT:  When is his son's wedding?

MR. VICK:  This weekend, I understand.

THE COURT:  We can put him on next week then.  Dalton has to be here.

**JA1321**

MR. VICK: Your Honor, as to the Brady issue -- never mind.

THE COURT: Don't waste time. Mr. Wagner?

MR. WAGNER: Yes. As to the testimony of Rodney Tucker, there is a motion in limine by the government. First of all, that's a statement of one of the defendants here and that comes under an exception to the hearsay rules. Secondly, it comes in as a statement against interest, Your Honor. But more importantly -- .

THE COURT: Let's save time, Mr. Wagner. If Mr. Tucker wants to come in and testify as the government has indicated, I'll let him do it.

MR. WAGNER: Thank you.

MR. VICK: Just a further note on the Wallington testimony: what she told Detective Dalton was purely hearsay that she had heard.

MR. BAUGH: We are not offering it for the truth.

THE COURT: Detective Dalton can come in and be asked the questions indicated by Mr. Baugh.

Let me just put this out so everybody will understand it, and I'm sure everybody knows this who knows me. The defendants are going to have a chance to put on the defense. You might as well get that in your head, Mr. Vick. I will be as generous to them as I have been to you in letting them make their case. I won't let you get outlandish or go outside of the scope, as I've indicated to Mr. Geary, but as the testimony comes along you can make your objections understanding what I have told you.

Now, I've got to finalize this Rule 29 stuff.

I went through and looked specifically to see if there was really any support in the law for the government's theory, the application of the 1959 statute, and I must say I was surprised. There is some. Having found some support in the law, there appears to me under the standard that I have to utilize at this juncture a thin reed of factual support. And I'm going to let it go on. The motions, Rule 29 motions relating to Torrick Brown and the related counts, will be denied.

MR. BAUGH: Do you have the cite there?

THE COURT: Well, I'll give you a couple cases you can look at. UNITED STATES v. CONCEPCION. I have a Lexis number on it, 33865, Second Circuit, December 28th of 1992. And then UNITED STATES v. BOYD, Lexis number 5207, Northern District of Illinois, March 31st, 1992. I would read BOYD first.

All right.

MR. COOLEY: I'm sorry, I don't want to

belabor this in light of your comments, but we have two witnesses that we sought to have subpoenaed at the addresses given to us by the government. They are Delores Jean Calvin and another witness that we were first given the name of Sam, and then I believe yesterday, two mornings ago, given the last name of Monk. We have made diligent efforts to serve them, and both addresses as supplied by the government are incorrect. Their relation to the case is that Delores Jean Calvin was the fourth person in the house on Church Hill at the time of the killing of Ms. Armstrong, Mr. Carter, and Mr. Long, and she identifies Mr. Gaiters as being the person who came in by voice and name and the only person she was aware that came in. That was told to Detective Woody. There is a second witness, Mr. Monk, who was outside and observed two folks go in and two folks begin shooting. That again was told to Detective Woody. And that's enclosed in his report.

THE COURT: Well, explain it to me; you say an unavailable witness. An unavailable witness who has made a statement, either under oath or has indicia of verification, all right, can be admitted when the witness is declared to be unavailable. What you want me to do, if the witness is unavailable, the witness told Detective Woody something and you want Detective Woody to come in and tell us what the witness told him?

MR. COOLEY: That's correct.

THE COURT: I see no way that you can do that.

MR. COOLEY: The statement that was given, particularly by Mr. Monk, Your Honor, is exculpatory. And we have asked for that address and his name throughout this, in fact beginning on January 11th, pressing to get that information. The United States Attorney told the Court when we were in chambers it would supply us with that. We got the first name of it earlier this week, and the second name two days ago.

THE COURT: What about the information? Not the name, but what about the information?

MR. COOLEY: We were supplied in terms of the report when we got -- no, in the Jencks material. And we began asking for it then. The response has been two days ago this was supplied to us. And that address is no longer valid.

MR. VICK: That's incorrect. Nobody asked me for that name prior to going to Court when this case started. Nobody made the request concerning that name. Indeed, Detective Woody gave the first name. Nobody inquired of me. Nobody told me until

Mr. Cooley did about two days ago that he had not gotten the full name, and I went and got it from Detective Woody.

THE COURT: Well, Mr. Cooley, if you can supply me with any authority for that proposition, I will be glad to listen to you.

MR. BAUGH: If I might, Mr. Gaiters' testimony pertains to all of us and his credibility is a pivotal issue. I would disagree with Mr. Vick that I was present in chambers when we asked for that name and address and it was some -- it was way before we started this trial.

I would also indicate to the Court that the statement that I saw in the Jencks material indicates that Mr. Gaiters is lying when he said someone held a gun at his back. That is Brady material.

Now, if we cannot get it in this way, then we are going to have to move for a continuance until Mr. Monk can be found. Because if we had been supplied with it as required, we wouldn't have a problem. I don't think Brady material is something that's just an inconvenience for the United States. This person says the principal witness, the only one present during the entire alleged conspiracy, has lied about a significant fact. That's exactly what that Jencks material says.

MR. VICK: Mr. Baugh doesn't understand Brady. Mr. Gaiters has pled guilty to that murder, admitted being there. He might have made a prior inconsistent statement. That is not Brady. It has nothing to do with the exculpation of Cory Johnson and his involvement.

MR. BAUGH: Brady is not limited to exculpation. If Brady impacts on the believability of their witnesses, if there is information in possession of the United States that indicates their witnesses might not be believable, that is Brady if it impacts on credibility, which is an issue in controversy.

MR. VICK: That's what Jencks is about and that's why it was provided.

THE COURT: I don't see any Brady issue, and there won't be a continuance. As I said, I'm open to be convinced on this, but I can't think of any basis for allowing you to do that, Mr. Cooley. If you can show me some authority, I'd be glad to listen to it. I really would. But I can't think of any. I don't know, how do we intend to proceed today?

MR. GEARY: Tipton is first, Your Honor.

MR. COOLEY: Realistically, Your Honor, I think the entire defense case is going to conclude

**JA1324**

today.  With the current rulings, it may well conclude, with the exception of Mr. Dalton, in a matter of a couple hours.

THE COURT:  How many witnesses do you anticipate calling for Tipton?

MR. GEARY:  Three, Your Honor.

THE COURT:  Three.  Mr. Cooley?

MR. COOLEY:  I have one who is present, and Detective Woody and Detective Dalton we have.  And those would be our three witnesses.  All of them will be very brief in terms of our questioning of them.

MR. VICK:  If I could beg the Court's indulgence to see exactly what they want from Detective Dalton.

THE COURT:  Mr. Cooley, do you have a report?

MR. COOLEY:  Yes, sir.  Detective Woody made a report.  It is a matter of a few paragraphs.

THE COURT:  Let me see it.

(Document proffered to Court.)

MR. VICK:  Your Honor, if I understand from Mr. McGarvey correctly, what he wants from Detective Dalton, it is two things.  First, he wants to talk to Detective Dalton about his investigation in the Katrina Rozier statements.  And I would submit, we will submit pages 14 and 15 of that statement by "Pepsi" Greene.  Again, it goes to the charging of Jerry Gaiters and all of that in Katrina Rozier.  It is not definitive proof of any involvement of him in that murder.  It is inadmissible, extrinsic impeachment.  I have no problem for the Court to review that.

As to the second item, he would only subpoena Detective Dalton to state that in an interview with "Pepsi" Greene she stated generically -- I believe it is contained in that same report?

MR. McGARVEY:  Page three of the report.  That's not the  --  that's in the report of the interview with "Pepsi."  Page three.

MR. VICK:  Page three.  He asked her what type of knife it was that was used to kill Doug Moody and she stated generically, "I don't know."  You know, she stated here a description of the knife.  That is not inconsistent.

THE COURT:  Why would you have any problem with that?

MR. VICK:  I don't have any great problem with that.  As to getting into the extrinsic evidence of the murder of Jerry Gaiters, it is just not proper.

MR. GEARY:  In regard to Detective Dalton, Mr. Tipton wants testimony in regard to Ms. Greene's

**JA1325**

statement to Detective Dalton about her personal knowledge.  She says the evening Rozier was killed that Tipton was in New York.  The government's witnesses have been allowed to say when people were all over the world.  She is an alibi witness for our defendant for that particular murder.

MR. VICK:  If the Court remembers the testimony, those people left in Linwood Chiles' car

2816

at about ten p.m. the night before the body was found.  That does not mean  --  and the body was frozen out there, as you can see from the pictures.  It has nothing to do with when she was killed.

MR. GEARY:  That's the government's version.  This witness disputes that.

MR. VICK:  She does not.

THE COURT:  Sit down.  All right, Mr. Vick, have you seen this page three and four, C.T. Woody's report?  I don't think it is worth fighting about, frankly.

MR. VICK:  I haven't seen it.  I probably have seen it.  I don't know the specific information.

(Counsel perusing document.)

THE COURT:  If that's all you want to talk about, I'll let you do it.

MR. McGARVEY:  Judge, may I raise another issue?

THE COURT:  Another issue?

MR. McGARVEY:  It is not a great big issue.  It has already been raised.  It is with respect to the phone records and the synopsis as supplied by  --

THE COURT:  You want them to put on a

2817

witness to come in and put those phone records on?

MR. McGARVEY:  I have no problem with the phone records coming in.  I do have a problem with the synopsis by Detective Leonard coming in.  There is no way for us to verify that.  The phone records themselves, I have no problem.

MR. VICK:  The rules allow for voluminous recording  -- .

THE COURT:  Mr. Vick, you don't have to agree.  You can put the witness on and make it as vivid as Mr. McGarvey wants it made.

Mr. Geary, let me see any reports that you have.

(Documents proffered to Court.)

MR. GEARY:  I'm giving you the cover page to show who is talking, then pages 14 and 15.

(Court perusing document.)

THE COURT:  Mr. Baugh, you have no objection to that?

MR. BAUGH:  I haven't seen it.

**JA1326**

MR. GEARY:  Page 14 and 15 of "Pepsi" Greene's interview with Detective Dalton.

MR. VICK:  If we are going to move it in piecemeal, let's move the whole thing in.

THE COURT:  I'll give you that opportunity.

MR. GEARY:  We are only offering it for Katrina Rozier and nothing else.

THE COURT:  Mr. Geary, I don't have any problem with the knife business.  We may have to stop short on this discussion of the whereabouts of Tipton.

MR. BAUGH:  Your Honor, we have an objection to this.  Yes, we would have an objection to this.

THE COURT:  I thought you might.

MR. BAUGH:  Thank you.

THE COURT:  Mr. Geary, I'll let you talk about the stuff with the knife.  I won't allow the other stuff over Mr. Baugh's objection.

MR. GEARY:  All right.

MR. COOLEY:  How about the portion which indicates that she knows that all the parties went out, had left the state, had gone to New York?  That portion would not create prejudice to anyone and that appears to be direct knowledge on her part.

THE COURT:  Well, it wouldn't be fair to let you use that part and not allow the government to use the other part.  And I couldn't let the government use it, not over Mr. Baugh's objection.  So that's where we are on that.

MR. BAUGH:  Is it too late to sever?

THE COURT:  All right, let's get going.  Like I say, Mr. Vick, as far as I'm concerned, these are minor matters that really shouldn't inhibit the progress of the trial waiting on Mr. Dalton.  But we will if we have to.

MR. VICK:  Just a second.

(Counsel conferring.)

MR. VICK:  Am I understanding correctly the Court's ruling that Detective Dalton will be allowed to testify when "Pepsi" Greene was asked about the knife, said, "I don't know what kind of knife it was"?  That's the extent of his testimony.  We are questioning whether to wait until Monday or stipulate that indeed will be what he says.

MR. BAUGH:  We have him coming as well concerning the murder of Doug Moody and the status of Keith Barkley as a suspect.

THE COURT:  We probably need Dalton.

MR. WHITE:  If the Court please, I don't mean to get involved as well, but when I was

**JA1327**

examining Priscilla Greene and we got to the point where she could not recall either speaking to Detective Dalton or even being arrested or served with a capeas or any other conversations with any Richmond police officers, it was my understanding that we would be able to use Detective Dalton to discuss her statements to him which were in conflict with her testimony that she delivered in Court yesterday.  That is my concern.

THE COURT:  Your understanding was incorrect.  All right?  Simply, you will be able to use Dalton as appropriate, no matter how you want to use him, no matter whether it is appropriate or not?

MR. VICK:  I hate to belabor the point, but I don't see the reason to sit around until Monday afternoon waiting for Detective Dalton.

THE COURT:  We have got the knife.  But Mr. Baugh's point where there was information that led to another suspect, a specific, identified individual, he has a right to ask questions about that.

MR. VICK:  I understand.  I can point to the Court exactly where that came from.  Catherine Wallington, the mother of the victim, told Detective Dalton approximately a week ago, "Prior to the murder of Doug Moody," his notes, I'm reading to you his notes, "Approximately a week ago she came home to find her front door open.  Later, a neighbor told her that some friends of Keith, quotation marks, no further identification, had kicked in the door while armed with machine guns."

That's triple hearsay at best.

MR. BAUGH:  And reading on from there, if I might, "Also, her son the victim had come home very dirty was cobwebs on him.  He told her he had been hiding under the house next door.  He said he was hiding from Maurice from Brookfield Gardens.  He denied any money or that it was for drugs.  He said he thinks Maurice killed his brother in Brookfield Gardens.  Approximately two hours before his death, Keith came looking for the victim.  They give a description of Keith which matches the identification of Gina Taylor."

THE COURT:  We will wait on Dalton.  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT:  I believe the government has one more witness.

MR. PARCELL:  Detective Tom Leonard, please.

THOMAS LEONARD, called as a witness by and on behalf of the government, having been first duly sworn by the

Clerk, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?

A    Detective Thomas P. Leonard.

Q    Your occupation?

A    Police officer, City of Richmond.

Q    Your present assignment?

A    Assigned to narcocide.

Q    Have you been so employed in that capacity through the entire year of 1992?

A    Yes, sir.

Q    Did there come a point in time that you and your colleagues were assigned to what's called the Newtowne investigation?

A    That's correct.

Q    During the course of your investigation, did there come a point in time when there was a request made of the C&P Telephone Company to receive the phone records of a Valerie Butler?

A    Yes, sir.

Q    Did you in fact receive those original copies from C&P Telephone?

A    They came to the DEA.  And the DEA brought them to me.  Yes, sir.

Q    That was pursuant to a state court order?

A    I believe it was a federal subpoena.

Q    And did there come a point in time you had occasion to review all those records?

A    Yes, sir, I did.

Q    Did you examine Valerie Butler's phone bills and produce a listing of the phone calls, long distance or collect phone calls she made or received during January, February, March, April of 1992?

A    Yes, sir.

        MR. PARCELL:  I'm going to ask he be shown Government Exhibit 149 and explain its contents.

        THE COURT:  All right.

    (Documents proffered to witness.)

        MR. WHITE:  We are seeing these -- if we could just have a minute, we are seeing them for the first time.  May I have a moment with the government, please?

    (Counsel conferring.)

        MR. VICK:  I would cite the Court to Rule 1006 of the Federal Rules of Evidence.

        THE COURT:  Come on, let's move on.

        MR. COOLEY:  We would have an objection to a portion of the exhibit prior to its being tendered.

    (At Bench.)

        MR. PARCELL:  We have got the big folder,

**JA1329**

2824

her phone records.  He went through them and to simplify it, he took the numbers, the dates, times, and all the information and put it on like a log.

THE COURT:  You have a problem?

MR. WHITE:  There are two kinds of documents.  Here we have the original documents from C&P.  We don't have a problem with that.  This is what the problem is, who these people are.

MR. McGARVEY:  That was my point.  I don't have a problem with the original records.

MR. WHITE:  The only person who can say made these calls is Valerie Butler.

MR. PARCELL:  He called that number and verified it, all the numbers from the jail.  He went down and physically looked at the phone.

MR. COOLEY:  How about the one that says "O."

MR. PARCELL:  Valerie Butler told him that's who that was.

MR. BAUGH:  That's hearsay.

MR. PARCELL:  He verified  --

THE COURT:  The things that are verified I don't have a problem with.

MR. McGARVEY:  As long as it's redacted, those portions, I don't have a problem.

2825

MR. PARCELL:  He verified the City Jail numbers, Trenton numbers.  We can white that out.

THE COURT:  You are going to have to take this out.

MR. McGARVEY:  We don't need the witness as long as we take those out.

MR. VICK:  All we need from him is that he verified she had been in touch with people in New York for three-way conversations.

MR. McGARVEY:  That's hearsay.

THE COURT:  He can verify a conversation on a certain date.  That's all you need.

(In Open Court.)

BY MR. PARCELL:

Q    Detective, you had occasion to review the phone bills of Valerie Butler; is that correct?

A    Yes, sir, that's correct.

Q    During the course of your reviewing those original phone bills from C&P, did you have occasion to determine whether or not she had made some three-way phone conversations between point A, her, and point C?

A    I'm not sure if the original phone bill shows it as being a three-way phone call.  It shows the phone calls coming to her phone, where that phone call came

2826

from.  It was collect.  Then it would show any phone

**JA1330**

calls she made from that phone to wherever the other phone was.

Q   Were you able to determine whether or not she received any collect calls from Richmond City Jail?

A   Yes, I was.

Q   Do you remember how many of those there were?

MR. WHITE:  I object.  I think the original records speak for themselves.

THE COURT:  He can answer that.

THE WITNESS:  As far as a number, I couldn't tell you a number.

BY MR. PARCELL:

Q   Would you please review your notes and give us a number?

THE COURT:  You don't need that.  If he doesn't recall the number, the document speaks for itself.

BY MR. PARCELL:

Q   Do you recall whether or not you verified that she made any calls to the Trenton, New Jersey Police Department?

A   Yes, I do.

Q   Was that more than one of those phone conversations?

A   Yes, it is several phone calls to Trenton.

Q   Were you able also to determine whether or not she made some phone calls to a Chinese market pay phone in New York City?

A   That's correct.

Q   Numerous phone calls to that pay phone?

A   Some phone calls went to the pay phone and some calls were received from the pay phone.

Q   Collect?

A   Right.

Q   Is that the same pay phone that you and your colleagues arrested the defendant Johnson at on June 23rd, 1992?

A   To the best of my knowledge, yes, sir.

MR. COOLEY:  Objection.

MR. McGARVEY:  Objection.

THE COURT:  Objection sustained.

MR. PARCELL:  I will introduce the original records as the government's exhibit.

THE COURT:  They will be admitted.  Any questions for the detective?

MR. McGARVEY:  No, sir.

MR. WHITE:  No, sir.

MR. WAGNER:  No.

CROSS-EXAMINATION

BY MR. BAUGH:

Q   Detective Leonard, in determining those, those phone calls from the jail, do you know if any of

**JA1331**

those calls came from Bobby Seward, the father of Valerie Butler's baby, who was being housed on a D-3 rap?  Do you know who placed the phone calls?

A    No, I just know the phone number went to that number.

MR. PARCELL:  With regard to Mr. Baugh's question, I'll object.  That's not a correct state of fact.

THE COURT:  Mr. Parcell, don't.

MR. VICK:  Your Honor, once we move in that government exhibit, the government rests.

## End of Government's Case

THE COURT:  All right.  That exhibit will be admitted.

All right, Mr. Geary?

MR. WHITE:  Your Honor, if the Court please, on behalf of Mr. Tipton we would call Gloria Bridges to the stand, please.

MR. VICK:  To make sure, we would invoke the rule on witnesses, if it has not been previously invoked, to make sure they are not in the courtroom.

THE COURT:  Anybody that would anticipate being called as a witness in this case will have to await their call outside of the courtroom.

MR. BAUGH:  I assume the rule applies to the guilt phase only?

THE COURT:  We can talk about that.

## Gloria Anne Bridges

GLORIA ANNE BRIDGES, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Ma'am, would you state your name?

A    Gloria Anne Bridges.

Q    How old are you, ma'am?

A    30.

Q    Where do you currently live?

A    2001 Halifax Avenue.

Q    What city?

A    Southside Richmond.

Q    Now, Ms. Bridges, do you know Richard Tipton?

A    Yes.

Q    Mr. Tipton, will you stand up, please?

(Defendant stood.)

Is that Richard Tipton?

A    Yes.

Q    How do you know Richard Tipton?  By what name do

**JA1332**

2830

you call him?

A    "Whitey."

Q    How long have you known "Whitey?"

A    About three or four months.

Q    Beg your pardon?

A    Three or four months or longer.

Q    Now, do you recall, do you know someone named "Studie?"

A    Yes.

Q    Do you know someone named Denise?

A    Yes.

Q    Do you know what Denise's full name?

A    Charlotte Denise Moore.

Q    Was there a point in time when you lived with Charlotte Denise Moore?

A    No, they lived with me.

Q    Where were you living at the time?

A    1421 Lynnmore Avenue.

Q    Where is that it, please?

A    In the Southside of Richmond.

Q    Do you recall when you moved into the Lynnmore address?

A    It was like in the first month sometime, january.

Q    January of which year?

2831

A    Last year.

Q    1992?

A    Yes.

Q    Now, prior to moving into Lynnmore, where were you living?

A    With my parents.

Q    And your current address is with your parents; is that correct?

A    Yes.

Q    How did you come to move to Lynnmore?

A    I moved from my parents to Lynnmore.

Q    Who did you move with?

A    My sister and I lived together.

Q    Did there come a point in time when your sister left?

A    Yes.

Q    What happened after your sister left?

A    Charlotte and "Studie" moved in with me.

Q    Do you know "Studie's" real name?

A    Thomas Green.

Q    Now, when "Studie" and Charlotte Denise Williams moved in to live with you, did you know Richard Tipton, "Whitey," before then?

A    Yes.

Q    How long before then had you known "Whitey?"

2832

A    Maybe about a month, two months.

**JA1333**

Q    And where did you meet him?
A    Up in the Central Gardens area.
Q    Do you recall how you met him?
A    Yes.
Q    Please tell the ladies and gentlemen of the jury how you came to meet "Whitey?"
A    Selling drugs.
Q    Where was that?
A    Up on Catchpenny and Beck Drive.
Q    Did you know anyone who was living on Catchpenny and Beck?
A    "Studie."
Q    Were you dating anyone at the time?
A    Yes.
Q    Who were you dating?
A    "Baldy."
Q    Do you know what "Baldy's" real name was?
A    James Mack Duffy.
Q    Do you know whether Mr. James Mack Duffy knew "Studie?"
A    Yes.
Q    Do you know whether Mr. James Mack Duffy knew "Whitey?"
A    Yes.

2833

Q    Now, ma'am, do you recall a point in time when Mr. Tipton stayed with you at Lynnmore?
A    Yes.
Q    Can you remember when that was?
A    It was like the beginning  --  it was like sometime, the middle part of January and until March, almost to March.
Q    Now, ma'am, do you have children?
A    Yes.
Q    How many children do you have?
A    I have five kids.
Q    Were they living with you on Lynnmore?
A    Yes.
Q    Do you receive any kind of public assistance?
A    Yes.
Q    A.D.C.?
A    Yes.
Q    Now, do you recall any assistance that you received from Mr. Tipton in January?
A    I was a little low on food and I recall him giving me some money to make a little groceries.
Q    Do you recall whether that would have been in January or February?
A    It was like at the end of January.
Q    Okay.  Were "Studie" and Denise living with you

2834

at the time?
A    Yes.
Q    Now, ma'am, do you recall reading in the

**JA1334**

Gloria Anne Bridges (Direct)

Q   newspapers about murders?
A   Yes.
Q   Do you recall specifically where those murders took place?
A   Out in the Fulton area.
Q   What do you recall about those murders, reading about those murders?
A   It has been so long, I'm trying to think.  It was two males, and two females had got wounded.
Q   And do you recall where you read about this?
A   Out on Jennie Scher Road.
Q   Do you recall?  Where did you read it?  Was it in a book, magazine, newspaper?
A   Newspaper.
Q   Do you recall how soon after the murders took place that you read about it?
A   No.  I can't say.
Q   Do you remember reading about it the next day, the day after that?
A   Day after.
Q   The day after?
A   The day after.

2835

Q   After.
A   Yes.
Q   Do you recall how you got the newspaper?
A   "Studie" went to the store to get a newspaper.
Q   And do you recall "Studie" and "Whitey" going anywhere after they read  --  after you all read about it in the newspaper?
A   "Studie," "Whitey," Denise, and Denise's son walked behind my house and that's where the bus stop was at.  They got on the bus and left.
Q   And did you have occasion to see anyone else that day, anyone else come by your house?
A   "Baldy" came by my house, was looking for "Whitey" and "Studie."  And he left.
Q   Now ma'am, the day before, on the evening before, did "Whitey" stay at your house?
A   Yes.
Q   Did "Studie" stay at your house?
A   Yes.
Q   Did Denise stay at your house?
A   Yes.
Q   Do you recall anyone else coming by your house on that evening?
A   A friend of mine came by to visit me.
Q   Do you remember what that friend's name was?

2836

A   They called him Red.  I don't know his real name.
Q   Do you recall whether Mr. Tipton left the night before?
A   No, he did not leave.

**JA1335**

Q    How regularly was Mr. Tipton staying at your house during that period of time?
A    Right often.
Q    And where would he stay in your house?
A    He slept on my sofa.
Q    Did you have any kind of a relationship with him?
A    No, we did not.
Q    Okay.  Now, ma'am, do you recall having any conversation with Ms. Williams about any guns?
A    No.  You mean Ms. Moore?
Q    Yes.  Do you recall having any conversations with her about guns?
A    I heard her mention it, and that was it.
Q    Do you recall what she said?
A    No.
Q    Did you have any conversations with Mr. Tipton about any guns?
A    No.
Q    Did you ever see  --  was Mr. Tipton dealing crack out of your house?
A    No.
        MR. WHITE:  If I can have just a moment, Your Honor.
    (Counsel conferring with co-counsel.)
    We have no further questions.  Pass the witness.
                CROSS-EXAMINATION
BY MR. VICK:
Q    "Baldy," Ms. Bridges, "Baldy" sold drugs for "Whitey," didn't he?
A    No.
Q    "Baldy" sold drugs, didn't he?
A    Yes, he did.  But I don't know if he sold it for "Whitey" or not.
Q    You don't know where he was getting his drugs?
A    No.
Q    But you know "Whitey" was selling drugs, crack cocaine, in Central Gardens?
A    Yes.
Q    There were a number of people out there selling drugs, crack cocaine, in Central Gardens?
A    Yes.
Q    You can't remember at all the date that you read the article about the murder in the Fulton Bottom area?
A    It was like the day after.
Q    You read the article the day after the murders?
A    Yes.
Q    Are you even sure about that?
A    Yes, I am sure.
Q    But you don't know what date that is.

**JA1336**

A No.

Q All right. How many nights a week would "Whitey" stay with you?

A Every night.

Q Every single night of every week, you are telling this jury --

A From the time I moved in, it was like at the end of the month, and when I moved out it was like in the first part of March, the middle part of March. When I moved out, that's when he left.

Q You are telling the ladies and gentlemen of the jury that every day from January until March, "Whitey" stayed with you?

A Yes.

Q So on February 11th, you are telling this jury that he spent the night with you?

A Yes.

Q All right. And on February 22nd, you are telling the ladies and gentlemen of the jury he spent the night with you?

A Yes.

Q Did you know that he had rented a car on February 11th?

A No, I did not.

Q To go to New York?

A No.

MR. WHITE: Objection. She wouldn't know that.

THE COURT: Overruled.

BY MR. VICK:

Q Did you know he rented a car on February 22nd to go to New York?

A No.

Q It is your testimony that he stayed with you on February 11th and February 22nd?

MR. WHITE: Objection, asked and answered.

THE COURT: Overruled.

BY MR. VICK:

Q Is that your testimony?

A Yes, it is.

Q Did he stay with you on March 20th, also?

A "Whitey" was at my house, I know, because when I cooked, "Whitey" was there to eat.

Q So "Whitey" was there on March 20th, 1992, also?

A Yes.

MR. VICK: No further questions.

THE COURT: Any redirect?

MR. GEARY: No, Your Honor.

MR. WAGNER: Could we have a short break?

THE COURT: This witness may be excused.

(The witness stood aside.)

All right, we need to take a break.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, remove the defendants.  This will be about ten minutes.

(Defendants removed from courtroom.)

(Recess taken from 11 o'clock a.m. to 11:10 a.m.)

THE COURT:  Let's bring in the jury.

(The jury entered the courtroom.)

THE COURT:  All right, Mr. Geary?

MR. GEARY:  J.J. Cox.

## Detective John J. Cox (2840)

JOHN J. COX, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GEARY:

Q    Mr. Cox, would you tell the jury your full name, please?

A    Detective John J. Cox.

Q    Okay.  Approximately how many years have you been employed by the Richmond Bureau of Police?

A    Started on my 33rd year.

Q    In January of 1992, what department or division were you serving in the bureau?

A    Homicide Division.

Q    Were you assigned the murder case involving the victim Douglas Allen Talley on January 5th, 1992 in South Richmond?

A    Yes.

Q    Did you go to the scene?

A    Yes, I did.

Q    Were you shown a jacket that had been recovered by one of the police officers?

A    I observed the jacket in the automobile when I got there.

Q    Can you tell the jury what the jacket looked like?

A    It was an Army fatigue jacket and it had the name of "Bird" on the front of the jacket.

MR. GEARY:  May he be shown Exhibit 137, please, the jacket?

(Exhibit proffered to witness.)

BY MR. GEARY:

Q    Will you take a look at Government Exhibit 137, please?  Does that appear to be the jacket?

A    It appears to be.  It appears to be the same type.

**JA1338**

Q    Did you go through the jacket yourself that morning on January 5th?
A    Our forensic went through the jacket, but I was present when he brought it out and I observed some things in the jacket.
Q    Tell the jury the items you observed in that jacket.
A    It had sewn in this jacket a knife scabbard where the knife was still in the jacket.
Q    You called that a knife what?
A    Well, you can call it whatever you want to.  It held a knife.
Q    When you examined the coat on January 5th, was there a knife in there?
A    Yes.  The knife was in here.  If you can notice this  --
Q    That's on the upper left side of the jacket?

2843

A    Yes, on the inside.
Q    Did either you or one of the detectives take the knife out in your presence?
A    The forensic officer took it out.
Q    Could you describe to the jury what the knife looked like?
A    It was approximately six inches long and it was a hunting-type knife.  It is not a closeable knife.  It is one that's open.
Q    When you say six inches long, are you talking about just the handle part?
A    No, the handle and the blade.
Q    Six inches?
A    Probably six inches long.
Q    Did you notice any other items besides the knife that were in the jacket that the forensic detective took out?
A    There was a couple of vials of pills in the pocket which had on it the name of Johnny Byrd.
Q    Did you see anything else, any personal items in the jacket?
A    I don't recall any.
Q    As a result of what you found, did you attempt to locate Johnny Byrd?
A    Yes, I did.

2844

Q    Did you use the assistance of other Richmond police officers, the assistance of McGuire Veterans' Hospital officers, Chesterfield County officers, Henrico County officers and the State Police in attempting to locate Johnny Lee Byrd?
A    No.  I used the assistance of the Veterans' Police, also people that work for the Veterans' Hospital, in attempting to locate him.  During this time, Chesterfield County put Johnny Byrd on the Ten Most Wanted List.  After that, I found that Henrico

**JA1339**

was also looking for him, and Trooper Himelright with the State Police.

Q    Did you come to meet with Johnny Lee Byrd at Henrico County Division of Police on February 21st?

A    Yes, I did.

Q    1992?

A    Yes, sir.

Q    At that time, did you give him Miranda warnings, advise him of his right to counsel?

A    Yes.

Q    Did he agree to make a statement to you?

A    He made several statements to me.

Q    Did you question him in regard to the coat and the knife that you had found in Douglas Talley's car on January 5th, 1992 on 13th Street in South

2845

Richmond?

A    Yes, I did.

Q    And did he tell you he had given the coat to somebody else?

A    He told me he had loaned the coat to an unknown friend.

Q    Did he say whether or not the unknown friend had done anything in return for getting the coat?

A    No.

Q    Did you ask him whether this person was Talley, the victim?

A    Yes, I did.

Q    What did he tell you?

A    No.

Q    At that point, he is telling you it is not Douglas Talley, but it is an unknown friend of his?

MR. VICK:  Objection, asked and answered. Leading.

THE COURT:  Sustained.

BY MR. GEARY:

Q    On March 11th, 1992, did you interview Johnny Lee Byrd again?

A    Yes, I did.

Q    At that time, did he say that he gave the coat to somebody?  Did he use a name on that occasion?

2846

A    Pardon me?

Q    On the occasion of March 11th, 1992, in the presence of yourself and a State Police officer, did Johnny Lee Byrd then give a name of the person he had given the coat to?

A    I don't recall.

Q    Have you had an opportunity to read the report in the case?

A    I looked over the report.

Q    Did he in fact tell you that he had given the coat to somebody by the name of Skip Talley?

A    I would have to see what you are reading from.

**JA1340**

MR. GEARY:  May I give this to him?

THE COURT:  Go ahead.

(Document proffered to witness.)

BY MR. GEARY:

Q    Page five of the supplemental report in regard to the murder of Douglas Talley.

A    Because I interviewed Skip Talley, and I don't recall.

(Witness perusing document.)

Where were you reading from, Mr. Geary?

Q    I believe it is the second paragraph.

A    On the second paragraph it stated that "He gave the coat to an unknown male that came by his house on Clay Street."

Q    Are you looking at page five?

A    Yes, I am.

Q    Look in the second paragraph, please.

A    I'm reading from the second paragraph.

Q    Then later on in the next sentence after that? "He told Barton..."

A    "He told Barton the name of the person was Skip Talley."

Q    That he had given the coat to?

A    Yes.

Q    Then later on in the interview, did Johnny Lee Byrd ask you how many times Douglas Talley had been stabbed?

A    The best I recall, he did.

Q    And did you note that no one had ever told Johnny Lee Byrd that Mr. Talley had been stabbed to death?

A    He also stated that his girlfriend went to the store with him and Talley, but he did not tell me this on the first interview.  This is the second interview.

Q    Could you read the next sentence?

A    "Bird asked how many times Talley was stabbed, but no one had told Byrd that Talley was stabbed."

MR. GEARY:  Thank you very much.  No further questions.

THE COURT:  Any questions from any other defendants?

MR. McGARVEY:  No.

MR. BAUGH:  No.

MR. WAGNER:  No.

CROSS-EXAMINATION

BY MR. VICK:

Q    The fact is that Doug Talley had been stabbed was stated in the newspaper article, wasn't it?

A    Yes.

Q    And that newspaper article was published well previous to your interview with Johnny Lee Byrd,

**JA1341**

correct?

A    That's correct.

Q    So anybody who chose to read the newspaper about Doug Talley knew he had been stabbed to death?

A    That's correct.

Q    All right.  Now, the quote on page five of the supplemental report, Johnny Lee Byrd didn't tell you that, did he?  You are reporting in that what Barton told you that Johnny Lee Byrd said.

A    That's right.

Q    So you don't really know anything other than

2849

what Barton told you.

A    Barton told me.

Q    Johnny Lee Byrd told you that he had given the coat to an unidentified male?

A    That's correct.

Q    And he had given the coat a couple of days prior to the murder of Doug Talley?

A    Correct.

Q    The knife that was found in that Court the investigation ultimately revealed had nothing to do with the murder?

        MR. GEARY:  Objection.  He is asking for a conclusion he can't give.

        THE COURT:  Overruled.

BY MR. VICK:

Q    The knife that was found in the coat belonging to Johnny Lee Byrd was determined to have nothing to do with that murder; is that correct?

A    That's correct.

Q    Now, indeed, at the scene you found on the car a bloody fingerprint on the car door, passenger's side, correct?

A    That's correct.

Q    That bloody fingerprint led to the identification of the murderer; is that correct?

2850

        MR. BAUGH:  Objection to "the murderer," Your Honor.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Led to the identification of Mr. Richard Tipton; is that correct?

A    That's correct.

Q    Indeed, the investigation allowed you to eliminate Johnny Lee Byrd as a suspect, correct?

        MR. BAUGH:  Objection.

        MR. GEARY:  Objection.

        THE COURT:  Sustained.

BY MR. VICK:

Q    Was Johnny Lee Byrd ever charged with this crime?

        MR. GEARY:  I haven't been allowed to do

**JA1342**

that.

THE COURT:  Sustained.

BY MR. GEARY:

Q    The forensic people did the fingerprints; you had nothing to do with the fingerprints?

A    I had nothing to do with the fingerprints.

Q    Barton, he referred to that Johnny Lee Byrd told that Skip Talley was the one he gave the coat to. Barton is a State Police officer; is that correct?

A    Correct.

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Sir, the knife that you found in there, am I correct that it was about  --  about how wide was the blade?

A    About this wide.  (Witness indicating.)

Q    Could you estimate it?  Was it smaller than an inch?

A    No.

MR. BAUGH:  Thank you.

THE COURT:  All right.  You may stand down, sir.  Thank you very much.

MR. VICK:  If we could, Your Honor  --

MR. GEARY:  Judge, this is surrebuttal.

MR. VICK:  In light of that, we have the knife.

MR. GEARY:  We were never allowed to do this.

THE COURT:  All right, Mr. Vick, both of you come up here.

(At Bench.)

THE COURT:  Mr. Geary?

MR. BAUGH:  I didn't know they had that weapon.

MR. VICK:  If you checked discovery  --

MR. GEARY:  I'll withdraw my objection.

THE COURT:  Then go ahead and have him identify it.

MR. BAUGH:  That's fine.

(In Open Court.)

RECROSS-EXAMINATION

BY MR. VICK:

Q    I'm going to show you what's been previously marked Government Exhibit 150.  Is that the knife recovered from that coat?

MR. BAUGH:  In light of this, if the United States will stipulate, if they are willing to state it is because of chain of custody, we have no objection.

MR. GEARY:  No objection.

BY MR. VICK:

Q    Is that the knife that was recovered?

**JA1343**

A    It appears to be.

Q    Is that the state it was in when it was recovered?

A    That's correct.  It was not the murder knife.

THE COURT:  You may stand down, sir.

(The witness stood aside.)

Mr. Vick, do you move the knife in?

MR. VICK:  We move Government Exhibit 150 in.

THE COURT:  It will be admitted.

MR. GEARY:  I call C.T. Woody.

C.T. WOODY, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

MR. VICK:  May we approach?

(At Bench.)

MR. VICK:  I understand Mr. Geary is going to be getting into the criminal record of Jerry Gaiters through Detective Woody.

MR. GEARY:  Because Detective Woody said that in consideration for Gaiters being an informant for ten years, he got petty things dismissed.  I'm going to show the Court the petty things.

MR. VICK:  I didn't understand that.

THE COURT:  That's fine.

MR. PARCELL:  Judge, there are some charges on that -- it indicates attempted rape.  This detective has no idea about those cases.

THE COURT:  He can say that.

MR. PARCELL:  It is unfair to him because he was not  --  just because he is charged.

THE COURT:  No, it is all right.

DIRECT EXAMINATION

BY MR. GEARY:

Q    Would you state your name for the jury?

A    Detective C.T. Woody, Richmond Bureau of Police, assigned to the Narcocide Division.

Q    With regard to Jerry Gaiters, you previously testified about your association with him; is that correct?

A    Yes.

Q    I believe you indicated in consideration for some of the information that he provided you, the Bureau of Police took care of some petty things, I think is the expression you used?

A    I made that statement.  Yes, sir.

Q    I'd like to ask you if you recall that in July of 1987  --  excuse me, in July of 1989, a robbery charge against Mr. Gaiters was dismissed; do you recall that?

A    Yes, sir, I do.

**JA1344**

Q    Do you recall in 1974 an attempted rape was nol prossed for Mr. Gaiters; do you recall that?
A    Yes, sir, I do.
Q    Do you recall in July of 1990 that Mr. Gaiters was charged with attempted murder and that case was also dropped by the Bureau of Police?
A    Yes, sir, I do.
        MR. GEARY:  No further questions.
        THE COURT:  Any questions from any other defendants?  Apparently not.
                CROSS-EXAMINATION
BY MR. VICK:
Q    Detective Woody, you know the police investigation revealed that he had not committed the murder, correct?
A    That is correct.
Q    That's why those charges were dropped?
A    That is correct.
Q    The police investigation revealed he had not committed the rape?
A    That is correct.
Q    That's why those charges were dropped?
A    Yes.
Q    He had not committed the robbery?
A    That's correct.
Q    That's why those charges were dropped?
A    That's true.
Q    Nothing to do with his cooperation with you; is that correct?
A    None whatsoever.

Q    So it had nothing to do with petty offenses that you might have helped him with.
A    That's correct.
                REDIRECT EXAMINATION
BY MR. GEARY:
Q    Could you tell of the petty offenses that Mr. Gaiters has committed that have resulted in favorable treatment from the police?
A    I can only tell the Court at this particular time that there were some involving some possible shoplifting, might have got convicted of shoplifting.
Q    Those go back into the '70s before he was an informer?
A    That's correct.
Q    In the last ten years, from 1982 to 1992, do you recall any charges which would be on file with the Bureau of Police in which Mr. Gaiters received favorable treatment in exchange for information he provided to the police?
A    No, sir.
        MR. GEARY:  No further questions.

**JA1345**

THE COURT:  All right.  You may stand down, sir.

(Witness stood aside.)

2857

Mr. Geary, anything further?

MR. GEARY:  Defendant Tipton rests, Your Honor.

THE COURT:  Mr. Cooley?

MR. COOLEY:  Detective M.D. Scott.

MAURICE D. SCOTT, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Good morning to you, Detective Scott.

A    Hello.

Q    Would you tell the ladies and gentlemen of the jury your full name and profession?

A    Maurice D Scott.  I work with the Richmond Bureau of Police, assigned to the Homicide Division.

Q    Have you been so employed since  --  can you give us a date?

A    1963.

Q    And certainly, during the course of February of 1992 through today, you have been so employed; is that correct?

A    Yes, sir.

Q    Have you had occasion to have direct dealings

2858

and meetings with and visitations to one young lady named Priscilla Greene since February of last year?

A    Yes, sir.

Q    Do you know how many times that you have visited with her?

A    Not exactly, no, sir.  But a number of times.

Q    Would it be more than ten?

A    Yes, sir.

Q    More than 25?

A    20 maybe.

Q    20, 25.  Do you know if any other members of the police department have visited her?

A    Yes, sir.

Q    Can you tell us who else has visited with her?

A    Myself and Detective Fleming.  I was with him usually when we visited.

Q    Were there any other members of the prosecution team that had visited with Priscilla Greene since February of last year?

A    Mr. Vick and Mr. Parcell.

Q    Do you know how many times they have visited with her?

A    No, sir.

MR. COOLEY:  Thank you very much.  That's

**JA1346**

Maurice D. Scott (Cross & Redirect)

all the questions.

2859

CROSS-EXAMINATION

BY MR. PARCELL:

Q    In all the visits you and your partner, Detective Fleming, had with "Pepsi" Greene, did you, your partner, or anyone else ever suggest to her an answer to any question that was asked about the events of February 19th, 1992?

A    No, sir.  Never.

Q    And as a matter of fact, did you ever ask questions about it or did she start talking about it to you?

A    She started talking about the case.

Q    And as time went along, did her memory improve or lessen?

A    It improved.

MR. PARCELL:  No further questions.

REDIRECT EXAMINATION

BY MR. COOLEY:

Q    Mr. Scott, just a couple of other things.  When she would start to talk to you all, did you ask her questions about what she was saying?

A    It took some time.  At first, the first time I saw her she was in ICU, of course.  And then she had -- her jaws were wired for some time.  So I don't really recall at what point she started talking.  It

2860

took her a long time.

Q    Once she started talking, you all would ask her questions to clarify what she was telling you?

A    Detective Fleming.

Q    Normal investigative techniques were used, weren't they?

A    Asking her what happened.  Yes, sir.

MR. COOLEY:  Thank you very much.

THE COURT:  You may stand down, sir.

(Witness stood aside.)

MR. McGARVEY:  Detective Billy Blaylock.

MR. VICK:  May we approach?

(At Bench.)

MR. VICK:  If this goes to Katrina Rozier, he knows nothing.

MR. McGARVEY:  The only questions I'm asking is about the times he came to the scene and what time it was reported to him.  Nothing further than that.

THE COURT:  If he wants to put him on for that --

MR. BAUGH:  Also, while we are here, I don't know how I should take this as direct or not, but Detective Blaylock also had Torrick Brown.  I would like to ask him whether or not he was given a

2861

**JA1347**

motive for the killing, because his notes indicated that some witness said that prior to the shots, James Roane said something about not coming over to his house.

MR. VICK:  Objection.

THE COURT:  The objection will be sustained.

BILLY BLAYLOCK, called as a witness by and on behalf of defendant Johnson,  having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McGARVEY:

Q    Good morning, Detective Blaylock.  Introduce yourself to the ladies and gentlemen of the jury, please.

A    Billy Blaylock, detective, Richmond Police.

Q    And how long have you been employed by the Richmond Police, sir?

A    32 years.

Q    And for a good part of that time you have been involved in homicides; is that correct?

A    Yes, sir.

Q    How long has that been?

A    I've been investigating homicides since 1970.

2862

Q    Now you were, I take it then, so employed back on January 21st of 1992?

A    Yes, sir.

Q    And in your capacity as a homicide detective then, did you have occasion to investigate the murder of one Katrina Annette Rozier?

A    Yes.

Q    Sir, do you recall what time you went, actually went to the scene?

A    I arrived at approximately 9:05 a.m.

Q    And do you recall what time the call came in to you with respect to that?

A    Approximately 8:43 a.m. I was in the office and responded.

Q    And at the point that you got to the scene, which was about 9:05, was there anyone else there?

A    Detective Cox, Sergeant Mangano, Sergeant Walker, and two or three uniformed patrolmen.

Q    Did you see any media when you arrived there at 9:05?

A    On my arrival, I didn't.

Q    Now, sometime later you came to investigate the murder of one Torrick Brown; is that correct?

A    Yes, sir.

Q    And did you have occasion to go to the Grand

2863

Jury with respect to one Torrick Brown?

A    Yes, sir, I did.

**JA1348**

Q    Okay.  And did you go as a result of information you received from Detective Woody?

A    Well, I went two times.

Q    The second time that you went?

A    That's correct.

Q    Okay.  And you went to procure an indictment; is that correct?

A    Yes, sir.

Q    Who were those indictments for?

MR. VICK:  Objection.  Anything done in state court  --  I'll withdraw it.

BY MR. McGARVEY:

Q    In state court, who were those indictments for?

A    Hardy and Mack.

MR. McGARVEY:  Thank you.  That's all I have.

THE COURT:  Any other questions?

DIRECT EXAMINATION

BY MR. GEARY:

Q    In regard to the Katrina Rozier murder, who was it that gave you information so that you got a warrant for Jerry Gaiters for her murder?

MR. VICK:  Objection.  It is improper.

MR. GEARY:  That's what I was told to ask before, that I could ask that.

THE COURT:  Go ahead.

BY MR. GEARY:

Q    Who gave the information that led you to believe --

A    "Pepsi" Greene.

MR. GEARY:  Thank you.

THE COURT:  Anything else?  Any questions, Mr. Vick?

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Mr. Blaylock, what unit were you assigned to in February of 1992?

A    Homicide.

Q    You were not narcocide?

A    No, sir.

Q    Am I correct then that the murder of Torrick Brown was handled as a straight murder and not a drug-related murder?

A    I got the indictments in Circuit Court.

Q    All right.  Based on your investigation, without asking what you found, were you able to develop the reason for the death of Torrick Brown?  What prompted the confrontation?

A    I found out.  Yes, sir.

Q    And upon finding that out, did you call in narcocide or did it stay a homicide case?

A    From my investigation, it was turned over to

**JA1349**

narcocide.

Q    When did you turn it over?

A    That night.

Q    Was that before or after you spoke with the young man, Montez McCoy?

A    After I spoke to him.

Q    All right.  When you spoke with Mr. McCoy, the young seven-year-old Mr. McCoy, at that time did you ask him whether or not statements were made at the time of the shooting?

A    Yes, sir.

Q    All right.  And without commenting on the truth or falsity of those statements, did Mr. McCoy tell you a statement that Mr. Roane allegedly made at the time of the shooting?

A    Yes, sir.

Q    And the statement allegedly made by Mr. Roane at the time of the shooting, was that statement allegedly made, something about Mr. Brown staying away from his house?

A    That's correct.

MR. BAUGH:  Thank you.  Pass the witness.  No further questions.

CROSS-EXAMINATION

BY MR. VICK:

Q    In addition to Sterling Hardy -- and you said Mack, you meant Lance Thomas Anthony Mack, also known as "V" --  they were charged in state court with that murder, correct?

A    That's correct.

Q    James Roane was charged, too, with that murder?

A    Yes, sir.

Q    Those charges were subsequently brought down here and are the subject of the federal indictment; is that correct?

A    That's correct.

Q    Now, as to the murder of Katrina Rozier, when you responded to that scene her body was frozen, wasn't it?  The corpse was frozen?

A    That's correct.  It was 16 degrees that morning.

Q    It had been there overnight, obviously  --

MR. McGARVEY:  Objection.

BY MR. VICK:

Q    Had been there long enough for that body to freeze?

A    That's correct.

Q    Frozen solid, wasn't she?

A    That's right.

Q    As to the statements made to you by "Pepsi" Greene which led to the warrant against Jerry Gaiters, all of those statements she made to you were

**JA1350**

hearsay; she had no direct knowledge about the murder of Katrina Rozier, did she?

A    It was all hearsay.

MR. GEARY:  I'd like to approach the bench now.

(At Bench.)

MR. GEARY:  Now I think I can impeach Detective Blaylock.  When she was being interviewed, those statements show personal knowledge on her part.

MR. VICK:  Right in the statement she said, "I don't know myself."

THE COURT:  I'm through with it.  Mr. Vick, while you are up here, a basic tenet of litigation is don't ask a question because you have an opportunity to ask the question.  I just thought I would throw that out.

(In Open Court.)

THE COURT:  All right, sir, you may stand down.

(Witness stood aside.)

Mr. Cooley?

MR. COOLEY:  C.T. Woody, Your Honor.

C.T. WOODY,
called as a witness by and on behalf of defendant Johnson, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Good morning to you again.

A    Good morning, Mr. Cooley.

Q    Mr. Woody, you have identified yourself earlier to the ladies and gentlemen of the jury on several occasions?

A    Yes, sir.

Q    And you were involved with the investigation, and I take it were the principal investigator on the murders at 2718 East Clay Street; is that correct?

A    That is correct.

Q    You did an offense report related to those circumstances up there; is that correct?

A    Yes, sir.  I did.

Q    Do you have with you a portion of that this morning?

A    Yes, sir, I do.

Q    I'm going to ask you, if you would, to look to page three and four of that report.  And if you would begin, if you don't mind, just read to the ladies and gentlemen of the jury what your report indicates beginning on the third paragraph on page three.

A    Starting with Jerry?

Q    No, the second line there.

**JA1351**

A    "I have additional information from a concerned citizen who witnessed the homicide of four people that he observed a relatively large beige auto which looked like a light beige Cadillac or Oldsmobile four-door.  They parked at the alley on 28th Street.  They walked east up the alley to 2817 East Clay Street.  He observed two black males hide behind an old truck in the back yard.  Then he observed two go in and began shooting.  This citizen identified Jerry Gaiters as being one  --  as being the one who knocked on the door while the other one who was with Jerry hid by the house.  This particular citizen, who refused to get involved because of his prior testimony in Court and his name was put in the paper, did not cooperate with Detective Jackson and I, and said that after the shooting, all four ran west down the alley leading to 28th Street and got into a large beige auto and went north on 28th Street."

Q    Let me interrupt you just a minute.  You indicated just above that that this person did not cooperate with you?

A    That is correct.

Q    Let me ask you, did you omit the word not?

A    I'm sorry, I stand corrected.  I'm sorry, I stand corrected.  He did cooperate with Detective Jackson and I.  In other words, we got him to talk with us, yes, sir.

Q    Pickup where you ended.

A    Okay.  "This particular citizen, who refused to get involved because of his prior testimony in Court and his name was put in the paper, did cooperate with Detective Jackson and I and said that after the shooting, all four ran west down the alley leading to 28th Street and got into the large beige auto and went north on 28th Street.  The citizen was quoted in the Times Dispatch the day after this shooting as saying he would not say anything  --"

MR. VICK:  We will move the entire report in, saving the necessity for the recitation.

MR. COOLEY:  I would prefer to put the evidence on in the manner we are.

THE COURT:  Go ahead.

THE WITNESS:  "He would not say anything if he saw someone kill the President of the United States, but after hearing so much about black-on-black crime, he decided that he would give us what he had witnessed.  He further related he went to high school with Jerry and that Jerry was wearing glasses.  And he is very familiar with him.  And that the four of them were walking up and down the street, and somebody was mumbling "Let's wait until the lights come on."  Dorothy Mae Armstrong had also

known this reliable citizen, and he related to us that he had talked to her two days before she was killed, and that she related to him that she was hiding out because she had witnessed the homicide of Katrina Rozier and that is why she was hiding. He thought Katrina Rozier's nickname was "Nat," and this conversation took place between this citizen and Dorothy Mae, alias "Mousey," on January 30th, 1992 at 2718 East Clay Street.

"I further interviewed Delores Jean Calvin, black female, 43, of 2718 East Clay Street, who was in the back bedroom watching TV. She related that on February 1st, 1992, around ten p.m., Bobby Lee Long and Dorothy Mae Armstrong and Delores Jean Calvin were in the bedroom watching TV. Papa, the guy sitting in the kitchen in the chair, was drunk and he was asleep. He did not answer the knock at the door. Bobby Lee Long got up, went to the side door, and asked "Who is it?" She remembered hearing someone saying "Gaiters." At that time, she heard Bobby say "Jerry," and the door opened. Dorothy got up, started down the hall, and she said "Hi, Jerry," and that is when the shooting started. She heard a whole lot of shots. She stayed in the bedroom, and after the shooting stopped, about five minutes later, after hearing the back door close, she crawled out the side window and ran for help. This witness will testify as to what she heard as far as "Jerry" and "Gaiters" and the shots. She did not know how many people came in. She did not see the shooting. And they did not come any further down the hallway after shooting Dorothy Mae Armstrong."

MR. COOLEY: Thank you.

THE COURT: All right. Mr. Vick?

CROSS-EXAMINATION

BY MR. VICK:

Q   Detective Woody, could you continue reading your report on page two? First two paragraphs?

MR. BAUGH: Wait a minute, Your Honor, if I might.

THE WITNESS: Did you say page two?

MR. VICK: Yes. Page two of that same report.

THE WITNESS: I don't have it. I have three and four.

(Document proffered to witness.)

MR. BAUGH: We have an objection. I have no question for the witness. I do have an objection to reading from paragraph two. CORDAY v. IOWA.

THE COURT: Let me see it.

(Document proffered to Court.)

MR. BAUGH: Fifth line down. Second

paragraph. I'm sorry, sixth line down.

MR. COOLEY: Maybe we should approach.

(Court perusing document.)

THE COURT: All right. Come on up.

(At Bench.)

THE COURT: All right. What is it you want me to --

MR. VICK: If we are going to read parts of it, in all fairness we should read the entire report.

THE COURT: You have to have a reason. He testified to this. What's the point?

MR. VICK: They have attacked the credibility of Gaiters and when he made it.

THE COURT: I'm not going to allow this.

MR. VICK: Yes, sir.

MR. VICK: I have no further questions.

THE COURT: You may stand down, sir.

(Witness stood aside.)

MR. COOLEY: With the exception of Detective Dalton, that concludes our witnesses.

THE COURT: All right. Mr. Baugh, are you ready to proceed?

MR. BAUGH: Your Honor, I need to approach. I'm sorry.

(At Bench.)

MR. BAUGH: I was just handed a statement from the Clerk. It doesn't pertain to you guys. I talked to her yesterday. That's our first witness. She was supposed to get here about 12 o'clock. She was served a subpoena yesterday.

MR. BAUGH: We have a doctor who is coming at 12:30, and we have Detective Dalton as well.

THE COURT: Mr. Baugh is having a problem now with some witnesses. He wants to know if you are ready to proceed. If it is a problem --

MR. WAGNER: I could put on three witnesses, and then I do need to talk to one before I put on a fourth witness.

MR. VICK: We will stipulate that the search of the house revealed nothing.

MR. WAGNER: That's the other one I had. So I could go forward.

THE COURT: Why don't we do this. I want to give Mr. Baugh enough time to try to find his witness.

MR. VICK: Two of the witnesses I understand he has are Scott and Leonard. They are here.

MR. WAGNER: That's the search of the house.

THE COURT: Let's go with what you have.

**JA1354**

Rodney Tucker (Direct)

And then we will stop and give you some time.

(In Open Court.)

All right, Mr. Wagner, we will proceed with your case.

MR. WAGNER:  Your Honor, I would call Rodney Tucker to the stand, please.

THE COURT:  All right.

MR. WAGNER:  I believe he is in the lock-up.

MR. VICK:  This is the individual we have previously made the ruling on, I believe.

THE COURT:  Come up here.

(At Bench.)

MR. WAGNER:  The ruling was to allow the testimony.

MR. VICK:  Rodney Tucker says "C.O." told him that Sandra didn't have a whole lot to do with it.

THE COURT:  I'll let it in.

(In Open Court.)

RODNEY TUCKER, called as a witness by and on behalf of defendant Reavis, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WAGNER:

Q    Please state your name for the ladies and gentlemen of the jury.

A    Rodney Tucker.

Q    Mr. Tucker, you are presently incarcerated, aren't you?

A    Yes.

Q    I represented you in a case last year; isn't that right?

A    Yes.

Q    It was an appeal of a criminal case?

A    Yes.

Q    During our discussions back in May of 1992, this particular case came up, didn't it?

A    No.

Q    You never mentioned anything about this case to me?

A    It was in August.

Q    I'm sorry, August of 1992.  This case came up then when we discussed it, right?

A    Yes.

Q    Who in this case were you on the same tier with?

A    Cory Johnson.

Q    Did you speak to Cory Johnson?

A    Briefly.

Q    What if anything did Cory Johnson tell you about

Sandra Reavis and her involvement in this case?

A    He told me that she just was like really more there at the wrong place at the wrong time.

Q    When you say wrong place at the wrong time, what did he mean by that?

MR. PARCELL:  Objection.

THE COURT:  Sustained.

BY MR. WAGNER:

Q    Did he say anything more about this wrong place, wrong time?

A    No.  It was like I was saying like she was going down like -- was she going to take all the weight or not.

Q    All the weight of what?

A    All the charges she got.

Q    What if anything did he say about whether or not she sold drugs for anyone here?

A    He told me no.

Q    What specifically did he say; do you remember?

A    He said she weren't in it, she weren't involved.

Q    What involvement if any did he say she had with anyone in this group?

A    She just was messing with James Roane.

Q    And what if anything did he say about him ever giving her any drugs?

A    He didn't say he gave her any drugs.

MR. WAGNER:  Thank you.  No further questions.

THE COURT:  Any questions?

CROSS-EXAMINATION

BY MR. PARCELL:

Q    What else did Cory Johnson tell you about this case?

MR. COOLEY:  We object.

THE COURT:  Sustained.

MR. PARCELL:  Judge, may we approach?

THE COURT:  There is no reason to approach.  Do you have any questions for this witness?

MR. PARCELL:  Yes, sir, Judge.  That's why I need to approach.

THE COURT:  If you ask an appropriate question, you can go ahead and ask it.  If it is inappropriate, an objection will be sustained.

BY MR. PARCELL:

Q    Did you have any further conversation with Cory Johnson about James Roane?

A    Yes.

Q    What did he tell you?

MR. BAUGH:  Objection.

THE COURT:  Sustained.

**JA1356**

BY MR. PARCELL:

Q    How about any involvement with Cory Johnson in this case?  Did Mr. Johnson tell you about his involvement with this case?

A    Yes.

Q    What did he tell you?

MR. COOLEY:  Objection.

THE COURT:  Sustained.

BY MR. PARCELL:

Q    How about Mr. Tipton?

MR. WHITE:  Same objection.

THE COURT:  Objection sustained.

MR. PARCELL:  No further questions.  You may stand down, sir.

(Witness stood aside.)

(At Bench.)

THE COURT:  There is a time and place for everything, Mr. Parcell.  Your questions are inappropriate for cross-examination based on the direct examination.  If you want to call a witness to testify about information that "C.O." provided these folks, that would be fine.  But again, not in the way you were trying to do it.

MR. PARCELL:  Based on the line of questioning, once they opened the door to what Johnson said about co-conspirators, it is the government's position that everything said by the co-conspirators, they can't pick and choose just because  --

THE COURT:  No.  If he said anything about himself, you could call him and put him on and he could relate that.  But you can't put him on to say what he said about somebody else.  This guy is not a part of the conspiracy.  He is in jail.  Hopefully, the conspiracy was over.  I justify wanted you to understand.  Come on, let's go on, Mr. Wagner.

(In Open Court.)

MR. WAGNER:  I would call Detective Woody, please.

C.T. WOODY, called as a witness by and on behalf of defendant Reavis, having been previously duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WAGNER:

Q    Good afternoon.  You are Detective Woody of the Richmond Police?

A    Yes.

Q    How many times was Sandra Reavis questioned by you or in your presence over the course of this investigation?

A    Approximately three times.

**JA1357**

Q   Three times?
A   Yes.
Q   Was it always at the police station?
A   No.
Q   So where were those three interviews, if you could tell the Court?
A   February 1st it was at West Moore Street, and then later at the police station.  And prior to that, another time at the police station.  Another time was when she was getting out of a taxicab when she was picked up and taken downtown by other officers.
Q   All the times you spoke with her and you met with her, was any cocaine ever found in her possession?
A   No.
Q   And all the times  --  did you ever go to her residence?  Did you personally ever go to her residence?
A   Not inside.  I was always outside.
Q   Were there ever any large sums of money found on Ms. Reavis?
A   Not to my knowledge, no.
Q   And if they were found, would it have come to your knowledge?
A   I would have known it at that particular time, yes.
Q   Were any guns ever found on Ms. Reavis' possession?
A   Not on her possession.
Q   In her house?
A   Not at her house.  At the location where she was found.
Q   West Moore Street?
A   Yes.
Q   But that was way back in the woods behind the house, right?
A   Not way back in the woods.  It was approximately 45 or 50 feet behind the house, yes.
Q   There were some six or seven other people in the house?
A   That is correct, yes.
Q   Were fingerprints done on those bags that the guns were found in?
A   Yes.
Q   Were Ms. Reavis' fingerprints ever found on that?
A   I don't recall.
Q   If they were found, would that have come to your attention?
A   Yes.
Q   Now, you questioned Ms. Reavis at length on several of those interviews; is that right?

**JA1358**

A    Yes, I did.
Q    Was Mr. Vick ever present at any of those interviews?

2884

A    One.
Q    He questioned her at one of the interviews?
A    He wasn't questioning her.  He was listening to what we were saying.
Q    You were not present then when Mr. Vick questioned Ms. Reavis; is that correct?  I'm sorry. I have no further questions.
        THE COURT:  All right.  Any questions for the witness, Mr. Vick?
        MR. VICK:  No questions.
        THE COURT:  All right.  You may stand down, Mr. Woody.
    (Witness stood aside.)
    Call your next witness.
        MR. WAGNER:  Detective Fleming, Your Honor.
                RALPH FLEMING,
called as a witness by and on behalf of defendant Reavis, having been first duly sworn by the Clerk, was examined and testified as follows:
            DIRECT EXAMINATION
BY MR. WAGNER:
Q    You are Detective Fleming of the Richmond Police Department?
A    Yes, I am.

2885

Q    Now, you heard the testimony of Detective Woody, didn't you?
A    Yes.
Q    There were times, or were there times when you questioned Ms. Reavis and Mr. Woody was not around?
A    I wouldn't say questioned.  I carried her home a few times after being questioned, picked her up a few times to be questioned.
Q    How many times did you pick her up to be questioned?
A    Once that I can recall.
Q    How many times were you present when she was questioned?
A    Not any, to my knowledge.
Q    So just one time that you actually picked her up for questioning?
A    That I can recall, yes.
Q    And at that time, were drugs ever found on her on that particular occasion?
A    No.  Not on her personally.
Q    Were any large amounts of cash found?
A    Not on her person.
Q    Any guns?
A    Not on her person.

**JA1359**

MR. WAGNER:  I have no further questions.

**2886**

THE COURT:  All right.  Do you have anything?

CROSS-EXAMINATION

BY MR. VICK:

Q    Was she searched?

A    I didn't search her.

Q    So you really don't know what she had on her.

A    No, I don't.

REDIRECT EXAMINATION

BY MR. WAGNER:

Q    Are you aware of her being searched in any of these times?

A    One time I could imagine she probably was.  That was on the day that she was arrested.

Q    And on that day  --

A    I shouldn't say arrested.  That she was at 1212 West Moore Street.

Q    And if anything was found on her, would that have come to your attention?

A    Well, at the time that she was arrested, she didn't have any clothes on.  I'm sorry, I shouldn't use the word arrested.  The time she was taken down for questioning.  She was not arrested.

Q    But she had her clothes there, didn't she?

A    She was allowed to dress and a female officer

**2887**

was present.

Q    There was nothing found in those clothes, was there?

A    Nothing was brought to my attention.

MR. WAGNER:  Thank you.  Nothing further.

THE COURT:  All right.  You may stand down, sir.

(Witness stood aside.)

Mr. Wagner, do you have anything else?

MR. WAGNER:  May we approach?

(At Bench.)

MR. WAGNER:  There are a couple of things.  For the record, I would call James Roane to the stand to testify.

MR. BAUGH:  James Roane will not take the stand.  I will tell the Court that he was willing if they had not been tried together.

THE COURT:  Well, you can call him.  He is not going to testify and I won't allow it.

MR. WAGNER:  Very well.

THE COURT:  You have another one?

MR. WAGNER:  There is a stipulation by Mr. Baugh that Mr. Roane wrote this letter.  And I'd like to admit that into evidence.

MR. VICK:  Your Honor, if we are going to

**2888**

**JA1360**

if that letter is part of a series, one in, all in. Mr. Wagner objected to putting them in.

MR. WAGNER:  That's because there was substantial prejudicial material in the letters, and the government chose not to respond to my motion in limine about those letters.  Therefore, the Court excluded them by order on January 15th.

MR. VICK:  Including this one.

MR. WAGNER:  No, this letter was not in the possession of the government.  I presented this to the government in discovery back at least two weeks before trial.  But the letters they were going to enter into evidence didn't come to my attention until I was provided with discovery.  So what I am saying is, this is a different letter than the ones presented by the government.

MR. VICK:  My point is, if he opens the door about letters by James Roane, then I move that the other letters sent to her by James Roane  --

MR. WAGNER:  The objection wasn't to the admission of the letters.  It was the material within the letters that was prejudicial.

MR. PARCELL:  There is a second page to this letter.

MR. WAGNER:  I provided everything I intended to admit in the case.

THE COURT:  If there is another page, you can't split up stuff.

MR. WAGNER:  That's all I have, Your Honor.

THE COURT:  Well, let's check and see.  Do you have a second page?  Mr. Baugh, do you have any objection?

MR. BAUGH:  I never saw a second page.

THE COURT:  No, do you have any objection to the letter?

MR. BAUGH:  No.  My client told me back last summer that he had written that.  That's the only thing I saw.

MR. VICK:  These are the other letters.

THE COURT:  Is there a second page to this one?

MR. VICK:  I can't find it.

MR. WAGNER:  I never had a second page.

THE COURT:  All right.

MR. PARCELL:  The last line isn't even a complete sentence.

THE COURT:  I understand that.  I'm going to let him put it in.  But I'm not going to put your stuff in.  We will let it in.

(In Open Court.)

MR. WAGNER:  I would submit, as Ms. Reavis'

Exhibit Number 1, a letter from James Roane.

THE COURT: All right. Have it marked and it will be admitted.

MR. WAGNER: If I could read from just a portion of that?

THE COURT: The letter is in.

MR. WAGNER: Very well.

THE COURT: Mr. Wagner, do you have anything else?

MR. WAGNER: Not at this time, Your Honor. Pursuant to our discussion before, I would ask to continue until after the break.

MR. VICK: We would ask that the original letter go in as opposed to a copy.

THE COURT: All right. Put in the original. All right. Mr. Baugh, you haven't heard anything?

MR. BAUGH: My co-counsel is outside doing something on that issue now.

THE COURT: All right. I am going to release you all now for lunch. Come back at 1:30 and we will get started with the afternoon session. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Remove the defendants.

(The defendants were removed from the courtroom.)

(Luncheon recess taken from 12:15 p.m. to 1:30 p.m.)

MR. BAUGH: Your Honor, our witnesses are present.

THE COURT: All right, good. Let's bring in the jury.

MR. GEARY: The government has agreed that we are going to offer into evidence on behalf of defendant Tipton the Times Dispatch article of 2-20-92. I would at this point like to offer an appellate exhibit, the 22-page statement from "Pepsi" Greene to Detective Dalton which begins January 28th and ends by Dalton saying, "This tape is ending at 11:45 a.m."

THE COURT: It will be admitted as an appellate exhibit. Bring them in.

(The jury entered the courtroom.)

All right, Mr. Baugh?

MR. BAUGH: Ms. Robin Cooper, please.

MR. GEARY: Before Ms. Cooper comes in, on behalf of defendant Tipton we are offering into evidence as Defendant's Exhibit 1, a February 20th, 1992 article from the Richmond Times Dispatch to which the government has agreed.

**JA1362**

THE CLERK:  It is Tipton Exhibit 2.

THE COURT:  It will be admitted.

ROBIN COOPER,

called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Would you please state your name for the Court and spell your last name?

A    Robin Lynne Cooper, C-O-O-P-E-R.

Q    Your middle name?

A    Lynne.

Q    Ms. Cooper, how old are you?

A    27.

Q    And calling your attention to February of 1992, where did you live?

A    2614 Lynhaven Avenue.

Q    At that time, did you know one of the defendants in this case, Mr. James Roane?

A    Yes.

Q    For how long had you known him?

A    Ten years.

Q    Did you know a man by the name of Torrick Brown?

A    Yes.

Q    Had you -- to your knowledge, had there ever been a disagreement between Mr. Brown and Mr. Roane?

A    Yes.

Q    Predicated upon what you have seen and observed yourself, do you know why Torrick Brown was killed?

A    Because of me.

Q    Other than you, do you know of anything else that Mr. Roane and Mr. Brown had in common?

A    No.

MR. BAUGH:  Pass the witness.

CROSS-EXAMINATION

BY MR. PARCELL:

Q    Ms. Cooper, do you know any reason why Cory Johnson would want to kill Torrick Brown?

A    I don't even know who that is.

Q    Do you know any reason why Anthony Mack would want to kill Torrick Brown?

A    No.

Q    Ma'am, on February 1st, 1992, was James Roane at your place of residence?

A    Yes.

Q    And earlier that day did you all go somewhere?

A    We went up to my mom's.

Q    Who took you?

A    James.

Q    Who else was in the car besides you?

**JA1363**

A     My children and Sterling.
Q     That's Sterling Hardy?
A     Yes.
Q     He took you all to the mall, you all came back, he left?
A     Yes.
Q     What time did he leave?
A     I don't know the time.  It was in the evening. Afternoon.
Q     James stayed at your apartment?
A     Yes.
Q     And did there come a point in time when James left?
A     Yes.
Q     What time?
A     I would say maybe about 5:30 or something, six.
Q     It was dark?
A     It was dark.
Q     Did somebody come and get him?

2895

A     Yes.
Q     How many people came to get him?
A     Three guys.
Q     And my last question, ma'am, is do you have any children?
A     I have three children.
Q     Tell the ladies and gentlemen of the jury who the father of your children is.
A     James Roane.
        MR. PARCELL:  No further questions.
        THE COURT:  All right.  Anything further?
        MR. BAUGH:  Nothing.  She may be excused.
     (Witness stood aside.)
     Call your next witness.
        MR. BAUGH:  Dr. Pam Royal, please.
              DR. PAMELA ROYAL,
called as a witness by and on behalf of defendant
Roane, having been first duly sworn by the Clerk,
was examined and testified as follows:
              DIRECT EXAMINATION
BY MR. HENDERSON:
Q     Good afternoon, Dr. Royal.  Would you please state your name?
A     Pamela J. Royal, M.D.
Q     And where do you live?

2896

A     Richmond, Virginia.
Q     What is your occupation?
A     I'm a physician.
Q     And are you licensed to practice medicine in Virginia?
A     Yes, I am.
Q     How many years have you been licensed, ma'am?
        MR. VICK:  We stipulate.

**JA1364**

THE COURT:  All right.

BY MR. HENDERSON:

Q    Dr. Royal, did you have an occasion on January 26th of this year to examine Mr. James Roane?

A    Yes, I did.

Q    And just so the jurors will know, what is your field, ma'am, of medicine?

A    I'm a dermatologist.

Q    Can you explain what a dermatologist is?  What is the field of dermatology?

A    Dermatology is the medical specialty that specializes in diseases or disorders affecting the hair, skin, and/or nails.

Q    You are in private practice here in Richmond?

A    Yes.

Q    You had an opportunity on January 26th to examine Mr. James Roane?

2897

A    Yes, I did.

Q    Now, during that examination, did you have an opportunity to talk to Mr. James Roane?

A    Yes, I did.

Q    And did he talk to you about any injuries that he had sustained to any of his hands?

A    Yes, he did.

Q    As a part of that conversation, did he give you a verbal history of his injuries?

A    Yes.

Q    What was Mr. Roane's verbal history relative to his left hand?

A    He told me he had not sustained any injuries to his left hand except for a minor scrape that he remembered while playing football during his younger years.

MR. VICK:  I hesitate to rise, but I don't see where this testimony has any relevance to what's going on.

THE COURT:  Go ahead.

BY MR. HENDERSON:

Q    Did Mr. Roane mention any puncture wounds that he had received to his left arm or left hand?

A    No, he did not.

Q    Did you have an opportunity to examine Mr. Roane

2898

at that time?

A    Yes, I did.

Q    And what did your examination consist of?

A    We took a thorough history, obviously, and examined both hands, wrists and forearm areas on both hands and arms.

Q    Did you conclude -- did you make any conclusion or diagnosis with respect to his left hand as a result of your examination and his history?

A    Yes, I did.

**JA1365**

Q    What was that conclusion?
A    On his left hand he had one small dark patch that was consistent with a minor scrape that he told me had occurred previously.
Q    Now, with respect to his right hand, did you have an opportunity likewise to examine his right hand?
A    Yes, I did.
Q    And based on your examination, did you find any evidence of any puncture wounds on his right hand?
A    Yes, I did.
Q    Now, did you likewise have an opportunity to examine his medical reports from the Medical College of Virginia?
A    Yes, I did.

2899

Q    What did your examination reveal in conjunction with the medical history that you got from the Medical College of Virginia?
A    I found multiple scars involving his right arm that were consistent with a history that I reviewed in his medical record from Medical College of Virginia.
Q    What did that have to do with?
A    He told me that he had been cut from glass when he was washing dishes or a dishwasher injury several years ago.
Q    And is that what the reports revealed from the Medical College of Virginia?
A    Yes, they did.
Q    And with respect to a conclusion then, what was your conclusion with respect to puncture wounds on Mr. Roane's left hand or arm?
A    My examination revealed no evidence of puncture wounds to his left hand or arm.
        MR. HENDERSON:  Thank you.  Pass the witness.
        THE COURT:  Any questions?
            CROSS-EXAMINATION
BY MR. VICK:
Q    It is my understanding he has a number of scars

2900

on his right hand and arm that are consistent with cuts?
A    Yes, sir.
Q    Not on his left hand, other than one consistent with a scrape?
A    That is correct.
Q    This examination took place January 26th, 1993?
A    Yes, it did.
        MR. VICK:  No further questions.
        THE COURT:  All right.  You may stand down, ma'am.  Thank you very much.
    (Witness stood aside.)


**JA1366**

MR. BAUGH:  Ms. Gina Taylor, please.

GINA TAYLOR,

called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Please state your name for the Court and for the record, spelling your last name.

A    Gina Stella Taylor, T-A-Y-L-O-R.

Q    You have a very soft voice, so speak all the way to the gentlemen in the back.  How old are you?

A    I am 24.

Q    What do you do for a living?

A    I am a working mother of three as well as a full-time student at J. Sargeant Reynolds.

Q    Where do you live at this time?

A    810 North Harrison.

Q    Were you living there on January 13th, 1992?

A    Yes, I was.

Q    Now, could you tell the members of the jury where 810 North Harrison is in relationship to the intersection of Harrison and West Clay?

A    In the middle.

Q    Excuse me?

A    In the middle.

Q    About how many feet from the intersection would your home be?

A    Feet?  You are asking me feet?

Q    I'm sorry, what runs -- as you look out your front door, what is on the right side of your house?

A    Clay.

Q    What?

A    When I am looking out my front door.

Q    No, on the side of your house is there an alley?

A    Yes, there is an alley.  It is a driveway, alley.

Q    Calling your attention to January 13th, did you have occasion in the evening hours to look out into that alleyway?

A    Yes, I did.

Q    What caused you to look out there initially?

A    The dogs barking in the back.

Q    You have dogs?

A    No, my neighbors do.

Q    Where did you look from?

A    I have a laundry room that's on that side.

Q    When you looked out of your laundry room window, what did you see?

A    At first I looked out the back door and didn't see anything.  And I turned to the left.  The curtain

**JA1367**

Gina Taylor (Direct)

was open and I looked out the window, and there was a man lying on the ground and someone was over him.

Q    What was the person over him doing or appear to be doing?

A    Jabbing him.

Q    Jabbing him?

A    Something to that effect.  I mean, you know, there is someone over someone.

Q    What did you do then?

A    Went in  --  well, I looked out again.  Then I turned the laundry room light off to look out again to make sure I was seeing what I thought I was seeing.  And once I established that I was actually seeing it, I went to my front door.

Q    When you went to your front door, what happened, if anything?

A    There was only one person there, and he asked me to help him.

Q    Were there people standing in the street nearby watching this?

A    Down on the corner.

Q    All right.  This person who was in the alleyway asked you to help him?

A    Yes.

Q    What did you do?

A    I told him that I would, but first I needed to get someone to call 911.  I yelled to the people on the corner to call, just yelled "Dial 911" and went back to him.  And he was bleeding, so I had to go back in and get a knife to try and cut, because he had layers of clothing on, to try and cut through the layers to stop the bleeding.

Q    Did you do that?

A    I attempted to.  Once I got through the first layer, I think nearly through the second layer, I don't know if it was the police, fire squad, or ambulance that pulled up.  But someone did, and they told me I had to move.

Q    All right.  During the time that you were working with him, did he say anything to you?

A    Other than to help him and don't leave him alone, no.

Q    About how long did you stay with him before the medical people got there?

A    It was minutes.  It wasn't seconds.  It was, at the most, maybe two, three minutes.

Q    All right.  Now, had you seen the person that you were helping before?

A    Yes.

Q    Did you know who he was?

A    The name he gave me was Hakim.  At that time I was going to C.T.C.

**JA1368**

Gina Taylor (Cross)

Q    What is that?
A    Career Training Center, to obtain my certification as a nursing assistant.  And he told me that he used to go there and that he wanted to get back into going.  He was going for business or something and he wanted to go back.
Q    Did you recognize the person that was sitting on this person and jabbing him?
A    No.

Q    Could you make out the person's face?
A    No.
Q    Could you give us a description, however, of the person that you saw doing the stabbing or jabbing?
A    A physical description, basically, yes.
Q    Give it to us.
A    I would give it as I myself am five-six-and-a-half.  They would be shorter than me and much, much smaller.  They were a thin person.  You could tell by the way they were bending as to their physical stature, and this was not a big person.
Q    How long have you lived in that neighborhood?
A    Two years.
Q    Have you ever seen this gentleman here in the blue shirt, this gentleman here in the green shirt, or James Roane over there in the blue blazer and white shirt, ever seen these gentlemen before, any or all of them?
A    Yes.
Q    You have seen them around the neighborhood?
A    Yes.
Q    I will ask you specifically, the gentleman over there, James Roane, was that the man you saw sitting on Hakim's chest jabbing him?

A    No.
Q    Did you tell the police that that night?
A    They didn't ask me that.
Q    What did they ask you?
A    Could I identify the person.  They didn't ask me was there a particular  --  did I think that it was a particular person.  They asked me could I identify them facially.  No, I couldn't.
Q    Did you give a statement to Detective Dalton of the Richmond Bureau of Police?
A    Yes.
          MR. BAUGH:  Thank you, ma'am.
               CROSS-EXAMINATION
BY MR. VICK:
Q    In your statement to the police, Ms. Taylor, you have told the police, in fact you have told Detective Fleming, that you could not, based upon what you saw, even state whether the person who was stabbing the

**JA1369**

Gina Taylor (Cross)

victim was a man or a woman.

A   Yes.  That's true.

Q   You don't even know whether it was a man or a woman.

A   That's true.  I don't know the gender, no.

Q   All you can say is that you saw somebody bending down over the victim stabbing that person.

MR. BAUGH:  Objection.  That is assuming a fact not in evidence.  She has given a description.

THE COURT:  It is a question.  She can answer.

THE WITNESS:  Well, like I said, I went to Career Training Center to obtain my certification for nursing assistant.  One of the skills that we were taught was observation.  It takes a few seconds to give a very good observation if you observe carefully, and that's what I did.  I said I could give physical stature, size, and height.  But as far as characteristics  --

BY MR. VICK:

Q   If you will just listen to my question.

MR. BAUGH:  She is answering the question.  She said "No, I saw more."

THE COURT:  Overruled.

BY MR. VICK:

Q   You saw the person actually bent down over the victim?

A   Yes.

Q   You did not see the person standing up at full height, either, did you?

A   No, but if I was to sit out here and stoop, you could tell I'm a moderately large woman, fairly tall.

Q   You are basing that  --

A   On my observation.

Q   Just based on the fact somebody was stooped over stabbing someone?

A   From my observation skills and what I have learned as far as observation goes, yes.

Q   You know "Whitey" because you dated him, didn't you?

A   We were friends.

Q   Didn't you date him?

A   Kind of.

Q   Aren't you good friends with "Whitey's" family?

A   Yes.  But I need to clarify that before you go any further.

Q   I don't need to go any further.  You are good friends with the family?

A   To say that, you would assume that I have known "Whitey" as well as the whole family, and that since this has happened I have had contact with them.

**JA1370**

Gina Taylor (Cross)

Growing up in the neighborhood that I grew up in, yes, his uncles and cousins lived down the street, grandmother around the corner.  Since leaving that neighborhood when I was 17, I'm now 24, constant contact has not been there.

2909

Q    You have dated him since then, haven't you?
A    We were close friends.  Not really dating.  It started out that way, but we recognized that friendship was better and left it at a friendship.
Q    You stated to Detective Dalton there was a long time between the shots you heard and  --  you heard shots prior to looking out the window?
A    Yes.
Q    There was a long time between the shots and the stabbing?
A    Yes.
Q    Did you see the murder victim, Doug Moody, actually get stabbed?
A    I wouldn't say that.  At the time of looking out my window I was seeing him being stabbed.  Until I saw him when I went out my door, I didn't know that what they were doing was stabbing him.  I thought they were robbing him.  But once going out my door, it became clear what they were actually doing.
Q    You have known for some months that James Roane has been charged with that murder, haven't you?
A    No.  When he came he did not  --  he didn't mention "J.R." at all.  He only talked to me about "Whitey."  The only way I found out that you were trying to say it was "J.R." was when the defense

2910

attorney came.
Q    Are you telling the ladies and gentlemen of the jury that you have dated "Whitey"  --
        MR. GEARY:  She never said that.
BY MR. VICK:
Q    Excuse me, that you were good friends with "Whitey" but that you have not noticed in the newspaper that "Whitey" and James Roane have been charged with a series of murders?
A    To answer that, I would say I have three children; I go to school full time; I work six days a week.  The only day I have off is Sunday, and basically I sleep.  I don't read the paper.  I rarely watch TV.  I rarely socialize with people because there is no time.  To be a mother, full time student, and working, what time do I have to do all of that?
Q    My question is simple.  You did not know that James Roane  --
A    No, I did not.
        THE COURT:  Overruled.
BY MR. VICK:
Q    You did note know that "Whitey" and James Roane

**JA1371**

were charged with a series of murders, including the murder of Doug Moody?

A   No.

2911

Q   Can't identify whether it was a man or a woman who was stabbing that person?

A   Gender?  No, I cannot.

MR. VICK:  Beg the Court's indulgence. Nothing further.

REDIRECT EXAMINATION

BY MR. BAUGH:

Q   Ms. Taylor, if it was a woman, was that woman smaller, about the same size or smaller than you?

A   Way smaller than me.

Q   And if it was a man, was that man way smaller than you?

A   Way smaller.

Q   If it was a man or woman, was it smaller than Mr. Roane?

MR. VICK:  Leading.

THE COURT:  I'll let it in.

BY MR. BAUGH:

Q   If it was a man or woman, was it smaller than Mr. Roane?

A   Yes.

MR. BAUGH:  Pass the witness.  No further questions.

THE COURT:  The witness may stand down.

MR. BAUGH:  We have no objection to her

2912

being excused.

(Witness stood aside.)

Subject to Mr. Dalton's availability, we will rest.

THE COURT:  Mr. Wagner, have you got your other witness?

MR. WAGNER:  I have no further witnesses.

THE COURT:  You have no further witnesses.

MR. BAUGH:  Perhaps if we took a 15-minute break, the attorneys could get together and we could talk about what we are going to do with Mr. Dalton.

THE COURT:  Let's do that.  I really can't tell you how long it will be, but 15 or 20 minutes. We are trying to figure out what we are going to do the rest of the afternoon and so forth.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, remove the defendants, please.

(The defendants were removed from the courtroom.)

THE COURT:  All right, we will take a few minutes, let you see if you can resolve your Dalton issue.  If it is resolved, I would probably take the

**JA1372**

rest of the afternoon to deal with instructions. We have a charge conference Monday morning, closings Monday afternoon. If it is not resolved, we have to wait on the Dalton matter.

MR. VICK: Judge, I know the Court is sick of hearing from all of us on this, but I just want edification before we get to trying to resolve the stipulations: Is Detective Dalton, would he, if here, be able to testify to the hearsay statements given to him by other people about his investigation other than the witnesses? I understand prior inconsistent statements by our witnesses, but other than witnesses in this case?

THE COURT: It would be my ruling if faced with it that he would be able to testify about comments made by individuals who have testified here today. He would also be able to testify about his investigation if it locked in on another individual. And the basis of that, not for the truth of it, but to understand why he locked on another individual. I think that's fair. Now, some of the quotes from the materials we received, the hearsay on hearsay, will not be admissible. But that information regarding the focus could come out.

MR. VICK: So the Court would allow him, if I could see if I understand you, the Court would allow him to say, for example, "We determined that on the Doug Moody investigation, that "Little Keith," "Baldy," was indeed a suspect," You would not allow him to get to the hearsay that led to him becoming a suspect, but allow him to say yes, he was a police suspect.

THE COURT: Unless it is direct. If it is over the hill and over the hill from somebody else, no. He would be able to say, "Because of our investigation, we focused on X." He would be able to say that. If he had direct information from a witness who testified in this case that led him to somebody else, he would be able to say that.

MR. BAUGH: As the Court is well aware, with the material you have read, one, if Ms. Wallington is unavailable, it will be inadmissible; and two, there are ways under the rules of evidence by focusing him to his suspect and the reason for it that the majority of these statements could come out. Believe me, Your Honor, I think I know how to get them out.

MR. VICK: Your Honor, our objection to going any further than that Keith Barley was a suspect is he was a suspect based on what Catherine Wallington said to Dalton, which was based on what

she heard from other people.

THE COURT: I can't decide what the evidence is, but that's different from what I have been hearing. I heard something that you read which indicated she got it from one person from another person. I hear something from over here different.

MR. VICK: Could we give the Court Detective Dalton's full report? We have all agreed that he could go no further than what is in his full report. And then we could get greater edification from the Court as to exactly what would be allowed in that problem. Do you have any problem?

MR. BAUGH: I apologize, I think we are wasting the Court's time right now. I would ask for a moment to talk. If we can get it in, we can. If we can't, we can't.

THE COURT: I think that's the bottom line. If you all can't agree, then put Dalton on and get what I allow you to get. It is that simple.

(Recess taken from 2:05 p.m. to 2:25 p.m.)

THE COURT: All right. Let's bring in the jury, please.

(The jury entered the courtroom.)

Ladies and gentlemen, I am informed that we have just one additional witness that will be put on in the case, and that witness is not currently in town. And we won't be able to have that witness appear before you until Monday morning. I am going to ask you all to come back in at 10 o'clock on Monday morning. We anticipate this witness will not last longer than 30 minutes. And then we will head into the instructions and closing arguments on the merits portion of this case.

Again, I admonish you, please steer clear of any newspaper, radio, or television items regarding this case, and do not discuss the case with anyone. And if anyone should try to discuss it with you, notify the Court immediately. We will see you on Monday morning at 10 o'clock. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

I need to see Roane's counsel ex parte on an issue. Come up here.

(At Bench.)

THE COURT: What happened?

MR. BAUGH: We sent her like 2,500 pages worth of documents and Norton came and made a couple of trips. About 1,500 pages of the documents, she ran out of time. About two-and-a-half weeks ago she sent the rest of the documents back, said, "It has been nice knowing you." She said it in a very Christian way. This person is local, and what we are

**JA1374**

asking her to do additionally, she is a social worker and we are asking her to do an assessment of our client. And I will tell the Court he should have been placed in services years ago. We are asking her to do an assessment on what he would have been placed in, why, what effect it would have had. She is a social worker. Plus, she is reading through the rest of our documents and putting our exhibits together.

THE COURT: All right. I will authorize this.

MR. BAUGH: Thank you.

MR. VICK: Soon we will get to the guilt phase, and I'm assuming we are going to. I would just note that I have received psychiatric reports only from counsel for Cory Johnson. I have received no other reports. I want it to remain clear that I am going to object to anything coming in.

THE COURT: Please, get the stuff to him as soon as you can.

MR. BAUGH: We have had examinations, there are no reports. There are no reports.

MR. COOLEY: There may not be any statutory authority for us to have to give to the government anything on the mitigation side of it.

THE COURT: No, if you had a psychiatric report I think you should give it to them. If you have got the stuff, give it to them. If you don't --

MR. VICK: But you will have psychiatric testimony?

MR. BAUGH: Psychiatric, no. We didn't have a shrink look at this guy.

MR. VICK: Doctor's testimony.

MR. BAUGH: Yes, sir.

(In Open Court.)

All right, Mr. Marshal, remove the defendants.

(Defendants removed from courtroom.)

We will be in adjournment.

(Proceedings adjourned at 2:30 p.m.)

**JA1375**

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                    VOLUME XV

                February 1, 1993
                Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

          THE CLERK:  92CR68:  United States of
America versus Richard Tipton, Cory Johnson, James H.
Roane, Jr. and Sandra Reavis, the fifteenth day of

trial.

MR. VICK: Government is ready.

MR. GEARY: Tipton is ready.

MR. McGARVEY: Johnson is ready.

MR. BAUGH: Does the Court have the instructions, does the Court have them?

THE COURT: My package has been prepared and you all can make whatever suggestions you like.

MR. BAUGH: We will take that as a warning. We have plagarized the PITERA instructions.

THE COURT: All right. Let's bring in the jury.

MR. VICK: While the jury is coming in, we will note our objection to the double, triple hearsay by Detective Dalton. I won't say anything more about it. I know the Court has seen the report so you know what it is we are objecting to.

THE COURT: All right.

(The jury entered the courtroom.)

All right, Baugh, call your witness.

MR. BAUGH: We would call -- I thought they were going to call Mr. Dalton first. I thought

2921

it was Mr. Geary's witness.

THE COURT: Mr. Geary?

MR. WHITE: We will call Detective Dalton.

**Concerning the two wounds that penetrated the brain, Dr. Fierro testified that it "would take moderate to severe force to penetrate the skull." JA 2901. Including these two wounds, six of the stab wounds penetrated through the brain (bone??) of the skull. *Id.* at 2896Steve A. Dalton (2921)**

STEVE A. DALTON, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q   Good morning, Detective Dalton.

A   Good morning.

Q   State your name, please.

A   Steve A. Dalton.

Q   How are you employed, sir?

A   Detective with the Richmond Police department.

Q   How long have you been so employed?

A   22 years.

Q   Were you so employed in January of 1992?

A   Yes, sir, I was.

Q   To what unit were you assigned in that time frame?

A   At that time frame I was assigned to the midnight cruiser unit.

Q   Did you have occasion to be involved in the investigations of the murders of Peyton Maurice

2922

**JA1378**

Johnson and Katrina Rozier?

A    Yes, I was.

Q    And pursuant to that investigation, sir, do you recall having a meeting with a Priscilla Greene?

A    Yes, sir, I do.

Q    Do you recall when that meeting was, sir?

A    That was approximately right around January 28th, I believe.

Q    Could you please tell the ladies and gentlemen of the jury where that meeting occurred?

A    The meeting occurred at police headquarters on January 28th at 10:55 a.m.

Q    And can you tell the ladies and gentlemen of the jury who was present?

A    Myself and Detective Blaylock and Detective Reid was in and out during the interview.

Q    And of course Ms. Greene was present?

A    Yes, that's correct.

Q    On that date you had occasion to serve a Circuit Court capeas on her; is that correct?

A    That is correct.

Q    Now, Detective Dalton, do you recall a conversation between yourself and Priscilla Greene specifically about the murder of Katrina Rozier?

A    Yes, sir.

2923

Q    Sir, do you have that statement in front of you?

A    Yes, sir, I do.

Q    If I could direct your attention to page 14 of that interview, sir.

A    Yes, sir.

Q    Directing your attention, Detective Dalton, to your question "How about Katrina..." can you please --

MR. VICK:  Your Honor, "Pepsi" Greene did not testify in this trial about that.  I don't see how this comes in as any rebuttal.

THE COURT:  Come on up.

(At Bench.)

MR. WHITE:  If the Court please, when we attempted to elicit information from Ms. Greene while on the witness stand, she did not recall her conversation with Detective Dalton.  She did not recall the interview at all.  She does not recall anything she said.

MR. VICK:  Didn't ask about "Nat" Rozier?

MR. WHITE:  How could we if she could not recall anything she said about the interview or having been served with the capeas?

MR. VICK:  She didn't testify about "Nat"

2924

Rozier.

MR. BAUGH:  One, Mr. White attempted to

**JA1379**

press her on the issue and you told him to stop repeating himself, even though he tried to get her to recollect it.

THE COURT: How many times can you ask about this? "Can you recall?" The fact that a witness doesn't know or can't recall doesn't make a person like this witness admissible. If he had something to impeach her on, all right.

MR. WHITE: She said on pages 14 and 15 that when Katrina Rozier was killed, that "Whitey" was not in town.

THE COURT: No. Denied.

MR. BAUGH: There is one other matter. It is conceded by all, and I think it is that her recollection has been impaired as a consequence of her injury. Then of course, that would make her unavailable as a matter of law. The question would then turn on whether or not there is indicia of reliability to get around the hearsay exception. Inasmuch as there are other portions of that statement on which the United States has relied, we would submit that there is -- granted, a de minimis indicia of reliability -- and therefore, subject to her injuries she is unavailable.

THE COURT: No. That was not my ruling. You should understand this as well. If you have something on which she makes a statement that is different than what she had said, that's one thing. But you can't increase her knowledge of something through the use of hearsay. You are absolutely right as to what the standard one considers this evidence would be. But there is no indicia of that.

MR. WHITE: We would suggest that the reliability is certainly more than her testimony would be here today given the fact she was severely injured.

THE COURT: I'm not going to allow it. The objection is sustained.

MR. GEARY: 14 and 15 for the appellate record?

THE COURT: Yes.

(In Open Court.)

MR. WHITE: If I can have a moment with Mr. Geary, please?

THE COURT: Sure.

(Counsel conferring.)

MR. WHITE: We have no further questions of Detective Dalton.

THE COURT: All right. Mr. McGarvey?

DIRECT EXAMINATION

BY MR. McGARVEY:

Q    With respect to that same interview you

**JA1380**

conducted with Priscilla Greene back on January 28th, do you recall asking her about the Douglas Moody killing?

A    Yes, sir, I do.

Q    All right.  If you would refer to page three of the transcript of that interview?

A    Yes, sir.

Q    About three-quarters of the way down, question by Detective Blaylock:  "You saw "J.R." stab him."  Greene:  "He had the knife."  You asked her what type of knife.  She said, "We left and went around the corner.  He was the only one left around there."  You asked her once again, "What type of knife was it?"  She replied "I don't know."  Is that correct?

A    That's correct.

Q    She did not know what type of knife it was.

A    That's her response.

Q    Do you recall after the murder of Peyton Maurice Johnson going to interview Stanley Smithers?

A    Yes, sir.

Q    And did you come in contact with someone you later found out to be Stanley Smithers?

A    That's correct.

Q    At the time you first tried to interview him, did he give you his correct name?

A    No, sir, he did not.

          MR. McGARVEY:  Thank you, sir.  That's all I have.

          THE COURT:  Mr. Baugh?

                DIRECT EXAMINATION

BY MR. BAUGH:

Q    Detective Dalton, as part of your duties for the Richmond Bureau of Police, were you assigned any part of the investigation concerning the death of Kareem A. Hakim, also known as Douglas Moody?

A    Yes, sir, I was the investigator.

Q    As a consequence of your investigation, did you meet a Ms. Gina Taylor?

A    Yes, sir, I did.

Q    Additionally, did you interview other witnesses?

A    Yes, sir, I did.

Q    As a consequence of your conversations with witnesses, did you identify an initial suspect?

A    Yes, sir, I did.

Q    Am I correct that that initial suspect was a gentleman known as Mr. Keith Barley or Barkley?

A    Keith Barley, B-A-R-L-E-Y.

Q    And Mr. Barley is a juvenile?

A    That's correct.

Q    Kind of a short little juvenile?

A    I recall him being sort of tall and lanky.  Not

**JA1381**

over six foot or anything, a small-featured type person.

Q    Did you get a physical description of him?

A    Yes, sir.

Q    All right.  Did you put it in your notes?

A    I'm sure I put it in there if I got one.

Q    We will come back to that, if I might.
Now, when you identified Keith Barley, was that predicated in part upon statements given to you by Gina Taylor and statements given to you by Mr. Moody's mother, Ms. Catherine Wallington?

A    Keith Barley came into the picture through Ms. Wallington.  Ms. Taylor did not know anybody by names or descriptions.

Q    All right.  The description of the person that you were looking for given to you by Ms. Taylor, was that person described as the smaller black male in the dark clothing who was on top of the victim?

A    Yes, sir.

2929

Q    And you know, of course, that Mr. Moody, as per the autopsy reports, the decedent was only five-foot-six.

A    Yes, sir.

Q    Based on that, did you get the impression that the assailant was smaller, either in weight or height, than the victim?

A    I don't recall whether there were two parties involved or just the two, the victim and the suspect.  I would have to review my notes.

Q    Please take your time.  I'll refer you to your first page of your handwritten notes.  Excuse me, if I might.  "She then observed two males out of her window facing the alley.  Both were on the ground and the smaller black male in dark clothing was on top of the victim."

A    That would be the accurate statement she gave me that date.

Q    So based on that, am I correct in assuming that she only saw two people, one the victim, one the assailant?

A    Yes, sir.

Q    All right.  Now, did Ms. Wallington give you information that led you to identify Keith as the suspect?

2930

A    Yes, sir.

Q    And in her statement that she gave that led or contributed to your identifying Keith, did she tell you that someone named Keith had been by the house two hours before her son was killed looking for the victim?

A    Yes, sir.

Q    All right.  Did she also give you information,

**JA1382**

other information, concerning Keith coming by the house earlier? Referring to page three of your notes.

A Which paragraph?

Q Let me put it this way. Without knowing the truth or falsity of her statement, did you receive information that someone, or friends of Keith, had kicked the door in while armed with machine guns?

A Yes, sir.

Q All right.

MR. VICK: I would just note that Mr. Baugh has Detective Dalton on direct and not cross.

MR. BAUGH: I have him on cross.

THE COURT: Go ahead and ask your questions. Finish up.

BY MR. BAUGH:

Q I'm sorry, without knowing the truth or falsity, did she tell you that some friends of this young man named Keith had been to her house several weeks before armed with machine guns?

A The way I have it written, "Approximately a week ago she came home to find the front door open. Later a neighbor told her it was some friends of Keith that kicked in the door while armed with machine guns."

Q Of course you didn't know if that was truthful or not?

A No, sir.

Q Additionally, did you receive information that her son had been hiding under a house next-door all that day?

A Yes, sir.

Q And that he was hiding out of concern for someone named Maurice?

A That's correct.

Q And that Maurice thinks that the victim had killed Maurice's brother a year earlier?

A That's correct.

Q Now, am I correct also then that Keith was cleared as a suspect or removed from the category of suspect because approximately two weeks later, Ms. Priscilla Greene, also known as "Pepsi" Greene, said she saw James Roane stab the man?

A That's correct.

Q Now, when Ms. Priscilla Greene told you that James Roane killed Douglas Moody and stabbed him, did you take a picture of James Roane back to Gina Taylor and ask her "Does this look like the person that killed Douglas Moody?"

A I don't recall anything like that.

Q All right. So then am I correct that based on your recollection, without further reference to Gina Taylor, the eyewitness, the word of Priscilla Greene

**JA1383**

cleared Keith Barley as a suspect?

A    Yes, sir.

MR. BAUGH:  Thank you.  Pass the witness. No further questions.

THE COURT:  Mr. Wagner, do you have any questions?

MR. WAGNER:  No questions, Your Honor.

THE COURT:  All right.  Government?

CROSS-EXAMINATION

BY MR. PARCELL:

Q    Detective Dalton, when you talked to Ms. Greene about the knife, you asked what type of knife it was; is that correct?

A    That's correct.

Q    You didn't ask her to physically describe the knife, did you?

A    No, sir.

Q    You indicated that you eliminated Keith Barley as a suspect.  When you talked to Wallington, she never saw Keith at her house, did she?  Everything she knew was something told  --

MR. BAUGH:  Objection.

THE COURT:  Ask one question at a time.

BY MR. PARCELL:

Q    When she related to you the incident about people coming by for Keith with machine guns, she didn't see that herself; that's what somebody told her?

A    I believe so.

Q    Do you want to confirm with your notes?

A    You are talking about the time the door was kicked in by friends?

Q    Yes, sir.

A    That's second-hand information she received from a neighbor.

Q    In regards to Maurice looking for Doug, that's not Peyton Maurice Johnson, is it?

MR. BAUGH:  Objection, unless there is a basis for his knowing.

THE WITNESS:  The only thing I have is the "Maurice."  Never were able to identify the exact Maurice.

BY MR. PARCELL:

Q    Never able to confirm that it was Peyton Maurice Johnson?

A    No, sir.

Q    Gina Taylor told you she did not identify or physically describe anyone in relation to the other person she saw in the alleyway with "Little Doug" Moody; is that correct?

A    That's correct.

Q    In fact, she didn't tell you she even saw him

**JA1384**

stabbing anyone.  She said she saw someone over top of the body; is that also correct?

A    That's correct.

MR. PARCELL:  No further questions.

MR. WHITE:  May I have a minute with Mr. Baugh, please?

THE COURT:  Go ahead.

(Counsel conferring.)

REDIRECT EXAMINATION

BY MR. BAUGH:

Q    The information that someone named Keith came by the house two hours before the killing, Ms. Wallington told you that of her own knowledge; am I correct?

A    Yes.  That's correct.

Q    And she indicated by that statement that she had seen this person, Keith, when he came by?

A    That's correct.  As far as I can tell from my notes.

MR. BAUGH:  Thank you, sir.

THE COURT:  All right, sir.  You may stand down.

(Witness stood aside.)

MR. WHITE:  Defendant Tipton rests.

MR. McGARVEY:  Defendant Johnson as well rests.

MR. BAUGH:  James Henry Roane, Jr. would rest.

MR. WAGNER:  Defendant Reavis would rest.

THE COURT:  Any rebuttal from the government?

MR. VICK:  No rebuttal, Your Honor.

THE COURT:  All right.  The taking of evidence has been concluded on the merits portion of the trial.  And what will happen for the rest of today is as follows:  Right now I'm going to let you all go out to the jury room.  We will be involved in instructions conference.  That's when the lawyers and I get together and I decide what instructions on the law will be given to you.  They will know and I will know when we come back in here.  At that time, the parties will then commence closing arguments.  The government will go first, the defendants will each individually follow with closing arguments, and then the government will have an opportunity for what's called rebuttal.  After that, I would instruct you in the law.  And when that is concluded, the jury would be released to begin its deliberations.

Let me say this by way of explanation to the alternates so you will understand what your role will be in this process as we go along.  When I complete my instructions and send the jury out to begin its

**JA1385**

deliberations on the merits, the alternates will be temporarily excused. You all will not go in to deliberate with the rest of the jury. If indeed we proceed to a second stage of this trial, and that's definitely not a given, you all still have it to decide and deliberate on that point. If it proceeds to a second stage, then the alternates will come back and we will call you. We will bring you back, you will sit and hear the second phase of the trial as well, and you will be with us until the end, when I send them out to deliberate on sentencing, if that

2937

becomes necessary. And we would let you know.

Obviously, the reason we do this, of course, is that just in case, God forbid, something was to happen to some member of the jury, illness or something, we would still have an alternate available. You all have heard all of the case and you will hear all of the sentencing phase if it becomes necessary. So you know what your roles will be.

All right, everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. GEARY: I'd like to offer the appellate exhibit from Detective Dalton.

THE COURT: Oh, sure. Mr. Marshal, would you remove the defendants?

MR. McGARVEY: On behalf of defendant Johnson, we would join in the motions as expressed at the bench and also join in with respect to the appellate exhibit.

MR. BAUGH: Before you take the defendants, we have to waive their appearance even for the instruction conference.

THE COURT: I thought they had been waived for all purposes.

2938

MR. BAUGH: That's been continued. Okay, fine, Your Honor.

(Defendants removed from courtroom.)

MR. BAUGH: Do you want us to renew our motions at this time or do it after we find out what the instructions look like?

THE COURT: Let's do that after we have the conference. If you all will come down in 10 or 15 minutes to my chambers, stuff is being copied now, it might be ready. But give me ten minutes at least.

(Recess taken from 10:30 a.m. to 10:40 a.m.)

(In Chambers.)

MR. BAUGH: Might I suggest we take these and go back and discuss them before we start the conference?

THE COURT: These are, I think -- I don't

**JA1386**

think we will have too much controversy about any of these. But I think it would save time. Go look through them, note the ones that you have got a problem with, and that will save us some time. Give us again 10 or 15 minutes. That should be enough. Really, these aren't, but for a couple that will require some explanation from me, they aren't much different from what we would normally do in a drug case. Go take a look at them and then come back.

2939

(Recess taken from 10:43 a.m. to 11:00 a.m.)

MR. VICK: The government has no problem whatsoever with the instructions. I had no problem with my supplemental instruction about leading questions in Grand Jury not being included, but if it is argued in the defendant's case, I do think it would then be proper to include that instruction.

THE COURT: All right.

MR. BAUGH: As to 21, Your Honor, a couple of objections. Number 21 is the statute defining offense and elements, instruction number 21. Our problem, Your Honor, is that I guess it is primarily with the second element. This instruction does not indicate that the killing must occur in furtherance of. The first one indicates that the defendant was engaged or working in furtherance and that while engaged he killed someone. It is our reading of 848 that the killing must be performed in furtherance of the illegal activity. It can't just be some other purpose while he is engaged in activity in furtherance of the illegal activity. Additionally, as to paragraph three, that the killing must actually result, there must be nexus language there as well.

THE COURT: I don't see the need for that.

MR. COOLEY: As to killing while he is

2940

engaged in the Continuing Criminal Enterprise, that would fall under the language that you have in this instruction.

MR. VICK: And the case law on that specifically addresses that and indicates that indeed they have not rendered -- that the statute is written just the way the Judge has it and that there has been no decision rendered. Indeed, that could be the case as we argued on the 1959 language.

THE COURT: I don't have a problem with the language the way it is. Your objection will be noted.

MR. WHITE: On behalf of Tipton.

MR. McGARVEY: Johnson as well.

THE COURT: All right.

MR. BAUGH: As to instruction 37, Your Honor, it has to do with actual or exact amount of controlled substance need not be proven. As to the

**JA1387**

conspiracy count, they do have to prove the amount.

MR. McGARVEY:  As it applies to 32 and 33, it is fine.  As it applies to the conspiracy  --

MR. COOLEY:  After the word "case," probably ought to insert "as to Counts Thirty-two and Thirty-three."

MR. VICK:  Actually, I don't think that's the case, either, but then I think we would need a special verdict.

THE COURT:  No, I think that's worthy. I'll put that in.  "Relating to Counts Thirty-two and Thirty-three."

Anything else?

MR. GEARY:  In regard to the verdict forms, are you going to have verdict forms for each defendant, each count?

THE COURT:  Each defendant, each count.  We will get to that in a minute.

MR. GEARY:  Could I ask you about time for closing?

MR. BAUGH:  I don't think we have any objections.

THE COURT:  Any other objections as to the instructions?

MR. GEARY:  No.

THE COURT:  All right.  Do you all have any additional instructions you want to offer?

MR. BAUGH:  Yes, we would submit and group the entire PITERA package.

THE COURT:  Obviously, I've already been through that.  If I was going to put some of that in, I already did.

MR. BAUGH:  We are just preserving the record, that's all.  Some of these we have trouble with.  Now we need some game plan on how we are going to do it today.  How long do you want to go today?

MR. GEARY:  How long do we get to talk?

THE COURT:  I would like to finish the closings today.  And depending on what time we get through, I will instruct.  If it is, you know, if it is late, I'll wait until tomorrow morning.

MR. BAUGH:  What do you call "late," if I could be so pushy?

THE COURT:  If they sit all afternoon -- let me tell you, I have the lunch coming for the jury at 11:45.  So I want to let them have their lunch and then we will get started so we won't have any interruption for lunch.  So I would think we would be getting started at, let's say, 12:45 with the closings.

MR. BAUGH:  That will take us to 4:30 easily.

**JA1388**

MR. WHITE: That will probably take us past five.

THE COURT: All right. Well, I don't see any necessity for putting time restraints on you. I didn't do it in the opening and I don't see any need for it now. The way I look at it, you know, it will probably be about like it was in opening. The government will take a fairly lengthy time in its first opening, and then you all will follow with your 30 to 40-minute responses.

MR. BAUGH: I think it will be a little bit longer than that.

THE COURT: I was about to say "giving Mr. Baugh an hour."

MR. BAUGH: I object to the laughter in the room.

THE COURT: So that will probably get us into the afternoon. If we were lucky and got through around four or something like that, I might take a brief break and then instruct them. If it is after five, I will bring them back, because they will be as tired as I am listening.

MR. BAUGH: Yes. That's true.

MR. VICK: We are taking two complete days off between, let's say, if the jury verdict comes back, just for purposes of figuring out what we are doing, say, 1 o'clock tomorrow afternoon on this portion and let's say we need a second phase, will we then begin the second phase Friday morning?

THE COURT: Yes. I was about to say, with the volume of evidence I'm going to have them set that video equipment up in the jury room. These people are conscientious. I would be very surprised if they would have a verdict by 1 o'clock tomorrow afternoon, especially if I instruct in the morning.

MR. VICK: I understand. Or at any point tomorrow?

THE COURT: Wednesday and Thursday would be off. And then we would get started on Friday.

MR. VICK: So if we go into Wednesday for a jury verdict, we are looking to start with the second case on Monday?

THE COURT: Right.

MR. WHITE: Will you give them the instructions to take back into the jury room?

THE COURT: Absolutely.

MR. GEARY: Excellent.

MR. BAUGH: And the indictment as usual.

MR. WAGNER: I would object to the instructions.

THE COURT: The instructions are going to go. Objection noted.

**JA1389**

MR. HENDERSON: During the trial, Mr. Vick made a motion to amend the indictment. I don't know if the Court ever ruled on that.

2945

THE COURT: Well, I'm going to grant it. In fact, I've taken out Count Thirty-two. I took out the more than 50 grams, and I will read that as a mixture of a substance.

MR. WHITE: It is still in there.

THE COURT: It is in yours. I've taken it out. You can strike it out in yours.

MR. BAUGH: Even though we haven't argued this officially, is Torrick Brown and Martha McCoy going to the jury or not; can you tell us that? Now we are in a new posture.

THE COURT: I know we are. You can make your arguments, but it is going to go to the jury. In fact, I think probably the best policy, once we get through here, we will go back upstairs, bring your people out, let you all make your arguments, and they will be ruled on and then we will stop. The verdict forms, I need to go through this. I have one for each of you. Cory Johnson. And Sandra Reavis. And this one is Tipton.

All right. Just kind of going through, I guess I'll use Tipton in this example. I have Count One, you know, just the standard. Going to Count Two, and it should be on all the forms that anybody has anything to do with Count Two, I am first going to

2946

have the jury answer the question "Do you find that the government has proven beyond a reasonable doubt a Continuing Criminal Enterprise existed as charged in the indictment?" Yes, no. Then "If you have indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant Richard Tipton not guilty as to Count Two. If you indicated that a Continuing Criminal Enterprise did exist you must now determine whether defendant, Richard Tipton, is guilty or not guilty." As we go on, each one of the death penalty counts, there is a parenthetical that will follow it, follow the recitation of the count.

"If you indicated in response to the question set forth in Count Two that a Continuing Criminal Enterprise did not exist, you must find the defendant not guilty as to this count." And that recurs. Look through your forms --

MR. BAUGH: I have a question. Number two, and only because Mr. Vick argued this under Rule 29, is it the position of the Court that if, say for instance, Mr. Tipton was running a Continuing Criminal Enterprise and our clients, the other clients do not have at least five or more people with

**JA1390**

whom they whatever, that these defendants can still

be -- our clients can still be found guilty because they were in some kind of way helping another defendant's CCE?

THE COURT: Yes. If they find the Continuing Criminal Enterprise --

MR. BAUGH: At least five or more.

THE COURT: Let's say Tipton is running a Continuing Criminal Enterprise. On each one of the death penalty counts they can decide that a defendant killed in furtherance of that Continuing Criminal Enterprise. Okay?

MR. BAUGH: The problem I have there is that each -- is that the defendant, Roane, need not commit a murder while he has at least five -- okay, we will use the term "kingpin" which is not a word of art.

THE COURT: He doesn't have to be a kingpin to be guilty of the death penalty statute.

MR. WHITE: As your verdict forms show, unless the jury finds that there was a CCE, none of the death penalty statutes kick in.

THE COURT: That's right. No Continuing Criminal Enterprise.

MR. VICK: It need not even be any four of these people charged in this indictment. They could

find, for example, that "Light" ran a Continuing Criminal Enterprise.

THE COURT: The question is, was there a Continuing Criminal Enterprise.

MR. GEARY: How about Noriega?

MR. BAUGH: Don't you guys start that.

MR. COOLEY: Can we note our objection to that ruling?

THE COURT: Objections are noted.

MR. BAUGH: The other issue, Your Honor, is not pertaining to instructions. Do you want to say something?

MR. COOLEY: No.

MR. BAUGH: The problem is this, Your Honor: Yesterday, there was an extremely prejudicial drawing and article in the newspaper.

THE COURT: I thought it was just wonderful.

MR. BAUGH: There were some statements made in the paper, particularly concerning the death of Katrina Rozier. The government has told us under the table several times, that Katrina Rozier was allegedly killed while performing an unnatural sex act on one of the defendants. We have always taken exception to that, but it never came out in

**JA1391**

evidence.  But it is in the article.  Which means that she died on her knees.  That flies in the face of a number of things, which means that there is information going to the papers outside of the record.

THE COURT:  No, this information about her dying on her knees, maybe I read it in something.

MR. BAUGH:  You read it in the paper.

THE COURT:  No, it didn't strike me as new news.

MR. COOLEY:  That's one of the Greenes in the opening statement was told to get on her knees.

THE COURT:  Oh.

MR. BAUGH:  Information is being given to the press outside of the evidence presented in trial.  For that reason, Your Honor, we have some concerns about sequestration of the jury.  That article coming when it did, with extra information, is bad.

THE COURT:  Let me tell you what I planned along those lines.  I had no plans to sequester them at this point.  I've been thinking very seriously -- in fact I have the Marshals on alert and we have the hotel space -- about putting them up once they start to deliberate after the sentencing phase.  A couple of these people have young children.  If I saw the necessity, and I understand your concern, but that doesn't drive me to just immediately put these people in sequestration.  They have been diligent and I think they are following my directions as best they can.  But I do think I may want to remove them from the pressure at the sentencing phase.

MR. COOLEY:  I have an objection to doing it at the sentencing phase, but would make a request it be done now.

MR. BAUGH:  It was a bad article.

MR. McGARVEY:  If Mr. Baugh's motion was that on behalf of defendant Johnson, we would join in that position and object to the Court's ruling.

THE COURT:  All right.  Well, your objection is noted.  We will close them out today, and I will continue to emphasize.  They will get back in and deliberate.

MR. McGARVEY:  Can I bring up a relatively minor issue?  We talked about the phone records the other day and the Court order that they be redacted.  I haven't seen them.

THE COURT:  Have you all done that?

MR. VICK:  I don't know.  I have not personally done that.  We will make sure it is done.

THE COURT:  Before anything goes back, make sure.

**JA1392**

MR. BAUGH: You have Mr. Fleming's report.

MR. COOLEY: That was done this morning.

THE COURT: As always, check everything.

MR. VICK: I'll to say it out for what it's worth. Would the Court entertain at least asking the jury if we get to the second phase whether they would want to go Saturday to get this moving?

THE COURT: No. I'm satisfied with the way we are moving along.

MR. PARCELL: Are you talking about redacting the identification of those numbers?

MR. McGARVEY: Yes.

MR. VICK: Like "C.O.'s" boyfriend.

MR. WHITE: Motions made on behalf of Mr. Baugh, we adopt the motions.

(Chambers conference ended at 11:15 a.m.)

(In Open Court - 11:25 a.m.)

THE COURT: All right. Defendants, do you care to renew your motions?

MR. GEARY: We renew motion for judgment of acquittal made on January 28th. There are now 26 counts against him and we would urge, for the same reasons we did on the 28th, and because of the heightened burden of proof at this point, for the Court to dismiss those charges.

THE COURT: All right. Mr. Cooley?

MR. COOLEY: Your Honor, on behalf of defendant Cory Johnson, we would renew the arguments and the issues raised in our motion pursuant to Rule 29 made on the 28th of this month. We would reiterate and adopt those arguments as made at that time.

THE COURT: All right. Mr. Baugh?

MR. BAUGH: Your Honor, on behalf of defendant James Roane, we would reurge our motions on the Rule 29. We would also adopt the arguments and motions of co-counsel. Particularly as to Torrick Brown, however, in light of the position put forward by the United States as to James Roane, not to the other defendants, but as to James Roane, we would submit that while the logic of the United States may pertain to people who may have gone along on that homicide for some reason, that the authorities cited by the Court, the Illinois case, that the defendant, James Roane still, we would submit, even with the inferences, that the killing of Torrick Brown shouldn't go to the jury as to defendant James Roane. The rationale put forward for other people being involved would not apply to Mr. Roane, and as such, it should not go. Also, we renew our objections previously made.

THE COURT: All right. Mr. Wagner?

**JA1393**

MR. WAGNER: Thank you, Your Honor. Ms. Reavis would also renew her Rule 29 motion. We renew based on the argument presented at the close of the government's case. In addition to that, on the letter received into evidence from James Roane to Sandra Reavis and the testimony of Mr. Rodney Tucker. Because of the heightened burden at this stage, we would ask the Court to grant that motion.

THE COURT: All right.

MR. VICK: Does the Court care for a response?

THE COURT: No, we don't need a response. The motions will be denied.

MR. WHITE: One last thing, if we could. There was one remaining issue regarding a piece of evidence, telephone records. On behalf of defendant Tipton, Your Honor, we are objecting to the use of any subscribers' names in these telephone records. I believe the Trenton Police Department was one which was brought out on direct. I don't know if the Court wants to allow that in. Any other civilian, individual, or person whose name appears on those records, we would ask that they be redacted.

THE COURT: I thought they were going to be redacted.

MR. VICK: In there are the notation "'O's' girlfriend." We will redact all of that. The other subscriber information is telephone company subscriber information as to particular names of people who had that telephone number. It is innocuous. It won't tell the jury anything.

MR. WHITE: Innocuousness, like beauty, is in the eye of the beholder. There are references to "Whitey's" grandmother.

MR. VICK: Anything like that that is an editorial comment, "'O's' girlfriend," '"Whitey's grandmother," will be out.

THE COURT: Get the redaction done and get it to me and I'll look at it. I'm going to bring the jury in and tell them what we are going to do.

(The jury entered the courtroom.)

All right, ladies and gentlemen, we have completed our instructions conference and the case is now in a posture where both sides are ready to argue. What I have decided to do is this, because I don't want the arguments broken up. I have ordered lunch for you, and they tell me it will be here at quarter to 12, somewhere in that range. I'm going to recess you now, let you all have lunch, and bring everybody back. Let's say 1 o'clock. At that point we will get started, and for the rest of the afternoon we will be hearing arguments. I just

**JA1394**

didn't want to have to break it up with lunch. So we will let you eat first. So let me release you now. And let me say this: If you all want to take a walk or whatever, you don't have to be confined to the room during this period. The lunch will come in, and if you want to take a walk or do whatever, that's fine, as long as you are back in time to start at 1 o'clock. You will notice as we go on, we will become a little bit more restrictive. You won't be allowed to come and go. I will feed you where you are and that kind of thing. But today, I think it will be all right if you want to take a walk or something. 1 o'clock. Your lunch will be there by, hopefully, between a quarter of 12 and 12.

(The jury left the courtroom.)

All right, remove the defendants.

(Defendants removed from courtroom.)

Mr. Vick, after we get started in the argument, at some point in the afternoon I think we need to get the video set up in the jury room. You can either use ours or --

MR. VICK: We have the signal TV here that plays -- if the Court thinks a single TV is enough, that plays the videotape correctly.

THE COURT: That's fine. As I say, we have smaller equipment than that as well. Just so it is set up.

All right, 1 o'clock for arguments.

(Luncheon recess taken from 11:35 a.m. to 1:00 p.m.)

MR. VICK: Your Honor, I believe Government Exhibit 149, the telephone toll records summary, has been redacted to everyone's satisfaction.

THE COURT: All right, fine. Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Vick?

## Vick Closing (2956)

MR. VICK: Thank you, Your Honor. Good afternoon, ladies and gentlemen. As you know from the Judge, this is the government's opportunity to give its closing statement. Closing statement is intended much like opening statement, to give you an outline of what we feel the evidence has shown and to give us an opportunity to argue to you what we believe, what inferences we believe you should draw from the evidence that has been presented to you from the witness stand. Remind yourself as we stated in opening that evidence is just that. It is what has come to you from the witness stand. It is not what I

**JA1395**

say, it is not what any defense counsel says. It is not what any argument that has gone on in the courtroom is. It is what has come from that witness stand.

And the purpose of my closing is to recount for you the evidence that has come before you in the last several weeks from that witness stand, and to summarize it in a fashion that I hope will allow you to go back to the jury room and make it easier for you to render your verdict.

But first I'd like to thank you. I'd like to thank you on behalf of all the lawyers involved. Your attention over the last few weeks has been admirable. We know we have taxed you at times. We know that the process of getting to this point is indeed a frustrating process to you people at some points. It is a very important chore that you are doing. We apologize if indeed at certain times it seems like we have stood in the way of that chore. But believe me, we are all trying to do our job and

2958

make it for you most possible to render the right jury verdict.

I told you at the beginning of this trial that the fact that this was a death penalty case would permeate the entire process. And I'm sure for you, just like for everyone else in this case, that fact has permeated the entire process. It would be humanly impossible for you to sit there and listen to the evidence that we have put on and think about that evidence and not to be considering the fact that we are seeking to put to death certain defendants in this courtroom.

But as I told you in opening, I'll remind you again now. Now is the time that you must put that aside. The fact that we are going to ask you to put to death certain defendants based upon their conduct need be set aside at this point. As you know from the voir dire and as you know from the Court's instructions to you, this is a bifurcated trial process. We are now entering into your decision-making process on the guilt phase alone. That is, are these defendants guilty as charged in the indictment. And until you render verdicts of guilty against these defendants on the particular capital counts involved in the indictment, you need

2959

not even worry about what the possible punishment should be. So put that aside to the extent that you can and concentrate only on the evidence and whether the evidence is sufficient to allow you to find each and every one of these defendants guilty. Is the evidence sufficient to prove to you beyond a reasonable doubt that each one of these defendants is

**JA1396**

guilty as charged in the indictment.

I submit to you, ladies and gentlemen, that based upon the evidence that's been put forth from that witness stand over the last several weeks, that indeed your decision should be a fairly simple one as to the guilt of each one of the defendants. I don't suggest to you that that will make your job easy. I don't suggest to you that that makes your job less than important. I just suggest to you that the government has proven, well beyond any reasonable doubt -- again we don't have to prove it beyond all doubt, but beyond any reasonable doubt -- that these men and that woman are guilty as charged

Once you have found that, then we will go on to the second phase. But for this portion, ladies and gentlemen, remember that you must find only that the defendants have been proven beyond a reasonable doubt to be guilty of the crimes charged in the

2960

indictment.

I suggest to you that the evidence has been clear and unequivocal. That Richard Tipton, also known as "Whitey," is a ruthless murderer; that Cory Johnson, also known as "C.O.," is a ruthless murderer; that James Roane, also known as "J.R.," is a ruthless murderer. That 11 people lie dead in the streets of Richmond, Virginia because those men with others, including "V," wanted to make themselves rich selling drugs, wanted to protect their drug business. 11 bodies bled on the streets of Richmond, Virginia because of those men and their actions. I suggest to you also, ladies and gentlemen, that as to Count One of the indictment, the conspiracy count, that those gentlemen haven't truly argued to you, in either opening or in the questions presented to witnesses during the trial, that they are not guilty of Count One. They have implicitly conceded that indeed they have sold drugs, that indeed they sold drugs together. Count One in this case has been implicitly conceded by defendants James Roane, Cory Johnson --

MR. BAUGH: I must object on that issue.

THE COURT: Objection overruled. This is argument, Mr. Baugh.

2961

MR. BAUGH: Note our exception.

MR. VICK: What you must find to find that they are guilty of conspiracy is very simple. The Court will instruct you as to what the law is. What I say is the law, what any one of these counsel says is the law, is not necessarily what the law is. What the Court instructs you that the law is is what the law is. What the Court tells you is the law is the law that you must follow. I will tell you that the

**JA1397**

Court will instruct you that the law as to conspiracy is fairly simple. That is, ladies and gentlemen, if two people come together and agree to commit a crime together, if two people come together and agree to sell drugs together, they have indeed committed the crime of conspiracy. And I suggest to you that through opening and through the questioning of the witnesses that have been put on in this case, there can be no great issue as to the guilt of James Roane, Richard Tipton, and Cory Johnson as to Count One of the indictment, the conspiracy count. Each of them has admitted tacitly, if not implicitly, that they sold drugs. Each of them have admitted tacitly, if not implicitly, that they were together often. Each of them has admitted tacitly, if not implicitly, that they sold those drugs together in concert one with each other. So I suggest to you that your verdict as to Count One is a fairly simple verdict to render as to those three gentlemen. They indeed conspired. That is, they agreed, very simply, with each other to sell crack cocaine.

Remind yourself in rendering your decision on Count One of the testimony of Greg Scott. He told you from the witness stand about the existence of the New York Boyz, a group of people who grew up at 155th and Amsterdam Avenue -- and others who joined them -- but a group of people who grew up at 155th and Amsterdam Avenue in New York decided in 1989 to go to New Jersey and sell drugs. Included in that group was "Whitey" and "C.O." That because of a string of events that occurred in Trenton, New Jersey, a number of the New York Boyz got arrested. And unfortunately for the people of the City of Richmond, and particularly unfortunately for the 11 people who died as a result of their actions, Richard Tipton chose to bring some of the New York Boyz south. He brought with him Cory Johnson, "C.O.," Lance Thomas, "V," "Hess" came south with him. Paul, the Jamaican from Blackwell, came south with him. And the New York Boyz continued their actions here in the City of Richmond.

The question you need to render as to James Roane is whether indeed he chose to join that conspiracy and the New York Boyz here in the City of Richmond. And indeed, the evidence was clear and unequivocal that he did choose to join that conspiracy. The question as to Sandra Reavis is whether indeed she chose to join that conspiracy. Now, you will be instructed by the Court that to find someone guilty of a conspiracy, to find someone guilty of joining that conspiracy, you must have the mental agreement, that is, the agreement to join

**JA1398**

together in crime.  But that mental agreement must result only in one small transaction.  A single event is enough to make one guilty of the conspiracy.  So you need not find that each one of these defendants joined in each one of the conspiratorial acts in order to find them guilty of Count One, the conspiracy.  You need not find that Sandra Reavis joined in each and every one of the murderous acts of this conspiracy in order to find her guilty of Count One.  You need only to find that she agreed to help these people sell drugs, and that she indeed did help these people in some way.

When you receive a copy of the indictment in the jury room, you will see that the trial has proceeded in about the same fashion as the indictment is drawn.  So I'll outline the specific evidence as to each count through my closing, and hopefully to aid you when you go back in the jury room to deliberate as to your rendering of the verdict on each particular count.

First, however, I would like to digress for a bit.  In opening and throughout the questioning in this case, counsel for the defendants have openly attacked, at times in an inappropriate and personal manner, the government's witnesses.  Remind yourselves, ladies and gentlemen, of Mr. Baugh's calling Dennis Moody a lying little man, an inappropriate and personal attack upon Dennis Moody.  That same sort of personal attack was done again against Johnny Lee Byrd and a number of the other government witnesses in this case.

Some of our witnesses unfortunately let these personal attacks affect them and responded in kind in their responses to defense counsel.  Perhaps they should have been a bit more thick-skinned, but I think any of you who sat here and saw those personal attacks would know that they were calculated to elicit just such a response.  They were calculated to get the people on the witness stand mad, and hopefully get the sort of responses that Johnny Lee Byrd and Dennis Moody gave to defense counsel.  That does not mean that those people weren't telling the truth.  It just means that perhaps they weren't as thick-skinned as they should have been.

It has been implied throughout this trial, and indeed was stated openly in opening, that the witnesses of the sort the government has put on cannot be believed, and that therefore, your jury verdict shouldn't be rendered guilty based upon their testimony.

I suggest to you, ladies and gentlemen, that that is preposterous.  There is no way, absolutely no

**JA1399**

way that you can look inside the inner workings of a criminal conspiracy and fully outline for the fact finders, fully outline for the jury, what is going on inside that criminal conspiracy without receiving the testimony from participants in that criminal conspiracy. It is necessary. Conspiracies, by their very nature, are secretive. They don't invite Detective Ralph Fleming in to see what they are doing. They don't invite Detective C.T. Woody or anyone of the other detectives that you have heard testify here in to see what is going on inside that conspiracy. They keep a dark veil over their actions. And that dark veil can only be peeled back through the testimony of the participants in the conspiracy. So the suggestion in opening and the implicit suggestion throughout the questioning of our witnesses that somehow this case cannot be proven with testimony of participants is wrong.

Now the Court will instruct you that you must look very closely at such testimony. You must scrutinize very closely testimony from witnesses of that sort. And we invite that, too. As I said in opening, and as I say again, I suggest to you that if you indeed scrutinize the testimony of the witnesses who have come forth for the government, you will see that they have told you the truth.

I remind you what I said in opening. Take their testimony and watch how it meshes one with the other. Watch how it meshes with the unimpeachable testimony from the police officers, from the custodians of the records which have been stipulated, from the other evidence that we know to be true. And I will suggest to you again that it shows that those witnesses who were participants in this conspiracy were indeed telling you the truth.

There is no evidence, ladies and gentlemen, with the exception of Hardy, Sterling Hardy and Gaiters, that any of the people brought forth by the government and placed on this witness stand to provide evidence to you knowingly and willingly engaged in a murder. And I ask you to consider that when making your decision as to whether or not to believe the witnesses brought forth by the government.

Now, as I said in opening, you are brought here for a very simple reason; and that is to apply your common sense to the facts that you hear from that witness stand and to determine, based upon your common sense, whether those people are telling you the truth. We as lawyers tend to get caught up in things that aren't commonsensical. We as lawyers tend to look at things through somewhat jaded vision

**JA1400**

sometimes. But apply your common sense to each and every witness that took that stand and say were they telling me the truth? Even though they are criminal participants, many of them, were they telling me the truth? And I suggest to you that when you do that, you will find that they were telling you the truth, that they are not murderers. That the government has indeed cut deals, as you will hear from the defense attorneys, for their testimony; that the government indeed has told these people that the words that they

2968

give to you from that witness stand will not be used to prosecute them, with the exception of Hardy and Gaiters, who were knowingly involved in murders by their own testimony, who are facing sentencing in this Court, by this Judge, for their involvement in those murders. Ladies and gentlemen, again I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you. It is not an exact science. Use-immunity agreements had to be given. We feel like we gave use-immunity agreements to only those people who were not murderers in this case. There has been no evidence that anyone other than Richard Tipton, Cory Johnson, James Roane, Lance Thomas, Sterling Hardy, and Jerry Gaiters were involved in the murders.

Ask yourself again to apply your common sense to the giving of use-immunity to these witnesses. We have told these witnesses that if you come in and if you tell us the truth, each and every one of them predicated their testimony upon telling the truth. That's the condition upon which they received use-immunity. If you come in and if you tell us the complete truth, we won't use those words against you. Think if you were them. Think if you were sitting in their shoes what you would do. Would you

2969

hold something back from the government knowing that the government is speaking to a number of other people who are also getting use-immunity, or would you be fearful that the other people were telling them about your involvement, that portion of the involvement that you were holding back and not telling the government about. You wouldn't do that. It makes no sense. If you are going to be given use-immunity for what you are going to testify about, it is in their best interest to tell the government each and every thing that they have done criminally. Because then they won't be prosecuted for it. To withhold that information could subject them to prosecution. And again, remember, they don't know what the others are telling us about their involvement. It is in their best interest. And I'm not suggesting to you that many of these people came

**JA1401**

forward through some sense of magnanimous citizenship. They came forward because they cut a deal. But that deal made it in their best interest to tell the complete truth. Apply your common sense to that.

It has been openly argued that the government has bought witnesses' testimony and that each witness in turn has been told how to testify. There has been

2970

absolutely no evidence about that presented in the courtroom. Each witness has unequivocally stated that their testimony has been the result of their own participation, as a result of their own knowledge. Each witness, without exception, said that the government did not provide them with the answers to their testimony. That's proven by the nature of the testimony itself.

Again, apply your common sense to what you have heard from that witness stand. For example, look at the testimony of Sterling Hardy and Jerry Gaiters concerning the murder of Louis Johnson on January 29th, 1992. Sterling Hardy said that when the car in which James Roane was driving pulled up and "V" and "C.O." got out of the car, that all three men walked around, surrounding Louis Johnson, and all three men fired, killing him. Jerry Gaiters, on the other hand, testified that the car pulled up just as Sterling said, that all three men got out of the car, just as Sterling said, but unlike Sterling, that James Roane walked over, put a gun to Louis Johnson's head, pulled the trigger, and it misfired. He said "V" then fired a single shot into Louis Johnson, and that Cory Johnson fired the rest of the shots into Louis Johnson. Does that mean that one of those

2971

gentlemen is lying? No, it doesn't mean that one of those gentlemen is lying. Indeed, it is indicative of the truth. If we had indeed orchestrated the testimony as has been argued by counsel, don't you think we would have orchestrated such inconsistencies out? You have seen those inconsistencies from other witnesses. "Man Man," Charles Townes, testified as to the amount of cocaine coming into town on a weekly basis, which was not consistent with the testimony given by Denise Berkley as to the amount of cocaine coming into town each week. Does that mean that they are lying? No. Ask yourselves, ladies and gentlemen, if anyone of you went out of here and described what had gone on in here the last three weeks, do you really think you would describe it in exactly the same way as the person sitting next to you? I don't think so. That's human nature. Each of us sees things a little differently. It doesn't mean that Sterling Hardy was lying, but it does

**JA1402**

indeed prove to you that we have not orchestrated the testimony. We would have orchestrated such inconsistencies out of the testimony. We have brought you our witnesses, warts and all, ladies and gentlemen. It is a necessary thing to peel back the cover of this conspiracy.

One last thought on that. Sterling was completely justified, if indeed he is wrong, as to how it happened and Gaiters is right. He is completely justified in thinking that when three men get out of a car and surround a fourth man, who they clearly want to kill, and gunfire emanates from that very location, that all three of them fired if all three of them had guns. Is that a man who is trying to lie or is that a man who is trying to recount for you what he believes happened that day?

Ladies and gentlemen, your common sense, when applied to the testimony, indeed tells you that our witnesses were telling the truth. Another interesting note about that particular piece of testimony. Mr. Baugh in his argument and in cross-examination made a great point of the fact, indeed I would say conceded, that James Roane had indeed been there and tried to fire and kill Louis Johnson, but his gun had misfired. That makes not a whit's bit of difference. If indeed that is what happened, James Roane is guilty of that murder. Do you think because his gun misfired when he intended to fire into the head of Louis Johnson that that absolves him of that murder? No, all three of those men were there with the pure and simple intent to kill Louis Johnson. If Roane's gun misfired, it does not mean that he is not guilty of that. Listen to the Court's instructions. See what the law is, and you will see that that was an attempt to mislead you as to what the law is in an effort to confuse you as to the guilt or innocence of James Roane on that particular instance.

MR. BAUGH: I must object to this. That is a personal attack and that is not what happened.

THE COURT: Overruled.

MR. VICK: It was argued, as I stated earlier, that we have bought testimony. Let me back up a second. I would suggest to you, too, ladies and gentlemen, that despite the minor inconsistencies of testimony in this case from the government's witnesses, there has been no inconsistency whatsoever concerning the crucial aspect of what this case is all about. There has been no inconsistency whatsoever concerning the involvement of these individuals, one with another, in the sale and distribution of cocaine. There has been no

**JA1403**

inconsistency whatsoever concerning the fact that these men operated a murderous, treacherous conspiracy, laying bodies in the streets of Richmond, Virginia. Don't lose sight of that. Don't lose sight of the forest for the trees, so to speak. Don't lose sight of the fact that it has been remarkably consistent testimony from each and every one of the witnesses concerning the overall scheme of this conspiracy.

Now, moving on, as to the argument that we bought the testimony in this case, there has only been evidence elicited from that witness stand of money given to witnesses in this case in one regard and one regard only: Money has indeed been given to certain witnesses who testified here as a necessary expense for their relocation in the Witness Protection Program.

Think about what it costs to relocate somebody. Think about what it means to take somebody from a city, put them in another city, find them an apartment and get them back on their feet, having ripped them from their place of residence. Indeed, that costs money. That's not big testimony, ladies and gentlemen. We would be an irresponsible government if we asked witnesses of the sort who came forward and testified in this case to testify against people like these and not offer them protection. Does that make them bounty hunters? No, it doesn't.

We would be an irresponsible government, ladies and gentlemen, to expect that Martha McCoy and Montez McCoy would come forward and testify as they testified and then be patted on the behind and sent outdoors and told take care of yourself. You heard the testimony of Valerie Butler, that they wanted to go back and kill all the survivors to that shooting. We would be an irresponsible government to allow those people to stay in their place where these people could get their hands on those witnesses. Does that make Montez McCoy a bounty hunter, because we have paid for his relocation? Does that make Stanley Smithers a bounty hunter, because we have paid for his relocation? No. That simply means that we have acted responsibly as a government in order to bring forth the sort of testimony that's necessary to peel back the cover of this conspiracy.

You ultimately must decide whether such witnesses told you the truth. Again, listen to their testimony, apply your common sense, listen to how it meshes one with the other, and listen to how it meshes with the testimony from unimpeachable sources. And I suggest to you that when you do that you will render a very clear choice that indeed the witnesses

**JA1404**

brought to you by the government were telling the truth.

2976

Now, let me talk as to the specific testimony as to each count. Count One, as I've already spoken about shortly, deals with the conspiracy to distribute more than 50 grams of crack cocaine. That is, the knowing coming together, the knowing agreement of these people and other people to get together in concert, one with the other, to aid each other in the sale and distribution of more than 50 grams of crack cocaine. I would suggest to you that there is not an issue in this case as to what the substance was. Each and every witness said it was crack cocaine, cook-'em-up, that was sold. Counsel, I would suggest again, has not argued the fact that Richard Tipton, "Whitey," Cory Johnson, "C.O.," James Roane, "J.R.," sold crack cocaine. They have not argued otherwise.

As to the 50-gram amount, ladies and gentlemen, you have heard testimony of kilograms of cocaine. I remind you of Maurice Saunders' testimony. You have heard testimony of ounce after ounce of cocaine being cooked up and sold on a weekly basis here in the City of Richmond. There is absolutely no issue concerning whether there was more than 50 grams of crack cocaine sold by these people.

Again I suggest that each one of the defendants,

2977

with the exception of Sandra Reavis, has implicitly conceded to you their guilt on Count One of the indictment. So let's concentrate for Count One of the indictment on Sandra Reavis.

You need to determine whether Sandra Reavis indeed joined the remnants of the New York Boyz when they came south and set up shop here in Richmond, Virginia, set up shop with James Roane. You need to determine whether indeed Sandra Reavis decided that she would join them in the sale of cocaine. I'll remind you of the testimony about the New York Boyz, 155th and Amsterdam Avenue, went to Trenton, and came then south through "Whitey" and set up shop in Richmond. And I'll show you how the testimony meshes in that regard, and is an example of how you should go back and weigh the testimony that you received from the witness stand and see how it meshes. Remember what Greg Scott told you about that, 155th and Amsterdam Avenue, the New York Boyz, "Whitey" and "O" got cocaine, and this is very important, "Whitey" and "O" got cocaine. Their primary source of cocaine was from a fellow named "Light." Remember that testimony? Maurice Saunders later testified he doesn't know Greg Scott from Adam. Has never met Greg Scott. But Maurice Saunders testified to you

**JA1405**

2978

that indeed he went to 155th and Amsterdam Avenue in New York with Hess and "Whitey" to get cocaine. And who did they get cocaine from? "Light."

Again, that clearly rings true, that testimony. It shows you that those people are telling you the truth, and the only way they wouldn't be telling you the truth is if you indeed believed that we got together and orchestrated their testimony in some way, told them how to testify. If you don't believe that, then indeed that proves their testimony to be true. How could two people testify about the same thing when they have not had an opportunity to talk to each other, don't know each other? The only way they could is if that is indeed a fact.

As to Sandra Reavis, there have been a number of witnesses who have come forward and testified to her joining that conspiracy, her joining the New York Boyz. You have heard testimony from Denise Berkley, Robert "Papoose" Davis, Valerie Butler, Jerry Gaiters, Priscilla Greene, and others that indeed said that she sold cocaine for James Roane, "Whitey," and "O." Indeed, Valerie Butler accounted to you on February 11th, 1992 that she took a packet of cocaine from "O" to Sandra Reavis and delivered it to her at Willow Lawn. Let me stop for a second and tell you,

2979

Sandra Reavis is only charged in the first count. That's all you need to determine about her, whether she indeed did join the conspiracy. She is not charged with any of the murders, only with the conspiracy count. So as to her guilt or innocence, you need only concentrate on deciding Count One of the indictment.

Later witnesses have told you that she indeed delivered a handgun to Richard Tipton. You got that testimony from the reluctant Greg Noble, who had to be led through his testimony because he didn't want to testify against his cousin, "Whitey," and you got it from Leroy Slater and Valerie Butler, that Sandra Reavis, indeed when "Whitey" came back from New York and set up shop in Blackwell, delivered him a .38. Remember, Leroy Slater said it was wrapped in plastic. Remember what Detective Rodriguez testified to you; that on April 9th, 1992 he went to that residence that "Whitey" had set up shop at and seized a .38 revolver which was wrapped in plastic. Again, it tells you Lee Roy Slater is telling you the truth, unless you think we got together and orchestrated his testimony and told him "Leroy, tell us it was wrapped in plastic." Unless you believe that, then J. Rodney Rodriguez confirms that Leroy Slater was telling you

2980

the truth about that. And ask yourselves to apply

**JA1406**

your common sense to that testimony. Why would "Whitey" allow Sandra Reavis to bring him a .38 for use, a .38 that had a dead body on it, a .38 that had been used to kill Katrina "Nat" Rozier, unless she was one of the initiated.

Criminals do not knowingly associate with the uninitiated. Criminals, conspirators, do not allow the uninitiated to look inside their criminal empire. They would not have allowed Sandra Reavis to have the knowledge that she had unless she were a member of the conspiracy.

Remind yourself of the testimony, when rendering the verdict against Sandra Reavis, of Denise Berkley; that at the time just prior to the murder of "Mousey" Armstrong, that "O" summoned her to 1212 West Moore Street to tell her that she had problems because of the drug debt, and that she better kill "Mousey." Remind yourself of the testimony of Denise Berkley that "O" said to her, "If you don't kill 'Mousey,' Sandra is going to kill 'Mousey.'" Sandra Reavis. Excuse me, "Sandra is going to kill you." Remind yourself of that testimony, ladies and gentlemen.

And all of that testimony, the repetitive testimony about her involvement in the sale and distribution of cocaine, is proven true by a single thing. When you go back, look at the government exhibit, the Western Union wire transfers, march 5th, 1992. Money was transferred from the City of Richmond to New York City in the amount of several thousands of dollars, about $1,400 or so, to get "O" out on bond. And look at the name on those wire transfers. Look at the name, and those records are -- have been stipulated to as true and accurate. Who sent that money? Sandra Reavis sent that money. Apply your common sense to that. And it tells you that indeed she is guilty as charged in Count One.

"O" is in jail not under his real name, Cory Johnson, but in jail under his name Kevin Hill, having been caught with the Glock in his waistband that was used to kill Linwood Chiles and Curt Thorne. He was anxious to get out of jail before the ballistics tests came back on that gun. And who does he get in touch with but Valerie Butler and Sandra Reavis? Would a man in that situation get in touch with the uninitiated in an effort to get himself out before the ballistics tests came back? No. Would he contact someone other than a member of the conspiracy to help him get out of that situation? No. That single piece of evidence, ladies and gentlemen, proves to you that what all the witnesses said about Sandra Reavis was true. She is guilty of Count One of that indictment. She is guilty of providing

**JA1407**

"Whitey" the gun that was used to kill Katrina Rozier. She is guilty of holding that gun, that gun that the conspiracy used -- we are not sure which one -- but that the conspiracy used to kill Katrina Rozier came from Sandra Reavis.

Apply your common sense and you will have no problem, I suggest to you, rendering a verdict of guilty against Sandra Reavis on Count One of the indictment.

Count Two of the indictment charges "Whitey," "C.O.," and "J.R." with operating a Continuing Criminal Enterprise. Now, the Court is going to apprise you of what the law is, but a Continuing Criminal Enterprise is also a fairly simple concept. A Continuing Criminal Enterprise means that you have an ongoing series of felony violations of the drug laws of the United States. And that's simple. Each and every sale of crack cocaine perpetrated by these people was a felony. Each and every one of them. So clearly, you would have no problem determining that there was an ongoing series of felony narcotics violations. You need the instructions to show --

we will show you, you need to find that there have been at least three. You had three sales of crack cocaine given in the testimony probably in a ten-minute period on any particular day during the life of this conspiracy. I would suggest to you there is no issue as to the series, the continuing series of violations of the felony drug laws of the United States. Remind yourself that each and every distribution of crack cocaine is a felony violation.

The next thing we must have proven to you in order to find them guilty of a CCE is that it was undertaken with five or more people acting in conjunction. And in deciding this, remind yourself of the testimony of Greg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. You had Denise Berkley, Priscilla Greene, Curt Thorne, Linwood Chiles, Jerry Gaiters, Sterling Hardy, "Papoose" Davis, Hussone Jones, Charles Townes, "Man Man," Maurice Saunders, Antwoine Brooks. You had the people from Charles City that were testified about. You had Pam

Williams, Charlotte Moore, Greg Noble, Sam Taylor, and a number of others you have heard testimony about. Well in excess of five people just here in the City of Richmond who these people recruited to sell crack cocaine with them.

**JA1408**

So that aspect of the CCE is also very clearly proven in this case. That is not an issue.

What is an issue -- let me back up as to the five or more people. You need not find that each and every one of these people charged with the CCE, and charged with the CCE are "Whitey," "C.O.," and James Roane, you need not find that each and every one of these people supervised five or more people themselves. You need find only that as a group, there were five or more people involved. And I suggest to you it is clear from the evidence that there were five or more people involved in the distribution of cocaine, just here in the City of Richmond.

But what will be an issue and what you do need to determine in order to determine that indeed a CCE was operated by these people, Continuing Criminal Enterprise was operated by these people, is whether "Whitey," "C.O." and "J.R." occupied a position of organizer or supervisor. And I suggest to you in that regard, the testimony is also clear and unequivocal. They came down with their source of supply from New York, their source of cocaine, and they orchestrated, organized the people we have already mentioned to you in a distribution outlet, a distribution network. Each and every witness who took that stand testified remarkably consistently concerning their relationship one with another; that "J.R.," "O," "Whitey," "V" were partners or bosses; that they were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law. It is not required by the law, as will be argued, I suggest, that they needed to provide explicit directions in and orders to each and every one of the people that sold cocaine for them. Although there has been testimony that indeed they supplied directions and orders to these people, that is not necessary in order for you to find them guilty of operating a Continuing Criminal Enterprise. The language is clear there. All you need to find is that they organized people. And indeed the evidence is clear and unequivocal that they organized a number of people here in the City of Richmond to sell drugs.

The final thing that you must determine in order to find them guilty of Count Two, that is, operating the Continuing Criminal Enterprise, is that indeed they received substantial income. I told you in opening that substantial income is a fairly nebulous

term.  It is a subjective standard which you must render in determining the verdict here.  The law and the instructions will show you that it must be ample income; that these people supported themselves doing that.  I suggest to you there is no contest whatsoever that that's exactly how these people supported themselves; that indeed they generated enough money selling crack cocaine to live on.  That's all that's necessary to prove substantial income.  We don't need to prove, as was implicitly suggested to you through the questioning by defense counsel, that they were rich, that they had Rolls Royces, that they had mansions.  We do not need to prove that under the law.

Now, I don't know how these men came about choosing what they wanted to spend their money on.  But it is clear that they had enough money if they wanted to buy a car, had enough money if they wanted to take fancy trips or have gold jewelry.  But they didn't choose to do that.  Denise Berkley told you that their money went back to the New York Boyz.  But it is clear that thousands of dollars a day changed hands because of their crack distribution.  Remind yourself of the testimony about "Mousey" Armstrong selling to as many as 50 people a day.  If she sold only one $20 rock to each one of those people, she has generated a thousand dollars of income a day for that conspiracy.  It is not net income, it is just the amount of money that's generated.

Remind yourself of the testimony of Maurice Saunders; that on one occasion he took $18,000 to New York to purchase cocaine, and on the another occasion he took $40,000 to New York to purchase cocaine.  The money came from "Whitey."  $40,000 is a lot of money, ladies and gentlemen.  And from unimpeachable sources we know that they generated substantial money.

Remember the $3,000 that was seized in New Jersey by Officer Jeanne Keim.  Remember on March 20th, 1992 when she stopped "Whitey" and "Man-Man" and Hussone together, they had $3,000 cash that they were going to New York and buy cocaine with.  Look at the firearms purchases, the thousands of dollars spent on firearms, cash.  Look at the rental car agreements.  There was substantial money spent on the rental car agreements.  Look at the wire transfers to New York to get "O" out on bond, thousands of dollars.  That in and of itself is ample income from a continuing series of drug violations.  We don't need to prove that these men made themselves rich.  We need to only prove that they made ample income, and indeed the evidence is clear and unequivocal that they made ample income.

**JA1410**

The next group of charges deals with Count Two, the Continuing Criminal Enterprise. The next group of charges are predicated upon the Continuing Criminal Enterprise. And that is the murder charges. They are predicated upon two things, the murder charges. There are a number of charges outlined in here that are charged under 21 U.S.C. Section 848. That is, murder in furtherance of a Continuing Criminal Enterprise. Each and every one of those murders, with the exception of Torrick Brown -- we will speak about that later -- all of the murders with the exception of Torrick Brown are charged under 21 U.S.C. 848, murders in furtherance of Continuing Criminal Enterprise. And each of the murders is charged also under Title 18 United States Code Section 1959, violent crimes in aid of racketeering. So for the Title 21 murder charges, you need to find that there was in existence a CCE, a Continuing Criminal Enterprise, as a predicate for finding these defendants guilty on those murder counts. Let me talk about that for a second.

That does not mean that you must find that "Whitey" was guilty of operating a Continuing Criminal Enterprise. It does not mean that you must find that "C.O.," or that James Roane, was guilty. I tell you that indeed the evidence is clear and unequivocal that they were indeed guilty of that, of operating a Continuing Criminal Enterprise. But you don't need to find that each one of them is guilty of operating a Continuing Criminal Enterprise in order for the murder charges to flow therefrom. You need only find that the murder charges were done in furtherance of or during a Continuing Criminal Enterprise. You might indeed find that indeed "Light," the head of the New York Boyz, ran the Continuing Criminal Enterprise. If that is your finding, then indeed you could acquit -- and don't get me wrong, I think each one of these defendants is guilty of Count Two with the exception of Sandra Reavis; she is not charged -- but you could still find them guilty of the murder charges that flow from the murder in furtherance of the Continuing Criminal Enterprise.

The murders are also charged as violent crimes in aid of racketeering. In order to prove that, we must show there was a racketeering enterprise. A lot of this is duplicative, ladies and gentlemen. If you find a conspiracy to sell and distribute drugs, then in essence the law will tell you you have found a racketeering enterprise. Because racketeering is defined as drug distribution. So if you find there is a conspiracy, then you have got a racketeering

JA1411

enterprise, if another technical requirement is met, if you show it affected interstate commerce. That's easily dismissed. You know about the trips to New York to get cocaine. That affects interstate commerce. They go back and forth in interstate commerce. And indeed, you have the gun purchases, which are guns flowing in interstate commerce. So you have the necessary prerequisites for the 1959 charges. You don't need to find them guilty of violent crimes in aid of racketeering to find that a CCE was operated.

Don't get me wrong. Very clearly, the evidence has shown that each one of these gentlemen are guilty of operating a Continuing Criminal Enterprise, but

2991

you don't need that to find them guilty of 1959.

Let's move now to the specific counts in the indictment that flow -- the specific murder counts that are a result of the CCE and the racketeering enterprise. Count Three charges the incredibly brutal murder on January 5th, 1992 of Doug Talley. Remind yourself that you heard the testimony from Charles Townes, "Man Man," and Hussone Jones, and Johnny Lee Byrd about that murder. That man, Doug Talley, was brutally murdered by that man, with the aid of James Roane -- by "Whitey" with the aid of James Roane -- because they thought he was "5-0." They thought he was a snitch. They thought he was cooperating with the police. They did it to protect the Continuing Criminal Enterprise. It was a murder during a Continuing Criminal Enterprise.

So they are guilty, if you believe they committed that murder, of an 848(e) murder. Richard Tipton is guilty of an 848(e) murder if you believe he indeed committed the murder of Doug Talley. And I suggest to you, ladies and gentlemen, that the testimony of Charles Townes, Hussone Jones, and Johnny Lee Byrd about his involvement in that murder, about the stabbing of Doug Talley more than 80 times, many of them to the head, about the stabbing that

2992

Hussone Jones told you about that resulted in the knife getting stuck in his head by Richard Tipton, I suggest to you that that testimony, too, was all proven true by a single item, a single damning piece of evidence: Richard Tipton's bloody fingerprint on the door of that car. Cross-examination by defense counsel tried to mislead you there, also, asking could that fingerprint have been there, sir -- in questioning the FBI fingerprint expert -- how long could that fingerprint of blood have been there? That fingerprint in blood came from the blood of Doug Talley. Your common sense tells you only that. That single piece of evidence tells you that what Hussone

**JA1412**

Jones witnessed did indeed occur.  Richard Tipton's bloody fingerprint was found on that car door.

There was another piece of interesting cross-examination that flowed from that particular murder testimony.  You might remind yourself and remember the testimony of the doctor who testified in the defense case about the fact that James Roane had no gashes, no puncture wounds in his hand.  Who said he did?  Hussone Jones never testified that he had a puncture wound.  Nobody ever testified he had a puncture wound.  Again, it was an attempt to mislead you from the truth.  Because the brutal truth, these defendants can't stand up to.  The brutal truth is that "Whitey" stabbed that man in the head over 80 times because they thought he was police, to protect the conspiracy.  Hussone Jones told you that James Roane put his arm around Doug Talley's neck and then removed it once Tipton started stabbing him and came back to his car.  Remember his testimony?  Check your notes.  "Man, he almost got me, 'cuz almost got me." He didn't say he had been punctured.  They tried to mislead you in another regard about that particular murder, crossing Dr. Fierro about what kind of cut in the body would be left by a serrated knife.  Nobody from the government's witnesses ever testified anything about a serrated knife.  Hussone Jones didn't say the knife was serrated.  "Pepsi" Greene, who identified the knife later, did not say it was serrated.  In fact, she drew a picture showing you it wasn't.  Yet there was cross-examination of Dr. Fierro about a serrated knife.  "Wouldn't that leave a different kind of imprint?"  Again, an attempt to mislead and misdirect you, because the facts are damning.

Count Four is the 1959 murder of Doug Talley. That is, a murder in aid of racketeering.  I won't belabor that as to each count.  Each one of these murders, again with the exception of Torrick Brown, has charged a murder in violation of the Continuing Criminal Enterprise, an 848 murder, and a 1959 murder.  They are guilty if you believe that they murdered them, based upon the recitation of the law, as to each one of those counts, if you believe that the people who are charged in there did indeed commit those murders.

Also charged, beginning with the Doug Moody murder which we will talk about next, is use of a firearm during a drug trafficking crime or a crime of violence.  It couldn't be any more simply stated than that.  If you find them guilty of murdering the people as the evidence and as the government has argued, through the use of a firearm, they are guilty

**JA1413**

of that.  So each one of these counts that follow hereafter also have firearms charges with them.  I won't belabor that issue.

Counts Five through Seven deal with the murder of Doug Moody.  He was shot and stabbed.  Count Six, by the way, deals with the use of a firearm.  Moody was killed over drug turf.  Remind yourself of the testimony on January 13th, 1992.  He was killed in the house there on Clay Street, shot in the back room, went out the window, and was stabbed repeatedly by James Roane over drug turf.  "Pepsi" Greene told you that.  And the other witnesses' testimony meshes in that regard.  Remember, Doug Moody worked for Peyton Maurice Johnson.  They didn't want anyone else operating in their territory, consistent with the testimony of Greg Scott.  They would kill anybody who came in their way in order to take over turf.  He didn't say "kill," he said "harm."  Remind yourself of what they did to Anthony Howlen in New Jersey, with all the cuts in his face because he tried to sell cocaine on the same corner that "Whitey" and "O" were selling cocaine.  That is the motive for the killing of "Little Doug" Moody.  That makes it an 848 murder.  That makes it a murder in furtherance of the Continuing Criminal Enterprise.

Remember the testimony of "Pepsi" Greene, that she indeed disposed of the knife that had been used to stab Doug Moody, and that she had been given that knife by James Roane.  Remind yourself of the testimony of Robert "Papoose" Davis, that he heard James Roane and "Whitey" when they came to his house after the killing of Doug Moody brag about how they really fucked up Doug.  Remember that?  They came back and bragged about how they really messed up "Little Doug."

Ask yourself why "Pepsi" Greene, Denise Berkley, and Robert Davis would come forward and testify that way if it is not the truth.  What do they have to gain by testifying that way?  What does "Pepsi" Greene have to gain by testifying that way if it is not the truth?  She only wants justice done, ladies and gentlemen.  She is paralyzed for the rest of her life.  She only wants justice done.  Denise Berkley and "Papoose" Davis have received use-immunity if they tell the truth.  What do they gain by lying about this?  They gain absolutely nothing.  They have no motive to lie.  They have every motive to be telling the truth.

The testimony put on by the defense concerning that particular murder underscores the fact that their complaints about our witnesses ring hollow.  If you will remember, they put on Ms. Gina Taylor to

**JA1414**

testify that she indeed had looked at out her back window and saw the person, saw some person kneeling over the body of "Little Doug" Moody. She didn't say that she had seen the person stabbing, so we don't even know if she was looking at the person who stabbed him or someone who came up afterwards. But think about her testimony anyway. She didn't tell you in direct examination that she had a relationship with "Whitey." She didn't tell you in her direct examination that she was "Whitey's" girlfriend. Mr. Baugh didn't tell you about that. He wanted you to believe that there was an unimpeachable witness here who had seen it and was going to tell you that James Roane was not the murderer. An unimpeachable witness who just happens to be "Whitey's" girlfriend. And she told you that she couldn't even tell the police whether it is a guy or a girl who was over that body. Yet she is sure it wasn't James Roane based upon some course she took at the College Training Center. It makes no sense. Her testimony makes no sense.

She said in a very telling statement that her boyfriend, "Whitey," that she didn't even know that her boyfriend, "Whitey," or James Roane had been charged with these murders. She didn't come forward and tell anybody about the fact that it couldn't have been James Roane before taking the stand. She didn't know they had been charged? An absolutely incredible statement, ladies and gentlemen. She knew they had been charged. She told you she didn't know until she came in here that day. She lied to you. Reject her testimony.

Counts Eight, Nine, and Ten deal with the murder of Peyton Maurice Johnson on January 14th, 1992. Remind yourself about the testimony of Pam Williams that on January 14th, 1992 she went to Southern Police Equipment here in the City of Richmond and bought them three guns. You have seen them. The Tec-9, the Intratec, and the 9mm Glock. You have seen those any number of times. I don't need to pull them out and show them to you now. As soon as that conspiracy got their hands on those weapons, they set about their murderous chore with dispatch. As soon as they got those guns they went after Peyton Maurice Johnson.

Remind yourself of Denise Berkley. They bought the guns, she gave them a tote bag, they took the guns. Who was there for the purchase of the guns? "O," "J.R.," and "V." When they got back to 1212 West Moore, what did they do with the guns? "Whitey" and "E.B.," the other core group participants, came together and all played with the guns. They were

**JA1415**

quite happy. They now had their murder instruments. They gave them to "Papoose." That very night they came back and got those guns from "Papoose" and went and killed Peyton Maurice Johnson. Why? Because he was selling drugs in Newtowne and they wanted that turf themselves. That testimony is clear from Ronita Hollman, that "Whitey" and "J.R." had come in an effort to recruit her and she had rejected them on two occasions. "Whitey" said, "We will lay bodies in the street if we have to. You don't think we are serious? We will lay bodies in the street."

The first body that they laid in the street because of that rejection was Peyton Maurice Johnson. They burst into Stanley Smithers' house and shot Peyton Maurice Johnson a number of times. Stanley Smithers corroborates the testimony of Ronita Hollman. He is not a participant in this conspiracy. Use-immunity is of no use to him. He did nothing wrong. Stanley Smithers, as you know, is also in the Witness Protection Program. Is he a bounty hunter because he has had to be relocated to protect his own life? What reason does he have to come in and testify as he testified about who killed Peyton Maurice Johnson? He has only the motivation of the truth. He has placed his life on the line. Do you think he placed his life on the line so we could orchestrate testimony? Or do you think he is telling you the truth?

Remind yourself of the testimony of "Papoose" Davis that after the murder of Peyton Maurice Johnson they came to his house with those weapons and "O" asked him to wipe the fingerprints off, and that he put those guns away for them. Remind yourself of the testimony of Denise Berkley, that about a half-hour after that murder, shortly after the murder she saw them run out, saw "J.R.," "V," and "O" and "E.B." running together with the guns in their hands. Does that tell you that "J.R." just wandered in the house aimlessly, as has been suggested by defense counsel Baugh, and then wandered out and the murder happened to follow from that? Or does that tell you that he walked in to make sure that Peyton Maurice Johnson was there so he could kill him? That's exactly it. Your common sense tells you that. "J.R." went into Stanley Smithers' house just to make sure that indeed Peyton Maurice Johnson was there. Gaiter's testimony tells you that, also. An hour-and-a-half later, he saw James, and James Roane was asking him if he had seen Stanley Smithers. They knew they had left a witness alive. They were looking for Stanley Smithers to go back and kill Stanley Smithers. And we are criticized for having paid money to put that

**JA1416**

man in the Witness Protection Program, the only responsible thing we could have done. The ballistics confirm that indeed that conspiracy, those criminals, committed that murder. Remember, you have a positive ballistics match on this murder and each murder after this that was testified to by Anne Jones. You have two guns, the Glock and the AA Arms, that have been positively matched as being used to kill Peyton Maurice Johnson. Remind yourself again, where were those guns seized? They were seized from 1212 West Moore on February 2nd, 1992 in that same blue tote bag that Denise Berkley had given them. Denise Berkley testified that only "J.R.," "V," "C.O.," "Whitey," "E.B.," had access to that tote bag. Only they could use those guns. And those guns were used in each of the murders after that point after their purchase on January 14th, 1992 until they were seized on February 2nd, 1992.

So that unimpeachable testimony proves that indeed the testimony of the people who came before that were telling you the truth. That conspiracy killed that man, killed Peyton Maurice Johnson.

Counts Eleven, Twelve, and Thirteen deal with the murder and the use of the firearm concerning Louis Johnson. Again, we have drug turf. Now, you haven't had anyone state explicitly to you in this regard that they were killing him over drug turf. You have had several people testify that "O" didn't like him, that "J.R." didn't like him because they had seen Louis Johnson up in the Newtowne area with a shotgun, and Jerry Gaiters testified that Louis Johnson indeed had been protection for other drug dealers in the neighborhood. The Court will instruct you that circumstantial evidence is just as strong as direct evidence. And although you have not heard direct evidence that that's why they killed Louis Johnson, I submit to you that circumstantially, and use your common sense again, proves to you that that's exactly -- that they killed him because of drug turf. They were making good their claim that "We will lay bodies in the street to take over this area."

Remember you heard from a number of witnesses that they were going to take over up there. Well, he is somebody that had to be killed in order to take over up there, circumstantial proof of the fact that indeed he was killed because of the operation of the Continuing Criminal Enterprise.

Three people intended to kill Louis Johnson that night, on January 29th, 1992: "J.R.," "V," and "C.O." I spoke a little while ago about how defense counsel would have you believe that if indeed the gun

**JA1417**

of "J.R." did not go off, he is not guilty of that murder. That's preposterous. That's not the law.

If indeed "J.R." was there intending or aiding or counseling or helping in any way the murder of Louis Johnson, then he, too, is guilty of that murder. And the evidence is clear that he got out, intended to kill him. Some would say he did indeed fire the first shot; others would say his gun misfired. It doesn't matter. It is legally insignificant. He is guilty. "C.O." finished that man off with a number of shots to his body. It was ballistically proven that the guns seized at 1212 West Moore were used to kill Louis Johnson. Again, confirmation from unimpeachable sources about the testimony that you have received from that witness stand.

I would suggest to you that in regards to the testimony about the killing of Louis Johnson there has been no real contest by defense counsel concerning the facts; that the only contest they made is whether "J.R.'s" gun misfired or not. There has been no contest about the fact that "C.O." and "J.R." were present there intending to murder that man. And whether his gun misfired or not, he is guilty of those murders.

Counts Fourteen, Fifteen, and Sixteen deal with the murder of Torrick Brown and the wounding of Martha McCoy. There is no 848 murder charged here, no murder in furtherance of the Continuing Criminal Enterprise charged here, because we know it was a murder over a woman. We know that Robin Cooper was the cause of that murder of Torrick Brown. Why it is charged as a violent crime in aid of racketeering is because we also know that despite the fact that that murder occurred, as admitted to by Mr. Baugh on behalf of James Roane, despite the fact that that murder occurred and was done by James Roane over a woman, other members of the conspiracy joined him to help that murder. Remember, "C.O." and "V" had no domestic dispute with Torrick Brown. They had no problem with Torrick Brown over Robin Cooper. They could have cared less I would guess, since they didn't know Robin Cooper or have any relationship with her. Yet they joined James Roane in that murder. Why? It is clear why. Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? They got together for protection and for going back to New York and re-upping cocaine. And when they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the New York Boyz. 1959 says that you must find that the murder was

**JA1418**

either paid for or done to maintain one's position within an organization. And I suggest to you that's the critical language in that statute as to each one of these murders. Those murders were done to maintain the individual defendants' stature within the conspiracy. They were done so that "C.O." and "V" could help James Roane kill Torrick Brown and prove what a macho drug dealer, what a macho, murdering drug dealer they were. Remember, they would have been ostracized had they not.

Another little telling piece of evidence here: Greg Scott told you that the workers didn't have to go in with the crimes of violence. Remember that? Only the New York Boyz themselves, the bosses, the partners, had to agree and follow up on the agreements to commit violence.

That's what they did with Torrick Brown. Remind yourself of this: Charles Townes, when he was in the car prior to the triple homicide on Church Hill, prior to going to kill "Mousey" Armstrong, they let him get out of the car. He did not have to go with them to commit that murder. Remember, they called him a pussy for not going, but he didn't have to go. He was a worker. It proves that the story that is being told is true. The New York Boyz, the partners, bosses, the heads of this Continuing Criminal Enterprise, had to help each other commit murders to maintain their position. That's why Torrick Brown was shot and killed. That's why Martha McCoy, who had absolutely nothing to do with this, was shot in front of her seven-year-old son, Montez McCoy. Those bounty hunters. Those people who we were being criticized for paying money to hide because they witnessed the murder of Torrick Brown.

And remind yourself again about the testimony of Valerie Butler that these murderous people, "Whitey," "C.O.," "V," and "J.R.," talked about going back and finding Martha McCoy and killing her and all the other witnesses so their conspiracy wouldn't be found out. There is also proof of 1959 violation. They intended to hide the conspiracy. They didn't want the veil to be rolled back on this conspiracy through the murder of Torrick Brown. It wasn't simply a domestic dispute. It was another murder done by this conspiracy for whatever reasons they defined to be the goals of the conspiracy, to protect the conspiracy. "Whitey" is charged in that count, although he wasn't there. We haven't put on evidence that put "Whitey" in that shooting. He is charged in that count because if you will remember the testimony of Valerie Butler, he aided at the end of all of

**JA1419**

that.  They talked about "Yeah, we will go back.  We will find those people, Martha and Montez.  We will kill them, the survivors.  We will help the conspiracy, hide this thing up.  We will kill all the witnesses."  So he is charged in that count.

Remember, you mess with one of the New York Boyz, you mess with them all.  That's what Greg Scott told you.  That's what Torrick Brown's murder proves to you.

The testimony of Martha McCoy and Montez McCoy meshes with the testimony about that murder that you heard from Sterling Hardy and Jerry Gaiters.  Remember the testimony of Martha and Montez.  And I suggest to you, what possible reason in the world do these people have to come in here and tell you a lie?  They have none.  Their brother and uncle were killed.  She was shot a number of times.  The only thing she could be motivated by is making sure that the right people go to jail for that.  What reason would she have to send the wrong people to jail for that?  And their testimony corroborates what Gaiters and Hardy said.  Remember how they both testified the others were dressed?  One in a black hoodie, the other with a big black coat on.  Hardy and Gaiters both testified that that was the way "V" and "O" were dressed.  Martha and Montez, remember, weren't asked to identify "V" and "O" particularly, but they were able to describe how the others were dressed.  The ballistics match also confirms the testimony.  The ballistics show that a Glock and an Intratec, those guns seized from 1212 West Moore, were used to kill Torrick Brown and shoot Martha McCoy.  That's completely consistent with the testimony of Sterling Hardy and Jerry Gaiters.  Remind yourself of the testimony of Sterling Hardy, what "J.R." said when he got back, when "V" asked him -- "V" said, "The bitch ain't dead."  Sterling said, "Yes, I know she is.  I know I can shoot straight."

Unbelievable testimony, ladies and gentlemen, concerning the violence of these people to kill anybody or anything that stood in their way, to hide up the conspiracy, the existence of the conspiracy so that they could make more money selling drugs.

The violence continued on February 1st, 1992.  Remember, Torrick Brown was shot that day.  And later that evening, in the early portion of that evening -- Torrick Brown was shot over in Lynhaven.  Later that evening, Cory Johnson, "C.O.," "Whitey," and Jerry Gaiters went to Church Hill where they perpetrated the triple homicide of "Mousey" Armstrong, Tony Carter, and Bobby Long.  Why?  Because "Mousey" Armstrong owed them a drug debt.  This was told to

you by Denise Berkley.  And because, as you heard from "Man-Man" and Jerry Gaiters, "the bitch knew too much," according to "C.O."  She had to be killed.  He couldn't wait until 10 o'clock.  She had to be killed.  That's Count Seventeen, Eighteen, Nineteen, Twenty, Twenty-one, Twenty-two, and Twenty-three of the indictment.  That triple homicide gives rise to all of those counts.  Some are use of a firearm in the commission of that offense; the others are 848 murders; and the others are 1959 murders.

There has been a suggestion here that indeed Jerry Gaiters as to this particular murder must have been lying to you because in his Grand Jury testimony he said that "C.O." had a gun behind him and that's why he went over on that murder.  Jerry took the stand and testified for you and said that "Look, if I said that, if that's what I said, then yeah, yeah, that was a lie."  But what he said here is completely consistent with that.  What he said in this courtroom is completely consistent.  He told you the whole time they are driving there, "C.O." indeed sat right behind him with a gun and he was completely convinced

3010

that had he not gone through with showing them where his cousin lived, he would have been killed.  We are talking about semantics here, trying to make him a liar over semantics.  Whether the gun is actually held to his head or figuratively is a matter of semantics and it doesn't matter.  It doesn't mean that Jerry Gaiters was lying to you.  He felt fearful for his life if he didn't go through with that.  That doesn't absolve him of his crime.  Indeed, he has pled guilty of those murders and he will be sentenced because he knowingly aided those people in the killing of "Mousey" Armstrong, Bobby Long, and Tony Carter.  And he will pay for that.  But he came in here and told you what happened that night based upon his own involvement.  Again, you have to have people like Jerry Gaiters to pull back the veil of this conspiracy.

His testimony is proven consistent and truthful by the ballistics.  There was one shooter in that house, according to ballistics.  The Glock was used to kill all three of those people.  Cory Johnson had the Glock that night.  They will say that indeed, this eyewitness who hasn't testified, but who was in Detective Woody's notes, shows that perhaps Jerry Gaiters was wrong.  The eyewitness said that there

3011

were four people, and that Jerry Gaiters and "C.O." both went in the house and firing started.  Tell yourself, does that show that Jerry Gaiters is lying?  No, it doesn't show that at all.  Put yourself in that man's position across the street.

**JA1421**

The house gets burst into, you see two people go in, which is what Jerry Gaiters told you was what had happened. Firing starts. Do you look? Are they both shooting? No. You just assume both are shooting. Four people he sees at that house. That could be completely consistent with what Jerry Gaiters told you. Remember, three of them went up there together: Gaiters, who went to the door, "C.O.," who came in after him, and "Whitey," who was in the car. Gaiters doesn't know where "Whitey" was. "Whitey" could have come right up to witness the whole thing. There was a fourth person who came out of that house, too. Bobby Long. Poor, old Bobby Long mowed down on the outside by Cory Johnson as he tried to get away. Four people. That doesn't mean Jerry Gaiters is lying. It is completely consistent with what Jerry Gaiters stated.

Bobby Long and Tony Carter, ladies and gentlemen, were killed that evening, ruthlessly murdered by "C.O.," because they happened to be in the wrong place at the wrong time. He had learned his lesson from earlier in the day where they left witnesses and from earlier in the conspiracy where Stanley Smithers had been allowed to escape. They didn't leave any witnesses on Church Hill. Tony Carter and Bobby Long were simply innocent bystanders who were caught up in this murderous web by Cory Johnson and Richard Tipton and "J.R." so that they could put more money in their pockets dealing crack cocaine.

Counts Twenty-four, Twenty-five, Twenty-six, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty deal with the February 19th, 1992 stalking and killing of Curt Thorne, Linwood Chiles, and the maiming of "Pepsi" Greene and Priscilla Greene. You saw their testimony. You saw the testimony of "Pepsi" and Gwen. They told you who was there when they shot them. They told you that the last memory that they had, the last memory "Pepsi" has is when "C.O." told Linwood, "Put your head on the wheel." And indeed that's exactly the way Linwood was found dead, shot in the back of the head. Gwen tells you the last thing she saw was when this man said, "Gwen --" when "Whitey" said, "Gwen," and she turned around and that's the last thing she remembers. Look at the ballistics, the Medical Examiner testimony there. A terrible, terrible, terrible photograph of Curt Thorne with sewing needles through his neck showing the crossfire. Two people were there, ladies and gentlemen. Two people were firing guns. Walter Tuck confirms that. Walter Tuck and Gwen's testimony, again, meshes perfectly. And unless you

**JA1422**

believe we have orchestrated this whole thing, it shows you that indeed "Whitey" was there and perpetrated that crime, along with "C.O." Walter Tuck said the person he saw leaving that scene was dressed in a brown leather coat with a scarf. How did Gwen say "Whitey" was dressed that night? Brown leather coat with a scarf. How did Walter Tuck describe the skin color of that man who walked away? He described it as this skin color, the color of the wood on this piece of chair. Look at him. It is exactly the same skin color as "Whitey." How did Valerie Butler tell you that "C.O." was dressed that evening? "C.O." was dressed in his usual black hoodie. In fact, you have seen it introduced into evidence. That black hoodie was what he wore that night when he killed his victim and retrieved his bounty of his coat. Remember that? Disgusting. He took the coat of Curt Thorne and left it in the backseat of her car. That testimony meshes, ladies and gentlemen. It shows you that Gwen is telling the truth about who was there. What possible reason does Walter Tuck have to come in here and lie? What possible reason does "Pepsi," or Gwen have to come in here and lie? Gwen wants the people who put her in the condition you saw her in to get justice. That's what is driving her, ladies and gentlemen. Is she a bounty hunter? I suggest to you not. I suggest to you it is irresponsible of the government not to protect those people, also.

Remember that there were the guns seized on February 2nd, 1992 at 1212 West Moore Street. The Glock, the Intratec, and the AA Arms weapons were seized, leaving those people who were left in there -- you have to remember, also, it is important, that arrested there that night at 1212, or in the early morning hours of February 2nd at 1212, were "J.R.," "V," Sterling Hardy, Sandra Reavis, and "E.B." and the guns were seized, leaving "Whitey" and "C.O." out on the street without a gun. So what did they do? They repeated themselves as they did with Pam Williams. They got Charlotte Moore to buy guns for them. She testified she bought them two Glocks and she gave them those Glocks on February 5th, 1992, three days after the seizure at 1212 West Moore Street.

Her testimony is proven true by the unimpeachable testimony of Officer Santo Gutierres from the New York Transit Police. Officer Gutierres arrested Cory Johnson on February 29th, 1992 in the subway in New York with that Glock bought by Charlotte Denise Moore in his belt, showing you that indeed what she said is true. She gave that Glock to

"C.O." and another one to "Whitey." He was in New York with it. That's the same Glock that ballistics have shown you unequivocally, unimpeachably, without a doubt, to be the gun that was used to kill Curt and Linwood and to shoot and maim "Pepsi" and Gwen. Unimpeachable testimony that proves the other testimony that you have received from the government's witnesses is true.

Apply your common sense to that, and you have absolutely no doubt that Cory Johnson was there and killed those people. And apply your common sense to what you heard from Gwen and Walter Tuck and you have no doubt that "Whitey," too, was there to kill those people. They wanted to kill Linwood because they thought he was a snitch. Remember C.T. Woody's testimony. He told them that Linwood had made some statements. Sterling Hardy said "V" was going to get that taken care of, "Don't worry about Linwood snitching. I've helped "Whitey" and "O" before, I'll take care of this." Curt Thorne was killed for a couple of reasons. One, he had a drug debt to them. But two, he was killed because he was there. Why are "Pepsi" and Gwen in the shape they are in now? Because they were there. Again, they learned their lessons well at the shooting at Lynhaven of Torrick Brown and the shooting of Peyton Maurice Johnson where witnesses escaped. They weren't going to let any other witnesses escape. That's why Gwen will be in this that chair for the rest of her life.

The defense witness called as to this particular case is also an example of why the defense complaints about the government's witnesses ring hollow. They called Gloria Bridges to say that "Whitey" was with her every evening, every night, from January through March, there on February 11th, 1992 when Valerie Butler said he rented a car and had gone to New York; there on February 22nd when Valerie Butler said he had rented a car and gone to New York. Perhaps you don't believe Valerie in that regard, but how could you possibly not believe Officer Jeanne Keim, who said she had arrested "Whitey" in Trenton, New Jersey on March 20th, 1992? Remind yourself that I specifically asked Gloria Bridges "Was he there on that date?" "Yes, he was there, each and every night, including March 20th, 1992." She lied to you. He couldn't possibly have been there that night. She was going to come in here and say whatever it took to protect "Whitey," including that he couldn't have been there on February 19th, 1992 for the murder of Curt and Linwood. Notice in her testimony she didn't even say what time of night he came there that evening. She didn't even

**JA1424**

successfully establish an alibi funneled her.  The murder took place at 10:17, according to Walter Tuck.  We don't know when it was "Whitey" showed up at her house.  There was no testimony establishing what time of night he showed up at her house.  But I suggest she lied anyway.  It is pretty clear from her testimony, she is a liar.

I will touch briefly on the murder of "Nat" Rozier.  No defendant has been charged, but the evidence is telling.  "Nat" Rozier was shot right between the eyes with a .38, that same .38 that was recovered from "Whitey" over in Blackwell wrapped in plastic.  Remind yourself of the testimony about the bullets used to kill her.  A particular grain of

3018

bullet that Anne Jones, Dr. Anne Jones, in all her years of testing firearms, had never seen before.  But that same type of ammunition was found in the blue tote bag seized from 1212 West Moore Street on February 2nd, 1992.  We don't know who pulled the trigger.  But we do know that that conspiracy, that that gun that had been held by Sandra Reavis and given to "Whitey," was the murder weapon and we know that there was a motive.  She owed them money for drugs.  And they believed her to be snitching to the police.

Count Thirty-three of the indictment deals with the January 15th, 1992 distribution by "C.O." to "Papoose" of cocaine.  Remember, "Papoose" said it pretty simply.  He said, "I got a rock of crack cocaine from "Whitey" when I wiped the fingerprints off the guns the night they were returned from the Peyton Maurice Johnson murder."  That's the distribution count.  Count Thirty-two deals with possession by the conspiracy of cocaine at 1212 West Moore Street on February 2nd, 1992.

The lab report shows it, Exhibit 85, that there were 18-point-some grams of crack cocaine seized that day in 120 different vials, crack cocaine that the partnership possessed together.  You will receive an

3019

instruction on that, joint and several ownership of property, mutual control over that possession of that cocaine.  And that's what that is.  That conspiracy, the testimony is pretty clear, used to go to New York, re-up together, resupply themselves with cocaine, give it to their workers.  Some of that happened to be caught when the police caught that bag on February 2nd, and that's why they are charged.  Under the conspiracy law -- it is important to remember this throughout the case -- each one of those conspirators were guilty if they knowingly joined that conspiracy of the possession of that cocaine, whether they actually knew it was there or

not.  By virtue of joining the conspiracy, they were guilty of the possession of that cocaine because they knew that's what that conspiracy was all about.

Count Thirty-three deals with the drugs seized on April 10th, 1992 from South Richmond by Detective Richard Farmer.  After "Whitey" was arrested they went back in and searched.  Remember, according to the stipulation, they found drugs and the .38, the firearm seized by Detective Rodriguez, wrapped in plastic.  Count Thirty-three deals with just the cocaine seized from that location, which cocaine belonged to "Whitey" and was distributed by him.

Remember when you go back what I have told you that I think you should concentrate on.  Apply your common sense to what you have heard; the meshing of the testimony here from 70-some different witnesses.  It all goes hand in hand.  That tells you that the government's witnesses were telling you the truth, unless you truly believed that we orchestrated that testimony in some way.  Indeed, if you believe that, I suggest you will probably go back there and just dismiss this indictment.  But unless you don't think we orchestrated this whole thing, then it is clear that the meshing of the testimony proves that these people have been telling you the truth.

I note one other thing.  Look at the plea agreements of Sterling Hardy and Jerry Gaiters and the language that's built into that plea agreement to ensure their providing truthful testimony here.  And ask yourself, were we intending to structure a case or were we looking for the truth to be presented from that witness stand?  Read that plea agreement.  Look at what the government is seeking to get from these people.  And I suggest to you that it will show that all the government wants in this case is to present truthful testimony.

Again, I thank you.  I'm sure you are sick of hearing from me.  I have been up here for an hour-and-a-half now.  And you have got many more arguments to go.  It is an important chore.  It is a very important chore.  I know it has been frustrating, and at times I'm sure you would have liked to have yelled and told all of us to sit down.  And I will in just a second.

It is a tough job you are about to undertake.  You have taken an oath and you can't shirk from that oath.  That oath says you will truly render the facts to a verdict.  When you do that, you have no choice but to find these defendants guilty of each and every count in that indictment.  We have proven each one of these defendants guilty beyond a reasonable doubt of each and every count in that indictment.  Ladies and

**JA1426**

gentlemen, eleven human beings have lost their lives to this murderous conspiracy. You owe it to them to go back and render the proper verdict. Thank you.

THE COURT: All right. We are going to take a brief break before we get started with the defense closings, in the neighborhood of ten minutes. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Recess taken from 2:30 p.m. to 2:45 p.m.)

THE COURT: Let's bring in the jury, please.

(The jury entered the courtroom.)

All right, Mr. Geary?

## Geary Guilt Phase Closing (3022)

MR. GEARY: May it please the Court, ladies and gentlemen of the jury: We don't know who shot. That's what the government tells you about Katrina Rozier. If you look in the indictments, and you will have the indictment back in the jury room with you, it provides a real guide on the front page, sort of an index. When you go through there you find that there are ten people's names who were murdered. You don't find eleven. You don't find Rozier in the indictment because we don't know who shot her. The government tells you they don't know who shot Katrina Rozier. Detective Blaylock doesn't know who shot Katrina Rozier. C.T. Woody doesn't know who shot her. When you are in the back in the jury room deliberating, the Court is going to give you a videotape showing an interview by Detective Woody of Jerry Gaiters in regard to the Church Hill murders. You can see the interaction between the detective and informant, detective and informant, being told what to say.

The government had a severe problem in the bringing of this case, in the bringing of a conspiracy, stretching all the way back, as Mr. Vick likes to point out, to New York City, to Harlem, to Central Gardens, to Newtowne, Blackwell. The problem is this: If you have a Continuing Criminal Enterprise charge as set forth in Count Two, and you wish to have executed two New York Boyz out of their teens, how do you deal with the jury when the jury is told to forget Jerry Gaiters? Forget Jerry Gaiters, who killed Katrina Rozier. The government can say, "Well, we will just have Jerry plead to that murder because he pleads to everything." He is an informant. He can plea to that.

But then in the second phase of the case it will

**JA1427**

be very difficult to get a jury to say, "We will execute these boys from New York but we won't do it to a 39-year-old man from Richmond who is the informer of Detective Woody and who killed Katrina Rozier." That's why I suggest to you that the government doesn't know who shot her. When the government lawyer gets up here today or tomorrow to tell you why you should believe them, rebut everything the defense says, ask yourself a question: Why isn't Rozier in the indictment? Because they hang "Hitman" Gaiters, Jerry "The Enforcer" Gaiters, Jerry who walks. Detective Woody said he walks on what? Robbery, rape, attempted murder. That's his sheet over the past ten years. "The best informer I ever had. 35 to 40 times he gave me information." Jerry says no, it is two. He lies repeatedly. He lies to you. He lies to the Grand Jury. He lies to Detective Woody. Woody has to pound it out of him in this interrogation because Jerry knows how to do this. He is out in the streets. He is a hit man, an enforcer. And he walks out of this. He is one of the "made men" for the government. He can do what he wants. He knows how the game is played. He is one of the bounty hunters Mr. Cooley talked about. He is the chief bounty hunter in this case. He lied to you. He insults your intelligence by lying to you, as among many government witnesses.

Mr. Vick told you in his opening statement they had four categories of witnesses: participants, police, experts, forensic, and that they all sort of complemented each other and corroborated each other. Baloney. What they did is took a witness who was a participant, put him on the stand, put in somebody behind him who is a civilian, i.e., somebody not in the drug world, in either New Jersey or Trenton or New York or Richmond. And that's how they say this stuff is corroborated. Some of this stuff is corroborated, but much of it isn't. Much of this case relies upon, or all of it relies upon these people from Newtowne, these people from New York and New Jersey that you have to believe beyond a reasonable doubt. Mr. Vick talked to you on the Thursday of the opening week and today for almost three hours. He mentioned reasonable doubt once then and once today. Judge Spencer is going to mention it a lot. The defense lawyers are going to mention it a lot. When someone in this country is charged with a minor traffic charge, they are not convicted unless it is proven beyond a reasonable doubt. In this case as well.

In addition to the indictment, you are going to have and Judge Spencer is going to read these

instructions to you, but you will have a copy of the instructions of law. The first one starts out "Court Instructions to the Jury." The instruction of reasonable doubt tells you that unless you are convinced beyond a reasonable doubt on every charge, on every element in the charge, that you find that person not guilty. Richard Tipton, "Whitey," sits here charged with 26 counts, and within those 26 counts are various elements. Each of those elements in that count must be proven and proven beyond a reasonable doubt before you can sign that verdict form that says guilty of a particular charge. That's the government's burden. That's not my burden, Eric White's burden, or Richard Tipton's burden. That's their burden.

And they have, as you can see, as you have seen over the last three weeks, they have the resources to do that. They have police, prosecutors, paralegals, marshals, sheriffs. You name it, they have got it. Videotapes. They can do all those things and they have been doing that in this case. So they have the resources. They have the burden of proof. That's why they get to go last, because the Court tells you they get to speak last because their burden is to prove this case, and each element of it, beyond a reasonable doubt. And they have to prove it individually, not just "they." Mr. Vick used the word "they" so much in talking about what happened, I looked in the indictment to see if somebody named "They" was charged. There is no "They" charged. They are individual people. Richard Tipton, Johnson, Roane, and Sandra Reavis.

When you have this indictment, and the one thing I would say to you as I think Mr. Vick would say to you and the other defense lawyers will tell you, is when you get back there, whenever you start your deliberations, that's the time you take control of the case. The time for us and the witnesses and Judge Spencer is over. The 12 of you who decide this case have it. And it is at your speed and your deliberation. You can take all the time you need. You are going to have a long indictment, going to have long jury instructions. You have some of the exhibits that the Clerk has over here, some exhibits here. You have the videotape. There is no rush to judgment involved in this case. Take your time.

If you look at the cover page of the indictment, it shows you in regard to Richard Tipton, who is named first, the various counts that he is charged with. Then it goes over to the right side and describes what some of those counts are as Mr. Vick indicated to you. There is a conspiracy count, a

**JA1429**

CCE, murder, firearms, distribution of crack. But study this. This is the charging document. This is what the government says. These are what Judge Spencer will read to you and give to you. This is the beginning of the case in my left hand, and this is the end of the case right here as far as we are concerned. Then everything goes to you. What's in between are the exhibits and the testimony of the witnesses.

This side is what the government says they are going to prove. This side is what the law is. And everything in the middle is what the government claims it has proven in this case.

And just because the government tells you something doesn't make it so. Just because Mr. Vick will stand up here for an hour-and-a-half and talk about unimpeachable sources, and something is simple, and these are technical requirements, that doesn't mean that's what it means. You have to look at these, look at the instructions, listen to what Judge Spencer has to tell you, and make up your mind for yourselves. Because the oath you took says that. I will decide based on what I hear and what I see and what I read and what I listen to. I will decide this case myself as 12 people. That's the obligation you have taken, all 12 of you. And as Mr. Vick indicates, it is a very serious obligation. This is not a minor case, as you well know. This is a CCE murder case. This means that if you find in Count Two, if you return a verdict that there was in fact a Continuing Criminal Enterprise, and in regard to that Continuing Criminal Enterprise, if you say that any of the nine murders -- because Torrick Brown is not a CCE murder -- any of those nine murders you attribute beyond a reasonable doubt to any defendant, that defendant goes to phase two, i.e., the penalty phase, the phase to determine whether the sentence will be life without parole or the death penalty. So it is a very serious matter.

If you will look at Count One and look at the indictment when you get back there, that charge is what Mr. Vick says is a very simple thing, which I don't think is very simple at all. It charges, and the dates from the charge are from January of 1989, the very first sentence of Count One, up until the time of the filing of the indictment -- well, this indictment is dated July 20, 1992, but it is also called the second superseding indictment, which means that there were two indictments before it. The original indictments were filed at the end of April, 1992. That's when the big publicity took place. That's when people like Johnny Bird and Hussone Jones

**JA1430**

had the opportunity to read the paper and find out what was going on.  But this one was filed in July.  So the government claims that from January of 1989, up until and including July of 1992, a drug conspiracy was being carried out in violation of

3030

Title 21 841.  That conspiracy was to distribute crack cocaine.  Pages two and three talk to you about the ways, means, and manners of the conspiracy.  And there are two places that are mentioned:  New York City, and Richmond, Virginia.  There is no mention in the indictment anywhere -- including the ways, means, overt acts -- of Trenton, New Jersey.  Nothing whatsoever.  They are saying in the indictment that cocaine was in New York and imported from somewhere else, brought down to Richmond on various occasions, and then was distributed in Richmond.  No mention of Trenton, New Jersey.

The government's first witness was a person by the name of Greg Taylor Scott.  You later found out from cross-examination he was called "Sweets." And he was asked what he expected to get out of his testifying.  He told you "a sweet deal."  Greg Taylor Scott was arrested in Trenton, New Jersey on June 4th, the 1991 in a raid by Trenton Police on a house on Martin Luther King Boulevard.  He and five other people were charged in an indictment much like this one, but without the CCE, in Federal District Court in New Jersey.  Gred Scott has forced those people to plead guilty because he was going to testify against them.  He comes down here, and as Mr. Baugh indicated

3031

when he asked him a question, "You are looking at 20 to life and you are on bond?"  Greg Scott was lock, stock, and barrel owned by the government.  He is getting a great deal.  He is looking for a sweet deal.  He tells you about Upper Manhattan, Harlem, and a particular block, 155th Street and Amsterdam Avenue.  He tells you, if you listen to him real carefully, about this concentric circle which is what the New York Boyz are, he claims.  The inner circle is those people born and raised on the block, 155th and Amsterdam.  "Whitey" is not from the block.  Cory Johnson is not from the block.  They are from the upper part of Manhattan, from Harlem, but they are not from the block.  They are, if Mr. Vick wanted to differentiate it, the second level of New York Boyz.  One of them goes to Trenton, has relatives, and they start to sell crack cocaine.  That's a way of life.  That's what these guys do.  They sell drugs.  They sell drugs for the price, in an amount which is probably less than two six-packs of beer.  They sell $10, and in some places it is called a bottle, in other places it is called a vial, in other places it

**JA1431**

is called a rock.  Very small amount of crack cocaine, sells for $10.  Gives you a quick high, as Denise Berkley testified to.  Much quicker than beer and wine, and apparently with no hangover.  They are salesmen, selling on the street.

Scott tells you that New York is big time and Trenton is small-time.  New York is where the big dealers are and Trenton is where the street dealers are.  "I'm the weight man."  He would sell weight for the government.  But he, like Mr. Cooley said, is one of those good criminals.  He can sell weight, and he told you how much he sold, but he is going to walk the streets because he is cooperating.  When they say a cooperating and truth-testifying witness, the emphasis is on cooperation.  Because neither Mr. Vick or Mr. Woody or anyone else is on the block when things happen.  They don't know what the truth is.  I don't know.  None of us do.  The witnesses, they can say whatever they like, i.e., Jerry Gaiters, i.e. Denise Berkley, Johnny Lee Byrd.  Did you believe Johnny Lee Byrd, Denise Berkley when I said to her "Ms. Berkley, you are telling this jury you knew everything Richard Tipton did; is that right?" "Yes."  "Who did you buy drugs from the day before he got here to New York?"  "I don't know."  "The entire year before then?"  "I don't know.  I don't remember."

She sat there and laughed.  That's the kind of witness the government wants to put on, to insult you.  The biggest one of them all is "Sweets" Scott, who ran the Trenton operation.  He was selling weight, coming down from New York to Trenton.  That's the government's witness.  That's who they want you to believe, the guy who is going to get a free ride.  He comes down and tells you this big litany of these meetings and retaliations.  Baloney, folks.  He told you one thing that was true, which was corroborated by Officer McMillian.  "Whitey" Tipton is nothing but a street-corner seller of crack.  He sells dimes.  That's where he is caught.  He is caught in a candy store on the corner of Clinton Avenue in Trenton, New Jersey selling dimes.  This is the big man that Mr. Vick makes out, "Whitey."  What's this case about, folks?  Get "Whitey."  Does he look like Manuel Noriega sitting here, John Gotti sitting there?  He is a little street drug dealer in Trenton who, when that deal blows up on 6-4-1991, comes here.

Did he scout out the Eastern Seaboard looking for a place to sell drugs?  He is from here.  His father was here.  His parents were married.  They separated very early.  His father is here.  He came here because he has people here.  He has been in

**JA1432**

Central Gardens before.  It was obvious to you he was here before June of 1991, according to Antwoine Brooks.  He was coming back and forth.  Tipton, the ultimate floater.  It was interesting in the case when some of the Newtowne people would be asked, in Mr. Vick's inimitable way, "Where did "Whitey" live?  Did he live on Hancock Street, in the yellow house on Norton Street?"  I suggest to you that nobody knew where he lived because he floated.  He was in one house one night, in Sandy Lane, on Leigh Street, he was on Moore Street, he was in Blackwell on two or three different occasions.  He had no furniture, no car, floated around.  But this is the man that Mr. Vick would say to you, "Folks, this is the biggest drug dealer in the world, bigger than all of them, the Medellin Cartel."

MR. VICK:  Nobody has said that and it has nothing to do with this case.

THE COURT:  Overruled.  Let Mr. Geary say what he has to say.

MR. GEARY:  He is one of the notorious New York Boyz?  How do you inflame the jury against these 21 or 22-year-old guys?  Make them foreigners.  They are bad.  They come down here to peaceful Richmond, Virginia, which doesn't know violence, and look what they stirred up?  We have to punish them, give them the electric chair.  That's what the government tells you.  Greg Scott.

Then they bring in the other guy from Trenton who was a rival of theirs, clearly.  They got into a fight, had a beef.  But that's the beginning of the, quote, violence.  Where was all this other violence in Trenton?  Scott told you they had a ton of guns on Martin Luther King Boulevard, but nobody ever got shot.  In 1989, he would have been 18 or 19-years-old.  Then they bring the evidence down here.  You get the Central Gardens people, the brothers, the brothers Jones, Saunders, and I forgot the third one.  Hussone Jones, Charles Townes, and Maurice Saunders.  Plus their good friend, Antwoine Brooks.  They testify to what in effect was going on.  They tell you that Tipton comes here, Tipton has a source in New York, Tipton can get crack.  Tipton goes to New York, Tipton comes back to Central Gardens, and they sell crack.

This worker-partner stuff is baloney.  He was the supplier of their crack.  He wasn't their boss.  You heard all of them say, "Well, we could do whatever we wanted to, didn't make any difference."  You get two-for-one.  And as long as you give the guy supplying the crack $200 back, they could care less.

**JA1433**

You can eat it as long as you give the $200 back. That's what happened in Central Gardens off and on for a considerable period of time, maybe two years if you listen to Antwoine Brooks. And then in terms of history in terms of the conspiracy, the key date apparently is around Thanksgiving to Christmas of 1991, where "Whitey" comes here, ostensibly either from New York, or from Trenton, "O" comes here, and some others come here. And according to one of the Central Gardens testifiers, "Whitey" at some point is playing basketball in Newtowne, "O" is there, and they meet people from Richmond. That's where the second part of this case comes from for "Whitey."

Of course for Roane, nothing has happened yet, or for Reavis. But at this point we are down to where "Whitey" and "O" were together in Richmond, Virginia. I suggest to you what you have at this point proven by the government is that, one, Richard Tipton was selling small amounts of crack cocaine in Trenton, New Jersey. So that if that indictment were proper, then he is probably part of that conspiracy. Then you have him selling drugs, crack cocaine, in Central Gardens during that same period of time, so he would be guilty of a conspiracy to sell drugs in Central Gardens. And then the evidence clearly is,

and we don't dispute this, we don't agree that Count One is proven beyond a reasonable doubt, but we do not dispute that for a period of time from Thanksgiving or Christmas of 1991 until sometime perhaps in March of 1992, Richard Tipton was selling drugs, crack cocaine, in Newtowne. And then for a short period of time, perhaps from mid-March until April 10th when he was arrested in the 400 block, 413 East 15th Street in South Richmond, he was selling drugs there. So he is involved in a number of different conspiracies, none of which, I suggest to you, ladies and gentlemen, if you read Count One, none of which is the allegations of the count of conspiracy charged in Count One.

Count Thirty-three charges that Richard Tipton possessed cocaine with intent to distribute at 413-D East 15th Street on 4-10-92. You recall, that was the day he was arrested. You might recall also the next day Detective Rodriguez told you that they conducted a search of 413 E 15th Street. You have heard the evidence on that charge. Count Thirty-two claims that on February 2nd, 1992, at 1212 West Moore Street, that Richard Tipton possessed cocaine with the intent to distribute. This must have been a flight of fancy for the government to put this

indictment in here. 2-1-92 was when the incident involving Torrick Brown took place and the murders on

JA1434

Church Hill.  The evidence in regard to that date is very simply that Charles "Man-Man" Townes told you that he and Richard Tipton were in a car which they had borrowed from a guy named Kenny; that they had driven from Central Gardens in the evening hours of February 1st going to Newtowne for marijuana or for crack cocaine; that no one was at 1212 West Moore Street; that in going through Newtowne -- and the government has provided an aerial, 17-1, which shows some of the streets over there, and it is not much bigger, really, than this.  Somewhere on Harrison Street, I think he said, they saw "O" and Gaiters; that there was no beeping, they just happened to meet by chance.  That next morning was when the raid took place on 1212 West Moore Street when the guns and the cocaine was seized, as Detective Rodriguez told you, when he was going in the back by the fence.  Right by Interstate 95 is where he found them.  There is absolutely no connection in this case to those drugs with defendant Tipton.  The government must prove that charge beyond a reasonable doubt.  They have absolutely failed to do that.

Douglas Talley died a horrible death.  Nobody

3039

can dispute that.  And the witnesses that you have in regard to that case, I don't know which one of these is the unimpeachable source that the government talks about:  Johnny Lee Byrd, Charles Townes, Hussone Jones.  Detective Hines, if you recall, was the forensics man who went and dusted the car and got all the items out of it.  The FBI fingerprint expert named Wynn.  We called, the defendant called Detective J.J. Cox, and there are two witnesses that were not called by the government.  That is a person that they called "**Wildman**," the one that Hussone Jones said they drove to his apartment after the murder and brought the knife and had the knife cleaned.  He was not called by the government as a witness in this case.  Also not called by the government as a witness was the girl from Blackwell.  I'll go over Hussone Jones' testimony with you in a minute.  That murder was on January 8th, I believe, and it was  --  it was the one in South Richmond at the corner of 13th and Stockton.  Government Exhibit 8 is a daytime picture.  And it shows Stockton Street here, 13th Street here.  They have a red arrow pointing to where the car was, according to Townes.  Over here about two blocks away from Stockton is Hull Street.  Johnny Lee Byrd told you that on  --  he

3040

told you a lot of things.  He told you that Doug Talley was his best friend, but he didn't go to his funeral; that he knew Doug Talley since August or

September of the year before, which means about four months; that they smoked crack cocaine together; and that they began selling crack cocaine together. And that on January 3rd, 1992, that he, Johnny Lee Byrd, had messed up Doug Talley's money, and that he saw the next day, on January 4th outside of 213 West Clay Street where Johnny Lee Byrd lived, a car which he identified as the Talley car, a picture of which is in evidence. He said that he saw three people, including Talley, in the car; that Richard Tipton was in the right front passenger's seat, the same passenger's seat where this bloody fingerprint, supposedly -- that's what Mr. Vick called it -- was found. Of course, the police never did an examination to see if in fact that smear was blood. But that's what Johnny Lee Byrd told you. The only person who had a motive to kill Doug Talley was Johnny Lee Byrd, because he had messed up Talley's money.

The evidence about Talley being a snitch or being "5-0," there is no evidence. There is allegations that somebody said that somebody said

that he was. But there is absolutely no evidence that Talley, who was a driver at most, was involved in snitching on the police. The police haven't come in here and said, "Yes, this guy talked to us any number of times." No evidence of that. Johnny Lee Byrd.

When Detective Cox testified about this coat, you recall the coat, Detective Hines said the coat was in the backseat of the car in the 200 block of East 13th Street; that the forensics people dusted the fingerprints inside and out, found no prints on the inside, found a print on the outside right passenger. What was in the coat? I think he told you some sunglasses, a vial of medicine from the VA, and some dog tags. That's what was in the coat. Until the defense called Detective Cox. What did Detective Cox say? Well, lo and behold in the scabbard of the coat, somewhere over here on the left side, was this thing. Do you recall a diagram being done by one of the witnesses in this case? How does that knife compare to the diagram?

And then on cross-examination, Detective Cox says "Well, we showed that that knife wasn't involved in the murder." Well, how do you show that, folks? When you listen to Dr. Fierro testify, well,

obviously that knife could have caused those wounds. What test did they run on the knife? You heard Ms. Jones testify in this case item to item. Whenever they had ballistics or any kind of report done, she did them. What test did the United States of America

run on that knife to show it wasn't involved?  None. Johnny Lee Byrd didn't fit into the "Get 'Whitey'" theory.  He is not a New York Boy.  Johnny Lee Byrd doesn't fit into our theory of the case.  When Johnny Lee Byrd is interviewed by Detective Cox, bird tells you in this Court that I gave the coat to Tipton. That's what he said.  I gave that coat to "Whitey." January 3rd or January 4th, a day or two before the murder of Doug Talley.  That's very convenient, Mr. Byrd, because that coat winds up in the car.  Sure Tipton did it.  But he tells Detective Cox the first time he is interviewed, and remember the man hunt that was going on for Johnny Lee Byrd, Chesterfield police put him on the top ten, Henrico, the State Police, the Richmond Police are looking for him, and he turns himself in.  J.J. Cox goes to see him and says, "All right, Byrd, what did you do with that coat, who did you give it to?"  He says, "An unidentified black male."  That's the first lie, or maybe it is not a lie.  Maybe he didn't give it to anybody.  Maybe he was wearing it the night he killed Doug Talley.

The secondly, about a month later Cox is talking to him again with a State Police officer present.  He says, "What about the coat, who did you give the coat to?"  He says, "I gave it to Skip Talley."  Then he comes in here under oath, the government parades him in, maybe he is one of Mr. Vick's unimpeachable sources.  He says, "I gave it to Tipton."  Well, that's good, because that squares the government  -- the government says, "We are glad Tipton has that coat.  Maybe he has it that night because we have got another guy who can come in here and really burn "Whitey," one of the drug-dealing partners from Central Gardens, Hussone Jones."  What does Jones say?

Jones says that on that night, 1-5-92, he takes a girl from Blackwell, picks her up, brings her to 1212 West Moore Street.  He says he takes her back at some point in the evening.  Before he brings her back, a guy named Doug or Talley, he is not real sure, he has never met this guy, but he thinks he hears this name, comes to the house.  And three people get into one car and he gets into his car. And he says "Whitey" said, "Follow us."  And the girl from Blackwell, "J.R.," and he get in one car.  And they come down 95 to the Blackwell section of Hillside Court, South Richmond.  The girl from Blackwell is dropped off at her house.  That's twice Hussone Jones has been to this woman's house on this night, so he knows where she lives.  According to him, he pulls around the block.

**JA1437**

Well, if the murder took place at 13th and Stockton, the girl from Blackwell, who would be a corroborating witness, one of these non-participants that Mr. Vick is always telling you he has got, here is a woman who would be a non-participant corroborating witness that would put "Whitey," "J.R.," and Doug Talley together just before he was killed. But she is not here. And Hussone Jones then begins to tell you this incredible story of what he said he saw. He says, "Well, 'Whitey' says snitches don't live." "But Hussone, you are sitting there two car lengths behind there and you are still alive." He says, "I wasn't afraid of 'Whitey.' I dealt with him almost every day after that." Does that sound like an incredible story to you? That you would witness somebody doing this brutal murder and yet you wouldn't have any fear of this person? You wouldn't, because it didn't happen.

How could how Hussone Jones know all of these people? The same way the government suggests to you that Johnny Lee Byrd knew that Doug Talley was stabbed with a knife. "Did you tell Byrd that Talley had been stabbed with a knife?" "No, but he knew it." They said, "Well, he could have read it in the newspaper. Hussone Jones read it in the newspaper." He was able to confirm what Johnny Lee Byrd, this excellent witness, was telling the government. Because it fit their theory: the New York Boyz. The New York Boyz, the plague on Richmond coming from New York that's got to be terminated. Where is "**Wildman**?" All the detectives were here. The uniformed police. Hussone knows where he lives. According to Hussone, he took Tipton to his house that night. "**Wildman**" is not here. If this were a simple murder case and we didn't have all these other charges, the evidence would be clearly not guilty. The government has the mechanism to prove it; the government failed to prove it.

This charge is like all the others, beyond a reasonable doubt. And the Talley murder, the evidence is more that Johnny Lee Byrd did it than Richard Tipton or James Roane did it.

Douglas Moody is perhaps one of the pivotal events in this case that took place on January 13th. The evidence, the testimony from Ms. Berkley and "Pepsi" Greene, if you can credit it, is that at some point Richard Tipton is in a house, maybe with James Roane, maybe with some other people, and according to Denise Berkley, later on that night at 1212 West Moore Street, Tipton says to the assembled people, "Moody tried to kill me." That's the evidence that

**JA1438**

you have. That Tipton says to Berkley or to those people that "Moody tried to kill me." There is no evidence that Richard Tipton is involved in anything outside of the house. He may or may not have been inside the house when the shots were fired. The evidence is that Moody was there to kill him. What evidence do you have that there was any intentional killing, murder, inside that house? You have none. None whatsoever.

In regard to Richard Tipton, on the Moody counts, which are Five, Six, and Seven, they have failed to show a murder by Richard Tipton; they have failed to show any murder, again, in the course of a Continuing Criminal Enterprise. Again, you can shut the door on the death penalty.

Peyton Maurice Johnson is that murder and the firearm and the 1959 counts, Counts Eight, Nine, and Ten of your indictment. Richard Tipton has never been charged in those counts.

Peyton Maurice Johnson's murder was January 14th. The next one in the indictment is Louis Johnson, January 29th. In between those is the Katrina Rozier murder, which is not charged in the indictment. In addition to what I told you before about Jerry Gaiters, remember that Denise Berkley told you that the night this happened that Jerry Gaiters had a gun. That's another fact you can consider when you say to the government, "Why is it you can't tell us who shot Katrina Rozier?"

Richard Tipton was charged with the murder of Louis Johnson, and during this trial the government has moved, and Judge Spencer has granted a motion to dismiss the charges against Richard Tipton in Counts Eleven, Twelve, and Thirteen. You ask yourself how could that happen, charge a guy with murder in a big case like this and come in here and dismiss the charges? That's how the government operates.

Torrick Brown, this is one of the most amazing stretches of legal juggling I've ever seen. Mr. Vick tells you Tipton wasn't involved, he wasn't there, but he talked about it later on so we can charge him with murder. That's what it comes down to. 2-1-92. That's the day that Charles "Man-Man" Townes and Tipton come from Central Gardens to Newtowne, and they go to 1212 West Moore and nobody is there. Shortly thereafter, they see "O" and Gaiters on the corner. At that point, whatever happened in South Richmond has already happened. There is absolutely no evidence other than Mr. Vick's fertile legal imagination to connect Richard Tipton with the Torrick Brown murder, the Martha McCoy maiming, which took place on 2-1-92, which are Counts Fourteen,

**JA1439**

Fifteen, and Sixteen of the indictment.

Counts Seventeen through Twenty-three are the three Church Hill murders, the CCE murders, the 848 murders, three violence in drugs, and one gun charge.

Charles Townes told you that when they got to the corner that night, when they saw "O" and Gaiters on, I think it was, Catherine and Harrison Street, which is in the pictures here, "O" said in Townes' hearing, "I've got to take care of some business." The four of them get into the car. Again, this is Charles Townes is driving this car, I think it was a white Pontiac 6000 which they had borrowed from a kid named Kenny. They drive from Newtowne to Central Gardens. Charles Townes tells you during that drive

3049

there is no discussion about any murder; that he gets dropped off, and that "Whitey" kids him, chides him about not coming, which I imagine he can tell you that "Whitey" does all the time. From that point on, there are three people left: "O," "Whitey," and Gaiters are in the car. And from there, according to Gaiters, they go from Central Gardens to park somewhere I guess on 28th Street, maybe Clay Street, near 2817 East Clay Street.

It is there that you have to determine how believable Jerry Gaiters is. It is there you have to listen and watch the video with Detective Woody to see what Gaiters really is telling you. Because he is the person that you can say, in regard to what Detective Woody read to you the other day, a concerned citizen who lives close to that house told Detective Woody that "Mousey" Armstrong had come to him two days before and said to this concerned citizen, "I'm worried, I'm worried about the person who killed Katrina Rozier; that he is looking for me." That's what the evidence is in this case. You have to believe Jerry Gaiters beyond a reasonable doubt in regard to that. There is absolutely no evidence that "Whitey" Tipton left the car. There is absolutely no evidence, if you find Jerry Gaiters a

3050

less than credible witness, that he knew what was going to happen other than what Charles Townes told you: that "O" had said at Catherine and Harrison, "I am going to take care of some business." It is not unusual in drug dealing for them to be taking care of business, going around collecting drug debts. Nothing unusual at all.

The last murder case is February 19th down here about 15 blocks from here. Stony Run is a street that connects Government Road and Williamsburg Avenue in the East End of Richmond. And you have a number of people that have information about that. Mr. Vick

**JA1440**

suggests to you that Walter Tuck corroborates whatever it is that the government's version is. I suggest to you very strongly that he does not. That he, in fact, assists the defense. This is the aerial photograph, Exhibit Number 65, of Stony Run. Here is the water culvert over here, the railroad tracks. The street is here. And you have this vacant land down a slope, down a hill here.

Mr. Tuck was on his way to the 11 p.m. shift at Reynolds Metals in South Richmond. He comes down Government Road, makes his turn. He told you there were a series of turns and it starts to straighten out. And what he says after he straightens out is he sees someone, a body, in the air. He tells you he sees a medium brown-complected black male standing over here and going down the hill this way, walking. There is no suggestion from Mr. Tuck that there is a second car. He tells you about the station wagon that's there.

Within a few seconds, he is over here on Williamsburg Avenue, which is not more than a couple hundred yards from there. He says at that point there is a police car coming down the hill, lights and siren. The police car would have made the left-hand turn there. There is no evidence of a second car. There is no evidence of a second shooter. The evidence is that a Glock did the shooting. The evidence Mr. Vick told you about in this gruesome picture about these needles simply means that maybe somebody moved, walked around. There is absolutely no evidence in regard to Richard Tipton except Gwen Greene says Richard Tipton. There is no evidence that she even knew him. They never brought that out on direct examination. He knew "Pepsi" Greene because she was in the business, she was in Newtowne using and selling drugs. No evidence that Gwen Greene was involved in that. None whatsoever. She describes a person as having on a brown coat, brown hood. Tuck said it was a brown scarf. But what does Charles Townes tell you? Townes tells you that he was with Tipton that night, another guy named John Knight was with them, and "Studie" Green, who didn't testify, were with him. He tells you that "Whitey" was beeped by "O," and that later on, a few minutes later, they took "Whitey" and "Studie" to Gloria's house, Gloria Bridges. That's the woman that Mr. Vick laughs at and ridicules because she thought maybe "Whitey" had been at her house on March 20th when he was in New York or Trenton, so she is a confirmed liar. I wonder why Mr. Vick didn't have that same feeling about his witnesses, Johnny Lee Byrd or some of these

**JA1441**

other people?

Our witness corroborates their witness. They were together. He was not over on Stony Run. And, more importantly, he tells you, Charles "Man-Man" Townes says Tipton was wearing bluejeans and a gray hood that night. Bluejeans and a gray hood. Not anywhere near the clothing description of the potential shooter in this case. So you have Tipton's alibi corroborated by one witness of his and one witness of the government's.

I would say that probably the most important charge in terms of the government in this case is Count Two, which is the Continuing Criminal Enterprise count, which you will hear about ad nauseam. You will hear about it because it is so important. The indictment tells you, and the Judge will instruct you about what the indictment means, but it says -- and there are different dates here now. When you look at the Continuing Criminal Enterprise, it has a significantly different date than the date of Count One. Count One, the conspiracy, says from January of 1989 up until the filing. Count Two, the CCE, says from January of 1991 until the filing of the indictment. The government has never introduced any evidence as to what the significance of January, 1991 is. You know in June of 1991 the Trenton bust took place, and we know in late November, early December, "Whitey" arrives on the scene. What the relevance of the January date is hasn't been made known to us. But what the indictment tells you is that these defendants had to act in concert with five other people and they had to occupy positions of an organizer, a supervisor, and a manager, and that they had to receive substantial income and resources from the CCE.

When you have the jury instructions back there after Judge Spencer reads them to you, you will have Instructions Number 18, 19. Like the other instructions, read those very carefully. 18 says the term organizer and the term supervisory position and position of management are to be given their usual and ordinary meanings. These words imply the exercise of power and authority by a person who occupies some position of management or supervision. Did the government introduce evidence in regard to Richard Tipton that he exercised supervision and control over other people?

This again was the manner in which the government presented its witnesses, a very tight script. They were not allowed to say on direct examination other than organizer, worker, partner.

**JA1442**

Until they were asked on cross-examination, "Well, what do you mean you were a worker, what do you mean Tipton was a partner?" Hussone Jones, for instance, said, "He was the guy I got my drugs from." "Oh, that makes you a worker and him a partner." "Yeah. " That doesn't make it, ladies and gentlemen. All that does is to show that Tipton was a supplier of crack cocaine. CCE requires much more than that. It requires, I suggest to you, a Mafia-like organization, which is totally missing from this case.

MR. VICK: Objection.

THE COURT: The objection will be sustained. Mr. Geary, you know better than that. That's a total misstatement.

MR. GEARY: You don't have what the instruction tells you. You don't have power. What power did Tipton exercise over them? Well, according to these witnesses, Antwoine Brooks: "He told us what we would get and they would get. We would just go out selling and that's it. We could do anything we wanted to do." Hussone Jones, Charles Townes: "We were free to do whatever we wanted to do in regard to drugs."

You get to the Central Gardens people, the Newtowne people, they tell you the same thing. He was one of the people, one of the many people who he got drugs from. That does not make him an organizer, a supervisor, or manager of a CCE. And that's the key count. That's the count that you must find beyond a reasonable doubt in order to satisfy what the government wants in this case, and that is, to get to the penalty phase in this case. Because the government says it, doesn't make it so.

The government likes to give people nicknames or use their nicknames. You can see on here the various nicknames, and you have heard them -- there must have been a couple of nights when I woke up with nightmares hearing Mr. Vick saying "Whitey," "C.O.," "J.R." It is a litany to get them all grouped together. But I suggest to you that if you want to think of some other people in this case that you may want to think of a lot when you think of "Whitey" and "C.O." and "J.R.," you might think of people like Greg Scott, who is skating. A heavyweight dealer from New York City, a seller of weight, skates out of here. High fives all around. "Sweets." "I'm going to get a sweet deal." Bought and paid for by the government. Hussone Jones, this brutal murder: "Oh, I was shot shocked, sort of shocked." "Would you be afraid of Tipton?" "No. Saw him every day. Went to New York with him."

**JA1443**

This substantial income that they have? $3,000. That's how big this gang was. They had $3,000. The only time you ever corroborated money in this case is $3,000. That's the big Newtowne drug gang. Johnny Lee Byrd, take a look at that coat and knife. Think of how many lies that man told you on this witness stand. Lie after lie after lie after lie. One of Mr. Vick's unimpeachable sources, a bald-faced liar.

And the last one, ladies and gentlemen, Jerry Gaiters, the hit man, the enforcer. The government of the United States wants you to convict the two New York Boyz, give them some murders, give them a CCE, and then come back and send them to the electric chair, death penalty, lethal injection, based on the testimony of Jerry "The Hit Man" Gaiters. I don't have to say any more. Thank you.

THE COURT: Mr. Cooley or Mr. McGarvey?

MR. COOLEY: Thank you.

May it please the Court, good afternoon to you, ladies and gentlemen. Gentlemen and lady of the government: Dr. Norman Vincent Peale, a somewhat renowned minister, was asked sometime ago how he decided on how long his sermons should be, when he should bring them to the end. And he said he relied upon one theorem, and that theorem was that the mind can absorb only as long as the bottom can endure. And my suspicion is that at this point, we are taxing in both areas. I do thank you for your patience. I thank you for the concern that you have shown through this trial. And I thank you for your endurance and for what I hope will be your absorption for the remaining portion of these arguments.

At daybreak this morning, a Wonder Bread delivery truck pulled up to the back of a Safeway. The delivery man got out, he unloaded the racks of his bread, and he resupplied that Saveway store for today. He charges Safeway $.25 for that bread, the going wholesale price. He expects to be paid for each and every one of those loaves of bread. He doesn't care, and he does not direct Safeway in how much they charge for those loaves of bread. He doesn't care whether they make a tremendous profit or they use his loaves as a loss leader. He doesn't direct them or supervise or manage them in price. In fact, he doesn't even care if Safeway sells that bread at all. He doesn't care where they sell it. He doesn't care if they move it to another Safeway store, or they discard it, or they sell it from a street corner. All Safeway has to answer to the bread man is to pay him his money, his wholesale price. He does not organize, he does not supervise.

**JA1444**

He does not oversee, direct, or control Safeway, because he supplies them with bread.

His supplying that bread does not make him a manager of Safeway. Now, he has done this. He has conspired with Safeway. He has agreed with Safeway that they will redistribute his loaves of bread. They have agreed to take his bread and try to sell it at their retail price. And they work to sell his bread, and they hope they make money. But he gets his money either way. And while Safeway is in that sense a worker for the bread man, as to the bread man, Safeway is neither his employee nor in his chain of command.

Now, if you understand the analogy that I have just laid before you, then perhaps you can better understand the indictment that has been laid before you. If instead of loaves of bread the delivery man is delivering cocaine; instead of just a legal contract, a legal conspiracy or agreement, we have a criminal drug conspiracy: simply, the agreement to deliver a narcotic and to redistribute it. And that is exactly what Count One of the indictment alleges. And it alleges that as to all four of the folks who are seated here.

Now, I would suggest to you, ladies and gentlemen of the jury, that in this indictment there are two predicate charges. One of them is that count I just spoke of, the conspiracy count. Count Two, however, is the other predicate charge. It is the Continuing Criminal Enterprise charge. And we, because we have dealt with this case for so long, have a tendency to shorten that Continuing Criminal Enterprise and call it CCE. And so if you hear that term, and you have heard it, what we are talking about is the allegation of a Continuing Criminal Enterprise. Three folks here, these two gentlemen and Mr. Roane, are charged with being engaged in a Continuing Criminal Enterprise. These two predicate offenses, conspiracy and Continuing Criminal Enterprise, are separate and distinct charges. They arise out of separate and distinct statutes. But in this trial, the distinctions between them have become somewhat obscured in the presentation of evidence and perhaps in the presentation of argument.

And the reason they have become obscured is that the government has alleged that the basis, the underlying criminal action of each, is the dealing of drugs. Dealing of drugs makes a drug conspiracy. A Continuing Criminal Enterprise must show that there was a violation of the narcotics act as one of the elements, one of the elements.

The biggest distinction between the two,

**JA1445**

however, is this:  Conspiracy merely requires agreement to supply and resell.  Count Two, however, Continuing Criminal Enterprise, goes further.  It

3061

requires that there be management, supervision, control, direction, or organization; and that there be substantial income or resources to each particular defendant charged with that count.  That is what is required by the statute.

Now, I will tell you, ladies and gentlemen, that there have been significantly different statements of interpretation of this statute than what I believe it to be in the argument presented this morning and this afternoon.  I am not going to attempt to tell you that my interpretation is correct.  I am going to tell you that in the instructions that will be read to you at the conclusion of these arguments by the Court, and which will be sent to you, sent along with you to your deliberations, there are certain instructions, they are number 13 through number 19, which tell you exactly what a Continuing Criminal Enterprise is and what the government has to prove in order to satisfy you as to that count.

I ask you to rely on that law as stated to you by the Court and stated to you in these instructions, not on that that was supplied to you in the statement by Mr. Vick, and for that matter, not what I might say.  Base it on that.

Just as there are two predicate offenses,

3062

conspiracy and Continuing Criminal Enterprise, there are other groups of offenses within this indictment that fall related to each of those two predicate offenses.  There are, I suggest to you, a first group.  And that first group are the counts which allege that a defendant caused the murder of someone for a purpose of maintaining or increasing his position in a racketeering activity.  And they have defined racketeering activity as drug dealing.  These are the alleged murders and one malicious wounding -- excuse me, three malicious woundings -- that require the government prove the drug conspiracy.  You can find the existence of a drug conspiracy and the commission of murders pursuant to that drug conspiracy, and that is the distinction between those offenses that are alleged to be part of the Continuing Criminal Enterprise.  You can find guilt of the drug conspiracy and murders pursuant to that, and if you do that, you may convict any of these three young men that you choose to of those offenses that you think the government has satisfied you with beyond a reasonable doubt.

Let me give you an example of what that might be.  The Wonder Bread man, desiring to enhance his

position in the sale of bread around the City of

3063

Richmond, kills the Merita bread man so that the Merita bread man cannot make his deliveries, cannot make his bread, cannot supply.  He has improved his position.  He has killed.  He is guilty under those counts to enhance his position in the conspiracy.  He is not guilty of a Continuing Criminal Enterprise or acting in furtherance of a Continuing Criminal Enterprise unless and until the government shows that in the course of his supplying to Safeway, he has exercised control, management, supervision, or those other things that have been outlined to you.

For Cory Johnson, those counts are Count Ten, Count Thirteen, Fourteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, and Twenty-eight.  The other group of alleged killings:  These are counts which allege that a defendant, while engaged in and/or working in furtherance of Continuing Criminal Enterprise, killed or procured the killing of someone.  To convict of these counts, the government must prove the existence of a Continuing Criminal Enterprise.  If they fail to do that, then they fail to prove the underlying predicate to these CCE murders.

They must prove more than just that drug conspiracy or drug dealing.  It must demonstrate in

3064

its evidence control, management, overseeing, organization, or supervision.  And these, ladies and gentlemen, these CCE murder counts are the capital counts.  Absent a finding of killing in furtherance of a CCE, we do not reach the second stage that's been constantly referred to in this trial.

Absent that demonstration of management, et cetera, the convictions, if any, are murders related to racketeering, the drug conspiracy, and drug dealing.  Now I suggest to you that the government's evidence has totally, and I mean totally, failed to establish a Continuing Criminal Enterprise.  And don't let the manner of presentation obscure that, ladies and gentlemen.  Cory Johnson may be a bread man.  He may be a supplier of a narcotic.  He is not a manager any more than the bread man in that analogy I gave you is the manager of Safeway.

Of the government's witnesses, not a single soul told you that Cory directed him or her where to sell, how to sell, how much to sell for.  Any profit they made was theirs.  All they had to do was bring back that specific amount, two-for-one, or 70-30, or 60-40, whatever the figure agreed upon.  That's all they had to concern themselves with.  Just like Safeway gives a wholesale price to the bread man,

3065

**JA1447**

that's what Hussone Jones and anybody else told you they did with any of these three defendants:  Bring back only the money to which they were entitled.  He supplied and they paid him.

Is there an agreement between them when you do that?  Give them 30 pieces, 30 rocks of cocaine, and they go sell it at $10 apiece and bring you $200 back?  Is there an agreement, a conspiracy?  Yes.  Is there control and management?  No.  Conspiracy?  Yes.  Continuing Criminal Enterprise?  No.  And that answer, to each one of those folks who testified before you in this courtroom about drug sales by them and by others, told you exactly the same thing.  They told you that from Mr. Tipton, they told you that from Mr. Johnson, and they told you that from Mr. Roane.  Now, if I wanted to sell McDonald burgers, I would have to go see McDonald's management and I would talk to McDonald's about what the price would be for me to be able to sell McDonald burgers.  And then they would tell me where my McDonald's had to be because they don't want it in competition, don't want it a block away from another McDonald's.  They would tell me it is going to be here or nowhere; you will sell here.  They would tell me what I could sell.  I'm going to sell Big Macs, not Whoppers.  I'm going to sell their product and no one else's.  They are going to tell me whether I can serve Pepsi, or I can serve Coke.  They are going to tell me how much I have to sell my product for at McDonald's, and they won't let me deviate from that.  They will tell me what hours I must be open and tell me what kind of uniforms my people and I must wear.  That, ladies and gentlemen, is control.  That, ladies and gentlemen, is supervision.  That, ladies and gentlemen, is organization and management.  And that, McDonald's, in the control, McDonald's, is a perfect example of a continuing enterprise.  It exercises control.  It exercises the power that Mr. Geary read to you from that instruction.

Contrast that, if you will, with this scenario.  You and I have our own separate retail stores.  We want to sell a product from our own separate retail stores.  We are looking for the best price, the best wholesale price.  So we pool our money.  I give you my $100, you put your $100 with it.  And we go to Price Club and we go up to Price Club and we buy a package of things.  And once we have bought it, we have used our pooled money.  We open it up, as best I can, we open it up and we divide it up.  And you take a portion.  And in this particular organization or this particular alleged conspiracy, he took a portion, he took a portion, and he took a portion.

**JA1448**

And what we sold it for was our business.  He didn't answer to him.  He didn't answer to him.  None of them answered to each other.  They just sold it for the best price they could.  That's the difference.  We pool our money, we split it up, and we buy a product from a supplier.  We sell it where we want and for what we want, and if we don't want to sell it, we don't even have to do that.

Price Club, and our dealings with Price Club, are not a Continuing Criminal Enterprise.  All Price Club wants is to be paid its wholesale price.  We got the money, we take the package.  We don't have the money, Price Club keeps the package.  Price Club exercises no control whatsoever, no management, no supervision, no organization.  None.  Price Club is our bread man.  Price Club is a supplier.  And where does Price Club get its inventory?  It gets it from the main Price Club distribution center in New York.  So the fact that the supplier goes to New York to a bigger supplier doesn't make it a Continuing Criminal Enterprise.  They are still suppliers, not exercising control or supervision over the ultimate seller.

I hesitate to mention the other element, because I fear it will obscure the real issue of management in this case.  But also for a Continuing Criminal Enterprise, there must be a demonstration for each person alleged to be part of that Continuing Criminal Enterprise of substantial income.  And contrary to the description that Mr. Vick gave to you, the instruction of law which you will read, instruction -- I believe it is Number 18, says that income, that income is such income that a reasonable person would consider to be considerable or ample economic benefit.  And in this case, ladies and gentlemen, there has not been an iota of description of lavish living or spending by any of these folks.  And when you judge credibility, ladies and gentlemen, and what the government has told you today, think back about what Maurice Saunders told you.  Gosh, one time he went to New York with $40,000, and once he went with $18,000.  And golly, they were selling a kilo a month.  A kilo a month, ladies and gentlemen, is $100,000 gross sale price on the street.  $100,000, Maurice Saunders told you.  He took this big money to New York and they were selling $100,000 worth a month.  And if you believe that, then ask yourself this:  How come Maurice and the other five or six people he was sharing this rented house with fought each month over having to contribute their $100 apiece for rent?  Now, that's the person, the unimpeachable source, the government wants you to rely upon.

**JA1449**

Charles Townes told you, "Oh, yes, we were doing a half kilo twice a week." Mr. Baugh incredulously says, "A half a kilo twice a week?" That's 15 kilos a month. That's $1.5 million worth of money, cocaine, a month. And they were arguing over having to put up that $100 for their rent?

I suggest to you, ladies and gentlemen, in this case we have heard of two cars. One of them belonged to Antwoine Brooks. I asked him, "Did you have a car?" "Yes. I had a Cadillac." "What year?" "1976. My grandma gave it to me." One witness made reference to Richard Tipton, "Whitey," having a car. What year was that? It was a 1972. Cory Johnson had no car. He had no house. He had no gold. He had no diamonds. He had no jewelry. And when we talk about considerable or ample economic benefit, I suspect it is a matter of perspective. For the homeless person, anything someone has might be ample and considerable economic benefit. For the chairman of one of our Fortune 500 corporations, having a half-million dollars income a year might not seem so considerable or ample. What person in this courtroom told you anything about Cory Johnson having things of value? One person. Valerie Butler. "What did he have?" "Oh, he had expensive things." "Such as?" "He had a pair of Guess jeans and a pair of Timberland boots. And I saw him with over $100, I don't think it was a thousand, might have been a thousand. But he had more money than most people who don't have jobs." And that was true.

Now remember, ladies and gentlemen, that we in this courtroom as attorneys are advocates. The attorneys for the government and the attorneys for the defendants, all of us are advocates. We are trained to present our position in the best possible light. And one of the things that we are taught in doing that is that when you have an area of weakness in your case, an element that we can't quite prove, then you attempt to hide that weakness by presenting your strongest point and trying to do so with visually-overwhelming evidence and hope that that wave, that overwhelming wave of strength from your good point will wash over and obscure the weakness of that other point. Here in this case, the government has failed to prove the Continuing Criminal Enterprise as to Cory Johnson or as to any other defendant.

So what does the government do? It covers this lack of participation, management, and control by the defendants by phrasing the question in the words "They," or "What did you get from them?" as Mr. Geary made reference to. There isn't a "they" in the

**JA1450**

indictment. And on direct examination, everything was done by "them." Why, "they" did it all. And when we got up, when we got up on cross-examination and said to them, "Well, excuse me, Mr. Witness, Ms. Witness, I would like for you to tell me specifically what did Cory Johnson do?" Well, more often than not he didn't do anything. Or one of the others did or didn't do something. Overwhelm the weakness if you can by showing your strength.

In this case, the government tried to overwhelm you and show you their greatest strength and to avoid you seeing their greatest weakness. They held up to you blown-up pictures showing results of violent acts. And they are entitled to do that. And they hope that you will be so repulsed by this show of gore that you will recoil from the evidence and thus lose sight of their failure to establish these elements of control and management.

The government in this case has rested its evidence on what I called in opening argument their bounty hunters. I make no apology for that label. There are 21 felons who have been paraded in front of you. They were surrounded by 29 officers who saw no commission of crime, only the result. And they were surrounded by eight citizen identifiers. I say there are three groups of folks here: officers, felons, and identifiers. The identifiers were brought in to identify the particular deceased. And these were the folks -- and I ask you to recall this -- to whom, in order to maximize the emotional effect of their dramatic presentation of their case, the government's case, the government handed instead of a school picture, or one of those pictures that was up here during the course of the government's opening statement, instead of handing to these loved ones a picture such as that, in order to maximize the emotional effect they hand to them a picture from the bloody crime scene. And they get the effect that they want. And they try to influence you in that manner. And they try to overwhelm you in that manner and cause you to recoil and not to see that they have failed in their effort to establish management, control, and supervision. 21 felons. What did they say about getting drugs from Cory? Not one of the 21 ever testified Cory managed them, directed, organized, supervised them. None of them did. Just the opposite: They told you he did not.

As important as what these bounty hunters say is why do they say it. What motivates them to be here? Is there an interest for them, a benefit to them to be here and to testify? How do you gauge their credibility, their believability? The credibility of

these bounty hunters is tainted by three things in this case, ladies and gentlemen. First of all, the promise of immunity. Second, the hope of a 5K.1 motion being filed by the government, exclusively at the decision of the government; and thirdly, the effect of suggestive questioning. Now, what I call "suggestion" Detective Woody calls "investigative technique."

Each of these 21 bounty hunter witnesses has come in here to testify before you tainted by one, two, or three, of those three situations.

There was a commercial that used to be on television in which they came on and to sell their product they said, "How do you spell relief?" The answer was R-O-L-A-I-D-S, Rolaids [AIDS|aids]. In this courtroom, when these witnesses came in before you, you could get one of three answers to this

3074

question: "How do you spell truth?" Some of them spell it 5K.1. Some of them spell it immunity. And some of them spell it L-E-A-D-I-N-G, leading. And you saw a great example of that through the course of this trial. And you can look, and I ask you to look at this tape. This is Exhibit Number 1 for Cory Johnson. It is cued up to exactly the place where I questioned Mr. Woody, Detective Woody, about how he got certain things to be said by Jerry Gaiters. Push it into your VCR. It is going with you. Watch the suggestive -- I'm sorry, investigative -- technique used by the detective. That is how you spell truth for Jerry Gaiters: L-E-A-D-I-N-G.

Do you remember, and I hate to keep going back to the Old West, but do you remember Palladin? He had a card that said "Have Gun - Will Travel." Well, these bounty hunters have a card, too. This one says, Have Immunity - Will Tattle." And they, just a few of them, not all of them, but the major ones in this trial, they have another card. It is a very valuable card. I carry credit cards, a couple of them, in my wallet. I don't have this one. They have it. It has the bounty hunter's name embossed on it. It is called the 5K.1 card. "Don't leave jail without it." You have got to have this card given to

3075

you by the government for you to get a reduction in your sentence. And when you are gauging the credibility of these witnesses, one other thing I would like for you to remember or to recall: These are the witnesses that I refer to as the nonrememberers. The nonrememberers. Our Forefathers wrote into our Bill of Rights a right to confrontation, a right to confront and to question one's accusers; a right to make a government witness answer your questions, not just theirs. Not just

**JA1452**

regurgitate the government line, but answer pointed questions by you or your counsel.

How many of the government's witnesses answered only the questions they wanted to answer, the ones they thought they had to answer to qualify for immunity or 5K.1 motions?

Denise Berkley, like Mr. Geary said, remembered every detail about one defendant, but couldn't remember the name of the person who supplied her with her crack money for two-and-a-half years before she ever met Richard Tipton, at roughly $30 a week. Couldn't remember his name, or wouldn't remember his name. Wouldn't answer defense questions. Wouldn't name other people from whom she purchased hundreds of times.

3076

All the government's crime scene men forgot to tell you that they found a knife in the coat of Johnny Lee Byrd in the car where Mr. Talley was stabbed to death. And only when the defense calls Detective Cox do you find out that in the very car with the stabbed body of Mr. Talley is there a knife which matches in physical characteristics the wounds on Mr. Talley's body. Why? Like Mr. Geary said, it doesn't comport with their case. It points the finger at Johnny Lee Byrd.

And Mr. Byrd, now that we are to him, refused to answer about his felony conviction. "Well, they don't mean anything. Those felony convictions, they are none of your business." He answered only what he thought the government wanted him to answer. And by the end, instead of saying he wasn't going to answer, he couched his refusals to answer in the terms "I don't know; I don't remember." By golly, by the time we got to the end of that meaningful cross-examination of Johnny Lee Byrd, he couldn't remember his birthdate. He couldn't remember his birthdate. "I don't know."

Robert "Papoose" Davis and Dennis Moody, exactly the same. Wouldn't or couldn't. And they did refuse to answer questions of the defense.

3077

And finally, we get to Detective Fleming, chief investigator in this case. He won't answer the question that is asked. It is kind of like being in a presidential debate. You ask a question, Detective Fleming answers whatever he wants to. Finally, even the Court has to scold him. "Mr. Fleming, you have been through this before. The answer can be yes or no. Explain it if you want, but answer the question." He doesn't want to answer the question.

Now, I ask you, ladies and gentlemen, he told you and we heard from Denise Berkley, who said, "Yes, I came in to talk to -- immediately to talk to

**JA1453**

Detective Fleming."  Now this is, I suppose, such a small case that the detective, knowing that this lady is telling him that she has been in constant contact with his suspects for the last two months, has overheard everything they have ever said, watched them do everything they have ever done, and it only involves 11 deceased, that he is not going to take contemporaneous notes.  He is not going to tape-record what she has to say.  He is not going to videotape what she has to say.  And then the government has the audacity, after she is finished, to call Mr. Fleming back to the stand and say yes, quite smugly, "Everything she said is consistent with

3078

the notes that I put in my report."
     Denise Berkley  --
          MR. VICK:  Objection, he did not so testify.  He said it was consistent with what she had stated.
          MR. COOLEY:  I will allow the jury to recall what they will.
          THE COURT:  Go on.
          MR. COOLEY:  And his notes, ladies and gentlemen, that so accurately reflect the consistency of her some hour-and-a-half to two-hour testimony are contained in this report which was put into evidence.  It is marked Government 142.  And we have redacted things that had no relation to Denise Berkley.  This is the entirety.  These two little tiny paragraphs that Mr. Fleming says tell him that everything she testified to you was consistent with what she said to him.  It will be back there with you, ladies and gentlemen, 142.  You read it and you see if we don't have another nonrememberer.
     Now, ladies and gentlemen, the right to confront and question your accusers has to be a meaningful one for the system of justice to work.  Was it, in your opinion, at this trial?  Or did these government witnesses answer only what they wanted to answer?

3079

     Like the surly warden in the movie "Cool Hand Luke," after he had just beaten a manacled prisoner into submission, "As I said, what we have here is a failure to communicate."  That's exactly what we have here, ladies and gentlemen.  We have a failure of the government's witnesses to answer anything but the questions they think the government wants them to answer.  And I ask you to remember that failure to communicate when you judge the credibility of these unimpeachable sources Mr. Vick makes reference to.
     When you judge credibility, I ask you, also, to consider the motivation of immunity.  Now, the government introduced each of its witnesses by saying, "We have only given you use-immunity, have we

**JA1454**

not?" And they did that to enhance the believability of these witnesses, as they called them. Use-immunity means what you say, tell them yourself, can't be used to prosecute you. Transactional immunity is much broader. It is an immunity that no matter what anybody tells them, it can't be used to prosecute you if you have talked to them. The government says, "You have only got use-immunity, isn't that right? We get information from anybody else, it can be used to prosecute you." But each witness that came up here when asked said that he or she understood and believed that they will never be charged. Each one of them had given to the government the names of all these other witnesses, and the government could have used their testimony. Hussone Jones to convict Antwoine Brooks. Or "May-May," Charles Townes. But they haven't even charged them. And the witness says, "I haven't been charged, and I'm not going to be charged."

Now, is the government's representation correct? Or is the witness' understanding correct? The plea agreement says that if their witnesses lie, if they become aware of them lying, they will be charged with perjury. And the government says that as each witness takes the stand to enhance their credibility, their believability, with you.

Well, Jerry Gaiters lied to the Grand Jury, he admitted that. In fact, he admitted it was perjury. Charles Townes lied to the Grand Jury; Hussone Jones lied to the Grand Jury. But as Gaiters said, ain't no one suggested he was going to be charged with perjury. The government wasn't going to charge him with perjury. In fact, he gave us an entirely new version when he took the stand here. Even this, then, even this the detective that he spent 18 hours with knew about. He is not going to be charged with perjury? So is the government's representation to you correct, or is the witness' understanding correct? Or is it just another failure to communicate?

You see, immunity saves these folks, every one of them, from exposure to Count One of the indictment. Count One of the indictment says that if you agree with somebody else to receive and to redistribute drugs, then you are part and parcel of that conspiracy. And as each one of them said, they understood they could be exposed up to the maximum of life in prison without parole if they didn't have immunity. So understand use-immunity when you gauge the interest of these folks.

And finally, I ask you to consider the effect of the 5K.1 motion. What does it mean? It means simply

what we told you at the beginning. If these people are convicted of an offense to which they pled guilty, they must be sentenced. As Jerry Gaiters said, he is going to get the maximum. He is going to get several life sentences if he doesn't come in here and testify the way he is expected to. If he gets a 5K.1 motion, his sentence can be reduced out of those mandatory sentences, out of those maximum sentences, and if necessary, and if the Judge decides, all the way down to zero. Who got the 5K.1's? Greg Scott. What did he tell you he was doing? He was doing weight. They weren't. He was doing one-and-a-half kilos a week. He is going to get a sweet deal. He is on bond. He doesn't think he is going to serve another day. And he told you the New York Boyz ended in June of 1991 when he was arrested. There was no Virginia conspiracy involved in that New York Boyz group. He doesn't know anything about Virginia. He has never been to Virginia. And he never mentioned these two fellows when he was arrested and getting the benefit of a 5K.1 motion in New Jersey. He tattled on all the other people arrested in that house and, according to him, never mentioned them. How surprising.

Pamela Williams, 5K.1, charged with gun charges, has been pending sentencing since last year. Almost a year she has been waiting for sentencing. What do you think she is waiting for? She is waiting to be sure that she can perform for you in this courtroom so the government can then decide how hard to push for a 5K.1 to allow her to walk, and that's what she is hoping for.

Sterling Hardy, 5K.1, pled guilty to murder, one of these causing murder in the course of racketeering. He pled guilty to conspiracy to commit murder -- pled guilty to the malicious wounding. 5K.1 if he testifies in here. And last, Jerry Gaiters killed "Nat" Rozier, and I think the evidence is clear on that. He killed "Mousey," killed Bobby Long, killed Tony Carter. Maximum if he doesn't testify. What do you think he might get? Oh, maybe 20 years. "Where did you get that from?" "Oh, just pulled it out of the air." He is a liar, ladies and gentlemen. You cannot rest a verdict on the testimony of Jerry Gaiters.

You see, for these people with the 5K.1 motion, the 5K.1 is their unholy salvation. Instead of bringing them in here individually, we should have brought them in and have them in unison raise their voices. It is not an Amazing Grace. It is an Amazing Disgrace, the 5K.1. 5K.1, how sweet the sound that saved a wretch like me. Once I was lost,

**JA1456**

but now I'm found.  I was blind but now, after talking with Detective Woody, I can see.  Led by a person who asked them leading question after leading question after leading question.  Consider the power of suggestion.  When you consider the credibility of these folks, consider suggestion.  You start with the bogeyman from New York.  You know, being from the

3084

South, we kind of get taught early that everything from New York must be bad.  And I think probably the only thing worse than these folks from New York is that secret ingredient of the competitor of Pace Picante Sauce.  That's the only thing I know of that's alleged to be worse than these two young men.

Now, I ask you to look at what Mr. Woody calls investigative techniques.  Watch that.  It is ten minutes where it is cued up.  If you want to watch the whole tape, start there.  Remember that this tape is part of 18 hours of working with Jerry Gaiters. We don't know whether this tape represents the fifth or the fifteenth hour of working with him.  We don't know what was suggested before or after.

MR. VICK:  Completely outside any evidence that's been heard in this courtroom.

MR. COOLEY:  It is not.

THE COURT:  I'll sustain that, Mr. Cooley. Go on.

MR. COOLEY:  There was a previous videotape Mr. Woody testified to on February 3rd, 1992, of Jerry Gaiters that was roughly two hours long, according to Detective Woody.  This is the second of those tapes.  There may not be any testimony about how many discussions there were in between.

3085

Now, Mr. Gaiters told you, and he answered a question from Mr. Geary, every time he gave an answer the detective didn't agree with, he was corrected. Mr. Woody says, "Yes, I would confront the person I was interviewing and I would confront them with what I believed to be the information from another witness and see if they would conform their version to that. Hit them in the head with what I thought to be the truth and see if they wouldn't then admit that."

It worked real well with Mr. Gaiters.  It worked real well with Mr. Hardy, who on his second interview, after telling them "I don't know anything about any of this, I haven't done anything," twice, one full interview, and halfway through the other, when Mr. Woody says, "Well, I don't believe you.  And this is why I don't believe you.  This is what we think happened," and he tells him what Mr. Chiles had told them.  And then and only then Mr. Hardy conforms his version to that of Mr. Woody's.

Mr. Byrd was locked up with Sterling Hardy.

**JA1457**

They read the newspaper together. And then in September, 1992, Mr. Byrd decided to write the United States Attorney, Mr. Cullen, and advise him that he had all this valuable information and was prepared to testify or to help. And of course, the fact that he had pending state charges certainly wouldn't have had anything to do with that.

Perhaps the most difficult area for me to address in this trial, certainly the most delicate of areas, is the suggestability of the Greene sisters. And I tell you, it is with great trepidation that I attempt to speak to you about it. But it is important for you to look at that and to address that issue as well.

Everyone on the prosecution team denies that they did anything to attempt to suggest anything to the Greene sisters. As their memories, which were total blanks at one point, began to come back, it was purely on their own. Certainly, those 25 or more visits by the prosecution team had nothing to do with the recollection of these two ladies. Mr. Scott said, Detective Scott, said, "We used our normal investigative techniques in dealing with the Greene sisters." "Pepsi" Greene said in her testimony, "I can't recall if they told me what questions would be asked." But perhaps the most telling demonstration in this trial of the government's ability to suggest the answer it wants comes from "Pepsi" Greene. Today, this morning, early, you heard Detective Dalton tell you about an interview he had with "Pepsi" Greene on January 28th of 1992. "Pepsi" Greene was in perfect health. This predates by a month her injury. She had no problem with memory or recollection at the time. She was asked about that knife, and she said, "I don't know what the knife looked like." But in her testimony before you, she is able to describe and to point out --

MR. VICK: Your Honor, I hesitate to rise again, but in black and white in evidence, it says, "I don't know what kind of knife it was." It is a misstatement of the evidence.

THE COURT: Go on, Mr. Cooley. The jury will recall about that.

MR. COOLEY: She didn't know what kind of knife it was. But when she got here today, excuse me, several days ago, she was able to identify this previously-marked Government Exhibit Number 146. And when did she first see this? The night before she testified for you. Do you think that might have been suggestive, the fact that she did not know what kind of knife it was on January 28th, 1992 when she was in perfect health, but the government shows her this

**JA1458**

picture, the night before, and says, "Which one did it look like?" And now they bring it in to you the next morning. And gosh, we asked, "Well, who drew this for you?" And we find out that it is the multi-talented "Vincent Van Gogh" Vick who has drawn this and handed it to her. Suggestive? I ask you, ladies and gentlemen, is there a better example in this trial of suggestive technique than this document? It is in evidence.

I ask you to take these things, the videotape, take the Grand Jury testimony that's in evidence, and read it. And look at it and see how it was presented. Take these exhibits, this yellow page with the knife drawing. And get a glimpse of what happened, what really what happened, in the 18 hours with Jerry Gaiters and the hours and hours of those 25 visits with the Greene sisters.

This combination of 5K.1 motion, immunity, and its suggestive investigative techniques, breeds inherent disregard for the truth. These modern-day bounty hunters, these 21 felons, have no more regard for the truth or for actual innocence than their predecessors did. They focus on coming in here, nailing their particular nail in the coffin of one of these accused, just so they can get their 5K.1. "Get them dead or alive, guilty or innocent, just give me my reward."

And just who are the principals in this? I'm going to try to speed through these because I know that your endurance is being tested, and I thank you for your continuing patience.

Sterling Hardy, leader of part one of the leaders of the pack. Convicted felon, convicted prior to any of these things occurring. Had a ten-year state penitentiary sentence over his head. First interview, knew nothing about anything, nothing about the specific murder, and specifically, he knew nothing about the killing of Louis Johnson. Second interview, he says the same thing all the way through, until Detective Woody says, "Well, wait a minute. I know you are lying, and here is how I know: Because somebody else told us it happened this way." And then and only then Sterling changes his testimony, conforms it to the version that Detective Woody has just given him. Woody says, "I can't put words in your mouth," and then after telling him what their version is, Mr. Hardy regurgitates it back to him. 5K.1 motion for this man. All the state charges dropped. Certainly, this must be the man on whose credibility we can rely in order to justify the execution of a person.

Johnny Lee Byrd. He is introduced to you as a

**JA1459**

military man, 13, 14 years. No promises. He is here

3090

because he is a good citizen. Well, we find out he says that he turned himself in in Henrico. All those things were designed to enhance his credibility for you by the government. What did we find out on cross-examination about Mr. Byrd? Well, when he would answer, we found out he had five burglaries and a number of other felonies, which means he spent most of those 13 years in the military either incarcerated or committing felonies. He turned himself in. What a noble thing to do, right after being declared one of Chesterfield's Ten Most Wanted men.

The State Police were looking for him and the Henrico Police were looking for him. The Richmond Police were looking for him. He is their principal suspect, but he lies to the detective about the coat and about the car. He lies to you about the knife. Says that knife wasn't there, no. No. "I didn't have any knife in my coat." And Detective Cox tells you on the defense case that the knife was right there. He is hostile. He refuses to remember. He contacts the United States Attorney in September from the City Jail after being locked up with Sterling Hardy and reading the newspaper. He wants help with his state charges. And finally, we discovered that the minimal offense that he is currently serving time

3091

for, forgery, involves theft of checks from his own church. Certainly, here then must be the man, that impeccable source, that Mr. Vick tells you about. This man must be the man upon whose credibility we should rely in seeking the execution of another person.

Ronita Hollman, convicted felon, drug moll with Peyton Maurice Johnson, fully involved with the distribution of crack by her own admission, not charged, not going to be. Had her third child at age 19, used crack throughout all three of them. Agrees that others consider her to be the enforcer. When she was arrested, she had hidden the quantity of crack that she was storing so the police would not find it in the Pamper of her newborn child. Certainly, here then must be that impeccable source. Here must be the person on whose credibility we must rely in order to execute another person.

Stanley "Stinker" Smithers, convicted felon, gives the detective a false name when he is first approached in the investigation. He has a Virginia penitentiary sentence about to be imposed on him in a show cause hearing. He is a nip joint operator. He didn't tell the police. He waited for them to come. Virtually true of every one of their witnesses. When

3092

**JA1460**

his case comes forward, when he needs help with that Virginia penitentiary sentence, then he becomes the most reliable, impeccable source. Surely, here then is the person on whose credibility you should rely in order to achieve a conviction of a count which could carry the death penalty.

MR. VICK: I object. He has continued to argue about the execution. As the Court knows, as the jury knows, as Mr. Cooley knows, that is not properly before the jury at this point.

THE COURT: All right. That's true, Mr. Cooley. I just wrote a note that commented on it. Don't do that.

MR. COOLEY: Valerie Butler. Valerie is a felon. She knew Cory a total of five weeks. She says he took her into the inner sanctum.

MR. VICK: Objection. Misstatement. She has never been convicted of a felony.

MR. COOLEY: She has admitted a felony, a multiple number of felonies to you in the use of and distribution of crack cocaine in her testimony before you in this courtroom.

MR. VICK: Objection. Mr. Cooley knows a felon is someone who has been convicted by a Court.

THE COURT: Sustained. Mr. Cooley, you can say what you just said, but don't call her a felon. She hasn't been convicted.

MR. COOLEY: I'm sorry. She is an unconvicted person who could have been charged by the government with each and every one of those felonies. And she would have been charged with a participation role in the conspiracy to distribute drugs had the government chosen to do so. She knew, by her testimony, Cory Johnson for five entire weeks. In about the second week of that, he took her into the inner sanctum of this conspiracy. Do you remember what Mr. Vick said in his opening statement this afternoon? That criminal conspirators do not let the uninitiated into the inner circles of their conspiracy. And he argues that as to why, and it being the most damning evidence as to why Sandra Reavis should be tied to this conspiracy. He says unless she was already part and parcel, fully into this conspiracy, they never would have let her in the door to the inner sanctum. But now, when it is Valerie Butler we are concerned with, then of course one week into her friendship with Cory Johnson he took her into the inner sanctum. She has gotten immunity. She was an addict. She never approached the police until they came to her in the John

Marshall Courts Building, the state courts building up the street. When? June of 1992. Not January,

**JA1461**

not February, not March, or any intervening month did she go to them and say, "I know some things about this." Only when they came to her and they tell her, "We know about your involvement, and we are going to give you immunity," and, as she says, "I began cooperating that day."

Lastly, we have Jerry Gaiters, a felon, a liar, and a murderer. He is a 39-year-old man who says he was only doing things because these youngsters told him to. He is a liar. He admitted lying to the Grand Jury. He gave a new version to you folks when he testified. He gave about ten versions to Detective Woody in the course of these individual videotaped interviews. He gave, according to Detective Woody, six interviews. He spent 18 hours of time with Jerry and he still couldn't get it right when he came into this courtroom.

Detective Woody says, under oath, "Jerry Gaiters always lies. Until I confront him and show him that I know the truth, only then will he conform his testimony." He has been snitching for ten years. Woody said, "I only helped him with petty things over the past ten years." What are the only things he was charged with in the last ten years? Only these petty things of robbery, nol prossed; rape, nol prossed; attempted murder, nol prossed.

MR. VICK:  Misstatement.

MR. GEARY:  I brought it out.

MR. BAUGH:  That was not a misstatement.

THE COURT:  All of you shut up. The objection will be overruled. Wrap it up, Mr. Cooley.

MR. COOLEY:  Thanks, Judge. He is a murderer. He killed Katrina Rozier. How do we know that? Timing. Denise Berkley, one of the government's witnesses, tells you on the morning that "Nat" Rozier's body was discovered that Jerry Gaiters told her between 9 o'clock a.m. and 9:30 a.m. that "Nat" had been killed. Now, how did he know that? Because Officer Wanda Brown tells you the first initial call, the initial call, came in at 8:43 a.m. Detective Blaylock arrived at the scene at 9:05. And he is the investigative detective. He says the press didn't even arrive for several hours. Well, no one else was there. But Jerry Gaiters manages to know between 9:00 and 9:30 that "Nat" has been killed. Remember, the police didn't determine that this was even a female until the body was taken to the Medical Examiner's Office.

We have a concerned citizen who tells us about Jerry Gaiters on Church Hill. He is not brought forward by the government. Told Woody in a

**JA1462**

conversation that "Mousey" Armstrong was hiding out from the person who killed "Nat" Rozier. "Who was that person?" "It was Jerry Gaiters." Rozier was killed with a .38, the same type of gun Hardy testified that Gaiters had in his possession the night of the Johnson killing a few days later -- just a few days before the killing of Rozier. So also says Jeanette Pauley, "Pea Sue." Gaiters killed the three folks on Church Hill. There were two witnesses that were not brought forward by the government. We have a second one, Delores Jean Calvin, who says she was inside the house. She heard only Gaiters announce himself. He was the only voice that she heard before the shots began. Jerry is the worst of the folks brought before you, ladies and gentlemen. And yet, for his cooperation, instead of facing the potential of a death penalty for his acts, he  --

MR. VICK: Objection again.

MR. COOLEY: It is before the jury.

THE COURT: Overruled. Just go ahead and wrap it up, Mr. Cooley.

MR. COOLEY: Thank you, Judge. Certainly, Jerry Gaiters must be the man on whose credibility you should rely.

And now, ladies and gentlemen, that they have ridden through, were you impressed with the government's bounty hunters and their most recent versions of the truth? Remember, after all, that they put their right hands up and swore to you to tell the truth. They gave their word. And the bounty hunters ride off into the sunset, their eyes firmly focused on that great 5K.1 on the horizon. And back here on the floor of this courtroom, the truth lies trampled in the hooves of their deceit.

You and you alone must decide the fate of Cory Johnson, whether he is to be convicted of offenses involving Continuing Criminal Enterprise, offenses that involve causing murders in the course of racketeering, in a drug conspiracy, or whether he is to be found not guilty.

To make your choice among those options, you and you alone must gauge the credibility of these fill-in-the-blank bounty hunters.

I urge you, ladies and gentlemen, the government has failed to demonstrate the necessary requisite elements of the Continuing Criminal Enterprise, period. They have not shown control. They have not shown management. They have not shown organization or supervision.

On behalf of Cory Johnson, I thank you for your attentiveness to the evidence, for your patience, and your courtesy to me. And I ask you to remember when

**JA1463**

you gauge each of these folks and their credibility, remember those words that Sterling Hardy so sincerely and genuinely said to the detectives after his first interview when he had told them absolutely the contrary of the version to which he testified to you:  "I swear to God, I have told you everything I know.  You have my word on it."

Thank you, ladies and gentlemen.

(At Bench.)

MR. VICK:  How long are you going to be?

MR. WAGNER:  Half-hour to 45 minutes.

MR. VICK:  Mr. Baugh said he will be at least an hour.  I don't know about everybody else, but in looking through the instructions, I do have something I would like to bring to the Court's attention before time runs out today.

THE COURT:  All right.

(In Open Court.)

THE COURT:  All right.  I've decided to stop here now.  It is clear we have got at least a couple of hours left of argument.  And it would be cruel to ask you to sit here for another couple of hours to handle this, so we might as well stop at this juncture.  Unless this will cause a particular problem for somebody, I'd like to start at 9:30.  If it is a problem, I will stay true to my word and start at ten.  But unless there is a particular problem for any one of you, I prefer starting at 9:30.  Is that all right?  All right, fine.  If you all will come in tomorrow morning at 9:30 a.m. Remember my admonition, please, especially at this stage: Don't look at any news reports, listen to radio, or view any newspaper coverage of the events in this trial.  Tomorrow morning at 9:30.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

Mr. Vick, do you want to discuss this?

MR. VICK:  I think we should up there.

(At Bench.)

MR. VICK:  I would just note that going through the Court's instructions, I didn't pick it up -- on Count Eighteen as to the instruction concerning the CCE, it does not outline what the case law in the Fourth Circuit very clearly is from the BUTLER decision and from the RICKS decision as to what the supervisor or organizer.  I just want that language in there, too.  As you know, it is in the disjunctive.  That is what we are going to be arguing primarily, and it would hamstring us not to have that language which the case law very clearly calls for, and it is not in here.

MR. GEARY:  The statute of limitations has

**JA1464**

run on that.  He should have said that downstairs. We have read that to the jury.

THE COURT:  That won't stop me from adding something else to it.  No, put your objections on the record.

MR. GEARY:  Is this going to be given the way it is now?

THE COURT:  I'm going to review BUTLER and I'll add what I think is appropriate.

MR. VICK:  I have BUTLER here.

MR. GEARY:  Will you let us know tomorrow?

MR. VICK:  We can do that right now.

(Document proffered to Court.)

THE COURT:  Have you highlighted the language?

MR. VICK:  Yes, sir.  That has been consistently cited by the Fourth Circuit as the CCE linchpin.

THE COURT:  I've given it before.  All right.  We will start 9:30 tomorrow morning.  I'll let you know.  I can tell you right now, I will incorporate some segments of that language.

MR. BAUGH:  After this I'm having them work on a multiple conspiracy.  Did you know this was there?  We have a multiple we will give you tomorrow.

MR. COOLEY:  I would raise an objection. When the Court gave to us the instructions and advised us that this is what the Court was going to give, and each side had an opportunity to make an addition or correction, none was made by the government.  We have been through an argument in which we raised, apparently, something on this very point based upon the instructions the Court advised us it would give to the jury.  It will now damage our credibility if the Court gives a different instruction, and it will change the theory of the argument.

THE COURT:  The objection is overruled.

MR. WHITE:  Tipton would join.

(In Open Court.)

All right, Mr. Marshal, you can remove the defendants.

(The defendant left the courtroom.)

All right, we will be in adjournment until 9:30.

(Proceedings were adjourned.)

**JA1465**

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

3103

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff;

    v.                              CRIMINAL ACTION
                                        92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

-----------------------------------------

VOLUME XVI

February 2, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3104

P-R-O-C-E-E-D-I-N-G-S
THE CLERK:  Case Number 92CV68:  United
States of America versus Richard Tipton, Cory

**JA1468**

Johnson, James H. Roane, Jr., and Sandra Reavis, the sixteenth day of trial. Are counsel ready to proceed?

MR. VICK: The government is ready to proceed.

MR. GEARY: Defendant Tipton is prepared.

MR. McGARVEY: Defendant Johnson is prepared.

MR. BAUGH: Defendant Roane is ready, Your Honor.

MR. WAGNER: Defendant Reavis is ready.

MR. GEARY: At the conclusion of the arguments yesterday, Mr. Vick indicated rather belatedly that he wanted additional jury instructions based on UNITED STATES v. BUTLER. I would like to know, before Mr. Baugh starts arguing, what changes if any the Court proposes to Instruction Number 18, the significant part of which I read to the jury yesterday and which Mr. Cooley spent a good deal of time on.

THE COURT: All right. 18 as you have it will not be changed. There will be an addition. The addition will read as follows, new paragraph: "An organizer can be defined as a person who puts together a number of people engaged in separate activities and ranges them in their activities in one essentially orderly operation or enterprise. A supervisory position can be defined as one who manages or directs or oversees the activities of others. For purposes of this element, a person may occupy a position of organizer, a supervisory position, or any other position of management without having direct personal contact with each of the persons he is organizing, supervising, or managing. It is not required that a defendant have had personal contact with five or more subordinates in order to satisfy the organizer, supervisor, or position of management element. It is entirely possible for a single Continuing Criminal Enterprise to have more than one organizer, supervisor, or other person in a position of management."

MR. GEARY: I would like to point out for the record that that language the Court quoted comes from Proposed Government Jury Instruction Number 18, which was tendered to all of us on January 7th of this year. And further, there is no UNITED STATES v. BUTLER citation. That language goes back almost eighteen years to UNITED STATES v. SPARLING, as indicated in the instruction proposed by the government. I think at this point, Judge, I know that the Court has a lot of authority in terms of jury instructions. This count, Count Two in the

**JA1469**

proposed, and the proposed addition, deals with the death penalty predicate in this case. Both Mr. Cooley and I, on behalf of Mr. Johnson and Tipton, yesterday argued significantly about our claim that the government failed to show a CCE and relied upon the language which the Court indicated yesterday morning.

THE COURT: Let's shortstop this. I have told you I'm going to give it. The language that you relied upon is in the instruction that I am going to give. The addition is supported by law. And beyond that, as I will instruct the jury in the strongest terms, whatever the lawyers have to say is not evidence, right? So, as far as I'm concerned, let's not waste any more time with this.

MR. GEARY: I don't think we are wasting Mr. Tipton's time with this.

THE COURT: You are wasting my time, because I've already told you I am going to do it. You have made your arguments. I understand them. It is over.

MR. GEARY: With all respect, my job here is not to waste anybody's time.

THE COURT: Absolutely your job is not to waste any time, and my job is to make sure you don't waste mine. All right?

MR. COOLEY: Would you note our objection as well?

THE COURT: Your objections were noted yesterday.

MR. BAUGH: We would join in that as well, Your Honor.

(The jury entered the courtroom.)

All right, Mr. Baugh?

MR. BAUGH: May it please the Court, ladies and gentlemen of the jury: I'm getting too old for this. There is too much evidence in this case. I'm having a hard time sorting it out. First, before I begin, I want to thank, as everyone pointed out, all of you for being so attentive through this. I also want to thank the other attorneys in this case. Whenever you hear people say bad things about court-appointed attorneys, remember this group of people, because they have done their clients proud, and they have done the profession proud with the amount of work and energy they have put into this case.

The Court has instructed you on a number of things. And one of those things is the presumption of innocence. And that's not just an idle theory. There is a valid reason for it. I want to digress from the order of evidence to show you the importance

**JA1470**

of it.

Yesterday morning, Detective Dalton testified that after the killing of Mr. Douglas Moody, he was the young man shot and stabbed in the alley at 810 North Harrison Street, Detective Dalton said he received information from the mother that a week before the killing a boy named Keith and some other people had come to the house with machine guns. He also testified the mother said that her son had hidden under the house all that day and came out with cobwebs because someone named Maurice was trying to kill him. Someone up in Central Gardens. He also testified that two hours before the young man was killed, that this person, Keith, came to the house looking for the victim. He also testified that Gina Taylor was an eyewitness and she had seen someone on top of the victim and had gone out to render aid.

And I asked him, did you ever take a picture of James Roane back to Ms. Taylor and say, "Is this the person you saw?" He said no, he didn't. The reason being is that he presumed, because "Pepsi" Greene said James Roane did it. So he stopped his investigation because he had pre-judged the guilt of James Roane. He never took the picture over there, because he had made up his mind, he had shut his mind to all other variables and had pre-judged James Roane. And that is not the presumption of innocence. So when you go back there, you can't do what the United States is asking you to do: View things in the light most favorable to the United States. When you go back there and you analyze the evidence, you must take the perspective of the presumption of innocence and measure that evidence with that presumption in mind.

Now, the United States has also made a lot of hoopla about the term "common sense." And the Court will instruct you, you may use common sense. But don't allow common sense to substitute or to be a false name for prejudice. You argue common sense when you don't have facts. Common sense at one time said the world was flat. Common sense said women could not run countries. Common sense said certain elements -- well, that's what common sense does.

"If you don't have facts, resort to common sense."

But in this case, we have facts. And I ask you to consider those facts. Additionally, I represent James Roane, along with Arnold Henderson. And even though I admire these attorneys, our job is only to see that you consider the guilt or innocence of our client individually. You are not allowed, and the Court will instruct you, you can't consider the guilt of "they." You have to consider Roane's case as

though no one else were sitting up here.  Just him.
And further, you must consider each allegation
individually as if it were being tried by itself.
And only when you are convinced of his guilt beyond a
reasonable doubt as to each offense beyond a
reasonable doubt can you convict.
     Mr. Roane is charged with several offenses.  He
is charged with Count One, which is conspiracy to
distribute drugs.  I will tell you briefly that we do
not concede the guilt of Mr. Roane, because in order
to be a conspiracy there must be interdependence of
the parties.  The people must be dependent upon one
another's success.  And the government's own
witnesses have said, in fact the most illustrative
witness was Jerry Gaiters, who said, "I initially
worked a deal with Mr. Roane that was 70-30.  And

then I worked a deal with Mr. Johnson that was
75-25.  And then I worked a deal with Mr. Tipton that
was 60-40."  If there was interdependence, there
would not be a difference in the arrangements.  And
all of you heard him say that.
     Further, all their witnesses said Mr. Roane can
sell his drugs for whatever he wants to.  He can do
whatever he wants to with them.  He is not dependent
upon what other people might do with theirs.  That
lack of agreement, that lack of interdependence,
means he may have conspired with people to whom he
gave or sold drugs, but there is no interdependence
with these others.
     Additionally charged in Count Two, the
Continuing Criminal Enterprise.  My father told me
when I was young that a brilliant person is a person
that can simplify any complex issue so that anyone
can understand it.  Yesterday in this courtroom, and
I have been a lawyer for years, and I have been a
federal prosecutor, and the most brilliant definition
I have ever heard of Continuing Criminal Enterprise
was given by that lawyer right there.  That is what
Continuing Enterprise is.  And I would submit to you
that Mr. James Roane did not participate in a
Continuing Criminal Enterprise.  The structure that

is required is not there.  The direction is not
there.
     He is also charged in Count Five.  Count Five
charges the murder of Mr. Douglas Moody in
furtherance of the Continuing Criminal Enterprise.
Note, he is not charged with the murder of Douglas
Talley.  Now, why if Hussone Jones knew back in July
that he was there and participated, why the United
States did not charge him with that offense, I don't
know.  But he is not charged in the murder of Douglas
Talley.  But he is charged in Count Five with the

**JA1472**

murder of Douglas Moody in furtherance of Continuing Criminal Enterprise. He is also charged in Count Six with use of a firearm in furtherance of that Continuing Criminal Enterprise in the death of Mr. Moody. He is also charged in Count Seven with killing Douglas Moody in furtherance of racketeering.

If you find that my client did participate in the murder of Douglas Moody, and you find a CCE, you can find him guilty of Count Five. Additionally, you can find him guilty of Count Six. If you find a series of racketeering activity, you can find him guilty of Count Seven, if you find he participated in the murder. And we would submit that is a significant question.

Mr. Roane is charged in Count Eight as well. Count Eight charges the murder of Peyton Maurice Johnson, who was shot in the nip joint on the corner of North Harrison Street, 1200 block of West Clay Street. He was shot several times. He is charged in Count Eight with the murder of Peyton Maurice Johnson in furtherance of the Continuing Criminal Enterprise. In Count Nine, he is charged with the use, or aiding and abetting the use of a firearm in that homicide.

Count Ten charges Mr. James Roane with the murder, or participating in the murder, of Peyton Maurice Johnson in furtherance of racketeering activity, the same as Count Seven charges as to Douglas Moody.

Count Eleven charges Mr. Roane with participation in the murder of Louis Johnson in furtherance of a Continuing Criminal Enterprise. Louis Johnson was the gentleman who was shot on Kinney Street just at the intersection of Kinney and Catherine. He is also charged in Count Twelve with the use, or aiding and abetting the use by another, of a firearm in the murder of Louis Johnson.

He is charged in Count Thirteen with the murder of Louis Johnson in furtherance of racketeering activity. Mr. Roane is charged in Count Fourteen with the murder of Torrick Brown on Lynhaven, on Southside. And he is charged in that murder in furtherance of racketeering activity. He is also charged in Count Fifteen with use of a firearm during the commission of the murder of Torrick Brown.

He is also charged in Count Sixteen with the murder of Martha McCoy -- I'm sorry, with the maiming of Martha McCoy in furtherance of racketeering activity. And he is charged with use of a firearm during that maiming.

One year ago today, February 2nd, 1992, James

**JA1473**

Roane was arrested. And he has been in custody continuously. All violations occurring after February 2nd, 1991, he has not been charged with except those that are overt acts attendant to the conspiracy. And now we need to analyze each of them.

I'm going to talk about, even though he is not charged with the murder of Mr. Douglas Talley, mr. Douglas Talley was stabbed a number of times over on Southside. And you saw the extremely gruesome photographs. You also heard the story by Mr. Hussone Jones. And Mr. Hussone Jones said that "I witnessed the killing and that I saw the knife." And the knife was a large government black-handled-type thing which most people would describe it, I'm not saying you are bound to this, but as a military fighting-type knife. The United States has alleged that Hussone Jones must be telling the truth because the weapon that was described by Priscilla Greene that she received from James Roane matched that description. And how could two people who didn't even really know each other that well coincidentally describe the same weapon?

Remember, Priscilla Greene said that immediately after the killing of Talley, James Roane brought her a bloody knife, and she kept it and returned it to him just before Douglas Moody was killed. And he gave it back to her again bloody and she was asked to dispose of it. Hussone Jones said that he saw the killing, and the United States has asserted, "Wait a minute, he must be telling the truth because Priscilla Greene saw it."

But one witness says they are liars. Now, during opening I stood up and I made a mistake. I said, "The United States knows what happened, because they found the murder weapon in the back of the car." And they said, "No, you know that's not true." Now, that was an assumption on my part. And here is what I predicate that assumption upon. Here is who says -- Hussone Jones may have seen something. But he is lying about that knife. And here is why.

Dr. Marcella Fierro sat in that chair, and even though she did not do the autopsy, she reviewed Dr. Wiecking's autopsy report. Remember that? She said, in response to my question, "The murder weapon had a blade approximately three-quarters of an inch in width." Now, you can take a small knife and stick it into something and make a big wound by slashing. But you can't take a big knife and make a small wound. The knife that was described by Priscilla Greene, the knife that was described by Hussone Jones, remember

**JA1474**

what Priscilla Greene said?  It was approximately 18 inches long.  And the blade was three inches thick. The weapon that killed Mr. Talley was three-quarters of an inch in width.  Take a ruler back with you and measure the width of this blade.

Now, the United States has said, "No, we will prove this is not the murder weapon."  And I assumed again, as I'm getting older, that there will be a report that they tested this and there is no blood, that no one washed this off; that they tested it and there were no fingerprints.  But those reports are not here.  But I don't know if this is the knife that killed Douglas Talley or not.  But the blade that killed Douglas Talley is the same size as this weapon.  And if you are doubting me, you can look in the autopsy reports which have been offered.  In fact, the autopsy report as to Mr. Talley has been offered as Government Exhibit 3.  And you will recollect the testimony of Dr. Fierro.  She described the weapon.  And Dr. Weicking in his autopsy did not do what we call wound measurements or a location chart as to where the wounds are, how deep each wound is, how wide.  But she was able to say, based upon the photographs, and they lay a scale next to the wounds, she says the knife could have been no wider up to the point that it penetrated of approximately three-quarters of an inch.

Now, by that, Dr. Fierro is saying, one, Hussone Jones is lying about the knife.  Number two, Priscilla Greene is lying about the knife.  And Johnny Lee Byrd is beyond  --  I mean, that's ridiculous.  I won't even discuss it.

Now, the United States has said, "Well, who is going to get up and call these people liars?"  Their witness does.  I'm not asking you for an issue of credibility.  I'm telling you Dr. Fierro has done a scientific analysis of these wounds and she has put her reputation on the line.  And she has said that's the size of the knife.  There is not one wound in that body that could match the weapon described by Priscilla Greene, who allegedly corroborates Hussone Jones.  It cannot have happened.

The killing of Douglas Moody:  My client is charged with participating and aiding in the killing of Douglas Moody in furtherance of a Continuing Criminal Enterprise.  Now first, the United States has no evidence, none, that this was in furtherance of any drug-related activity.  They have put forth the argument, "Wait a minute, Douglas Moody was involved in drugs, these people were involved in drugs, if they murdered him, it must be over that."

Use your common sense.  No, it is not a question

**JA1475**

of common sense.  Where is the evidence?  If one judge beats up another judge, is it a judicial issue?  No, it is not.  The question is, where is the evidence?  And you can sit here and say, "Well, I think it was; it must have been."  No, where is the evidence?  You have sworn an oath that if the evidence is there, hunch is not enough.  And where is it?  Did you hear one  --  we heard some evidence from Trenton about a fight over turf.  Did you hear one person come in and say that any of these defendants told someone "If you don't move off this block we will hurt you"?  Did anyone come in and say that?  No.  Did anyone say, "I overheard a confrontation between any of these defendants and Mr. Douglas Moody, saying we understand you are biting into our turf"?  No.  They said, "We want you to assume, use your common sense, and assume that, one, there is a murder; and number two, it was in furtherance of some drug activity."  I would submit there is no evidence.

But let's get into the Douglas Talley murder first.  The United States yesterday  --  Mr. Robert Davis gave some discussion about "I heard them talking about it" and all that sort of stuff.  And we also heard from Ms. Denise Berkley.  Denise Berkley said, "We were in the place, we were doing drugs, we heard the gunshot or the boom.  We thought that the police were coming.  We cleaned up all the drugs, went outside.  And when I got outside, I saw James Roane stab Mr. Moody."  I sat there and I asked her this.  She said, "I stayed out there until the ambulance came, and the police.  But I didn't tell them anything.  I stood out there and watched until then."

"Did you see someone bent over to save his life?"

"No, I didn't."

Robert Davis said the same thing.  But Denise Berkley said she did.  She said, "I saw him stab Douglas Moody."

Now, the United States has said no, that we have cheated.  We brought Ms. Gina Taylor in.  They said no, we have cheated.  We have brought Gina Taylor in and we didn't tell you that Gina Taylor was Mr. Tipton's girlfriend.  That's a lie.  No one said she was a girlfriend.  That was a lie.  She said she had gone out with him.  More importantly, I don't care if she is having his baby.  Did Ms. Taylor come in here and alibi Mr. Tipton?  No.  Did she mention Mr. Tipton's name?  No.  She said James Roane didn't stab him.  Did she offer one bit of evidence?  No, because she didn't see that part.

**JA1476**

And, more importantly, reading along, we know that Ms. Taylor was out there because Detective Tuttle, the forensic gentlemen, said he received information she was out there. In fact, they found a knife out there that they thought might have been the murder weapon that was used to cut his clothes off to try to resuscitate him. And they come in here and say she is a liar. She has lied under oath. The only person in this whole damn case that has done anything to help of any of these victims, the only person who sat out there, gave her name to the police that night, gave her address. And shame. And we know she was there. But because she doesn't fit with the plan, she is a liar. She told them that night what she saw. She said it. She told Detective Dalton. She told everyone out there what she saw.

Now, she must be a liar because she knows Mr. Tipton. Obviously. She is his girlfriend. Who was Dr. Fierro sleeping with? Because Dr. Fierro describes the weapons and she said in her autopsy report, referring to Exhibit Number 11 -- you can take it back there, I'm on the third page -- "Stab wounds were of a single sharp-edged type with knife width of five-eighths to three-quarters of an inch and depth of at least three inches."

Now, this was not the knife that killed Mr. Moody, because the police had it in their possession. But you take a ruler back and measure three inches up this blade and measure the width. The knife that killed Douglas Moody was shaped like this. Now, is Marcella Fierro dating Mr. Tipton? Because she says that anyone who says that that young man was stabbed with a fighting knife like Priscilla Greene said is lying. This is the shape of the blade.

Now, I'm not sitting here and saying you can't believe these people because they are scummy. I'm just saying Dr. Fierro, in her scientific analysis which is written in there, describes a blade that could not match the -- I will never use the term "Vincent Van Gogh" Vick, but could not match the drawing which she identified. It is impossible. You can't take a blade like that and make a wound that small.

And by the way, Dr. Fierro is not commenting on Dr. Wiecking's report. She did it herself. In fact, not only does she describe the weapon, she actually did a wound chart detailing each wound and number, and when you read down here, Section 4, it has wound size in inches, width, length, and depth. I should warn you, where it says width, it would be, remember, you are talking about in a surface. So width would

**JA1477**

be this distance.  Length of the wound would be this distance.  And depth would be here.
(Counsel indicating.)
She did a chart on each wound.  Some of the wounds are bigger because you can make a slice.  But she said that the blade is five-eighths to three-quarters of an inch.  This is not the weapon that killed Douglas Moody.  But it was shaped like this.  And if Denise Berkley  --  well, if Priscilla Greene said she saw the knife that killed him, she is wrong.

Now, Detective Dalton told you that "The reason I stopped this person named Keith from being considered a suspect is because Priscilla Greene told me that she saw James Roane stab Douglas Moody to death."  And on the stand on direct examination, she said the same thing.  But on cross-examination, she said, "I saw James Roane bending over him slapping his face trying to wake him up on the porch."  And he wasn't stabbed on the porch.  She did not see James Roane stab anyone.

But let's go a little bit further.  Gina Taylor said, "I did not recognize the person who did the stabbing.  In fact, I couldn't tell you if it was a man or a woman at the time.  I can't tell you if it was a man or a woman."  But she can tell you  --  I mean, if you saw someone in the distance, can you tell it is a man or woman?  You might not be able to.  But she said, "I can tell you this:  It wasn't him."  And look at the description she gave Mr. Dalton.  She said one, the person that was on top doing the jabbing was the smaller black male.  On page one of the autopsy report of Mr. Douglas Moody, here is the name of Kareem Abdul Hakim.  Height or length of the body, 66 inches.  Weight, 160 pounds.  Whoever killed him was smaller than that.  She said that that night.  I don't know if it was a small woman.  I don't know if it was a small man.  But they were dressed in dark clothes and they were smaller than the victim.  She said that that night.  Look at the autopsy report.

Has the United States convinced you that Gina Taylor is a liar?  What motivation does she have to come in and say, "That was not the person I saw"?  Some relationship she might have had with Mr. Tipton?  She said, "I went out with him."  She didn't say girlfriend.  He tried to get her to say that.  She didn't.  Anyone who gets up there and says that she said she was a girlfriend, that's a lie.  Now true, I understand that sometimes in the heat of battle people might hear things a certain way.  But it is still wrong.  The government may have their own

**JA1478**

reason for lying about this woman. But it is still a wrong reason. People have reasons for doing wrong things all the time. That doesn't justify it.

There should be shame for making fun of that woman, or trying to. She sat out there and she tried to save a stranger's life. She had blood on her from a stranger. She stayed until the police came and she came forward like a citizen. The only person I have seen in this case who is not a police officer that should be admired is her. Shame. And I will apologize to her for somebody in the profession.

And remember this: Did the United States put Detective Dalton on the stand to give you this story about Keith? No, they did not. And do you know why? Because it didn't jive with the plan to get "Whitey." And that's why. Did you see Mr. Dalton last week at all? No, you didn't. Detective Dalton spoke with the mother. Now, of course, she might be having an affair with one of these defendants, too, and might be trying to cover who murdered her son. But she told Detective Dalton over a year ago that this man, Keith, and his friends came there with guns. And Keith was looking for him two hours earlier, because somebody named Maurice thought that Doug Moody had to die.

And remember this, I cannot overly emphasize this: Detective Dalton stopped his investigation into Keith's involvement because "Pepsi" Greene said she saw the stabbing and it wasn't Keith. But now we know from the stand she did not see the stabbing. And we also know that Gina Taylor did. And we also know that Dr. Fierro describes a knife different from that which Priscilla Greene said she received. Priscilla Greene in her own mind might believe that James Roane stabbed that person, just like she got on the stand and said initially "I saw him." But somewhere in there, somebody told her something. I don't know if it was the government, street talk, or whatever. But she is now convinced in her own mind that he did. But the objective evidence, the evidence that cannot be cross-examined, the lab report, the autopsy report on the weapon, says it could not be as she said it was.

Now, if you want to start off with the presupposition that Mr. Roane is guilty, you can probably come up with some common-sense logic, maybe the certain way he held the knife a certain way. But if you start off with the presumption of innocence, and you look at Dr. Fierro's report, "Pepsi" Greene cannot be telling the truth. Period. And I will say this, by the way: Doug Moody died, and all these young people died horrible deaths. All of them, the

**JA1479**

3127

majority of them, were drug users.  Mr. Moody had fresh injection marks in his antecubital space when he died.  But he did not deserve to die that way.  And Gina Taylor did try to comfort him.  And for that, she should be lauded, not called names.

Peyton Maurice Johnson.  Oh, back up a minute.  Denise Berkley says she came in here and told a lot of things.  Remember Denise Berkley?  She said a lot of things.  And then because she didn't stand up too well under cross-examination the United States put Detective Fleming back on the stand.  The detective got up there and said, "She testified consistent with what she gave me from our reports or what she told me."  Remember that?

Now, this is the redacted version that co-counsel has offered.  On 2-21-92, which was several weeks after the death, and in fact, it was 19 days after my client's arrest, and some time after the death of Mr. Peyton Maurice Johnson, and also after the death of Doug Moody, these are Detective Fleming's words.  "I interviewed an informant on 2-21-92 at 2100 hours in the A-Squad interview room.  This informant advised me of their knowledge of the homicides in the Hancock, Norton, and Clay Street area.  This informant advised me of the suspects in

3128

the homicide at 2817 East Clay Street.  The source pointed out 2710 Catchpenny Road as the place where "O" and "Whitey" stayed.  They are also responsible for some of the recent homicides.  There is a description."

You heard Ms. Denise Berkley talk about James Roane.  Did you hear Roane's name in here?  Did you hear any mention of James Roane?  There are not even that many J's in this paragraph.  James Roane was not mentioned.  She did not testify consistent with the information.  Maybe she told Detective Fleming that James Roane was a big crack dealer up in that area and the detective, out of some sense of sportsmanship decided not to put his name in the report.  Was that added later?  The government must convince you beyond a reasonable doubt that it was not.

Peyton Maurice Johnson.  No wait, let's back up again for a second.  If my client did not stab Douglas Moody, then he could not  --  and I haven't heard anyone that put him there that is credible.  Because Denise Berkley's testimony, you can't accept her testimony and accept Dr. Fierro's testimony.  You can't accept Robert "Papoose" Davis' testimony and Marcella Fierro's testimony.  You cannot except "Pepsi" Greene's testimony and accept Marcella

3129

Fierro's testimony.  Who but those three even said

**JA1480**

they saw him that night?  Who can even put James Roane in that neighborhood?  He probably was.  Hell, he was living over there.  But they are the only ones who put him anywhere in that neighborhood that evening.  We would submit there is no evidence before this Court at this time, credible evidence, consistent with Dr. Fierro, that would indicate that James Roane participated in the murder of Doug Moody.

Number two, even if he did, and believe me, I am not conceding that point, there is no evidence that it was in furtherance of drug activity.  Period, dot, whether it be racketeering activity or Continuing Criminal Enterprise.  You have to make it up.  You have to allow any prejudice that is created to run rampant.  A moment about prejudice:  As you sit here now, some of you may actually hate these young people.  Some of you may view them as a scourge.  Others you may look at them as in saying, "What went wrong?"  But if you do recognize that, if you recognize in yourself that feeling, then you have the duty to suppress that feeling and handle their cases as you would handle the most important person you have ever met.  You are not allowed to have your prejudice manifest itself.  And if you feel that now, and you should search your conscience now, if you feel that way, then you should recognize you have a higher duty; that you have an obligation to suppress that, and view them with the presumption of innocence.  The United States is going to try and make you hate them.  They have with these photographs.  I can understand that.  And the pictures of Douglas Moody are horrible.  The picture -- they show these pictures to these people, these loved ones.  But because the killing -- I mean, the United States has the theory these killings are so horrible, let's kill someone.  No.  Convict the person that has been proven guilty.  No one else.  No one else.

Peyton Maurice Johnson.  Peyton Maurice Johnson was shot in the nip joint.  The United States put on Mr. Smithers.  Mr. Smithers came to Court and said, "I run the nip joint."  Mr. Smithers said, "I have the nip joint, it is the only club up there, the phone is a half-block away.  It is not uncommon to find Peyton Maurice Johnson in my nip joint.  He is there two to three times a week," I believe he said.  Your recollection controls.  I have heard a lot of evidence.  But I believe he said two to three times a week.  Additionally, he says it is not uncommon to find James Roane there two to three times a week.  He comes in there and he drinks.  So it is not uncommon to see him there.  He said that on the night that

**JA1481**

Peyton Maurice Johnson was killed, James Roane came in and said "'Stinker,' are you open yet?" He looked right at Peyton Maurice Johnson, and "Stinker" said, "No, not yet." And James left.

Now sometime, either two minutes or five minutes later, people burst in and shot Peyton Maurice Johnson. Now the United States says use your common sense. Obviously, James Roane went out and told these people that Peyton Maurice Johnson was in there so they could jump in and kill him.

Now, they have offered some witnesses who said, I believe it was Denise Berkley, who said James Roane was looking for Peyton earlier. Well, that's the only evidence of that. And quite candidly, I don't know if he did or not. But I'll tell you this: The United States says to use your common sense. Those people knew he was in there and they went in there to kill him. But recollect the testimony of Mr. Smithers. Mr. Smithers said that when the shooters came in -- remember Anne Jones first. This is an automatic. The bullets are inserted into the stock. When you pull the slide back and let it go, the top

3132

bullet is stripped off and put in the chamber so it can be fired. Until that happens, the gun can't be fired. Mr. Smithers testified, under oath, that when the people came in, in his presence, they pulled the slide back. The weapon was not ready to fire when they came in.

Now, and far be it from me to use the term "common sense," that's a government term. But does it follow that if you know someone is inside, and your purpose is to kill him, why do you wait to get inside before you arm the weapon?

(Counsel distracted by noise in courtroom.)

I'm sorry, I didn't hear the whisper. Did I miss something?

THE COURT: Mr. Baugh, continue with your argument.

MR. BAUGH: I thought it might be important, Your Honor.

And you heard Mr. Smithers say that. Now, does it -- is that evidence that Mr. Roane warned someone? Now Mr. Smithers, I would concede, he said five minutes one time, he said two minutes another time. That's fine. We all know that with the passage of time -- I'm not saying he is a liar, but with the passage of time everybody's story gets a

3133

little better. The fish gets bigger, the woman more attractive, the play more spectacular. He was probably frightened, as he should be. But the bottom line is, the weapon was not armed when they came in. And that's the evidence that Mr. Roane tipped, like

**JA1482**

some bird dog, pointed out Mr. Peyton Maurice Johnson to be killed.  Now, of course, we also have the testimony of a person in protective custody who says Mr. Roane was looking for Mr. Johnson earlier.  There is no corroboration for that.

Now, "Papoose" Davis said, "Well, James Roane came and got the weapons and all that stuff."  Number one, no one saw James Roane with a weapon that night.  Not any of their other snitches say that.  We know about Ms. Berkley, about Mr. Robert "Papoose" Davis, because they told you that they watched James Roane stab Doug Moody.  And Marcella Fierro says they are liars.  The weapon was not armed.  And if I am wrong, that's fine.  Your recollection controls.  In fact, I know I irked the Judge because I asked the guy about pulling the slide back about three times.

We would submit  --  oh, wait a minute.  I'm getting old.  I'm forgetting all of this.  Peyton Maurice Johnson was a drug dealer.  Peyton Maurice Johnson had a friend he lived with, and I believe

3134

somebody testified it was a girlfriend, but I don't know, Ronita Hollman.  But did anyone tell you, did Ronita Hollman tell you that James Roane or Mr. Tipton or Mr. Johnson had come to her and said, "You better tell Peyton to stop selling drugs here"?  Did anyone overhear a conversation where someone said, "You are interfering with our turf"?  There was a conversation about Ronita:  "You are kind of heating up the area here.  You know, you are going to get everybody busted because you are just getting a little rampant."  But was there any conversation, any evidence that there was some rival activity?  There was some discussion about a tape, which of course we never heard.  It was never fully developed.  But has anyone heard anything about that tape having something about rival drug activities.

Under the cross-examination by counsel, Mr. McGarvey, we heard that Mr. Peyton Maurice Johnson was a bad dude.  But there is no evidence of a drug war.  There is no evidence.  Now true, Peyton Maurice Johnson was a drug dealer, my client sold drugs, these other defendants sold drugs.  These two gentlemen over here.  I don't know about this lady over here.  She goes out with Mr. Roane.

Where is the evidence?  Common sense?  You can

3135

make it up.  But that's not evidence.  If you want to presume guilt, you can probably see it that way.  But if you follow your oath, I submit you go back there and you ask your fellow jurors, "Where is the evidence?  Show me the objective evidence that if this killing did occur," and obviously it did, somebody killed the young man, and no matter what

**JA1483**

that young man might have been, if he had drugs in his system or he was a drug dealer, he did not deserve to die.  "Where is the evidence?"

Now, absent that  --  well, first, in order to convict my client of participating in the murder of Peyton Maurice Johnson, you must be convinced beyond a reasonable doubt that my client knew what was going to happen and aided and participated in some way.  Now, "Papoose" says they came back and had all these guns.  "They told me to wipe them off."  Well, that's fine.  There is no corroboration for that.  If you want to accept Mr. Davis' testimony, you can.

In fact, let's talk about Mr. Davis for a minute.  Which probably is why I got so angry when I woke up this morning thinking about Gina Taylor.  That man sits there and says that he couldn't find his family for 26 years.  He doesn't remember the day that his brother and sister were murdered.  He doesn't remember the day they were buried.  That is shocking.  That should make people cry, that someone can be so insensitive.  Now wait, I'm not saying he is the only insensitive person in this case by any stretch of the imagination.  But contrast what he did with what Ms. Taylor did.  It is dreadful.

There is no evidence that Mr. James Roane participated in the murder of Peyton Maurice Johnson.  And further, if there is evidence to that effect, there is no evidence that it was involved in drug activity or because of drugs.

Now, the United States has put forward the theory the reason these people were killed is that because up in Trenton, New Jersey, they said, "People who mess with us must die."  And further, Ronita Hollman said that Mr. Tipton and Mr. Roane came and said, "We are going to take over, even if bodies have to fall or bodies have to be laid" or something to that effect.

Where is the evidence that this murder involved drugs?  It is not there.  Period.  In fact, Ronita Hollman testified it was a personal thing.  She did.  There is no evidence of participation in CCE, no participation in murder, no participation in use of a firearm, no evidence of participation in the murder involving racketeering activity.

Notice, I'm not talking about you can't believe these people because they are scumbags or because they are under witness protection.  I'm talking about the evidence.

Louis Johnson was on the corner of Catherine and Kinney street when he was shot.  Three witnesses came in:  Dennis Moody, Sterling Hardy, and Jerry Gaiters.  Now first, Jerry Gaiters:  It is a sin that

**JA1484**

Jerry Gaiters is not in custody, under arrest.

MR. VICK:  He is, Your Honor.

MR. BAUGH:  I have misspoken.  It is a shame that he is not sitting at this table being tried for the killing of Katrina Rozier.  You heard Denise Berkley say that Katrina Rozier was her best friend.  In fact, I believe she used the word "lover."  And you heard Denise Berkley say what time Jerry Gaiters told her that Katrina had been killed.  Now, unless Detective Blaylock checks with Jerry Gaiters before he responds to a murder scene -- in fact Detective Blaylock didn't know a name and didn't even know the sex of the victim.  And in Katrina Rozier's  --  I don't know if they introduced the autopsy or not, but the time is on there from the Medical Examiner as to when the call came in and when the police responded and when the M.E. responded.  How did Jerry Gaiters know about the murder before it happened, before the police found out?  How did he know?

Katrina Rozier was a drug addict.  She died with a crack pipe in her glove and a condom in her pocket.  But she did not deserve that death.

Jerry Gaiters comes to Court and he says -- I got mixed up now.  One of them says that the car pulls up and that three people jump out with guns.  And one of them says that my client, Mr. Roane, fires his gun and that the victim, Mr. Louis Johnson, falls and that another defendant stands over him and pumps bullets into him.  But Anne Jones comes in and says that all the bullets recovered  --  now, all the bullets that were fired were not recovered.  I'll concede that.  But all the bullets that were recovered, both in the body and on the scene, came from a Glock.  One gun.

Further, you can take those bullets back with you.  I don't know if Anne Jones told you this or not, but a Glock has a very unique firing pin.  It is shaped like a rectangle.  You can look in the back of the brasses and you can tell whether or not it was fired with a Glock.  All the brasses that were found out there, and there were like 15, are Glock.  Now, of course there is a possibility that Mr. Roane fired a shot, picked the brass up, put it in his pocket and left with it.  Or possibly, a shot was fired, the round ejected, and they didn't find it.  But statistically, the implications of some 16 brasses, and the only one they can't find is that one, is rather odd.  Particularly in light of the fact that  --  well, the next witness says that Mr. Roane got out and put the weapon directly against the man's head, or within inches of his head, and it misfired.

**JA1485**

Now, did Mr. Moody say that Mr. Roane got out, walked over, put the weapon against his head, and fired a shot and then he fell? No, we don't have him that close. We have him jumping out of the car firing a shot. So the stories are different there. Mr. Gaiters said, I believe, "All three people were standing around and I saw fire come from all three weapons."

Now, absent Mr. Gaiters, Mr. Moody, or Mr. Hardy, is there any evidence that James Roane was there? What corroboration? What corroboration on Louis Johnson?

Would any of those people, would they convince you beyond a reasonable doubt to believe their word?

Of course, if you are convinced beyond a reasonable doubt that those three people are telling the truth, then of course you can convict. There is one other problem, though. My client isn't charged with aiding and abetting or participating in the murder of Louis Johnson. He is charged with aiding and abetting and participating in the Louis Johnson murder in furtherance of either a CCE or a racketeering activity. What evidence? Now, we know that Louis Johnson sold drugs. True. In fact, I believe that someone testified that most people over there do. One witness said 95 percent. I believe Ronita Hollman said everybody did. On cross-examination she said a few old people don't.

What evidence is there that if my client did participate in that killing, and I am not conceding that he did, that it was in furtherance of drug activities?

If you find the evidence, fine. Convict. But if it is not there, if you have to make it up, you can't. And if you do, you are violating your oath.

Torrick Brown. We have conceded the shooting of Torrick Brown and Martha McCoy. You have heard the evidence that the defendant, James Roane, got out of prison in November; that the mother of his children told him that she was having an affair with Torrick Brown, who lived six doors down; that there was a confrontation between the two; that in January, she told James Roane that it was time to change their relationship, and that she was seeing Torrick Brown again, and Torrick Brown was killed.

Now, true, it is alleged that other people involved in the conspiracy, in fact it is almost conceded that other people involved in the conspiracy were there and participated in the shooting. But the United States says, "Well, that's part of this macho thing about 'We have to kill.' That's common sense." This is an indirect drug involvement. If my

**JA1486**

car doesn't start when I leave here today, and the Judge gives me a boost, is that a judicial act? No. The same thing in this killing. Because people involved in the activity participated in it, is it a drug activity? No. There must be evidence of this. And it is not there.

And by the way, I want to bring this out. The other killings all occurred in Newtowne, with the exception of Mr. Talley, who was killed over in Blackwell, on Southside. But we already know that Mr. Talley had driven the car and all this sort of stuff. Is there any evidence that Torrick Brown had anything to do with these people? No. Any evidence that he had anything to do with drugs? Well, he had drugs in his system, but they didn't bring it out. Look in the autopsy report. It is in there. No. Was he even killed in an area nearby? No. In fact, as the evidence is here, was this a domestic shooting? It makes no difference to the victim. You are just as dead and it is just as wrong. But we are talking about man's law, and it is not in furtherance of any racketeering activity.

And further, look at Mr. Roane's reaction. According to Mr. Hardy, Mr. Roane left that murder scene, went to Whitcomb Court, and consumed so much heroin that he threw up and was sick all that night, into the next day, when he was arrested one year ago today. And also remember this -- well, moving along.

The same would apply to the shooting of Martha McCoy. Why she got shot, I don't know. Now, we do know from Martha McCoy that James Roane had come over to the house and there had been some kind of discussion between James Roane, Martha McCoy, and Torrick Brown's wife. And she said, "I was trying to keep her from finding out about this." And maybe that had something to do with it. I don't know. But the burden is not on us. The burden is on these people to convince you beyond a reasonable doubt that that killing or that wounding had something to do with drugs. And I would submit to you that you have to violate your oath rampantly in order to come to that finding.

There is conversations allegedly with Ms. Butler, who said after all of this, James Roane called her and said he was being held for the shooting of Torrick Brown and Martha McCoy. He said, "I should have killed her" or "If I had killed them all, I wouldn't be in jail." And he was concerned about witnesses against him to that murder. And further, he told Valerie Butler, according to the United States' evidence, that he was concerned that

**JA1487**

"Stinker" knew that he was in that house prior to the killing of Peyton Maurice Johnson. But did Mr. Roane indicate that he had a concern about Talley? No. I mean, Hussone Jones had to have seen the murder. Did he indicate any concern about that? No. Why? Because he didn't know. Was there a concern about Doug Moody? I mean, everybody in the world sat out there and said they watched what happened; they watched the ambulance pull up, watched the police pull up. Did he indicate any concern about all the witnesses over there? No. Why? Because he didn't do it. Did he indicate he had a concern about witnesses coming forward on Louis Johnson? No. Because he didn't to do it. That's right.

Now, the United States would say, "Well, we have to take these witnesses the way we find them." Mr. Hussone Jones, Ms. Denise Berkley, and Ms. Priscilla Greene -- Ms. Priscilla Greene admitted it on the stand -- embellished their testimony. They went a little bit further than the facts would permit. That's called perjury. That's called perjury. Dr. Fierro says that's perjury.

They say, "Well, if that's perjury, you can believe them on some other things." No, the wounds could not have been imparted the way they say. Did Ms. Denise Berkley improve upon her story with time? Yes. Did Ms. Priscilla Greene improve upon her story in time? Yes. She said, "I saw him kill him. I saw him stab him." It got better.

My client has done some things that are illegal. And he has done some things that are morally bad. And you are being asked to pass judgment on him. And if he did those things which are illegal and it can be proven beyond a reasonable doubt, you should convict him. But if the acts were bad and there is no evidence that they were his, you cannot. No matter how strong a hunch you might have, or how strong your sense of common sense, you should be able to point to the evidence. I expect that each of you back there will remind each of the others that you can't make things up to convict anyone, no matter how you feel about them.

The United States said this is a serious case because we are going to ask you to put these people to death. That's what they told you. Even if this were not a potential death penalty case, you should treat this case with all the seriousness of the most important decision you have ever made in your life.

I hope that concerning the murder of Doug Moody, you acquit all these defendants so that someone will go find out who killed him. For no matter who he was, his life was worth justice and someone should

**JA1488**

care.

My client is entitled to have 12 people determine his guilt or innocence. Oh, wait; back up a second. Oh, I forgot about this. Where is the evidence that my client knew of, managed, organized, or supervised anybody? I don't remember hearing that. I do remember he sold drugs. I remember he gave drugs to people to be sold. But I have not

3146

heard anything about him being a kingpin. And further, this guy has to go to Ronita Hollman's house to use a stove to cook some crack. Is that evidence of lavish spending? It is not there. You talk about income. Any evidence he had on Guess jeans? Any evidence he had anything? He had a car. It is a Regal. I don't even know what year it is. Any evidence of money? Income? No. Nothing.

My client is entitled to have 12 independent jurors determine his guilt or innocence. Not 11 of you speaking for 12, not one big strong one, but 12 independent minds. Each of you has sworn an oath independently to assess the evidence and follow the law. Not any prejudice, not any moral code, but the law. If you disagree morally with what my client did, he will answer to God for that. Right now he is answering for man's law before this Court. And believe me, no matter what you do, God will get his.

But if the evidence is not here and each of you individually, if you are not convinced beyond a reasonable doubt to the point where five years from now you see us and you think I remember that evidence and I still know in my heart that the evidence was there to support that conviction and I didn't fall back on prejudice, I didn't fall into the game the

3147

United States wants to play, the game of "paint them with a broad brush, view them as different from us." Yes, let's call them something different so we can lower the standard to jam them. Let's create an atmosphere like the Salem witch trials. Except instead of witch trials, we will call them drug dealers, because then we don't have to treat them like Nancy Reagan. But no, they are not. As they sit here now before you, they are not drug dealers. Even if I say they are, they are not. They are citizens. They are entitled to the same rights as any other citizen. Period.

Now, when this is over, if you want to strip them of that right, you may. But you can't do it now to justify what you are going to do later. And if you can't do that, if as you sit here now you have a doubt as to your ability to see these people as citizens, you should stand up now and tell the Judge, "I don't think I can do this. Because I am not

living up to my oath." And if, when you are back in that room, one of you weakens and stops being a representative of the law, the others owe you the obligation to remind you.

I tell this in all the cases, I've been doing it this for a long time. I'm older than most of these folks, except for Mr. Geary. I have been a trial lawyer for a long time. I have never seen a jury cheat. I have seen juries do the most complex and the most brilliant resolution of facts you can imagine. I have disagreed with a few. But I've never seen them make stuff up. I have every confidence you won't do it, either. If you don't like my tactics, if you don't like the way I do things, don't take it out on Mr. Roane. Later, you can punch me if you want to. It doesn't matter. But he is entitled to have his guilt determined based upon his acts, that which he did, and the law.

If you allow prejudice to control your actions, you will have done a disservice to the law, you will have done a disservice to the country, and you will have done a disservice to yourselves. If the evidence is there, convict. I'm not telling you that you cannot. But justice is not the result. I'm sure the United States will get up and say, "If there is justice you are going to convict these people." Justice is not the result. Justice is the process. If you play by the rules through the process, the end is just. If you practice justice, the result will be justice. It is the process that counts.

People say, "Oh, no, Mr. Baugh, that is so jive; that's a technicality. You lawyers get up and talk about technicalities." It is wrong to murder in the Soviet Union, what used to be the Soviet Union. It is wrong to murder in Iran. It is wrong to murder in the United States. What makes us different from those people is how we treat citizens who are accused of crimes. That's not a technicality. That's our morality. And all I'm saying is, stick by the rules.

This has been a long case.

MR. BAUGH: Can I have a moment, please, Your Honor?

THE COURT: Sure.

(Counsel conferring with co-counsel.)

I often rely on the younger lawyer. This is a serious, serious case. The measure of a person, as my father told me, is how you treat someone who can do nothing for you. The measure of a person is how you treat people you don't like or people who are not worthy of your friendship. If you can bring yourself to resist the rabble-rousing and call to prejudice of

the United States and follow the law, you will have done something that will have made you stronger. I'm not talking about the result. If after applying those standards you find my client guilty, I can ask for no more. I'm not talking about the result, I'm talking about the process.

You have been very, very attentive. I want to thank Mr. Vick and the Court for allowing me to participate in a case like this. This is what this is all about. It is not about fighting wars. It is about how we treat people that perhaps everyone else hates. If we give them their due, if we give them that which every citizen is entitled to, I trust, and I pray with all the seriousness in my soul, that you are up to that task. And if you are, I will submit to you that as to a significant number of these charges, specifically the killing of Douglas Moody, Peyton Maurice Johnson, and Louis Johnson, you will find the defendant not guilty.

As to the shooting of Torrick Brown, it is going to be very difficult. Because remember, my client is not charged with just killing Torrick Brown. He is charged with killing him in furtherance of drug activity. The murder charge, just killing someone, that's a state violation. And he might have to be -- maybe he should have been tried by the state.

Now, I know you are going to find him guilty of dealing drugs, because he did. But we would submit that if you follow the law given to you by the Court and you follow your oath that you have sworn, you must find the defendant, James Roane, not guilty of many, many, many of these charges. Thank you.

THE COURT: Mr. Wagner?

MR. WAGNER: May it please the Court, ladies and gentlemen: After hearing all the evidence in this case involving Sandra Reavis, you now know that she is not guilty of the conspiracy charge that she faces here. She is not guilty for three very important reasons. First, because of the reliability of the witnesses that have testified. Second, because she was very separate from the criminal activity of the others charged in this conspiracy. And third, she did nothing in furtherance of the criminal activity.

Before I go into those three points, I'd like to review the facts a little bit. Sandra Reavis met James Roane in December of 1991. They started their romantic relationship then and it lasted until February 1st of 1992 when James Roane was locked up on these charges. Now during that time period, it is important for you to decide how much contact Sandra Reavis had with the people in this conspiracy. Well,

**JA1491**

perhaps the best person to tell you how much contact she had was Denise Berkley.  Denise Berkley was

3152

living with these people at Moore Street and at Norton Street, and she told you that she saw Sandra Reavis maybe two or three times at the Norton Street house.  She also told you that she saw her maybe two or three times at the Moore Street house.  Remember, Denise Berkley was the one who was cooking for these people, cleaning for these people, and doing groceries for these people, living with these people.  That's the first segment of time that I ask you to concern yourselves with in relationship to Sandra Reavis.

The second period of time is from February 1st of 1992 to April 24th of 1992 when Sandra Reavis was locked up on this charge.  During that period of time, but for three incidents alleged by the government, they have shown you no evidence of any contact between Sandra Reavis and Cory Johnson, and no contact except for one of those three incidents between Sandra Reavis and Richard Tipton.

Based on this evidence, they ask you to find that Sandra Reavis is a member of this organization. But she is not.  The first reason why she is not is because you have heard no reliable testimony to prove her guilt.

Co-counsel has explored the reliability of the

3153

witnesses here in great depth, and I'm not going to repeat what they had to say.  But I would like you to look at this concept, the concept of perception versus proof.  The government, through their witnesses, has tried to give the perception that Sandra Reavis was a drug dealer for this organization.  But they have not provided you with sufficient proof of that.

But what was the perception based on?  What was the perception of these government witnesses based on in saying that she was a drug dealer for these people?  Well, first of all, she was involved in a romantic relationship with James Roane.  Second, James Roane was a drug dealer.  Third, on occasion you have heard testimony that Sandra Reavis was selling drugs.  So the perception was Sandra Reavis was selling drugs for James Roane, Sandra Reavis was selling drugs for the organization.  Again, the perception.

Well, let's look at the proof.  Let's look at the facts and the details they have provided you with to show that she was a member of this organization. There is very little evidence of any distribution by Sandra Reavis.  You have heard from Ronita Rochelle Hollman.  She said she was selling drugs every day on

**JA1492**

3154

the street out in Newtowne during the year preceding her arrest.  She said she saw Sandra Reavis sell drugs on one occasion.  Stanley Smithers, "Stinker," says he saw her sell drugs on a couple of occasions. Jeanette Pauley, she said that Sandra Reavis was selling drugs, saw her selling drugs a couple of times.

The problem here, ladies and gentlemen, you haven't heard what time frame it was that they say Sandra Reavis was selling drugs.  You haven't heard if it was before she met James Roane or after she met James Roane.  And also, you haven't heard that any of the drugs that she may have been distributing out there were from anyone charged in this conspiracy. There is no evidence.

Also, you have heard very little evidence that anyone charged here gave drugs to Sandra Reavis. Very few particular circumstances of her ever getting drugs from anyone here.  But, of those very few circumstances, of that little evidence that you have heard, there has been absolutely no evidence of any quantities of drugs that Sandra Reavis received.  You haven't heard if quantities distributed or given to her were for her personal use or for distribution. No testimony of any quantities that she received.

3155

There was no testimony regarding any money that she transferred to anyone for drugs.  Nothing whatsoever about Sandra Reavis and money for drugs.

But beyond that, ladies and gentlemen, you have heard nothing of any financial arrangement, of any financial structure, between Sandra Reavis and anyone charged in this conspiracy involving drugs.  You have heard a lot of testimony about two-for-one, how someone gets $300 worth of drugs and they have to pay back $200 for those drugs, keep $100 for themselves. You heard about a 60-40 split, 70-30 split, 75-25 split.  But as to Sandra, you heard nothing, nothing about any financial arrangement for drugs.

So when you peel back the veil of this conspiracy, with all of the government witnesses that testified here, you have no details, no facts, no proof of Sandra Reavis selling drugs for this conspiracy.

But beyond that, the government has told you that they have corroborating evidence, physical evidence, unimpeachable government witnesses, police officers, who have been able to support every bit of the evidence they have presented from their witnesses here.  In Sandra's case, there is no corroborating evidence.  You have heard that she was taken down to

3156

the police station five or six times, taken off the

street, taken from her home.  Each of those times she was picked up, no drugs were found on her, no money was found.  No corroborating evidence.

So the perception of the witnesses here, there is a big gap here between the perception of these witnesses and the proof that the government has offered you.  The government cannot fill that gap.  The reliability of their witnesses tells you that Sandra Reavis was not selling drugs for this organization.

But Sandra was also very separate from the criminal activity of this organization.  She was first separate from the violence.  There is no evidence whatsoever that she was involved in any way in any of the violence that you have seen here.  James Roane wrote a letter to Sandra Reavis.  That letter is in evidence, and I urge you, when you go back in the jury room, to look carefully at the letter.  In the letter, he says, "You didn't know about the killings.  You didn't know what I was doing out there."

If you look carefully at this letter, if you look at those statements in the context of the letter, you will see that those statements are true.

What he is saying in that letter is the truth.  He is apologizing to Sandra, apologizing to Sandra for having her get locked up on a charge that she had nothing to do with, for having her being implicated in a conspiracy that she really wasn't involved with.  Please, read the letter.

But the testimony of Sterling Hardy also supports what James Roane says in that letter.  The night of the Torrick Brown murder, Sterling Hardy told you that when they left the scene of the murder, they went out and got some heroin.  Then they went to West Moore Street, over to Sandra Reavis' house, but Sandra wasn't home.  They went over to West Moore Street and later went over to Sandra's house.  When James Roane got out of the car to go into Sandra's house to get her, he put the gun underneath the seat in the car.  Please, recall that testimony from Sterling Hardy.  What he was doing here, by putting that gun underneath the seat of the car, he was hiding the violence from Sandra.  He took Sandra back to West Moore Street.  They spent the night there, and Sandra was awakened by the police, who broke in at 9 o'clock that morning.  James Roane was hiding the activity of the conspiracy from Sandra Reavis.

Now, I ask you to ask yourselves this question: The government has told you in this case that the drug activity here went hand in hand with the violence.  They have told you that the drug activity

**JA1494**

here accompanied the violence. How can someone who was not involved in any way with the violence in this case truly be a member of this organization? How can Sandra Reavis, who was not involved in any violence here, how can she really be a member of this organization? She can't. She can't. But Sandra was also separate from the drug activity here.

You have never heard any testimony about Sandra going to New York to get any drugs. You haven't heard any testimony about Sandra being in possession of any large quantities of drugs. In fact, you haven't heard any testimony of any quantities of drugs that Sandra Reavis was in possession of. You have heard no testimony about any money, no testimony of any financial arrangements she may have had with drugs with people in the conspiracy.

Cory Johnson made a statement to a man named Rodney Tucker, who testified here. Back in August of 1992, he told Rodney Tucker that Sandra Reavis wasn't involved in this conspiracy; that she was not selling drugs for the conspiracy; and that he never gave her drugs to sell.

3159

Well, what did the government present to impeach that testimony? What did they ask Rodney Tucker to question the truthfulness of that statement? Nothing. Absolutely nothing. So that statement stands as presented to you. You have now two people charged here who have told you that Sandra Reavis didn't know what was going on with that conspiracy, wasn't involved with it.

Cory Johnson also said to Rodney Tucker that Sandra Reavis was in the wrong place at the wrong time. This is a very important statement that I ask you to consider. Here was Sandra Reavis, at the Moore Street house, brought there late at night after some murders were committed. The police come in the next morning. They arrest her, bring her to the police station, or pick her up, bring her to the police station. They ask her questions about what was going on. She didn't know about the murders. She didn't know about the dealings of the conspiracy, the drug conspiracy. She didn't have anything to tell the police officers. So they bring her in five or six more times and ask her the same questions. And still, she couldn't tell them about the murders, and she couldn't tell them about the intricacies of this drug operation. So they indicted her, and they

3160

bring her before you here on trial.

Sandra Reavis was separate from the criminal activity of this organization. She was separate from their violence and separate from the drug activity.

So ladies and gentlemen, Sandra Reavis did

**JA1495**

nothing in furtherance of this conspiracy.

Now, in order to evaluate this question, you have to know what exactly a conspiracy is. Mr. Vick told you that a conspiracy is a very simple thing. Well, the Judge is going to instruct you between five and ten minutes as to what a conspiracy is. You are going to have those instructions back with you in the jury room. And you will see seven or eight pages explaining, or trying to explain, what a conspiracy is. You will hear terms such as a conspiracy is a partnership in criminal purposes, that it is an agreement to further criminal activity. You will also hear that it is important to consider whether someone had a stake in the outcome of the conspiracy. But most importantly, you are going to see an instruction about membership in the conspiracy. In order for someone to be guilty of a conspiracy, they must be a member of that conspiracy.

I suggest to you that these instructions are technical and that the law regarding conspiracy is very complicated. But you can be the judge of that. You will look at the evidence. You will look at the instructions that you will have about conspiracy, and you will decide that.

Now, what have the government witnesses told you about Sandra Reavis acting in furtherance of the conspiracy? Well, several witnesses said that their perception was that she was selling drugs for the conspiracy. And as you have seen, there is this gap between the perception and the proof that the government has presented to you.

"Papoose" told you about that, Priscilla Greene told you about that. But they had no proof, no details, no facts to support what they said.

Jerry Gaiters also talked about Sandra Reavis and her involvement with the conspiracy.

Now, co-counsel has dealt with Jerry Gaiters, and you have heard that he was a liar and a murderer, and you certainly can't rely on his testimony in convicting Sandra Reavis or in evaluating Sandra Reavis' guilt. But you also heard from Denise Berkley. And the other counsel in this case, they have talked about Denise Berkley, too, and about her credibility. Let's look at the specific situation that Denise Berkley described to you, which the government has indicated has placed Sandra Reavis in this conspiracy.

Talk about a night of fear, where a threat was given Denise Berkley by Cory Johnson, a threat which she admitted was an idle threat, a threat which she admitted he did not really mean. She said she was

**JA1496**

put in great fear that night, great fear one night before "Mousey" Armstrong was killed. Well, the day after "Mousey" Armstrong was killed, you heard testimony that Denise Berkley was out on the street talking to Sandra Reavis. They were getting along. In fact, Denise Berkley got in a truck with Sandra Reavis. You have also heard that Denise Berkley that very same day, the day after "Mousey" was killed, she moved into an apartment next-door to Sandra. She didn't avoid Sandra. She wasn't afraid of Sandra.

How does this align with what the government says about Denise Berkley being in fear? She was not in fear of Sandra Reavis. She did not perceive Sandra Reavis to be a part of this conspiracy.

Now, after James Roane got locked up, February 1st, 1992, that period of time between February 1st and April 24th, the government has pointed to three isolated incidents of Sandra Reavis. They allege Sandra Reavis had something to do with members of this conspiracy, this drug conspiracy.

After "J.R." got locked up, Sandra Reavis' contact with these people essentially stopped. There was no reason to continue. The man that she loved was in jail. Over this two-and-a-half-month period, only three incidents that they present to you, three incidents separated by between three weeks and a month. The first incident involved testimony of Valerie Butler.

Now, Valerie Butler testified that she saw Sandra Reavis four or five times over this period of time. And but for this first incident, she never saw her with any drugs, never saw her with any money. That was her testimony. She said that on February 11th, 1992, she delivered drugs to Sandra Reavis. Well, she gave no facts about the quantity of the drugs. But remember, Cory Johnson said that he never gave drugs to Sandra Reavis to sell. So this contradicts what Valerie Butler had to say.

MR. VICK: I don't remember Cory Johnson testifying, Your Honor.

THE COURT: Sustained.

MR. WAGNER: I'm sorry, Cory Johnson told Rodney Tucker, who testified here, that he never gave

3164

Sandra Reavis any drugs.

MR. VICK: The jury's recollection will control.

THE COURT: Go ahead.

MR. WAGNER: By this fact alone, the government has failed to prove beyond a reasonable doubt that this transaction ever took place. But it is also important to look at Valerie Butler's credibility. The second incident occurred three weeks later, early March of 1992, three weeks after

**JA1497**

the first incident.  This is the incident that Mr. Vick points to as proving Sandra Reavis' guilt: a transfer of money to New York.  Valerie Butler testified that Cory Johnson asked her to send him some money in New York.  First, she said that she sent him $1,500.  Then she saw the Western Union document.  She corrected herself.  It was $1,200. Please, go back through your notes and look at Charles Townes' testimony, look at Hussone Jones' testimony.  They said that they gave Valerie Butler $5,000.  So what we have here is a $3,800 mistake somewhere.

The Western Union records will show -- and please, look at those Western Union records when you go back to the jury room.  The Western Union records show that the money was sent on two separate dates, one date to Priscilla Hodges, one date to a Priscilla Williams.  Valerie Butler never testified about two separate dates.  So Valerie Butler has $5,000 from Charles Townes that she is supposed to send to Cory Johnson in New York.  Why does she call Sandra Reavis then?  Why does she want Sandra Reavis to help her send this money?  Valerie Butler is very calculating.  By her own testimony, she is a drug dealer; she used drugs; she was involved in a lot of criminal activity.

She calls in Sandra Reavis to send $1,200 so that she can pocket the other $3,800.  If anyone comes to her and asks her what happened to the other $3,800, she points to Sandra Reavis and says, "I don't know, I gave her the money.  I told her to send it."  You can see that from the documents from Western Union.  Valerie Butler used Sandra.  Sandra was never contacted by Cory Johnson.  Sandra was doing a favor for Valerie Butler.

Look at the evidence.  Look at the Western Union documents.  Consider the testimony of Charles Townes and decide if Sandra Reavis was acting in furtherance of the conspiracy or if she was being used by Valerie Butler.

The third incident, early April of 1992, one month after that second incident.  Something about Sandra Reavis and a gun.  She gave a gun to "Whitey." The government said that Greg Noble testified about this incident.  I ask you to think back to Greg Noble's testimony.  He was an uncooperative witness. He was asked, "Do you know Sandra?"  He said, "No, I don't."  "Have you ever heard of Sandra?"  He said, "No, I haven't."  And the government got upset with him.  So he provided no information about Sandra Reavis.  The only person who really provided information about that was Leroy Slater.  I ask you

to recall the testimony of Leroy Slater.  He was the one who talked were  --  I asked him "When did this trip to the Amoco station happen?"  He said, "Well, it was in the evening."  I said, "Well, was it light or dark out?"  "It was light out.  In the evening it was light out."  "What time did it happen?"  "12 or 1 o'clock."  "12 or 1 o'clock in the evening?  It must have been dark."  He said no.  He was confused about night and evening.  He was also asked about whether he sold any drugs.  First he said no.  I said, "Weren't there drugs in your apartment?"  He said yes.  "Didn't you know about those drugs?"  Yes.  Then he turned his testimony around and finally he

3167

admitted that he sold drugs.  Then he was asked about the identification of Sandra Reavis.  He was shown one picture by the government; that he saw Sandra's picture in the newspaper.  This is the identification that he gave of Sandra Reavis.  And I tell you, this is an identification that was  --

MR. VICK:  Your Honor, I hesitate to rise, but he stated he was shown several pictures.  There has been several misstatements of his testimony here.

THE COURT:  All right.  Go on, Mr. Wagner.  The jury's recollection will control.

MR. WAGNER:  Very well.  Now, the government must prove beyond a reasonable doubt each and every element of their case.  And for this incident, they rely on the testimony of Leroy Slater.  You can't find, based on any reliable testimony, that this ever occurred.  You can't find beyond a reasonable doubt this particular fact.

So over this two-and-a-half month period, the government only alleges three possible isolated incidents where Sandra had any contact with the people involved in this conspiracy.

In none of these situations have they proven that Sandra Reavis acted in furtherance of the

3168

conspiracy.  They have shown no contact with Sandra Reavis over this time with Cory Johnson, and except for that one situation that they tell you about, no contact with Richard Tipton.

Now, is that, ladies and gentlemen, proof of being a member of this organization?  No.

What the government has tried to do with their testimony in this case, through the government witnesses that they have presented to you here, they have tried to present you with a package, a neat, tidy, tight package that represents the guilt of Sandra Reavis.  And they tell you that these government witnesses have put together this package.

Well, let's look at those government witnesses

**JA1499**

that put this package together. First, we know that virtually every single one of those witnesses were drug addicts. They were using cocaine; they were using marijuana; they were using alcohol. The Judge is going to instruct you as to drug addict testimony. He is going to tell you that that testimony must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol. So that's the first thing you know about these people who have presented this package to you. This neat and tidy package is starting to look a little rumpled.

Then they have told you or then you know that the people who put this package together, not only were they drug addicts, but they are convicted felons, many of them, and many of them convicted of crimes involving lying, cheating and stealing. The Judge is going to instruct you on this particular point, too, on the testimony of convicted felons. He is going to tell you that this is a circumstance to take into account in determining the weight of the testimony. Scrutinize the testimony of these convicted felons.

Well now, not only are these people who have put together this package drug addicts, but they are also convicted felons. Now the paper on the package is starting to look a little ripped, and the tape is starting to come off the sides. But in addition to those two things, you know that each and every one of those witnesses cooperated with the government. In exchange for their cooperation, no charges would be brought against them. And in the case of a couple of the people, they get the 5K. The Judge will also instruct you about these witnesses; that these witnesses' testimony should be received with caution and weighed with great care. So now the package is falling apart. The package to prove Sandra Reavis' guilt beyond a reasonable doubt is looking awfully shabby.

But finally, finally, they have provided no corroborating evidence for these witnesses who are drug addicts and felons and have cooperated with the government. Absent any corroborating evidence, the package doesn't even look like a package anymore. That's the evidence that the government has presented you against Sandra Reavis.

Now, Mr. Vick told you in his closing argument that every person who testified for the government that received immunity in this case had nothing to do with the murders. Every witness who received immunity who testified here had nothing to do with the murders. That's not true, ladies and gentlemen.

**JA1500**

That's absolutely not true.  Hussone Jones, Hussone Jones took the stand here, told you about trips he took to New York, told you about selling large quantities of drugs.  And based on the government's theory, based on what they have told you, he drove the getaway car from the Douglas Talley murder.  In any court that Hussone Jones would go to in the United States, that would be first degree murder.  Hussone Jones gets  --

MR. VICK:  Misstatement of the law.

THE COURT:  All right.  Just finish up, Mr. Wagner.  As I'll tell the jury over and over again, what the lawyers say are not evidence.  Their statements are not what the law is.  Don't listen to it because I'm telling you what the law is.  Go on, Mr. Wagner.

MR. WAGNER:  Hussone Jones spent no time in jail.  Hussone Jones had no charges brought against him.  Sandra Reavis sits here, having been involved in no violence here.  She sat in jail for the past nine months on this charge.  She faces ten years to life on this conspiracy charge, with no parole.

The government tells you that one occurrence is sufficient to prove Ms. Reavis guilty as being a member of this organization.  Well, that occurrence, that one occurrence, if you find it, has to make you sure beyond a reasonable doubt, has to make you that certain that she was a member of the conspiracy.  There has been no occurrence like that.  There has been no combination of occurrences like that to convince you beyond a reasonable doubt that Sandra Reavis was guilty of selling drugs for this conspiracy.  You don't have the details.  You don't have the facts.  You don't have the proof that you need to find her guilty.

The government has failed to provide reliable testimony to prove Sandra Reavis' guilt.  The government has failed to overcome the fact that Sandra Reavis was separate from the criminal activity here.  The government has failed to show you that Sandra Reavis acted in furtherance of this conspiracy.

Because they have failed to prove these things, you must find her not guilty.  So please, when you go back to that jury room, I urge you:  Get together collectively, look over your notes.  Look carefully at the evidence in this case.  Look carefully at the instructions that you are provided.  From these notes, from this evidence, from those instructions, you will see very clearly that Sandra was not guilty.  Please, do what's right here, do what's just.  Find Sandra Reavis not guilty.  Thank you.

**JA1501**

THE COURT:  All right.  Rebuttal?

### Parcell Guilt Phase Rebuttal (3173)

MR. PARCELL:  I've been listening to these lawyers tell you yesterday and today all their reasons why their clients didn't do anything, aren't guilty.  And I've been listening to the funny stories that Mr. Cooley told you, and the renditions of a hymn.

MR. GEARY:  I object to the characterization of the closing arguments.  It is highly personalized.

THE COURT:  Mr. Geary, you say you object to personalization of closing argument?

MR. GEARY:  Yes, sir.  You told me in the beginning that I didn't object to Mr. Vick in the opening statement.  Now I object.

THE COURT:  That's overruled.

MR. PARCELL:  The only thing they haven't done yet is bring Ray Charles and his chorus line and say, "You've Got The Wrong One, Baby."  That's the only thing they haven't done.  That's not going to happen, because the government does have the right ones.

You heard about probably the only thing we agree as lawyers about, that there is a conspiracy that you have been listening to.

MR. GEARY:  That's a misstatement of the evidence.  I did not concede on behalf of my client there was a conspiracy.

THE COURT:  Overruled.

MR. PARCELL:  Their argument is the conspiracy is by the government.  Mr. Vick, myself, Detective Fleming, Detective Woody, the rest of the police officers, Anne Jones, Dr. Fierro.  The government's contention is that the conspiracy lies here with Mr. Johnson, Mr. Tipton, Mr. Roane, and Ms. Reavis.  It is amazing to listen to their arguments.  They pointed a finger repeatedly at the United States Government and accused us, the government, of setting all these people up.  Let's walk through first the raw basic physical evidence of the murders.  Then we will get back to the drug angle.

January 5th, 1992, 13th and Stockton, South Richmond.  The police find Mr. Talley stabbed 84 times in his car.  What did they find?  Detective Hines finds a bloody shoe print in the backseat of Talley's automobile.  In the right passenger window, he finds this finger and this finger in red body fluid, blood  --

MR. GEARY:  Objection.  Misstatement of the

**JA1502**

evidence.

THE COURT: Overruled.

MR. PARCELL: And what does he do? He lifts that print. And he takes a photograph of that shoe print in the backseat of that automobile indicating two people. And lo and behold, no witnesses, lo and behold, who do those prints belong to? That killer, Richard Redfield Tipton, III. We don't need anyone to tell us that because Hines pulled the prints and the gentleman, Mr. George Wynn from the FBI laboratory, said those prints belong to him, nobody else in the United States, the world, the universe. Him.

Hussone Jones helps you with that crime, because unfortunately he saw it. And he was afraid to tell anyone because he knew they would kill his family.

MR. GEARY: I object again. That's not the evidence.

THE COURT: The objection is overruled.

MR. GEARY: Misstatement of the evidence.

THE COURT: Overruled.

MR. PARCELL: We go to January 13th, 1992. "Little Doug" Moody dives through a window as he is shot twice in the back by Tipton, again with a .38.

MR. GEARY: That's a misstatement of the evidence. There is no testimony about that.

THE COURT: Overruled.

MR. PARCELL: What happens next? James Roane comes to his aid and there is a confrontation on the porch. Three witnesses told you that. And as Moody runs for his life, he gets to that fence and Roane continues to stab him 18 times and he dies on the way to MCV. I take argument with what Mr. Baugh says, the government scorns the witness after she assisted him. She deserves praise, too, as well as by the government. Only thing she told Detective Dalton was, "I couldn't tell if it was a male or female. I couldn't tell if he was being stabbed. All I saw was motions towards the chest." She didn't even see the man stabbed. We praise her, too, for trying to help another human being. But that's what she said. She couldn't even tell Dalton it was a man or a woman.

Then we go to January 14th. What happens on January 14th? James Roane, Cory Johnson, and Richard Tipton and "V" Mack get Pam Williams to go buy this, the Intratec, and the AA Arms handguns. What do they do with these guns next? They take them to "Papoose" Davis' house.

MR. GEARY: I object to the use of "they" in closing argument. That's clearly improper now.

THE COURT: Overruled.

**JA1503**

MR. PARCELL: They took them to "Papoose's" house for storage. They come up there that day on January 14th, get the guns, and go take a life, that of Peyton Maurice Johnson. They come back and brag about their marksmanship.

MR. GEARY: My client is not charged in

3177

that murder. He is using the word "they." He just said Tipton bought the gun. That's the problem in this case. They have done it throughout, "they."

THE COURT: Overruled.

MR. PARCELL: Roane, Johnson, and "V" Mack go back to "Papoose" Davis' house to get the fingerprints of off of these guns. Mr. Baugh makes much merit of the fact that the guns weren't loaded. He talked about his knowledge about how a Glock works. When you bring a Glock back, a Glock has no safety. You put a bullet in the chamber. You put a bullet in that chamber. If it is touched, it fires. I know something, too, about a Glock and how it works. That's important.

After Peyton Maurice Johnson is shot -- he said "numerous times." He was shot 15 times. It wasn't a one or two-wound type case or killing as these cases are.

At the crime scene, there were 12 casings found. Not 15, 12. Ten of them were a Glock and two of them were the AA Arms. This weapon. From his body, there were removed five bullets, two Glocks and three AA Arms. It is important. It is in the lab report. It is important you understand what that means, because at the crime scene we found two

3178

casings from this weapon. Just two. But in his body we found three bullets that came from this gun. My point is, forensic science, or our recovery, is not a perfect one because obviously we lost some casings at that crime scene as we did other crime scenes. The ballistics will bear that out. And those two guns which these folks got Pam Williams to buy killed Peyton Maurice Johnson.

Mr. Baugh asks how do we prove that has anything to do with the Continuing Criminal Enterprise? Ms. Hollman told you about it, and so did "Pepsi" Greene. Because Ms. Hollman was selling drugs for Peyton Maurice Johnson. James Roane and Mr. Tipton came to Hollman and said, "Start selling drugs for us. You are too busy in the neighborhood. The heat is going to come in on us. We want you to start pushing our product, not Peyton's." She refused. Tipton says, "We are going to get ours, our drug business. If we don't, a lot of bodies are going to fall." What does that mean, Ms. Hollman? It means they are going to start killing people. And what did

**JA1504**

they do?  As "Pepsi" Greene told you, they killed "Little Doug" Moody because he worked for Peyton Maurice Johnson, and they killed Peyton Maurice Johnson because he was a competitor in Newtowne.  And they told numerous people "We are going to take over the drug business in Newtowne."  That's what they tried to do as they continued their criminal enterprise, as they went from New Jersey, to Central Gardens, to Newtowne, to Blackwell, where he was ultimately arrested on April 9th, 1992.

Then we go to Louis Johnson, another drug dealer.  Where was he a drug dealer?  Newtowne.  They are getting rid of the competition again.  Roane, Cory Johnson, "V" Mack, Sterling Hardy, Jerry Gaiters, and Dennis Moody were all out there.  Moody told you what he saw, Sterling told you what he saw, and Jerry Gaiters told you what he saw.  He told you Roane was the driver.  He stopped his automobile, got out, said something to Johnson, made him stop.  After he stopped is when the shooting began.  And one of those fellows told you how they put the gun right next to his head and fired, and he went down.

Why is that significant?  And it was a Glock that they used at the back of his head.  Why is that significant?  Because Dr. Fierro told you there was stippling or powder burn on his stocking cap, on his skin where these heroes shot him in the back of the head.  And she told you how the wounds went, left to right, left to right, and in the back from back to front, just as those witnesses told you.  He was surrounded from the back side and they fired at him from three different directions and he fell dead.  After he fell on the pavement, Cory Johnson, this hero, continues to shoot him in the head until he empties his gun.  They get in the car and speed away with Sterling Hardy driving.  Those three guns, once again -- correction, those two weapons are ballistically matched up to that killing.

MR. BAUGH:  Your Honor, excuse me.  That is a gross misstatement.

THE COURT:  The objection is sustained.

MR. BAUGH:  Thank you.

MR. PARCELL:  Then we go to Lynhaven avenue, Torrick Brown and Martha McCoy.

Mr. Baugh's stipulating that his client killed Torrick Brown because of a romantic interest in Robin Cooper makes no sense for two reasons.  Reason number one, he has a one-on-one beef with another person.  Why does he get "C.O.," Sterling Hardy, "V" Mack, Linwood Chiles to bring him the guns to Lynhaven?  Why does he get "C.O." and "V" Mack to go with him to the door when they knocked on the door?  Martha McCoy

**JA1505**

comes to the door, and they shoot Torrick Brown 20-some times. They shoot her six times as she dives

3181

over the couch. Her three kids, two, four, and seven, watch Romeo shoot someone else and kill him, and shoot their mother. And he, James Roane, is so disturbed by this romantic thing with he and Robin Cooper, being Torrick Brown, that he goes home and in less than 12 hours is arrested in bed with Sandra Reavis. Is that a romantic killing or an act in furtherance of the conspiracy? I submit to you it is the latter. Because it doesn't make sense. He leaves Robin Cooper, kills her lover, then goes home and gets in bed with Sandra Reavis. It doesn't make sense. And he gets the conspiracy to assist in that killing. Why? And once again, those guns are matched up to that killing.

Then we go to West Clay Street. Cory Johnson, "C.O.," is looking for "Mousey." He says, "I treated the bitch like a queen. Where is she? She messed up my package."

What does he do? They go back to West Moore Street. They had to reload these weapons. Why? Because they had unloaded those weapons in two human beings in South Richmond. After they reload their weapons, where do they go? Jerry Gaiters, Charles Townes, "Whitey," and "C.O." go to East Clay Street. Enroute they drop off Charles Townes or "Man-Man" in

3182

Central Gardens. "Whitey" is driving. Gaiters gets out of the automobile, "C.O." behind him with a gun. He knocks on the door. Bobby Long opens the door. "Mousey" comes down the hall. Cory Johnson burst into the door and shoots her nine times. She falls with fatal wounds in that hallway. You saw that hallway. Next, he shoots Anthony Carter. They called him "Papa." He receives two to the left neck. Wrong place at the wrong time, as Mr. Wagner indicates to you that his client Sandra Reavis was. I don't think so.

If you want to see somebody at the wrong place at the wrong time, look at Anthony Carter's crime scene video. Drunk, passed out, stocking cap on at the kitchen table. Cory Johnson shoots him like an animal for no reason. Wrong place, wrong time. Bobby Long runs for his life. Cory Johnson shoots with the 9mm Glock. He falls in the alley behind the garage. He walks up and shoots him in the head again.

Then what happens? They all get back in the car driven by "Whitey" and go back to West Moore Street. You heard the evidence that the police were looking everywhere for them because James Roane had three houses. He hung out with his gang at Norton Street,

**JA1506**

3183

Hancock, and West Moore. And they were frantically trying to find these killers as the night progressed through until February 2nd. They did a raid at 1212 West Moore Street, and what did they find? They found the guns that killed Peyton Maurice Johnson, Louis Johnson, Bobby Long, Anthony Carter, Dorothy Armstrong, Torrick Brown, and shot Martha McCoy. With what? 120 individually-wrapped packages of crack cocaine, their dope. And what else do they find in that bag along the fence that separates that yard from I-95? They found a box of.3838 silvertipped 95 grain hollowpoint Winchester bullets. Anne Jones had only seen that kind of ammunition twice before. The first time, the bullets that came out of Katrina Rozier's body. They were 95 grain .38 hollowpoint silvertipped bullets. The second time was when she got his gun that he got from Sandra Reavis and the police did a search warrant April 10th, 1992 at 15th Street in South Richmond. It had five Winchester 95 grain hollowpoint silvertipped bullets. Anne Jones has been in the firearms business for years. All these lawyers stipulated her expertise. She is qualified to give you an expert opinion. Whatever she tells you, you can believe.

3184

She told you folks the only time she has ever seen that ammunition was those three times, because of its flat bottom as she described it to you, those combination of factors on one series of bullets. They came from "Nat" Rozier, "Whitey's" gun he got from Sandra, and West Moore Street. We can't tell you, as Mr. Vick told you in the beginning of the government's case, we cannot tell you who killed "Nat" Rozier. But we can tell you the conspiracy had the bullets at West Moore Street and we can tell you that the conspiracy had the gun, because the gun went from Sandra Reavis to Richard Tipton, "Whitey." And he was arrested with it just as Leroy Slater told you it was, wrapped in plastic and buried in the yard. That's exactly how it was found on April 10th.

Then we go to Stony Run. Let me back up one second. At that point in time the guns were seized, the three guns from the January 14th purchase. That was a Glock, Intratec, and the AA Arms. So on February 4th, 1992, Charlotte Denise Moore goes to the same gunshop at the direction of "Whitey" and "C.O.," because Roane is in jail now, and so is Reavis. She purchases not one, but two more Glocks, because their guns have been seized. So what do they do.

3185

On February 19th, Cory Johnson is in the

**JA1507**

backseat of Linwood Chiles' station wagon.  It was called a cab.  And what happened next?  You have "Pepsi" Greene in the front seat, you had Gwendolyn Greene in the middle.  You had Curt Thorne in the passenger right back seat.  That human being, Cory Johnson, takes another Glock and puts it to Linwood Chiles' head and says, "Put your head on the steering wheel" and shoots him twice.  He dies at that steering wheel.  He turns and shoots "Pepsi" Greene in the left ear.  It comes out her right cheekbone.  You saw her.  She is paralyzed for life because of him, and him.  What does Gwen tell you?  Same seating arrangement.  She looked over to her right and saw "Whitey," Richard Tipton, coming to her from her right behind a tree.  Look in that diagram and you will see the tree she described.  He had on jeans and a tan coat.  That's the last she remembers, because now she carries for the rest of her life a Glock bullet from one of those two people's guns between her fifth and sixth vertebrae in her spinal cord.  She is paralyzed for life by these two killers.  They shoot Curt Thorne in the crossfire.  You saw the knitting needles showing the angle of the bullets.  He dies at the crime scene.

What happens next?  On February 29th in the City of New York, Officer Gutierres arrests Kevin Hill.  It is not Kevin Hill.  It is "C.O.," Cory Johnson.  He arrests him with that same Glock that killed those two people and wounded the other two.  We didn't find Tipton's gun.  But they told you he was there.  What happens next?  He gets out of jail.  How does he get out of jail?  Because Sandra Reavis, the lover and girlfriend of James Roane who has been in jail since February 2nd, 1992, wires him $1,200 in U.S. currency.  And Mr. Wagner misleads you once again and says on two different dates.  Look at the Western Union receipts.  Both of them were mailed on March 5th, 1992.  One was for $800, another one for $400.  That is a fact.  He misled you.  Look at the evidence.  What happens next?  Hill is bonded from jail with Reavis' money.  The conspiracy continues.  And he is finally picked up based on Valerie Butler's cooperation with the police on June 23rd, 1992 in New York City.  Mr. Geary and Mr. Cooley both misled you about how Mr. Cory Johnson was apprehended.

MR. GEARY:  I object to him telling anybody that I misled them.

THE COURT:  Overruled.

MR. PARCELL:  They told you that the police met her in the John Marshall Courts Building, and she told you her mother and her aunt took her to John Marshall Courts Building to meet with the police

because they wanted her to do the right thing and tell the police and the prosecution what she knew. That's what she did.

The police didn't roust her. She came to us and told us what she knew and what she could tell us. And she was so accurate, she told you she came to us on Monday, June 22nd. And she told us how she got in touch with "C.O." Uptown, in New York. And what does she do? She makes a phone call. That detective goes to New York City and arrests him at 8: 23 p.m. on 6-23-92, just as she had assisted the police in doing it. If not, he wouldn't be here. They say she is a liar, or she can't be trusted. Well, she came forward and cooperated with law enforcement. She did the right thing and helped us apprehend that killer.

Now for a few minutes, I'd like to go over a few things about Count Number Two, the Continuing Criminal Enterprise. My colleagues have told you and told you and told you how there is no organization here. There is no management. There is no supervision. They say all of those things have to be done. It is not true. Judge Spencer will tell you

3188

what the law is and I will suggest to you the law is that it only requires a person to organize, to supervise, or to manage five or more people in a criminal activity. Mr. Cooley's little cute Wonder Bread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. Because we are talking about illegal crack cocaine. We are talking about killings. And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy is to distribute crack cocaine and to make money. It is not about the legal bread business or Safeway. It is a good analogy, but it doesn't make any difference. We are talking about apples and oranges. We are talking about a criminal enterprise and a criminal nature. He is talking about a legitimate business.

Let me go through with you the people that were directed, managed, or organized by this conspiracy. When I refer to the conspiracy, I'm talking about Tipton, Johnson, and Roane. Ms. Reavis to my far right was just charged with Count One, that being the conspiracy to distribute crack cocaine or possession with intent to distribute.

Let's talk about Denise Berkley. She was the

3189

conspirators' housekeeper. They told her watch for the "5-0" or the police when they were cooking crack cocaine. They paid her money to do that. They gave her crack cocaine to do that. She ran errands for them. "Papoose" was given crack cocaine by Tipton,

Roane, and Johnson to clean their prints off their weapons and to store them for them.  Linwood Chiles was given crack cocaine to drive them to New York City and drive them back to the Richmond metropolitan area to distribute crack cocaine.  "Man-Man" and Hussone were told by Tipton and Johnson and Roane where they could sell and how much for.  In fact, Tipton eventually made him a lieutenant.  He sent Maurice Saunders to New York City with Hess to purchase some crack cocaine.  They bring back kilos at a time at the direction of Tipton and Johnson. When they went to Newtowne, James Roane told them where they could and couldn't sell their product. "Studie," Charlotte Denise Moore, and Pam Williams, were directed by Roane, Tipton, and Johnson to purchase the weapons that the police recovered that did these killings.  Valerie Butler was directed to send money by Sandra Reavis to New York to bond Cory Johnson out of jail.  She was also told to take crack cocaine in the amount of $1,200 to Willow Lawn to Sandra Reavis.  She didn't show up with the money. She gave her the crack cocaine anyway.

Hess, as I said before, went to New York City to get pounds of powdered cocaine to bring back to make crack cocaine.  Sterling Hardy was a driver, was told to drive away from the Louis Johnson killing, was told to drive "C.O." to South Richmond to meet James Roane so they could kill Torrick Brown and shoot Martha McCoy.  Greg Noble was instructed to sell crack cocaine on 15th Street by Tipton, prior to his arrest.  Leroy Slater was directed by Tipton to meet Sandra Reavis over here for the purpose of picking up that .38 that killed Katrina Rozier because his guns were seized, too.  That gun was seized from him on April 10th, 1992.  "Wildman" cleaned up the knife that was used to kill Douglas Talley.  And why was Talley killed?  Because they thought, Tipton and Roane, that he was "5-0" or an undercover police officer.  They directed Priscilla Greene on several occasions to deliver cocaine and to throw away the knife that was used to kill "Little Doug" Moody. They directed Douglas Talley prior to his death, because he drove to New York City to purchase cocaine to be brought back to Richmond.

According to the government's account, there are 22 people they have directed during a six-month time period to further their criminal enterprise.  And the reason that my colleagues are attacking that count so severely is because if you don't convict them of criminal enterprise, the murder offenses fall, too. That's why they are trying to discredit those witnesses.

**JA1510**

The United States Government does not apologize to you for the photographs you have had to see. We don't owe to you the apology. We didn't kill them. It is part of our job to produce those photographs so you will see how horrendous and horrible these people were and are.

I, too, appreciate you listening on behalf of the United States Government. The government would also want to encourage you to go through all of these exhibits and evidence. You go through your notes. What I have said, Mr. Vick said, or the defense lawyers say, is not fact. It is not law. The facts are what you recall. Judge Spencer will give you the law.

One other thing about Judge Spencer: These lawyers have been saying 5K.1, 5K.1, 5K.1. There is only one human being in the whole world that can cut a sentence in this case, and that's that man. You heard Gaiters and Hardy both tell you they pled in front of Judge Spencer. The government can make the motion. But it is in that man's discretion. And you go back and look at Gaiters' and Hardy's plea agreements, and what do they tell you? They have to be truthful in their cooperation with the government, all the people that are getting 5K's. That man knows it, these men know it.

MR. GEARY: I object. Greg Scott is a key witness in this case.

MR. PARCELL: Ladies and gentlemen, thank you very much.

MR. GEARY: Another misstatement by Mr. Parcell.

THE COURT: Objection overruled. We are going to take about 10 or 15 minutes, then we will get started with the instructions. They are going to take awhile, and you have been sitting awhile. So we will give you a break. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Defendants removed from courtroom.)

(Recess taken from 11:50 a.m. to 12:05 p.m.)

## Court Instructions to Jury re Guilt (3192)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

Members of the jury: You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties. It becomes my duty therefore to instruct you on the rules of law that you must follow and apply in arriving at your

**JA1511**

decision in this case.

In any jury trial there are, in effect, two judges. I am one of the judges. The other is the jury. It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It is also my duty at the end of the trial to instruct you on the law applicable to the case. You as jurors are the judges of the facts. But in determining what actually happened in this case, that is, in reaching your decision as to the facts, it is your sworn duty to follow the law I now am in the process of defining for you. Unless otherwise stated, you should consider each instruction to apply separately and individually to each defendant on trial. And you must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. That is,

3194

you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you regardless of the consequences. By the same token, it is also your duty to base your verdict solely upon the testimony and evidence in the case without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors in this case, and they have the right to expect nothing less.

The indictment, or formal charges against a defendant, is not evidence of guilt. Indeed, the defendants are presumed by law to be innocent. The law does not require a defendant to prove his or her innocence or produce any evidence at all. The government has the burden of proving him or her guilty beyond a reasonable doubt. And if it fails to do so, you must acquit him or her.

Thus, while the government's burden of proof is a strict or heavy burden, it is not necessary that the defendants' guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendants' guilt.

Now, as I've stated earlier, it is your duty to

3195

determine the facts. And in so doing, you must consider only the evidence I have admitted in the case. The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted into the record, and any stipulations or agreements between the parties.

Remember that any statements, objections, or arguments made by the lawyers are not evidence in the

**JA1512**

case.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case; and in so doing, call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case.  What the lawyers say is not binding upon you.

Also, during the course of the trial I occasionally make comments to the lawyers or ask questions of a witness or admonish a witness concerning the manner in which he or she should respond to the questions of counsel.  Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should

**3196**

disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Now, while you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts and which have been established  --  facts which have been established by the testimony and evidence in the case.  You should not be concerned about whether the evidence is direct or circumstantial.  Direct evidence is the testimony of one who asserts actual knowledge of a fact such as an eyewitness.  Circumstantial evidence is proof of a chain of facts and circumstances indicating that the defendant is either guilty or not guilty.  The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, I have said that you must consider all of the evidence a number of times.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or believability of each witness and the weight to be given to his testimony.  In weighing the

**3197**

testimony of a witness, you should consider his or her relationship to the government or the defendants; his or her interest, if any, in the outcome of the case; his or her manner of testifying; his or her opportunity to observe or acquire knowledge concerning the facts about which he or she testifies; his or her candor, fairness, and intelligence, and the extent to which he or she has been supported or contradicted by other credible evidence.

You may in short accept or reject the testimony

**JA1513**

of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

A witness may be discredited or impeached by contradictory evidence by a showing that he or she testified falsely concerning a material matter, or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness' present testimony. If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

The fact that a witness has been previously convicted of a felony or a crime involving dishonesty or false statement is also a factor you may consider in weighing the credibility of that witness. The fact of such a conviction does not necessarily destroy the witness' credibility, but is one of the circumstances you may take into account in determining the weight to be given to his or her testimony.

In this case, the government called as some of its witnesses an alleged accomplice named as a co-defendant in the indictment with whom the government has entered into a plea agreement providing for the dismissal of some charges or providing that the government may in its discretion file a motion informing the Court that the witness has provided substantial assistance to the government in its investigation or prosecution of the defendants in this case or of other persons. If such a motion is filed by the government, the court may elect to impose a lesser sentence than the witness would otherwise have received for the offense to which he pled guilty.

Such plea bargaining, as it is called, has been approved as lawful and proper and is expressly provided for in the rules of this Court.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of such a witness alone may be sufficient weight to sustain a verdict of guilty. However, the jury should keep in mind that such testimony is always to be received with caution and weighed with

**JA1514**

great care.  You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.  The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person.

The testimony of an alleged accomplice and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You the jury must decide whether the witness' testimony has been affected by any of those circumstances or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of being immunized from prosecution.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of a drug or alcohol abuser has been affected by drug or alcohol use or the need for drugs or alcohol.

Now we come to the offense instructions, starting out with Count One.  Title 21 of the United States Code Section 846 makes it a separate federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 841(a)(1).  Section 841(a)(1) makes it a crime for anyone to knowingly distribute, dispense, and/or possess a controlled substance with the intent to distribute.

So under the law, a conspiracy is an agreement or a kind of partnership in criminal purposes in which each member becomes the agent or partner of each other -- of every other member.  In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme or that those who were members had entered into a formal type of agreement.  Also, because the essence of a conspiracy offense is the making of the scheme

**JA1515**

itself, it is not necessary for the government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.  What the evidence in the case must show beyond a reasonable doubt is this:  First, that two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment.  And second, that the defendant knowingly and willfully became a member of such conspiracy.

A person may become a member of a conspiracy without knowing all of the details of the unlawful scheme and without knowing who all of the other members are.  So if a defendant has an understanding of the unlawful nature of a plan, and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him or her for conspiracy, even though he or she did not participate before, and even though he or she played only a minor part.  Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy.

Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

The first element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.  In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement.  Similarly, you need not find that the alleged conspirators stated in words or writing what the scheme was, its objective or purpose, or every precise detail of the scheme, or the means by which its object or purpose was to be accomplished.  What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.  You may of course find that the existence of an agreement to disobey or disregard the law has been established by direct proof.  However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of

**JA1516**

conspiracy cases, actions often speak louder than words.  In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a common design existed on the part of the persons charged to act together to accomplish an unlawful purpose.

It is charged in Count One of the indictment that the conspiracy distributed and possessed with

3204

intent to distribute a particular amount or quantity of narcotic controlled substance.  The evidence in the case need not establish the exact amount or quantity of the substance containing cocaine, except you must find beyond a reasonable doubt that the conspiracy distributed or possessed with intent to distribute, or attempted to possess with intent to distribute at least 50 grams or more of crack cocaine.

The second element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy, the first count of the indictment, is that the defendant knowingly, willfully, and voluntarily became a member of the conspiracy.  If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourself who the members of that conspiracy were.  In deciding whether the defendant whom you are considering was in fact a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy; did he or she participate in it with knowledge of its unlawful purpose and with the specific intent of furthering its business or objective as an associate or worker.

In that regard, it has been said that in order

3205

for a defendant to be deemed a participant in a conspiracy, he or she must have had a stake in the venture or its outcome.  You are instructed that while proof of a financial interest in the outcome of the scheme is not essential, if you find that the defendant has such an interest, that is a factor which you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendants can be found to have been a conspirator, you must first find that he or she knowingly joined in the unlawful agreement or plan.  The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendants' participation in the conspiracy must be

**JA1517**

established by independent evidence of his or her own acts or statements and the reasonable inferences which may be drawn from them.

A defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of a conspiracy, the defendant need not have known the identities of each and every other member. Nor need he or she have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details or the scope of the conspiracy in order to justify an inference of knowledge on his or her part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his or her participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not by itself make him or her a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know or be friendly with a criminal without being a criminal himself or herself. Mere similarity of conduct, or the fact that they may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant without knowledge may happen to further the purposes or objectives of the conspiracy does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy, and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for

**JA1518**

the purpose of furthering the illegal undertaking. He or she thereby becomes a knowing and willing participant in the unlawful agreement; that is to say, a conspirator.

Now, let me move on to Count Two. Count Two of

3208

the indictment charges that in at least January, 1991 and continuously, beginning at least January, 1991 and continuously up to the date of the indictment, in the Eastern District of Virginia and elsewhere, the defendants Richard Tipton, Cory Johnson, James H. Roane, and Vernon Lance Thomas engaged in a Continuing Criminal Enterprise, in that those defendants committed a violation of certain narcotic laws as part of a continuing series of such violations; and that further, this series was done in some type of agreement with at least five other persons who were managed or supervised or organized by those defendants, and that from this continuing series of narcotics violations, those defendants received substantial income or resources.

You are instructed that Title 21 of the United States Code Section 848 reads in pertinent part: Any person who engaged in a Continuing Criminal Enterprise shall be guilty of an offense against the United States. The statute also provides as follows: For the purpose of Subsection (a) of this section, a person is engaged in a Continuing Criminal Enterprise if he violates any provision of this subchapter or Subchapter 2 of this chapter, the punishment for which is a felony; and two, such

3209

violation is a part of a continuing series of violations of this subchapter or Subchapter 2 of this chapter. When I talk about subchapter, it relates to narcotic felony violations, which are undertaken by such person in concert with five or more persons in respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and from which such person obtains substantial income or resources.

Now, in order to sustain its burden of proof for the crime of engaging in a Continuing Criminal Enterprise as charged in Count Two of the indictment, the government must prove the following five essential elements with respect to each individual defendant charged beyond a reasonable doubt: One, the defendant committed a felony violation of the federal narcotics laws; two, such violation was part of a continuing series of related violations of federal narcotics laws; three, the continuing series of violations was undertaken by the defendants in association or in concert with five or more other persons; four, the defendant was an organizer of

**JA1519**

these five or more other persons, or occupied a management or supervisory position with respect to these five or more other persons; five, the defendant obtained substantial income or resources from the continuing series of narcotic violations.

I will now discuss in more detail and define for you the meaning of certain terms used in the Continuing Criminal Enterprise statute and in these instructions relating to the elements of the Continuing Criminal Enterprise offense charged in Count Two.

The first phrase: "Felony violation." The phrase "felony violation of the federal narcotics laws" as used in these instructions means the commission of any act specifically prohibited by certain sections of the United States Code for which a defendant could be imprisoned for more than one year. The distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S. Code Section 848(a)(1) is a felony violation of the narcotics laws.

What is a continuing series of violations? A continuing series of violations means at least three violations of the federal drug laws as charged in Counts One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two, and Thirty-three of the indictment before you. It also requires a finding that those violations were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

The phrase "in concert with five or more other persons" means some type of agreement or joint action, whether direct or indirect, with at least five other persons who were involved in the continuing series of narcotics violations. The phrase "in concert with five or more other persons" does not require proof from the government that the five or more other persons actually had contact with each other or knew each other, or committed each violation together or operated together continuously at the same time. The government is not required to prove that the defendant managed, supervised, or organized these five or more persons at the same time. The government must prove beyond a reasonable doubt, however, that the defendant and at least five or more other persons were part of an agreement or joint action to commit the continuing series of violations of the federal narcotics laws alleged in the counts I've outlined: One, Three, Five, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-four, Twenty-five, Thirty-one, Thirty-two and/or

**JA1520**

Thirty-three of the indictment.

The term "organizer" and the terms "supervisory position" and "position of management" are to be given their usual and ordinary meaning. These words imply the exercise of power and authority by a person who occupies some position of management or supervision. This person need not be the sole or only organizer, supervisor, or manager of the activities in question.

An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise.

A supervisory position can be defined as one who manages or directs or oversees the activities of others. For purposes of this element, a person may occupy a position of organizer, a supervisory position, or any other position of management without having a direct personal contact with each of the persons he is organizing, supervising, or managing. It is not required that the defendant have personal contact with five or more subordinates in order to satisfy the organizer, supervisor, or position of management element. It is entirely possible for a single Continuing Criminal Enterprise to have more than one organizer, supervisor, or other person in a position of management.

You are further instructed that the term "substantial income or resources" as it appears in Title 21 United States Code Section 848 is defined as money or other material resources or property received or gained directly from illegal dealings in controlled substances by the defendants. Controlled substances are a material resource for purposes of this definition of income.

Furthermore, the term "income" does not necessarily mean net income. That is to say, it could mean gross receipts or gross income. It would follow that the phrase "substantial income or resources" should be construed as far as possible in an objective manner; that is to say, that the defendant would have to have  --  would have to receive what any reasonable person would consider to be considerable or ample economic benefit from engaging in a Continuing Criminal Enterprise. In determining income, you may consider a defendant's position in the enterprise, the quantity of controlled substances involved, and the amount of money that changed hands.

Now, in a moment I'm going to begin to instruct you on the law governing those counts in the

**JA1521**

indictment that involve homicide.  When I do so, you will notice that defendants Richard Tipton, Cory Johnson, and James H. Roane, Jr. have been charged with two very specific, very distinct types of homicide:  Killing while engaged in or in furtherance of a Continuing Criminal Enterprise in violation of Title 21 Section 841(e) of the United States Code, and killing for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity in violation of Title 18 Section 1959 of the United States Code.

The reason you are being asked to limit your deliberations to these two very specific types of killings is that you are sitting as a jury in a federal court.  In criminal cases, federal courts may try a defendant only for violations of federal law. Most types of homicide, that is, murder in the first degree or the second degree, voluntary manslaughter, are crimes under state law, not federal law.  And therefore, they cannot be tried by this Court.

As I am about to explain to you, if in your deliberations you find that a particular defendant has killed another person, that would not be enough for you to find that defendant guilty of a federal crime.  Instead, you must be convinced beyond a reasonable doubt that each of the specific elements of a federal crime charged in the indictment has been proved by the government.

The indictment charges that defendants Richard Tipton, Cory Johnson, James Roane, Vernon Lance Thomas, and Jerry Gaiters, between January 5th of 1992 and February 19th, 1992, within the Eastern District of Virginia, while engaged in or working in furtherance of a Continuing Criminal Enterprise, intentionally killed, counseled, commanded, induced, procured, or caused the intentional killing of certain individuals.

Note however that no defendant is charged with all the murders discussed in the indictment. Specifically, the following defendants face these charges with respect to the following killings.  With respect to the killing of Douglas A. Talley, the defendant, Richard Tipton, is charged.  With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged.  With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged.  With respect to the killing of Louis Johnson, Jr., defendants James H. Roane and Cory Johnson are charged, along with defendant Vernon Lance Thomas.  With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong,

**JA1522**

defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters.  With respect to the killings of Curtis Thorne and Linwood Chiles, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each separate count charged against that defendant.  The verdict forms which will be provided to you by the Court, and which I will discuss with you in more detail in a few minutes, will list the specific charges in the indictment which you must consider with respect to each of these defendants.

Title 21 United States Code Section 848(e)(1)(A) provides in pertinent part that any person engaging in or working in furtherance of a Continuing Criminal Enterprise who intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual, and such killing results, is guilty of an offense against the United States.

3217

Before you can find an individual defendant guilty of this offense, you must be convinced beyond a reasonable doubt of each of the following elements:  First, that the defendant was engaged in or working in furtherance of the continuing enterprise charged in Count Two of the indictment; second, that while the defendant was so engaged, the defendant either intentionally killed, or counseled, commanded, induced, procured, or caused the intentional killing of the individual victim named in a particular count; and three, that the killing of that victim actually resulted.

The indictment charges that defendants Richard Tipton, Cory Johnson, James H. Roane, Jr. and Vernon Lance Thomas, and Jerry Gaiters, and Sterling Hardy, between January 5th, 1992 and February 19th, 1992, within the Eastern District of Virginia, murdered or maimed certain individuals as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value and engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

3218

Now, this is the 1959 counts.  These are the 1959 counts.  They are Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight,

**JA1523**

Twenty-nine, and Thirty. Again, however, no single defendant is charged with all of the killings and maimings discussed in the indictment.

Specifically, the following defendants face these charges with respect to the following killings and maimings: With respect to the killing of Douglas A. Talley, the defendant Richard Tipton is charged. With respect to the killing of Douglas Moody, defendants Richard Tipton and James H. Roane, Jr. are charged. With respect to the killing of Peyton Maurice Johnson, defendants James H. Roane and Cory Johnson are charged. With respect to the killing of Louis J. Johnson, Jr., defendants James H. Roane, and Cory Johnson are charged, along with defendant Vernon Lance Thomas. With respect to the killing of Torrick Brown, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants Vernon Lance Thomas and Sterling Hardy.

With respect to the maiming of Martha McCoy, defendants Richard Tipton, James H. Roane, Jr., and Cory Johnson are charged, along with defendants

3219

Vernon Lance Thomas and Sterling Hardy. With respect to the killings of Bobby Long, Anthony Carter, and Dorothy Mae Armstrong, the defendants Richard Tipton and Cory Johnson are charged, along with defendant Jerry Gaiters. With respect to the killings of Curtis Thorne and Linwood Chiles, and the maiming of Priscilla Greene and Gwendolyn Greene, defendants Richard Tipton and Cory Johnson are charged, along with defendant Vernon Lance Thomas.

Again, I emphasize that in your deliberations you must give individual consideration to each defendant with respect to each count charged against that defendant. The verdict forms, as I mentioned, will assist you in this respect.

You are instructed that Title 18 United States Code Section 1959 reads in pertinent part as follows: Whoever, as consideration for the receipt of or as consideration for a promise or agreement to pay anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a

3220

crime of violence against any individual in violation of the laws of any state or the United States, or attempts or conspires to do so, is guilty of an offense against the United States.

To find a defendant guilty under this statute, you must find that the government has proven each of

**JA1524**

the following elements beyond a reasonable doubt: First, that a racketeering activity actually did exist; second, that the racketeering activity affected interstate commerce; third, that an individual defendant did knowingly and intentionally commit or conspire to commit the crime charged in the particular count under consideration. Fourth, that the defendant acted for the purpose of gaining entrance to the racketeering activity or for the purpose of maintaining or increasing his position in the racketeering enterprise; or that the defendant received or was promised that he would receive something of pecuniary value from the racketeering enterprise in exchange for his acts.

I will now explain and define for you the meaning of certain terms found in the statute and within these instructions relating to the elements of the 1959 murders referred to as violent crimes in aid of racketeering activity.

3221

As I've outlined for you, those offenses are in Counts Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty of the indictment.

"Racketeering activity" means any act or threat involving murder or dealing in narcotic or other dangerous drugs. An enterprise includes any group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce. The phrase "anything of pecuniary value" means anything of value in the form of money or negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

It is charged in the indictment that within the Eastern District of Virginia, between on or about January 13th, 1992 and on or about February 19th, 1992, the defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Vernon Lance Thomas, and Sterling Hardy used a firearm during and in relationship -- or in relation to the commission of a crime of violence or a drug-trafficking crime.

Now again, as I mentioned with respect to some of the charges I discussed earlier, no single

3222

defendant is charged in each of these counts. The verdict form will assist you in keeping track of which defendants are charged in which counts and in giving individual consideration to each defendant for each count against him or her.

Let me read the firearms statute. And the firearms violations are contained in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six. Title

**JA1525**

18 United States Code Section 924(c)(1) provides in pertinent part:  Whoever during and in  relation to any crime of violence or drug trafficking crime for which he may be prosecuted in a Court of the United States uses or carries a firearm shall be guilty of a crime against the United States.

In order to sustain its burden of proof of the crime of using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime as charged in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:  One, the defendant committed the crime as charged in the indictment; and two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm.

The term "crime of violence" means an offense that is a felony and has as one of its essential elements the use, the attempted use, or threatened use of physical force against the person or property of another, or an offense that by its very nature involves a substantial risk that such physical force may be used in committing the offense.

The term "drug trafficking crime" means an offense that is a felony and involves the distribution, manufacture, or importation of any controlled substances, or the conspiracy to distribute, import, or manufacture controlled substances.  The offenses alleged in Counts Three, Four, Five, Seven, Eight, Ten, Eleven, Thirteen, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty-one, Twenty-two, Twenty-three, Twenty-four, Twenty-five, Twenty-seven, Twenty-eight, Twenty-nine, Thirty, Thirty-one, Thirty-two, and Thirty-three are crimes of violence or drug trafficking crimes.

Title 18 United States Code Section 92(1)(a)(3) defines firearm is including any weapon which will or is designed to, or may readily be converted to expel a projectile by the action of an explosive, the frame or receiver of any such weapon.  You need not find that the firearm was loaded or that it was operable at the time of the offense.

The phrase "uses or carries a firearm" means a firearm or firearms available to assist or aid in the commission of a crime of violence or a drug-trafficking crime charged in the indictment.

In determining whether a defendant used or carried a firearm, you may consider all of the factors received in evidence in the case, including the nature of the underlying crime of violence or drug-trafficking crime alleged:  the proximity of the

**JA1526**

defendant to the firearm in question, the usefulness of the firearm to the crime alleged, and the circumstances surrounding the presence of the firearm.

The government is not required to show that the defendant actually displayed or fired the weapon. The government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession or under the defendant's control at the time that a crime of violence or a drug-trafficking crime was committed.

It is charged in the indictment that on or about January 15th, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Cory Johnson, did knowingly and intentionally distribute a Schedule II narcotic controlled substance; that is, a mixture and substance described in Title 21 United States Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack, or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1).

The prosecution on this count is based on a statute which is federal law, Title 11 U.S. Code Section 846, and Section 841(a)(1), which reads in pertinent part as follows:  It shall be unlawful for any person knowingly or intentionally to distribute a controlled substance.

In order to sustain its burden of proof for the crime of distribution of a controlled substance as charged in Count Thirty-one of the indictment, the government must prove the following two essential elements beyond a reasonable doubt:  The defendant, Cory Johnson, knowingly and intentionally distributed the controlled substance, crack cocaine described in the indictment; two, at the time of such distribution, the defendant knew that the substance distributed was crack cocaine, a controlled substance.

The term "to distribute" as used in these instructions means to deliver or to transfer possession or control of something from one person to another.  The term "to distribute" includes the sale of something by one person to another.  You are instructed as a matter of law that crack cocaine is a controlled substance.  It is solely for the jury, however, to determine whether or not the government has proved beyond a reasonable doubt that the defendant distributed a substance which was crack cocaine.

The evidence received in this case relating to Counts Thirty-two and Thirty-three need not prove the actual amount of the controlled substance that was

**JA1527**

part of the alleged transaction or the exact amount of the controlled substance alleged in the indictment as distributed by the defendant.  The government must prove beyond a reasonable doubt, however, that a measurable amount of the controlled substance was in fact knowingly and intentionally distributed by the defendant.

Count Thirty-two reads as follows:  It is charged in the indictment that on or about February 2nd, 1992 at Richmond, Virginia, in the Eastern District of Virginia, defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Sterling Hardy, Vernon Lance Thomas, and Jerry Gaiters did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 United States Code Section 841(a)(1)(ii) which contains cocaine base commonly known as crack or cook-'em-up in violation of Title 21 United States Code Section 841(a)(1).  And Title 18 United States Code Section 2.

It is charged in the indictment in Count Thirty-three the following:  That on or about April 10th, 1992 at Richmond, Virginia, in the Eastern District of Virginia, the defendant, Richard Tipton, did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance; that is, more than 50 grams of a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii), which contains cocaine base commonly known as crack or cook-'em-up, in violation of Title 21 United States Code Section 841(a)(1), and Title 18 United States Code Section 2.

Section 841(a)(1) of Title 21 of the United States Code provides in pertinent part that it shall be unlawful for any person knowingly or intentionally to possess with intent to distribute a controlled substance.  In order to sustain its burden of proof for the crime of possession of a controlled substance with intent to distribute that substance as charged in Counts Thirty-two and Thirty-three of the indictment, the government must prove the following three essential elements beyond a reasonable doubt:  The defendant possessed the controlled substance described in the indictment; the defendant knew that the substance was a controlled substance; and the defendant intended to distribute this controlled substance.

The law permits the jury in proper circumstances to infer intent to distribute from the quantity of the substance possessed, and/or the manner in which it is packaged.  However, the ultimate question of

intent to distribute should be resolved by the jury upon all of the evidence in the case. The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly had direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

3229

The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint. You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that ordinarily, anything a person can do for himself may also be accomplished by that person through direction of another person as his agent or her agent, or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise. So if another person is acting under the direction of the defendant, or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conducts of such other persons, just as though the defendant had committed

3230

the acts or engaged in such conduct. Notice, however, that before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participated in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons,

**JA1529**

and that the defendant voluntarily participated in its commission with the intent to violate the law.

You will note that the indictment charges that the offense or offenses were committed on a certain date. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The word "knowingly" as that term has been used from time to time in these instructions means that the act was done voluntarily and intentionally and not because of a mistake or accident. The word "willfully" as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposefully with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

A separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any offenses charged should not control your verdict as to any other offense or any other defendant. I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the evidence in the case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

Also, the punishment provided by law for the offenses charged in the indictment should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.

**JA1530**

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight of the evidence or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans.  You are judges, judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

Now, upon retiring to the jury room, you should first select one of your number to act as your Foreperson, who will preside over your deliberations and will be your spokesperson here in open Court.

Now, I have prepared verdict forms for you, and I need to give you some explanation in that regard.  There is a verdict form that relates to each individual defendant.  And the way you can tell which verdict form relates to which defendant, at the top you will see the style of the case and that defendant's name.  The United States of America versus Richard Tipton.  And then you will have the verdict form.  Now, the verdict forms will vary.  They are different because each defendant is charged differently under the indictment.  But there is one thing that I want to make clear, and this will relate to the verdict forms of Mr. Tipton, Mr. Johnson, and Mr. Roane.

The first thing you will do is deal with Count One, which is the conspiracy.  It says, "We the jury find as follows on Count One, which is conspiracy to distribute controlled substance:"  And then there will be a line where you will write in guilty or not guilty.  When you are finished with Count One, you move to Count Two.  Now, Count Two is the Continuing Criminal Enterprise count.  And when you go down under Count Two, the first thing you see will be a question.  And the question is as follows:  "Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?"  And there is a line, yes or no.  You have got to answer that question first before you go any further.  You have got to answer this question.  And it says, as I say, this relates to both Mr. Johnson and Mr. Roane, that question is presented, and you have to answer that question on each verdict form.

If you indicated above that a Continuing Criminal Enterprise did not exist, you must find the defendant, Richard Tipton, Cory Johnson, or James H. Roane, as the case may be, not guilty as to Count

**JA1531**

Two. If you indicated that a Continuing Criminal Enterprise did exist, then you must go further and now determine whether the defendant, Richard Tipton, is guilty or not guilty of the crime of engaging in that Continuing Criminal Enterprise as charged in Count Two, and you would enter your finding below, guilty or not guilty. And you have to do this as to Mr. Johnson and as to Mr. Roane. You see, it is a process. Answer the question: Was there a Continuing Criminal Enterprise? If no, then obviously no one can be guilty of engaging in that Continuing Criminal Enterprise, so you would have to be not guilty as to Count Two. If yes, it doesn't follow then that they are automatically guilty of it. You have to then decide is this defendant guilty of engaging in the continuing enterprise you have found. Does everybody understand?

(No response.)

Then as you go through the indictment, and you get to the charges which allege killings of certain individuals while engaged in or working in furtherance of a Continuing Criminal Enterprise, you will see a parenthesis after each one of those charges. For instance, this is Mr. Tipton. Count Three, the killing of Douglas Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise. Beneath that is a parenthetical to remind you. If you indicated in response to the question set forth under Count Two above that a Continuing Criminal Enterprise did not exist, you must find the defendant not guilty as to this count. Again, it follows as the night does day. If you all do not find a Continuing Criminal Enterprise, then you cannot find a defendant guilty of engaging in killing somebody while engaging in or working in a Continuing Criminal Enterprise.

The other counts are self-explanatory as you go through them. The 1959 count, which I've described to you in detail, the elements there, you would consider those independently, as well as the drug counts, the firearm counts. Consider those independently based on the evidence. But remember that the Continuing Criminal Enterprise count is tied to the allegations of murder while engaged in or working in a Continuing Criminal Enterprise.

You go through each individual defendant, through their verdict form, and when you have completed it the Foreperson will sign the form and date it. And you will have done your job as to that defendant. And then you will go to the next defendant and you would go through the same process. Make your decisions. And you do that as it relates

**JA1532**

to each individual defendant.

When you have reached unanimous agreement and dealt with all the defendants, you simply let us know. You will just have to knock on the door and the Bailiff, Marshal, will be standing there.

If you have some question during the course of your deliberations, do the same thing. Just knock on the door. We want you to write your question down and have your Foreperson sign the question. Knock on the door, give it to the Marshal, and he will bring it to me. If it is a question that I can't answer, and sometimes I can't, I just can't answer it. You may ask me something about the evidence. You heard it. You are going to have to determine what the evidence is. But if there is something technical or something that you want to know from me, I will usually bring you back in and then give you the answer as best I can in open Court from the bench.

Now, if during your deliberations you all have some question and need to come out here, please don't tell me how you stand as it relates to any defendant or any count. We don't want to hear from you until you have a unanimous verdict. If you come out here and you ask a question and you come out and the Foreperson stands up and says, "Judge, we are six to six on this," that would be tragic because it would result in a mistrial. We don't want to hear that from you. So don't do that.

Now, the exhibits will be going out with you. They will follow momentarily. Like I said, your first order of business, just select your Foreperson. Lunch should be waiting on you, probably. And you all can eat your lunch. The exhibits will follow. Take your time. You have as much time or as little time as you wish. It is up to you, whatever you need to do justice to this trial and the parties.

All right, counsel, any objections other than those previously stated?

MR. VICK: May we approach?

(At Bench.)

MR. VICK: I understood the way you read the verdict form, I thought it might be misleading. They need to find, one, CCE existed. If they find that the CCE existed then there is almost a two-part second question. Two, were these people charged, Roane, Tipton, or Johnson, leaders of the CCE, organizers, managers, or supervisors of the CCE, then they go to two. But the way it is written, when they say engaged in, they could indeed be found not guilty of Count Two but still be found guilty of the murders if, as I argued, there was a CCE, "Light" was the

**JA1533**

head of it, the organizer, supervisor, or manager.

The guilt would still follow under the other counts. The language in the second part said "engaged in." That's not really what Count Two is about. That's what the other counts are about.

And there is one other thing, my oversight as to Count Thirty-one. We charged, just like we did in Count Thirty, might be Thirty-two, we charged more than 50 grams. It will be less than 50 grams so it needs to be deleted. Just drug distribution.

MR. BAUGH: I thought the Court did.

MR. VICK: That was one count. There is also a second one.

MR. BAUGH: Your Honor, in light of the argument of the United States, I have prepared a multiple instruction. I'm concerned about that. We have asked for that because of the New York Boyz thing. Because there might be a question for the jury whether the New York Boyz activity led to this conspiracy. The United States argued that yesterday. I think we would ask for that.

THE COURT: I think it is clear enough.

MR. VICK: My concern as to Count Two, they need to be -- to be found guilty of Count Two, they need to be found to be managers, supervisors, or organizers.

THE COURT: I don't know how much more I can say about that.

MR. VICK: Yes, sir. But my concern is not with the jury instruction, only with the verdict form. The verdict form says they need to be found guilty of Count Two only to have been engaged in. Am I making my distinction clear?

MR. BAUGH: On behalf of defendant Roane, I think you are correct. It seems to apply to Count Two if a CCE existed.

MR. VICK: Our argument is that they could find a CCE, find them not guilty of Count Two, but still find them guilty of the murder counts in furtherance of the CCE.

THE COURT: No, I explained that to them. I didn't put all the elements in the verdict form. I'm going to leave it alone.

MR. VICK: Okay. Could I show the Court the other --

THE COURT: Thirty-two?

MR. VICK: The April 10th count. That should be "less than." We didn't prove the 50 grams, so it should be just plain possession.

MR. GEARY: I offer Number 18 in regard to the five or more persons.

**JA1534**

THE COURT: Oh, sure.

(Court perusing instruction offered by Mr. Baugh.)

MR. VICK: There has been no evidence of multiple conspiracies here. There has been argument by counsel, but evidence of only one conspiracy. Certainly there has been no evidence of any conspiracy with any other goal other than murder and distribution of drugs.

MR. WHITE: On behalf of Mr. Tipton, Your Honor, we would suggest that the New Jersey information is separate as well as the separate Central Gardens information is separate. That's for the jury.

THE COURT: You can suggest all you want. I'm trying to recollect. And what's in evidence, separate conspiracy?

MR. BAUGH: I can tell you this. The United States cannot put my client in New Jersey, period, dot.

MR. WHITE: That argument could be made in regard to the Central Gardens period before Mr. Roane was arrested and also surrounding the Sandy Lane stuff. There was no violence alleged in connection with that.

THE COURT: I'm not going to give it. Your objection is noted.

MR. BAUGH: May I stick it in as an exhibit?

MR. WHITE: We object on behalf of defendant Tipton as well.

THE COURT: All right.

(In Open Court.)

All right, let me say one other thing about Count Thirty-three. The indictment will read as follows when you receive it: The Grand Jury charges that on or about April 10th, 1992 at Richmond, Virginia in the Eastern District of Virginia, the defendant Richard Tipton did knowingly and intentionally possess with intent to distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21 U.S. Code Section 841(b)(1)(A)(ii) which contains cocaine base, commonly known as crack or cook-'em-up.

All right. As I indicated to you, the alternates, the other day, we will have to excuse you for now. You will be outside of this process during the deliberations. We will, if necessary, call you back and have you sit with us and be with us during any penalty or sentencing phase that might be required. So we can't obviously give you any estimate as to when these deliberations will be

**JA1535**

over.  We will simply call you and give you a time to come when we know what that time will be.

If you would be excused now, I think we have lunch for you.  Go get your lunch out of there and then be excused until we call you again.  Thank you very, very much for your participation so far, and I'll thank you in advance in case we do need you again.  Thank you so much.  You all can be excused.

(The alternate jurors left the courtroom.)

Do we have the video in the jury room?

MR. VICK:  The TV is right here.  It just simply needs to be plugged in.

THE COURT:  Let's go ahead and do that.

(Mr. Vick left the courtroom with television monitor.)

All right, we will excuse you now to begin your deliberations.  Elect your Foreperson, have your lunch, and get to work.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

3244

MR. VICK:  I don't know how close the Court wants us to stay.  Can we go back to our offices?

THE COURT:  Give us a number where we can reach you and you can get here within minutes.  We will be in recess.

(Recess to await call of the jury taken at 1:25 p.m.)

(Court was reconvened at 5:15 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right.  I'm going to send you home now.  You all have had a long day.  And I'd like for you to come back tomorrow at 9:30 unless that's a problem for somebody, so you can get an early fresh start in the morning.  As I've indicated to you over and over again, I really want to emphasize this now, do not discuss this case with anyone and don't allow anyone to discuss it with you.  Don't review any newspaper, TV, radio items related to this case.

In the morning when you come in at 9:30, we have to do it this way.  Don't start deliberating as soon as you get grouped together.  I have to bring you in here and then send you right back out to begin your deliberations.  So wait until I do that.  You all

3245

have a good evening.  Everyone remain seated until the jury leaves the courtroom.

(The jury left the courtroom.)

All right.  You can remove the defendants.

**JA1536**

(The defendants were removed from the courtroom.)

We will be in adjournment until 9:30 tomorrow morning.

(Proceedings adjourned at 5:20 p.m.)

3246

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

      v.                                    CRIMINAL ACTION
                                               92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------

VOLUME XVII

February 3, 1993
Richmond, Virginia
9:30 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                 JEFFREY B. KULL
               OFFICIAL COURT REPORTER

3247

THE CLERK: Criminal Number 3:92CR68:
United States of America versus Richard Tipton, Cory
Johnson, James H. Roane, Jr., and Sandra Reavis. The

**JA1538**

seventeenth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. WHITE:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right, good morning to you.  We are going to allow you now to continue your deliberations.  All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will recess to await the jury's call.

(Recess taken from 9:35 a.m. to 11:20 a.m.)

THE COURT:  All right, I got a note from the jury which reads as follows:  "Instruction 43, 44, and 45, please explain further, more clarification."  Those are, 43, the aiding and abetting; 44, on or about, knowingly, and willfully; and 45, caution, punishment not relevant, multiple defendants, multiple counts.

Now, I have passed out to you a supplemental I'm giving on aiding and abetting which I think will help.  The one about knowingly and willfully, I will give an example highlighting what knowingly and willfully are.  That's the best I can do on that.  It seems to me self-explanatory.  I don't know what the problem is with it.  But perhaps the example will help.  I'll explain to them the general purpose of the multiple defendants, multiple counts instruction.  The middle paragraph, which might be the problem, which reads "I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case.  The defendant is not on trial for any act or conduct or offense not alleged in the indictment."  Now, this sentence:  "Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case."

Taking the group of instructions that they wanted clarification on, they might be hung up on that particular language.  I don't know.  If a person is charged with aiding and abetting someone else in the commission of an offense, you would necessarily

**JA1539**

have to look at the actions of another person in making that determination. And it is likewise with conspiracy. In order to have a conspiracy, you have to have agreement between at least two people, so they are necessarily looking at somebody else's action. And that sentence to some extent might negate that understanding. Does everybody see what I am saying?

MR. BAUGH: Your Honor, I understand. But on behalf of defendant Roane, I don't even mean to attempt to usurp your prerogative, but I would ask perhaps our first response to them would be a note back to them asking them what paragraphs in 44 and 45 are giving them problems. We could zero in on it.

THE COURT: No, I think I'll do this and ask them then if that solves their problem. If it doesn't, they will let us know.

All right, bring in the jury.

(The jury entered the courtroom.)

All right, I received a note from the jury asking for clarification to Instructions 43, 44, and 45. I'm going to give you some additional instruction on aiding and abetting in an effort to clarify. And if you would listen to me, it is as follows: A person may violate the law even though he or she does not personally do each and every act constituting the offense if that person aided and abetted the commission of the offense. Section 2(a) of Title 18 of the United States Code provides whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal. Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself or herself in some way with the crime charged, and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of the crime charged in the indictment, the government must prove beyond a reasonable doubt that the defendant knew that the crime charged was to be committed or was being committed; that the defendant knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime, and that the defendant acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or abettor to a crime, the government must also

**JA1540**

prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed to you in the instructions. Merely being present at the scene of the crime or merely knowing that a crime is being committed, or is about to be committed, is not sufficient for the jury to find that the defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself or herself with the crime in some way as a participant. Someone who wanted the crime to be committed, not as a spectator. One who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act is if he committed it directly. There may be some confusion as to the difference between conspiracy and aiding and abetting.

Conspiracy is, as I have instructed, an agreement to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act, whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. Aiding and abetting rests on a broader base. It states a rule of criminal responsibility for acts which one assists another in performing.

Now, you all have asked about Instruction Number 44, which talks about on or about, knowingly, and willfully. The on or about, I think, should be crystal clear. That simply means that the date charged in the indictment, the government need not prove the specific date. They can prove that it happened on a date on or about or near the date actually charged.

Now, with these words knowingly and willfully: Again, they are both explained in the instruction. But let me give you an example to try to help you understand knowingly and willfully.

Now, if I was out and about driving my car and pulled up to a friend's house and three guys got in my car and they were friends of mine, I knew them, and I was driving the car, and they asked me for a ride over to the bank, if I took them over to the bank not knowing what if anything they were going to do when they got there, and they subsequently robbed the bank, the act of driving the three people to the bank was done knowingly. It was voluntary. It was

**JA1541**

intentional. It was not a mistake. I did it. I meant to do it. But not knowing what was going to happen at the bank, that would not be a criminal act.

Now, if I knew that they were going to rob the bank, and if I took them to the bank for the purpose of robbing the bank, this would be a willful act done not only knowingly, voluntarily, and intentionally, but with a specific intent to do something the law forbids. And that would be a criminal act. "Knowingly" as described in this instruction means just that, something that is done voluntarily and intentionally, not by mistake or accident. "Willful," on the other hand, is something else again. It requires that it not only be done voluntarily, which is the same as knowingly and

3254

purposefully, but with the specific intent to do something the law forbids.

Now, the last instruction you asked about is one that we give regarding multiple -- when we have multiple defendants as well as multiple counts. The primary purpose for this particular instruction is to emphasize that each defendant who is charged with a count or counts is to be given individual consideration as it relates to that count or counts. It is that simple. If you have four defendants, as we have in this case, each defendant deserves to be considered individually. And that's why we give this kind of instruction.

Now, let me say this: If a defendant is charged with aiding and abetting somebody else in the commission of a certain offense, you may have to look at the actions of that other person to determine if the defendant you are considering is indeed guilty of aiding and abetting a particular crime. It still means he gets individual attention, but you have to look at the actions of somebody else to give him that individual attention. The same may apply with conspiracy. Conspiracy involves an agreement between at least two people. So necessarily, you may have to consider the actions of another person when

3255

determining the guilt or innocence of a particular defendant on the conspiracy count.

All right. Now, does this answer your question? Okay?

(Affirmative response.)

All right. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

You may remove the defendants.

(The defendants were removed from the courtroom.)

**JA1542**

All right.  We will be in recess and await the jury's call.

(Recess awaiting jury verdict taken from 11 o'clock a.m. to 5:10 p.m.)

(In Open Court.)

THE COURT:  All right.  I understand we have a verdict.  Bring in the jury, please.

(The jury entered the courtroom.)

Will the Foreperson please rise?  I understand the jury has reached a verdict?

THE FOREPERSON:  Yes, it has.

THE COURT:  Would you give the forms to the Marshal, please?

(Verdict forms proffered to Court and Clerk.)

3256

All right.  The verdict forms appear to be in order and the Clerk will publish the verdicts.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts.  If defendant Tipton will please stand.

(Defendant Tipton stood.)

Case number 3:92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Answer:  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise. Guilty.  Count Three, killing of Douglas A. Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Four, killing of Douglas A. Talley to maintain or increase position in racketeering enterprise.  Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Not guilty.

3257

Count Six, use of firearm in relation to killing of Douglas Moody.  Not guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Not guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering

**JA1543**

enterprise.  Not guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in rack racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count 29, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

Count Thirty-three, possession of controlled substance with intent to distribute on or about 4-10-92.  Guilty.

So say we all dated 2-3-93.  Signed by the Foreperson, Margaret M. Griffiths.  You may be

**JA1544**

seated.

(Defendant Tipton resumed his seat.)

If defendant Cory Johnson will please stand.

(Defendant Johnson stood.)

Case number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

**JA1545**

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of a firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-nine, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-one, distribution of controlled substance, guilty.

Count Thirty-two, possession of controlled substance with intent to distribute it on or about 2-2-92.  Guilty.

So say we all, dated 2-3-93, signed by the Foreperson, Margaret M. Griffiths.

You may be seated.

(Defendant Johnson resumed his seat.

If defendant Roane will please stand.

(Defendant Roane stood.)

Case number 3:92CR68-03:  United States of America versus James H. Roane, Jr., also known as "J.R."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance, guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.

**JA1546**

Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Six, use of firearm in relation to killing of Douglas Moody.  Guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

So say we all.  Dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Roane resumed his seat.)

If defendant Reavis will please stand.

(Defendant Reavis stood.)

Case number 3:92CR68-07:  United States of America versus Sandra Reavis.  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

So say we all dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Reavis resumed her seat.)

**JA1547**

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK: Do counsel wish the jury polled?

MR. BAUGH: Yes.

THE CLERK: Jurors, if these are your verdicts as I call your name please respond by answering yes.

Victor M. Catlett.

THE JUROR: Yes.

John E. Coleman, Sr.

THE JUROR: Yes.

Edward Cooke.

THE JUROR: Yes.

Debra J. Dabney.

THE JUROR: Yes.

Nina S. Eike.

THE JUROR: Yes.

Bonita S. Faircloth.

THE JUROR: Yes.

Margaret M. Griffiths.

THE JUROR: Yes.

Charles V. Guthrie, Sr.

THE JUROR: Yes.

Jerome Harrison.

THE JUROR: Yes.

Connie E. Harvey.

THE JUROR: Yes.

Frances P. Hodson.

THE JUROR: Yes.

Thomas C. Jackson.

THE JUROR: Yes.

THE COURT: All right. Ladies and gentlemen, I'm going to ask you to come back on next Monday morning at 10 o'clock. We will get started with the sentencing phase of the trial. You all may be excused now. 10 o'clock on Monday morning. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. BAUGH: Before the jury leaves the building, I have something I would like to say.

THE COURT: Have Bill hold on to them.

(Bench conference held off the record per Mr. Baugh's request.)

All right, is anybody here from probation?

(Probation Officers Gill and Ault conferred with Court off the record.)

All right, I'm going to set a sentencing date for Ms. Reavis. There is no need for the other three defendants to be held. They can be removed at this

**JA1548**

time.

MR. COOLEY: Judge, has the counsel been

given some opportunity to discuss with the Court, either with or without the defendants being present, the timing, scheduling for next week?

THE COURT: Oh, sure. Defendants other than Reavis can be removed.

MR. VICK: Mr. White had filed a motion asking for the government's witness list as to the sentencing phase of this. I don't know what the Court's pleasure is in that regard, but we can provide one by 5 o'clock tomorrow afternoon if necessary.

THE COURT: Well, as soon as you can, get it to them.

MR. VICK: We can probably even get it sooner than that.

MR. BAUGH: Will we each have to file a motion?

THE COURT: No. Everybody should get one. All right, Mr. Wagner, how about April 14th for sentencing?

MR. WAGNER: That's fine, Your Honor.

THE COURT: Mr. Vick, April 14th?

MR. VICK: April 14th is fine with the government, Your Honor.

MR. PARCELL: Will that be at ten?

THE COURT: No, we will do it at 9:30.

(Defendant and counsel executing sentencing documents.)

MR. PARCELL: Judge, may we leave our stuff here in the next two days?

THE CLERK: Judge Merhige has a docket here in the morning.

THE COURT: I'm sorry, you have to clear it up. Judge Merhige has something.

MR. GEARY: Is there any gag order in effect from now until Monday?

MR. BAUGH: That's a good idea. We so move.

MR. GEARY: Yes.

MR. VICK: We don't intend to talk about the case at all.

MR. GEARY: We have "reliable authority" reports all the time and it can only come from the United States Attorney's Office.

THE COURT: I don't want members of the U.S. Attorney's Office or any of the lawyers to make any comments to the press about this. We still have a very sensitive phase to go through and you should know better than that. And I'm on record.

THE COURT: All right. Ms. Reavis, could

**JA1549**

3270

you stand up a minute, please?

(Defendant Reavis stood.)

Ms. Reavis, your matter has been set for sentencing to commence at 9:30 a.m. on April 14th in this courtroom.  In the interim, somebody from the Probation Office will be in touch with you.  I urge you to cooperate with them as much as you possibly can.  All right.  That completes the matter.  Ms. Reavis may be removed from the courtroom.

(The defendant was removed from the courtroom.)

All right, I'm going to adjourn Court.  We can talk scheduling back here.

(In Chambers.).

THE COURT:  All right, tell those folks to get in here.

(Counsel assembled in chambers.)

THE COURT:  Somebody wanted to talk about scheduling?

MR. BAUGH:  I was going to make the suggestion, Your Honor, that being as how it would give us one day apiece, if we break early.  Ours looks like about a day, and we are number three.

MR. VICK:  Judge, in aggravation, I would think that, and we will need to get together on this, but we have got a list of about six witnesses, none

3271

of whom will be very long.

THE COURT:  You are talking about a day between each presentation?

MR. BAUGH:  A day for each presentation.

MR. VICK:  I expect we will be handing it to the defense mid-afternoon Monday, I would think.

MR. COOLEY:  You are assuming opening statements?

MR. VICK:  Well, that's right.

THE COURT:  We will assume a full day.

MR. VICK:  For us on Monday.

MR. WHITE:  Because Judge, you know, we are bringing people down from New York and I just want to know, we are going to have them all here on Monday, but for purposes of making sure we are prepared and ready to go forward, we should count on Monday?

THE COURT:  Tipton gets started on Tuesday.  We do the openings, and if we fall short we will just put it over until Tuesday.

MR. COOLEY:  How long for you?

MR. WHITE:  I would say no more than a day, Judge.  Six witnesses, tops.

MR. COOLEY:  I think ours is three to five hours, probably, of testimony.

MR. BAUGH:  Ours is a day.

3272

MR. VICK:  Full day?

**JA1550**

MR. BAUGH: Yes.

THE COURT: We are talking about maybe Thursday or Friday for closing up.

MR. WHITE: Friday, probably, I would think.

THE COURT: That's fine. You know, if we fall short or if you go over, it is no problem. We will adjust. But it looks like Friday for closing.

MR. BAUGH: Thank you.

(Proceedings adjourned at 5:35 p.m.)

**JA1551**

JA1552

INTENTIONALLY LEFT BLANK TO PRESERVE PAGINATION

3246

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff;

        v.                                CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

------------------------------------------
                    VOLUME XVII

                February 3, 1993
                Richmond, Virginia
                    9:30 a.m.

BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge


APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, ESQ.
                 Office of the United States Attorney;
                     Counsel for Government;

                 ROBERT P. GEARY, ESQ.
                 ERIC D. WHITE, ESQ.
                     Counsel for Defendant Tipton;
                 CRAIG S. COOLEY, ESQ.
                 JOHN F. McGARVEY, ESQ.
                     Counsel for Defendant Johnson;
                 DAVID P. BAUGH, ESQ.
                 ARNOLD R. HENDERSON, V, ESQ.
                     Counsel for Defendant Roane;
                 ROBERT J. WAGNER, ESQ.
                     Counsel for Defendant Reavis.
                     JEFFREY B. KULL
                 OFFICIAL COURT REPORTER

3247

THE CLERK:  Criminal Number 3:92CR68:
United States of America versus Richard Tipton, Cory
Johnson, James H. Roane, Jr., and Sandra Reavis.  The

**JA1553**

seventeenth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. WHITE: Defendant Tipton is ready.

MR. COOLEY: Defendant Johnson is ready.

MR. HENDERSON: Defendant Roane is ready.

MR. WAGNER: Defendant Reavis is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.)

All right, good morning to you. We are going to allow you now to continue your deliberations. All right. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, remove the defendants.

(The defendants were removed from the courtroom.)

All right. We will recess to await the jury's call.

(Recess taken from 9:35 a.m. to 11:20 a.m.)

THE COURT: All right, I got a note from

3248

the jury which reads as follows: "Instruction 43, 44, and 45, please explain further, more clarification." Those are, 43, the aiding and abetting; 44, on or about, knowingly, and willfully; and 45, caution, punishment not relevant, multiple defendants, multiple counts.

Now, I have passed out to you a supplemental I'm giving on aiding and abetting which I think will help. The one about knowingly and willfully, I will give an example highlighting what knowingly and willfully are. That's the best I can do on that. It seems to me self-explanatory. I don't know what the problem is with it. But perhaps the example will help. I'll explain to them the general purpose of the multiple defendants, multiple counts instruction. The middle paragraph, which might be the problem, which reads "I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment." Now, this sentence: "Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case."

3249

Taking the group of instructions that they wanted clarification on, they might be hung up on that particular language. I don't know. If a person is charged with aiding and abetting someone else in the commission of an offense, you would necessarily

**JA1554**

have to look at the actions of another person in making that determination.  And it is likewise with conspiracy.  In order to have a conspiracy, you have to have agreement between at least two people, so they are necessarily looking at somebody else's action.  And that sentence to some extent might negate that understanding.  Does everybody see what I am saying?

MR. BAUGH:  Your Honor, I understand.  But on behalf of defendant Roane, I don't even mean to attempt to usurp your prerogative, but I would ask perhaps our first response to them would be a note back to them asking them what paragraphs in 44 and 45 are giving them problems.  We could zero in on it.

THE COURT:  No, I think I'll do this and ask them then if that solves their problem.  If it doesn't, they will let us know.

All right, bring in the jury.

(The jury entered the courtroom.)

All right, I received a note from the jury

3250

asking for clarification to Instructions 43, 44, and 45.  I'm going to give you some additional instruction on aiding and abetting in an effort to clarify.  And if you would listen to me, it is as follows:  A person may violate the law even though he or she does not personally do each and every act constituting the offense if that person aided and abetted the commission of the offense.  Section 2(a) of Title 18 of the United States Code provides whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.  Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself or herself in some way with the crime charged, and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of the crime charged in the indictment, the government must prove beyond a reasonable doubt that the defendant knew that the crime charged was to be committed or was being

3251

committed; that the defendant knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime, and that the defendant acted with the intention of causing the crime charged to be committed.

Before a defendant may be found guilty as an aider or abettor to a crime, the government must also

**JA1555**

prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed to you in the instructions. Merely being present at the scene of the crime or merely knowing that a crime is being committed, or is about to be committed, is not sufficient for the jury to find that the defendant aided and abetted the commission of that crime.

The government must prove that the defendant knowingly and deliberately associated himself or herself with the crime in some way as a participant. Someone who wanted the crime to be committed, not as a spectator. One who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act is if he committed it directly. There may be some confusion as to the difference between conspiracy and aiding and abetting.

Conspiracy is, as I have instructed, an agreement to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act, whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. Aiding and abetting rests on a broader base. It states a rule of criminal responsibility for acts which one assists another in performing.

Now, you all have asked about Instruction Number 44, which talks about on or about, knowingly, and willfully. The on or about, I think, should be crystal clear. That simply means that the date charged in the indictment, the government need not prove the specific date. They can prove that it happened on a date on or about or near the date actually charged.

Now, with these words knowingly and willfully: Again, they are both explained in the instruction. But let me give you an example to try to help you understand knowingly and willfully.

Now, if I was out and about driving my car and pulled up to a friend's house and three guys got in my car and they were friends of mine, I knew them, and I was driving the car, and they asked me for a ride over to the bank, if I took them over to the bank not knowing what if anything they were going to do when they got there, and they subsequently robbed the bank, the act of driving the three people to the bank was done knowingly. It was voluntary. It was

**JA1556**

intentional.  It was not a mistake.  I did it.  I meant to do it.  But not knowing what was going to happen at the bank, that would not be a criminal act.

Now, if I knew that they were going to rob the bank, and if I took them to the bank for the purpose of robbing the bank, this would be a willful act done not only knowingly, voluntarily, and intentionally, but with a specific intent to do something the law forbids.  And that would be a criminal act. "Knowingly" as described in this instruction means just that, something that is done voluntarily and intentionally, not by mistake or accident. "Willful," on the other hand, is something else again.  It requires that it not only be done voluntarily, which is the same as knowingly and purposefully, but with the specific intent to do something the law forbids.

Now, the last instruction you asked about is one that we give regarding multiple  --  when we have multiple defendants as well as multiple counts.  The primary purpose for this particular instruction is to emphasize that each defendant who is charged with a count or counts is to be given individual consideration as it relates to that count or counts. It is that simple.  If you have four defendants, as we have in this case, each defendant deserves to be considered individually.  And that's why we give this kind of instruction.

Now, let me say this:  If a defendant is charged with aiding and abetting somebody else in the commission of a certain offense, you may have to look at the actions of that other person to determine if the defendant you are considering is indeed guilty of aiding and abetting a particular crime.  It still means he gets individual attention, but you have to look at the actions of somebody else to give him that individual attention.  The same may apply with conspiracy.  Conspiracy involves an agreement between at least two people.  So necessarily, you may have to consider the actions of another person when determining the guilt or innocence of a particular defendant on the conspiracy count.

All right.  Now, does this answer your question?  Okay?

(Affirmative response.)

All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

You may remove the defendants.

(The defendants were removed from the courtroom.)

**JA1557**

All right.  We will be in recess and await the jury's call.

(Recess awaiting jury verdict taken from 11 o'clock a.m. to 5:10 p.m.)

(In Open Court.)

THE COURT:  All right.  I understand we have a verdict.  Bring in the jury, please.

(The jury entered the courtroom.)

Will the Foreperson please rise?  I understand the jury has reached a verdict?

THE FOREPERSON:  Yes, it has.

THE COURT:  Would you give the forms to the Marshal, please?

(Verdict forms proffered to Court and Clerk.)

3256

All right.  The verdict forms appear to be in order and the Clerk will publish the verdicts.

THE CLERK:  Ladies and gentlemen of the jury, these are your verdicts.  If defendant Tipton will please stand.

(Defendant Tipton stood.)

Case number 3:92CR68-01:  United States of America versus Richard Tipton, also known as "Whitey."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Answer:  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise. Guilty.  Count Three, killing of Douglas A. Talley while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Four, killing of Douglas A. Talley to maintain or increase position in racketeering enterprise.  Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Not guilty.

3257

Count Six, use of firearm in relation to killing of Douglas Moody.  Not guilty.

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Not guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Not guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering

**JA1558**

enterprise.  Not guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in rack racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count 29, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

Count Thirty-three, possession of controlled substance with intent to distribute on or about 4-10-92.  Guilty.

So say we all dated 2-3-93.  Signed by the Foreperson, Margaret M. Griffiths.  You may be

**JA1559**

seated.

(Defendant Tipton resumed his seat.)

If defendant Cory Johnson will please stand.

(Defendant Johnson stood.)

Case number 3:92CR68-02:  United States of America versus Cory Johnson, also known as "O," also known as "C.O."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Seventeen, killing of Bobby Long while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Eighteen, killing of Anthony Carter while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nineteen, killing of Dorothy Mae Armstrong while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty, use of firearm in relation to killing of Bobby Long, Anthony Carter and Dorothy Mae Armstrong.  Guilty.

**JA1560**

Count Twenty-one, killing of Bobby Long to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-two, killing of Anthony Carter to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-three, killing of Dorothy Mae Armstrong to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-four, killing of Curtis Thorne while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-five, killing of Linwood Chiles while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twenty-six, use of a firearm in relation to killing of Curtis Thorne and Linwood Chiles and maiming of Priscilla Greene and Gwendolyn Greene.  Guilty.

Count Twenty-seven, killing of Curtis Thorne to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-eight, killing of Linwood Chiles to maintain or increase position in racketeering enterprise.  Guilty.

Count Twenty-nine, maiming of Priscilla Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty, maiming of Gwendolyn Greene to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-one, distribution of controlled substance, guilty.

Count Thirty-two, possession of controlled substance with intent to distribute it on or about 2-2-92.  Guilty.

So say we all, dated 2-3-93, signed by the Foreperson, Margaret M. Griffiths.

You may be seated.

(Defendant Johnson resumed his seat.

If defendant Roane will please stand.

(Defendant Roane stood.)

Case number 3:92CR68-03:  United States of America versus James H. Roane, Jr., also known as "J.R."  We the jury find as follows:

Count One, conspiracy to distribute controlled substance, guilty.

Question:  Do you find that the government has proven beyond a reasonable doubt that a Continuing Criminal Enterprise existed as charged in the indictment?  Answer:  Yes.

Count Two, Continuing Criminal Enterprise.

**JA1561**

Guilty.

Count Five, killing of Douglas Moody while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Six, use of firearm in relation to killing of Douglas Moody.  Guilty.

3264

Count Seven, killing of Douglas Moody to maintain or increase position in racketeering enterprise.  Guilty.

Count Eight, killing of Peyton Maurice Johnson while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Nine, use of firearm in relation to killing of Peyton Maurice Johnson.  Guilty.

Count Ten, killing of Peyton Maurice Johnson to maintain or increase position in racketeering enterprise.  Guilty.

Count Eleven, killing of Louis J. Johnson, Jr. while engaged in or working in furtherance of a Continuing Criminal Enterprise.  Guilty.

Count Twelve, use of firearm in relation to killing of Louis J. Johnson, Jr.  Guilty.

Count Thirteen, killing of Louis J. Johnson, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fourteen, killing of Torrick Brown, Jr. to maintain or increase position in racketeering enterprise.  Guilty.

Count Fifteen, use of firearm in relation to killing of Torrick Brown, Jr. and maiming of Martha McCoy.  Guilty.

3265

Count Sixteen, maiming of Martha McCoy to maintain or increase position in racketeering enterprise.  Guilty.

Count Thirty-two, possession of controlled substance with intent to distribute on or about 2-2-92.  Guilty.

So say we all.  Dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Roane resumed his seat.)

If defendant Reavis will please stand.

(Defendant Reavis stood.)

Case number 3:92CR68-07:  United States of America versus Sandra Reavis.  We the jury find as follows:

Count One, conspiracy to distribute controlled substance.  Guilty.

So say we all dated 2-3-93, signed by the Foreperson, Margaret Griffiths.

You may be seated.

(Defendant Reavis resumed her seat.)

**JA1562**

Ladies and gentlemen of the jury, are these your verdicts?

(Affirmative response.)

THE CLERK:  Do counsel wish the jury polled?

MR. BAUGH:  Yes.

THE CLERK:  Jurors, if these are your verdicts as I call your name please respond by answering yes.

Victor M. Catlett.

THE JUROR:  Yes.

John E. Coleman, Sr.

THE JUROR:  Yes.

Edward Cooke.

THE JUROR:  Yes.

Debra J. Dabney.

THE JUROR:  Yes.

Nina S. Eike.

THE JUROR:  Yes.

Bonita S. Faircloth.

THE JUROR:  Yes.

Margaret M. Griffiths.

THE JUROR:  Yes.

Charles V. Guthrie, Sr.

THE JUROR:  Yes.

Jerome Harrison.

THE JUROR:  Yes.

Connie E. Harvey.

THE JUROR:  Yes.

Frances P. Hodson.

THE JUROR:  Yes.

Thomas C. Jackson.

THE JUROR:  Yes.

THE COURT:  All right.  Ladies and gentlemen, I'm going to ask you to come back on next Monday morning at 10 o'clock.  We will get started with the sentencing phase of the trial.  You all may be excused now.  10 o'clock on Monday morning. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

MR. BAUGH:  Before the jury leaves the building, I have something I would like to say.

THE COURT:  Have Bill hold on to them.

(Bench conference held off the record per Mr. Baugh's request.)

All right, is anybody here from probation?

(Probation Officers Gill and Ault conferred with Court off the record.)

All right, I'm going to set a sentencing date for Ms. Reavis.  There is no need for the other three defendants to be held.  They can be removed at this

**JA1563**

time.

MR. COOLEY: Judge, has the counsel been given some opportunity to discuss with the Court, either with or without the defendants being present, the timing, scheduling for next week?

THE COURT: Oh, sure. Defendants other than Reavis can be removed.

MR. VICK: Mr. White had filed a motion asking for the government's witness list as to the sentencing phase of this. I don't know what the Court's pleasure is in that regard, but we can provide one by 5 o'clock tomorrow afternoon if necessary.

THE COURT: Well, as soon as you can, get it to them.

MR. VICK: We can probably even get it sooner than that.

MR. BAUGH: Will we each have to file a motion?

THE COURT: No. Everybody should get one. All right, Mr. Wagner, how about April 14th for sentencing?

MR. WAGNER: That's fine, Your Honor.

THE COURT: Mr. Vick, April 14th?

MR. VICK: April 14th is fine with the government, Your Honor.

MR. PARCELL: Will that be at ten?

THE COURT: No, we will do it at 9:30.

(Defendant and counsel executing sentencing documents.)

MR. PARCELL: Judge, may we leave our stuff here in the next two days?

THE CLERK: Judge Merhige has a docket here in the morning.

THE COURT: I'm sorry, you have to clear it up. Judge Merhige has something.

MR. GEARY: Is there any gag order in effect from now until Monday?

MR. BAUGH: That's a good idea. We so move.

MR. GEARY: Yes.

MR. VICK: We don't intend to talk about the case at all.

MR. GEARY: We have "reliable authority" reports all the time and it can only come from the United States Attorney's Office.

THE COURT: I don't want members of the U.S. Attorney's Office or any of the lawyers to make any comments to the press about this. We still have a very sensitive phase to go through and you should know better than that. And I'm on record.

THE COURT: All right. Ms. Reavis, could

**JA1564**

3270

you stand up a minute, please?

(Defendant Reavis stood.)

Ms. Reavis, your matter has been set for sentencing to commence at 9:30 a.m. on April 14th in this courtroom.  In the interim, somebody from the Probation Office will be in touch with you.  I urge you to cooperate with them as much as you possibly can.  All right.  That completes the matter.  Ms. Reavis may be removed from the courtroom.

(The defendant was removed from the courtroom.)

All right, I'm going to adjourn Court.  We can talk scheduling back here.

(In Chambers.).

THE COURT:  All right, tell those folks to get in here.

(Counsel assembled in chambers.)

THE COURT:  Somebody wanted to talk about scheduling?

MR. BAUGH:  I was going to make the suggestion, Your Honor, that being as how it would give us one day apiece, if we break early.  Ours looks like about a day, and we are number three.

MR. VICK:  Judge, in aggravation, I would think that, and we will need to get together on this, but we have got a list of about six witnesses, none

3271

of whom will be very long.

THE COURT:  You are talking about a day between each presentation?

MR. BAUGH:  A day for each presentation.

MR. VICK:  I expect we will be handing it to the defense mid-afternoon Monday, I would think.

MR. COOLEY:  You are assuming opening statements?

MR. VICK:  Well, that's right.

THE COURT:  We will assume a full day.

MR. VICK:  For us on Monday.

MR. WHITE:  Because Judge, you know, we are bringing people down from New York and I just want to know, we are going to have them all here on Monday, but for purposes of making sure we are prepared and ready to go forward, we should count on Monday?

THE COURT:  Tipton gets started on Tuesday.  We do the openings, and if we fall short we will just put it over until Tuesday.

MR. COOLEY:  How long for you?

MR. WHITE:  I would say no more than a day, Judge.  Six witnesses, tops.

MR. COOLEY:  I think ours is three to five hours, probably, of testimony.

MR. BAUGH:  Ours is a day.

3272

MR. VICK:  Full day?

**JA1565**

MR. BAUGH:  Yes.

THE COURT:  We are talking about maybe Thursday or Friday for closing up.

MR. WHITE:  Friday, probably, I would think.

THE COURT:  That's fine.  You know, if we fall short or if you go over, it is no problem.  We will adjust.  But it looks like Friday for closing.

MR. BAUGH:  Thank you.

(Proceedings adjourned at 5:35 p.m.)

**JA1566**